UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
ELECTRICAL CONTRACTORS, INC.,   :  No. 3:11CV1449(JAM)
                                :
                 Plaintiff      :
                                :
             vs.                :
                                :
THE PIKE COMPANY,               :
                                :  Bridgeport, Connecticut
                 Defendant      :  June 17, 2014
                                :
- - - - - - - - - - - - - - - - x


                         BENCH TRIAL
                         VOLUME II


B E F O R E:

        THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


A P P E A R A N C E S:

     FOR THE PLAINTIFF:

             MICHELSON KANE ROYSTER & BARGER
                  Hartford Square North
                  10 Columbus Blvd.
                  Hartford, Connecticut 06106
             BY:  STEVEN B. KAPLAN, ESQ.

     FOR THE DEFENDANT:

             ROBINSON & COLE
                  280 Trumbull Street
                  Hartford, Connecticut 06103-3597
             BY:  CHRISTOPHER J. HUG, ESQ.
                  DEBORAH A. VENNOS, ESQ.


                              Diana Huntington, RDR, CRR
                              Official Court Reporter

1                          TABLE OF CONTENTS

2

3    PLAINTIFF'S                                                    VOIR
     WITNESS           DIRECT   CROSS   REDIRECT   RECROSS   DIRE
4
     CLIFFORD CLAUSON
5      By Mr. Kaplan      263
       By Mr. Hug                                             346
6      By Mr. Kaplan      346
       By Mr. Hug                 352
7      By Mr. Kaplan                        477

8    STEPHANE MATHIEU
       By Mr. Kaplan      488

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **8:00 A.M.**

2              THE COURT:  We are back on the record in Day Two

3    of the bench trial in Electrical Contractors, Inc. vs.

4    Pike Company, 3:11CV1449.

5              Are there any matters to be taken up before we

6    resume with evidence?

7              MR. HUG:  Yes, Your Honor.

8              MR. KAPLAN:  Mr. Hug has a request.

9              MR. HUG:  We have a joint motion, Your Honor,

10   emphasis on joint.  Although the accommodations are quite

11   lovely and better than we're usually used to -- we're

12   grateful for that -- it is a slightly stuffy in here.

13   We'd ask Your Honor, with no disrespect to the Court

14   intended, may we take our jackets off and proceed on this

15   rather lengthy day without our jackets?

16             THE COURT:  Oh, absolutely.

17             MR. KAPLAN:  Thank you.  Appreciate it very

18   much.

19             MS. VENNOS:  I actually like the accommodations,

20   Your Honor.

21             THE COURT:  Thank you.  As long as there's no

22   attribution to the personality of the Court.

23             MR. KAPLAN:  Absolutely.  Believe me.

24             And Your Honor, at your request, we have an

25   extra copy of plaintiff's --

1          THE COURT:  Terrific.

2          MR. KAPLAN:  -- exhibit books whenever your

3   clerk wants them.

4          THE COURT:  She'll be in in just a moment.

5          MR. KAPLAN:  They're here in a box.  Want me to

6   put them over here?

7          MR. HUG:  Ours should be here sometime this

8   morning.

9          THE COURT:  Thanks so much.

10          All right.  Anything else to take up?

11          MR. KAPLAN:  I don't think so.

12          THE COURT:  Okay.

13          I guess, Mr. Clauson, if you'd like to take the

14   stand again.

15          Mr. Clauson, I'll just remind you that you're

16   still under oath.

17          THE WITNESS:  Yes.

18

19                    CLIFFORD CLAUSON,

20        a witness, having been previously duly sworn,

21        was examined and testified further as follows:

22

23             CONTINUED DIRECT EXAMINATION

24   BY MR. KAPLAN:

25   Q.   Good morning.

 1   A.   Good morning.

 2   Q.   Picking up where we left off, Mr. Clauson, we were

 3   sort of at the beginning of -- we talked about the setup

 4   of the job, talked about initial issues with the Phase 3

 5   work.  I'd like to just go back for a moment to Exhibit 4,

 6   which is in the -- I don't know if you have the exhibit

 7   books in front of you?

 8   A.   I do not.

 9   Q.   That would be in Book I.

10   A.   Yes.

11   Q.   All right.  The first page, we had spoken about this

12   yesterday, the allocation of hours for the various phases.

13   You showed 7,593 hours for the bid for Phase 3?

14   A.   Yes.

15   Q.   When you set the job up and were planning to work,

16   did you think you had sufficient hours for the bid to

17   perform the Phase 3 work?

18   A.   Yes, at that time.

19   Q.   What did you say?

20   A.   Yes, sir, at that time we did.

21   Q.   And then if we could go to I think this is in the

22   third volume, Exhibit 30.

23        Exhibit 30 has got a couple pages.  The first page,

24   would you just describe what that is?

25   A.   Manpower loading chart showing the as bid and actual

 1   manpower allocations.

 2   Q.   Did you prepare this?

 3   A.   Yes.

 4   Q.   It's dated June 12, 2011.  Is that when it was

 5   prepared?

 6   A.   Yes.

 7   Q.   So that would have been pretty much almost a year

 8   after Phase 3 was completed?

 9   A.   Yes.

10   Q.   Okay.  And the hours for as bid, what's the total

11   there that you used?

12          THE COURT:  Could you refresh my recollection,

13   is this admitted?

14          MR. KAPLAN:  I'm sorry, it's not admitted yet.

15   I'll do that.  Thank you, Your Honor.

16   BY MR. KAPLAN:

17   Q.   The other two pages are a chart?

18   A.   Yes.

19   Q.   What does the chart illustrate?

20   A.   It's a manpower loading chart, shows how many men we

21   had in each week.

22   Q.   Is that based on the numbers that are in the table?

23   A.   In the table on the first page, yes.

24          MR. KAPLAN:  I would move to admit this.

25          THE COURT:  Any objection?

1          MR. HUG:  Your Honor, did the witness -- I think

2     he did say when he prepared this.

3          MR. KAPLAN:  Yes, dated June 21, 2011, left

4     corner of table.

5          MR. HUG:  That's when he prepared it?

6          THE WITNESS:  That's correct.

7          MR. HUG:  Okay.  No objection.

8          THE COURT:  Exhibit 30, full exhibit.

9     BY MR. KAPLAN:

10    Q.    Looking at the table, the 7600 hours, that roughly

11    comports to the estimated hours we looked at, 7593?

12    A.    Yes.

13    Q.    Is that where you got that number from?

14    A.    That's correct.

15    Q.    And where did you get the numbers where it says

16    actual manpower required in the table, where did you get

17    those figures from?

18    A.    That came from our accounting system and the

19    subcontractor hours that were allocated to that Phase 3

20    work.

21    Q.    Let's break that down.  I'm going to return to this a

22    little later in your testimony and get more detail, but to

23    describe what this is, you said two things.  You said it

24    came from the allocated hours I think you said?

25    A.    It came from the hours from our accounting system --

1    Q.    Oh, yes.

2    A.    -- for the manpower used for our in-house labor.

3    Q.    Was that the system you described at the end of the

4    day yesterday with the daily records that Mr. Mathieu

5    kept?

6    A.    That's correct.

7    Q.    Actual manpower required, is that what you actually

8    used in the field?

9    A.    Yes.

10   Q.    And who allocated these hours or who assigned these

11   hours to the Phase 3 work?

12   A.    The hours would have came from the daily reports

13   along with the subcontractor hours that we use.

14   Q.    Hours from the daily reports were the ones generated

15   by Mr. Mathieu?

16   A.    Correct.

17   Q.    You said subcontractor hours, what are you referring

18   to there?

19   A.    We subbed out subcontractors to help us perform the

20   work in Phase 3.

21   Q.    Okay.  And I'll get into some of your specific

22   records on that.  Was that something you planned on doing

23   at the outset of the job?

24   A.    No.

25   Q.    And how many -- what did you actually have to do in

1    terms of bringing in the subcontractors to perform some of

2    the work?

3    A.   We had to find them, to start with.  We had to find

4    them, write subcontracts and get manpower out there.

5    Q.   How many companies did you bring in?

6    A.   It was five or six, I think.  Maybe a couple more.

7    Q.   Okay.

8    A.   Couple that had just one guy that was a

9    subcontractor.

10   Q.   And we'll go through some of those records, we have

11   the specific information.

12        And is that something you normally do on projects,

13   bring in other subcontractors to perform work?

14   A.   No.

15   Q.   Looking at the chart -- and I don't know if it's one

16   page in your book, I have it as two here, I just don't

17   know how it's set up.

18             THE COURT:  Exhibit 30?

19             MR. KAPLAN:  Yes, sir.

20             THE COURT:  Appears to be two pages, color

21   chart?

22             MR. KAPLAN:  Yes, sir.

23   BY MR. KAPLAN:

24   Q.   Just to look at the chart, the red, on the second

25   page the red says manpower bid, the green says manpower

1    used?

2    A.   Yes.

3    Q.   Would you talk about briefly that red, the way the

4    chart works with the red bars, on the left-hand side is

5    that how many -- what is that, the numbers 10, 20, 30, 40?

6    A.   That's the manpower, the number of men we assumed we

7    were going to have during that period of time.

8    Q.   Is that a week or month?

9    A.   It's weekly.

10   Q.   So that red bar, the first red bar for June 27 would

11   be slightly over 10 men you would expect?

12   A.   Yes.

13   Q.   And then what's the high point you expected in terms

14   of the crew -- this is just Phase 3, right?

15   A.   This is just Phase 3.

16   Q.   What is the high point of the crew size you expected?

17   A.   It peaks out at 25 men.

18   Q.   That's around the June 25, August 1st time frame?

19   A.   Yeah, around July 18th, start that week.

20   Q.   Okay.  And then it ramps down towards the end of the

21   Phase 3 work?

22   A.   Yes.

23   Q.   Now, is that the normal progression for this type of

24   work?

25   A.   Yes, I think it would be normal, yeah.  Peak up and

1    go down.

2    Q.    Why does it drop down after it peaks up?  I know I'm

3    asking you dumb questions for a guy who has been doing

4    this 37 years.

5    A.    Because you get most of your big equipment in place

6    and poled.  As you go down, you're doing finish work,

7    light fixtures and trimming up, testing, that sort of

8    stuff.

9    Q.    Okay.  Now, the green as-used bars, what are you

10   showing in August for your peak labor crews?

11   A.    Peak labor for that, August 15, 60 men.

12   Q.    Okay.  Did you expect to have 60 men on this job in

13   August?

14   A.    Absolutely not.

15   Q.    I'm sorry, let me frame a better question.  At the

16   outset of Phase 3 in June, did you expect to have 60 men

17   in August?

18   A.    No.

19   Q.    Okay.  We're getting into specifics, but generally

20   what caused you to have to have this size crews that were

21   so much in excess of the estimated hours that you had?

22   A.    Well, there was many problems on the job that delayed

23   our work.  And then at one point we had to start to

24   accelerate.

25   Q.    Accelerate, meaning what, bringing more men?

```
 1   A.    Bringing more men in to catch up to the work.

 2   Q.    All right.  We'll get into more detail with you and

 3   Mr. Mathieu on that.

 4        Now, this chart shows June 27 starting and September

 5   4th ending.  Did the Phase 3 work actually go longer than

 6   this period depicted here?

 7   A.    Yes.

 8   Q.    I think yesterday you said you started some of it

 9   earlier?

10   A.    Yes, started some work in April.

11   Q.    Okay.  And did you go past September 4th in

12   actuality?

13   A.    Yes.

14   Q.    So this chart doesn't pick up all the hours?

15   A.    No.

16   Q.    Now, let's start talking about some of the problems

17   you ran into.  You talked yesterday about the demolition

18   and delays with the demolition.  I don't necessarily want

19   to revisit that.  I want to show you something from the

20   project schedule, the contract schedule which I think is

21   Exhibit 12.  If we could go to Sheet 20 of the project

22   schedule which is in Exhibit 12.

23        There's a blue line that says gym, do you see that?

24   A.    Yes.

25   Q.    What does that reflect, that section?
```

```
 1    A.    P3G is the gym area.

 2    Q.    The demolition line, which is I think P3G-110, what

 3    is the date that's supposed to be completed?

 4    A.    July 7.

 5    Q.    Was it completed July 7?

 6    A.    No.

 7    Q.    Was any interior demolition supposed to run past

 8    July 7 per the contract schedule?

 9    A.    I'd have to look at every date.  I don't think -- I

10    mean, it was supposed to go pretty quick.

11    Q.    Okay.  So do you know -- do you remember when the

12    demolition was supposed to be done per the schedule?

13    A.    I don't remember the exact date.  I know it was early

14    July.

15    Q.    And do you recall when the demolition, the interior

16    demolition in fact was completed?

17    A.    It went on for a long time.  Probably into August.

18    Q.    Into August?

19    A.    At least.

20          THE COURT:  May I ask a point of clarification

21    here?  This speaks to demolition.  Is this in one zone,

22    P3G?

23          THE WITNESS:  That is one area.

24          THE COURT:  Okay.  So are you accounting for the

25    entire demolition throughout the whole --
```

```
 1              MR. KAPLAN:  I'm --
 2              THE COURT:  You're getting there?
 3              MR. KAPLAN:  Yeah.  Yes.  Yes, sir, exactly.
 4    That's why I sort of -- I'll just round that up just to
 5    clarify.
 6    BY MR. KAPLAN:
 7    Q.   I think you just said your recollection of when the
 8    interior demolition was supposed to be completed was when?
 9    A.   Sometime in July.
10    Q.   Early?  Late?  Mid?
11    A.   I'd say mid.
12    Q.   Mid-July.  And when was it in fact completed, by your
13    recollection?
14    A.   Late August.
15    Q.   Towards the end of August?
16    A.   Yes.
17    Q.   Now, with the demolition being late, let's say, at
18    least numerous areas, what effect did that have on ECI's
19    work other than simply delaying when you could start?  Was
20    there any other effect other than you came in and started
21    it later?
22    A.   Well, it's pretty much we had to start late.
23    Q.   Did that have any effect on your manpower?
24    A.   Yeah.  We couldn't put manpower on the job until the
25    demolition was done.
```

1   Q.   Okay.  When you got there, was there any impact on

2   the crews you expected to use?

3   A.   They were reduced until we were able to ramp up.

4   Q.   Did you just come in with the expected crew size a

5   few weeks later?

6   A.   We probably increased the crews in July.

7   Q.   From what?

8   A.   From -- probably had about 17 guys on the job then,

9   18 guys.

10  Q.   Then the manpower loading chart shows the increases?

11  A.   Right.

12  Q.   Okay.  Were you running into any other problems,

13  other problems with the project end of June, early July

14  when you were starting Phase 3?

15  A.   Yeah.  The steel problems.

16  Q.   What was that?

17  A.   There was steel that needed to be put in throughout

18  the building that was very late in delivery.

19  Q.   Were there particular areas -- let me just put this

20  up if this helps you at all.  This was Exhibit 504, if

21  there's anything you want to point out.

22       Were there any particular areas where there were

23  problems with steel that delayed your work?

24  A.   The main area would be the P3G area over in the

25  corner.

1    Q.    Here?

2    A.    Yeah.

3    Q.    This is the gym area?

4    A.    It's really a storage area back there, but it was

5    where our electrical and data rooms were up above.  So

6    steel had to be put in to build the upper level.

7    Q.    Now, just tell us non-electricians, what's an

8    electrical room that you're referring to here?  What is

9    that?

10   A.    Electrical room?

11   Q.    Yes.

12   A.    That's where all the panels would reside.

13   Q.    The panels, what are the panels?

14   A.    Distribution panels that feed all the branch circuits

15   out to each of the rooms.

16   Q.    Okay.  Where does that -- so you put your panels in

17   the electrical room?

18   A.    Yes.

19   Q.    And then you put the panels in, is that -- what comes

20   into the panels and what goes out of the panels?

21   A.    The feeder wires go into the panels and the branch

22   wires go out of the panels.

23   Q.    And the feeder wires are what, feeding the pallet?

24   A.    The main feeders to the panel.

25   Q.    Where are they coming from?

1   A.   Come from the main switch gear.

2   Q.   Where is the switch gear located?

3   A.   Main switch gear was located in the mechanical

4   room -- not mechanical room but right next to it.  P3M.

5   Q.   P3M?

6   A.   Yes.  Right up in that -- in the corner.

7   Q.   Down here?

8   A.   Yes.

9   Q.   That's feeding the electrical room.

10       How many electrical rooms were there in Phase 3?

11   A.   In Phase 3 there were three.

12   Q.   Okay.  And you said you had a problem with one of

13   them in 3G in that corner because the steel installation?

14   A.   Correct.

15   Q.   And what was the effect of the steel installation in

16   terms of the timing of you being able to do your work in

17   the electrical room that you noted?

18   A.   What was the timing?

19   Q.   What happened with the steel, in other words, from a

20   timing point of view?

21   A.   Well, it went in very late.

22   Q.   Very late, meaning when?

23   A.   I don't know exactly when.  I don't know the exact

24   date.

25   Q.   Okay.  Do you recall when the electrical rooms were

1   supposed to be done per the schedule?

2   A.   Not off the top of my head, no.

3   Q.   Okay.  One second, please.

4             (Pause.)

5   Q.   If you're still on Sheet 20 of the schedule,

6   Mr. Clauson?

7   A.   Yes.

8   Q.   Okay.  At the bottom of that sheet it says Electric

9   Room C22A, where is that one located?

10  A.   That one's located in that P3G area.

11  Q.   Up in here?

12  A.   Yes.

13           MR. HUG:  I'm sorry, Counsel, what number?

14           MR. KAPLAN:  Bottom of Sheet 20, it says the

15  electric room, in that blue bar it says electric room --

16           MR. HUG:  I see.

17  BY MR. KAPLAN:

18  Q.   And it says that you're to mount electrical panels

19  starting July 16; am I reading that right?

20  A.   Yes.

21  Q.   Could you mount the electrical panels before the

22  electrical room is constructed?

23  A.   No.

24  Q.   Were you able to mount the electrical panels starting

25  July 16?

1    A.    No.   There was no room.   There was no steel, there

2    was no room.

3    Q.    Were you able to do that at any time in July?

4    A.    No.

5    Q.    Okay.   So that happened in August sometime?

6    A.    I would say sometime in August.

7    Q.    And what impact did that delay in being able to work

8    in the electrical room and put your panels in have on

9    related work?

10   A.    The biggest delay was our branch circuit conduits and

11   branch feeder conduits.

12   Q.    Let's break that down.   Conduits and branch feeder

13   conduits, could you describe what those are and what they

14   do?

15   A.    The branch feeder conduits would leave the electrical

16   room and go to a collector box we call it.   And then the

17   branch circuits would leave from there.

18   Q.    What did the branch circuits do?

19   A.    The branch circuits go to each individual room.

20   Q.    That's really branching the wiring out to the various

21   rooms?

22   A.    Correct.

23   Q.    Okay.   Can you do any of that until the electrical

24   room is built and the panels are mounted?

25   A.    Well, we did part of it.   We were jumping around

1    doing whatever we could.  There was steel missing in

2    several areas.  So where we could put some pipe in, we

3    did.  We'd have to go back and finish it once the steel

4    was in.

5    Q.   Per the schedule, did the schedule reflect what you

6    would call a normal sequence of building operations for

7    this type of project?

8    A.   Yes.

9    Q.   Okay.  And in terms of doing the electrical rooms,

10   doing your branch conduit, your branch feeder, what's the

11   normal sequence that you anticipated?

12   A.   Normal sequence would be for them to build the room,

13   I'd put my panel boards in, and start piping out to our

14   areas.

15   Q.   So you go from the electrical panels out to the

16   areas?

17   A.   Yes.

18   Q.   And then you put -- the conduit is the piping?

19   A.   Yes.

20   Q.   And then how do you get the wiring?

21   A.   Well, we pull the wire in after the conduit is done,

22   snake the conduit and pull it in.

23   Q.   And then what do you -- how do you get that wiring to

24   the various places it's supposed to go, like fixtures,

25   outlets, other things?  What's the sequence, in other

1    words?

2    A.   Well, from the collector boxes we'd bring the branch

3    circuits to each room.  And then this project, we had

4    lighting control panels that we had to mount.  From there

5    they would terminate in the lighting control panels and

6    then we would wire it to each of the fixtures.

7    Q.   And that's the normal sequence that you would

8    anticipate?

9    A.   Yes.

10   Q.   Does the schedule reflect that sequence?

11   A.   Yes.

12   Q.   Could you follow that sequence, in reality?

13   A.   No.

14   Q.   Okay.

15   A.   No, we couldn't.  Right from the beginning.

16   Q.   From the beginning of Phase 3 you couldn't do that?

17   A.   No.

18   Q.   And what impact -- so what did you do instead in the

19   context of what we've been talking about, putting your

20   conduit in, putting your branch feeder, what were you

21   faced to do facing the circumstances you encountered?

22   A.   As I said previously, we'd jump around and put

23   conduit where we could when there was no steel in our way,

24   and then we'd have to come back later on and join those

25   conduits together, finish the work.  So our work was all

1   out of sequence.

2   Q.   Does that make it more difficult?

3   A.   A lot more difficult, yeah.

4   Q.   What impact does that have on the amount of time in

5   terms of man hours it takes to do that?

6   A.   Just reduces the productivity completely.

7   Q.   And what impact -- I know I'm asking dumb questions,

8   excuse me.  We have to track this out.

9        When you reduce the productivity, what effect does

10  that have on your man hours?

11  A.   It increases them.

12  Q.   Did you have any other issues at the outset of

13  Phase 3 that were causing problems for your work?

14  A.   Well, there was -- the steel was just not in that

15  area.

16  Q.   When you say the steel --

17  A.   Missing steel.  They had to put new steel in the

18  building to reinforce the rooftop units and to reinforce

19  new sections of the building.

20  Q.   Okay.  And that meant you couldn't work in the areas

21  where they were going to be putting the steel?

22  A.   We couldn't finish our work between those areas now.

23  Q.   Okay.  Could you just explain why you couldn't work

24  in -- you couldn't finish your work in the areas until the

25  steel was complete?  Physically, what was going on there?

```
 1    A.   I'm not sure I understand what you're asking.  There

 2    was no steel.  So we couldn't run our conduits in that

 3    area until the steel got in place.

 4    Q.   Was the steel being put in overhead?

 5    A.   It was being put inside the building and up to the

 6    roof.

 7    Q.   All right.

 8    A.   For support.

 9    Q.   So you couldn't have conduits in the way?

10    A.   No.

11    Q.   Now, that problem was in different parts of Phase 3?

12    A.   Phase 3 and Phase 2.

13    Q.   And Phase 2?

14    A.   Yes.  Right at the beginning where the new addition

15    met the existing building.

16    Q.   Were there any other problems that you were running

17    into at the outset of Phase 3?  You mentioned the

18    demolition, you mentioned the steel problems related to

19    the electrical rooms and other areas.

20    A.   And then the masonry work.

21    Q.   The masonry work?

22    A.   Yes.

23    Q.   What was the problem with that?

24    A.   Well, the masons started late because of the demo

25    delays.  And then once they did start, they just took over
```

1    the whole building.  They were all over the place.

2    Q.   Did the masonry work follow the sequences of the

3    schedule?

4    A.   No.  Nothing followed the sequence of the schedule.

5    Q.   Nothing followed the sequence?

6    A.   No.

7    Q.   And did the masonry work, in terms of how long it

8    took in different areas, follow the sequences that were in

9    the schedule?

10   A.   No.

11   Q.   Okay.  When you said that the masonry -- the mason

12   took over -- what did you say, took over the whole area,

13   is that what you said?

14   A.   Yeah.  They had all their staging and block work and

15   they just took over all the corridors.  Couldn't even walk

16   through the corridors, they were all blocked.

17   Q.   Did that have any impact on your work?

18   A.   Yeah.

19   Q.   What was it?

20   A.   We couldn't get into any of the classrooms to do any

21   of the work.  We had to climb through the staging.

22   Q.   Okay.  Did that affect your man hours in performing

23   your work?

24   A.   Absolutely, yeah.

25   Q.   If we just look, for example, at Sheet 15 of the

1    schedule.  This is again Exhibit 12.  And the second half

2    of that first floor administration area, there is an entry

3    P3AD-220, it says rub CMU walls.  What does that refer to?

4    A.   That would refer to cleaning the wall after it's

5    built.

6    Q.   CMU wall, is that a block wall?

7    A.   A block wall.

8    Q.   Obviously it has to be built before it could be

9    cleaned; is that correct?

10   A.   Yes.

11   Q.   And work you do in that area with the block wall, you

12   have -- do you have to wait until it's done until you can

13   get in there?

14   A.   Well, we work with the masons when they're building

15   the wall to put our boxes and conduit within that new

16   wall.

17   Q.   And then you have to work after they're out of there

18   as well?

19   A.   Yes.

20   Q.   In this area it has the mason finishing on July 3.

21   And we can go through many other entries showing different

22   times and different areas the masons were supposed to be

23   done.  Were they done on time per the schedule in any

24   area?

25   A.   I don't believe so.

1    Q.    Okay.  Were they done in July?  Were the masons done

2    in July with their work?

3    A.    With all their work?  No.

4    Q.    So their work ran into August?

5    A.    Their work was into August, yes.

6    Q.    Does the schedule show them doing work in August at

7    all?

8    A.    I'd have to look at specific dates to confirm that

9    out.  I don't remember exactly when.

10   Q.    Let's look at page 16 at the bottom, Sheet 16 of the

11   schedule.  This is toilet rooms, P3T-5060, CMU interior

12   walls, does that refer to the masonry work?

13   A.    Yes.

14   Q.    And what's the date that was supposed to be done by?

15   A.    July 20th.

16   Q.    That's the rub walls, right below that.

17         At page 18 at the bottom for electrical room, you

18   have P3EL-220.  Again, that same entry, rub walls, what's

19   the date for that?

20   A.    July 19th or July 20 again.

21   Q.    And at page 22, classrooms towards the top it says

22   P3CL-230, interior CMU, what's the date that's supposed to

23   be done?

24   A.    July 4.

25   Q.    And you were saying that masonry work was still being

1    done into August in various areas?

2    A.    Yes.

3    Q.    Okay, you mentioned earlier teledata rooms earlier.

4    We talked about electrical room.  What were the teledata

5    rooms?

6    A.    Telecommunication rooms.  There's a main

7    telecommunication room in P3G right next to the electrical

8    room that was to be built above.

9    Q.    That's up in here?

10   A.    In that corner, yeah.  It was supposed to be built

11   above the existing storage area.

12   Q.    Okay.

13   A.    Which, again, had to wait for the steel to get in and

14   then build that room.

15   Q.    What were you doing with the teledata room, what was

16   your work?

17   A.    That was where all of our systems originate, fire

18   alarm systems, the sound systems, the security systems,

19   data systems, they all originated in that room.

20   Q.    And then from there how -- how was it supposed to

21   proceed?

22   A.    From there went out to each of the areas and feed all

23   of our devices, our field devices.

24   Q.    Were those all throughout the Phase 3?

25   A.    Through every phase, 1 through 4.

1   Q.   Again, per the schedule and per your anticipated

2   sequences, how did you expect to install those various

3   systems you just mentioned?

4   A.   Well, we expected to be able to set up our pulling

5   crews and pull from that room and out to each of those

6   areas.

7   Q.   So you start -- again, do you start with the teledata

8   room and work out there from?

9   A.   Yes.

10  Q.   Were you able to do that here?

11  A.   No.  There was steel missing in several locations and

12  then the room wasn't built.

13  Q.   How did you end up doing the installation of those

14  systems?

15  A.   We started to pull as far as we could to where the

16  steel was missing.  We'd coil that cable up and then once

17  the steel got put in, we'd continue it on and finish our

18  work.  We had to leave everything at that main

19  telecommunications room coiled up until the room was

20  built.

21  Q.   How many -- you had like four or five systems coming

22  out or going into that teledata room -- I'm sorry, let me

23  rephrase that.

24       How many systems were going into that --

25  A.   We had security system, we had the telecommunications

1    system which would have been data and telephone outlets.

2    We had a PA system which would be the local PA for the

3    school.  We had CATV system which would have been direct

4    TV, table TV.  And then fire alarm system.

5    Q.   Did each of those systems have its own coiled-up

6    wires?

7    A.   Oh, yeah.

8    Q.   Were they numerous?

9    A.   Oh, yeah.

10   Q.   So instead of coming out from the connected areas and

11   branching out, you actually had to go in sort of in

12   reverse; is that correct?

13   A.   We had to leave everything coiled up.  We couldn't go

14   from Point A to Point B anywhere.

15   Q.   What problems did that create in terms of time it

16   took to do that work?

17   A.   Well, probably doubled the time it would have taken

18   us.

19   Q.   And when was that work done, do you remember, in

20   terms of the timing of Phase 3 when that work ended up

21   being done, all that work into the teledata room?

22   A.   When it was completely done?  Very, very late August.

23   Maybe into September.  We didn't finish the security

24   system a hundred percent until after the school came back

25   to school.

```
 1   Q.   And was that later than the schedule had set forth?

 2   A.   Yes.

 3   Q.   Did that create problems, just the timing of it alone

 4   create problems?

 5   A.   Yes.

 6   Q.   Why?

 7   A.   Because we couldn't finish our work.

 8   Q.   In the field, what problems did that cause for you

 9   doing it so late in the scheduled time frame?

10   A.   Well, at that time we were -- they were actually

11   putting the ceilings in in some spots.  We had to get back

12   in and finish our work.

13   Q.   Had you expected to be doing the wiring for that work

14   with ceilings already installed?

15   A.   No.  We would have pulled the wire when the ceilings

16   went in.

17   Q.   You expected to pull the wire for these various

18   systems without ceilings in areas?

19   A.   Yes.

20   Q.   And in fact, were you able to do that?

21   A.   Not in all areas, no.

22   Q.   And in the areas where ceilings were installed and

23   you were pulling the wires for these systems, did that

24   cause any problems for you?

25   A.   Well, sure it did, yeah.
```

1    Q.   What were they?

2    A.   It took longer to do the work.

3    Q.   Why?

4    A.   Because you're working above a ceiling instead of

5    free area, cable.  You got to pull the wire above a

6    ceiling.  It takes longer to do.

7    Q.   What kind of ceilings were these?

8    A.   Suspended ceilings.

9    Q.   So you had grid systems in?

10   A.   Yes.

11   Q.   So you were working sort of inside and around grid

12   systems?

13   A.   Correct.

14   Q.   And you expected not to have those in there at all

15   when you were doing this?

16   A.   Correct.

17   Q.   Any other issues that you ran into at the outset of

18   Phase 3?  You mentioned the steel, the teledata room,

19   electrical room, masonry.

20   A.   The mason was supposed to notch the walls for us so

21   we can get our devices in all the existing rooms.  In a

22   lot of places that didn't happen until very, very late.

23   We'd have to go back and work with the mason and finish

24   our flexible conduit down those walls.

25   Q.   Was that something where that process happened later

 1    than scheduled?

 2    A.    Yes.

 3    Q.    Did that cause problems for you in terms of the

 4    field?

 5    A.    Oh, yeah.  We were sending guys all over the place,

 6    chasing the mason wherever he decided to chop the wall.

 7    There's line items in the schedule that says when he's

 8    supposed to do it.

 9    Q.    Notch the wall?

10    A.    Notch the wall, yeah.  So we could put our conduit

11    in.

12    Q.    How did Pike manage all of this in terms of telling

13    you where areas were available and where you could work,

14    that kind of thing?

15    A.    They pretty much did it at the weekly job meeting.

16    Q.    How did they instruct you as to how to perform your

17    work at those weekly job meetings?

18    A.    They just put up on a whiteboard what areas were

19    supposed to be coming up next for each contract.

20    Q.    Okay.

21    A.    It was like a two-week look-ahead schedule.

22    Q.    So they'd say in the next week or two here's the

23    areas you'll be able to work in?

24    A.    Yes.

25    Q.    Did that have any relation to the scheduled areas in

1    the CPM schedule?

2    A.    No, no.

3    Q.    In fact, were you able to hit those areas the

4    following week or two that Pike was telling you would

5    become available?

6    A.    No, not all the time, no.

7    Q.    Was there some frequency?  Most of the time?  Some of

8    the time?

9    A.    Maybe some of the time.

10   Q.    Okay.  So some of the time you couldn't get there?

11   A.    No.

12   Q.    So how were you able to plan your work then?

13   A.    It was very difficult.  Stephane was planning his

14   work almost on a daily basis, depending on where things

15   were done.

16   Q.    Stephane Mathieu, your --

17   A.    Superintendent.

18   Q.    -- superintendent?

19        Mr. Clauson, what was your expectation of your own

20   time at the outset of the job that you planned on being

21   around for the Phase 3 work or dedicated to the Phase 3

22   work?

23   A.    Well, normally, I would attend the job meeting on a

24   weekly basis and walk the job with Stephane Mathieu.  And

25   then if I needed to be there any other time, I would.

1   Normally one or two days a week --

2   Q.   Okay.

3   A.   -- I would assume I'd be there.

4   Q.   And back at the office, how much time did you

5   anticipate you'd spend on this job?

6   A.   Maybe ten hours a week.  Between five and ten hours a

7   week.

8   Q.   So you'd have two or three days dedicated to this job

9   during the Phase 3 work?

10  A.   Yes.

11  Q.   In reality in the summertime, how much time did you

12  dedicate to this job?

13  A.   Well, after July, the middle of July, I was on the

14  job site all the time.

15  Q.   When you say all the time, what does that mean

16  days-wise?

17  A.   Every day.

18  Q.   Every day?

19  A.   We were working Saturdays and we were working Sundays

20  too.

21  Q.   Were you working back at the office as well on this

22  job?

23  A.   Yes.

24  Q.   Okay.  Were you able to work on any other jobs at the

25  end of July and August 2010?

1    A.    I had some other jobs, but I turned them over to

2    other people in the office because of the workload I had

3    at Kelly.  I kept one job.

4    Q.    Was that something that you expected to do or didn't

5    expect to do?

6    A.    No, I didn't expect to do that.

7    Q.    You're familiar with what ECI is claiming in this

8    case, right?

9    A.    Yes.

10   Q.    Is there any hours or money being claimed for your

11   actual time?

12   A.    No.

13   Q.    Okay.  So the claim is all for the field hours?

14   A.    The field hours, correct.  And subcontractor.

15   Q.    And the subcontractor.  Okay.

16         Now, once the job got going in July, what was the

17   situation with -- did there come a time when you asked

18   Mr. Flynn to talk to you about the job?

19   A.    Yes.

20   Q.    Now, who is Mr. Flynn?

21   A.    He's vice president of construction.

22   Q.    Do you report to him?

23   A.    Yes.

24   Q.    Did you bring him in to review the project with you?

25   A.    Yes.  Yes, I asked him to come down to the job site

1    and see what was going on, because none of the work was

2    getting done on time.  Everybody was behind.

3    Q.   Okay.  When did that occur?

4    A.   Second week in July.

5    Q.   Okay.  Is that something you normally do on your

6    projects, bring Mr. Flynn in look at the site and talk

7    about what's going on?

8    A.   Not normally.  Not unless there's a big problem.

9    Q.   And did he come and walk the site with you?

10   A.   Yes, he did.

11   Q.   And you then asked for a meeting with Pike?

12   A.   That's correct.

13   Q.   Okay.  And did you and Mr. Flynn meet with Pike?

14   A.   Yes, we did.  And Stephane Mathieu.

15   Q.   And Mr. Mathieu.  When did that occur?

16   A.   The 21st of July.

17   Q.   And who did you meet with on the 21st of July from

18   Pike?

19   A.   Mel Strauss and Ed Oloff.

20   Q.   Mr. Strauss was?

21   A.   Project manager for Pike.

22   Q.   And Mr. Oloff was?

23   A.   Field superintendent.

24   Q.   Had you been coordinating with those gentlemen

25   previously on the project?

1    A.    Oh, yes.

2    Q.    What was the purpose of the meeting?

3    A.    Well, the purpose of the meeting was to ask for an

4    extension of time.

5    Q.    From ECI's point of view?

6    A.    From ECI's point of view, yes.

7    Q.    Did you express that to Mr. Strauss and Mr. Oloff?

8    A.    Yes.

9    Q.    Do you recall who said what about an extension of

10   time?

11   A.    When we asked for an extension of time?

12   Q.    Yes.

13   A.    Well, Mel Strauss said there was no extension of

14   time.  We had to be done when school came back.

15   Q.    Okay.  What did you -- did you describe conditions to

16   Mr. Strauss and Mr. Oloff in that conversation?

17   A.    Yes, we did.

18   Q.    What did you review with them?

19   A.    All the items that we just spoke about, the fact that

20   the demo was late, steel was missing all over the place,

21   and that the masons were taking over the building.

22   Q.    Okay.  This was July 21st.  So you're roughly

23   three-plus weeks into the Phase 3 schedule?

24   A.    Correct.

25   Q.    Per the schedule, around June 28.

1        What were you projecting how much time you needed to

2    complete the Phase 3 work as of that point?

3    A.   Like four weeks' extension.

4    Q.   Did you discuss that with them?

5    A.   Yes, we did.

6    Q.   And what was their response, either Mr. Strauss or

7    Mr. Oloff?

8    A.   They said absolutely not, no extensions of time.

9    Q.   Did they --

10           THE COURT:  May I just ask clarification?  Was

11   there a request for four weeks' extension of time

12   specifically?

13           THE WITNESS:  We asked for four weeks of time.

14   BY MR. KAPLAN:

15   Q.   Did they talk about why you need it or do you only

16   need two, or get into the detail of the request itself?

17   A.   No.  No, they were pretty adamant about no extensions

18   of time.

19   Q.   Okay.  And this had to do with the Phase 3 work?

20   A.   Correct.

21   Q.   Did anybody discuss about, well, what can we do to

22   remedy the situation?

23   A.   Yes, yes.  Bill Flynn asked what Plan B was.

24   Q.   He used that expression?

25   A.   Yes.  And Mel Strauss said there is no Plan B.  Bill

1    offered other alternatives to, you know, to get us past

2    that point, either to bring in some temporary trailers or

3    to move kids to a different school if they had to, because

4    we didn't think we'd be done on time.

5    Q.    Okay.  Now, when you mentioned alternatives, now

6    you've testified you worked on I think you said 40 or 50

7    schools?

8    A.    Probably 30 or 40.

9    Q.    Had you been in situations where summer scheduling

10   requirements, for whatever reason, were not met and

11   different alternatives were used?

12   A.    Yes, it's happened before.

13   Q.    What kind of options are available?

14   A.    Well, like I said, to bring in temporary classrooms,

15   trailers.  We've had situations where they moved kids to

16   different schools.  I'm sure there's other alternatives.

