UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                 :
ELECTRICAL CONTRACTORS, INC.,    :  No. 3:11CV1449(JAM)
                                 :
            Plaintiff            :
                                 :
        vs.                      :
                                 :
THE PIKE COMPANY,                :
                                 :  Bridgeport, Connecticut
            Defendant            :  June 18, 2014
                                 :
- - - - - - - - - - - - - - - - x


BENCH TRIAL
VOLUME III


B E F O R E:

     THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


A P P E A R A N C E S:

     FOR THE PLAINTIFF:

            MICHELSON KANE ROYSTER & BARGER
                Hartford Square North
                10 Columbus Blvd.
                Hartford, Connecticut 06106
            BY:  STEVEN B. KAPLAN, ESQ.

     FOR THE DEFENDANT:

            ROBINSON & COLE
                280 Trumbull Street
                Hartford, Connecticut 06103-3597
            BY:  CHRISTOPHER J. HUG, ESQ.
                DEBORAH A. VENNOS, ESQ.


                        Diana Huntington, RDR, CRR
                        Official Court Reporter

1                          TABLE OF CONTENTS

2

3      PLAINTIFF'S                                              VOIR
       WITNESS          DIRECT   CROSS   REDIRECT   RECROSS   DIRE
4      STEPHANE MATHIEU
5        By Mr. Kaplan    565
         By Mr. Hug               590
6        By Mr. Kaplan                      628
         By Mr. Hug                                    632
7
       WILLIAM FLYNN
8        By Mr. Kaplan    633

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **8:16 A.M.**

2              THE COURT:  We're back on the record for Day 3

3    of the trial in Electrical Contractors, Inc. vs. The Pike

4    Company, 3:11CV1449.

5              Appearance of counsel this morning?

6              MR. KAPLAN:  For the plaintiff, Steven Kaplan

7    from Michelson Kane Royster & Barger, Your Honor.

8              MR. HUG:  For the defendant, Christopher Hug of

9    Robinson & Cole.

10             MS. VENNOS:  Also for the defendant, Deb Vennos

11   of Robinson & Cole.

12             THE COURT:  Do we have clients with us as well?

13             MR. HUG:  We have an additional person with us

14   today, Richard Merkhofer, who is one of the witnesses in

15   the case.  He came into town thinking maybe he would be

16   testifying today, but probably won't until tomorrow.  But

17   he's here in town and stranded, so he came to court with

18   me.

19             THE COURT:  Fair enough.

20             And we have Mr. Clauson and Mr. Flynn as well, I

21   understand.

22             I understand there's updates on our video

23   technology as well as exhibits.  Maybe you just want to

24   put that on the record.

25             MR. KAPLAN:  As far as the video, I've been

1    trying very hard to plug into the court system.  We've

2    tried many different ways.  I don't think it's working to

3    get it on all the screens.  I won't go into why, it's just

4    not.  We've tried three different laptops, it's just not

5    working.  But I have it on a laptop.  In a few minutes I'd

6    like to ask if we could just view it sort of, for a few

7    minutes, around the laptop and have the witness comment on

8    it, if that's all right with the Court.

9              THE COURT:  I think that's fine.

10             Mr. Hug?

11             MR. HUG:  Sure.  We talked a little about it.

12   From a space standpoint, if Your Honor's okay with it, it

13   would be easier if you came off the bench and the witness

14   came off and we looked at it right around here would make

15   it easiest.

16             THE COURT:  That's great.  I've got popcorn in

17   chambers, maybe we'll do that.

18             Okay.  And I understood that there's something

19   also with exhibits before we continue.  Were there

20   additions to the exhibits?

21             MS. VENNOS:  Yes, Your Honor.  Defendant has

22   another exhibit that plaintiff doesn't object to putting

23   on the list, but does have an objection to.

24             THE COURT:  When it comes up?

25             MS. VENNOS:  Yes.

 1          THE COURT:  We'll wait on that.

 2          Mr. Mathieu has taken the stand again.

 3          Mr. Mathieu, I just remind you that you're still

 4  under oath.

 5          Mr. Kaplan, please proceed.

 6          MR. KAPLAN:  Thank you, Your Honor.

 7

 8                  STEPHANE MATHIEU,

 9       a witness, having been previously duly sworn,

10       was examined and testified further as follows:

11

12              CONTINUED DIRECT EXAMINATION

13  BY MR. KAPLAN:

14  Q.   I'm going to pick up and work through the rest of the

15  daily reports, Mr. Mathieu, and then we'll give this video

16  viewing a try.

17       We were in Exhibit 17, and I just would like to pick

18  up at your August 11, 2010 entry.  And I will try to

19  follow the Court's recommendation to spot things and move

20  through this quickly.

21       Actually, we were at August 14, I'm sorry, you had

22  talked about that tornado.  Let me see.

23       I'm sorry, August 18 would be where we would be.

24       Are you there, Mr. Mathieu?

25  A.   Yes, sir.

```
1    Q.   So this was an issue I think we left off with

2    yesterday, this note in the middle about ripping out

3    temporary lighting above ceilings that had been closed.

4    That's where I think we left off yesterday, Mr. Mathieu,

5    you were describing that problem?

6    A.   Yes.

7    Q.   That was going on on the 18th?

8    A.   Yes.

9    Q.   Okay.  And I think actually for the 19th, we've

10   already talked about the flooring.  So I'll go through

11   there.

12        The 20th you have a note at the bottom about the

13   flooring going in and you're still being detoured all

14   over.  What does that mean?

15   A.   Where the flooring is going on in the classrooms and

16   the hallways, mostly the corridors, we had to walk around

17   the area, large area, to get over to where we had to work.

18   Q.   Did you have work to do actually in those corridors

19   at that time?

20   A.   I'm sure I did.  But the focus was the classrooms, to

21   get them done.

22   Q.   Could you do your work in the corridors while the

23   flooring was going in?

24   A.   No.

25   Q.   The 21st of August is the next page in this exhibit.
```

1   At the bottom, you have a note about a temporary wall will

2   be built next to auditorium.  Do you see that at the very

3   bottom?

4   A.   Yes.

5   Q.   What is that referring to, sir?

6   A.   The auditorium was attached to the main lobby and the

7   auditorium wasn't built yet.  So they made it safe so kids

8   wouldn't go through it.

9   Q.   Was the auditorium part of your space framework?

10  A.   No, it wasn't.

11  Q.   The 22nd you had 16 men there?

12  A.   Yes.

13  Q.   Your note at the bottom, "Ceilings in art room still

14  not started."  Was the art room part of Phase 3?

15  A.   Yes, it was.

16  Q.   Did the art room get done by the end of August?

17  A.   No.  They put it on hold.

18  Q.   Okay.  And why did that get pushed beyond?

19  A.   I say because of the steel wasn't ready yet.

20  Q.   That was part of that steel problem you described?

21  A.   Yes.  And it was behind.  I believe the steel was

22  done at that time, but we didn't have time -- nobody had

23  time to finish that area before school started.

24  Q.   Okay.  On the 23rd, you have 42 men there.  Then you

25  have a note, "Today I sent seven men to other job sites

1    due to us catching up quickly in all areas."

2         Were you starting to reduce your forces at that time?

3    A.   Yes, we were winding down.

4    Q.   But 42, was that -- had you expected to have 42 men

5    at the end of August on the job?

6    A.   Not from the start of the job, no.

7    Q.   The 24th you have a note, "Flooring guys are killing

8    me.   Lobby is blocked off."

9         What does that mean?

10   A.   We couldn't get to the main lobby.   That was the time

11   where we were getting ready to start up our fire alarm

12   system.   I had Simplex techs there.   I don't know if it

13   was this particular day, but --

14   Q.   The next day there's a note about that.

15   A.    We couldn't get into that area to get these guys in

16   there to program everything and tie in all the wires.

17   Q.   And the fire alarm, you could wait on the fire alarm,

18   right, because they couldn't get a certificate of

19   occupancy without fire alarm?

20   A.   That's correct.   Fire alarm is critical path.

21   Q.   The next day, 25th, I think you have a note, "Simplex

22   is working on planking because tile was drying under his

23   fire alarm panels in lobby."

24        What does that mean?

25   A.   The floor guys were doing special tile in that area

1    and they weren't stopping for anybody.  They were doing it

2    anyways.  I had to put planking up so my guy could stand

3    on it and program and work on his fire alarm panel.

4    Q.    Is that something that's the normal way of putting in

5    fire alarm systems?

6    A.    No.

7    Q.    27th of August.  Here you're at the end of the month,

8    it's a Friday, still have 31 men there?

9    A.    Correct.

10   Q.    And you have a note in the middle -- I'm sorry, hold

11   on.

12         At the bottom, I'm sorry, you have a note about you

13   can't install fixtures until millwork is installed.  What

14   is that referring to?

15   A.    That is in the corridors in the -- I believe it was

16   the P4W area, the lighting wasn't able to go in until the

17   millwork was done because the lights go inside of the

18   millwork.

19   Q.    And where were those located?

20   A.    It was in the P4W area.

21   Q.    P4, was that in Phase 3?

22   A.    Well, it was also P2.  It was in this pink area.

23   Q.    Yes.

24   A.    And in the P4W area upstairs.

25   Q.    Was any of it affecting the Phase 3 work?

```
 1   A.   At that time I don't believe so, because P4W they
 2   moved in after they got school started.
 3   Q.   Okay.  I'd like to show you Exhibit 56, which is in
 4   our third volume.
 5            MR. KAPLAN:  Your Honor, this is a copy of an
 6   e-mail that we not through discovery from Pike.  I
 7   don't -- it addresses an issue Mr. Mathieu has been
 8   talking about.  It's not an e-mail he was involved with.
 9   I would offer it so that I could ask him about the
10   reference in there, the subject matter.
11            THE COURT:  Any objection to Plaintiff's
12   Exhibit 56?
13            MR. HUG:  No objection.
14            THE COURT:  Admitted as a full exhibit,
15   Plaintiff's Exhibit 56.
16   BY MR. KAPLAN:
17   Q.   Okay.  The e-mail refers to "the Art, Music, Storage,
18   and Locker Rooms will not be available for the opening of
19   school.  There was a delay with the installation of
20   structural steel and a delivery issue with the new
21   skylight in the Art/Music areas.  We anticipate that these
22   areas will be available no later than October 3, 2010."
23       Does this refer to the issues you were talking about
24   with the steel and delaying those areas?
25   A.   Yes, it does.
```

1    Q.   This is dated August 3rd.  Were you informed by Pike

2    around August 3rd that they were going to delay the

3    opening of those areas until the end of September, early

4    October?

5    A.   Yes.  I'd say yes.

6    Q.   Okay.  Were you still doing work in those areas in

7    August?

8    A.   Yes, I was.

9            MR. KAPLAN:  Okay.  Well, let me give this a try

10   with the video, Your Honor.  I'm not optimistic about the

11   quality of this on this laptop, perhaps we can muddle

12   through, if you don't mind.

13           THE COURT:  Okay.

14           MR. KAPLAN:  Let me set this up on a corner

15   where we'll have a little more room, Your Honor.

16           If we could perhaps huddle over here, if that's

17   all right with Your Honor.  I'll try my best.

18   BY MR. KAPLAN:

19   Q.   Mr. Mathieu, okay.  This is from Exhibit 52.  We had

20   just started and you explained this was taken by

21   Mr. Reynolds at the beginning of August.  I'm just going

22   to hopefully -- if you could describe as we're going

23   through this, what it's showing.

24           THE COURT:  Nice and loudly, because our court

25   reporter needs to be able to make a record.

1    A.   This is the cafeteria area, and the kitchen and the

2    hallways.

3    BY MR. KAPLAN:

4    Q.   Is there anything you want to point out there?

5    A.   You could see all the stuff in the middle of the room

6    everywhere as we're going by there, and the ceilings

7    aren't complete yet.

8    Q.   Okay.  What work did you have to do in this area?

9    A.   They had to notch all the walls.  There was special

10   tiles in the walls that wasn't in there.  As you go

11   through, you'll see there's notched-out areas.  You can

12   see a portion of the ceiling is in back there, but over

13   here there's nothing going towards the back wall.  The

14   back walls aren't built yet because of the special door

15   frames going in.

16   Q.   And then right there, is that -- what's this

17   material?

18   A.   Looks like a few lifts and there's ceiling exhaust

19   fans.

20   Q.   Those?

21   A.   Those are ceiling pads, I believe.

22        This is in the same area, you can see the block work

23   wasn't done.  You could see the staging all over.  We have

24   our sleeves up in the ceiling, that's part of the

25   corridor, actually.

1   Q.   Okay.  Now, this is -- obviously, that's brick.
2   Where is that supposed to be going?
3   A.   In those areas to the left.  You can see where they
4   notched out all the blocks here.  In this particular case
5   it's hard to see, but if you keep going, you'll see more
6   where we have the finish work.
7   Q.   Is this where you're talking about notching out the
8   walls?
9   A.   Not in this particular case.  This is where the beams
10  are.
11       This is part of the main corridor, you saw one of my
12  guys walking through.  This is one of the masons blocking.
13  Q.   Where are the conduits?
14  A.   These are all the conduits here.  These are main
15  feeders going to the cabling.
16  Q.   Okay.  Are the walls up in this area?  Are the walls
17  being constructed there that you were waiting for?
18  A.   Yes.  They were waiting for the door frames to be put
19  in and start building.
20  Q.   I'm going to get rambunctious here and try to fast
21  forward.
22       And what are we seeing here, Mr. Mathieu?
23  A.   Those are the walls that are notched out for our
24  piping that they had to flex in.  It's hard to see, but
25  there's a box there that has to be patched in by the

1    masons.

2    Q.   You talked about these being late, the cutting out of

3    these areas so you could get work in there?

4    A.   Correct.  It was more of the patching, filling them

5    back in so we could finish.

6    Q.   So they had to patch this up so you could do

7    subsequent work?

8    A.   Yes.

9    Q.   Okay.  This is very blurry.

10        Were those blocks that we just saw that was piled up,

11   Mr. Mathieu?

12   A.   Yes.  This looks like it was part of the main lobby

13   going up to the connector.

14        That's the gym area.  And you can see our conduits

15   right here, waiting for the brick to go up in that area.

16   Q.   Okay.  I'm going to skip some of this.

17   A.   We used this as a staging area for some of those

18   areas.

19   Q.   This doesn't want to cooperate.

20   A.   We had to walk up to an area where there's all kinds

21   of block.  We had to tooth and nail all this stuff here.

22   We had to work everything inside the walls, tooth and nail

23   the brick work, and then they had to patch that all back

24   in so we could finish our systems.

25             THE COURT:  Tell me what you mean by "tooth and

1    nail the brick work."

2              THE WITNESS:  See how the bricks are cut at an

3    angle back and forth and in and out?  They can't just cut

4    through the middle of the block, they have to replace it

5    with full brick, actually.  So it takes time to do that.

6    And then they have to patch all this back in before we

7    could finish.

8              THE COURT:  Is that normal or is this condition

9    that we're looking at here caused by the disruption that

10   you already testified about that was on the site?

11             THE WITNESS:  This is not normal.  I'd never

12   have to do this before.  Usually it's a lot quicker.  This

13   is first time I've ever had to do something like this

14   behind block walls and brick walls.

15   BY MR. KAPLAN:

16   Q.   Timing-wise, was it being done in a timely fashion,

17   from your point of view?

18   A.   In this case it took longer because it took them a

19   lot longer to patch it all in.  We also had to rough it

20   in.  So we'd get it all roughed in and there was spots

21   like this throughout the school that weren't patched until

22   the middle of August or two weeks, a few weeks in.

23   Q.   Once it gets patched, what do you do next?

24   A.   We have to pull all our circuitry into the conduits.

25   In this case, we had the fire alarm, pull station with

1    lighting switches, and there was an outlet underneath.

2    Q.   You have to wait until this gets patched up before

3    you can do that?

4    A.   That's correct.

5    Q.   Okay.

6    A.   Now they're walking to where the locker area is.

7    This is the area that got postponed.  But we still had to

8    do work in here doing our fire alarm infrastructure.  When

9    we start the fire alarm when school gets in, all the

10   systems had to be ready.

11           MR. KAPLAN:  I would fast-forward all this,

12   Your Honor, but I'm having trouble with this machine and

13   getting it to cooperate.

14   A.   This is the art room area.  It also got delayed.  If

15   you look in the back, you can see the auditorium.

16           This is walking towards the main lobby now.

17   Q.   What area?

18   A.   Going back into the locker area.

19   Q.   This is the locker area again?

20   A.   Yeah.

21           THE COURT:  We don't see anybody present in

22   this, other people wandering around.  Is there a reason

23   for that?

24           THE WITNESS:  Yes.  There's a few guys that you

25   saw before, but this is after hours.

1              Those are some of our guys that walked by there.

2     BY MR. KAPLAN:

3     Q.   I'm going to speed this up to get to other sections.

4     A.   This is a typical classroom, walk through.

5          All these doors that they're walking through, they

6     had to cut all these doors and recess them back about

7     3 feet.  Every classroom was like that.

8     Q.   That's where you say you were putting in your

9     security wiring?

10    A.   It was mostly lighting and fire alarm.  Each room had

11    fire alarm.

12    Q.   Did you wire things with the doors for security?

13    A.   Yes, we did.  This is where there's millwork.  And

14    you can see our wires are waiting for the millwork and

15    walls.  Wires in the ceilings and everything with all our

16    lighting.

17    Q.   Why couldn't you put the lights in there?

18    A.   There's no ceiling there yet.  But that was early on.

19              THE COURT:  Were the ceilings supposed to be

20    done already?

21    A.   I don't believe so.  It was another two weeks or so.

22         They're walking into the boiler room.  This is where

23    my guys -- our subs that we had had to work in this room.

24    BY MR. KAPLAN:

25    Q.   That was Phase 3?

1    A.    Yes.

2    Q.    And what were you doing in the boiler room, what

3    work?

4    A.    We had to power up all these hot water heaters that

5    you saw.  There's boilers that we had to power up.

6    There's PMVs, variable speed drives.  And you could see

7    during the day there's a lot of plumbers there, piping all

8    their plumbing.  There's sprinkler guys in there.  And I

9    had the Horton guys in there during the day also.  And the

10   ceilings were a good 16-, 17-feet tall.

11   Q.    I want to go to another area I wanted to ask you

12   about.  Should be in a couple of seconds here.

13        What is that showing?

14   A.    That's cinder blocks from where they -- the door

15   opening comes into the classroom.

16             THE COURT:  For the record, we're at 11 minutes,

17   19 seconds into the video.

18   BY MR. KAPLAN:

19   Q.    Was that supposed to be part of the wall?

20   A.    Yes.

21   Q.    I think we have other walls of that shown.  Now, I

22   think we have some other walls that are shown that are

23   like that.

24        Did you have issues with the masonry walls being

25   partially built and then left, and then other areas the

1    same way, like there (indicating)?

2    A.   Yes, I did.  In a few areas.  E3 wing.  That was the

3    storage area for the janitors.  That wasn't -- you can see

4    the notching of the pipes are waiting for us to connect

5    our stuff.

6    Q.   I'm trying to get to one other spot here.

7         All these materials are being loaded up here.  What

8    area is that, Mr. Mathieu?

