```
                     UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
ELECTRICAL CONTRACTORS, INC.,   :  No. 3:11CV1449(JAM)
                                :
               Plaintiff        :
                                :
          vs.                   :
                                :
THE PIKE COMPANY,               :
                                :  Bridgeport, Connecticut
               Defendant        :  June 19, 2014
                                :
- - - - - - - - - - - - - - - - x
```

BENCH TRIAL
VOLUME IV


B E F O R E:

      THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


A P P E A R A N C E S:

    FOR THE PLAINTIFF:

        MICHELSON KANE ROYSTER & BARGER
            Hartford Square North
            10 Columbus Blvd.
            Hartford, Connecticut 06106
        BY:  STEVEN B. KAPLAN, ESQ.

    FOR THE DEFENDANT:

        ROBINSON & COLE
            280 Trumbull Street
            Hartford, Connecticut 06103-3597
        BY:  CHRISTOPHER J. HUG, ESQ.
            DEBORAH A. VENNOS, ESQ.


                    Diana Huntington, RDR, CRR
                    Official Court Reporter

1                          TABLE OF CONTENTS

2

3    PLAINTIFF'S                                                     VOIR
     WITNESS              DIRECT   CROSS   REDIRECT   RECROSS   DIRE

4    WILLIAM FLYNN
5      By Mr. Kaplan        709
       By Mr. Hug                  740
6      By Mr. Hug                                      778
       By Mr. Hug                                      786

7

8

9    DEFENDANT'S                                                     VOIR
     WITNESS              DIRECT   CROSS   REDIRECT   RECROSS   DIRE

10   DAVID CAPRIO
       By Ms. Vennos       789
11     By Mr. Kaplan                                            795
       By Ms. Vennos       798
12     By Mr. Kaplan                828
       By Ms. Vennos                         878
13     By Mr. Kaplan                                    883

14   ED OLOFF
       By Mr. Hug          888
15

16

17

18

19

20

21

22

23

24

25

1              **8:10 A.M.**

2              THE COURT:  We are back for Day 3 of the bench

3    trial for Electrical Contractors, Inc. vs. Pike Company,

4    3:11CR1449.

5              Appearance of counsel, please?

6              Is it Day 4?  Time has gone by so fast.

7              MR. KAPLAN:  We all can appreciate that.

8              Steven Kaplan, Your Honor, for the plaintiff,

9    ECI.

10             MR. HUG:  Christopher Hug of Robinson & Cole for

11   the defendant, The Pike Company.

12             MS. VENNOS:  Deb Vennos, Robinson & Cole, for

13   The Pike Company.

14             THE COURT:  I see Mr. Flynn is ready on the

15   witness stand.

16             My apologies again for having to curtail today's

17   proceedings at 3:00 p.m., but it's in light of a rather

18   interesting criminal trial that's coming up next week

19   that's taken some unexpected turns.

20             We are, I think, all set.  Anything else

21   preliminary to take up?

22             MR. HUG:  We were just surprised that something

23   could be more interesting than this.

24             MR. KAPLAN:  That was not my comment,

25   Your Honor.

1          I think we can jump back in.

2          THE COURT:  Thanks.

3          MR. KAPLAN:  I'm going to pick up where we left

4    off with Mr. Flynn.  We were in Plaintiff's Book III and I

5    would like to go to Exhibit 40.  And I think this was part

6    of the series of letters that were admitted towards the

7    end of the afternoon yesterday.  We have to get the

8    exhibits for the witness.

9

10                    WILLIAM FLYNN,

11          a witness, having been previously duly sworn,

12          was examined and testified further as follows:

13

14               CONTINUED DIRECT EXAMINATION

15    BY MR. KAPLAN:

16    Q.   Book III is the one in front of you, Mr. Flynn.  It

17    would be in Exhibit 40.

18    A.   I'm there.

19    Q.   This letter, March 4, 2011 from ECI, it's a four-page

20    letter, is something you signed and sent out to Pike?

21    A.   Yes, it is.

22    Q.   Okay.  And what was the purpose of this letter?

23    A.   It was a follow-up of a meeting and it was to outline

24    the various issues again.

25    Q.   Okay.  In the first paragraph, let me read what it

1    says.  I think there's a word missing, but I want to ask

2    you about that.  Second sentence:  "I especially want to

3    you and your team for stating that if in fact ECI had been

4    harmed during Phase III by others, then we should be

5    compensated fairly for that harm."

6         Was that something that Pike had told you prior to

7    writing this letter, somebody from Pike?

8    A.   Yeah.  At the meeting, which this is a follow-up

9    letter, they had indicated if in fact we could show that

10   we had been harmed, in fact, that they believed we should

11   be paid.

12   Q.   Who did you meet with?

13   A.   Ed Oloff again and -- I believe Ed was there and Mel

14   Strauss, and I think there was another fellow.

15   Q.   Where did this take place?

16   A.   I'm not sure where -- I don't recall where it took

17   place now.

18   Q.   Okay.  And then your summary of events here, I'm not

19   going to go through it with you, I think there's been

20   testimony about all the issues.  If you would look at it

21   just to make sure you feel the testimony has already

22   addressed the issues that are addressed in the letter.

23   A.   Yeah, this pretty much outlines everything that's

24   been testified to, but it was just a summation of all the

25   issues and history to those issues.

1    Q.   Okay.  And I'm -- like I said, I'm not going to go

2    through it.  I just want to ask you to point out the

3    various issues and the impact you were stating here that

4    had affected ECI.  If we start on the second page, in the

5    second paragraph you're talking about the bid and ECI's

6    reliance on the bid.  Then you said these problems

7    impacted ECI's rough-in labor, that's in the second

8    paragraph.  What were you addressing there?

9    A.   I believe the second paragraph just -- it talks about

10   the fact that the demo was performed in several areas of

11   Phase 3 late and that, more specifically, we're talking

12   about the fact that that impacted our branch labor

13   rough-in to some extent and that we relied upon when we

14   bid the project, we relied upon the schedule provided by

15   Pike, the sequencing, the durations and the flow, the work

16   as indicated on that schedule to take place in that

17   manner.  And here we are at the beginning of the job, in

18   this particular case we're talking about how demo wasn't

19   taking place as per the schedule.

20   Q.   In the second paragraph you talk about the steel

21   issue.  You already have addressed that.

22        Then at the end of that paragraph you say that

23   impacted pulling feeder cables and many branch circuit

24   home runs.  Where do those go?

25   A.   Normally, in any of these schools, conduit home runs,

1    whether it's a branch home run, which is a larger small

2    pipe that would bring a multitude of smaller circuits into

3    an area that would then be distributed maybe between two

4    or three or four classrooms.  They always run down the

5    hallways.  In conjunction with that, you have the main

6    feeder conduits which are usually 3- or 4-inch conduits

7    about that big around (indicating) that contain or will

8    eventually contain very large electrical wires that go

9    from the main switchboard at the electrical service of the

10   school out through the various electrical rooms that then

11   distribute the power into various sections of the school.

12   These rooftop units, a great many of them that were

13   delayed were located in the hallways.  They were right in

14   the center of the areas that were the highway for all of

15   our conduits to go down.

16       In the case of the branch home runs, in an attempt to

17   get some of the -- as much as of the work done as

18   possible, conduits were run as far as they could in areas,

19   wires were pulled from various areas to a particular point

20   in the hallway where we would have to stop, additional

21   wire would be pulled out of that, we would put a junction

22   box or something at that point, wires would be pulled out

23   and tagged with numbers so that we knew the circuitry,

24   they'd be rolled up and hung, because it was far more wire

25   than could fit in a box, but it would be rolled up and

1    hung and supported underneath those boxes.

2         In the case of feeders for the panels, the conduit,

3    you couldn't pull the wires.  You can't have a bunch of

4    terminations for large wire all over the place.  One, it

5    would not be a good installation and it just wouldn't be

6    conducive.  So the empty conduit system was installed

7    wherever it could be.  And in a great many cases it was

8    installed at night on second shift.  That's some of the

9    work they were talking about that they did early, that

10   they were able to get in in the evenings before Phase 3

11   even started.  They ran those down the hallways.  But,

12   again, only to the point where they ran into interference.

13   When the steel was finally cured, the interferences were

14   cured and we were able to go forward with these conduits.

15        In the case of the branch circuit conduits, wherever

16   they had pulled any conductors, they now had to piece the

17   conduits in and then make sense of the wiring that was

18   there, what circuits did they have there.  In a lot of

19   cases they lost the labels.  There was a great many other

20   trade contractors working in those hallways running other

21   work product.  And when they -- I know for a fact that

22   when they unrolled a lot of these branch circuit cables

23   weeks later, the tags that are normally used are usually

24   installed in a panel, after you're all down, you put these

25   circuits on, no one touches them, had been brushed off --

1   for whatever reason were missing.  It then created a

2   dilemma for the crews and they had to go back, start

3   ringing out wiring trying to figure out what exactly these

4   individual wires were feeding back in, for instance, the

5   admin. area.  I know for a fact that they were climbing

6   back up in the ceilings trying to ring back what the

7   circuitry was because the markings were gone.

8       With the case of feeders, it was much easier.  They

9   pieced in the pieces that they couldn't get in before and

10  then they pulled the cable like they always intended to

11  from an electric room, which was our room, working in a

12  manner that we always intended to work, it's our room,

13  there's no one in there but us, straight through the

14  conduits and into the electric room, which again is our

15  room, it's empty and there's no one in there but us.

16      The feeder conduits, because of the fact that we were

17  able to get them in for the most part in the evenings

18  unobstructed, went efficiently, and the feeder wiring was

19  installed pretty efficiently because there wasn't really

20  any obstruction to that method.

21      But the branch we took a beating on.  Branch was very

22  confusing.

23  Q.   Go to page 3 of your letter.  Top paragraph you talk

24  about working rough crews alongside of finish crews in a

25  most non-productive manner imaginable.  What is your

1    reference there?

2    A.    Normally, you never would see electrical crews

3    installing the work product, the pipe, the wiring, support

4    hangers, things that we call rough.  The work that goes in

5    before the sheetrock goes up, before the ceilings go up in

6    a building, you would never see that kind of work activity

7    going on in a room that has a finished floor, painted

8    walls, finished ceilings.  That's what was happening here.

9    Because a great many of these branch circuits that were

10   now completed and we were able to finish pulling branch

11   wiring into various areas, we were opening up ceilings, we

12   were having to trace back and ring down into finished

13   walls -- not troubleshoot, but try to determine where

14   these circuits needed to go down because they were done

15   piecemeal.  Normally, you'd start in the wall, you'd pull

16   out into the corridor, you go back to electric room and

17   you're done.  When you turn it on, you check the power at

18   the outlet or the device from the electric room to the

19   room.  In this case you have all these breaks.  And now

20   you're making splices.  And you're trying to identify

21   conductors that were pulled two or three weeks ago that no

22   longer have the markings on them.  And you have wires

23   coming out of a room that may have three or four circuits

24   in it that you have no idea where they go anymore.  So you

25   now have to go in the room, open the boxes up in the room,

1    try to figure out what color goes to what circuits, close

2    that box up, go in the hallway and try to make the

3    connections.

4    Q.   Those issues you've been talking about the last five

5    or ten minutes, is any of that related to the contract

6    schedule and doing the Phase 3 work in a 12-week period

7    had that job been done the way that schedule indicated?

8    A.   Had the schedule been followed, none of these things

9    would have been a problem.  They never would have

10   occurred.

11   Q.   Okay.  You talked about some of these other items.

12   I'm going to skip over them.

13        Just the masonry again.  I'll skip that.  I think

14   Mr. Clauson and Mr. Mathieu addressed the masonry issues.

15        The masonry issue when you were there in early

16   August, was that still an issue, a problem?

17   A.   What I don't understand to this day was the masons

18   went in and started a lot of wing walls here and there,

19   little sections of wall.  Like they would establish where

20   they were building a wall.  They would put in three, four,

21   five blocks along the floor.  So from wherever it was

22   going to wherever it was ending and go up one or two

23   courses and then stop and go to another area.  So

24   everywhere -- and if you look through the movie, the movie

25   shows it, everywhere all over the place were these little

1   sections of block work that were started and never

2   completed.  And that's not normal.  Normally you go in,

3   they build a wall with us, you finish it, you move on, and

4   you go room to room to room and work your way out of an

5   area.  This job, the brickies were everywhere.  Started

6   but not completed.  And so we were -- as Stephane said, we

7   were bouncing around with no rhyme or reason, not knowing

8   on any given day where they were going to work next, what

9   walls they were going to finish next.  So that's really

10  hard to do because you can't even plan it.  In the

11  morning, you find out where they're at and you send your

12  guys to stay with them.

13  Q.   The claim that you -- claim information you were

14  giving to Pike at this point, which is March of 2011,

15  there's a summary page after your letter indicating labor

16  hour overruns and subcontractor labor overruns, I think

17  Mr. Clauson reviewed this in terms of the labor hours

18  report, we've had sufficient testimony about where those

19  hours came from.

20      The attachment Mr. Clauson testified to at the end of

21  this letter, sub phase totals?

22  A.   Yes.

23  Q.   Was this done at your direction?

24  A.   Yes.

25  Q.   And what did you ask Mr. Clauson to do in this

1    regard?

2    A.    Before Mr. Clauson did anything, we reviewed this

3    report and we sat around and talked about how we had been

4    harmed and methods and types.

5    Q.    I just mean the last page, his two pages as to the

6    subcontractor, the sub phase totals, that's what I was

7    referring to.

8    A.    This here.  I'm sorry, I was on the wrong page.

9    Q.    Did you ask Mr. Clauson to prepare this?

10   A.    Yes.

11   Q.    And what did you direct him to do?

12   A.    Just to go in and audit and determine what the hours

13   were and put them in some kind of a format that depicted

14   exactly what those hours were and what weeks, days, et

15   cetera.

16   Q.    For Phase 3?

17   A.    For the Phase 3 subs.

18   Q.    And this was his work product?

19   A.    Yeah.  He went back to the daily reports and the

20   various accounting documents that we had and audited those

21   to determine the specific hours for Phase 3 for subs.

22   Q.    Were you there on site when the outside subs were

23   doing work on Phase 3?

24   A.    Yeah, I was part of -- you know, help deciding what

25   areas we'd implement.

1   Q.   Did you help direct where those people would work?

2   A.   Yeah.

3   Q.   Okay.  Were they -- what was the -- were the subs

4   working -- how -- strike that.

5        As to Phase 2 and Phase 3 for those subs, where were

6   they working?

7   A.   Well, the place that I remember more vividly, and I

8   can't recall the specific areas because there was quite a

9   few subs, obviously, but one of the things I wanted to see

10  pushed was the boiler room.

11  Q.   That was Phase 3?

12  A.   Yes.  That had been the room that had just been

13  demoed, was already way behind, had a lot of electrical

14  equipment in it, had its own transformer and its own panel

15  board in that room.  Nothing was in there yet.  It was

16  clear to me that Pike was, in fact, attempting to get the

17  room ready for us.  They still had a hole in the ceiling

18  that was obstructing us, but by the time we were getting

19  the subs on board, which I think was in early August, or

20  the time that I recall was around early August, we brought

21  in one group, one sub of I think five men that was

22  assigned -- that I wanted to assign specifically to that

23  boiler room to push it and get it done.

24  Q.   Your recollection of other areas the subs were

25  working in?

1   A.   I heard what Stephane said, and my recollection is

2   that the rest of the subs were utilized, augment his

3   forces in whatever area, as he said, was hot at that

4   particular point.  So if he needed to get a specific area

5   complete, he would put whatever sub forces he needed to

6   augment ours to get that area done.

7   Q.   Okay.  Going to Tab 41, this is a letter from Pike.

8   And it's got pictures.

9             MR. KAPLAN:  Just to advise the Court, ECI's

10  copy had -- the copy that we had originally submitted, we

11  used black and white copies of the pictures, and Attorney

12  Hug provided me with color copies.  So I supplemented that

13  with color copies, but I've left some of the black and

14  white in because the response ties in to page numbers and

15  it will make it easier to follow.

16            THE COURT:  That's fine.

17            MR. KAPLAN:  There's some duplication, but the

18  color and the black and white aren't duplicative.  It's

19  just by way of information.  You may have just the color

20  photos in 41.  There's nothing different, in other words.

21            MR. HUG:  I took out the black and whites

22  because they were confusing me.  I left the colors in.

23            MR. KAPLAN:  I don't think it's going to be a

24  problem.  Nothing new.  Some are duplicative, that's all.

25

1   BY MR. KAPLAN:

2   Q.   The letter from April 6 from Pike with pictures,

3   comments on certain issues you've raised, right?

4   A.   Correct.

5   Q.   I want to go to your response and just have you play

6   out some of the points that you raised.

7        In Exhibit 42 there's a June 21 memo that's entitled

8   ECI Responses to Pike Photos & Commentary.  Did you author

9   that?

10  A.   I wrote the response.  I sat with Cliff Clauson and

11  Steph Mathieu when we got this package from Pike and we

12  went picture by picture as an effort to get, obtain the

13  data that's in the responses below.

14  Q.   Okay.  Suffice it to say, you went through -- in your

15  memo, Exhibit 42, you went through five and a half --

16  well, about five pages of commentary basically disagreeing

17  with a number of comments that Pike folks had put in their

18  letter?

19  A.   Well --

20  Q.   Start there.

21  A.   Yes, we responded with facts.

22  Q.   Okay.  Now, where were you getting your information

23  from for your responses?

24  A.   From the original contract schedule and from our

25  daily reports.

1    Q.   That would be the reports that Mr. Mathieu authored?

2    A.   Correct.

3    Q.   And in a general sense, this is all talking about

4    when certain items were done and timing and what was done

5    and what was not done at a certain point in time, is that

6    a general overview?

7    A.   Correct.  Or to correct statements being made by them

8    as to what ECI was doing at a certain point in time, what

9    they thought the pictures indicated that ECI was doing at

10   a certain period of time.

11   Q.   Okay.  And I'm not going to go through every one.  I

12   just wanted to point out a few which I think reflect sort

13   of what's going on with this point and counterpoint.

14        Your commentary on your first page where you -- your

15   third entry says "Page 2:  Middle two pictures dated

16   8/5/10 indicates that electrical devices are completed and

17   3 days ahead of schedule."

18        Now, you're referring to, I think, what is in the

19   Pike letter 41 at page 2.  Could you find the comment

20   you're responding to, the pictures you're responding to in

21   the Pike letter?

22   A.   In the middle of page 2, the page has a single photo

23   at the top, two in the middle and one single photo at the

24   bottom.  The one I'm responding to is the two pictures in

25   the middle.  And underneath that it says "See 2 pictures

1   above on 8.5.10" –– which means that were taken on the

2   date of August 5, 2010 –– "in the P3AD area," which is

3   admin. area.  "The electrical devicing and finish plates

4   are ongoing and have started at least 3 days ahead of

5   schedule.  The area is clear and ready for the following

6   work."

7        Now, my response is Pike is indicating three days

8   ahead of schedule, yet the Pike schedule that we bid the

9   project off of shows all of the work to be completed on

10  7/23.  So here we are on August 5, quite a bit later than

11  that, we're not done, according to them, and we should

12  have been completely done by that.

13       In addition to that, you know, they're indicating

14  that we're a breath away from being done, but what they're

15  also not indicating is that none of the branch circuit

16  wiring that normally would be installed to these devices

17  is there yet.  So it's disingenuous to make a comment that

18  here we are finishing up this area, we're three days ahead

19  of schedule and we're almost done when, in fact, the

20  original schedule, it's actually behind.  And they're not

21  even addressing the fact that it's not done and it won't

22  be done for a long time until the branch circuit wiring is

23  brought into that area, which according to their schedule

24  should have already been there.

25  Q.   Okay.  And again, I'm not going to go through every

1    one, I want to go through one or two more.

2    A.   Yeah.

3    Q.   Your commentary on your first page there, in your

4    memo, Exhibit 42, page 3, you are referencing a picture in

5    the Pike letter and talking about holding off the millwork

6    and flooring because ECI was not done with the overhead

7    electrical.

8         Which picture are you referring to in the Pike

9    Exhibit 41?

10   A.   Yeah, the problem --

11   Q.   Let's find the picture first.

12   A.   Find the pictures, because the page numbers changed.

13   Q.   Page 3 -- again, your reference is to page 3, the top

14   photo in page 3.  And I think if you look at 3C, that's

15   just a color version of that, what I have as 3C.

16             THE COURT:  What's the reference point,

17   Exhibit 42?

18             MR. KAPLAN:  42 it's the first paragraph on

19   page 1 that says page 3.  Top picture dated 8/18/10 and

20   let's see.

21             THE WITNESS:  I've got it.

22   BY MR. KAPLAN:

23   Q.   Page 3C is color picture.

24   A.   It's the middle picture on the 3C page.  It's the

25   middle picture on the 3C page.

1   Q.   Color?

2   A.   Yeah.  Which the caption under the picture says "See

3   picture above on 8.18.10 in the P3AD area.  ECI needed the

4   area to be left unfinished until they completed their

5   overhead work in this area as there are multiple panels

6   due above the ceiling in this area.  Due to ECI needing

7   more time in the area, the ceiling tile, flooring and

8   millwork in this area was held off to allow ECI to

9   complete their work."

10       Basically, our response is that Pike blamed ECI for

11  holding off the millwork and flooring because we were not

12  done on the overhead.  Photo shows boxes mounted for fire

13  alarm, but mason still needs to install finish brick.  If

14  you don't have the finish brick, we can't go forward

15  because the box needs to be in its finished product.  Yet

16  Pike's bid schedule shows this complete on 8/1.  So the

17  brick work, which we needed, was supposed to be done 18

18  days ago or 17 days ago and it's still not done.

19       Pike also fails to mention that ECI's branch home

20  runs that feed the electrical systems in this area were

21  also delayed and held us up from being able to furnish the

22  work.  And Pike also failed to have the steel installed on

23  time, which stopped ECI from being able to pipe branch

24  home runs and pull the branch wiring until 8/14.  Once

25  those obstacles were removed, ECI was going forward.

1        So on 8/18 when they're making this statement, it's

2    with the full knowledge that only four days before that

3    had the steel obstructions been removed and were we able

4    to start completing the conduit, not even yet pulling the

5    wire because we had to finish the conduits.  So it's kind

6    of a disingenuous statement again indicating they're

7    holding up this area for us when in fact that's not the

8    truth.  And the records for the project don't support that

9    statement.

10   Q.   I'll just ask you to comment on one more, because

11   this can be very time-consuming.  I wanted to give the

12   Court a flavor of this back-and-forth that was going on.

13       If you go to page 3 of your letter, Exhibit 42, at

14   the top you're talking about photos at page 8 of the Pike

15   letter that are dated 7/29 and 7/31.  I want to find those

16   photos.  I think they're labeled page 8 in the Pike

17   letter, Exhibit 41.

18       Could you just explain what the photos refer to and

19   what your response refers to?

20   A.   Pike has pictures of basically the data systems

21   rooms.  They're indicating that the two pictures were

22   taken on 7/29 and 7/31 in the P3G area for the MDF and

23   C19A room.  And the pictures show that the racks and the

24   cable trays had been installed and cabling is starting to

25   be pulled.

1          The gist of our comment -- and it's just simply to

2     say that this work was supposed to be a hundred percent

3     complete, all the cables, everything was supposed to be in

4     the room by 7/17.  As of the dates referenced above in the

5     Pike photos, the room is not done, a great deal of added

6     work had to be performed because ECI was delayed in this

7     room.

8          So, I mean, Pike isn't making any statements in their

9     pictures other than to proffer that here you are, it's

10    almost done.  And the problem with that is that this

11    particular room and the racks in this room literally had

12    tens of thousands of wires and terminations to be made.

13    All of those cables had to be pulled into the room.  And

14    most of the system cables are multi-conductor cables.

15    They're sound data, telephone, security, et cetera, are

16    usually smaller conductors within a cable.  And there were

17    a lot.  There were a lot of terminations.  So by delaying

18    this room and the ability to pull the cable into the room,

19    it created a lot of grief for us to have to accelerate all

20    those terminations and the pulling of that cable at the

21    last minute.

22    Q.   Is it fair to stay your Exhibit 42 constitutes ECI's

23    detailed response to Pike's Exhibit 41?

24    A.   Correct.

25    Q.   Then if we would go to Exhibit 43.  Mr. Clauson

1   reviewed this.  This is -- is this ECI's final claim here?

2   A.   Yes.

3   Q.   It's in the same format, some of the numbers were

4   updated?

5   A.   Yes.

6   Q.   And you have the summary, the next page, the Labor

7   Hours Report.  Mr. Clauson went through that, explained

8   it.  I think you've explained a lot of those points as

9   well.

10  A.   Yes.

11  Q.   One point there in that labor hours summary of

12  July 26, 2011.  The four items for Phase 3 where you

13  don't -- are not claiming anything, where there are

14  underruns, so to speak, between the bid and actual, would

15  you just explain why those are not being factored into the

16  mix here in the way the claim is being presented?

17  A.   Because in all of those cases, ECI was able to

18  perform its work in a manner close to or even better than

19  what we anticipated when we bid the project.  And I don't

20  believe it's fair.  If, in fact, the whole job had gone

21  that way, we may have saved those kind of comparable

22  amounts of hours across the board and we wouldn't be here

23  and we'd be a very happy contractor.  Here we are getting

24  crushed on certain categories for specific reasons in

25  certain areas, yet in other areas where we were

 1   unaffected, we were able to do the work as anticipated or

 2   even better than that, and I just don't think it would be

 3   fair to offset our harm by giving back our hard work.

 4           THE COURT:  And specifically those areas are

 5   what, Mr. Kaplan, remind me?

 6           MR. KAPLAN:  In the labor hours report --

 7           THE WITNESS:  I could answer.  Well, the feeder

 8   conduits that we talked about a few minutes ago, feeder

 9   cabling that we talked about a few minutes ago.

10           MR. KAPLAN:  It's listed as feeder wire.

11           THE COURT:  Demolition and gear?

12           THE WITNESS:  Yes, sir.

13   BY MR. KAPLAN:

14   Q.   Demolition is what ECI did for demolition?

15   A.   Yeah.  As Steph and I think Cliff indicated, all we

16   had to do is go in certain areas and cut the circuits

17   free.  It's as simple as that.  If Steph planned it out

18   properly, which I'm sure he did, when it came time to go

19   in and cut circuits free, he had it already identified and

20   he's done his detective work and knew ahead of time

21   exactly where the circuits were fed from and the quickest

22   and easiest way to cut them free, make them safe.

23   Q.   And then the attachment, the final page of

24   Exhibit 43, are you familiar with what that is, the last

25   page of 43?

1    A.   This is another one of the summary sheets for the

2    subcontractors.

3    Q.   Was this something done at your direction?

4    A.   Yes.

5    Q.   And this shows the subs, the hours, the amounts paid.

6    And at the bottom it says total amount paid for subs for

7    work on Phase 3 only, $130,392, and to the left it has an

8    hour summary, 2033.5 hours that you're using in the claim,

9    correct?

10   A.   Correct.

11   Q.   Now, is there any question in your mind that that

12   reference to the Phase 3 work there is in fact for

13   Phase 3?

14   A.   No, there's no doubt in my mind at all.  Those were

15   the sub hours for Phase 3.

16   Q.   And this was submitted -- now, do you recall when

17   this document was first submitted to the Pike people?

18   A.   No, I don't.  I assume it was at the same time that

19   the whole package was.

20   Q.   Okay.  Do you recall a meeting with Pike where this

21   information was presented to them?

22   A.   In Albany, yes.

23   Q.   Do you know when that occurred?

24   A.   I want to say November, but I'm not sure.  I don't

25   remember now.

1    Q.   Was this information presented to Pike at that time?

2    A.   Yes.  Hand-delivered, yes.

3    Q.   Any issue about a typo in this report or this

4    summary?

5    A.   Yes.  As Mr. Kaplan knows, we were in my office, we'd

6    produced -- my accounting department produced all this

7    stuff and we were on our way to Albany for that meeting

8    and I realized that my controller, who actually pulled a

9    lot of this stuff together, had made a typographical error

10   and it indicated it was Phase 2 subcontractor totals

11   rather than Phase 3.

12   Q.   And that would be that bottom notation that we just

13   went through?

14   A.   Yes.  In the car on the way up, we discussed we'd

15   have to point that out.

16   Q.   Did you advise that to the Pike people at the

17   meeting?

18   A.   As soon as I handed it out.  And we followed up a few

19   days later.

20             THE COURT:  Show me where this typo is again.

21             MR. KAPLAN:  Reference on the last page of

22   Exhibit 43, that summary of all the various subcontractor

23   hours and dollar amounts.

24             THE COURT:  It says Phase 3 at least on my copy,

25   but the copy initially given to Pike --

1          MR. KAPLAN:  Instead of Phase 3, it said

2    Phase 2.

3          THE COURT:  Phase 2 at the Albany meeting?

4          MR. KAPLAN:  Yes.

5    BY MR. KAPLAN:

6    Q.   And Mr. Flynn, that was the only difference in this

7    piece of paper?

8    A.   Yes.

9    Q.   And that's what you immediately pointed out to Pike?

10   A.   Yeah.  And I think we sent corrected copies up within

11   days.

12   Q.   Okay.  The last item I want to go through with you is

13   Exhibit 31.  I don't think this has been introduced.  I

14   started to with Mr. Clauson.

15         MR. HUG:  No objection.

16         THE COURT:  Exhibit 31.  Okay, Exhibit 31, full

17   exhibit.

18         MR. HUG:  I take it Exhibit -- oh, they were

19   introduced yesterday, Exhibit 42 and the other

20   correspondence, we did that as a group.  Never mind.

21   BY MR. KAPLAN:

22   Q.   What's Exhibit 31?  What is this sheet?

23   A.   This is a sheet developed by the accounting

24   department in conjunction with the estimating department

25   and my department to give guidance to everyone in those

1    departments as to what the various electrical prevailing

2    wage rates loaded are at that time.

3    Q.   What does "loaded" mean?

4    A.   With all of the additional overhead costs, any costs

5    that is a direct labor cost that's above and beyond what's

6    in the paycheck.

