UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
ELECTRICAL CONTRACTORS, INC.,   :  No. 3:11CV1449(JAM)
                                :
                Plaintiff        :
                                :
        vs.                     :
                                :
THE PIKE COMPANY,               :
                                :  Bridgeport, Connecticut
                Defendant        :  June 20, 2014
                                :
- - - - - - - - - - - - - - - - x

BENCH TRIAL
VOLUME V

B E F O R E:

        THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


A P P E A R A N C E S:

    FOR THE PLAINTIFF:

            MICHELSON KANE ROYSTER & BARGER
                Hartford Square North
                10 Columbus Blvd.
                Hartford, Connecticut 06106
            BY:  STEVEN B. KAPLAN, ESQ.

    FOR THE DEFENDANT:

            ROBINSON & COLE
                280 Trumbull Street
                Hartford, Connecticut 06103-3597
            BY:  CHRISTOPHER J. HUG, ESQ.
                DEBORAH A. VENNOS, ESQ.


                        Diana Huntington, RDR, CRR
                        Official Court Reporter

# TABLE OF CONTENTS

| DEFENDANT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| ED OLOFF | | | | | |
| By Mr. Hug | 936 | | | | |
| By Mr. Kaplan | | 1101 | | | |
| By Mr. Hug | | | 1163 | | |
| VINCENT SAVINO | | | | | |
| By Ms. Vennos | 1170 | | | | |
| By Mr. Kaplan | | 1183 | | | |
| CARROLL LAWLER | | | | | |
| By Ms. Vennos | 1191 | | | | |

1                        **8:24 A.M.**

2              THE COURT:  Please be seated unless you need to

3   be standing.  I'm sorry about the delay.  As you may have

4   heard, I was a casualty of Metro-North and the delay on

5   the trains this morning.

6              We're here for Electrical Contractors, Inc. vs.

7   The Pike Company, 3:11CV1449, and it is Day 5 of trial.

8              Appearance of counsel, please?

9              MR. KAPLAN:  For the plaintiff, Steve Kaplan,

10  Michelson Kane Royster & Barger, Your Honor.

11             MR. HUG:  For the defendant, The Pike Company,

12  Christopher Hug of Robinson & Cole.

13             MS. VENNOS:  For the defendant, Deb Vennos of

14  Robinson & Cole.

15             THE COURT:  And I see Mr. Flynn is also present

16  in the courtroom and Mr. Oloff is on the stand.

17             Please continue with your examination.

18             MR. HUG:  Thank you, Your Honor.

19

20                        ED OLOFF,

21        a witness, having been previously duly sworn,

22        was examined and testified further as follows:

23

24

25

1                    CONTINUED DIRECT EXAMINATION

2     BY MR. HUG:

3     Q.   Mr. Oloff, yesterday I left off with sort of a final

4     question which is:  Were there any claims made with

5     respect to Phase 3 of the project?  Do you remember that?

6     A.   Yes, I do.  There was not.

7     Q.   Okay.  And that would include loss of productivity

8     claims for any other subcontractor other than ECI,

9     correct?

10    A.   That's correct.

11    Q.   And with respect to the project as a whole, were

12    there a lot of claims made?

13    A.   To my understanding, there was not.

14              THE COURT:  Claims made by --

15              MR. HUG:  Other subcontractors.

16    BY MR. HUG:

17    Q.   And no claims with the owner?

18    A.   No.

19              THE COURT:  Do you mean by claims, change orders

20    or --

21              MR. HUG:  Lawsuits.

22    BY MR. HUG:

23    Q.   How about loss of productivity claims, any claim,

24    change order, requests for equitable adjustment, did any

25    subcontractor -- let's stick with Phase 3.  Did any

1    subcontractors make any request for equitable adjustment

2    or change order for loss of labor productivity with

3    respect to Phase 3?

4    A.    Only ECI, to my knowledge, yes.

5    Q.    Okay.  Let's jump to the July 21 meeting.  And just

6    for the witness's edification, there has been testimony

7    prior to today about what happened at the July 21 meeting.

8    I may skip through some things.

9         The July 21 meeting, first of all, were you there?

10   A.    I was.

11   Q.    Who else was there?

12   A.    Mel Strauss was there.  Cliff Clauson was there.

13   Stephane Mathieu was there.  And Bill Flynn.

14   Q.    Do you know who called the meeting?

15   A.    I do not recall.  I think it's something that Mel and

16   Cliff set up together.

17   Q.    All right.  What were you told was the purpose of the

18   meeting?

19   A.    I understood the meeting was to be an issues meeting,

20   to work through the remainder of the project, talk about

21   how we were going to catch up and get to our ending.

22   Q.    Is that an uncommon meeting to have with a

23   subcontractor during the course of the project?

24   A.    No.

25   Q.    And during this meeting, did you get into the details

1    of how that was going to happen?

2    A.   Yes.

3    Q.   Did you have a working session of how you were going

4    to accomplish that?

5    A.   Yes.

6    Q.   All right.  And do you recall that session as being a

7    gripe session?

8              THE COURT:  Is there any way you could be more

9    open ended of questions at this point?

10             MR. HUG:  Thank you, Your Honor.

11   BY MR. HUG:

12   Q.   Do you recall any contentiousness at this particular

13   meeting?

14   A.   I do not.

15   Q.   Do you recall claims being raised at this meeting?

16   A.   I do not.

17   Q.   Did ECI raise concerns about what -- how the project

18   was proceeding at that meeting?

19   A.   What I recall at the meeting was I was talking about

20   the need to get resources, catch up, and continue and

21   complete areas and make sure we were making our end date.

22   Q.   Was any request for extension of time made?

23   A.   No.

24   Q.   We've heard testimony that there was a four-week

25   request for extension of time.  Did that come up in any

1    way during the course of that meeting?

2    A.    I do not recall that coming up.

3    Q.    Do you recall the concept of a Plan B discussion at

4    all?

5    A.    I do.

6    Q.    Could you describe for the Court that Plan B

7    discussion?

8    A.    You know, I think what came up is, "What's Plan B?"

9    And the response was typically, "There is no Plan B."

10   Q.    What do you mean by that, the concept of Plan B came

11   up?  In what context was that?

12   A.    The context of what if we didn't make it.  With what

13   was at stake, with the kids coming back, there was nowhere

14   else the kids could go.  The kids had to get back to

15   school, get back in the classrooms.  We had to finish that

16   job.  There was no Plan B.

17   Q.    I see.  So when you say came up, what were you

18   talking about?  Were you talking about meeting the end

19   date?

20   A.    Meeting the end date.

21   Q.    At that time was there any discussion about

22   alternatives to opening the school late or something along

23   those lines?

24   A.    I don't recall those suggestions.  My understanding

25   of the meeting was to do what we had to do to meet the end

1   date, make sure we were working on that.

2   Q.   Okay.  Did you discuss at all any of your

3   observations about ECI's performance up to that point in

4   time?

5   A.   I believe I did, yes.  I think I talked about the

6   need for manpower to make sure we were getting things in

7   place or other resources, whatever it might take.  I

8   believe we were still on second shift at that point, there

9   was opportunity there.  And more foremen to watch over and

10  supervise people to make sure that they were being

11  productive.

12  Q.   Did you express those thoughts to ECI at that

13  meeting?

14  A.   Yes.

15  Q.   After that meeting was over -- we touched upon

16  this -- did Pike give ECI some schedule relief in certain

17  areas?

18  A.   We did.  In the art room and locker room.

19  Q.   And you've already testified about the timing of when

20  that occurred, correct?

21  A.   Correct.

22  Q.   Did ECI, either Mr. Flynn or anybody else from ECI at

23  that meeting, make any claim or contention about that they

24  would be filing a claim?

25  A.   No.

1   Q.   Did they ask for extra compensation?

2   A.   No.

3   Q.   Did you laugh at them for any -- to anything they

4   said during the course of that meeting?

5   A.   No.  I don't recall an unprofessional conversation

6   with anybody from ECI.

7   Q.   At any time?

8   A.   At any time during that job.

9   Q.   And on the July 21 meeting did you treat any of their

10  comments or requests with a derogative tongue?

11  A.   No.

12  Q.   Was there any discussion at that meeting about any

13  particular areas such as the art room or storage room or

14  any other room in there, the electrical rooms?

15  A.   I believe the electrical rooms came up.  Bill I think

16  noted or Cliff that the -- need to get some electrical

17  work done.  I forget the exact rooms, but we did take that

18  as an action item and make sure whatever those action

19  items were were completed quickly right after the meeting.

20  Q.   All right.  So there were issues that came up and you

21  discussed a resolution about?

22  A.   Yes, just like any other day.

23  Q.   Were there other issues that came up that you can

24  recall?

25  A.   Not that I recall.

```
 1   Q.   Okay.  You believe, though, there were other issues
 2   that came up?
 3   A.   I'm sure there were a few other things that came up
 4   during the meeting, yeah.
 5   Q.   At the end of the meeting how do you think it was
 6   left between the two companies?
 7   A.   I think it was left that we came up with a game plan
 8   and we were going to go execute it and finish the job on
 9   time.
10   Q.   Did you have an understanding that ECI was going to
11   have a claim against Pike?
12   A.   That was not my understanding.
13   Q.   By the way, if in a situation where you understand
14   there is going to be a claim or potential claim that will
15   be filed against Pike or the owner or anybody, what do you
16   do under those circumstances?
17   A.   We would definitely call a meeting, schedule it, talk
18   to them what their claim was for, and work to resolve
19   whatever those problems would have been.
20   Q.   That's what you would do with this particular
21   subcontractor that was making a claim, right?
22   A.   Absolutely.
23   Q.   You would discuss a resolution, that is?
24   A.   Yes.
25   Q.   And what kinds of resolutions would you -- I mean,
```

1    it's a general question, but in the course of a project,

2    are there things that you can do during the course of a

3    project to ameliorate any stress a subcontractor might be

4    having?

5    A.   I guess it depends on what the issue is.

6    Q.   Depending upon what the issue is, there may be ways

7    to do that, correct?

8    A.   Certainly.

9    Q.   So I gather, from your testimony, it's important to

10   understand what those are and address those?

11        MR. KAPLAN:  Objection, Your Honor.  We're

12   leading again.  I'd like to have the witness testify, not

13   counsel.  This is summation.  It's an improper question.

14        THE COURT:  If you could be a little more open

15   ended.

16        MR. HUG:  That was sort of a summary to close

17   out an item.  It wasn't really -- it's not so much leading

18   as it is packaging, which is I think a typical practice.

19   In any event, I've gone slow enough I think the Court gets

20   it.  I'll move on to another topic rather than rephrase

21   it.

22        THE COURT:  Fair enough.

23   BY MR. HUG:

24   Q.   Mr. Oloff, we've heard some testimony about claims

25   made at this meeting and a direction that there was

1    additional manpower.  How did that come up in the

2    context -- if it came up at all, how did it come up in the

3    context of this meeting?

4    A.   I don't recall any claim during this meeting.  I

5    don't recall any request of anything like that.  I'm sure

6    we talked about manpower as one of the resources available

7    to expedite the work and make sure it was getting done

8    timely and that we were going to finish.  My understanding

9    of that meeting was get it finished and make sure we had

10   whatever we had to do to make that date.

11   Q.   Let's go back to the other line of questioning I was

12   asking you.  If a claim had been filed, you've talked

13   about what you do with ECI or any subcontractor.  Would

14   you do anything else with the people up the food chain?

15   A.   Absolutely.

16   Q.   What would you do?

17   A.   They would get notified through Pike right up to the

18   upper management right away.

19   Q.   Are there reports that Pike does for the management?

20   A.   There is.  There's a monthly report that goes in and

21   I believe there's a claim piece associated with that

22   report that would get filled out.

23   Q.   Do you prepare that document?

24   A.   Mel Strauss would prepare that document.

25   Q.   But you provide input to Mel Strauss for that

 1  document, correct?

 2  A.   Correct.

 3  Q.   So anybody else other than the owner, is there

 4  anybody else you'd tell?

 5  A.   The owner and upper management.

 6  Q.   Okay.  And to your knowledge, is there any

 7  document -- sort of proving a negative, but is there any

 8  document that exists that you reported a claim to upper

 9  management in or about July 21?

10  A.   Not that I recall, no.

11  Q.   Okay.  But the monthly reports to the owner, those

12  are done primarily by Mel Strauss?

13  A.   Yes.

14  Q.   Okay.  I'll do those with Mel Strauss.

15       At this July 21 meeting, did you try to shove the

16  contract, subcontract down ECI's throat?

17  A.   No.

18  Q.   Did the subject of the subcontract come up in the

19  context of that meeting?

20  A.   It's possible it came up.  I don't recall it coming

21  up.  I was really focused on what we were going to be

22  doing to finish and meet the end date, as I said.  The

23  contract at that point, you know, I think the focus was on

24  how we get the work in place, not so much shoving a

25  contract down somebody's throat.

1    Q.   Do you recall any discussion regarding liquidated

2    damages at that meeting?

3    A.   No.

4    Q.   In fact, do you know if there's even liquidated

5    damages in the contract?

6    A.   I do not.  I don't believe there is.

7    Q.   And over the course of this project, did you receive

8    requests for change orders from ECI?

9    A.   Yes.

10   Q.   And how would those typically be raised?

11   A.   Could have been the architect submitted something.

12   Could have been we found something in the field that was

13   different than in plans when it was issued and a change

14   was created to it.

15   Q.   And then when you -- when an issue arose, how would

16   it be dealt with?

17   A.   Depending on what the issue is, it would typically

18   get documented.  We would get the answers back from the

19   engineers.  We would come up with a plan how to move

20   forward.  Get it priced and move forward.

21   Q.   How would it be documented?

22   A.   It would be documented through a contract change

23   order.

24   Q.   Okay.  And that's a written document?

25   A.   Correct.

1    Q.    And would it be priced out?

2    A.    It would typically be priced out.  Depending on the

3    complexity of the work and how fast it needed to happen,

4    it could be they were directed to proceed and do a T & M,

5    time and material.

6    Q.    And to your knowledge, did ECI execute change orders

7    in connection with this project?

8    A.    Yes.

9    Q.    All right.  So ECI knows how to do change orders?

10   A.    Yes.

11   Q.    I want to show you what's been marked as Exhibit 44,

12   should be in one of those volumes, it's already been

13   marked as an exhibit.

14           MR. KAPLAN:  Volume III.

15           MR. HUG:  Thank you.

16   BY MR. HUG:

17   Q.    I want you to take a look at Exhibit 44 and take a

18   look through the first two pages.  Do you see that?

19   A.    Yes.

20   Q.    And what does this regard?

21   A.    A change for a temporary feed for the temporary

22   generator.

23   Q.    Is that something that happened during Phase 3 of the

24   project?

25   A.    It looks like it was for Phase 3, yes.

1  Q.  Okay.  And it's dated August 23, 2010, so that is in

2  Phase 3, correct?

3  A.  Correct.

4  Q.  I notice on the first page it says "We will require a

5  zero extension of time to complete this work"?

6  A.  Correct.

7  Q.  And where is this work to be done, can you tell from

8  this?

9  A.  I don't recall what this work was for.

10  Q.  Okay.  And then attached to that is a summary sheet

11  from ECI?

12  A.  Yes.

13  Q.  Okay.  And that's where ECI substantiates their costs

14  for this change order?

15  A.  Correct.  It's their breakdown of cost.

16  Q.  And then following the submission of these two

17  documents, what would happen?

18  A.  This would get turned in to Mel Strauss and he would

19  process it.

20  Q.  And then ultimately it would result in a change

21  order, correct?

22  A.  Correct.

23  Q.  All right.  Now, take a look at -- take a look at

24  Exhibit 48.  What is Exhibit 48?

25  A.  It's their application for payment.

```
1    Q.   All right.  And on the front page of this there is --
2    let's kind of go over how to read it.  The date -- where
3    do you see the date that this covers?  If you could
4    explain that to the Court.
5    A.   Application date is September 30, 2010.  Period to
6    September 30.  This would be September's payment issue.
7    Q.   Okay.  And then you have below that sort of heading
8    area, you have the contractor's application for payment on
9    the left-hand side?
10   A.   Yes.
11   Q.   And you have nine different line items.  If you could
12   just take the Court through what those line items mean?
13   A.   The original contract amount is the base job.
14   Q.   All right.
15   A.   Change orders to date is next.
16   Q.   All right.  So that's where the change orders
17   actually come into the price of the contract, increase the
18   price of the contract?
19   A.   Correct.
20   Q.   They could also decrease the price of the contract if
21   it was in that deduct?
22   A.   It could.
23   Q.   Next line?
24   A.   Combined amount with the new total.
25   Q.   A number 4 is?
```

1    A.    Number 4 is work completed and anything they may have

2    stored.

3    Q.    And how is the work completed determined?

4    A.    It's -- there's a requisition behind this that shows

5    all the breakdown of areas, percent complete, schedule of

6    work in phases.

7    Q.    All right.  And that shows the schedule of work

8    complete up through whatever period of time it's through?

9    A.    Correct.

10   Q.    Okay.  The retaining summary, line 5, what does that

11   mean?

12   A.    The amount of retainage kept for payment for a

13   certain amount of time.

14   Q.    And number 6?

15         THE COURT:  I'm sorry, what is retainage?

16   BY MR. HUG:

17   Q.    Could you explain what retainage is, sir?

18   A.    So, there's 5 percent retainage kept on each

19   application that he submits until the end of the project.

20   Q.    Is it an amount withheld from each payment?

21   A.    It is.

22   Q.    For what purpose?

23   A.    For problems that may exist that need to be fixed.

24   Q.    And when does it get paid, if ever?

25   A.    At the end of the project or 12 months after the

1    project is complete, I forget when the retainage is paid.

2    Q.   What's a punch list?

3    A.   Punch list is deficiencies in the building that we do

4    after the work is near completion or at completion to make

5    sure they all go on a list and get fixed.

6    Q.   All right.  And is the retainage withheld for any

7    particular purpose, conceptually, now?

8    A.   For punch lists.

9    Q.   Is retainage something unique to this project?

10   A.   No.

11   Q.   Is it pretty standard in the industry?

12   A.   It's pretty standard in the industry.  I don't recall

13   a job I've done without retainage.

14          MR. HUG:  Does that answer your question,

15   Your Honor?

16          THE COURT:  Yes, it certainly does, thank you.

17   BY MR. HUG:

18   Q.   Number 6, total completed less retainage.  That's a

19   mathematical function?

20   A.   It is.

21   Q.   Previous applications, what does that mean?

22   A.   Another mathematical function.  Previously paid.

23   Q.   And then 8 is what?

24   A.   It's the current payment due for that period.

25   Q.   All right.  And then 9?

1    A.   Contract balance including retainage, what's left to

2    go.

3    Q.   There's a little box under there, Change Order

4    Activity.  And it indicates what?

5    A.   Total previously approved.  Additions and

6    subtractions.  Total approved this month.  Looks like

7    there wasn't any.  Subtotals which, since there wasn't

8    any, match the above line items.

9    Q.   And that's true, if we go back to Exhibit 47, the one

10   right before that, we see the application for payment for

11   the previous month, correct?

12   A.   Correct.

13   Q.   And that indicates no change orders during that time

14   period covered through August, right?

15   A.   No change orders?

16   Q.   Were there change orders in August pursuant to this

17   schedule?

18   A.   Well, they're billing for some change orders under

19   line 2.

20   Q.   They are?

21   A.   Yes.

22   Q.   Where is that showing?

23   A.   Under line 2.

24   Q.   Okay.

25             THE COURT:  Is that for net of change orders?

1           MR. HUG:  Net of change orders.

2    BY MR. HUG:

3    Q.   I was looking about change orders activity this

4    month, that box below.

5    A.   Oh, total approved this month, there was zero.

6    Q.   And then we take a look at the immediate previous

7    exhibit -- yeah, 46.  And that covers the period July 31,

8    2010?

9    A.   Yes.

10   Q.   All right.  And that -- looking at change orders, it

11   says now net of change orders zero, line 2?

12   A.   Correct.

13   Q.   And it says total approved this month, zero?

14   A.   Correct.

15   Q.   I'm trying to understand, that's immediately

16   preceding month.  And then the August application goes up

17   to 37,000?

18   A.   Correct.

19   Q.   Were there 37,000 change orders during the August

20   month?

21   A.   It appears as though there were.  It could have been

22   that there was some stuff built up from that month and

23   maybe a previous month.

24   Q.   Okay.  But it gets docketed in August?

25   A.   Looks like when they started billing their change

1    orders, so I'm not sure exactly when the change order

2    happened.

3    Q.   Okay.  And do you get involved in the applications

4    for payment?

5    A.   Yes, I would look them over for percentage complete.

6    Q.   All right.  And to the best of your knowledge, were

7    the percentages complete for the months of July and

8    August 2010, as submitted by ECI, accurate?

9    A.   Yes.

10   Q.   Let's turn to the Exhibit 47 and let's go over how to

11   read that percentage complete.  Take the Court through

12   that.

13        So if I look to the application for payment on page 2

14   continuation sheet?

15   A.   Yes.

16   Q.   Could you explain to the Court what those show?

17   A.   It shows specific line items with monetary figures

18   assigned to them that get tracked throughout the job.

19   Each month work is done to monitor how much they're doing

20   in a month and what they're billing for.  So if you were

21   to take item 21, for example, branch material, they have

22   $6,200 assigned to it.  They've already billed $5,890

23   previously.  They're not billing this period.  There's

24   nothing presently stored.  Total completed stored is

25   5,890.  95 percent complete with that item.  And there's

1    $310 remaining to complete at sometime further in the

2    project.

3    Q.   So that percentage, there's a percentage completion

4    line that may change from month to month, go up from month

5    to month?

6    A.   Go up.

7    Q.   And pretty much the other numbers are fixed or at

8    least the Contract Value, Column C, is that a fixed

9    number?

10   A.   Yes.

11   Q.   Okay.  So -- and then if you go to -- are they broken

12   out by phases at all?

13   A.   Yes.

14   Q.   Okay.  Turn to line item 77.

15   A.   Okay.

16   Q.   Line item 77, I notice there's zeros and all that.

17   Why is that?

18   A.   That's just a heading for all the activity below it.

19   Q.   And are the line items below it in a particular

20   phase?

21   A.   They're in Phase 3.

22   Q.   Okay.  And does that Phase 3 go all the way to line

23   item 115?

24   A.   Correct.

25   Q.   So you could -- you look down the line items and you

1    see percentage complete of the contract value, it's

2    between Columns G and H, I can see as of this application

3    for payment for the period for which this application is

4    for payment, the amount of percent complete, correct?

5    A.    Correct.

6    Q.    And that goes by each of the line items, right?

7    A.    It does.

8    Q.    So we're looking at August 31.  That's pretty much at

9    the end of Phase 3?

10   A.    Yes.

11   Q.    So I see a lot of them 100 percent?

12   A.    Yes.

13   Q.    And that's not surprising to you, is it?

14   A.    It's not.

15   Q.    So if you go to the previous application, Exhibit 46.

16   And I go to line item 77 on that one.  That's the

17   beginning of Phase 3, right?

18            THE COURT:  I'm sorry, the date on this one is?

19   BY MR. HUG:

20   Q.    What period does it cover?

21   A.    It covers through July 31.  So it would cover the

22   month of July 2010.

23   Q.    And can you see from these things the percent

24   complete, these various items?  Line 77?

25   A.    Yes.

1    Q.   So there's general conditions -- what are general

2    conditions?

3    A.   General conditions are, you know, setting things up,

4    being part of that phase, whatever stuff they had to go

5    into that.  Mobilizations, things like that.

6    Q.   Does it include the trailer?

7    A.   Yeah.

8    Q.   Includes some of their administrative costs?

9    A.   Yes.

10   Q.   And they have that at 20.  Schedule, do you know what

11   line item that is?

12   A.   81?

13   Q.   Yes.

14   A.   So that would be scheduling.  Probably their foreman

15   and their project manager looking over schedules, making

16   sure they had the resources, do whatever it took.

17            MR. KAPLAN:  Objection, Your Honor.  I don't

18   know that the witness has knowledge of what ECI included

19   in those items in terms of who was doing what.

20            THE COURT:  You're free to explore that on

21   cross-examination.  I think he has ample knowledge what

22   the general practice is.

23   BY MR. HUG:

24   Q.   You did review these for the purposes of percent

25   complete?

1  A.   I did.

2  Q.   And make sure they were accurate?

3  A.   Yes.

4  Q.   Now, some of these line items, 80 through 83, are

5  those different kinds of line items than some of the

6  others, the others after that?

7  A.   Yes.

8  Q.   How are they different?

9  A.   It's not work in place.  It's, you know, requirements

10 of the job, clean up, safety, so it's a different type of

11 thing.  It's not pulling wire and putting it in place.

12 Q.   So 84 is demolition, right?

13 A.   Yes.

14 Q.   Okay.  And that has a percentage complete of 90?

15 A.   Yes.

16 Q.   And branch conduit is 85, what's the percent complete

17 there?

18 A.   100.

19 Q.   And then branch wire material is 86?

20 A.   It looks like a 60.

21 Q.   And then the next one is 87 -- I'm not going to go

22 through all of them.  Making sure the Court can see and

23 understand what the percentages are.

24 A.   That one's 30.

25 Q.   Okay.  95, jump down to that, branch conduit gym

1    labor?

2    A.    90.

3    Q.    Branch finishes material, 97, what's that?

4    A.    100 percent.

5    Q.    Feeder wire material, that's material though.

6          Let's look at labor.  Branch wire gym labor is what?

7    A.    50 percent.

8    Q.    Now, at this point in time in the project, material,

9    does it surprise you to see 100 percent material bought

10   out or 100 percent done on materials or high percentage of

11   materials bought at 50 percent or July 31 for Phase 3?

12   A.    It does not surprise me.

13   Q.    Why not?

14   A.    Because they brought a lot of stuff in so it would be

15   available to do the job.

16   Q.    So the materials may have been ahead of the actual

17   work installed?

18   A.    Yes.

19   Q.    98, branch finishes labor, 0 percent, that's right?

20   A.    Correct.

21   Q.    Okay.  What kind of work is that?

22   A.    Branch finish labor is probably final pulls, maybe

23   some termination.

24   Q.    102, feeder wire labor?

25   A.    30 percent.

1    Q.   Switch gear labor, number 104, what is that?

2    A.   70 percent.

3    Q.   Lighting labor, 106?

4    A.   10 percent.

5    Q.   And systems labor?

6    A.   40 percent.

7    Q.   Okay.  So that's how -- and then it goes on with the

8    other phases, too?

9    A.   Correct.  Probably very similar chart.

10   Q.   Let's just take a quick look at Phase 2.  Phase 2

11   starts on line 32.

12   A.   Okay.

13   Q.   And looking at Column E, does Column E represent work

14   percentage performed or the functional equivalent of work

15   percentage performed during that period?

16   A.   Yes.  It is a monetary figure for the work that was

17   performed under that line item during that month.

18   Q.   And if you go through some of those line items, we

19   see the largest one is Item Number 60, lighting control

20   material, correct?

21   A.   Correct.

22   Q.   So that's just material, that's not labor at all,

23   it's $83,000 of material purchased and invoiced for that

24   period?

25   A.   Yes.

1   Q.    Number 48 or 46, is that labor?

2   A.    46 is branch conduit classroom lighting.

3   Q.    47, labor?

4   A.    Yes.

5   Q.    50 is labor?

6   A.    Yes.

7   Q.    57 is labor?

8   A.    Yes.

9   Q.    And you can see that because labor is in the heading,

10  correct?

11  A.    Yes, it's typically followed by labor or material,

12  depending how it is.

13  Q.    All right.  So from these kinds of schedule

14  applications, you go through and make sure that the

15  application reflects what's out in the field?

16  A.    What's on site for material and what's installed.

17  Q.    All right.

18          THE COURT:  And just a point of clarification,

19  these applications, I take it, are generated in the first

20  instance by the subcontractor?

21          MR. HUG:  Thank you, Your Honor.

22  BY MR. HUG:

23  Q.    Are they?

24  A.    They are.  They're submitted by the subcontractors.

25  Q.    Do you have an opportunity to review these and

1    dispute them?

2    A.   Yes.

3    Q.   And if there are disputes or if the percentage

4    complete is incorrect, do you go back and ask for

5    corrections?

6    A.   Yes, we would mark it up.  If they were billing for

7    1000 feet of conduit and I couldn't go down and put my

8    hand on it and see the conduit was there, we would

9    question it and say, What's the conduit for?  If it's not

10   there, we need to take it off.

11             THE COURT:  May I ask, what's the

12   significance -- why does the contractor care about the

13   percentage complete?

14             THE WITNESS:  The contractor would care about

15   the percentage complete because it's his way of billing

16   for that line item.  The percentage complete is a direct

17   correlation to the monetary amount they would bill for at

18   the end of the month.

19   BY MR. HUG:

20   Q.   So you had a -- let's take it back a step.  I think

21   actually Attorney Kaplan went over this a little bit with

22   Mr. Madore or Mr. Clauson, but your question suggests

23   maybe we should go over it again.

24        They had -- ECI had a contract price, correct?

25   A.   Correct.

1    Q.    And after the contract was in effect, did you set up

2    a method by how they were going to bill for their work?

3    A.    Yes.

4    Q.    Okay.  Explain that to the Court.

5    A.    So what a subcontractor would do, would provide a

6    requisition.  And it would be detailed similar to this

7    one, by phase, by activity.  And they would load these

8    activities with how much it cost to do the work, whether

9    it would be material or labor.  And then the rest of the

10   sheet is pretty much calculated by that number.

11   Q.    And it's broken out by phase?

12   A.    And this one is broken out by phase.

13   Q.    And then each month they submit an application.  And

14   in that application what do they do?

15   A.    They go through each activity, see where they've done

16   work or brought in material, and increase the percentages

17   accordingly.

18   Q.    Okay.  Let's contrast that to they don't submit you a

19   bill each month for how much labor has been spent by them

20   or materials at the cost purchased by them, do they?

21   A.    No.  We don't see that.  We only see the requisition.

22   Q.    So earlier in this trial we talked about buyout of

23   materials.  You don't get the advantage of if they bought

24   the materials for less cost, you don't just get billed the

25   costs for buying those materials?

1    A.    No.

2    Q.    You bill a percentage of whatever they have on the

3    line item for that material?

4    A.    Correct.  The contract amount would be adjusted if

5    they had economies or --

6    Q.    Okay.  And with respect to labor, who prepared -- did

7    ECI prepare its own schedule of values?

8    A.    They did.

9    Q.    And submitted it to you at the beginning of the job,

10   correct?

11   A.    Correct, it is.

12   Q.    And they submitted it broken out by phase?

13   A.    Yes.

14   Q.    And then with each application for payment, they

15   updated it to reflect the work that was done in the field?

16   A.    Correct.

17   Q.    And then you went and verified that the materials

18   were purchased and the labor done?

19   A.    Correct.

20          MR. HUG:  Okay.  Sorry to lead there,

21   Your Honor, but I wanted to it in a package.

22          THE COURT:  It's helpful, thank you.

23   BY MR. HUG:

24   Q.    After that is done, do you sign off on the

25   application for payment and the schedule of values?

1    A.    After I review it, I gave it back to Mel.  Mel would

2    go through it and then follow up with anything that was on

3    it that needed to be reviewed.

4    Q.    Is it your expectation, when you received those

5    applications, the information on there is true and correct

6    concerning the percentage complete?

7    A.    It is.

8              MR. HUG:  Exhibit 532, Counsel.

9    BY MR. HUG:

10   Q.    Mr. Oloff, do you recognize Exhibit 532?

11   A.    I do.

12   Q.    And is this a document you're familiar with?

13   A.    It is.

14   Q.    What is it?

15   A.    It's a report card.  Pike Company would send report

16   cards to their clients to fill out how they feel about the

17   project teams, how the project is going.  And it's an

18   opportunity to find out how we're doing.  And then we

19   would review that in-house to make sure we're responding

20   to something if there was a weakness somewhere.

21   Q.    All right.  Do you send these out periodically during

22   the course of a project?

23   A.    Yes.  We don't actually know when they're going out.

24   The office would send these out.  But we would follow up

25   with them after they came back.

1    Q.   And you get to see these documents yourself?

2    A.   I do.  I was copied on the documents when they came

3    back.

4    Q.   Are these documents used in just the Kelly Middle

5    School project?

6    A.   No.

7    Q.   Are they used widespread?

8    A.   They're used on every job that we did is my

9    understanding.

10   Q.   Are these documents generated by Pike in the ordinary

11   course of business?

12   A.   Yes.

13   Q.   Are they maintained by Pike in the ordinary course of

14   business?

15   A.   Yes.

16   Q.   And you review them in the ordinary course of

17   business?

18   A.   Yes.

19             MR. HUG:  I'd offer this document.

20             THE COURT:  Objection?

21             MR. KAPLAN:  Yes, sir.  Irrelevant.  They have

22   nothing to do with any of the issues that need to be

23   resolved in this case.  The determination the trial court

24   has to make has nothing to do with whether Pike's

25   architect or various owner representatives put smiley

1    faces on forms that Pike sent to them.

2              THE COURT:  All right.  I will overrule the

3    objection.  I do conclude it's at least relevant and it

4    goes to weight and not admissibility.  Exhibit 532, full

5    exhibit.

6    BY MR. HUG:

7    Q.   Sir, I'm not going to really go over this with you

8    other than to point to the fact that some of these are

9    dated at various times.  And if you go to -- by the way,

10   if you go to the one -- there's one in here for

11   October 12, 2010.  See that?

12   A.   Yes.

13   Q.   Okay.  So that's the one that's taken shortly after

14   Phase 3?

15   A.   Correct.

16   Q.   And the scale is 1 is strongly disagree and 6 is not

17   applicable and 5 is strongly agree, correct?

18   A.   Correct.

19   Q.   If they filled this out correctly, it will accurately

20   reflect their view of what's on the project?

21   A.   Yes.

22   Q.   Okay.  And it covers various items in terms of

23   various issues in the case or with the project, correct?