17   Q.    Was Mr. Oloff or Mr. Strauss interested in discussing

18   alternatives at that meeting?

19   A.    No.

20   Q.    Did you ask for any kind of relief from the schedule

21   in terms of we could do this area this way or that area

22   that way, something along those lines?

23   A.    I don't recall if we asked.

24   Q.    Okay.  Was there any discussion of manpower?

25   A.    Well, yeah, there was.

1    Q.   What was that?  What did that include?

2    A.   It included Pike telling us to increase our manpower

3    to get the job done.

4    Q.   So Pike told you to increase your manpower to get the

5    job done?

6    A.   Yes.  Said bring in more men, do whatever you got to

7    do to get the job done.

8    Q.   Do you remember --

9            THE COURT:  Do you know who it was who said

10   this?

11   A.   Pike.

12   BY MR. KAPLAN:

13   Q.   Do you remember which of the gentlemen from Pike said

14   that?

15   A.   Mel.

16   Q.   Mr. Strauss?

17   A.   Yes.

18   Q.   Project manager?

19   A.   Yes.

20   Q.   So you remember him saying, "Do whatever you got to

21   do, bring in more men"?

22   A.   Yes.

23   Q.   And at that time, this is July 21st, I'm just

24   referring quickly to Exhibit 35 to pinpoint how many men

25   you had at that time -- not 35, I'm sorry.  Thirty.

1      At that time, per Exhibit 30, you had 21 men on the

2  site.  And then after that point, by the week of July 25,

3  you were up to 42 men per your chart?

4  A.   That's correct.

5  Q.   And then it continued to ramp up after that?

6  A.   Yes.

7  Q.   So I take it you followed the instructions

8  Mr. Strauss gave you to bring in more men?

9  A.   Yes, we did.

10  Q.   Now, did Pike know what ECI's manpower levels were

11  from week to week?

12           MR. HUG:  Objection.

13           THE COURT:  Sustained.

14  BY MR. KAPLAN:

15  Q.   Did you provide information to Pike on a regular

16  basis to inform them of your manpower levels weekly?

17  A.   Yes.  We provided them with daily reports.

18  Q.   Your daily reports were submitted to Pike?

19  A.   Yes.

20  Q.   And did the daily reports reflect how many men you

21  had on the site?

22  A.   Yes.

23  Q.   And -- all right.  You were there almost every day

24  after that meeting, correct?

25  A.   Yes, almost every day.

1    Q.   Were Mr. Strauss and Mr. Oloff on site on a daily

2    basis after that July meeting?

3    A.   Ed was there all the time.

4    Q.   Ed Oloff?

5    A.   Yes.  Mel Strauss was there most of the time, I would

6    say three or four days a week.

7    Q.   After the July meeting did either Mr. Oloff or

8    Mr. Strauss say anything further to you about manpower

9    levels?

10   A.   They continued to ask us for more men, yes.

11   Q.   Who did?

12   A.   Both Mel and Ed.

13   Q.   They continued to tell you to bring more men in?

14   A.   Yes.

15   Q.   Even as you were increasing your crew?

16   A.   That's how we got up to 60 guys.

17   Q.   That's how you got up to 60 guys?

18   A.   Yeah.

19   Q.   Because they kept telling to you bring more men?

20   A.   Yes.  At that time areas of the building started to

21   open up.  We hadn't even started in them.

22   Q.   Okay.  And that was in August?

23   A.   That was in August.

24   Q.   Okay.  Now, at the meeting, July 21, Mr. Oloff or

25   Mr. Strauss tells you to bring in more men.  Did anybody

1    talk about financial consequences of doing that?

2    A.   Yes.  Bill Flynn did.

3    Q.   Do you recall what Mr. Flynn said?

4              MR. HUG:  Objection, hearsay.

5              THE COURT:  Is it being offered for its truth?

6              MR. KAPLAN:  It's being offered for what was

7    said at a meeting, he's talking about what transpired at

8    the meeting.

9              THE COURT:  What the potential financial

10   consequences --

11             MR. KAPLAN:  Not for the truth of the financial

12   consequences.  It's being offered that the statement was

13   made.

14             THE COURT:  And for its impact, I take it?

15             MR. KAPLAN:  Yeah, for the fact that this was a

16   conversation about this topic with the project manager at

17   Pike and statements were made by the parties to each

18   other.

19             THE COURT:  Okay.  The objection's overruled.

20   BY MR. KAPLAN:

21   Q.   I think the question was:  Do you recall what

22   Mr. Flynn said about financial impact at that meeting?

23   A.   I don't recall what he said, but I know what he was

24   saying was that if --

25             MR. HUG:  Objection.

 1  BY MR. KAPLAN:

 2  Q.   You may not recall --

 3          THE COURT:  Hold on just a second.  The witness

 4  said he doesn't recall what Mr. Flynn said.

 5          THE WITNESS:  Word-for-word.  I don't know

 6  exactly what he said word-for-word.  I know what he was

 7  saying.

 8          THE COURT:  In substance?

 9          THE WITNESS:  Correct.

10          THE COURT:  Rephrase the question.

11  BY MR. KAPLAN:

12  Q.   Do you recall the substance of what Mr. Flynn said at

13  that meeting?

14  A.   Yes.

15  Q.   Okay.  And what's your recollection of that?

16  A.   Was that we would bring in more men and if our costs

17  for that phase went over, that we'd be looking for payment

18  for that.

19  Q.   Okay.  What was Pike -- do you recall either of the

20  gentlemen from Pike responding to that in any way?

21  A.   I don't remember exactly what was said from Pike.

22  Q.   So you don't remember any response from them on that

23  point?

24  A.   Well, they made a response, but I don't remember

25  exactly what it was.

1    Q.   Was the issue of liquidated damages discussed at that

2    meeting?

3    A.   Yes.  Mel brought up the fact that if we didn't get

4    the job done, that there would be liquidated damages.

5              MR. KAPLAN:  And Your Honor, liquidated damages,

6    as a concept, should I ask the witness or are you aware of

7    that?

8              THE COURT:  That's okay.

9              MR. KAPLAN:  I'm just not sure.  I live in a

10   construction world where these terms get thrown around,

11   I'm not trying to --

12             THE COURT:  That's okay.  Great.

13   BY MR. KAPLAN:

14   Q.   So, walking out of that meeting, what did you do?

15   A.   Well, we put our plan together to get more guys on

16   the job.

17   Q.   Did you in fact increase your manpower?

18   A.   Yes, we did.

19   Q.   We went through your manpower loading chart that

20   shows what happened?

21   A.   Yes.

22   Q.   And you continued to do that until Phase 3 work was

23   completed?

24   A.   Yeah.  Well, there became a time where we were able

25   to get rid of the subcontractors, towards the end of

1    August.

2    Q.    Okay.  All right.  Had you gotten a four-week

3    extension of time as of July 21st, which would have, per

4    the schedule, roughly pushed the Phase 3 completion

5    towards the end of September; is that correct?

6    A.    Yes.

7    Q.    How would you then have proceeded, from a manpower

8    level?  You were at around 21 at that time, I think we

9    just checked that.  How would you have proceeded in the

10   next what would have been eight to ten weeks, I guess,

11   instead of four to six weeks?

12   A.    Well, we would have bumped the crew up to get the

13   feeder work done and then been able to start ramping back

14   down, I think.

15   Q.    Would you have to get up to those 60-men crews?

16   A.    I don't think so.

17   Q.    Would you have to provide outside subcontractors to

18   do work?

19   A.    I don't think so.

20   Q.    In Exhibit 13, which is the master subcontractor

21   agreement, there's just a couple sections I would like to

22   point out to you, Mr. Clauson, and to the Court.

23        At page 6, paragraph 3.1 is entitled Subcontractor's

24   Prosecution of the Work.

25                THE COURT:  The exhibit number?

1          MR. KAPLAN:  I'm sorry, Exhibit 13.

2          THE COURT:  Paragraph number?

3          MR. KAPLAN:  3.1 on page 6.

4          THE COURT:  I have it.

5   BY MR. KAPLAN:

6   Q.   Now, Mr. Clauson, right at the bottom of that

7   right-hand column, I'm going to read you two sentences.

8   "The contractor may" -- first of all, were you familiar

9   with the contract documents at the outset of the job?

10  A.   Yes, yes.

11  Q.   And the contractor here, that's referring to Pike and

12  ECI is the subcontractor?

13  A.   That's correct.

14  Q.   "The Contractor may prepare the Schedule of Work for

15  the Project and Contractor shall have the right to modify

16  the construction schedule, to suspend, delay or

17  accelerant, in whole or in part, the commencement or

18  execution of Subcontractor's Work, or vary the sequence

19  thereof, without compensation to Subcontractor.  In the

20  event such a delay or suspension extends the overall time

21  of performance, the time for the Subcontractor to complete

22  its work shall be extended."

23       Were you aware of that clause when you were talking

24  to the Pike folks on July 21?

25  A.   Yes.

1    Q.   Were any of the problems you were encountering in

2    July caused by ECI?

3    A.   No.

4    Q.   Okay.  Was there anything about the way ECI

5    prosecuted its work that caused you to have to increase

6    your manpower crews the way your chart showed?

7    A.   No.  No, I believe it was just that we had to

8    accelerant the work.  And at that time our productivity

9    was very low.

10   Q.   Okay.  There's one other section that starts on

11   page 6 and goes to the next page.  I just would like to

12   point out to you it says Delays 3.4 and -- again, if I may

13   read part of that.

14       "Should the Subcontractor be delayed by the act or

15   omission of the Contractor or by any other contractor or

16   subcontractor on the Project, or by any cause beyond the

17   Subcontractor's control and not due to any fault, act or

18   omission on its part, then the time for completion of the

19   work shall be extended for a period equivalent to the time

20   lost by reason of any act of the aforesaid causes, as

21   determined by the Contractor..."

22       Again, at your meeting with Pike, was there any

23   discussion about who caused problems, how long were these

24   problems taking, what kind of extensions of time should be

25   given because of certain issues, any kind of detailed

1   discussion?

2   A.   Well, we did --

3           THE COURT:  Is this the July 21?

4           MR. KAPLAN:  Yes, at the July 21 meeting.

5   A.   Yes, we told them what was going on out there.  They

6   knew what was going on out there.

7   BY MR. KAPLAN:

8   Q.   You don't believe this was a surprise to them?

9   A.   Not at all.

10  Q.   Did they talk with you about, okay, you need extra

11  time to do this, specific discussion of any particular

12  issues, did any of that occur?

13  A.   I don't know if there was specific -- about any

14  specific issue.

15  Q.   From Pike's point of view?

16  A.   I don't believe so.

17  Q.   All they said was you're not getting extra time?

18  A.   That's correct.

19  Q.   Now, in terms of your -- after you ramped up -- did

20  you know on July 21 that you'd need 60 men working three

21  weeks later, four weeks later?

22  A.   Not at that time, no.

23  Q.   When were you able to quantify the impact of these

24  problems in terms of the manpower you expended for the

25  Phase 3 work?

```
 1   A.   Well, once I got all the cost reports in, it was

 2   probably September.

 3   Q.   The cost reports for the actual men you used?

 4   A.   Yeah.  And the cost from the subcontractors.

 5   Q.   Okay.  Because you used subs and they were then

 6   invoicing you?

 7   A.   Yes.

 8   Q.   You got that data collected in September?

 9   A.   Yes.

10   Q.   Okay.  Now, did you have any follow-up discussions

11   with either Mr. Oloff or Mr. Strauss about the issue of

12   the extra manpower and the cost impacts that it was having

13   or had on ECI after the July 21 meeting?

14   A.   Probably not until sometime in September.

15   Q.   Okay.  And what was the next conversation you recall

16   having with either of those gentlemen on that topic?

17   A.   Well, I met with both Mel Strauss and Ed Oloff and

18   told them that we were preparing a claim.

19   Q.   When was that?

20   A.   Sometime in the middle of September.

21   Q.   And why did you meet with them then as opposed to

22   some other time?  Was there anything about -- was there

23   any reason, in other words, that you met with them?

24   A.   I had spoke with Bill Flynn about it.  We were

25   putting our numbers together to find out how much our loss
```

1    was.  I told him that we should let them know that the

2    claim is coming.

3    Q.   Okay.  And that was what prompted you to talk to

4    Mr. Oloff and Mr. Strauss in September?

5    A.   Yes.

6    Q.   Okay.  And so you informed them -- what did you tell

7    them at that time?

8    A.   I told them that Bill Flynn was preparing a claim for

9    the labor overages that we had in Phase 3 and we would be

10   getting it to them.

11   Q.   Were you working with Mr. Flynn on that claim?

12   A.   Yes.

13   Q.   What were you doing in September in regard to the ECI

14   claim?

15   A.   I was putting all the total overage hours together

16   for each of the -- for our labor and for the

17   subcontractors.

18   Q.   Okay.  And to do that, what did you have to do --

19   were you reviewing records?  What did you have to do to be

20   able to put those numbers together?

21   A.   I had to get the printouts from the accounting

22   department.

23   Q.   For what?

24   A.   For the labor.

25   Q.   Okay.  And that would be the labor through the end of

1   August?

2   A.   Through the end of August, yes.

3   Q.   Okay.  And how long -- what's your normal sequence of

4   getting that kind of information?  In other words, when

5   can you get the August labor information?

6   A.   Well, I can't get it until after August is over.

7   Q.   So you got it in September?

8   A.   Correct.

9   Q.   How did you go about actually assigning or allocating

10  hours, your man hours, to the Phase 3 work?  What process

11  did you use in September?

12  A.   Well, the process was being done the whole time.

13  Stephane Mathieu was doing the daily reports.  So our

14  hours were allocated on a weekly basis.

15  Q.   To various work.  We looked at those yesterday,

16  Mr. Mathieu's daily reports?

17  A.   Correct.

18  Q.   And did you take any other steps -- if we look at,

19  for example, let's pick one.  In book -- this is Volume 2.

20       If you look at Tab 25, Exhibit 25 of Volume 2, this

21  is -- Exhibit 25 are the reports for the week ending

22  August 21, 2010.  Those are the reports that Mr. Mathieu

23  was keeping?

24  A.   That's correct.

25  Q.   Now, at this time, like there's handwriting on the

```
 1    first page here that says Phase 2E wing, whose handwriting
 2    is that?
 3    A.    I'm sorry?
 4    Q.    Tab 25, the first page, it says Elliot Bell for the
 5    employee?
 6              MR. HUG:  Tab 25?
 7    A.    I don't have that in my book.
 8    BY MR. KAPLAN:
 9    Q.    What do you have for the first page?
10    A.    Tab 25?
11    Q.    Yes.
12    A.    Week ending 8/21, Stephane Mathieu.
13    Q.    Is that the first page in yours?
14              THE COURT:  Yes, it is.
15              MR. KAPLAN:  Mine is a different order, but
16    that's okay.  That's fine.
17    BY MR. KAPLAN:
18    Q.    At this time Mr. Mathieu was keeping these.  And how
19    is he allocating work in terms of recording?
20    A.    Well, he's recording how many hours he had in each
21    phase of the project for each cost overage of the project.
22    Q.    This is the information that's going to your payroll
23    department?
24    A.    Yes.
25    Q.    Now, did you ask Mr. Mathieu to review these in
```

1    September?

2    A.    Yes, we had him go back and look at all the daily

3    reports and all the weekly manpower sheets.

4    Q.    Okay.  And what did you ask him to do in that regard?

5    A.    Well, we wanted to make sure that all his phasing was

6    correct for each phase to make sure that the hours that he

7    put down for Phase 3 were correct through the entire

8    period of time and make any corrections that he had to

9    make --

10   Q.    Okay.  And did he do that?

11   A.    -- if they were off.

12         Yes, there were some corrections that he made.

13   Q.    When you ended up -- did those corrections for the

14   assignment of hours for Phase 3 and other phases, did that

15   end up getting adjusted in your reporting system?

16   A.    Yes.

17   Q.    Okay.  So the reports then you ran afterwards, were

18   those based on his work in reviewing?

19   A.    In the review, yes.

20   Q.    Okay.  Now, after the July 21 meeting going through

21   the end of August, did conditions on the site improve?

22   A.    Well, they probably got worse for a while.  There was

23   a lot more manpower on the job.  It was pretty crazy out

24   there.

25   Q.    Okay.  So in terms of your ability to do your work,

1    did that mean it became -- what effect did that have on

2    you?

3    A.    Well, it just affected our productivity primarily.

4    Q.    Why so?

5    A.    Well, because the place was loaded with men.  There

6    was people all over the place, equipment all over the

7    place.

8    Q.    Was that something that you had anticipated would

9    happen?  Mr. Mathieu talked about the idea of a summer

10   slammer, you talked about doing these schools many times

11   before.  Is there some type of large concentration of

12   workforces on the job to be expected in these types of

13   jobs?

14   A.    Not that large, no.  We actually put men onto a

15   second shift to alleviate some of that.

16   Q.    And how about the concentration of other

17   subcontractors, was this something that you would have

18   expected to this degree for this job?

19   A.    No, not to that degree.

20   Q.    Okay.  You mentioned a number of times bringing in

21   outside crews from other companies.  I'd just like to show

22   you Exhibit 33, which I think is in Volume 3.

23        Do you have Exhibit 33, Mr. Clauson?

24   A.    Yes.

25   Q.    Would you just identify what these are?

1    A.    These are invoices from our electrical subcontractors

2    that we hired for Phase 3.

3               MR. KAPLAN:  I would offer this, Your Honor.

4               MR. HUG:  No objection.

5               THE COURT:  Admitted.  Exhibit 33 is a full

6    exhibit.

7    BY MR. KAPLAN:

8    Q.    The dates here tend to be pretty much in August,

9    2010, Mr. Clauson, some of them are running into

10   September, is that correct, of these bills?

11   A.    That's correct.

12   Q.    Now, I'd like to refer you to Exhibit 43, there's a

13   couple sheets in there.  And might as well just identify

14   the whole exhibit and then I'll move for its admission.

15        You have a couple of pages here.  The first page is

16   what, Mr. Clauson, in terms of what it reflects?

17   A.    It's just an overview of total cost labor overrun in

18   dollars.

19   Q.    And then the second page is the labor hours report of

20   July 26, 2011?

21   A.    Yes.

22   Q.    What is that for?

23   A.    It's a labor hours report of all the phases on the

24   project.

25   Q.    That's from your accounting system?

1    A.    Yes.

2    Q.    And then the third page is what?  That's more of the

3    same?  Another part of that report?

4    A.    Third page is an overview of all the subcontractors.

5    Q.    Well, I have two pages of the labor hours report,

6    right?

7    A.    Yes.

8    Q.    And then actually the fourth page, I'm sorry, that's

9    a summary of the subcontractor?

10   A.    Total subcontractor cost.

11   Q.    That's dated 10/1/2013, that summary.  Did you

12   participate in the preparation of this summary?

13   A.    I think this is something that our accounting

14   department did, but the hours probably came from a report

15   I did earlier.

16   Q.    Okay.  There are lists of various subs and then

17   there's allocations of dollars in different columns.  Did

18   you participate in the various allocations?

19   A.    Yes, for each of the cost codes.

20   Q.    Okay.  And -- well, let me move to have this admitted

21   and then I'd like to examine the witness further.

22             MR. HUG:  No objection, Your Honor.

23             THE COURT:  May I ask, is the first page of

24   this, is this the witness's own creation?

25

```
 1   BY MR. KAPLAN:

 2   Q.   Did you participate in putting together the

 3   information on the very first page of this exhibit?

 4   A.   Yes, that's mine.

 5             THE COURT:  Okay.  Exhibit 43 is admitted as a

 6   full exhibit.

 7   BY MR. KAPLAN:

 8   Q.   And staying with the last page, the subcontractor's

 9   summary, it lists one, two, three, four, five -- eight

10   firms, I think.  Am I correct there?

11   A.   Yes.

12   Q.   Were those all firms that you brought in to

13   supplement your labor for Phase 3?

14   A.   Yes.

15   Q.   And at the top it's got some dates, July 24, July 31,

16   et cetera.  What does that indicate?

17   A.   The week ending dates.

18   Q.   That they were there?

19   A.   That they were there, yes.

20   Q.   And then you've got total hours column.  Is that the

21   total hours that they worked?

22   A.   Yes.

23   Q.   Okay.  Invoice amounts, what are those from?

24   A.   Those would have been from the actual invoices they

25   submitted to us.
```

1    Q.    Okay.  And then at the bottom there is a total amount

2    paid to subs for work on Phase 3 only.  And then it's got

3    a figure of $130,392.95.  How is that -- did you

4    participate in coming up with that number?

5    A.    I participated in coming up with the hours, yes.

6    Q.    What did you do in terms of that?

7    A.    Well, we went back and figured out what phase they

8    were in from the daily reports.

9    Q.    What phase the subs were working in?

10   A.    Yes.

11   Q.    Okay.  And you did that based on what, the man hours?

12   A.    From the daily reports that Stephane Mathieu

13   produced.

14   Q.    And at the bottom to the left of that entry, it says

15   total amount paid to subs for Phase 3 only.  There's some

16   entries, 48, 437, 493.5, 514, 163, then below that it says

17   2,033.50, what does that represent?

18   A.    That's the total hours that they worked, they were in

19   Phase 3 and if they're working on the cost codes that were

20   affected by the overage.

21   Q.    So those are hours they are working on Phase 3?

22   A.    Yes.

23   Q.    This is the totals for the subs?

24   A.    Yes.

25   Q.    You're talking about the cost codes.  What's the

1    reference to the cost codes?

2    A.    The labor cost codes.  They were working on branch

3    conduit, branch wire.

4    Q.    So if they're working on certain codes, you're

5    including those hours?

6    A.    Yes.

7    Q.    Okay.  And is that -- you got 2033.50.  If you go

8    back to the first page of this exhibit, it says total

9    subcontractor labor overrun 2033.50.  Do those two numbers

10   sync up?

11   A.    Yes.

12   Q.    And the first page, is that your claim in this case?

13   Is that ECI's claim in this case?

14   A.    Yes.

15            THE COURT:  567,000 is what you're talking

16   about?

17            MR. KAPLAN:  Yes.

18   BY MR. KAPLAN:

19   Q.    So the subcontractor labor overrun, you're claiming

20   that against Pike in this case as being extra hours you

21   want compensation?

22   A.    Yes.

23   Q.    And in the estimate itself, ECI's estimate, were any

24   of those hours anticipated, those type of hours for

25   subcontractor work on Phase 3?

```
 1    A.    No.

 2    Q.    Okay.  And the ECI labor overrun, 4,930.27, would you

 3    show me on the next page where that's coming from?

 4    A.    That would be coming from the Area 2 Phase 3 column.

 5    Q.    That's in the middle of the second page?

 6    A.    Yes.

 7    Q.    This is your labor hours report of July 26, 2011?

 8    A.    Yes.

 9    Q.    Okay.  And by then had you gotten all the change

10    orders and other information for Phase 3 processed?

11    A.    I don't think all the change orders were tabulated at

12    that time.

13    Q.    Well, July 26, 2011, that's nine months or so

14    after --

15    A.    Oh, yeah.

16    Q.    So had all the change orders been cranked in by then?

17    A.    Yes.

18    Q.    The 4,930.27, does that appear in that labor report?

19    A.    Yes, under the Variance column.

20    Q.    The Variance column.

21          And working across, we have -- in that Variance

22    column, we have one, two, three, four, five entries to add

23    up to the 4,930?

24    A.    Yes.

25    Q.    Working back from the left, the first one is branch
```

1   conduit?

2   A.   Yes.

3   Q.   And in the Variance column, 2,162, what does that

4   represent?

5   A.   That represents the amount of hours that that phase

6   code went over.

7   Q.   For Phase 3?

8   A.   For Phase 3 only.

9   Q.   And branch conduit, again, was what activity was that

10  to describe physically what it was that goes into the

11  branch conduit code?

12  A.   Running the actual conduit, steel tubing conduit.

13  Q.   Throughout the area?

14  A.   Yeah.

15  Q.   Now, of the problems you mentioned, you mentioned a

16  number of problems you encountered on the job, what of

17  those problems impacted the branch conduit man hour

18  activity?

19  A.   Which problems affected it?

20  Q.   Yes, sir.

21  A.   The steel issue and the masonry issue both affected

22  it.

23  Q.   Okay.  Branch wire, you have an overrun there, a

24  variance of 769.61 hours?

25  A.   Yes.

1  Q.   And again, is that based on the actual versus your

2  bid?

3  A.   Correct.

4  Q.   And what problems affected the branch wire?

5  A.   The same problems.  We had to leave stuff hanging all

6  over the place.  Same problem.

7  Q.   Okay.  Branch finish, what is branch finish?

8  A.   Branch finish is the trim work that occurs.  The

9  actual outlet or switch on the wall, putting the devices

10 in the ceiling, sensor switches, that sort of thing.

11 Q.   What problems are you saying caused the overrun for

12 the branch finish?

13 A.   Just the delay in getting the work done.  At one

14 point we had guys that were doing finish work and doing

15 branch rough at the same place at the same time.  Just

16 productivity was just, you know, very low.

17 Q.   Branch rough is what?  Is that pulling the wires

18 through the conduit?

19 A.   Pulling the wires, yes.

20 Q.   And that's supposed to be done before you're doing

21 the branch finish?

22 A.   Yes.

23 Q.   One of the other variance items you had was I think

24 fixtures, 767 hours; am I reading that correct?

25 A.   Yes.

1    Q.   What caused the fixture category to overrun in man

2    hours?

3    A.   Well, I think by the time we got to do the fixtures,

4    the flooring contractor and the door contractor had

5    started.  So it was just a mess to even get the fixtures

6    to the location it had to go to.

7    Q.   Normally, would those -- the flooring and door guy

8    have been out of your way when you were doing fixtures?

9    A.   Normally, we would go in either before him or after

10   him, not at the same time.

11   Q.   Okay, okay.  And systems has an overrun of over a

12   thousand hours.  First of all, what is the systems code

13   involved?

14   A.   That's all the systems that were in the building, the

15   PA system, the security systems, the telecommunications

16   systems.

17   Q.   That's what you were describing as connecting to the

18   teledata room?

19   A.   That's correct.

20   Q.   And the overruns?

21   A.   Reading all that cabling, going back and

22   re-stretching it out, getting it to the room afterward,

23   that's where those hours came from.

24   Q.   You have another column here of four items, feeder

25   conduit, feeder wire, demolition and gear, that total

1   1,086 hours.  It appears, if I'm reading this right, that

2   you actually came in under your estimate on those items.

3   Am I reading that correctly?

4   A.   Yes, that's correct.

5   Q.   Why were you -- take the conduit -- feeder conduit

6   and the feeder wire, why were you able to come in under

7   your estimate on those items in light of what was going on

8   on the job?

9   A.   Well, the feeder conduit, we did have to leave that

10  not done in some areas.  But once it was done, it was just

11  a matter of pulling the wire through it.  So there was no

12  delay to pull the wire.

13  Q.   Okay.  And so are you saying that the problems you

14  encountered here did not affect those activities?

15          MR. HUG:  Objection, leading.

16          MR. KAPLAN:  Okay.

17  BY MR. KAPLAN:

18  Q.   Did the problems you encountered affect those

19  activities?

20  A.   Not for the feeder wire, no.

21  Q.   And demolition, I think you mentioned that you

22  were -- your demolition involved cut and make safe, I

23  think that's what you said yesterday?

24  A.   Cut, cap and make safe.

25  Q.   Did it involve anything beyond that?

 1    A.    No.

 2    Q.    Okay.  Did you run into any problems in performing

 3    your demolition work?

 4    A.    No.

 5    Q.    Okay.  And then the other item there is gear.  What's

 6    gear?

 7    A.    That would be the mounting and terminating of the

 8    panel boards or switchboards.

 9    Q.    Once you were actually doing those activities, did

10    you run into problems in mounting and terminating the

11    gear?

12    A.    No, not once the wall was built.

13              THE COURT:  Mr. Kaplan, may I ask what's the

14    distinction between feeder conduit and feeder wire?

15              THE WITNESS:  The conduit is the physical

16    conduit tubing, and the wire is what would go into it.

17    BY MR. KAPLAN:

18    Q.    Let's go to Exhibit 35, if we could.

19              THE COURT:  I'm going to ask one more time while

20    we're on this exhibit, so what is it that accounts, in

21    your view, for the distinction between branch conduit and

22    feeder conduit in terms of the cost being more than you

23    anticipated for branch conduit but less than you

24    anticipated for feeder conduit?

25              THE WITNESS:  Well, the feeder conduit, we were

1    able to install a big portion of it in areas before the

2    school even got out.  We were working nights.  And we were

3    installing that feeder conduit.  We had to leave some

4    sections out of it where steel was, but majority of it was

5    installed.

6              THE COURT:  And you did not have a similar -- or

7    you had a greater problem with respect to the branch

8    conduit?

9              THE WITNESS:  Yes.  The branch conduit we

10   couldn't do it at all.

11             THE COURT:  Because of the problems with respect

12   to the main rooms that you talked about?

13             THE WITNESS:  The main rooms and we had to wait

14   for the other trades to put their stuff in before we put

15   our stuff in.

16             THE COURT:  Thank you.

17   BY MR. KAPLAN:

18   Q.   Exhibit 35, Mr. Clauson.

19   A.   Yes.

20   Q.   Okay.  I'm just going to go through this somewhat

21   sequentially.  Various cost worksheets, Mr. Madore talked

22   about this to some extent yesterday.

23        Are these all documents you created?

24   A.   Yes.

25   Q.   And is this something you did on every job, these

1    types of reports?

2    A.    Yes.

3    Q.    Okay.  And who reviews these after you do them?

4    A.    Lou Bona and our accounting department.

5    Q.    Do you customarily discuss this information with

6    Mr. Bona back at the office?

7    A.    Sometimes if there's a problem.

8    Q.    And you've been working for Mr. Bona 37 years?

9    A.    Thirty-seven years, sir.

10   Q.    Is he a hands-on boss?

11   A.    Yes, he is.

12   Q.    In the office every day?

13   A.    Every day.

14   Q.    Okay.  Just in terms of what you're showing 12/16/09,

15   that's at the very beginning of the job.  If we go to the

16   second page of the project job cost worksheet, Mr. Madore

17   talked about this.  I just want you to explain it.  The

18   box at the top showing the different products and then the

19   totals, what is that?

20   A.    That is our -- well, that's what I call our equipment

21   buyout for the project.

22   Q.    And that 1.18 percent that's shown at the lower

23   right, what does that represent?

24   A.    That represents the total buyout cost, $279,000.

25   Q.    Is that a saving?

1   A.   Yes.

2   Q.   What is that?

3   A.   Yes, that's a savings from what we carried for those

4   items listed there.

5   Q.   You're getting that from the bid itself?

6   A.   Correct.

7   Q.   Okay.  And the buy value -- when are you putting in

8   the numbers for the buy value in terms of what's going on?

9   In other words, for you to be able to put those numbers in

10  there?

11  A.   Once I purchase those packages, then I know what the

12  cost is.

13  Q.   So the buy value numbers are actual numbers?

14  A.   They're actual numbers after we've recounted the job

15  and selected the vendor we're going to use and issued a

16  purchase order.

17  Q.   Okay.  So that difference in cost, are those

18  basically savings in the bid price?

19  A.   Yes.

20  Q.   Okay.  Now, does that -- here you're carrying

21  $279,000, I'll round off.  Now let's talk about the cost

22  to complete information that's in the middle there.  Could

23  you just describe generally what that's showing?

24  A.   Want me to review the whole form with you?

25  Q.   Let me walk you through it.  Maybe if we look at the

1    right-hand side where it says Total Labor, Total Material,

2    Variance, PM Estimate.  Talk about what those columns

3    represent.  That Variance column I think Mr. Madore

4    mentioned yesterday was actually a bid value?

5    A.   That Variance column is the remaining cost for each

6    of the items listed, the remaining cost of labor as of the

7    last month of the date that it's entered.  So today's

8    date, if you looked on the left-hand side, it says

9    December '09, December 16, '09.  As of that date, that's

10   how much money is left in our estimate.

11   Q.   In your estimate you've got 1.310 million dollars

12   left for labor as of that date?

13   A.   As of that date, correct.

14   Q.   And then the PM estimate, is that your estimate what

15   it's going to take to complete?

16   A.   That's correct.

17   Q.   All right.  Now, that 18 percent above, that $279,000

18   above for the equipment buyout --

19   A.   Yes.

20   Q.   -- is that entered anywhere in your cost-to-complete

21   figures?

22   A.   Well, no, it's listed -- if you look at the total

23   equipment line item, the variance of $1,468,000.

24   Q.   Yes.

25   A.   And then the PM estimate I put the same amount.  So

1    it's not showing any profit, but we know that there's

2    $279,000 that is going to be profit.

3    Q.   So let me ask you this.  The total equipment of

4    1.468, is that the bid number or is that the number after

5    the buyout?

6    A.   The $1,468,000 is the remaining value.

7    Q.   Per the bid?

8    A.   Per the estimate.

9    Q.   That does not have the adjustment for the buyout, is

10   that correct?

11   A.   That's correct.

12   Q.   So if you look below, you have at this point in time

13   total profit and overhead, one point -- minus

14   1.22 percent, the 44,498 number?

15   A.   Yes.

16   Q.   Does that include the $279,000 savings amount from

17   the buyout?

18   A.   No.

19   Q.   So if you were going to do your overview at a given

20   time, you'd have to take that bottom number and then

21   factor in the buyout as well?

22   A.   Well, we do that purposely for the accounting

23   department to use that money if they want.

24   Q.   Okay.

25   A.   Show that deduct.

1   Q.   Okay.  But just to be clear, that bottom line number

2   in your summary, that does not factor in the buyout?

3   A.   That's correct.

4   Q.   Okay.  If we go to your May 13, 2010 entry.

5        Now, you're showing at this point in time that on

6   your cover sheet that you've started work on slab in third

7   shift feeders in F area.  If we go to your project job

8   cost report, it appears your buyout numbers are the same

9   as from December?

10  A.   Yes.

11  Q.   And your total profit and overhead that you are

12  projecting now without the buyout is slightly positive,

13  correct?

14  A.   Correct.

15  Q.   Okay.  And again, your cost to complete, that's your

16  projection at that point in time of what it's going to

17  cost to complete the job?

18  A.   Yes.

19  Q.   This report would have been as of the end of

20  April 2010?

21  A.   Yes.

22  Q.   Because I'm just looking at your April 30th entry.

23  A.   Dated May, so it would have been an April report.

24  Q.   And the cost complete box, it says today's date

25  April 30, is that what the figures are dated?

1    A.    Correct.

2    Q.    And then the next one is June 18, 2010.  Your cover

3    sheet says working in all Phase 2 and 3 areas, we're going

4    okay, increase crew for some of the work.  This is right

5    before you're about to start the push in Phase 3?

6    A.    Correct.

7    Q.    If you look at your cost worksheet, you're basically

8    at a zero for your projected overhead and profit and your

9    buyout has not changed, right?

10   A.    Correct.

11   Q.    Okay.  The next one is July 19.  Now, this is when --

12   you started the Phase 3 work and, as you've testified, you

13   were running into a number of problems.  You have your

14   cover comment on the review form, it says:  "The place is

15   a zoo.  Send help."

16   A.    Yes.

17   Q.    What does that mean?

18   A.    Well, exactly what it was.  The place was a zoo.

19   There was equipment and people all over the place.

20   Q.    When you say send help, who are you asking for help

21   from?

22   A.    I was helping for the office to send some more help.

23   Q.    Being who?

24   A.    More manpower.  We had asked formally for more

25   manpower.

1  Q.   Your manpower request, was this the only method you

2  had?

3  A.   No, no.  We spoke daily.  Lou Bona's office is right

4  next to mine.  We'd speak daily about the need for

5  manpower or any other thing.

6  Q.   And even at this point in time, July 19, I'm going to

7  your cost-to-complete sheet, based on the figures you have

8  for the end of June, you're still projecting a slight loss

9  of about $27,000 at the bottom?

10 A.   Correct.

11 Q.   And that doesn't bring in the buyout, right?

12 A.   No.

13 Q.   Okay.  And this was right -- the numbers are through

14 the end of June.  Your comment on the prior page, July 19,

15 "the place is a zoo," this is just a couple days before

16 you met with the Pike folks?

17 A.   That's correct.

18 Q.   Then the next one, August 13, 2010, this is where

19 there seems to be a pretty significant change in a bunch

20 of things in your report?

21 A.   Yeah.  At that time I was having a meltdown.

22 Q.   As of what time, August 13?

23 A.   August 13th, yeah.

24 Q.   Why did you say that?

25 A.   Well, I had a whole bunch of guys on the job, we were

```
 1   expecting to lose $700,000.  The place was still a mess.

 2   Q.   You've been at ECI for 37 years?

 3   A.   Yes.

 4   Q.   Had you ever filled out a job cost report where you

 5   went from basically a zero loss to a $712,000 loss in a

 6   month on a report?

 7   A.   No.  And I was anticipating all the labor that we

 8   were going to use through the end of Phase 3 at that

 9   point.

10   Q.   As of what point, the August 13?

11   A.   Right.

12   Q.   So you were estimating --

13   A.   All the extra subcontractor costs that we would be

14   incurring plus our labor to finish this Phase 3 area, and

15   then the rest of the labor to go and finish the project.

16   Q.   Because by August 13 you had already brought in the

17   subs, the extra subs, they were there?

18   A.   Correct.

19   Q.   You were up to your 60-man crews and you were a

20   couple weeks away from finishing most of Phase 3?

21   A.   Most of Phase 3, yes.

22   Q.   But you were in the middle of all the push to get it

23   done?

24   A.   Absolutely.

25   Q.   Okay.  And so your cost estimates that are driving
```

1    this $711,000 loss, those are still estimates, right?

2    A.    Yes.

3    Q.    But they're fairly informed estimates?

4    A.    Yes.  All I'm doing there is increasing the field

5    hours to account for the additional subcontractors and our

6    overruns.

7    Q.    You still didn't have the actual cost in until the

8    following month?

9    A.    Until September, right.

10   Q.    But you're making your estimates based on what's been

11   going on in the field in August?

12   A.    That's correct.

13   Q.    And you dated this -- if you look at the

14   cost-to-complete sheet, at the top of it it says

15   August 13.  The numbers say today's date July 31.  Does

16   that mean you're producing this document in the middle of

17   August but you're basing it on numbers from the end of

18   July?

19   A.    We're doing our cost to completes in August, but it's

20   based on the accounting system cost through the end of

21   July.

22   Q.    Okay.  So when you look at variance there for total

23   labor for the August 13 report, it says 722,000, that's

24   what's left in the job?

25   A.    That's the remaining labor cost that's left.

1    Q.   In the bid?

2    A.   That's correct.

3    Q.   And your estimate is still an estimated number of

4    your remaining cost to do the whole job?