9    A.   That would be the P4W, I believe.

10   Q.   That was P4?

11   A.   Yeah.  That was an area that wasn't going to come up

12   right away.

13        This is pictures of all my conduits that went

14   straight through, and then storage closet.

15   Q.   I'm trying to get to the front area here which is

16   another two minutes into the video.

17   A.   This is just a video of the backside of the

18   auditorium.

19        This looks like it's part of the courtyard.

20             MR. HUG:  May I ask a question?  That courtyard,

21   is that part of Phase 3?

22             THE WITNESS:  It was a mix of Phase 3 and P4W.

23   It was in between.

24   BY MR. KAPLAN:

25   Q.   Where are we here, Mr. Mathieu, 15:42?

1    A.    Play it back.

2    Q.    Just a second.

3    A.    Looks like the main lobby.  Our fire alarm panels

4    are back -- it's hard to see, there's a big cinder block

5    pallet in the way.  If you keep playing, it will show

6    better.

7    Q.    I'd love to.

8    A.    This is where our fire alarm infrastructure starts.

9    You can see we have a back box up behind the pallet.

10   Basically, had brick all in front of that and all around

11   it.

12   Q.    You had brick being what, walls?

13   A.    Yes.  The brick was tapped out about 8 inches or so,

14   because these panels were 6 inches.  They had to brick

15   everything up before we could finish trimming it.

16   Q.    Could you do your installation within the panels

17   until that work was done?

18   A.    No.  That was very special gear and equipment.

19   Q.    So this is August 2.  And those walls haven't been

20   built?

21   A.    Correct.

22   Q.    Okay.

23            THE COURT:  Were you supposed to be doing those

24   installations at that time, August 2?

25            THE WITNESS:  I believe so.  It was really close

1    to that point.

2            This was the main lobby.  When you first walk

3    in, go to your left, all this was built around.  Bathrooms

4    are there.

5            MR. KAPLAN:  Okay.  I think, for purposes of

6    what we've been doing, this is probably fair enough.

7    Thank you, Your Honor.  Appreciate your patience with us.

8            (Pause.)

9    BY MR. KAPLAN:

10   Q.   Mr. Mathieu, in Volume II after your reports, your

11   daily reports, we had Tabs 18 through 28.  Now, if we

12   would -- let's go to Tab 18, the first set.  What are

13   these documents?

14   A.   These are my white rods.

15   Q.   And what information -- first of all, did you do

16   these on a daily, weekly basis?  How did you keep these?

17   A.   I did these on a weekly basis.

18   Q.   What were you recording on these?

19   A.   Our hours spent working on the job.

20   Q.   Was this done for each individual person on the job?

21   A.   Yes, it was.

22   Q.   So you had a different sheet for each person?

23   A.   Yes.

24   Q.   Were the sheets organized week by week?

25   A.   Yes, they were.

1    Q.   Okay.  And just the format on the first one, that

2    appears to be for you, your name?

3    A.   Yes.

4    Q.   And just to indicate the format, obviously we have

5    the days of the week you dated it, but across the top,

6    those codes, what are those?

7    A.   Those are the codes that we have to use to track our

8    time on.

9    Q.   Okay.  And when you entered your time here, did you

10   do it -- when you entered it in certain blocks, was that

11   to line it up with a particular code?

12   A.   Yes, it was.  If you look at it, you see 1 and 4 on a

13   Tuesday and a Wednesday.  I put it underneath line

14   Section 67, which was temporary.

15   Q.   Okay.  And then in terms of at this point, this is in

16   March.  If you flip through -- let's go to the fifth page

17   in, I think it's Russell Kuczynski.  Do you have that?

18   A.   Yes.

19   Q.   Okay.  There's handwriting in there on some of those

20   line items that says Phase 3.  Whose writing is that?

21   A.   That's my writing.

22   Q.   And why did you write that in?

23   A.   Because I had to go back through and double-check all

24   of these.  And when I first it this, I had put down

25   Phase 2.  I didn't have Phase 3 in there.

1    Q.    Okay.  As you were entering this, at the upper right

2    it said Phase 2 next to project number?

3    A.    Correct.

4    Q.    Is that an entry you did contemporaneously on the

5    week of April 10 when you prepared the report originally?

6    A.    Yes.

7    Q.    What did that mean at that time?  How was that

8    entered by your bookkeeping department?

9    A.    They based it on our payroll.

10   Q.    Well, this went in to payroll?

11   A.    Yes.

12   Q.    So payroll was derived from these records?

13   A.    Yes.

14   Q.    Okay.  But did your bookkeeping department enter in

15   anything as to which phase the people were working on?

16   A.    Yes.  When they do the payroll, they do the hours for

17   the guys and then they put their hours under whatever

18   codes I put them under.

19   Q.    At the same time you're generating the payroll, your

20   bookkeeping department is also putting in the code

21   information that you've put in for the men?

22   A.    Yes.

23   Q.    And what about the phase information, is that also

24   being put in at the same time?

25   A.    Yes, it is.

1   Q.   Okay.  Now, did you go back at some point in time and

2   review these records to review the phase allocations you

3   had made?

4   A.   Yes, I did.  That's why there's this handwriting on

5   here.

6   Q.   So the handwriting for, let's say, Monday and Tuesday

7   says Phase 3?

8   A.   Yes.

9   Q.   That's your handwriting?

10  A.   Yes.

11  Q.   When did you put that in?

12  A.   I put it in after I reviewed all these sheets.

13  Q.   When was that?

14  A.   It was after Phase 3.

15  Q.   That would have been when, in the fall of 2010?

16  A.   Yes.

17  Q.   Who asked you to do that?

18  A.   The shop did or Cliff.

19  Q.   Did he say why he wanted you to do it?

20  A.   Yes, because we had to review where -- there was five

21  different phases on the job.  We just had to make sure

22  that we worked all our hours in the correct phases.  I had

23  to go through my dailies, page by page where I wrote where

24  the guys worked, that's how I would make these.  And I

25  would make sure, verify that wherever I had them in my

1    dailies I'd put them down in the right phase.

2    Q.   Your dailies, is that what you're referring to from

3    Exhibit 17, those are your daily reports?

4    A.   Yes.

5    Q.   Okay.  So when you went back, is this in September

6    when you did that of 2010?

7    A.   Yes.  I believe so.

8    Q.   So when you went back, you said you used your dailies

9    as a reference point for making whatever modifications on

10   the phase assignments; is that correct?

11   A.   Yes, it is.

12   Q.   All right.  And did you do that throughout all of

13   these documents that we have in all of these tabs?

14   A.   Yes, I did.  It basically went to the end of July.

15   Q.   Okay.  Well, the end of July or through the whole

16   period that we have in here?

17   A.   I went through the whole period.  But during Phase 3,

18   I had everything under the Phase 3.  There's a few where

19   you can see where the guys worked in Phase 2, you know,

20   P4 West.

21   Q.   We'll get to a few other selected ones.  But your

22   review of these documents in September, to go through to

23   make sure your allocations for phases were correct, were

24   those for all of the information we have in this book,

25   Tabs 18 through 25?

1    A.   Yes, this is the entire job.

2    Q.   So --

3              THE COURT:  I'm sorry, is it 28 or 25?

4              MR. KAPLAN:  It's through 28, yes, Your Honor,

5    thank you for that.  Sorry.

6    BY MR. KAPLAN:

7    Q.   A few more pages in the same tab, Tab 18, actually

8    towards the back, I believe, there's an entry for you week

9    ending 4/24/10, Stephane Mathieu.  Do you have that?

10   A.   4/20 or 4/24?

11   Q.   Let's see.  4/24/10, and then there's a couple after

12   you for Mr. Barillari, Mr. Kuczynski?

13   A.   Yes.

14   Q.   See those?  And in each one of those several ones

15   there's a circle in the middle, it says all Phase 2 work;

16   do you see that note?

17   A.   Yes.

18   Q.   Now, was that your note?

19   A.   Yes, it is.

20   Q.   Was that part of your review process in September?

21   A.   Yes, it is.

22   Q.   What are you indicating here?  Why did you make the

23   note?

24   A.   Because when I circled -- up top where you see where

25   the line goes up to the arrow and it says foreman on the

1    right, I would circle the two thinking that was the

2    Phase 2, even though it said Phase 3 right there.  2 was

3    my Phase 2.  That's how I did it.  So that's why I had to

4    go back through and check them.

5    Q.   You're telling your bookkeepers to make adjustments

6    for the phase allocations?

7    A.   Yes.

8    Q.   If you turn the page, you have a few more of those

9    notes?

10   A.   Yes.

11   Q.   Does that mean that was assigned to Phase 2 after you

12   did this review?

13   A.   Yes.

14   Q.   Okay.  Did that go into the labor reports that we've

15   seen for 2011?

16   A.   Yes.  But what happens, the way they track the job,

17   see how many hours go through what areas, that's where

18   that comes to play.

19   Q.   Okay.  Just a few more just to show you.

20        If you go to Tab 20 for the week of June 12, which

21   starts I think about the middle of this tab, there's a

22   number of sheets for June 12, 2010.

23   A.   Yes.

24   Q.   Starting with you and a number of the other workers,

25   do you see those?

1    A.    Yes.  Yep, I'm on mine.

2    Q.    On a number of those, there's a note, some of it says

3    Phase 2 and then there's another note for Phase 3?

4    A.    Correct.

5    Q.    Again, is that the same process you were going

6    through?

7    A.    Yes.  I had to go through my dailies and check Monday

8    through Friday and make sure that I did this correctly.

9    Q.    Okay.  So are you confident that, having gone through

10   this, that all the assignments of the labor for Phase 2,

11   Phase 3 ended up being properly entered into your

12   bookkeeping system?

13   A.    Yes.

14   Q.    Had you gone back and reviewed this?

15   A.    About three times.

16   Q.    One other thing, just to point out.  If we go to

17   Tab 23 sort of around the back -- it's sort of the back

18   quarter of these.  There's an All Brite indication.  A

19   number of these sheets from August 7 say All Brite and

20   some of them say Bonner, some say Demming.  They're marked

21   at the top, do you see those?  I think it starts with

22   All Brite.  And those -- what are -- who are these guys,

23   All Brite, Demming, Bonner, et cetera?

24   A.    These were all our subs that we used on Phase 3.

25   Q.    You were recording this for the subs as well, their

1    labor?

2    A.    Yes.  I had to, so the shop could pay them through

3    payroll.

4    Q.    Did this information get entered into your labor cost

5    reporting system?

6    A.    Yes.

7    Q.    Did it get entered in as ECI hours or was it used to

8    determine the subcontractor hours?

9    A.    I'd say a combination of both, to keep track of the

10   subs and it went as part of the job.

11   Q.    Okay.  For part of the job.  Did you review labor

12   hour reports?  Mr. Clauson had testified about a number of

13   those reports.  Is that something you reviewed?

14   A.    No.

15   Q.    So that's not a document that you used?

16   A.    No.

17   Q.    Okay.  This particular series is from August 7.  Do

18   you recall when your subcontractor labor showed up?

19   A.    When they showed up --

20   Q.    When they first came onto the site.

21   A.    It was close to this time.

22   Q.    Okay.  And what did you use the -- did you assign the

23   subcontractor labor as to where they worked?

24   A.    Yes, I did.

25   Q.    Where did most of your subcontractor labor work on

```
 1    the project at the end of July and into August?
 2    A.    All in Phase 3.
 3    Q.    All in Phase 3?
 4    A.    Yes.
 5    Q.    Did any of them do any Phase 2 work?
 6    A.    No.  And if they did, I would have marked it on my
 7    thing.  Basically, they were there just for Phase 3.  They
 8    helped me in the boiler area and the heavy pin areas, all
 9    the classrooms in P3.
10    Q.    You were the one who was assigning them every day as
11    to where they were going?
12    A.    Yes.
13               MR. KAPLAN:  I think I'm done with Mr. Mathieu.
14               THE COURT:  All right.
15               Cross-examination?
16               MR. HUG:  Yes, Your Honor.
17
18                     CROSS-EXAMINATION
19    BY MR. HUG:
20    Q.    Good morning, Mr. Mathieu.
21         Now, as I understand it, this was your -- the Kelly
22    Middle School job was your second summer slammer?  That's
23    the term we've been using through the trial, so to speak,
24    it's not exactly a nice term.  Do you know what that
25    means?
```

1    A.    Yes, I do.

2    Q.    This was your second summer compressed school job, to

3    say it nicely?

4    A.    Correct.

5    Q.    And the other one, I think you admit, was not

6    anywhere near the intensity as this one, correct?

7    A.    That's correct.

8    Q.    And in fact, just on the video a couple of minutes

9    ago, you referred -- the Court I think asked you a

10   question about the notched -- there was some I think it

11   was the tooth and nail type situations?

12   A.    Yes.

13   Q.    And you explained how they have to pull the block out

14   and put the block in.  That was the first time you had

15   ever been involved with that type of particular

16   construction, right?  I think you said that?

17   A.    I did say that.  In this case, those were older

18   bricks, they were trying to preserve the way of the

19   school.

20   Q.    I think the Court asked you if that was normal.  And

21   in your experience, it's not normal because that's not the

22   way it's usually done or you've done it in the past,

23   correct?

24   A.    That's correct.

25   Q.    But it wasn't abnormal for this job, was it?

 1   A.    No.

 2   Q.    Okay.  So it was something that was -- it was

 3   supposed to be done that way; is that right?

 4   A.    Sure, yes.

 5   Q.    Now, staying on that, your recent testimony, just to

 6   clear a couple things up, you were shown Exhibit 56 which

 7   shows the art room and the storage room in August 3rd, you

 8   were told that that those can be completed late, correct?

 9   A.    Correct.

10   Q.    You were told on or about that date, correct?

11   A.    Yes.

12   Q.    And you heard Mr. Clauson testify he didn't know

13   until the very end of the job.  So Mr. Clauson was

14   incorrect; is that right?

15   A.    I don't know if he was incorrect.

16   Q.    Well, be that as it may, you got word of it in early

17   August, correct, that the art room and storage room could

18   be pushed off; is that right?

19   A.    Yes.

20   Q.    Now, in fact, at the weekly foremen meetings, the

21   issue of pushing the art room and the locker room, I think

22   it was, and storage room off to the later portion of the

23   project was already being discussed in the project foremen

24   meetings on a weekly basis beginning in, say, mid-July

25   when you knew the steel was potentially going to be an

1    issue; isn't that right?

2    A.   Most likely, yes.

3    Q.   Okay.  So it wasn't all of a sudden that the art room

4    and locker room were pushed out a little bit, it's a

5    gradual process, and then finally you got permission from

6    the owner to be able to turn those areas over later; is

7    that correct?

8    A.   I guess.

9    Q.   As far as you know?

10   A.   As far as I know, yes.

11   Q.   So the consequence of that -- and was that when the

12   art room and the storage room, and it was the locker room

13   was well, correct?

14   A.   Yes.

15   Q.   And there's also a corridor in there, right?

16   A.   Yes, the connector to the tunnel or --

17   Q.   Let's use a picture.

18       I think the art room is AR?

19   A.   Yes.

20   Q.   Okay.  And the locker room is here.

21       There's also a corridor, I think, right here,

22   somewhere here or there?  Or am I wrong?

23   A.   Yes, there's a corridor there.  This is the only

24   little portion of the corridor that they blocked off.

25   Q.   So a portion of the corridor.

```
1              THE COURT:  For the record, you're looking at
2    Exhibit --
3              MR. HUG:  504.
4    BY MR. HUG:
5    Q.   That was able to be done later because that would
6    allow you to concentrate on the critical items that needed
7    to be done, correct?
8    A.   Correct.
9    Q.   And in fact, you were told that -- without asking,
10   you were told by Ed Oloff and project management at Pike
11   that you should actually defer your workforce to other
12   more critical areas and defer that work until a later
13   point in time, correct?
14   A.   That's correct.
15   Q.   So, effectively, you got an extension of time to do
16   that storage locker room and art room work, correct?
17   A.   Correct.  But what you don't see is a lot of my
18   systems go through those areas.
19   Q.   I see.  So some of the work in that area still needed
20   to be done?
21   A.   Yes, a lot of it.
22   Q.   Okay.  A lot?
23   A.   Yes.  I have feeder conduits that feed that P3AR,
24   those go through those areas.
25   Q.   Okay.
```

```
 1    A.    That's where there was steel missing.

 2    Q.    Let's go into that, the steel area, the steel that

 3    was missing.  Looking at 504, point to the Court where the

 4    steel was missing?

 5    A.    In the locker area, there was some beams that had to

 6    be put in against the gym wall, there's where I had a lot

 7    of feeders.  And then in this area across -- you got the

 8    corridor and then you got the art room area, all this

 9    stuff was what was delaying the project.  That's why they

10    needed the extension.

11    Q.    Okay.

12    A.    It wasn't because our work wasn't able to get done

13    due to ECI.

14    Q.    Your work wasn't able to get done because some of the

15    other work that needed to be done before your work

16    couldn't get done, right?

17    A.    Could you rephrase that, please?

18    Q.    I think I'm actually agreeing with you.  Some of your

19    work had to be delayed because some of the work that you

20    needed to have done was delayed?

21    A.    Correct.

22    Q.    Okay.  All right.

23          Now, you took a look at this schedule when you were

24    assigned this project, I think you said in December or so

25    of 2009?
```

1    A.    Yes.

2    Q.    And when you got it, you looked at the schedule,

3    right?

4    A.    Yes, a little bit.

5    Q.    But you didn't look at the original estimate, did

6    you?

7    A.    What does that have to do with the schedule?

8    Q.    Let me ask it this way.  Did you also look at the

9    estimate?

10   A.    I looked at the material list for the job.

11   Q.    But you didn't look at the man hour estimate to do

12   all the work, did you?

13   A.    Not right away.

14   Q.    But when you looked also back at the schedule for a

15   moment, when you looked at the schedule, you were -- with

16   respect to Phase 3, you were at that point in time, pretty

17   much immediately in December, that there was work that you

18   had concerns that the work could be done within that time

19   period; isn't that correct?

20   A.    For Phase 3?

21   Q.    Yes.

22   A.    Yes.

23   Q.    This is way back in December of 2009.  And I think

24   you would have described it as you looked at the schedule

25   in December and said, boy, this is going to be chaotic; is

1    that right?

2    A.    That's correct.

3    Q.    So you knew going into this project -- you did, at

4    least -- that it was going to be, in your words, chaotic,

5    correct?

6    A.    It was going to be tight.

7    Q.    Well, would you use the term "chaotic"?

8    A.    I guess.

9    Q.    Remember when I took your deposition?

10   A.    Yes.

11   Q.    Did you describe it as chaotic in there?

12   A.    Sure.

13   Q.    Now, with respect to the schedules -- well, after you

14   determined that you thought it was going to be chaotic,

15   did you go back to Mr. Madore and ask him how he planned

16   to get this thing done within that ten-week time frame?

17   A.    I never talked to Mr. Madore about this.

18   Q.    Okay.  So you don't know whether he thought it was

19   going to be chaotic either?

20   A.    He's the estimator.  I don't talk to the estimator.

21   Q.    In fact, you were here earlier in his testimony and

22   you heard him say he thought it was going to be a normal

23   project, right?