7    Q.   So we do have base rate.  In that column on the left,

8    base rate is -- this says prevailing hourly labor rates?

9    A.   Correct.  What's in effect at that time.

10   Q.   Okay.  And then all those items on the left, FICA,

11   federal unemployment, all the way going down that column,

12   you're adding all those in as costs?

13   A.   Correct.

14   Q.   Okay.  And then from journeyman, foreman, general

15   foreman, you have different categories?

16   A.   Correct.

17   Q.   Bottom Total Billing Rate you've got composite

18   numbers for each of those categories?

19   A.   Correct.

20   Q.   Just as a question, where it says Apprentice

21   85 percent, do you see that column, Apprentice 85 percent?

22   A.   Yes.

23   Q.   What does that mean?  What does that refer to?

24   A.   That's -- apprentices are paid at different rates at

25   different stages in their training.  When an apprentice

1    first begins, first six-month apprentice gets 50 percent

2    of journeyman rate.  Every six months through entire

3    apprenticeship they get an increase every six months.

4    85 percent apprentice is a fourth-year apprentice, is in

5    the closing moments of his apprenticeship.

6    Q.   Apprenticeship is five years, six years?

7    A.   Five years.

8    Q.   Okay.  And you could use apprentices who are

9    50 percent, 60 percent, 70 percent?

10   A.   On a project like this where there's a lot of

11   carrying of pipe and moving of materials, typically what

12   you think of is laborer work.  We try to bring in as many

13   50 percent apprentices as possible to do that.

14   Q.   What is this pricing used for?

15   A.   It's used for change orders.  It's used as a basis

16   for change orders.  It's a general guide.  It's used by

17   the estimating department.  It's for them to have an

18   understanding of what the various costs are and what they

19   are at that moment in time.

20   Q.   And at the top it says Effective till July 1, 2011?

21   A.   Correct.

22   Q.   Is that the time period that these costs were in

23   play?

24   A.   It's effective until that date.  So, yeah, after July

25   1st, they would need a new sheet developed by accounting

1    to reflect the newer prevailing wage rate.  They change on

2    July 1st.

3            THE COURT:  Were these in effect during the

4    project dates then, July 2010?

5            THE WITNESS:  Yes, they would be, Your Honor.

6    It would have been up to July 11, so it would have been

7    July 11 of 2010 to July 11 of 2011 these would have been

8    prevailing wages.

9    BY MR. KAPLAN:

10    Q.   Okay.  So these are your complete costing internally

11    you're using for change order requests?

12    A.   Correct.

13    Q.   All of these things are not required by prevailing

14    wage law?

15    A.   No.

16    Q.   Okay.

17            MR. KAPLAN:  I have nothing further of

18    Mr. Flynn, Your Honor.

19            THE COURT:  Could I ask -- and I'm sorry if I

20    missed this connection.

21            How do the numbers here hook up to the

22    Exhibit 43, $81.46 prevailing?

23    BY MR. KAPLAN:

24    Q.   The $81 and change that's being used in the claim,

25    that's from what?

1  A.    That's from a negotiation or from, at bid time if

2  there was a page in the bid documents that asked us to

3  call out our -- the rate we would want to charge during

4  the project.  A lot of times we either indicate what the

5  rate is going to be or we negotiate a rate afterwards.

6  This is a guide.  We would always want to see our project

7  managers to acquire a rate no less than whatever is here.

8  Certainly if they could get a rate higher than that, that

9  would be great.

10           MR. KAPLAN:  So we referred to this with

11  Mr. Clauson, but just to -- Exhibit 44 has a number of

12  change orders in them.  The rate -- we reviewed this with

13  Mr. Clauson, Your Honor.  The rate is the $81 figure that

14  was actually used in change orders.

15           THE COURT:  For change orders.  I guess -- and

16  I'm sorry if I don't recall some prior discussion about

17  this.  But I'm trying to figure out why the 81.46 is the

18  reasonable rate to use, given that it's significantly

19  higher than the journeyman rate that's listed here on the

20  change order on Exhibit 31.  And as I understand it,

21  almost all of the extra labor involved journeymen and that

22  there were very few, say, foremen on site.  I'm just --

23  it's not clear to me why the 81.46 really represents the

24  appropriate value in terms of the loss experienced.

25

```
 1  BY MR. KAPLAN:

 2  Q.   Mr. Flynn?

 3  A.   Couple of things, Your Honor.  I disagree.  There

 4  were quite a few foremen.  There were references made in

 5  the very opening moments after Pike giving us direction to

 6  increase crew sizes, there were statements made that there

 7  were not enough foremen or supervisors on the job, but

 8  that was remedied rather quickly.  You may have heard

 9  testimony from Cliff or Stephane -- I believe Cliff, we

10  had to reach out to --

11            MR. HUG:  Objection, Your Honor.  I think you

12  asked a simple question why the 81.46.

13            THE WITNESS:  I'm trying to get there.

14            THE COURT:  I'll let the witness explain.

15            MR. HUG:  Okay.  It seems like it's an

16  opportunity to do argument.

17            THE COURT:  Well, I'll let him try to answer the

18  question.

19            THE WITNESS:  We had to reach out to all of our

20  other jobs and try to pull foremen from other crews on

21  other jobs, break them free and bring them to this job.

22  Were there a few days, possibly even a week, where we

23  didn't have the number of foremen on this job that we

24  would have liked to manage 40 to 60 men?  Sure.  But that

25  wasn't our fault.  We hadn't planned on having that many
```

1    men.  We did get those foremen.  I believe there were six

2    or seven foremen for all of that peak period of time and

3    they were all our lead guys.  Jimmy Bona, the owner's

4    son --

5              THE COURT:  I don't need more detail than that.

6              If I take you at that number, six or seven,

7    that's still 10 percent or 15 to 20 percent at the most of

8    the workers who are foremen.  The rest of these workers,

9    according to your change order rate, it's $74.80 for a

10   journeyman, that's throwing in a lot of -- looks like a

11   lot of things beyond actually what they're paid.  It's not

12   clear to me why the 81.46 represents the appropriate

13   valuation here what was really lost.

14             MR. KAPLAN:  May I ask some questions,

15   Your Honor, on that line?

16             THE COURT:  Go ahead.

17   BY MR. KAPLAN:

18   Q.   Your change order rate approved and paid by Pike on a

19   number of change orders for foremen -- I'm sorry, for

20   journeymen is the same rate that you're using in the

21   claim?

22   A.   That's correct.

23   Q.   Okay.  So if this had been approved as a change order

24   for the hours you submitted, what rate would have been

25   applied to the journeymen?

```
 1          MR. HUG:  Objection, calls for speculation.
 2          THE COURT:  I'm going to listen to the answer.
 3  It's overruled.
 4  A.   Any authorized additional work on this job, the
 5  agreed-upon rate was the 81-and-change-an-hour rate.  Pike
 6  never had an issue with paying $81.  It was a negotiated
 7  rate established at the beginning of the job that was
 8  agreeable to both parties.
 9  BY MR. KAPLAN:
10  Q.   And, in fact, under 44, the foremen rate, the
11  agreed-upon foremen rate in the change orders, for change
12  order work was $94 an hour?
13  A.   That's correct.
14          MR. KAPLAN:  Just a point of reference, Your
15  Honor.
16  BY MR. KAPLAN:
17  Q.   Going back to 41 -- is it 41?  43, I'm sorry.  No, I
18  lost my track.
19          MR. HUG:  31.
20          MR. KAPLAN:  Thank you.  I'm sorry.
21  BY MR. KAPLAN:
22  Q.   31, you said all those items in the left-hand column,
23  those are costs to you?
24  A.   Oh, yeah, those are all costs.  When we're
25  negotiating a rate, if a party wants to know what our
```

1    costs are, we would submit a sheet something similar to

2    this to them in the negotiations.

3    Q.   And in this sheet your foreman rate is $86.63 an

4    hour, bottom line, right?

5    A.   Correct.

6    Q.   And general foreman is 91.57.  Who are general

7    foremen?

8    A.   Stephane.

9    Q.   Did you have other general foremen on the job?

10   A.   When we geared up, we did, yes.

11          MR. KAPLAN:  I don't know if that addresses your

12   concerns, Your Honor.

13          THE COURT:  It does for now, thank you.

14          Cross-examination?

15          MR. HUG:  Thank you, Your Honor.

16

17                    CROSS-EXAMINATION

18   BY MR. HUG:

19   Q.   Mr. Flynn, you have the benefit of being the fourth

20   witness covering some of the same territory.  I will

21   not -- I will endeavor to not do the same thing and cover

22   the same ground.  I would like to cover some of the same

23   area, however, briefly.  Let's go right to the July 21

24   meeting.

25          I think we've heard an awful lot from a lot of the

1    witnesses, including you, that that July 21 meeting was

2    called by you, ECI, to discuss the project and where it

3    was going; is that a fair statement?

4    A.   Yes.

5    Q.   All right.  And there's specifics about it.  That's

6    certainly not all there was to that meeting.  In that

7    meeting we heard testimony that you made a request for

8    extension of time?

9    A.   Yes.

10   Q.   And it was denied?

11   A.   Correct.

12   Q.   And the Court has heard testimony about all the

13   things that were said, I'm not going to repeat.

14        Did you file a claim at that point in time that that

15   request for extension of time was wrongful?

16   A.   We did not.

17   Q.   Then, as I understand it, you advised Pike that it

18   was going to cost a lot of money -- excuse me.  I missed a

19   part.  Then you had a discussion about manpower, right?

20   A.   Yes.

21   Q.   All right.  The Court has heard the testimony of what

22   ECI believes was said about the manpower.  I'm not

23   agreeing with you, I'm not contesting you.  It's your

24   testimony that Pike directed you to add manpower, correct?

25   A.   Absolutely.

1   Q.   And that in response to that, you advised Pike that

2   that was going to cost a lot of money, that was going to

3   have financial consequences, correct?

4   A.   Financial consequences, correct.

5   Q.   Your intent to communicate at that point in time was

6   that you were going to have a claim because it was going

7   to cost some money; is that your testimony?

8   A.   I advised them that there would probably be financial

9   consequences.  I couldn't see any way of adding that many

10  men without it having financial consequences.  Although

11  without knowing exactly what those financial consequences

12  were going to be, I advised them that if there were, and I

13  expected there would be, we would be looking for

14  compensation.  I don't believe I ever said claim.  I said

15  we would be looking for compensation.

16  Q.   Okay.  You wanted to be compensated extra for --

17  A.   The labor and inefficiencies, yes.

18  Q.   That's because you didn't get what you wanted in

19  terms of time?

20  A.   Correct.

21  Q.   And Pike, your testimony is, Mr. Oloff, which the

22  Court will soon meet, they laughed at you?

23  A.   I'm sorry, I missed that.

24  Q.   And the gentlemen from Pike, Mr. Strauss and

25  Mr. Oloff, were there and they laughed at that, I think

1    was your testimony?

2    A.   Yeah, they did.

3    Q.   In a mocking way I think is the way you kind of

4    testified; am I mischaracterizing that?

5    A.   They laughed because they felt they were completely

6    insulated from any cost to ECI.  If you want to call it

7    mocking, you can characterize it how you want.  I'm

8    indicating I don't know what their motivation was other

9    than it was clear to me that they thought it was amusing

10   and that they were completely insulated.

11   Q.   That's important.  I want to know what you thought

12   their characterization -- what you understood, not

13   necessarily what they meant, but what you understood Pike,

14   the impression they gave you is something they weren't

15   going to pay that, they were insulated by the contract,

16   right?

17   A.   Yes, they had no intention of paying any money.

18   Q.   And somebody with 40 years of experience and your

19   extensive testimony about your qualifications, is it fair

20   to say you've been around the block a long time on

21   electrical matters?

22   A.   A few times.

23   Q.   It's not meant to be insulting, it's meant to be

24   differential.

25        You didn't file a written notice of claim after that?

```
 1   A.   We left that room feeling as though --
 2            THE COURT:  I'm sorry, I think it was just a
 3   "yes" or "no."
 4   A.   Okay.  We did not.
 5   BY MR. HUG:
 6   Q.   Okay.  And you're aware of the contract provision
 7   that requires you to file a notice of claim, are you not?
 8   A.   Yes, I am.
 9   Q.   And actually, when you read that provision, sir, it
10   has two parts to it.  I think it's Exhibit 12.
11   Section 5.4.  It's actually 13, excuse me.  And
12   Section 5.4 appears on page 9 of the exhibit.
13            Now, before I ask this question, I also understood
14   your testimony to be that at July 21, you couldn't
15   quantify yet what your damages were; is that right?
16   A.   Correct.
17   Q.   You thought at that time, is it fair to say, you're
18   going to be impacted, correct?
19   A.   Correct.
20   Q.   But you don't know the amount?
21   A.   Correct.
22   Q.   And then you get the monthly report for September and
23   it shows a significant -- I don't want to mischaracterize
24   it, but it shows that you're not doing as well as you
25   thought you'd do on the project, correct?
```

1    A.   It shows for the project as a whole to that point and

2    more specifically for Phase 3 having now been completed.

3    Q.   Okay.  At that point in time you have a better

4    understanding of the quantification of the damages,

5    correct?

6    A.   Correct.

7    Q.   Section 5.4 reads that if the subcontractor believes

8    that any order, directive or condition, other than as

9    provided in Paragraph 5.7, entitles him to extra

10   compensation or an extension of time, he shall give the

11   contractor written notice of his claim -- that's number

12   one, written notice of this claim -- not later than three

13   days after the occurrence of the event giving rise to the

14   claim, and number two, and as soon as is practical furnish

15   sufficient facts in support of his position as may be

16   necessary for a decision.

17        In your 40 years of experience, you understand this

18   to be a two-point exercise.  You at times during projects

19   know that you might have a claim or you actually have one,

20   but you can't yet quantify it.  That happens all the time,

21   doesn't it?

22   A.   Yes.

23   Q.   You give notice of the claim and then you say I can't

24   quantify it now, but later on I will quantify it.  That's

25   the way it works, isn't it?

1    A.   Sometimes.

2    Q.   That's the way it works in this contract provision,

3    correct?

4    A.   If you're addressing specifically -- there's a whole

5    contract here.  If you're asking me if that specific

6    section says what it says, yes, it does.

7    Q.   Isn't it true that you didn't file a claim because at

8    that point in time you understood that there was a bid

9    bust by ECI?

10   A.   No, that's totally wrong.

11   Q.   You acknowledged that Mr. Oloff told you you didn't

12   have enough men on the job and you didn't have enough

13   supervision on the job prior to July 21, correct?

14   A.   There's two questions there.

15   Q.   Let's talk about the first one.

16   A.   That's -- Mr. Oloff and Mr. Strauss never thought ECI

17   had enough men on the job.  So if you want to reference a

18   particular point in the job or through the entire Phase 3

19   project, they never thought we had enough men, so my

20   answer is yes, they made those statements.

21   Q.   Okay.  As to both supervision and manpower, correct?

22   A.   Those were their allegations.

23   Q.   And you went to the site called by Cliff Clauson to

24   take a look at what was going on?

25   A.   I did.

1    Q.    You called a meeting?

2    A.    I requested a meet.

3    Q.    And there was a meeting.  And you were told, no

4    uncertain terms, at least as you allege, that Pike was

5    insulated by the contract and not going to pay any claim?

6    A.    I think that -- I don't know what they were thinking,

7    but that's my impression.

8    Q.    That's what's important is your impression.

9          And then afterwards, we see Mr. Clauson in this

10   exhibit for the job performance review form, which is part

11   of Exhibit -- before you file any claim, your internal

12   records show that the estimating department is ignoring

13   the project schedule and other things criticizing the

14   estimate.  That's all going on before you file a claim.

15   So what you're --

16              THE COURT:  We need a question.

17   BY MR. HUG:

18   Q.    You're hearing between July 21 and September and then

19   October 1st from your project manager that there's a bid

20   bust?

21   A.    He wrote that on a given day.  On that particular one

22   at a time when he was facing walking into Lou Bona's

23   office and telling him that within a matter of 30 days he

24   was now going to lose somewhere between six and $700,000

25   on his job.  And the man was scared to death that Lou was

```
 1    going to blame him.  That's the fact of the matter because
 2    I have known the man for 20 years.  He was as close to --
 3    you couldn't have been any more upset than he was at that
 4    time.  And I know I heard him say on the stand he wasn't
 5    afraid.  He was in fear of his job, yes, he was.
 6    Q.   So he lied to Mr. Bona, the President of the company?
 7    A.   He wrote down that statement because at that moment,
 8    looking at the picture that was in front of him, he
 9    thought that was a plausible possibility.  He doesn't
10    think that now and he didn't think that very much longer
11    after he wrote that when he met with Mark Madore and they
12    went back over the estimate, went back over the conditions
13    of the job, and they could really look at what was causing
14    this six or 700,000 -- what was going to cost the six or
15    $700,000 overrun.
16    Q.   So after this job performance review, he then went
17    with Mark Madore and looked over the job estimate?
18    A.   Later on after that, they did.
19    Q.   Up to that point in time, what I understand happened
20    is that he was at that July 21 meeting and he was there
21    when you were reciting all of the problems that Pike had?
22    A.   That's correct.
23    Q.   Yet he doesn't tell Mr. Bona, who is looking at this,
24    that Pike has problems here, does he?
25    A.   No, because when he walked out of that meeting, based
```

1    on his perception again of what Pike was pitching to us,

2    we were going to have to eat it.  So you're looking at a

3    man who's hearing Pike say you own it contractually, we

4    bought this from you, and you're going to have to eat six

5    or $700,000.  That's what he's hearing.  And so therefore,

6    he's got to go back and tell Mr. Bona that a job that was

7    basically not too bad the month before is now going to

8    take a $600,000 hit.  I wouldn't have wanted to have been

9    in his shoes.

10   Q.   Neither you nor Mr. Clauson -- you didn't believe

11   that?

12   A.   Personally, I did not.

13   Q.   And we heard Mr. Clauson's testimony about what he

14   understood existed at that time already, and we'll leave

15   it at that.

16        MR. HUG:  I'm sorry, Your Honor, I'm actually

17   eliminating questioning.  What may take a minute or two of

18   time in light of this morning's testimony, trust me, I've

19   saved more.

20        THE COURT:  If it's eliminating questions,

21   please take your time.

22        MR. KAPLAN:  No objection, Your Honor.

23             (Pause.)

24        MR. HUG:  Mr. Caprio just joined us in the

25   courtroom, Your Honor.

1   BY MR. HUG:

2   Q.   I'd like you to turn to the second volume, starting

3   with Exhibit -- well, let's see.  Exhibit 40?

4            MR. KAPLAN:  Forty?

5            MR. HUG:  Forty.

6   BY MR. HUG:

7   Q.   That's the March 4, 2011 letter.  March 4, 2011

8   letter Attorney Kaplan went over with you.

9   A.   It's in another book.

10  Q.   Okay.

11  A.   Yes.

12  Q.   As I understand it -- and to quickly, before that, we

13  heard testimony about the series of letters that went back

14  and forth and at some point in time there was a meeting

15  between Pike and ECI to discuss the claim, correct?

16  A.   That's correct.

17  Q.   All right.  So even though Pike -- in the earlier

18  letters we see Pike taking the position that you didn't

19  get proper notice and you signed lien waivers.  Right?

20  Remember those?

21  A.   Correct.

22  Q.   Pike nevertheless decided to entertain a meeting with

23  you to discuss whether or not you really were impacted,

24  correct?

25  A.   Correct.

1    Q.   All right.  And after that meeting you wrote this

2    letter and you thanked Pike.  It says, I especially want

3    to -- I think it's thank you.  There's a word missing.

4    Thank your team for basically meeting with us and whatnot.

5         Down further in that letter in the third paragraph

6    you acknowledge that some schedules, even the best

7    schedules require some shifting.  That's still true today,

8    isn't it?

9    A.   Sure.

10   Q.   And then in your examination today, Attorney Kaplan

11   went over with you some paragraphs.  And I heard something

12   that you were pulling some wires through and you labeled

13   the wires and the labels got knocked off and that caused

14   you some extra time, right?  That's an oversimplification

15   by many degrees, but essentially that's the testimony?

16   A.   That occurred.

17   Q.   Is that in your letter anywhere?  I missed that.

18   A.   No.

19   Q.   Is that the first time you're raising that issue is

20   here today?

21   A.   No.

22   Q.   Did you ever mention that to Pike or in any of your

23   letters or any of your other claims?

24   A.   I think if you look at some of the responses to the

25   pictures, it may have been raised.

1    Q.   Now, also in your claim you discuss acceleration and

2    compression.  What are those?

3    A.   They're basically the same thing.  One is where you

4    have -- in this instance where you have a ten-week period

5    and if you try to do the work in five weeks, that would be

6    compression.  If you have a four-week -- it's a very

7    similar --

8    Q.   So if you have to do work over a shorter period of

9    time, it's compression, or over shorter period of time,

10   its accelerated?

11   A.   Quicker than expected.

12   Q.   Sometimes acceleration means do it sooner than

13   expected, too?

14   A.   Sometimes.

15   Q.   In any event, it's a squeezing in?

16   A.   Correct.

17   Q.   Exhibit 41, you touched on just briefly.  That's

18   Pike's response to your letter in Exhibit 40.  I just want

19   to go to the last paragraph of that letter.  This is where

20   Pike -- and you understood this to be the case, Pike

21   rejected your claim for equitable adjustment to the

22   contract.  And it says, "In addition to the absence of

23   notification in accordance with its Master Subcontract

24   Agreement, ECI has by virtue of its execution and

25   submission of monthly lien waivers to Pike waived its

1    rights to any and all claims with respect to work

2    performed for the period in question."

3        So Pike was still maintaining those lack of notice

4    and lien waiver notice as of that meeting that you had

5    prior to your letter, correct?

6    A.   Correct.

7    Q.   And they reiterate that in their letter here.

8        Now, in April 6 of 2011, first page of Exhibit 41, it

9    acknowledges that ECI, it says after our meeting on

10   January 19, 2011 -- I don't think you remembered when the

11   meeting was, but that's the date.  Do you remember where

12   that meeting was?

13   A.   Albany, I believe.  But I don't recall.  No, the

14   second meeting was in Albany.  It was locally.  It was

15   locally.

16           MR. KAPLAN:  We didn't attend.

17           MR. HUG:  We didn't?

18           MR. KAPLAN:  No, not that one.  Sorry for that.

19           MR. HUG:  We've had a lot of history.

20           MR. KAPLAN:  We're trying to coordinate as best

21   we can what was going on here.

22   BY MR. HUG:

23   Q.   So it says that you were to provide substantive proof

24   to support the allegations that ECI was impacted by causes

25   outside their control, right?

1  A.  That's what it says.

2  Q.  And Pike's position was with you that, is it fair to

3  say, we understand what you're saying that these various

4  items caused you a problem, we understand that concept, we

5  don't necessarily agree with it, but we understand it, but

6  please tell us specifically how you were impacted.  Isn't

7  that their position?

8  A.  That's what it says, yes.

9  Q.  And Pike responds to that and says ECI has put forth

10  a series of unsubstantiated allegations that are simply

11  not supported by the project record.

12      I take it you don't agree with that?

13  A.  No, I don't agree.  I think the project record speaks

14  for itself.

15  Q.  Two paragraphs down, "ECI is making a total cost

16  claim that completely exonerates their own management

17  issues which includes a bad estimate for reasons

18  enumerated below," and they go on for that, poor planning

19  and poor execution, lack of understanding of the project

20  and so forth.

21      Is this a total cost claim?

22  A.  Well, a total cost claim, in my mind, would be if one

23  was to take the total estimated hours for the project

24  versus the total actual hours for the project, that would

25  be a total cost claim.  I guess this is a hybrid.

1    Q.   A modified total cost claim?

2    A.   Modified total cost claim, yeah.

3    Q.   All right.  And it is true, is it not, that your

4    position is that ECI takes no responsibility for poor

5    planning and poor execution of ECI's work?

6    A.   That's correct.

7    Q.   And ECI takes no responsibility for lack of

8    understanding of the project, doesn't acknowledge it

9    lacked the understanding of the project, correct?

10   A.   We did not lack.

11   Q.   You did understand the project?

12   A.   Yes, we did.

13   Q.   And you also understood the complexity of the

14   schedule, that's your position?

15   A.   I don't believe the schedule is very complex.

16   Q.   Oh, okay.  And lack of preparedness, you don't

17   acknowledge that ECI was unprepared in any way, do you?

18   A.   We were not unprepared.

19   Q.   And no late material deliveries?

20   A.   None that impacted the schedule.

21   Q.   Lack of supervision and poor cost control and

22   internal accounting records, none of that is accurate

23   either?

24   A.   Absolutely inaccurate.

25   Q.   Did ECI make any mistakes in this project?

1   A.    Taking the job.

2   Q.    Is this ECI's first project where they did everything

3   perfect?

4   A.    This is the first one in my lifetime that I've ever

5   seen go so badly where the person in charge of the

6   schedule who totally lost control of the project I'm

7   sitting here trying to defend my actions.  I don't know

8   what to tell you.  I think we did not do anything wrong in

9   that short six-week window that we were left with to

10  finish the project.  I mean, I think the film, one week

11  into August there are no door frames, there are no

12  windows, there are no ceilings, there's block work

13  everywhere, and you want me to perform all that work and

14  not in three or four weeks but two to three weeks because

15  the Pike schedule, which I'm sure was carefully thought

16  out, gave a week to everyone to do testing and starting.

17  So the actual construction work had to be performed,

18  everything that we watched in that movie had to be wrapped

19  up in two weeks.  I don't claim any responsibility for

20  that.  I didn't birth that.  I wasn't responsible.  It

21  wasn't my schedule and I wasn't responsible for keeping

22  the other subcontractors on schedule.  Why is it only ECI

23  was the only contractor working the second shift that Pike

24  keeps talking about?  We were the only ones there at

25  nighttime.  Why?  I sure as heck would like to know.

```
 1   Because I haven't heard anyone answer that.  I'm sorry,

 2   I'm sorry.

 3   Q.   Okay, that's all right.  I'm just going on with the

 4   next question.

 5        You testified that you're experienced with the

 6   critical path method scheduling, correct?

 7   A.   Yes, I am.

 8   Q.   At your direction, Exhibit 51A and 51B were prepared.

 9   I think 51B is up here now.

10   A.   That's correct.

11   Q.   Now, I just want to make sure, just generally

12   understand.  I think Attorney Kaplan asked you some

13   general questions about it.  But as is often the case,

14   counsel don't always agree that is the way it should

15   always be explained completely.  So let me try it this

16   way.

17        Someone prepares a schedule for the project at the

18   beginning, correct?

19   A.   Correct.

20   Q.   And during the bidding phase various subcontractors,

21   including ECI, look at the bid package which includes a

22   schedule and they see that, correct?

23   A.   Correct.

24   Q.   After the bid, there's a selection and notice of

25   award given, correct?
```

```
 1   A.   Correct.
 2   Q.   And at some point in the process, ECI is given the
 3   opportunity to make comments on the schedule and make sure
 4   that they understand the schedule and they can do the work
 5   within the schedule confines, correct?
 6   A.   Correct.
 7   Q.   And from time to time adjustments need to be made,
 8   correct?
 9   A.   Usually with the input of the subs, yes.
10   Q.   Correct.  The subs aren't completely out of the
11   equation, they have some input, correct?
12   A.   Most of the time.
13   Q.   That doesn't necessarily mean the owner or general
14   contractor agree with them, but they have input, correct?
15   A.   Correct.
16   Q.   And then during the project -- and we're talking
17   generally now.  I know there may be some issues with the
18   way schedules were kept on this project, but just
19   generally.  This Primavera schedule has a certain logic to
20   it, right?
21   A.   Correct.
22   Q.   That means that there is a critical path -- define
23   "critical path" for the Court, please.
24   A.   Critical path is a linking of certain key activities
25   that drive the entire project and that are key elements
```

1   from the start to the finish.  Not all items in a schedule

2   will impact the finish date, so therefore they are not on

3   the critical path.

4   Q.   Okay.  And it's fair to say that there is a plethora

5   of information in the internet world on what critical path

6   means and critical path scheduling means, correct?

7   A.   A lot of verbiage.

8   Q.   People talk about it in your industry all the time

9   about what it means and what it is in a particular

10  project?

11  A.   Correct.

12  Q.   The logic in a critical path project, that's a term

13  that was used that is probably unfamiliar to the Court.

14  There's a logic.  What is logic in a critical path

15  project?

16  A.   Logic is the linkage, basically, between the

17  activities.

18  Q.   Okay.  So you'd agree with me that looking at a

19  schedule on a piece of paper is really only one --

20  important, but one piece of the schedule, correct?

21  A.   Correct.

22  Q.   Because if you look at it on the computer, if I had a

23  computer here and I wanted to look at critical path

24  scheduling, if I clicked on any one of those items I would

25  see what is called predecessor activities and successor

1  activities, correct?

2  A.   Correct.

3  Q.   That would show all that has to be done with all of

4  those activities?

5  A.   Correct.

6  Q.   There's also this concept of float.  Do you know what

7  float is?

8  A.   Yes, I do.

9  Q.   What is float?

10  A.   Float is the -- the total amount -- well, it is a

11  piece of time between activities where there is a lag.  In

12  other words, a particular activity may end on a specific

13  date that the next activity that begins does not have to

14  begin, can actually allow to slip until several days

15  later, but may be scheduled to start on a different date

16  but it can slip.

17  Q.   Let's put it in the context of an example.  Drywall.

18  After you put drywall up, it needs to be primed and

19  painted.  There may be other things, but let's keep it

20  that simple for now, okay?  Drywall put in, primed and

21  painted.  It might say that the drywall needs to be put in

22  by August 1st, needs to be completed by August 1st.  The

23  painting doesn't need to start until August 8.

24  A.   Correct.

25  Q.   What's that difference?

1    A.    That's float.

2    Q.    That's float.

3    A.    Yes.

4    Q.    That's the lag time.  So the painter actually could

5    come in earlier, maybe?

6    A.    Which would be an early start.

7    Q.    An early start and early finish, which gets to my

8    next thing.  What is the concept of early start and early

9    finish?  We don't see them on here.  We see baseline

10   start.  That's the -- baseline is the base schedule, what

11   the start was in the baseline schedule.  And the baseline

12   finish is what -- by the way, the baseline start was the

13   early start in the baseline schedule?