24   A.   Correct.

25   Q.   Now, if you go back to the very first one.

```
1   A.   Okay.

2   Q.   And you're given all strongly disagrees?

3   A.   Right.

4   Q.   Okay.  And we'll cover that with Mr. Lawler.  But

5   look at the comment.  What does that say?

6   A.   Says "Ed Oloff is one of the best supers I have

7   worked with in 30 years.  He's presently in the top two

8   trying to be number one."

9   Q.   Did you review these in the course of the project as

10  they came in?

11  A.   Yes.

12  Q.   Okay.  And you notice on that one, he has a lot of 1s

13  there.  You don't know why he put 1s instead of other

14  numbers in there, do you?

15  A.   I think he explained later that he filled it out

16  backwards.

17  Q.   Okay.

18  A.   He understood it to be the other way.

19  Q.   Now, there's other comments throughout in terms of --

20  I'm going to leave for the Court to review.

21       I would like to point to September 12, 2011.  That's

22  now a year after Phase 3 and this is from City of Norwich?

23            THE COURT:  Whereabouts is that?

24            MR. HUG:  It's right before the October 18, 2010

25  one, page before.
```

```
 1  BY MR. HUG:
 2  Q.   Again, on this one you're given all 5s in the various
 3  categories and there's a reference to great team.  And
 4  gives reasons under item number 16 that you're very --
 5  "Pike's very easy to reach and talk to."
 6       Did you consider yourself available during the
 7  project?
 8  A.   Yes.
 9  Q.   Were you physically there every day at the project?
10  A.   Yes.
11  Q.   Did you huddle in your trailer or were you out in the
12  field?
13  A.   I was out in the field quite a bit.
14  Q.   Did you try to talk to the subcontractors every day?
15  A.   Yes.
16  Q.   And did you try to see what was going on out there?
17  A.   Yes.
18  Q.   The next page, which is the October 18, 2010, there's
19  a comment on number 15.  Can you look at that?
20  A.   Yes.
21  Q.   This is shortly after Phase 3 is concluded.  He has
22  you marked as exceeding expectations?
23  A.   Yes.
24  Q.   And "Ed Oloff is the best super I have worked with in
25  my career over 40 years."
```

 1    A.    Yes.

 2    Q.    And then he says to turn over.  And the next page is

 3    handwritten notes?

 4              THE COURT:  And I've read those.

 5              MR. HUG:  Okay.  You even saw "He walks a little

 6    funny"?

 7              THE COURT:  I did.

 8    BY MR. HUG:

 9    Q.    Do you know what that's in reference to?

10    A.    I don't recall.

11    Q.    All right.  Okay, sir, that brings me to another

12    portion of what I want to do.

13          Turn to Exhibit 40 for the moment.

14          Okay.  Yesterday there was testimony about the

15    various correspondence that went back and forth between

16    Pike after Phase 3 concerning the project.  I don't want

17    to go over all of that again with you.

18          Do you recall attending a meeting in or about January

19    of 2011 with ECI to discuss their loss of productivity

20    claim?

21    A.    I believe I do.

22    Q.    And take a look at Exhibit 40.  And the first

23    paragraph.

24          And I take it that that January meeting didn't result

25    in a resolution, did it?

1    A.   It did not.

2    Q.   And do you know if Pike requested anything of ECI?

3    A.   I do believe there are a number of requests.

4    Q.   And did you understand March 4, this Exhibit 40 to be

5    the response to those requests?

6    A.   I do.

7    Q.   Okay.

8    A.   I could use a minute to look at this, though, if

9    that's okay.

10   Q.   Actually, what I really want you to do is take a look

11   at Exhibit 41.  You're familiar with Exhibit 41?

12   A.   Yes.  It's a response to the equitable adjustment

13   from Pike.

14   Q.   Were you involved in the preparation of this?

15   A.   Yes.

16   Q.   There are a number of pictures that are attached?

17   A.   Correct.

18   Q.   And you're familiar with those pictures?

19   A.   I am.

20   Q.   And did you actually put these pictures together and

21   the assistance in this response?

22   A.   I did.

23        MR. HUG:  Your Honor, I think this is the point

24   in my presentation where I think you want to keep a finger

25   on Exhibit 41.  You maybe want to take it out of -- I

1    think it would be best if you took it out of the binder

2    for a moment because I'm going to have several things in

3    front of you.

4              THE COURT:  Okay.  This is the promised triple

5    whammy document?

6              MR. HUG:  Yeah, that's right.

7              THE COURT:  Okay.

8              MR. HUG:  I don't want to raise expectations too

9    high here, Judge.  This is the part where I'm having him

10   go over several documents at once.

11             All right.  So Exhibit 645.  Judge, there's an

12   extra loose copy of 645.

13             THE COURT:  I'm fine here.  I'll keep this copy

14   in case I want to mark it up.

15   BY MR. HUG:

16   Q.   Yesterday, Mr. Oloff, I showed you Exhibit 645 and

17   you identified it yesterday.  I want you to have that in

18   front of you as well.

19        Lastly, I have an additional exhibit which has not

20   been marked as yet but I'd like to mark that as the next

21   exhibit number.

22             THE COURT:  Maybe 655?

23   BY MR. HUG:

24   Q.   Okay.  Exhibit 655, sir, have you seen that before?

25   A.   Yes.

1    Q.   And what is that?

2    A.   It's a different breakdown of the schedule showing

3    baseline start, baseline finish, current start and current

4    finish.  Another way of breaking out the schedule.

5    Q.   Okay.  We saw during the examination of Mr. Flynn a

6    breakout of the schedule for Phase 3 for electrical work

7    only without the areas?

8    A.   Yeah.

9    Q.   This has them broken out by area?

10             MR. KAPLAN:  Objection, mischaracterization of

11   the document.  All the areas are in there, it's just

12   listed in a different order.

13             MR. HUG:  Correct.  He's actually correct.

14   BY MR. HUG:

15   Q.   They're broken out, the areas are broken out in a

16   different way?

17   A.   Correct.

18   Q.   All right.

19             MR. HUG:  I'd like to offer that.

20             MR. KAPLAN:  No objection.

21             THE COURT:  I don't have a copy.

22             MR. HUG:  I'm handing it.

23             THE COURT:  Exhibit 655, full exhibit.

24   BY MR. HUG:

25   Q.   Okay.  What should be in front of you, Mr. Oloff, is

1    655, 645 and 641.  Okay?

2    A.    41.

3    Q.    Or 41, thank you.

4          Looking first at Exhibit 645, as you've previously

5    testified, that is the baseline versus 9/12 update, do you

6    see that?

7    A.    Yes.

8    Q.    Does that have tasks in it that are nonelectrical?

9    A.    Yes.

10   Q.    And Exhibit 655, that one, does that one have

11   nonelectrical in it?

12   A.    No, this is electrical activities only.

13   Q.    Okay.  Let's start with the admin. area.

14   A.    Okay.

15   Q.    The Court has seen now a number of times Exhibit 652

16   which shows P3AD, that's the admin. area?

17   A.    That's the admin. area.

18   Q.    Describe the work that was to be performed in the

19   admin. area during Phase 3.

20   A.    There was demolition work, electrical rough-in work,

21   control wiring work, patching of walls, drywall, painting,

22   ceilings, millwork, and devicing and finishing.

23   Q.    So by the admin. area, that was the school's

24   administration area, like the principal's office?

25   A.    It was.

1    Q.    Referring to Exhibit 645, line item P3AD-140, what is

2    that?

3    A.    Demolition.

4    Q.    And when was that originally scheduled to start?

5    A.    On June 28.

6    Q.    And when did it actually start?

7    A.    On April 27.

8    Q.    Okay.  So that's looking at Target 1 early start,

9    right?

10   A.    That's right.

11   Q.    Early finish, is that the baseline finish date?

12   A.    It is.

13   Q.    When was that supposed to finish?

14   A.    June 29.

15   Q.    And what's the Target 1 early finish, what's that

16   date?

17   A.    July 6.

18   Q.    Has that little "a" attached to it?

19   A.    The "a" is when you actualize the activity.

20   Q.    And so July 6 is when I did my little request about

21   demolition in an area before, remember that yesterday with

22   the panels?

23   A.    Yes.

24   Q.    And hopefully the Court recalls that you don't close

25   out an activity until everything is done; is that right?

1    A.    Correct.

2    Q.    Let's take a look at now Exhibit 41.

3          Turn to the first set of color pictures, admin. area

4    number 1.

5    A.    Okay.

6    Q.    And what does that picture, top picture show?

7    A.    It shows the admin. area.

8    Q.    As of what date?

9    A.    As of July 1st.

10   Q.    All right.  So July 1st.  And what else does it show?

11   What does it show it happening in the admin. area?

12   A.    It shows that the area is substantially complete as

13   far as demolition, temp. lights are hanging.

14   Q.    Okay.  "Overhead rough-in is started," what does that

15   mean?

16   A.    ECI started to run the overhead rough-in above

17   ceiling bringing their conduits and cables into the area.

18   Q.    Next sentence, what does that mean?

19   A.    "Activities in this area are tracking on schedule."

20   So the area is tracking on schedule.

21   Q.    "ECI has not started any overhead rough-in, however

22   the area is available."  What does that mean?

23   A.    It means work could be going on in that area right

24   now.

25   Q.    But it's not yet started by ECI or it is started?

1   A.   Overhead rough-in is started.

2   Q.   Okay.  So that area shows in 7/1 that that area is

3   available for rough-in?

4   A.   Yes.

5   Q.   Taking a look now at Exhibit 645.  P3AD-200, do you

6   see that?

7   A.   Yes.

8   Q.   And what does that show?  What item is that?

9        I'm sorry, go to P3AD-340.  What is that?

10  A.   Electrical overhead rough-in.

11  Q.   That's what you were just talking about, right?

12  A.   Yes.

13  Q.   And that has it starting when?

14  A.   July 9.

15  Q.   And early finish is July 11 and the early start was

16  when?

17  A.   The target start?

18  Q.   Target start.

19  A.   July 13.

20  Q.   All right.  And actual finish was?

21  A.   July 16.

22  Q.   Okay.  So why did -- and the July 13, is that ECI's

23  actual start?

24  A.   Yes.

25  Q.   And can you tell that from the "a"?

1    A.   Yes.

2    Q.   All right.  Do you know why ECI wasn't starting their

3    electrical rough-in on June 1st?

4    A.   I believe they had small number of people there still

5    and they were working on make safe activities.  And then

6    they worked their way back into this area.

7    Q.   And so was there anything impeding ECI's ability to

8    start electrical overhead rough-in in the admin. area?

9              MR. KAPLAN:  Could you give a time frame,

10   please?

11   BY MR. HUG:

12   Q.   From July 1st to July 13?

13   A.   No.

14             THE COURT:  May I ask?  I'm unclear.  It looks

15   like demolition was not complete until 6 July.

16             MR. HUG:  Correct.

17             THE COURT:  So is the witness's testimony that

18   the rough-in could occur before the demolition is done?

19             MR. HUG:  If I could have the witness -- I'd

20   love to answer, Judge, but I think you want him.

21   BY MR. HUG:

22   Q.   Could electrical contractors start before the

23   demolition was finally complete?

24   A.   Yes.

25   Q.   Why?

1    A.   Because I left activities open until the demolition

2    was complete.  In your example, if there was a piece of

3    plywood left to take down that wasn't affecting anything,

4    work could continue behind that activity.

5    Q.   Okay.  So you didn't close it out until -- as we went

6    over yesterday, you don't close anything out until

7    everything is done?

8    A.   Right.

9    Q.   Is that like a to-do list, when you see an open

10   activity?

11   A.   Correct.  So if an activity is 80 percent or 95

12   percent and there's a small amount done, it doesn't mean

13   work is being held up behind us.  Other work can continue.

14   Q.   So even though I look at the schedule and I look at

15   the demo isn't complete until July 6, it doesn't

16   necessarily mean that that area is impaired until July 6?

17   A.   Correct.

18   Q.   And even if it was impaired until July 6, do you know

19   why ECI did not start their electrical overhead rough-in

20   until July 13?

21   A.   Just manpower issue, I believe.

22   Q.   And does the photograph in Exhibit 41 help you

23   understand the condition of that area as of July 1st,

24   2010?

25   A.   Yes.

1   Q.   Now, let's take a look at electrical wall rough-in,

2   P3AD-200.  That has an early start and an early finish.

3   When did ECI actually start and finish?

4   A.   July 5.  And completed on July 7.

5   Q.   Was that ahead of schedule?

6   A.   It was.

7   Q.   And electrical wall rough-in and inspections, is that

8   a big work activity?

9   A.   It is.  Once that's completed, we're able to put the

10  drywall on the walls.

11  Q.   Is the inspection work-extensive activity?

12  A.   The inspection was an inspection by the local

13  building inspector.

14  Q.   All right.  That's not necessarily ECI doing work,

15  that's --

16  A.   That's ECI completing their work, having a local

17  inspector come through and look at it and make sure it

18  meets code, releasing it so we can drywall.

19  Q.   Okay.  All right.  Now, electrical control wiring,

20  that's P3AD-310.

21  A.   Yes.

22  Q.   When was that supposed to start and finish and when

23  did it actually start and finish?

24  A.   It was supposed to start on July 9 and complete on

25  July 10.  It started on July 6 and completed on July 14.

1    Q.    Okay.  So it was a two-day activity and extended out

2    to eight days of activity, correct?

3    A.    Correct.

4    Q.    Were they working on that the entire time?

5    A.    I do not recall if they were working on it

6    continuously.

7    Q.    Okay.  So it doesn't necessarily mean that -- by

8    looking at the schedule alone, does it mean that it

9    actually took them eight days to do that or --

10   A.    It could be that it took them eight days or could be

11   they pulled some guys, did something else, came back to it

12   and finished it.

13   Q.    The fact that it wasn't finished until July 14, does

14   that indicate that they were impaired in any way?

15   A.    No.

16   Q.    By saying no, it's saying the schedule doesn't show

17   they were impaired or were not impaired?

18   A.    Correct.

19   Q.    You can't tell necessarily by reading the schedule

20   alone?

21   A.    That's correct.

22   Q.    But you can see when they actually started the work?

23   A.    Yes.

24   Q.    Now, let's run down to the next electrical activity,

25   P3AD-750, I think it is.

1    A.   Okay.

2    Q.   That's electrical devicing.  Can you go over with the

3    Court the planned and actual dates and if you have any

4    information as to why the differential?

5    A.   Planned was July 22 through July 23.  Actual was

6    July 31 through August 11.  And I don't recall any reason

7    they would not be able to do that.

8    Q.   Okay.  Are you looking at any pictures?

9    A.   I am.  Walls were in place, work was available.

10   Q.   And you can tell the walls were in place by what?

11   A.   By the pictures and the activities.

12   Q.   And what pictures are you referring to?

13   A.   The pictures, the earliest picture I have of drywall

14   is on 8/5 on page 2.

15   Q.   Okay.  8/5.  All right.

16        Now, there's also an item P3AD-620.  What is that?

17   A.   Electrical and systems devicing.

18   Q.   How does that relate to P3AD-750?

19   A.   I believe this was more devicing for a piece of

20   equipment or something and not so much an inwall outlet or

21   receptacle switch type of device.

22   Q.   All right.  So let's take a look at the second --

23   well, let's go back to the first page on Exhibit 41.  I

24   want to take the Court through your 7/5/10 picture.  Two

25   pictures on the bottom of the first page.  I'm numbering,

1   and I think Attorney Kaplan numbered them as he went as

2   well.  I'm numbering, that's page 1.

3   A.   Okay.

4   Q.   What do those two pictures show?

5   A.   They show the administration area, framing in this

6   area is substantially complete and electrical wall

7   rough-in is ongoing.

8   Q.   All right.  Turn to the next page, the top picture,

9   7/9/10.

10  A.   Okay.

11  Q.   And what does that show?

12  A.   7/9 shows the electrical wall rough-in is complete in

13  the area and drywall is ready to begin two days earlier.

14  Area is tracking on schedule.

15  Q.   And you know that by looking at the schedule -- go

16  back to Exhibit 645 and give the Court a pictorial view of

17  that.

18  A.   If you look at the schedule on P3AD-890 drywall

19  walls.

20  Q.   Right.

21  A.   We started on the 7th.  The planned start was on the

22  11th.  So we were able to start early.

23  Q.   I notice the finish date, though, is three days

24  later, correct?

25  A.   Correct.

1  Q.   All right.  So does that impair any of ECI's ability

2  to start their work by finishing late?  Can you tell that

3  by looking at the schedule?

4  A.   ECI's next activity is electrical devicing that

5  starts on the 22nd as planned.  So as long as drywall was

6  done, they could have deviced.

7  Q.   The period between that is?

8  A.   Period between those activities is tape and finish

9  walls and first coat paint.

10 Q.   And were those done prior to the need to start

11 electrical devicing?

12 A.   They were completed before they actually started.

13 Q.   Did they need to be complete?

14 A.   They didn't need to be complete.  We often device and

15 tape the devices and paint around them.

16 Q.   And ECI actually started electrical devicing on

17 July 31 and finished August 11, see that?

18 A.   Yes.

19 Q.   Do you know of any reason why they had to wait until

20 July 31 to start their work?

21 A.   No.

22 Q.   By looking at the schedule, do you see anything on

23 the schedule that shows that they were impaired by looking

24 at actual finish dates, to the extent those are completely

25 accurate?

1    A.   No.

2    Q.   And I understand that even though something may not

3    be done, it may be done enough to do work in that area,

4    for example?

5    A.   Correct.

6              THE COURT:   What exactly is electrical devicing?

7              THE WITNESS:   Putting switches and plugs in,

8    whatever other devices there might be beyond that.

9    BY MR. HUG:

10   Q.   And the next activity is P3AD-460, light fixtures and

11   devices in grid.   How did those days compare between

12   baseline and actual?

13   A.   Looks like they were pretty close.   They took an

14   extra day or two to complete.

15   Q.   Do you have any knowledge as to why it took them some

16   additional time?

17   A.   No.

18   Q.   Okay.   Are you aware of anything going on in the

19   project that would have delayed them in that particular

20   area?

21   A.   I think ECI looked at devicing as low lying fruit.

22   And they took resources to go into areas that were being

23   impacted to get them moving along.   And then followed up

24   on the devicing in that area.

25   Q.   Next electrical activity is P3AD-620, electrical and

1    system devicing.  Is that activity tracking ahead or

2    behind schedule, according to this schedule?

3    A.   Behind schedule.

4    Q.   By how long?

5    A.   Three days.

6    Q.   All right.  Take a look at page 2, the other picture

7    8/5/10 which -- and you have the comment there "Electrical

8    devicing and finish plates are going and starting at least

9    three days ahead of schedule."  Could you explain that to

10   the Court, please, using Exhibit 645?

11   A.   The pictures indicate on 8/5 in the admin. area, "The

12   electrical devicing and finish plates are ongoing and it

13   started at least 3 days ahead of schedule.  The area is

14   clean and ready for following work."

15   Q.   Look at 645.  Is that consistent with Exhibit 645,

16   that comment?

17   A.   No.

18   Q.   Okay.  Explain.

19   A.   It looks like it's hard to tell by this picture.

20   Looks like fire alarm devices have started.  I can't tell

21   if it was a switch line on the wall.  Maybe they started

22   work in that area prior to the actual line date.

23   Q.   That's a reference in P3AD-630?

24   A.   Yes.

25   Q.   And that's tracking ahead of schedule?

1    A.   It is.

2    Q.   What are teledata electric fire alarm finishes?

3    Please explain that to the Court.

4    A.   Fire alarm finishes is like what's above the door by

5    the exit sign.  We plug all our computers and phone into.

6    Q.   Now, the top of the next page of 645 has just a

7    non-ECI item, right, final clean?

8    A.   Correct.

9    Q.   All right.  Now, let's turn to Exhibit 655 for the

10   moment, that's the new exhibit.

11   A.   Okay.

12   Q.   And just go over with the Court how to read this

13   document starting with -- I think the Court is by now

14   probably familiar with the P3AD-200 electrical and the

15   descriptions and the baseline and early start and baseline

16   early finish.  Are those the same as early start and early

17   finish?

18   A.   Yes.

19   Q.   Current start and current finish, are those the same

20   as Target 1 early start and Target 1 early finish?

21   A.   Yes.

22   Q.   And you also have a current finish?

23   A.   And actual finish.

24   Q.   Actual finish on that document.  There's a start and

25   finish variance columns?

1  A.   Yes.

2  Q.   I don't have any questions on that.  Those are just

3  functions of the computer looking at variances between

4  start and finish?

5  A.   Yes.

6  Q.   And then you have the graphics?

7  A.   Yes.

8  Q.   All right.  And the first area limits the graphics to

9  the admin. area through P3AD-2640, see that?

10  A.   Yes.

11  Q.   And it shows that fire alarm inspection is pushed out

12  from the middle of -- in the July 9 time frame towards the

13  end of August time frame, do you see that?

14  A.   I do.

15  Q.   What is that activity?

16  A.   Fire alarm inspection is the final inspection on fire

17  alarm inspection, walk around school, make sure everything

18  is working properly, it's ringing into the panel correctly

19  and alerting the fire department correctly.

20  Q.   Okay.  That's a critical path activity?

21  A.   It is.

22  Q.   Is it critical that that be done in -- I'm sorry, I

23  said probably July 9.  It looks like August 9 or 10 that

24  it's supposed to be done.  Was that critical to be done

25  August 9 in terms of getting the school open?

1    A.    No.

2    Q.    Did the fire inspector come and look at just the

3    admin. area?

4    A.    No.  Typically when we to this, we actually do it

5    towards the end after the last piece of the fire alarm

6    system has been installed and we ring it out.

7    Q.    If I look down at the toilet rooms and the art room

8    on that same page of Exhibit 65, I see the fire alarm

9    inspection.  Looks like it's the same date, right?

10   A.    Right.

11   Q.    And if I go over to the next page, I see -- I see

12   nothing on fire alarm and inspections there.  And then the

13   third page in the library, I see fire alarm inspections.

14   A.    Yes.

15   Q.    And again, is that about the same date as for the

16   admin. area?

17   A.    Yes.

18   Q.    And I see fire alarm inspections in the classroom

19   about the same date?

20   A.    Correct.

21   Q.    And on the final page, I see two more fire alarm

22   inspections on the same date?

23   A.    Correct.

24   Q.    Okay.  And those -- almost all of those, not all of

25   them, all except I think classroom corridor, they track

1    behind the original schedule, correct?

2    A.    Yes.

3    Q.    Is that an ECI labor-intensive activity?

4    A.    Yes.

5    Q.    Okay.

6    A.    Usually when you're ringing out fire alarm system,

7    you're chasing troubles, you're working through whatever

8    issues you might have.  If there's a bad connection, if

9    the device isn't working properly, it's difficult to find

10   and it can be very laborous.

11   Q.    And it could be laborous if things are done -- if

12   some of the work is not done per code, correct?

13   A.    Sure.

14   Q.    And it could be done because the fire alarm inspector

15   just wants it just so, correct?

16   A.    Yeah, it's usually an antsy time of the job.  You're

17   hoping everything goes perfect and once in a while you

18   have one or two problems that you have to follow up on.

19   But the contractor usually checks it out before we bring

20   an inspector comes in.

21   Q.    Inspector comes in, checks it; if it passes

22   inspection, you go on?

23   A.    Correct.

24   Q.    And you have the fire inspector come out one time?

25   A.    Typically, yes.

1    Q.    And that's typical for most projects?

2    A.    It is.  On this project we brought him out many

3    times, at the end of each phase.

4    Q.    Do you keep subcontractors apprised of that

5    modification, that it was going to be coming at the end?

6    A.    Yes, I don't think that was any secret to them.

7    Q.    Don't you have to tell people when the fire inspector

8    is going to come in?

9    A.    Yes.

10   Q.    ECI personnel and other personnel, they need to be

11   there, correct?

12   A.    They need to be there.  We would coordinate that in

13   conjunction with ECI.

14   Q.    Does the fire alarm inspection system involve any

15   other trades other than ECI?

16   A.    In some cases, it does.  The sprinkler system has

17   some components that tie to the fire alarm system and

18   there's some fire/smoke dampers from the mechanical

19   subcontractor that apply to that as well.

20   Q.    Okay.  So Exhibit 655, the bars in there give you

21   some graphic illustration.  I'm colored-blind, but I

22   understand there are only two colors in the actual bars.

23   Even though there may be an early bar that's in green that

24   I can't see.  But I think you've confirmed there's only

25   two colors?

```
 1   A.   I see two colors for the most part.

 2   Q.   And the baseline early bar is what color?

 3   A.   Light blue.  I'm colored-blind as well.

 4   Q.   It looks light blue to me.

 5        Progress bar is what color?

 6   A.   Dark blue.

 7        THE COURT:  And I think, for the record, there

 8   are green bars, but they're mostly to the right, in the

 9   September zone.

10        MR. HUG:  Okay, thank you, Your Honor.  They

11   don't look any different to me than the baseline entry

12   bar.  A lighter color, I see.

13   BY MR. HUG:

14   Q.   In any event, in focusing in on the baseline early

15   bar and progress bar, looking at the admin. area only,

16   does it show a graphic illustration of planned versus

17   actual?

18   A.   Yes.

19   Q.   Now, this gray area between August 16 and

20   August 30th, what does that show?

21   A.   It shows the last two weeks of the project.

22   Q.   Okay.

23   A.   Of the phase.

24   Q.   And this graphic highlights for the viewer the

25   activities that are going on in the last two weeks?
```

1    A.   Correct.

2    Q.   Now, I want to turn back to Exhibit 41 for a moment.

3    Your photos.  And go to the page 3 of the photos.

4              MR. HUG:  Your Honor, this will speed up a

5    little bit.

6              THE COURT:  Okay.

7    BY MR. HUG:

8    Q.   The top picture, see picture above on 8/7/10, do you

9    see that picture?

10   A.   Yes.

11   Q.   What does that show?

12   A.   It shows -- it says area above.  I assume I'm looking

13   at the picture below.

14   Q.   Okay.  The 8/7/10?

15   A.   Yeah.  The picture below it is the administration

16   area.

17   Q.   The picture above is some other area?

18   A.   I don't see the picture above on this sheet.

19   Q.   Oh, you don't?

20              THE COURT:  Are you on page 3, or 3C?

21              THE WITNESS:  I'm on what's labeled 3 in mine.

22              MR. HUG:  May I?

23              THE COURT:  Of course.

24   BY MR. HUG:

25   Q.   I think you might have been ahead.

1          Here.  3C, okay.

2               MR. HUG:  Your Honor, it says picture above on

3     8/7/10.

4               THE COURT:  I see.

5     BY MR. HUG:

6     Q.   What does that show?

7     A.   It shows the administration area substantially

8     complete with all finishes.

9     Q.   The picture in the middle, on 8/18, what does that

10    show?

11    A.   It shows another picture of the administration area

12    looking at the viewing window when people would enter the

13    building from the administration area.

14    Q.   All right.

15    A.   "See picture above 8/18/10 P3AD area.  ECI needed the

16    area to be left unfinished until they completed their work

17    in this area as there are multiple panels in this area.

18    Due to ECI needing more time in this area the ceiling

19    tile, flooring and millwork in this area as held off to

20    allow ECI to complete their work."

21    Q.   I see what you've written.  Can you explain that?

22    A.   There were control panels I believe on the ceiling

23    area there that they needed to complete.

24    Q.   Any reason why they couldn't complete that earlier,

25    other work that was in the way?

1    A.   Not that I recall.

2    Q.   Was that a problem for you?

3    A.   It may have been a concern, but I think we still had

4    time to finish.  I didn't see it as a big problem.

5    Q.   But that impacted other contractors, correct?

6    A.   It impacted the following trades.  But there was

7    little to do at that point, right.

8    Q.   Okay.  So would that be an accommodation to ECI?

9    A.   Yes.

10   Q.   Were these kinds of accommodations throughout the

11   project fairly common?

12   A.   Yes.

13   Q.   The next two pictures at the bottom, what area do

14   they show?

15   A.   "The P3T area, toilet room area.  The CMU is

16   substantially complete and the fire alarm panels have been

17   set to enable ECI to perform the fire alarm work.  This

18   area was focused on in order to complete in time and was

19   turned over to" -- oh, that's the same.

20   Q.   Okay.  Make sure you go to the next page because

21   there's duplicate pages.

22   A.   Is the next page 4?

23   Q.   No.

24   A.   Okay.

25            MR. KAPLAN:  4A, the color picture, is the next

1   page.

2            THE WITNESS:  It says 4C.

3            MR. KAPLAN:  3C and then -- you're right, 4C.

4   For color.  Thank you, sir.

5   BY MR. HUG:

6   Q.   Goes from this page to that page.

7   A.   "Area focused on in order to complete on time.  There

8   were 2 areas (P3AR, art room, P3LO, locker rooms) that

9   were identified as areas turned over late in order to

10  allow contractors relief in order to focus on the areas to

11  be turned over in time to allow school to begin.  The P3T

12  area completed on time and was turned over to the owner

13  prior to starting school.  The baseline schedule called

14  for this area to be completed on 8/24, however due to some

15  delays it was able to complete on 9/6 (9 days late) which

16  was still in time to start school."

17  Q.   Okay.  So there were some delays in this toilet area

18  and that is shown in this area right here, correct?

19  A.   Correct.

20  Q.   And it's right near the art room and come around the

21  corner into the locker room, correct?

22  A.   Correct.

23  Q.   And what were the problems, challenges that you had

24  in getting that area complete?

25  A.   That was the structural steel issues that we had

 1    throughout the art room, locker room.

 2    Q.   Was that ECI's fault?

 3    A.   It was not.

 4    Q.   Okay.  But it did actually affect ECI, correct?

 5    A.   Correct.

 6    Q.   And it affected other contractors as well?

 7    A.   It did.

 8    Q.   Now, take a look at Exhibit 645, page 2.

 9    A.   Okay.

10    Q.   And that, again, is a -- Exhibit 645 is the ECI plus

11    other activities.  What's ECI's first activity?

12    A.   Overhead electrical rough-in.

13    Q.   And when were they planned to start and to finish in

14    that area?

15    A.   Planned to start on the 23rd.  Planned to finish on

16    the 25th.

17    Q.   All right.  What was their actual start and finish?

18    A.   Started on the 21st and finished on August 6.

19    Q.   And why did it take them until August 6 to finish?

20    Was that affected by the steel issue?

21    A.   It may have been.

22    Q.   This is electrical overhead rough-in, is that in the

23    ceiling area?

24    A.   Yes.

25    Q.   And the steel was going to go in the ceiling?

1    A.    Correct.

2    Q.    So is it fair to say that more likely than not that

3    that area was impacted -- that activity may have been

4    impacted by the steel?

5    A.    That's fair to say.

6    Q.    P3T-5180, lighting in the grid.  That one has slid a

7    bit as well.  Could you explain that one?

8    A.    So if I would go back to ceiling grid, it was planned

9    to go up on the 2nd and the 3rd.  Ceiling grid went up on

10   August 18 through August 25.  The lighting started the day

11   after grid and actually completed before the ceiling grid

12   finished.  So we probably made sure the grid was in place

13   in order for him to finish his lighting or we were

14   finishing up some of the grid areas where it didn't have

15   light.

16   Q.    Okay.  Now, this is an example of if you take a look

17   at the baseline start and baseline finish of ceiling grid,

18   P3T-5150, it says ceiling grid start August 2, 2010 and

19   finished one day later?

20   A.    Correct.

21   Q.    I take it this toilet area is not very large?

22   A.    It's not.

23   Q.    But then the next item it had planned activity,

24   lighting in grid August 4 to August 4.  So put the

25   lightings up in one day, correct?

 1   A.   Correct.

 2   Q.   So it's fair to say that ECI, when looking at this

 3   schedule, thought the ceiling guy would be -- grid person

 4   would be done before they went in?

 5   A.   Yes.

 6   Q.   Okay.  But in actuality, ECI started working in that

 7   area before the ceiling grid was completely put up,

 8   correct?

 9   A.   Correct.

10   Q.   And they actually finished before the ceiling grid

11   was entirely finished?

12   A.   Correct.

13   Q.   All right.  And that was -- and describe for me the

14   working conditions, if you recall what they were like, for

15   the ceiling grid and the lighting person to work in that

16   area?

17   A.   It was a busy spot.  Main entrance to the building

18   coming in.  There was a lot going on.  Everyone was trying

19   to finish their work at that time.

20   Q.   Okay.  Was there anybody else working in there at

21   that particular time in that toilet area?

22   A.   Per the schedule, I don't see anything.  But there

23   was probably a few things going on in there.

24   Q.   Might have been some other activities going on?

25   A.   Sure.

```
 1    Q.    But you don't see anything in the schedule?

 2    A.    No.

 3    Q.    And would you expect that to slow ECI down if they

 4    have to work with the ceiling grid guy?

 5    A.    Depends on how much was ready.  If they could put one

 6    guy there and there was enough done in order to put their

 7    ceiling lights in, flow right behind him, it wouldn't slow

 8    them down.

 9    Q.    Depending -- did you notice that they were being

10    slowed down in their productivity in that particular area

11    during that time period?

12    A.    Not after they started.  I didn't take notes, no.

13    Q.    Did they complain to you about being impacted in the

14    toilet area?

15    A.    No.

16    Q.    Did they complain that they had a lot more manpower

17    in the toilet area to do that work?

18    A.    Not that I recall, no.

19    Q.    Okay.  And the lighting in the grid, was there a lot

20    of lighting in that grid in the toilet area?

21    A.    If we left a day in the schedule for the lighting, I

22    wouldn't imagine there was very much lighting.  It's a

23    pretty small area.

24    Q.    And that's the only other activity of ECI in that

25    particular area, correct?
```

1   A.   Correct.

2   Q.   So if I go over to 655 and I look at the graphic

3   illustration for the toilet room area, I see a couple

4   activities that aren't in the other one.  And I don't

5   understand Primavera enough to know why things sometimes

6   appear in the big schedule and don't always appear –– this

7   one has final MEP connections to equipment in the toilet

8   area also?

9   A.   Yes.

10  Q.   And that's showing having been moved out from earlier

11  on in the project in mid–July, see that?

12  A.   I do.

13  Q.   And final MEP connections to equipment, what is that?

14  A.   That could be a rooftop unit above the space on the

15  roof where they would conduit over and put some wires into

16  that equipment to tie it in.

17  Q.   And the final MEP connection to equipment, is that

18  the actual connection activity?

19  A.   Yes.

20  Q.   And that's listed as a one–day duration activity?

21  A.   Correct.

22  Q.   Does that describe the work that particular activity

23  has to involve?

24  A.   That's really going up, terminating the wires,

25  connecting the actual equipment.

1    Q.   Is that delay because of the structural steel, you

2    think?

3    A.   Likely.

4    Q.   Did you need to -- did you need to put the structural

5    steel in before the rooftop units?

6    A.   Yeah, probably had supplemental steel for the unit.

7    Q.   And then the other one we saw was fire alarm

8    inspection, you already explained that one?

9    A.   Correct.

10   Q.   Now, let's move on to the art room area.

11              MR. HUG:  Your Honor, I'm going to start another

12   area.  I lost track of time.  If you wanted to have a

13   morning break -- I don't remember when we started.

14              THE COURT:  We started about 8:30.

15              We'll take a break and reconvene in 20 minutes.

16                 (Whereupon, a recess followed.)

17

18              THE COURT:  Let's plan to go until 12:15 to

19   12:30 or earlier if Ms. Huntington wishes to stop, if

20   that's okay.

21              MR. HUG:  May I proceed, Your Honor?

22              THE COURT:  Please.

23   BY MR. HUG:

24   Q.   Mr. Oloff, we just completed talking generally about

25   the toilet room.  One last question in that area.  The

1    total days of ECI activity in that area for lighting in

2    the grid and final MEP inspection was anticipated to be

3    about how many days?