5    A.   That's correct.

6    Q.   Okay.  Now, in your comments on the August 13, 2010

7    sheet, I'd like to ask you about some of this.  You have,

8    "Take off show MC cable spec calls for 6 ft. whips only."

9    What does that mean?

10   A.   That means that the contract specification stated we

11   could only use MC cable in lengths of 6 feet.

12   Q.   Why did you note that?

13   A.   Well, we had taken the job off MC cable.

14   Q.   The bid?

15   A.   That area, yeah.

16   Q.   Was that an issue that was being discussed with Pike

17   at that time?

18   A.   Pike was aware of the issue, yes.

19   Q.   How was it resolved?

20   A.   Well, after the end of Phase 3, they requested that I

21   give them a credit for the use of MC in the Phase 3 area.

22            THE COURT:  What is MC?

23   A.   It's an armored metal cable, flexible, and it

24   contains wires in it.

25

1    BY MR. KAPLAN:

2    Q.   Why did they ask for a credit?

3    A.   Because of what the spec called for.  The spec said

4    you couldn't use MC for long lengths.  And we used it.

5    Q.   So you bid it that way?

6    A.   Yes.

7    Q.   And that's what you ended up using?

8    A.   That's correct.

9    Q.   So in terms of what you bid and what you did, there

10   was no difference?

11   A.   No.

12   Q.   So the way it was bid ended up being the way it was

13   being performed in the field?

14   A.   Correct.

15   Q.   And then Pike wanted a credit of some hours because

16   you did it differently than what they said the specs said?

17   A.   Yeah.  The engineer asked for a credit.

18   Q.   Okay.

19   A.   It wasn't a formal request.  It was an e-mail that we

20   received.

21   Q.   What happened with that issue subsequently?

22   A.   Well, there was other issues that we had a

23   telecommunication room that was relocated.  Again, it

24   wasn't a formal request for change, but it was in the

25   lower level of P4W.  And so I wanted additional cost for

1    that extra work.  So I prepared a cost for the extra work

2    to relocate that IDF room and I prepared a cost for the

3    credit to change the cabling to MC.

4    Q.   So you did a trade-off?

5    A.   And I submitted them both to Pike.  And neither one

6    was formally approved.

7    Q.   So they were sort of washed out?

8    A.   Washed out in their favor, I guess.  Mine cost more

9    than theirs cost.

10   Q.   In terms of the issues we have here and the claim for

11   the labor overruns, these numbers -- these numbers don't

12   come into play, do they?

13   A.   No.  They were never entered.  They were never

14   approved.

15   Q.   They were what?

16   A.   They were never approved.  The change wasn't

17   approved.

18   Q.   And there wouldn't be a variance in your bid because

19   you bid it with MC cable and performed it with MC cable?

20   A.   That's correct.

21   Q.   Your next entry on the cover sheet, August 13 cover

22   sheet, "Fixture labor units way off what it's taking in

23   the field," what does that refer to, Mr. Clauson?

24   A.   It was taking us more time to install the fixtures at

25   that time.  Like I mentioned before, I mean, everybody was

 1    right there.  Everybody was on top of each other, the

 2    flooring contractor, the door contractor.  So anything you

 3    tried to do was very difficult.

 4    Q.    Okay.  You then say: "A lot of time wasted due to

 5    lack of supervision.  This is now being corrected."  What

 6    does that refer to?

 7    A.    That refers to our own supervision.  I had asked for

 8    more help for Stephane Mathieu, field supervision.

 9    Q.    Is that because your crews were going up to 50, 60

10    guys at this time?

11    A.    That's correct, yes.

12    Q.    Who did you bring in to help supervise along with

13    Mr. Mathieu for ECI?

14    A.    Brought several foremen in from other jobs.

15    Q.    Okay.  And when did they come in?

16    A.    Right around the end of July.

17    Q.    When you started to ramp up?

18    A.    Yeah, yeah.

19    Q.    Okay.  Could you just pull another foreman off a job

20    on a day's notice?

21    A.    No.  No.  It took a little bit of coordination to get

22    them off the jobs.

23    Q.    So you had to pull foremen off jobs to come in and

24    work at the Kelly School?

25    A.    That's correct.

1    Q.    Was that a normal thing to do?

2    A.    No.

3    Q.    Then you have the paragraph after that, "Someone

4    needs to stop the estimating department from ignoring the

5    project schedules at bid time and providing an estimate

6    that's going to cost the company huge amounts of loss."

7          You said today at the outset of the job you said you

8    thought you had enough hours in the estimate had there not

9    been the problems?

10   A.    Yes.

11   Q.    Do you still feel that way today?

12   A.    Yes.  When I wrote that, I was -- the place was a

13   mess.  I didn't want to be blamed for the whole thing.

14   That's why I put that.  And then after that, I did sit

15   down with Mark Madore and we went over the job together.

16   And we went over the factoring that he showed on the

17   project.  And we looked at other jobs that we had done

18   with the same labor units.  So I felt more comfortable

19   after meeting with him.

20   Q.    Okay.  You've said a couple times Pike wasn't

21   following their schedule?

22   A.    Not at all.

23   Q.    Okay.  Had they been following their schedule, would

24   you have been projecting a $712,000 loss as of August 13?

25   A.    I don't believe so.

```
 1    Q.   Okay.  Did you talk with your boss about this after
 2    this report?
 3    A.   Oh, yeah.
 4    Q.   Was Mr. Bona interested in what was going on?
 5    A.   Yes, he was.
 6    Q.   Had you ever had a situation like this before where
 7    you had this kind of dramatic or significant labor overrun
 8    going on on a job?
 9    A.   Never before.
10    Q.   Okay.  How do you think Pike did in managing the
11    Phase 3 scheduling work and administering the work?
12    A.   They didn't manage the scheduling at all.  No one was
13    following the schedule.
14    Q.   Okay.
15            MR. KAPLAN:  I don't know what you want to do
16    about breaking.  I have a little more.  Not a terrible
17    amount.  Maybe another 10 minutes or 15 minutes.  I'm
18    happy to break now or later, it's up to you.
19            THE COURT:  Well, Mr. Hug?
20            MR. HUG:  I would appreciate a short break.
21            THE COURT:  Okay.  Why don't we at this time
22    take our morning break and reconvene at 10:10.
23            MR. KAPLAN:  Do you anticipate we'll go to about
24    noon?
25            THE COURT:  I think so.  It depends upon the
```

1   preference of the parties.  Maybe 12:15 or so and take our

2   lunch break.

3           MR. KAPLAN:  Thank you.

4           THE COURT:  Stand in recess.

5               (Whereupon, a recess followed.)

6

7           THE COURT:  Mr. Kaplan, you may continue.

8           MR. KAPLAN:  Thank you, sir.

9   BY MR. KAPLAN:

10  Q.   Mr. Clauson, after that July 21 meeting with Pike,

11  did the Pike folks do anything differently in the way they

12  administered the project?

13  A.   No.  Not really, no.

14  Q.   Was there any improvement, from your point of view,

15  in the way the sequences were being implemented of the

16  various work?

17  A.   No.

18  Q.   Were you speaking to Mr. Oloff and Mr. Strauss on a

19  regular basis as to the progress of the job and trying to

20  coordinate your work?

21  A.   Yes, coordinate work and identifying issues that were

22  going on, resolving issues.

23  Q.   Did you feel you gave them all the information you

24  could in July and August as to what was going on the job

25  from ECI's point of view?

1    A.   Yes.

2    Q.   Now, we talked about this buyout.  You explained it

3    at length.  For the Phase 3 work, did you encounter any

4    problems with the quantities and materials that were

5    carried in the bid to do that work?

6    A.   No.  The cost reports show that the material is good.

7    Q.   So did you have any problem with the bid estimate as

8    to the amount or quantities of materials to be

9    incorporated in the Phase 3 work?

10   A.   No.

11   Q.   I'd like to turn to Exhibit 36.  This is the

12   October 1, claim letter.  I'd like to offer that.

13            THE COURT:  Any objection?

14            MR. HUG:  No objection.

15            THE COURT:  Exhibit 36 admitted, full exhibit.

16   BY MR. KAPLAN:

17   Q.   Are you familiar with this letter, Mr. Clauson?

18   A.   Yes.

19   Q.   And you signed the letter?

20   A.   I did sign it, yes.

21   Q.   Who prepared this letter for ECI?

22   A.   Bill and I.

23   Q.   Bill Flynn?

24   A.   Bill Flynn.

25   Q.   And is this the actual written claim to Pike?

1    A.   This is the first letter that we sent them, yes.

2    Q.   And was this -- you had mentioned the review of the

3    hours and all that.  Is that what preceded this letter

4    going out?

5    A.   That's correct.

6         MR. KAPLAN:  I'm not going to walk the witness

7    through the letter, Your Honor.  I'm sure -- you know,

8    he's already talked about the issues in here.  I don't

9    think there's any reason to go through them again.

10        THE COURT:  Okay.  The letter speaks for itself.

11        MR. KAPLAN:  It's a summary of pretty much a lot

12   of the stuff Mr. Clauson's already testified about.

13        Just a couple of points here that I want to pick

14   out and then just carry through.

15   BY MR. KAPLAN:

16   Q.   On the second page, the discussion that you have in

17   the middle paragraph about the estimate for the Phase 3

18   work and the reality of the man hours, where were you

19   getting -- at that point, October 1, 2010, where were you

20   getting those numbers from?

21   A.   From our accounting department.

22   Q.   That was after you'd done the review and Mr. Mathieu

23   had done his review and the allocations had been made for

24   Phase 3?

25   A.   That's correct.

1    Q.   And you have a number there, direct cost of $521,000.

2    What was driving that number?  You have the hour overrun.

3    What was the dollar amount driving that number?  Where

4    were you getting that from?

5    A.   I'm not sure I understand that.

6    Q.   Was there a rate you were using?

7    A.   The labor rate?

8    Q.   Yes.

9    A.   That was our change order labor rate.

10   Q.   Pike never accepted the claim, did they?

11   A.   No.

12   Q.   They never paid anything on it?

13   A.   No.

14   Q.   And there was a later -- there's a lot of

15   correspondence here.  I'm not going to go through the

16   review, I'll go through that with Mr. Flynn.  But if we go

17   to Exhibit 40, this is a March 4, 2011 letter from ECI.

18   Mr. Flynn signed it and then there's some attachments.

19   Are you familiar with this letter and the attachments,

20   Mr. Clauson?

21   A.   Yes.

22   Q.   The attachments, did you participate working those

23   up?

24   A.   Yes, I did.

25              MR. KAPLAN:  I'd offer this exhibit, Your Honor.

1             THE COURT:  Any objection?

2             MR. HUG:  May I voir dire just a question or

3    two?

4             THE COURT:  Certainly.

5

6                   VOIR DIRE EXAMINATION

7    BY MR. HUG:

8    Q.   Mr. Clauson, did you also assist in the preparation

9    of the actual document, the three-page letter?

10   A.   Yes, I did.

11            MR. HUG:  No objection, Your Honor.

12            THE COURT:  All right.  Plaintiff's Exhibit

13   Number 40 admitted as a full exhibit.

14

15                   DIRECT EXAMINATION (Resumed)

16   BY MR. KAPLAN:

17   Q.   Again, I'll go through the body of the letter with

18   Mr. Flynn, but in terms of the last page, at this point --

19   the last page of the letter, page 4 of Exhibit 40, the

20   overrun of hours as stated as being 7,251 hours, you have

21   a billable rate of 81.46 that you're using.  Now, those

22   figures are somewhat summarized on the next page, labor

23   hour overrun, total subcontractor labor hour overrun, and

24   you have the rate, and the next page you have a labor

25   hours report of February 25, 2011?

1   A.   Correct.

2   Q.   Now, is that just for Phase 3, that sheet?

3   A.   That's correct.

4   Q.   And where was this taken from?

5   A.   Our accounting department.

6   Q.   So that's as of 2/25/2011, that's the information you

7   have in your records?

8   A.   Yes.

9   Q.   Is that where you're getting the ECI labor hour

10   overrun of 5,218 hours?

11   A.   Yes.

12   Q.   Again, it's set up the same way as the others,

13   there's a Variance column?

14   A.   Correct.

15   Q.   Now, the next two pages, could you explain what that

16   is?  It starts with sub phase totals, I think that's a

17   typo.  And there's a bunch of numbers on them.  What is

18   that?

19   A.   Well, this was a spreadsheet that I made to identify

20   the hours that each subcontractor worked on each phase of

21   the Phase 3 project.

22   Q.   Okay.

23   A.   Each cost code.

24   Q.   What did you use as a reference point for that?

25   A.   The daily reports that Stephane Mathieu developed.

1    Q.   So he was reporting the subcontractor hours as well

2    as the ECI hours?

3    A.   Correct.

4    Q.   And is that how you came up with that 2,000 hour

5    total for the Phase 3 work for the subcontractor?

6    A.   Yes.

7    Q.   We had looked earlier at Exhibit 43 which had that

8    spreadsheet of itemizing the various subs with totals for

9    the Phase 3 hours, it has that same 2,033.  Does that

10   correlate to this chart you did in Exhibit 40?

11   A.   Yes, our accounting department used my spreadsheet to

12   develop Exhibit 43.

13   Q.   Okay.  You took 40, that was your work for the subs

14   in the Phase 3 and gave that, and accounting just came up

15   with a spreadsheet that's in 43?

16   A.   Yeah, they used the actual subcontractor that was on

17   that.

18   Q.   They listed the sub and they also included the dollar

19   amounts as well for 43?

20   A.   Correct.

21   Q.   But the man hours was from your worksheet that's

22   listed in 40?

23   A.   Yes.

24   Q.   Okay.  And as far as that labor rate is concerned, I

25   just want to give you a reference for that.

1        If we look at Exhibit 44, this has a number of

2   project change orders.  Do you have Exhibit 44 in front of

3   you?

4   A.   Yes.

5   Q.   Are these some of the change orders that were issued

6   on the project?

7   A.   Yes, these are change requests that I sent to Pike.

8   Q.   Okay.  And did these particular ones become change

9   orders?

10  A.   Yes.

11            MR. KAPLAN:  I would offer these.

12            THE COURT:  Any objection?

13            MR. HUG:  No objection, Your Honor.  Exhibit 44?

14            MR. KAPLAN:  Yes, sir.

15            THE COURT:  Plaintiff's Exhibit 44 admitted as a

16  full exhibit.

17  BY MR. KAPLAN:

18  Q.   I just would like to refer you to start of the second

19  page of this exhibit in this ECI quote for this particular

20  change is a number in the middle there's -- you know what?

21  Let me go to the next one is a better example.

22        If I go to the second one dated September 29, 2010,

23  it's about four pages in.  And the attachment there on

24  ECI's stationery, it's a spreadsheet, says labor and

25  various rates in the middle.  This would be ECI Change

1   Number 026 dated September 29, 2010.  Those labor rates

2   that are included there, where are those coming from,

3   Mr. Clauson?

4   A.   The electrician rate of 81.46 was the approved change

5   order rate for the project.

6   Q.   Okay.  So it was approved by whom?

7   A.   That was part of the contract.

8   Q.   So, in other words, when you had change orders, this

9   was the rate you were supposed to use for the

10  electricians?

11  A.   That's correct.

12  Q.   And in fact, is that the rate you used for change

13  orders for electricians?

14  A.   Yes.

15  Q.   Is that the same rate that you're using in the claim

16  as reflected in Exhibit 43, for example, the 81.46 an

17  hour?

18  A.   Yes.

19  Q.   Now, the rates in the change order that's in

20  Exhibit 44, they list foreman at $94.01 an hour,

21  electrician, 81.46.  Did you have foremen hours involved

22  in those claim hours as well?

23  A.   We did not.

24  Q.   In terms of the hour overruns that are listed in,

25  let's see, Exhibit 43, your total of 4,930 hours, are any

1   of those foremen hours?

2   A.   Some of those hours are Stephan's hours, but we

3   didn't bill them at foreman rate.

4   Q.   You didn't change your rate in your claim for foreman

5   at $94 an hour?

6   A.   No.

7   Q.   So you just used across the board the 81.46 for the

8   electrician rate?

9   A.   Correct.

10  Q.   And did you use the same rate for the subcontractor,

11  the extra subcontractor hours?

12  A.   Yes.

13  Q.   Now, for the Phase 3 work, were there any problems

14  that ECI encountered of its own doing that contributed to

15  manpower overruns?

16  A.   Although we had an issue with some exit signs that we

17  had to go back and do at a late stage.  They came in late.

18  Q.   Did that create any overruns in your bid hours versus

19  actual hours?

20  A.   Well, I would think not much.  We had to rough in the

21  box into the ceiling, so it was just a matter of waiting

22  for the fixture or the extra to come in and finish the

23  work.

24  Q.   When it came in, did you have to spend extra time

25  putting in it?

1   A.   Not really.  Extra time just getting to the location.

2   Q.   Okay.  Were there any other issues that you believe

3   caused -- that ECI was involved with that caused any of

4   these labor overruns that we're talking about here?

5   A.   I don't believe so.

6            MR. KAPLAN:  I'm all done with direct.

7            THE COURT:  Thank you, Mr. Kaplan.

8            Mr. Hug, cross-examination?

9            MR. HUG:  Good morning, Mr. Clauson.

10           May I proceed, Your Honor?

11           THE COURT:  Yes, please.

12

13                    CROSS-EXAMINATION

14   BY MR. HUG:

15   Q.   Now, I want to make sure I understand your role at

16   the project.  As I understand your direct testimony, you

17   were present at the project for the first few weeks of the

18   project on a couple of days a week for the first few weeks

19   of this project from June 28 to the first couple of weeks

20   in July; is that right?

21   A.   I was present on the project from the beginning of

22   the project in November.

23   Q.   I'm talking about Phase 3.  I'm sorry, with respect

24   to Phase 3 and prior to Phase 3, I think your testimony

25   was that you were on the job for the foremen meetings, for

1    the most part, and maybe one or two other days a week; is

2    that right?

3    A.   Sometimes I was.  Not every week.

4    Q.   I'm sorry?

5    A.   Not every week.  I wasn't there every week twice a

6    week, but yes.

7    Q.   And that continued up until some point early in

8    Phase 3; is that right?

9    A.   Probably not until July.

10   Q.   July, okay.

11   A.   Mid-July after the July meeting we started ramping

12   up.

13   Q.   And by the July meeting, July 21 meeting, were you

14   there on the project site every day?

15   A.   Not every day.

16   Q.   Okay.  About how many days?

17   A.   A portion of the time.  Like I said, three to five

18   days a week.

19   Q.   And were you there also in the evenings?

20   A.   Sometimes I would be there, come in later in the

21   afternoon and then wait for the night crew to come in,

22   walk the job with the night foreman.

23   Q.   So, your testimony, is that based upon your personal

24   observation alone about the conditions of the site?  Is it

25   based upon your personal observations alone?

1  A.   It's based upon my personal observations and our

2  daily reports.

3  Q.   Okay.  And by daily reports, what do you mean?  What

4  are daily reports?

5  A.   Our superintendent, Stephane Mathieu, would write a

6  daily report every day to outline how many men he had,

7  what the progress of the work was, what problems were

8  going on, and subcontractors that were on the project that

9  day.

10  Q.   Okay.  And do you have Exhibit 17 in front of you,

11  Plaintiff's Exhibit 17?

12  A.   Yes.

13  Q.   Okay.  Exhibit 17, is that -- what are those?

14  A.   These are the daily job reports that I was referring

15  to.

16  Q.   And Mr. Mathieu, who was the project superintendent?

17  A.   That's correct.

18  Q.   And he is in court today?

19  A.   Yes, he is.

20  Q.   Okay.  And you were in court yesterday during

21  Mr. Madore's testimony, correct?

22  A.   Correct.

23  Q.   Back to Exhibit 17.  And these reports in Exhibit 17,

24  they were filled out and given -- filled out by

25  Mr. Mathieu daily?

1   A.   That's correct.

2   Q.   And they list the number of employees that is at the

3   project?

4   A.   Yes.

5   Q.   For ECI?

6   A.   Yes.  For ECI, yes.

7   Q.   Okay.  All right.  We'll come back to that in a

8   minute.  I wanted to distinguish that between Exhibit 18

9   through 28 I think we introduced yesterday?

10  A.   Yes.

11  Q.   Remember those?  Those are, I think, called the

12  foreman's weekly labor report?

13  A.   Correct.

14  Q.   Are those completed by Mr. Mathieu as well?

15  A.   That's correct.

16  Q.   So he completes these for all of the employees on the

17  project?

18  A.   Yes.

19  Q.   Okay.  So I notice that, for example, employee name,

20  there may be -- let's take a look at Exhibit 19.  So the

21  first page of Exhibit 19 is employee's name --

22  A.   Stephane.

23  Q.   And the last name is pronounced?

24  A.   Mathieu.

25  Q.   That easy, okay.  Thank you.

1          So Mr. Mathieu, that's his name on the first page?

2    A.   That's correct.

3    Q.   The second page, we see Russ something?

4    A.   Kuczynski.

5    Q.   Does Russ fill out that report or does Mr. Mathieu

6    fill out that report?

7    A.   If you look at the bottom there, the foreman's

8    signature is Stephane.  He fills them out.

9    Q.   It's not really his signature, is it, it's typed in

10   there?

11   A.   It's typed in so he wouldn't have to sign his name on

12   every one he was doing.  He was doing 60 of them.

13   Q.   Okay.  So he did 60 of these every week and he filled

14   out the date on there, correct?

15   A.   Correct.

16   Q.   And these Exhibits 18 through 28 were important to

17   you in preparing the claim in this case, correct?

18   A.   That's correct.

19   Q.   You used these weekly foremen reports, we'll call

20   them, 18 through 28?

21   A.   These went to our accounting department.  And they

22   were punched into the accounting system.  And the hours

23   were recorded in that manner.

24   Q.   All right.

25   A.   I didn't use them directly.

1  Q.   Did you use any other reports in preparing your claim

2  to determine hours and where people were working and the

3  various cost codes?

4            THE COURT:  Any reports other than 18 to 28?

5            MR. HUG:  Correct.  I'm sorry, thank you.

6  A.   Well, we would have used the subcontractor reports as

7  well.

8  BY MR. HUG:

9  Q.   Okay.  Would you also have used the daily reports in

10 Exhibit 17?

11 A.   Well, Stephane would use those daily reports to

12 record his hours.  On a daily basis he would know where

13 his guys were and he would mark on his daily report where

14 they're working so he would know where they were working

15 each day so he could record those hours on a weekly labor

16 report.

17 Q.   I'm trying to get to, did you look at Exhibit 17, the

18 documents within Exhibit 17, for the period in question in

19 assisting you in preparing the claim that ECI has made in

20 this case?

21 A.   No.

22 Q.   No?

23 A.   Stephane went through, as I said before, and went

24 through his daily reports to make sure that there was no

25 errors on the weekly labor reports.

```
 1   Q.   I'd like you to turn to Volume 3 of ECI's exhibits,

 2   Exhibit 646.  Do you have Volume 3?

 3               MR. KAPLAN:  ECI's or Pike's?

 4               MR. HUG:  Pike is 646.

 5               MR. KAPLAN:  You said ECI.

 6               THE COURT:  Mr. Hug, that's Volume 3?

 7               MR. HUG:  Volume 3.

 8               THE COURT:  Exhibit Number 646?

 9               MR. HUG:  Yes.

10               THE COURT:  Okay.  In response to

11   interrogatories?

12               MR. HUG:  Yes.

13               MR. KAPLAN:  646 is in response to

14   interrogatories?

15               MR. HUG:  Yes.

16               MR. KAPLAN:  I have a schedule.

17               MR. HUG:  That would be 645.

18               How about 647?

19               There it is under 648.

20               MR. KAPLAN:  They're different?

21               MR. HUG:  They shouldn't be.  Maybe we gave you

22   a dummy one to play with your mind.  Certainly wasn't the

23   intent.

24               MR. KAPLAN:  So you're looking at the

25   interrogatory responses?
```

1             MR. HUG:  Yes.

2             MR. KAPLAN:  You're listing those as 646?

3             MS. VENNOS:  Yes.

4             MR. KAPLAN:  Okay.

5             MR. HUG:  Hopefully this is not an endemic

6    problem.

7             MR. KAPLAN:  I think I noted that to you,

8    revised exhibit list.  I sent you an e-mail saying you had

9    dropped something in the numbering involved.

10            MS. VENNOS:  Here's 646.

11            MR. KAPLAN:  I just want to get the index so I

12   have the numbers correct.

13            MR. HUG:  May I proceed?

14            MR. KAPLAN:  Yes.  I have no objection to 646,

15   Your Honor.

16            MR. HUG:  I didn't want to proceed until he was

17   ready.

18            THE COURT:  You're offering them?

19            MR. HUG:  Yes, I am offering it.

20            THE COURT:  Defendant's Exhibit 646 admitted as

21   a full exhibit.

22   BY MR. HUG:

23   Q.   If you turn to page 2 of Exhibit 646, you see

24   Interrogatory Number 1 and it asks who was providing

25   answers to these interrogatories or providing information

1    used in preparing answers to these interrogatories.  And

2    it says, among others -- well, it says Mr. Flynn and

3    yourself, correct?

4    A.    Correct.

5    Q.    And, in fact, you did provide information in response

6    to these interrogatories, correct?

7    A.    Yes.

8    Q.    Okay.  And to the best of your knowledge, these

9    interrogatories are true and correct, aren't they?

10   A.    Yes.

11   Q.    So I just want to turn to Interrogatory Number 5.

12         These are a little bit messed up, Your Honor.  We

13   sort of did them the old fashioned way.  Attorney Kaplan,

14   being as old as he is, he remembers the Practice Book when

15   you actually filled in the document right on the

16   interrogatory.  And so the way that he responded is if you

17   see in the previous page, the actual interrogatory is

18   there, you see "See attached."  It's technically the

19   proper way to do it.  And I'm only kidding about that.

20   But it may not appear that way with most practitioners

21   today, just for Your Honor's edification.

22         Interrogatory Number 5 appears on the prior page

23   which says:  "For each delay, interference, interruption

24   listed and described in response to Interrogatory 3,

25   provide a complete accounting of all damages incurred,

1    including the identification of the methodology employed.

2    Accounting should include, but not limited to, payments to

3    subcontractors" -- I'm not going to read the rest, it goes

4    on from there.  Do you see that?

5    A.   Yes.

6    Q.   And in response to that, you have Interrogatory

7    Number 5 and it says:  "In regard to a complete accounting

8    of all damages incurred, it is impossible to break down

9    ECI's damages and allocate them for each delay,

10   interference or interruption listed."  Is that correct?

11   A.   That's what it says, yes.

12   Q.   That's a true statement, too, isn't it?

13   A.   Yes.

14   Q.   The next sentence:  "The Phase 3 delay and

15   interruptions occurred from June through November 2010 and

16   were overlapping and cumulative in their effect."

17        You're claiming your hours are only for Phase 3 which

18   was primarily in July and August, correct?

19   A.   Phase 3 started in June.

20   Q.   Excuse me.  Right.  It started late June?

21   A.   And ended in September.

22   Q.   Early September.  But the primary hours were incurred

23   in July and August, correct?

24   A.   And there were hours afterwards, too.

25   Q.   There were some hours in September and there were

 1   some hours between April and June 28, too, correct?

 2   A.   Probably hours in November, too.

 3   Q.   Okay.   There were hours in November?

 4   A.   Yeah.   We had not finished the work in the art area

 5   or the locker area in September.

 6   Q.   Are hours in November included in your claim?

 7   A.   I'd have to look at the -- every sheet to find out.

 8   Q.   You would agree --

 9   A.   All the hours that were attributed to Phase 3, all

10   the overrun hours are part of the Phase 3 claim.

11   Q.   Okay.   The next sentence says:   "The following

12   records for work performed from late April through

13   November 2010 reflect these damages."

14       "Certified payroll reports."   Which I don't believe

15   have been introduced yet as records.

16       "Job cost reports."   I think those have been

17   introduced.   You've seen some of those documents?

18   A.   Yes.

19   Q.   Okay.

20       "Payment requisitions."   I think they were referenced

21   when you were going over your schedule of values.

22   Schedule of values are used in the payment requisitions?

23   A.   Correct.

24   Q.   By the way, the way -- just to divert a second.   The

25   way the applications for payment were done in this case is

```
 1   that -- correct me if I'm wrong, but every time an

 2   application for payment comes into place, you -- I think

 3   it's you -- go out and look at the work and figure out

 4   what the percentage of completeness is in various line

 5   items, and then you put the percentage completion in.  And

 6   then you get whatever additional completion from the last

 7   requisition you got to now the current completion rate,

 8   you get that in terms of a line item amount for payment,

 9   correct?

10   A.    Dollar value, yes.

11   Q.    That's right.  It will probably work better with an

12   exhibit later on, and I'll go over that in a little bit.

13         Part of that is you have to certify to the owner that

14   that's the percentage that is complete, correct?

15   A.    Correct.

16   Q.    And you did that, didn't you?

17   A.    Yes.

18   Q.    You personally looked out there and when you said

19   something was 10 percent complete, it was 10 percent

20   complete, give or take a reasonable amount.  It's not

21   going to be 80 percent complete on your application for

22   payment and, you know, in reality only 30 percent

23   complete, right, you wouldn't do that?

24   A.    Sometimes you try to overbill a little bit.

25   Q.    Well, do you really want to say that?  You don't --
```

1   you don't -- sir, I don't want to say it.  You don't

2   fraudulently bill, do you?

3   A.   No, I'm saying sometimes you overbill a little bit.

4   It's hard to figure out exactly how much material for each

5   line item is on the job site or how much labor.  There's

6   probably 300 line items.

7   Q.   Wow.  I'd have to say I didn't expect that answer.

8        So you submit fraudulent applications for payment?

9   A.   I'm not saying it's fraudulent.  I'm saying it's hard

10  to make an exact accounting of every line item.

11  Q.   I understand that.  Instead of being 30 percent, it

12  might be 27 percent or 34 percent, but my example was

13  80 percent.  You don't say it's 80 percent when it's only

14  30 percent, do you?

15  A.   No.

16  Q.   Because that would be fraud, wouldn't it?

17  A.   Yes.

18  Q.   And you don't do that, do you?

19  A.   No.

20  Q.   So when I look at the application for payment, I can

21  rely upon that as a pretty accurate statement of the

22  percentage completion, given a measure of error that any

23  human being would make in those circumstances, right?

24  A.   I guess.

25  Q.   And somebody with 37 years of experience of doing

1    this kind of thing, I bet you're pretty accurate?

2    A.    I guess.

3    Q.    So it lists, among other things, change orders.  All

4    right.  That you looked at change orders.  And we've seen

5    some information about change orders and change order

6    proposals.  You were shown at the end of it.  It says

7    subcontractor and vendor payment records.  Think those are

8    the subcontractor invoices you showed us a few minutes

9    ago?

10   A.    Yes.

11   Q.    That went into your calculation of your damages in

12   this case?

13   A.    Correct.

14   Q.    And it says ECI daily job reports.

15   A.    Correct.

16   Q.    Okay.  And that's Exhibit 17, correct?

17   A.    If you say so.

18   Q.    Stephane Mathieu's daily job reports?

19   A.    Yeah, 17.

20   Q.    They also factored into your calculation of damages?

21   A.    Well, they were used -- yeah, they were used as part

22   of the accounting of hours by Stephane.

23   Q.    Okay.  So you have the weekly foreman reports as one

24   set of documents.  You have the daily reports as another

25   set of document.  You used both sets of documents in

1  formulating the damages for ECI in this case?

2  A.   Yes.

3  Q.   Okay.  Now, were you in fear of your job during the

4  course of this project?

5  A.   No.

6  Q.   You're well thought of by ECI management?

7  A.   Yes.

8  Q.   Your 37 years as an employee, you must have been

9  doing something right all these years?

10  A.   That's correct.

11  Q.   And a project manager in a company is -- I've equated

12  it as a princely position to some degree, would you agree

13  with me?

14  A.   I would not.

15  Q.   You're running the project, aren't you?

16  A.   I am.

17  Q.   Sort of the buck stops there?

18  A.   That's correct.

19  Q.   And when things go right, you get the credit; when

20  things don't go right, you get harmed?  Or not?

21  A.   Okay.

22  Q.   I'm asking you if you agree with that?

23  A.   Sometimes.

24  Q.   But after 37 years, you've earned your stripes and

25  you're well thought of and trusted, correct?

1    A.    True.

2    Q.    At this point in time you can kind of tell it like it

3    is, can't you?

4    A.    Yes.

5    Q.    Let's turn to the schedule for a moment.

6          Mr. Madore said -- you were here for his testimony, I

7    take it?

8    A.    Yes.

9    Q.    Now, let me ask directly to you:  This was a

10   seven-day work week schedule, wasn't it?

11   A.    I don't know if the schedule identified it as seven

12   days.

13   Q.    Do you remember yesterday when I showed Mr. Madore

14   Exhibit 504, 503, the addendum?  Why don't you pull that

15   out.

16   A.    I don't have it.

17   Q.    That's right, you don't have the exhibits up there.

18         Exhibit 503.  You may recall yesterday I went over

19   Addendum Number 1, which has been admitted as an exhibit

20   in the case.

21         By the way, did I move for admission of Exhibit 17,

22   the daily reports?

23              MR. KAPLAN:  Exhibit 17, they were in through

24   me.

25              MR. HUG:  Okay.  I didn't know they were in.

1          THE COURT:  I believe that they're in.

2          MS. VENNOS:  They're not in.

3          MR. HUG:  I didn't think they were in.  If they

4  aren't in, I'd like to move their admission at this point.

5          MR. KAPLAN:  I'm sorry, no objection.  I thought

6  they had been admitted because we had referred to them.

7  Fine.

8          THE COURT:  Plaintiff's Exhibit 17 admitted

9  without objection as a full exhibit.

10  BY MR. HUG:

11  Q.   Now, turning to Exhibit 503, on the second page

12  you'll see Item 021 construction schedule?

13  A.   Yes.

14  Q.   You see the answer to that, third sentence says

15  "Phase 3 is a seven-day schedule.  Schedule activities may

16  require two shifts to complete per schedule."  Do you see

17  that?

18  A.   I do.

19  Q.   It doesn't say it's at the option of the

20  subcontractor, does it?

21  A.   Well, it doesn't say you have to work seven days.

22  Says it's a seven-day schedule.

23  Q.   So you're expected, when you're doing the work, to

24  work seven days?

25  A.   If you need to.

```
 1   Q.   It doesn't say if you need to, does it?

 2   A.   It doesn't say you have to, either.  It says it's a

 3   seven-day schedule.

 4   Q.   And that imparts to you that there's some option?

 5   A.   Yes.

 6   Q.   Okay.  In fact, however, though, you did work at

 7   least six days a week and most weeks seven days a week,

 8   correct?

 9   A.   Yes.

10   Q.   And that would be true pretty much right from the

11   beginning; isn't that right?

12               THE COURT:  The beginning of --

13               MR. HUG:  Phase 3, I'm sorry.  Phase 3.

14   A.   I don't recall exactly when we started working

15   overtime.

16   BY MR. HUG:

17   Q.   And Exhibit 503 says you might have to work a second

18   shift as well, do you see that?

19   A.   Yes.

20   Q.   And you knew going into this that Phase 3 would be

21   worked at the same time in conjunction with other phases;

22   is that right?

23   A.   Correct.

24   Q.   Now, in fact, isn't it true, sir, that you considered

25   this project to be quite challenging prior to actually
```

1   starting any of the work on the job; isn't that right?

2   A.   What do you mean by challenging?

3   Q.   Let's turn to Exhibit 530.  Defendant's Exhibit 530.

4        Do you recognize Exhibit 530?

5   A.   Yes.

6   Q.   And what is it?

7   A.   This is a sheet that we get from our Conest

8   program -- not Conest program, but our NECA labor rate

9   program to identify what labor level we should be pricing

10  our change orders at.

11  Q.   All right.  So it's done before any change orders

12  happen, though, correct?

13  A.   I didn't do that, by the way.

14  Q.   Who did it?

15  A.   Adam Heon, my assistant.

16  Q.   Did he do it under your direction?

17  A.   I asked him to fill it out to see where our score

18  landed for change orders, yes.

19  Q.   Did you agree with the score?

20  A.   Yes.

21  Q.   I just want to go over this.

22       Judge, are you there?

23            THE COURT:  At 530?  Is this in?

24            MR. HUG:  I'd like to move for its admission.

25            THE COURT:  Any objection?

```
 1            MR. KAPLAN:  No, sir.

 2            THE COURT:  Defendant's Exhibit 530, full

 3   exhibit.

 4   BY MR. HUG:

 5   Q.   So I just want to understand that there are a couple

 6   of things here.  First of all, total score is 65.  And

 7   there are six columns, five of which have data in them.

 8   This is after the heading Situation, normal, difficult,

 9   very difficult, grade, then notes.  See that?

10   A.   Yes.

11   Q.   For each of these items you put a grade in.  Very

12   difficult is 3 points, difficult is 2 points, and normal

13   is 1 point.  See that?

14   A.   I do.

15   Q.   So you look at the hours worked, this is a very

16   difficult project.

17            MR. KAPLAN:  Objection, that's not what it says.

18   BY MR. HUG:

19   Q.   What does it say, Mr. Clauson?

20            MR. KAPLAN:  I'm sorry, withdraw that objection.

21   I was looking at the summary.  I'm sorry.  Withdrawn.

22            MR. HUG:  So I'm right?

23            MR. KAPLAN:  Withdrawn.

24            THE COURT:  Mr. Hug, could you help me?  I'm

25   sorry if I missed this.  What's the purpose of this
```

1   document?  What is it?

2   BY MR. HUG:

3   Q.   Could you explain the purpose this document was

4   prepared?

5           MR. HUG:  I think you're asking the purpose of

6   them preparing it or why I'm offering it?

7           THE COURT:  Why the witness has prepared this

8   document.  What's its function?

9           THE WITNESS:  This is just to identify what

10  labor level we should use on change orders.  So the higher

11  the score, the higher the labor level on a change order.

12          THE COURT:  Okay.

13  BY MR. HUG:

14  Q.   But you're assessing the project for that purpose,

15  correct?

16  A.   At the beginning of the job.  It's primarily a guess.

17  A lot of this stuff you can't anticipate.  This was done

18  back in probably November 2010.

19  Q.   Okay.  So you're assessing back --

20  A.   2009, really.

21  Q.   Prior to getting on the job?

22  A.   Correct.

23  Q.   For hours work, you evaluate or your office evaluated

24  this as a very difficult job, correct?