24   A.    On Monday?

25   Q.    Yes.

1    A.    Yes.

2    Q.    Focusing on Phase 3 now, you went to weekly foremen

3    meetings, right?

4    A.    Yes.

5    Q.    At each weekly foreman meeting, you went over the

6    immediate schedule for the next week and perhaps even the

7    coming week after that; is that right?

8    A.    We did a two-week look-ahead.

9    Q.    And that was in writing, correct?

10   A.    I believe so, in the beginning, yes.

11   Q.    And you also had a whiteboard?

12   A.    Yeah.

13   Q.    And there were updated full schedules for the project

14   or for that phase of the project available at each of the

15   foremen meetings?

16   A.    Talking in December?

17   Q.    No, no.  I thought I prefaced my question with

18   Phase 3.  If I didn't, I apologize.  We're now talking the

19   period June 28 to September.  At the weekly project

20   meetings, updated schedules were available to you, but you

21   focused on the two-week look-aheads on the whiteboard,

22   right?

23   A.    Yes, like every trade did.

24   Q.    And you talked in detail about the schedule and what

25   needed to be done each and every day with Mr. Oloff and

1    perhaps others, correct?

2    A.    Yes, I said that yesterday.

3    Q.    Now, in your testimony on direct, you testified that

4    you understood that the project was to be a seven-day work

5    week available I think is the way you said it?

6    A.    Correct.

7    Q.    And that you planned on six days and hopefully no

8    Sundays; is that right?

9    A.    I did say that.

10   Q.    And you thought it would take 20 to 25 guys per week?

11   A.    To do the summer slammer.

12   Q.    Okay.  So 20 to 25 guys for ten weeks for six days a

13   week, correct?

14   A.    I figured that if we had to work Saturdays, we would.

15   Q.    I'm trying to think, when you're planning it, it was

16   20 to 25 guys six days a week?

17   A.    We planned on -- sure.

18   Q.    In fact, you did work six.  And I think I looked at

19   the daily reports as you were going through with

20   Mr. Kaplan, actually I looked at them before, it was six

21   days a week at the beginning and then it went into seven

22   days, although the seventh day, Sunday, was often a lower

23   workforce; isn't that right?

24   A.    Absolutely.

25   Q.    But for six solid days a week it went, and you had

1   the manpower there for six days as you had thought back in

2   December, correct?

3   A.   Correct.  And during the week there was probably

4   more, not counting Saturday.

5   Q.   All right.  So we'll save the math for post-trial

6   briefs, Your Honor, but I think the testimony is we can do

7   the math right now, but there's a multiplication out there

8   that would show the number of man hours that you

9   anticipated.

10      I think it's fair to say, sir, you weren't looking at

11  this from how do I fit within the estimate; that wasn't

12  your job, was it?

13  A.   No, it was not.

14  Q.   Your job was look at the schedule and how long it's

15  going to take and how many people it's going to take to

16  get it done, correct?

17  A.   My job was to make sure that I could put my guys in

18  the areas that needed to be done per the schedule that Ed

19  would give us in all the areas.

20  Q.   And hopefully the two match.  Hopefully, what you

21  think it takes to get it done is similar to what the

22  estimate was, correct?

23  A.   That's beyond my control.

24  Q.   Okay.  Back in December when you were planning out

25  this particular job, you understood that you would be

1   working in -- this is dovetailing off the chaotic comment

2   that you made.  You understood part of the reason why it

3   was chaotic was because you were going to be working in

4   many different areas at the same time, correct?

5   A.   Yes.

6   Q.   All right.  And I could go through -- would it be

7   helpful to you -- would it surprise you -- rather than

8   take the time to go through everything, would it surprise

9   you to know that, say, for the week of July -- or for the

10  days July 9 through 11, you would be working in the admin.

11  area, the gym area, several different tasks in the

12  classroom area, a task in the cafeteria area, and several

13  different tasks in the mechanical room area?

14  A.   Is there a reference you want me to go through in the

15  book?

16  Q.   I could.  But would that surprise you?

17       Let me do one example.  Turn to Exhibit 12.

18  Exhibit 12 is part of the contract schedule.

19  A.   Is that Volume I?

20  Q.   Yes, Plaintiff's Volume I.

21       Are you there?

22  A.   What am I looking at?

23  Q.   You want to go to the schedule.  Go to page 15 of 44

24  of the schedule.

25  A.   Okay.

1          MR. HUG:  And for the Court's reference, let me

2    take it -- I can't remember if Mr. Kaplan did this or not.

3    Let me go through it and make sure the Court understands.

4    BY MR. HUG:

5    Q.   The left-hand column, Mr. Mathieu, P3AD-340, P3AD

6    refers to an area like the admin. area, correct?

7    A.   Yes.

8    Q.   So P3 is Phase 3, AD is admin.?

9    A.   Yes.

10   Q.   Okay.  So if I'm looking at the schedule and I want

11   to know approximately the area where an event is

12   occurring, I can look at that left-hand column and it says

13   P3AD-340, I know it's P3, I'm referring to 504, and I know

14   it's AD, so it's in this area?

15   A.   When you say 504 --

16   Q.   340.

17   A.   I don't see no 340 either.

18   Q.   P3AD-340 on page 15 of 44, electrical overhead

19   rough-in?

20   A.   Okay, I see it now.  Yep.

21   Q.   Early start and early finish, July 9 to July 11, see

22   that?

23   A.   Yes.

24   Q.   What's early start and early finish mean?

25   A.   It starts early and finishes early.

1    Q.   Do you know what it means in CPM scheduling terms?

2    A.   They have a variance between those couple days.

3    Q.   So that's a duration?  What do you mean a variance?

4    Explain.

5    A.   They could start between those few days.

6    Q.   Okay.  They can start between July 9 and July 11?

7    A.   Can you please reask that question?

8    Q.   I thought I understood that you were familiar with

9    CPM scheduling, and you are, correct?

10   A.   A little.

11   Q.   A little.  All right.  Then maybe I don't want to ask

12   you the question.

13        Do you know what early start and early finish means

14   in the schedule?

15             THE COURT:  You're referring to the very top of

16   the column, right?

17             MR. HUG:  Yes.

18   BY MR. HUG:

19   Q.   Do you know what those concepts are in CPM

20   scheduling?

21   A.   Not a hundred percent sure.

22   Q.   Do you know what late start, late finish is?

23   A.   Probably the same thing.

24   Q.   Well --

25   A.   Except it's late.

```
 1    Q.    Okay.  Do you ever see those in a schedule?

 2    A.    Not on this one.

 3    Q.    Did you see those in the updated schedules that were

 4    given to the foremen weekly?

 5    A.    I don't recall seeing them.

 6    Q.    Do you know what the concept of float is in a CPM

 7    schedule?

 8    A.    The time it takes to do it?

 9    Q.    Are you guessing or is that your answer?

10    A.    I'm guessing.  Usually float means floating.

11    Q.    I don't think either I or the Court or your counsel

12    wants you to guess.  Do you know what it is?

13    A.    Float time is the time that you have between the time

14    to get the work done.  If there's a float time of two or

15    three days, it will take two, three days between that

16    time.

17    Q.    Okay.  So it's the duration of how long it's going to

18    take you to do the activity?

19    A.    There's a float time.  If you don't finish, you have

20    a little bit of time to go past it.

21    Q.    So could be between activities, correct?

22    A.    Sounds okay, yeah.

23    Q.    All right.  It doesn't sound to be me that you're

24    tremendously familiar with the concept of float in a CPM

25    schedule; is that right?
```

1    A.    You're hitting me hard with these questions really

2    quickly, it's confusing.

3    Q.    I'm sorry, take your time.

4          Are you comfortable in explaining to the Court what

5    float is in the CPM schedule?  If you're not, you're not;

6    if you are, you are.  I'll take you as your word.

7    A.    Okay, I'm not.

8    Q.    All right.  Okay.  Go to P3AD-310, that's control

9    wiring rough-in on the same page.

10   A.    I see it.

11   Q.    That's July 9 to July 10.  That's electrical

12   contracting work, correct?

13   A.    Yes.

14   Q.    Okay.  So that's being done at the same time.

15         Now turn to P3G-160, which is on page 20 of 44.  You

16   see it?

17   A.    Yes.

18   Q.    Rough in new electric July 10, July 13?

19   A.    You said P3G-360?

20   Q.    160, sorry.  Rough in new electric, P3G-160.

21   A.    Yes.

22   Q.    That's in the gymnasium, for G, gymnasium?

23   A.    Yes.

24   Q.    There's overlap between at least, in part, for a

25   couple of the days with the ones I showed you before on

1    the admin., correct?

2    A.    Correct.

3    Q.    Go to P3CL-280 that appears on page 22 of 44.

4    A.    Electrical overhead rough-in.

5    Q.    Yes.  July 3, so it's starting earlier than our time

6    period but it goes to July 10 so it overlaps a portion of

7    it, see that?

8    A.    Yes.

9    Q.    Okay.  Now go to P3CL-370, electrical wall rough-in,

10   July 11 through July 13.

11   A.    I'm still trying to find 370.  It's on -- I see it,

12   okay.

13   Q.    Same page.  Electrical wall rough-in.  That overlaps

14   with the July 9, July 11 time frame, at least in a little

15   bit, little part?

16   A.    Yes.

17   Q.    Now, if I go down to P3CL-720, which appears on the

18   next page, page 23, mount panels, that's July 12 through

19   July 14.  That doesn't overlap the original one, but it

20   overlaps some of the other ones that overlap the original

21   one?

22   A.    Yes.

23   Q.    So you're working in that -- by the way, that's in

24   the -- it's electrical room in the classroom area,

25   correct?

1    A.    Yes, that would be near the main gear room.

2    Q.    And then go down to P3C-1140, that's on the same

3    page, page 23.

4    A.    Yes.

5    Q.    Electrical overhead rough-in July 10 to July 13?

6    A.    Correct.

7    Q.    P3M-380, go to that one now.  Control wiring

8    rough-in, see that?

9    A.    Yes.

10   Q.    That's July 6 to July 12?

11   A.    Okay.

12   Q.    And then I go to P3M-220, which is on the same page,

13   24 of 44, connect electrical connections to boilers,

14   July 2 to July 16.  Again, during that same time period?

15   A.    Yes, it is.

16   Q.    So I could go over -- I have a couple more examples,

17   one I chose for the middle of July and one I chose for the

18   August 8 time frame, but you'd agree with me, sir, if I

19   want through this schedule or the Court went through this

20   schedule, they'd find you'd be working --

21   A.    Five areas.

22   Q.    -- many areas at the same time?

23   A.    Correct.

24   Q.    And that's what was planned for the project, correct?

25   A.    Yes.

1    Q.   All right.  Let's go back to -- go back to page 15 of

2    that document.

3                    THE COURT:  Exhibit 12?

4                    MR. HUG:  Exhibit 12, thank you, Your Honor.

5    A.   I'm there.

6    BY MR. HUG:

7    Q.   Okay.  Now, P3AD-140 is demolition, it says June 28

8    to June 29?

9    A.   Yes.

10   Q.   All right.  If I go to -- when is ECI planning to do

11   its first activity in that area?

12   A.   We're supposed to start there, but I think I started

13   prior to that because the -- according to what I remember,

14   we started disconnecting the stuff the day before.  They

15   took the ladies out of the admin., the administration

16   staff.

17   Q.   I want to focus on -- you're focusing on reality, and

18   that's terrific.  For the moment right now, I want to

19   focus on the reality of the schedule.

20   A.   Okay.

21   Q.   Okay.  So when was ECI first expected, based on this

22   schedule, to work in the admin. area?

23   A.   The 28th and the 29th.

24   Q.   How do you know that?

25   A.   You just showed it to me in the schedule.

1    Q.    Demolition?

2    A.    Yes.

3    Q.    Okay.  And you did that work in demolition, okay.

4          Let's go to the next activity then.

5    A.    New brick veneer?

6    Q.    No, no.  My fault.  Clarify.  I want to go to the

7    next activity that ECI was to perform in that area.

8    A.    Electrical wall rough-in.

9    Q.    Okay.  That's P3AD-200.

10   A.    Okay.

11   Q.    Okay.  So if the demolition, say, were delayed until

12   June 5, would that necessarily --

13              THE COURT:  July?

14              MR. HUG:  What did I say?

15              THE COURT:  June 5.

16              MR. HUG:  I meant July 5, thank you, Your Honor.

17   BY MR. HUG:

18   Q.    If it were delayed to July 5 or July 6 -- let's talk

19   July 5, would that necessarily delay the electrical wall

20   rough-in?

21   A.    Well, yes.  I can't do it if the demo's not done and

22   the walls aren't built, yes.

23   Q.    Okay.  What do you mean the walls aren't built yet?

24   A.    You have to do the demo, and then they have to build

25   the walls after the demo is done.

1    Q.    Okay.

2    A.    I can't do rough-in without walls.

3    Q.    All the walls in the area had to be redone?

4    A.    In the admin. area?

5    Q.    Yes.

6    A.    The whole place got torn down and they rebuilt the

7    whole thing.

8    Q.    In the admin. area?

9    A.    Yes, the admin. area.  P3AD.

10   Q.    All right.

11   A.    That's the same area that was missing door frames

12   everywhere.  Once everything was framed, I still couldn't

13   finish because the door frames weren't there.

14   Q.    When were you able to start work in that area?

15   A.    I'd have to look back at my dailies.

16   Q.    Okay.  But your testimony is you weren't able to

17   start work in that area until all the walls were done and

18   that took quite some time?

19   A.    The framing for the walls need to get done before we

20   start any in-wall rough.

21   Q.    I see.  Your testimony, that was late?

22   A.    It was slow.  Late according to this schedule, yes.

23   Q.    How late was it?

24   A.    I'm not positive.

25   Q.    Okay.  You know it was late, but you don't know how

1   late it was?

2   A.   Right.  I'd have to look through my dailies.

3   Q.   Do you know whether it was actually not late and you

4   just wanted to start work earlier but couldn't because it

5   wasn't done earlier?

6   A.   No.  That's not the case.

7   Q.   But you can't show me in the schedule when that work

8   was done, can you?  You haven't shown me or the Court any

9   time when work was actually done that delayed you?

10          MR. KAPLAN:  I object.  We've spent a lot of

11  time going through his daily records.  It's a complete

12  mischaracterization.  The witness testified for hours

13  about specific things that were late and delayed his work.

14  We went through numerous pages of his daily records on

15  that.

16          THE COURT:  Mr. Hug is free to ask the question.

17  That's what you have redirect for.

18          MR. KAPLAN:  Okay.

19  BY MR. HUG:

20  Q.   So when was the demolition done and the walls ready

21  for rough-in in the admin. area?

22  A.   It was -- it was a week or so after they started.

23  Q.   Okay.  When were they supposed to be done and when

24  were you able to get in there?

25  A.   I was able to get in there after the walls were done.

1    I don't know when exactly they were supposed to be done

2    from right here.

3    Q.   Did you look at the schedule every day to see when

4    the -- that you were actually -- did you look at this

5    original schedule every day when you were doing your daily

6    reports and say, okay, they're behind here, that's

7    delaying me?

8    A.   No, I didn't.

9    Q.   You didn't do that.  How was it done?

10   A.   It was done through -- the way that we were told in

11   the meetings, they were going to do these areas, it was

12   going to get done, and it didn't get done.  I would make

13   notes on my things saying it wasn't done yet.  And we

14   would carry on with other things that we could do.

15   Q.   Okay.  So when you say Pike didn't follow the

16   schedule --

17   A.   I didn't say Pike didn't follow the schedule.  I told

18   you what I just -- how I got -- why I would have put that

19   stuff in my dailies.

20   Q.   Did Pike follow the schedule?

21            THE COURT:  Which schedule?  Are you referring

22   to the schedule --

23            MR. HUG:  The original schedule.

24            THE COURT:  Exhibit 12?

25            MR. HUG:  Yes, Exhibit 12.

1    A.    According to this, no, because it wasn't ready.

2    BY MR. HUG:

3    Q.    Did you look --

4    A.    At the time I did not.

5    Q.    As you were going through the project, did you look

6    at the original schedule and determine whether or not Pike

7    was following the schedule?

8    A.    I did briefly when I first started the job to do all

9    our layouts.  And then we would get updated every week

10   through meetings once all that started.

11   Q.    Okay.  So I'm just trying to determine what you did

12   and what you didn't do.  Mr. Oloff told you what you were

13   going to do for the next week or two at each foremen

14   meeting, right?

15   A.    Yes.  Not me specifically, he'd talk to everybody.

16   Q.    Including you though?

17   A.    Yes.

18   Q.    And, as I understand it, your testimony is that he

19   did not follow what he said he was going to do, at least

20   some instances?

21   A.    In some instances it was beyond his control also.  I

22   wouldn't say he didn't follow it specifically.

23   Q.    I won't personalize it to Mr. Oloff.  The project

24   didn't proceed as it was anticipated; is that a fair

25   statement?

1    A.    Yes.

2    Q.    And you're basing that, and those comments that you

3    make in the daily reports are based upon the comments made

4    by Mr. Oloff as to where the project was going in those

5    weekly meetings, correct?

6    A.    Yes.

7    Q.    Those comments don't relate to the original schedule,

8    do they?  You weren't looking at the original schedule,

9    were you?

10   A.    At that time?

11   Q.    Yes.

12   A.    No.  You asked me if I was doing that to do my daily

13   reports, and I was not using these as to my daily reports.

14   Q.    So you don't know whether or not Mr. Oloff is

15   actually directing work ahead of schedule or behind

16   schedule versus the original schedule because you weren't

17   looking at the original schedule at that time, were you?

18   A.    At that time it was -- the original schedule is what

19   they talked about, going through the admin. and starting

20   in the other areas.  I remember everybody going over it

21   and everybody talking about it.

22   Q.    So you did go over updated schedules throughout the

23   project?

24   A.    During the weekly meetings we would talk about

25   scheduling and what areas people are going to start demo,

1    how far they got, how far they didn't.

2    Q.   But those were updated schedules, right?

3    A.   It was every week we talked about it in meetings.

4    Q.   I just want to make sure.  Your comparison and your

5    comments in the report are based upon an updated schedule

6    given to you by Mr. Oloff and not your comparison to the

7    original schedule?  I just want to make sure we have that.

8    A.   It was my comparison of what was happening at the

9    time, yes.

10   Q.   And you don't know, do you, as you sit here today,

11   how the updated schedules compared to the original

12   schedule, do you?

13   A.   I do know they were pushed off.

14   Q.   Okay.

15   A.   Or they were updated.

16   Q.   Can you show me any area in the original schedule

17   where you were pushed off and by how many days?

18        Have you testified today about how many days you were

19   pushed off in any particular area?  Days now.

20   A.   I don't recall days, but I recall what I would write

21   in my dailies.

22   Q.   You recall generally that certain areas were pushed

23   off from what you were told by Mr. Oloff at the foremen

24   meeting?