14   A.    That was the descriptor in the schedule that was in

15   the bid package.  When you click on those particular

16   activities, I didn't see any other start or finish dates

17   in the logic of those activities that would have allowed

18   for the other start dates.  I didn't see that.  So it is

19   titled early start, but from my perspective that was the

20   planned start.

21   Q.    There was no late start and late finish?

22   A.    Not that I saw.

23   Q.    And in this schedule here, did you do any analysis as

24   to whether there was float in this schedule?

25   A.    Primavera says there was I think 111 days of negative

```
 1   float.

 2   Q.   What's negative float?

 3   A.   Means they're already 111 days behind.

 4   Q.   Oh, really?

 5   A.   That's what I believe the report shows.

 6   Q.   Did you look at the individual items to see if there

 7   was any float in any of the individual items?

 8   A.   On Phase 3?

 9   Q.   Yes.

10   A.   I did not.

11   Q.   So if there is float, you would agree with me that

12   holding to the exact start or the exact finish date isn't

13   necessarily an indication that the project is ahead or

14   behind schedule?

15   A.   No, I wouldn't agree with that.

16   Q.   Why not?

17   A.   Because where's the float?

18   Q.   Okay.  Did you do that analysis?

19   A.   I didn't see any float.  I didn't analyze it, but I

20   looked at the Phase 3 activities, the electrical

21   activities, and I saw no float in the electrical

22   activities.  And those are the ones that were seriously

23   behind and the ones that I cared about.  Whether the

24   drywall guy had float or the painter had float, I don't

25   know.  I didn't review that.
```

1   Q.   Was there float in ECI's activities?

2   A.   Not that I saw.

3   Q.   But you didn't do the analysis though, did you?

4   A.   I did a review and I didn't see any.

5   Q.   If ECI did have float, hypothetically, ECI did have

6   float and didn't start on the exact date that it is

7   indicated in the baseline, it doesn't necessarily mean

8   that it's a late start, is it?

9   A.   I'm sorry, but I --

10   Q.   If there is float, if there is float in ECI's

11   activities, simply because it started a little later

12   doesn't necessarily mean it's late, does it?

13   A.   I don't think it's that simple.  I don't think -- you

14   can proffer that, but I think you need to be more specific

15   about where the float is, is the float available to all

16   activity, certain activities.  It's a lot more detailed

17   than that.

18   Q.   It's a comprehensive analysis, correct?

19   A.   It just -- I have to have more information.  It's not

20   a comprehensive analysis, it's like asking me if I can

21   paint some walls but I don't know what the walls are, what

22   the material is.  You don't have enough information as you

23   offered me that question.

24   Q.   But you didn't do that analysis in this case, did

25   you?

1   A.   Again, I said it's not an analysis, it's just simply

2   looking at the data.  I looked at the electrical

3   activities, I don't recall there being any float.  So you

4   can ask me six more times, but I don't recall there being

5   any float.

6   Q.   How about a CPM -- how is the CPM schedule updated?

7   A.   They open the original baseline file, they make

8   corrections, modifications, changes, and they save it as a

9   new file.

10  Q.   Right.  And that's done -- so taking an example of

11  drywall again, when the drywall is, say, scheduled to

12  start on Monday of this week and it is done on Thursday of

13  this week, when I redo the schedule next Monday, if I'm

14  doing them weekly every Monday, I'm going to note on there

15  it started on Monday and ended on Thursday?

16  A.   I'm going to put actual start and finish dates into

17  the activity logic.

18  Q.   How do you determine the actual finish dates?

19  A.   When it's done.

20  Q.   What does done mean?

21  A.   Everything that is supposed to be performed within

22  that activity has been completed.

23  Q.   Okay.  So let's say you're in a room this size and

24  you have to demo the paneling on this wall, okay?

25  A.   Okay.

1  Q.   You take all the paneling out except for that one

2  panel over there because you're concerned about some

3  particular pipe that's in there and you don't want to demo

4  it until you get better drawings as to what's behind that

5  panel.  Is that demo of the paneling activity done?

6  A.   No.

7  Q.   But that doesn't mean that you can't put new furring

8  strips in the walls here or start your drywall on the rest

9  of the room, does it?

10  A.   It could.  Your suggestion then is that you're going

11  to schedule the next contractor to come in and work

12  piecemeal, which has ramifications.

13  Q.   If you work piecemeal, if you start from there and

14  work your way around here and by the time you get to here,

15  that's out?

16  A.   Is it out?  You didn't say that.  You didn't proffer

17  that.

18  Q.   Let's assume it is.

19  A.   Then it's done.  If by the time I start there that's

20  done, then it's done and it doesn't interfere with me.

21  But if I come into a room or any contractor comes into a

22  room and finishes part of it and leaves and has to come

23  back to do one little area, as you're suggesting in the

24  initial question, there would be ramifications to that and

25  that would be poor management.

 1   Q.    You're going to come in and drywall this area.  This

 2   place is demoed except for that piece.

 3   A.    Correct.

 4   Q.    Okay.  Even though that piece is not yet out, you can

 5   start dry walling, correct?

 6   A.    You can start.

 7   Q.    Right.  And as long as you get to that point and that

 8   is out before you get there, then it doesn't impair your

 9   work?

10   A.    It wouldn't be a problem.

11   Q.    And because that piece of demoed wall is not out, it

12   doesn't mean you took more labor to do this work, does it?

13   A.    If it happens exactly as you just proffered, then it

14   does not.

15   Q.    Did you do any type of analysis -- although you

16   weren't necessarily proffered as an expert, I neither

17   objected either.  But in your analysis, did you do any

18   sort of scheduling analysis and printout of anything that

19   shows whether ECI started its work when it was available

20   to be done?

21   A.    Based on our project records and discussions with my

22   site foreman, it is my belief that wherever the --

23   whatever work was scheduled and was ready was started.

24   There was never an instance where we -- there's no record

25   of any complaint from Pike that I know of indicating that

1    we hadn't started a piece of work somewhere.  Because to

2    the best of my knowledge, we did start every bit of work

3    that was available when it was available.

4    Q.   So you didn't construe Pike's request that you add

5    manpower, had nothing to do with the fact that you weren't

6    keeping up with the work?

7    A.   The simple answer to that is no, I did not, because

8    having worked on both sides of the fence I don't have too

9    many general contractors when they're running behind who

10   don't think all the subs need more men.  That's their

11   remedy to every ail they have.  Everyone else who is

12   paying the labor needs to bring in more people.

13   Q.   So if, in fact, ECI didn't start its work when it was

14   available to them in some instances, I take it then that

15   therefore your loss of productivity claim here doesn't

16   address it?

17   A.   Because it never occurred.

18   Q.   Okay.  In some of the areas of -- in some of these

19   schedules, it's hard to see, but there are durations.

20            THE COURT:  Are you referring to Exhibit 51A?

21            MR. HUG:  51B.  Maybe I'll just do it

22   conceptually.  It's easier, because it's pretty hard to

23   read.

24   BY MR. HUG:

25   Q.   In some areas the duration is listed as a couple of

1  days, but on the dark blue line there it indicates it took

2  a longer period of time; is that right?

3  A.   Correct.

4  Q.   Is that compression?

5  A.   No.  Not for that item.

6  Q.   Okay.  And if I see a blue bar that, you know, I

7  think it's right -- it's tough to see.  Let me do it

8  conceptually.

9      If I see an item that has a blue bar that has 15 days

10  in it instead of the planned two days in it, does it mean

11  you worked 15 days in that area?

12  A.   No.

13  Q.   All right.  What does it mean?

14  A.   It means it took 15 days to complete the two days of

15  work.

16  Q.   Does it mean you put more men in that area?

17  A.   No.

18  Q.   It means --

19  A.   All the schedule is is identifying a period of time

20  that was planned to do the work versus a period of time

21  that it took to do the work.  This, Pike's schedule, does

22  not track manpower associated with those work items.

23  Q.   Okay.  So to be clear, if an activity is scheduled to

24  take two days, and it really does take two days, as I

25  understand it, even though something is scheduled to be

1    two days, sometimes it takes a half day or day and a half?

2    A.   That's correct.

3    Q.   So if it's scheduled for two days and, for purposes

4    of my hypo, it really does take two days, it shows that

5    you did it out over 15 days on the schedule that you're

6    showing to us in Exhibit 51B, all right?  Let's take that

7    as an example.  The actual workers on that may have only

8    been there for two days, it just may have been over that

9    15-day period?

10   A.   They may have been there for an hour on 15 days.

11   Q.   So it doesn't track how much actual time was worked

12   on that task, it's just how long it took that task from

13   the first time anybody started it to when it was finally

14   complete, correct?

15   A.   Yeah.  The conduit distribution line is one of your

16   examples.  I think it was certain number of days, but it

17   took far more because of the interruptions.

18   Q.   And it doesn't necessarily mean that more men were

19   used to do that task, does it?

20   A.   It does not.

21   Q.   It might mean that somebody who was in the classroom

22   area, an activity that was supposed to take a five-day

23   duration, took 15-day duration.  They may have had to move

24   from the classroom to the cafeteria for a day, then they

25   went back to the classroom for a couple of days and went

1  back to somewhere else, right?  That could happen?

2  A.   Philosophically, that could happen, but that wasn't

3  what happened here.

4  Q.   Could you show me, using 51B, an example of

5  compression or acceleration?

6  A.   Sure.  The fact that if you look at the number of

7  activities that were supposed to be done throughout the

8  ten-week period, as we testified previously, and you see

9  the slant of the work which there was a nice logic to the

10 work, progression of the work, and you lift that slanting

11 group of activities and you stand it up, now performing

12 all of those activities in a four-week period, that's

13 acceleration or compression, whichever one you want to

14 use.

15 Q.   So you're talking about all of the activities are

16 compressed?

17 A.   Basically a great many of them were pushed into the

18 next month and were performed at the same time the August

19 activities were planned on being performed.  So therefore

20 you're now performing July activities in August and August

21 activities in August, that's compression or acceleration.

22 Q.   All right.  Now, you can sort Primavera schedules in

23 a lot of different ways, can't you?

24 A.   You can.

25 Q.   And this one was sorted for ECI's work but without

 1   reference to any of the areas.  It's not broken out by

 2   area?

 3   A.   Yeah, it is.

 4   Q.   How is it broken out by area?

 5   A.    It's identified along the side.  And if you look at

 6   the progression of the schedule, the logic of the

 7   schedule, which is apparent if you study the list of

 8   activities, you can see the progression where they've got

 9   us beginning in the AD area and moving to the next area

10   with very similar activities, roughing the walls in the

11   area, moving to the next area, rough the walls, moving on

12   to the next area, rough the walls, so on and so forth.  So

13   you've got a flow.  There's a really intelligent flow of

14   the work as it was originally planned.

15   Q.   The contract schedule, though, has it based -- has it

16   printed out by area, correct?  So all the admin. area

17   items --

18   A.   No, no.  I think if you go back -- well --

19   Q.   Contract schedule I'm referring to.

20   A.   The contract schedule shows the AD area activities

21   and then it shows the next area activities, yes.

22   Q.   So you could break this out -- you could do that with

23   this -- you could break it out by area?

24   A.   You could tell Primavera to do pretty much anything.

25   Q.   That kind of schedule would show what happened in

1   each area, correct?

2   A.   Sure.

3   Q.   Would be the same schedule but make it out by area?

4   A.   Just sorting it differently.

5   Q.   Then you could see how each area, in each area it was

6   moved out, correct?

7   A.   Yeah, or look at the schedule and pick out those

8   areas and see the same thing.

9   Q.   But it's coming from the same database, correct?

10  A.   Always.

11  Q.   You didn't do that, right?

12  A.   Didn't do what?

13  Q.   Didn't do that kind of schedule for the Court today,

14  did you?

15  A.   No.  Primavera, when you ask it to print a

16  comparative schedule like this, does it this way.  I guess

17  you could go in and maybe override some of the stuff.

18  This is a standard Primavera comparison.  It isn't an

19  ECI-elected comparison.

20  Q.   Just as sort of a general issue, you don't -- you

21  don't dispute the fact that when ECI undertook to do this

22  work, it was expected that you were going to work in a lot

23  of different areas at one time?

24  A.   That's normal.

25  Q.   Okay.  Why did you choose to calculate a finish

1    variance for each of these activities?  That's what this

2    is, a finish variance schedule?

3    A.    No.  What you missed is that my technician elected to

4    take a standard Primavera comparison report.  We didn't

5    elect to do anything.  We took one of the standard

6    approaches and just printed them.

7    Q.    During your testimony, you gave testimony to this

8    Court about durations in the finish variance dates?

9    A.    Yes.  The program gives you the variance as part of

10   the report.

11   Q.    Why did you do that?  Why are you showing that to the

12   Court?

13   A.    To see what the comparison is between the original

14   bid schedule for each activity versus the projected at

15   that point in time.

16   Q.    But that doesn't show you used more man hours or man

17   people in that particular activity, does it?

18   A.    No.  What it shows is the information available to

19   Pike in early July when they were meeting with us and the

20   fact that they were intimately aware of how far behind

21   they were in the electrical activities.

22   Q.    But just because something says it has a 40-day

23   variance or a 10-day variance or whatever variance, it

24   doesn't mean that that duration of that activity took that

25   entire period of time, correct?

1   A.   No.  We've addressed that.  No, it does not.

2   Q.   I'm sorry if I'm repetitive, but I believe this may

3   be the Court's -- one of the few times they've looked at

4   schedules.  I don't want to leave that stone unturned.

5        Why didn't you calculate a start variance?  You could

6   have done that.

7   A.   As I already have testified, the sole purpose for

8   this document was to depict at that point in time when we

9   were meeting with Pike what information was available to

10  Pike at that point in time and to determine how far off

11  behind they were on various key electrical activities.

12  That was what I was looking to get.  I got it.  And it's

13  here on the stand for everybody to see.

14       Anything other than that, I didn't need and I wasn't

15  interested in -- I didn't think I needed to put it here.

16  Q.   Okay.  So just as kind of to put a period on the

17  whole variance thing, you'd agree with me that variance

18  calculation that you gave the Court doesn't show the

19  actual work -- when the actual work was performed during

20  the variance period; you agree with that?

21  A.   Yeah, I'm not quite sure what you're asking me.  It

22  does not show on any given day during the period depicted

23  whether work was performed or not.

24  Q.   So that's a "yes"?

25  A.   Well, I said it that way because I wasn't quite sure

1   what you were asking.  I guess yes.

2   Q.   Does the variance indicate whether any of the actual

3   work was performed during the original baseline duration?

4   The variance.

5   A.   No.  The variance is the variance of the completion

6   dates.

7   Q.   Does the variance show whether the actual work was

8   performed in a shorter or a longer duration than actually

9   performed?

10  A.   The variance column only depicts the variance.

11  Q.   And it doesn't take into account the planned manpower

12  versus ECI's actual manpower for each of the work

13  activities that are listed, correct?

14  A.   It does not.

15  Q.   And it doesn't show whether the work was done

16  incrementally, correct?

17  A.   Correct.

18          MR. HUG:  Your Honor, I may be close to

19  conclusion.  I'd like to conclude before the break.  I

20  suspect you do, too.  If I have one minute, I can read

21  some comments or I can take a break.

22          THE COURT:  Go ahead.

23          MR. HUG:  Or I could take a break, Your Honor,

24  and come back and probably have no questions, I don't

25  know.  I just don't know.

1          THE COURT:  Then we will take our break now.

2          MR. HUG:  I would ask that.  I think maybe I can

3     either refine them or have none.

4          THE COURT:  We'll come back at 10:15, twenty

5     minutes.

6               (Whereupon, a recess followed.)

7

8          MR. HUG:  Your Honor, I have no further

9     questions.

10          THE COURT:  Okay.

11          Mr. Kaplan, I have a few questions to ask.  I

12     can ask them now or after you.

13          MR. KAPLAN:  I have no redirect, so I'll be

14     happy to have you ask questions, Your Honor.

15          THE COURT:  Mr. Flynn, could you explain one

16     more time, we had 51B up on our chart.  Put it up on the

17     stand here.  I want to make sure I understand all the

18     discussion about the variance, what the variance means.

19          The finish variance, this column here that you

20     got a lot of questions from Mr. Hug about, that just means

21     the day that the project was initially supposed to finish

22     according to the July 10 schedule?

23          THE WITNESS:  It's the difference between when

24     it was originally supposed to finish versus, in this

25     particular schedule, when it's projected to finish.

1          THE COURT:  I'm sorry, one more time?

2          THE WITNESS:  It's always based against the

3   original finish date versus -- right now this is in July.

4   They're projecting, they're not sure yet on all these

5   activities.  They're projecting a new finish day.

6          MR. KAPLAN:  This is September 1.

7          THE WITNESS:  In some cases, it's still a

8   projection.

9          All these items down here, they haven't been

10  done yet, so all these dates are projections.  Where

11  there's blue lines is where it actually finished versus

12  where it was planned to be finished.

13          THE COURT:  The beginning point is what date?

14          THE WITNESS:  The original completion date

15  versus actual completion date.  Original bid schedule

16  completion date.

17          THE COURT:  Bid schedule completion date.

18  Everybody understands that the same way?

19          MR. KAPLAN:  You say bid schedule; I think it's

20  contract schedule.

21          THE WITNESS:  Contract schedule.  I'm sorry, I

22  misspoke.  The first schedule as of the signing of the

23  contract.

24          THE COURT:  That's the contract that we've been

25  spending a lot of time looking at.

1          MR. KAPLAN:  Exhibit 12.

2          THE COURT:  Exhibit 12, okay.

3

4                    RECROSS-EXAMINATION

5   BY MR. HUG:

6   Q.   Mr. Flynn, there are these little a's that appear on

7   the dates on the current finish?

8   A.   Actual.

9   Q.   That's actual.

10         So if you look down here on the bottom, they don't

11  have a's?

12  A.   That means planned.

13          MR. HUG:  Judge, when you're looking at this at

14  some later time, that's helpful.

15  A.   That's the way it's done when it's actual or it's got

16  a blue line.

17          THE COURT:  All right.  Great.

18          MR. HUG:  Actually, Mr. Kaplan explained it to

19  me.  If you get confused about when the snapshot is, this

20  has 9/1 here, I'm not sure if the actual one he has has

21  that.

22          MR. KAPLAN:  I'm not sure either.

23          MR. HUG:  But there's this line here.  And

24  that's what they call in the construction industry the

25  data date.  That's effectively 9/1/10.

 1              THE COURT:  That was explained, I understand

 2    that.

 3              MR. HUG:  You understand that, okay.

 4              THE WITNESS:  They all do have a dot.  Remember

 5    you were asking?

 6              THE COURT:  Yes.

 7              THE WITNESS:  They all do.

 8              THE COURT:  I understand that as well.

 9              Just a couple of other questions.

10              The July 21 meeting.

11              THE WITNESS:  Yes, sir.

12              THE COURT:  I want to make sure I'm

13    understanding your testimony, as we've heard about it

14    twice.  Were you aware of Section 5.4 of the contract?

15              THE WITNESS:  As I was sitting in that meeting,

16    no.

17              THE COURT:  Does that mean you had no idea that

18    there was any such requirement in the contract or are you

19    saying you didn't know specifically of that specific

20    contractual provision?

21              THE WITNESS:  I wasn't sure that particular

22    section applied.  The contract was very confusing.  There

23    are a whole host of sections that have to do with the

24    topic.  And I wasn't completely sure what section applied,

25    what didn't apply.

1          THE COURT:  Okay.  Would it be fair to say that

2     you were not aware that there was any kind of written

3     notice of claim within three days requirement that

4     Section 5.4 suggests?

5          THE WITNESS:  Correct, Your Honor.

6          THE COURT:  Was there any discussion between you

7     and other members of the company about putting together at

8     an earlier date than you did notice of claim, written

9     notice of claim?

10         THE WITNESS:  In early September we, through

11    Cliff Clauson, told them on the project that we were -- we

12    had in fact been harmed, we were in fact auditing our

13    labor, and that as soon as we could get hard numbers, we

14    would be forwarding it to them.

15         THE COURT:  Okay.  Your claim in this case

16    concerns only labor overruns for Phase 3; is that right?

17         THE WITNESS:  Correct.

18         THE COURT:  Is that because Pike did not cause

19    any labor overruns as to Phase 4 or Phase 2 or other

20    phases in the project?

21         THE WITNESS:  No, it's because initially -- in

22    retrospect, we probably should have put a claim in for the

23    whole job, but we didn't.  We felt as though Phase 3 was

24    just -- and we're in Phase 3 at that point in time, we

25    felt as though that was the only opportunity we were going

1   to have because we were already in Phase 3.  Phase 2 was

2   done and behind us, for the most part.  And we just

3   decided -- we made a business decision, but at the time

4   that we were dealing with Phase 3, that that's what we

5   would only pursue, Phase 3.  But we had the same issues,

6   you know -- we had very similar issues on other parts of

7   the job.

8              THE COURT:  So your view is that any labor

9   overruns that you had throughout the whole job was Pike's

10  fault?

11             THE WITNESS:  Yeah.  I mean, there's not a

12  letter in the file anywhere that says you're not managing

13  the job right, you're not doing this right, that right.

14  Yes, at times they did say need more men, but you hear

15  that all the time.  There was never any specific instance

16  that I'm aware of ever where we did not man the job when

17  we were supposed to and do the work.  It was just the way

18  it was run.  It was terrible.  The whole job wasn't

19  coordinated right.  It was a mess.

20             THE COURT:  Now, was there a reason during

21  Phase 4, for example, that you would have needed to put

22  more men on because the kids are already back in?

23             THE WITNESS:  No.  No.  The only inefficiencies

24  that we may have incurred on the other phases were just

25  having to go back to areas that we should have been able

1    to finish the work, hopscotching around, things of that

2    nature.  It wasn't -- to the degree that we were harmed in

3    Phase 3, there wasn't that sort of harm in the other

4    phases.  It was minimal.

5              THE COURT:  There was harm -- to the extent

6    there was harm in other phases, it was minimal?

7              THE WITNESS:  It was minimal compared to

8    Phase 3.

9              THE COURT:  Can you look at Exhibit 43 for a

10   second?

11             THE WITNESS:  Sure.

12             THE COURT:  And I guess this is on the second

13   page of 43, it's the Labor Hours Report, it looks like a

14   printout from the company July 26 --

15             THE WITNESS:  Yes, sir.

16             THE COURT:  -- 2011.  I see where the labor

17   number of hours of 4,930 is derived from.  Do you see on

18   the middle of the sheet towards the right side 4930?

19             THE WITNESS:  Are you at this one here, Judge?

20             THE COURT:  Go to the second page.

21             THE WITNESS:  Second page.

22             THE COURT:  So-called Labor Hours Report.

23             THE WITNESS:  Right.  Estimating hours, actual,

24   so forth, yes.

25             THE COURT:  There's been lots of testimony about

1    how these figures came in.  I see that the figure for

2    4,930.27 for labor hours overrun, do you see that?

3              On the right side there's a lot of numbers

4    there.  I'm going to walk over and point you to it.  It's

5    right there (indicating).

6              THE WITNESS:  Okay.

7              THE COURT:  See how that ties in to your first

8    page of this exhibit, total ECI labor overrun?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Okay.  As I look at the exhibit and

11   look down a little further for the bottom of the page on

12   Phase 4 West --

13             THE WITNESS:  Yes, Your Honor.

14             THE COURT:  -- it appears that for the items of

15   branch conduit and branch wire that there was a very large

16   not minimal overrun of hours there, isn't there?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  From the estimated hours of 1,045 up

19   to 1,417 branch conduit and for branch wire from 670 up to

20   1,175.  So one's about 50 percent, the other is almost

21   100 percent increase.

22             I guess I'm curious how that's reconciled with

23   the statement that the problems were minimal in Phase 4,

24   first of all, and secondly, really what to make of the

25   fact that there was such a large overrun in this Phase 4

1  area of I guess it's nearly a thousand hours that you

2  haven't made a claim for.

3          THE WITNESS:  Because at that point, Phase 4,

4  we'd already put a claim in for Phase 3.  We're already

5  battling them for the Phase 3.  We're also looking at the

6  overall project.  If you pull Phase 3 out and look at the

7  overall project, there was some positives in some of the

8  other phases that offset Phase 4.  We just decided that

9  the one battle was enough.  In retrospect, should we have

10  filed a claim for Phase 4?  Maybe.  Possibly we should

11  have.  We virtually talked about this and decided we only

12  wanted to do the one battle.

13          THE COURT:  Okay.

14          Follow-up questions?  That's all for me.

15          MR. HUG:  I've been instructed to sit down by my

16  colleague.  No questions, Your Honor.

17          MR. KAPLAN:  May I just have a moment, please,

18  Your Honor?

19          THE COURT:  Certainly.

20          While you're taking that moment, it occurred to

21  me one more question that I had been thinking about.  If I

22  may have leave of counsel.

23          MR. KAPLAN:  Absolutely.

24          MR. HUG:  You may.  You don't need it, but you

25  may.

1           THE COURT:  I had asked earlier about the use of

2     the wage rate.  You'll see on the first page of Exhibit 43

3     of 81.46 per hour and I understand the reason that's what

4     would have been charged had it been change order.  Have

5     you calculated what the company actually spent as opposed

6     to what it would have gotten if it had been able to charge

7     all these extra hours as a change order?

8           THE WITNESS:  I believe that information is in

9     the record somewhere.  I believe it's available.

10          THE COURT:  Do you know what that is or where

11    you could direct me?

12          THE WITNESS:  I don't.

13          THE COURT:  Okay.

14          THE WITNESS:  The actual cost.

15          THE COURT:  I take it the actual cost the

16    company would have outlaid to these subcontractors that

17    had to come in, to the foremen that you had to pull off of

18    other jobs or other workers from other jobs, that would

19    work out to be at a wage rate of less than 81.46 per hour

20    or more?

21          THE WITNESS:  Close.  Close.

22          THE COURT:  It would be close?

23          THE WITNESS:  Yes.

24          THE COURT:  What would be the basis for your

25    view that it's close?

1          THE WITNESS:  Because we added six people who

2    were highly paid foremen and general foremen from ongoing

3    jobs that would have moved that rate up.  Would it get

4    right to the 81?  I'm not sure, Judge.  But it would be in

5    the high 70s, based on the information that I have.

6          THE COURT:  That's my last question.

7          MR. KAPLAN:  I don't have anything further.

8

9              FURTHER RECROSS-EXAMINATION

10   BY MR. HUG:

11   Q.  Sir, could you point me to the document where your

12   actual cost for the additional man hours are?

13   A.  No, that's what I said.  I don't know if it's in the

14   records or not, if there was some kind of report or

15   something out there.  I assumed that you guys would have

16   that, but I don't have it.  And all these volumes, I don't

17   know exactly what you guys have in there and don't have in

18   there.

19   Q.  When you say "you guys," you don't mean Pike, you

20   mean lawyers, right?

21   A.  Right.

22   Q.  Do you know if ECI has that information?

23   A.  At this point in time, I don't know.

24   Q.  Can you tell the Court what that amount is?

25   A.  No, I can't.  I already answered that.

1    Q.   Okay.

2              MR. KAPLAN:  Well, the only point is when we

3    refer to that change order labor sheet that we spent time

4    on, which was exhibit --

5              THE COURT:  Yes.  We saw that.

6              MR. KAPLAN:  Right.  As I went through the

7    testimony with Mr. Flynn, those are actual costs for the

8    various categories of individuals.  I think that's the

9    closest thing we have in the record to show actual cost.

10   As a function of man hours, that's the rate.

11             THE COURT:  All right.

12             Thank you, Mr. Flynn.  You're excused.

13             THE WITNESS:  Thank you, sir.

14             MR. KAPLAN:  We are done with plaintiff's case.

15             THE COURT:  Okay.  Plaintiff rests its case.

16             Defendant Pike Company would like to call its

17   first witness?

18             MR. HUG:  Your Honor, at this point in time,

19   normally or often one would make a motion to dismiss for

20   failure to make a prima facie case.  We believe that that

21   exists here.  However, Your Honor has indicated you want

22   post-trial briefs.  Lawyers spend a lot of times trying to

23   read judges and we fail miserably most of the time.  But

24   I'm going to glean from that that Your Honor needs the

25   parties to marshal the evidence and explain it in total

1   and put the pieces together.  So unless Your Honor invites

2   me to make one, I'm going to assume that I've read the tea

3   leaves, so to speak, to say that you wish us to marshal

4   the evidence.  If you would prefer that we make that

5   motion now, we could.

6           THE COURT:  I don't prefer that you make that

7   motion now.

8           MR. HUG:  So I read the tea leaves.

9           THE COURT:  I would like to hear from more

10  witnesses before making any kind of decision like that and

11  to have the benefit of post-trial briefing.

12          MR. HUG:  Thank you, Your Honor.

13          MS. VENNOS:  The defense calls David Caprio.

14          THE CLERK:  Please remain standing and raise

15  your right hand.

16

17              DAVID CAPRIO,

18       called as a witness, having been first duly

19       sworn, was examined and testified as follows:

20

21          THE CLERK:  Please be seated.

22          Please state your name.

23          THE WITNESS:  David Caprio.

24          THE CLERK:  Please spell your last name.

25          THE WITNESS:  C-A-P-R-I-O.

```
 1              THE CLERK:  Please state your city or town.

 2              THE WITNESS:  I live in Haverhill,

 3    Massachusetts.

 4

 5                      DIRECT EXAMINATION

 6    BY MS. VENNOS:

 7    Q.    Good morning, Mr. Caprio.

 8    A.    Good morning.

 9    Q.    Can you give us a little bit of background about

10    where you work currently?

11    A.    I work at a company called the Chappy Corporation.

12    We're an electrical contracting company in Chelsea,

13    Massachusetts.

14    Q.    All right.

15    A.    I've been there since 1996.

16    Q.    What do you do currently for the Chappy Corporation?

17    A.    Chief estimator.

18    Q.    What does the Chappy Corporation do?

19    A.    We're an electrical construction company specializing

20    in utility-type work, airport lighting systems.  We do

21    pretty much everything.  Not much residential.

22    Q.    All electrical work?

23    A.    Yeah, we do some industrial work, commercial work.

24    Q.    Okay.  And when you say "utility work," can you give

25    a brief description of what that is?
```

1    A.   Underground distribution type jobs.  Like we go on a

2    college campus, for instance, and you would have the

3    distribution to different buildings to bring the power to

4    the different buildings.  That's underground distribution.