4    A.   One day for lighting.

5    Q.   And final MEP connections to equipment?

6    A.   One day.

7    Q.   Okay.  And the lighting in the grid indicates that it

8    was -- the actual start and finish was how many days?

9    A.   Five days.

10   Q.   Okay.  Do you know if they were installing the

11   lighting that entire period of time?

12   A.   No, I don't know sitting here.

13   Q.   Do you know any way it could take five days to

14   install the lighting in that room, why it would take five

15   days of time, actual time, people working on it in five

16   days?

17   A.   No.

18   Q.   And the MEP -- final MEP connections, it looks like

19   that was done and started and finished in the same day; is

20   that right?

21   A.   Correct.  That's a relatively simple activity that

22   probably would take less than a day.

23   Q.   And the duration of that was as planned, correct?

24   A.   Yes.

25   Q.   And the timing in which that occurred is in this

1    August 8, 16 through 30th time frame, right?

2    A.   Yes.

3    Q.   And I can look down through the three pages or so of

4    this schedule and see what activity, other activities fell

5    within that time frame, right?

6    A.   In the hashed area, yes.

7    Q.   If I go through those three pages of Exhibit 655, I

8    can see wherever there's a dark blue, I can see where

9    the -- what activities ECI was doing in that particular

10   time frame?

11   A.   Yes.

12   Q.   Okay.  And I could do that for the other time frames,

13   too, but that happens to be highlighted.

14        Let's go to the art room, storage corridor.  Let's

15   first turn to Exhibit 41 and the pages that has art room

16   color pictures, art room area number 3.  Tell me what the

17   picture on 7/1 shows.

18   A.   Picture on 7/1, P3AR, "Demo work in this area is

19   substantially complete and clean.  The exterior wall and

20   overhead rough-in is ready to start."

21   Q.   Okay.  So if I look at the art room, there is an item

22   for selective demolition and another item for complete

23   demolition, that is P3AR-170, P3AR-710.  Could you

24   describe for the Court what those activities are?

25   A.   Selective demolition is just going in to selectively

1    take out items, specific items.  Complete demolition would

2    be the structural demolition.

3    Q.   Okay.

4    A.   Walls, structural steel, maybe put some shoring up,

5    things like that.

6    Q.   I noticed on this schedule, the selective demolition

7    is a blank; is that right?

8    A.   The target finish?

9    Q.   Yeah, target finish on 645?

10   A.   Target finish is blank.

11   Q.   And looking at the selective demolition item and

12   compare that to your picture on 7/1/10, is there any

13   demolition that's selective demolition that still needs to

14   be done in that area that you're aware of of any

15   significant amount?

16   A.   I don't believe so.

17   Q.   Okay.  Do you know of anything that was impeding

18   ECI's ability to do electrical overhead rough-in in that

19   area?  This is the art room area, P3AR-310.

20   A.   So this is where we had steel issues.  If you look at

21   the picture, I think the CME wall to the right, there was

22   differences from what the plan showed to the existing

23   conditions.

24   Q.   Okay.

25   A.   So we had steel ready to install the way it was

 1    shown.  And we needed to react to the difference in

 2    condition.

 3    Q.   All right.  You talked about that already.

 4         So if I go down some of the other areas, I see

 5    P3AR-350, that is pushed out to -- those aren't actual

 6    dates in there, but if we look at Exhibit 655 for lights

 7    in soffit, we can see the actuals in there of it being

 8    started on September 1st and finished on September 2nd,

 9    correct?

10    A.   Correct.

11    Q.   So that was a one-day activity?

12    A.   Yes.

13    Q.   Or two-day activity?

14    A.   Two-day activity, yeah.

15    Q.   And electrical overhead rough-in, they have the

16    actual dates in there, those were started a week or so

17    later?

18    A.   Correct.

19    Q.   And that, again, is due to the steel issue again?

20    A.   Yes.

21    Q.   And it's your testimony you gave them relief for

22    that?

23    A.   Yes.

24    Q.   Go down to P3AR-470, light fixtures and devices in

25    grid?

1   A.   Yes.

2   Q.   Now, unfortunately, the target early start and target

3   early finish are not in the actuals, there's no "a" after

4   those.

5        If you turn to Exhibit 655 on page 2, you'll see

6   actual dates for current start and current finish.  See

7   that?

8   A.   Yes.

9   Q.   And what are those dates?

10  A.   Actual start, September 12.  Actual finish,

11  September 14.

12  Q.   Okay.  So that's a two-day duration?

13  A.   Yes.

14  Q.   And that was pushed out into September?

15  A.   Three-day duration, yes.

16  Q.   Three days, okay.

17       So in the art room, could you describe ECI's work in

18  the art room?

19  A.   ECI's work was overhead rough-in, new walls went in.

20  They had to rough in new walls.  After finish has started,

21  device, install lights and finish all electrical

22  associated work.

23  Q.   Did they need to rough in new walls in that area,

24  ECI?

25  A.   Yes.

1    Q.    What line item is that?

2    A.    I don't see a line item for that.

3    Q.    Notwithstanding the fact that it's not on here, do

4    you know if they had to do that in that area?

5    A.    They did.

6    Q.    Was that likewise moved off at all?

7    A.    Likely.

8    Q.    Now, turn back to the Exhibit 41 for a moment.

9          Exhibit 41 has the electric room and the art room.

10   And that -- if I turn to Exhibit 645, the activities in

11   that room begin on the top of page 3.  And on Exhibit 655,

12   they appear on the top of page 2.  Okay.

13         So where is this electrical room on the plans?  I'll

14   hold it up for you.  If you can just point.

15   A.    Right here (indicating).

16   Q.    How big is that room?

17   A.    Maybe 7 X 10, something like that.

18   Q.    What work needed to be done in that room?

19   A.    New electrical panels needed to be installed in that

20   room to feed that area.

21   Q.    Did you have to build the room?

22   A.    Partial -- the room was partially remaining and there

23   was some new walls.

24   Q.    Show us where the new walls were.

25   A.    So the new walls are patched, those indicate new CME

1   walls, and the white blocks indicate existing additions

2   that remained.

3   Q.   You had to put new walls up?

4   A.   Correct.

5   Q.   Do you know where the electrical panels were going to

6   go in that room?

7   A.   They were going on that room.

8   Q.   Existing walls?

9   A.   Existing walls.  There may have been a panel or

10  transformer around the corner at the other end on that.

11  Q.   A portion of it on the new wall as well?

12  A.   Correct.

13  Q.   Do you see that in any of the pictures?

14  A.   I do.

15  Q.   So you have some panels on existing wall and

16  something on the new wall?

17  A.   Correct.

18  Q.   All right.  So what does your picture show on 8/2/10?

19  A.   You're on page 5?

20  Q.   No.

21          THE COURT:  Page 4C, I believe.

22          MR. HUG:  Thank you, Your Honor.

23  BY MR. HUG:

24  Q.   Says "EO - see above pictures on 8/2/10."

25  A.   "See above picture 8/2/10 of the P3AR electric room

1    C39.  Panels and equipment are set and piped."

2    Q.   Take a look at the next page as well.  Does that also

3    show the electric room C39?

4    A.   It does.

5         "See pictures above on 8/4/10.  P3AR electric room

6    C39.  The feeders are pulled and the panel else are ready

7    to terminate.  The feeders were scheduled to be completed

8    by 7/30/10.  The work is moving forward within a

9    reasonable schedule."

10   Q.   This is in the area where you're not going to be able

11   to complete by the opening of school, right?

12   A.   Yes.

13   Q.   Did you delay at all putting up the new walls?

14   A.   The new walls?

15   Q.   For the electric room?

16   A.   Went up after the steel issue was resolved.

17   Q.   Okay.  So you were delayed putting those walls up

18   until you got the steel fixed?

19   A.   Correct.

20   Q.   What is -- there's this item P3EL-220, rub walls.

21   Okay, what's the activity -- just to remind, make sure the

22   Court -- you prepared the schedules, correct?

23   A.   Correct.

24   Q.   So you know what all of these activities are because

25   you prepared it; is that right?

1    A.    Correct.

2    Q.    So rub walls, what is rub walls?

3    A.    When you install CMU walls, the blocks come in rough.

4    After you install them, the mason goes back with a stone

5    and rubs the whole wall down to knock off any high spots

6    sticking out and smooth out the wall prior to paint.

7    Q.    Okay.  Are these walls held together by mortar?

8    A.    Yes.

9    Q.    Is that also including getting rid of any mortar

10   leaking out from the joints?

11   A.    Any mortar that might be sticking out beyond the

12   base.

13   Q.    So you clean them off so you can paint them and make

14   them look nice?

15   A.    Correct.

16   Q.    Do the walls need to be rubbed before you mount any

17   electrical panels?

18   A.    You may typically do that.  In an environment like

19   this where we're trying to get things, we wouldn't think

20   twice about mounting panels before the wall was rubbed.

21   Q.    Did ECI approach you at any time and say, Listen, if

22   we don't get these walls rubbed right away, it will delay

23   us putting in our panels?

24   A.    No.

25   Q.    If they had done that, what would you have done?

1    A.   Told them to put in the panels without the walls

2    being rubbed.

3    Q.   Would you paint the wall?

4    A.   I'd paint around the panel.

5    Q.   You don't need paint behind a panel; is that right?

6    A.   No.

7    Q.   And I think I asked this.  Did Mr. Mathieu come to

8    you and say with respect to electric room C39 I can't do

9    my work because you haven't rubbed the walls?

10   A.   No.

11   Q.   I notice that the rub wall activity is a one-day

12   activity.  Is that -- you did this -- or actually, it's

13   listed as a two-day activity because it looks like it was

14   done in one day?

15   A.   Yes.  It doesn't take long to do.  To rub a room like

16   that would probably take about two hours.

17   Q.   Okay.  You're the mastermind of getting this done.

18   How important was it overall to the project completion as

19   a whole to have this electric room done exactly in

20   accordance with the schedule?

21   A.   It was important to be close to that time in order to

22   facilitate all the branch circuits and everything coming

23   out and tying into it.

24   Q.   Okay.  And did that delay ECI from doing some of its

25   branch circuitry?

1   A.   I think the steel for the most part did.  After the

2   panels caught up, it was relatively easy work to catch

3   that work up to finish up.

4   Q.   Okay.  Let's go to the locker room.  Before I do

5   that, Exhibit 655, if I look at the locker room -- excuse

6   me, the electric room, we see that the electrical room on

7   page 2, the activities are the dark blue is pushed out

8   from the July time frame to the late July time frame and

9   from the early to the -- or late July to the early August,

10  right?

11  A.   You're looking at the electric room C39?

12  Q.   Yes.

13  A.   So the electrical panels were planned the 24th.

14  Started on the 26th.  We finished on the 28th.  They

15  planned to finish on the 25th.  So it was three days

16  after.

17  Q.   In the overall scheme of your effort to get the job

18  done, was that a material difference to the overall

19  project schedule?

20  A.   The time?

21  Q.   Yeah.

22  A.   No, not really.  Three days, schedule like this on a

23  project like this, moving around, that's not too bad.

24  Q.   Okay.  Let's turn to the locker room.

25       First turning to Exhibit 41, there's a locker room

1    area number 4.  You have pictures on the bottom of one

2    page and into the top of the next page.  Could you

3    describe to the Court what those pictures show?

4    A.   "See picture above on 7/20/10 of the P3LO area.  The

5    demo is coming to completion and area is being cleaned up

6    to be ready for following activities.  There have been

7    some changes made to the structural steel that support the

8    RTU in this area that caused a slow start to this area.

9    Since the unforeseen steel issues in this area caused

10   problems, we concentrated on other areas and the owner

11   agreed this area could be turned over late."

12        Picture below on 8/2 or picture above, P3LO area.

13   "The overhead rough-in and plumbing rough-in work is

14   ongoing.  The area is tracking behind and we have

15   identified at this point that there will be some relief to

16   this area as it will not be turned over when school starts

17   in September."

18   Q.   The next sentence?

19   A.   "ECI had also started to perform overhead rough-in

20   this area starting prior to when the Phase 3 work started.

21   ECI started a crew on third shift approximately 3 months

22   prior to the starting in an effort to get a lot of

23   overhead work installed.  Pike had the demo subcontractor

24   start early as well in order to remove ceilings to enable

25   ECI to perform this work.  ECI indicated early on that

```
 1    they had personnel available that they wanted to be able
 2    to keep some personnel busy instead of laying them off."
 3    Q.   How did you come to learn that they had people they
 4    wanted to keep busy and not layoff?  That comment, how did
 5    you learn that?
 6    A.   In discussions and coordination with ECI.
 7    Q.   Specifically anybody at ECI?
 8    A.   Probably would have been Cliff Clauson or Stephane.
 9    Q.   So you tried to accommodate ECI and allowed them to
10    get in early to do some of this work?
11    A.   We thought it was a great idea.
12    Q.   Working together?
13    A.   Yes.
14    Q.   Now, it also says that you concentrated -- somewhere
15    in here it says you concentrated on other areas after you
16    delayed these two areas.  Do you know what areas you
17    concentrated on, in particular?
18    A.   It would have been the classroom, cafeteria, library.
19    Q.   Okay.  So ECI gets relief in one area, but you're
20    able to work harder in other areas?
21    A.   Yes.
22    Q.   Because the locker room area was pushed off, did ECI
23    have to spend more time that you know of -- did ECI have
24    to spend more time in the locker room area than they would
25    have otherwise had to spend had it not been delayed?
```

1    A.    No, I don't believe so.

2    Q.    Why not?

3    A.    It's the same amount of work, pushed to a different

4    start date.

5    Q.    Okay.  Now, let's go to -- I dealt with C39.  I

6    haven't dealt with a schedule on locker room yet.  And I'm

7    not going to spend a lot of time because I think you

8    testified already that this area was delayed.  Let's do

9    look at, though, Exhibit 655 and see the graphic

10   illustration of the locker room area.

11   A.    Okay.

12   Q.    And this shows that most of the activities are moved

13   outside of the July/August time frame, doesn't it, except

14   for the electrical overhead rough-in?

15   A.    Correct.

16   Q.    Now, the electrical overhead rough-in, I don't mean

17   to suggest that's a -- belittle that activity.  That's a

18   significant activity, isn't it?

19   A.    Sure.

20   Q.    And that you would agree had to work -- it was

21   started ahead of time, correct?

22   A.    Correct.

23   Q.    I think it indicates here May?

24   A.    Correct.

25   Q.    So it started during periods before the July time

 1   frame during the non–10–week period?

 2   A.   Correct.

 3   Q.   And then did electrical overhead rough–in occur any

 4   time during the July and August time frame?  It looks like

 5   it did.

 6   A.   Yes, it did.

 7   Q.   But do you know when in the July and August time

 8   frame it occurred?

 9   A.   Not sitting here.

10   Q.   Okay.  Do you know that –– did ECI wait to do the

11   electrical overhead rough–in until the steel was in?

12   A.   They waited to complete it until the steel was in.

13   Q.   Okay.  Do you know if ECI spent any more time doing

14   electrical rough–in because of the steel delay?

15   A.   I don't believe they did.

16   Q.   But they did have to do it in a period of time before

17   July perhaps before the steel issue ––

18   A.   They were able to do rough–in for what we opened up

19   for the third shift before the summer started to bring in

20   conduits in when they could, and then they finished it

21   sometime after the steel work was completed.

22   Q.   This concept of shifts, you've had to deal with

23   projects that had several shifts, correct?

24   A.   Yes.

25   Q.   And you've had projects yourself where you work with

1    double shifts?

2    A.    Yes.

3    Q.    How, in your experience as a project super, is it

4    supposed to work from one shift to the next?  How does the

5    second shift know what they have to do?  Because the first

6    shift has been working on stuff.  How do they know what

7    the second shift is supposed to do?

8    A.    You would need supervision on site to be able to span

9    some of the shifts from first to second to make sure the

10   second shift guys were set up, getting into the areas and

11   had the material that they needed.

12   Q.    And did you have occasion to observe ECI in its

13   transition from first and second shift?

14   A.    Yes.

15   Q.    Could you describe the transitions that you saw?  Did

16   you have any concerns with the transitions that you saw?

17   A.    The transitions were uncoordinated.  The new guys

18   would come in, they wouldn't know where they're going.

19   And supervisors had to get to them to find out what

20   happened to them during the day and then get going in the

21   night.

22   Q.    Is that related to supervision at all?

23   A.    Sure.  Yes.

24   Q.    And does that reflect some of your comments you made

25   earlier about supervision?

1    A.    It does.  Making sure guys know where they're going

2    so they can be productive, have the material they need and

3    go right to work.

4    Q.    That circumstance impact ECI in terms of its ability

5    to do as much work as it otherwise could have on that

6    second shift?

7              MR. KAPLAN:  Objection.  At this point I'm going

8    to object.  I've been sitting down.  There's no foundation

9    for this gentleman knowing anything about manpower it

10   takes to install electrical work of any kind.  He made a

11   number of comments that this wouldn't have taken them

12   longer, this wouldn't have taken them longer.  He doesn't

13   know.  He's not -- no foundation he has any expertise in

14   the manpower it takes to do electrical work.  Here, the

15   testimony that it would take ECI more time to do

16   electrical work, he doesn't know.  There's no foundation

17   for it.  He did no studies.  He says he was all over the

18   job.  He doesn't have any firsthand knowledge of what they

19   intended it to take, what it should have taken, what it

20   did take.  I know I'm rambling a little bit, but I have a

21   number of issues.  One is his competency.

22             THE COURT:  I think you have to object to

23   specific question.

24             MR. KAPLAN:  I'm objecting to this question.

25   Lack of competency of the witness to know the manpower

1    required for electrical installation.  I'm also objecting

2    to his lack of firsthand knowledge as to what they

3    expected it to take and should have taken and what it

4    actually did take.

5              THE COURT:  So I guess, Mr. Hug, maybe you could

6    reframe a question at this time and then we'll see.

7              MR. HUG:  Thank you, Your Honor.

8    BY MR. HUG:

9    Q.   First of all, I guess, Mr. Oloff, you put this

10   schedule together, correct?

11   A.   Correct.

12   Q.   What do you need to know to be able to put a schedule

13   like this together?

14   A.   You have to have a good idea what somebody can do in

15   a day.

16   Q.   Would that include many different trades?

17   A.   It would.

18   Q.   How long have you been doing this?

19   A.   About 15 years.

20   Q.   And you've been doing scheduling throughout that

21   period of time?

22   A.   Probably started scheduling toward the middle.  Seven

23   or eight years in.

24   Q.   And do you have knowledge of what it takes to do the

25   various trades to get the job done?

```
 1   A.    I think I do.  I see them do it every day.  I have a

 2   good idea how many lights can go in a day, what can be

 3   done in a small area.  That's why we grouped it down to

 4   small areas, so it was more controllable on a schedule.

 5   Q.    Okay.  And notwithstanding that particular background

 6   that you have, I'm asking you factually did you observe

 7   ECI in the transition process from the day shift to the

 8   night shift?

 9             MR. KAPLAN:  Could I ask the question be put in

10   a time frame, Your Honor?

11             MR. HUG:  Yes, Phase 3.  In Phase 3.

12             MR. KAPLAN:  Well, again, in a time frame.  When

13   it time in Phase 3?

14             THE COURT:  No, I think it's fair Phase 3.

15             MR. KAPLAN:  My objection is first week, second

16   week?

17             THE COURT:  You can follow up.  Overruled.

18   A.    Yes, I did observe.

19   BY MR. HUG:

20   Q.    Okay.  And to Mr. Kaplan's point, did ECI work a lot

21   of night shifts?

22   A.    They did.

23   Q.    And you were there, correct?

24   A.    Yes.

25   Q.    Did you observe them early on in Phase 3 of the
```

1    project?

2    A.   Yes.

3    Q.   Did you observe them later on in Phase 3 of the

4    project?

5    A.   I did.

6    Q.   And in the middle of Phase 3 of the project?

7    A.   I did.

8    Q.   Early on in Phase 3 of the project where they were

9    doing second shifts, did you observe the transition from

10   the first to the second shift?

11   A.   I did.

12   Q.   What did you observe?

13   A.   I observed inefficiencies in the gap between the

14   shifts.

15   Q.   Describe those inefficiencies for the Court.

16   A.   Inefficiencies were journeymen, apprentices standing

17   waiting for direction, waiting for material, waiting for

18   people to answer questions that they may have had on

19   installations.

20   Q.   Did you also observe them during the middle of July

21   the second half of July from first to second shift?

22   A.   Yes.

23   Q.   And did you -- what did you observe?  Did you observe

24   ECI's first to second shift switch, in particular?

25   A.   Yes.

1    Q.   What did you observe?

2    A.   It was very similar.

3    Q.   All right.

4    A.   Very similar.  The guys have a lot of questions.  And

5    end up needing a lot of direction from foremen.

6    Q.   And when you say inefficiencies, is that a time

7    factor that you're talking about?

8    A.   Yes.

9    Q.   So describe what you mean by inefficiencies.

10   A.   I mean if you have a guy that's waiting half hour for

11   a foreman to get around and answer a question or for

12   somebody to bring him material or something like that,

13   that's time that he's not installing light fixtures or

14   installing devices or installing conduit.

15   Q.   You observed the same condition in the middle of

16   July?

17   A.   Yes.

18   Q.   Did you observe the same condition at the end of

19   July?

20   A.   It was getting better toward the end.

21   Q.   As you went through the project it got better?

22   A.   Yes.

23   Q.   Did you make your observations known to ECI?

24   A.   I would talk to Stephane on site and make sure he

25   knew he had guys waiting for information if I saw them

1    there.  I'd pick up the phone and call him.  If a guy had

2    a question and was waiting for someone to answer, I'd call

3    Stephane and let him know.

4    Q.   That's aren't hypotheticals, these actually happened,

5    correct?

6    A.   Correct.

7    Q.   Okay.  I think where I got off on that diversion was

8    locker rooms.  I think I asked you that except for

9    electrical overhead rough-in -- yeah, I did.  Everything

10   else was moved out.  All right.

11        Let's move on to the gym area.  That would be page 4

12   of Exhibit 645, page 2 of Exhibit 655.  I want you to

13   start first with the Exhibit 41, gym area.  You're on the

14   same page you should have been on, just at the bottom.

15   A.   Okay.

16   Q.   Could you explain to the Court what your observations

17   were from your pictorial photographs on this page and the

18   next page of the conditions in the gym on the dates

19   indicated?

20   A.   "See picture above 7/2/10 in the PG3 gym area.  The

21   wall notching has begun early in order to allow ECI to

22   perform the wall rough-in work in this area."

23   Q.   Stop there.

24        Wall rough-in.  ECI's -- I think there's been enough

25   testimony on this one.  ECI -- let me have you -- what's

1    electrical wall rough-in that ECI had to do in this area?

2    A.   It's putting new outlet boxes in and device out boxes

3    in, and then roughing up conduit or MC to be able to feed

4    those.

5    Q.   What kind of walls?

6    A.   CMU.

7    Q.   Did that require anybody to do any -- did the CMU

8    block have to be -- anything done with that?

9    A.   What typically happened where we run into an area CMU

10   that needed to be roughed in existing condition, we would

11   grab Stephane.  Stephane would lay out what he needed to

12   be able to bring conduit up and a box in, whatever route

13   they might need to take.  We'd bring a guy in to slot the

14   wall to accommodate that box.  CMU wall, you have to cut

15   it to open it up and patch it back.

16   Q.   This gym required you to build some new CMU wall in

17   the gym area?

18   A.   There is some new CMU wall in the gym area.

19   Q.   Where is that new CMU wall?

20   A.   Right there (indicating).

21   Q.   Did ECI have to do any work in that new CMU wall?

22   A.   I believe they did, yeah.  There was some boxes on

23   the other side, as I recall.

24   Q.   Okay.  The other side of that CMU area, is that

25   another room?

1    A.   It is.

2    Q.   What is it?

3    A.   That's the workout room, I believe.  Fitness room.

4    PE health they call it.  Put all their exercise equipment

5    in there.

6    Q.   So turning to Exhibit 645 for a minute.  P3G-110 is

7    demolition.  Could you show the Court, make sure the Court

8    follows you on what was the early start and finish and the

9    actual start and finish of those items?

10   A.   P3G-110.

11   Q.   Yes.

12   A.   So the early start was July 6.  We started May 12.

13   The early finish was July 7.  We finished on July 16.

14   Q.   Okay.  So you finished the demolition nine days after

15   the targeted finish, correct?

16   A.   Correct.

17   Q.   All right.  I'll come back to that in a second.

18        Next item, P3G-390 build new CMU wall petition.

19   Could you describe the start and finish date?

20   A.   Start date planned was July 8.  We started on

21   June 28.  Completion planned was July 12.  We finished on

22   July 13.

23   Q.   So you actually built the new CMU partition before

24   your demolition was complete?

25   A.   Correct.

1   Q.   How does that work?

2   A.   The area was cleaned out enough to start that work.

3   Q.   And that work, next item is P3G-160, rough in new

4   electric.  Is that in the walls?  Ceiling?  Where is that?

5   A.   That's in the walls.

6   Q.   That would include the new CMU wall?

7   A.   Correct.

8   Q.   Okay.  What's the targeted start and finish for those

9   areas?

10  A.   July 10, start.  We started on June 24.  July 13,

11  completion.  We finished on July 29th.

12  Q.   Okay.  So it looks like ECI started well before its

13  original schedule; is that right?

14  A.   That's correct.

15  Q.   Including before demolition was complete?

16  A.   Correct.

17  Q.   But it finished well after?

18  A.   Yes.

19  Q.   I don't know the days, but 13 -- some 15, 16 days

20  after.  I think it's 16.  Could you explain why?

21  A.   No.

22  Q.   Okay.  So that appears to be an area where ECI took

23  longer -- it took longer for ECI to complete that work

24  than originally -- than in the schedule, correct?

25  A.   Correct.

1    Q.   Is there any reason that you can see from looking at

2    the schedule as to why ECI couldn't rough in new electric

3    before -- finish before July 16th or 18th or some earlier

4    date?

5    A.   No.

6    Q.   What else needed to be done in order for them to

7    rough in new electric?

8    A.   Once the walls were slotted, they could rough in new

9    electric.

10   Q.   Okay.  Now, the slotting issue, is that -- that's

11   another one of these issues, is that shown here on the

12   schedule, the CMU?

13   A.   It's not.

14   Q.   It's not.  Describe -- and do you know why it's not

15   on there?

16   A.   I don't have a good reason for it not to be there.

17   Q.   It's one of Primavera's --

18   A.   No, activity wasn't created for slotting wall.  So

19   this is a good example of why we do a three-week

20   look-ahead.  If there's activities that aren't here that

21   end up being something that needs to be done during the

22   three-week look-ahead, we can throw it on there in more

23   details.

24   Q.   Those are the schedules we showed you before?

25   A.   Correct.

1  Q.   Now, who does the slotting?

2  A.   The demo contractor.

3  Q.   Okay.  The demo contractor does the slotting.  Is

4  that the mason?

5  A.   No, I believe it was the demo contractor that did the

6  slotting.  The mason did the repair.

7  Q.   So the -- so when was the slotting done?

8  A.   Well, if I look at the picture, slotting was done --

9  we were doing slotting on 7/2.

10 Q.   Okay.  And you see that from which picture?

11 A.   The picture on 7/2 at the bottom of page 6.

12 Q.   "The wall notching has begun early in order to allow

13 ECI to perform the wall rough-in work."  That's

14 Exhibit 41; is that right?

15 A.   Yes.

16 Q.   I wanted to point the Judge to Exhibit 41.

17      Let's go to the next picture.  I guess kind of

18 closing off that issue, are you aware of any reason why

19 roughing in new electric couldn't have been completed

20 earlier than July 29?

21 A.   No.

22 Q.   And also we do know from prior testimony that it may

23 be that in fact they were almost completely done before

24 that date, we don't know from looking at the schedule?

25 A.   Correct.

1    Q.   Let's turn to the next page of Exhibit 41.  There's a

2    7/5 picture in the P3G area.  July 5, what does that show?

3    A.   Shows a picture of the gym.  "The stage demo was

4    complete and the masonry has started in this area."

5    Q.   Is that the new wall?

6    A.   That's the new wall.

7    Q.   How about the two pictures below?

8    A.   Pictures of the electrical room C22A.  "The pictures

9    show that electrical panels and conduit work are

10   completed.  Area is clean and available for following

11   work."

12   Q.   That goes into another room yet on the schedule.

13   We're going to cover that in a second.

14        Let's go back to the Exhibit 645 and go back to the

15   645 and look at electrical overhead rough-in, P3G-240.

16   Now that one -- could you go over with the Court the start

17   and finish dates, anticipated and actual?

18   A.   The planned start date was July 29.  The actual start

19   date was July 16.  Planned completion date was August 1st.

20   Actual completion date was July 30th.

21   Q.   So they're tracking ahead in that item?

22   A.   Yes.

23   Q.   The next item, P3G-540, electrical devicing, can you

24   go over the same items there?

25   A.   Plan start was August 7.  Actual start was August 16.

 1   Planned finish was August 8.  Actual finish was August 20.

 2   Q.   Actual finish was August 20th?

 3   A.   Actual completion was August 20.

 4   Q.   So ECI is tracking a little bit behind in that

 5   particular area.  Do you know why?

 6   A.   I do not know why.

 7   Q.   Okay.  Was ECI having any problems with devicing?

 8   A.   As I said earlier, when it came down to low lying

 9   fruit, if they needed manpower, they tended to wait to

10   complete that work.

11   Q.   So, by the way, in the gym area, was the gym area

12   used for any purposes for other trades?

13   A.   Yes.  It was used as a lay-down area for material

14   coming in and getting used.

15   Q.   So that's a pretty big area?

16   A.   It is.

17   Q.   Did ECI use it as well?

18   A.   They did.

19   Q.   ECI wasn't exclusive to that area though?

20   A.   They were not.

21   Q.   So give me an example of some materials other than

22   the electrical area that would be staged in there?

23   A.   Staged in the gym?

24   Q.   What other materials would be stored in there, I

25   mean?

1    A.    There was a lot of lighting stored in there.  Gang

2    boxes were stored in there.  I believe that's where

3    Stephane set up his gang boxes for his central place for

4    his tools.  We may have stored plumbing fixtures in there.

5    I think that's about it.  I'm sure there were a few other

6    things.  Ceiling tile, when it came in, went in there and

7    got distributed out.

8    Q.    Okay.  I just want to understand, on a construction

9    site, you got -- and let's stick with ECI.  They got

10   fixtures.  You mentioned fixtures were stored in there,

11   all right.  Describe for me the process by which ECI or

12   any electrical contractor would put lights up in, say, the

13   classroom.  What would it do?  Have to go to the -- get

14   the stuff.  Describe that for the Court.

15   A.    Workers would go get the material they were going to

16   use, bring it to the room, and then they would start to

17   install it.

18   Q.    Somehow that stuff had to get to the gym as well?

19   A.    Correct.

20   Q.    That takes labor as well?

21   A.    Yes.

22   Q.    Not necessarily ECI labor, that could be a supplier

23   as well, right?

24   A.    Well, supplier would bring it in the truck and ECI

25   would unload it.

1   Q.   So if those materials -- when those materials came

2   in, ECI materials, what did ECI do?

3   A.   Unloaded them and stored them.

4   Q.   So who did they use, special workers come in for that

5   or use existing?

6   A.   I believe they tried to use apprentices for the most

7   part.

8   Q.   Take those apprentices off wherever they were doing

9   and unload?

10  A.   Correct.

11  Q.   That wasn't just true for ECI?

12  A.   No, that's typical delivery condition.

13  Q.   Okay.  Next item is lighting, P3G-310.  Is that

14  tracking ahead -- did that actually track ahead of

15  schedule?

16          THE COURT:  Are you on 655 now?

17          MR. HUG:  I'm sorry, I went back to 645.

18          THE COURT:   Thank you.

19  A.   So lighting was planned to start on August 7.  It

20  started on July 26.  Planned to complete August 10.

21  Completed on July 28.

22  BY MR. HUG:

23  Q.   Okay.  All right.  So this is -- you didn't have a

24  problem with them finishing ahead of time, did you?

25  A.   No.

1   Q.   P3G-290, final teledata electric fire alarm devicing.

2   I think you've explained what that is for the Court.  Can

3   you explain the timing within which that was done?

4   A.   So the planned start date was August 12.  They

5   started on August 2.  Planned completion was August 14.

6   They completed on August 18th.

7   Q.   Okay.  Do you have any idea as to why that was -- why

8   there was a delayed -- was there a delayed start?  No

9   delayed start, was there?

10  A.   No, started early.

11  Q.   But it finished a few days late, four days, I think

12  it is?

13  A.   Correct.

14  Q.   Do you know why?

15  A.   No.  I don't see any reason why.  Again, it might be

16  the -- leaving the devices for a little later.

17  Q.   Final painting, would that have impaired their

18  ability to do that work?

19  A.   No.  As you mentioned earlier, it's not untypical to

20  tape over devices and finish painting.  Usually the

21  painter wants to take off the plates and everything

22  anyway.

23  Q.   Let's turn to Exhibit 655 to look at the gym.  And

24  see the graphic illustration there?

25  A.   Okay.

1    Q.    This illustration for the gym shows where items were

2    shifted from planned, correct?

3    A.    Correct.

4    Q.    Okay.  I don't have any further questions on that.  I

5    just have the picture.

6          Let's turn to the electric room C22A.

7          This will speed up, I think now, Your Honor.  I think

8    I've covered most of the explanations of the area work.

9          Electric room, P3G-360.  This electric room is in the

10   gym area, correct?

11   A.    Correct.

12   Q.    Could you point the Court where this area is?

13   A.    Electrical room right here (indicating).

14   Q.    Okay.  What work needed to be done in there?

15   A.    It housed new electrical panels.

16   Q.    Did the room need to be built?

17   A.    There was a room above it that needed to be built, I

18   believe.

19   Q.    Building the room above it affect the ability to do

20   work in that actual work?

21   A.    Well, we could have -- I think we actually mounted

22   panels -- we could have mounted panels, I'm not sure we

23   did or not, prior to the flooring above being complete.  I

24   believe what we did was add new steel and decking, poured

25   the slab on top of the wall at a certain elevation to

1  create a room above.  The room above that one, as I

2  remember, was just access to the roof.  May have been a

3  little bit of electrical rough.  The other side was

4  storage room with teledata room above, similar condition.

5  Q.   Okay.  So before you mount the panels, would you want

6  to put the ceiling in?

7  A.   You would typically do that.  If we're in a pinch and

8  the wall was built, we could have mounted the panels and

9  poured the concrete around it.  I think we actually did in

10  some cases.

11  Q.   Did you need to do anything to the walls in that

12  room?

13  A.   Not much.  Not much.

14  Q.   There's this item rub walls?

15  A.   Yeah.  Mind if I look at that again?

16  Q.   I know you're stuck in there with exhibits.  Let me

17  bring it to you.

18  A.   Those look to all be existing walls.  May have been a

19  new wall in between.