25  A.   Correct.

1   Q.   And for crew density, you had extreme, correct?

2   A.   Correct.

3   Q.   And crew density is what?

4   A.   How many people would be working in that area.

5   Q.   So it would be very crowded?

6   A.   Correct.

7   Q.   And you gave it the highest score or worst score --

8   A.   I didn't do this report.

9   Q.   But you did review it and you do believe it's

10  correct, don't you?

11  A.   I reviewed it, yes.

12  Q.   You do believe it's correct, don't you?

13  A.   Yes.

14  Q.   And take a look at job duration.  Very difficult,

15  which means shorter in this context, that's for the whole

16  job, correct?

17  A.   Correct.

18  Q.   Systems, complex.  You rate that as complex, correct?

19  A.   Correct.

20  Q.   And there's others in here that you rate as well, and

21  I won't go over all of them.  I'm hitting some of the

22  highlights that fit for my position.

23       Job schedule, you say normal.  In your view, this was

24  a normal schedule job?

25  A.   Correct.

```
 1   Q.   And that is looking at the entire job, correct?  So
 2   that includes Phase 3?
 3   A.   Yes.
 4   Q.   And Phase 3, you would agree with me, was not a
 5   normal job?
 6   A.   Well, yeah, it was a normal summer slammer job.
 7   Q.   A normal summer slammer job?
 8   A.   Yeah.
 9   Q.   A normal summer slammer job is a little bit
10   different, as the name would apply, a little different
11   than, say, Phase 2 work?
12   A.   A portion of Phase 2 was during that summer period,
13   too.  The entire addition, it was part of it, too.
14   Q.   As I understand you correctly, it was business as
15   usual for the summer slammer period?
16   A.   Yes.
17   Q.   Now, you testified this morning concerning the
18   schedules and schedule updates.  You attended the foremen
19   meetings, correct?
20   A.   Not all of them, but yes, I did attend.
21   Q.   And I thought I heard you testify that you didn't
22   receive updated schedules as a foreman?
23   A.   Correct.
24   Q.   Were updated schedules handed out and available at
25   the foremen meetings?
```

1    A.    I don't believe so.  I believe they would mark up on

2    a whiteboard a period of work that we were going to do for

3    the next week or two.  And they would record those on the

4    minutes.

5    Q.    Pike was required to give you updated schedules,

6    wasn't it?

7    A.    Yes.

8    Q.    And in fact, you do know that they did update the

9    schedule, right?

10   A.    I don't know that they did.  I assume they did.

11   Q.    Well, I thought you were involved in some of the

12   preparation of the claim here and became aware that Pike

13   in fact did update the schedules weekly; you're not aware

14   of that?

15   A.    Well, I wasn't involved in that portion of the claim,

16   no.

17   Q.    So it comes as a surprise to you that Pike actually

18   did update -- if it shows to be the case, it would be a

19   surprise to you that Pike updated the schedules weekly?

20   A.    They didn't give us a weekly schedule at the meeting.

21   Q.    Whether they did or didn't, your testimony is you

22   didn't get the weekly updated schedule?

23   A.    Correct.

24   Q.    You did get some schedules though.  You got what you

25   said on the whiteboard?

1   A.   Yes.

2   Q.   Did you get anything else?

3   A.   I don't recall.

4   Q.   Do you remember look-ahead schedules?

5   A.   Well, that's what I was just referring to, whiteboard

6   was like a two-week look-ahead.

7   Q.   Did you get anything from them in writing for a

8   look-ahead schedule?

9   A.   They would put that on the back of the minutes, yes.

10  Q.   So you got something in writing, what's called a

11  look-ahead schedule for the next few weeks?

12  A.   Correct.

13  Q.   And the look-ahead schedule is a composite of the

14  actual schedule that is showing the critical activities

15  that need to be done over a period of time, say three

16  weeks or two weeks, however long it shows, correct?

17  A.   I don't know if their look-aheads came directly from

18  the schedule.  We discussed what we're doing during the

19  job meetings.

20  Q.   So how were you able to manage without an updated

21  schedule?

22  A.   It was pretty difficult.

23  Q.   Okay.  I would venture to say it would be almost

24  impossible, given the number of activities you had going

25  on?

1    A.   Well, you're talking about me personally being able

2    to manage my work?

3    Q.   Anybody.

4    A.   I knew what I was doing, and I knew where I was

5    going.  I was following everybody else.

6    Q.   So you didn't need the schedules?

7    A.   I didn't need the schedule -- no, I didn't need a

8    schedule.  Not to figure out what I had to do.

9    Q.   Okay.  So was Pike not providing -- if it in fact

10   didn't provide you with a schedule, was that a problem for

11   you at all?

12   A.   Well, the problem was they didn't follow the

13   schedule.

14   Q.   How do you know if you didn't get one?

15   A.   They didn't follow the original schedule is what we

16   were supposed to be following, the contract schedule.

17   Q.   But you know the schedule is updated periodically.

18   You didn't know whether -- how do you know they weren't

19   following their updated schedule?

20   A.   I don't know.

21   Q.   So you don't know.  They might have been following

22   it, you just didn't get the schedule?

23        I'm trying to understand, sir, you were following the

24   original schedule during the job and thinking that was the

25   perfect schedule at that point in time notwithstanding all

1    the fact, as you testified, all this other stuff is going

2    on.  You didn't get an update?

3               MR. KAPLAN:  Objection.  First of all, there's

4    no question embedded in there.  Second of all, it's a

5    total mischaracterization of the witness's testimony.

6               MR. HUG:  Well, there was a question at the end.

7               THE COURT:  Let's hear the question at the end.

8               MR. HUG:  Okay.

9    BY MR. HUG:

10   Q.   Let me go back at it this way.  Let me have you

11   testify, sir, in terms of how can you possibly -- how did

12   you possibly schedule this project?  ECI's working this

13   project without updated schedules from Pike?

14   A.   I followed the course of the project.  As it moved

15   along, I scheduled my work as the project moves along.  If

16   there was areas available, we would work.

17   Q.   So you just did that from eyeballing what was going

18   on and from the whiteboard that was shown in the various

19   weekly meetings?

20   A.   Correct.

21   Q.   You didn't complain to Pike that they weren't

22   providing you with updated schedules?

23   A.   No.

24   Q.   Because you didn't complain internally in your job

25   performance reports which Attorney Kaplan went over with

1   you.  I don't recall seeing, and perhaps you do, I don't

2   recall seeing where you were complaining internally that

3   it was difficult to review because you didn't have any

4   schedules.  Do you recall any such complaints, internal

5   complaint?

6   A.   No.

7   Q.   So you didn't complain to Pike and you didn't advise

8   your management that you were having difficulties because

9   of any lack of schedule; is that right?

10  A.   That's correct.

11  Q.   So when you say Pike was off schedule on all these

12  items, you made that statement without ever having looked

13  at an updated schedule from Pike?

14  A.   Oh, I was looking at the original schedule.

15  Q.   I understand that.  Did you look at any updated

16  schedules from Pike?

17  A.   No.

18  Q.   And when you looked at -- when you commented on

19  direct examination that even after you were told on the

20  whiteboard what to do, I think your testimony was Pike

21  didn't even follow that; is that right?

22  A.   That's correct.

23  Q.   But you don't have anything in writing that shows

24  what it is that Pike was telling you to do?  Or if you do,

25  let me know.

1   A.   Just what was on the whiteboard and what was listed

2   on the daily report -- weekly reports that Pike provided.

3   Q.   Isn't it a fact, sir, that schedule updates were

4   provided to you on a weekly basis and ECI, like many other

5   subcontractors, elected not to pick them up?

6   A.   I don't believe so.

7   Q.   Let's move on to another topic here.  I think I

8   understood from somewhere, maybe not this morning's

9   testimony, that you and Mr. Mathieu got together and

10  planned out how you were going to do the work, is that

11  right, for the whole project?  This is before the project

12  began.

13  A.   We planned a lot of the work in the office before

14  Stephane was even selected to be the foreman.

15  Q.   And when you were planning that work, you needed to

16  figure out how much manpower you would need, correct?

17  A.   Correct.

18  Q.   And you need to know what manpower you needed at

19  particular time during the course of the project,

20  including but not limited to Phase 3, correct?

21  A.   As the project went along, I would increase manpower

22  as needed.  I couldn't anticipate how many men I would

23  need on a certain week before the job started, no.

24  Q.   Isn't it true that in doing your planning, you

25  provided -- you anticipate when you're planning your

1    manpower and planning out what you're going to do and how

2    you're going to get the job done, you in fact understand

3    there's going to be some minor interruption in the work

4    from time to time; isn't that right?

5    A.   Yes.

6    Q.   It happens on virtually every project, correct?

7    A.   Correct.

8    Q.   You'd agree with me that schedules should be

9    followed, but there are times when work shifts a little

10   bit here and there, correct?

11   A.   Correct.

12   Q.   That's not what happened, I think, according to your

13   testimony in this case; is that right?

14   A.   Yeah, it shifted a lot.

15   Q.   It shifted so much that ECI expended almost double

16   the man hours than it anticipated, correct?

17   A.   Correct.

18   Q.   So the project must have been, I think your term was

19   a zoo?

20   A.   That's correct.

21   Q.   And it was a complete mess?

22   A.   That's correct.

23   Q.   Contractors and subcontractors must have been flying

24   all over the place, right?

25   A.   There was a lot of people there.

1   Q.   And you weren't the only one that was impacted, were

2   you?

3   A.   I don't know.

4   Q.   Well, before some of your work had to go in, other

5   people's work had to be done, right?

6   A.   That's correct.

7   Q.   So the demolition guy didn't just demolish parts of

8   the building and only ECI was affected, there was other

9   trades that were affected, correct?

10  A.   I would assume so.

11  Q.   Like the CMU wall guy, sometimes the drywall guy,

12  plumber, HVAC contractor, all of them must have been

13  impacted by these terrible scheduling problems created by

14  Pike's various things it did or its subcontractors did,

15  right?

16  A.   I don't know.

17  Q.   What do you mean you don't know?  You were there.

18  A.   I don't know if they were impacted or not.

19  Q.   What's that?

20  A.   I don't know if they were impacted.  I know I was

21  impacted.

22  Q.   You were late sometimes because people before you

23  were late, right?

24  A.   Right.

25  Q.   And people before them were late, weren't they?

1    A.    I don't know that it impacted their work.

2    Q.    So the demolition going in didn't impact anybody else

3    but ECI, the demolition being late?

4    A.    I don't know if it impacted their work.

5    Q.    And the steel contractor, the steel being put in

6    late, did it impact anybody else?

7    A.    I would assume it impacted the mechanical contractor.

8    Q.    The tin knockers they call them?

9    A.    Correct.

10   Q.    And the plumber as well?

11   A.    I don't know.

12   Q.    Before -- and Your Honor may still have Exhibit 44

13   open.  So I'm going to -- if you do, I'm going to take an

14   opportunity to just go one more exhibit because it's right

15   here and it's easy.

16         I mentioned applications for payment.  Exhibit 45,

17   46, 47, 48 are all applications for payment.  Do you see

18   that, Mr. Clauson?

19   A.    Yes.

20   Q.    Okay.  And were you involved in some way in preparing

21   the data that went into these applications for payment?

22   A.    Yes.

23              MR. HUG:  Your Honor, I move that these be made

24   a full exhibit.

25              THE COURT:  45 through 48?

1          MR. HUG:  Yes.

2          MR. KAPLAN:  No problem.

3          THE COURT:  Okay.  They're admitted, 45, 46, 47,

4    48, full exhibits.

5    BY MR. HUG:

6    Q.   And Mr. Clauson, I'm not going to go over these in

7    detail, Exhibit 45, the very first page, I was asking

8    about -- I asked you questions about certifications that

9    these are correct and whatnot.  That actually appears in

10   the first page, contractor's certification, it says "The

11   contract signature hereby certificates that, to the best

12   of their knowledge, the document accurately reflects the

13   work contemplated in this application for payment.  The

14   contractor also certifies that all payments have been made

15   for work on previous applications for payment and also

16   that current payment is due."  And that's signed by

17   Mr. Bona in this particular case, correct?

18   A.   Correct.

19   Q.   That's the certification that I was referring to

20   before.  Was that your understanding at the time as well?

21   A.   Yes.

22   Q.   Okay.  I'd like to jump to another topic.  The

23   July 21 meeting, you've testified a little bit on direct

24   examination about that July 21 meeting.

25          Now, I want to -- I think it could be helpful to do a

1    little timeline that brings us up to this July 21 meeting.

2        Your Honor, I hope it's of assistance to the Court.

3        Phase 3 starts late June, June 28 or so, in that

4    area, formally, correct?

5    A.   Yes.

6    Q.   Prior to that date, between April and June 28, ECI

7    had been performing some work during the night shift to

8    get ahead of its work and whatnot; is that correct?

9    A.   That's correct.

10   Q.   In fact, ECI specifically requested that it could do

11   that because it didn't want to lay off employees during

12   that slow period of time?

13   A.   That's not correct.

14   Q.   That's not correct?

15   A.   We had talked on the job site about the availability

16   of taking some of the corner ceilings down so we could get

17   a jump on our feeder work.  Not only us but the mechanical

18   and plumbing contractor.

19   Q.   And that had nothing to do with you wanting to keep

20   employees employed?

21   A.   Not at all.

22   Q.   All right.  Well, so be it.

23       I'll put April here to June 28.  So ECI is working --

24   that's -- I think school let out a week earlier, but ECI

25   is working night shift?

1    A.    Not the whole time.  We had started some feeders in

2    the Phase 4 area, but then we found out that the

3    coordination drawings weren't approved, so we had to stop.

4    And then we were able to get back in and do some more

5    night work with some feeder conduits.

6    Q.    So June 28, that's pretty much the contract formal

7    start of Phase 3, correct?

8    A.    Correct.

9    Q.    And I think you immediately noticed that in these

10   early days by the 10th of July, or maybe it's earlier, you

11   noticed the demo was behind?

12   A.    Yes.

13   Q.    So if I put -- when did you first notice the demo was

14   behind?

15   A.    I don't remember.

16   Q.    At least by July 10?

17   A.    Yes.

18   Q.    So we'll just say by July 10.  And it's not just

19   behind in one area, according to your testimony.  It's a

20   problem in many areas and causing problems with a lot of

21   portions of the job, correct?

22   A.    Correct.

23   Q.    And that's impacting ECI, correct?

24   A.    Correct.

25   Q.    And we'll get into this later, but that impact is

1   causing you to add manpower to the job?

2   A.   Not at that time, no.

3   Q.   Okay.  So July 10 demos behind, you know it.  Steel,

4   when did you first learn that steel was behind?

5   A.   Very early.  I don't know exactly when.

6   Q.   By July 10?

7   A.   Before then.

8   Q.   Okay.  July 5?  Just say between July 1st and July

9   10?

10   A.   Okay.

11   Q.   So a little out of order here, but July 1 to 10,

12   steel behind.

13        So by July 10, you know that demo is impact -- is

14   going to impact your work, is impacting your work, as I

15   understand it, and steel is going to impact your work?

16   You know that, correct?

17   A.   Correct.

18   Q.   So then we have -- I think we have the July 21 --

19   well, actually, I forgot.

20        I want you to turn to Exhibit 17.  All right.

21   July 17 are the daily reports.  And I want you -- the

22   daily reports have listed in them the date up in the upper

23   left-hand corner, and I want you to go to July 7.

24   A.   July 7?

25   Q.   Yes.

1           MR. HUG:  Has Your Honor found it?

2           THE COURT:  I have, thank you.

3    BY MR. HUG:

4    Q.   Are you there, Mr. Clauson?

5    A.   Yes.

6    Q.   Okay, briefly just go over how to read this.  Upper

7    left-hand corner has the date.  And often it will have the

8    day of the week written down in front of it.  I take it

9    the project number for the Kelly Middle School is 341 and

10   has the project name and the report number, all that's

11   pretty standard, correct?

12   A.   Correct.

13   Q.   Underneath that it lists the employees that you had

14   on the job that date, correct?

15   A.   Correct.

16   Q.   And those were ECI employees that you had on the job?

17   A.   Yes.

18   Q.   It doesn't -- you don't list subcontractor employees

19   in this report, do you?

20   A.   Yes, I believe we do.

21   Q.   So you actually list them on the report here?

22   A.   Yes.

23   Q.   Okay.  We'll come back to that one.

24        That's how you read this report, you have the list of

25   employees.  And if we went back to 76, we would find a

```
 1   list of names, I think.

 2        Yeah.  See a list of names of 14 different employees

 3   and even in that case they had the parentheses of A for

 4   apprentice, correct?

 5   A.   Correct.

 6   Q.   Then underneath that you have a section called

 7   special equipment.  But as I understand the way ECI filled

 8   these reports out is they pretty much wrote in comments as

 9   needed from the list of names down, correct?

10   A.   I'm not sure I understand what you're saying.

11   Q.   In other words, special equipment isn't necessarily

12   always about special equipment, it could be about

13   something else?

14   A.   Well, he should have listed his remarks down on the

15   Remarks section.

16   Q.   Okay.  But often there are other things that -- well,

17   let's go back.

18        Special equipment here.  In Special Equipment it says

19   "Cliff and I walked job site.  We agreed to me adding 10

20   more guys ASAP once demo is completed after this week."

21   Correct?

22   A.   Correct.

23   Q.   So on 76 your project superintendent tells you we

24   don't have enough manpower on site, we need more manpower?

25             THE COURT:  Do you mean 77?
```

```
 1            MR. HUG:  Yes, 77.

 2   BY MR. HUG:

 3   Q.   Is that right, Mr. Clauson?

 4   A.   That's correct.

 5   Q.   That's about nine days into the formal start of the

 6   project, your project superintendent is saying we need

 7   more manpower.  Okay.  So I suspect you would say that you

 8   needed more manpower because things were behind schedule

 9   such as the steel and the demo and perhaps other things,

10   correct?

11   A.   Well, I don't remember exactly where we were going to

12   apply the manpower.  We were working other areas of the

13   building.  We were working in the auditorium and we had a

14   Phase 2 area.  And we might have been working on the site

15   at that time as well.

16   Q.   Okay.

17   A.   As well as Phase 3.  So we were working in multiple

18   phases of the project.

19   Q.   Okay.  And that continued throughout July and August,

20   correct?

21   A.   At some point the auditorium section was taken away.

22   Q.   So your super asked for more men on July 7 for some

23   reason?

24   A.   I don't recall where we were going to apply these

25   men.
```

1   Q.   So then we have the July 21 meeting.

2        Before we get to the July 21 meeting, I thought you

3   mentioned on direct examination that you invited Bill

4   Flynn out to the project because -- and this isn't

5   something you normally do on every job, but when you see a

6   problem happening, you call up Mr. Flynn and say, "You'd

7   better come out and take a look and let's talk"?

8   A.   Yes.

9   Q.   That's what happened.  I think you said that happened

10  about the second week of July?

11  A.   Somewhere around this.

12  Q.   So again, in the July 10, 11, 12 range?

13  A.   Somewhere around there, yeah.

14  Q.   So I'll put July 10.

15       And you and Mr. Flynn come out to the site and, I

16  take it, you walk the site?

17  A.   Yes.

18  Q.   And you advised him that the demo was behind what you

19  anticipated?

20  A.   Correct.

21  Q.   And the steel was behind what you anticipated,

22  correct?

23  A.   Correct.

24  Q.   And that there were other problems.  Do you remember

25  what those were, if any?

1    A.    Primarily masonry.

2    Q.    Masonry, okay.

3          So that brings us to the July 21 meeting, I think.  I

4    don't think I remember anything else.  July 21, who calls

5    that meeting, by the way?

6    A.    I believe I do.

7    Q.    And the purpose of that meeting is to discuss the

8    problems that ECI was having on getting the work done in a

9    timely fashion?

10   A.    Correct.

11   Q.    And at that meeting -- at the time of that meeting,

12   it was your position that you needed four weeks more time

13   to complete the project, correct?

14   A.    Correct.

15   Q.    You were in approximately the third week of the

16   project and you needed four more weeks to complete it?

17   A.    Correct.

18   Q.    All right.  And at that particular point in time I

19   think you testified you knew that the demolition -- your

20   position was that the demolition was behind, correct?

21   A.    That's correct.

22   Q.    The steel was behind, correct?

23   A.    The steel wasn't there.

24   Q.    All right.  I think you testified as to other issues,

25   the masonry, the electric rooms I think you mentioned were

1    an issue?

2    A.    There was no electrical rooms.  Masonry was behind,

3    so there was no electrical rooms.  We had no steel to

4    finish.

5    Q.    So you were going to be affected, that was your

6    position.  You were going to be impacted, I think the word

7    is, in some way, shape or form?

8    A.    Correct.

9    Q.    And I think you testified that you advised Pike that

10   you needed more time but Pike refused, correct?

11   A.    Correct.

12   Q.    But of course that didn't come as any big surprise to

13   you, did it, since you had been informed all along that it

14   was a summer slammer, correct?

15   A.    They had said that many times, yes.

16   Q.    And that this project needed to open and be completed

17   in all material parts for school to open in early

18   September, correct?

19   A.    Correct.

20   Q.    So Pike wasn't being a jerk by saying no, was it?

21   A.    Were they being a jerk?

22   Q.    Yeah.  That's the way the project was done out,

23   that's the way it was scheduled, right?

24   A.    That's the way it was scheduled, but no one followed

25   the schedule.

 1   Q.   The schedules that you never actually received?

 2   A.   The contract schedule.

 3   Q.   But the updated schedules you never received.

 4        In terms of the -- in terms of the -- I lost my train

 5   of thought for a second there.

 6        So you told Pike that you needed more time.  You knew

 7   Pike said no and you knew that this was a summer slammer.

 8   Did you also know or have an appreciation after 37 years

 9   that Pike was just the construction manager, that it

10   needed to answer to the owner, the City of Norwich?

11   A.   Yeah.

12   Q.   Okay.  In fact, Pike just couldn't unilaterally

13   change your schedule, could it?  It would have to get

14   permission from the owner to do any of these remedies that

15   might have existed, such as adding -- I think you

16   mentioned adding modular classrooms, things like that,

17   correct?

18   A.   Correct.

19   Q.   All right.  And so Pike wasn't in any sort of

20   position to do that without further consultation with the

21   owner, correct?

22   A.   Correct.

23   Q.   Was the owner's representative at that meeting?

24   A.   No.

25   Q.   Do you know who Gary Schnip is?

```
 1   A.   Yes.

 2   Q.   And he's the owner's representative, correct?

 3   A.   Yes.

 4   Q.   That means he represented the City of Norwich on

 5   various project issues, correct?

 6   A.   Correct.

 7   Q.   But he wasn't there at that meeting?

 8   A.   No.

 9   Q.   So I think your testimony is that someone at Pike

10   told ECI to add manpower, and that someone from ECI

11   advised Pike that it will cost them more money; is that

12   right?

13   A.   Well, Bill Flynn told him that we would add more

14   manpower and if it cost us more money, that we would be

15   submitting a claim.  Not in those words, but that's

16   basically what he was saying.

17   Q.   And you don't recall what Pike's reply was, do you?

18   A.   No.

19   Q.   And I think you testified that whatever Pike's reply

20   was, you went ahead and added manpower?

21   A.   We added manpower at their direction, yes.

22   Q.   To quickly summarize, at the July 21 meeting you know

23   you're behind and you know it's going to take -- you've

24   already added manpower from Mr. Mathieu's July 7 comments,

25   correct?
```

```
 1   A.   I don't know if we actually added manpower right

 2   after that or not.

 3   Q.   Okay.  I think there's an exhibit to that effect.

 4        Exhibit 30.

 5   A.   This was just for the Phase 3 work.  This wasn't for

 6   the whole project.

 7   Q.   But I want you to take a look at the actual manpower

 8   from 6/27 to 7/3, the actual manpower was 12, correct?

 9   A.   Correct.

10   Q.   And for the next week, 7/4 to 7/10 in which July 7

11   falls within, you had 14 men on the job?

12   A.   Fourteen men working in Phase 3.

13   Q.   Fourteen men working in Phase 3.

14        So on 7/7 Mr. Mathieu says he needs more people to

15   work, 10 more guys ASAP once demo is completed.  Demo,

16   that's the demo in Phase 3, isn't it?

17   A.   Correct.

18   Q.   After this week.  And that was on a Wednesday.  So

19   then we see on 7/11 to 7/17 you see your actual manpower

20   jump up to 21.  Does that help refresh your recollection

21   that the manpower was increased for Phase 3?

22   A.   Yes.

23   Q.   So you knew on July 21 that -- you knew on July 21

24   that not only did you have the demo issues, but that you

25   were increasing your manpower by July 21 even before
```

1    talking to Pike, correct?

2    A.    Correct.

3    Q.    And that Pike told you they weren't going to give you

4    an extension of time.  And you don't know what Pike's

5    response was, do you?

6    A.    No.

7    Q.    So we'll hear testimony about that in a little bit.

8          All right.  So now we jump to -- I just want to make

9    sure I get the right exhibit.

10         Exhibit 35.  Job performance review forms.  Are you

11   there?

12   A.    I'm there.

13   Q.    And this is the job performance review form that we

14   have blown up right here.

15         So by July 21, you know Pike, according to your

16   testimony, has caused all these problems, steel, demo, I

17   forgot to mention mason, put that in here too, not

18   providing you with updated schedules, not managing the

19   project very well.  And then you come to 8/13 and you have

20   the negative gross margin of $711,000 as of July 31, 2010.

21   But instead of blaming that on Pike, which you knew had to

22   cause all of that, you actually blamed it on the

23   estimating department, didn't you?

24   A.    In some way I did, yeah.

25   Q.    And you want this Court to now believe that that was

1   just a, what, a mindo, a breakdown?

2   A.   That's correct.

3          THE COURT:  Did you say a mindo?  I don't

4   know what that is.  Is that a specialized construction

5   term?

6          MR. HUG:  Meltdown.  I knew it was an M.  It was

7   meltdown.  Mindo is something else.  Instead of being a

8   typo, you have a mindo, and you just say the wrong thing

9   instead of spelling it wrong.

10  BY MR. HUG:

11  Q.   This is a meltdown I think was your testimony?

12  A.   That's correct.

13  Q.   Despite all these things you knew about the project

14  and all the problems you had as of 8/13, because that's

15  written as of the middle of the August, that's almost at

16  the end of the job --

17  A.   We were discussing those problems privately, yeah.

18  Q.   That private discussion is in these job performance

19  review forms?

20  A.   No.

21  Q.   No, it isn't?

22  A.   No.

23  Q.   You're having your private discussion, but on your

24  job performance review form you're saying the estimate is

25  all wrong.  Even though you contend today that you knew

1    Pike was in the wrong and was doing a horrible job on this

2    project, yet that doesn't get mentioned at all in here,

3    does it?

4    A.   No, because Lou Bona and Bill Flynn were aware of the

5    issues with Pike and the fact that there was going to be a

6    claim with Pike.  I didn't note those there, no.  I was

7    noting items that I thought were a problem with the bid in

8    this report.

9    Q.   Okay.  Well, actually the first time you note that

10   there was a problem -- if Mr. Bona and everybody knew

11   that, why did you feel compelled to first note that there

12   would be a claim filed in I think it's the September --

13   yes, if you turn to the next job performance review.

14        So if Mr. Bona knew about that claim, there was no

15   real need to mention it in the job performance review

16   form; is that your testimony?

17   A.   Well, I just mentioned that I mentioned it.

18   Q.   You did think to mention it on September 23, 2010,

19   correct?

20   A.   I mentioned it there, yeah.

21   Q.   But you didn't mention it before because Mr. Bona

22   knew that?

23   A.   Well, I was mentioning here that Bill was writing a

24   letter in September on that report.

25   Q.   Now, I assume that you supplied Pike with a written

1    request for extension of time, correct?

2    A.    No.

3    Q.    As required by the contract, isn't it?

4    A.    Yes.

5    Q.    And I assume that since you knew about all these

6    problems as of July 21, that you wrote Pike an e-mail

7    saying we have all of these problems with this job, we're

8    adding manpower and we're going to file a claim?

9    A.    I did not do that.

10   Q.    Okay.  But you think it's important, don't you, to

11   document changes in the contract where parties are going

12   to be impacted?

13   A.    Yes.

14   Q.    I would characterize -- wouldn't you characterize

15   that as a part of your regular practice?

16   A.    I was concentrating on the project at that time.

17   Q.    Okay.

18   A.    So I wasn't --

19   Q.    You're the project manager?

20   A.    I wasn't writing the letters.  I was trying to get

21   the job done.

22   Q.    Well, part of getting the job done is managing the

23   financial aspects of the project, correct?

24   A.    Correct.

25   Q.    And it's fair to say that you had a lot of

1    communication with your material suppliers about getting

2    the right product there on time and in place to be able to

3    use on the work, correct?

4    A.    Correct.

5    Q.    That's your job?

6    A.    That's correct.

7              MR. HUG:  If I could ask the Court and counsel

8    do refer to Exhibit 615.

9    BY MR. HUG:

10   Q.    Mr. Clauson, do you recognize Exhibit 615?

11   A.    Yes.

12   Q.    And you see this is an e-mail string beginning from

13   the second page to the first page, correct?

14   A.    Correct.

15   Q.    And this is -- what's this regarding?

16   A.    Looks like we're adding some fixtures.

17   Q.    And you're on that e-mail chain?

18   A.    Yes.

19             MR. HUG:  Your Honor, I'd like to ask this be

20   made a full exhibit.

21             MR. KAPLAN:  No objection.

22             THE COURT:  Defendant's Exhibit 615 admitted as

23   a full exhibit.

24   BY MR. HUG:

25   Q.    I want you to turn to the second e-mail on the first

1   page.  This is just one example I just wanted to show you

2   of your diligence in documenting changes.  The e-mail

3   concerns a potential change that you're going to have in

4   the project, correct?

5   A.   It talks about lighting change, yes.

6   Q.   You say in the middle e-mail on August 11, 2010, 741,

7   I think we need to document all changes.  You were also

8   going to send out a bulletin for the relocation of the

9   data closet.  I will have to find a temp. fixture for this

10   location.  And it goes on from there.

11        Did I read that correct?

12   A.   Yes.

13   Q.   All right.  So, just an example, sir, of your pension

14   and desire to document things so that people know later on

15   what happened, correct?

16   A.   Well, this was actually an e-mail from Bill Lynch,

17   who is the engineer, and he didn't want to document the

18   fact that they moved the data closet.  So that's what I

19   was telling, you got to document the change.  And then you

20   could see what he's saying, I'm not sure how I would --

21   what I would say in the bulletin.

22   Q.   Right.

23   A.   This is the engineer that I'm talking to.

24   Q.   So this wasn't even a real clear issue and you

25   thought it should be documented, correct?

1    A.   It was clear.  They moved the room from one floor to

2    another floor.  It was real clear.

3    Q.   And you wanted it documented?

4    A.   I wanted it documented so I could submit a change

5    order for it.

6    Q.   Okay.  And that was your usual practice, correct?

7    A.   Correct.

8    Q.   And that's a good practice, isn't it?  Do you agree

9    with that?

10   A.   Yes.

11   Q.   It's a good practice because, first of all, it covers

12   your whatever, it protects you professionally, makes you

13   look like you're diligent and you're on the job and you're

14   doing your stuff; is that right?

15   A.   That's right.

16   Q.   But it also gives the other side an opportunity to

17   know what the heck is going on so that they can deal with

18   it, correct?

19   A.   Correct.

20   Q.   So, for example, if somebody knows that they're going

21   to be charged something for doing something, it's good

22   that you tell them up front so they can decide, well, I

23   don't want that or I'm going to do something else; would

24   you agree with that?

25   A.   Pike was well aware that we were going to send them a

1    claim when we knew what the costs were.

2    Q.   So knowing that -- so you knew July 21 you were going

3    to probably file a claim, correct?

4    A.   Correct.

5    Q.   But you didn't actually tell Pike that, did you?

6    A.   We told them if there was additional cost, that we

7    were going to claim those costs.

8    Q.   Did you follow up with a writing on that?

9    A.   We did not.

10   Q.   I take it, of course, since you knew you might have

11   to have a claim if you were going to have additional

12   costs, you certainly alerted Pike that they should also

13   keep track of the additional man hours and the impact so

14   they could make sure and verify that your claim would be

15   correct?  That would be the fair thing to do, correct?

16   A.   We did not do that, no.

17   Q.   No.  So Pike didn't have the benefit, you would say,

18   of being able to track whatever additional man hours you

19   were having because of these impacts that you discussed,

20   correct?

21   A.   They received certified payrolls every week.

22   Q.   And those certified payrolls specifically identified

23   what work was being done because of what impact, correct?

24   A.   No, it identifies how many men we had on the job.

25   Q.   Okay.  So Pike just knew you had more men on the job;

1    is that right?  Is that your testimony?

2    A.   Well, they knew where we were working.  They had our

3    daily reports and they had their own people on site.

4    Q.   So it's your position Pike knew you had a claim

5    because you had more men working on the job?

6    A.   We told them we were going to file a claim if we were

7    harmed by the project.

8    Q.   So I take it that after that, you directed

9    Mr. Mathieu to do his daily reports or do something else

10   to make sure that he tracked the additional man hours as

11   it relates to how it was specifically impacted by the

12   steel, the mason, the demo, and thereafter so that you had

13   a nice clear documentation of exactly what that claim was

14   going to be, because you knew July 21 you were going to

15   make a claim; you did that, didn't you?

16   A.   No.

17   Q.   I think your testimony is that you told Mel Strauss

18   and Ed Oloff in mid-September that ECI was going to file a

19   claim, correct?

20   A.   Correct, somewhere around there.

21   Q.   I'm sorry?

22   A.   Yes, sir, mid-September.

23   Q.   And Exhibit 36, which is the October 1, 2010 letter,

24   that letter is the first written notice of any claim that

25   ECI was making with respect to impacts in Phase 3?

1  A.   Correct.

2  Q.   And as Mr. Kaplan went over with you, you knew the

3  contract terms, did you not?

4  A.   I did.

5  Q.   You've been in the industry and these contracts are

6  used over and over again, these various forms, correct?

7  A.   Correct.

8  Q.   You're familiar with the requirement that you prepare

9  and send in a change order, correct?

10  A.   Correct.

11  Q.   Because although it's titled Request for Equitable

12  Adjustment, I think you've characterized it as a change

13  order, haven't you?

14  A.   I don't know if it's characterized as a change order.

15  Q.   It's certainly a request for additional money,

16  correct?

17  A.   Correct.

18  Q.   Certainly a claim you're making against Pike for

19  additional money, correct?

20  A.   Correct.

21  Q.   And you to know that, under the contract, in order

22  to -- if you do have a claim, as soon as you know you have

23  a claim, you're supposed to give notice in writing; you do

24  know that, correct?

25  A.   Correct.

```
 1   Q.   And you didn't do that in this case?

 2   A.   Well, we provided them with the claim when we knew

 3   what the cost of the claim would be.

 4   Q.   But you knew you had a claim July 21, didn't you?

 5   A.   We didn't know if there was going to be a claim, what

 6   the impact was going to be.

 7   Q.   You didn't know what the amount was?

 8   A.   Or what impact it would be.  I didn't know I was

 9   going to have to add 60 guys to the project.

10   Q.   Okay.  Well, you knew that in another week or so,

11   didn't you?

12   A.   Yeah.

13   Q.   So you filed a claim then, right?

14   A.   We didn't know what the impact was.

15   Q.   So you didn't know at the end of -- you didn't know

16   by end of July even though you're $711,000 behind and

17   you're now up to over 50 men per day, you don't know

18   you're going to have a claim against Pike?

19   A.   We didn't know what the dollar value of the claim

20   was.

21   Q.   You knew you had a claim, you just didn't know the

22   amount?

23   A.   Correct.

24   Q.   So I take it you fired off an e-mail or sent a letter

25   saying we have a claim, we're keeping track of it, we'll
```

1    document, let's discuss right away?

2    A.   No, I didn't do that.

3    Q.   If you had done that, Pike could have looked at it

4    and said, Listen, let's talk about what we can do to

5    ameliorate or mitigate this problem, correct?

6    A.   I didn't write them a letter.

7    Q.   Take a look at Exhibit 53 for a moment.  I think your

8    counsel -- is that right?  Oh, yeah, that's fine.  No,

9    that isn't it.

10        Defendant's Exhibit 613.

11        I want to show you what's been marked as Exhibit 613.

12   Have you seen Exhibit 613 before?

13   A.   It's an e-mail that was, yeah, back in August.

14   Q.   Back in August of?

15   A.   2011.

16   Q.   During Phase 3 of the project?

17   A.   Correct.

18   Q.   It's regarding Kelly – HC door operator

19   raceway/existing phone extensions.

20        So here is an example where there's an issue -- maybe

21   you could describe for the Court what's the issue in this

22   particular e-mail exchange?

23             THE COURT:  Do you want to offer that?

24             MR. HUG:  I'm sorry.

25             MR. KAPLAN:  No objection.

```
 1              THE COURT:  Defense Exhibit 613, full exhibit.

 2   A.    This is about the handicap door operators.

 3   BY MR. HUG:

 4   Q.    All right.  And Mr. Strauss, who was the project

 5   manager for Pike, right?

 6   A.    That's correct.

 7   Q.    He writes to you on August 11 and says that he has

 8   not found anything yet that says ECI owns the HC door

 9   operator raceway.  Unfortunately, the field does not have

10   the time for me to totally research this.

11        And then says he says, Continue this work and keep

12   track of the time and materials.  If we find that this is

13   not part of ECI's scope, you will be compensated for this

14   work.

15        Correct?

16   A.    Correct.

17   Q.    And then you write back and say, We'll keep daily

18   T & M tickets.  We'll also keep T & M tickets on the

19   temporary generator set.  Correct?

20   A.    Correct.

21   Q.    So, in essence, this is an exchange regarding a

22   particular item of work where neither ECI nor Pike have

23   yet agreed that it's either in-scope or out-of-scope type

24   of work, and until you resolve that, he wants ECI to make

25   sure they keep track of their costs, correct?
```

1   A.   Correct.

2   Q.   That's a very common thing that goes on on projects,

3   correct?

4   A.   Correct.

5   Q.   But the important thing is the parties communicate

6   with one another and they have an understanding as to how

7   they're going to proceed, correct?

8   A.   Correct.

9   Q.   And that's important for you on your side of the

10  equation; I'll get Pike to say how important it was for

11  them.  For you it was important?

12  A.   Correct.

13  Q.   You know later on after you get the scope issue

14  resolved, you've now agreed with Pike, and Pike has told

15  you save the time and material slips and we'll figure it

16  out from there.  And you're covered, aren't you?

17  A.   Yes.

18          MR. HUG:  617, e-mail dated August 13, 2010.

19          MR. KAPLAN:  No objection, Your Honor.

20          THE COURT:  Defense Exhibit 617 admitted as a

21  full exhibit.