25   A.   Yes.

```
 1    Q.   But you have really no idea whether Mr. Oloff was

 2    using an updated schedule and had accelerated dates in it

 3    or delayed dates in it, or a mixture of both, do you?

 4    A.   Sure.

 5    Q.   In your daily reports there is lost delay time.  Let

 6    me get one of your reports.

 7         Lost time delays.  What do you put in there?  What's

 8    the purpose of that particular line item?

 9         That's Exhibit 17, Your Honor, and the witness.

10    A.   Put down lost time and delays.  Sometimes I didn't

11    write stuff in there.

12    Q.   What's the purpose of putting it in there?

13    A.   To let people know that there's some time being lost

14    and/or delays.

15    Q.   Okay.  And did you do that every day?  Did you fill

16    in lost time every day?

17    A.   Not every day.

18    Q.   In fact, if I look at just the one -- well, I just

19    opened it up randomly.  There's a lot of them that you

20    don't have anything that's in there.  And there's also a

21    number of them where you have special equipment, you start

22    writing in and it kind of runs over into the whole area,

23    correct?

24    A.   Correct.

25    Q.   And in fact, isn't it fair to say that although you
```

1   try to adhere to the schedule, you use the basic -- after

2   the manpower, you use the basic form to tell what the heck

3   was happening on the job, right?

4   A.   Yes.  And there's not a lot of lines on here to write

5   things.  In some instances I would write near those areas.

6   It doesn't mean that that was a delay or not.

7   Q.   And you also tried to identify where people were

8   working, weren't you?

9   A.   I did identify where, yes.

10  Q.   And to the best of your knowledge, these are accurate

11  as to where people were working, correct?

12  A.   Yes.

13  Q.   The daily reports are fairly specific, working in E

14  Wing, for example, or working on lobby floor or working in

15  electrical room or MDF room; fairly specific, isn't it?

16  A.   Correct.

17  Q.   So you're looking back at these daily reports, you

18  can get a pretty good snapshot of what is happening and

19  where people are working, correct?

20  A.   Yes.  Do we have a date we're looking at?

21  Q.   I really just wanted to make a couple points about

22  daily reports in general.

23       What I'd like to do now is turn to the July 21st

24  meeting you attended with Mr. Flynn and Mr. Clauson.  And

25  we've been over that meeting a number of times, so I'm not

1    going to repeat questioning that's already occurred.  What

2    I want to focus on is what did Pike tell you -- or I think

3    you testified that you heard Mr. Flynn ask for more time,

4    maybe I'm confusing Mr. Clauson.  So let me ask it this

5    way.  Did you hear Mr. Flynn ask for more time?

6    A.    I asked him to ask for a Plan B, what are we going

7    to.

8    Q.    And Pike's response is there is no Plan B, right?

9    A.    Yes.

10   Q.    And you also heard Mr. Flynn say that, well -- you

11   also heard Pike say, What about manpower?

12   A.    Yes.

13   Q.    Did you hear -- I want you to tell the Court what you

14   heard Pike say.

15             THE COURT:  Who is Pike?  I need to know who is

16   Pike.

17   BY MR. HUG:

18   Q.    Mr. Strauss, I think?

19   A.    Mr. Strauss and Mr. Oloff.

20   Q.    What did he say to adding additional man hours?

21   A.    They said add in additional manpower, not hours.

22   Q.    Manpower, okay.  What did they say?

23   A.    They said, "Add in additional manpower.  Do what it

24   takes."

25   Q.    Did they say anything else?

1    A.    No.  That's what they told us.

2    Q.    Didn't he say that Pike told you that it was ECI's

3    contractual requirement to do what it had to do to get the

4    job done?

5    A.    That's -- yes, that's basically the same thing except

6    not as extravagant as you have it.

7    Q.    Actually, sir, those are your words that I took from

8    your deposition.

9    A.    I understand that.  But you didn't say "Tell me

10   exactly what you said" in your deposition.  That's hard to

11   remember.  It was over a year ago.

12   Q.    I understand.

13   A.    It's the same basic answer.

14   Q.    But we're there now.  That's what Pike said.  Pike

15   said it was ECI's -- by the way, this is in response to

16   Mr. Flynn saying -- telling him he's going to add more

17   manpower, it's going to cost you, it may cost you

18   something.  Pike said, Do what you have to do, it's ECI's

19   contractual requirement to do what you have to do to get

20   the job done.  Correct?

21   A.    Yes.

22   Q.    And you left that meeting, did you not, thinking

23   Pike -- understanding that Pike had told you it wasn't

24   going to give you any sort of extra time to add manpower,

25   correct?

1   A.    They weren't going to give me time to add manpower.

2   Q.    Any extra dollars, excuse me, for added manpower?

3   A.    At that time I did not think so.

4   Q.    Now, prior to that time, prior to July 21, did

5   Mr. Oloff ever advise you that ECI didn't have enough men

6   on the job to do the work that was available for them to

7   do?  Didn't he tell you that?

8   A.    Yes, he did.

9   Q.    In fact, prior to July 21st ECI was not able to do

10  all the work that was available to it, correct?

11  A.    Correct.

12  Q.    And in fact, in some areas, ECI was a little later

13  getting started than it otherwise could have started -- in

14  other words, work was available on, say, July 6, but you

15  couldn't start until July 10 or didn't start until July 10

16  for among -- at least the reason you didn't have enough

17  manpower, correct?

18  A.    No.

19  Q.    Let's go back.  It's your testimony, isn't it, that

20  you were not able to start -- let me phrase this the right

21  way.

22        Were you able to start -- before July 21, were you

23  able to start all the work that was available to you when

24  it was available?

25  A.    Some.  But you just asked me if I had enough

```
 1   manpower.  Now you're asking me a totally different

 2   question.

 3   Q.   Yes, that's right.  Okay.  So go ahead and answer

 4   this question.

 5   A.   I thought I just did.

 6   Q.   Could you -- now you've managed to confuse me.  Let

 7   me try it again so we don't repeat the question.

 8        Was ECI, prior to July 21, on Phase 3, were you able

 9   to do all available work that was available to ECI when it

10   was available to ECI?

11   A.   I believe I was able to, yes.

12   Q.   And you've done that analysis, you've gone back and

13   looked at that analysis and made sure that that's

14   accurate?

15   A.   I have not done that analysis.

16   Q.   Did you ever complain to anybody else about Pike and

17   their schedule problems at Phase 3 at the Kelly Middle

18   School project other than anybody within ECI?

19   A.   Other than anybody?

20   Q.   Yes.

21   A.   Some of the subcontractors that were there that I

22   worked with.

23   Q.   They were struggling, too, I take it?

24   A.   Yes, not as bad as we were.

25   Q.   You were struggling to the tune of almost double your
```

1   manpower that you thought you would need, correct?

2   A.   Correct.

3   Q.   Did you ever speak to Mr. Lawler or Mr. Lynch about

4   Pike?

5   A.   About Pike in what regards?

6   Q.   Well, specifically about Mr. Oloff in that he was the

7   best project manager that you had ever worked with?

8   A.   Yes, I have.

9   Q.   Did you ever tell anyone at Pike or Mr. Lynch -- who

10   is Mr. Lynch?

11   A.   He's with the engineers --

12   Q.   Okay.

13   A.   -- the architects.

14   Q.   Who is Mr. Lawler?

15   A.   He's the architect.

16   Q.   Did you ever tell either one of them that this was a

17   poorly run project?

18   A.   Did I ever tell any of them?

19   Q.   Yes.

20   A.   That it was a poorly run project?

21   Q.   Yes.

22   A.   Not that I recall.  Considering the circumstances of

23   how it was.

24   Q.   Now, with respect to you went over Exhibits 18

25   through 28 with Mr. Kaplan.  You didn't obviously go over

```
 1    all of them.  I don't think -- you could look at them, but

 2    I have more general questions.

 3         You say you went back and you looked at these white

 4    rods again in September of 2010, right?

 5    A.   Yes.

 6    Q.   Why did you do that?

 7    A.   Because I had to go back through and track my hours

 8    and make sure I tracked them on the right phase.

 9    Q.   Why were you asked to do it at that particular time?

10    A.   Because I had to double-check and make sure that our

11    phasing was correct.

12    Q.   Okay.  Who asked you?

13    A.   Cliff had asked me.

14    Q.   Did Cliff tell you why he was asking you?

15    A.   Yes.  To make sure that we have our phasing correct.

16    Q.   Okay.

17    A.   How I phased them.

18    Q.   Beyond that, did he tell you why he was asking you

19    for this?

20    A.   No.  He just told me he wanted it because he wanted

21    to make sure I kept track of the phasing right.  Things

22    didn't look right at first.  So I had to make sure, go

23    through and fix them.

24    Q.   And that was in the middle of September?

25    A.   It was around September, yeah.
```

```
 1   Q.   Was it later than September or --
 2   A.   It could have been later, a little bit.  But it was
 3   around September that I recall.
 4   Q.   Well, October 1st is the date that the claim went in.
 5   Was this before or -- did you do your analysis before or
 6   after October 1st?
 7   A.   I'd say before.
 8   Q.   Did Cliff tell you that this was being done for the
 9   purposes of preparing a claim?
10   A.   No.  I had no idea about the claim until after.
11   Q.   Okay.  Well, you had no idea that Pike was -- or that
12   ECI was filing a claim?
13   A.   I had no idea that they sent it in.
14   Q.   Did they talk to you about the claim before it was
15   sent in?
16   A.   No.  I had no idea.
17   Q.   Okay.  You're the project superintendent, right, on
18   Phase 3 of the project?
19   A.   Yes.
20   Q.   You were there every day, correct?
21   A.   Yes.
22   Q.   And you were there to see what was happening on the
23   project at every moment during Phase 3, correct?
24   A.   Right.
25   Q.   And you were not consulted before they filed this
```

1    claim?

2    A.   I was not consulted about any claim before they filed

3    it.  I know that they talked about wanting to get paid for

4    all the overtime that they spent.  That's it.

5              THE COURT:  Can I ask one question, because it

6    just came up in something he said?

7              You said things didn't look right.  I thought I

8    heard you say that.  What did you mean by that?

9              THE WITNESS:  There's five phases to the job.

10   When I did some phasing, we were mixed in between phases

11   where I had guys working in areas.  So what I ended up

12   doing was, I put my phasing down like under Phase 3, but

13   it was actually supposed to be Phase 2.  That's why all

14   those marks are to take it off Phase 3, because I put too

15   many hours -- I was putting more hours on Phase 3 than I

16   was -- because I was really working in Phase 2.  So that's

17   why we did these changes.

18             THE COURT:  You were correcting it to decrease

19   the number of hours allocated in Phase 3?

20             THE WITNESS:  Yes.

21   BY MR. HUG:

22   Q.   I think we've established, at least in your

23   understanding, Phase 3 was going to be chaotic.  And I

24   take it, after having now experienced Phase 3, it met your

25   expectations, correct?

1    A.    Yes.

2    Q.    Okay.

3    A.    Above and beyond.

4    Q.    I think you testified that you had men working in

5    many different areas, correct?

6    A.    Yes.

7    Q.    And over a ten-week intense period, these men were

8    working, correct?

9    A.    Yes.

10   Q.    And then weeks after that is over, you are asked to

11   go back and double-check to make sure all of these men are

12   properly allocated in the correct cost code and the

13   correct phase; is that right?  Or is it just right phase?

14   A.    If you look at where I corrected, it was before

15   Phase 3 started.

16   Q.    So you made no corrections to Phase 3?

17   A.    I made some corrections.  Most of the corrections

18   were before July.

19   Q.    Okay.

20   A.    If you look at it.

21   Q.    Okay.  So very few corrections in July and August?

22   A.    Correct.  Because mostly all the guys worked in

23   Phase 3.

24   Q.    And you did that how?  How did you make -- even

25   before July, what document did you use to go back and

1    adjust?

2    A.   My daily reports.

3    Q.   There we go.  The daily reports give a nice roadmap

4    of where you're working -- where people are working on the

5    job during the job, right?

6    A.   Yes, because I would write down where they're

7    working.

8              MR. HUG:  Thank you.  No further questions.

9              THE COURT:  Thank you.

10             Redirect?

11             MR. KAPLAN:  Very briefly, Your Honor.

12             MR. HUG:  May I have one administrative item,

13   Your Honor?  I don't think there's an objection to this.

14             Exhibit 624.  This is one exhibit I did not move

15   in before or show the witness before.

16   BY MR. HUG:

17   Q.   I'm showing you what's been marked as 624.  Are you

18   familiar with the temporary feed for the temporary

19   generator?

20   A.   A little bit.

21   Q.   And did you understand ECI provided a quote for the

22   temporary feed to the temporary generator?

23   A.   I do now.

24   Q.   Okay.

25             MR. HUG:  Your Honor, I'd offer this.  I don't

1    think there's any objection.

2              MR. KAPLAN:  No objection.

3              THE COURT:  624, full Exhibit.

4              MR. HUG:  I have no further questions of the

5    witness on this.  I just needed to get that in for the

6    record.

7              THE COURT:  Thank you.

8              MR. KAPLAN:  Just a few questions, Your Honor.

9              THE COURT:  Great.

10

11                    REDIRECT EXAMINATION

12   BY MR. KAPLAN:

13   Q.   Mr. Mathieu, at the outset of this job, did you

14   expect ECI would be working in various areas at various

15   times?

16   A.   Yes.

17   Q.   And did you think you'd have men working in several

18   areas at the same time?

19   A.   Yes.

20   Q.   Was there any surprise in that, that several men were

21   working in different areas at different times on the same

22   day?

23   A.   No.

24   Q.   Okay.  Did you expect that there would be a certain

25   sequence of construction for the Phase 3 work, that things

1    would go in a certain direction and sequence of

2    activities?

3    A.    Yes.

4    Q.    Okay.  When you said you expected it would be chaotic

5    at the outset, to use a term Mr. Hug used in referring to

6    your deposition -- well, let me start with that.  When

7    you're anticipating your work on this job prior to

8    Phase 3, what's your expectation about the way the level

9    of activities would be in July and August?

10   A.    It would be exactly that, chaotic.  There would be a

11   lot of people everywhere trying to perform all their work

12   all at the same time.

13   Q.    So you had no surprise about that aspect of the job

14   as it actually turned out?

15   A.    No.

16   Q.    But you said, I think, also it went above and beyond

17   your expectations in that regard.  What do you mean by

18   that?

19   A.    It was a lot more than what I originally expected.

20   Everything was all compressed.

21   Q.    Okay.  So does that mean that you had more men

22   working in more areas at the same time than you had

23   expected?

24   A.    Yes, to finish them.

25   Q.    Does that also mean that the men were not working in

1  the sequence of construction that you expected?

2  A.   A little, yes.

3  Q.   And your notes that you put down in your daily

4  reports, which we went through in some great detail, when

5  you put those notes down, were you noting problems or just

6  what was going on that day?

7  A.   A combination of both.  Big problems, I would write

8  them down.  But it was the same ongoing stuff.

9  Q.   So mainly the issues that I picked out and talked to

10  you about, did you consider those to be problems?

11  A.   Yes.

12  Q.   Okay.  Now, did you consult with Mr. Clauson

13  throughout Phase 3 as to problems and issues that were

14  arising on the job?

15  A.   Yes.

16  Q.   How often did you do that?

17  A.   I talked to him on a daily basis.

18  Q.   So you were keeping him abreast on a daily basis on

19  the issues that you were confronting on a job?

20  A.   Yes.  Sometimes I wouldn't talk to him for two days.

21  Q.   The questions about you said you didn't know a claim

22  had been submitted October.  What were you referring to?

23  A.   What Mr. Hug asked me.

24  Q.   I know, but when you said a claim that was submitted

25  October, you were referring to a written claim?

1    A.    Yes.

2    Q.    All right.  Prior to that, did you feel you had told

3    Mr. Clauson everything that had happened on Phase 3?

4    A.    Yes.

5    Q.    Okay.  Had you talked to Mr. Flynn about what was

6    happening on Phase 3?

7    A.    Yes.

8    Q.    Had you talked to him on a regular basis?

9    A.    When I saw him during the weeks -- or the days he

10   would come on the job.

11   Q.    Were your daily reports available for Mr. Clauson and

12   Mr. Flynn to review?

13   A.    Yes.

14   Q.    One other question.  Mr. Hug asked you if there were

15   times prior to the July 21 meeting that ECI did not

16   perform work that was available to it, and you said no.

17   A.    Correct.

18   Q.    Okay.  When ECI had work that became available, did

19   ECI get on that work and perform it?

20   A.    I'm going to say yes.

21   Q.    Were there any times that you believe ECI delayed

22   performing work that was available to it?

23   A.    Not that I recall, no.

24              MR. KAPLAN:  I have nothing else.

25              THE COURT:  All right.  That concludes this

1    witness, I trust?

2            MR. HUG:  One question.  The witness often used

3    the response to many questions "I want to say yes."

4

5                    RECROSS-EXAMINATION

6    BY MR. HUG:

7    Q.   What do you mean by that?

8    A.   That's it.  Just yes.

9    Q.   "I want to say yes" suggests to me that you're pretty

10   sure but you're not really sure?

11   A.   No.  It's just the way I talk or the way I said it.

12   Your question is why do I say "I want to say yes"?

13   Q.   I'm trying to understand what it means when you say

14   "I want to say yes."  Why not just say "yes"?

15           MR. KAPLAN:  I don't really think --

16           THE COURT:  I think if you have a concern about

17   that, that can be raised when he actually gives that

18   rather than asking for a global.

19           MR. HUG:  He just used it again.  That's why I

20   raised it, Your Honor.

21           I think we've heard the witness.  No further

22   questions.

23           THE COURT:  Thank you, Mr. Mathieu.  You are

24   excused.

25           We will take our morning break at this time

1    until 10:15 and then continue until noontime.  Thank you.

2    We'll stand in recess.

3                    (Whereupon, a recess followed.)

4

5              THE COURT:  All set to go?

6              MR. KAPLAN:  Yes, sir.  I call William Flynn.

7

8                        WILLIAM FLYNN,

9          called as a witness, having been first duly

10          sworn, was examined and testified as follows:

11

12             THE CLERK:  Please be seated.

13             Please state your name.

14             THE WITNESS:  William Joseph Flynn, Jr.

15             THE CLERK:  Please spell your last name.

16             THE WITNESS:  F-L-Y-N-N.

17             THE CLERK:  Please state your city or town.

18             THE WITNESS:  Glocester, Rhode Island.

19

20                    DIRECT EXAMINATION

21   BY MR. KAPLAN:

22   Q.   Good morning, Mr. Flynn.

23   A.   Good morning.

24             MR. KAPLAN:  Your Honor, I'm going to briefly go

25   through some of Mr. Flynn's background.

1          Exhibit 50 in the expert disclosure, his

2    resume's attached for your reference.  I'm not going to go

3    through the entire resume.  Just to let you know that

4    that's there if that helps you in any way.

5          THE COURT:  Great, thank you.

6          MR. KAPLAN:  It's at the back of that Tab 50.

7    BY MR. KAPLAN:

8    Q.   Mr. Flynn, where are you presently employed?

9    A.   Electrical Contractors, Incorporated.

10   Q.   What's your position?

11   A.   Vice President.

12   Q.   How long have you been Vice President at ECI?

13   A.   Almost 20 years.

14   Q.   When did you start at ECI?

15   A.   February of 1994.

16   Q.   Did you come in as Vice President?

17   A.   No, as a senior project manager.

18   Q.   How long after you started did you become

19   Vice President?

20   A.   One year.

21   Q.   One year.  Okay.

22        As Vice President, what are your basic job

23   responsibilities?