5    That's the kind of work we do.

6    Q.   Do you also do interior electrical work?

7    A.   Yes, we yet involved with interior work.

8    Q.   Commercial buildings?

9    A.   Correct.

10   Q.   How long have you been at the Chappy Corporation?

11   A.   July of 1996 is when I started.

12   Q.   And your position there is?  What's the formal title?

13   A.   Chief estimator.

14   Q.   And in your job as an estimator at Chappy

15   Corporation, what does that involve?

16   A.   Well, right now I'm the only estimator now.  We've

17   been downsizing.  We're looking for more estimators to

18   come back because we just lost one.  I do all the

19   estimating and I look at potential jobs that we might want

20   to bid.  Usually bring them in, the plans and specs, look

21   at them quickly, and make a decision as to if it fits with

22   Chappy or not.

23   Q.   All right.  And then you come up with an estimate if

24   you choose to come up with an estimate to do the job?

25   A.   If we decide we're going to bid on this particular

1    project, then I'll make sure I get all the plans and specs

2    and bid documents and start my quantity survey and proceed

3    with my estimate.

4    Q.   Okay.  We'll get to that.

5         Before you were at the Chappy Corporation, where were

6    you employed?

7    A.   When I got out of school, I went to work for a

8    company called Anthony Mancini, Incorporated.  I refer to

9    it as Mancini Electric.  That was in Portland, Maine.

10   Q.   What year would have that have been?

11   A.   I started there in 1973.

12   Q.   And you were there from '73 to '96 then?

13   A.   That's correct.  I left Mancini and went to work for

14   Chappy.

15   Q.   And when you started at Mancini, what did you do

16   first?

17   A.   I actually worked out in the field pulling wire,

18   running pipe, learning the trade, so to speak.

19   Q.   So Mancini was an electrical corporation as well?

20   A.   They were electrical contractor, correct.

21   Q.   Before Mancini, you said you graduated from school.

22   What school did you graduate from?

23   A.   I went to University of Maine, graduated in '73 with

24   a degree in electrical engineering.

25   Q.   At Mancini, you started off as a field worker doing

 1  electrical work.  What type of jobs did Mancini do?

 2  A.   We did lot of commercial, a lot of residential, we

 3  did a number of schools in my time there, office

 4  buildings.

 5  Q.   All right.  And you were in the field for how long

 6  would you say?

 7  A.   Year and a half, maybe a little more.

 8  Q.   And then after a year and a half, did you take on a

 9  different role there?

10  A.   Then I came into the office and started estimating

11  with the owner.  At the time the owner did all the

12  estimating.

13  Q.   Okay.  The name of the owner?

14  A.   Anthony Mancini.

15  Q.   Did you learn estimating essentially on the job then?

16  A.   I learned from him.

17  Q.   How long had he been an estimator?

18  A.   Well, he started his company in 1996 -- excuse me,

19  1966.  And he was the only estimator up until me.

20  Q.   All right.  Is it typical in the industry to be

21  trained as an estimator on the job?

22  A.   I believe so, yes.  Most of the people that I know

23  that do it, that's how they began.

24  Q.   When you were at Mancini, did you do estimation by

25  hand or did you use a software program?

 1   A.   When I started, it was all by hand.  But then we got

 2   into Estimation Inc. was the software program that he

 3   purchased.  That was in the '80s.  I estimated by hand for

 4   a number of years.

 5   Q.   And you mentioned that Mancini had done some schools.

 6   Did you ever provide some estimates for school jobs

 7   yourself?

 8   A.   Oh, yes.  Very first job I estimated was a tiny

 9   addition on an elementary school.

10   Q.   So how many school jobs would you say that you've

11   estimated at Mancini?

12   A.   Wow.  In excess of 50 at least.

13   Q.   And you mentioned that you'd used the software

14   program Estimation while you were at Mancini.  While at

15   Chappy Corporation, did you use a different estimating

16   software?

17   A.   Yes, McCormick Systems.

18   Q.   Have you been trained on McCormick?

19   A.   Yes.  When we get the program in, we had a McCormick

20   rep come to our office for a week and he trained a couple

21   of us.  And they have an annual convention that they have

22   in their home office in Arizona where they do additional

23   training and I've been to that half a dozen times.  Plus

24   if you have a problem, you call them and they have good

25   support service.

1        THE COURT:  That's McCormick?

2        THE WITNESS:  M-C-C-O-R-M-I-C-K.

3   BY MS. VENNOS:

4   Q.   Are you familiar with the software program Conest?

5   A.   Yes, a little bit.  I've seen a demonstration.  And I

6   really believe most -- Conest, McCormick, Estimation,

7   they're all fairly similar.  They all do things a little

8   differently, but the bottom line is they're not too much

9   different, I don't think.

10  Q.   All right.  So if I count correctly, which I'm not

11  the greatest at math, you have about 35 years of

12  experience as estimator for electrical contracting jobs?

13  A.   Yeah, that's -- yes.

14  Q.   Have you ever testified as an expert estimator?

15  A.   No, never.

16       MS. VENNOS:  I'm not sure if the Court wants us

17  to proffer Mr. Caprio as an expert.

18       THE COURT:  That's not really my preference.

19       MR. KAPLAN:  Your Honor, I'd like to be heard on

20  that point.  I'd object to this witness being able to

21  issue expert testimony based on the qualifications he has

22  given.  And I'd like to further voir dire the witness to

23  elaborate on some of the issues I'm concerned with.  May I

24  do that?

25       THE COURT:  Do you have anything else to

 1    establish his expert qualifications, Ms. Vennos, to add

 2    before he's voir dired?

 3                MS. VENNOS:  I don't think so, Your Honor.

 4                MR. KAPLAN:  Can I do it from here?  I don't

 5    want to disrupt Attorney Vennos.

 6                THE COURT:  Sure.

 7

 8                        VOIR DIRE EXAMINATION

 9    BY MR. KAPLAN:

10    Q.   Mr. Caprio, I want to ask you questions about your

11    qualifications.

12         Do you hold any electrical licenses in the state of

13    Connecticut?

14    A.   I do not.

15    Q.   Have you ever been involved in a construction project

16    in the state of Connecticut?

17    A.   Yes.

18    Q.   What?

19    A.   Chappy's done work down at the Groton Navy base.

20    Q.   Okay.

21    A.   Done a couple jobs down there.

22    Q.   Were you involved with that?

23    A.   Not on site, but I helped with some office work on

24    the job.

25    Q.   Were you ever involved with any school construction

1  in Connecticut?

2  A.   No, I have not.

3  Q.   Okay.  Are you familiar with the Connecticut Building

4  Code in your normal practice in your job?

5  A.   No, I would not be.

6  Q.   Are you familiar with the public bidding statutes in

7  the state of Connecticut?

8  A.   No, I'm not.

9  Q.   Are you familiar with the prequalification

10  requirements for contractors in the state of Connecticut

11  on public jobs?

12  A.   I don't know what they are.

13  Q.   Are you familiar with the Connecticut Building Code

14  as it applies to public construction in the state of

15  Connecticut?

16  A.   No, sir.

17  Q.   Are you familiar with the Fire Code of the State of

18  Connecticut as it applies to building projects in the

19  state of Connecticut?

20  A.   No, sir.

21  Q.   Are you familiar with the bid listing requirements

22  for public construction projects in the state of

23  Connecticut?

24  A.   No, sir.

25  Q.   Are you familiar with the bonding requirements for

1  public construction projects in the state of Connecticut?

2  A.   No, I'm not.

3          MR. KAPLAN:  Your Honor, this witness has no

4  familiarity with public construction or electrical

5  construction in the state of Connecticut.  There are

6  specifics about the statutes, there are specific building

7  codes, there are specific fire codes, there are specific

8  electrical codes, all of which obviously apply to a public

9  school project such as this one in the state that all, I

10  would suggest to the Court, is an essential part of being

11  able to intelligently bid a three or four or $5 million

12  electrical job on a public school construction project in

13  the state of Connecticut.  I don't think this witness is

14  qualified to testify as an expert about the bid in this

15  particular project based on his lack of qualifications for

16  the state of Connecticut.  I'm not casting aspersions on

17  his ability to do work in Maine or Massachusetts.  There's

18  no understanding at all of any of the requirements, which

19  there are many that are required for public construction

20  in the state.

21          So I would object to his expert qualifications

22  on those grounds.

23          THE COURT:  Ms. Vennos?

24          MS. VENNOS:  Yes, Your Honor.  If I may ask the

25  witness some follow-up questions?

1        THE COURT:  Sure.  And then maybe address the

2   arguments that are being made by Mr. Kaplan would be

3   great.

4

5             DIRECT EXAMINATION (Resumed)

6   BY MS. VENNOS:

7   Q.   Mr. Caprio, the litany of questions that Mr. Kaplan

8   just asked you, would they have any effect on the way that

9   you develop a bid?

10  A.   Only if Connecticut would have a specific requirement

11  of work that's not covered by the NEC, the national code.

12  Most states are pretty close on the national code, but

13  they may require certain particular things that -- beyond

14  what the NEC does.  I would assume it would be pretty

15  minor, especially on a school-type building.  Not usually

16  anything too particular, like working at a nuclear power

17  plant would have particular things.  School probably

18  wouldn't.

19            MS. VENNOS:  Your Honor, I don't think -- I'm

20  sorry, were you finished?

21  A.   All these items he talked about were more

22  administrative-type things than actual physical work.

23            MS. VENNOS:  Your Honor, if the various items

24  listed by Mr. Kaplan don't affect Mr. Caprio's ability to

25  determine the number of labor hours to do a particular

1  job, it doesn't seem relevant as to whether he can be an

2  expert in this matter.

3          THE COURT:  Mr. Kaplan, I'm not recalling the

4  part of your examination of Mr. Madore concerning his

5  qualifications that focused on the connection between the

6  accuracy of a bid and knowledge of state-specific building

7  codes, fire codes, the other codes that you recalled.  Is

8  that something that you even asked Mr. Madore about?

9          MR. KAPLAN:  All of the witnesses testified as

10  to the scope of work involved.  The fire alarm system has

11  to meet the fire code.  Every state has its own codes.

12  They're not national codes.  They are state-oriented

13  codes.  The witness himself admitted he does not know what

14  Connecticut's particular applications of national codes,

15  which are only for reference, are adopted.  And they're

16  adopted by state statute and regulation.  The fire safety

17  codes, same thing.  The electrical codes, same thing.

18  There are specific codes, there are inspections.

19  Mr. Mathieu talked about, in his review of his records,

20  fire alarm inspections, electrical inspections.  They're

21  just part and parcel --

22          THE COURT:  I accept that there are codes and

23  that's good to have knowledge of those codes.  My

24  recollection of Mr. Madore's testimony largely was that

25  his estimate was based on national estimates in terms of

1    the price that would be used for specific kinds of

2    materials.

3            MR. KAPLAN:  Actually, Mr. Madore extensively

4    talked about the company's use of the units, the labor

5    units which really drove the man hour.  Really, you have

6    the material items and the labor units, and he talked

7    about the historical references on doing these types of

8    projects and that ECI would very carefully adjust, review,

9    factor the units based on their historical experience on

10   these types of projects obviously in the state of

11   Connecticut, obviously meeting our own codes and

12   references.

13           I have a big problem that this witness has never

14   done a public school job in the state of Connecticut.

15   Also, he's given no indication that he's done any public

16   schoolwork anywhere of the scope and size of this project.

17   My main concern is both right now.

18           THE COURT:  I see the concern.

19           I am satisfied that the witness is competent to

20   testify as an expert and that you will be given free

21   latitude to cross-examine on those bases.

22           MR. KAPLAN:  Thank you, Your Honor.

23           THE COURT:  I'll overrule the objection.

24           MS. VENNOS:  Thank you, Your Honor.

25

1    BY MS. VENNOS:

2    Q.   Mr. Caprio, you mentioned earlier when you get a job,

3    you start your quantity table, correct?

4    A.    Correct.

5    Q.   Can you explain, just in general, what you typically

6    do in coming up with an estimate to do a particular job?

7    A.    Well, the very first thing is you look at the general

8    scope of work and go through the drawings to get a feel

9    for the job to find out if you actually want to bid the

10   job.

11        Once we go past that, assuming you want to go ahead

12   and maybe bid the job, then I'll -- you have to read the

13   specs to find out wiring methods and go through the

14   drawings and start my quantity survey.  You have to know

15   how many light fixtures you have, how many panel boards,

16   what size they are, what systems are involved and how

17   you're supposed to wire them, whether you can use flexible

18   wiring or everything has to be in conduit, whatever the

19   method is.  That should all be laid out in the documents

20   as to what you need to do.

21        So then you continue with your quantity survey.  At

22   some point you've done all of that.

23        Generally, at that point what I do is I get -- do

24   like a global view of this whole job.  And compare my

25   quick sit-on-the-box, so to speak, idea of how many man

1    hours I need for this job and compare it to what my

2    computer has come up with.

3    Q.    Now, you mentioned that you would take a look at

4    drawings and specs.  Would you look at the contract as

5    well?

6    A.    You mean other than electrical?

7    Q.    No, I mean the electrical contract, would you take a

8    look at the contract?

9    A.    I'd look at the whole job.

10   Q.    Okay.  Would you look at the schedule to know how

11   long the job was going to take?

12   A.    Oh, yeah, that's a definite.

13   Q.    Once you've done your quantity takeoff, are you

14   saying that -- you mentioned that you would look at what

15   the computer says.  You would input all that information

16   into the software program?

17   A.    Right.

18   Q.    In other words, 5,000 feet of wire -- I'm probably

19   oversimplifying it -- 1,000 feet of this type of conduit,

20   and after you do that, is there -- you mentioned that

21   there's a labor portion of the estimate.  How does that

22   come into play in the software program?

23   A.    Each item is assigned a particular labor unit value.

24   Whether it's an each or per 100 feet or 1000 feet,

25   whatever it is, it's assigned a certain value.

1        Now, most -- I believe most companies will get their

2   software from somebody that already has labor values put

3   in and they will adjust them based on their own

4   experiences.  Sometimes they might think it's a little

5   light.  Sometimes they might think it's a little heavy.

6   And then it also depends on the job, how much are you

7   doing.  There's economies of scale on every job.

8   Q.    In other words, if you're on a compressed schedule,

9   you might raise the number or -- can you give examples?

10              MR. KAPLAN:  I'll object to leading at this

11  point.  Obviously, for introductory purposes leading is

12  fine.  Substantive matters at issue in the case, I ask

13  counsel not lead the witness.

14              MS. VENNOS:  I'm not sure if you're objecting to

15  this particular --

16              MR. KAPLAN:  I'm objecting to the question.

17              THE COURT:  Try the question again and we'll see

18  if it flags another objection.

19              MS. VENNOS:  Sure.

20  BY MS. VENNOS:

21  Q.    With respect to the factors on the labor units you're

22  discussing, could you give us an example of why a labor

23  unit might go up?

24  A.    Well, in our experience, we find that, in our case

25  McCormick has a labor value that we don't think is enough

1    to do that particular item and what they're saying.  We,

2    as a company, have adjusted some of those values.

3    Q.    All right.

4    A.    Like if they assign an hour to do something, we may

5    say, no, you really need about an hour and a quarter to do

6    that or maybe you need three-quarters of an hour.  That's

7    something that I think most companies go through their

8    database and make those adjustments based on their own

9    experiences.

10   Q.    And you do that with your --

11   A.    We have done that for McCormick.

12   Q.    I assume then, after you go through all of your line

13   items and you do your adjustment on the labor rate or the

14   labor factor, then do you come out with a complete

15   estimate in order to do the job?

16   A.    We come up with a number of hours, yeah.  You've got

17   to make sure you get all the quotes on equipment, all your

18   soft costs, your mobilization, demobilization costs,

19   whatever that happens to be.  We also look at how long

20   they give you -- there's always the job's got to be done

21   in a certain amount of time.  Sometimes even within the

22   job there's certain things that have to be done at certain

23   times.  Typically, on a school, a renovation job, there's

24   portions that they want done at a particular time so that

25   the school can use those areas like when school starts,

1    for instance.

2    Q.   All right.  So you've had experience doing estimates

3    with schools then?

4    A.   Yes.

5    Q.   Over like a summer period?

6    A.   Yes.

7    Q.   A ten-week or so period?

8    A.   Well, we've done all kinds of things where you had

9    this area of work that had to be done in the summer so

10   that in September when they start, they'd be ready.  Then

11   we've done things where you've got over the Christmas

12   break things have to be done so that the next semester

13   starting in January they'd be ready.  We've done all kinds

14   of things like that.

15   Q.   So once you've come up with your total number of

16   hours in your estimate, then what do you do?

17   A.   In the end, you're putting everything together.

18   You're making sure you're not missing any quotes.  You're

19   making sure you have all your material done right, all

20   your costing.  But you'd have to look at how long they've

21   given you to do the job, how many men that's going to

22   take.  Do you have the men?  Or do you have to go augment

23   your staff?  You've got to look at how this job is going

24   to progress and can you handle it?  We've done estimates

25   where we get to the end and say, you know, we don't have

1    the people to do this.  And I have done a complete

2    estimate and the day the bid is due, just fold it up and

3    put it away, we can't bid this job.

4    Q.   All right.  Is there any further work that you would

5    do on an estimate once you come up with the total labor

6    hours from the McCormick system?

7    A.   The way we do it is I do my quantity survey, which

8    gives me McCormick.  I do my own sit-on-the-box.  And my

9    owner, Charlie Colbert, he'll do the same thing, he'll

10   take the drawings and go through them and come up with

11   what he thinks.  And he does it a little different.  He

12   says I need a three-man crew for this, two-man crew for

13   this.  He's got his own way he's done it over the years.

14   He's been doing this over 40.

15       Then we'll sit down and now we have really three

16   different labor estimates:  Mine, McCormick's, and his.

17   And we figure out where we want to be.  If we're close, we

18   don't have much discussion.  If there's a big spread, then

19   why is there a spread?  How did you look at it?  How did

20   Charlie look at it?

21   Q.   And then you decide whether or not you're going to

22   bid the job?

23   A.   And we decide -- we make the final decision, yeah,

24   we're actually going to bid this job or no, we're not

25   going to bid this job.  It depends how many people you

1    need, how much work you have at the present time, what's

2    your backlog.  So if we can't support the job, we're just

3    not going to bid it.

4    Q.   Now, if you're lucky enough to win the bid and the

5    company gets the job, are you involved in any way once the

6    work gets under way?

7    A.   Well, I would turn it over to the project manager and

8    tell him what I see in this job, how I look at it.

9    Q.   All right.  And then as work progresses, are you

10   consulted with respect to number of labor hours that are

11   being expected on the job?

12   A.   Oh, yeah.  The project manager -- well, I constantly

13   ask him how are we doing on the job, how are we doing?

14   Well, so far we're right on schedule or he said

15   actually -- unfortunately, it doesn't happen enough --

16   actually, we've done it a little faster than you saw.

17   Generally he says we're running a little bit more, but

18   hopefully it's not too, too bad.

19   Q.   How much do you check in with a project manager on a

20   typical day?

21   A.   Well, I'm constantly asking him how are we doing.

22   Yeah, okay, okay.  But on our jobs, depending how long, we

23   always do a quarterly report.  How much money was spent,

24   how many man hours you used up, how many man hours do you

25   think you need to finish the job from this point.  Not how

1   many man hours are left over in the bid, how many man

2   hours do you think you need to finish.  Project managers

3   always do that.  But that's an official thing.

4        Generally, about every month we'd look at a job and

5   just see if we see any potential problems or something's

6   going haywire.

7   Q.   On school jobs that you've mentioned that you've been

8   involved in, how often would you check in with a project

9   manager?

10  A.   Well, on a normal school job -- as, for instance, say

11  this was a new school where you had constant construction,

12  we would probably once a month look at that.  But on a

13  renovation job where you've got certain areas generally

14  that have to be done at a certain time, we would probably

15  look at it every week and see we should be at this point

16  this week, and the following Monday, did we get there?

17  Why did we not get there?  Or actually, we're a day ahead

18  or two days ahead.  On a renovation job, we generally take

19  a little tighter view of that.

20  Q.   Why did you do that?

21  A.   Well, you got -- you got places where you know you

22  have to be done at a certain time and you got to be done

23  by then.  So if you're falling behind, it's easier to

24  remedy a time you've fallen behind when you're only

25  getting a little bit of time as opposed to getting near

1    the end and all of a sudden say, oh, my God, we need more

2    time.

3              MR. KAPLAN:  Your Honor, I'd object now.  We're

4    getting into areas this witness was not disclosed as an

5    expert.  He was disclosed as an expert concerning the bid

6    for the job, and the only documents that were submitted

7    were his -- some figures he projected about what he

8    believed the bid should have included, nothing to do with

9    managing a project or the recordkeeping during the course

10   of a project, that kind of thing.

11             MS. VENNOS:  I'll move on.

12             THE COURT:  Great.

13   BY MS. VENNOS:

14   Q.   You're familiar with the Kelly Middle School project?

15   A.   Pardon me?

16   Q.   Are you familiar with the Kelly Middle School

17   project?

18   A.   Somewhat.

19   Q.   How did you first get involved with respect to this

20   project?

21   A.   We were asked by Mr. O'Neill from Beacon if we would

22   help him with a labor estimate.

23   Q.   Did you know that the matter was in litigation when

24   you were asked to help out with labor estimate?

25   A.   No.

1    Q.    No?

2    A.    No.

3    Q.    Did you come to an opinion as to the amount of hours

4    that would be required to do a particular phase of the

5    Kelly Middle School project?

6    A.    Yeah.  He sent -- he sent plans and specs and said we

7    need to look at a certain area that he said Phase 3.  And

8    he said these are the rooms in Phase 3, and he needed what

9    I thought would be my estimate if I was bidding that phase

10   of work.

11   Q.    If we can take a look at Exhibit 504.

12         Could you just point out the areas that you were told

13   were Phase 3?

14   A.    Yeah.  It's kind of like this middle section in here.

15   Like there's the gym and locker rooms and classrooms here.

16   This was the cafeteria area.  Library, I remember that.

17   Q.    So you're pointing to all of these areas in

18   Exhibit 504 that have P3?

19   A.    P3.  And then G is gym, LO is locker rooms.

20   Q.    Was it Mr. O'Neill or Mr. Bruno who you were working

21   with?

22   A.    Actually, both of them.

23   Q.    So you said that they provided you with -- I'm sorry,

24   drawings?

25   A.    Yeah.  They e-mailed me plans and specs for this

1    project.

2    Q.   Okay.  Did they provide you with everything you

3    needed in order to come up with an estimate for labor

4    hours, as far as you know?

5    A.   Yes, I believe they did.

6    Q.   And what's; the first thing that you did once you got

7    the documentation from Mr. O'Neill and Mr. Bruno?

8    A.   Just took a quick overview of the areas involved and

9    started my quantity survey.

10   Q.   When you did your quantity survey, did you put it in

11   the McCormick system?

12   A.   Yes.

13   Q.   Did you provide a summary of the information that you

14   input into the McCormick system?

15   A.   I did.

16   Q.   All right.  If I could draw your attention to

17   Defendant's 654.

18            MS. VENNOS:  Your Honor, I think I gave you the

19   document with -- it's off by one number.  I put on 653,

20   but it's 654.

21            THE COURT:  Recent document you gave up?

22            MS. VENNOS:  Yes.

23            THE COURT:  I have a 653, Items and Byproducts?

24            MS. VENNOS:  That's 654, Your Honor.

25            THE COURT:  It should be 654?

```
 1            MS. VENNOS:  Yes.

 2   BY MS. VENNOS:

 3   Q.   Handing you what's been marked as Defendant's

 4   Exhibit 654, could you tell me what that is?

 5   A.   This is my printout from McCormick, all those items

 6   that I would have inputted.

 7   Q.   All right.

 8   A.   It shows an item, the quantity of each item, the unit

 9   price for that particular item, and then the extended

10   price based on the quantity input.

11   Q.   All right.  I need to back up just a little bit.  Do

12   you remember the month and year that Mr. Bruno or

13   Mr. O'Neill contacted you with regard to this particular

14   task?

15   A.   Last fall, I want to say maybe September.

16   Q.   And so do you know approximately when you put your

17   data into Exhibit 654?

18   A.   That would have been September, maybe into October.

19   Q.   2010?

20   A.   '13.

21   Q.   2013.

22        Now, if you look down at the bottom of 654, there's a

23   date of March 6, 2014?

24   A.   Yeah.  That's when this gets printed out.

25   Q.   That's the print date?
```

1    A.    That's the print date.

2    Q.    That's not the date you actually input?

3    A.    No.  This was done last year.

4              MS. VENNOS:  I offer Exhibit 654.

5              MR. KAPLAN:  I object, Your Honor.  And my

6    objection here is tied in to what's the November 19, 2013

7    two-page summary that Mr. Caprio submitted to Mr. O'Neill.

8    We reviewed that before in the motions.  This has not been

9    offered yet, but it's part of the Beacon report.  And it's

10   what Beacon relied on.  It's a two-page summary.

11             These two are taken together and I have to

12   review them together and express my objection on both of

13   these together because there's, I think, serious problems

14   under Rule 26(b) as to the incomplete -- the woefully

15   incomplete nature of this information.  All we got from

16   this witness originally was a two-page letter with hours

17   stating total electrical work, total systems work, and six

18   categories broken down, branch conduit, feeder, et cetera.

19   That's what we got.  Nothing else.  There was no backup,

20   no documentation of any kind.  That was the supposed

21   expert report.  Which, standing alone, doesn't come close

22   to complying with the requirements of 26(b) which, as

23   Your Honor knows, are very explicit.  In a situation like

24   this where someone's doing a detailed bid takeoff, I

25   believe they'd have to show the documentation.

1          THE COURT:  Haven't I already overruled this

2     objection?

3          MR. KAPLAN:  You did.  That was in the motion in

4     limine.  Now we're getting into the exhibit that's been

5     proffered now, which is the only other paper related to

6     Mr. Caprio, the only other paper related to him that's

7     been disclosed.  And all this is is a listing that comes

8     up with 12,193 hours.  That's all that it does.  The hours

9     that he lists in his November 19 report total 10,300

10     hours.  They don't jibe.  They're off by 2,000 hours,

11     roughly.

12          The other problem I have, substantively, there's

13     a breakdown in the November report, branch conduit, light

14     fixtures, each has man hours attached to it as to how many

15     man hours he assigned.  There's no breakdown in what's

16     being offered as 654.

17          If you look at what we've been given as the

18     expert's report, we have these two documents.  We have a

19     summary, which has no backup of any kind, which was the

20     original report, and then we have a table units, which I

21     understand the information, part of what we should have

22     gotten.  But it's nowhere near all of the facts or data

23     considered by the witness because he's already testified

24     that he does his own quantity takeoffs on his own that are

25     separate from what he inputs into the computer.  And this

1    is what the computer spits out and it doesn't correlate to

2    what his report was.  So there's obviously information

3    missing in his approach and his report that we haven't

4    been given.  And I have a problem -- a very serious

5    substantive problem with the documentations and I don't

6    think it meets the criteria of 26(b).  We're in realtime

7    here, we're not in a motion in limine.  We're in realtime.

8    We have the only two pieces of paper supporting the

9    witness.  And they don't comply with the requirements of

10   the Federal Rules.

11            THE COURT:  Ms. Vennos?

12            MS. VENNOS:  Yes, Your Honor.  I disagree with

13   opposing counsel.

14            26(b) requirements require that you provide all

15   the documentation that was relied on by the expert in

16   performing his opinion.  Our 26(a) disclosures certainly

17   did that.  We provided what Mr. Caprio relied on in

18   forming his opinion.

19            Looking at this particular document at issue

20   here, this document was provided to counsel I believe it

21   was in March 2014.  We had extensive motion practice over

22   this issue.  And we offered Mr. Caprio for deposition to

23   explain the discrepancy between Exhibit 654 and what would

24   be Exhibit 649, the difference in the hours.  Opposing

25   counsel did not take us up on that offer.  There is no

1    other documentation to explain it.  It will be

2    explained --

3              THE COURT:  You're going to go into that

4    discrepancy?

5              MS. VENNOS:  Yes, Your Honor.  If counsel chose

6    not to depose Mr. Caprio, I can't make up for that now.

7              THE COURT:  I'm going to overrule the objection,

8    but of course still have latitude to cross-examine the

9    witnesses on those discrepancies or disclosure issues.

10             MR. KAPLAN:  Thank you, Your Honor.

11   BY MS. VENNOS:

12   Q.  Mr. Caprio, turning to Exhibit 654, the first line.

13       I'm just going to do one line, Your Honor, won't

14   belabor the point.

15       If you can go to category -- under the category

16   heading 60 I think it's a comma 001?

17   A.  Yes.

18   Q.  Go across that line and explain what all those

19   numbers are horizontally, please?

20   A.  Well, the 60,001 is just a number that McCormick

21   assigns for a particular item.  In this case, this is

22   something I put in on a temporary database, 60,001 is the

23   first number.  The next is a description of what the item

24   is.  The next column is the quantity of all of those in

25   the whole job, or in this case the whole Phase 3.  And

 1    then the next one is the unit for that item.  In this

 2    case, it was assigned a unit of six hours per 100 of

 3    those.  And then the last one is just extended out to six

 4    hours per 100 for the quantity taken on.

 5    Q.   All right.  And with respect to the six hours per

 6    100, how do you know it's per 100?

 7    A.   The C is per 100.

 8    Q.   It's like a Roman numeral?

 9    A.   Generally E or each, C or 100 or M for 1000.

10    Q.   And then you multiply 867 by 6, divide by 100 and get

11    52.02?

12    A.   Correct.

13    Q.   And that would be 52 hours in order to install 867 --

14    A.   52 man hours total.

15    Q.   To install 867 --

16    A.   Of those items.

17    Q.   -- of the device plates, correct?

18    A.   Correct.

19    Q.   The labor column where it says bid labor?

20    A.   Yes.

21    Q.   It's got the number 6.  Where does that number 6 come

22    from?