20  Q.   When you say there might be a new wall in between,

21  are you talking about --

22  A.   Between that storage and --

23  Q.   This storage area?

24  A.   Yeah.  I don't recall if that was a new wall or not.

25  Q.   All right.  Doesn't have that sort of jot thing?

1  A.    Yeah.

2  Q.    The schedule indicates you needed to rub walls there.

3  There had to be some wall work, right?

4  A.    Right.  We would have cleaned up the wall before we

5  painted.  I think there were old cabinets attached that we

6  would have removed.  We would have cleaned up the wall and

7  then painted it.

8  Q.    All right.  You mentioned that some of the activities

9  that are listed P3G-410, -420, -490, are some of the

10  activities that had to occur in that area.  Some of those

11  are not actual finish dates in those area, so I want to

12  turn to Exhibit 655.

13  A.    Okay.

14  Q.    And actually even the current finish is not even in

15  there for the mount electrical panels, is it?

16  A.    It's missing.

17  Q.    That's a missing date.  Okay.

18      And the feed electrical panels, what does that show

19  in terms of -- on Exhibit 655, does that show where?

20  A.    So 655, electrical -- feed electrical panels,

21  activity P3G-420.  Planned start July 14.  Started on

22  August 1st.  Planned completion July 23.  Completed on

23  August 8.

24  Q.    Okay.  So this one's -- and mounting electrical

25  panels we don't know -- or do we?  We do know from

1    Exhibit 645 that the actual start was July 27, 2010?

2    A.    Correct.

3    Q.    There it is.  I'm sorry, it's there 655 as well.

4    A.    Planned start July 16.  Current start July 27.

5    Q.    Planned finish was July 18.  And it finished at some

6    later point in time.

7          Do you recall approximately when it finished or does

8    that -- do you not know?

9    A.    It would be -- looks like it would be sometime before

10   the feeders.

11   Q.    Next item has feed electrical panels.  You have to

12   have the panels in --

13   A.    Right.

14   Q.    -- to be able to finish feeding the electrical

15   panels.

16   A.    So if we started feeding electrical panels on August

17   1st, it would be reasonable that the panel was installed.

18   And when I look at the picture on page 8, "See picture

19   above on 8/4 of the 3PG electric room C22A.  The pictures

20   show that feeders have been pulled and tied in to the

21   panels."  So the panels and feeders were done by 8/4.

22   Q.    But that's a little later than planned?

23   A.    Yes.

24   Q.    Okay.  And do you have any understanding as to why

25   the electric room in this case was done a little bit

1  later?

2  A.   I don't recall any issue in that area.  The floors

3  above may have tracked behind a bit.  But like I said, we

4  would have run conduit up through and poured the slab

5  around, if that was doing anything.

6  Q.   All right.  In fact, if you look back at 645, it

7  looks like the walls were rubbed by July 22; is that

8  right?

9  A.   Correct.

10  Q.   Okay.  So as you sit here today, do you know in fact

11  if ECI was delayed in any way in that -- in starting their

12  work in that room, from looking at the schedule?

13  A.   I do not.

14  Q.   Now, did ECI at either foremen meetings or directly

15  with you -- I know you've testified you walked around the

16  site.  Did ECI, anybody from ECI express to you any

17  concern about the electrical room in the gym getting done?

18  A.   I believe they did.

19  Q.   Okay.  And what did they say?  First of all, who said

20  it?

21  A.   I think it was Stephane.

22  Q.   What did he say?

23  A.   He was worried about getting electrical panels

24  installed.  We went and looked at the room make sure we

25  made provisions for him to install them as quick as

 1    possible.  I don't recall specifically what the issues

 2    were.

 3    Q.   Do you recall when that was?

 4    A.   I don't.

 5    Q.   Okay.  So Stephane came to you and said he wants the

 6    gym electrical room?

 7    A.   Yeah.

 8    Q.   And did you have to do some work in there before he

 9    could get in there?

10    A.   I think there was something to do before he could get

11    in there.  Got everybody -- like a usual issue, brought

12    everybody together and made sure it was done so whatever

13    the issue was could get resolved and work could take

14    place.

15    Q.   Did he tell you that that was going to cause him

16    major problems on the project down the road or immediately

17    or in any way?

18    A.   I don't recall that.

19    Q.   You don't recall that or he didn't -- you don't

20    recall -- he did not say that?

21    A.   I don't recall him saying that.

22    Q.   The next room is the MPF room -- before we leave the

23    electric C22A, mounting electrical panels.  That's listed

24    on your schedule, baseline schedule as being a two-day

25    activity.  Is that right?

1  A.   P3G-410?

2  Q.   Yes.

3  A.   Three days.

4  Q.   Okay.  I'm counting wrong.  16th, 17th, 18th, three

5  days.

6       From your experience, how many people does it take to

7  do that work?

8  A.   For a room like that, it would take a couple of guys

9  a day or two.

10  Q.   Okay.  And then feeding electrical panels, P3G-440,

11  that has a duration of -- is that four or five days?  I

12  guess it's five days by the way you count?

13  A.   Yes.

14  Q.   All right.  And in your experience, how many men does

15  that take?

16  A.   That's a pulling crew pulling the wires in.

17  Depending on how many feeders that we had coming in here

18  from the main electric room, that might take two or three

19  guys on a pulling crew.  Couple days.

20  Q.   Okay.  And by the way, I -- pulling wire.  Describe

21  for the Court what pulling wire is.

22  A.   So if this room had a panel designated to it, it

23  would have another panel somewhere else in the building

24  that fed the power to that panel.  The conduit that goes

25  between the panels is the feeder conduit.

 1    Q.    Stop there.   Feeder conduit, is it like a steel pipe,

 2    plastic pipe?

 3    A.    We call it a raceway.   A wire is going to go through

 4    that at some point in time.

 5    Q.    Is that plastic or steel?

 6    A.    Steel.

 7    Q.    Why not plastic?

 8    A.    We didn't use plastic inside that building.

 9    Q.    Why not in that building?

10    A.    That was the specification.

11    Q.    Okay.   Does it have anything to do with the fact that

12    it was a school or fire code?

13    A.    Could be.

14    Q.    Anyway, it's steel.   That's just a pipe, pipe looking

15    thing?

16    A.    That's right.

17    Q.    Now, go on.

18    A.    Just like a plumbing pipe that water goes through.

19    So once you're connected between the panels, you pull the

20    wire through that pipe.   They pull a string through it,

21    from that string they tie a rope through it, pull the rope

22    through it.   They tie the rope to the wire.   They have

23    special pulling equipment.   If it's a long run that they

24    can't pull manually and the machine will pull that cable

25    through.

```
 1   Q.   So it's really literally either people or a machine

 2   pulling --

 3   A.   That's it.

 4   Q.   -- pulling wire, okay.

 5        And if they're in a -- if you're pulling wire into --

 6   where were we, in the electrical room in the gym?  Is that

 7   right here again?

 8   A.   Yes.

 9   Q.   How big is that room?

10   A.   12 X 12, 12 X 14, something like that.

11   Q.   Realistically, how many men can you fit in there

12   pulling wire, physically fit?

13   A.   I don't think you'd need more than a couple of guys

14   to do that.

15   Q.   Could you really fit any more?

16   A.   No.

17   Q.   Physical space within the room of people swinging

18   their arms around over their head?

19   A.   Right.

20   Q.   So even if I had five men to put on that particular

21   job, could I speed it up appreciably?

22   A.   No.  Unless you had, you know, multiple pulling

23   equipment.  Like you said, it would be tight in that room

24   to do.

25   Q.   Okay, let's move on to the MDF room C19A.  Before I
```

```
 1   do that, I want to make sure -- go back to Exhibit 41.  I
 2   think you covered all the C22A areas.  Go down to the
 3   pictures below that, the 7/29 pictures.
 4        First of all, the MDF room, what is the MDF room?
 5   A.   It's the main data room where all the data gets into
 6   the building and gets distributed out.
 7   Q.   Where is that room?
 8   A.   That is on the second floor of that room.
 9   Q.   That's across the area from the other --
10   A.   It's the brother room to the back of the gym.
11   Q.   Is that an important room to get built?
12   A.   Yes.
13   Q.   Why?
14   A.   That's where all the equipment is housed to run
15   security systems, fire alarm systems, all the data that
16   runs the school systems like that.
17   Q.   What work was to be done in this data room?
18   A.   So the slab needed to be poured and then the racks go
19   in.  The cable tray goes up.  And then they start bringing
20   all of the data wires in so they could start functioning.
21             THE COURT:  Show me again where is that data
22   room?
23             THE WITNESS:  There's a spiral stair right
24   there.  You walk in this room, go up the spiral stair and
25   gets into the elevated room.  The elevation of the room is
```

1  nearly roof elevation, but it's a very high bay right

2  there, so there's an elevated roof at the back.

3            THE COURT:  What's the reason to elevate it?

4            THE WITNESS:  I don't think they had a good

5  reason.  They just used the room for that, central

6  location of the room.

7  BY MR. HUG:

8  Q.   You used a couple of other terms of what they had to

9  do in that room that I'd like to outline for the Court.

10 You mentioned rub walls, we know.  You said a cable tray.

11 What's a cable tray?

12 A.   If you look at the bottom right picture, you can see

13 at the top of the picture something that looks like a

14 ladder horizontally.  That's a cable tray.

15 Q.   Picture to the right on Exhibit 41.

16 A.   I'm on page 8.  They put that up so they can run

17 wires in a neat, orderly condition on top of the room and

18 bring it into the racks, which is the equipment that you

19 see on the left picture where the equipment is housed.

20 Q.   Okay.  Looking at the picture on the right, cable

21 tray, what is cable tray used for?

22 A.   All the blue wire that's hanging down.

23 Q.   That's wire?  That was my next question.

24 A.   Data wire.  That would go around on top of the cable

25 tray.  Gives you a place to put it and keep it neat.

1   Q.   Okay.  Doesn't have anything to do with cable TV,

2   does it?

3   A.   There was probably some cable that was brought into

4   this room, but the data is a different system.

5   Q.   Okay.  Cable tray is for the purposes of you bringing

6   cable in, cable being cable, not cable TV?

7   A.   Correct, correct.

8   Q.   So as of 7/29, they show they've been installed and

9   they're starting to pull cable, right?

10  A.   Correct.

11  Q.   So if we look at Exhibit 645, the MDF room has some

12  line items on here of rubbing the walls, you have cable

13  tray, racks and whatnot.  But I think was there any

14  demolition in this room?

15  A.   I believe there was.

16  Q.   All right.

17  A.   I think there was a unit above it that came out.

18  Q.   Okay.

19  A.   I also believe we ripped those out early with the gym

20  demolition activity.

21  Q.   Okay.  So that would have been part of the overall

22  gym demolition?

23  A.   Yeah.

24  Q.   So it has an item rub walls.  There must have been

25  some new masonry walls put in?

1   A.   Yeah.

2   Q.   Do you know where -- did those masonry walls, were

3   those new masonry walls, where they put the cable trays in

4   racks?

5   A.   I believe the new masonry walls were actually coming

6   off existing masonry walls going up to house that room.

7   Q.   Okay.  So was rub wall a necessary predecessor

8   activity to any of ECI's work in that room?

9   A.   No.  We would have installed -- we would have

10  installed panels if we hadn't rubbed the wall.

11  Q.   The cable tray electric activity, is that an electric

12  activity, that cable tray PG3-460 on Exhibit 645?

13  A.   Yes.

14  Q.   Okay.  And go over with the Court the early start,

15  early finish, and target and actual?

16  A.   The cable tray was planned for July 15 to start.  It

17  was started actually on the 20th.  It was planned to be

18  completed on the 16th.  It actually completed on July 29.

19  Q.   So it took a little extra time it looks or at least a

20  duration -- it has a little longer duration, about,

21  whatever period that is, 10, 12 days later, correct?

22  A.   Correct.

23  Q.   Is there any reason you're aware of as to why the

24  cable tray could not have been put in earlier?

25  A.   Only if the floor wasn't complete.  But I believe

1   that was complete by then.

2   Q.   Does the picture show on 7/29 that the floor was

3   complete -- actually, can you see --

4   A.   The floors were complete, the racks are actually

5   sitting on it.  When you look around, you actually see

6   painted walls and plywood installed.

7   Q.   Now, assume for the moment that the MDF room could

8   not have been completed earlier by ECI.  I'm not -- just

9   assume that for a second.  Did that have a domino affect

10  on their work, and if so, what?

11  A.   They did have a lot of work to do in that room as far

12  as pulling cable, setting up systems and equipment.  But I

13  think it was still achievable.

14  Q.   The racks, is that part of ECI's work?

15  A.   Yes.

16  Q.   How about the final terminations, was that ECI's

17  work?

18  A.   Yes.

19  Q.   Is that final terminations, is that the most

20  labor-intensive activity in that area?

21  A.   It takes a while with all that wire coming in to have

22  to put an end on everything, punch it down in the system.

23  Q.   Final terminations, is that where they're pulling the

24  wire and plugging it in?

25  A.   They're placing an end on the wire after they trim it

1    to the correct length and then plugging it in.

2    Q.   Okay.  But what about other activities, putting the

3    conduit in to pull the wires through, is that impaired at

4    all by this room not being available?

5    A.   No, I don't believe so.  I believe they had conduit

6    in the room.

7    Q.   So turn to Exhibit 655.  If we look at the MDF room,

8    we see the activities in that area for racks and cable

9    tray moving from the middle of July towards the end of

10   July and a final termination moving from the middle of

11   July to the end of July into early August.  Is that right?

12   A.   Correct.

13   Q.   In doing this MDF room, this is another one of those

14   small rooms, right?

15   A.   Yes.

16   Q.   Could I put five people in there to do those final

17   terminations -- if I put five people to do the

18   terminations, would the work go any faster?

19   A.   Yeah.

20   Q.   Okay.  How about ten people?

21   A.   Ten people might be pretty tight in that room.

22   Q.   And you're all trying to work around one panel?

23   A.   No.  There was some room in that to work multiple

24   people punching down.

25   Q.   Describe what a final termination is.

1    A.   So final termination is when they cap the end of the

2    wire with the device that goes on it to plug it into the

3    wall plate or the equipment.  Just like the back of your

4    TV or the back of your phone, put the jack on it and then

5    you plug it in.

6    Q.   Okay.  All right.  So if you had more people in that

7    room, could you do it a little faster?

8    A.   Yes.

9    Q.   Okay.  But there's a limit to how many people you can

10   put in the room?

11   A.   Right.

12   Q.   I notice that in this area, the MDF room, the final

13   terminations, the duration went from July 29 to August 6.

14   It was listed, however, as a one-day activity?

15   A.   Correct.

16   Q.   Do you have any knowledge as to why or how you could

17   start the terminations and not be able to finish in one

18   day?

19   A.   I don't think -- once they started, I don't think

20   there was anything for a whole month.  No reason they

21   couldn't finish.

22   Q.   If you can start it, you can finish it, can't you?

23   A.   In that particular room, yes.

24   Q.   Is there anything else that's going on in the room

25   that could -- in that tech room that could impair your

1  ability to start, then have to stop and then come back and

2  finish that you're aware of?

3  A.   No.

4  Q.   So is it possible that it just could be an activity

5  that took ECI longer than it anticipated?

6  A.   Yes.

7  Q.   Or for that matter, longer than you anticipated since

8  you do the schedule, correct?

9  A.   Correct.

10  Q.   But ECI actually had a chance to review the schedule

11  and make comments?

12  A.   Yes.

13  Q.   And do you know if they made any comments with

14  respect to this particular item?

15  A.   No.

16  Q.   Let's turn to the library.

17       First, let's --

18          THE COURT:  That sounded like a baby crying.

19  The baby is not in this courtroom.

20  BY MR. HUG:

21  Q.   All right.  Let me go with the method I've been using

22  so far.  The library area, where is that?

23  A.   P3LI.

24  Q.   That's over here?

25  A.   Yes.

1    Q.   Off the beaten path from the rest of the work,

2    correct?

3    A.   A little further area of the corridor area.

4    Q.   This was renovated area?

5    A.   Existing area that we renovated.  Removed ceiling,

6    removed carpet, removed some millwork in the middle of the

7    library.  I believe most of the exterior room stayed.

8    Built a couple of offices on the left side of that area.

9    It wasn't -- it wasn't bad for working in.

10   Q.   Okay.

11   A.   Activities were okay.

12   Q.   All right.  Let's go over to your Exhibit 41 and look

13   at the pictures for the library area.  I'm not sure what

14   number it is in yours, but I obviously didn't number them

15   all.  I think I numbered the wrong book.

16   A.   9C.

17   Q.   9C.  Picture on 7/9/10, could you describe for the

18   Court what that shows?

19   A.   "The demo in this area is substantially complete and

20   area is being cleaned for following work to begin."

21        So that's the millwork I was telling you about that

22   stayed.  Carpet is gone and these pieces of concrete that

23   you see where we cut the slab so we can install new

24   electrical boxes and underground.

25        "See picture above on 8/2 of the library area.  The

1    Ceiling has been installed and the area is tracking ahead

2    of schedule."

3        See picture on 8/16.  It's a terrible picture.  "The

4    lighting is installed and the floor is complete in this

5    area.  The area continues to track to an early

6    completion."

7    Q.   You say the lighting is installed, but it's not very

8    well lit, is it?

9    A.   No.

10   Q.   That's just circumstances of the photo.

11       Okay.  Let's take a look now at Exhibit 645.

12   P3LI-1010 is demolition?

13   A.   Correct.

14   Q.   All right.  The demolition work you needed to do in

15   there I think you mentioned floors and what else?

16   A.   Floors, ceilings, electrical devices, whatever above

17   ceiling mechanical systems there were.

18   Q.   Now, it looks like -- it looks like from Exhibit 645,

19   although it started earlier than anticipated, it finished

20   seven or eight days later than it was anticipated,

21   correct?

22   A.   Correct.

23   Q.   All right.  What was ECI's first activity planned for

24   in that area?

25   A.   Says electrical devicing.

1    Q.    Are you aware of any other activity?

2    A.    Electrical overhead rough-in.

3    Q.    Are you aware of any other activity that's not shown

4    on here, say wall roughing in?

5    A.    Yes.  There was some slotting to do in there as well.

6    Q.    That was part of the demolition contractor?

7    A.    Open up the wall so we could install rough-in, yes.

8    Q.    But just looking at this schedule here, electrical

9    devicing, the electrical devicing was -- when was that

10   scheduled to start and when did it actually start and

11   finish?

12   A.    Scheduled to start July 19, scheduled to finish

13   August 16th.

14   Q.    Okay.

15   A.    It was scheduled to complete the same day.  And

16   finished on August 17th.

17   Q.    All right.  So do you know why that activity by ECI

18   was started almost a month late?

19   A.    I don't, but it seems like it's a little out of order

20   in this schedule too.

21   Q.    Why do you say that?

22   A.    The electrical devicing would happen closer to --

23   finishes rather than prior to following demo.  The

24   following demo would be de-rough-in.

25   Q.    So that may be, what, an error in the schedule?  You

1    might have put that as an earlier activity when it should

2    have been a later activity?

3    A.    Yeah, looks as though that's the case.

4    Q.    Was that corrected in the field?

5    A.    Yes.

6    Q.    Okay.  So saying ECI was late in putting in the

7    electrical devicing in this area wouldn't really be fair,

8    would it?

9    A.    No, it wouldn't.

10   Q.    Let's look at electrical overhead rough-in.  When was

11   that to start and when was that to finish?

12   A.    Scheduled to start on the 28th of July, scheduled to

13   finish on the 31st.  It started on the 12th and it

14   finished on the 27th.

15   Q.    So that actually, from a finish time frame, finished

16   early?

17   A.    Yes.

18   Q.    The duration was quite a bit longer?

19   A.    Yes.

20   Q.    Was there something in there that you're aware of

21   that prevented ECI from not being able to start and just

22   do their work?

23   A.    No.

24   Q.    Do you know of any activity that was in there that

25   slowed ECI down at all?

1    A.    No.  Pretty open room.

2    Q.    Let's take a look at -- by the way, notwithstanding

3    that, that wasn't concerning to you, was it?

4    A.    No.  The library was in good shape, was looking good.

5    Q.    Take a look at devices and ceiling grid.  That's

6    P3LI-1240.  When was that to start and finish?

7    A.    P3LI-1180?

8    Q.    I went right to devices and ceiling grid.

9    A.    I'm with you.

10   Q.    Let's start with lighting, because that's earlier.

11   P3LI-1230.

12   A.    August 6 was the planned start.  Actual start was

13   August 5.  August 8 was planned completion.  Actual finish

14   was August 12.

15   Q.    Now, you notice a ceiling grid, P3LI-1180, which is

16   right before that.  Did they need to have the ceiling grid

17   in in order to do the lighting?

18   A.    To complete the lighting, they'd have to have the

19   ceiling grid in.

20   Q.    I do see that looks like the ceiling grid light was

21   closed out on August 5?

22   A.    Correct.

23   Q.    And they started their lighting on August 5?

24   A.    August 6 -- August 5, yes.

25   Q.    That was ahead of schedule?

1    A.    Yes.

2    Q.    Took them a duration until August 12 instead of a

3    three-day duration planned?

4    A.    Correct.

5    Q.    Do you know why it took them a longer period of time?

6    A.    No.

7    Q.    Do you know of any reason that -- any reasons for

8    problems that occurred in that room that would have caused

9    ECI to take more time to do that work?

10   A.    No.

11   Q.    Is there anything shown on the schedule that would

12   suggest that there was something in their way or they

13   couldn't do that work in the duration that is indicated?

14   A.    No.

15   Q.    And just to be fair, you don't necessarily know

16   whether or not they spent, you know, that whole seven or

17   eight -- seven or eight days as opposed to three days?

18   A.    Right.

19   Q.    Maybe they were in there only three days?

20   A.    Right.  There could have been space in between.

21   Q.    The next item is devices and ceiling grid.  Could you

22   go over the start and finish dates there?

23   A.    Planned start date was August 6.  We started on

24   July 30th.  Planned completion was August 6.  And

25   completed on August 5.

1    Q.   That's tracking ahead of schedule?

2    A.   It is.

3    Q.   The teledata rooms, P3LI-1300, did that also track

4    ahead of schedule?

5    A.   Yes.

6    Q.   Now I want to go to 655 and look at the library.  And

7    again we see the fire alarm inspection.  That's out there,

8    as you've testified already?

9    A.   Yes.

10   Q.   But that gives you a graphic illustration of what

11   work they were doing versus planned of when they'd be in

12   that room?

13   A.   Yes.

14   Q.   Okay.  I want to turn to the next page of Exhibit 41,

15   probably 9D or 10?

16   A.   10C.

17   Q.   Does that have 8/17 library area on it?

18   A.   Yes.

19   Q.   Could you explain the pictures, what those pictures

20   show to the Court?

21   A.   "See pictures above on 8/17, P3LI area.  ECI

22   continues to work on the Lutron system.  ECI ran into a

23   lot of trouble with the Lutron system and it required a

24   lot of time to work out all the issues they ran into."

25   Q.   Okay.  So if I go back to 645 or 655, what item --

1    what activity takes into account the Lutron system?

2    A.    The lighting.

3    Q.    Okay.  And you've testified I think before on the

4    Lutron lighting.

5          There's a picture below on that same page on

6    8/20/10 in the library area?

7    A.    "See picture above on 8/20 of the P3LI area.  The

8    area is substantially complete and all finishes have been

9    installed.  The area is substantially complete two weeks

10   early."

11   Q.    All right.  Let's go to the next activity, the

12   classrooms.  All right.  Describe for the Court the

13   classroom area, where it is, what needed to be done?

14   A.    The classroom area is this portion and this portion

15   (indicating).  And they all got renovated.  We went into

16   the rooms, we tore them all apart, demoed all the stuff,

17   above ceiling equipment.  We refitted up the doorways to a

18   new entrance type so that there was a alcove coming into

19   the classroom out of the hallway.  And then put all the

20   new systems and interiors up.

21   Q.    A lot of work in that area?

22   A.    Yeah.

23   Q.    Were there a lot of different trades in that area?

24   A.    Yes.

25   Q.    So you had -- first you had the demo person.  You had

```
1   a mason doing some walls?

2   A.   Correct.

3   Q.   Were the floors done too?

4   A.   The floors were all done as well.

5   Q.   How about the existing walls, did something get done

6   with them?

7   A.   We repainted existing walls.  Touched up and

8   repainted.

9   Q.   Was there new HVAC and plumbing in those rooms?

10  A.   Yes.

11  Q.   There was all of ECI work?

12  A.   There was ECI in there.

13  Q.   HVAC, what kind of HVAC work was done in that area?

14  A.   There was some ductwork and some water feeds.

15  Q.   Was this a hot air or cool air system?

16  A.   Yeah, it was like a thin tube system in a box against

17  the exterior wall.

18  Q.   Okay.  Was that carrying hot air?

19  A.   It provided heat and cooling.

20  Q.   Was that completely new or renovation?

21  A.   That was completely new.

22  Q.   So you had to have the HVAC, those are the ones

23  called the tin knockers?

24  A.   Yeah.

25  Q.   They come down -- were they on the exterior of the
```

1    building or in the hallway?

2    A.    In the classroom areas, they mainly popped up through

3    the tunnels below the school.

4    Q.    Where were the heating ducts and the cooling ducts?

5    A.    Very small duct that needed to feed this.  It was a

6    new type of system they were using.

7    Q.    All right.

8    A.    So he came up from tunnels and there was small ducts

9    above the ceiling as well.

10   Q.    And who did the -- was there notching of the walls

11   needed for ECI to do its --

12   A.    In the existing walls there was notching, yes.

13   Q.    That was done by the demo contractor?

14   A.    Correct.

15   Q.    All right.  Let's turn to first Exhibit 41.  And

16   there's a page with the classroom area, Area #7.

17   A.    Okay.  I'm on page 11C.  Classroom Area #7.

18   Q.    There's -- first one I see is 7/7/10 picture?

19   A.    Yes.

20   Q.    Could you go over what that picture shows?

21   A.    "See picture above on 7/7/10 of the P3CL area.  The

22   demo is substantially complete in this area.  The area is

23   clean and ready for the following work.  The area was

24   worked from one end to the other to make it so following

25   work could begin on one end and follow the preceding

1    work."

2    Q.   From which end to which end?

3    A.   From that end to this end.

4    Q.   So you didn't wait for the demo contractor to be

5    completely done with this work before you started other

6    work here?

7    A.   Correct.

8    Q.   Okay.  You kind of shifted down and hopefully -- you

9    tell the Court.  I don't want to testify.

10   A.   We started demo-ing down at the far end and worked

11   our way up the corridor and out.  The following activity

12   started behind that.

13   Q.   Did it actually work like that in actuality?

14   A.   Yes.

15   Q.   Now, the demolition contractor in the classroom area,

16   you have P3 -- I'm looking at 645 for the moment.

17   P3CL-130, demolition east/west sequence.  Could you tell

18   the Court what happened in terms of demolition timing in

19   that area?

20   A.   So it was planned to start on the 28th.  It actually

21   started on April 5.  That was during the early three

22   months that we opened up to be able to start activities in

23   there.  Completion date was planned to be June 29.  It

24   completed on July 16.

25   Q.   Okay.  I want to go to your first picture again

1   7/7/10, electrical overhead rough-in.  Is that to be

2   done -- is that to be done overhead, I guess?

3   A.   Yes.

4   Q.   In the ceiling area?

5   A.   Above the ceilings, yeah.

6   Q.   So as of 7/7/10, what do you see in terms of the

7   overhead area?

8   A.   I see the ceilings are open and it looks like we have

9   some walls still to build on the interior.

10  Q.   All right.  Focusing on the ceilings, is that ceiling

11  area ready for additional work to come in and do that

12  work?

13  A.   There is work that can be done on that ceiling.

14  Q.   Do you know if ECI as of this date has begun their

15  work?

16  A.   No.  Not by looking at the picture.

17  Q.   You can't tell?

18  A.   Looks like it started on July 12.

19  Q.   Does it appear that it is ready to be worked?

20  A.   Yes.

21  Q.   From the picture in Exhibit 41?

22  A.   Yes.  Correct.

23  Q.   Do you have any understanding as to any reason -- it

24  looks like electrical overhead rough-in for ECI P3CL-280

25  was actually started way back in April, correct?

1   A.   Which activity?

2   Q.   P3CL-280?

3   A.   Correct.

4   Q.   Okay.  And finished July 30?

5   A.   Correct.

6   Q.   And that's for this entire classroom area, correct?

7   A.   Yes.

8   Q.   How are they able to get in early before the end of

9   school?  Did they take the ceiling down first?

10  A.   Yes.

11  Q.   So how much work was ECI able to perform in this area

12  in terms of electrical rough-in prior to the beginning of

13  Phase 3?

14  A.   Substantial amount of the work.

15  Q.   In terms of electrical overhead rough-in?

16  A.   Yes.

17  Q.   But it shows that they didn't finish that work until

18  July 30th.  Do you know why?

19  A.   I don't.

20  Q.   Was it impacted at all by any particular area where

21  they were impacted in terms of putting in overhead rough?

22  A.   The only thing -- could you repeat that?

23  Q.   Well, was there anything to do with steel in this

24  area or RTUs or anything that impaired ECI's ability to

25  finish putting in or finishing overhead rough in this

1    area?

2    A.    In the classrooms, I don't believe so.   In the

3    corridor there may have been some steel for rooftop

4    equipment.

5    Q.    The corridor is part of the classroom item though?

6    A.    Yes, yes.

7    Q.    So it's not just the classroom, it's the corridor?

8    A.    Correct.

9    Q.    In that classroom area.   Okay.

10        So there may have been some steel issues for the RTUs

11   in that area?

12   A.    Yes.   But I believe we had -- I think there was RTUs

13   and I believe there were skylights.   A lot of the

14   skylights went over existing mechanical penetrations and

15   they were sized appropriate where the steel was completed

16   already.   Some of them it was just a couple of angles that

17   needed to be thrown in.   RTUs I think were C channels.

18   Q.    What's a C channel?

19   A.    Type of steel shaped like a C.

20   Q.    So those had to be installed?

21   A.    Correct.

22   Q.    Were those late in being installed?

23   A.    I don't believe so.   I recall something down by the

24   electric room that may have been an issue.   But I believe

25   we worked around that by getting steel sub over there,

 1   talking about and finding a way to run the conduit below

 2   that so he could install the steel after.

 3   Q.   The electrical room, where is that on the P3CL?

 4   A.   It's near the mechanical room (indicating).

 5   Q.   So go back to Exhibit 41 for a moment.

 6        Now, P3 -- this first picture in the classroom area,

 7   that shows one of the classrooms, correct?

 8   A.   Yes.

 9   Q.   There's more than one classroom, correct?

10   A.   Correct.

11   Q.   So it's substantially complete in that particular

12   classroom?

13   A.   Right.

14   Q.   And you moved east to west, so you would move down

15   east to west, correct?

16   A.   Correct.

17   Q.   The next two pictures below that, 7/20/10, what do

18   they show?

19   A.   It's a picture of the electrical delivery that was

20   received and stored in A wing.  And the lighting was

21   generally for classrooms.

22   Q.   Okay.  And that's just -- was there a delay in

23   receiving the lighting at all?

24   A.   It was planned to start on August 15.  So got the

25   light in time.

1    Q.    Okay.  So let's go back to Exhibit 645 for the

2    moment.  And look at the next activity is electrical wall

3    rough-in, P3CL-370.  Go over with the Court the planned

4    start and finish dates for that?

5    A.    Planned start date was July 11.  Actual start date

6    was July 7.  Planned completion date was July 13.  Actual

7    start date was July 29 -- actual completion date was

8    July 29.

9    Q.    Next item, electrical rough-in inspection, that is

10   actually a date before July 29?

11   A.    Yes.

12   Q.    Is that possible?

13   A.    It's possible we had some interim inspection to this

14   work.  But that could be an error.

15   Q.    Now, I see that there's a previous activity.

16   P3CL-170, notch existing walls for rough-in?

17   A.    Right.

18   Q.    So here you have that as a separate line item

19   activity?

20   A.    Yes.

21   Q.    You've included in demolition and other activity?

22   A.    Yes.

23   Q.    And that appears to have finished 18 days late, do

24   you see that?

25   A.    I do.

1    Q.   Could you explain that and if there's any connection

2    with the electrical wall rough-in?

3    A.   We opened up walls for not only electrical but other

4    things.  But I don't recall what this issue may have been.

5    The crew that we had cutting walls, typically if it was

6    marked out got them cut quickly so we could rough them out

7    and patch them back in.

8    Q.   So your -- the electrical wall rough-in is delayed by

9    16, 17 days.  Do you know -- or at least the duration is

10   17 days.  Do you know why it is?

11   A.   No.

12   Q.   All right.  Do you recall ECI having a lot of

13   problems with electrical rough-in in that area?

14   A.   No.

15   Q.   Was ECI having to stop work in one area of the

16   classrooms and go somewhere else?

17   A.   No, not that I recall.

18            THE COURT:  One moment.

19            I think we're probably good to go to 12:15.

20            MR. HUG:  All right.  Obviously by this point in

21   time Your Honor has learned to completely disregard my

22   time estimates in terms of how long things will take.

23            THE COURT:  I think my sense of the progress

24   here is that I have a sense of how to read these charts

25   now and for me it's just a question of what the witness

1    can add in addition to in terms of explaining if there was

2    a particular circumstance that mattered rather than having

3    the witness repeat the dates that we can see from the

4    chart.

5              MR. HUG:  Okay, that will save a little time.

6    Thank you.  I'll try to take that into my delivery here.

7    BY MR. HUG:

8    Q.   Exhibit 41 again, there are some further pictures of

9    the classroom area on the next page.

10   A.   Okay.

11   Q.   What does the first picture show?

12   A.   Picture on 8/2 shows ceiling grid has begun

13   approximately ten days early.

14   Q.   Does that impact any ECI work?

15   A.   I don't believe so.

16   Q.   Does it allow them to start earlier their work?

17   A.   If they don't have overhead rough done, it might

18   impact their overhead rough.

19   Q.   So if they're put -- in other words, if they're

20   putting in ceilings or putting in ceilings before ECI has

21   finished their overhead rough, that's going to make it

22   harder for ECI?

23   A.   Correct.  They have to reach through the ceiling to

24   finish.

25   Q.   Okay.  Did that happen?

1   A.    I don't believe it happened, no.

2   Q.    Okay.

3   A.    I'm looking here and I see wires hanging all over the

4   place.

5   Q.    The next two pictures below that?

6   A.    Pictures on 8/16.  "Finish devices are being

7   installed and lighting has been installed in this area.

8   These activities have started early and this area is

9   tracking a couple of weeks ahead of the baseline

10  schedule."

11  Q.    By the way, if the ceiling grid is in, once the

12  ceiling grids are in, what's ECI's next activity in the

13  classroom area?

14  A.    Lighting and any ceiling devices.

15  Q.    So they would be able to install their light fixtures

16  and devices in the grid beginning a little earlier,

17  correct?