22  BY MR. HUG:

23  Q.   This is -- Mr. Clauson, do you recognize this e-mail?

24  A.   Yes.

25  Q.   And this is another example where ECI is giving

1   direction as to how to proceed in light of a particular

2   situation, correct?

3   A.    Correct.

4   Q.    And it's directed that they're authorized to proceed

5   on an T & M -- that means time and materials, correct?

6   A.    Correct.

7   Q.    And time and materials means you keep track of the

8   particular time you're spending on that particular task

9   and the materials that you're using in connection with

10  that particular task, correct?

11  A.    Correct.

12  Q.    And you and Pike again communicated on that subject

13  and you now have the documentation that you are authorized

14  to proceed, correct?

15  A.    Correct.

16  Q.    Turn to Exhibit 625, e-mail dated September 1, 2010.

17        625, along that same line, is this another example

18  where you're given specific direction and authorization to

19  proceed with respect to additional electric work?

20  A.    Yes.

21  Q.    Again, another documentation of an issue where Pike

22  and ECI now have correspondence between themselves as to

23  how to proceed with respect to particular work, correct?

24  A.    Correct.

25  Q.    And in this case it was additional work, correct?

 1   A.   Correct.

 2   Q.   Additional work is out-of-scope work?

 3   A.   I think this was the owner requested work, work that

 4   the owner requested us to do.

 5   Q.   And it was not in your original scope of work that

 6   you had?

 7   A.   No, sir.

 8   Q.   And that's what additional work is, isn't it?

 9   A.   Correct.

10          MR. KAPLAN:  No objection to the admission of

11   the exhibit, Your Honor.

12          THE COURT:  Exhibit 625 comes in as a full

13   exhibit.

14          MR. HUG:  All right.  I'm trying to figure out,

15   Your Honor, I'm going into another area that's going to

16   take me a bit of time.  I'm trying to look for something

17   that I could nip off in a few minutes.

18          THE COURT:  I think maybe I'd like to go to

19   12:15, if that's possible, or 12:10, if that's okay.  I

20   have a conference call at 12:30 that I have to handle in

21   chambers.

22          MR. HUG:  Let me -- I sort of want to -- I want

23   to conclude a couple areas.  I don't want to stop in the

24   middle.  That's not your issue; that's my issue.

25

```
 1   BY MR. HUG:

 2   Q.   Exhibit 529 I'd like to show you for a moment.

 3            THE COURT:  Any objection?

 4            MR. KAPLAN:  No, sir.

 5            THE COURT:  Exhibit 529 full exhibit.

 6   BY MR. HUG:

 7   Q.   Mr. Clauson, I'm showing you what's been marked as

 8   Exhibit 529.  With respect to the Phase 3 project, is it

 9   fair to say that ECI put its B team on this project?

10   A.   I wouldn't say our B team.

11   Q.   On Exhibit 529, is that an evaluation of the

12   employees that worked in connection with Phase 3?

13   A.   I'm not sure.  I don't recall this document.  I don't

14   know where it came from.

15   Q.   It came from ECI in their production.  So you weren't

16   involved in preparing this document at all?

17   A.   I don't recall this document at all, no.

18   Q.   Okay.  So do you agree with the evaluations that are

19   in this document?

20   A.   You want me to tell you about each one of these guys?

21   Q.   No. Just generally, is there anything --

22   A.   I have no idea.  I mean -- I don't know.

23   Q.   You have no idea whether it's right or whether it's

24   wrong?

25   A.   No, I don't.
```

1    Q.    Do you recognize these individuals as having worked

2    on Phase 3?

3    A.    Some of the names I do.

4    Q.    Okay.  Now, with respect to -- you get involved in

5    the applications for payment, as we testified before,

6    correct?

7    A.    Correct.

8    Q.    And you fill out the schedules or the schedule

9    values, you update it as you need to?

10   A.    Monthly.

11   Q.    Okay.  And with respect to the schedule of values,

12   there's a whole package that gets put together, correct?

13   A.    That's correct.

14   Q.    And it's supporting documentation to the application

15   for payment, correct?

16   A.    Correct.

17   Q.    And you provide information that goes into that

18   application for payment, correct?

19   A.    Correct.

20   Q.    Not only the schedule values, but you also keep the

21   home office aware of any changes to the contract, any

22   increases in the contract; is that correct?

23   A.    On a schedule of values itself?

24   Q.    Not on the schedule of value, but if there are change

25   orders, you need to report that somehow to the folks at

1    the home office before they prepare an application for

2    payment, correct?

3    A.    If there was a change order, I would update it on the

4    schedule of values myself.

5    Q.    Okay.  All right.  So do you get involved in putting

6    the package together at all?

7    A.    When you say "package," what do you mean by the

8    package?

9    Q.    Application for payment package.  Includes the

10   application for payment, supporting documentation,

11   includes lien waivers, I don't know what else.  What else

12   does it include?

13   A.    I don't know myself.

14   Q.    Do you review the package before it goes out?

15   A.    Not all the time, no.

16   Q.    Do you review it any of the times?

17   A.    Sometimes, yeah.

18   Q.    Do you review the whole package before it goes out?

19   A.    I normally get the schedule of values, do the

20   billing, wait for the approval, and then I turn it back in

21   to the office to send it out, formally send it out to

22   Pike.

23   Q.    Exhibit -- if you can -- yes, Exhibit 49, that's in

24   one of the books.

25             THE COURT:  Is that one in?

1          MR. HUG:  Not yet.

2          MR. KAPLAN:  No objection, Your Honor.

3          THE COURT:  Plaintiff's Exhibit 49, full

4  exhibit.

5  BY MR. HUG:

6  Q.   Mr. Clauson, are you there?

7  A.   Yes.

8  Q.   You're familiar with the concepts of lien waivers and

9  release?

10  A.   Yes.

11  Q.   You know that they get filled out as a matter of

12  course in pretty much every job, correct?

13  A.   Yes.

14  Q.   Do you know the purpose of them?

15  A.   Yes.

16  Q.   Explain to the Court the purpose of a lien release

17  and waiver.

18  A.   It's to certify that everything's going to get paid

19  to that period.

20  Q.   And that's because the owner needs to know that so

21  they can release payment, correct?

22  A.   Correct.

23  Q.   So that you've paid all your employees and material

24  suppliers and your subcontractors, and the owner and the

25  general contractor need to know that you're up to date

1    before they release more money to you, correct?

2    A.   That's correct.

3    Q.   It's sort of fiscal responsibility to make sure we

4    don't -- Peter isn't robbing Paul.  And that does happen

5    from time to time in the industry where a contractor

6    diverts funds, never with ECI and never with any projects

7    you've worked on, but you've heard of that concept,

8    correct?

9    A.   Correct.

10   Q.   But that's what these are for, to make sure that

11   you've done your job in paying all your suppliers and

12   people, correct?

13   A.   Correct.

14   Q.   It also is there to make sure that we know the status

15   between ECI and Pike as of that particular moment, are

16   there any plans for change orders or whatnot that are

17   outstanding, correct?

18   A.   Well, it doesn't list that on there.  On this

19   particular lien waiver, we have that language.

20   Q.   In fact, if you go to the first page, it's actually

21   typed in.  It looks like a standardized form.  And then in

22   the very last paragraph, it looks like -- in different

23   type.  I think I'm correct in saying that ECI inserts this

24   language at the bottom of the standard lien waiver,

25   correct?

1    A.   Well, this is a lien waiver that came from Pike.  So,

2    yes, sometimes the lien waivers have verbiage about the

3    change orders.

4    Q.   Did the lien waiver that came from Pike have that

5    last paragraph beginning with "Specifically excluded," did

6    that come from Pike that you're aware?

7    A.   No, it did not.

8    Q.   That's language ECI had?

9    A.   That's correct.

10   Q.   It says:  Specifically excluded from this lien waiver

11   and release are any amounts due for retainage, any pending

12   change order proposals or requests, and any pending

13   requests for equitable adjustment to the contract.

14         MR. KAPLAN:  We'll stipulate that it would say

15   time or amount.

16         MR. HUG:  Thank you.  I was trying to figure

17   that out.

18         MR. KAPLAN:  I think some of the others will

19   hopefully be clearer on that.

20   A.   Yes.

21   BY MR. HUG:

22   Q.   So I'm looking at that one.  So that says -- it says

23   what did says and it's signed by Mr. Bona?

24   A.   Correct.

25   Q.   Now, this one happens to be dated February 15, 2010,

1    see that?

2    A.    Yes.

3    Q.    And these are in somewhat of an order.  Why don't you

4    jump to the one on 8/31.

5          So, as I understand it, the application for payment

6    went through the end of a particular month and they were

7    on a monthly basis; is that right?

8    A.    That's correct.

9    Q.    So the payment submitted on 8/31 was for payments

10   through July 31, correct?

11   A.    Correct.

12   Q.    So as of July 31, were there any pending change order

13   proposals related to work performed during July of 2010

14   related to additional manpower ECI incurred?  You had not

15   yet filed any change order?

16   A.    You lost me completely.

17   Q.    What's that?

18   A.    You lost me completely.  You're asking me if this

19   document is referring to a change order for the claim we

20   didn't submit yet?  What are you asking?

21   Q.    As of July 31, had you submitted your claim to Pike

22   for additional manpower?

23   A.    No.  We did it in October.

24   Q.    Okay.  So there was no request for equitable

25   adjustment as of that date, correct?

1    A.    No.

2    Q.    And there was no change order as of that date

3    relating to additional manpower, correct?

4    A.    Correct.

5    Q.    So work performed during July, you released your

6    claim, correct?  Isn't that the intent of this document?

7    Whatever claims you had, except as they might exist,

8    they're gone?

9              MR. KAPLAN:  I'd object to that.

10   A.    I don't understand what you're asking.

11             MR. KAPLAN:  My objection is he's asking the

12   witness to form a legal conclusion about the import of

13   this document which shows, first of all, there's no

14   foundation he was even involved in the preparation, he

15   certainly didn't sign it.  I have a couple of different

16   problems with that question.

17             MR. HUG:  Your Honor, let me stick to a factual

18   question forum.

19             THE COURT:  That would be great.

20             MR. HUG:  I think where I left it off, and maybe

21   leave it there, if I understand correctly, as of July 31,

22   which is the time period through which this lien waiver

23   applies -- you agree with me on that?

24   A.    Yes.

25   Q.    Okay.

1        -- there was no request for equitable adjustment

2    asserted by ECI?

3    A.    Correct.

4    Q.    Now I turn to the next page.  9/17/2010.  Now, I

5    notice that that particular paragraph is not missing -- or

6    it is missing?

7    A.    It is missing.

8    Q.    As of -- now, this lien waiver, as you understand the

9    process, relates to the lien waiver for that application

10   for payment that goes through August 31, 2010, correct?

11   A.    Can I tell you why the language is missing?

12   Q.    Yes.  Answer my question first.

13   A.    Okay.

14   Q.    Does it cover the period through August 31?

15   A.    Yes.

16   Q.    Okay.  As of August 31, were there any pending change

17   order requests or requests for equitable adjustment

18   relating to additional manpower for ECI?

19   A.    It was pending change orders for change order work.

20   Q.    But not for the impact?

21   A.    Specifically for the Phase 3 work, no.  But there

22   were other pending change orders.

23   Q.    So for those pending change orders, they were

24   excepted out from this particular release?

25   A.    I'm sorry?

1   Q.   Let me try that again.  Withdrawn.

2        Assume the language is there, the missing language is

3   there.

4   A.   Okay.

5   Q.   And this lien waiver covers the work performed during

6   August of 2010.  Correct?

7   A.   Correct.

8   Q.   As of August 31, there was no change order or release

9   or request for equitable adjustment for work performed in

10  August of 2010 as of the date this lien waiver was signed;

11  is that correct, factually?

12  A.   I still don't understand what you're asking.  There

13  were change orders that weren't approved.

14  Q.   Except for change orders you had in writing relating

15  to additional work.  I think I know where you're getting

16  confused.  So there were change orders pending, correct?

17  A.   Correct.

18  Q.   There were change orders pending with respect to some

19  additional work?

20  A.   That's correct.

21  Q.   But was there any change order or request for

22  equitable adjustment relating to impacts as of August 31?

23  A.   No.

24  Q.   And this --

25  A.   Didn't submit the claim letter until October 1st.

1   Q.   Right.  And the lien waiver applies to work performed

2   during August 31, factually; is that your understanding?

3   A.   Yes.

4   Q.   Now, although technically you're not allowed to ask a

5   question, but you did, and I'm going to give you the

6   courtesy of answering, why is that language not in there?

7   A.   The language is not there because we had changed

8   comptrollers during this period.

9   Q.   Okay.  And somebody made a mistake?

10  A.   And somebody made a mistake, that's correct.

11  Q.   That's a mistake -- it wasn't intentional on ECI's

12  part so they would make sure that they would get paid,

13  correct?

14  A.   Absolutely not, no.

15          THE COURT:  All right.  We are at 12:15.  It

16  might be a good time to take a stopping point until 1:00?

17          MR. HUG:  Perfect.

18          THE COURT:  All right.  Do you have a sense,

19  Mr. Hug, how much longer you have?

20          MR. HUG:  Your Honor, I think probably less than

21  a half hour.

22          THE COURT:  Okay.

23          MR. HUG:  I sort of jumped around my stuff here.

24  So I've got to figure that out over the lunch break.

25          THE COURT:  That's great.

 1          Mr. Kaplan, will Mr. Flynn be next?

 2          MR. KAPLAN:  No.  Mr. Mathieu.

 3          THE COURT:  Mr. Mathieu, okay.  Followed by

 4   Mr. Flynn?

 5          MR. KAPLAN:  Followed by Mr. Flynn.

 6          THE COURT:  Okay.  Is that it then?

 7          MR. KAPLAN:  That's it for our witnesses.

 8          THE COURT:  That's great.

 9          And do you have a time estimate for those

10   witnesses relative to --

11          MR. KAPLAN:  If we get to Mr. Mathieu by 2:00 --

12          THE COURT:  I'm sure we'll get there much sooner

13   than that.

14          MR. KAPLAN:  1:30.  I don't have a lot of

15   redirect so far.  I'll be finished with Mr. Mathieu before

16   the afternoon session is over and hopefully we'll be done

17   with him.  I would think we'll be done with him, maybe be

18   able to start with Mr. Flynn, I just can't tell.

19   Certainly I'm thinking with Mr. Mathieu probably about two

20   hours or so.  We have to go through some records.

21          THE COURT:  Okay.  We'll stand in recess.

22              (Whereupon, a recess followed.)

23

24          THE COURT:  Mr. Clauson, I just remind you that

25   you're still under oath.

1          You may proceed, Mr. Hug.

2          MR. HUG:  Thank you, Your Honor.

3    BY MR. HUG:

4    Q.   Mr. Clauson, I understand you were involved in

5    putting together the claim that ECI has in this case; is

6    that right?

7    A.   I assisted Bill Flynn, yes.

8    Q.   As I understand it, from a general standpoint, you

9    looked at Phase 3 and you looked at the estimate for

10   Phase 3 and compared it for the actual hours for Phase 3

11   and compared those two, correct?

12   A.   Correct.

13   Q.   And then you also looked at the particular cost codes

14   that were impacted, and you've outlined that extensively

15   on direct examination; do you recall that testimony?

16   A.   Yes.

17   Q.   Okay.  Did you make any adjustments in your claim

18   either on the estimate side or actual hours side for any

19   problem with the estimate, for example?

20   A.   No.

21   Q.   So no adjustments because you saw any problems with

22   the estimate?

23   A.   I didn't say there was any problems with the

24   estimate.

25   Q.   So there's no problems with the estimate, so you made

1    no adjustment to your claim because, say, you

2    misunderstood how long it was going to take to put in,

3    say, light fixtures; you didn't make any adjustment for

4    that?

5    A.    No.

6    Q.    And you didn't make any adjustment for any areas

7    where ECI may have been inefficient, correct?

8    A.    I didn't say we were inefficient.

9    Q.    I'm not suggesting you're not, and I understand why

10   you think it's a loaded question.

11        So your contention is ECI was not inefficient in any

12   area of the project and therefore no deductions should be

13   made from its actual cost?

14   A.    Correct.

15   Q.    So, for example, even though we see in the

16   8/13/2010 you're saying that light fixtures is taking a

17   lot longer than anticipated, or fixture labor units way,

18   way off what it's taken in the field.  And you talk about

19   fixture labor units in the bid, correct?

20   A.    Yeah.  I indicated that that was probably due to

21   everybody being in the same area while we were, the

22   flooring guy, the door guy, having to move stuff around to

23   get to an area.

24   Q.    Although you understood at the beginning of the job,

25   remember I went over that job scoring report, you

1  understood that there was going to be a lot of people in

2  one area; do you remember that item on that job report?

3  A.   That was for change orders, yes.

4  Q.   Okay.  Yeah, but that was before any change orders

5  were there, you were just describing the job?

6  A.   It was a guess at what the job was going to be, yes.

7  Q.   But I understand your contention that even though the

8  job was going to be congested, it was even more congested

9  than you originally thought?

10  A.   Yes.

11  Q.   But bottom line is you didn't make any adjustments in

12  your presentation or your calculation of your claim for

13  anything ECI did wrong?

14  A.   No.

15  Q.   All right.  So, now, I understand you asked for more

16  time on July 21, correct?

17  A.   Correct.

18  Q.   And you actually got more time for certain areas of

19  the project, correct?

20  A.   What do you mean we got more time?

21  Q.   You could finish it later than anticipated, right?

22  Isn't that right?

23       You said it was going to take more time to do the

24  project, you wanted four weeks, Pike said no, right?

25  A.   Right.

1    Q.   But in fact, as it came to pass, you did get more

2    time to finish portions of the project?

3    A.   You mean portions of Phase 3?

4    Q.   I'm sorry, you're right, thank you, Phase 3.

5    Portions of Phase 3 were allowed to be finished later

6    than --

7    A.   Well, actually some of that later work actually cost

8    us more time.

9    Q.   Okay.

10   A.   Because we were able to do the locker area and the

11   art room later, but we had to have all the systems in

12   those areas operational.  So, for instance, the fire alarm

13   system had to be operational.  Once they did put ceilings

14   in that area, we had to go back, take the fire alarm

15   devices out and put them in the ceiling.  So it cost us

16   more time to do that.

17   Q.   Just to let the Court know the area that we're

18   talking about, am I right that the art room is here?

19   A.   That's correct.

20   Q.   And what's this?

21   A.   That's the --

22   Q.   Cafeteria?

23   A.   -- center corridor, connector area.  This is the

24   locker.

25   Q.   Locker room and art room are actually done a little

1   later at the end of August and into September, right?

2   A.   That's correct.

3   Q.   I understand your testimony that it still didn't

4   result in any efficiencies for you?

5            THE COURT:  For the record, you're referring to

6   what exhibit number?

7            MR. HUG:  Exhibit 504, Your Honor.

8   BY MR. HUG:

9   Q.   Was the toilet area or the gym area also a little bit

10  later?

11  A.   No.  Those were turned over at the right time.

12  Q.   Now, is it fair to characterize your claim as a loss

13  of productivity claim?

14  A.   I'm not sure the exact term you'd call it.

15  Q.   Okay.  Well, from the standpoint of you thought it

16  would take a little under 7600 man hours, it took roughly

17  14,000 man hours.  And you're claiming those additional

18  man hours, the difference between the two, correct?

19  A.   Correct.

20  Q.   And as I understood on direct examination, that these

21  additional man hours were incurred because you weren't as

22  productive, your men weren't as productive, so therefore

23  you needed to have more man hours on the job; is that

24  right?

25  A.   Loss of efficiency, production.

1    Q.   Loss of efficiency?

2    A.   Acceleration.

3    Q.   That's an interesting term.  What is acceleration?

4    A.   Where you have to accelerate your work.

5    Q.   That means, say, if duration for work is expected to

6    be two days and it gets accelerated to have to be done in

7    one day, for example?

8    A.   Correct.

9    Q.   All right.  What's compression of work?  Is that the

10   same thing?

11   A.   Yes.

12   Q.   So did that occur in this particular job where your

13   work was accelerated?

14   A.   Yes.

15   Q.   Okay.  And the durations were much less than you

16   originally anticipated to complete a piece of work,

17   correct?

18   A.   Correct.

19   Q.   And is there also a claim that work was pushed out a

20   little bit?  In other words, work that you'd hoped to do

21   in, say, the middle of July, you couldn't do until the end

22   of July or early August or at some other point, right?

23   A.   That's correct.

24   Q.   So kind of a shifting of the work?

25   A.   Correct.

```
 1   Q.   And I take it your testimony is that at all points in
 2   time that ECI started work when it could start work?
 3   A.   In some areas we started work when we could start
 4   work and we'd have to abandon that work and come back to
 5   it.
 6   Q.   In Phase 3, when work was available, you started it,
 7   correct?
 8   A.   Correct.
 9   Q.   You never started late on any of your work, did you?
10   A.   Oh, yeah, we started late.
11   Q.   Okay.  I'm talking about it's available to work, but
12   you don't get to it for two or three or four days.  So
13   available to be worked, but were there any situations
14   where it was available to work but you couldn't -- you
15   didn't get to it?
16   A.   I'm not sure if that happened or not.
17   Q.   Well, you would agree with me that if that happened,
18   if, say, work was available to be done on July 6 and you
19   didn't start it until, say, July 13 because you didn't
20   have enough manpower to be able to do that work and all
21   the other work you had to do on the project, you would
22   agree with me that because now you have to do that work a
23   little faster, that's not Pike's fault?  Understand?
24   A.   I understand.
25   Q.   That's not Pike's fault, is it?
```

1    A.    I'm not sure if it's Pike's fault or not.

2    Q.    I just gave you a scenario.  The scenario is you

3    could start the work on July 6 or 7, but you didn't start

4    until July 13.  So say it's July 7.  You didn't start

5    until July 13, but you could have started July 7, is that

6    Pike's fault if Pike didn't do anything and the work was

7    ready?

8    A.    I guess not.

9    Q.    Okay.  So if you start on July 13 and now you have to

10   do that same piece of work which was going to take three

11   days to do, you're now doing it during three days when you

12   have other work that you were expected to do during that

13   same three-day period, okay?  You understand that?

14   A.    Yes.

15   Q.    Now you've got more people having to do things on

16   that later time period, correct?

17   A.    Correct.

18   Q.    So that results in some inefficiencies, correct?

19   A.    Correct.

20   Q.    If that happened on the job, if it happened, I'm not

21   going to see any deductions in your claim for that, am I?

22   A.    We didn't make any deductions.

23   Q.    So your testimony is that when I go through this

24   claim and the schedules, I'm not going to see where you

25   ever started late?

1   A.   I don't know if you would or not.

2   Q.   Well, if you don't know, how do you know that your

3   claim is accurate?

4        Let me ask you this.  Did you do that analysis that I

5   just said to make sure that ECI started the work when it

6   was available?  Did you do that analysis?

7   A.   No.

8   Q.   Don't you think that's an important analysis to do?

9   A.   I think it's probably impossible to do.

10  Q.   Why is it impossible to do?

11  A.   Well, there's just so many issues that were going on

12  at the time.

13  Q.   Okay.  In the claim that you prepared, is ECI making

14  any claim for extra scope work?

15  A.   No.

16  Q.   In ECI's claim are you making any claim for

17  additional services that were provided?

18  A.   No.

19  Q.   It's just additional manpower that you believe was

20  incurred because of conditions on the site, correct?

21  A.   Correct.

22  Q.   I'd like to go to Exhibit 29.  That's probably in the

23  first -- no, second volume.

24            MR. KAPLAN:  Three.

25

1           MR. HUG:  Volume III.  Okay.  I don't think that

2    this has been offered as an exhibit yet.

3    BY MR. HUG:

4    Q.    If the witness is there -- are you there,

5    Mr. Clauson?

6    A.    Yes, I am.

7    Q.    What is Exhibit 29?

8    A.    Certified payroll reports.

9    Q.    Are you familiar with these documents?

10   A.    I know what they are.  I don't work with them.

11   Q.    Did you use this document in the preparation of the

12   claim in this case?

13   A.    I did not.

14   Q.    Remember Exhibit 646 that I showed you, the

15   interrogatories?  Go to Interrogatory Number 5.

16   A.    Here it is.

17   Q.    In Exhibit 646, Interrogatory Number 5, which I read

18   to you earlier, isn't there a listing of the documents

19   that you reviewed or relied on in preparing the claim, and

20   does it list certified payroll reports?

21   A.    It does.  But I didn't work with these myself.  I

22   used the hours that came from our accounting department

23   that were recorded on a weekly basis.

24   Q.    Okay.  Are you familiar with these reports?

25   A.    I don't work with them so.

1    Q.    Do you know how to read them?

2    A.    Yeah, I know how to read them.

3    Q.    We'll test the limits of your knowledge.

4          THE COURT:  Any objection?

5          MR. KAPLAN:  No objection.

6          THE COURT:  Exhibit 29 admitted as a full

7    exhibit.

8    BY MR. HUG:

9    Q.    First of all, certified payroll reports, these are

10   the people who were working on the job, in total, for a

11   particular period of time, correct?

12   A.    Correct.

13   Q.    All right.  So if I look at the first page, just to

14   orient everyone, it says in the middle of the page

15   underneath the certified payroll report for the period

16   ending 6/19/10, do you see that?

17   A.    Yes.

18   Q.    All right.  And then it has a list on the left-hand

19   column, a list of employees.  Donato Carducci, for

20   example?

21   A.    Yes.

22   Q.    Underneath Mr. Carducci, there is a number of

23   identifying characteristics which include, you know, his

24   name, his gender, his grade, such as electrician or some

25   other identifying characteristics.  Then under the column

1    it says Sunday, Monday, Tuesday, Wednesday, Thursday,

2    Friday, total hours?

3    A.   Yes.

4    Q.   And next column after that -- if I understand that,

5    by the way, so that's for that week ending, it's going to

6    show how many hours that particular employee worked on the

7    Kelly Middle School job, correct?

8    A.   Correct.

9    Q.   And then it has rate.  35.40, what is that?

10   A.   That's the prevailing job wage.

11   Q.   Okay.

12   A.   For hourly.

13   Q.   And what's cash fringe?

14   A.   Fringe benefit package.

15   Q.   And that's 18.66.  So that's additional sums that

16   you'd have to pay to the employee based upon the wages?

17   A.   Yes.

18   Q.   That's not a fixed sum, it varies with the wages?

19   A.   I see different amounts here, I'm not sure why.  I

20   thought the fringe benefit package was a fixed amount.

21   Q.   So I see that.  And then if I add those two together,

22   I come up with a total rate, correct?

23   A.   Correct.

24   Q.   And so in this case, if I add 35.40, I come up with

25   something along the lines of $54 or so; is that right?

1    A.   That's right.

2    Q.   Okay.  And as I understand it, that is what ECI is

3    paying that particular employee for that week?

4    A.   Among other things.

5    Q.   Among other things?

6    A.   Yeah.  It doesn't show everything that we pay for

7    him.

8    Q.   Well, for that particular time period on this

9    particular job, does it show everything you're paying for

10   that person?

11   A.   Yeah, but he has other benefits that he receives from

12   us.

13   Q.   Oh, really.  What are the other benefits?

14   A.   Vacation pay, holiday pay.

15   Q.   And are those --

16   A.   A host of different benefits that he gets.

17   Q.   Are they stated here in any way on this --

18   A.   No.

19   Q.   The very last column it says check number, net sum,

20   do you know what that is?

21   A.   I don't see the check number -- oh, I see, yeah.

22   That's the total he made that week, looks like, after

23   deductions.

24   Q.   After deductions and it comes out to 1,133.19,

25   correct?

 1   A.   Correct.

 2   Q.   So that's how much it cost ECI for that employee for

 3   that week excepting out his other benefits such as

 4   vacation pay and I don't know what else?

 5   A.   We have to pay other things, too.

 6   Q.   For this employee?

 7   A.   Yeah, pay the state, pay federal taxes.

 8   Q.   So you had --

 9   A.   There's other things.

10   Q.   And do you know what that factor is?

11   A.   No, I don't, off the top of my head.

12   Q.   Now, I want to cover a couple more.

13        Stephane Mathieu, he has a rate of 37.40 and a cash

14   fringe of 17.11; do you see that?

15   A.   Yes.

16   Q.   And the next person, José Perez, has a rate of 30.09,

17   19.51.

18   A.   Correct.

19   Q.   And from the looks of this, it looks like that's what

20   you're paying on the right-hand column -- correct me if

21   I'm wrong -- it looks like you're paying that particular

22   employee for the work on that job?

23   A.   Gross amount, right.

24   Q.   Gross amount less the deductions?

25   A.   Correct.

1   Q.   Is that right?

2   A.   That's correct.

3   Q.   Okay.  Now, Mr. Madore testified that some work was

4   done, fabrication work I think it was, was done back at

5   the factory.  Do you recall that testimony?

6   A.   We anticipated fab shop work.  I don't recall how

7   much we actually got done there.  Yeah.

8   Q.   And that work, did they have to do some of that work

9   for Phase 3?

10  A.   Again, I don't recall what our fab shop did for the

11  project.

12  Q.   Okay.  So you don't know whether or not that's

13  included in Phase 3 or not?

14          MR. KAPLAN:  Objection.  That's not really clear

15  as to what you're referring to.  Included how?

16          MR. HUG:  Okay.  If I may withdraw the question

17  and start again.

18  BY MR. HUG:

19  Q.   What kind of fabrication work was done back at the

20  fab shop?

21  A.   At the fab shop, I just told you I didn't know what

22  we did on this project for fab shop work.  This is not

23  really the type of project we could apply our fab shop to.

24  Because majority of the job is masonry.

25  Q.   Okay.  So, just to be clear, was there fab work done

```
 1   at your shop related to this job?

 2   A.   I just said I don't remember.

 3   Q.   So you don't know?

 4   A.   I don't know.

 5   Q.   So in preparing your claim, you don't know whether

 6   you have included those hours in your claim or not, those

 7   hours worked back at the fab shop?

 8   A.   We just bill the direct hours off the job site, the

 9   overage on the job site.

10   Q.   Let's get to wage.  The wage that you used in your

11   claim was $81 and change, remember that?

12   A.   Yes.

13   Q.   So you established that rate or that rate is there

14   without regard to what you actually paid anybody; is that

15   right?

16   A.   It was agreed-to change order rate.

17   Q.   Okay.

18   A.   Prior to me starting a job, it was part of the

19   contract.

20   Q.   I might be wrong on this, but where is that in the

21   contract?

22   A.   The change order rate?

23   Q.   Yes.

24   A.   I'm not sure.  It's in there someplace.

25   Q.   Okay.  There's actually a change order rate somewhere
```

1  in the contract that you signed at the beginning of the

2  job?

3  A.   Yes.

4  Q.   You're sure of that?

5  A.   He wouldn't have gave me $81 if it was wrong.  There

6  has to be a document somewhere that identifies the change

7  order rate for the project.  I'm pretty sure it's in the

8  contract.

9  Q.   Okay.  So -- all right.  But you can't point me to

10 any particular place in the contract.  I can show the

11 contract, if you'd like, and see if you can find it, but

12 would you be able to do that if I gave that to you?

13 A.    If it's in the contract, I would be able to.

14 Q.   Okay.  Well, turn to exhibits --

15        THE COURT:  Mr. Hug, is this the most efficient

16 way to deal with this issue?  I don't know where you're

17 going to be going with this questioning.

18        MR. HUG:  You know, Judge, I'm going -- I was

19 thinking the same thing, because it could take him a while

20 to do this.  I was trying to figure out -- I was kind of

21 expecting him to say something different.

22        THE COURT:  The curse of cross-examination.

23        MR. HUG:  Yes.  I suspect that what will happen

24 is that -- maybe we'll just leave this for briefing.  I'll

25 prove the negative by saying it's not in there.  And they

1    have the burden of proof; if it's there, it's there,

2    they'll show us.

3              THE COURT:  All right.

4              MR. HUG:  Maybe I'm wrong.  I could be wrong in

5    that.  There are a few documents in this case, as you are

6    aware.  And I could have easily missed it.

7    BY MR. HUG:

8    Q.   Let's move on to something a little more efficient

9    here.  You were shown Exhibit 33.  Do you have that in

10   front of you?

11   A.   Yes.

12   Q.   Now, as I understand it, those are the subcontractor

13   invoices that you got relating to the additional manpower

14   you needed for Phase 3?

15   A.   Correct.

16   Q.   By the way, when I go through the weekly foremen

17   reports, the weekly foremen reports, Exhibits 18 through

18   28, which Stephane Mathieu filled out, those reports do

19   not include subcontractors, do they?

20   A.   I believe he filled out a white rod, what we call a

21   white rod for each subcontractor.

22   Q.   Each subcontractor employee?

23   A.   Yes.

24   Q.   So they went into the ECI payroll system?

25   A.   No, just to track the hours where they were working.

1    Q.    Okay.  So he got their name and their affiliation?

2    A.    He put down their name and the location they were

3    working in the building.

4    Q.    Okay.  Now, looking at these ECI Exhibit 33 for a

5    moment, I'm looking at these -- and maybe that answers the

6    next question.  I went through these.  Correct me if I'm

7    wrong, but there's no indication on any of these documents

8    where these employees are working, is there?

9    A.    No.

10   Q.    Okay.  I'm only going to find that -- and I think

11   you've answered the question.  If I go to the white rods,

12   I'm going to find somebody who we don't know the name of

13   that works for All Brite Electric who billed out 40 hours.

14   Maybe their name is here on this one, Journeyman Brejwo,

15   Apprentice Testone?

16   A.    That looks right to me.

17   Q.    If I go to the weekly foremen reports, I ought to

18   find somebody by the name of Testone or Brejwo or whatever

19   it may be.  Is that the way you worked it?

20   A.    Yeah.

21   Q.    And then Mr. Mathieu then assigned, after the fact,

22   where all these people were working?

23   A.    Well, during the week.

24   Q.    Right, during the week.

25   A.    Yeah.

1   Q.   Now, if you take a look at the first page, now, when

2   ECI paid these particular folks, the invoice is shown as

3   5490.80, correct?  And that includes tax of whatever -- I

4   don't know if that is a percentage or a number, I think

5   it's a number of $310, I'm not sure.  So ECI paid them

6   5490.80 in this case, including tax, for All Brite, right?

7   A.   For that invoice, correct.

8   Q.   So if I divide 5490 by 80 hours, I'm going to come up

9   with some number which is basically the cost per person of

10  what it cost for this particular week for All Brite,

11  right?

12  A.   What they charged us.

13  Q.   It lists their rate of 69.50 and $60, correct?

14  A.   Correct.

15  Q.   And they didn't actually go through ECI's payroll,

16  did they?

17  A.   No, sir.

18  Q.   So you ended up paying, on this invoice, whatever

19  that is, 5990 or 5490, whatever it is -- I think it's

20  5490, just the math?

21  A.   5490.

22  Q.   So that's what you paid.  That was your actual cost?

23  A.   Correct.

24  Q.   And if I go to the next one, I see the rates for

25  All Brite are 69.50 and 60 as well.

1      If you go in the package a little bit more, you'll

2  see Bonner Electric, the rates they were charging were 65

3  and 57 an hour, correct?

4  A.    Correct.

5  Q.    Depending on the level of skill, journeymen or

6  apprentice, I think that's skill level, correct?

7  A.    Yes.

8  Q.    Another one for C&M Electrical, $57 an hour?

9  A.    Yes.

10  Q.    Demming Electric, 84 -- excuse me, $45 an hour for

11  some, $66 for another.  Have I read that right?

12  A.    Correct.

13  Q.    And so forth.

14      So if I went through all these, I can check and see

15  that none of them come out to $81 an hour even with the

16  tax; is that right?

17  A.    That's correct.

18  Q.    Let's turn to Exhibit 36 for a moment.

19      This is a letter that you and Mr. Clauson drafted,

20  it's previously been admitted, it's the notice of claim on

21  October 1, 2010?

22          MR. KAPLAN:  Mr. Flynn.

23  A.    Mr. Flynn.

24  BY MR. HUG:

25  Q.    Mr. Clauson and Mr. Flynn prepared together, you

1    signed it?

2    A.    Correct.

3    Q.    Sorry.  That was a mindo.

4         If I look at the second paragraph, I see what I think

5    is a curious sentence to me, I'll give you a chance to

6    explain it.  The last sentence of the second paragraph

7    says:  "Please note further that ECI did not carry any

8    contingencies or added costs to account for any delays or

9    interruptions, as these would have been totally

10   unanticipated."

11        Do you see that?

12   A.    Yes.

13   Q.    You had a hand in drafting this.  What does that

14   mean?

15   A.    I didn't draft that sentence, but I think what it

16   means is we didn't plan on any delays.

17   Q.    You didn't carry any contingencies for the Phase 3

18   summer slammer, as I understand it?

19   A.    No, for the delays and interruptions that happened

20   during the Phase 3 summer slammer.

21   Q.    Well, first part says "did not carry any

22   contingencies or added costs to account for any delays or

23   interruptions."

24        Isn't it true, to your knowledge, you didn't carry

25   any contingencies to account for the fact that it was a

1    summer slammer?

2    A.   No, we didn't.

3    Q.   And you agree with me that even the best schedule

4    requires some shifting, correct?

5    A.   Correct.

6    Q.   In fact, you all put it in writing in Exhibit 40,

7    didn't you?  Take a look at Exhibit 40.

8         Are you there?

9    A.   Yes, I am.

10   Q.   Take a look at the third paragraph.  This is a letter

11   signed by Mr. Flynn.  You addressed this letter in direct

12   examination in another portion of it.

13        And it says in the first sentence of the third

14   paragraph, it says:  "Of course, even the best schedules

15   require some shifting."  See that?

16   A.   Yes, I do.

17   Q.   And you degree with that?

18   A.   Yes.

19   Q.   And there were some shifting in this particular case,

20   weren't there?

21   A.   A tremendous amount.

22   Q.   Such amount that it almost doubled the amount of man

23   hours that you anticipated, correct?

24   A.   Correct.

25   Q.   Now, on the fourth page of that letter, Attorney

1    Kaplan went over with you the man hours.  And attached to

2    that is also the latest -- well, it wasn't the latest

3    summary of the labor hours report for Phase 3?

4    A.   Correct.

5    Q.   Okay.  And there's another one that's later that has

6    a little bit more estimated hours than this one?

7    A.   Yes.

8    Q.   And I don't recall you ever explaining that, the

9    reason for that.  I may have missed it.  Could you explain

10   why one has a little more hours in it?

11   A.   That was -- I don't know, 2011, so I'm not sure which

12   one you're referring to.  Maybe it accounted for change

13   orders.