24   A.   I'm responsible for overseeing the project managers

25   and the construction projects in general, ensuring that

1    scheduling, material, purchasing department, I work

2    closely with the estimating department.

3    Q.   Okay.  Is it fair to say you're involved in all

4    aspects of the construction work ECI does?

5    A.   Pretty much, yes.

6    Q.   Who do you report to?

7    A.   Louis Bona.

8    Q.   Owner of the company?

9    A.   Yes.

10   Q.   Who reports to you directly?

11   A.   All the project managers.

12   Q.   ECI, the last couple years, what kind of work has it

13   been doing?  What size projects has it been doing?

14   A.   In the last couple years, we've been running in the

15   20 or 25 million volume-wise.  We do about 5 to 7 million

16   in service work, several million in traffic control work.

17   We do mostly larger electrical projects.  Besides the

18   traffic and the service, most of our construction division

19   does larger electrical projects, a million and above, 6,

20   7, $8 million electrical contracts.

21   Q.   In your tenure with what has been -- have there been

22   volumes over 20 to 25 million at ECI annually?

23   A.   Yes.  Back before the economy took a dive, we were

24   running in the mid to high 30s.

25   Q.   Same size of individual projects throughout?

1   A.   Pretty much, yes.

2   Q.   Public schoolwork, has that been -- what kind of a

3   portion of ECI's work has that been in your 20 years?

4   A.   We've always done a lot of public schools.  It's a

5   part of the market that we pursue always.

6   Q.   Okay.  And have you been involved in those projects?

7   A.   Yes.

8   Q.   Your background listed in your resume, very quickly,

9   you were the President of Inland Electric Corp. in the

10  early 1990s.  What did Inland do?

11  A.   Pretty much the same thing ECI does but on a smaller

12  overall volume.  We did public projects within the state

13  of Rhode Island.

14  Q.   Was that a company that you owned?

15  A.   Yes.

16  Q.   And then prior to that, you had worked for several

17  years as a vice president at Evergreen Construction?

18  A.   Yes.

19  Q.   What kind of work did Evergreen do?

20  A.   Evergreen was a mechanical electrical general

21  contracting firm that was based in Braintree,

22  Massachusetts.  I was hired by them to establish and --

23  open, establish, and operate an office in the Rhode Island

24  market.

25  Q.   And then you worked at EG Sawyer before that as a

1    senior project manager.  What kind of work did Sawyer do?

2    A.    Same thing as ECI.  Very large commercial projects.

3    One Memorial Drive is a very large office building in

4    Cambridge.  We did a fire alarm system.  We renovated the

5    entire Bank of Boston and did the fire alarm system there.

6    We renovated and completely rebuilt the Harvard indoor

7    athletics facility.  Similar work.

8    Q.    Okay.  Your electrical licenses you hold?

9    A.    In Rhode Island I hold a journeyman and an E1

10   master's license.  Plus I hold master telecommunications

11   and data license in Rhode Island market, which in the

12   Rhode Island market is a little different that Connecticut

13   in that it allows you to perform the design.

14   Q.    Do you have any Connecticut licenses?

15   A.    No, I do not.

16   Q.    Your military service is noted in your resume?

17   A.    Yes.

18   Q.    Did you have any electrical experience when you were

19   in the military?

20   A.    Yes.  I joined the Navy in 1967 and I served one year

21   of Reserves.  During that period of time, I also went to

22   various schools for the Navy.  And then from '68 to '70, I

23   served on nuclear submarines, Poleris submarines.

24        I was honorably separated.  My active duty was up in

25   '70.  The Navy really didn't have any submarine reserves

1    to speak of.  So when I got off of active duty, I

2    transferred to Seabees.  I then transitioned into a Navy

3    electrician for the next three years, final three years of

4    my hitch in the Naval Reserve as an electrician.

5    Q.   And you note here you also have Civil Air Patrol,

6    major and squadron commander in the last 13 years.  What's

7    that?

8    A.   Civil Air Patrol is an auxillary of the United States

9    Air Force.  It's an organization formed during World

10   War II to perform search and rescue for the Air Force

11   within the boundaries of the United States.  It still

12   continues to this date with that as one of its missions.

13   Q.   What do you do?

14   A.   I'm a squadron commander within the Connecticut Civil

15   Air Patrol.

16   Q.   That's something you still do now?

17   A.   I just recently retired from that position within the

18   last couple of months.

19   Q.   Okay.  In terms of scheduling issues that come up on

20   projects, have you been involved in scheduling matters for

21   ECI?

22   A.   Yes, I have.

23   Q.   Could you just describe your typical involvement?

24   A.   Well, if and when a project manager comes to me with

25   scheduling issues relative to this particular project,

1    I'll assist him and help him analyze the schedule he's

2    working with.  If it's a project where we're required to

3    develop a schedule of our own, myself and one of my other

4    project managers, George Ortiz, will work with them to

5    develop our own internal schedule for ECI.

6    Q.    You mentioned traffic work.  Is that mostly for the

7    Connecticut Department of Transportation?

8    A.    Yes, sir.

9    Q.    As publicly bid?

10   A.    Yes.

11   Q.    Does DOT routinely require schedules from you for

12   their projects?

13   A.    Yes, they do.

14   Q.    What format?  Are they CPMs?

15   A.    Yes.

16   Q.    Did you get involved in submitting and reviewing

17   those schedules?

18   A.    Years before, I did.  George is more than capable

19   doing them on his own now.

20   Q.    Did you have any training with scheduling?

21   A.    Yes, I've been to the Primavera P3 class.

22   Q.    Okay.  What kind of class was that?

23   A.    It was a few hours a night for a number of weeks.

24   Q.    Primavera is who?

25   A.    Primavera is pretty much the main scheduling program

1    used by everyone in the business.  Microsoft makes a

2    software system that's similar but much weaker called

3    Microsoft Projects that I'm also familiar with.

4    Q.    Are you aware of the schedule that's in Exhibit 12,

5    the contract schedule in this case?

6    A.    Yes, I am.

7    Q.    Is that a Primavera schedule?

8    A.    Yes, it is.

9    Q.    Do you get into -- how frequently do you actually get

10   involved in a project itself in a school construction

11   project?

12   A.    Not very.

13   Q.    Okay.  Typically at ECI, what brings you into a

14   project?

15   A.    When there's a problem.

16   Q.    Okay.  And so let's talk about Kelly Middle School.

17   What was your first involvement with this project?

18   A.    Cliff Clauson spoke to me about the fact that he was

19   deeply concerned about Phase 3.  It was somewhere in early

20   July that things weren't progressing -- the project wasn't

21   progressing, certain activities were behind and weren't

22   progressing.  He was concerned that it didn't appear as

23   though they would be progressing, moving forward in any

24   reasonable fashion.  So he was concerned that it's a 10-

25   to 12-week window to get all this work done and a great

1    deal of predecessor work that was delaying us was not

2    happening and wasn't on the horizon that it was going to

3    happen.

4    Q.   Were you aware of the project prior to Mr. Clauson

5    speaking to you in early July?

6    A.   In general terms, yes.

7    Q.   When this project went out to bid, did you know ECI

8    was bidding?

9    A.   Yes.

10   Q.   Okay.  And did you review the bid before it went out?

11   A.   I did not review the bid.  I reviewed the bid

12   package.  I reviewed the bid schedule.  And had

13   discussions with Mark Madore during the bid process.

14   Q.   Is that a typical function you serve on public

15   construction bidding?

16   A.   Yes.

17   Q.   Was there anything unusual about any of those aspects

18   when this job was being bid by ECI?

19   A.   No.  Typically, any of the school projects where

20   there's renovation, the only time that you can do it,

21   unless you relocate the students from a school, is during

22   the summer when they're out of the school.  The only thing

23   that varies is how big a bite of the apple the

24   construction manager may want to take during that 10-week

25   period.

1    Q.   What do you mean by that?

2    A.   Well, I mean many times they will only do a portion

3    of the renovation during the time they schedule if they

4    fear that -- for instance, on this school, if they -- I

5    don't know if they could have done something different.

6    They could have maybe done a portion of the Phase 3 work

7    during the 10-week summer and taken other steps when

8    people were coming back to school.  For instance, portable

9    classrooms or things of that nature, or maybe they could

10   have a portable cafeteria.  There are other things you can

11   do to plan to ensure that you can get all the work done.

12   Q.   Let me get you back in the chronology of things and

13   we'll get into issues in a little bit.

14        When ECI was bidding, you said you reviewed the data

15   with Mr. Madore?

16   A.   Yes.

17   Q.   And you reviewed the schedule?

18   A.   Yes.

19   Q.   I think I asked you if there was anything that stood

20   out about that that you noted at the time.  Was there

21   anything?

22   A.   No.  The amount of work to be performed during the

23   summer during the Phase 3 period was substantial, but was

24   not -- wasn't of any significance that it would require

25   more than 20, 25 people at peak period.

1    Q.   Did you speak about manpower levels with Mr. Madore

2    during the bid phase?

3    A.   We used to speak from the perspective when jobs were

4    being selected to bid, when they would hit, and how many

5    men they would require at certain periods of time so ECI

6    would plan its own manpower.  So if, in fact, at a

7    specific point in time we were going to be maxed out with

8    men, we needed to know that early so that we could either

9    decide to pass on a new job we were bidding because we may

10   not have enough manpower available or we had options to

11   pick up more people with the plan ahead of time to be

12   bringing them into the company.

13   Q.   So even in the selection process what jobs you're

14   looking at to actually bid, you're talking about expected

15   manpower requirements for the job?

16   A.   Yeah, we do that now.

17   Q.   So that's something you just typically have done?

18   A.   Yeah.  I mean, the project managers update their

19   manpower requirements, they do a look-ahead every so

20   often, and the estimator has the ability to review that.

21   Q.   Was that something you did on this project, talk with

22   Mr. Madore about the projected manpower requirements of

23   ECI to do the job?

24   A.   Yeah, Mark had certain levels of people at the time

25   that he thought the project would need.  And it didn't

1    seem to be of any significance to us overall.  It wasn't

2    going to impact us to any great extent.

3    Q.   You're a non-union contractor?

4    A.   Yes, we are.

5    Q.   What does that mean in terms of your manpower, your

6    employees in the field?

7    A.   It means we have a lot more flexibility than a union

8    shop.

9    Q.   You're not calling the union hall to bring men in

10   when you need them?

11   A.   No, we have to hire.

12   Q.   From --

13   A.   Off the street.  Or people who worked for us

14   previously who we may have reached out to.

15   Q.   When you're looking at having to put 100 men in the

16   field in July and August on three different jobs, all of

17   those people are your employees?

18   A.   Yes.

19   Q.   You're not calling the union hall saying I need 20

20   people next week at the Kelly School job?

21   A.   No, we're not.

22   Q.   Now, this term "summer slammer," we've been throwing

23   it around.  I think I started that when we talked to

24   Mr. Madore.  The idea of having school jobs which have

25   concentrated amounts of work in the summertime, is that

1    something that ECI's done before the Kelly Middle School?

2    A.    Every electrical contractor that's our size does,

3    yeah.  All the school projects that have existing

4    buildings that are part of the contract are going to -- if

5    they have renovation, are going to have to probably do

6    them during the summer unless they relocate students.

7    That's always another way to do it.

8    Q.    During your tenure at ECI, how many public school

9    jobs comparable to the Kelly Middle School project has

10   your company done?

11   A.    Thirty.

12   Q.    Okay.  And on this job -- on public school bid, it's

13   a competitive bid, right?

14   A.    Correct.

15   Q.    Lowest responsible qualified bidder?

16   A.    Correct.

17   Q.    So the low bidder gets in unless there's a

18   qualification issue or some other problem arises?

19   A.    Correct.  We're all prequalified by the Department of

20   Administrative Services.

21   Q.    So every direct bidder on a job has to be

22   prequalified through the public statutes with the

23   Department of Administrative Services?

24   A.    Correct.

25   Q.    And is that something ECI has to do in order to bid

1    publicly?

2    A.   That's correct.

3    Q.   Okay.  And how frequently do you bid public school

4    projects of this nature?

5    A.   Whenever they're in our area, our normal travel area,

6    and unless they have a PLA or something on them.

7    Q.   For average, any average over the last five years of

8    public school projects of this nature your company's bid?

9    A.   I wouldn't know how many they bid because I'm really

10   not -- I mean, I review the documents when they're bidding

11   them.  Unless they actually acquire them, I try not to --

12   it's not my thing.

13   Q.   Has ECI bid more jobs than it actually gets contracts

14   for?

15   A.   Yeah.  The average in our industry, if you can pick

16   up one or two jobs for every ten you bid you're doing

17   well.

18   Q.   So you bid ten to pick up two?

19   A.   Yeah, I believe ballpark-wise we've done somewhere

20   around 25, 30 schools in the last 15, 20 years.  Could be

21   more than that.  That means they would have bid 300.

22   Q.   Are you aware of Ferguson Electric Company?

23   A.   Yes, I am.

24   Q.   Do they bid the same type of projects you do?

25   A.   Yes, they do.

```
1    Q.    How frequently?

2    A.    Often.  It would be a rarity to be on a list for a

3    public school where they're not on it with us.

4    Q.    Is it fair to say sometimes you get bids and

5    sometimes they get bids?

6    A.    Yeah.

7    Q.    Were you aware whether the bids were open on this

8    project, who was low and who was second and who was third?

9    Is that information provided to you?

10   A.    Yeah, any time there's an award and we're one or two,

11   we're aware of it the day we bid.

12   Q.    Just to make sure I heard right, any time that

13   there's a bid where ECI is in the one or two position --

14   A.    Yes.

15   Q.    -- you become aware of that?

16   A.    Absolutely.  Because if we're number one, we pretty

17   much have the job.  If we're number two, we still may be

18   in the running for the job and so they want me to be

19   aware.

20   Q.    Have you -- on this project, Ferguson, after his

21   testimony and we have evidence here there was a bidder

22   that withdrew, and then Ferguson and ECI were pretty close

23   in their base bids.  Were you aware of that at the time

24   that happened?

25   A.    Yes.
```

1   Q.   Have there been other situations where you and

2   Ferguson were very close and somebody got knocked out of a

3   job?

4   A.   Yes.

5   Q.   And did ECI get the job?

6   A.   Yes.

7   Q.   How many times did that happen in the last couple of

8   years?

9   A.   I know it happened with Ferguson on the Health Law

10  project.  I can't recall if there have been other ones.

11  We have been second bidder, I just don't recall the jobs,

12  in a few other cases and we ended up with the project.

13  Q.   Where the low bidder gets knocked out?

14  A.   For one reason or another, yeah.

15  Q.   I'll refer to Exhibit 6 because I went through this a

16  little bit with Mr. Madore -- or, actually, not Exhibit 6.

17       Exhibit 9, ECI's base bid was approximately $60,000

18  higher than Ferguson and Ferguson was not -- Pike did not

19  go forward with Ferguson; for whatever reason, ECI got the

20  job.  Did you know at the time that was the bid spread?

21  A.   Yes, I did.

22  Q.   Did that tell you anything about your bid?

23  A.   Yeah, I mean, they're a very successful company.

24  They usually make money on the projects that they're

25  successful on.  And when they beat us, it drives me a

1    little crazy because we're always usually very close to

2    their number.  But for a few dollars, the job could be

3    ours.  So when they beat us out, they're usually close.

4    And when we beat them, we're usually close.  So I'm sure

5    we drive Lee Ferguson crazy a bit too.

6    Q.   Being that close to Ferguson, did that raise any

7    concerns that your bid was somehow deficient?

8    A.   No.  No, not at all.

9    Q.   So after you got the job, did you get involved with

10   reviewing any of the contract documents when the job was

11   awarded, actually awarded to ECI?

12   A.   Yes.  As a normal process, I review all the

13   contracts.

14   Q.   That would be, what, the contract specifications,

15   general conditions, those kinds of things?

16   A.   The specifications I don't usually -- the general

17   conditions and the specifications I don't usually bother

18   with unless the project manager, who also reviews it, has

19   any concerns about anything within those documents.

20   Q.   So what --

21   A.   The actual contract.

22   Q.   The contract itself?

23   A.   Yeah.

24   Q.   The contract provisions.  Are the general conditions

25   considered part of the contract?

```
 1   A.    Sometimes.

 2   Q.    By you?

 3   A.    Yes.

 4   Q.    Do you remember what you reviewed when you got the

 5   award here?

 6   A.    The entire package.

 7   Q.    Okay.  Were you aware of the schedule at that time?

 8   A.    Yes.

 9   Q.    Did you review the schedule at the outset of the

10   project?  This would be right after it was executed, the

11   contract was executed by ECI?

12   A.    I reviewed it in the sense that I looked through it.

13   I didn't study it or analyze it.

14   Q.    Okay.  Now, what was your next involvement with this

15   project?

16   A.    In early July when Cliff Clauson approached me and

17   told me that he had problems.

18   Q.    Okay.  What did you immediately do?

19   A.    I wanted to walk the job and see what the problems

20   were myself.

21   Q.    Did you do that?

22   A.    Yes, I did.

23   Q.    And when was that?

24   A.    I think it was like the second week of July.

25   Q.    Okay.  And what did you observe, generally?
```

1    A.    I observed the very cluttered project that appeared

2    to be running behind in a number of areas.  There was

3    debris from the demo guy that was not being cleaned up.

4    Contractors were attempted to work in some of the areas

5    that the demo guy had completed 80 or 90 percent of his

6    work but hadn't cleaned up yet.  There were materials

7    stored all over the place.  The main electric -- well, the

8    electric rooms for the P3 area, which are normally the

9    very first thing that anyone jumps on to augment the

10   rough-in phase for any area, were behind and were not in

11   sight of even being started yet.  There were a lot of

12   mechanical equipment, key components, rooftop units,

13   boiler room, various mechanical items that were not set,

14   were not in place, were in sight.  Masonry.  Everywhere I

15   went there was masonry -- there was no rhyme or reason to

16   the masonry contractor's work.  If you went to the

17   schedule, there was a sequencing of work that was not

18   being followed.

19   Q.    At that time, either immediately before or after your

20   site visit, did you review the project schedule?

21   A.    I reviewed those portions of the schedule that

22   pertained to electrical work, yeah.

23   Q.    You said a couple of times just now something was

24   running behind, something was late, something was -- the

25   masonry was not following the sequence, I don't know if

1   you used "sequence," but I think that's what you were

2   saying.  Where were you getting that information from?

3   A.   Well, Cliff was pointing out to me and Stephane

4   that -- again, electric rooms.  Forget everything else on

5   a construction project, to an electrician, that's the

6   heart of the project for us.  The electric room and they

7   mentioned the data rooms.  All of our wiring comes from

8   those areas.  And if we don't have those areas, it

9   presents a huge problem to sequence our work in the normal

10  fashion.

11  Q.   Did you review the schedule to see when those areas

12  were supposed to be completed per the contract schedule?

13  A.   Yeah.  The electric rooms were -- I believe there

14  were four, and they were supposed to be finished either

15  second, third -- in July.  So for the middle of July to

16  the end of July, we should have had all of our electric

17  rooms in place.