23    A.   Either McCormick item or it's an item that Chappy has

24    put in.

25    Q.   All right.  Based on its experience?

1    A.    Correct.

2    Q.    Does McCormick take into account the schedule of the

3    job?

4    A.    I don't know how they could.

5    Q.    All right.  So do you account for the schedule of the

6    job?

7    A.    I look at the schedule, yes.  If I need to adjust

8    something for that job, I will adjust it for that job.

9    Q.    All right.  Can you explain to the Court what you

10   would do to account for a scheduling issue?

11   A.    Well, as a for instance, if you are running a lot of

12   feeder conduits, for instance, all together, you might

13   factor that down from what is in the McCormick database

14   just because of economies of scale.  When you're running

15   things together -- if you're running two of something

16   together, it's not going to take you twice as long as

17   doing one and then doing another one.  Because there's

18   common things that you do within that phase of work.

19   Q.    All right.  So can you -- so you would then take the

20   number from the software program and adjust it down

21   slightly in that instance or you might?

22   A.    I might actually adjust it up if I thought McCormick

23   was too light.

24   Q.    Based on experience?

25   A.    Based on experience.

1  Q.   Now, as counsel noted, the number of hours total

2  to -- does this represent the total number of hours for

3  Phase 3, is that what 654 is?

4  A.   Yes.  In my quick estimate, that's what it is.

5  Q.   So if we look at the last page, you come up with a

6  total of 12,193 hours, correct?

7  A.   Correct.

8  Q.   Now, in responding to Beacon's request that you help

9  them out with this job, did you do anything else with

10 respect to determining the number of hours that you would

11 estimate to bid this job?

12 A.   Beacon asked for number of hours as if I was bidding

13 this job trying to win this job.  So after I input

14 everything and I get out a report, I will look at that

15 whole thing and do my global sit-on-the-box sort of

16 estimate and see where it compares to McCormick.  And in

17 this case, as you can see by the letter that I gave

18 Dennis, there's a significant drop on what I think should

19 have taken for the job versus what McCormick had.  And I

20 would go down to these different items, generally I look

21 at the bigger quantities as they're extended and said do I

22 really need -- is there really that many hours for that?

23 That's too much.  And that's too much.  And that's too

24 much.  And I remember this one in particular, if you go

25 down to wire, there's some metal clad cable items in

1    there.  I said, no, you don't need anywhere near that

2    amount of man hours to do that.

3         So just looking at the whole thing, I came up -- I

4    think if I bid that job to win it, it would have been what

5    I wrote in that letter.

6    Q.   All right.  And you keep referring to this letter.

7    I'm going to draw your attention to Exhibit 649.  If you

8    would turn to Tab A of Exhibit 649, please.

9    A.   Okay.

10   Q.   Can you explain what Exhibit 649 is?

11   A.   This is what I gave to Beacon as my number of hours

12   if I was bidding this job to win this job.  And he asked

13   for these different breakdown of different parts of the

14   job.  So that breakdown is -- there's one, two, three --

15   there's six on the first.  Beacon Construction asked me to

16   give them an idea as to each one of those.  And then the

17   bottom one is systems, fire alarm system or PA system,

18   whatever it happens to be.

19        So that's what I -- if I was bidding this job, if

20   Chappy Corporation was bidding the job, these are the

21   number of hours we would have used --

22   Q.   All right.

23   A.   -- in the bid.

24   Q.   And when you say these are the number of hours, do

25   you mean --

1          THE COURT:  Hold on a second.  This document is

2     not a part of evidence yet?

3          MS. VENNOS:  Not yet.

4          THE COURT:  What I would ask you to do is

5     identify the document with specificity because it's a

6     single letter within a larger document that you've offered

7     here.  I don't understand that you're trying to put the

8     entire Document 649 through this witness.

9          MS. VENNOS:  No, Your Honor.

10          THE COURT:  You just want to put the single

11     letter that represents Tab 3A, as I see it, the letter of

12     November 19, 2013 from David Caprio to Dennis O'Neill; is

13     that correct?

14          MS. VENNOS:  Yes, Your Honor.  Just the two-page

15     letter in that tab.

16          THE COURT:  Are you offering that at this time?

17          MS. VENNOS:  Yes, Your Honor.

18          THE COURT:  Objection to the letter?

19          MR. KAPLAN:  Same objection I expressed before.

20     I reiterate it with an expectation of Your Honor's ruling,

21     but I do reiterate the objection.

22          THE COURT:  I will overrule the objection and

23     I'll ask that this letter -- or I'll ask that during the

24     next break if you identify this letter as a separate

25     exhibit.  Maybe 649-3A, for example.

1          MS. VENNOS:  So it's not confusing with the

2    tabs, sure, Your Honor.

3    BY MS. VENNOS:

4    Q.   Mr. Caprio, looking at the letter November 19, 2013,

5    you indicated that you have total electric work 9,315

6    total man hours, correct?

7    A.   Correct.

8    Q.   Can you explain -- is total electric work all of the

9    pieces that are outlined below that?  In other words, the

10   conduit, the fixtures --

11   A.   Conduit wire, light fixtures, devices, switches,

12   outlets.

13   Q.   Did you include demolition in that as well?

14   A.   Yes.

15   Q.   All right.  And then could you explain what total

16   systems were?

17   A.   Systems would be work needed for the fire alarm

18   system or PA system or CCTV system.

19   Q.   All right.  In forming a bid to do this job, would it

20   be the addition of those hours?

21   A.   Yes.

22   Q.   So you would have 9,315 plus 1,032, and that comes

23   out to 10,347?

24   A.   Correct.  That would have been the total number of

25   hours for everything in that phase that I could think of.

1  Q.   All right.  And that 10,347 is what you came up with

2  after McCormick spit out the 12,000 --

3  A.   Correct.

4  Q.   -- or so hours in the system, correct?

5  A.   Correct.

6  Q.   Do you have any documents that show your calculations

7  from between Exhibit 654 and exhibit what will be -- I'll

8  refer to it as the November 19, 2013 letter?

9  A.   I do not.

10 Q.   Can you just explain specifically how you got from

11 12,000 down to 10,000 or approximately that?

12 A.   Well, back then I would have taken this McCormick

13 printout, gone down all the items and said too much, too

14 much, too much, and looked at the overall work.  And would

15 have come up with those 10,300-plus hours.

16 Q.   All right.  So is it your opinion, then, that 10,347

17 hours is the accurate number of hours that it would take

18 to perform Phase 3 of the project?

19 A.   That would have been my estimate for that, correct.

20 Q.   All right.  And is that to -- are you saying it's

21 exact, it would take 10,347 hours to do Phase 3?

22 A.   Absolutely not.  There's no such thing as an exact

23 estimate.

24 Q.   All right.  So is it within a certain range that your

25 opinion --

```
 1   A.   I would have felt pretty comfortable that that would

 2   have been within 3 or 4 percent.

 3   Q.   All right.  If Beacon came back to you and said can

 4   you do it at 9,000 hours?  Let's go back.  Can you do it

 5   at 8,000 hours?

 6   A.   Not even close.  No.

 7   Q.   You would say no, not taking the job?

 8   A.   Wouldn't take the job.

 9   Q.   8500 -- I'm sorry.  Go up to 8500, would you take

10   job?

11   A.   For me, I wouldn't have taken the job much less than

12   that.

13            THE COURT:  I'm not sure I understand the

14   relevance of this in terms of he said what he thinks the

15   job would require.  I don't see the point.

16            MS. VENNOS:  The point is Mr. Madore estimated

17   somewhere around 7,000 hours.

18            THE COURT:  I know that.  But I don't see what's

19   gained here in terms of the exposition to say, well, would

20   you have taken it at 9500.  I think the point is made.

21            MS. VENNOS:  Thank you, Your Honor.

22   BY MS. VENNOS:

23   Q.   Looking at Exhibit 654, your printout from McCormick,

24   the left-hand side of that McCormick printout is the

25   quantity of materials and equipment, correct?
```

```
1    A.   Correct.

2    Q.   All right.  If you make a profit on your quantities

3    of materials and equipment, does that necessarily mean

4    that your estimate is right on labor hours?

5    A.   I'm not sure what you're talking about.  How you buy

6    material and equipment?

7              THE COURT:  Can you reframe the question?  I

8    didn't understand the question.

9    BY MS. VENNOS:

10   Q.   McCormick comes up with a 12,000-hour estimate,

11   correct?

12   A.   Okay.

13   Q.   If you bid the job and say you make a profit from --

14   your intent is to make a profit on the job, correct?

15   A.   We hope so.

16   Q.   All right.  If you make a profit based on your

17   estimate of the quantities of materials and equipment,

18   does it necessarily mean that you will also make a profit

19   on your labor?

20   A.   No.

21   Q.   Why is that?

22   A.   The number of hours and what you end up paying for

23   your material don't correspond to each other.  If you

24   buy -- if you buy something for $100 and you think it

25   takes two hours, that's fine.  But maybe tomorrow you buy
```

1  that same item for $110 or $90, it still takes you two

2  hours.

3  Q.    All right.  And could be the other way around, right?

4  You could think you're going to buy something at $100 and

5  you wind up buying it for 90?

6  A.    Congratulations to you.

7  Q.    And you could also, in your estimate, think that it's

8  going to take two hours to put in whatever that item is,

9  but it winds up taking four, is that possible?

10 A.    Oh, yeah.  The estimator may think you can do

11 something in a certain time and you get out in the field

12 and have an electrician or apprentice and it takes longer

13 than you thought.

14 Q.    Again, the left-hand column on materials and

15 equipment is -- while the labor is associated with a

16 quantity of materials --

17 A.    Right.

18 Q.    -- it's not necessarily a direct relationship with

19 respect to whether you're going to make a profit on that

20 job, correct?

21 A.    Right.  The labor only corresponds to the quantity,

22 not what you paid for that particular item.

23 Q.    All right.  On your 10,347 hours, did you understand

24 that this job was a ten-week job?

25 A.    Yeah, I knew it was summer, had to be done for the

 1   next school year.

 2   Q.   All right.  I'm going to give you a calculator.

 3        So if you're at 10,347 hours for ten weeks, can

 4   you --

 5   A.   Yeah.

 6   Q.   You probably don't need a calculator for this.  How

 7   many hours is that going to be for a week?

 8   A.   1,035, rounding off.

 9   Q.   Let's assume an eight-hour-a-day shift.  How many

10   hours per day?

11   A.   I go by 40 hours a week, which would be a little more

12   than 25 guys, so to speak.

13   Q.   Let's get to day first.  So ten thousand thirty-five

14   divided by 8?

15   A.   A little over 129.

16   Q.   129 hours per day?

17   A.   .75.

18   Q.   Let's assume a six-day work week.  How many --

19   A.   Divide that one by 6.  21 and a half, roughly.

20   21.56.

21   Q.   Men on the job per day?

22   A.   Right.

23   Q.   Your 10,347 hours for a ten-week job, eight hours a

24   day, six-day work week, how many men does that come out to

25   be?

```
 1    A.    129 should be 172.  I think I misunderstood what you

 2    were saying.

 3    Q.    Does it still come out?

 4    A.    It's 21, 22 guys a week on a six-day week.

 5    Q.    A week or a day?

 6    A.    A day based on the six-day week.  You've got a little

 7    over a thousand hours.  On a 40-hour week, that's a little

 8    over 25 guys, but you're doing six days a week.  So you

 9    would need 21, 22 guys on average.  But that's probably

10    not the way the job went.

11    Q.   All right.

12              MS. VENNOS:  No further questions, Your Honor.

13              MR. KAPLAN:  I have some cross.

14              THE COURT:  Yes, I think you do.  Please

15    proceed.

16              MR. KAPLAN:  If I could have just a moment.

17                  (Pause.)

18

19                    CROSS-EXAMINATION

20    BY MR. KAPLAN:

21    Q.   Hi, Mr. Caprio.

22    A.   Hello.

23    Q.   Again, I went through a little bit of this in my

24    initial questions, I just want to flesh a few things out.

25         You never bid a public construction job in the state
```

```
 1    of Connecticut other than something at the Groton Naval
 2    Base, right?
 3    A.   That's correct.
 4    Q.   Never bid a school job?
 5    A.   Never bid a school job.
 6    Q.   So you never dealt with any of the local things that
 7    go into building a school job in the state of Connecticut,
 8    basically?
 9    A.   That's correct.
10    Q.   Okay.  I want to talk with you about starting sort of
11    at the beginning here.  You were contacted by Beacon,
12    Mr. O'Neill and Mr. Bruno?
13    A.   Correct.
14    Q.   What is Beacon?  What is Beacon?
15    A.   They're --
16    Q.   Who are they?
17    A.   They're a consulting firm that has done work for
18    Chappy in the past.
19    Q.   In what capacity?
20    A.   Helped with schedules, consulting on various claims
21    that we've been going through.
22    Q.   So you know them as a claim consultant?
23    A.   And also they have a construction division.
24    Q.   You've worked with them in preparing your own claims?
25    A.   He's helped us and advised us on some claims.
```

1   Q.   Is that Mr. O'Neill or Mr. Bruno?

2   A.   Mostly Dennis.

3   Q.   Mr. O'Neill?

4   A.   Mr. O'Neill.

5   Q.   When he contacted you originally last fall about this

6   project, you knew he wasn't asking you to bid a job so you

7   could build it, right?

8   A.   Oh, yeah, I knew that.

9   Q.   You knew that you were not entering into a

10  competitive bid that somebody might rely on for real money

11  to hold your company to the line to build the job at a

12  price based on man hours or whatever, right?  That was

13  clear?

14  A.   Yeah.

15  Q.   And you know that Beacon is involved in consulting

16  and litigation business?

17  A.   Correct.

18  Q.   So you knew this involved a claim, right?

19  A.   At the time he -- when he gave us this, I did not

20  know it was -- I didn't know if he was just advising

21  somebody.

22  Q.   Okay.  But you knew you were not going to be

23  submitting this with dollars attached to it in a

24  competitive bid situation?

25  A.   He just asked for labor hours.

```
 1   Q.   Okay.  You described -- you described a process

 2   where -- and I'm going back to my notes.  I want to make

 3   sure I've got this correct.  Normally you go through three

 4   separate processes to estimate a job.  You enter

 5   information into the computer and you get something

 6   similar to this, right?

 7   A.   Yes.

 8   Q.   Which is Exhibit 654.  And you do your own

 9   sit-on-the-box?

10   A.   That's what we call it.

11   Q.   Is that a quantity survey?  Is that the quantity

12   survey?

13   A.   No, this is the quantity survey.

14   Q.   Your own sit-on-the-box, what is that?

15   A.   That's how I look at a job and build it in my mind

16   that it's going to take so many men so many hours to do

17   this work and so many men to do so many hours of that

18   work, and come to a conclusion at the end that I need so

19   many hours.

20   Q.   Okay.  And when you're doing that, are you taking

21   notes, are you marking up plans, are you looking at the

22   specs and doing any kind of takeoffs of any kind?

23   A.   If I'm doing a bid, I will do some notes, yes, if I

24   do a bid we're going to submit.

25   Q.   If you're doing a bid where your company's money is
```

```
 1   involved --

 2   A.   Right.

 3   Q.   -- in the real world of competitive bidding, would

 4   you not be doing takeoffs of plans, actually making notes

 5   and highlighting, and then doing your counts in some kind

 6   of paper form before you enter that information into your

 7   computer software?

 8   A.   Well, I would probably just make some notes on these

 9   sheets --

10   Q.   As you're going along?

11   A.   -- as I go along, too high, take off so many hours.

12   Q.   Let's take a look at Exhibit 64.

13        MS. VENNOS:  Your Honor, objection.  Objection,

14   Your Honor.  He keeps talking over.

15        THE COURT:  Is it 64?

16        MR. KAPLAN:  654.

17        THE COURT:  I thought I heard you say 64.

18        MS. VENNOS:  Opposing counsel keeps talking over

19   the witness as he's finishing his answers.  I ask that he

20   allow the witness to finish.

21        THE COURT:  I'm sure he'll do so.

22        MR. KAPLAN:  Happy to do so.

23   BY MR. KAPLAN:

24   Q.   Look at Exhibit 654.  You called this a quantity

25   survey?
```

1    A.   Yes.

2    Q.   Now, let's go down where you have some significant

3    numbers in the quantity.  Label branch circuit, that's

4    about two, four -- eight down, number 60,007?

5    A.   Right.

6    Q.   The quantity there is 1,786, right?

7    A.   Yes.

8    Q.   How did you come up with -- the computer didn't come

9    up with that quantity, right?

10   A.   I inputted as I went, and it totals out to that.

11   Q.   When you say you inputted as you went, what are you

12   doing to be inputting this as you go?

13   A.   For instance, you got a panel board.  And you have

14   wires that go into that panel board for your different

15   circuits.  Those circuits are supposed to be labeled.

16   This one might have 20, this one 40, this one might have

17   32.

18   Q.   Okay.  And how are you keeping track of those

19   numbers?

20   A.   Well, based on how many devices and how many items

21   you have that you counted.

22   Q.   Are you making notes of your counts as you're going

23   along?

24   A.   If I count up an area, I enter that into the

25   computer.

1  Q.   And if you're going through the entire project, and

2  we'll just use Exhibit 504, and you're doing counts in

3  this case involving 1,786 items, how are you keeping track

4  of what you've counted and what you haven't counted?

5  A.   On my blueprint, I usually highlight different colors

6  for different things.

7  Q.   Okay.  And did you do that here?

8  A.   I'm sure I did.

9  Q.   Where is it?

10  A.   Probably if I still have them, they're at my office.

11         MR. KAPLAN:  I go back to my objection,

12  Your Honor.  We haven't gotten the information this man

13  relied on.  Because if you go through this, and we'll go

14  through some more, number 6108 on this same page --

15         THE COURT:  I just ask you to continue your

16  questioning.

17         MR. KAPLAN:  I will.

18         THE COURT:  I understand the concern you have.

19  If you develop the point more for your question.

20  BY MR. KAPLAN:

21  Q.   Let's go through more of the larger items.  60018, FA

22  enunciation cable, see that entry?

23  A.   Yes.

24  Q.   That's 6,650 items, right?  How did you count those

25  so you could enter those into your computer program?

1    A.   There's a little wheel that we use, a scale wheel

2    that I'm saying, well, you got to run a wire from here to

3    here.

4    Q.   And how do you keep track as you're going through the

5    plans that you've actually counted an area or not counted

6    an area?

7    A.   Same way.  Usually color code everything.

8    Q.   Color code?

9    A.   Yeah.

10   Q.   And then you have --

11   A.   And that would be all down this whole process.

12   Q.   So you're keeping track on another document of how

13   you're doing all of these counts that are then getting

14   entered into the software program, and the software

15   program then produces your quantities?

16   A.   Right.

17   Q.   Okay.  And you have other items with substantial

18   quantities to them.  I'll point a few of them out to the

19   Court.  If we go to page 4 of 9, under branch rough --

20   you've got page 4 of 9, sir?  You have number 900,

21   three-quarter EMT?

22   A.   Correct.

23   Q.   That's 12,562 items.  Right?

24   A.   Right.

25   Q.   Okay.  And then if you go to a few lines down, 1065,

 1   the EMT coupling I think that would be, item 1065?

 2   A.   Yeah, correct.

 3   Q.   Those are individual couplings, right?

 4   A.   Yes.

 5   Q.   Over 6,000 of them --

 6   A.   Correct.

 7   Q.   -- that you've identified.  And then -- I mean, okay.

 8   Let's go to a few more, because I think there are some

 9   that have larger quantities.

10        If we go to page 6, you've got some very large

11   quantities of materials here, do you not, on this page,

12   Mr. Caprio?

13   A.   Yes, this wire is substantial.

14   Q.   82,820 units of the Number 36 item, Category 36?

15   A.   Yes.

16   Q.   And then you'd have other items there in the

17   thousands under feeder wire, right?

18   A.   Correct.

19   Q.   And then when you get to the Romex category, the

20   first one is 48,685?

21   A.   Correct.

22   Q.   So this is not stuff you're just entering from your

23   head into the computer, right?

24   A.   No.

25   Q.   You have to be marking things up, making notes,

 1   keeping track of your counts so that you're doing an

 2   accurate or what you believe to be an accurate estimate of

 3   these various items, correct?

 4   A.   Correct.

 5   Q.   And we've never been given any of that documentation

 6   of how you actually came up with these numbers because you

 7   never provided it, right?

 8   A.   The only thing I've turned over is this and that

 9   letter.

10           MR. KAPLAN:  I repeat my objection.  I ask that

11   Number 654 be stricken.  And I ask that the November

12   report be stricken because we have not been given the

13   underlying documentation and work product required under

14   Rule 26 that we asked for.  I asked for this in December,

15   Your Honor.  If you want, I can give you the letter.  I

16   don't think there's any dispute that I requested this

17   information.  In fact, if I may, I'd like to give you the

18   letter and I'd like to give you the supplemental

19   disclosure that followed that because I think it shows

20   exactly what we were told versus what we did not get.  May

21   I do that?

22           THE COURT:  I guess I want to ask the witness to

23   be more specific about how you kept track of 82,820 on

24   page 6 of 9 on Exhibit 654.  Could you explain that, how

25   you -- what kind of notes you kept to do that number?

1    Because I don't assume you could individually one by one

2    by one on a blueprint account for all this.

3              THE WITNESS:  Yeah, this is a measure of wire.

4    So I used the wheel.

5              THE COURT:  Explain what the wheel is.

6              THE WITNESS:  It's a scale wheel that you set to

7    whatever the scale of the drawing is, corridor to a

8    corridor or something else.  And when you run the wheel

9    from point A to point B, it gives you that distance.  So

10   when you wheel out your branch circuits, for instance,

11   you'll come up with a total for the area that you've done.

12   So I'll put that in.  Then I might go to another area that

13   might have that same item, wheel that off, enter that.

14             When I press the button to get the extension,

15   the McCormick program adds all those and comes up with the

16   total.

17             THE COURT:  Did you make any notations on the

18   blueprint itself that you're running this wheel on?

19             THE WITNESS:  The only thing I typically do is

20   color code, like I have a device, I count the device, I'll

21   color code that something.  When I do wire, I will take an

22   area, do the wheel, and then I will just make a circle or

23   something that I've a done the wire for that area.

24             THE COURT:  Is the wheel a physical device that

25   you role on the blueprint?

1          THE WITNESS:  Yes, has a little wheel -- it's

2     like a pen and has a wheel at the bottom and run it across

3     your blueprint from this point to that point, and it tells

4     you how many feet that is, based on the scale of the

5     drawings.

6          THE COURT:  So that makes the calculation for

7     length of wire?

8          THE WITNESS:  Yes.

9          THE COURT:  I take it you're not using a wheel

10    when you're calculating parts?

11         THE WITNESS:  When I'm counting an individual

12    device, that's a count of one each.

13         THE COURT:  So, for instance, label branch

14    circuit.

15         THE WITNESS:  That's an each.

16         THE COURT:  That's a what?

17         THE WITNESS:  Each.  Each item I've counted

18    them.  I counted that and would be color-coded.

19         THE COURT:  Did you mark that count on the

20    blueprint?

21         THE WITNESS:  I would color code.  That would

22    go, say, a device, for instance, I would color code that

23    that I've counted that device and everything that went

24    with it.

25         THE COURT:  But did you mark up, keep a summary

1    on the blueprint there's this many label branch circuits

2    in this part of the building and this many in the gym and

3    this many in other parts?

4            THE WITNESS:  On this, I would not, no.  No.  I

5    just color code that I've counted that device.

6            THE COURT:  And this blueprint that you used to

7    run the wheel and you did color codes on, where is it?

8            THE WITNESS:  I'm not even sure I still have

9    them.  If I did, they would be at my office.  I did this

10   last year.

11           THE COURT:  Did anybody suggest to you that you

12   keep the blueprints or the work papers?

13           THE WITNESS:  When I was asked by Beacon, I was

14   asked to come up with a number of hours, and I assumed I

15   was -- he was using that to see if he had something that

16   mine would match what he was coming up with.

17           THE COURT:  So for all we know, the blueprint

18   might still be back at your office, you're just not sure?

19           THE WITNESS:  Yeah, I'm not sure.  It could be.

20           MR. KAPLAN:  I'd like to submit the letter and

21   the supplemental disclosure.  I think it's informative

22   here, Your Honor.

23           THE COURT:  Just one more question first.

24           Before today, has anybody ever asked you where's

25   the blueprint?

```
 1                 THE WITNESS:  No.

 2                 THE COURT:  Has anybody asked you do you have

 3     any notes that you've kept your tabulations?

 4                 THE WITNESS:  No.

 5                 MS. VENNOS:  Your Honor, we've asked Mr. Caprio

 6     for all of his documents associated with this case.

 7                 THE COURT:  Hold on a second.

 8                 Mr. Caprio, I'm going to ask you to step down

 9     from the stand and wait outside, please.

10                 (Pause.)

11                 MR. KAPLAN:  May I submit those I've talked

12     about to the Court's attention?

13                 THE COURT:  Yes, please.

14                 MR. KAPLAN:  What I have here -- and I've given

15     this to counsel.  I'm not going to argue what they are,

16     but I'll just show you what they are.  Two here.

17                 THE COURT:  I'll just look at them, thank you.

18                 This is your letter of December 17, 2013 and

19     January 17, 2014.

20                 MR. KAPLAN:  Correct.  The second one from

21     Attorney Vennos is her cover letter with the supplemental

22     disclosure as to this witness of January in response to my

23     letter.  And what's germane, I think, for present

24     purposes.  In the supplemental disclosure is the second

25     page at the top where it says Mr. Caprio performed all of
```

1  his calculations, takeoffs, and tabulations electronically

2  and does not have any notes of such calculations.  So we

3  had asked for all work product, both electronic or paper,

4  back in December.  We got what's Exhibit 654 in March,

5  which is fine.  I don't have a problem with the timing.

6  Mr. Hug and I were working on that.  But that's all we

7  got.  And we were told in the supplemental disclosure that

8  essentially there isn't anything else.

9          THE COURT:  I'll tell you, this looks really

10  amateur in terms of the way that this witness was handled.

11  If the witness is to be credited, he says that nobody ever

12  asked him for his notes -- hear me out on this.  Maybe

13  there's answers to this.  I don't want to jump to

14  conclusions.

15          This issue in terms of what he relied on was the

16  subject of our motions hearing on motions in limine.  It's

17  clearly the subjects of these letters.  This is complex

18  big money stuff.  And this single printout, 654, combined

19  with this letter, the letter of November 19, 2013, just

20  raises all kinds of alarm in practice, I would think, in

21  terms of what one would reasonably expect to get from an

22  expert that you're putting on that you're predicating your

23  case on.

24          I have to say I'm really mystified at the

25  adequacy of inquiry to this witness and the adequacy of

1    the process that this witness followed, keeping in mind

2    the stakes involved in this case.

3              Maybe, Mr. Hug or Ms. Vennos, you could clear

4    this up for me and allay my concerns.

5              MR. HUG:  Yes, Your Honor.

6              First, this was a -- as he testified, this was a

7    blind bid.

8              Attorney Kaplan did request his work papers,

9    calculations, takeoffs, tabulations in reaching various

10   estimates for the categories listed.  That was provided.

11   Actually, what was provided in sequence, I don't think

12   there's a dispute of this, is that there was a piece of

13   the 646, the latest exhibit, that was initially produced

14   because Mr. Caprio was reluctant to produce his work

15   product.  We then prevailed upon him and in March we

16   produced the final document.

17             In terms of the witness's testimony as to us not

18   asking him for documents, I'm mystified by his testimony.

19   I suspect now -- and I know we asked him for it because I

20   was there for it, but also --

21             THE COURT:  If you could particularize that.  Do

22   you have something in writing?

23             MR. HUG:  I'd have to go back and check to see

24   if we did anything --

25             THE COURT:  Do you have a retainer agreement

1    with this witness that would explain what the requisites

2    are for serving as an expert witness and the duty to

3    preserve all notes, just the normal accoutrements that you

4    see in terms of showing the credibility of a witness, much

5    less the fairness to the other side in terms of the

6    ability to cross-examine.

7            MR. HUG:  No, the way this witness was retained,

8    it was retained by Beacon to assist Beacon.  Our letter

9    with Beacon covers all of that.  So this is actually a --

10   Beacon -- you'll see later on Beacon will testify that

11   they relied upon an expert, which we argue they're

12   entitled to do, for a piece of their estimate.

13           Now, what we've heard today, Your Honor, is

14   there's something missing.  And that is the plan

15   specification.  That's not -- there is his work product

16   that is on these plans and specifications, apparently.

17   There is some notations as to when he went through it, he

18   did a color-coded acknowledgment that he's counted that

19   item or that he's measured that wire.  That's what we're

20   talking about is missing here.  What he asked for and what

21   we provided was a detailed list of the plans,

22   specifications and addenda received via email from Beacon

23   Consulting Group.  And I believe in his disclosure and in

24   his statement today, he said he reviewed all of those

25   things.  That the witness did not perceive and understand

1    that his actual methodology for assuring that he counted

2    up all the right fixtures or measured all the right wires

3    is clearly a miscommunication on our part to him or his

4    understanding of what we said which we obviously thought

5    was clear at the time.  But it's not a material issue.

6    It's not as if we're omitting calculations.  We're not

7    omitting any of that.  What we're talking about is his

8    markings on the documents that showed he counted up a

9    fixture, check, counted up wire, check.  That's what he's

10   testified to.

11            So I'm not so sure that that is even covered by

12   the request or that it's at all material to this

13   litigation.

14            You have his quantities.  His quantities are

15   verifiable.  They could present alternative testimony that

16   his quantities for the amount of wire or the amount of

17   whatnot is incorrect.  They can do that by showing the

18   drawings and specifications, their own estimate.  And

19   comparing it to their own estimate.  The only thing that

20   they are missing at this point is a document that has a

21   checkmark on it, effectively.

22            So, as to how this happened, Your Honor, yes,

23   I'm not going to -- that's -- the buck stops here.  But

24   the fact of the matter is that neither the witness nor

25   we -- I can assure you, Your Honor, we didn't hold back

1    anything intentionally.  I would like to make that

2    statement.