18  A.    Yes.

19  Q.    And in fact, if you turn to P3CL-520, that happened,

20  correct?

21  A.    Yes.

22  Q.    They were able to start earlier and they finished at

23  their appointed time?

24  A.    Correct.

25  Q.    Now, on that same page, P3CL-780, electrical

1   devicing --

2   A.   Yes.

3   Q.   -- the schedule shows that there was a delay in the

4   start and finish of that particular item.  Do you

5   understand what was the problem there?

6   A.   No.

7   Q.   Do you know of any reason why ECI was delayed in

8   starting that work?

9   A.   No.

10  Q.   Do you know why the duration of that activity was 16

11  days instead of four days?

12  A.   No.

13  Q.   Was there anything, to your knowledge, that happened

14  in the project that prevented ECI from doing its devicing

15  within the time allotted, six days I think you said?

16  A.   No.

17  Q.   Not six days.

18       THE COURT:   Three days.

19  A.   Four days.

20       MR. HUG:   You have to count the day that's on

21  there as well as the days.

22  BY MR. HUG:

23  Q.   It appears from the schedule teledata rooms were

24  finished ahead of schedule, right?

25  A.   You're looking at P3CL-620?

1    Q.   Yes.

2    A.   Yes.

3    Q.   Now, if I go to 655, which is the illustration of the

4    classroom of where, you know, the graph is illustrating

5    where the work was done in relation to planned, I see that

6    electrical devicing is pushed out from the mid-July time

7    frame to mostly in the last two weeks of August.  You see

8    that?

9    A.   I do.

10   Q.   And do you understand if there was a reason why -- do

11   you understand that -- do you know of any reason ECI had

12   for doing that work later?

13   A.   No.

14   Q.   Actually putting up the electrical devicing, was

15   there any condition in the -- this would be -- not just

16   the ceilings, this would be in the walls and whatnot,

17   right?

18   A.   Yes.

19   Q.   Do you know of any reason why that was made more

20   difficult for ECI?

21   A.   No.

22   Q.   You walked the site every day; is that right?

23   A.   Yes.

24   Q.   And is it fair to say that you were looking for areas

25   that were causing problems?

1    A.   Yes.  And typically foremen weren't shy telling you

2    if they have them.

3    Q.   Okay.  Let's go to the next one, which is the

4    electric room.

5         Before we do that, go back to Exhibit 41.  I want to

6    go through a couple more pictures with you quickly.  Go to

7    the next set of pictures on 8/16/10.

8    A.   Okay.

9    Q.   What does 8/16 show?

10   A.   "See picture above on 8/16, P3CL area.  ECI needed to

11   spend a lot of time with the Lutron system to make it work

12   correctly."

13   Q.   The next two pictures -- and you talked about the

14   Lutron lighting system already.  So next two pictures?

15   A.   "See pictures above on 8/19 P3CL area.  The millwork

16   has started to be delivered and installed.  The millwork

17   is being installed early and the area is tracking about 2

18   weeks ahead of schedule."

19   Q.   And then turn to the next page.

20   A.   Okay.

21   Q.   And that's also the top picture at least -- well,

22   more than that, is in the P3CL area?

23   A.   Yes, on 8/19?

24   Q.   Yes.  Describe that picture.

25   A.   "The ECI worker is performing rework of electrical

1    work in completed walls in an office area.  Due to this

2    work the finish trades were required to come back into

3    this area and perform repairs."

4    Q.   Okay.  You didn't dock ECI for that, did you?

5    A.   I did not.

6    Q.   Middle picture, describe that one?

7    A.   "The corridors in the classroom areas are

8    substantially complete and clean."

9    Q.   Is that a new floor?

10   A.   Yes.

11   Q.   Is that a new ceiling?

12   A.   Yes.

13   Q.   I see the walls on either side?

14   A.   Yes.

15   Q.   Is that a broom?

16   A.   It is.

17   Q.   I do see some ceiling tiles missing.  What's that

18   about?

19   A.   I'm not sure what that is.

20   Q.   Go to the next two pictures.  What does that show?

21   A.   "See pictures above on 8/23, P3CL area.  There are

22   substantially completed rooms.  Per the baseline schedule,

23   the millwork was to start on 8/29 and as this picture

24   shows they are completed rooms 6 days prior to when it was

25   scheduled to begin."

1   Q.   Okay.  Go to the next page.

2   A.   Okay.

3   Q.   What does that show?

4   A.   "See picture above on 8/25 of the P3CL area.  ECI

5   continues to work on Lutron panels.  They have spent a lot

6   of time working to make the Lutron system work correctly."

7   Q.   Okay.  We've already talked about that.  The next

8   picture?

9   A.   "See picture above on 8/25 of the F3CL area.  The

10  millwork is substantially complete in the classrooms well

11  ahead of schedule."

12  Q.   And then the last picture in the last room area

13  appears on the next page?

14  A.   "See picture above on 8/16 of P3CL area.  ECI

15  continues to work on the Lutron system.  ECI has spent a

16  lot of time working to make the system work correctly."

17  Q.   Okay.  So now let's turn to the electrical room, F19,

18  F29, F29A on 645.  I don't think we have any pictures of

19  that one though; is that right?

20  A.   No.

21  Q.   All right.  For the Court's reference, could you

22  describe where this area is on the map drawing?

23  A.   Electric room is this area here (indicating).

24  Q.   Is it part of the mechanical room or area?

25  A.   It's in the mechanical area, yes.

1    Q.   It's given a P3CL number, though, in the schedule?

2    A.   Yes.

3    Q.   Okay.  So this area right here?

4    A.   Yeah.  Says 19 right on it, I think.  Yep.

5    Q.   You've had a few projects since this one, right?

6    A.   Yes.

7    Q.   What was done in this electric room?

8    A.   The room was pretty much substantially there, it was

9    existing.  We ripped out a door frame, put a door frame in

10   a different location and demolished what was in the room.

11   Q.   All right.  So we have that item rub walls, paint

12   walls, flooring and whatnot.  Let's go right to ECI's

13   work.  Mount panels.

14   A.   Starting on July 12.  Actual start, July 12.  Planned

15   completion, July 14.  Actual completion, July 15.

16   Q.   Okay.  I notice that the mount panels looks to be

17   pretty much on the schedule, correct?

18   A.   Yes.

19   Q.   Feeder panels looks, however, to be behind schedule.

20   Do you know why the feeder panels were behind in this

21   room?

22   A.   I do not.

23   Q.   What are feeder panels?

24   A.   Panels that feed smaller panels in other areas of the

25   building.

1    Q.    Actually a panel that's mounted on the wall?

2    A.    Yes.

3    Q.    Okay.  Do you need to do any work before you mount

4    the panels?

5    A.    Not in this room.  As long as the walls were done,

6    they can mount the panel.  This panel might have actually

7    sat on the curb, I forget.

8    Q.    Were the walls built?

9    A.    Yes.

10   Q.    Do you know when the walls were built?  Were they

11   built on or before July 19?

12   A.    The walls were existing.

13   Q.    Oh, the walls didn't need to be built?

14   A.    Correct.

15   Q.    Any reason you know of why ECI was delayed in this

16   area in doing feeder panels?

17   A.    No.

18   Q.    Do you know if Pike or another one of Pike's

19   subcontractors did something in this area that caused some

20   sort of delay?

21   A.    No.

22   Q.    Is there anything from this schedule that shows you

23   why ECI started late?

24   A.    No.

25   Q.    And duration of ECI's work in this area was also

1   longer than originally planned.  Do you know why?

2   A.   No.

3   Q.   Do you know if there's anything that happened with

4   respect to the feeder panels that would have caused ECI to

5   have a longer duration?

6   A.   No.

7   Q.   Then let's go to P3CL-740, final terminations.  For

8   final terminations, that's -- you described that -- so the

9   final terminations are the wires are there and they have

10  to finish the end of the wires and plug them in?

11  A.   Yes.  Prep the wire and connect it to the panel.

12  Q.   But the wire had to get there --

13  A.   Yes.

14  Q.   -- right?

15       So was there anything impeding ECI getting the wires

16  to that area that you're aware of?

17  A.   No.

18  Q.   So let's turn to Exhibit 655 on page 4 of 4.  And the

19  electrical room, F19, F29, F29A.  And we can have the

20  graphic -- see the graphic illustration of where ECI's

21  work fell versus planned.

22  A.   You're on 655?

23  Q.   Yes.

24  A.   What activity?

25  Q.   We're talking just about the electrical room.  I'm

1    just pointing that out to the Court.

2            MR. HUG:  All right, Your Honor, we're done with

3    the electrical room, F19.  I would start on the cafeteria

4    now, but that would take longer than --

5            THE COURT:  Why don't we take our lunch break

6    and reconvene here at 1:15.  Look forward to seeing you

7    then.  Thank you.

8                (Whereupon, a recess followed.)

9

10           THE COURT:  Please be seated.

11           You may proceed.

12           MR. HUG:  Thank you, Your Honor.

13   BY MR. HUG:

14   Q.   We left off with the cafeteria.  I note we're on

15   page 4 of 4 of Exhibit 655 for that and on page 6 of 8 of

16   Exhibit 645.

17        First of all, cafeteria area is indicated by a P3C,

18   correct?

19   A.   Yes.

20   Q.   P3C is where?

21   A.   Right there.

22   Q.   Could you describe the work that was to be done in

23   that particular area?

24   A.   The cafeteria, we did the typical demo on the

25   interior work.  We added skylights through the roof, I

1   think there were like eight.  Existing windows got

2   painted.  Some electrical rough-in got done in the walls.

3   And then we patched it back in.  New soffit over here.

4   Q.   What's a soffit?

5   A.   Drywall drop and return similar to what you have on

6   the light fixture.

7   Q.   All right.  Are you talking about this here?

8   A.   Drywall portion, the drop.

9   Q.   The drop.  Okay.  Ceiling comes down and goes over?

10  A.   Returns to the wall.

11  Q.   So that's a soffit.

12       Were there any new walls that needed to be built?

13  You did say some walls --

14  A.   Most of the walls were existing.  There was a new

15  entrance door frame that went across between corridor in

16  the cafeteria.

17  Q.   Okay.  Let's go to Exhibit 41, the pictures for a

18  moment.  And are there any pictures of the cafeteria area

19  in there over I think it's three pages?  Yeah, three

20  pages.  I want to start with the one on July 5.  Just tell

21  us -- you don't need to read the whole thing, read it out

22  loud, but advise the Court what is going on in that area

23  and what does it show?

24  A.    It shows the demo work being substantially complete

25  and overhead rough-in work ongoing.  You can see the new

1   ductwork in the picture.

2   Q.   Silver stuff right above the ladder?

3   A.   Yes.  Fire protection system in the picture.

4   Q.   Where do you see that?

5   A.   Underneath the ductwork laterally in the back of the

6   picture.

7   Q.   Sort of those pipes?

8   A.   Yeah.

9   Q.   Kind of hanging?

10  A.   Fire protection system is nearly in place two weeks

11  early it says here.

12  Q.   All right.  By the way, who did that overhead

13  ductwork?

14  A.   Tin knocker did that.

15  Q.   That was what company?

16  A.   That was --

17  Q.   Is that Action Air?

18  A.   Action Air.

19  Q.   In terms of -- let's go to the next picture.  Get

20  through some of the pictures first.  The next page as of

21  August 9, 2010 in the P3C area?

22  A.   "Ceiling grid is ongoing in this area.  The area is

23  cluttered with ECI materials that other subcontractors

24  needed to work around while performing their work in this

25  area."

1    Q.   All right.  So did you backcharge ECI for that?

2    A.   No.

3    Q.   Next picture?

4    A.   8/16.  "The lighting installation is ongoing."

5    Q.   All right.  That looks like there's some sort of

6    forklift in there?

7    A.   Those are platform lifts to get men up and down.

8    Q.   Is that being used by ECI?

9    A.   It looks as though it is, but not sure for certain.

10   Q.   Okay.  The next page is 8/17/10 in the PC3 area?

11   A.   The lighting is completed and the area is clean and

12   ready for the following activities.  The lighting in this

13   area took longer to install than planned in the baseline

14   schedule.  However, due to the baseline schedule

15   completion being two weeks earlier than the owner needed,

16   we were able to absorb the increased duration, still turn

17   over the space on time.

18   Q.   Why did the lighting in the area take longer to

19   install than planned?

20   A.   There was something the way the hangers supported the

21   light.  They initially went in on an angle, splayed.  And

22   I believe ECI reached out to the manufacturer, told them

23   they had a problem, and the manufacturer said they had to

24   be straight, plumb.  So they had to go back in and take

25   them all down and reinstall them all.

```
 1   Q.   Was that another contractor who did that work or ECI
 2   who put the hangers down?
 3   A.   ECI.
 4   Q.   ECI had to go put the hangers in and go back and
 5   correct its own work?
 6   A.   Correct.
 7   Q.   So it took a little longer than anticipated?
 8   A.   Yes.
 9   Q.   I take it that's also -- if they had to do the same
10   basic activity twice, they had to incur additional man
11   hours for that, correct?
12   A.   Correct.
13   Q.   Let's look at the last picture on that page.  Before
14   we get to that, there's a happy ending to the story in the
15   cafeteria area, isn't there?  You still were able to turn
16   the space over on time?
17   A.   Correct.
18   Q.   Go to the next picture, please.
19   A.   On 8/19, flooring work is ongoing in the areas, is on
20   track to complete.
21   Q.   All right.  Go to 645 for a moment.  Page 6 of 8
22   there is the demolition issue, demolition line item
23   P3C-1110.  And from schedule it looks like it is late by
24   18 days now; is that right?
25   A.   You're on P3C-1110?
```

1    Q.   1010.

2    A.   1010.  Yes, it was scheduled to be complete on

3    July 2.  Actually was completed on July 17.

4    Q.   Do you know why that happened?

5    A.   I do not recall why that happened.

6    Q.   All right.  Now, it appears that ECI's first area of

7    item of work is P3C-1140, electrical overhead rough-in.

8    And from this schedule it looks like although it started

9    early, it finished 25 or 26, 27 days -- excuse me, in 27

10   days and 17 or so days late?

11   A.   Correct.

12   Q.   Now, the demolition in the room, was there some

13   demolition in the ceiling area that needed to be done?

14   A.   Looks like demolition in the ceiling area was

15   complete as all the contractors were already roughing in.

16   Q.   That's shown in your first picture in the cafeteria

17   area, 7/5/10?

18   A.   Correct.

19   Q.   And shows overhead rough is ongoing in that area?

20   A.   Correct.

21   Q.   Did the tin knockers need to complete their work

22   before electrical overhead rough-in occurred?

23   A.   No.

24   Q.   Do you know of anything that prevented ECI from

25   completing its work before July -- on or before July 13?

1    A.    No.

2    Q.    Do you know of any reason why it took ECI -- or the

3    duration, it doesn't say it took ECI 17 or 18 days to do

4    this.  That's a misstatement on my part, right?

5    A.    Correct.

6    Q.    It's just a duration of when is it started and

7    finished, lasted that time.  But do you have any reason

8    why the duration of that activity lasted longer than four

9    days?

10   A.    No.

11   Q.    Do you recall any significant issues impacting ECI in

12   the cafeteria area?

13   A.    No, I do not.

14   Q.    Let's turn to the next page, 645.  And P3C-1260, the

15   top item is electrical devicing.  And it appears ECI

16   started and finished those items later than the baseline

17   schedule, see that?

18   A.    I do.

19   Q.    Do you know why?

20   A.    I do not.

21   Q.    Did they defer electrical devicing at all in any

22   areas?

23   A.    Yes.  They would typically hold on to electrical

24   devicing and move guys to high areas and come back and do

25   electrical devicing.  They've done that in a number of

1    portions.

2    Q.   I notice the duration of that activity was two days

3    and it took two days in the duration, correct?

4    A.   Correct.

5    Q.   Install devices -- excuse me, set lights in grid,

6    P3C-1230, the schedule says what it says.  They were

7    tracking a few days behind the baseline schedule, correct?

8    A.   Correct.

9    Q.   Now, to set the lights in the grid, I take it you

10   have to have the grid up?

11   A.   Yes.

12   Q.   The grid was put on, based on line item P3C-1180, on

13   the prior page between August 3 and August 12, right?

14   A.   Yes.

15   Q.   So could ECI have been impaired slightly on the end

16   of that segment because the ceiling grid wasn't in until

17   August 12?

18   A.   It's possible.

19   Q.   Okay.  But they could also -- could they also work in

20   that area while some of the ceiling grid was being put up?

21   A.   Yes.

22   Q.   They didn't have to wait until the entire ceiling

23   grid was up, did they?

24   A.   No.

25   Q.   In fact, based on the schedule, it looks like they

1    didn't?

2    A.    That's correct.

3    Q.    It says install devices in the grid area, is that the

4    same basic issue there?

5    A.    Yes.

6    Q.    Now, let's take a look at Exhibit 655 for the

7    cafeteria on page 4 of 4.  Again, another graphic

8    illustration of ECI's work versus baseline, I notice again

9    the teledata technical fire alarm devicing is moved out.

10   Do you have an understanding as to why that was moved out?

11   A.    No.

12   Q.    And the duration was supposed to be three days, but

13   the actual duration was seven days.  Do you know why it

14   would take ECI any longer to do that work than the three

15   days?

16   A.    No, I don't.

17   Q.    Was there some other contractor that was impairing

18   their ability to work in that area that you can recall?

19   A.    Not that I can recall.

20   Q.    We talked about final NEP connections to equipment

21   and fire alarm inspection all ready in a general way.

22   Those areas -- those items were pushed out into the gray

23   area that last two weeks of August, see that?

24   A.    Yes.

25   Q.    Along with electrical devicing.

1        I want to turn to -- you have a note here that ECI --

2    as of August 9, ECI's material is cluttered around the

3    cafeteria area.  Did that also impair -- did that impair

4    ECI's ability to do its own work?

5    A.   Sure.

6    Q.   Okay.  I think I've covered the cafeteria.  Let's

7    turn to the next area which is the mechanical room.

8        First of all, the mechanical room, this was -- what

9    was this, the mechanical room?

10   A.   Mechanical room is right here (indicating).

11   Q.   All right.

12   A.   Depressed area, outside entrance, step down to get

13   into it.  If you came in this way, you have to walk

14   through the stairs.

15   Q.   You had to walk through the electrical room?

16   A.   This is a vestibule to get to the electrical rooms on

17   either side.

18   Q.   All right.  Did they have new equipment that was

19   installed in the mechanical room?

20   A.   Yes.

21   Q.   What kind of equipment?

22   A.   New boilers, new pumps, new hot water heaters.

23   Q.   Was this area critical to the start of -- finish of

24   the school to get it open on time?

25   A.   Yes.

1  Q.   Was there any work in there that was less critical

2  than others?

3  A.   The boilers would be less critical.  We wouldn't need

4  hot water coming back to school.

5  Q.   Did you have discussions with ECI about the boiler

6  room and how that fit into their overall plan?

7  A.   Yes.

8  Q.   When did you have these discussions?

9  A.   Throughout the summer, probably the middle of the

10 summer forward.

11 Q.   Okay.  Could you relay to the Court what those --

12 what happened in those discussions?  What was discussed?

13 A.   We discussed getting in there to make terminations

14 and tie-ins to all the equipment.  ECI wanted to wait

15 until toward the end of the job.

16 Q.   Did ECI tell you why they wanted to wait until the

17 end of the job?

18 A.   I'm not sure if we ever discussed why, but it was

19 clear they were working in other areas trying to finish

20 them up and they were going to bring a gang in and hit the

21 mechanical room and wrap it quick.

22 Q.   Was it ECI's election to do some of this work in the

23 hater portion of the project?

24 A.   Yes.

25 Q.   Now, there was some -- were there some issues that in

1    the boiler area that were later than you anticipated

2    anyway?

3    A.    I believe the hot water heater came late.

4    Q.    Okay.  That's not shown on the schedule, is it?

5    A.    No.

6    Q.    When you say late, was that during Phase 3 or before

7    Phase 3 started?

8    A.    It was during Phase 3.

9    Q.    How about the chiller, P3M-250, set chiller?

10   A.    Yeah, so that was planned to set on June 21.  It set

11   on August 2.

12   Q.    All right.  And do you know why that was late?

13   A.    I don't recall the reason.

14   Q.    Okay.

15   A.    But it was clearly late.

16   Q.    And then ECI had a one-day duration activity connect

17   electric to chiller?

18   A.    Right.

19   Q.    And in fact, that activity, though, one-day duration

20   on the schedule, it was delayed though it was delayed

21   by -- well, almost two months.  Just a little under two

22   months.  It still was a one-day duration activity, do you

23   see that?

24   A.    Yes.

25   Q.    What's involved with connecting the electric to

1  chiller?

2  A.   Have to bring power feed up to it and terminate it up

3  to the chiller.

4  Q.   How many men would you estimate need to do that?

5  A.   Probably a two-man crew that was working in there to

6  complete that work.

7  Q.   Did the number of people to do that particular work

8  change because it's done almost two months later than the

9  original schedule?

10  A.   I don't think so.

11  Q.   Why don't you think so?

12  A.   Because it's a small amount of work coming from a

13  very close electric room.

14  Q.   Now, P3M-320, connect electrical to hot water

15  heaters.  That item also looks like it was supposed to be

16  completed on June 23 even before Phase 3 started and

17  actually didn't get done until August 14.  Is that related

18  to the delay in the hot water heater?

19  A.   It likely is.

20  Q.   Do you know if the duration of that activity was much

21  longer than the one day originally predicted?

22  A.   I don't believe it would be.

23  Q.   Do you know of any reason why the duration of that

24  activity would have increased by more than -- it would

25  have taken more men to do that particular item of work?

1   A.   I don't think so.

2   Q.   So I'm not going to go down through all of these

3   because I think the Court can see it.  I want to jump over

4   to 655 for the moment and take a look at the schematic for

5   the mechanical room.

6        So we see -- I want you to look at the duration for

7   the moment of how long it was planned to do any of these

8   activities.  And particularly the first four activities.

9   Was there any reason you're aware of why the duration

10  should have substantially differed from what was planned?

11  A.   No.

12  Q.   In other words, it would have been moved out to a

13  different time frame, but was there something going on in

14  those rooms that impaired ECI's ability to do that work

15  when it needed to be done?

16  A.   No, I don't believe so.

17  Q.   Now, we heard testimony about a ceiling or a chimney

18  being removed, demolition of a chimney.  Do you recall a

19  chimney being demolished?

20  A.   I do.

21  Q.   And I take it that chimney went and penetrated

22  through the roof?

23  A.   Yes.

24  Q.   What did you do with the roof after you took the demo

25  out?  Was there a hole in the roof?

```
1    A.   Yes.

2    Q.   And did you just leave a hole?  Did you just leave

3    that hole in the roof there?

4    A.   No.  We temporarily covered it.  We left that hole

5    open to receive the new hot water heater because it was

6    too big to come in the door to the room.

7    Q.   So you put a temporary roof over it?

8    A.   Correct.

9    Q.   Then opened it up again when you needed to put the

10   hot water heater in?

11   A.   Then did the permanent patching, replace.

12   Q.   What kind of roof was on this building?

13   A.   EDPM.

14   Q.   What's EDPM?

15   A.   Tough type of roofing membrane.

16   Q.   Flat room?

17   A.   There were some slopes in some areas.  Phase 3 was

18   basically flat.  Boiler room was basically flat.

19   Q.   Okay.  And EDPM, are they like sheets of insulation

20   and tar or like a tar-like substance?

21   A.   It's insulation and rubber.

22   Q.   Rubber, okay.  All right.  And are there a number of

23   plies that you put over a roof when you're doing an EPDM

24   roof?

25   A.   Yes.  That job had an extensive amount of insulation
```

1    that went on top of everything for insulation qualities.

2    Q.   You have to cover the hole in the roof first.  What

3    do you cover the hole in the roof with?

4    A.   Metal deck.

5    Q.   And then after the metal deck, what goes in?

6    A.   Then insulation would go down.

7    Q.   And what's after that?

8    A.   Then the membrane.

9    Q.   Okay.  And then it's somehow sealed for water,

10   correct?

11   A.   Correct.

12   Q.   Now, that's the finished roof, right?

13   A.   Yes.

14   Q.   What's a temporary roof?

15   A.   In a lot of cases we used EDPM as a temporary roof as

16   well.  We patched it in and used adhesive glue and temp.

17   it in.  We would have put plywood over that and a piece of

18   membrane.

19   Q.   What you wouldn't have done is put the steel roof

20   deck?

21   A.   Correct.

22   Q.   But you would have put like a plywood material and

23   then the EPDM?

24   A.   Yes.

25   Q.   Did you -- why did you do that?  You were trying to

1    create a water seal?

2    A.    Yes.

3    Q.    Is that a common practice in the industry?

4    A.    It is.

5    Q.    And let's take a look at your photo on Exhibit 41.

6              THE COURT:  What page?

7              MR. HUG:  Your Honor, it's -- it's towards the

8    back near -- says boiler room area.

9              THE COURT:  All right.  18C.

10             MR. HUG:  Okay.

11   BY MR. HUG:

12   Q.    There's some picture on 7/6/10 of the P3M area, do

13   you see that?

14   A.    Yes.

15   Q.    There's three pictures of the boiler room area there.

16   Could you explain to the Court what those show?

17   A.    Yes.  The picture to the top left is some new

18   equipment pumps.  The picture to the right is the new

19   boilers.  The picture on the bottom is some pumps for the

20   hot water heater system.  The hot water heater was sitting

21   behind those pumps, I believe.

22   Q.    Did you -- was this before or after the demolition of

23   the chimney?

24   A.    After.

25   Q.    Did you have a hole in the roof there?

1    A.   The hole was probably in the roof, but it was

2    covered.

3    Q.   With this temporary roof?

4    A.   Correct.

5    Q.   Do you see any water on the floor, any indication of

6    water intrusion in that room?

7    A.   No.

8    Q.   Was there expensive equipment in that room?

9    A.   Yes.

10   Q.   And would that equipment be damaged if it became wet?

11   A.   It would, but the room was built -- if you look at

12   all the equipment, it's all sitting on curbs.  So that

13   flooring is meant to get wet.  There's a drain in the

14   floor in the event some of that equipment is leaking or

15   something like that.

16   Q.   All right.  At this point in time as of 7/6, is it

17   your understanding that the temporary roof was in place?

18   A.   It is.

19   Q.   Let's go to the mechanical -- excuse me, the -- well,

20   the boiler is in the mechanical room, correct?

21   A.   It is.  Those blue things in the top right corner are

22   the boiler.

23   Q.   Let's go to the switchgear area.  What's the

24   switchgear area?

25   A.   Switchgear area is where the switching that goes to

 1    bring in the power from outside the building.

 2    Q.   All right.  Let's look at the plan.  Where is the

 3    switchgear room?

 4    A.   It's on the -- in this area here (indicating).

 5    Q.   So it's near the mechanical room?

 6    A.   It is.

 7    Q.   Is that an important room from an electrical

 8    standpoint?

 9    A.   It is.

10    Q.   Why is that important?

11    A.   That's where we're getting our new power feed to the

12    building.

13    Q.   Let's go over to Exhibit 6 -- what do these pictures

14    show again?

15    A.   It shows the switchgear.

16    Q.   Okay.  On August 2?

17    A.   Mine doesn't have a date.

18    Q.   On the next page?

19    A.   Yeah.

20    Q.   See it?

21    A.   Yes.  On August 2nd.

22    Q.   I'm looking at the switchgear room on 645 for the

23    moment.  And I want to go down to "place switchgear

24    equipment curb."  That's not ECI's work, is it?

25    A.   It is not.

1   Q.   But that appears to have been done early on.

2        If I go to the last page of Exhibit 645, I see

3   switchgear and conduit distribution.  Are those ECI work?

4   A.   It is.

5   Q.   And I see that with respect to set switchgear, that

6   was done early?

7   A.   It was.  It looks like it was done five days early.

8   Q.   The conduit distribution looks like it's done a

9   little bit late.  Do you know why that was done late?

10  A.   I do not.

11  Q.   Do you know of anything that was impeding ECI in that

12  area to do that work?

13  A.   I do not.

14  Q.   If I go to Exhibit 655, the only thing I really see

15  on there is the -- because this only goes from June to --

16  through past September, I see the conduit distribution

17  here.  That's also ECI work, right?

18  A.   Yes, it is.

19  Q.   Okay.  Now, continuing on in Exhibit 41 for the

20  moment, and this now going back to response to the letter

21  in Exhibit 40.  Did you also point out certain EC issues

22  to ECI?

23  A.   Yes.

24  Q.   Let's just go through the photos showing that.  I

25  think the first one we can skip quickly, that's the light

```
 1   pole issue, you've already testified about?

 2   A.   Correct.

 3   Q.   And on the next page you see more pictures of the

 4   light poles?

 5   A.   Second time they came in and they were damaged again.

 6   Q.   All right.  And then on the next page, 7/29 photos of

 7   the switchgear.  What happened with the switchgear?

 8   A.   The switchgear was sent out with some incorrect parts

 9   that ECI had to resolve and wait for parts to arrive prior

10   to completing their work.

11   Q.   Is that part of conduit distribution or is that

12   something else?

13   A.   That's something else.

14   Q.   Okay.  And on the next page we see more pictures,

15   generator shrouds.  I think you talked about that already?

16   A.   Yes.

17   Q.   And then the next picture you're showing certain

18   panels that were damaged.  I think you've already

19   testified as to that?

20   A.   Yeah, it was missing some components.

21   Q.   Okay.  Now, you saw ECI working on this project

22   during the course of July and August 2010, correct?

23   A.   Correct.

24   Q.   Did you see how much manpower they were adding?

25   A.   Yes.
```

1    Q.   Did you have any appreciation that they were going to

2    be looking to Pike for a claim for that?

3    A.   Based on the fact that they were bringing manpower

4    in?

5    Q.   Yes.

6    A.   No.

7    Q.   And why did you think they were bringing manpower in?

8    A.   To complete their project on time.

9    Q.   You were reading Mr. Mathieu's daily reports, weren't

10   you?

11   A.   Yes.

12   Q.   Did you see him marking his progress from day-to-day?

13   A.   Yes.

14   Q.   Did you glean from that that ECI was being impaired

15   in any way?

16   A.   No.

17   Q.   Again, there were no other loss of productivity

18   claims on Phase 3, right?

19   A.   Correct.

20   Q.   Nobody actually was awarded more money because of

21   inefficiencies on Phase 3?

22             MR. KAPLAN:  Asked and answered.

23             THE COURT:  I think it's asked and answered,

24   Counsel.

25             MR. HUG:  I want to follow up.

1    BY MR. HUG:

2    Q.   So there are other contractors aren't there,

3    subcontractors that were impacted by the steel, correct?

4    The steel going in late?

5    A.   In the art room and locker room, yes.

6    Q.   And those -- and what subcontractors would those be?

7    A.   Well, it would have affected all of them to some

8    degree.

9    Q.   All right.

10            MR. HUG:  No further questions, Your Honor.

11            THE COURT:  Thank you.

12            Cross-examination?

13            MR. KAPLAN:  Yes, sir.  And if you don't mind, I

14   might be bouncing back between locations, if that is okay.

15            THE COURT:  No problem.

16            MR. KAPLAN:  Thank you.

17

18                    CROSS-EXAMINATION

19   BY MR. KAPLAN:

20   Q.   Hello, Mr. Oloff.

21   A.   Hello.

22   Q.   I want to talk with you first about the July 21

23   meeting with ECI.  And I just want to make sure I got your

24   testimony correct.

25       You said that it was an issues meeting for purposes

1    of determining how to catch up and get to the end date of

2    Phase 3?

3    A.    Correct.

4    Q.    And do you know whether ECI requested that meeting?

5    A.    I don't recall if it was ECI or how it was set up.  I

6    believe it was set up between Mel and Cliff.

7    Q.    And you said that there was no request for extension

8    of time --

9    A.    Correct.

10   Q.    -- asked by ECI at the meeting, asked for by ECI at

11   the meeting?

12   A.    Correct.

13   Q.    Are you certain of that?

14   A.    I don't recall them ever requesting additional time.

15   Q.    So to the best of your recollection, ECI never made a

16   request for an extension of time at that meeting?

17   A.    Correct.

18   Q.    Would you have remembered if they did?

19   A.    I think that's something I'd key right into.

20   Q.    Because it would have been a significant event at the

21   time?

22   A.    Sure.

23   Q.    Okay.  How long have you known Mr. Strauss?

24   A.    I've worked with Mr. Strauss one job before that.

25   Q.    For how long?

1    A.   One or two jobs before that.

2    Q.   For how long?

3    A.   Pretty much my time with Pike up to that point.

4    Probably two or three years at that point.

5    Q.   Okay.  And is Mr. Strauss a truthful individual?

6    A.   Yes.

7    Q.   Would he issue a false affidavit to this Court do you

8    think?

9    A.   I don't think he would.

10   Q.   Okay.  I'm going to read to you what Mr. Strauss said

11   under oath in an affidavit he submitted to this Court

12   January 2014.  Docket Number 68.  It was submitted by

13   defendant in response to the application for PJR that's

14   pending.

15            MR. HUG:  Objection.

16            THE COURT:  Let me make sure you show it to --

17            MR. HUG:  He's impeaching this witness with the

18   affidavit of someone else, if I understand the testimony

19   here.

20            MR. KAPLAN:  I'm going to impeach this witness

21   with a sworn affidavit that was submitted by defendant and

22   is in the record of this Court already and constitutes a

23   judicial admission as to facts that have been put in

24   controversy by this witness.  This is a project manager

25   for Pike who submitted this affidavit through counsel.

1    It's Docket Number 68.  It's already on record.

2              THE COURT:  So what's the objection?  I'm trying

3    to figure out what basket are you putting this objection

4    in?

5              MR. HUG:  It's not the witness's statement.

6    It's an affidavit that's filed with the Court.  It's not a

7    judicial admission.  Factual admission by Mr. Strauss.

8    Mr. Oloff has a different recollection.

9              THE COURT:  Okay.  I don't think it's improper

10   for a person to be contradicted by other evidence of

11   record, whether photograph or something that somebody else

12   swore to, especially if it was a managerial employee who

13   purportedly I think speaks on behalf of the company and

14   submitted by the company in its defense.  I'm going to

15   allow it.

16             I'll just caution Mr. Kaplan, I don't know how

17   much we really want to dwell on that.  I think Mr. Strauss

18   is coming as a witness and I think if you made the point

19   that Mr. Strauss said something different, that's fine.

20             MR. KAPLAN:  I'm not dwelling.  It's not going

21   to take very long.

22             THE COURT:  Sounded like you were going to do a

23   lengthy reading of an affidavit.

24             MR. KAPLAN:  I've got six lines of an affidavit

25   to read.