14   Q.   I thought Attorney Kaplan might have mentioned it,

15   but it wasn't real clear to me that's what you were

16   saying.  This one here doesn't account for change orders

17   that may have related to Phase 3 but weren't actually

18   written up and finalized until after that date, right?

19   A.   That's correct.

20   Q.   Why were change orders -- by the way, change orders,

21   you got a change order, it was added to the contract,

22   correct?

23   A.   Correct.

24   Q.   Then you got paid for it?

25   A.   Correct.

1   Q.   Are there any change orders that you're aware of for

2   which you did not get paid for other than this request for

3   equitable adjustment?

4   A.   Just the ones I mentioned previously about the

5   relocation of the telecommunication room.

6   Q.   But I think you testified that was never actually

7   reduced to a change order; that was an agreement you made

8   that one offset the other?

9   A.   That's correct.

10  Q.   So later on change orders increased the estimated

11  hours, right?

12  A.   That's correct.

13  Q.   And do the actual hours get increased as well?

14  A.   Yes.  If the change order was part of that Phase 3,

15  yes.

16  Q.   So did you actually keep track of the additional

17  hours that were spent on that particular change order?

18  A.   No.  Did we track a change order by hour?  No.  We

19  provide them with an estimated cost.

20  Q.   So, if I understand it, your claim has embedded

21  within it hours that you added to your actual for which

22  you have already been paid?

23  A.   Yes.  It also increases the estimated hours as well.

24  Q.   Correct, but we don't know whether or not you

25  performed that change order work efficiently or

```
 1   inefficiently either, we don't know?

 2   A.   No.

 3   Q.   We don't know.  You added it in one side, you added

 4   it in the other end, you just made an assumption they

 5   offset each other, right?

 6   A.   Well, we hope we make money on change orders.

 7   Q.   So you make money on the change orders?

 8   A.   That's the plan.

 9   Q.   But, as you sit here today, you don't have any idea

10   how that actually impacted your claim in any way?

11   A.   No way we could track every change order on the

12   property individually by hour.

13   Q.   You couldn't track a change order through time and

14   materials?

15   A.   Well, it wasn't a time and material change order, it

16   was a lump sum change order.  Might have been some time

17   and material change orders as well.

18   Q.   So you actually had to do an estimate for those

19   change orders, correct?

20   A.   Correct.

21   Q.   And you had to put an estimate in there for the time

22   that it would take you to perform that work?

23   A.   Correct.

24   Q.   Okay.  And who did that estimate?

25   A.   Myself or I had an assistant, Adam Heon, that would
```

1   help me with change orders.

2   Q.   I understand you testified before you're not an

3   estimator, though?

4   A.   No, I'm not a full-time estimator.  I've estimated

5   projects before.  I've estimated change orders for the

6   past 25 years.

7   Q.   As we sit here today, you can't tell me how to

8   unravel that, you can't tell me how to unravel the actual

9   cost, the actual hours you spent on that change order, can

10  you?

11  A.   In the field?

12  Q.   Yes.

13  A.   I'd have to assign people to do that.

14  Q.   But you'd agree with me, wouldn't you, that you

15  shouldn't be paid extra for the hours that you've already

16  been paid for, should you?

17  A.   Well, those hours went into the estimating hours.

18  Q.   Let's assume you got the estimate right and you say

19  you make a lot of money on the change orders.  Suffice it

20  to say, you made no adjustment for that, correct?

21  A.   Correct.

22  Q.   Turn to Exhibit 43.

23       Are you at Exhibit 43?

24  A.   Yes, I am.

25  Q.   I want to turn to the second page, actually.  Now,

1   this second page is a labor hours report for the entire

2   project, correct?

3   A.    Correct.

4   Q.    And it's actually two pages long.  I want to make

5   sure I understand how to read this.  It's broken into

6   different blocks or areas in some way?

7   A.    Correct.

8   Q.    I want to just go over what these are.  The first

9   block is Kelly Middle School, it says 09-04341E?

10  A.    There's not an area assigned to that.  It's a listing

11  under base bid in our software.

12  Q.    Okay.  So that's a general area or something along

13  those lines?

14  A.    Well, that's Phase 2.  I had originally, as I

15  testified before, originally punched the job in as one

16  phase, everything under the base phase.

17  Q.    I see.  So let's go to that for a second.

18  Mr. Mathieu, he didn't break it out by phases, correct?

19  A.    Correct.

20  Q.    Did you work with Mr. Mathieu with that or Mr. Heon?

21  A.    I asked him to re-estimate it so it was broken down

22  by phase.  And the Estimating Department did that.

23  Q.    So first estimate, full project.  Second thing you do

24  is now you break it out into different phases.  And you

25  worked with Mr. Mathieu and others at ECI worked on doing

1   that, correct?

2   A.   I didn't work on it; they did.

3   Q.   So hopefully that was done correctly, just like

4   hopefully the original estimate is done correctly.

5        There's two points of error that could have happened

6   here, first with the original estimate and then second

7   breaking it into phases; am I right?

8   A.   I assume that they estimated it correctly.

9   Q.   And then after you broke it out into a phase, then

10  you broke it out into different cost codes?

11  A.   Correct.

12  Q.   So if I go to Exhibit 4, I'm going to see handwritten

13  Number 40, Number 41, and all the other cost codes that

14  are applicable in this case, right?

15  A.   Correct.

16  Q.   And that's -- you did that, right?

17  A.   That's correct.

18  Q.   Even though you didn't do the original estimate, you

19  came in and did that piece, correct?

20  A.   Well, I know what the cost codes are.

21  Q.   So that's a third area for error.  First one with the

22  original bid, second one breaking it down into phases, and

23  a third one getting them all in the right cost code,

24  correct?  Three potential areas where there could have

25  been error?

1    A.    Okay.

2    Q.    Is that right?

3    A.    Yes.

4    Q.    All right.  Now, going back to Exhibit 43, I

5    understand now Phase 2, the next area looks like the site?

6    A.    That's correct.

7    Q.    Then Phase 3?

8    A.    Correct.

9    Q.    Then Phase 4 East, then Phase 4 West, correct?

10   A.    Correct.

11   Q.    And Phase 5.  And then there's a summary of the whole

12   project.  All right.

13         I know Phase 3, you got a composite in here and

14   that's shown elsewhere.  If I go down the line items, I

15   can see, the Court can see, and everyone else can see that

16   you were off on certain items like branch conduit, branch

17   wire and others.  And you went over that before, see that?

18   A.    Yes, sir.

19   Q.    I happened to do a total and figure out that you were

20   basically 43 percent off.  If I look at the line items,

21   all of the line items, I figure you were about 43 percent

22   over on Phase 3 than you anticipated from the estimate,

23   actual versus estimate, simple math.  Does that sound

24   about right, eyeballing it?

25   A.    Yes.

1  Q.   I go up to Phase 2, that's about 40 percent off; see

2  that?

3  A.   I do.

4  Q.   So your estimate or your actuals exceed your estimate

5  by 40 percent in that particular phase, correct?

6  A.   Well, there's a line item in that Phase 2 area that's

7  listed as overhead.  And we didn't carry any overhead.

8  That's my time.

9  Q.   Okay.  So that's 1698 hours --

10  A.   That's correct.

11  Q.   -- is an overhead.

12       I see no overhead carried on Phase 3?

13  A.   That was the overhead for the entire job.  That's

14  whatever time I applied my hours to on a weekly basis.

15  Q.   Okay.  It's interesting to look at Phase 2, take a

16  look at branch conduit.

17  A.   As I indicated earlier, we had taken the job off with

18  MC cable.

19  Q.   That was actually a savings of hours, wasn't it?

20  A.   Not for conduit.  The job was supposed to be done in

21  conduit, that's how we did Phase 2.

22  Q.   Didn't Pike ask you for a credit?

23  A.   For Phase 3.

24  Q.   For Phase 3?

25  A.   If you recall that letter that they wrote, it said

 1   not to do it in any other phases.

 2   Q.   So they gave you a break in Phase 3?

 3   A.   We only did it in Phase 3.

 4   Q.   So you misestimated the other phases?

 5   A.   We carried MC instead of conduit.

 6   Q.   In Phase 3?

 7   A.   Correct.

 8   Q.   So, in other words, your estimate was wrong with

 9   respect to the project for branch conduit?

10   A.   The specification called for MC cable only in 6-foot

11   lengths.  And we took it off in longer than 6-foot

12   lengths.

13   Q.   You took it off, what do you mean by that?

14   A.   Our estimators took the job off in lengths longer

15   than 6 feet.

16   Q.   Okay.  So that's an error?

17   A.   Well, if you want to call it an error.

18   Q.   It wasn't consistent with what you were asked to do

19   on the job by the bid package, correct?

20   A.   Correct.

21   Q.   So that was off in Phase 3, Phase 2 as well, correct?

22   A.   In all phases.

23   Q.   And did you make any allowance for that mistake in

24   Phase 3?

25   A.   I don't understand the question.

1   Q.   Did you adjust your estimated hours down at all or

2   adjust them at all because of that mistake?

3   A.   No.  We took it off MC and used MC in Phase 3.  So

4   there's no difference.

5   Q.   For Phase 3 there's no different?

6   A.   Right.

7   Q.   For the other phases, it's just an error in your

8   estimate?

9   A.   Correct.

10  Q.   That's branch conduit, right?  For Phase 2 your

11  branch conduit is off about 20 percent.  That's due, you

12  think, to the MC cable?

13  A.   I think so.

14  Q.   How about branch wire, that was off by more than

15  21 percent?

16  A.   I'm not sure.

17          THE COURT:  What number are you comparing?

18          MR. HUG:  Phase 2, cost code 41.  Phase 2.

19          THE COURT:  So what are the numbers?

20          MR. HUG:  1863 versus actual of 2260.

21  BY MR. HUG:

22  Q.   And then likewise, cost code in Phase 2 again, 66

23  fixtures, you're off by a little over two -- about 210

24  hours on that one, correct?

25  A.   Correct.

1    Q.    Now, I look at the site.  So overall in that Area 2,

2    taking into account overhead, which was not in your bid,

3    it's 40 percent over what you estimated?

4    A.    A good portion of that Area 2, which we did during

5    that same summer slammer at the time.

6    Q.    But you're not making any claim for that?

7    A.    We're not making any claim, but there were delays in

8    there as well with the steel, masonry.

9    Q.    Now, take it look at the site work, which was part of

10   Phase 3 as well, correct?

11   A.    No, sir.

12   Q.    Part of the site work wasn't part of Phase 3?

13   A.    The site was outside the building.

14   Q.    What about light poles, was that part of Phase 3?

15   A.    That was part of the site.

16   Q.    Okay.

17   A.    It's not part of Phase 3 within the schedule.  They

18   had to be done during the summer, yes.

19   Q.    Okay.  But for recordkeeping purposes, you didn't

20   track it in Phase 3?

21   A.    No, sir, we kept it separate.

22   Q.    So, for any of the inefficiencies you had with

23   respect to the light pole being defective and whatnot,

24   that's not included in your claim?

25             MR. KAPLAN:  Objection.

1          MR. HUG:  Any --

2          MR. KAPLAN:  Objection.  Absolutely no

3    foundation for the claim that there's inefficiencies due

4    to the light pole.  Nothing of that sort was covered on

5    direct.

6          MR. HUG:  Withdrawn.

7    BY MR. HUG:

8    Q.   Sir, if there are any inefficiencies with respect to

9    the light pole that I might ask you about, it wouldn't

10   matter because that was not included in your claim; is

11   that right?

12   A.   That's right.

13   Q.   I notice, however, you were about 600 percent over --

14   excuse me, under the bid on the site work.  Can you

15   explain that?

16   A.   No.

17   Q.   Let's go to Phase 3 for a moment.  You've gone over

18   the cost codes in Phase 3 on direct examination.  I notice

19   that on feeder conduit you underestimated feeder conduit

20   by 337 hours.  Percentage-wise, I didn't do the math out,

21   but that's a significant percentage, isn't it?

22   A.   That's a good percentage, yes.

23   Q.   Is there an explanation for why you're so low on

24   that?

25   A.   No.

1   Q.   For Phase 4 East you're roughly 315 percent under

2   budget there.  Do you have any explanation for that?

3   A.   No.

4   Q.   And for Phase 4 West you're about 30 percent over

5   budget for that.  Is there any explanation for that?

6   A.   No.

7   Q.   Okay.  I started to go into this with the light pole,

8   but I'll take that off my list.  I wanted to ask you

9   whether or not -- I did ask you already, I think you said

10  no, that ECI didn't have anything that caused it

11  inefficiencies during the course of Phase 3, right?

12  A.   That's right.

13  Q.   How about the Lutron lights?

14  A.   Lutron lights?

15  Q.   Or Lutron system.  What's a Lutron system?

16  A.   We have a Lutron lighting control system.

17  Q.   What is that?

18  A.   That's the lighting control system that controls the

19  entire building light.

20  Q.   What work had to be done with respect to the Lutron

21  lighting control system?

22  A.   There was a network cable that had to be brought

23  around the entire building.  Lutron relay panels that were

24  installed in the classrooms and other areas.

25  Q.   Okay.

1   A.   And our light fixture circuits would tie into those

2   panels.

3   Q.   Is this one of the systems where you walk in a room

4   and the light goes on and if you walk in another part of

5   the room, it goes off?

6   A.   Part of it.

7   Q.   Talk about it in terms of what the Lutron system

8   does.

9   A.   The other part of it is you can control it through

10  temperature control VMS system.

11  Q.   Okay.  ECI had a lot of problems with the Lutron

12  system, didn't it?  The installation of it?

13  A.   We didn't have any problems with the installation.

14  We had some programming problems, which we didn't do the

15  programming; Lutron did.

16  Q.   It was under your scope of work, correct?

17  A.   Yes, it was.

18  Q.   And you got the materials from Lutron, correct?

19  A.   Correct.

20  Q.   And the materials that you got and the programming

21  that you got needed some tender loving care, for lack of a

22  better term?

23  A.   No.  Once the system was all tied in, it needed to be

24  programmed.

25  Q.   Okay.

1   A.   So a technician from Lutron had to come out to the

2   job site and go through each of those lighting control

3   panels and program it.

4   Q.   And that --

5   A.   If that's what you're referring to.  We didn't have

6   any problems with the Lutron system itself.

7   Q.   So ECI was not going back in and doing extra work --

8   ECI personnel going back in and doing extra work,

9   additional work to get the Lutron control system working;

10  that's your testimony?

11  A.   That's correct.  Technicians from Lutron was there.

12  Q.   Switch gear.  Did you have any problems with the

13  switch gear?

14  A.   We had a problem with one switchboard where we needed

15  to order some parts.

16  Q.   All right.  Some of the parts came in and they were

17  defective or damaged?

18  A.   That's correct.

19  Q.   And you had to go back out and order more parts and

20  install them?

21  A.   That's correct.

22  Q.   And that resulted in additional work for you, ECI?

23  A.   Well, I obtained the parts in pieces and I brought

24  them out to Stephane.  I helped him do the job.  Probably

25  took us about three hours.

1    Q.    Okay.

2    A.    Just a matter of changing a piece of bus.

3    Q.    No allowance was made in your damage claim for any of

4    that work, though?

5    A.    No.

6    Q.    And how about with respect to the Lutron light, you

7    didn't make any adjustment in your claim for the Lutron

8    lights issue?

9    A.    It was all on a Lutron technician to make the

10   lighting control work.  So he's the guy that was spending

11   the extra time.

12   Q.    Okay.  How about the exit sign?  You talked about

13   that on direct examination, do you recall that?

14   A.    Yes, sir.

15   Q.    And I think you testified already that there was a

16   problem with those and there was some hours associated

17   with additional hours you needed to get that situation

18   squared away?

19   A.    It was a problem obtaining them.  And we had prepped

20   those exit signs during the ceiling installation.  And

21   there was additional time getting to that area to put them

22   in.  The actual time to put the exit sign in was still the

23   time that was estimated.

24   Q.    Okay.  And with respect to fixtures, did you have a

25   problem getting fixtures to the site?

1   A.   There were some fixture delivery delays, yes.

2   Q.   That delivery delay caused you to have to put

3   fixtures in in a more compressed time frame, correct?

4   A.   I don't recall if it did or not.  I don't remember

5   what dates the fixtures came in.  I mean, if we were

6   waiting for them or not, I don't remember.

7   Q.   Did you make any adjustment in your claim for the

8   time it took -- the extra unanticipated time it took to

9   put fixtures in?

10  A.   No.

11  Q.   So there's no adjustment in your claim for that as

12  well.

13       Did you have any problems with the Simplex system?

14  A.   Not that I'm aware of.

15  Q.   Turn to Exhibit E30 for the moment.  Just a few more

16  questions.

17       E30 was a document that you prepared, it appears.  It

18  says revised 6/21/2011, correct?

19  A.   Correct.

20  Q.   Is that when you prepared it?

21  A.   I would say yes, that's when I prepared it.

22  Q.   And you put the numbers in for the manpower loading

23  as-bid and actual, correct?

24  A.   Correct.

25  Q.   And the actual comes from -- the actual comes from

1   your cost reports, correct?

2   A.   Correct.

3   Q.   And the manpower required as-bid comes from taking

4   7600 and dividing it up, correct?

5   A.   Correct.

6   Q.   You didn't do as-bid manpower required, you didn't do

7   that portion of this while the job was going on, did you?

8   This portion of this document, the top half?

9   A.   No.

10  Q.   That was done after the fact?

11  A.   Correct.

12  Q.   Okay.  And so it doesn't demonstrate that the hours

13  of 7600 are reasonable or correct, it's just that's how

14  many hours were in your bid, correct?

15  A.   Correct.

16  Q.   And you compared those hours to the actual hours?

17  A.   That's correct.

18  Q.   Did the subcontractors that you hired, did they all

19  work on Phase 3?

20  A.   No.

21          MR. HUG:  I just have one more line, Your Honor.

22  I just need to look at something.

23  BY MR. HUG:

24  Q.   I'm going to go to Exhibit 509 and 510, which are in

25  our first volume.

 1       Now, I want to show you Exhibit 510.  Now, if I were

 2   more efficient, I would have shown you the document

 3   Mr. Kaplan showed you earlier with the same exhibit

 4   number.

 5       This is already an exhibit, Your Honor, with a

 6   different number.  It was just easier for me to get it.

 7            MR. KAPLAN:  509 is not an exhibit, and I

 8   object.

 9            MR. HUG:  I'm on 510.

10            MR. KAPLAN:  Okay.

11            MR. HUG:  510 is already an exhibit with another

12   number.  If I could move for admission of that exhibit

13   since it's already in.

14            MR. KAPLAN:  Just so we're clear, I want to make

15   sure the exhibit number is the same.

16            43, this is part of --

17            THE COURT:  It's the last page of 43.

18            MR. KAPLAN:  I just wanted to make sure they

19   were linked up.

20            THE COURT:  Any objection?

21            MR. KAPLAN:  No.

22            THE COURT:  Defendant's Exhibit 510, full

23   exhibit.

24   BY MR. HUG:

25   Q.  Sir, you've seen Exhibit 510 before in another view.

1    And this is a document that ECI prepared and produced,

2    correct?

3    A.   That's correct.

4    Q.   This is not the first version of this document, is

5    it?

6    A.   I had indicated earlier that I had given the

7    accounting department the hours for each of the

8    subcontractors on a spreadsheet.

9    Q.   Actually, the first version of this I think was

10   Exhibit 40 which was attached to the March 4, 2011 letter.

11   I think Attorney Kaplan went over that with you.  But if

12   you look at that document, does that document have any

13   reference to Phase 3 on it at all?

14   A.   Are you referring to Exhibit 510?

15   Q.   No, Exhibit 440.  Your spreadsheet that you attached

16   to Exhibit 40.

17   A.   No, it doesn't have anything -- it just says subphase

18   totals and gives a week ending for each one.

19   Q.   All right.  And there was another version of this

20   document between what's attached in Exhibit 40, that

21   spreadsheet, and Exhibit 510, which is the same as you

22   were shown earlier; isn't that right?

23   A.   What do you mean another version?

24   Q.   Let me show it to you.

25        Showing the witness Exhibit 509.

1          MR. KAPLAN:  I objected to this in our joint

2     trial memo, Your Honor.  And we have a lot of disputes in

3     this case, they're good-natured disputes and professional.

4     This one to me is absurd.  This is a typo.  And it was

5     pointed out when this document was originally given to

6     Mr. Hug and his client at a meeting that there was a typo

7     in Exhibit 509.  And there was an incorrect reference, it

8     was immediately corrected.

9          THE COURT:  Where is the typo?

10         MR. KAPLAN:  The typo in the exhibit at the very

11    bottom says total amount paid to sub for work on Phase 2

12    only, instead of Phase 3, which was the appropriate thing.

13    We noticed it when we gave it to them, it was at a

14    meeting, I believe.

15         MR. HUG:  Actually --

16         MR. KAPLAN:  If I may complete my objection.

17         And it was corrected.  And to have this being

18    presented here for some reason, which I can only

19    conjecture what the reason would be, I think is absolutely

20    absurd.

21         MR. HUG:  Your Honor, if I may?

22         THE COURT:  Yes.

23         MR. HUG:  As I recall it, it was given to us

24    when we asked for support backup for their support for how

25    the subcontractors were allocated.  We received exhibit

1    509.  We then gave it to our expert.  Our expert wrote a

2    report.  After the report came out, we were advised that

3    there was a typo on that.

4         Now, I agree with him in some respects that

5    ordinarily a typo, they happen.  But maybe perhaps

6    somewhere along this case I'm going to put up on the board

7    for Your Honor the number of typos, the number of mindos

8    or meltdowns I think it was -- I'm going to be stuck with

9    mindos for the rest of the case.  The number of

10   misstatements that we saw here and in the later job

11   reports.  What's the other one?  There's about five or six

12   of them.

13        You know, why does that keep happening?  So I'm

14   putting that to the Court and saying it's relevant -- it's

15   relevant in the sense that if you start to see a pattern

16   here of they've got an excuse for everything and they can

17   explain it away.  Maybe that factors into the weight you

18   give to the evidence.  And maybe it means that this claim

19   isn't all that it's made out to be.  Or Your Honor could

20   conclude, after hearing the evidence, maybe this was the

21   reality of what it was because it makes sense, as my later

22   witness will say.  That's for you to decide.  But the

23   reality is --

24        THE COURT:  Can I just cut you off?  I'd rather

25   move quickly here.  I take it is your claim going to be

 1    that all these other contractors, All Brite, Bonner

 2    Electric, Ferguson, Horton, actually performed services

 3    during Phase 2?

 4              MR. HUG:  Oh, no.

 5              THE COURT:  Then doesn't it have to be a typo?

 6              MR. HUG:  No, no, no, no.  Actually, what it

 7    says, total amounts paid to subs for Phase 2, $130,000.

 8    The rest of the work was done on Phase 3.  They brought in

 9    the supplemental labor to work on Phase 2 and used their

10    ECI workforce for Phase 3.

11              THE COURT:  So that's your claim.  Your claim is

12    they brought supplemental labor in.

13              MR. HUG:  I don't deny that they brought it in.

14    That's not the issue.  The question is:  Should this be

15    added to their claim for Phase 3?  Did they use these

16    hours on Phase 3?  That's the only issue.

17              THE COURT:  I'm sorry.  I guess I misunderstood

18    the evidence to suggest all these other outfits, like

19    Bonner Electric, had only come in during Phase 3 as part

20    of an emergency response.

21              MR. HUG:  I think that's their claim.

22              THE COURT:  But your claim is going to be no,

23    they were working on Phase 2?

24              MR. HUG:  Well --

25              THE COURT:  You don't have any -- if you have no

1    other evidence that these outfits were involved in

2    Phase 2, then it is hard to get away from the notion that

3    this is simply a typographical error and would make me

4    curious why the big emphasis on this.  But if your claim

5    is, in fact, Bonner Electric, they were working on Phase 2

6    and all that --

7            MR. HUG:  That these people were working on the

8    job we don't contest.  And that they were needed because

9    Phase 3 for ECI was messed up.  We contend they did it;

10   they contend we did it.  That they were needed at this

11   time in the project, we're not objecting to that.  When we

12   do the calculation, as you'll see later on, you'll see

13   that it all seems to make sense as to where people were

14   working at different points in time and that this doesn't

15   necessarily have to be a typo.

16           THE COURT:  Was Phase 2 completely done by the

17   time --

18           MR. HUG:  No.

19           THE COURT:  So still ongoing and overlapping.

20           MR. HUG:  Correct.

21   BY MR. HUG:

22   Q.   Mr. Clauson, Phase 2 was going on before Phase 3,

23   correct?

24   A.   Phase 2 was going on before Phase 3.

25           THE COURT:  Mr. Kaplan, briefly?

1          MR. KAPLAN:  Very brief reply.

2          THE COURT:  I can't rule as a matter of law this

3   is a typo.

4          MR. KAPLAN:  I'd like to address the document,

5   not to give a speech about what I'm going to supposedly

6   prove.  The facts are incorrect as Mr. Hug has set them

7   forth.  We attended this meeting, we gave them this

8   document and immediately identified at that meeting there

9   was a typo.  What he did after that is his business.  He

10  was informed immediately upon receipt that this was a

11  typo.  If he screwed up and gave that to an expert with

12  incorrect information, that's on him; it's not on us.

13         THE COURT:  Okay, I get that.

14         MR. KAPLAN:  This is an insult to be having this

15  argument.  He knows at the time he got this this was a

16  typographical error.

17         THE COURT:  The two of you will have to talk

18  about that later.  At this time it's fair game for him to

19  at least make the claim here because I can't resolve this

20  credibility dispute between counsel.

21         So unless he was prepared to say there's

22  absolutely no evidence that would support this, then --

23  which I don't think you are saying, then I think it's fair

24  game for you to explore this issue of Exhibit 509, keeping

25  in mind that we are now at 2:35.

1          MR. HUG:  Actually, Your Honor, all I really

2     wanted to do was get this in.  There was an objection

3     posed.  So I'm moving to have it made a full exhibit.

4          THE COURT:  I think you need to lay a foundation

5     for it.

6     BY MR. HUG:

7     Q.   Did you get involved with preparing 510, correct?

8     510?

9     A.   All I did was pass the spreadsheet for the

10    subcontractors that worked in Phase 3 over to my

11    accounting department.  And they created this.  I've never

12    seen these before.

13    Q.   Okay.

14    A.   I didn't review them after they were done.

15    Q.   So you never reviewed 510 after it was done?

16    A.   Either one of 510 or 509.

17    Q.   Okay.

18    A.   Which is the same document.

19         MR. HUG:  Your Honor, I still move the

20    document's admission.  It clearly came from ECI's files.

21         THE COURT:  I understand there's an objection to

22    the 509 coming in.  510 is already in.  I don't see that

23    you've established Mr. Clauson's connection to Exhibit

24    509.  Have I missed this?

25         MR. HUG:  Yes.  Mr. Clauson prepared the

1    spreadsheet that was attached to Exhibit 40.  Okay.

2    Exhibit 40 has a spreadsheet that results in Exhibit 510.

3    509 is just another version of five --

4            THE COURT:  510 is already in.  You're trying to

5    put in 509.

6            MR. HUG:  Correct.

7            THE COURT:  How is Mr. Clauson authenticating

8    509?  He didn't give it to you, did he, himself?

9            MR. HUG:  ECI gave it to us.

10           THE COURT:  Then you would need to authenticate

11   it in terms of how it became within your possession.  You

12   wouldn't bring it in properly through Mr. Clauson.

13           MR. HUG:  All right.  I'll bring it in through

14   someone else.

15           No further questions, Your Honor.

16           THE COURT:  Thank you.

17           MR. HUG:  Excuse me, Your Honor.  May I?

18           THE COURT:  Yes.

19               (Pause.)

20           MR. HUG:  There is one more document,

21   Your Honor.

22   BY MR. HUG:

23   Q.   Turning to Exhibit 582 --

24           THE COURT:  Any objection?

25           MR. KAPLAN:  No, sir.

 1           THE COURT:  Exhibit 582 is a full exhibit.

 2   BY MR. HUG:

 3   Q.   Following up on the fixtures questions I asked you

 4   earlier, sir, do you recognize this series of e-mails?

 5   A.   Yes.

 6   Q.   Okay.  And you're copied on the last e-mail in

 7   particular, correct?

 8   A.   That's correct.

 9   Q.   All right.  If I look down at the bottom e-mail,

10   there's a letter from Gerald Sullivan -- or an e-mail from

11   Gerald Sullivan to John Sullivan.  Do you know who John

12   Sullivan is?

13   A.   He's a lighting rep for Vanguard.

14   Q.   Was that a subcontractor or a material supplier for

15   ECI?

16   A.   It was a lighting rep.  Our supplier is Graybar

17   Electric.

18   Q.   So they supplied things to Graybar who supplied

19   things to you?

20   A.   I purchased the package from Graybar.  The lighting

21   representative is Vanguard.  They purchased the lights

22   from the manufacturers and sell to Graybar and Graybar

23   sells them to me.

24   Q.   Did you tell your representative from Graybar or the

25   person Mr. Sullivan from Graybar that the failure to

1    provide certain fixtures was causing ECI a huge problem at

2    the Phase 3 portion of the project and impacting their

3    committed schedule?

4    A.   On the second page you'll see what I told them.  I

5    said Jerry, you need to find out why the ship dates keep

6    moving on this order.

7    Q.   And then take a look at the next e-mail above.

8    A.   That's from Jerry Sullivan.

9    Q.   Correct.  Did you agree with that?  My question was:

10   Did you tell Mr. Graybar that the failure to timely

11   provide these items in this e-mail were seriously

12   impacting your committed schedule?

13   A.   No.  I told him I needed to have dates on the

14   fixtures.  That's what I wrote right below there.

15   Q.   So you don't agree that it was impacting your

16   committed schedule at that point?

17   A.   The exit signs were late, yes, I'll agree with that.

18   Q.   Okay.

19   A.   Some of these other items, 622, that's not a problem.

20   735, probably not a problem.

21            MR. HUG:  Okay.  No further questions,

22   Your Honor.

23            THE COURT:  Thank you.

24            Redirect examination?

25            MR. KAPLAN:  Yes, sir.  Just a few questions.

1                    REDIRECT EXAMINATION

2  BY MR. KAPLAN:

3  Q.   I'm just going to go over a few things.  I have to

4  pick and choose different exhibits.  I'll start with

5  Exhibit 530, which was in Plaintiff's Binder II.

6  A.   I have it.

7  Q.   Do you have that exhibit, Mr. Clauson?

8  A.   Yes, I do.

9            THE COURT:  That's defense?

10           MR. KAPLAN:  Defense exhibit, yes.

11  BY MR. KAPLAN:

12  Q.   This was that scoring sheet for change orders you

13  talked about?

14  A.   Correct.

15  Q.   And in the upper right-hand corner there's three

16  levels: normal, difficult, and very difficult?

17  A.   Correct.

18  Q.   With ranges.  The total score for this rating sheet

19  was 65.  Where does that put that in your range?

20  A.   Difficult.

21  Q.   And that's between the low of 34 and 102, that's

22  pretty much in the middle of the range, correct?

23  A.   Correct.

24  Q.   And you said you evaluated this or your office

25  evaluated this for change orders.  Do you agree with the

```
 1   evaluation that it was in the mid-range of difficulty for

 2   the project?

 3   A.   Yes.

 4   Q.   Okay.  Going to Plaintiff's Exhibit 29, Volume III,

 5   now, these were the certified payrolls?

 6   A.   Correct.

 7   Q.   And the particular series in here starts with the

 8   week ending June 23 and it runs through I think the week

 9   ending September 8 at the end of this series?

10   A.   Week ending 9/4.

11   Q.   September 4th, okay.

12        Now, these are done weekly?

13   A.   That's correct.

14   Q.   And they include all the ECI employees that are on

15   the project?

16   A.   That's correct.

17   Q.   Did they also include when you got into having other

18   subcontractors' laborers, did they include them as well or

19   would those be in a separate document?

20   A.   We had to submit certified payrolls for the certified

21   contractors as well.  I don't know if they are within this

22   package here or not.

23   Q.   But ECI was submitting --

24   A.   We did have to do certified payrolls for our subs.

25   Q.   You would submit certified payrolls for all of the
```

```
 1    field people you had working under your supervision

 2    whether they were your employees or the other subs'

 3    employees?

 4    A.   That's correct.

 5    Q.   Who were those submitted to?

 6    A.   To Pike.  It went to the job site, Maris -- I forget

 7    her last name.  Maris was the clerk for Pike.

 8    Q.   So Pike was getting these on a weekly basis?

 9    A.   Correct.

10    Q.   That's required by state law, is it not?

11    A.   That's correct.

12    Q.   And so Pike had all of this detailed information week

13    in and week out, not only as to who was working for ECI

14    but how many people, and even when you had your

15    subcontracted personnel, they were getting this

16    information on a weekly basis?

17    A.   That's correct.

18    Q.   And these reflected all of your field people who were

19    working on site?

20    A.   With the exception of myself.

21    Q.   Well, you're a project manager?

22    A.   Right, I was considered overhead.

23    Q.   These are all the payroll people?

24    A.   That's correct.

25    Q.   Okay.  Now, Mr. Hug asked you again about the July 21
```

1    meeting.  I'm not going to go over all of that.  But one

2    point that was raised I think in the discussion of that I

3    do want to review with you very briefly.  In your

4    discussion on the 21st of July with Pike, did Pike –– you

5    told Pike about the problems you were experiencing?

6    A.    Yes.

7    Q.    Did Pike discuss with ECI any alternatives to either

8    mitigating or ameliorating these problems?  And I'm

9    quoting from the question Mr. Hug asked you.

10   A.    No, they did not.

11   Q.    They did not.  Was there anything else you could have

12   told Pike at the time about what was going on had you

13   written them a letter the next day?

14   A.    No.  They pretty well knew what was going on.

15   Q.    Okay.  And following that –– did you feel that Pike

16   made it clear to you that they were not going to consider

17   an extension of time for ECI as of July 21?

18   A.    They made it very clear, yes.

19   Q.    If you had written them a letter the next day, did

20   you believe, based on what they told you on July 21, that

21   that would have prompted any further response?

22          MR. HUG:  Objection.  I think he's asking the

23   witness to presume what Pike would do.

24          THE COURT:  I'll sustain the objection.

25

1    BY MR. KAPLAN:

2    Q.    Leaving the meeting on July 21, did you have any

3    doubt that Pike was not entertaining your request, as

4    expressed to you, for an extension of time?

5    A.    No.

6    Q.    Okay.  There was also a series of questions about

7    keeping track of time.  Mr. Hug asked you about certain

8    change orders, T & M work, and that you would keep records

9    of certain extra work that would be subject to either a

10   change order or change order request?

11   A.    Yes.

12   Q.    And I believe those were for discreet items that were

13   subject to a claim of a change, adding something or

14   changing something around?

15   A.    Yes.

16   Q.    How did you track?  How did ECI track the labor

17   overruns that are subject to this claim that we're here

18   for in court?  How did you track those labor overruns?

19   A.    We couldn't track all the overruns.

20   Q.    First of all, how did you track them?

21   A.    We just listed the overrun, total overrun amounts.

22   Q.    But on a daily basis, how were the field people's

23   labor tracked or recorded?

24   A.    From the daily reports.

25   Q.    Okay.  So every day the hours worked were recorded?

 1    A.    That's correct.

 2    Q.    And Mr. Mathieu then did what, in terms of any kind

 3    of assignments or allocations to those hours?  What did he

 4    do?

 5    A.    What do you mean what did he do?

 6    Q.    Well, he didn't just put down hours, right?

 7    A.    He recorded the hours under what each employee was

 8    doing.

 9    Q.    Both by code and phase?

10    A.    Both by code and phase.

11    Q.    Do you believe it would have been feasible in July

12    and August of 2010 for ECI to record how many hours they

13    lost in efficiencies because the teledata room was a

14    number of weeks late?

15    A.    There was just no way to do that.

16    Q.    Do you believe there was any way you could have

17    measured that?

18    A.    No.  It would be like trying to track a change order,

19    there's no way to do it.

20    Q.    What do you mean it would be just like trying to

21    track a change order?

22    A.    How could you track all the work you're doing on a

23    change order unless you assigned a person to watch the

24    people install a change order.

25    Q.    T & M work you actually submit slips for discreet

1    items of work?

2    A.   That's correct.

3    Q.   On the questions I'm asking you, teledata room, lost

4    efficiencies, any way to track that in the field?

5    A.   No.

6    Q.   All right.  Structural scale problems, electrical

7    rooms are not completed per the contract schedule, you

8    described different issues arising out of that.  Any way

9    to track that on a daily basis as to how it affected your

10   labor efficiencies?

11   A.   No.

12   Q.   Masonry not being done on time or masons being in the

13   way with the supplies, you described that, any way to

14   track that on the daily level in the field as to the type

15   of labor inefficiencies that that was causing you?

16   A.   No.

17   Q.   Demolition problems, problems getting the demo done

18   on time, any way to track the inefficiencies that was

19   causing you in the field?

20   A.   No.

21   Q.   Are you aware of any way you could have tracked the

22   inefficiencies or labor overruns you're claiming here in

23   any other way than you did?

24   A.   No, I don't believe so.

25   Q.   Mr. -- I'll do that with another.

1        May I consult with counsel?

2                (Pause.)

3   BY MR. KAPLAN:

4   Q.   Could I ask you to look at Exhibit 31, please.

5        Was this prepared by ECI, Mr. Clauson?

6   A.   I assume it is, yes.

7   Q.   Do you know what this represents?

8   A.   This is a prevailing hourly labor rate sheet.

9   Q.   Okay.

10              MR. HUG:  Objection.  I don't object to the

11  document coming in, but this witness just said -- I think

12  he just said he assumes it's an ECI document.

13              THE WITNESS:  I said I believe it is.

14  BY MR. KAPLAN:

15  Q.   Do you know who developed this document?

16  A.   Our office.

17  Q.   Okay.  I'll do it through Mr. Flynn.  I think he has

18  more direct knowledge.  I'll get back to this with

19  Mr. Flynn.

20       If I could ask you to turn to Exhibit 43.  I just

21  wanted to clarify something about the change orders.  I

22  would like to look at the labor hours report for the

23  Phase 3 work.

24       Now, this is July 26, 2011.  I think you testified on

25  both direct and cross that by this time, the change order

1   numbers had been entered into the accounting system for

2   the Phase 3 change orders?

3   A.   Correct.

4   Q.   Just to make sure it's absolutely clear, if you carry

5   estimated hours for the change order which was accepted

6   and processed and paid, did those estimated -- and it

7   effected Phase 3 work, did those estimated hours get

8   entered into your system?