18  Q.   And did that turn out to be the case?

19  A.   No.  Two of the rooms -- two of the electric rooms,

20  one which I know fed the classrooms and other areas was

21  three weeks late.  So two or three weeks late.  One was at

22  least a week late and I think one finished -- one was

23  given to us a day late.

24  Q.   Okay.  As a result of your -- was there anything else

25  you recall observing at your initial site visit around the

1   second week of July?

2   A.   Yeah, the boiler room.  When I walked into the boiler

3   room, it had just been demoed.  And there was a large

4   chimney -- as you walked into a stairway, metal stairway

5   platform where you could look out over the whole boiler

6   room, to the left there was a large chimney that had been

7   there for an old boiler, I'm supposing.  That had been

8   demoed and debris was still on the floor.  And there was a

9   huge hole in the ceiling where the old chimney was.

10  Stephane pointed out to me at that time that right

11  underneath that hole was where we were supposed to be

12  mounting a panel on a transformer that would handle all

13  the equipment in the boiler room.

14  Q.   Couldn't do that with a hole in the roof, right?

15  A.   We're prohibited by code to install electrical wiring

16  or devices in a building that is not watertight.

17  Q.   Do you recall when that actually -- that condition

18  got to the point where you could go in and install your

19  equipment in that area?

20  A.   We put a subcontractor in that room like first or

21  second week of August.  I know that the room was -- the

22  boiler room was 30 days away.  From the time it was

23  supposed to be complete to the time it was complete was 30

24  days beyond what the original contract schedule called

25  for.

1   Q.   When we get into a more detailed review of the

2   schedule, I'll get into a little cause and effect with you

3   at that point; I'm not going to do that right now.

4        So following that -- there's been discussion about

5   the July 21st meeting with some of the people at Pike.

6   Who requested that?

7   A.   I asked Cliff Clauson to make that request.

8   Q.   What was that, about a week or so after you initially

9   viewed the site?

10  A.   Well, immediately after reviewing the site, I

11  instructed Cliff to contact them and tell them we needed

12  to meet ASAP.  And I was ready to meet the next day, but

13  Pike conveyed back to Cliff that they could meet with us

14  on the 21st.

15  Q.   So you met on site?

16  A.   On site.

17  Q.   Okay.  We've had discussion that Mr. Strauss,

18  Mr. Oloff, you, Mr. Clauson, Mr. Mathieu were there?

19  A.   I've heard of it.

20  Q.   Now, what did you say at that meeting?

21  A.   What did I say?

22  Q.   Yeah.

23  A.   Well, initially when we started the meeting,

24  everybody did the usual meet and greet.  And then Pike

25  wanted to know, It's your meeting, what do you want?  I

1    had Stephane and Cliff go through all of the various areas

2    that we had expected to be working in by now and were not.

3    And that we didn't see them being available for us to even

4    begin working in for at least another two weeks.  And, you

5    know, that this was time lost.  It couldn't be recouped.

6    So they went through the whole litany of the electric

7    rooms, the block, the demo, the various areas that were

8    behind.

9    Q.   Was steel mentioned?

10   A.   And steel.  Which -- well, anyways, that was a big

11   concern for me because in addition to not having electric

12   rooms, even if they built the electric rooms, in some

13   cases we couldn't get to them because all of our feeders

14   run down the hallway and turn into the electric room.  So

15   if they built the electric room, we couldn't get there.

16   So it was a double whammy that this needed to be

17   addressed.

18        Basically, Mel and Ed did not disagree about any of

19   the things that we were telling them and in fact we were

20   being delayed.

21   Q.   Let's stop right there.  Mr. Mathieu and Mr. Clauson

22   went through detailed items of problems that they felt

23   were holding ECI?

24   A.   Correct.

25   Q.   Did Mr. Oloff or Mr. Strauss disagree with them on

1    any of these issues?

2    A.   Not once.

3    Q.   Not once.

4         Did they ask for any further information about any of

5    these problems?

6    A.   No.  They agreed with us that those problems existed.

7    Q.   Okay.  What about -- did either -- did any of the ECI

8    folks ask these guys, the Pike fellows, when these

9    problems would be resolved?

10   A.   Yeah, because the conversation was that ultimately we

11   needed an extension of time.  For instance, the electric

12   room, Stephane was deeply concerned about when are we

13   going to get them, when are you going to build them.  At

14   that point in time they couldn't tell us.  And as part of

15   the discussion, we all agreed that they probably -- that

16   two key electric rooms probably would not even be looked

17   at as far as starting them for another two weeks or more.

18   Q.   This was something that Mr. Strauss and Mr. Oloff

19   agreed with you about?

20   A.   Yeah, because in one case they had to install steel

21   and the steel wasn't on the job.  And they had no idea

22   when that steel was going to get there.

23   Q.   During this discussion did anybody from Pike have an

24   updated CPM schedule with them?

25   A.   No.  Never.

1    Q.    Okay.  Did you talk with Mr. Oloff and Mr. Strauss

2    after that at any time until the end of the summer?

3    A.    I spoke to Ed Oloff several times a week.

4    Q.    Okay.  And we'll talk about that in a little bit.

5          So you were on the job several times a week through

6    the end of August?

7    A.    That's correct.

8    Q.    At any time did anybody from Pike share with you an

9    updated CPM schedule?

10   A.    No.  They never did.

11   Q.    Are you aware of anyone from ECI ever being given an

12   updated CPM schedule during the summer of 2010?

13   A.    No.  And --

14   Q.    Are you aware?

15   A.    I'm not aware.  And I also attended some of those

16   project -- the foremen meetings.

17   Q.    Okay.  We're on it, we'll talk about it.  There were

18   these weekly foremen meetings where the schedule was

19   discussed?

20   A.    Yes.

21   Q.    How many of those did you attend?

22   A.    About three or four.

23   Q.    And this would have been following July 21?

24   A.    Yes.

25   Q.    Okay.  And at that time were there any updated CPM

1    schedules from Pike being made available to the

2    subcontractors?

3    A.    There were not.  Nor were any mentioned by Mr. Oloff

4    at any meeting ever openly to the contractors indicating

5    that they were available.

6    Q.    Okay.  Did anybody from Pike even say they had

7    updated CPM schedules during this period?

8    A.    They did not.

9    Q.    Okay.  Not to your knowledge, anyways?

10   A.    Not in any of the foremen meetings that I attended,

11   not to my knowledge, nor were any ever transmitted in any

12   proper way to ECI during the course of the project.

13   Q.    And I'll get back to that foremen meetings you

14   attended.

15        I'm sorry for jumping around, I'm just trying to nail

16   down some issues as they come up.

17        So we're going back to the July 21 meeting.  You've

18   been talking about issues with the folks there.  You

19   mentioned extension of time.  Did anybody from ECI discuss

20   a request for extension of time?

21   A.    I did, as part of the analysis of where we were, what

22   delays were confronting us, and what a reasonable outlook

23   was for any of these delays such as electric rooms being

24   cured by Pike.  We all agreed that we were about four

25   weeks behind -- we would be four weeks behind on many of

1    these areas before Pike had even the possibility of maybe

2    starting to cure some of the issues.

3    Q.   So did you say that to Pike at this meeting, the Pike

4    guys at this meeting?

5    A.   That's what we all discussed.  We all agreed that,

6    yeah, the electric rooms probably won't be able to get

7    started for at least another couple weeks, the ones that

8    were directly impacted by steel.  And so I said that, you

9    know, as we sit here today, it's reasonable to see where

10   ECI's going to be four weeks behind in these key elements

11   of the project.

12   Q.   Did you ask for an extension of time?

13   A.   I did.

14   Q.   What do you remember saying on that specific point?

15   A.   Well, the next -- I mean, the next logical

16   progression of that discussion is we all agree --

17   Q.   Mr. Flynn, please, listen to my question carefully.

18   What do you remember saying about an extension of time at

19   that meeting?

20   A.   That's what I was trying to tell you.

21   Q.   Okay.

22   A.   As we were discussing and reaching a conclusion that

23   we would be four weeks behind, I then summed up and said

24   to Ed Oloff and Mel Strauss, "Then we need a four-week

25   extension.  And we may need more if you can't cure these

1    things.  When we get to the fourth week and the electric

2    rooms still aren't started or the week after that they're

3    still not started, we may need to revise that.  But as a

4    minimum, as I see it, we need a four-week extension of

5    time."

6    Q.   You said that at that meeting?

7    A.   Yes.

8    Q.   What was the response from either Mr. Strauss or

9    Mr. Oloff?

10   A.   "There will be no extensions of time for Phase 3."

11   Q.   Who said that?

12   A.   Mel.

13   Q.   Mr. Strauss?

14   A.   Yes.

15   Q.   So he didn't ask you for any further information on

16   that request, he just made that statement?

17   A.   He said that the school would never approve an

18   extension of time for the Phase 3, that they had to open

19   back up -- regardless of whatever was on the table, it did

20   not matter, there would be no extensions and we had to

21   open the school on time.

22   Q.   Okay.

23   A.   And I said to him then, "There's got to be a Plan B.

24   You can't lose four weeks and then just tell the

25   contractor, oh, well, too bad.  You have to have a

1    Plan B."  And Mel said, "There is no Plan B.  You got to

2    do whatever you got to do, get as many men here as you

3    need to get here, and you need to meet the deadline."

4    Q.   That's what he said?

5    A.   Those were his words.

6    Q.   Did either Mr. Strauss or Mr. Oloff ask for you to

7    submit that request in writing to them?

8    A.   No.  They made it perfectly clear it would not be

9    entertained, period.  There would be none.

10   Q.   Did they ask you for any further information so they

11   could review or consider that request?

12   A.   They did not.

13   Q.   Did they mention anything about having to confer with

14   anybody else, whether from Pike, the City, the architect,

15   whoever, to review your request for extension of time?

16   A.   No.  They made it pretty clear to me that the City

17   would say no and that therefore it was not going to even

18   be entertained.

19   Q.   And then you asked them what the Plan B was, they

20   said --

21   A.   There was no Plan B.

22   Q.   Did you have any further discussion about what it was

23   they expected ECI to do in this context?

24   A.   Well, as I said, they directed -- they said there

25   would be no extensions of time, that we needed to do

1    whatever we needed to do to get to the finish line and

2    bring in as many men as possible.

3        My response was that we would do whatever they

4    directed us to do.  However, doing what they were

5    suggesting, which was to bring in as many men as possible,

6    would have severe -- in my mind, would have financial

7    consequences.

8    Q.   Did you state that to them?

9    A.   Yes.

10   Q.   Did you say anything further about who would be

11   responsible for that?

12   A.    Well, I basically said that I believed that it would

13   harm ECI, that there would be financial consequences, and

14   that at the end of Phase 3 if in fact we were harmed,

15   which would have been six weeks down the road, that we

16   would be seeking compensation from Pike.

17   Q.   How did either of the gentlemen from Pike respond to

18   that?

19   A.   They laughed at me.

20   Q.   They laughed at you?

21   A.   They laughed at me.

22   Q.   In terms of what?

23   A.    They felt as though, and they made a statement that

24   they had bought from us, contractually, whatever we needed

25   to do to make that deadline, they had bought that from us.

1    They believed that they were completely insulated from

2    ever having to pay for any kind of inefficiencies that

3    they may create by accelerating the project.

4    Q.   Did they say -- make comments to that effect?

5    A.   They made a comment that they had contractually

6    bought from us whatever we needed to do to get to the

7    finish line.

8    Q.   Was there any mention of liquidated damages?

9    A.   Yes.  They said if we didn't gear up and delayed in

10   any way, caused harm to the school system and they

11   couldn't open on time, there were going to be liquidated

12   damages assessed to ECI.

13   Q.   Were you aware of any provision in your contract that

14   provided for the assessment of liquidated damages by Pike?

15   A.   At the time they made that statement, I was not, but

16   I could -- I wasn't positive 100 percent that there might

17   have been some little clause within the contract that I

18   hadn't remembered that might have a liquidated damages

19   clause.

20   Q.   Certainly they mentioned they would hold your firm

21   responsible for damages that the City suffered by reason

22   of delayed opening of the school?

23   A.   Yes.

24   Q.   I just would like to point out to you just a couple

25   of provisions in the contract.  We've been there before so

1    I'm not going to spend a lot of time on all of them.  Just

2    a few.

3         In Exhibit 1 -- do you have Exhibit 1 in front of

4    you?

5    A.   What book would that be in?

6    Q.   Volume I, Exhibit 1.

7         Now, this is Book I, the project specifications,

8    would you have reviewed this prior to having met with Pike

9    in July?

10   A.   Yes.

11   Q.   At page 10 of 18, paragraph 11, and we visited this I

12   think with Mr. Madore, it says page 10 of 18, Electrical

13   at the bottom, 20 pages in?

14   A.   I have it.

15            MR. KAPLAN:  Do you have that, Your Honor?

16   BY MR. KAPLAN:

17   Q.   Paragraph 11, Construction Schedule, references the

18   construction schedule and says:  "Subcontractor will base

19   his bid for this project on the critical path milestones

20   contained in the project schedule."

21        Were you aware of this provision going into that

22   meeting with Pike?

23   A.   Yes, I was.

24   Q.   Okay.  So you were -- okay.

25        And then if we go in Tab 2 -- I'm sorry.  Exhibit 13.

1    Go to Exhibit 13 in the same book.  This is the

2    subcontract agreement itself.

3    A.    I'm there.

4    Q.    And in Article 3.1 at page 6 --

5    A.    I'm there.

6    Q.    That's the Time and Schedule paragraph.  And on the

7    top of the right-hand column there's a reference to

8    suspending, delaying or accelerating the work without

9    compensation to subcontractor.  The next sentence:  "In

10   the event such a delay or suspension extends the overall

11   time of performance, the time for the Subcontractor to

12   complete its work shall be extended."

13        Were you aware of that provision going into that

14   meeting?

15   A.    Yes, I was.

16   Q.    At the end of that section, it also talks about the

17   contractor's opinion that a sub falls behind -- and I'm

18   paraphrasing -- the contractor shall have each of its

19   subcontractors basically increase its labor force.  I'm

20   parsing that, but I think that's pretty much what the

21   reference is?

22   A.    Yes, which is pretty standard.

23   Q.    At the July 21 meeting did Pike talk to you about

24   getting other subs to accelerate their work or speed up

25   their work to try to catch up to the schedule?

1    A.    They did not.

2    Q.    And then I think the other part here, the bottom of

3    page 6, 3.4, Delays.  Should the subcontractor be delayed

4    by the act or omission of the contractor or any other

5    contractor or subcontractor on the project -- and I'm

6    parsing a little bit -- not due to any fault on its part,

7    then the time for completion of work shall be extended for

8    a period equivalent to the time loss by reason of any of

9    the aforesaid causes.

10        Were you aware of that provision going into that

11   meeting?

12   A.    Yes, I was.

13   Q.    And you had talked with Pike at the July 21 meeting

14   about at that point in time looking at something

15   equivalent to a four-week delay, wanting a four-week

16   extension of time?

17   A.    Correct.

18   Q.    You said Pike didn't disagree with you at that point?

19   A.    They didn't disagree with the logic or the reasoning

20   for the four-week extension.

21   Q.    Okay.  Now, following walking out of that July 21

22   meeting, what was the -- what did you perceive to be your

23   marching orders, so to speak, from Pike?

24   A.    To do whatever it takes to get the job -- the

25   electrical portion of the project complete by the Phase 3

1    completion date.

2    Q.   Okay.  And did you talk with Mr. Clauson about what

3    ECI needed to do from that point on?

4    A.   Yeah.  I directed -- I told Cliff that I would be

5    going back and asking our labor person, we have a person

6    who handled acquiring labor, moving the men around from

7    different jobs, that I would be informing him that he

8    would have to start acquiring a substantial number of

9    people, and that Cliff and Stephane needed to come up with

10   a head count, how many did they need and how many could we

11   put to work.  It also wasn't something where you could

12   just pull the trigger and put 30 guys on the job the next

13   day.  What would they be doing?  Was the work laid out?

14   Was the work available?  Stephane and Cliff worked closely

15   and they ramped up people as quickly as they were

16   available and as they could put them to work.

17   Q.   And were you aware of the last two weeks of July

18   through the end of August about the increasing labor

19   levels, manpower levels that ECI was putting on the

20   project?

21   A.   Very much so.

22   Q.   Following the July 21 meeting, how frequently were

23   you on the project yourself?

24   A.   A minimum of twice a week and sometimes as much as

25   every day.

1   Q.   Okay.  And did that -- from what period was that?

2   A.   Until the school opened back up.

3   Q.   And when you -- how long did you usually spend on the

4   project when you visited?

5   A.   I would walk the entire project, go through every

6   area of the project.  I mean, from bottom to top.  The

7   first week of August, I was actually on active duty with

8   the Civil Air Patrol and I came there every day in

9   uniform.

10  Q.   Did you speak with Mr. Oloff or Mr. Strauss on any of

11  those occasions?

12  A.   Pretty much every time I went there I saw Ed.

13  Q.   Mr. Oloff.  And did you have any conversations with

14  Mr. Oloff about the same issues -- let's just break it

15  down.  Conversations about progress of the work?

16  A.   Ed was usually hustling up and down the corridors

17  moving from place to place.  He was working hard.  And I

18  was usually walking in the opposite direction going

19  somewhere else to look.  And for the first two or three

20  weeks, I used to always greet Ed with "How are you doing,

21  Ed?  How are we doing?"  His response would be to me, "You

22  need more men."

23  Q.   He said that every time?

24  A.   Every single time.  There wasn't a single time that I

25  said, "How are we doing, Ed?" where he didn't say, "You

1    need more men."

2    Q.   Did he explain why he was saying that to you?

3    A.   No.

4    Q.   Okay.  Did you say anything back to him?

5    A.   Yeah, because he would say it with a big grin on his

6    face.  So my response back to him was, "Are you sure?

7    Because wait until you get the bill for the ones you've

8    already got."

9    Q.   How many times did you say that to him?

10   A.   Many.

11   Q.   And did he ever question what you meant by that?

12   A.   No.  He knew what I meant by that.

13   Q.   Now, we'll get into the letters.

14        The first written claim here was October 1st?  We

15   have it as one of the exhibits.

16   A.   That's correct.

17   Q.   We'll get to that in a while.

18        So from the July 21 meeting to the October 1st

19   written claim notice, did ECI issue any kind of written

20   notification to Pike that it was making a claim for extra

21   man hours on the job?

22   A.   We did not.

23   Q.   Following that July 21 meeting, why did you not write

24   something to Pike mentioning anything about claimed breach

25   of contract, overruns, those kinds of things?

1    A.    When I left that meeting room, which was like a

2    little conference room in the trailer --

3              THE COURT:  On July 21?

4    A.    Yeah.

5          It was crystal clear to me that, one, under no

6    circumstances would any extensions of time be granted,

7    period.  Two, it was crystal clear that they knew we were

8    being harmed.  They knew we had been delayed.  They knew

9    that -- they didn't argue once that we were entitled to

10   the four-week extension.  Their response was that it

11   wasn't obtainable, it wasn't going to happen.  And three,

12   I made it crystal clear to them that if we did what they

13   wanted us to do, it would be hugely inefficient and we'd

14   be harmed.  And they didn't care.