3              MR. KAPLAN:  May I --

4              THE COURT:  Just let Mr. Hug finish.

5              MR. KAPLAN:  I'm sorry.

6              MR. HUG:  So the fact that the witness has now

7    disclosed to us this, I'm not sure why he testified nobody

8    told me not to save notes.  I'm mystified at that, not

9    particularly pleased by that.  We'll have to obviously

10   present something that shows that we did do that.  I'm not

11   prepared to do that for you right now since I don't

12   have -- we actually do have access to our e-mail.  We may

13   be able to show that to Your Honor.

14             THE COURT:  We're about to take our lunch break.

15   There might be time to try to gather that information that

16   shows what communications were made to the witness

17   requesting any work papers and blueprints or any markings

18   he may have.  The December 17 letter from Mr. Kaplan quite

19   clearly asked for work papers, doesn't it?

20             MR. HUG:  Actually, there's another

21   communication from Mr. Kaplan a little bit later on on

22   that.  To put it in perspective, it was by e-mail, I

23   think.  You followed up on e-mail several times.  At that

24   point in time I was getting a little bit upset myself with

25   the topic.  And I had -- I personally got involved with

1    it.  I remember running up two flights of stairs to get on

2    a phone call with Mr. Caprio to essentially ream him out

3    for not giving us the documents that he wanted because he

4    was holding them back for proprietary reasons.  I said,

5    "No, no, no, you can't do that.  We disclosed you as an

6    expert in this.  You have to give us that."  I have a

7    vivid recollection, I remember running up two flights of

8    stairs to a colleague's office for that very purpose.

9    There's no question that I asked Mr. Caprio, "You got to

10   give me everything."  Whether I can prove that to you in

11   writing or not, I have no idea where he's going on the

12   testimony.

13           But Mr. Kaplan, yes, he did make it clear that

14   he wanted those documents and, yes, I did make it clear to

15   the witness.  I can only surmise that the witness -- and I

16   think I'm fairly certain of this -- surmises you don't

17   want my documents where I just counted the stuff, do you?

18   You want my materials.  That's what I think he made his

19   own judgment call on that.

20           That's all I have.  That's all there is.

21           THE COURT:  It will be helpful to get any more

22   documents that shed light on what was communicated to the

23   witness in terms of preserving or producing any kind of

24   work product papers at this point because it's hard to

25   know, absent even seeing those, that blueprint that may or

1    may not exist, whether in fact there are more tabulations

2    and the like that went into his calculation given that

3    already, according to your own account, this is a witness

4    who had difficulty following instructions.

5            MR. HUG:  I don't think he has difficulty

6    following instructions; he has difficulty disclosing what

7    he deems confidential information.

8            THE COURT:  I do want to take a lunch break.

9            Mr. Kaplan, do you have anything else to add?

10           MR. KAPLAN:  Very succinctly, nothing at all

11   about Mr. Hug's professional integrity.  Nothing.  I have

12   the greatest respect for Mr. Hug.  I have no doubt that he

13   was not -- or Attorney Vennos, nothing that they were up

14   to shenanigans.  I say that professionally and personally.

15           THE COURT:  And I also do not -- I feel that

16   there was not an adequate inquiry made of this witness, I

17   certainly feel that.  And that this witness was not

18   handled appropriately given what we heard here, but I

19   certainly do not think there's remotely anything

20   intentional in terms of the issues here.

21           MR. KAPLAN:  I have a material concern,

22   Your Honor.  On the very specific request I made in

23   December, it was for a reason.  And I think, as you know

24   from having sat here for a number of days and absorbed the

25   testimony about bidding and estimating, the takeoffs, what

1    you include, these are germane to coming up with these

2    types of numbers.  They go to the heart of it.  ECI's

3    exhibits, there's voluminous notes and takeoffs and those

4    kinds of things.  That's not even everything they did.

5           So that's why I asked for it, because it was

6    germane.  We didn't get it.  So it really is extremely

7    prejudicial on just a substantive level of dealing with

8    that summary and how it was done and how you approach it

9    and, you know, what the problems are with that.

10          THE COURT:  Okay.  I understand that.

11          MR. KAPLAN:  I'm sure you know.

12          MR. HUG:  Thank you for the comments, but I

13   don't agree with that.  There's no substantive issue here

14   at all.  It may be a crisis in confidence of the Court,

15   but we're talking about a document that's missing that

16   says check off here, check off here.  That's the only

17   thing that's been disclosed that is missing.  If there's

18   other documents that he thinks are missing and he has

19   other things, well, that would be further concern.  But

20   I'm not talking about anything substantive here.  They

21   have his totals.  The way he went about doing his job and

22   color-coding, I don't understand how that's substantive at

23   all.  It's a number, did he count right.

24          MR. KAPLAN:  Simple example.  If he color-coded

25   something which is not in Phase 3 because he thought it

```
 1   was in Phase 3, you get extra stuff and then you get extra

 2   man hours.  We don't know.  That's one possible point that

 3   would have been --

 4           MR. HUG:  But they could bring that out by

 5   showing a different quantity which, by the way, they

 6   can't.  Because they are correct quantities.  We compared

 7   them.

 8           THE COURT:  Okay.  We're going to take our break

 9   now at this time.

10           I'm going to ask you, Mr. Kaplan, when we're

11   back, to continue your cross-examination.

12           I'm not going to rule and preclude this witness

13   at this time.  I'm certainly going to take into

14   consideration the issues that you've raised about that for

15   further consideration, assuming you make a motion to

16   strike the testimony of this witness, but the witness is

17   here, so I'm going to ask you to continue your

18   cross-examination.  And then we will see, in light of what

19   may further develop in terms of what the witness has, this

20   blueprint or any other work papers at all exist out there,

21   it's clear we want this witness to go back to the drawing

22   board to look and conduct that inquiry so that we have a

23   full record.

24           MR. KAPLAN:  That motion to preclude should be

25   in writing or can I state it orally after the break?
```

 1            THE COURT:  You made a motion to preclude.  This

 2   will be -- we're not finishing the trial this week, as we

 3   know.  So there will be time to continue discussion and

 4   consideration of this topic.

 5            I'd like the witness to continue.  He's here

 6   now, we should have cross-examination, finish your

 7   cross-examination of the witness.

 8            MR. KAPLAN:  I will.

 9            THE COURT:  And make all the points that you

10   wish to make concerning this witness.

11            MR. KAPLAN:  Okay.

12            THE COURT:  And we'll have more information

13   concerning what was communicated to this witness in terms

14   of keeping records and producing records and disclosing

15   records.

16            MR. HUG:  Did you want him to produce those

17   records if he has them?

18            THE COURT:  Certainly.

19            MR. HUG:  I mean --

20            THE COURT:  Absolutely.

21            MR. HUG:  Well, that's fine.  He is going to be

22   done.  I don't think Mr. --

23            THE COURT:  He's going to be done today?

24            MR. HUG:  I may have to recall him.

25            THE COURT:  I don't know exactly how we'll go

 1    about this.  Let's get a fuller record of what was

 2    communicated to him, what efforts he made.  Maybe that's

 3    one of the options that's out there.

 4              MR. HUG:  Okay.  We'll do that.

 5              I don't know, Your Honor, if we'll be able to

 6    get into our system and be able to get everything before

 7    the beginning of the next session.

 8              THE COURT:  Do what you can.  Do what you can to

 9    illuminate.  Certainly you'll have some time at the end of

10    the day since we're stopping at 3:00 p.m.  I assume when

11    the cross-examination is done, you'll have your next

12    witness to go?

13              MR. HUG:  Yes, he's here.  He's in the area.

14              THE COURT:  Great.

15              Let's take a break until 1:10.  See you at 1:10.

16              MR. KAPLAN:  Thank you, Your Honor.

17              THE COURT:  Stand in recess.

18                   (Whereupon, a recess followed.)

19

20              THE COURT:  All right.  Are we ready to proceed

21    with continued cross-examination?

22              MR. KAPLAN:  Yes, sir.

23              THE COURT:  Mr. Caprio, I remind you you're

24    still under oath.

25              THE WITNESS:  Yes.

1           THE COURT:   Thank you.

2    BY MR. KAPLAN:

3    Q.   Mr. Caprio, if we can get back to your Exhibit 654

4    and then also your two-page letter which for now we're

5    calling Tab 3A of Exhibit 649, November 19, 2013 letter.

6         You have a couple of things.  Your total man hours

7    that Attorney Vennos wrote down that's based on your

8    letter of November is 10,347 hours?

9    A.   Correct.

10   Q.   That is not reflected in any way in Exhibit 654, a

11   different total number?

12   A.   Correct.

13   Q.   And I understand that you would say that the 10,347

14   is a subset as part of the numbers in Exhibit 654, right?

15   A.   Okay.

16   Q.   That's what it is, right?

17   A.   Yes.

18   Q.   There's no document, there's no table, there's no

19   calculation that shows how you got from the number --

20   A.   From here to there, no.

21   Q.   I'm sorry?

22   A.   There's none that shows how I not from 12 to 10,

23   right.

24   Q.   And you also have a breakdown in your November 2013

25   letter of the various -- some various categories that you

```
 1   said Mr. O'Neill gave you?

 2   A.   Right.

 3   Q.   Like branch conduit?

 4   A.   Yeah.

 5   Q.   And there's hours allocated to those categories.

 6   Again, there's nothing in Exhibit 654 that shows how you

 7   got to those breakout numbers, right?

 8   A.   Correct.

 9   Q.   All right.  And when you did your reduction from

10   Exhibit 654 to Exhibit -- to the lower number, you did

11   that sort of intuitively, right?

12   A.   Yes.

13   Q.   Wasn't a real systematic process?

14   A.   Right.

15   Q.   You sort of did it what you felt the right number

16   would be?

17   A.   Correct.

18   Q.   And you did that, although you've never competitively

19   bid a school job in Connecticut?

20   A.   Correct.

21   Q.   Now, let's go to Exhibit 654.  You've got items

22   listed under various as -- line items, different things

23   that you have to put in the job, install on the job.  And

24   then you have quantities that we discussed already how you

25   did your takeoffs.  I don't want to necessarily go back to
```

```
 1    that.

 2         Then you had your big labor units?

 3    A.   Right.

 4    Q.   And then by multiplying your quantities and your

 5    labor units, that's how you came up with your man hours,

 6    you total them up, that's how you came up with total

 7    amount?

 8    A.   Yes.

 9    Q.   You'd agree with me, right, that if your quantity was

10    either too high or too low for a line item, it's going to

11    result in the man hours being too high or --

12    A.   If the quantity's incorrect, the man hours is going

13    to be.

14    Q.   If you went through the whole study and there was

15    some significant overruns in your quantity counts, your

16    man hours would be too high, right?

17    A.   Okay.  Correct.

18    Q.   Would you agree?

19    A.   Yes.

20    Q.   By the same token, these big labor units that you're

21    using, the very first one is 6 per 100, so that would be

22    .06 times the quantity of 867, and that's how you came up

23    with 52.02?

24    A.   Right.

25    Q.   And so forth and so on.
```

1      If those labor units were too high or too low for the

2   particular project involved or that particular item in

3   that project, your bid to be too high or too low, right --

4   A.   Right.

5   Q.   -- by the same approach?

6   A.   Correct.

7   Q.   Let's look at the labor units.  You say you got these

8   from your software system, that were in your software

9   system at least for starters, right?

10  A.   Correct.

11  Q.   And did you go through any of these for purposes of

12  this calculation and make any specific adjustments on any

13  of these labor units on any of these pages?

14  A.   The first two pages that start with 60,000 --

15  Q.   Yes.

16  A.   -- those would have been adjusting labor units that I

17  used for this particular job.

18  Q.   For this particular job.  Go ahead, would you explain

19  how you adjusted that?

20  A.   Just these are units based on experience, past

21  experiences on jobs where we've used things like this.

22  Q.   You've never done a school job in Connecticut -- hold

23  on, please.  So what adjustments are you making that are

24  germane to the Kelly Middle School in Norwich,

25  Connecticut?

 1   A.   These are based on other school work or other

 2   commercial work we've done that have these items.

 3   Q.   When was the last time you did a $3.7 million

 4   competitively bid public school project for Chappy Corp.?

 5   A.   Been quite a while.

 6   Q.   What's quite a while?

 7   A.   Probably ten years.

 8   Q.   Okay.  Do you remember what the project was?

 9   A.   A building down in UMass Dartmouth in Massachusetts.

10   Q.   UMass?

11   A.   UMass Dartmouth.

12   Q.   College campus?

13   A.   Yes.

14   Q.   What kind of building?

15   A.   It was a renovation job.

16   Q.   Of what?

17   A.   What do you mean of what?

18   Q.   What kind of building?  A dorm?  A garage?  What kind

19   of building?

20   A.   Classrooms, library, office.

21   Q.   That was at least ten years ago?

22   A.   It was quite awhile ago, yes.

23   Q.   So would you agree with me whatever adjustments, up

24   or down, one would make to bid the Kelly Middle School

25   project in 2009 in Norwich, Connecticut might be different

1    than the adjustments you might have made ten years earlier

2    for the UMass Dartmouth job?

3    A.   Could be, yes.

4    Q.   Because you want to make adjustments in realtime,

5    right?

6    A.   I'm putting down figures that I think I would bid

7    this job at if I were bidding it.

8    Q.   That's based on current experience.  You want to base

9    jobs based on what's going on this year, maybe last year,

10   things that are happening, not ten years or more ago,

11   right?

12   A.   Try to be up to date, yes.

13   Q.   You want to be, because estimating is a moving

14   target, isn't it?

15   A.   You try to be as current as possible.

16   Q.   Okay.  Did you look at prevailing wage rates for this

17   job to figure out how to bid?

18   A.   No, because I wasn't involved with dollars.

19   Q.   Okay.  But this translates to dollars, doesn't it?

20   If you were bidding this for real, you wouldn't just stop

21   here, you would then have to establish the rate, the

22   hourly rate to apply your bid to come up with a dollar

23   value, right?

24   A.   Correct.

25   Q.   What goes into a prevailing wage job in terms of

1    establishing the dollar value to bid the job out at --

2             MS. VENNOS:  Object.

3             MR. KAPLAN:  I want to finish the question.

4             THE COURT:  Finish the question and we'll hear

5    the objection.

6    BY MR. KAPLAN:

7    Q.    What goes into the prevailing wage rate for -- I'm

8    sorry, let me rephrase that.

9         What goes into the dollar value or the hourly rate

10   you're going to use to bid a job in 2010 for a public

11   school in Connecticut?

12            MS. VENNOS:  Objection, Your Honor.  This goes

13   beyond the scope of what Mr. Caprio was disclosed for.  He

14   was disclosed with respect to hours required for the

15   Phase 3 work.  He was not asked to do anything with

16   respect to financial issues with respect to how much it

17   would cost to do the job.  Just the hours is what he was

18   asked to do.

19            THE COURT:  Okay.

20            Response?

21            MR. KAPLAN:  They're integrally related because

22   if you change the rate, it affects what the bid value is.

23   You could have 12,000 hours and bid $50.  You could have

24   10,000 hours and bid $60 and come out to the same amount.

25   There's nothing fixed about the hourly rates that bidders

1    use in their bids.  And it also goes to this witness's

2    knowledge or lack thereof of public bidding, his

3    familiarity with prevailing wage rates and how they're

4    used for bidding purposes.

5              THE COURT:  I will overrule the objection.

6    BY MR. KAPLAN:

7    Q.   So the question, I think, if I can capture it

8    properly, was:  What goes into establishing your hourly

9    rate that you use for your bid on a public construction

10   job in Connecticut in 2010?

11   A.   I would assume that the prevailing wage rates to be

12   used on the job are part of the documents.

13   Q.   Okay.

14   A.   Usually have a wage rate that tells you whatever

15   trades you're working has to pay an electrician a certain

16   amount and then you have apprentices and depends on what

17   step apprentice, they get a certain percentage of that

18   rate.  And any fringes that may go along with that.

19   Q.   Okay.  So you get that information and what do you do

20   with it?

21   A.   Then you look at the number of hours and you figure

22   how many of those hours you're going to have the

23   electrician do and how many you're going to have the

24   apprentice do, and there's certain ratios you can use,

25   maybe two apprentices to three electricians or one

1    apprentice to one electrician, however the rate,

2    prevailing wage rate tells you.

3    Q.   Do you bid prevailing wage jobs very frequently?

4    A.   We bid prevailing wages quite a bit because we do a

5    lot of federal government work.

6    Q.   Do you ever look at the relationship of the wage rate

7    you're using for your bid and the man hours you're

8    carrying in the bid?  Do you look at how they work out for

9    a total bid number?  Because you've got to multiply one

10   times the other to come up with your bid, right?

11   A.   Right.

12   Q.   Do you ever adjust your rate or adjust your hours as

13   it interplays with the other part of that equation, the

14   hours or the rate?

15   A.   We don't base the number of hours based on the rate

16   we have to pay.

17   Q.   Like for here you reduced your estimated hours by --

18   A.   Yeah.

19   Q.   -- 1800 or something like that?

20   A.   That had nothing to do with what a rate would have

21   been.

22   Q.   Why did you reduce it?

23   A.   Because I felt that this came out with a number that

24   was too high if I wanted to win that job.

25   Q.   If you wanted to win the job.  Winning the job means

1    you're submitting a monetary bid at a dollar value?

2    A.   Right.

3    Q.   So if you wanted to win the job, you could use a

4    lower rate to come up with a lower monetary value?

5    A.   You can't.  You have to pay the rate --

6    Q.   I'm not saying you don't pay the rate.

7              THE COURT:  Hold on.  Just let him finish his

8    answer.

9    A.   When we bid a job that has prevailing wage rate

10   posting, we figure out what the percentage of journeymen

11   and apprentices are going to be, how many hours of each,

12   and just multiply by the rate we have to pay.

13   BY MR. KAPLAN:

14   Q.   Okay.  You said you had made adjustments for the

15   rates on the first two pages, the labor rates the first

16   two pages?

17   A.   Yes.

18   Q.   And do you have any record of what you were adjusting

19   it from?  In other words, there's no column here that

20   shows an adjustment or a factoring column of what you

21   factored or what the percentage or amount was you were

22   raising or lowering these rates.

23   A.   I plugged these numbers in as I think this is going

24   to take me so long to do this and so long to do that.

25   Q.   So for each line item you were changing the bid labor

1   rate that's in there; is that what you're saying?

2   A.   This is what I think for those line items.

3   Q.   So as you went through this, Exhibit 654, you said if

4   you look in the bid labor column for each of those labor

5   rate numbers, were you individually changing those?

6   A.   I individually input those numbers, yes.

7   Q.   Where did you get that information from?

8   A.   Just how I feel it's going to take that long to do

9   that item.

10  Q.   Okay.

11  A.   It's not --

12  Q.   I'm sorry.

13  A.   It's not something -- these are just for this job.

14  Q.   Okay.  But you said how you feel how long it's going

15  to take to do that item.  What's the -- where is that

16  coming from, just your own head, basically?

17  A.   Past experiences of those line items.  And I could

18  have copied some of them from what McCormick had but

19  changed it anyway if I didn't like what McCormick had.

20  The other ones past those two pages, McCormick values that

21  I think are acceptable.

22  Q.   You didn't make any changes past those two pages?

23  A.   The ones that start on page 3 towards the bottom, it

24  says Category C code wiremold poles.

25  Q.   Yes.

1   A.   All of those items after that are McCormick items

2   that I think would be acceptable for this particular

3   project.

4   Q.   Okay.

5           THE COURT:  I'm sorry, that was page 3?

6   A.   Towards the bottom where it says category C code

7   wiremold poles.  Page 3 of 9.

8           THE COURT:  I'm sorry, I'm on page 4 of 9.

9           Yes, okay.

10          THE WITNESS:  The number starts 6921.

11          THE COURT:  And you didn't adjust any numbers?

12          THE WITNESS:  Those are McCormick numbers from

13   that point on.

14          THE COURT:  There's a column here -- and I'm

15   sorry if I missed this.  Under bid labor, there's a letter

16   like an E or sometimes a C.

17          THE WITNESS:  Okay.

18          THE COURT:  Or an M.  What do those mean?

19          THE WITNESS:  E is each.

20          THE COURT:  Okay.

21          THE WITNESS:  So it's that amount of an hour for

22   each item.

23          C means that number of hours per 100 of that

24   item.

25          And M means that for 1000 of that item.

```
 1   BY MR. KAPLAN:
 2   Q.   Were you aware that when this job was bid, it was bid
 3   as a lump sum bid for the entire work, all of the phases?
 4   Did you know that?
 5   A.   I probably made the assumption.  I was told this is
 6   only one phase of a big job.
 7   Q.   Right.
 8   A.   I didn't know if it was one month for the whole thing
 9   or could have been alternates involved.
10   Q.   Put aside any alternate considerations.  You said
11   that there are considerations in the way you adjust your
12   labor units based on economies of scale, right?
13   A.   Yes.
14   Q.   That means if you do a lot more work, maybe you could
15   be more productive in it, right?
16   A.   Correct.  Possible.
17   Q.   Okay.  And if you're more productive of doing a
18   certain type of work with large quantities, you might
19   reduce the labor unit for that item because you could be
20   achieving a better result, right?
21   A.   Correct.
22   Q.   And if you were bidding a whole job rather than one
23   piece of it, would some of those considerations of
24   economies of scale come into play so that they may affect
25   the labor units you're using for individual items?
```

1    A.    Could.

2    Q.    Could.  But you have no way of knowing that because

3    you didn't look at the entire job?

4    A.    Right.

5    Q.    I'd like to show the witness Exhibit 4, which is in

6    Volume I.  If you'd take the book that's marked Volume I,

7    sir.  If you go to Tab 4 within that book.

8          I'd like to go through some of the items in ECI's bid

9    for Phase 3 and compare them to some of the items you have

10   in Exhibit 654 in your takeoff.

11         So if you have your takeoff at the ready.  If we

12   could look at your takeoff, please, at page 4 of your

13   exhibit and go to your Item Number 1065.

14   A.    Okay.

15   Q.    That's a three-quarter EMT coupling, right?

16   A.    Yes.

17   Q.    You have 6,094 units there?

18   A.    Correct.

19   Q.    Okay.  If you could look at page 4 of 31 in the

20   exhibit you have in front of you.  The page numbers are at

21   the bottom right corner.

22   A.    Yes.

23   Q.    And then if you go to item 3119, you see

24   three-quarter EMT steel coupling, right?

25   A.    Right.

1    Q.   The quantity there is 2,332, right?

2    A.   Correct.

3    Q.   So if that was the only entry in ECI's bid for that

4    item for Phase 3, they would be running at almost 4,000

5    less units than you took off for that particular item,

6    right?

7    A.   Correct.

8    Q.   Okay.  And that, in turn, would drive the labor --

9    forget about the labor unit.  Let's say they used your

10   labor unit.  I'm not looking at that.  But the quantity

11   which drives the labor regardless of whatever unit you use

12   is going to be significantly decreased for that item if

13   you're using almost one-third of the quantity, right?

14   A.   Right.

15   Q.   Okay.  And if we could go to page 2 of 9 of your

16   takeoff and you have item 60027, install 200-amp panel

17   board, right?

18   A.   Correct.

19   Q.   You have 16 of those, correct?

20   A.   Correct.

21   Q.   If we could go to the ECI bid at Exhibit 4 to

22   page 18, if you would look at item 17227, you have 200-amp

23   panel board, one of them, right?

24   A.   Correct.

25   Q.   Okay.  And again, if there's that kind of a

1  difference in the amount of the item, you're going to have

2  a significant difference in the man hours carried for that

3  item, correct?

4  A.   Correct.

5  Q.   If we could go to page 6 of 9 of your takeoff, for

6  your item 57, you have 500 THHN CU stranded, does that

7  identify a type of wire?

8  A.   Yes.

9  Q.   You have 2520 feet, is it?

10  A.   2520, yes.

11  Q.   And if we could look at ECI at page 12 of their bid,

12  their Item Number 7052, you got that?

13  A.   Got that, yes.

14  Q.   They've got 2020.  So they have 500 less units than

15  you did for that, correct?

16  A.   Correct.

17  Q.   Stay at page 6 of 9 of your takeoff and we have two

18  items I'd like you to look at on this page.  You have

19  number 36 and number 48.  Number 36 is 12 THHN CU 82,820

20  units.  That's branch wire?

21  A.   Yes.

22  Q.   And if you look at page 11 of ECI at item 7035,

23  they've got 53,944, right?

24  A.   Correct.

25  Q.   And that's less by almost 30,000 units of that

1    particular item?

2    A.    Correct.

3    Q.    Again, that would mean that there would be a

4    considerably smaller amount of labor involved to do 53 or

5    54,000 feet of that versus 83,000 feet of that, right?

6    A.    Correct.

7    Q.    Okay.  And if we're on that same page of ECI's

8    page 11 at the bottom, number 7042, you have 1 THHN

9    stranded is 419 feet, right?

10   A.    Correct.

11   Q.    And then if we go to your estimate at number 48, I

12   believe, you've got 4,610 of that item, right?

13   A.    Correct.

14   Q.    So the difference there is over 4,000 units, right?

15   A.    Correct.

16   Q.    And again, same idea with the labor, 4,000-unit

17   swing, there's going to be a lot of difference in labor,

18   correct?

19   A.    Yes.

20            THE COURT:  Point of clarification.  Are there

21   possibly double entries, do we know?

22            MR. KAPLAN:  Not to my knowledge.

23            THE COURT:  Do you mind asking about that, just

24   so --

25            MR. KAPLAN:  For this witness?

 1   BY MR. KAPLAN:

 2   Q.   You have single item entries in your exhibit.  Every

 3   item is one item unit, you did not duplicate them on

 4   another line, right?

 5   A.   No.

 6   Q.   Yours is just one item, and for each item you're

 7   doing that?

 8   A.   Yes.

 9            THE COURT:  Thank you.

10   BY MR. KAPLAN:

11   Q.   And just a few more of these.

12        At page 6 of 9 still under your Romex cable for

13   number 438 you have got 12/2 MC CU cable, right?

14   A.   Correct.

15   Q.   You have 48,685 units?

16   A.   Uh-huh.

17   Q.   If we go to page 12 of 31 of ECI and you look at

18   number 7218, for the 12/2 MC cable, you've got

19   17,318 feet, right?

20   A.   Correct.

21   Q.   So there you have a difference of 31,000 units,

22   right?

23   A.   Correct.

24   Q.   Okay.  And in the same page for ECI, number 7231

25   right below that 12/3 MC cable they have 3,204 units,

1    right?

2    A.    Correct.

3    Q.    And then at your page 6 of 9 for that 12/3 cable

4    which is number 439, you have 7900, correct?

5    A.    Correct.

6    Q.    So there's a difference there of 4600 units?

7    A.    Correct.

8    Q.    Okay.  And if we went through this -- you haven't

9    reviewed ECI's bid?

10   A.    No.

11   Q.    There are many more discrepancies in these quantities

12   between what you have and what they have for the same?

13   A.    I'm sure there is, yeah.

14   Q.    Now, if you're wrong and some of your quantities are

15   way high, substantially higher than an accurate count

16   should be for the quantities necessary to do the Phase 3

17   work, that's going to mean your labor quantities are too

18   high, right?

19   A.    That would be correct.

20   Q.    And that your total man hours would then be too high?

21   A.    Total would be high, yes.

22   Q.    And if ECI in doing this work discovered that its

23   quantities carried in its bid were too low, substantially

24   too low, they'd know about it, right?

25   A.    They would.

1   Q.   Any electrical contractor would know, geez, I carried

2   17,000 units for an item, I ended up putting 50,000 units,

3   that's something they'd be aware of, right?

4   A.   Yes.

5   Q.   And if that didn't happen and they didn't overrun

6   their material quantities as bid, it meant that their

7   quantities as bid were correct, right?

8   A.   Probably, yes.

9   Q.   Okay.  Now, are you aware of how many hours ECI

10  actually bid the Phase 3 work at originally?

11  A.   Not until recently.

12  Q.   Okay.  If we use your original estimates in your

13  Exhibit 654 of 12,193, their bid per Exhibit 2 –– sorry.

14  Their bid hours for various exhibits we have for Phase 3

15  was –– I'll round it up, 7600.  It was 7593, it's just

16  easier to say 7600.  So their bid is 7600 hours for

17  Phase 3.  Your equivalent bid, before you reduced it, you

18  actually calculated man hours was the 12,193, right?

19  A.   Correct.

20  Q.   So the difference there is about 4600 hours?  I just

21  did the math, right?  12,193 minus 7600, it's about 4600

22  hours.  That's a swing of well over 50 percent of what ECI

23  bid.  So you're saying in your calculation that they

24  were –– they blew this by over 50 percent of their labor

25  estimate, that's basically what you're saying, right,

1   Mr. Caprio, with your study that's in Exhibit 654?

2   A.   What I was saying is the difference between what they

3   had and that number.

4   Q.   Well, we haven't gotten there.  Based on your

5   detailed takeoff with your adjustments that you said you

6   made on the first two pages?

7   A.   Right.

8   Q.   Based on your experience?

9   A.   Right.

10  Q.   You're estimating line by line counting up everything

11  there is?

12  A.   Right.

13  Q.   You came up with over 12,000 man hours to do Phase 3;

14  they came up with just shy of 7600 hours to do Phase 3.

15  All right.  That's what happened, right?

16       And you then reduced it because you thought it was

17  too high and it had to be reduced, right?

18  A.   Right.

19  Q.   Okay.  Did you ever see the actual bid results here?

20  A.   No.

21  Q.   Did you know that ECI's bid was, total bid was

22  about -- I want to get the exact number.  Where is that?

23  $3,496,000 base bid, did you know that?

24  A.   No.  I don't know what their price is.  I don't know

25  what any bidders' prices were.

1   Q.   But if you're high on just Phase 3, higher on Phase 3

2   by 4600 hours, if we took their 7593 and divided that by

3   your 12,193, there's 63 percent of your hours, right?

4   Just the math.

5   A.   Okay.

6   Q.   And if you took that same ratio for their bid of 3496

7   and divided that by 62 percent, let's say, you got a bid

8   of $5.6 million.  You would have been high of five bidders

9   by $700,000 on this job.  Did you ever look at that?