1          THE COURT:  Read on.

2          MR. KAPLAN:  It was submitted on January 10,

3     2014, paragraph 17 where Mr. Strauss is referencing the

4     July 21 meeting.  I will read this verbatim.

5          "At that meeting four weeks into the ten-week

6     Phase 3, ECI requested an additional four weeks to

7     complete their work.  This was an absurd request and quite

8     frankly it reinforced my concern that ECI did not have an

9     appreciation of the true needs of this phase of the

10    project.  They knew or should have known that Pike did not

11    have the ability to extend the deadlines by four weeks."

12          There's obviously more in the affidavit, that's

13    all I'm reading.

14    BY MR. KAPLAN:

15    Q.   So your recollection -- you have no recollection of

16    the statement that Mr. Strauss swore to and submitted in

17    affidavit that in fact ECI did request a four-week

18    extension of time at the July 21 meeting?

19    A.   Correct.

20    Q.   Okay.  Now, at that time -- and I think, per your own

21    testimony, you said that Phase 3 had to finish by the end

22    of August, as scheduled, and let's put the exception aside

23    to some of those areas that were in fact pushed out into

24    September.  I'm going to ask you some questions on that.

25    But obviously we know you made some exceptions, you pushed

1    some areas out.  Those aside, you were adamant on July 21,

2    as you were before and after, that the rest of Phase 3 had

3    to be completed by the end of August, roughly, as given?

4    A.   Correct.

5    Q.   And you made that clear to ECI at the July 21

6    meeting?

7    A.   I did.

8    Q.   Okay.  And Mr. Strauss did?

9    A.   Yes.

10   Q.   So any consideration of an extension of time on

11   July 21 for the bulk of the Phase 3 work was off the

12   charts, right?

13             MR. HUG:  Objection.  I don't know what off the

14   charts --

15             THE COURT:  Off the table.

16   BY MR. KAPLAN:

17   Q.   Was off the table?

18   A.   Correct.  We had to get the kids back in.

19   Q.   So no matter what, you weren't going to grant it,

20   Pike wasn't going to grant it, right?

21   A.   I don't believe we would.  Kids were coming back.  As

22   I've said many times, no Plan B.

23   Q.   No Plan B.  Did you say no Plan B at that meeting?

24   A.   Sounds like I would.  I said that a lot, I probably

25   said it at the meeting.

1   Q.   No Plan B would mean we're not giving you any

2   extension of time as to what I'm calling the bulk of the

3   Phase 3 work?

4   A.   Plan B meant we owed the City that job so that the

5   kids come back and have a place to go to school.

6   Q.   Within the Phase 3 requirements?

7   A.   Correct.

8   Q.   So if ECI would have submitted an e-mail request the

9   next day saying Ed –– let's say Cliff Clauson wrote you

10  something, Ed, just to summarize what we talked about

11  yesterday, we asked for a four-week extension of time,

12  what would your response have been?  It would have been no

13  Plan B, it's not happening, right?

14  A.   I think I would have tried to schedule another

15  meeting to come back in and work through whatever issues

16  we had to try to make time.

17  Q.   You don't recall it being requested ––

18  A.   I do not.

19  Q.   –– on the 21st?

20       Mr. Strauss certainly does because he swore to it in

21  an affidavit, right?

22  A.   So you said.

23  Q.   I didn't say it.  I read the court document to you.

24            MR. HUG:  Objection, argumentative.

25            THE COURT:  We'll just move on.

```
 1    BY MR. KAPLAN:

 2    Q.   All right.  Were you aware of the contract

 3    requirements during the project?

 4    A.   I think so, yeah.

 5    Q.   Okay.  And would you mind -- I won't even put you

 6    through it.  We've been through this before.

 7         Exhibit 13 is the Pike master subcontract agreement.

 8    And it's in Volume I of the plaintiff's exhibits.

 9    A.   Okay.

10    Q.   If you go to page 6 of that tab?

11    A.   Okay.

12    Q.   Delays at the bottom of the right-hand column.

13    A.   Yes.

14    Q.   Paragraph 3.4.

15         First of all, were you familiar with these provisions

16    while you were running this job for Pike?

17    A.   It's typical language.

18    Q.   Okay.

19    A.   From a typical contract that I'm familiar.

20    Q.   So you were familiar with these provisions?

21    A.   Yes.

22    Q.   Okay.  And it says, does it not, that if the

23    subcontractor is delayed by an act or omission of the

24    contractor or by any other contractor or subcontractor on

25    the project, or by any cause beyond the subcontractor's
```

1   control and not due to any fault, et cetera, et cetera,

2   the time for completion of the work shall be extended

3   equivalent to the time lost by reason of any of the

4   aforesaid causes, and it goes forward?

5           THE COURT:  Could you read the rest of it?

6           MR. KAPLAN:  Sure.

7   BY MR. KAPLAN:

8   Q.   As determined by the contractor and the subcontractor

9   agrees to make no claim for damages for delay in the

10  performance of his subcontract occasioned by any act or

11  omission to act of the contractor or any of its

12  representatives.

13       So basically that's a no-damages-for-delay clause,

14  right?

15  A.   Yes.

16  Q.   It says time is a remedy but not money if there are

17  delays not the fault of the subcontractor?

18          MR. HUG:  Objection, asks for a legal

19  conclusion.

20          THE COURT:  You can answer the question with

21  respect to what you at least understood this contractual

22  type of language to mean.

23  A.   I understand it to mean that if they were delayed,

24  they might need more time.

25

1    BY MR. KAPLAN:

2    Q.   And if they were delayed and if it was no fault of

3    their own, then they might be -- I'm blanking on the

4    word -- they might be entitled to a commensurate extension

5    of time, right?

6    A.   Yes.

7    Q.   Okay.  So the notion that ECI on the 21st could ask

8    for an extension of time and if they were entitled to it,

9    if -- I know it's an if because they had been delayed

10   through no fault of their own, that was something the

11   contract provided for them to do, wouldn't you agree with

12   that?

13   A.   Yes.

14   Q.   Okay.  And so the notion that them asking for an

15   extension of time on the 21st, if again they were entitled

16   to it, that's not an absurd idea, is it?

17   A.   No.

18   Q.   Okay.  And does it say anything in that provision or

19   anywhere else in the contract that you're aware of that

20   requesting extensions of time does not apply to Phase 3 of

21   this contract?

22   A.   I'm not aware of any.

23   Q.   Okay.  And again, I know it's a school, I know you

24   have deadlines, I know you want to get the kids back in

25   the classroom.  ECI knew that.  But the fact is, as far as

1    the contract provisions for asking for extensions of time,

2    they don't relate to that and they don't refer to that as

3    a criteria, do they?

4    A.    No.

5    Q.    Okay.  But you and Mr. Strauss -- and rightfully so,

6    as your job is to get this job done for your company and

7    for the school, but you were adamant there would be no

8    extensions of time for the Phase 3 work regardless; is

9    that a fair statement?

10   A.    It is.

11   Q.    Okay.  And regardless means regardless of whether ECI

12   was legitimately being delayed by factors beyond its

13   control, right?

14   A.    Regardless meant there was no Plan B.

15   Q.    So it doesn't matter what the cause was, they weren't

16   getting an extension of time --

17   A.    The kids were coming back.

18   Q.    Just let me finish the question so we have a clear

19   record, okay?

20         So it doesn't matter what the cause was, they were

21   not going to get an extension of time for Phase 3; fair

22   statement?

23   A.    It's a fair statement.  However, just like the locker

24   room and art room --

25   Q.    Mr. Oloff, please answer my question.  If Mr. --

1    A.    It's a fair statement.

2    Q.    Okay, thank you, sir.

3          Near the end of your examination by Mr. Hug, you

4    stated that you received the daily reports from

5    Mr. Mathieu?

6    A.    I did.

7    Q.    You said you reviewed them.  Did you review them

8    during the Phase 3 work on a regular basis?

9    A.    Yes, put them on my desk and I looked at them.

10   Q.    Every day?

11   A.    When he put them on my desk.  Might not look at them

12   the same day, but I'd catch up with them.

13   Q.    So you were staying in touch with what he was writing

14   in those daily reports?

15   A.    Yes.

16   Q.    Did you ever respond in writing to anything he put in

17   front of you in his daily reports?

18   A.    No.

19   Q.    Okay.  Now, earlier I think yesterday I believe you

20   said that ECI never made any complaints to you about the

21   schedule, did I get that right?  I appreciate you said

22   that.  I don't want to put words in your mouth.

23   A.    I think about holding them up is what I said.

24   Q.    Thank you.  They never made complaints to you about

25   things that were holding them up; is that fair?

1   A.   Yes.

2   Q.   Okay.  Yet you read Mr. Mathieu's daily reports on a

3   regular basis.  Isn't that replete, almost every day he's

4   complaining about issues that are holding him up, right?

5   A.   Well, a lot of those daily reports were in the summer

6   before they were even scheduled to start, prior to the

7   project even starting.

8   Q.   What about the ones for July and August, did you read

9   those as well?

10  A.   I did.  And we walked it.  We worked out issues every

11  day.  Not only those, but his.

12  Q.   Okay.  Working out issues, I appreciate, but that's

13  not the same as never getting complaints about issues,

14  right?  Isn't there a difference between you get the

15  complaint, how you work is out is a different story,

16  right?

17  A.   You could say that.  But, you know, you could also

18  twist what a delay is and what an issue is.  If it's

19  stopping him from doing something and we found a way to

20  work around it, I would call that an issue.  We found a

21  way to work around it as a team out on the job.

22  Q.   I'm not getting into what you did or didn't do right

23  now.  I'm questioning your statement you never got

24  complaints about these various issues.  Maybe I can go

25  through just a few of Mr. Mathieu's reports and ask you

1    whether you thought those were issues or not.  Let me grab

2    that.  I'm not going to go through a lot because we spent

3    a lot of time with Mr. Mathieu and I know the Court has

4    been through this.

5              THE COURT:  This is Exhibit 17?

6              MR. KAPLAN:  This is Exhibit 17, sir, yes.

7    BY MR. KAPLAN:

8    Q.   You may want to get that in front of you, Mr. Oloff.

9    It's in the plaintiff's Volume II and it's Tab 17.

10   A.    Okay.

11   Q.   Okay.  If you could turn to July 8 and we'll just go

12   through some of these in a sequential fashion.  July 8 was

13   after Phase 3 started, right, Mr. Oloff?

14   A.    July 8?

15   Q.   Upper left-hand corner has the dates.  Report

16   number 89.

17   A.    Okay.

18   Q.   He's got a statement "Masons still haven't started

19   any cuts in walls.  Lots of demo to do."

20        He's waiting for masons to puts cuts in walls so he

21   can put electrical installations in those walls, right?

22   A.    Yes.

23   Q.   Do you recognize this as an issue affecting his work?

24   A.    I'm not even sure of the location of where this is.

25   Q.   Would you have asked him about it after you read

 1    this?

 2    A.    I walked with Stephane every day.

 3    Q.    So you were constantly talking about any issues he

 4    had that were affecting his work?

 5    A.    Yes.

 6    Q.    So are you saying -- okay.  Strike that.  Let me go

 7    to another entry.

 8          If you go to his reports 92 and 93, two days

 9    combined, the 12th and 13th of July.  In the middle of

10    that he -- are you there?

11    A.    No.

12    Q.    Okay.

13    A.    92?

14    Q.    92, report number 92.

15    A.    Oh, okay.

16    Q.    In the middle of that page he states "We are still

17    yet to see any steel in both the IDF room and main

18    electric room in old stage area."

19          Was that an issue he was concerned about, as far as

20    you understood?

21    A.    I believe so.

22    Q.    And then two pages later, 94, 95, at the bottom, this

23    is for July 14 and 15, "Still no steel for rooftop units

24    and also the main IDF and electric room and C wing."

25          That's the same topic he said a few days ago,

1   correct?

2   A.   Correct.

3   Q.   Were you aware at that time that he was concerned

4   with that?

5   A.   I believe so.  I believe we actually went out there

6   and talked about it.

7   Q.   Okay.  If you go to the July 19 report, number 99,

8   sir.

9   A.   Okay.

10  Q.   In the middle, he says "QSR is working on other

11  locations."

12       QSR was the steel contractor, right?

13  A.   Correct.

14  Q.   "Now bouncing around all over due to miscellaneous

15  steel missing.  I've's been accommodating them as well as

16  Ed O. when needed."

17       Ed O. would be you, of course, right?

18  A.   Yes.

19  Q.   Okay.  And did he discuss with you his concerns about

20  accommodating you in the context of what the steel guy was

21  doing?

22  A.   I believe what we did is we ran his conduit before

23  some of the steel was actually installed in some areas.

24  Q.   He was putting in what he could piecemeal in those

25  areas?

1   A.   We put it under where the steel would go.  The steel

2   guy would have to work harder to twist it around and put

3   it in place.

4   Q.   There were places he couldn't put conduits at all

5   because the steel had to go up through here, right?

6   A.   In the art room, locker room.

7   Q.   Now, the report 101 and 102, in the middle there --

8   this is July 21 and 22.  In the middle again, "C wing

9   electric room still not ready."  That's an issue he was

10  concerned about and talked to you about, right?

11  A.   Yes.

12  Q.   "Masons are all over."

13       Was he complaining to you that the masons seemed to

14  be scattered all over the place in the way they were doing

15  their work?

16  A.   I don't remember many issues with the mason.  The

17  mason work went in from one end to the other in a sequence

18  and we followed suit.

19  Q.   When you read what Mr. Mathieu said, "Masons are all

20  over," did you understand what he was writing about?

21  A.   I don't know what he means as I sit here now.

22  Q.   So you wouldn't have discussed that with him?

23  A.   I'm sure whatever his issue was, we discussed.

24  Q.   Okay.  So if he had a complaint about it, you're sure

25  he told you?

1   A.   If this was doing anything to him, he would have told

2   me.

3   Q.   So if he had a complaint about it, he would have told

4   you?

5   A.   Yes.

6   Q.   So you would have heard about all his complaints

7   about the masons?

8   A.   Yes.

9   Q.   July 23, the next one, 103 in the middle.  "Masons

10  jumping around all over."  He says it again.  Did you

11  understand what he was talking about again?

12  A.   I don't know what he's speaking of here.

13  Q.   Okay.  104, 105.  July 24 and 25.  This is near the

14  end of July now.  He's got a remark, "Sunday like ghost

15  town.  ECI is the only contractor putting manpower on

16  site."

17       Did you work on Sundays?

18  A.   Yes.

19  Q.   Okay.  Were you seven days a week?

20  A.   Yes.  Some days I would leave early on the weekends,

21  but I would always show up.

22  Q.   Your typical workday in July and August was from when

23  to when?

24  A.   Probably 3:00 to 4:00 in the morning to 6:00, 7:00 at

25  night.

1   Q.   That's what I thought.

2        So how often in July and August did you order any

3   subcontractor to work on a weekend?

4   A.   Often.

5   Q.   Often?  Okay.

6        So if you wanted someone to catch up with their work,

7   what did you do?  Let's say July, August a sub is behind,

8   you want them to catch up, what did you do?

9   A.   We would sit with them, think of a way to catch them

10  up.

11  Q.   Did you ever have to issue a directive You are

12  ordered to work overtime or second shift or a Saturday or

13  a Sunday because you have to catch up?

14  A.   I don't recall issuing an order, but I recall making

15  plenty of phone calls to make it happen.

16  Q.   So you were talking to people, as a good

17  superintendent would, making sure they did what they were

18  supposed to do?

19  A.   Correct.

20  Q.   But did you ever issue a directive, say, You are

21  hereby directed to catch up, do this, do this, that thing,

22  that thing?

23  A.   I don't recall.  I don't recall issuing a directive.

24  Might have been some e-mails.

25  Q.   If you go to his daily report 107, July 27.  And

1  couple things here.  I'm going to get back to the notion

2  of manpower by ECI a little later.  Good example.

3      Were you noting the manpower numbers that Stephane

4  was indicating in his daily records in terms of how many

5  men he had on the job?

6  A.   Yes.

7  Q.   Okay.  So on this day, July 27, six days after your

8  meeting of July 21, they had 45 men on the job, right?

9  A.   Yes.

10  Q.   Okay.  Was that enough?  Did ECI have enough men on

11  the job on July 27, by your estimation?

12  A.   I don't recall the day.

13  Q.   Okay.  Well, we'll go through that in a minute.  I'm

14  going to show you their manpower levels.  We have a chart

15  that shows that.

16      You don't recall -- as of less than a week after that

17  July 21 meeting, you don't recall whether you thought they

18  had enough men on the job or not; is that what you're

19  saying?

20  A.   No, I don't recall.

21  Q.   Okay.  As you sit here today and you're looking at

22  that -- I'm sure you have a very good memory what happened

23  on this job, don't you, Mr. Oloff?

24  A.   I do.  However, I don't remember what happened on

25  July 27.

1   Q.   Fair enough.  Fair enough.

2        My question to you is you knew pretty –– you know

3   pretty much now where the job was at the end of July,

4   right?

5   A.   Yes.

6   Q.   And also your memory was refreshed because we spent a

7   lot of time walking through information about July and

8   August, correct?

9   A.   Correct.

10  Q.   As of the end of July, were 45 men enough for ECI to

11  be manning the job properly, in your estimation?

12  A.   Isn't that the same question you just asked me?

13  Q.   Pretty much.  Still can't answer it?

14  A.   Right.

15  Q.   Okay.  On this page, Mr. Mathieu has a couple of

16  statements I want to ask you about.

17       "All other trades still behind."  That's sort of near

18  the top next to Lost Time/Delays.  Do you remember seeing

19  that he was expressing this at the end of July?

20  A.   No, I don't.

21  Q.   Okay.  Do you remember ––

22  A.   I don't think Stephane spent a lot of time looking at

23  the schedule.  I think Stephane spent a lot of time

24  working where he thought he could.

25  Q.   Okay.  It's a fair statement, but that's not my

1    question.  My question was:  Do you remember him talking

2    to you about his belief that all other trades were still

3    behind as of July 27?

4    A.   I do not.

5    Q.   You don't recall him talking to you -- strike that.

6         Do you recall reading this?

7    A.   I don't.

8    Q.   Okay.  Would you call that a complaint by ECI at that

9    time?

10   A.   Sure.

11   Q.   Okay.  At the bottom -- towards the bottom it says

12   "Pike is getting me all my electric rooms ready by the end

13   of the week."  This would be basically the end of July, I

14   guess.

15        Do you recall making those types of statements to

16   Mr. Mathieu, We will have electric rooms for you by the

17   end of the week?

18   A.   Probably.

19   Q.   Okay.  That didn't happen?

20   A.   Making some commitments or something.

21   Q.   That didn't happen, did it?

22   A.   I don't recall.  I have to go back and look at the

23   schedule.

24   Q.   Okay.  Report number 110 and 111, July 30 through

25   July 31.  At the bottom, again Mr. Mathieu says "Masonry

1    is taking longer than expected."  He mentions "due to

2    missing steel and other reasons."

3        Do you remember talking to him about the masonry

4    taking longer than expected at the end of July?

5    A.   I'm not sure where this area is he's talking about.

6    He's not specific if it's Phase 3 or the auditorium.  I

7    don't recall the conversation.

8    Q.   Okay.  If you go to Wednesday, August 4, under

9    Lost Time/Delays, he's again mentioning electric rooms,

10   "We need our electric rooms built in B upper and C wing.

11   Steel is still not completed."

12       This is the same issue he mentioned a week earlier.

13   Do you remember talking to him about that on August 4?

14   A.   I don't remember that day.  I remember having

15   discussions with him about it.

16   Q.   It's clear this is a serious matter.  He's mentioned

17   it here, I'm sure he talked to you about it?

18   A.   He did.  I'm not sure of the dates.

19   Q.   Okay.  But these records would indicate the dates,

20   right?

21   A.   I suppose.  I'm not sure if he turned these in daily

22   or handed these all in to me at the end of the week.

23   Q.   Okay.  All right.  If he gave them weekly, you

24   reviewed them weekly?

25   A.   Every once in a while.  Wasn't every day.  If it hit

1   my desk and it was sitting there, I would look at it.  If

2   there was a stack delivered, I'd get to it.

3   Q.   I thought you said a few minutes ago you reviewed

4   them on a regular basis?

5   A.   Weekly basis.  Every-so-often basis.

6   Q.   Is that weekly?  Biweekly?

7   A.   It could go more than a week.

8   Q.   Okay.  But you were talking to him every day?

9   A.   Every day.

10  Q.   If he's writing it down, he's probably talking to you

11  about it, right?

12  A.   Yeah.

13  Q.   If you go to the August 8 entry, number 118, couple

14  notes.  This is a Sunday, ECI's got 19 men on Sunday.  Did

15  anybody else have that kind of manpower on Sundays in July

16  and August?

17  A.   I don't recall exactly who was there those days.  ECI

18  wasn't the only contractor working Sundays.

19  Q.   Did anybody else bring in 19 guys on a Sunday, to

20  your recollection?

21  A.   I can't say sitting here.  I wouldn't be certain.

22  Other people had high numbers.

23  Q.   If you go to August 9 and August 10, record there

24  near the top.  You're saying "Masonry still being

25  installed in corridors in F wing."

1       Masonry was supposed to be done by now, wasn't it?

2   A.   I'd have to look at the schedule.

3   Q.   He says, "Still cutting and patching needs to be done

4   in cafeteria.  And miscellaneous areas already marked up."

5       Did he complain to you about the cutting and patching

6   was late as of August 9 to 10?

7   A.   I don't recall the conversation, but I do recall

8   areas that weren't marked out that we had to follow up on.

9   Q.   If you look, it's Friday the 13th, August 13,

10  Communication With Others.  "I'm working in all areas.

11  Basically this job is out of control.  All other trades

12  are in same areas everywhere."

13      Do you recall Mr. Mathieu telling you at around this

14  time that he believed the job was out of control?

15  A.   I don't believe he said that to me.  I believe he

16  felt very busy and he was supposed to be working in many

17  areas.  And I think he was just feeling the stress of that

18  job.

19  Q.   Okay.  Do you think that working in many areas is

20  different than believing something's out of control?

21  A.   You'd have to be there, I guess.

22  Q.   Okay.

23  A.   Stephane was there and he was running around all the

24  time.

25  Q.   Was he doing a good job?

1   A.   Yeah.

2   Q.   Okay.  If you go to Sunday, the 15th, ECI's got 14

3   men there that Sunday.  Lost Time/Delays.  "Still not

4   finished in lobby area with masonry."

5        Was the masonry supposed to be done as of the middle

6   of August?

7   A.   I'd have to look at a schedule.  I would think it

8   would.

9   Q.   Because school was supposed to open in about two

10  weeks or so, right?

11  A.   Yes.

12  Q.   So the masonry -- I'm sure if you looked at the

13  schedule, the masonry should have been done by then?

14  A.   Correct.  I'm not sure of the extent of the masonry

15  he's talking about.

16  Q.   Fair enough, fair enough.

17       He mentioned the lobby area in his comment?

18  A.   I know.  I just don't know the extent, if it was two

19  bricks or an entire wall.

20  Q.   You think he would have made that comment if it was

21  two bricks missing?

22  A.   I don't know.

23  Q.   Okay.  He also says, "Ceiling still can't go up in

24  lobby area including bathrooms and art room.  Still no

25  ceilings in corridor to connector area."  And mentioned

1   the north locker room and F wing.

2       Ceilings are important because he's got to do work up

3   there?

4   A.   Correct.

5   Q.   He's mentioning this.  Did he complain to you about

6   the fact that, hey, the ceilings aren't up, I have work to

7   do?

8   A.   He's specific in the area, the art room.  Art area.

9   That's the art area he's explaining.

10  Q.   There's other areas he's mentioning as well, not just

11  the art.  Down a little further he says, "We're still

12  awaiting millwork in B and F wing."

13      Now, what work did ECI have to do in conjunction with

14  the millwork?

15  A.   They had to put a wiremold on top after it went in.

16  Q.   So they have work to do after?

17  A.   Work was roughed in through a wall, millwork could

18  come in, and they come in and install a wiremold that had

19  data outlets in it.

20  Q.   Data outlets?

21  A.   Data and electrical outlets, I believe.

22  Q.   So until millwork gets installed, they can't do

23  finish working in those areas?

24  A.   Correct.

25  Q.   Was he complaining to you about the fact they were

1    still waiting for millwork in the middle of August?

2    A.   He was complaining here, but what I recall on site he

3    had a crew following millwork.

4    Q.   He had a crew following them around to get the work

5    done as soon as it was installed, correct?

6    A.   Correct.

7    Q.   Okay.  Also on that page, sir, he mentions at the end

8    of his comments "We also worked on fixing cafeteria

9    fixtures."

10        You mentioned something about ECI having to fix

11   cafeteria fixtures, right?

12   A.   Correct.

13   Q.   I think yesterday you said you thought it was eight

14   or nine fixtures?

15   A.   Yeah.

16   Q.   Okay.  And in going through this, and we can all

17   check this, I looked through, this was the only mention of

18   this issue anywhere in Mr. Mathieu's records.  Would that

19   mean that this was the day they fixed that issue?

20   A.   Took more than one day to fix that issue.

21   Q.   Were you there watching them work on it?

22   A.   I saw them, yeah.

23   Q.   You saw them.  Were you just there all day watching

24   them work on the cafeteria fixtures?

25   A.   No.

1   Q.   You walked by and saw some guys working on it?

2   A.   Yeah.

3   Q.   Okay.  And how long did you stay to watch them?

4   A.   I would walk through there many times a day.

5   Q.   Okay.  August 17 Mr. Mathieu has a reference that

6   "Pike is getting inspections on ceilings that still don't

7   have temp. lighting in there.  And starting to close

8   ceilings up."

9        This was an issue that Mr. Mathieu complained to you

10  about?

11  A.   I don't recall the issue.

12  Q.   That ceilings were getting closed up while he still

13  had not yet removed temporary lighting above the ceilings;

14  do you remember that issue?

15  A.   I do not.

16  Q.   You do not.  Okay.

17  A.   It's not the end of the world to that, though.  We

18  leave tiles out where there's a bulk and leave enough room

19  to cut that work out after.

20  Q.   No one's insinuating it's the end of the world,

21  Mr. Oloff.

22       The next page, August 18, he has a note also in the

23  middle, "Also starting to rip out temporary lighting above

24  ceilings that have been closed up even though I asked to

25  leave pads open so we could rip them out."

1        So he had -- do you remember him asking you to leave

2   the pads open?

3   A.   I don't recall, but we generally do.  It's standard

4   practice.

5   Q.   In this case evidently that didn't happen, according

6   to Mr. Mathieu?

7   A.   According to Mr. Mathieu, it didn't happen.

8   Q.   Friday, the 20th of August, number 130 at the bottom,

9   "Flooring going in many different areas that we still need

10  to get in, we're being detoured all over."

11       Do you remember Mr. Mathieu complaining about the

12  fact that when flooring was going in, he didn't have

13  access to areas to do his work?

14  A.   When a flooring went into a room, he wouldn't have

15  access to a room.

16  Q.   Right.  But obviously he thought he should have had

17  access to do work in certain area and he wasn't getting it

18  because of flooring.  Did he talk to you about that?

19  A.   I don't recall him talking to me about that.  But I

20  think that falls under him not understanding his schedule.

21  Q.   You don't think he understood the schedule?

22  A.   I don't think he followed the schedule when he was

23  writing these daily reports.

24  Q.   I didn't hear you.

25  A.   I don't think he followed the schedule writing his

1    daily reports.  I don't think he understood flooring was

2    going to continue through under normal sequence and he

3    wasn't going to be able to be in the room during normal

4    activity.

5    Q.    So based on his writing, you don't think he

6    understood the schedule?

7    A.    Correct.

8    Q.    What schedule --

9    A.    He also --

10              THE COURT:  Hold on.

11              MR. KAPLAN:  I thought he was done.

12              I'm sorry, Mr. Oloff.

13   A.    He doesn't reference the area he's working in.  He's

14   working in multiple areas beyond Phase 3.  He doesn't

15   reference in these reports which areas he's talking about.

16   Some of it is obviously Phase 3.  Others is vague which

17   area it is.

18   BY MR. KAPLAN:

19   Q.    Okay.  But when he was talking to you, you would have

20   been able to figure out with him what areas he was talking

21   about?

22   A.    Certainly.

23   Q.    Now, when you said you don't think he understood the

24   schedule, which schedule are you talking about?  Are you

25   talking about the contract schedule or the way this job is

1    built?

2    A.   I'm talking with the contract schedule, the update

3    schedule, and the look-aheads.

4    Q.   You mentioned I think yesterday that your updated

5    critical path schedules, which you were looking at one of

6    them extensively with Mr. Hug and we have a series of

7    them?

8    A.   Correct.

9    Q.   That those were available at your weekly foremen

10   meetings?  I think that was the word you used.

11   A.   I believe that is the word I used.

12   Q.   You didn't make copies of those and hand them out to

13   the foremen on a weekly basis?

14   A.   We would make copies and put them on the conference

15   table along with meeting minutes and look-aheads.  It

16   might not have been every week they got an updated

17   schedule, but they always got a look-ahead.

18   Q.   They always got a look-ahead.  I don't believe you

19   testified that you copied the updated CPMs every week and

20   handed them out to folks at the foremen meetings.  That's

21   not what you did, did you?

22   A.   We put them on the table so they were available to

23   take.

24   Q.   I see.

25        And you worked off the look-ahead schedules, the

1    other ones we talked about?

2    A.    That was the schedule with more detail to look at.

3    Q.    Tuesday, August 24, at the top Mr. Mathieu says,

4    "Flooring guys are killing me.  Lobby is blocked off."

5         Did he complain to you about not having access to the

6    lobby at that time?

7    A.    I don't remember it.  The flooring -- when the

8    flooring went down in the corridors, it did make it

9    difficult to get around that area.

10   Q.    When was the flooring supposed to be installed per

11   the schedule, August 25?

12   A.    You'd have to look at the schedule.

13   Q.    Okay.  You had Exhibit 645 in front of you a moment

14   ago.

15   A.    I do.

16   Q.    Okay.  I think it was talking about a number of

17   areas.  Classroom area, lobby area.  Do you have any

18   indications in your schedule when the flooring was

19   scheduled to be put in?

20   A.    I don't see any activities for flooring.

21   Q.    So you didn't put it in your schedule?

22   A.    No.

23   Q.    Okay.  So even though it wasn't in your schedule,

24   you're saying Mr. Mathieu didn't understand the schedule

25   about when the flooring was supposed to be going in; is

1    that what your testimony is?

2    A.    Yes.   We still would have talked about it in meetings

3    and planned the work.

4    Q.    Okay.  Would you look at Volume III, Mr. Oloff,

5    plaintiff's exhibits.  I'd like to direct you to

6    Exhibit 30.

7    A.    Okay.

8    Q.    If we go to the manpower chart that ECI has here, and

9    look at the color -- there's a two-page color chart, I

10   think.  See that?  And this goes from beginning with

11   June 27 through September 4.  I just want to ask you at

12   various times it shows ECI at the end of June about 12

13   men, roughly, 14 men, a little over 20, and then going up

14   to 25 towards the end of July, continues -- I'm sorry.

15   I'm sorry.  Strike that.

16        Look at the green side, which is the actual.  My

17   fault.  Starts at about 12 and goes up incrementally, 40

18   men, and then in August it goes to up as high as 50 and

19   even 60.  Okay.

20        See what I'm saying with the green bars?

21   A.    I do.

22   Q.    I'd like you to -- I want you to go through some of

23   these areas and ask you the same one or two questions.   In

24   the end of June, beginning of July, ECI's got 12, 14 men.

25   Do you think they should have had more men at that time?

1    A.    Yes.

2    Q.    Okay.  And I think you said that -- do you believe

3    there was sufficient work for them to efficiently use more

4    men at that time?

5    A.    Absolutely.

6    Q.    How many men should they have had on the site at that

7    time, the first two weeks of this chart?

8    A.    I don't have a number.

9    Q.    Two more?  Five more?  Ten more?

10   A.    Probably ten to 15 more.

11   Q.    Ten or 15 more.  So as of the first two weeks, you

12   think they should have had 25 men or so?

13   A.    Yes.  They were working in more than one area.

14   Q.    Okay.  So the first two weeks you're saying instead

15   of 12 or 14 men, 25 men, is that about --

16   A.    Yeah.

17   Q.    And then July -- let's take this in two-week

18   increments.  July 11 and July 18 they had about 20, 21 men

19   and then I think about 28 men.  At that period of time,

20   were those crew sizes correct or should they have had more

21   men?

22   A.    I'm not there now so it's hard to say, but I feel

23   they should have had more men.

24   Q.    How many men do you say they should have had?

25   Thirty-five?  Forty?

1    A.    Again, I don't have an exact number.

2    Q.    What do you think?  You've commented they didn't have

3    enough men.

4    A.    I would think ten more.

5    Q.    So July 11 they should have had 21.  And July 18, 38?

6              MR. HUG:  Objection.

7              MR. KAPLAN:  I'm asking.

8              THE COURT:  I think he said they should have ten

9    more.  I'm not sure what we're advancing here.

10             MR. KAPLAN:  I think it will be clear.

11             THE COURT:  Okay.

12   BY MR. KAPLAN:

13   Q.    Same 31 or ten more than the 28 they had?

14   A.    More.  I don't know a number.

15   Q.    They had 28 as of July 18, that week.  Should they

16   have had more?

17   A.    You know, I can't answer that at this point in time.

18   Q.    Okay.

19   A.    If I was still there at that point in time, I could

20   easily have answered that question.  Generally through the

21   summer they could have used more guys.  It would have been

22   their high peak and brought it down.

23   Q.    Before we get there, you've testified today and

24   yesterday and said a number of times sitting here today

25   that you believe today they should have had more men back

1    in this period of time, right?

2    A.    Correct.

3    Q.    Okay.  All I'm asking you is to try and detail that a

4    little bit more as to when and how many more men.  I'm

5    following up to what you've already testified to.  Are you

6    saying now that you do not know whether they should have

7    had more men?

8                MR. HUG:  Objection.  At some point this gets

9    argumentative.  It's gotten there.  I object.

10   Argumentative.

11               THE COURT:  I just wish we could be very

12   specific as to what you're asking in a way that doesn't

13   sound like it's repeating what you've just asked because

14   you're not satisfied with the answer.

15               MR. KAPLAN:  I'm trying to get an answer.  The

16   witness started answering.

17               THE COURT:  I heard him say ten more.  That's

18   what I heard.

19               MR. KAPLAN:  Okay.  I'm fine with his answer.

20   So that's 38.

21   BY MR. KAPLAN:

22   Q.    Go to July 25, that week there's 41 men.  Was that

23   enough?

24   A.    You're asking me to guess the number.  They needed

25   more men.  I don't know the number how many more they

1    needed.  I didn't do an analysis at the time to find out

2    how many more they needed.  I felt they needed more men

3    because I'm walking around and I see opportunities to do

4    work per the schedule.

5    Q.   As of July 25 did they need more men?

6    A.   I don't recall.

7    Q.   As of August 1st, they had 41 men.  Did they need

8    more men?

9    A.   Again, generally speaking, they needed more men

10   through the summer.

11   Q.   Generally as of August 1st or generally as of some

12   other time?