9   A.   Yes, it would.

10   Q.   Is that something you were involved in to make sure

11   those hours got entered?

12   A.   I entered them myself.

13   Q.   You entered them yourself?

14   A.   Yes, sir.

15   Q.   And did you make the allocations -- let's say there's

16   100 hours estimated for a change order, hypothetically,

17   and there were allocations between branch conduit, branch

18   wire, branch finish for that change order.  Were you the

19   one making those allocations in the estimated column?

20   A.   That's correct.

21   Q.   And then did those hours also get entered as far as

22   the actual work done pursuant to those change orders?

23   A.   Yes.

24   Q.   How did that happen?

25   A.   That would have been calculated out in the field.

1   Q.   In the field.  So whatever hours were done in the

2   field were entered along with all the other hours done in

3   the field?

4   A.   Correct.

5   Q.   And Mr. Mathieu was making the allocations as to the

6   phase and the cost codes?

7   A.   That's correct.

8   Q.   So on both sides of the ledger, on the estimating

9   side and on the actual side, the hours are going in for

10  the change order?

11  A.   Correct.

12  Q.   If you had a T & M change order for 100 hours, you'd

13  have 100 hours entered estimated, 100 hours entered

14  actual?

15  A.   That's correct.

16  Q.   So there would be no increase in the claim, per se,

17  because of change order work, given the example I gave

18  you?

19  A.   That's correct.

20  Q.   And whether you got paid for change order work or

21  not -- when you got paid for a change order in that

22  scenario, it has nothing to do with the claim?

23  A.   No.

24  Q.   Okay.  The discussion about fixture delivery right at

25  the end of your cross, was there anything -- are you aware

1    of any issue involving fixture delivery that caused ECI to

2    expend more hours than it expected to in the field?

3    A.    With exception of maybe going back a little bit of

4    time to take care of those exit signs.

5    Q.    Is that the only issue?

6    A.    That's the only one I can recall.

7              MR. KAPLAN:  Thank you.  I have nothing else.

8              THE COURT:  All right.  Does that conclude this

9    witness's testimony?

10             MR. HUG:  Yes, Your Honor.

11             Administrative point.  582, was that moved in as

12   an exhibit?  I think it was.  We have some dispute at my

13   table whether it was or not.

14             THE COURT:  It is indeed.  Appears to be

15   admitted as an exhibit, yes.

16             MR. HUG:  All right.  No further questions.

17             THE COURT:  Okay.

18             Mr. Kaplan, do we want to take our short break

19   at this time before we start the next witness?

20             MR. KAPLAN:  Sure.

21             THE COURT:  Thank you, Mr. Clauson.  You are

22   excused at this time.

23             We will stand in recess until 3:10.  See you

24   then.

25                  (Whereupon, a recess followed.)

```
 1              THE COURT:  Call your next witness, please.

 2              MR. KAPLAN:  Mr. Mathieu.

 3

 4                    STEPHANE MATHIEU,

 5         called as a witness, having been first duly

 6         sworn, was examined and testified as follows:

 7

 8              THE CLERK:  Please be seated.

 9              Please state your name.

10              THE WITNESS:  Stephane Mathieu.

11              THE CLERK:  Spell your last name.

12              THE WITNESS:  M-A-T-H-I-E-U.

13              THE CLERK:  Please state your address, city or

14    town?

15              THE WITNESS:  7 Chaffee Road, Stafford Springs,

16    Connecticut.

17              THE REPORTER:  Please spell your first name

18    also, please.

19              THE WITNESS:  S-T-E-P-H-A-N-E.

20

21                    DIRECT EXAMINATION

22    BY MR. KAPLAN:

23    Q.   Mr. Mathieu, where do you work?

24    A.   I work with Electrical Contractors, Incorporated.

25    Q.   And what's your position there?
```

```
 1   A.   I am a foreman, field foreman.

 2   Q.   How long have you been employed at ECI?

 3   A.   For 23 years.

 4   Q.   Okay.  And when you started there 23 years ago, what

 5   was your status as an employee?

 6   A.   I was an apprentice.

 7   Q.   How long did you -- after that, did you get your

 8   journeyman's license?

 9   A.   About six years.

10   Q.   So you've had your journeymen's license 17 years,

11   something like that?

12   A.   At least, yeah.

13   Q.   Okay.  And when did you become a foreman?

14   A.   About two or three years after, 1998.

15   Q.   Okay.  So you've been a foreman since '98?

16   A.   Yes.

17   Q.   And as a foreman for ECI, what do your job duties

18   include?

19   A.   Well, you get assigned a project or a job, and then

20   you run it.  You get assigned guys and you have to make it

21   work.

22   Q.   Okay.  And what are your basic responsibilities in

23   that regard?  Do you manage the labor crews?

24   A.   Yes, I manage the guys.

25   Q.   And what else do you do in terms of running the job?
```

```
 1    A.   I have to keep track of all their time, I have to do

 2    dailies, daily reports.  And we do our planning how to run

 3    the job, pipe it, execute it.

 4    Q.   Do you actually lay out where your certain

 5    installations of materials and equipment are going to go?

 6    A.   Yes.

 7    Q.   Okay.  Do you have to work with plans and specs in

 8    order to do that?

 9    A.   Yes.  That's one of the first things we do.

10    Q.   Do you normally review contract documents as part of

11    your job as a foreman?

12    A.   When you say -- do you mean the specs?

13    Q.   Well, you tell me.  What parts of the documents do

14    you normally review?

15    A.   I usually get the specs.  Look at the building

16    material, which is what they expected to use for material,

17    and I compare it to what I order so I don't over order, so

18    I don't order extra materials.

19    Q.   Material, the bill of materials is coming from where

20    for you?

21    A.   From the shop.  From ECI.  Whenever we start a job,

22    they give me -- they show me the overview of the whole

23    job.  And then I look at the plans, review the plans.  And

24    I start to do my layout.

25    Q.   Are you getting this information from the project
```

1   manager or from somebody else?

2   A.   From the project manager.

3   Q.   Now, you were the foreman for the Kelly Middle School

4   project?

5   A.   Yes.

6   Q.   And this obviously is a school renovation and new

7   addition.  Had you done school projects before the Kelly

8   project?

9   A.   I have, yes.

10  Q.   What were some comparable jobs that you had done

11  previously that were school projects?

12  A.   I did Rockville High School in Rockville,

13  Connecticut.  That was a summer job.  The extent wasn't as

14  big as this one, as Kelly, but it was practically the

15  same.

16  Q.   Summer schedule, school's out, doing a lot of work in

17  the summertime?

18  A.   Correct.  We did a big auditorium and kitchen work,

19  redid a kitchen, gymnasium.  Pretty big portion of the

20  school.

21  Q.   That was Rockville.  Any other schools other than

22  Kelly?

23  A.   Not as a foreman, but I have worked on a few others.

24  Q.   Any other comparable projects that you had done as

25  foreman for ECI that were comparable in size and scope to

 1    Kelly?

 2    A.    Not prior to Kelly.  I just got done doing one in

 3    South Windsor, Connecticut, last year.

 4    Q.    Okay.  Had you been working on critical path schedule

 5    projects as a foreman prior to Kelly?

 6    A.    Yes, I have.

 7    Q.    Okay.  How frequently?  A lot?  A little?

 8    A.    I worked at Hartford Hospital for almost nine years

 9    of my career and I did a really big job there.  That was

10    all critical path.

11    Q.    Nine years you were working on a Hartford project?

12    A.    Not one job.  Lots of jobs.  But nine years of being

13    a foreman I was there.

14    Q.    Various projects at Hartford Hospital?

15    A.    Yes.

16    Q.    For ECI?

17    A.    Yes.

18    Q.    And other significant critical path projects you had

19    done prior to Kelly?

20    A.    I worked at Backus Hospital in Norwich.  That was a

21    two-and-a-half, almost three-year project.  Similar to the

22    Hartford Hospital.

23    Q.    When you get -- as a foreman, and you're starting up

24    on a job, what do you do with the critical path schedule

25    at the outset of the job?

1    A.    Usually we review it with the owners or the GC or the

2    CM, and they let us know what the schedule is.  And we

3    work from there.

4    Q.    Okay.  And on Kelly, when did you first get involved

5    on the Kelly project?

6    A.    It was -- I think it was December of '09.

7    Q.    Okay.  Was that at the beginning of the project for

8    ECI?

9    A.    Yes, it was.  I went there to do some minor demo.

10   Q.    And were you there throughout the entire project for

11   ECI?

12   A.    At the beginning I was.  After Phase 3, I had another

13   job at Backus Hospital prior to the one I was just talking

14   about, big generator job.  That was right down the street

15   and I started that job.

16   Q.    Okay.  But you were at Kelly through the end of

17   Phase 3 at least?

18   A.    Yes.  And further.

19   Q.    All right.  Were you the, for lack of a better word,

20   the lead foreman through the end of the Phase 3

21   activities?

22   A.    Yes, I was.

23   Q.    Okay.  Now, at the outset of the job, what did you do

24   on Kelly?

25   A.    What do you mean?

 1    Q.   Beginning of the job, when you first got in there,

 2    what did you do to get going?

 3    A.   Well, we did some minor demo for the start of Phase 2

 4    before they started building the additions.  So I had to

 5    do some demo in some classrooms and some hallways.  And

 6    then I worked on layout.

 7    Q.   Minor demo, that's ECI's doing minor demo?

 8    A.   Yes.

 9    Q.   What does that involve?

10    A.   Relocated some exit lights, some light switches.

11    When they started Phase 2, the new addition was attached

12    to the existing school.  So Pike had blocked off a few

13    rooms and needed to make an access way to get outside so

14    we wouldn't interfere with kids, so we wouldn't have to

15    walk through corridors and stuff.

16    Q.   What was your work for Phase 2?  What did ECI do for

17    the Phase 2 work?

18    A.   There was an addition, a two-story addition.  And

19    then there was the auditorium on the opposite side and

20    there was a courtyard that was built.

21    Q.   What work was ECI doing in that area?

22    A.   We did all the slab work, whatever little slab, there

23    wasn't a lot of slab work, but we did slab work and wall

24    roughs.

25    Q.   Slab work means what?

1    A.    Conduits under the concrete.

2    Q.    So you put conduits in before the slab gets poured?

3    A.    Yes.

4    Q.    Wires go through those conduits?

5    A.    Correct.

6    Q.    Did you do finish work in the addition as well?

7    A.    Yes, we did.

8    Q.    What systems did you put in the addition?

9    A.    Every system that we have.  Fire alarm, Lutron

10   lighting, regular power for outlets, lighting, security,

11   sound.

12   Q.    Okay.  Do you recall when the Phase 2 work was going

13   on, what period of time it was going on?

14   A.    It was a month into me being there doing the demo.

15   So I'd say January.

16   Q.    Of 2010?

17   A.    Yeah.

18   Q.    Okay.  And do you recall how long it went for, the

19   Phase 2 work?

20   A.    It went until past Phase 3, because they overlapped

21   each other.

22   Q.    Phase 3 was -- when was the Phase 3 work being done?

23   A.    That was for summer work.  But we started earlier so

24   we could try to get some feeder conduits into the

25   corridors and stuff.

```
 1    Q.   Do you recall when you first did Phase 3 work?

 2    A.   It was probably around April.

 3    Q.   2010?

 4    A.   Yeah.

 5    Q.   Okay.  All of the work was done in July and August --

 6    A.   Yes.

 7    Q.   -- Phase 3?

 8         And how late did the Phase 3 work go past August?

 9    A.   Past Phase 3 time?

10    Q.   Phase 3, when were you finishing up Phase 3?

11    A.   Well, after school had started because they delayed

12    the locker rooms and the art room.

13    Q.   What month was that?

14    A.   That was after August.

15    Q.   So September?

16    A.   Yes.

17    Q.   Did you go further than that for finishing Phase 3

18    beyond September?

19    A.   Yes, to finish the art rooms and the locker area.

20    Q.   Okay.  All right.  Now, your initial work as the

21    foreman when you get there in December of '09,

22    January 2010, what does your work entail?

23    A.   Prepping.  All the systems that have to be done

24    throughout the project.

25    Q.   When you talk about layout, what does that mean in
```

1    that context?

2    A.    Well, we have risers that come with our fire alarm,

3    risers that come with the Lutron system.

4    Q.    What are risers in that context?

5    A.    We'll say a 30-page drawing that shows you all the

6    components in the system, all the parts and pieces, and

7    how the wires have to get run throughout the building.

8    Q.    Okay.

9    A.    But it's basically a one-line diagram.  You have to

10   piece it together with all the different -- all the

11   different phases.  Many loops.

12   Q.    So you're actually laying out how you're going to

13   install that work?

14   A.    Yes.  I would mark on my drawings and prep them and

15   get ready.  When we were still doing Phase 2, I would work

16   on prepping up the drawings.

17   Q.    And is that basically the plan of attack you're

18   planning to do in the actual construction?

19   A.    Yes.

20   Q.    Okay.  You said you were doing that for various

21   systems.  Are you doing that for other parts of the work

22   as well, the layout?

23   A.    Yes.  Well, got all the feeder panels, all --

24   everything.  The generator work, all the big

25   infrastructure systems, lighting.

```
 1   Q.   So you're laying out how you're going to install that

 2   work?

 3   A.   Correct.

 4   Q.   And you did that at Kelly?

 5   A.   Yes.

 6   Q.   And you did it for Phase 2?

 7   A.   Yes.

 8   Q.   And you did it for Phase 3?

 9   A.   Yes.

10   Q.   All right.  For doing that layout work, as you've

11   described it, are you referring to the contract schedule

12   as you're doing that work?

13   A.   Not when I'm doing the layout.  Because the systems

14   go throughout the whole school.  They start in the main

15   hub which was indeed in Phase 3.

16   Q.   Where was the main hub, as you've referred to it?

17   A.   P3G, which was over here.  And then there was

18   electrical ones here.  And also in P3 near the boiler was

19   our main switch gear.

20   Q.   So you had main areas and the two top corners of 3G

21   and 3M?

22   A.   Correct.  And we had smaller -- actually, in P3AR

23   here, which fed the whole entire admin. area.

24   Q.   When you're doing your layouts, are you also

25   configuring your timing on sequencing of doing different
```

```
 1   work?
 2   A.   Yes.  But we didn't start in Phase 3 because we
 3   weren't allowed to go in there right away because it was
 4   during school.
 5   Q.   Are you aware of the contract schedule?
 6        Let me refer you to Volume I, Exhibit 12.  And at
 7   Exhibit 12 there's the color schedule that's the second
 8   half of that?
 9   A.   Yes, I've seen this.
10   Q.   Did you have that schedule when you started to do
11   your layout work on the project?
12   A.   When we first started the job, I've seen this, yes.
13   Q.   And did you -- how did you use it in terms of
14   planning your work?  Before you actually started Phase 3,
15   did you use it at all in planning the work?
16   A.   A little.
17   Q.   How did you -- what reference did you make to it
18   before you actually got into Phase 3?
19   A.   Phase 2 starts, two-story addition in the tunnel --
20   not the tunnel, the crossway.  We had to figure out when
21   they were actually starting to do the foundations,
22   footings and everything.
23   Q.   Okay.  And how did you -- when you were planning for
24   Phase 3, Phase 3 really got going at the end of June of
25   2010, right?
```

1   A.    Correct.

2   Q.    Okay.  When did you start figuring out how are you

3   going to man the Phase 3 work?

4   A.    It was before Phase 3 started.

5   Q.    Yeah.  Did you utilize the schedule at all in

6   figuring out what your manpower requirements were going to

7   be?

8   A.    Yes, a little bit.

9   Q.    How did you do that?  What information from the

10  schedule, in other words, helped you figure out your

11  manpower requirements?

12  A.    Well, there's a lot of stuff that Pike overlaid in --

13  everything overlaid each other.  So I tried to -- we tried

14  to figure how many guys we would need for the big Phase 3

15  work because that was the bulk of the work.

16  Q.    When you say "the big Phase 3 work," what do you

17  mean?

18  A.    All of P3.

19  Q.    All of Phase 3?

20  A.    Yes.  Yes.

21  Q.    And did you have the estimate, in terms of man hours,

22  that ECI prepared for the job?

23  A.    At the beginning of Phase 3?

24  Q.    Yes.

25  A.    I did not.

1    Q.    Did you ever refer to the man hours estimate in

2    planning your work for Phase 3?

3    A.    I did not.

4    Q.    How did you figure out what crew sizes you were going

5    to use?

6    A.    Well, I went by the schedule and I figured -- there's

7    a lot of real estate in Phase 3.  So -- and Pike always

8    talked about how we'd have a lot of guys on the job.  I

9    actually talked to the shop, too, how we'd have a lot of

10   guys.

11   Q.    Going into the end of June, what did you anticipate

12   for manning the Phase 3 work, what crew size levels were

13   you assuming you would be using?

14   A.    Twenty guys, maybe 25.

15   Q.    That would be starting when to when?

16   A.    That would be when -- some of the demo got started.

17   We had to wait for the demo or we had to do some cutting

18   and capping and safing off for all existing conduits and

19   all the panels.

20   Q.    That's the cut-and-make-safe aspect?

21   A.    Yes.  We anticipated guys once the wall started

22   getting built and we were able to start roughing.  The

23   demo was fairly easy, our portion of it.

24   Q.    Your portion of it?

25   A.    Our portion of it.

1    Q.   Did you refer to the schedule to determine what the

2    timing would be for those activities?

3    A.   A little bit we did, yes.  I even -- with Pike, we

4    talked about the scheduling in the few prior meetings that

5    we had when we were doing Phase 2 about Phase 3.  We

6    talked about manning up.

7    Q.   Before you got into Phase 3, this would have been in

8    June, did you have any reason to believe that Pike would

9    not follow the schedule that we have for Phase 3 work in

10   Exhibit 12?

11   A.   I did not.

12   Q.   You did not?

13   A.   No.

14   Q.   And you were discussing schedule with them at that

15   time?

16   A.   Yes.

17   Q.   As you started the Phase 3 work, did the project work

18   follow the schedule Pike had provided in the contract?

19   A.   This original contract?

20   Q.   This schedule we have.

21   A.   It did for a little while.

22   Q.   Okay.  When you say "a little while," how long?

23   A.   Well, a few weeks.

24   Q.   Into when?

25   A.   Once the demo -- once we started getting with the

1    demo and patching the walls, it started getting thrown off

2    a little.

3    Q.    When was that?

4    A.    About three weeks into it.

5    Q.    Which would be, what, second week of July?

6    A.    Well, yeah.  Because we started June 26th or 28th.

7    Q.    All right.

8          When you were planning your work -- again, prior to

9    June 28, you talked about a 20- to 25-man crew, did you

10   anticipate using night shift work at all for the Phase 3

11   work?

12   A.    Yes, we did.

13   Q.    Okay.  And what was going to determine your ability

14   to do night shift work?

15   A.    There wouldn't be any other contractors there.  And

16   we started earlier, too, than them.

17   Q.    What do you mean started earlier?

18   A.    I started night shift crew with guys doing feeder

19   prior to that.

20   Q.    Prior to what?

21   A.    Prior to Phase 3 starting.

22   Q.    Prior to June 28?

23   A.    Yes.

24   Q.    What was your -- going into the end of June, what was

25   your assumption as to night shift work?  Would you be

1   doing it every day?  What would be driving that?

2   A.   It would be during the week.

3   Q.   And what would be driving whether you -- what would

4   determine whether or not you used night shift work?

5   A.   The demo guys were in there demo-ing.  So during the

6   day it was very hectic to get things done, the demo guys

7   demo-ing everywhere.  So after 3:30 or 4:00, there would

8   be hardly anybody there.

9   Q.   Okay.  Was that your plan?

10  A.   Yes.

11  Q.   And did you end up following that and doing a lot of

12  night shift work?

13  A.   Yes, we did.

14  Q.   And when you talk about having 20 to 25 guys, is that

15  total for various shifts or is that for each shift?

16  A.   That's total.

17  Q.   Okay.  Now, did you encounter any initial problems

18  late June, early July when you started the Phase 3 work?

19  A.   Yes, we did.

20  Q.   Okay.  And what were the problems you encountered?

21  A.   The demo was not going as fast as planned.

22  Q.   When you say "as fast as planned," you mean the

23  contract schedule?

24  A.   Yes.

25  Q.   Okay.  And how did that progress, the demo, in terms

1    of what issues did you experience with the demo?

2    A.    The first section we started was P3AD, which was the

3    admin. area.  P3AD on the right side there in the middle.

4    And that was only -- I think it was only supposed to be

5    four days or so.

6    Q.    Of demolition?

7    A.    Yes.

8    Q.    When, in early July?

9    A.    Early July, yes.

10         The first big thing was the teachers had all kinds of

11   equipment or all their stuff that they didn't want in all

12   of P3.  And all the classrooms, library, there was stuff

13   everywhere.  So the demo guys I think -- or somebody was

14   supposed to take care of it all.

15   Q.    And so you said in the admin. area that demo was

16   supposed to take three or four days.  What did it end up

17   taking?

18   A.    I'd say a few days longer than that.

19   Q.    What other areas did you encounter problems with

20   demo?

21   A.    Well, from there it was supposed to start to go into

22   the gym area and then the cafeteria area or P3CL.  They

23   were supposed to work their way around.

24   Q.    And there was a sequence demo was supposed to take?

25   A.    Yes.

1  Q.   Did demolition folks follow the sequences?

2  A.   They followed it where they could, yes.

3  Q.   In terms of time -- we'll get into some records that

4  will be a little more specific.  Do you have any

5  recollection of when you expected the demolition would be

6  done in Phase 3?

7  A.   It was a couple weeks into it, a few weeks into it.

8  Q.   Would be what, mid-July, third week of July?

9  A.   I'd say yeah.

10 Q.   Do you recall when the demolition actually was

11 completed in Phase 3?

12 A.   I think there was still some going on in August.

13 Q.   Okay.  And did that create -- those types of delays

14 create problems for ECI doing your work?

15 A.   Yes, they did.

16 Q.   What was the problem?

17 A.   Well, the problem is you can't start roughing in if

18 the stuff's not all demoed.  Roughing in our systems,

19 conduits and whatnot.  And there was also a lot of

20 notching that needed to get done by the masons, which the

21 demo guys weren't doing that, but that was --

22 Q.   That was a different issue with the masons, notching

23 the walls?

24 A.   Yes.  Because I had to go through and lay out all the

25 walls.  We started painting some of the block walls that

1    we knew were getting re-painted.  We put blue tape on the

2    walls, marked them all out everywhere throughout the

3    entire Phase 3 area.

4    Q.   So you can't get in areas because of demo.  Did that

5    cause you to change what you anticipated doing?

6    A.   Yes.

7    Q.   What changes did it cause?

8    A.   As far as the demo goes, every classroom in the P3CL

9    areas there was a lot of -- every wall had to be bumped in

10   to the classrooms.  So we had people walk down the

11   corridors, the walls --

12   Q.   So they had to take walls down?

13   A.   Yes, take 6-foot sections out everywhere, every

14   classroom.

15   Q.   Was that done in the sequences per the schedule?

16   A.   They started doing it that way and then they just

17   started going throughout the school, started going

18   everywhere.

19   Q.   So there came a point where there was not a sequence

20   that was being followed?

21   A.   I'm going to say yes.

22   Q.   And did that -- what effect did that have on your

23   work?

24   A.   It made me start bouncing around, Phase 3.

25   Q.   Okay.  Does that create problems for you when you

1    have to bounce around?

2    A.    Yes, it does.

3    Q.    What kind of problems?

4    A.    Well, I have relocate everywhere and it's not as

5    productive for us to get anything done.

6    Q.    Late June, early July, any other problems other than

7    the demo, as you just described them?

8    A.    That was the biggest thing.  Once the demo started

9    getting progressively done more, they were waiting on

10   steel for all the rooftop units.

11   Q.    Let me show you Exhibit 58, which is -- I think

12   everybody has the electrical plans.  And the very last

13   page is page EP-110.  Do you have that, Mr. Mathieu?

14   A.    That one was not in here -- I got it.  It got mixed

15   up in here.

16   Q.    Now, are the rooftop units shown on this plan?

17   A.    Yes, they are.

18   Q.    And maybe you could point to the Court where the

19   rooftop units are indicated?

20   A.    Would it be easier down there?

21   Q.    Whichever makes more sense for you, sir.

22   A.    Well, if you look at the prints in relation, it's

23   close to what we got here.  There's rooftops in the locker

24   area, P3AR area, and all in here (indicating), total of

25   eight or nine.

```
 1    Q.   All right.  And those rooftop units, did you have

 2    work to do with the rooftop units?

 3    A.   Yes, we had to feed them with power.

 4    Q.   Okay.  Were there problems in terms of the

 5    installation of rooftop units?

 6    A.   I don't think there was problems with the

 7    installation of it.  Well, there were problems because the

 8    steel didn't get put in before the rooftop units.  So we

 9    had to work all our systems around coordination drawings

10    that we worked on a lot, and we had to bring all our

11    feeder conduits around those areas.  And there were also

12    skylights.

13    Q.   Let's just talk about the rooftop units.  The steel

14    that was going into the supports structure underneath the

15    rooftop units, there were delays with that; is that what

16    you're saying?

17    A.   Yes, yes.

18    Q.   You had to wire up those rooftop units so you

19    obviously had to wait until they were in to do your

20    wiring?

21    A.   Yes.  I was able to bring the feeder conduits to

22    those.  There weren't that many big ones, but some

23    substantial ones, inch-and-a-half conduits.  We also had

24    to bring our conduits that fed the other wings through the

25    corridors that were very, very tight.  And the steel
```

1  spanned the entire corridor from wall to wall, that's what

2  would hold them up.

3  Q.   Did that also affect any other work you were doing in

4  the area where the steel was going in?

5  A.   Yes, it did.

6  Q.   What was that?

7  A.   We had to be careful with pulling all our data

8  cabling.  We had to pull it before they put the steel in.

9  We had started putting pipes in where we could, where it

10  wouldn't be affected by the steel, but it got to a point

11  where we couldn't put no more in until the steel.

12  Q.   Did that affect the sequence of work that you planned

13  on doing at the outset of Phase 3?

14  A.   Yes.  On paper it looks very simple on the prints to

15  put things everywhere.  When you get out there, actually

16  get into the field, dealing with the coordination

17  drawings, things weren't fitting incorrectly.

18  Q.   The schedule you have, the contract schedule, if we

19  could look to page 26, Sheet 26.

20       THE COURT:  Plaintiff's Exhibit Number 12?

21       MR. KAPLAN:  Yes.

22  BY MR. KAPLAN:

23  Q.   Are you on Sheet 26, Mr. Mathieu?

24  A.   Not yet.

25  Q.   Okay.

1    A.    I'm getting there.

2          Okay, I'll be there in a second.  I'm there.

3    Q.    Okay.  There's a couple of entries I want to ask you

4    about the third line down from the top, P3LO-2090.  It

5    says Set HRRTU #4.  Is that a rooftop?

6    A.    Yes, it is.

7    Q.    What does that say that was going to be finished by?

8    A.    It says July 15.

9    Q.    Okay.  And then a few lines down, about six lines

10   down there's a P3G-2100.  It says Set HRRTU #7.  Is that a

11   different rooftop unit?

12   A.    Yes, it is.

13   Q.    When was that one supposed to be set by?

14   A.    July 19.

15   Q.    And were all the rooftop units pretty much going in

16   around the middle of July, is that what the schedule

17   called for?

18   A.    That's what the schedule called for, yeah.

19   Q.    Do you recall when they actually got set?  Were they

20   set in July?

21   A.    I believe they were set in August.

22   Q.    And so these issues you were talking about were

23   continuing at least into August with the rooftop units?

24   A.    Yes.

25   Q.    This first couple weeks in July period, what was

1    happening with the mason work?  Was that affecting you at

2    all, the masonry work?

3    A.    Yes.  Because we had to wait for them to start

4    building the walls.

5    Q.    So what were you doing in conjunction with the

6    masonry walls?

7    A.    We had to do a series of lighting switches in each

8    classroom.  Every room that got bumped in had to have

9    lighting fixtures in it.

10   Q.    Because the walls that were moving were masonry

11   walls?

12   A.    Walls that they had to demo first, build new walls,

13   and jogged in 3 feet and went across 6 or 7 feet.

14   Q.    Okay.  Was that being done in a timely fashion per

15   the contract schedule?

16   A.    I don't think so.

17   Q.    Okay.  Was there a certain sequence that the masonry

18   walls were going to be built in, go from Spot A to Spot B?

19   A.    Pretty much the same as how the demo was supposed to

20   go.

21   Q.    Which was what?

22   A.    Start with the admin. area, which is P3AD.  That was

23   rough metal framing, but everything else was all -- that

24   was all cinder blocks, masonry, brick work.

25   Q.    Okay.  Was that sequence actually followed as the

1   mason was doing his work?

2   A.   It was, to a certain extent.  Once they had like a

3   lot of masons there.  Once they started getting backed up.

4   So they had crews everywhere once they got going.  They

5   had to thin all these -- the doorways.  They had to demo

6   out.  To rebuild it, they toothed all the bricks so they

7   could match them up the block work with the corridors, or

8   brick work.

9   Q.   Did that get done in a timely way per the schedule?

10  A.   I don't think so.

11  Q.   Okay.  Was there masonry work being done in August?

12  A.   Yes, there was a lot.

13  Q.   Per the schedule, did you expect the masonry work

14  going into August?

15  A.   A little bit.  Not as extensive.

16  Q.   Okay.  Now, you were working with Mr. Clauson on this

17  project?

18  A.   Yes, he was my PM.

19  Q.   How frequently were you discussing issues with him or

20  coordinating your work with him?

21  A.   I would try to talk to him on a daily basis.

22  Sometimes I wouldn't talk to him for two days, but.

23  Q.   You kept daily reports on this project?

24  A.   Yes, I did.

25  Q.   Okay.  Could you look at -- would you look at

1   Exhibit 17, which is Volume II.

2   A.   Is that the first page?

3   Q.   Now, Exhibit 17 has got electrical contractor daily

4   reports, daily job reports, start in December of '09 and

5   go through October of 2010.  Are these your records?

6   A.   Yes, they are.

7   Q.   And you prepared these daily?

8   A.   Yes, I would.

9   Q.   Was this a normal part of your job to prepare daily

10  job reports?

11  A.   Yes, it was.

12  Q.   When you prepared these, where did they go?  Who else

13  saw them?

14  A.   I made copies of them and I gave them to Pike.

15  Q.   How frequently did you submit these to Pike?

16  A.   They wanted us to do it on a daily basis.

17  Q.   You gave them your reports every day?

18  A.   I started to, but it started to be on a weekly basis.

19  Q.   Okay.  Throughout this period, which is December '09

20  through the end of -- almost the end of 2010, the end of

21  October 2010, did Pike ever communicate with you, contact

22  you, comment to you about anything you were submitting in

23  these daily job reports?

24  A.   No.

25  Q.   Okay.

1    A.    Just that we were one of the only ones that were

2    doing it when it got really busy.

3    Q.    You were the only ones submitting it?

4    A.    Yes, and have them organized.

5    Q.    Who told you that?

6    A.    Maris.

7    Q.    The Pike secretary?

8    A.    Yes.

9    Q.    Let's start with the June 28th entry.  And I think

10   these are chronological.

11        Actually, let's -- if I can, let's start on June 7.

12   There's a June 7 report, Report Number 63, you have that?

13   A.    Yes.

14   Q.    You have a comment, a remark there.  Would you just

15   state what that is under the Remark section?

16   A.    "Can't go installing conduits in hot areas until

17   steel is installed for all rooftops."

18   Q.    What does that mean, "hot areas"?

19   A.    Area that needs to get done right away.

20   Q.    And what was the reference to at that point?

21   A.    At that point it had to be in Phase 3 near the

22   cafeteria area.

23   Q.    Even in June you were doing stuff in Phase 3, June 7?

24   A.    Actually -- well, that would be close to that area.

25   The steel wasn't approved yet for any of that, but that

1   was where we were running our feeders.  Through those

2   areas.

3   Q.   As of June 7 you're identifying problems with the

4   steel for the rooftop?

5   A.   Yeah.

6   Q.   If we go to June 28, your first entry on June 28

7   talks about "Steel I beams for rooftop units still need to

8   be finished for rooftops also on the north side of the

9   gym."  Is that the same issue that you had identified

10  several weeks early?

11  A.   Yes.

12  Q.   Okay.  And so it was at this point in time your

13  records are showing that steel is still not -- has not

14  been installed in the areas you've identified?

15  A.   That's from what I wrote down.

16  Q.   And you're doing these reports daily, right?

17  A.   Correct.

18  Q.   Okay.  So you're writing down -- are you writing down

19  what's going on on the job at that time?

20  A.   Yes.  I would fill up the pages if I wrote more, but

21  I wrote what I thought was important.

22  Q.   The next day, June 29 -- just to make sure, on the

23  28th, because we're there, you have a listing, you have

24  all sorts of people on the top of the page, 1 through 17.

25  Are those the people working for ECI on the project on

1    that day?

2    A.   Yes, they are.

3    Q.   Okay.  And the F means foreman, J --

4    A.   Journeyman.

5    Q.   And A is apprentice?

6    A.   Yes.

7    Q.   The next page, just as a reference point, work

8    performed, you seem to be identifying where people are

9    working at given points in time?

10              THE COURT:  What report number is this?

11              MR. KAPLAN:  I'm sorry, 6/29, Tuesday,

12   Number 81.

13   BY MR. KAPLAN:

14   Q.   Was that your practice in doing these reports to

15   identify where men were working?

16   A.   Yes.

17   Q.   Okay.  And the bottom, you have a remark, "Still lots

18   of steel and ductwork and demo that needs to get done."

19   Why are you writing that down at that time?

20   A.   Because some of the demo wasn't finished.  I don't

21   know what the exact area right at this second.

22   Q.   When you say "still lots of steel," was that still

23   that issue with the rooftops?

24   A.   Yes.

25   Q.   If we go to July 1, 2010, you have a remark at the

1    bottom, "Lots of demo still needs to be completed."  Why

2    are you writing that?

3    A.   I would write it because we were waiting on getting

4    into areas that we couldn't get into.

5    Q.   Is that because it's a problem?

6    A.   At the time, yes.

7    Q.   Lost time/delays on that same page, higher, "Still

8    steel going up all over, much more demo needs to get done

9    all over."

10         Same type of work?

11   A.   Same principle, yes.

12   Q.   The next page, July 2, your lost time/delays, "Still

13   tons of demo to do all over."

14         On July 6 you have an entry for lost time/delays,

15   "Still lots of demo and steel to go in."

16         Are those the same issues still going on there?

17   A.   Yes.

18   Q.   Now, you've got 14 men per your record there July 6

19   working on the job?

20   A.   Correct.

21   Q.   Were you being held back at this point due to steel

22   or demo problems in terms of the work you were able to

23   perform?

24   A.   I'm going to say yes.

25   Q.   And how were you -- how are you figuring out where

1  your men could work and where they could not work during

2  this period, early July?

3  A.   Well, there was lots going on.  That's when we were

4  starting to slab the auditorium --

5  Q.   Just a little slower, please.

6  A.   There was a lot going on.  There was slab in the

7  auditorium going on and there was a lot of demo we were

8  working on also.  And I had guys all over the whole job.

9  Q.   Okay.  Now, at this point, July 6, were you referring

10  to the contract schedule as to where you could perform

11  work and when work was going to become available to you?

12  A.   A little bit.

13  Q.   Okay.  And was it -- were you able to do that?  Was

14  the work becoming available as dictated by the contract

15  schedule?

16  A.   As far as I know, it was progressing slowly.

17  Q.   Okay.  How -- what direction were you getting from

18  Pike in the beginning of July?  Here's July 6, as to where

19  the work or what areas were going to become available.

20  A.   They would tell me to do what I had to do.  Work

21  where the guys are, work where it's available.

22  Q.   Who would tell you you had to do what you had to do?

23  Who said that?

24  A.   Well, Ed.

25  Q.   Ed Oloff?

1   A.   Yes.

2   Q.   Was he your main contact for Pike?

3   A.   Yes.

4   Q.   How frequently would you talk to him on the project

5   about your work activity?

6   A.   Almost every day.

7   Q.   Okay.  And so did Mr. Oloff give you any updated

8   schedules during the Phase 3 work?

9   A.   During the weekly meetings, we would all talk about

10  it in the foremen's meetings.  He would hit his areas

11  where he wanted to hit and where we would start.

12  Q.   When you say "hit his areas," what do you mean by

13  that?

14  A.   Hit his days that he wanted the work in the areas.

15  And then we would start those areas.

16  Q.   How did he express that to you?  You're having a

17  meeting, how is he telling you what areas to hit and what

18  to do?

19  A.   Verbally he would tell us all in the meetings.

20  Q.   Did he use -- Mr. Clauson referred to a whiteboard.

21  Did he use a whiteboard for illustrative purposes?

22  A.   Yeah, they had a big whiteboard on one side of the

23  whole thing.  They would write down all the activities in

24  their office trailer.

25  Q.   This was once a week?

1    A.    Yes.

2    Q.    At your meetings?

3    A.    Yeah.

4    Q.    And he would tell you what areas he wanted you to go

5    to for the next week, two weeks, for what period?

6    A.    For the next week or two.

7    Q.    Okay.  And did he distribute to you any updated

8    critical path schedules during those foremen meetings?

9    A.    Not when it was crazy, when there was 60, 70 guys

10   there, not just our crews.

11   Q.    During the Phase 3 week, let's say from end of June

12   into early September, did -- at any time did Pike provide

13   you with updated CPM schedules similar to the schedule

14   that's in the contract at Exhibit 12?

15   A.    They would give us our weekly meeting minutes every

16   meeting we would have what was talked about the former

17   week.

18   Q.    Was that in the form of a CPM schedule?

19   A.    Not that I recall.

20   Q.    What was is in the form of?

21   A.    It was just written out, typed out.

22   Q.    Things that had to be done in the next week or two?

23   A.    Yes, topics that were missing from certain

24   contractors, things that weren't getting done.  Milestones

25   that they hit, that they wouldn't hit, and other areas

1    that they would start working on.

2    Q.    Was it in the form of a CPM schedule with activities

3    and sequences and --

4    A.    Nothing like the schedule that you made me look at

5    before.

6    Q.    Did you ever get anything updated like the contract

7    schedule in Exhibit 12 during the Phase 3 work?

8    A.    Not that I remember.

9    Q.    Okay.  Did you ever see any updated CPM schedules

10   displayed or available at any meetings Pike was holding

11   for the Phase 3 work?

12   A.    They did have some schedules, but they -- I never --

13   I didn't take them out in the field with me or anything.

14   Q.    Were they offering them to you?

15   A.    Not that I recall.  It was very hectic.

16   Q.    In other words, were there copies of CPM schedules

17   Mr. Oloff was handing out saying these were revised

18   schedules?