15   BY MR. KAPLAN:

16   Q.    If you got a four-week extension of time as of

17   July 21, what effect would have that had as to how ECI ran

18   the rest of the Phase 3 work?

19   A.    It would have substantially mitigated the cost.

20   Q.    How so?

21   A.    Because many of the areas that we were being forced

22   to work in on top of other people or many of the things

23   that we were being forced, for instance, to rough in an

24   incomplete manner, we would have more time now, we could

25   rough them in the normal manner, pull the wire in a normal

1    manner and work much more closely to the way we envisioned

2    when we bid the project.  So our labor efficiency would

3    rise and our labor overrun would fall.  It wouldn't have

4    cured everything on the project because some things

5    continued to be delayed even beyond that four-week period.

6    Q.   Okay.  Now, what about providing Pike with any kind

7    of financial information about the claim?  What did you

8    need in terms of your own information and documentation to

9    be able to determine what kind of claim you're talking

10   about?

11   A.   Well, my reading of the contract and my perception

12   was that they understood we were being harmed.  Two, we

13   couldn't -- I don't see how we could send them anything

14   other than hard financial data showing them what the labor

15   overrun actually was at the end of Phase 3.  Anything

16   prior to that would have been an educated guess.  I mean,

17   many years ago, in my younger years, I've done that on

18   occasion and then rebuked by construction managers and

19   general contractors for submitting data that I wasn't sure

20   of.  If it's based on my gut, they don't want to hear it.

21   They want to know it's a sum certain.

22   Q.   You're talking about July 21 and most of the labor

23   overrun was incurred through the end of August, most of

24   it?

25   A.   Correct.

1   Q.   What's your reporting system like?  When do you get

2   the information of the man hours being spent in the field?

3   A.   It's a typical accounting system.  Our payroll goes

4   in each week.  Usually the first week of -- well, let's

5   just use January as an example.  Payroll and material

6   billings would be inputted into our accounting system

7   throughout the month of January.  Once the last payroll

8   and all the last invoices, whatever, were input into the

9   system and the controller is sure everything is in there

10  for January, he would at some point, as soon as he could

11  into the following month, post that.  It's an accounting

12  process.  The software then takes all of those numbers and

13  moves them into -- in the old days would be the general

14  ledger.

15  Q.   So in terms of getting your man hour reports and your

16  labor reports for the month of August of 2010, those

17  become available sometime in September?

18  A.   Correct.

19  Q.   Okay.  And if you're finishing most of your Phase 3

20  work at the end of August, that means your information to

21  look at your labor spent comes to you sometime in

22  September?

23  A.   Correct.

24  Q.   Okay.  You mentioned you had gone to some of the

25  foremen's meetings, I think you said three of them

1  following July 21 meeting with the Pike folks?

2  A.   I think the second week in August when I went out

3  with Cliff and Stephane -- I'm not positive, but I think I

4  attended a meeting that week.

5  Q.   Okay.  And then a couple of others later in August?

6  A.   I attended three or four.

7  Q.   Of the foremen meetings?

8  A.   Yes.

9  Q.   These were the weekly meetings where the schedule was

10 being discussed?

11 A.   Yeah, I sat in the back.

12 Q.   How was that being conducted by Pike?  What was their

13 process?

14 A.   They had a big table, round table -- not round, it

15 was a big square and everybody sat around the room.  Ed

16 and Mel would sit up front.  They had a whiteboard up

17 front.  And it was a typical job meeting.  They would go

18 through all of the issues on the project.  They would

19 have -- they'd go over all the items that were existing

20 items of concern from the previous meeting to discuss if

21 they'd been resolved or not resolved or what was being

22 done about them currently, anything new would come up.

23 They would talk about where they were on the project as of

24 that particular moment.  Sometimes there would be some

25 heated discussions with various subs about their not being

 1   finished in areas they were supposed to be finished.

 2   There was a lot of -- as I recall, there was a lot of

 3   shouting and yelling across the table between Pike and the

 4   subs.  And every once in a while we'd have to calm them

 5   down and get them to get back on track.  There were a lot

 6   of angry people in that room, that was my perception.

 7   Q.   The schedules -- in terms of planning ahead, I think

 8   both Mr. Clauson and Mr. Mathieu talked about one- or

 9   two-week look-aheads being discussed at those meetings?

10   A.   Yes.

11   Q.   What's your recollection of that topic?  How was that

12   handled by Pike at those meetings?

13   A.   Ed had a pretty good handle on where he was at at any

14   given time in the project as of that meeting, and he had

15   goals of where he wanted to go for the following week and

16   where he was hoping to go the week after that.

17        The biggest obstacle that -- in my perception, the

18   biggest obstacle Pike had was they were trying to herd

19   cats, in my opinion.  They weren't getting people to be

20   where they were supposed to be.  I mean, the masonry guy

21   was everywhere.  And I know that they were not happy with

22   his performance and him being everywhere.  And I don't

23   recall which contractors during those meetings they were

24   the most upset with.  They were doing what they could do

25   to get people to get on track.

1    Q.   Were they taking -- in the contract schedule, which

2    is in Exhibit 12, and if you could open this up?

3    A.   Exhibit 12?

4    Q.   Yes, at the back of Exhibit 12.  And the Phase 3

5    activities start at page 15.

6         First of all, you have reviewed this, I think you

7    said, prior to the July 21 meeting?

8    A.   Yes.

9    Q.   Okay.  During these project meetings you were

10   attending, these foremen meetings during the construction,

11   were any references being made to this contract schedule?

12   A.   No.

13   Q.   Were there any comparable depictions?  What I mean by

14   that are CPM type of illustrations of durations,

15   sequences, the same kind of format, in other words, that's

16   used in this schedule, was any of that kind of information

17   being updated and posted at any of these foremen meetings?

18   A.   No.

19   Q.   Was anything being posted or illustrated in a graphic

20   way at the foremen meetings?

21   A.   No.  Basically, the discussion was where particular

22   areas that they wanted to get done.  When it was ready, it

23   was ready.  Pike was the conduit to the other foremen

24   making them aware that, okay, our goal is -- for instance,

25   admin.  I'm only using it as an example, I don't recall it

1    being discussed specifically.  When they were trying to

2    focus on completing an area, Ed was bringing everybody's

3    attention to what was required and in what order for that

4    particular area next week, what he expected individual

5    contractors to do next week.

6    Q.   Did that get printed up in any fashion, that

7    discussion or that summary?

8    A.   As I recall, the verbiage of what he was saying was

9    printed on the back of the minutes.

10   Q.   So the minutes had a listing of that information?

11   A.   Yes.

12   Q.   But that was not in a schedule format?

13   A.   No.  It was a to-do list.

14   Q.   Let me show you quickly Exhibit 30.

15        This is in our Volume III, Mr. Flynn.

16        Have you seen this document before?

17   A.   Yes, I have.

18   Q.   Okay.  The manpower -- just go to the chart, if you

19   would, the color chart.  Bid versus actual.  Were you

20   aware of these actual manpower levels in realtime as they

21   were occurring?

22   A.   Absolutely.

23   Q.   And were you aware of the as-bid information what was

24   anticipated at the outset of the job by ECI?

25   A.   Yes, I was.

```
 1   Q.   In your 20 years of experience with ECI, had you ever
 2   experienced, encountered this type of use differential
 3   between what was expected and what was done in a two-month
 4   period on a project?
 5   A.   This is the first time I've ever seen such an extreme
 6   example in 40 years that I've been in this business,
 7   40-some years, this kind of a skewed situation.
 8   Q.   Worst in 40 years in this context?
 9   A.   It's the worst I've seen.  I've been in the business
10   since 1970, you do the math.  Forty-four years.
11   Q.   You were involved in the project from July, pretty
12   much hands on from July 21 on?
13   A.   Correct.
14   Q.   Are you aware of anything ECI did to cause this huge
15   differential in manpower?
16   A.   No.  None.  I mean, I was there at the outset and
17   very aware of us wanting to get going, wanting to do the
18   project as we had envisioned and as it was laid out in the
19   original schedule.  And from that point on when they told
20   us to do whatever was necessary, I don't see how anything
21   could have been our fault after that.  It was chaos and it
22   was -- it was a crazy way to proceed.
23   Q.   Okay.  I'm going to switch gears here a little bit.
24        Exhibit 51.
25                      (Pause.)
```

1           MR. KAPLAN:  Your Honor, I'd like to introduce

2   Exhibit 51.  There's a set of rolled-up plan sheets sort

3   of, they're schedules that comprise Exhibit 51.  There's

4   three documents in there.  One is entitled Phase 3 ECI

5   Activities Current Versus Baseline.  And that's got a data

6   date of July 11, 2010.  There's another comparable

7   document that has a data date of September 1, 2010.  And

8   then there's a full-page document that's also part of the

9   exhibit which is all construction activities, I think that

10  data date is September 1, 2010 as well.  This is

11  information that -- I could have the witness explain, but

12  I don't think Mr. Hug and I have any issues on this.  This

13  is taken from information that Pike provided to us during

14  discovery.  I will have the witness explain how these

15  documents actually were produced.

16          THE COURT:  Side by side?

17          MR. KAPLAN:  These two will be a side by side.

18          So I offer Exhibit 51 into evidence.  The clerk

19  has the entire exhibit, I'm just using two pages of it.

20          THE COURT:  Those are blown-up pages?

21          MR. KAPLAN:  They're actually the same size.

22  It's a rolled-up set of plan.  In your book, you have them

23  in the notebook, but they're very difficult to read at

24  Exhibit 51.

25          THE COURT:  I have one page for Exhibit 51.

1          MR. KAPLAN:  So there is the oversized exhibit,

2    looks like this size.

3          THE COURT:  So where is the original exhibit?

4          MR. KAPLAN:  Right there.  All I have is two

5    exact sheets on poster board to make it easier for the

6    witness.

7          THE COURT:  That's fine.  Are you offering them

8    now?

9          MR. KAPLAN:  Yes.

10         THE COURT:  Any objection to Exhibit 51,

11   Plaintiff's?

12         MR. HUG:  As to there are more than that in

13   Exhibit 51, I just want to clarify as to the two, is that

14   7/9 or --

15         MR. KAPLAN:  7/11.

16         MR. HUG:  7/11 and 9/1/10, those two I have no

17   objection to.  The other ones you say you're not going to

18   use?

19         MR. KAPLAN:  They're part of the exhibit, they

20   should be admitted with it.  I'm not going to use them

21   with the witness at this time.

22         MR. HUG:  As long as the other ones are not

23   going to be used in argument in post-trial briefs, then I

24   don't have a problem with that.  I don't want the other

25   pages to be admitted without questioning on them.

1           MR. KAPLAN:  Okay.  I have no problem with that.

2    We're not going to use them.  In fact, if you want, I can

3    take them out of the exhibit.

4           MR. HUG:  I don't want to go through the hassle

5    of taking them.  I want to make sure I'm not going to have

6    argument --

7           THE COURT:  Are you only -- 51, only using those

8    two pages?

9           MR. KAPLAN:  For Mr. Flynn, yeah.

10          THE COURT:  Are you using more pages later?

11          MR. KAPLAN:  It's possible.  Based on what one

12   of your witnesses say, I may want to refer to that.

13          MR. HUG:  I would stipulate to admission of

14   these two pages.

15          THE COURT:  Why don't you offer those two?

16          MR. KAPLAN:  We can do that.

17          THE COURT:  Why don't you mark 51 for

18   identification only and offer the first one July 11, 2010

19   as 51A and September 1, 2010 as 51B.

20          MR. KAPLAN:  I'll do that.  That's fine,

21   Your Honor.

22          MR. HUG:  You know, I may end up using the

23   others with Mr. Flynn, now that I think of it.  Put them

24   all in.

25          THE COURT:  So 51, 51A and 51B all come in as

1    full exhibits.

2              MR. KAPLAN:  And I've's got 51A is the July 11,

3    2010 schedule and 51B is the September 1, 2010 schedule.

4    BY MR. KAPLAN:

5    Q.   Let me start with 51A, which is the July 11 one.

6    Mr. Flynn, you may have to get up.  This is tough.  That

7    size it's still small.

8         First of all, I described that we got this from Pike.

9    Are you aware of the process of what ECI received in

10   discovery through Pike that led to the production of this

11   document?

12   A.   Yes, I am.

13   Q.   Would you describe that?

14   A.   We had requested during discovery for copies of any

15   and all schedules that Pike had produced during the course

16   of Phase 3.  Pike produced a number of perimeter update

17   schedules that they apparently developed during Phase 3.

18   Q.   And then what did you do at your shop to come up with

19   what's marked as 51A?

20   A.   I had one of my fellows who is very good with

21   Primavera take one of the update schedules which was dated

22   7/11/2010 and Primavera allows you to overlay that against

23   the baseline schedule so that you then get the data from

24   the original baseline schedule as compared to the update

25   schedule, so you can view where you are at that point in

1    time as compared to the original base schedule.

2    Q.    For this one, we just have the electrical activities

3    indicated?

4    A.    Yes.  At the same time I asked my particular, his

5    name is George Ortiz, to sort out all the other activity

6    so I'd only be looking at the electrical.

7    Q.    So just to show -- and I know this is very tough to

8    read, Your Honor.  But I think we can go through it,

9    illustrate.

10        Just in terms of what's being marked here, these blue

11   lines -- first of all, this is the July 11 date.  What

12   does that represent?

13   A.    That's what they refer to as the data date.  That's

14   the point in time when they did this.

15   Q.    And that's when the information was put in?

16   A.    The information is as of that date.

17   Q.    Okay.  The dark blue bars that are to the left of

18   that data line, what do those represent?

19   A.    That's the index at the bottom.  The dark blue is

20   actual work performed.  The green bar is remaining work.

21   Q.    Let me stop you.  So these light green bars are

22   remaining work --

23   A.    Right.

24   Q.    -- as of that date?

25   A.    Right.

1          And then there's a thin black bar, which is the

2    primary baseline, original schedule activity dates.

3    Q.   So these thin black lines are from what was the

4    baseline schedule?

5    A.   Correct.

6    Q.   The dates in the baseline schedule?

7    A.   Correct.

8    Q.   So if you look at the -- for any single activity

9    then, and let me try to do this in some fashion that's

10   easy to read.  Take this one.  That goes across to final

11   terminations in an area P3CL-740?

12   A.   Yes.

13   Q.   Right here?

14   A.   Yes.

15   Q.   So the dark black line bar shows when that was

16   scheduled to be done?

17   A.   That was the original schedule, yes.

18   Q.   The green line?

19   A.   Remaining to be performed.  It hasn't been done yet.

20   Q.   It's being scheduled as of July 11 to be done in this

21   period from the beginning of August through, I don't

22   know --

23   A.   Well, if you carried across, it's identified as P3CL

24   number one, classroom area.  It's activity 740, which is

25   identified as final terminations.  In the baseline, the

1   original schedule 10-day duration, the baseline -- well,

2   anyways, you can continue on over to the right and you get

3   to the baseline start, which was 20 July, the finish was

4   31 July.  And now they're showing it as starting on 29

5   July and ending on 9 August or 11 days late.

6   Q.   Okay.

7          THE COURT:  Let me just ask a point of

8   clarification.  This is a side-by-side of Pike's own

9   produced document, Pike's update to Primavera schedules?

10          THE WITNESS:  This is all Pike data.

11          THE COURT:  This is stuff you got in discovery,

12   not updated data that you had at the time?

13          THE WITNESS:  Correct.

14   BY MR. KAPLAN:

15   Q.   Other than just printing this in this fashion, ECI

16   did not produce any of this data?

17   A.   No.

18   Q.   Okay.

19          THE COURT:  I understand.

20   BY MR. KAPLAN:

21   Q.   So to go through, first of all, in sort of an

22   overview sense, the blue bars are what already was done

23   and these black lines show what was scheduled to be done?

24   A.   All of these black lines are work activities that

25   were scheduled to be done and obviously have not been done

1    because they're not blue.  And all of these activities

2    beyond it that are in the same level line with the skinny

3    black line are indicating when those activities -- when

4    Pike believes they'll now be done.

5    Q.    So as of July 7, Pike's own scheduling is showing

6    these green areas basically being pushed out relative to

7    these light black lines for the same item?

8    A.    Correct.

9    Q.    Okay.  Now, if we use the end of August, which is

10   this vertical line here, that's roughly when most of the

11   Phase 3 work is scheduled to be complete?

12   A.    Correct.

13   Q.    So they're still showing this as being completed,

14   most of it, within the end of August period?

15   A.    I believe all these items which are way past that are

16   all probably the art room and the gym area.  Yeah, art

17   room, they're all P3AR activities which we've already

18   heard were pushed out.

19   Q.    So those activities that are pushed out have been

20   originally scheduled for July and August?

21   A.    Right.  And they're now scheduled out in September,

22   October.

23   Q.    Okay.  And this is Pike's projection.

24         Now, some of -- I'm not going to go through every

25   single one of these.  Just to identify some of the ones

1    that were perhaps more significant in terms of the delay

2    periods being projected at that time, P3M-610?

3    A.    Conduit distribution, yes.

4    Q.    Okay.  What is that showing for a variance or a delay

5    period?

6    A.    Thirty days behind.

7    Q.    Okay.  And what kind of work was that for ECI?

8    A.    Talking about the distribution, the main feeders.

9    Q.    Okay.

10              THE COURT:  And can we see the 30 days on this

11   chart?

12              THE WITNESS:  Sure you can, Judge.  Let me find

13   it again.  This is such a pain.

14              THE COURT:  Right there.

15              THE WITNESS:  Yeah.  So it's close to this line

16   it shows you the 30 days.  He wanted to see it

17   graphically.

18              THE COURT:  Does it show up?

19   BY MR. KAPLAN:

20   Q.    This one doesn't have a green bar.  Just says it, but

21   didn't have a green bar on that line.

22              THE COURT:  Do we know why that's the case?

23              MR. KAPLAN:  I can't tell you.

24              THE WITNESS:  It's Primavera.  The data says

25   it's going to finish in August instead of when it was

1    supposed to.

2              THE COURT:  Does the 30 days come from Primavera

3    itself?  Is there an entry that says 30 days on the

4    program?

5              THE WITNESS:  Right here, Judge.  If you go back

6    across, this is the original completion date, this is the

7    new projected completion date which gives you the 30 days.

8              THE COURT:  To 30 July.  That seems like 28

9    days.

10             THE WITNESS:  The answer is the software does

11   the math.

12   BY MR. KAPLAN:

13   Q.   Now, what kind of input is being done by Pike at this

14   time or whoever would be creating this in July of 2010 to

15   go from the baseline schedule to current?  What kind of

16   information has to be put in?

17   A.   Whoever was keeping the schedule would be inputting

18   the actual completion dates as something completed, they

19   would enter that as being completed.  The day it started,

20   day it finished, which would give you the blue line.

21        For activities that were supposed to be started, say,

22   here (indicating) and are going to be here (indicating),

23   they would make a new entry into the activity item giving

24   it a new start and finish date.

25   Q.   So just keeping with the one we looked at, final

1   terminations, it was here, P3CL-740.  So the current start

2   and the current finish information is something that would

3   be put in by a person inputting that information?

4   A.   Yes.

5   Q.   So that's the new data that's being put in, all the

6   stuff in the current start and current finish counts?