10  A.   How could I look?  I didn't --

11  Q.   You didn't have any information?

12  A.   I didn't have any information on the total job.  I

13  don't think you can take a phase of work and extrapolate

14  that into a complete job.

15  Q.   But you didn't bid the whole job?

16  A.   Right.  But that's what you're doing.

17  Q.   The job was bid in the entirety, it wasn't bid in

18  phases.  It was bid in the whole job, right?

19  A.   Right.

20          MS. VENNOS:  I'm going to object, Your Honor.

21          THE COURT:  It's probably time to move on on

22  this topic.  I think the point's been made.

23  BY MR. KAPLAN:

24  Q.   One other question or series of questions.  When you

25  do comparative bidding and you have -- do you have people

1    you regularly compete against in competitive bidding?

2    A.   Yes.

3    Q.   Other companies that you come up against a lot?

4    A.   Yes.

5    Q.   What does it mean to leave money on the table on a

6    public bid?

7    A.   Generally the difference in low bid versus second,

8    generally.

9    Q.   And would you agree with me that the best situation

10   in a public bid is when you win that bid by one dollar?

11   A.   That would be great.

12   Q.   That's perfect, right?

13   A.   As good as it gets.

14   Q.   As good as it gets.  And when the number two person

15   is your closest competitor, the guy you're always

16   competing against, correct --

17   A.   Yes.

18   Q.   -- that puts a smile on your face?

19   A.   At bid time it would.

20   Q.   If the job worked out, you'd still be smiling?

21   A.   If it worked out.

22        MS. VENNOS:  Objection.  We're going beyond what

23   Mr. Caprio was disclosed for.  He provided number of hours

24   to do a phase.  He's not here as a public bidding expert

25   or anything like that.

1          THE COURT:  I'm aware of that.  I'll allow it

2    for now.  He has been brought in as an expert as somebody

3    who does this kind of estimation, and I think Mr. Kaplan

4    is allowed to go into his background and knowledge of

5    bidding procedures.

6    BY MR. KAPLAN:

7    Q.   And have you ever been in situations where you were

8    actually second low bidder?

9    A.   Oh, yeah.

10   Q.   One of your regular competitors was lower than you

11   but you got the job anyway?

12   A.   Yes, we've gotten work where we were not the low bid.

13   Q.   You like that, too, right?

14   A.   Uh-huh.

15   Q.   Does that give you confidence in your bid when you're

16   close to your -- a regular competitor, he's actually lower

17   than you but you get the job anyway?

18   A.   It gives you a good feeling going in that you've got

19   a pretty good chance of having a good job.  You wait until

20   the end of the job and see how you made out.

21   Q.   It gives you a pretty good feeling that your bid was

22   accurate, right?

23   A.   It gives you a good feeling that you think you had a

24   good number.  That's all it does.

25          MR. KAPLAN:  Let me check my notes, Your Honor.

1          (Pause.)

2     BY MR. KAPLAN:

3     Q.   One or two other things.  Are you open shop or union

4     shop?

5     A.   Open shop.

6     Q.   When you bid this job, did you take into any

7     consideration the availability of labor in Norwich,

8     Connecticut, if you were going to actually do this job?

9     A.   No.

10    Q.   So you didn't take any pricing factors or labor

11    availability?

12    A.   No.  That's really a money issue as opposed to an

13    hour issue.

14    Q.   And you knew, working with Beacon, that this was not

15    a money bid?

16    A.   All I was asked to do is look at time.

17    Q.   Did they give you any information about their own

18    estimations of man hours for Phase 3?

19         THE COURT:  Who?

20         MR. KAPLAN:  Beacon.

21    A.   I had no idea of anybody's number of hours.

22         MR. KAPLAN:  Thank you.  Nothing further.

23         THE COURT:  Redirect?

24

25

1                    REDIRECT EXAMINATION

2    BY MS. VENNOS:

3    Q.   Mr. Caprio, with respect to the McCormick system, is

4    it up to date with respect to the various rates that it

5    comes up with?

6    A.   Talking about labor rates?

7    Q.   Yes.

8    A.   Yeah, they do updates periodically.

9    Q.   Every what?  How often?  Every so often?

10   A.   Depends on how many they get that change as far as

11   labor goes, which doesn't really change that often.  But

12   usually a couple times a year we'll get an update from

13   McCormick for labor, pricing, we get those periodically.

14   Q.   Do you know where McCormick gets its information?

15   A.   What they do, they have a network of contractors that

16   they periodically go out and survey and ask them for their

17   rates that they're finding in the field for different

18   items.

19   Q.   And then they update?

20   A.   They update their database and send it out.  If you

21   want it, you can incorporate it.

22   Q.   Do you incorporate the updates from McCormick?

23   A.   I generally do, yes.

24   Q.   Are you confident in the quantities that you have in

25   your Exhibit 654?

1    A.   Yes, except I have grouped -- because I wasn't doing

2    a full-blown estimate, I would sort of group like items

3    together and just call them one thing.  For instance, when

4    he was talking about the 200-amp panel board, I only have

5    one.  That's what I call them.  Well, if you look on any

6    estimate, if you were doing legitimate estimate, you would

7    have maybe a 200 and a 225, 150-amp panel board, which I'm

8    sure he does in here.  I just grouped those into one,

9    because I was trying to do something quick and it wasn't

10   really a legitimate bid.  I thought I was trying to

11   confirm what Beacon had.

12   Q.   I'm sorry, could you go back to the panel board

13   issue, which was on page 2 of 654.  It notes you have 16

14   of those, right?  And Mr. Kaplan noted that ECI's

15   estimate, Plaintiff's Exhibit 4, only had one?

16   A.   It only had one of the 200.  But if you look at the

17   other ones, there's 100-amp, there's 150-amp, there's 200,

18   there's a 300 and a 400.

19   Q.   Which page are you on?

20   A.   I'm on page 18 of 31.

21   Q.   So what numbers are you looking at?

22   A.   Down towards the bottom of that page 18, starting at

23   17223.

24   Q.   Okay.

25   A.   Starts with 100-amp panel boards.  And then goes down

1  to 400-amp panel boards.  So he has one, two, three --

2  five different sizes.

3      If you look at my breakdown, I only have two sizes,

4  200-amp and 400-amp.  I just grouped like panel boards

5  together and called them a -- 150-amp panel board and 250

6  is going to take about the same time.

7  Q.  I see.  You're looking at ECI's numbers, Plaintiff's

8  Exhibit 4, which one of those -- which ones of those would

9  be grouped within your 200-amp panel board, 60027?

10 A.  If you look at his total panel boards, he's got 18

11 total panel boards.  And I have -- how many do I have?  I

12 have 18.

13 Q.  You have 18 as well?

14 A.  I have 16 on the line item of 60027.

15 Q.  Right.

16 A.  And I thought further down 60033 there were two more

17 larger panel boards that I have.

18 Q.  So you're at the same number then, correct?

19 A.  We're close to the same number for number of panel

20 boards.

21 Q.  All right.  And what about with respect to the 12

22 THHN item on Exhibit 4 which is on page 11 of 31, 7035 is

23 the cross count.

24 A.  Yeah, okay.  That's part of Grant's.  He wheeled his

25 off or however he measured it and came up with his total

1    length of conduit and wire for that branch circuit and I

2    did the same thing.  But again, I have combined like --

3    anything that's close to that, I combine it.  I mean, he's

4    got 31 pages of breakout.  And I have nine.

5    Q.    Okay.

6    A.    So he's in a lot more detail than am I because he's

7    doing a legitimate bid.  I was doing a quick

8    confirmation-type thing, not really a bid.

9    Q.    When you say a legitimate bid, do you mean a bid

10   that's actually going to be used on a project?

11   A.    His bid is what he, I'm sure, planned on using.  If

12   he won that job, he would be able to turn this over to his

13   project manager and say this is what I got in my bid.

14   Q.    And would your numbers change significantly if you

15   were going to be bidding the job?

16   A.    If I was going to actually bid this job, I would have

17   different values than what you show here and it would have

18   been broken out more.  I would have counted 100-amp panel

19   board, counted 150-amp panel board as opposed to calling

20   them a 200-amp panel board.

21   Q.    You would have broken it out more specifically?

22   A.    I would have ended up with more than nine pages on my

23   extension report.

24   Q.    But for example, with respect to the panel boards,

25   you wouldn't come up with a different number in total,

1   would you?

2   A.   No, number of panel boards would have been correct,

3   at least the way I see it.

4   Q.   With respect to the 7035 cost code, page 11 of

5   Exhibit 4 --

6   A.   What number is that, 7035?

7   Q.   Yes.

8   A.   Yes.

9   Q.   Is there something in your bid other than on page 6

10  of 9 at Category 36 of 12 THHN -- I'm sorry, is there

11  anything in ECI's bid that would add to the 53,944 feet

12  that would be comparable to your total of 82,820?

13  A.   Yes.  If you look at his communication cables

14  starting on page 12 about two-thirds -- maybe

15  three-quarters of the way down, starts with 9 is the first

16  number.  Like 903 -- 9031 on page 12.

17  Q.   Okay.

18  A.   And go to the next page down to 9652.

19  Q.   Okay.  So you're saying --

20  A.   He has all of these different types of cables.  And

21  what I did was sort of just call that conductors and

22  conduit for my assembly that I'd build in the THHN,

23  because the pulling of the cables is fairly similar in my

24  mind.

25  Q.   So some of your categories are essentially

1    combinations of what ECI's breakdown would have been?

2    A.   Correct.  He's done a thorough and a nice breakdown

3    on materials here.  He did what you would do to be able to

4    turn it over to a project manager.

5    Q.   Mr. Kaplan asked you when you did your estimate for

6    labor hours whether you knew at the time it wasn't going

7    to be a bid for a real job involving money?

8    A.   Right.

9    Q.   Would your number of labor hours change if you were

10   going to do a bid for a real job involving money?

11   A.   Probably a little bit on the McCormick.  But I think

12   I would have ended up saying that 10,347 figure would have

13   been about what I would have gone in for that phase.

14   Q.   Okay.  Thank you.

15              MS. VENNOS:  Nothing further.

16              THE COURT:  I have a couple of questions to ask.

17              MR. KAPLAN:  I have one little one.

18              THE COURT:  Go ahead.

19

20                   RECROSS-EXAMINATION

21   BY MR. KAPLAN:

22   Q.   You said I was trying to do something quick and it

23   wasn't really a legitimate bid, I was trying to confirm

24   something that Beacon had.  You just said that about three

25   minutes ago.  What was it that Beacon had that you were

1   trying to confirm?

2   A.   I don't know what he had.  He asked me to give him an

3   idea of what -- if I was bidding this job, how many man

4   hours for this phase of work.  And I was under the

5   impression that he was looking from me to confirm or deny

6   what he had already done.  A check point for him.  I

7   assumed he did this and he just wanted to know -- he

8   wanted an independent guy to see if he was right or wrong.

9   Q.   Was that based on anything that Mr. O'Neill or

10  Mr. Bruno told you?

11  A.   Never told me anything.  He just told me -- gave me

12  the drawings and asked me for this Phase 3 section, how

13  many hours.

14  Q.   Okay, thank you.

15  A.   And to this day, I don't know what he has.

16       THE COURT:  Did you have any sense that you were

17  supposed to arrive at a specific number or a high number?

18       THE WITNESS:  Not whatsoever.

19       THE COURT:  So I'm not clear what you meant when

20  you say, quote, I was trying to confirm what Beacon had.

21       THE WITNESS:  Confirm or deny in his eye.  I

22  thought I was going to give him a number and he was going

23  to use that as a check for what he had already done.

24  Because they're not -- he has a construction group, he

25  doesn't have an electrical -- they do this all the time,

1    give budgets all the time.

2              THE COURT:  So yours --

3              THE WITNESS:  I was under the impression that he

4    already did something, but he wanted to know if he was

5    correct or not, so he asked me to give him a number.

6              THE COURT:  So you were doing kind of a gut

7    check?

8              THE WITNESS:  For him.

9              THE COURT:  You mentioned the McCormick numbers

10   and how they get updated from time to time?

11             THE WITNESS:  Yes.

12             THE COURT:  Including for the labor, amount of

13   labor?

14             THE WITNESS:  When they do their surveys, if

15   they find something they put out in their database has

16   changed, then that will be part of the update.  It's

17   usually the newer items that come out.  Pipe and wire that

18   has been used forever, that hasn't changed in a long time.

19             THE COURT:  Okay.  So you did your numbers in

20   the fall of 2013?

21             THE WITNESS:  Fall of last year, yes.

22             THE COURT:  You don't think that they changed

23   substantially, the labor numbers would have changed

24   substantially to middle of 2010?

25             THE WITNESS:  Not for the bulk of these items,

1    no.  There could be one or two here or there that might

2    have changed.  Nothing significant that I remember in the

3    last five to six years.

4         THE COURT:  I think my last question is:  So

5    you're asked to do this estimate of number of hours it

6    would take to do the job.  I take it you knew the job had

7    already been done?

8         THE WITNESS:  Yeah, he told me it was a job done

9    in Connecticut.

10         THE COURT:  Did you ever ask to have –– because

11    you have two things to do, you had to first of all figure

12    out how much stuff needs to go into the job, right?

13         THE WITNESS:  Right.

14         THE COURT:  Then you had to figure out what

15    would be the man hours that would correspond to that

16    amount of stuff, right?

17         THE WITNESS:  Correct.

18         THE COURT:  So you decided to do your own

19    estimate of how much stuff would go into the job, I take

20    it, by taking your wheel and looking at the blueprints?

21         THE WITNESS:  Counting all the devices and

22    counting all the items.

23         THE COURT:  Did it ever occur to you to save

24    yourself some time doing all that counting and just ask

25    for the material data that had actually been installed in

1    the job as reflected in Plaintiff's Exhibit Number 4?

2              THE WITNESS:  No.  I never asked.

3              THE COURT:  May I ask why not?  Wouldn't that

4    have saved time?

5              THE WITNESS:  That wouldn't have been my

6    estimate.  If I take the quantities that someone's already

7    given me, that wouldn't be my estimate of the job.

8              THE COURT:  Of the amount of labor hours?

9              THE WITNESS:  Right.

10             THE COURT:  Wouldn't it be important for you to

11   know if you had historical evidence of how much was

12   actually used in the job, wouldn't that be important to

13   you doing the estimate?

14             THE WITNESS:  That would have been nice.

15             THE COURT:  Nice to know?

16             THE WITNESS:  That would have been nice to know

17   to see if a number of man hours for that bill of material

18   made sense.  But he asked me to give my labor hours for

19   this phase of work and only this phase of work, how much I

20   would have bid -- how many hours I would have bid if I

21   wanted to bid and win this job.

22             THE COURT:  Okay.

23             Anything else from counsel?

24             MS. VENNOS:  Nothing, Your Honor.

25             MR. KAPLAN:  No, thank you, Your Honor.

1        THE COURT:  Mr. Caprio, you're excused.  Safe

2   travel back to Maine or Massachusetts.

3            Next witness?

4            MR. HUG:  Ed Oloff.

5            THE CLERK:  Please remain standing.  Please

6   raise your right hand.

7

8                     ED OLOFF,

9        called as a witness, having been first duly

10        sworn, was examined and testified as follows:

11

12            THE CLERK:  Please be seated.

13            Please state your name.

14            THE WITNESS:  Ed Oloff.

15            THE CLERK:  Please spell your last name.

16            THE WITNESS:  O-L-O-F-F.

17            THE CLERK:  Please state your city or town.

18            THE WITNESS:  Canterbury, Connecticut.

19            THE COURT:  Please proceed.

20            MR. HUG:  Thank you, Your Honor.

21

22                 DIRECT EXAMINATION

23   BY MR. HUG:

24   Q.  Mr. Oloff, just if you could give the Court a little

25   bit of background on yourself, including your education

1    and employment history starting with where you are today.

2    Who do you work for?

3    A.   I work for Consigli Construction today.  Worked for

4    them the past couple of years.  Prior to that I worked for

5    the Pike Company for about six years.  Prior to that I

6    worked for a national firm called Fluor Daniel for about

7    nine to ten years.

8    Q.   Your educational background?

9    A.   Educational background was through high school and

10   carpentry apprenticeship and union.

11   Q.   All right.  And what do you currently do for

12   Consigli?

13   A.   I'm a superintendent.

14   Q.   What is a superintendent at Consigli?

15   A.   Superintendent is somebody who runs the projects,

16   schedule, and make sure things are getting done safely.

17   Q.   And you've done that for your entire tenure the last

18   few years at Consigli?

19   A.   Correct.

20   Q.   What did you do when you were with Pike?

21   A.   The same thing.

22   Q.   All right.  We'll cover a little about your

23   particular duties.

24        Let's jump into the Kelly Middle School project.  Are

25   you familiar with that project?

1   A.   I am.

2   Q.   How are you familiar with it?

3   A.   I was a superintendent on that project from start to

4   nearly completion.

5   Q.   And you were with Pike Company at that time?

6   A.   I was.

7   Q.   What were your duly duties on the Kelly Middle School

8   project?

9   A.   Daily duties were to coordinate subcontractors,

10  follow the schedule, and make sure the job was getting

11  done on time.

12  Q.   Were you there every day?

13  A.   Every day.

14  Q.   And were you the project superintendent throughout

15  the entire portion of Phase 3?

16  A.   I was.

17  Q.   Were you still at Pike through all of Phase 3

18  including some of the carryover items into September?

19  A.   Yes, I was.

20  Q.   And when did you leave Pike?

21  A.   I left Pike in April of 2012.

22  Q.   Okay.  And you were on this project up until the time

23  you left, correct?

24  A.   The project ended, but I was on a different project

25  after that project.

1   Q.   All right.  Okay.  So you were on this project

2   through to the end?

3   A.   Nearly the end.  I got pulled off towards the end.

4   Somebody else took over.

5   Q.   This litigation is about Phase 3 of the project.  Are

6   you familiar with Phase 3?

7   A.   I am.

8   Q.   What was Phase 3 of the Kelly Middle School project?

9   A.   Phase 3 was a summer portion of the project to go in

10  and take portions of the school that really didn't make

11  sense to take other times of the year due to the need of

12  the school, the administration wing, the gym, cafeteria,

13  art rooms, locker rooms, and portion of classrooms,

14  mechanical room, and cafeteria.

15  Q.   I'm showing you what's been marked as Exhibit 652,

16  which is a bigger version.  We've already had testimony of

17  what the P3 and P3AD means.  For example, P3AD means

18  admin. area?

19  A.   Yes.

20  Q.   Was there a general way of proceeding throughout the

21  project?

22  A.   Yes.

23  Q.   Could you describe that to the Court?  If you need to

24  get up and point to anything, feel free.

25  A.   The general -- it was laid out in the schedule.  We

1   started, I believe, with P3AD and started working our way

2   around that area.  Art room, locker room, classrooms,

3   cafeteria, and the boiler room, which is the mechanical

4   room.

5   Q.   That's P3M over here?

6   A.   Correct.

7   Q.   Was it -- if I'm pointing this way or how did it go?

8   A.   I believe it was that way.

9   Q.   This way?

10  A.   Yeah.

11  Q.   So start in this area -- if I'm understanding

12  correct, start in the admin. area, you start this side of

13  the admin. area?

14  A.   The admin. area is a pretty small area.  So the whole

15  length.

16  Q.   Okay.  Were you involved in the bid process for this

17  project?

18  A.   I was.

19  Q.   What was your involvement?

20  A.   I worked in the office at that time working on

21  helping make phone calls, receive information, vet out

22  people as we did get the bids, things of that such.

23  Q.   Okay.  In the bid package there was a bid schedule.

24  Were you involved in the creation of that bid schedule?

25  A.   I was.

1    Q.    What was your involvement?

2    A.    I created the majority of that schedule with our

3    project team.

4    Q.    All right.  Just to jump ahead a little bit, there

5    was a schedule included in ECI's contract as well.  Did

6    you have any involvement in the preparation of the

7    schedule that's attached to the ECI contract?

8    A.    Yes.

9    Q.    You're familiar with the ECI contract, correct?

10   A.    To some degree I am, yes.

11   Q.    But the schedule that's attached to it, the project

12   schedule that was actually used, you prepared that?

13   A.    I did.

14   Q.    There were various updates to the schedule as well,

15   correct?

16   A.    Correct.

17   Q.    And were you involved in the update of the schedules?

18   A.    I performed the updates to the schedules.

19   Q.    In performing the updates of the schedule, you did

20   the finish dates as well as the start dates?

21   A.    Correct.

22   Q.    And any updates to the start dates or updates to the

23   projected finish dates, did you do those as well?

24   A.    Yes, I did.

25   Q.    The bid documents included what?  Why don't you

1   describe it for the Court.

2   A.   The bid documents contained the plans, Pike Company's

3   contract, Kelly Middle School information, addendums,

4   questions, and our replies, things like that.

5   Q.   Some of the questions and RFIs -- RFI means request

6   for information?

7   A.   Yes.

8   Q.   What does that mean?

9   A.   Means a contractor had a question during his bid,

10  submitted it to get an answer, that gets shared with all

11  the bidders so they're all on the same wavelength.

12  Q.   Addendum Number 1, are you familiar with Addendum

13  Number 1?

14  A.   I believe I am.

15  Q.   That's Exhibit 503.  I don't think it's in front of

16  you though.

17  A.   Okay.

18  Q.   So explain to me the whole RFI process, starting with

19  a potential bidder asks a question, what do you do with

20  it?

21  A.   If it's something we can answer, we answer it, put it

22  back out.  If it needs to be submitted to the architect,

23  we submit it to the architect and get an answer and put it

24  out.

25  Q.   You publish those answers?

1  A.   We publish those answers to all the bidders.

2  Q.   Addendum Number 1, Exhibit 503, that's an example of

3  some of the questions that come in and the answers that

4  have been given?

5  A.   Yes.

6  Q.   That's part of the bid package?

7  A.   Yes.

8  Q.   Is there an expectation that all of the

9  subcontractors will understand what is in the addendums?

10  A.   Yes.

11  Q.   On page 2 of Exhibit 503, Question Number 021

12  construction schedule, which asks to clarify the phasing

13  sequence, were you involved in the answer?

14  A.   It looks like I was.

15  Q.   How do you know that?

16  A.   Because I was very critical of Phase 3 to make sure

17  everybody understood it.  Because it was critical portion

18  of the project in a very short time.

19  Q.   And you say you made sure everybody understood it.

20  What do you mean my that?  What did you do to make sure

21  everybody understood it?

22  A.   During critical path meetings, we laid it out in the

23  contract language.  We put stuff in the contract to make

24  sure they understood Phase 3 was a critical schedule.  The

25  schedule that was contained in the contracts was on a

1    seven-day calendar, where the other areas were on a

2    five-day calendar.  And we answered questions like this to

3    make sure they knew.

4    Q.    You mentioned a pre-bid meeting, can you describe for

5    the Court a pre-bid meeting, is that a meeting open to any

6    potential bidder?

7    A.    Yes.

8    Q.    Do bidders typically come to that?

9    A.    They do.

10   Q.    And questions are raised verbally at that meeting?

11   A.    Correct.  We usually start with a sitdown there.  We

12   did walk-arounds so people have an opportunity to go see

13   the school.  So any questions that were asked during that

14   time, they all had a chance to hear.

15   Q.    Did you at that meeting try to emphasize any

16   particular items in that pre-bid meeting?

17   A.    The schedule for Phase 3 and the tightness of that

18   job and the importance to finish.

19   Q.    Was Phase 3 different than the other phases in terms

20   of tightness?

21   A.    It certainly was.  The Phase 3 area, you know, was a

22   complex area bringing in a lot of trades and doing a lot

23   of work in a short time, as opposed to other areas of the

24   school where we had much more time to complete them.

25   Similar work in the renovation areas had, you know, many

 1    months more.

 2    Q.    Not as compressed and not as intense?

 3    A.    Not as compressed, not as intense.

 4    Q.    Did you make that clear to the bidders verbally?

 5    A.    We did.

 6    Q.    Do you recall if ECI attend the pre-bid meeting?

 7    A.    Yes.

 8    Q.    Did they?

 9    A.    Yes.

10    Q.    Do you recall if they asked any questions?

11    A.    I don't recall.

12    Q.    After the bids were in and prior to award, did you

13    discuss -- and after the bids were in and prior to --

14    after the bids were in and after the bids were opened so

15    you knew who bid, did you discuss -- and prior to award,

16    did you then go out and discuss the bids with the various

17    subcontractors who had submitted bids?

18    A.    We have post-bid meetings with two or three

19    contractors, usually, who were the low bidders.

20    Q.    And are those called descopings?

21    A.    Descopings.

22    Q.    Why do you use the word "descope"?

23    A.    To make sure they understand the scope, make sure

24    they have the whole scope, make sure they understand the

25    project.

1    Q.   Did you have such a meeting with ECI?

2    A.   Yes.

3    Q.   Could you tell us what happened at that meeting?

4    A.   We talked about schedule.  We talked about getting

5    the job done.  They seemed to have a good handle on the

6    scope of the work involved.  We always focused with every

7    contractor that we did that with with the critical Phase 3

8    schedule.

9    Q.   Okay.  And did you document your meeting after that

10   meeting was over?

11   A.   Yes.

12         MR. HUG:  Your Honor, I'm going to show the

13   witness Exhibit 539.

14         THE COURT:  Okay.

15         MR. KAPLAN:  No objection.

16         THE COURT:  All right.  539, full exhibit.

17   BY MR. HUG:

18   Q.   Mr. Oloff, Exhibit 539, what is it?

19   A.   It's notes that I took to document what we discussed

20   at the meeting.

21   Q.   Okay.  And who was present at that meeting for ECI?

22   A.   Mark Madore, Cliff Clauson, I believe.

23   Q.   Okay.  Take a look at the notes here.  If you look at

24   the notes of the attendees?

25   A.   Yes.

1    Q.    See Steve King?

2    A.    I do.

3    Q.    Okay.  And Mark Madore was there?

4    A.    Correct.

5    Q.    You also had other members of the project management

6    team at that meeting as well.  Jim Lawler, who is he?

7    A.    Jim Lawler was the architect of the project.

8    Q.    Bill Lynch?

9    A.    He was the contract administrator for van Zelm.

10   Q.    And I don't want to go over all of this, but this is

11   a contemporary or a statement, that e-mail that you wrote

12   shortly after the descope meeting with ECI on 11/5/09,

13   correct?

14   A.    Correct.  I would typically write these just so we

15   have some document of what we discussed.

16   Q.    The topics in there included, among other things,

17   phasing and schedule, correct?

18   A.    Correct.

19   Q.    And in the schedule first bullet it says ECI

20   explained that they have reviewed the schedule and have no

21   issue to meet the dates and durations listed.  Do you

22   recall discussing that with them?

23   A.    I do.

24   Q.    I already asked you a couple of questions about the

25   schedule.  You were the person who generally prepared and

1    updated the schedule as you went along, as you testified,

2    right?

3    A.    Correct.

4    Q.    That's called a CPM schedule; is that right?

5    A.    Correct.

6    Q.    And the original -- the schedule -- ECI's contract,

7    you recall, has a schedule attached to it.  I think you

8    testified that you prepared that schedule that was

9    attached to their contract, correct?

10   A.    That is correct.

11   Q.    And did you update the schedule periodically

12   throughout the project?

13   A.    I did.

14   Q.    How often?

15   A.    Usually weekly.

16   Q.    And did you give updates to the subcontractors?

17   A.    During meetings we go would make it available on the

18   table and I did four-week look-aheads as well.

19   Q.    What are look-aheads?

20   A.    Where we are today and moving forward four weeks,

21   gives them a good snapshot where we're going to be three

22   or four weeks out so they can be looking ahead.  So

23   they're not just looking one day ahead, they're looking

24   four weeks ahead.  A little more detailed breakdown of the

25   schedule.

1   Q.   How does the look-ahead schedule relate to the formal

2   project schedule?

3   A.   It usually mimics it.   It's just a little more

4   detailed.

5            MR. HUG:   My apologies, Your Honor, I put the

6   wrong exhibit number down in my notes.

7            MR. HUG:   Mr. Kaplan, 632.

8            MR. KAPLAN:   All right.

9            THE COURT:   Objection?

10           MR. KAPLAN:   I have to look at it first,

11  Your Honor.   I'll be right there.

12           MR. HUG:   Don't say anything just yet.

13           MR. KAPLAN:   I have no objection.

14           THE COURT:   632, full exhibit.

15  BY MR. HUG:

16  Q.   Okay.   I'm looking at Exhibit 632.   Do you see 632?

17  A.   I do.

18  Q.   What is 632?

19  A.   632 is a look-ahead schedule prepared by me for the

20  week ending 6/27.

21  Q.   So it's just an example of one of your look-ahead

22  schedules, correct?

23  A.   Correct.

24  Q.   And you made these available to the subcontractors in

25  writing as well?

1   A.    Correct.

2   Q.    Okay.  In addition to the updates and the updated

3   schedule, did you do anything else to try to explain to

4   the subcontractors what the schedule would be over the

5   course of the next week or two weeks?

6   A.    In the conference room we had set up in the trailer,

7   we had postings around the walls of the trailer with

8   logistics plans, whiteboards, and we would make notes on

9   that and talk about schedule, talk about areas, what was

10  coming up.

11  Q.    What did you understand your role to be with respect

12  to subcontractors and their compliance with the schedule?

13  A.    To make sure that they got their work done in time so

14  other contractors could come in.

15  Q.    All right.  Now, before I go on, I want to show you a

16  couple of other documents.

17        633, 634, 635, 636, 637, 638, 639, 640 also.

18             MR. KAPLAN:  633 through 640?

19             MS. VENNOS:  They go to 645.

20             MR. HUG:  633 to 645.

21             MR. KAPLAN:  No objection.

22             THE COURT:  All right.  Exhibits 633 through 645

23  are all admitted as full exhibits, inclusive.