13   A.   Generally through the summer period.

14   Q.   Would you say the entire period of July and August

15   ECI did not have enough men on the job on any week?

16   A.   Generally, yes, I would.

17   Q.   That's fine.  So whatever their manpower was for the

18   entire period of time they took in July and August, you're

19   saying they should have had more men than they did; is

20   that a fair statement?

21          MR. HUG:  Objection, Your Honor.

22          MR. KAPLAN:  I would like to stop being

23   interrupted in my cross.  Those are absolutely valid

24   follow-up questions.  There's nothing wrong with asking

25   him to clarify what he's saying on cross.

1          MR. HUG:  What he's doing is misstating the

2     witness's former testimony.

3          THE COURT:  I'll overrule the objection.

4          The witness can answer the question.

5     A.   Can you repeat the question?

6     BY MR. KAPLAN:

7     Q.   Yes, sir.

8          So you're saying that if you take their manpower for

9     July and August, they didn't have enough, they should have

10    had more across the board for those two months; is that a

11    fair statement?

12    A.   I would say towards the end of August, they were at a

13    level they should have been at.

14    Q.   Okay.  So you're saying, what, the last --

15    A.   The latter part of August.

16    Q.   Last two weeks, three weeks?

17    A.   Last couple weeks.

18    Q.   Last three weeks that was fine, up until then they

19    should have had more men?

20    A.   Correct.

21    Q.   Did they ever have more men than they should have

22    had, in your estimation?

23    A.   I didn't look at it.  I didn't evaluate that.

24    Q.   Okay.  Volume III, Mr. Oloff.  Mr. Hug spent a fair

25    amount of time with you looking at Exhibit 41, the letter

1    with all the photos, right?  I'm not going to go through

2    every one of those, though I have to go through some of

3    them.

4    A.    I might have these a little mixed up here.

5    Q.    You can look at my book.

6    A.    It's not in this book.

7    Q.    If you look at Volume III?

8    A.    Forty-one?

9    Q.    Volume III, Plaintiff's Exhibit 41, they should be in

10   here.

11         MR. HUG:  He took it out.

12   A.    If it's the one I have, I might have it jumbled.

13   Tell me which page.

14   BY MR. KAPLAN:

15   Q.    That's fine.

16         If you look at the exhibit book, also Exhibit 42,

17   that's right after that?

18   A.    Okay.

19   Q.    Have you ever seen that?  Take a minute to look at

20   it, Exhibit 42.

21   A.    I believe I have.

22   Q.    Okay.  Are you aware that this was ECI's response to

23   the April 6, 2011 letter, which is Exhibit 41?

24   A.    It appears to be, yes.

25   Q.    And I just want to go through --

1    A.   I don't see a date on this.  Is there a date on this?

2    Q.   Yeah, first page says June 21, 2011.

3    A.   Okay.

4    Q.   Okay.  I am not going to go through point by point

5    with this because the Court ask certainly read this.  When

6    I had Mr. Flynn testify, I did go through this point by

7    point.

8             THE COURT:  Yeah, the parties will be doing

9    post-argument briefing, still point out any perceived

10   discrepancy there, so I ask the cross be focused on points

11   in which something might come to light from pointing out

12   the discrepancy.

13            MR. KAPLAN:  I'll think about that.  I'm going

14   to really -- Mr. Hug did the other.  Give me 30 seconds, I

15   might save 30 minutes.  Give me a second, please.

16                 (Pause.)

17   BY MR. KAPLAN:

18   Q.   You said today many times in reviewing Exhibit 41,

19   you said you didn't know why certain things were done or

20   not done by ECI, right, time frames, you didn't know why

21   they did something at one point versus another.  Mr. Hug

22   asked you that a lot when you were going through this?

23   A.   I think you're referencing a long activity that look

24   longer than planned.  And I said if it was a one-day

25   activity and the actual was seven days, I wasn't sure if

1  they worked the entire seven days or took time off of that

2  activity.

3  Q.   And also in context you said you weren't sure why

4  they started at a certain point rather than at another

5  point when an area was open to them?

6  A.   Yes.

7  Q.   You said that on numerous occasions in that

8  testimony, right?

9  A.   Yes.

10  Q.   When you were saying that, had you -- have you

11  recently reviewed Exhibit 42?

12  A.   I have not.

13  Q.   Okay.  So to the extent that ECI gave just about

14  point-by-point responses to the various photos and

15  comments, your testimony today did not factor in any of

16  their comments or points they made in the June 21

17  response, did it?

18  A.   Correct.

19  Q.   Okay.

20         MR. KAPLAN:  I think, Your Honor, that saves me

21  a lot of time.  And I'm sure you understand.

22         THE COURT:  Great.  Thank you, yes.

23  BY MR. KAPLAN:

24  Q.   In the schedule values we looked at with the various

25  payment requisitions -- I don't think we need to put it in

1    front of us –– there were all those line items for the

2    various activities that showed percentages of complete,

3    right, Mr. Oloff?

4    A.    Right.

5    Q.    If ECI said we're 50 percent complete with this item

6    and it's a $5,000 item, then that percentage they

7    completed in that period is what they were billing for,

8    right?

9    A.    Correct.

10   Q.    Okay.  And you reviewed that every time they

11   submitted it, right?

12   A.    Yes.

13   Q.    And you reviewed those percentages of completion,

14   right?

15   A.    Yes.

16   Q.    And to the extent those were processed and paid, that

17   was because you agreed with those percentages, right?

18   A.    Correct.

19   Q.    And the schedule of values itself had –– and maybe we

20   need to pull it out for one minute, I'm sorry.  Just to

21   illustrate something.  I think it's in –– yeah, it's in

22   this book.  If we went to, let's say Exhibit 46, good

23   example as any.  And we went to page 4 of 8 of –– I'm

24   sorry, Exhibit 48, my fault.  Exhibit 48, page 4 of 8?

25   A.    Page 48?

1   Q.   Four of eight.  Yes, sir.

2   A.   Okay.

3   Q.   Phase 3, right?  Starts in the middle of the page.

4        Then there's a number of classifications for types of

5   labor, Number 87, branch conduit classroom labor, right?

6   A.   Correct.

7   Q.   Goes down.

8        Now, these values under C for contract value, those

9   were basically approved at the outset of the job to the

10  original schedule of values that ECI submitted, right?

11  A.   Correct.

12  Q.   And did Pike review that?

13  A.   Yes, I believe Mel Strauss reviewed that.

14  Q.   And if Pike did not like the breakdown for the

15  schedule of values, what would Pike have done?

16  A.   Pike would have marked it back and sent it back to

17  them.

18  Q.   You had to accept this because this was the grid

19  basically for all billing that would be going on during

20  the job, right?

21  A.   Correct.

22  Q.   And so also means that when you accepted that, you

23  accepted their breakdowns of the labor categories for the

24  various items?

25  A.   Means we would have lived with this document for the

1   rest of the job.

2   Q.   So it was an important document?

3   A.   Yes.

4   Q.   As you went through the job, if you had any problems

5   with these items, you would have brought them to the

6   attention of ECI, right?

7   A.   Yes.

8   Q.   Okay.

9   A.   I don't think we would have had any problems

10  following up with the requisition though once we approve

11  it.

12  Q.   Once you approved it.  So at the outset, it got

13  scrutiny because it was important to set the template for

14  going forward, right?

15  A.   Right.

16  Q.   Now, you issued daily reports for this project,

17  right?

18  A.   Yes.

19  Q.   And I think we have in the same book Exhibit 55 at

20  the back of this.  I believe these are your daily reports

21  from June 21 through end of September?

22  A.   Look to be.

23  Q.   September 10, reports 214 through 283, that's your

24  work product?

25  A.   What's that?

```
 1   Q.   Those are your reports?

 2   A.   Yes.

 3              MR. KAPLAN:  I offer these.

 4              THE COURT:  Any objection?

 5              MR. HUG:  No objection, Your Honor.

 6              THE COURT:  Plaintiff's Exhibit 55, full

 7   exhibit.

 8   BY MR. KAPLAN:

 9   Q.   You did these on a daily basis, Mr. Oloff?

10   A.   Yes.

11   Q.   You basically recorded I think -- and correct me if

12   I'm wrong -- who was on the job, what they were doing, and

13   I think you also recorded the number of men for the

14   various subs on the job?

15   A.   Yes.

16   Q.   Essentially -- some other details, time, weather,

17   that kind of thing, that's essentially what you did on a

18   daily basis throughout all the reports that are in here,

19   right?

20   A.   Yes.

21   Q.   Okay.  Did you note any particular problems in your

22   reports?

23   A.   Not that we've known to see.

24   Q.   Was it your practice to note particular problems

25   occurring in the job to ECI?
```

1   A.   I think I would pretty much put what was going on.

2   Q.   Okay.

3   A.   Work that was going in place, subs that were on site.

4   Q.   Okay.  It wasn't your practice to note any issues

5   with subs, was it, in these reports?

6   A.   There may be some issues in here.  I don't recall

7   what they are.

8   Q.   Let me ask you this.  If there were problems with

9   prosecution of the work by any sub, would you have put it

10  into your report?

11  A.   Not necessarily.

12  Q.   What would have determined that?

13  A.   If it was -- if it was a very big problem, I may have

14  done it.  If it was stuff we were working around, probably

15  wouldn't have noted it in the report.

16  Q.   What if you didn't think a sub had enough manpower on

17  the job, would you have noted that?

18  A.   I may not have.

19  Q.   May you have as well?

20  A.   I may have.

21  Q.   Okay.  And what if you didn't think a sub was

22  prosecuting his work in a timely fashion, would you have

23  noted that?

24  A.   I don't believe I noted anything like that.

25  Q.   Okay.  I'd like to direct your attention to Book I of

1    our exhibits, please.

2              MR. HUG:  Is there an exhibit?

3              THE COURT:  Yes, go ahead.

4              MR. KAPLAN:  I'm not trying to prod you,

5    Your Honor.

6              THE COURT:  Sorry.  I was looking at the

7    Exhibit 55 for a minute there.  What exhibit number?

8    BY MR. KAPLAN:

9    Q.   Exhibit 7, please.  This is a new exhibit in terms of

10   it hasn't been introduced yet.

11        Would you look at Exhibit 7, Mr. Oloff?

12   A.   Yes.

13   Q.   These are a couple e-mails that you were involved

14   with in November of 2009 involving the project, right?

15   A.   Yes.

16             MR. KAPLAN:  I would offer these.

17             THE COURT:  Objection?

18             MR. HUG:  No objection.

19             THE COURT:  Plaintiff's Exhibit 7, full exhibit.

20   BY MR. KAPLAN:

21   Q.   Now, the first page has to do with the issue of the

22   Ferguson bid and your involvement with getting references

23   for Ferguson, right?

24   A.   Repeat that, please.

25   Q.   The first page, the November 11 e-mails, two of them,

1    those involved Ferguson and the lower one is your

2    reporting on the references you received, the reference

3    checks you received for Ferguson; is that true?

4    A.   Yes.

5    Q.   Okay.  And you were reporting to Mr. Strauss and cc

6    to Michael Raycraft.  And Mr. Raycraft's response is on

7    top.

8         Who is Mr. Raycraft?

9    A.   Mr. Raycraft was an OP for Pike on the project, an

10   operations person.

11   Q.   Was he Mr. Strauss's boss?

12   A.   Yes.

13   Q.   Okay.  And you're reporting information you received

14   from several sources on other jobs about Ferguson, right?

15   A.   Correct.

16   Q.   Okay.  And is it fair to say they were pretty much

17   negative comments about Ferguson?

18   A.   They were.

19   Q.   And then Mr. Raycraft's response to you is:  "Is this

20   strong enough to disqualify them?  We can send to Tony for

21   his opinion.  If we can get rid of Ferguson Electric by

22   taking alternates 1 – 5 and get rid of Ferguson Mechanical

23   based on this, I think we should."

24   A.   That's what it said, right.  Yes.

25   Q.   Was this part of the decision-making process to

1    disqualify Ferguson Electric from this project?

2    A.   That was the basis of this e-mail.

3    Q.   And you were doing this on the basis of the negative

4    reports you found about Ferguson?

5    A.   I didn't disqualify Ferguson.

6    Q.   I know that.  Good point.  Your report to your

7    superior was --

8    A.   Was the comments that I got back from the reference

9    checks.

10   Q.   You made no comments here about Ferguson not

11   understanding the job properly, did you?

12   A.   No.

13   Q.   And Mr. Raycraft --

14   A.   This was basically just references.  Wasn't about the

15   job.

16   Q.   And Mr. Raycraft did not say anything about

17   disqualifying them on the basis of a descope meeting.  He

18   was asking if this was enough to disqualify them, being

19   these negative references, correct?

20   A.   Yes.

21   Q.   And then just the second e-mail happens to be your

22   report of one of ECI's references, which was a fairly

23   positive reference, right?

24   A.   Correct.

25   Q.   Okay.  And then you're aware, are you not, that

 1   Ferguson actually sued Pike and the City to try to retain

 2   or be awarded this project?

 3   A.   I'm aware of some legal action, yes.

 4   Q.   Did you testify in that courtroom proceeding?

 5   A.   I did not.

 6   Q.   Okay.  But how often -- you're involved in public

 7   jobs a lot?

 8   A.   I have been.

 9   Q.   Okay.

10   A.   Not a lot.

11   Q.   Are you familiar with the competitive bidding on

12   public jobs in Connecticut?

13   A.   Yes.

14   Q.   And how frequently -- how frequent is it for a

15   contractor who is disqualified to actually go to court and

16   sue the owner to try to get the job?  Have you ever seen

17   that other than this Ferguson case?

18   A.   I think one other time.

19   Q.   It's fairly rare, is it not?

20   A.   Yes.

21          THE COURT:  I think now might be a good time to

22   take a short break if that's okay.

23          MR. KAPLAN:  Certainly.

24          THE COURT:  Do you know have a sense how much

25   longer?

1          MR. KAPLAN:  Not much more.

2          THE COURT:  Will there be more --

3          MR. HUG:  We had four witnesses here to testify.

4    We sent two home who live in Norwich and had a 95 issue.

5    We kept two to fill up the day.  So if they go on by 3:30

6    or quarter of 4:00, I don't think they'll be very long

7    witnesses.  Should be pretty short.  Finish before 5:00

8    with them if we go on before quarter of 4:00 and maybe

9    before that.

10         THE COURT:  Okay.

11         MR. HUG:  Or you can tell me to send them home.

12         THE COURT:  Let me address that when we get

13   back.  Make this a short break, just ten minutes if that's

14   okay.

15              (Whereupon, a recess followed.)

16

17         THE COURT:  I learned a little bit of

18   information about scheduling.  We, unfortunately, are

19   starting a major jury trial on Monday in which we would

20   have to make changes to the courtroom.  I have to put in

21   two new monitors.  I lose all my IT people unless they

22   have an opportunity to work this afternoon.  I'm going to

23   have to stick to pretty much the time I suggested

24   yesterday, which has been I think 4:15 is about the time I

25   need to stop for the day so that we can make sure we have

1    the courtroom available for the multi-defendant criminal

2    trial that starts on Monday.  If we can stop with the

3    evidence at that point in time.  My apologies, it looks

4    like the witnesses are here.

5            MS. VENNOS:  Your Honor, we have one subpoenaed

6    witness with an attorney.  They've been waiting since

7    11:00 today.

8            MR. KAPLAN:  I'll be done in five minutes.

9            THE COURT:  Hopefully we can get to the other

10   witnesses.  I'm trying to balance the concerns here and

11   the problems that it causes for Monday morning when we

12   have to be up and ready to go.

13           MR. KAPLAN:  Maybe at 4:15 --

14           THE COURT:  We'll talk future scheduling as

15   well.  Absolutely.

16           MR. KAPLAN:  I just have a few more questions.

17           THE COURT:  Okay, great.

18   BY MR. KAPLAN:

19   Q.   Mr. Oloff, just a couple of questions.  I think you

20   looked at the change orders briefly which were at

21   Exhibit 44 in the plaintiff's Binder III.  And if you look

22   to --

23   A.   Okay.

24   Q.   If you look to the September 29 change order, which

25   is I think the second one in there, number 26?

1    A.    Okay.

2    Q.    And the change order itself, there's rates there for

3    foremen, electrician, overtime, et cetera.  Do you see

4    those?

5          Electrician, $81.46 per hour?

6    A.    Yes.

7    Q.    Okay.  Were those the agreed-upon rates for the

8    change orders that were issued ECI on this job?

9    A.    I didn't really get into the agreed-upon rates.

10   There were discussions I recall about the agreed-upon

11   rates.  I don't recall the exact number.

12   Q.    As reflected in these change orders, if those are the

13   rates being used, would those have been the agreed-upon

14   rates?

15   A.    They may have been.

16   Q.    Okay.  But you are aware --

17   A.    They certainly were for this change order and there

18   were discussions on a fixed rate.

19   Q.    Okay.  Well, as far as you know, was there an

20   agreed-upon rate that was reached by Pike and ECI for the

21   change orders on this job?

22   A.    I couldn't say for certain.  I know there was

23   discussion on it.  I didn't really get into the numbers of

24   change orders.

25   Q.    Is that Mr. Strauss's --

1   A.   That would be Mr. Strauss.

2   Q.   Thank you.

3        Now, I want to ask you about man hours.  We looked at

4   ECI's man hour chart, I'm not going to go back to it.  You

5   recall they were peaking in August at 50, 60 men for a

6   couple weeks?  You recall that from your recollection on

7   the project, right?

8   A.   Okay.

9   Q.   What if ECI told you we're only going to keep 35 men

10  on the job, we're not going up to 40, 45, we're not going

11  up to 50, we don't think we have to, we think there's

12  other problems on the job, we don't think we should spend

13  this money, this is what we planned to do, that's all

14  we're doing; what would have happened then?

15  A.   A high level meeting would have been called with

16  people from the Pike Company and people from ECI to meet

17  and discuss that.

18  Q.   And I presume you would have ordered them at that

19  point to increase their crews as you saw fit were

20  necessary to complete the project within the schedule,

21  right?

22  A.   That would have been a problem and we would have

23  worked on that issue.

24  Q.   And if ECI said we're -- if you said, You need 50

25  guys here for the next three or four weeks to finish the

 1    job, something to that affect, and they said, No, we're

 2    not going past 30, then what?  What happens next?

 3    A.   Like I said, would have called a meeting, would have

 4    brought Pike people in, would have brought high level ECI

 5    people in, we would have discussed it and come up with a

 6    plan forward.

 7    Q.   What were your options if ECI stuck to their guns on

 8    that point?

 9    A.   I'm not going to guess my options here.

10    Q.   Do you know what your options would have been?

11    A.   I could have supplemented them.

12    Q.   If you supplemented them --

13    A.   Could have directed them to get more people.

14    Q.   If you supplemented them, what does that mean?

15    A.   Bring in other people to supplement their work.

16    Q.   Okay.  Other subcontractors?

17    A.   Other subs.

18    Q.   Who would have paid them?

19    A.   Their bond probably would have.

20    Q.   You would have made a claim on the bond?

21    A.   I mean, we're speculating here.  I don't know what

22    would have happened.  These are some things that could

23    have happened.

24    Q.   I'm asking what your reasonable belief would have

25    been, the steps that would have been taken.

1    A.   Typically, the reasonable steps that I see taken and

2    are effective is meeting with the subcontractor, talking

3    about a plan forward, working out issues and getting the

4    job done.

5    Q.   When the subcontractor says I'm not bringing in more

6    than 30 people, you think he needs another 30 people and

7    you decide to supplement, does that mean Pike hires those

8    subs and then backcharges in this case ECI for those

9    costs?

10   A.   Well, it would go through the bonding company.

11   Q.   Well, in the first instance, someone would that have

12   pay those supplemental subs, right?

13   A.   Yes.

14   Q.   Would that be Pike saying we're backcharging you,

15   ECI, for whatever we have to pay?

16   A.   Not necessarily.  Not necessarily.

17   Q.   How else would they get paid?

18   A.   The bond company would step in and write checks.

19   Q.   If ECI's bonding company in fact came in.  What if

20   they said, We're not coming in, we think our guy is right?

21   A.   We're speculating a lot here.

22   Q.   I know we are.  But I'm asking these questions

23   because --

24   A.   Unless I'm in that situation, I don't know how I

25   would move forward.  It wouldn't be only my decision.  It

1   would be other people involved.

2   Q.   Let me ask you this.  At the point in time when ECI

3   increased from 30 to 40 to 50 to 60 guys, which was

4   basically the last five to six weeks -- four or five weeks

5   of this phase, right, if they hadn't done that, could they

6   have gotten the electrical work done?  If they stayed at

7   that 35-men crew, could they have gotten that work done by

8   the end of August?

9   A.   At 35, probably not.  If they had more efficiency in

10  their work and they're more productive, had more

11  supervision, they probably could.

12  Q.   At 35?

13  A.   At a higher number, but not the number they had.

14  Q.   At 35 they could not have?

15  A.   Depends on the efficiencies.

16  Q.   You think 35 guys would have been efficient enough to

17  do what 60 guys would have done?

18  A.   Hard to say.  It's possible.

19  Q.   Is it?

20       Last series of questions.  I don't know if you've

21  seen this.  You may have.  This is Exhibit 51B.  It was

22  run from the same database as the exhibit you were

23  spending a lot of time with Mr. Hug on today, Exhibit 655,

24  that's been the testimony.  Have you seen this in

25  preparation for your testimony today?

1    A.   I believe I have.

2    Q.   Okay.  And this is just the electrical activities,

3    basically just the same information in a slightly

4    different format, right?

5    A.   Correct.

6              THE COURT:  Same information as what?

7              MR. KAPLAN:  As from Exhibit --

8              MR. HUG:  655.

9              THE COURT:  Great.

10   BY MR. KAPLAN:

11   Q.   Same dates, same start and finish dates?

12   A.   Same information sorted a different way.

13   Q.   Yes.  Right.  Exactly.

14        Now, these light black lines are as planned, right?

15   A.   Okay.

16   Q.   And then these blue lines are as built?

17   A.   Correct.

18   Q.   Okay.  And this vertical blue line is that September

19   first date?

20   A.   The data date on the schedules.

21   Q.   Originally -- forget about why, I'm not talking about

22   the why.  Just the durations.  These durations of these

23   various activities, for the most part, many were supposed

24   to take place in July, they take place in August, right,

25   based on the schedule?

```
 1   A.    Yes.
 2   Q.    And a large number that were supposed to take place
 3   in either July or August become longer in duration for
 4   whatever reason?
 5   A.    Correct.
 6   Q.    And you testified about that for a good part today as
 7   well?
 8   A.    Yes.
 9   Q.    When you were running these update schedules, and
10   your Exhibit 655 is one of the -- is part of one of the
11   update schedules you were running, right?
12   A.    Yes.
13   Q.    Now, the completion date for most of the Phase 3 work
14   was the end of August, right?
15   A.    Correct.
16   Q.    And you never changed that, right?
17   A.    No.
18   Q.    Except for a couple of the items, a number of items
19   in several areas you talked about which were shown at the
20   bottom of 51B, right?
21   A.    What are those items?
22   Q.    These are in those areas in the locker room, the
23   AR -- the art room and locker rooms that got extended into
24   September?
25   A.    Yes.
```

1   Q.   So you didn't change any of the completion periods

2   for those -- well, you did change completion periods of

3   those into September for some of those activities,

4   correct?

5   A.   Correct.

6   Q.   The rest you kept as originally scheduled for Phase 3

7   the end of August, correct?

8   A.   Correct.

9   Q.   And if you had not -- when you were doing your

10  updates, did you instruct the program to keep the original

11  completion date for the bulk of the Phase 3 work in coming

12  up with the revised schedule?

13  A.   Did I instruct the program?

14  Q.   Don't you have to tell -- basically tell the program

15  we're keeping this original completion date for most of

16  the work and as it reformulates these durations that are

17  going in for the work that's being extended out, it's not

18  changing that end of August completion date for most of

19  the items?

20  A.   I don't think so.  I don't think I changed the date

21  and I don't think the computer computed it.

22  Q.   Did you have in the logic for your schedule that --

23  A.   Some sort of milestone completion date.

24  Q.   Right.

25  A.   Right.

1    Q.   So when you reformulate or revise or update, rather,

2    the schedule, that milestone completion date doesn't

3    change?

4    A.   It can change.

5    Q.   But you didn't change it?

6    A.   I don't have control over that.  It's the program

7    that does that.

8    Q.   Don't you -- when you originally set up the schedule,

9    don't you put in a milestone completion date for Phase 3?

10   A.   Yes.

11   Q.   And you didn't change that when you were doing your

12   revised schedules?

13   A.   I wouldn't update that milestone activity.  The logic

14   would push it wherever it's pushing it.

15   Q.   I'm simply asking you did you change the milestone

16   completion date for Phase 3 when you were doing your

17   revised schedules?

18   A.   I wouldn't update milestone.

19   Q.   Right.  You didn't change it, in other words?

20   A.   Correct.

21   Q.   Okay.  So as it was doing the revised schedules, it

22   was doing those in the context of the same milestone

23   completion date that had been in the original contract

24   schedule for Phase 3, correct?

25   A.   I think so.

1    Q.   Okay.

2            MR. KAPLAN:  No further questions.

3            THE COURT:  Thank you.

4            Redirect?

5            MR. HUG:  Yes, Your Honor.  I'll probably do it

6    from right here, if I may.

7

8                      REDIRECT EXAMINATION

9    BY MR. HUG:

10   Q.   I want to do it quickly.  You were shown Exhibit 7.

11   Exhibit 7?

12           THE COURT:  The contract?

13           MR. HUG:  No, it was a new exhibit.

14           THE COURT:  The e-mails?

15           MR. HUG:  Yes.

16   A.   I'm there.

17   BY MR. HUG:

18   Q.   That's an e-mail from you to folks inside of Pike,

19   correct?

20   A.   This is an e-mail from Michael Raycraft back to

21   people at Pike.

22   Q.   Mr. Kaplan read you the first sentence or so, I think

23   the first couple sentences of that e-mail.  Could you read

24   the last sentence or second to last sentence?

25   A.   "If we have legal right to do so" --

1    Q.   No, no, the second page.  I'm sorry.  Second page.

2    Says "Explained that"?

3    A.   "Explained that the admin. end of things were okay.

4    Explained that change orders were twice what they should

5    have been although they were able to negotiate to a fair

6    value along the way.  Submittals/shops were well handled."

7    Q.   That was a discussion about ECI that you had

8    obtained, correct?

9    A.   Correct.

10   Q.   Now, you were asked about a number of daily reports.

11   And I'm not going to go over really many of these.  I do

12   want to go over -- you don't have to turn to it.

13       On August 24th, Attorney Kaplan read this section to

14   you from -- this is Exhibit 17 -- Stephane Mathieu,

15   "Flooring guys are killing me."  I think your testimony

16   was that you didn't think Mr. Mathieu understood the

17   schedule.  I don't want to put words in your mouth.  What

18   did you say?

19   A.   I said I don't think Mr. Mathieu understood the

20   schedule and looked at the schedule regularly.

21   Q.   And then Mr. Kaplan asked you to look at the schedule

22   for the flooring and you couldn't find it?

23   A.   Correct.

24   Q.   If you went to Exhibit 12, you could find one.  I'd

25   like you to turn to that in that binder now.

1          That would be Exhibit 12.  If you go to the classroom

2   area.  That was one of the areas he was talking about,

3   right?

4               THE COURT:  Do you have a sheet number?

5               MR. HUG:  Yes, I do.  Well, I did.

6   A.   Sheet number 22.

7   BY MR. HUG:

8   Q.   What's the line item, Mr. Oloff?  Is it actually on

9   the next page, P3CL-580?

10  A.   P3CL-580.

11  Q.   When does that indicate that the flooring is to go

12  in?

13  A.   August 24.

14  Q.   And finish?

15  A.   August 28.

16  Q.   So Mr. Mathieu is writing an e-mail complaining about

17  the flooring going in on this day and the flooring is

18  supposed to go in on that day, correct?

19  A.   Correct.

20  Q.   Daily report.  It's on his daily report, I'm sorry.

21       Just clarification, with respect to the daily

22  reports, did you get them daily during Phase 3?

23  A.   No.

24  Q.   Did you get some of them daily?

25  A.   Sometimes.

```
 1   Q.   Did you get some of them in groups of several days?

 2   A.   Yes.

 3   Q.   And did you get some like at a week at a time?

 4   A.   Yes.

 5   Q.   And did you review those reports?

 6   A.   I did.

 7   Q.   But these daily reports, were they the main form of

 8   communication that you had with subcontractors?

 9   A.   It's not the main form of communication I established

10   with contractors.  I was very -- I was very visible on

11   site to approach and work out issues, make complaints,

12   whatever it might be.

13   Q.   You walked into -- you walked into the construction

14   area and you talked to the people doing the work?

15   A.   All day.

16   Q.   You were asked a number of questions, some of which

17   were -- I think your response was that's just speculative

18   about what you would do under certain circumstances.  In

19   this case, did you believe at any time that ECI was

20   entitled to an extension of time during Phase 3?

21   A.   No.

22   Q.   Typically when somebody comes in and asks for an

23   extension of time, what did they provide to you?

24   A.   Written documentation.

25   Q.   And what does that written documentation include?
```

1   A.   Includes what their issues are and why they think

2   they need an extension of time.

3   Q.   What do you do with that then?

4   A.   Then we go to work and look at it, evaluate it, see

5   what can be done.

6   Q.   So if ECI had presented you with an extension of time

7   on July 21, or some other time, at any time during

8   Phase 3, did you believe, based on your superintendent

9   duties and your experience on that project, were they

10  entitled to an extension of time?

11  A.   No.

12  Q.   Now, when we say an extension of time, that's to

13  complete and extend the overall project, correct?

14  A.   Correct.

15  Q.   But there's been ample testimony that you did give

16  them relief in certain areas?

17  A.   Correct.

18  Q.   That's not an extension of time, so to say?

19  A.   It could be construed as that in those areas.

20  Q.   But that was -- is it fair to say that's just

21  administration of the contract?

22          MR. KAPLAN:  These are all leading questions,

23  Your Honor.

24          MR. HUG:  Yes, that's right.  Withdrawn,

25  Your Honor.  I'm trying to move it along.

```
 1   BY MR. HUG:

 2   Q.    By the way, another question that was asked about

 3   these schedules.  I'm not sure how much it matters, but

 4   did the subs typically take updated schedules that you

 5   provided to them?

 6   A.    No.

 7   Q.    Is that your experience on most jobs?

 8   A.    Yes.

 9   Q.    And in most jobs -- and this job, in particular,

10   let's focus on that.  Well, I think we've heard how you

11   communicated the schedules.  You communicated that in

12   other testimony, correct?

13   A.    Correct.

14   Q.    Finally, had you received any written requests for

15   extension of time by ECI during the course of the project?

16   A.    I did not.

17   Q.    Did you receive any written change order during

18   Phase 3 during July and August of 2010 for increased

19   manpower and loss of productivity?

20   A.    I did not.

21   Q.    Did you receive any verbal claim from ECI saying to

22   the effect that I have a claim?  Did you receive anything

23   like that during the period of July and August 2010 with

24   respect to lost productivity?

25   A.    I did not.
```

1   Q.   What was the first time that you learned of the lost

2   productivity claim by ECI?

3   A.   It was after the summer was over, but I don't recall

4   the date.

5   Q.   All right.  So it was after Phase 3 was over?

6   A.   Yes.

7              MR. HUG:  No further questions, Your Honor.

8              THE COURT:  Thank you.

9              Mr. Oloff, thank you for your testimony.  You're

10  excused at this time.

11             THE WITNESS:  Thank you.

12             THE COURT:  Next witness, please?

13             THE WITNESS:  Would you like me to do anything

14  with these papers?

15             MR. HUG:  Just leave them there.

16             MS. VENNOS:  The defense calls Vinny Savino.

17             THE CLERK:  Please raise your right hand.

18

19                     VINCENT SAVINO,

20        called as a witness, having been first duly

21        sworn, was examined and testified as follows:

22

23             THE CLERK:  Please be seated.

24             Please state your name.

25             THE WITNESS:  Vincent Savino.

1          THE CLERK:  Please spell your last name.

2          THE WITNESS:  S-A-V-I-N-O.

3          THE CLERK:  And please state your city or town.

4          THE WITNESS:  Ellington, Connecticut.

5          THE COURT:  You may proceed.

6

7                      DIRECT EXAMINATION

8    BY MS. VENNOS:

9    Q.   Good afternoon, Mr. Savino.  Are you here pursuant to

10   a subpoena?

11   A.   Yes, I am.

12   Q.   Can you give us some -- just a very general

13   background of where you work right now?

14   A.    I'm the owner, president and owner of Action Air

15   Systems out of Manchester, Connecticut.

16   Q.   You can lean back a little bit.

17   A.    I'm sorry.  First time I've ever done this.

18   Q.   Action Air Systems is the name of your company?

19   A.    That's correct.

20   Q.   And you're the owner of the company?

21   A.    Sole owner of the company, that's correct.

22   Q.   And how long have you been the owner of Action Air?

23   A.    Since 1990.

24   Q.   What does Action Air do?

25   A.    Mechanical contractors.  We furnish and install

1    systems, HVAC systems for commercial industrial buildings.

2    Q.   All right.  Have you done any HVAC and plumbing --

3    did you do plumbing as well or just HVAC?

4    A.   We do have plumbers on staff.  We're an HVAC company

5    that does plumbing as well.

6    Q.   Does Action Air do school projects?

7    A.   Quite often.  We've got about close to 20 years

8    experience in the school sector.

9    Q.   So in that 20 years of experience, how many schools

10   have you done?

11   A.   Oh, my gosh.  Hundreds.  Too numerous to mention.

12   Q.   All right.  And the school projects that you've done,

13   did they ever involve ten-week summer period to do work?

14   A.   Oh, yes.  Quite often.  Usually school projects you

15   have a lot of that involved with the summertime, you have

16   like eight to ten weeks of work to do and get it all done

17   before the kids get back to school.  It's always -- it's

18   fast track.

19   Q.   And with respect to why we're here today, did you

20   have a contract with Pike to perform certain work on the

21   Kelly Middle School project?

22   A.   Yes, we did.

23   Q.   What was that contract for?

24   A.   We were contracted to do the HVAC and plumbing on

25   that particular school.

 1   Q.   And do you remember approximately what the amount of

 2   that contract was?

 3   A.   Believe it was $6 million.  Somewhere around there.

 4   Very similar to other projects we had going on at the same

 5   time.

 6   Q.   So multimillion-dollar project?

 7   A.   Correct.

 8   Q.   With respect to the Kelly Middle School project, what

 9   specifically were you hired to do?

10   A.   We were to do the heating and cooling, the renovated

11   and addition areas, as well as the plumbing for the

12   renovated and addition areas.

13   Q.   So with respect to the heating and cooling, can you

14   give us a couple of specific examples of what Action Air

15   would do in the Kelly Middle School project?