19   A.    Not that I recall.  The big thing was the

20   coordination drawings that we all had to do.

21   Q.    You've mentioned that a couple times.  What are

22   coordination drawings that you just mentioned?

23   A.    They are drawings that we have to draw up where the

24   conduits are going, ductwork is going.

25   Q.    A little more slowly.

1   A.   Where the conduits are going, where ductwork is

2   going, lighting fixtures, soffits, obstacles.

3   Q.   So you provide information, other subs as well

4   provide information for the coordination drawings?

5   A.   That's correct.  Tin knockers, sprinkler guys, we all

6   had to do it together.

7   Q.   Plumbing guys?

8   A.   Plumbing guys.

9   Q.   Once you coordinated your drawings showing where all

10  your stuff was going in for the various trades, where

11  would the drawings go?

12  A.   The tin knockers would take in -- take their own set

13  and we would try to compile them all into one.  Our shop

14  actually did a lot.  Adam Heon did a lot of work with me.

15  Q.   Did that then go to Pike when it was all coordinated?

16  A.   Yes.  Whenever Pike wanted them, we would have them

17  there.  Sometimes I would go to the shop to get them.

18  Q.   And did Pike comment on them and give you feedback on

19  those?

20  A.   Yes.  They wanted them approved by the other

21  contractors.

22  Q.   Okay.

23  A.   Had a hard time approving them.

24  Q.   That was a process you were regularly doing

25  throughout the job?

1   A.   Yes.

2   Q.   That was just in terms of layout, right, where things

3   were going?

4   A.   Correct.

5   Q.   All right.  Did that have anything to do with

6   scheduling and when things were going to be installed?

7   A.   I'm going to say yes, because we had to coordinate

8   where our stuff was going so we could get it in.

9   Q.   So once you got the approval for the coordination of

10  the various systems and installations, then you could then

11  start to install; is that correct?

12  A.   Yes.

13  Q.   All right.  But after that, were the coordination

14  drawings used to schedule the work?  Once they were

15  approved, did anybody use them to schedule installing

16  work?

17  A.   No, we used them as a reference on the site.

18  Q.   Now, if we go to the July 7, 2010 entry, actually

19  this is one that Mr. Clauson was asked about.  You have a

20  note:  "Cliff and I walked job site.  We agreed to me

21  needing 10 more guys ASAP once demo is completed after

22  this week."

23       So that phrase "once demo is completed after this

24  week," what does that mean?

25  A.   That I was expecting most of the demo to be done.

1  Q.   So then you would have to load up with 10 more men

2  once the demo was done?

3  A.   Yes.

4  Q.   And why wait?  Why couldn't you load up with 10 more

5  guys before the demo was done?

6  A.   Because it wouldn't be productive.  I'd have guys

7  standing around.

8  Q.   After this week, this is a Wednesday, so that would

9  mean that you're expecting the demo to be done the

10 following Monday?

11 A.   Yes.

12 Q.   Okay.  And what was that expectation based on?

13 A.   It was based on what was happening during that week,

14 what was accomplished by demo.

15 Q.   Was Pike telling you the demo was going to be done in

16 the next week?

17 A.   They did in a few instances.  I don't think I wrote

18 it on this report.

19 Q.   By your recollection, was the demo done by the July

20 11th or 12th?

21 A.   I don't believe it was a hundred percent.

22 Q.   July 8 you have a note here, "Mason still haven't

23 started any cuts in walls.  Lots of demo to do."

24      What does that refer to, "masons haven't started any

25 cuts in walls"?

1    A.    That refers to all the notching that has to be done

2    for our systems -- our boxes to get cut into the wall.

3    Q.    So you can't do that particular part of the work

4    until the masons do their cutting of the walls?

5    A.    That is correct.

6    Q.    Based on your understanding of the schedule, was the

7    mason behind in that activity as of July 8?

8    A.    I'm not a hundred percent positive.

9    Q.    Okay.  Did that become an ongoing problem for you,

10   that issue with the cutting in the walls?

11   A.    Yes, it did.

12   Q.    Why was it a recurring problem?

13   A.    Well, it would happen throughout the gym and the

14   hallway corridors.  So where I would mark, we would have

15   to relocate because they thought it was harder to cut it

16   out the way it was shown on the drawings, so I would have

17   to get permission from Ed or somebody from Pike actually

18   to give us permission to move things over a little bit and

19   let them notch it out where it was easier for them to

20   snake down the walls for us.

21   Q.    Did it proceed in what you understood to be a timely

22   fashion, the cutting of the masonry walls?

23   A.    It took some time in the corridors, yes.

24   Q.    So was that on time?  Late?  Ahead of time?

25   A.    It was -- I'm going to say it was late because I was

1   writing down all the time I couldn't do my work.

2   Q.   You're making entries in your daily reports on these

3   issues.  Is that because these are problems for you?

4   A.   Yes.

5   Q.   On July 13, which is Reports 92 and 93, it's actually

6   for two days, you have a notation here on IDF room.

7   "Started data sleeve layouts for IDF room which still is

8   being demoed.  We are still yet to see any steel in both

9   the IDF room and main electric room in old stage area."

10  You have an exclamation point there.

11       Is that a problem at this time?

12  A.   Yes, it is.

13  Q.   What's the problem there?

14  A.   The problem is that's where -- back to what we first

15  started on, P3G, main IDF room is your hub.

16  Q.   Your hub?

17  A.   For all the systems.

18  Q.   So that wasn't -- that hadn't been -- the steel

19  hasn't arrived as of July 13, is that what your note said?

20  A.   Yes.

21  Q.   How is that impacting your work, the delays in that

22  area?

23  A.   Once the steel is installed, then they had to build

24  the floor and then they had to pour it, and so I couldn't

25  get in that area.

 1  Q.   And by not being able to get into that area, did that

 2  impact the way you were doing work?

 3  A.   Yes.  I had to revert to working in other areas.

 4  Q.   Was there any other impact by the fact you had to

 5  wait for the electric rooms to be done?

 6  A.   Well, no.  I couldn't get in there.

 7  Q.   What was the sequence that you expected to do -- what

 8  did you put in the electric rooms?

 9  A.   We had to run our 3-inch feeders, two-and-a-half inch

10  conduits, we had to run our pipes to all the panels that

11  go in there.

12  Q.   And was your expectation that you would work from the

13  electric room out or from out and go into the electric

14  room?

15  A.   I had to work from -- going towards the electric room

16  because it wasn't there.

17  Q.   Was that how you had planned to do that?

18  A.   Yes, because we knew it was going to get demoed.

19  Q.   Normally, would you wait for the electric room to get

20  did done and start from there?  I'm trying to get your

21  sequence.

22  A.   In this case, we had to start in the main gear room,

23  which isn't in this area that I talked about.  We had our

24  conduits in the hallway down below ready to rise up so we

25  could finish the electrical.  So at that point I wrote

1    this down because I couldn't get my guys into that

2    particular electric room.

3    Q.   Okay.  You have comments on July 14 and 15 about demo

4    still being done, still no steel for rooftop units in main

5    IDF and electric room.

6         Those issues are still not resolved as of the middle

7    of July, is that what your comments are saying?

8    A.   Yes.

9              THE COURT:  Can you give me a report number,

10   please?

11             MR. KAPLAN:  That would be 94 and 95, July 14

12   and 15.

13             THE COURT:  Thank you.

14   BY MR. KAPLAN:

15   Q.   Report for the 16th and 17th for July, you're still

16   waiting for demo to be done in the locker room area and

17   cafeteria, Mr. Mathieu?

18   A.   Yes, that's what I wrote.

19   Q.   Is that still the same kind of issue you've been

20   talking about holding you up in certain areas?

21   A.   Yes.

22   Q.   Did you work on weekends in July and August?

23   A.   Yes, I did.

24   Q.   Did you take any time off at all in July and August

25   from this project?

```
 1   A.    I did not work July 4th.

 2   Q.    That was it?

 3   A.    Uh-huh.

 4   Q.    Seven days a week July and August other than July

 5   4th?

 6   A.    Correct.

 7   Q.    Is that something you had planned to do at the outset

 8   of Phase 3?

 9   A.    I did not -- well, I knew it was a seven-day job

10   because we were told that by Pike early in the beginning,

11   but I did not plan on working seven days a week.

12   Q.    When Pike told you it was a seven-day job, did you

13   understand that you had to be there seven days every week?

14   A.    No.  They said the job was open seven days a week.

15   Q.    And so what did that mean to you?  How did you

16   understand -- strike that.

17         When they told you it was open seven days a week, how

18   did you take that in terms of working seven days a week or

19   not working seven days a week?

20   A.    I didn't really plan on working the weekends -- or

21   Sundays, anyways.  Overtime was an issue.  So that's

22   probably why we got into the meeting with these guys on

23   the 21st.

24   Q.    Okay.  We're almost there.

25         You have an entry for the 19th.  Couple of items
```

1    here.  At the bottom it says:  "Getting crazy working with

2    all trades in the same locations everywhere."

3         What does that mean?

4    A.   We were on top of each other.  In the same rooms,

5    we'll say.

6    Q.   Okay.  Is that something you expected would be

7    happening in the middle of July, that subcontractors would

8    be on top of each other, as you said?

9    A.   A little bit.  Not as much as it was.

10   Q.   So -- okay.

11        And what's the impact of that on your ability to do

12   your work?

13   A.   It hurts it.

14   Q.   You also have an entry under Communication With

15   Others:  "Bouncing around all over due to miscellaneous

16   steel missing.  I have been accommodating them as well as

17   Ed O. when needed."

18        What is that referring to?

19   A.   When Ed was in a dilemma, he would call me and ask me

20   what I could do with it, take care of it.  Move our pipes,

21   move whatever was in the way that was electrical.

22   Q.   This was work you already installed?

23   A.   Some of the times, yes.

24   Q.   Okay.  And is this because -- was this note -- who is

25   QSR?

1    A.    That's the steel contractor.

2    Q.    Okay.  So was your note in regard to the steel

3    contractor's work?  Is that what that note refers to?

4    A.    Yes.

5    Q.    Okay.  So as he was doing work, you had to move your

6    work so he could install steel; is that what you're

7    saying?

8    A.    Yes.

9    Q.    You have an entry for July 20, Report Number 100.

10   The lost time/delays, that refers to the RTU, the rooftop

11   units.  What's going on with that note?

12   A.    There's no curb for that rooftop unit.

13   Q.    What's a curb for the rooftop unit?

14   A.    It's what the rooftop unit sits on on the roof.

15   Overlays over it so it doesn't get water in the building.

16   Q.    So what did that mean for your work?

17   A.    It means that we can't finish wiring RTU-3 because

18   it's not there.

19   Q.    Now, you also say:  "Much work needs to be done once

20   these units are set in place."

21         So the RT units were not set in place at the time?

22   A.    No, they were not.

23   Q.    When you say "much work needs to be done," what were

24   you referring to?

25   A.    We have to finish piping up into the unit, seal tight

1    into them, which was flexible conduit, we'll say,

2    waterproof.  And we had to pull our feeder wires through

3    them.

4    Q.   Okay.  Now, was this something you felt was being

5    delayed at this time?

6    A.   Yes.  That's why I wrote it down.

7    Q.   Then at the bottom you say:  "All the craziness with

8    steel still going in."

9         What is that referring to?

10   A.   It refers to steel was coming in, but it wasn't

11   coming in -- it was -- they would say some units would --

12   a unit was supposed to go in front of the cafeteria, but

13   they were getting the unit for the other area.  Wherever

14   they got the steel, they would go dump that day to try to

15   put it in.

16   Q.   The support for the rooftop, you mean?

17   A.   Yes.

18   Q.   So was this something Pike was scheduling week to

19   week saying we're going to have steel here next week, be

20   aware of this, or something like that?

21   A.   Pike was having a hard time with the steel guys

22   getting the steel there.  It was kind of hard to schedule.

23   Q.   So they weren't telling you in advance where this was

24   going to be happening?

25   A.   Not when I wrote this down.

1  Q.   That's why you wrote it down, because you didn't know

2  where it was going to be?

3  A.   Right.

4  Q.   That takes us up to July 21.  And did you attend a

5  meeting on July 21 about the various problems with ECI and

6  Pike?

7  A.   Yes, I did.

8  Q.   Okay.  Who was there?

9  A.   It was Mel Strauss and Ed Oloff.

10 Q.   From ECI, yourself and who else?

11 A.   Cliff Clauson and Bill Flynn.

12 Q.   And what issues do you recall being discussed at that

13 meeting?

14 A.   We talked about not being able to finish in time

15 because we thought it was way behind.

16 Q.   The job was way behind?

17 A.   Yes.

18 Q.   Did you identify the various issues that were going

19 on that were making it way behind?

20 A.   Yeah.  Well, we needed more manpower and a lot of

21 demo wasn't done, finished a hundred percent yet.  And we

22 had to work in those areas.  None were complete.

23 Q.   Did you talk about the other issues you've mentioned,

24 masonry, electrical room, data room, steel?

25 A.   Yes, we did.

1   Q.   Was Pike aware of the status of these various items

2   at the time?

3              THE COURT:  One moment.

4              MR. HUG:  Objection.

5              MR. KAPLAN:  I'm sorry.

6   BY MR. KAPLAN:

7   Q.   Did you discuss those various issues with Pike at the

8   time?

9   A.   The electrical --

10  Q.   Problems.

11  A.   Yes.

12  Q.   And you were talking with the Pike folks, with Oloff

13  on an ongoing basis up to the July 21 meeting, right?

14  A.   Yes.

15  Q.   You say you spoke to him daily?

16  A.   Yes.

17  Q.   So had you discussed these issues with him prior to

18  July 21?

19  A.   Yes.  He would always be telling me more manpower.

20  Q.   He was telling you, prior to July 21, you needed more

21  manpower?

22  A.   Correct.

23              THE COURT:  Who is "he"?

24              THE WITNESS:  Ed Oloff, superintendent for Pike,

25  we'll say.

1    BY MR. KAPLAN:

2    Q.   Prior to July 21, what was your response to these

3    statements from Mr. Oloff about needing more manpower?

4    A.   I told him I would try and talk to the shop about it.

5    Q.   Did you tell him anything else about what the

6    manpower would do when it got there?

7    A.   A little bit.  And I told him that I need more areas

8    done.

9    Q.   Okay.  All right.  So you talked about issues,

10   problems.  Was anything discussed about a time extension

11   at this July 21 meeting?

12   A.   At this meeting, well, these guys, we talked about it

13   a little bit.

14   Q.   When you say "these guys," who are you talking about?

15   A.   With Mel, Ed, Bill, and Cliff.

16   Q.   From ECI's side of the table, who was leading the

17   discussion as to time extension?

18   A.   Bill was with Cliff.

19   Q.   Okay.  And what was Pike's response to that?

20   A.   They said we don't have an extension or we can't do

21   that, you have to get it done.  It's per your contract.

22   Q.   You're talking about the Phase 3 work, right?

23   A.   Yes.

24   Q.   Did they ask for any further information from you

25   about justifying the time extension?

1   A.   I don't recall, but they told us to get more men, I

2   know that.

3   Q.   So you asked them for a time extension, they told you

4   to get more men?

5   A.   Yes.

6   Q.   Okay.  Do you recall anybody discussing alternatives

7   or solutions to the scheduling issues you were

8   identifying?

9   A.   A little bit.

10  Q.   And what do you recall about that?

11  A.   Well, we needed to know -- we wanted to come up with

12  a plan of how we're going to get this job done in time.

13  Q.   That was something ECI was asking for?

14  A.   Yes.

15  Q.   Okay.  So you were asking for a plan on how to get

16  Phase 3 done --

17  A.   Yes.

18  Q.   -- on time?

19       And what did Pike tell you in response?  What did the

20  Pike people, Strauss and Oloff, tell you in response to

21  that request?

22  A.   They told us to get more manpower.

23  Q.   Okay.  That was the plan they told you, more

24  manpower?

25  A.   Yeah.  And Bill would ask them if there was another

1    plan, and they said there is no other plan.  That's when

2    there is no Plan B came about.

3    Q.   You remember that being said?

4    A.   I do remember that.

5    Q.   Do you remember any discussion about the implications

6    of more manpower, anything discussed about financial

7    implications?

8    A.   I don't recall all that, but I know they told us we

9    owned it per our contract.  We owned having guys there to

10   do this work, we bought it in our contract.

11   Q.   Okay.  The discussion about contract requirements,

12   time extension, potential impacts on that, was that

13   something you were in the middle of the discussion or was

14   that something other people were talking about?

15   A.   That's something other people were talking about.  I

16   mean, I was there in the room and I was, you know, working

17   with people calling me on my phone so I wasn't paying a

18   hundred percent attention.

19   Q.   Okay.  So your status, if we look at your July 21

20   report, which is 101 in Exhibit 17, on that date, you have

21   28 men total all shifts per your statement.  The next day

22   you have 31 men.  Did you increase your workforce after

23   that?

24   A.   I know we did.  I believe we did the next week.  Some

25   days I would have a few men call up sick, so maybe that's

 1    why we're two men short.

 2    Q.   Just in terms of the manpower, just to flip ahead a

 3    week to July 28, you're showing for the 28th, Wednesday, I

 4    think 43 men.  The following day, 40.  And did that

 5    continue the next few weeks after that to increase -- you

 6    increased your manpower?

 7    A.   Yes.

 8    Q.   The 21st, going back to July 21st, 101, your entry

 9    there, part of your comments are:  "C-wing electric room

10    still not ready.  That's in the middle of that Comment

11    section.  Masons are all over."

12         Skipping a line down, "All trades are behind in all

13    areas."

14         Were those all problems that you were encountering at

15    that time?

16    A.   Yes.

17    Q.   Okay.

18              MR. HUG:  Your Honor, is there a possibility for

19    a short three- or four-minute break, five-minute break?

20              THE COURT:  Yes, there is.  We'll stand in

21    recess for five minutes.

22                   (Whereupon, a recess followed.)

23

24              THE COURT:  You may proceed again.

25

 1   BY MR. KAPLAN:

 2   Q.   We're going to go to 5:00, Your Honor?

 3              THE COURT:  We are.

 4              MR. KAPLAN:  Okay.

 5              MR. HUG:  Until 5:00?

 6              THE COURT:  Until 5:00.

 7              MR. KAPLAN:  I'm trying to think about -- all

 8   right.

 9              THE COURT:  Any possibility we'll be done with

10   this witness by 5:00?

11              MR. KAPLAN:  I'll be almost, but not quite.  I'm

12   thinking I'll be able to do the video.  I can do that

13   starting about five minutes.  If I can turn this on.  I

14   still have five minutes of lead-up.

15              I have a few minutes, but I was told I had to

16   get this warmed up.  Let me do a couple more things before

17   we do the video.

18   BY MR. KAPLAN:

19   Q.   We were at 101, 102, the July 21 and 22nd entry,

20   reference to the C Wing electrical room still not ready.

21              If you would look at the schedule, the contract

22   schedule which is Exhibit 12, at page 20, Sheet 20?

23   A.   I'm on it.

24   Q.   The electric room is down at the bottom.  Is that for

25   the C Wing, that Electric Room #C22A?

 1   A.   Yes.

 2   Q.   And that shows rub walls being done when?

 3   A.   That shows July 13.

 4   Q.   And then the painting the electric room would be done

 5   July 15, next line down?

 6   A.   Yeah.

 7   Q.   Yes?

 8   A.   Yes.

 9   Q.   Okay.  Here your entry is the electric room is still

10   not ready as of what, the 22nd of July, in your daily

11   report?

12   A.   That's correct.

13   Q.   Okay.  The next day, on the 23rd, you've got an entry

14   saying:  "Masons jumping around all over."

15        What does that mean?

16   A.   They were just going from section to section wherever

17   they felt like it.

18   Q.   Okay.  Was there any way for you to schedule the work

19   you had to do with the masons if they were jumping all

20   over the place?

21   A.   I had to jump around with them.  So there was no way.

22   Q.   You also have an entry at the bottom:  "Rooftop steel

23   still not installed for all RTUs."

24        That's the same issue you were mentioning earlier in

25   these reports?

1    A.    Yes.

2    Q.    Sunday, 25th -- Saturday and Sunday, the 24th and

3    25th, you have 20 men on Saturday and seven men on Sunday?

4    A.    That's correct.

5    Q.    You have a note at the bottom:  "ECI is the only

6    contractor putting manpower on site."

7          Why did you note that?

8    A.    Because we were the only ones there on Sunday.

9    Q.    Okay.  The 26th of July you have a note under

10   Communication with others:  "I've got guys piping rooftop

11   conduits and also tying in fire dampers as they are

12   getting installed."

13         Is that something you typically do, is do that work

14   as those units are being installed?

15   A.    In this case -- no, it's not.  As they put them in,

16   they were very tight to get to.  So I had to tie them as

17   they were installing them.

18   Q.    What do you usually do when you are piping rooftop

19   unit conduits in terms of the sequence?

20   A.    Usually pipe it all and then pull it in.  You're

21   referring to --

22   Q.    Your note.  I should be asking you to explain your

23   note.  Why don't you do that?

24   A.    Let me see how I wrote it here real quick.

25         Basically, the rooftop units and the fire dampers

1    were going in at the same time.  So that's -- I had guys

2    finish piping as the rooftop unit gets put in.  The same

3    thing with the fire dampers, as they're getting installed,

4    I'd have to tie them in.

5    Q.   Is that the normal sequence or is that something you

6    don't usually do?

7    A.   It's something we don't usually do.  Usually

8    everything is ready and then we go through.  If there's

9    ten fire dampers, we do them all in one shot.

10   Q.   Is it more time-consuming to do it the way it was

11   being done here?

12   A.   Yes.

13   Q.   The next entry -- your next report for July 27, you

14   have a couple things here.  Under lost time/delays, you

15   say:  "All other trades still behind."

16        What does that mean?

17   A.   It means they're not as far as they should be.

18   Q.   Is that holding you up?

19   A.   Yes.

20   Q.   And you also have an entry under Communication With

21   Others:  "Today we met with Ed/Mel in Pike's office and

22   went over the plan for getting the job done."

23        Some other things in there I'll talk about in a

24   moment.  What was that meeting all about?

25   A.   It was about being able to finish it on time.

1    Q.    Who asked for that meeting?

2    A.    It must have been either Ed or us, I'm not a hundred

3    percent positive.

4    Q.    Were you the only one from ECI at that particular

5    meeting?

6    A.    I don't believe so.  I believe Cliff must have been

7    with me because I wouldn't write "we."  I do that when

8    Cliff was with me.

9    Q.    You believe Mr. Clauson was with you?

10   A.    Yes.

11   Q.    Were you still complaining to Pike about the various

12   problems on the job as of the 27th of July?

13   A.    Yes, they knew that they were behind.  We talked

14   about it in weekly meetings.

15   Q.    Did they give you any direction on the 27th as to how

16   to catch up?

17   A.    I'm going to say it was probably getting more guys

18   once I get more.  Because I know we ramped up more than we

19   have there.  I have 45 guys there.

20   Q.    You have 45 guys there then.  You ended up having

21   even more later?

22   A.    Right.

23   Q.    When you started this job, did you expect to have 45

24   men working on Phase 3 as of the end of July?

25   A.    No.

1   Q.   Did you expect you'd have 60 guys working on Phase 3

2   for several weeks in August?

3   A.   Definitely not.

4   Q.   There's also a notation here:  "Pike is getting me

5   all my electric rooms ready by the end of the week."

6   That's next to Subcontractors On Site.  See that?

7   A.   Yes.

8   Q.   Was that something that somebody from Pike told you?

9   A.   Yes.

10  Q.   Okay.  Now, this end of the week would be the end of

11  July, right?

12  A.   Yes.

13  Q.   Okay.  Did that actually happen?

14  A.   I think it was a little bit longer than that.

15  Q.   Didn't get them until later?

16  A.   Yeah.  A week after or so.

17  Q.   So you didn't get your electric rooms until, what,

18  the first week of August?

19  A.   Maybe the second.

20  Q.   Second week of August, okay.

21       Then if we go to the 31st, which is a Saturday, at

22  the bottom you have under Remarks:  "Masonry is taking

23  longer than expected due to other reasons.  I will do what

24  it takes to get it done to the best of my ability and

25  more."

1      Again, this is the same ongoing problems you were

2  having with the masonry?

3  A.   Yes.

4  Q.   Let me see if I can get this -- at this point in time

5  get this video.  We're not going to go through the entire

6  thing, but I'd like to flip through some parts of it with

7  Mr. Mathieu.  I think it will take about ten minutes.

8            THE COURT:  Fine.  Is there an exhibit number?

9            MR. KAPLAN:  Yes, there is.

10           THE COURT:  Is there an objection to the video?

11           MR. HUG:  No objection to the video, Your Honor.

12           MR. KAPLAN:  The video number is Exhibit 52.

13           THE COURT:  All right.  Exhibit 52, the video,

14  is admitted, full exhibit.

15           THE WITNESS:  Does it come up here, too?

16           MR. KAPLAN:  I think so, if our crackerjack

17  technology is working.

18  BY MR. KAPLAN:

19  Q.   Let me ask you one or two questions.  This video, are

20  you aware of when the video was taken?

21  A.   It was in the first week of August, I'd say.

22  Q.   Who took it?

23  A.   Mark Reynolds.

24  Q.   He works for ECI?

25  A.   Yes, he does.  He was my second shift head man during

1    that time.

2    Q.   Okay.

3    A.   Foreman, we'll say.

4            MR. KAPLAN:  What I'd like to do, I'd like to

5    play some segments and ask Mr. Mathieu to just describe

6    some of the things that are being shown and skip ahead to

7    some other areas.  I'll do my best to coordinate it with

8    the witness.

9            THE COURT:  Do your best.  Thanks.

10   BY MR. KAPLAN:

11   Q.   Mr. Mathieu, as we go through, please feel free to

12   add commentary.  Tell me where to stop, that kind of

13   thing.

14        I'll keep playing it until you have it show up.

15            THE COURT:  Was it playing a moment ago for you?

16            MR. KAPLAN:  For some reason --

17            THE COURT:  Maybe pop the DVD out.

18            MR. KAPLAN:  I'll re-load it.

19                (Pause.)

20                (Video played.)

21   BY MR. KAPLAN:

22   Q.   Mr. Mathieu, what is that generally showing you?

23   A.   That's the boiler room right there.  That's the

24   entrance behind the main gear room.

25        It looks like it froze up again.

1          (Pause.)

2               MR. KAPLAN:  Rather than waste more time, I'll

3    play it tomorrow morning on my machine and we can huddle

4    around.  I have other questions.  I didn't anticipate this

5    problem.

6               THE COURT:  That happens.

7               MR. HUG:  Hit "play" again.

8               MR. KAPLAN:  It may be it's just not loading up.

9    I don't want to waste everybody's time with this.

10              THE COURT:  All right.

11              MR. KAPLAN:  Let me get this off.  We'll pick

12   that up in the morning.  Sorry.

13   BY MR. KAPLAN:

14   Q.   Mr. Mathieu, let's go back to your daily reports.

15        Back in Exhibit 17, the August 3 entry, sir?

16   A.   You said the 3rd?

17   Q.   August 3rd, please.  At this point in time, the

18   work's still going on with the rooftop units?

19   A.   Yes.

20   Q.   Okay.  And then the next entry, August 4, you have

21   "Bill F. was here with Cliff.  We talked with Pike on

22   areas of critical path."

23        What does that mean?

24   A.   Areas that we needed to get done to open the school.

25   Q.   "We need our electric rooms built in B upper and C

 1  Wing.  Steel is still not completed."

 2      So you still don't have those areas yet as of

 3  August 4?

 4  A.   Apparently not, according to this.

 5  Q.   Okay.  Well, if you put it down there, if you wrote

 6  that down, was that your entry for what the status of the

 7  job was at that time?

 8  A.   Yes.

 9  Q.   Okay.  The next day, August 5, you have an entry that

10  "boiler room is full of miscellaneous debris from other

11  trades."

12      What were you supposed to be doing in the boiler

13  room, Mr. Mathieu?

14  A.   Re-piping all the new units in there, hot water

15  tanks, the boilers, two or three of them, I believe.

16  Q.   Okay.  And was the situation you're noting there, was

17  that affecting your work?

18  A.   Yes.  That was a very crowded area.  They had to

19  install all the units before we could start piping

20  anything.

21  Q.   Okay.  What kind of debris was there in the boiler

22  rooms?

23  A.   There was trash.  There was pieces of material that

24  weren't being used, stuff from when they demoed.  They

25  demoed out a big boiler room and had to repatch the roof.

1    There was junk everywhere.

2    Q.   Your entry for the 6th and 7th of August, Friday and

3    Saturday.  Friday you've got 50 men on site, 26 men on

4    Saturday, right?

5    A.   Yes.

6    Q.   And your entry -- couple entries there about doors

7    are still not installed.  "Many doors still not

8    installed."

9         How did that affect your work?

10   A.   It's security.  We couldn't run our wires through the

11   doors because the wires have contacts in them.  And you

12   can't finish anything until the frames are there, you've

13   got to work them in there.

14   Q.   When you're making a note of this, does that mean

15   you're stating this is a problem for prosecuting your

16   work?

17   A.   Yes.

18   Q.   And you also say a little bit down below:  "We're

19   working on all systems all over."

20        What does that mean?

21   A.   Along with the security, we have the fire alarm

22   system I was working on everywhere.  The Lutron system.

23   We had the PA system.

24   Q.   Okay.  For the 11th and 12th, Reports 121 and 122, it

25   says:  "Ceilings starting in corridors in Admin. and B

 1   Wing and F Wing.  Still nothing in front of cafeteria

 2   corridor."

 3        What does that mean?

 4   A.   The ceilings weren't ready to be installed there yet.

 5   Q.   Okay.  And what kind of ceilings are we talking

 6   about?

 7   A.   Drop ceilings.

 8   Q.   So you have these grid systems?

 9   A.   Yes.  Like the ceiling behind the lights there

10   (indicating).

11   Q.   In the back part of the courtroom?

12   A.   Correct.

13   Q.   What work were you doing up in the ceilings?

14   A.   We had to install all our fixtures.  And finish

15   pulling our -- basically, they wanted all the lights on

16   wherever they put the corridors.

17   Q.   Say again?

18   A.   They wanted all the lights on wherever they're

19   putting corridor ceilings in.

20   Q.   Okay.  What was the sequence of work for your wiring

21   and fixture installation in ceilings?  How did you

22   anticipate that was supposed to go?

23   A.   Well, the ceilings went up rather quickly because

24   they're pretty easy to do once they're ready.  That went

25   up, they went up rather quickly.  So my sequence is we

1    have rough wire waiting, home runs.  Then all corridors

2    had no power packs; we had to install the lights, shoot

3    wires up, support the lights, and then we had to wire them

4    together.

5    Q.   Okay.  And was there anything about the way that

6    actually happened that changed what you expected to do?

7    A.   A little bit.  Once they started getting the ceilings

8    in and we got some lights in, they would start padding and

9    closing the ceilings up.

10   Q.   Was that --

11   A.   Then would start doing the cuts right away.

12   Q.   I'm sorry?

13   A.   Start doing the cuts, installing the pads before I

14   would be able to rip out all the temp. lighting.

15   Q.   So you had temporary lighting in where the ceilings

16   were going?

17   A.   Yes.

18   Q.   You were supposed to take that out before they

19   installed the ceilings?

20   A.   Yes.

21   Q.   Were you able to take the temporary lighting out

22   before they installed the ceilings?

23   A.   Not everywhere.  Mostly the corridors got done that

24   way.

25   Q.   What way?

1  A.    They would -- we would install our new lights and

2  then they would start padding.

3  Q.    And you hadn't taken out the temporary lights yet?

4  A.    Correct.

5  Q.    Why didn't you take the temporary lights out early?

6  A.    Because I would have to turn off the new lights -- I

7  have to turn on the new lights first.

8  Q.    Okay.  Was that something you expected?

9  A.    No.  That's not something I expected.

10  Q.    All right.  Okay.  Friday, the 13th, you have an

11  entry:  "I'm working in all areas."  This is in the middle

12  of the page.  "Basically this job is out of control.  All

13  other trades are in same areas everywhere."

14       Why are you saying it's out of control the 13th of

15  August?

16  A.    Everybody was scrambling to try to get their stuff

17  done all at the same time.

18  Q.    Okay.

19  A.    It was very, very hectic.

20  Q.    Was that something you expected at the beginning of

21  Phase 3, that you'd be in this situation, as you say, all

22  of the trades in the same areas everywhere?

23  A.    I expected some of it, but not to the extent that it

24  was.  It was very hectic, like I wrote down.

25  Q.    Okay.  Your next entry, Saturday the 14th, you've got

1    31 men there.  At the bottom you say:  The job site looks

2    like a tornado hit it.

3        What does that refer to?

4    A.   There's debris everywhere.  If you would have seen

5    the video, you'd see when you see the video, there's

6    obstacles everywhere.

7    Q.   Does that impact your work?

8    A.   Yes.

9    Q.   How?

10   A.   We have to crawl under staging.  We have to work

11   around all the stuff.  If we have carts going in the

12   hallways, we have to move stuff out of the way.  Even just

13   to set up our ladders.

14   Q.   Okay.  You have an entry for Sunday, August 15:

15   "Still not finished in lobby area with masonry."

16       Masonry is still going on in the lobby area?

17   A.   Yes.

18   Q.   Okay.  You also have a note:  "Ceilings still can't

19   go up in lobby areas including bathroom and art room.

20   Still no ceilings in corridor connector area."  You

21   mention some other areas.

22       How is that impacting your work, the fact that

23   ceilings were not up in these various areas you

24   identified?

25   A.   We're not able to put our lights up into the ceiling.

1    Q.   Okay.  Monday the 16th, you have a note at the

2    bottom:  "Job site very hectic.  Never seen so many men

3    working frantically to get it done."

4        Is that more of the same from the note you had prior

5    from a few days before?

6    A.   Yes.

7    Q.   For the 17th, in the middle here, it says:  "As

8    ceilings are going in, we are installing fixtures behind

9    them," exclamation point.

10       What does that refer to?

11   A.   I'm putting the lights in as they're putting the

12   ceiling up.  So we're going behind them and installing the

13   lights as they're putting the ceiling in.

14   Q.   Is that something you normally do?

15   A.   No.  We normally do it once the ceiling is all done.

16   I would do the sections as they get it done, I would

17   install the fixtures.

18   Q.   Now, was Pike coordinating this work for you --

19   sorry.

20       Was Pike directing you in how the sequencing and

21   timing of this work?

22   A.   Not really.  It was just when the ceilings went up,

23   that's what I did.

24   Q.   How did you know the ceilings were going in?

25   A.   Well, they would have the ceiling guys start

1    installing them.

2    Q.    You were observing that?

3    A.    Yes.

4    Q.    You also say "Pike is getting inspections on ceilings

5    that still have temp. lighting in them and starting to

6    close ceilings up."

7         What does that refer to?

8    A.    That's referring to -- that's what I told you about,

9    they were getting inspections without me knowing it, and

10   they would start closing ceilings up and leave a couple

11   pads here and there with my temp. stringers just hanging

12   on, lit, along with my other lights.

13   Q.    Is that the normal course of business for you?

14   A.    Absolutely not.

15   Q.    So what did you have to do then, go in and remove

16   your temporary lighting?

17   A.    Correct.

18   Q.    From a finished ceiling?

19   A.    Yes.

20   Q.    Does that create problems for you?

21   A.    Yes.

22   Q.    What problems?

23   A.    If we remove a pad, we would get blamed for damaging

24   it and stuff like that.

25   Q.    So usually you're removing your temporary lighting

1    without the pads in?

2    A.    Correct.

3    Q.    And what about the inspections, are you supposed to

4    be there for electrical inspections in the ceiling?

5    A.    Technically, yes.  I was supposed to.  But somehow

6    they were getting it inspected.

7    Q.    Okay.

8              THE COURT:  Ninety more seconds, it looks like.

9    Use them wisely.

10             MR. KAPLAN:  Give me the hook.

11   BY MR. KAPLAN:

12   Q.    And you make the same type of note on the 18th,

13   right, about the ceilings and the temporary lighting and

14   taking that out?

15   A.    Yes.

16   Q.    Okay.  Now, on the 19th of August, at the bottom:

17   "Flooring starting everywhere.  Corridors being blocked

18   off.  Can't get in rooms while they are there."

19         What does that refer to?

20   A.    That was when the flooring guy started doing their

21   floors, they would have to patch the flooring before they

22   could install their tile, would have to wait to dry.  We

23   couldn't get anywhere near those areas.

24   Q.    Was this something that was supposed to be going on

25   on August 19, the flooring started?

1    A.   Probably, because the job had to be done in the next

2    few weeks.

3    Q.   It had to be done by the end of August.  From a

4    scheduling point of view, would the flooring usually be

5    starting two weeks before school was to open?

6    A.   No.

7    Q.   Okay.  And you could not get access to areas where

8    the flooring was going in; is that what you're saying?

9    A.   Yes, until the next day.

10              MR. KAPLAN:  Might as well stop here.

11              THE COURT:  Okay.

12              MR. KAPLAN:  I'll pick up in the morning.

13              THE COURT:  Thank you, Mr. Kaplan.

14              And thank you, Mr. Mathieu.

15              We will resume tomorrow.  Let's start at

16   8:00 a.m. again, go just until noontime.  And hopefully we

17   will be -- I'm keeping my fingers crossed we'll be done,

18   maybe close to being done?

19              MR. KAPLAN:  We'll see.

20              THE COURT:  Depends on the amount of

21   cross-examination.  Close to being done with the

22   plaintiff's case.  We've got Mr. Flynn.  I guess Mr. Flynn

23   is going to be quite a bit of time?

24              MR. KAPLAN:  I don't know.  We'll do our best.

25   I think with Mr. Mathieu, this is about ten minutes when I

1    get it going, the video.  Otherwise, I probably have

2    another 20, 25 minutes with him.  So it's not a tremendous

3    amount left.  Maybe 35 minutes or so.

4            THE COURT:  Okay.  I appreciate everybody's

5    cooperation today.  See you tomorrow.

6            We'll stand in recess.

7                 (Proceedings adjourned at 5:01 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


RE:  ELECTRICAL CONTRACTORS, INC. v. THE PIKE COMPANY

No. 3:11CV449(JAM)



          I, Diana Huntington, RDR, CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.








                    _____/s/_____

                    DIANA HUNTINGTON, RDR, CRR
                       Official Court Reporter
                    United States District Court
                    915 Lafayette Blvd., Room 423
                    Bridgeport, Connecticut 06604
                         (860) 463-3180