7   A.   Yeah.  When they create an update schedule, it's a

8   brand new schedule.  It's saved as a brand new file.  It's

9   named differently than the baseline.  The base schedule is

10  a file to itself.  Every update is a file to itself.  So

11  Primavera allows you to take any two data files and

12  compare them.

13  Q.   What does the software do?  If you just -- let me ask

14  you this:  If you just input new start dates for these

15  various items and then say, okay, schedule, talk to me,

16  what does the schedule come up with?

17  A.   The schedule -- Primavera will generate a schedule

18  based on the data and the logic of the schedule that you

19  created.  It will generate a critical path schedule with a

20  completion date.

21  Q.   So if you just said we give all these new start

22  dates, all the ones down the line, all the ones being

23  changed, and then you directed the scheduling software to

24  create a new schedule, what would that do for a completion

25  date for you?

1   A.   It would change the completion date to a date that

2   your logic would drive the completion date to be.

3   Q.   Can you also, in that same operation, tell the

4   software here's the new information, but I'm keeping an

5   August 30 completion date, for example?

6   A.   Absolutely.

7   Q.   Okay.  Based on your review of this document -- we'll

8   get to the next one as well -- was that basic August 30th

9   completion date most of the work imposed in the schedule?

10  A.   Yes.  From what I saw in the schedule, the logic was

11  overwritten.  I think if Primavera was allowed to generate

12  this particular schedule with the logic working, it would

13  have had a different completion date.

14  Q.   I think that's easier to see in the other one, when

15  we get to the other exhibit.

16       So you have these various activities being pushed out

17  in the schedule.  Basically, it looks like the effect is a

18  large chunk of work is being pushed out certainly from

19  either late July or early August out to the end of August,

20  is that how that's shown?

21  A.   Correct.

22  Q.   These are all electrical activities?

23  A.   All electrical.

24  Q.   If we went through just looking at the variance days,

25  the negative numbers, you've got connect electrical to hot

1   water heaters, which is minus 30 at P3M?

2   A.   That's the boiler room.

3   Q.   That's the boiler room.

4        You have conduit distribution, which I think you

5   already looked at, which is 30 days variance P3M-610.  I'm

6   just looking at some of the larger ones.  You've got mount

7   VFD starters, P3M-580?

8   A.   Boiler room.

9   Q.   That's 28 days.  You've got one down here which is 30

10  days for electrical devicing, P3M-390.  You've got one

11  which is 40 days final MEP connections?

12  A.   Which is probably the roof top units.

13  Q.   You've got some down here that are 53 and 54 days, a

14  number of them.  Electrical devicing is 54 days?

15       THE COURT:  I think you're in the period that

16  was exempt.

17       MR. KAPLAN:  You're right.  Okay.

18  BY MR. KAPLAN:

19  Q.   Now, this was July 7?

20  A.   This was a couple weeks before we met.

21  Q.   About a week before you went to the sub?

22  A.   Right.

23  Q.   So, obviously, the situation is constantly changing

24  throughout July?

25       THE COURT:  Is this July 7 or 11?

```
 1              MR. KAPLAN:  I'm sorry, Your Honor.  It's

 2    July 11, I'm sorry.

 3    BY MR. KAPLAN:

 4    Q.   So right around the time you're at the site for the

 5    first time?

 6    A.   Correct.

 7    Q.   Let's look at the other one.

 8    A.   Okay.

 9    Q.   Anything else?

10    A.   That tells you exactly where the job was.

11    Q.   Let's look at the other part of this, which is 51B.

12         This is formatted the same way?

13    A.   Right.

14    Q.   And the date now is September 1, 2010.  The symboling

15    is the same, right, Mr. Flip?  The blue bars show work

16    actually completed and when it was completed?

17    A.   Correct.

18    Q.   These light black lines show when it was originally

19    scheduled in the baseline schedule to be completed?

20    A.   Yes.

21    Q.   And this shows, except for those items that were

22    pushed into September in the scheduling, which we had seen

23    before, this shows almost the entire job being completed

24    in August, all these activities, right?

25    A.   Yes, it does.
```

1  Q.   And you have the same variance column showing overrun

2  days?

3  A.   Yes.

4  Q.   We could go through, but we have days running from

5  minus 20, minus 46, 28, 33, 20, 29 -- a lot of those --

6  many in those areas 20 to 40 days?

7  A.   Correct.

8  Q.   Now, to look at these two somewhat side by side, does

9  this show anything about what happened from the beginning

10 of July to the end of August in terms of the way the job

11 progressed?

12 A.   What it shows is in July there's a slant.  There's a

13 certain amount of -- still a certain amount of work, maybe

14 40 percent of this column still being performed in July.

15      But then if you go over here and look at the reality,

16 and this is the actual what happened, you pretty much see

17 all of it being done in August.

18 Q.   Being complete?

19 A.   Being completed in August.

20          THE COURT:  Can you explain, it doesn't appear

21 that -- what are the thin black lines again?

22          THE WITNESS:  The original project schedule.

23          THE COURT:  I don't see thin black lines

24 corresponding for every single one of the blue and/or

25 green lines.

1           THE WITNESS:  Yeah, I can't explain why

2     Primavera didn't print it.

3           MR. KAPLAN:  If you come close, there's very

4     small for things that have one- or two-day durations, it's

5     almost like dots, which I presume is because they were

6     very short durations.  Some of these actually have --

7     they're in front of the blue lines.  So I think almost

8     every one has a dark black line.

9           THE COURT:  Dark black line or a dot?

10          MR. KAPLAN:  Yes.

11          THE WITNESS:  If start date was here, still it

12    took longer to finish for whatever reason, it could be in

13    fact -- the data, which is here, printed data for the

14    factual dates for each of the activities is displayed.

15          THE COURT:  Yes.  All right.  Thank you.

16    BY MR. KAPLAN:

17    Q.  Now, okay.  Let's get into Exhibit 31.  I want to go

18    through some of the correspondence you have, Mr. Flynn.

19          MR. HUG:  Prevailing wage rates?  I don't think

20    so.

21          MR. KAPLAN:  I'll get to that later, thank you.

22    Thirty-six.  Thank you for that.

23          Exhibit 36, this is in our Volume III.  I think

24    this already is admitted.

25          THE COURT:  Yes, it's in.

1    BY MR. KAPLAN:

2    Q.   What's this letter, Mr. Flynn?

3    A.   This is the letter that we, ECI, submitted to Pike

4    outlining and detailing the reasons behind the enclosed

5    claim.

6    Q.   Okay.  Mr. Clauson signed this.  Did you work with

7    him on this?

8    A.   Yeah, I wrote most of it with his input.

9    Q.   In terms of coming up with the numbers that are on

10   the second page at this time, where did you get that

11   information from, the 8050 man hours in the bid, the

12   14,450 man hours actually used, and then the dollar amount

13   of the claim at that time?

14   A.   From our accounting system.

15   Q.   Okay.  And those were the records that Mr. Clauson

16   and Mr. Mathieu have testified about?

17   A.   Correct.

18   Q.   Did they put this information together at your

19   direction?

20   A.   Yes.

21   Q.   Did you review it with them?

22   A.   I reviewed it with Cliff.

23   Q.   With Cliff, okay.

24        Were the extra subcontractor costs -- I'm sorry, were

25   the extra subcontractor man hours included in this

1    calculation?

2    A.    Yes, they were.

3    Q.    Okay.  Now, there's been -- we have the records, and

4    I may even ask you about it.  There's roughly I think it

5    was 2,000 man hours or so of subcontractor labor for the

6    Phase 3 work --

7    A.    That's correct.

8    Q.    -- as part of the claim?

9         Does ECI normally hire other electrical

10   subcontractors to perform its work on a project?

11   A.    Not under these circumstances.  We do occasionally

12   hire subcontractors to do specific portion of the work on

13   a project, but it's planned.

14   Q.    That's planned at the outset?

15   A.    Yes.

16   Q.    You might have a specialty contractor come in as a

17   sub to do a specific portion of the work?

18   A.    We may decide at bid time that we're very busy so

19   we're going to sub out the data, fire alarm, telephone,

20   whatever, or we may have minority considerations where we

21   need to meet certain goals and therefore we would sub out

22   a portion of the work.

23   Q.    This was not something you anticipated doing?

24   A.    This was definitely not something we anticipated

25   doing.  We would have been in a better position to

1    negotiate something early on with the sub versus running

2    around pleading with every contractor we had a

3    relationship with to borrow men.

4    Q.   You were basically asking your friends to help you

5    out?

6    A.   Absolutely.

7    Q.   Tab 37, this has not been admitted.  This was a

8    letter from Pike dated October 26, 2010, I take it,

9    responding to the prior letter.

10           MR. KAPLAN:  I'd offer this.

11           MR. HUG:  I'm sorry.  I zoned for a second.

12           MR. KAPLAN:  37.

13           MR. HUG:  No objection, Your Honor.  I

14   apologize.

15           THE COURT:  Exhibit 37 is a full exhibit.

16   BY MR. KAPLAN:

17   Q.   So this October 26 response from Pike, was this the

18   response to their claim?

19   A.   Yes.

20   Q.   Pretty short and sweet.  It says that they rejected

21   the request based on a statement that proper notice of

22   claim was not issued in accordance with Article 5 of the

23   contract.

24        Did you review this after it came in?

25   A.   Yes, I did.

1   Q.   Did you respond to it?

2   A.   Yes, I did.

3   Q.   If we go to Tab 38, Exhibit 38, the November 23, 2010

4   letter, is that the response you issued to Pike to their

5   October 26 letter?

6   A.   Yes, it is.

7             MR. KAPLAN:  I'd offer that, Your Honor.

8             MR. HUG:  No objection.

9             THE COURT:  May I ask, are you going to offer

10  39, 40, 41 and 42?

11            MR. KAPLAN:  Yeah, through 42.

12            THE COURT:  Are there objections to any of

13  those?

14            MR. HUG:  No objection, Your Honor.

15            THE COURT:  So Exhibits 39, 40, 41, 42, full

16  exhibits.

17            MR. KAPLAN:  Thank you, sir.

18  BY MR. KAPLAN:

19  Q.   The November 23 letter --

20            THE COURT:  I misspoke.  38, 39, 40, 41, 42,

21  full exhibits.

22            MR. KAPLAN:  Thank you, Your Honor.

23  BY MR. KAPLAN:

24  Q.   You responded to the suggestion by Pike that there

25  was a deficiency of notice by ECI?

1   A.   Correct.

2   Q.   Okay.  And there's a number of citations to various

3   contract revisions.  I'm not going to go through it, we've

4   gone through it in briefs.  Basically, is that your

5   position today on the issue of notice?

6   A.   Yes, it is.

7   Q.   There are a few statements you make that aren't

8   necessarily discussions of the contract.  I just would

9   like to ask you about a few of those.

10       At the second paragraph on the last page, page 4,

11  your letter states, "Pike cannot claim there was any

12  prejudice to it by virtue of receiving ECI's request on

13  October 1, as opposed to September 30."  And then you

14  refer to Pike's edict in late July that ECI must increase

15  its crew sizes and accelerate its work.

16       What were you referring to in terms of the prejudice

17  that was suffered or not suffered by Pike on that point?

18  A.   I was referring to the fact that they were completely

19  aware of where the project was at that point in time and

20  they were completely aware of the ramifications of

21  directing us to proceed in the manner they did.  The

22  prejudice, there was no prejudice.  We didn't sneak up on

23  them.  We didn't surprise them.  They knew they were

24  harming us when they directed us to do it.  It was a

25  business decision.  Maybe it would have been more

 1  expensive to have temporary classrooms or something in

 2  order to have a Plan B and they elected to harm ECI and do

 3  what they did.

 4  Q.   Then, if we go to 39, this appears to be a response

 5  to your letter December 20, 2010.  Pike again mentions the

 6  absence of notification per the subcontract, and also now

 7  mentions an issue of submission of monthly lien and claim

 8  waivers to Pike that ECI waived its rights to any and all

 9  claims.  Do you know what that refers to?

10  A.   Yeah, they indicated that by virtue of signing their

11  waiver of lien each week for payment, that we had waived

12  any right to a claim.

13  Q.   Now, Exhibit 49 in this book has a series of lien

14  waivers and releases.  I think Mr. Clauson was asked about

15  this a little bit the other day.  Your signature is on

16  some of these.  The August 31, 2010 waiver I think has

17  your signature, is that correct, Mr. Flynn?

18  A.   Yes.

19  Q.   And then I think on another one in March has your

20  signature.

21       Were you familiar with this form during the course of

22  this project?

23  A.   Yes, I was.

24  Q.   And I think it was established yesterday that there's

25  language on all but one of these that seems to have been

 1   added.  Was that added by ECI?

 2   A.   Yes, it was.

 3   Q.   And why was that language added?

 4   A.   It was our way of protecting ourselves from

 5   particular waiver, the language in the Pike waiver to make

 6   it crystal clear that we weren't waiving our rights to

 7   pursue compensation for additional work being performed

 8   that as of that moment had not yet been turned into a

 9   change order or additional labor utilized in the instance

10   of this particular case that we're at right now that had

11   not yet been put into the form of a claim.

12   Q.   Well, you say pending request -- one of the items in

13   your language that's added is "any pending request for

14   equitable adjustments to the contract time or amount."  Is

15   that what you were just referring to, that language?

16   A.   Correct.  If there were ongoing activities or issues

17   that would end up being in a proposed equitable adjustment

18   claim, we were reserving our right to submit those.

19   Q.   Okay.  This language appears on all but one of these

20   between February of 2010 and March of 2011.  Did Pike

21   ever, to your knowledge, question why this language was

22   being added by ECI?

23   A.   They never did.

24   Q.   And these were submitted to Pike?

25   A.   Correct.

1   Q.   Okay.  In executing this waiver with that added

2   language, did ECI ever intend to waive or release the

3   claim that we're here in this litigation for?

4   A.   No, the purpose for the language was to protect it.

5   Q.   Okay.  In one of these, the one for September 17,

6   there's a new signature that's not in any of the other

7   ones.  Whose is that?

8   A.   The 9/17/2010?

9   Q.   Yes.

10  A.   That's Lou Bona's wife, Toni Bona.

11  Q.   Is she an officer of the company?

12  A.   She's the secretary.

13  Q.   Are you aware of why this was signed without that

14  language being added by ECI?

15  A.   Yeah.  Our controller, Sheldon Keeney, had retired.

16  And we were in a transition process where a new guy was on

17  board.  Sheldon always handled generating the waivers as

18  part of his normal duties.  For those projects where he

19  was instructed to make sure that language was there, he

20  would make sure it was there.  When he retired and left

21  the company, there was -- there was a gap.  And the bill

22  was due to send out, and Toni was just simply trying to be

23  helpful and sent out all the papers that were required for

24  the monthly invoice.

25  Q.   Is it fair to say that the absence of that language

```
 1    was an oversight by ECI?
 2    A.   Oh, it absolutely was.
 3              THE COURT:  We're at 12 noon.  We're going to
 4    break for the day and resume tomorrow at 8:00 a.m.
 5              Thank you, Mr. Flynn.
 6              I have an active hearing with many parties this
 7    afternoon beginning at 1:00 p.m.  All of your exhibits you
 8    probably want to secure on this side of the courtroom so
 9    that the entire counsel area over here is entirely clear.
10    And make sure to maybe a arrive a bit early tomorrow to
11    replace your exhibits.
12              Thank you, counsel.  We'll stand in recess.
13              MR. HUG:  Your Honor, may I inquire, are we
14    going to end at 5:00 on Friday even if we're not done?
15              THE COURT:  Well, what are parties' predictions
16    about being done on Friday?
17              MR. HUG:  First, my colleague is doing a lot of
18    witnesses.  And there's other life events that need to
19    happen to take place, i.e., home care and things like
20    that.  And those witnesses are scheduled to be that time.
21    So 5:00 is fine.  But after 5:00 there are issues that we
22    can attempt to resolve, but I'm not so sure we can
23    resolve.  I want to make sure I alert the Court to that
24    right away.
25              As to timing, how much left with Mr. Flynn?
```

1          MR. KAPLAN:  Not too much.

2          MR. HUG:  Okay.  So I probably have at least an

3   hour or so or hour and a half with Mr. Flynn.  Then I'll

4   put on Mr. Oloff tomorrow.  He will probably -- between

5   Mr. Flynn and Mr. Oloff, that should take us through

6   lunch.  I need to put on Mr. Caprio in the afternoon

7   because he's a Thursday witness.  And then Mr. Merkhofer

8   and Mr. Bruno, and then three other short witnesses and

9   then one three-hour witness.

10          So my rough calculation is there's not enough

11  hours of testimony available to do it all.

12          MS. VENNOS:  Your Honor, if I have notice, I can

13  arrange for child care, I can try to arrange for child

14  care.  I need notice if we're going to stay past 5:00 on

15  Friday.

16          THE COURT:  I don't anticipate us staying past

17  5:00.  Otherwise, I will no longer have a court reporter

18  working for me, for good reasons.  So it will not -- we

19  will not go past 5:00.

20          MR. HUG:  I've given thought to one or two

21  solutions to this, that if there are a few witnesses that

22  are not left to be done, if -- they're not going to be

23  long.  If there is a day or half day in the next couple of

24  weeks, they're all pretty local, we could do it then.

25  It's even possible -- I haven't discussed this with

1    Mr. Kaplan -- that we may be able to even do one or two of

2    the witnesses by deposition and agree to submit the

3    deposition or videotaped testimony.  I don't know if

4    Your Honor was -- I think you could do that by stipulated

5    exhibits, that way we don't take up court time if the

6    Court doesn't have time.  I don't want you to do that with

7    Mel Strauss, but maybe willing to do it with other

8    witnesses.

9           THE COURT:  I think you should begin that

10   conversation.  The only initial concern I have, I don't

11   know how long Mr. Oloff is going to be on the stand.  I'd

12   be concerned whether Mr. Caprio will get off the stand in

13   time to be all done tomorrow.  I just let you all know

14   that I have concern about that.

15          MR. HUG:  I may actually put -- depending on

16   when Mr. Flynn gets done -- because I think Mr. Oloff will

17   be on the stand for a long time.  It's possible, if I put

18   him on, start at 10:00, he may not finish before the end

19   of the day.  You're right, Your Honor.  I have thought

20   about whether or not to put Mr. Caprio on and get him done

21   and out of here.

22          THE COURT:  Okay.  We'll see you tomorrow at

23   8:00 a.m.  Thank you.

24               (Proceedings adjourned at 12:06 p.m.)

25

1

2

3                        C E R T I F I C A T E

4

5      RE:  ELECTRICAL CONTRACTORS, INC. v. THE PIKE COMPANY

6                       No. 3:11CV449(JAM)

7

8

9              I, Diana Huntington, RDR, CRR, Official Court

10   Reporter for the United States District Court for the

11   District of Connecticut, do hereby certify that the

12   foregoing pages are a true and accurate transcription of

13   my shorthand notes taken in the aforementioned matter to

14   the best of my skill and ability.

15

16

17

18

19                    _____/s/_____

20                    DIANA HUNTINGTON, RDR, CRR
                          Official Court Reporter
21                    United States District Court
                      915 Lafayette Blvd., Room 423
22                    Bridgeport, Connecticut 06604
                            (860) 463-3180
23

24

25