24  BY MR. HUG:

25  Q.    I'm going to show you one of the exhibits for now.

```
 1   We can go back and do the others.  In the interest of

 2   time.

 3        I show you Exhibit 645.  Do you know what 645 is?

 4   A.   645 is a baseline schedule versus an update schedule.

 5   Q.   Is it based on an update that you prepared comparing

 6   it to the baseline?

 7   A.   Correct.

 8   Q.   And the baseline is the contract schedule that was in

 9   ECI's contract?

10   A.   Correct.

11   Q.   And this particular baseline schedule, is it broken

12   out by area?

13   A.   It is.

14   Q.   Okay.  So on the first page of 645, I see the

15   administration area, correct?

16   A.   Correct.

17   Q.   And does it have trades other than ECI in it?

18   A.   It does.

19   Q.   And if I thumb through that, I'm going to see the

20   next area is the toilet rooms, then the next area art,

21   instrument, storage, corridor, and it goes on from there;

22   do you see that?

23   A.   I do.

24   Q.   And those correspond.  So P3AD for the admin. area,

25   that's going to correspond to P3AD on Exhibit 652,
```

1    correct?

2    A.   Correct.

3    Q.   Then if I go to the next page, toilet rooms, I go to

4    P3T-5230, that line item, that's going to correspond to

5    P3T on this exhibit here?

6    A.   Correct.

7    Q.   I could go all throughout, but I think at this point

8    in the trial people know that.

9         And that's based upon -- well, let me ask you a

10   question about finish date on here.  Early start, early

11   finish.  What are those dates in Exhibit 645?

12   A.   That was the original plan.

13   Q.   And Target 1 early start and Target 1 early finish,

14   what are those?

15   A.   Actual dates.

16   Q.   Okay.  And to the extent that they're not actual yet,

17   they're events to occur in the future, are they projected

18   dates as to when things will start and finish?

19   A.   Correct.

20   Q.   This is a look at the snapshot of the baseline versus

21   the actual as of 9/12, the 9/12 schedule, updated

22   schedule, right?

23   A.   Yes.

24   Q.   Now, with respect to early finish -- excuse me,

25   Target 1 early finish that is actual, when do you mark a

1    particular line item as done and finished?

2    A.    When the item's 100 percent finished.

3    Q.    So if I were doing this room and I were ripping out

4    all the panels in this room and going to put drywall up

5    and I finish this whole room, demoed all the panels in

6    here except for one or two panels down in this end, would

7    you mark this as finished demolition yet?

8    A.    No.

9    Q.    You wouldn't mark it until I finished those last two

10   panels?

11   A.    Correct.

12   Q.    Why do you do that?

13   A.    To make sure that we're tracking completion.  To make

14   sure they complete, make sure they don't miss something.

15   Q.    You use it as a management tool?

16   A.    Yeah.

17   Q.    So you know if it's not closed, you've got to go back

18   to that room and check to see if something isn't done in

19   demolition?

20   A.    Correct.

21   Q.    Okay.  Did you have weekly meetings with the

22   subcontractors?

23   A.    I did.

24   Q.    Were they called foremen meetings?

25   A.    Yes.

1    Q.   Did you conduct them?

2    A.   I did.

3    Q.   And who attended those meetings?

4    A.   The subcontractors on the project.

5    Q.   And did anybody else in project management attend

6    those meetings from time to time?

7    A.   From time to time project manager did come and

8    participate in the meeting.

9    Q.   And I think you testified also that -- that's the

10   time when you discussed the schedule and used the

11   whiteboard and the updates, correct?

12   A.   That's correct.

13   Q.   Did issues come up with the schedule during those

14   meetings?

15   A.   Sure.

16   Q.   For example?

17   A.   We had some steel issues in P3AR, the art area and

18   the locker room, discovered during demo.

19   Q.   What would you do when that kind of issue comes up

20   generally?  Not necessarily talking about that specific

21   issue.  If a scheduling issue came up in general, how

22   would you deal with it?

23   A.   Focus on what the issue was and work to resolve it as

24   quickly as possible.

25   Q.   In that room with all the subcontractors?

 1   A.   Yeah, at the time the demo was coming to completion

 2   and that's when it was discovered.

 3   Q.   When you had issues that arose, did you have a

 4   dialogue with the subcontractors?

 5   A.   Yeah, all day going around.  And if there was

 6   something off, grab the foreman, get everybody together

 7   and work out a plan around it.

 8   Q.   How did the subcontractors get along with each other

 9   on this job?

10   A.   Very well.

11   Q.   How did you get along with the subcontractors on this

12   job?

13   A.   Very well.  It's one of the best jobs I've done as

14   far as relationships go.

15   Q.   In terms of personal contact with ECI's project

16   management, did you have any altercations with them?

17   A.   I didn't.

18   Q.   Okay.  Did you have a cordial relationship with

19   Mr. Mathieu?

20   A.   I did.

21   Q.   And with Mr. Clauson?

22   A.   Yes.

23   Q.   Were they complaining to you constantly about the

24   project verbally?

25   A.   No.

1    Q.   Were you proud of this project and the work you did?

2    A.   I am.

3    Q.   Were you proud of Phase 3?

4    A.   Yeah.  Quite an accomplishment to finish Phase 3.

5    Q.   Did the school open on time?

6    A.   It did.

7    Q.   Do you have any major scheduling issues?  This is

8    where you started to get into the steel.  Did you have any

9    scheduling issues on this project?

10   A.   Sure.  There were issues along the way.

11   Q.   Let's talk about -- let's talk about steel for a

12   moment.

13   A.   Okay.

14   Q.   Generally, what was going on with the steel?

15   A.   So when we opened up the art room, locker rooms, the

16   steel was different than what the plan had shown.  So we

17   had to respond to that, had to fix this from the

18   architect, have the steel guy to fabricate and install.

19   Q.   Let's take it a step at a time.  You open up.  I

20   think they used a term "concealed condition"?

21   A.   Correct.

22   Q.   It's different than what you expected?

23   A.   Yes.

24   Q.   It's not your fault, right?

25   A.   No.

```
 1   Q.   It's not ECI's fault?

 2   A.   Correct.

 3   Q.   It's somebody else's fault, if anybody's?

 4   A.   Yes.

 5   Q.   Be that as it may, you're responsible for getting the

 6   job done on time, correct?

 7   A.   That's right.

 8   Q.   So how do you deal with it?

 9   A.   We focused into it, identify what the issues are, get

10   with the architect and work to resolve a new design that

11   works.

12   Q.   Did you do that?

13   A.   Yes.

14   Q.   Now, did that impair the schedule at all?

15   A.   In those two areas, it did.

16   Q.   How did you deal with that?

17   A.   We ended up extending the schedule in those areas.

18   Q.   Was that at the request of any subcontractors?

19   A.   No.  We realized somewhere along the way, I'd say it

20   was July, that we had a problem there.  We talked to the

21   City about it, they agreed that we could extend that.

22   Q.   Okay.  So before you could extend the time to

23   complete those two areas, did you have to go to the City

24   of Norwich and ask their permission?

25   A.   Yes.
```

1    Q.    And they gave that permission?

2    A.    Yes.

3    Q.    Did you tell the subcontractors?

4    A.    Yes.

5    Q.    And did you -- and then what happened after that in

6    those two areas?

7    A.    They slipped a little bit and they ended up getting

8    turned over a little later than planned.

9    Q.    And instead of working in those areas for a period of

10   time, did the workers have to work in other areas?

11   A.    Yeah.  There was plenty to do.

12   Q.    Any other issues -- I'll come back to the structural

13   steel a little bit later.  Any other issues with the

14   structural steel -- excuse me, any other issues on the

15   project?  Let's stay with the structural steel.

16         RHU, what are RHUs?

17   A.    RTU?  Rooftop unit.  Equipment on the roof to supply

18   in mechanical to the building.

19   Q.    Where were those located generally?

20   A.    They were throughout the building.

21   Q.    And throughout Phase 3?

22   A.    There were some in Phase 3 as well.

23   Q.    Any issues with the RTUs?

24   A.    The RTUs going in, I don't believe there were any

25   issues.  I know Stephane had in his daily reports early on

1   some steel issues in the corridors.  We worked through a

2   lot of those issues.  Stephane had those on his daily

3   report.  We started that Phase 3 three months early.  We

4   were able to start that early.  That wasn't in the

5   schedule.  We opened it up and asked if people were

6   interested in doing it.  ECI was interested in doing it.

7   So we were able to get in there and rip all the ceilings

8   down from all the corridors and get infrastructure into

9   that building before the summer even kicked off when it

10  was planned to.  A lot of work was able to be done there.

11       During that time Stephane identified areas of steel

12  that were affecting his ability to install conduit.  There

13  was nothing I could do over the summer for that prior time

14  because the work wasn't even planned to start there.  We

15  were just in there doing as much as we could to alleviate

16  some of the time it was going to take to do Phase 3.

17  Q.   The steel wasn't going to be done at that time, you

18  were ahead of schedule?

19  A.   We were ahead of schedule.  We were doing work early.

20       So after the summer started, we found work and

21  installed steel and got things done so we could complete.

22  Q.   Any other issues that you saw, any other issues that

23  impaired the progress of the work?

24  A.   I'm sure there are.  A couple that come to mind, the

25  cafeteria, during the time we were putting the ceiling

 1   grid up and installing lights in there, we had some sort

 2   of manufacturer issue with the light the way it was being

 3   hung.  The cables -- similar to lights here, I guess.

 4   Those cables were actually splayed instead of plumb.  I

 5   think when they went back to the manufacturer, they found

 6   they had to be plumb.  They had to take all the lights

 7   down and redo it.  It was quite laborious to do.

 8        We had numerous problems with the Lutron panels.

 9   Q.   Let's start with the cafeteria.  Even though you told

10   me this before, I still get lost.  You said they weren't

11   plumb.  All right.  What do you mean by that?

12   A.   They were splayed and they went to where the grid

13   was, which is a certain layout, 2 X 2 grid.  Splayed into

14   wherever the grid was.

15   Q.   It was the wrong material?

16   A.   It was the right material installed in the wrong

17   place.

18   Q.   In the wrong place.  Who installed that material?

19   A.   ECI.

20   Q.   And did ECI have to -- what did ECI have to do?

21   A.   ECI got with the manufacture, as I recall, mitigated

22   the issue, took all the lights down, put all the lights

23   back up correctly.

24   Q.   About how many lights are we talking about?

25   A.   Probably nine, if I recall.  I could be wrong with

```
 1   the total number.
 2   Q.   Okay.  Did that create any other issues for the other
 3   workers on the project?
 4   A.   Well, it's a good example of how a project goes.  If
 5   one company's behind a little in one area, like that
 6   particular area, now there's more people in there for a
 7   longer period of time.  Other people are trying to get in
 8   to do their work, so they have to work around it or do
 9   work somewhere else.  Once it's done, come in and
10   accelerate their work a little bit to get done on time.
11   It's not uncommon.
12   Q.   You didn't backcharge ECI for problems caused for
13   that issue, did you?
14   A.   No.
15   Q.   That was a work-around that you, as the project
16   superintendent, worked with a bunch of different
17   subcontractors to make it work, correct?
18   A.   Correct.
19   Q.   Any other issues?
20   A.   The Lutron lighting system.
21   Q.   First of all, what's a Lutron lighting system?
22   A.   Lighting control system.  Controls all the lights in
23   the building.
24   Q.   Explain to the Court what the issues were with that.
25   A.   They couldn't get it to work properly.  They were
```

1    having problems with lights coming on and shutting off.

2    They had to work on it.  I don't know -- I don't recall if

3    it was an installation or manufacturer issue.  Could very

4    well have been a manufacturing issue.  I know they were in

5    those ceilings a lot of times working on those things

6    right until the end trying to get those to work right.

7    Q.    Did they have to leave it for a period of time and

8    come back to it from time to time?

9    A.    Yeah, they were in and out of it.

10   Q.    Any other issues that you can recall with respect to

11   any subcontractor?

12   A.    I'm sure if I sat here long enough I could think of a

13   few.

14   Q.    How about -- let's stick with ECI for a moment.  How

15   about the light poles?  Were the light poles part of ECI's

16   work during Phase 3?

17   A.    Yes.

18   Q.    Were they actually in Phase 3 work or were they on

19   the site work portion of the job?

20   A.    Site work in the parking lot and the rear area of the

21   building.

22   Q.    But they were done during Phase 3, right?

23   A.    Right.

24   Q.    So ECI was using manpower for them during Phase 3?

25   A.    Yes.

```
 1   Q.   What was at issue with the light poles?

 2   A.   They came in and they were damaged on the outside,

 3   paint finish.  So they ended up sending some back.  And I

 4   believe they got another load and it was damaged again.

 5   Had to wait again for a second delivery.

 6   Q.   Did that take a little extra time to get done as a

 7   result?

 8   A.   Sure.

 9   Q.   Did it take ECI men off someplace and put them on

10   there and take them off and put them back on?

11   A.   Sure.  Time spent there was time they could have

12   spent doing something productive.

13   Q.   What about the generator shroud?

14   A.   Generator came in damaged to the exterior.

15   Q.   What does that mean?

16   A.   The shroud was all damaged and it needed to be

17   replaced.

18   Q.   What's a shroud?

19   A.   It's an enclosure.

20   Q.   How do you spell shroud, S-H-R-O-U-D?

21   A.   Sounds right.

22   Q.   Okay.  And did ECI go ahead and install that?

23   A.   They did.  They installed the generator and that then

24   had to come back and replace these.

25   Q.   From a scheduling standpoint, installing generators
```

1   is part of a line item on the schedule.  Is it part of a

2   line item on the schedule?

3   A.    It likely is.  I don't recall sitting here.

4   Q.    Assuming it is for the moment, if they had to redo

5   these panels or order new panels and put them on, would

6   that require them to leave that work and come back at a

7   later time and reinstall it?

8   A.    Yes.

9   Q.    Okay.  And would that extend -- doing your schedule,

10  you would not close that item until that panel was put on,

11  correct?

12  A.    Correct.

13  Q.    How about electrical panels?

14  A.    Yes, there were a few issues with electrical panels

15  as well.  The foreman, Stephane, asked me to take a few

16  pictures to send to his office and I did.  Missing

17  components in the electrical panels.

18  Q.    And the electrical panels were part of ECI's work?

19  A.    Yes.

20  Q.    Now, when you say missing electrical components,

21  you're not suggesting that ECI did something wrong

22  particularly, do you?

23  A.    No.

24  Q.    That was a material that ECI was putting in that it

25  bought and it had some defect in it?

1    A.    Correct.  I'm sure they expected everything was right

2    in that panel and installed it and found out.

3    Q.    What did that require them to do?

4    A.    They had to put time in chasing down the

5    manufacturer, get the piece they need, get it delivered

6    and put it back and install the panel.

7    Q.    How about exit signs?

8    A.    Exit signs came late in the project.

9    Q.    Did it cause any -- they came late in the project,

10   were they installed late?

11   A.    They came late, they were installed late.  Finished

12   ceilings were up, had to go up and open them up and

13   install those.

14   Q.    Did that impair other than subcontractors?

15   A.    Whatever might have been going on in the corridor.

16   Q.    MC cable.  Let me show you an exhibit.  E626.  E-mail

17   dated October 12, 2010.

18             THE COURT:  I'm sorry, objection?

19             MR. KAPLAN:  I thought it was already admitted,

20   but maybe not.

21             MR. HUG:  I think he talked about this issue.  I

22   can't recall if he has this as an exhibit or not.

23             MR. KAPLAN:  I don't have an objection in any

24   event.

25             MR. HUG:  It may be a duplicate.

1          THE COURT:  Exhibit 629 is admitted as a full

2     exhibit.

3     BY MR. HUG:

4     Q.   Mr. Oloff, take a moment to take a look at this.

5     A.   Yes, I've looked at it.

6     Q.   What's the issue here?  Describe for the Court what

7     the issue is.

8     A.   It's installation of MC instead of conduit.  So

9     conduit is more labor, MC is easier to install.  Somewhere

10    along the way, ECI asked if they could install MC instead

11    of conduit in certain areas of the job.  The engineer

12    ended up agreeing to it and he calculated what he feels is

13    the amount of hours associated with that for Phase 3.

14    Q.   Did he ever get a credit or request a credit from ECI

15    for the MC cable?

16    A.   I believe it was discussed, but we never received a

17    credit for the MC cable.

18    Q.   There was testimony earlier about a quid pro quo with

19    some other items that ECI had done, do you recall any of

20    that happening on the project related to the MC cable?

21    A.   Say again?

22    Q.   Let me just actually go on to the material issue

23    related to this.  This resulted in some savings in the

24    hours for total hours for ECI?

25    A.   Sure.

1    Q.   It took them less time to do it with MC cable than

2    with the conduit?

3    A.   Yes.

4    Q.   And you wanted to do that, didn't you?

5    A.   Yeah.

6    Q.   It would help them out?

7    A.   I was on board to try to save anybody time when I

8    could.

9    Q.   Did you early on in the project -- by the way, when

10   did Phase 3 come to work in earnest?  When did it start in

11   earnest?

12   A.   Pretty much the first week.  We got right into it and

13   brought guys there who were demo-ing around and following

14   with the following work.

15   Q.   That would have been around June 28?

16   A.   Yes.

17   Q.   In those initial couple of weeks, last week of June,

18   first week of July, did you have any observation

19   concerning the sufficiency of the workforce supplied by

20   ECI?

21   A.   Yes, I was surprised of the little number they had

22   for all the work they had to do.

23   Q.   Were they able to keep up with the work that was

24   available to them?

25   A.   In some cases they were.  Sometime they fell behind,

1    but we were able to work it out.

2    Q.    It was not a big issue for you at that time?

3    A.    No, not at that point in time.

4    Q.    It did become a bigger issue as time went on; is that

5    right?

6    A.    Yes.

7    Q.    They fell a little further behind?

8    A.    Yes.

9    Q.    By further behind is that they weren't able to work

10   in all the areas that were available?

11         THE COURT:  Just, we're -- I understand the need

12   for efficiency, we're leading a little bit.  I was unclear

13   who was testifying.

14         MR. KAPLAN:  The Court was using his

15   extrasensory perception on my getting out of my seat.

16         MR. HUG:  I thought somebody was opening the

17   door, I thought you were talking over me.  Yes,

18   Your Honor, I'm trying to move as expeditiously as

19   possible.

20         THE COURT:  Thank you.  Maybe a little more open

21   ended on some of these.

22         MR. HUG:  I'm trying to do the significant stuff

23   open ended.  I apologize.

24   BY MR. HUG:

25   Q.    You understand, sir, I can't testify for you.  I've

1   got to have you testify.

2   A.   I understand.

3   Q.   So I can't recall now where I left off, so let me

4   start with this.  At some point in time did you become

5   concerned with ECI providing sufficient manpower?

6   A.   I did.

7   Q.   And did you raise that with ECI?

8   A.   I did.

9   Q.   And did they comply?

10   A.   They were working on getting more people.  But there

11   was -- at the times it was they could have already had

12   more people and then continued to ramp up from there.

13   Q.   All right.  Did you make any observations concerning

14   supervision that ECI had?

15   A.   I did.

16   Q.   And what were your observations?

17   A.   As we got into it and we were in most of the areas

18   working, there was inefficiencies of people waiting around

19   for a foreman telling them what to do or someone bringing

20   them material.  I recall they added a few apprentices at

21   some point to try to chase material and whatnot.  They

22   didn't want journeymen chasing material.  And the

23   journeymen would sit around waiting for someone to bring

24   them material.  So, you know, there was a lot of

25   inefficiencies on that part.  I feel they could have had

1    more supervision running areas for certain guys to make

2    sure that those guys had what they need and they were

3    productive.

4    Q.   Thank you.  One last topic.

5              MR. HUG:  We need to break at 3:00, Your Honor?

6              THE COURT:  I think so, unless the witness is

7    done.  But I understand --

8              MR. HUG:  Oh, no.

9              THE COURT:  Significant cross?

10             MR. HUG:  No, actually I have --

11             THE COURT:  Quite a bit more with him?

12             MR. HUG:  Actually, I wanted to save the main

13   portion of his testimony because I couldn't do it in an

14   hour because I'm going to get Your Honor set up with three

15   documents in front of you with the witness and Mr. Kaplan.

16   And I'm going to go through these documents area by area.

17   And I think it will be very productive.  At least that's

18   the plan.

19             If I've got three minutes --

20             THE COURT:  You do.

21   BY MR. HUG:

22   Q.   Ferguson.  We've heard a number of things about

23   Ferguson in this case.  Who was Ferguson Electric?

24   A.   Ferguson Electric was another subcontractor that bid

25   the project.

1    Q.    Were you involved in the disqualification of

2    Ferguson?

3    A.    I was.

4    Q.    What was your involvement?

5    A.    I called the references and vetted those out and made

6    the notes on it.

7    Q.    Did you also meet with Ferguson?

8    A.    We did.

9    Q.    Was somebody else there with you when you met,

10   another member of the Pike team?

11   A.    Yes.

12   Q.    Who was that?

13   A.    Mel Strauss.

14   Q.    Who is Mel Strauss?

15   A.    Project manager.

16   Q.    So you reported to Mel, correct?

17   A.    Correct.

18   Q.    Now, in your conversation with Ferguson, what was the

19   purpose of that meeting you had with Ferguson?

20   A.    To make sure they understood the project, understood

21   the schedule and had a good understanding what the project

22   needed.

23   Q.    After that meeting and after you got the references,

24   was there a decision to disqualify Ferguson?

25   A.    There was.

```
 1   Q.   Were you involved with that decision?

 2   A.   Yes.

 3   Q.   And what was the reason that you had for

 4   disqualifying Ferguson?

 5   A.   Mainly the comments under the references that I

 6   checked.

 7   Q.   Anything else?

 8   A.   Lack of understanding of the project.

 9   Q.   And how --

10   A.   We got into Phase 3, they didn't talk that they

11   understood it, didn't really talk that they carried

12   overtime to do the project.  Based on those Phase 3 and

13   the references, we moved to disqualify them.

14   Q.   A bid dispute went on after that?

15   A.   It did.

16   Q.   Okay.

17            MR. HUG:  Your Honor, one last question for the

18   witness before we leave today.

19   BY MR. HUG:

20   Q.   We had a number of witnesses before you testify that

21   this job was -- my words -- problematic, correct?  You

22   don't know that.  With that as a backdrop, has any other

23   subcontractor filed a claim against Pike with respect to

24   Phase 3?

25   A.   No.
```

```
 1   Q.   Has any other subcontractor claimed loss of

 2   productivity for which they were compensated for with

 3   respect to Phase 3?

 4   A.   No.

 5   Q.   How do you think Phase 3 went overall?

 6   A.   I think it went pretty much to plan.  It was planned

 7   to be stacked, many trades, many number of people,

 8   multiple shifts, seven days a week.  We were there every

 9   day.

10   Q.   Was it perfect?

11   A.   It wasn't perfect.

12   Q.   Is any project ever perfect?

13   A.   No.

14   Q.   But you had a good group of subcontractors, didn't

15   you?

16   A.   Yes.

17   Q.   Including ECI?

18   A.   Correct.

19          MR. HUG:  Your Honor, that's it for the day.

20          THE COURT:  Thank you.

21          Mr. Oloff, we're going to excuse you today, but

22   need you back tomorrow morning to show us more documents

23   and testimony.  So you're excused at this time.  You may

24   step down.

25          MR. HUG:  8:00 tomorrow?
```

1          THE COURT:  Yes.

2          I wanted to talk about scheduling.  I know there

3    was some scheduling issues.  Seems where we are right now

4    we're not going to realize our finest hopes of being all

5    done by the end of this week.  So I think perhaps,

6    especially for all concerned, it's been a good productive

7    week, we might want to do not the full 8:00 to 5:00

8    tomorrow.  But I leave it up to you in terms of your

9    availability, your witnesses' expectations.  Can I have

10   input on that?  What's your sense?

11          MR. HUG:  Since it's my case -- excuse me, our

12   case at the moment, I think, Your Honor, what is a

13   reasonable thing to bite off tomorrow is to complete

14   Mr. Oloff.  I got through a lot of Mr. Oloff's preliminary

15   stuff and then I have this one project I want to do with

16   him.  I estimate that that's going to take a couple of

17   hours.  And if I gear up on the coffee, I'm going to try

18   to make it exciting.  After that, I suspect there will be

19   Mr. Kaplan's usual vigorous cross-examination and that

20   should take us to -- I can't imagine us being done much

21   before noon.  Maybe 11:30, in that area.

22          I then have four local witnesses.  They won't be

23   that long.  But I think it makes good sense to put them on

24   and get them done because the other witnesses that I have

25   will all take perhaps more time than we have left in the

1    day.  And they are coming from some distance.  So, for

2    example, Mr. Merkhofer is coming from southern New Jersey.

3    I fear bringing him up and having him start at 3:00 and

4    Your Honor wants to stop at 4:00 and then he's got to come

5    back on Monday.  I'll do it.  Absolutely.  But I'd ask

6    Your Honor if we could maybe have mercy on a Friday since

7    we're not going to be done anyway and have to come back.

8    It seems to make sense.  It seems to make sense to me.

9              THE COURT:  Okay.

10              MR. HUG:  Attorney Kaplan and I are going to

11    discuss after court today maybe some creative method, but

12    I'm not so sure -- we're working on it.

13              MR. KAPLAN:  May I inquire, Your Honor, what the

14    Court's availability is following tomorrow?

15              THE COURT:  It's not good.  I have another trial

16    that goes for probably two weeks and then another one

17    starting for the next two weeks after that.  Tiny possible

18    window, sometimes trials go away.  But the next month is

19    pretty much gone, I would think roughly.

20              MR. KAPLAN:  Are we talking about being able to

21    get back late July for a hard day or two, is that --

22              THE COURT:  I'm hopeful.  I'm hopeful.  It

23    depends on how long this other case goes.  I have a jury

24    selection July 9.  I'm out of town for a required session

25    the last week of July.  So it's -- it's not looking great

1  now, but sometimes clouds clear.

2           MR. KAPLAN:  Well, what I would suggest is we

3  huddle and discuss with the Court sometime tomorrow what

4  our anticipated requirements are to expeditiously conclude

5  the case and try to fit that into the Court's schedule as

6  best we can so when we walk out of here tomorrow we know

7  what we're doing.

8           THE COURT:  Okay.  Great.  I'll go back and

9  check possible dates for getting together again as well.

10          MR. KAPLAN:  Okay, appreciate it.

11          THE COURT:  And so tomorrow do we want to go

12  probably not later than 4:00 then?

13          MR. HUG:  I would suggest, Your Honor, that we

14  put Mr. Oloff on, finish Mr. Oloff.  I put my four other

15  short witnesses on, and I've got to believe that's going

16  to take us, with the lunch break, at least to 3:00 and

17  maybe close to 4:00 or 5:00.  I can't predict exactly how

18  long they're going to take.  There's a possibility --

19  we've never done it, we could be done a little before 4:00

20  with those four witnesses.  So I would do those four

21  witnesses up to whenever Your Honor wants to stop.  If we

22  happen to get done at 3:30, then I would be done.

23          THE COURT:  And Ms. Vennos, I know you had

24  scheduling concerns.  Is that okay?

25          MS. VENNOS:  Yes.

1          MR. HUG:  Your Honor, if I may address while

2     we're still on the record one other thing.  Your Honor

3     addressed an issue with respect to Mr. Caprio's disclosure

4     and the disclosure of documents.  Your Honor asked us to

5     go back and take a look.  I have -- first of all,

6     Your Honor, I do apologize, I think your remarks are,

7     unfortunately, they're well placed.  I hate to have to

8     admit that, but they are.  However, I do want to assure

9     the Court and we do have some documentation that we did

10    request the document.  So, unfortunately, in 20/20

11    hindsight, perhaps there could have been more focused

12    conversations that could have gleaned the fact that he had

13    this document.  There's no excuse.  It's just a mistake.

14    And I apologize to Attorney Kaplan who has been very

15    professional and gracious in this.  We will do what we can

16    to ascertain those documents.  We will do what's required

17    for us under the rules for disclosure.  And then we'll

18    throw ourselves on the mercy of the Court and opposing

19    counsel.  That's all we can do.  If I've missed something

20    else I can do --

21         THE COURT:  No, I appreciate that.  I think part

22    of my concern about it had been, frankly, to the substance

23    as well.  I thought he was coming in as an expert on

24    hours.  And I heard him say he pretty much was just doing

25    a quickie.

1          MR. HUG:  That will be explained with Mr. Bruno.

2          THE COURT:  Okay.  So I thought you're

3   predicating a whole bunch of this, this is a cornerstone

4   of your case and he's just done a quickie, almost a

5   back-of-the-napkin kind of estimate it seemed.

6          MR. HUG:  Well, Your Honor, it's -- I think it

7   will be illuminated when I put Mr. Bruno on.  And I can

8   appreciate -- no, he is not intended to be put on as

9   someone for -- and I don't want to get into argument now.

10          THE COURT:  It's okay.

11          MR. HUG:  But that it will become hopefully

12   clear in Mr. Bruno's testimony.

13          THE COURT:  That's great.

14          MR. KAPLAN:  Motion to preclude stands.  I'm

15   reiterating it.

16          THE COURT:  Understood.  I'm going to hold on to

17   that.  I think get the witnesses in and all that, we'll

18   get more information from you hopefully about that.  We'll

19   hear more about that.

20          MS. VENNOS:  Do you need us to clear our stuff

21   out?

22          THE COURT:  No.  Let me ask -- we're fine.  I

23   have a telephone conference this afternoon.  We don't have

24   parties coming in.

25          MR. HUG:  Your 5:00 to 7:00 hearing or evening

1    hearing isn't in here?

2              THE COURT:  They're coming into chambers.  It

3    looks like the sheer number of people we've got coming, we

4    may need to use the courtroom.  We'll have to clear to the

5    side.

6              MR. HUG:  8:00 a.m. tomorrow?

7              THE COURT:  Yes, look forward to it.  Stand in

8    recess.

9                   (Proceedings adjourned at 3:09 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


RE:  ELECTRICAL CONTRACTORS, INC. v. THE PIKE COMPANY

No. 3:11CV449(JAM)



I, Diana Huntington, RDR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.




                    /s/
          _____

          DIANA HUNTINGTON, RDR, CRR
            Official Court Reporter
         United States District Court
         915 Lafayette Blvd., Room 423
         Bridgeport, Connecticut 06604
               (860) 463-3180