16   A.   As far as our installation what we did there

17   actually?

18   Q.   Yes.

19   A.   We were responsible for the rooftop equipment,

20   heating, cooling equipment, chillers, the interconnecting

21   pipe work, the ductwork, radiation.  This particular job

22   had chilled beam technology on it.  We were responsible

23   for installing that.  And doing interconnecting piping.

24   And also did the direct digital control system for the

25   entire school as well.

1   Q.   All right.  Now, with respect to the ductwork, where

2   was that?

3   A.   Mostly hanging from the structure, the steel from the

4   roof deck inside the building.

5   Q.   Okay.  So you were to install various ductwork.  Was

6   there ductwork prior to you coming in, as far as you know,

7   or do you know?

8   A.   For the most part if there was any ductwork in there,

9   it was taken out in the demo phase to remove to make room

10  for the new ductwork.

11  Q.   Did you partake in any part of the demolition for the

12  ductwork?

13  A.   I believe we had to do cut and drop and it was hauled

14  away by others.

15  Q.   What does cut and drop mean?

16  A.   Cut the hangers from the existing ductwork, drop the

17  ductwork to the floor, and then another crew would

18  actually take the debris out from the floor and bring it

19  to dumpsters outside the building.

20  Q.   And what was your position on this project?

21  A.   I actually was project management for this particular

22  job.

23  Q.   All right.  And so on a daily basis, what would you

24  do for this particular job?

25  A.   You know, I would have a lot of constant contact with

1    my project foremen.  We had a piping foreman and a sheet

2    metal foreman.  Attend weekly project meetings and have

3    communication pertinent to the job.  We also had a project

4    coordinator in the office that was also assigned to the

5    project.

6    Q.   All right.  Did you ever go to the site?

7    A.   Yes.

8    Q.   How often?

9    A.   Well, you went -- we went for weekly job meetings.

10   If I had to go another time during the week for an issue

11   that they might have, might be a couple times a week.  For

12   the most part, there was weekly job meetings and as

13   needed.

14   Q.   Would you ever walk the site?

15   A.   Quite often.  Every time we had a job meeting, I'd

16   walk with the foreman, we discussed issues what was going

17   on the job and any issues we had.

18   Q.   Who would attend the weekly job meetings?

19   A.   Mostly the project managers for the respective

20   trades, the ones I attended.

21   Q.   Who from Pike attended?

22   A.   Mel Strauss, Ed Oloff, and another woman,

23   administrative.

24   Q.   Okay.  And do you remember anybody from ECI being at

25   the meetings that you were attending?

 1   A.    Yeah.   There was a fellow by the name of Cliff that

 2   was there at meetings.

 3   Q.    Was that Cliff Clauson?

 4   A.    I believe so, yes.

 5   Q.    Do you remember if a person named Stephane Mathieu,

 6   would he attend those meetings?

 7   A.    He occasionally attended in the absence of Cliff or

 8   sometimes together.   But I didn't quite keep track as far

 9   as their attendance totally.

10   Q.    Okay.   At these meetings were schedules provided?

11   A.    Yes.   They had look-aheads.

12   Q.    Two- to three-week?

13   A.    Two- to three-week look-aheads, that's correct.

14   Q.    What was discussed at these meetings, in general?

15   A.    Well, the days' events for the next two to three

16   weeks.   What needs to be done, what's expected to be done

17   of us, things like that for what our jobs had to be done

18   based on certain areas we were at at the point in time in

19   the project.

20   Q.    All right.   And would you look at the schedule to see

21   where they were with respect to the project or where you

22   were with respect to the project?

23   A.    You know, it never seemed to be an issue as we were

24   going through the project when we had to finish certain

25   things.   So based on where we were asked to be, we had no

1    problem with where we were asked to be in the two- to

2    three-week look-ahead every week.

3    Q.   After you were in a meeting looking at the two- to

4    three-week look-ahead, you said you would walk the site,

5    correct?

6    A.   That's correct.

7    Q.   Would you verify whether the two- to three-week

8    look-ahead was accurate?

9    A.   You know, it's funny.  The way this business is, you

10   look at things and you say I don't know if we can make

11   that and you end up finishing it.  How the heck did we

12   ever do that?  It gets done.  On this particular project,

13   I didn't seem to have a problem.

14   Q.   All right.  At the weekly meetings that you attended,

15   what was discussed at those meetings other than

16   scheduling?  Anything else that was discussed?

17   A.   There was like SKs, which are sketches for additional

18   work.  If it came up or, you know, does anybody have any

19   issues.  You know, they talk about the day-to-day stuff,

20   the stuff that's boilerplate, submittals, transmittals.

21   Get your requisitions in, things like that.

22   Q.   Do you remember there being an issue about steel at

23   any of those meetings?

24   A.   No, I don't.  I know they talked about the art room

25   and the locker room areas about steel sometimes, but it

1   was never an issue that impacted us.

2   Q.   All right.  And aren't you hanging your ductwork from

3   the steel?

4   A.   Yeah, but that was more framing up at the roof deck.

5   We were able to hang from our joists, things like that

6   that were still in place.  There wasn't anything that

7   affected my ductwork or piping in that area.

8   Q.   All right.  Were you hanging your ductwork in the

9   same area where ECI was running conduit?

10  A.   More than likely, yes.  We hung ductwork everywhere.

11  Q.   Do you remember there being -- did you say that you

12  subbed out the plumbing work on this?

13  A.   Yes, we did.

14  Q.   This is a "yes" or "no" question.  Did you receive

15  any complaints from your plumbing subcontractor regarding

16  scheduling?

17  A.   No, I did not.

18  Q.   With respect to scheduling issues that came up at

19  this meeting, was there any other way that Mr. Oloff would

20  communicate how the project was supposed to proceed?

21  A.   You'd get occasional e-mails from Mr. Oloff asking me

22  about certain areas we're working in, how things are

23  going, if it was an issue.  He not only would be

24  communicating to me on weekly job meetings, he might send

25  an e-mail or things like that if he had an issue with us.

1    Q.   Do you remember there being a whiteboard at these

2    meetings?

3    A.   Yeah.  I mean -- yes, there was a whiteboard.  He

4    would draw some things on.  Sometimes they would be used

5    for strategizing, doing some things and drawing some

6    things out, but it was only if they had to explain

7    something, like if a curb or how the blocking was going in

8    or something like that.  So draw iosumetic view or

9    elevation or something like that.  It was there in his

10   trailer.

11   Q.   Do you remember demolition being raised as an issue

12   at any of these meetings?

13   A.   With respect to my trade and things like that?

14   Q.   Yes.

15   A.   No.

16   Q.   All right.  If demo wasn't completed on time, would

17   you have been able to have been in and do your work?

18   A.   If the demolition wasn't done, we don't -- you've got

19   to remember, demolition is basically removing and getting

20   ready for us to put our stuff in place.  We would have to

21   have that out of the way.  But in some areas, demolition

22   did not affect me because if I didn't have anything in

23   that area, it was free spot, I would take it even while

24   demo was going on.  Demolition, sorry.

25   Q.   Did demo affect your scheduling of what you had to

1    do?

2    A.   On this job, no.

3    Q.   You mentioned you did a walk-through on the job

4    almost weekly, correct?

5    A.   Uh-huh, yes.

6    Q.   Can you describe what the job site looked like during

7    Phase 3?  You know what I'm talking about, that summer of

8    2010 time frame?

9    A.   It was no different than any other job site.  You

10   walk through, there's lot of trades working.  Everybody

11   is, you know, in each other's way, so to speak.  It's a

12   construction site.  I thought for the most part the

13   construction site was very manageable.  You can get to and

14   from where you had to get.

15   Q.   You mentioned something about coordination meetings.

16   What were those?

17   A.   They were meetings where based on certain areas and

18   phases, you would have a drawing of all the ductwork,

19   piping, things like that, coordinate together to make sure

20   when you put it up in the ceiling space it all fits.

21   Q.   And did ECI attend those coordination meetings?

22   A.   Yes.

23   Q.   Who at ECI attended?

24   A.   A lot of times I saw Stephane at the meetings.  Cliff

25   had been at some of the meetings as well.  What we do,

1    too, a lot of times we would post these drawings on what's

2    called an FTP site.  Everyone would have to overlay their

3    trade onto our work, which is the ductwork and the piping

4    to coordinate.  And then we would, when necessary, have

5    meetings to go over conflicts that we had.  If the

6    conflicts were resolved, you sign off on the drawings.

7    And everybody would have to adhere to the spaces allocated

8    for them.

9    Q.   Do you remember there being a boiler room in this

10   project?

11   A.   Yes.

12   Q.   And what kind of work did you have to do in the

13   boiler room?

14   A.   We had to complete new boilers, pumps, piping, tanks,

15   water heaters, things like that.

16   Q.   Do you remember being delayed by anything going on in

17   the boiler room?

18   A.   No.  No.  When we were supposed to get in there, we

19   would get in there so we had our materials ready to go.

20   When we were supposed to get in there, we'd get in there

21   and do the work.

22   Q.   If the millwork was behind, would you be affected by

23   that?

24   A.   No.  Because the millwork was basically off to the

25   sides of the rooms and things like that, like cabinets and

1  things like that.  We were up above the ceiling.  We had

2  this chilled beam, it's called TROX, that was up against

3  the side in certain areas of the facility where the

4  classrooms were and things like that.  We had to actually

5  install our work first before the millwork would actually

6  have to go on to decoratively cover our stuff.

7       So, to answer your question, no, the millwork did not

8  hold us up.

9  Q.   Was there anything that held you up in this job in

10  any respect that you can recall?

11  A.   No.  I think, like I say, I think it was a good job.

12  I think it worked out well for us.  It was not a job that

13  held us up.

14  Q.   At the various meetings that you went to, the weekly

15  project meetings or coordination meetings, did you ever

16  hear ECI complain about their being delayed on the job?

17  A.   No, I did not hear that.

18  Q.   This is four years ago, right?

19  A.   2010, yes.

20  Q.   Is it possible that you just don't remember that

21  there was some big delays on this job and you just don't

22  remember it?

23  A.   You know, I have to tell you, doing this for -- being

24  on my own 25 years and being in this business over 30

25  years, and doing a lot of project management, the

1    smoothness you never remember.  It's only the rough stuff

2    when people bump heads you remember.  I don't remember the

3    bumping heads at all.  Job meetings, sometimes they can

4    get confrontational.  This is one job I do not remember it

5    being like that.

6    Q.   With respect to Pike's management of this job, in

7    other words, coordinating the job, getting the job done,

8    what was your assessment of Pike's management?

9    A.   I think it was one of the better jobs I've ever been

10   on as far as management.  We had a lot of support and

11   management from them and their management team.  It was a

12   very good job for us.

13   Q.   I assume you had issues as all construction sites do?

14   A.   Yes.

15   Q.   How were your issues addressed?

16   A.   They were resolved quite quickly.  Different than

17   what I'm used to.  If I had an issue or a problem, it got

18   addressed right away and I would get phone calls directly

19   back from Mr. Oloff and he wanted to take care of the

20   problem.  I was not held up on answers.

21   Q.   Did you ever have conflicts with ECI on the project?

22   A.   No.  I think my guys worked well with ECI.

23   Q.   When's the first time you heard there was a claim

24   being made against Pike by ECI?

25   A.   Oh, geez.  I don't know.  Might have been a year ago?

 1   Two years ago?  A year ago?

 2   Q.   What was your reaction to that?

 3   A.   I was very surprised.  I don't remember people being

 4   upset with the job.  We finished on time.  We finished

 5   ahead of schedule.  I was a little taken aback that there

 6   was any kind of claim against them.

 7             MS. VENNOS:  That's all I have, thank you.

 8             THE COURT:  Cross-examination?

 9             MR. KAPLAN:  Yes.

10

11                     CROSS-EXAMINATION

12   BY MR. KAPLAN:

13   Q.   Mr. Savino, do you know Mel Strauss?

14   A.   Yes, I do.

15   Q.   Do you know where he works now?

16   A.   I believe Fusco.

17   Q.   Do you know Mr. Oloff?

18   A.   Yes, I do.

19   Q.   Where does he work now?

20   A.   He works at Consigli.

21   Q.   How do you know that?  How do you know that Strauss

22   works at Fusco?

23   A.   Because I've spoken to him before.  We have a good

24   relationship with those people.

25   Q.   You've spoken to him before when?

1   A.   Probably a year ago, two years ago.

2   Q.   Since he left Pike?

3   A.   I believe.

4   Q.   Do you ever do work with Fusco?

5   A.   No.

6   Q.   Ever do work with Consigli?

7   A.   No.

8   Q.   Okay.  Who first told you that ECI had a claim here?

9   A.   I believe Mr. Strauss.

10  Q.   Mr. Strauss did.  Did he just call you up and say

11  ECI's got a claim?

12  A.   No.  I was talking to him -- I sometimes bounce

13  things off him about general construction stuff and things

14  like that.  We were talking in passing and it got brought

15  up to my attention.

16  Q.   Was he still at Pike when you were bouncing things

17  off and he mentioned to you that ECI had a claim on this

18  project?

19  A.   He might have been.  I don't remember exactly when he

20  started with Fusco.

21  Q.   Do you have a friendly relationship with Mr. Strauss?

22  A.   No, I just, you know, I know everybody in this

23  business.  I just talk to people.

24  Q.   Do you have a friendly relationship in terms of the

25  business discussions you have with him?

1    A.    What kind of business discussions?

2    Q.    You said you call him up and bounce things off of

3    him, right?

4    A.    Uh-huh.

5    Q.    So that means you initiate a call to Mr. Strauss and

6    say, gee, I want to talk to you about something that's on

7    my mind and bounce it off to you; is that what you're

8    talking about?

9    A.    Yeah, like a contract or some like that.  If I bid a

10   job or something.

11   Q.    But that's outside of a contractual relationship

12   where you are working for him or his firm on a job, right?

13   A.    Yeah, just a friendly phone call.

14   Q.    So you're making a friendly phone call to a

15   professional friend; is that right?

16   A.    I guess you're right.  He's a professional.

17   Q.    You have a friendly relationship with him?

18   A.    Excuse me?

19   Q.    You have a friendly relationship with him as a

20   professional?

21   A.    You could say that, yes.

22   Q.    I'm asking you.  Do you?

23   A.    I have a lot of friends in the business.

24   Q.    I'm not asking you about your other friends, sir.

25   I'm asking you about your relationship with Mr. Strauss.

1    You call him up to bounce off ideas in a professional

2    context, right?

3    A.    Correct.

4    Q.    You do that because you have a friendly relationship

5    with him, right?

6    A.    Yes.

7    Q.    In that context, he told you about a claim that ECI

8    had filed against Pike, right?

9    A.    No.  He wasn't -- he wasn't descriptive exactly about

10   what's going on with ECI and Pike.

11   Q.    I thought you said you learned from him -- that

12   that's who you learned about ECI's claim from?

13   A.    Yes.  That's correct.  Yes.

14   Q.    All right.  When did that first conversation about

15   this claim occur, first conversation with Mr. Strauss?

16   A.    I don't know.  I don't recall.

17   Q.    Did you ever have any other conversations with

18   Mr. Strauss about ECI's claim against Pike?

19   A.    No, sir.

20   Q.    Okay.  Did you ever have any conversations with

21   Mr. Oloff about ECI's claim against Pike?

22   A.    No, sir.

23   Q.    All right.  Who else have you spoken to about your

24   testimony today, anybody?

25   A.    No one, sir.

```
 1   Q.   No one at all.

 2        Did you talk to anybody from Attorney Vennos and

 3   Attorney Hug's office?

 4   A.   I've been talking to Attorney Vennos.  I was

 5   subpoenaed by their office.

 6   Q.   Other than the subpoena, receiving it, did you speak

 7   to Attorney Vennos about your testimony today?

 8   A.   Yes.

 9   Q.   Okay.  What did she tell you?

10   A.   Just to be honest and answer questions.

11   Q.   Did she tell you what she was going to ask you?

12   A.   No.

13   Q.   She didn't tell you what the subject matter was?

14   A.   About the suit.

15   Q.   Okay.  And what did she tell you?

16   A.   To answer honestly and openly.

17   Q.   Did she tell you what questions she was going to ask

18   you?

19   A.   No.

20   Q.   Not at all?  Didn't tell you what the subject matter

21   of her questioning would be?

22   A.   Oh, yes.  About the job, of course.

23   Q.   What did she tell you about that?

24   A.   How the job went and, you know, did you have any

25   problems on the job.
```

```
 1   Q.   Did you understand that she was Pike's lawyer?

 2   A.   Excuse me?

 3   Q.   Did you understand that she was calling you as Pike's

 4   lawyer?

 5   A.   Yes.

 6   Q.   Okay.  Did you understand that Mr. Strauss was

 7   involved in this project on behalf of Pike?

 8   A.   He was the project manager.

 9   Q.   You knew that?

10   A.   Yes.

11   Q.   And you knew that his involvement as project manager

12   would be an issue in this case, right?

13   A.   He was project manager, so if it's a case involving

14   them, I guess you're right.

15   Q.   And he's your professional friend?

16   A.   He's a friend that -- he's a person, I call him a

17   friend, but he's an acquaintance because it was through

18   the job, yes, sir.

19   Q.   You want to keep a good relationship with

20   Mr. Strauss?

21   A.   You know, I talk to everybody, as far as that goes.

22   Q.   That's not what I asked you, Mr. Savino.  I asked if

23   you want to keep a good relationship with Mr. Strauss.

24   A.   Yeah, I would like to, yes.

25   Q.   When's the last time you talked to him?
```

1   A.   Quite some time ago.

2   Q.   Months?

3   A.   Yeah, months.

4   Q.   Did you make money on this job?

5   A.   Yes.

6   Q.   Did you review any records prior to your testimony

7   today?

8   A.   Actually, no.  I didn't.

9   Q.   Okay.

10          MR. KAPLAN:  Nothing further, Your Honor.

11          THE COURT:  Thank you.

12          Redirect?

13          MS. VENNOS:  Nothing further, Your Honor.

14          THE COURT:  Mr. Savino, thank you very much for

15   coming in.  I appreciate you waiting as long as you had to

16   wait.  This happens sometimes with these court hearings.

17   Thank you very much.

18          THE WITNESS:  Thank you.

19          THE COURT:  Do we have an idea how long the next

20   witness would take?  I think I can extend to 4:30 because

21   it turns out we have one of the -- let me just --

22          (Pause.)

23          THE COURT:  I'm willing to extend if need be.  I

24   don't want the attorney -- is he leaving?  The next

25   prospective witness, do you want to put him on?  I will

1    hold on a little longer if you think you can tell me how

2    long it will take.

3                MS. VENNOS:  I don't think it will take that

4    long, Your Honor.  I don't do this, Your Honor.

5                THE COURT:  Mr. Hug, I really want to

6    accommodate our next witness if at all possible.  But I

7    also don't want to put ourselves in an impossible

8    situation.  Do we think we can get this next witness done

9    in a half hour?

10               MS. VENNOS:  We can try, Your Honor.

11               MR. HUG:  If worse comes to worst, Your Honor,

12   he is here and he'd have to come back anyway if we don't

13   do it.  Why not give it a shot?

14               THE CLERK:  Remain standing and please raise

15   your right hand.

16

17                        CARROLL LAWLER,

18         called as a witness, having been first duly

19         sworn, was examined and testified as follows:

20

21               THE CLERK:  Please be seated.

22               Please state your name.

23               THE WITNESS:  Carroll James Lawler, Jr.

24               THE CLERK:  Please spell your last name.

25               THE WITNESS:  L-A-W-L-E-R.

```
 1              THE CLERK:  Please state your city or town.

 2              THE WITNESS:  West Hartford, Connecticut.

 3

 4                       DIRECT EXAMINATION

 5   BY MS. VENNOS:

 6   Q.   Good afternoon, Mr. Lawler.  Could you give the Court

 7   an idea of what you do for your profession?

 8   A.   I'm an architect.  For most of my 40-year career, I

 9   did additions and renovations K through 12 public schools.

10   About a year and a half ago I retired from that and I'm

11   now an expert witness.

12   Q.   You're not hired as an expert in this case, are you?

13   A.   No, I'm not.

14   Q.   You mentioned before that you've done architectural

15   drawings for various schools.  How many schools?

16   A.   Probably 40 or 50.  Never really counted the list.

17   It's been for 40 years.

18   Q.   You're aware of the Kelly Middle School project?

19   A.   Yes.  It was my last project and my favorite project.

20   Q.   All right.  Why was it your favorite?

21   A.   It ran the smoothest of any project I have been on in

22   40 years.  It was the best organized.  The fewest RFIs.

23   My drawings and specifications in the office are barely

24   even wrinkled because all of the foremen on the job knew

25   all of the documents very, very well and I was never asked
```

1    a stupid question on the job that I can just go look up in

2    the drawings and specs.  Ed Oloff kept everybody really,

3    really well-informed and made sure they understood the

4    scope of the work.

5    Q.   All right.

6         What was your role on the project on a daily basis?

7    You're the architect, what would you do on a daily basis?

8    A.   During the construction period, I've always kept a

9    very small firm because I enjoy all the phases of work

10   except marketing, but I enjoy design, I enjoy writing the

11   specifications, doing the cost estimates, and overseeing

12   the work in progress.  But I really enjoy watching it come

13   together in construction.  I've always done the

14   construction administration either with somebody at my

15   office or all by myself.  On this particular project, I

16   did the vast majority by myself.  I was on the job a

17   minimum of once a week, once in a while twice a week, and

18   on occasion three times a week.

19   Q.   So let's back up a little bit.  Were you involved in

20   the pre-bid meeting?

21   A.   Pardon?

22   Q.   In the pre-bid meeting?

23   A.   Yes, I was.

24   Q.   How many meetings were there?

25   A.   The pre-bid meeting, I believe there was only one

1    pre-bid meeting.  And that was one where, as the

2    architect, I explained at the pre-bid meeting the phasing,

3    which basically this part of the building had to be done

4    first, then this part of the building had to be done, and

5    what work had to be done during the summer.  That's very

6    different than what the contractor does in scheduling

7    sequences, but the basic phasing that I came up with the

8    client early on is pretty much the phasing that the

9    sequencing happened during the project.

10   Q.   By the way, who hired you to be the architect on this

11   project?

12   A.   City of Norwich Board of Education.

13   Q.   At the pre-bid meeting, who attended that, if you

14   recall, for Pike?

15   A.   For Pike, I believe it was Mel and Ed.  I'm not

16   positive, but I believe it was Mel and Ed.

17        From my office, it was me, my structural engineer,

18   Mike Vines.

19        And I think that William Lynch from van Zelm,

20   mechanical electrical person was there.  We might have had

21   a couple other people from van Zelm's office to answer

22   detailed questions.

23   Q.   Was anyone from ECI there?

24   A.   I did not keep a tally on who was there as

25   contractors and subcontractors.

1   Q.    Okay.   Did the subject of Phase 3 come up at the

2   pre-bid meeting?

3   A.    The subject of all of the phases and the impact of

4   the amount of work that had to be done for opening of

5   school, what had to be finished before the next phase

6   could start, and what start and stops were impacted by

7   opening of school in the fall.

8   Q.    With respect to Phase 3, which is that summer period

9   2010, was that discussed specifically?

10  A.    Absolutely.

11  Q.    Tell me what was discussed.

12  A.    Basically during the Phase 3, there are parts that

13  can only be done in the summer.   The kitchen, cafeteria

14  gymnasium, and the administration offices.   The rest of

15  the building, we would shift classrooms around, because we

16  added an addition of 12 classrooms.   But critical during

17  that summer were those things that had to be opened by

18  September so that children could be fed and the program

19  could be manned, the administration could have their

20  offices.

21  Q.    And is that typical of any summer job for a school?

22  A.    Absolutely.   And most of my schools are -- I've only

23  done one school that was not occupied during renovation.

24  In some high schools you can actually shift classrooms

25  around because classrooms are specific to a teacher and go

1    through high school, you may find a classroom vacant 25,

2    30 percent of the time.  So you can compress that during

3    construction and take parts of the school away from them.

4    Q.   Did you attend any meetings on a regular basis for

5    this project?

6    A.   I attended building committee meetings once a month.

7    I attended the owners or the contractors CM meeting every

8    week.  And on two occasions I believe I also attended the

9    foremen's meetings, one time at the beginning of the

10   project when Ed Oloff introduced me to the foremen for

11   each of the subcontractors and once about two-thirds of

12   the way through the project when I was so happy with their

13   performance I brought them Giant Grinders from Franklin

14   Avenue in Hartford.

15   Q.   When was that that you went --

16   A.   I think it was about two-thirds of the way through

17   the project.

18   Q.   Through Phase 3?

19   A.   Coordination and everything was going so well --

20   Phase 3, I brought coffee and doughnuts for 150 men who

21   were working on the job.  That was going so absolutely

22   beautifully and every time I walked through the job,

23   everybody was working, everybody was moving.  And they

24   were working awful hard.  So I wanted to thank the men,

25   not just the foremen.

1   Q.   At the owner meetings, would Pike attend those?

2   A.   Yes.  And actually, Pike ran the meetings and I would

3   run the architectural part and we would go over questions

4   Pike would have and any coordination items that had to

5   happen with the owner for the school program, any issues

6   that were safety issues that the owner needed to be aware

7   of and to keep me abreast of where we were on the project.

8   Then I'd spend the rest of the day walking through the

9   project looking at the progress in preparation for

10  reviewing the requisitions and answer various questions

11  from the various people on the project.

12  Q.   Was there schedules handed out at the owner meetings?

13  A.   The schedule for the owner is very, very different

14  than what happens in construction.  We were all very well

15  aware of the phasing and when things would be turned over.

16  And that coordination, actually Pike requested that the

17  owners shift the school program a week during one summer

18  so that we could gain an additional week during the summer

19  program.  So we ended at the right time, but we started

20  school a week later in the fall, which added a week to the

21  summer so the workers could work on it.

22  Q.   While you were on the site, did you ever speak to

23  anyone at ECI?

24  A.   Yes.

25  Q.   Who would you speak with?

1    A.   I would speak to Stephane and then one of the

2    gentleman on his team I would joke with considerably

3    because he was always wondering why the architect was

4    looking at the electrical work, what the architect was

5    doing around so often.  I also ride a Harley-Davidson.

6    When you ride a Harley, people talk to you that never

7    ever, ever talked to you before.

8    Q.   Did Mr. Mathieu ever -- when you say Stephane, you

9    mean Mr. Mathieu?

10   A.   I never knew him by his last name.

11   Q.   Did Stephane ever explain to you about any delays on

12   the project?

13   A.   No.  The only you complaint I ever heard from

14   Stephane was, "Boy, as an architect, you sure made the

15   lighting in this auditorium complicated."

16   Q.   Did he ever talk to you about how Mr. Oloff was

17   managing the project?

18   A.   I think pretty much every one of the foremen on the

19   job and I discussed Ed's performance, because everybody

20   that I knew thought it was the best job they had ever been

21   on, most coordinated job, best run job they'd ever been

22   on.  I believe I had that conversation with Stephane.  I

23   believe that I had that conversation with the HVAC crew.

24   I don't believe I had it with the plumbing crew.  I do

25   believe I had it with the site people and pretty much

1  everybody else.

2  Q.   Do you remember there being a delay in demolition?

3  A.   Not a significant delay.  There was a minor delay

4  which occurred in the area where the building abutted the

5  new auditorium.  That's the area where the art room and

6  the grooved toilets are presently located.  When they took

7  out the corridor wall, it turned out the structural steel

8  was not as shown on the drawings.  We had to immediately

9  get the structural engineer down there and re-design the

10  structure for that area.  That probably held the work up

11  maybe a couple of weeks.  But that was basically just the

12  area along the corridor wall across from the office.  It

13  was not a big area.

14      There was some other minor, minor delays.  The roof

15  handling units on this building, which I can't remember

16  exactly but I think there were 12, those roof handling

17  units all had to be supported on supplementary steel.  And

18  in some cases, the size and spacing and where that

19  structural steel could be supported in the building

20  weren't known until the ceilings were taken out and they

21  were ready to bring the equipment in, because it depended

22  on the size and weight of the equipment which, although

23  they're all specified, each manufacturer's equipment

24  configuration, where they're held down and supported are

25  different.  So at the time that had to be coordinated and

1   I would say each one of those was maybe a week.

2            THE COURT:  Roof handling unit, what is that?

3            THE WITNESS:  Roof handling units were the air

4   handling units, air condition and heat.  One of the things

5   is this school has a lot of ventilation, it's an

6   air-conditioned school. So there are air handling units

7   that have gas fired heating air that's coming into the

8   building.  They had condensers or chilling tower that

9   pumps cool water to it.  Either cool water goes through

10  the coils and then that's pumped into the classrooms.  The

11  exhaust areas we covered and brought back through what's

12  called the heat recovery wheel, so when we exhausted air,

13  we actually recovered the heat or the cooling from it

14  before it went on to go into the heating and cooling

15  chambers.  But these are big items.  They have to be crane

16  lifted onto the roof.  The roof of the existing school

17  primarily is open web joists, fairly light steel

18  construction, so you just can't go plopping in and out.

19  You have to put supplementary steel from bearing wall to

20  bearing wall.

21  BY MS. VENNOS:

22  Q.    Did this school have masonry walls?

23  A.    Yes.  The corridor walls were masonry.  The exterior

24  was masonry and the walls that divided each classroom were

25  concrete block walls.

```
 1   Q.    When you have -- is it masonary or masonry?
 2   A.    It all depends which part of Italy you're from,
 3   Sicily or the mainland.  It's actually spelled masonry.
 4   Q.    So with masonry walls, did masons and electricians,
 5   how did they coordinate their work?
 6   A.    On the existing walls and basically as an architect,
 7   I do not like to see surface wiring.  So that even on the
 8   existing walls, I require that the contractor route out
 9   vertical walls from above the ceiling to outlet boxes.
10   The first coordination on the existing walls was the
11   demolition contractor to route out those walls.  The
12   electrician would go mark on the wall with a crayon where
13   the outlets would go, where the switches would go.  And
14   then they would come in and then would cut a hole, and the
15   electrician would put his conduit and boxes in, and the
16   mason would patch that.
17       On the new walls, usually what would happen is the
18   mason lays out the first two courses of the wall, maybe
19   three courses of the wall.  And then the electricians
20   would hang conduit with the box on it off of the
21   structural steel above with wire.  So then the mason would
22   build that into the wall as they went up.
23   Q.    So it sounds like for both types of wall, the mason
24   and electricians have to work together; is that correct?
25   A.    Correct.  Everybody on a job like this has to work
```

1   together.  Everything is going to dovetail together and

2   everything overlaps a little bit.  Somebody has to be

3   there first, somebody second, and sometimes the guy that's

4   there first has to be there third.

5   Q.   Did you ever hear ECI complain about the mason?

6   A.   No.

7   Q.   Remember there being any problem about the millwork

8   being delayed?

9   A.   Some of the millwork took a little longer to get

10  there.  I don't think it was a substantial delay.

11  Basically, as the classrooms are built, all the masonry

12  walls are in, the floors are finished, the lighting and

13  the wiring for outlets and things.  When the masonry comes

14  in, the only coordination with the electrical is under

15  cabinet lights and plugmold.  Usually the outlet boxes

16  were in the wall before the millwork got there.  And so

17  when the millwork got there, the electrician would then

18  come in and just run the plugmold along the wall above the

19  building.  But I do not remember anything sub conflicts or

20  sub delay with any of those things.

21  Q.   Did you fill out some report cards for Pike?

22  A.   I did.  And I understand that you have found one that

23  I thought number 1 was best when number 1 was worst.  But

24  I think if you'll read those, you'll find my comments show

25  every one of them received extremely high remarks.

1          MR. HUG:  I think it's over there.

2          THE COURT:  I'll say that I recall these

3    exhibits quite well.  I do recall the portion in the

4    exhibits where the 1s were circled.  I personally don't

5    see the need to see exhibits again unless you have

6    specific questions about the exhibits.

7          MS. VENNOS:  I wanted to have the witness

8    testify regarding number 1 versus number 5.  And he's

9    cleared that up.

10         THE COURT:  Yeah.  I just want you to know.

11         MS. VENNOS:  That's all right.

12         THE WITNESS:  I got the numbering backwards,

13   Your Honor.

14         THE COURT:  Thank you.

15   BY MS. VENNOS:

16   Q.   You did get schedules at those owner meetings?

17   A.   We didn't look at the schedules and sequencing that

18   you would look at the foremen meeting, because those were

19   individual areas and specific tasks that had to be done.

20   When we looked at the owner's meeting it was, will this be

21   ready when school opens?  We have to have a week to set

22   the furniture.  These are the dates, are you going to make

23   that?  And those are the kinds of things that we talked

24   about with Ed Oloff and Mel Strauss for scheduling.

25   Q.   What was represented to you at those meetings when

```
 1    you went and walked the site, was it consistent with what
 2    was represented at the meetings?
 3    A.    Absolutely.  Beginning to end.
 4    Q.    Was Mr. Schnip at those meets?
 5    A.    Yes.
 6              MS. VENNOS:  I have nothing further.
 7              THE COURT:  Thank you, Ms. Vennos.
 8              Mr. Kaplan?
 9              MR. KAPLAN:  Your Honor, I am going to give you
10    the best news you've had all day.  No questions.
11              THE COURT:  All right.  Well, then that
12    concludes your testimony.  Very much appreciate your
13    coming in, Mr. Lawler.
14              THE WITNESS:  Thank you for accommodating me.
15              THE COURT:  Glad it worked out for the best.
16              THE WITNESS:  I'm just disturbed I didn't get to
17    talk about Mr. Kaplan's tie.  He has wonderful Franklin
18    and Wright ties.
19              THE COURT:  I don't think we need to stay on the
20    record for scheduling unless there's a preference to do
21    so.
22              MR. KAPLAN:  I agree.
23              MR. HUG:  Yes.
24              THE COURT:  I want to put on the record I've
25    learned a lot this week from all counsel.  I appreciate
```

1    how hard you've worked to put together this case.  I know

2    we have further to go in the case, but that I'm pleased

3    with the way that the case has gone this week.

4              MR. KAPLAN:  Thank you.

5              THE COURT:  We can go off the record.

6                   (Proceedings adjourned at 4:23 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        C E R T I F I C A T E

4

5      RE:  ELECTRICAL CONTRACTORS, INC. v. THE PIKE COMPANY

6                       No. 3:11CV449(JAM)

7

8

9             I, Diana Huntington, RDR, CRR, Official Court

10   Reporter for the United States District Court for the

11   District of Connecticut, do hereby certify that the

12   foregoing pages are a true and accurate transcription of

13   my shorthand notes taken in the aforementioned matter to

14   the best of my skill and ability.

15

16

17

18

19                    _____/s/_____

20             DIANA HUNTINGTON, RDR, CRR
                  Official Court Reporter
21             United States District Court
               915 Lafayette Blvd., Room 423
22             Bridgeport, Connecticut 06604
                    (860) 463-3180
23

24

25