UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
ELECTRICAL CONTRACTORS, INC.,   :  No. 3:11CV1449(JAM)
                                :
                Plaintiff       :
                                :
        vs.                     :
                                :
THE PIKE COMPANY,               :
                                :  Bridgeport, Connecticut
                Defendant       :  July 24, 2014
                                :
- - - - - - - - - - - - - - - - x


BENCH TRIAL
VOLUME VI


B E F O R E:

     THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


A P P E A R A N C E S:

    FOR THE PLAINTIFF:

            MICHELSON KANE ROYSTER & BARGER
                Hartford Square North
                10 Columbus Blvd.
                Hartford, Connecticut 06106
            BY:  STEVEN B. KAPLAN, ESQ.

    FOR THE DEFENDANT:

            ROBINSON & COLE
                280 Trumbull Street
                Hartford, Connecticut 06103-3597
            BY:  CHRISTOPHER J. HUG, ESQ.
                DEBORAH A. VENNOS, ESQ.


                        Diana Huntington, RDR, CRR
                        Official Court Reporter

1                          <u>TABLE OF CONTENTS</u>

2

3    DEFENDANT'S                                                    VOIR
     <u>WITNESS</u>             <u>DIRECT</u>  <u>CROSS</u>  <u>REDIRECT</u>  <u>RECROSS</u>  <u>DIRE</u>

4
     DENNIS O'NEILL
5      By Mr. Hug         1209

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **2:05 P.M.**

2               THE COURT:  Good afternoon.  We are back for

3     resumption of trial in ECI vs. Pike, Inc., 3:11CV1449.

4               Appearance of counsel, please?

5               MR. KAPLAN:  For the plaintiff, Steven Kaplan

6     from Michelson Kane Royster & Barger.

7               MR. HUG:  For the defendant, Pike Company,

8     Christopher Hug from Robinson & Cole.

9               MS. VENNOS:  For the Pike Company, Deb Vennos

10    from Robinson & Cole.

11              THE COURT:  Nice to see you all.

12              And I gather we have client representatives?

13              MR. KAPLAN:  With me is William Flynn,

14    Vice President of ECI, Your Honor.

15              MR. HUG:  With me, Your Honor, is our witness

16    from Beacon Construction Consulting, Dennis O'Neill.

17              THE COURT:  Terrific.  Then I think we're

18    probably ready to go.  If you'd like to continue.

19              MR. HUG:  I'd like to call Dennis O'Neill.

20              THE COURT:  While Mr. O'Neill is coming up, I'll

21    tell you, if you're not aware, I have a jury out right

22    now.  So it may be that we need to take a timeout if they

23    come back with a question or the like.

24              MR. HUG:  Okay.

25              THE CLERK:  Would you please stand and raise

1    your right hand.

2

3                        DENNIS O'NEILL,

4         called as a witness, having been first duly

5         sworn, was examined and testified as follows:

6

7              THE CLERK:  Please be seated.

8              Please state your name.

9              THE WITNESS:  Dennis O'Neill.

10             THE CLERK:  Please spell your last name.

11             THE WITNESS:  O-apostrophe-N-E-I-L-L.

12             THE CLERK:  Please state your city or town.

13             THE WITNESS:  Rachel Road, Reading,

14   Massachusetts.

15             THE CLERK:  Thank you.

16

17                   DIRECT EXAMINATION

18   BY MR. HUG:

19   Q.   Mr. O'Neill, first could you tell us by whom you are

20   employed?

21   A.   Beacon Consulting Group.

22   Q.   What is Beacon Consulting Group?

23   A.   Beacon is a construction consulting/construction

24   management firm that consults financial institutions,

25   insurance companies, developers, litigators on all sorts

1    of construction issues.

2    Q.   And have you been retained as an expert in this case

3    to do any particular work?

4    A.   Yes.

5    Q.   First of all, "this case," what am I referring to?

6    Do you know what this is about?

7    A.   It's ECI vs. Pike.

8    Q.   Okay.  You're familiar with the claim?

9    A.   Yes.

10   Q.   Have you performed some analysis of the claim in

11   connection with the Kelly Middle School project in

12   Norwich, Connecticut?

13   A.   Yes.

14   Q.   Before I go down that road, sir, I just want to first

15   note that you have brought a box up with you today?

16   A.   I did.

17   Q.   And what generally is in that box?

18   A.   These are the three reports that we prepared.

19   Q.   Do they contain your prep notes for testimony here

20   today?

21   A.   Yes, they do.

22   Q.   To the extent you didn't commit it all to memory, you

23   have notes that you've written in preparation for your

24   testimony?

25   A.   That's correct.

 1    Q.   Okay.

 2              MR. HUG:  I just want to inform the Court and

 3    counsel that that is there.  As Your Honor will see, they

 4    are fairly voluminous.  He's tabbed them and he's written

 5    some things in to remind him of what is important.

 6    Counsel is welcome to look at it when he has a chance.

 7              THE COURT:  So noted.  Thank you.

 8              MR. KAPLAN:  Your Honor, I ask that if the

 9    witness refers to notes or anything that's not in

10    evidence, that he advise us of that so I could see what it

11    is he is referring to that's not in evidence.

12              THE COURT:  You're fine, Mr. Kaplan, if you see

13    him -- if you see something that he's doing that concerns

14    you, go ahead and make a record of that.

15              MR. KAPLAN:  Thank you.

16              MR. HUG:  My thought is it will facilitate the

17    testimony, Your Honor, finding daily reports and things.

18    BY MR. HUG:

19    Q.   Let's go with a little bit of background, first of

20    all.  Tell us a little about your education.

21    A.   Sure.  I have a Bachelor of Science in civil

22    engineering from the University of Maine.  I have a Master

23    of Science in real estate finance from NYU.

24    Q.   All right.  And any licenses you hold of any sort?

25    A.   I do not.

1   Q.   Also, do you have any work experience in the

2   construction industry?

3   A.   Yes.  Out of college I worked for Structure Tone, one

4   of the larger general contractors in the country.  I was

5   with them for about four years.  Then I was with Vertex

6   Engineering for about seven years, which is a construction

7   management and engineering firm.  2003 I started Beacon

8   Consulting Group.

9   Q.   And what did you do for Structure Tone?

10  A.   Sure.  Structure Tone, I started out as project

11  engineer.  Then I advanced to construction estimating, and

12  from there to project management.

13       And with Vertex, I came in as a project manager

14  managing construction sites, did estimating, kind of grew

15  their New York office.  And then they got bought by a

16  public company eventually.

17  Q.   In terms of estimating, do you estimate electrical

18  claims yourself -- excuse me, not claims, electrical

19  projects?

20  A.   Generally speaking, I can get around an electrical

21  project, drawings, specs.  But if it's going to get into

22  detail in any specific trade, I may bring an expert in on

23  that.

24  Q.   In terms of some of your duties in your prior jobs,

25  if you could briefly explain to the Court what those

1  duties involved?

2  A.   Sure.  So back at Structure Tone, we used to do gut

3  rehabs of office buildings, municipal buildings, retail,

4  hospitality.  And I'd be on the project team.  I started

5  out lower level on the project team, worked my way up.

6      At Vertex, I was in the New York office, New York

7  City office.  And we did a lot of municipal work, did a

8  lot of work for public authorities down in New York.  The

9  MTA subway stations, School Construction Authority.  We

10  did a lot of work with the surety companies when I was at

11  Vertex where we consulted on jobs where a surety

12  performance bond was in place.  We'd come in, status these

13  projects, see where they were, sometimes take the jobs

14  over and complete the jobs.

15  Q.   Now, in terms of valuing construction claims, have

16  you had any experience in that area?

17  A.   Yes.

18  Q.   Explain your experience to the Court.

19  A.   Sure.  Just one of the roles we do as construction

20  consultants, we're brought in to evaluate claims, prepare

21  claims all the time.  I testify as to construction

22  management issues as well as cost issues, claim issues.

23  One big thing in construction that happens is delay

24  claims.  We do a lot of scheduling in delay claims and

25  preparing those claims.  Along with preparing them, we're

1    always evaluating them in different roles.

2    Q.   Who are your clients, typically?

3    A.   So, we do a lot of work with insurance companies and,

4    in particular, the surety products which provides

5    performance bond for municipal construction projects.  So

6    we come in for them a lot, assess projects.  There's

7    always some sort of disputes, litigation, claims in these

8    jobs across the board, all the different disciplines, and

9    we'll evaluate these claims, try to resolve them.

10   Q.   Do you also get involved sometimes in taking over as

11   a construction manager for the surety or as owner's rep

12   for the surety?

13   A.   We do.  We have several owners rep jobs going on

14   currently as well as general contracting job where we're

15   the general contractor on the project.

16   Q.   And where was your birth place?

17   A.   Boston, Massachusetts.

18   Q.   So you have a little bit of a Boston accent?

19   A.   Probably a little bit of a twang.

20   Q.   We'll have you speak a little more slowly and it

21   might be a little easier for the court reporter as well as

22   everybody else.

23   A.   Fair enough.

24   Q.   In terms of analyzing loss of productivity claims,

25   explain to the Court your experience.

1  A.   Sure.  There's obviously all sorts of different

2  claims.  Loss of productivity claims is where someone's

3  claiming it takes longer to complete a certain task than

4  they had budgeted or they thought it should have taken

5  them.  We've come in on several of these claims, prepared

6  them, analyzed these type of claims from different

7  aspects.

8  Q.   Okay.  You've also prepared loss of productivity

9  claims?

10  A.   We have.

11  Q.   And typically in your experience in preparing loss of

12  productivity claims, what's a typical methodology you

13  would use to explain those?

14  A.   Sure.  Usually there's a cause of what's going to

15  take you or might take longer to complete this particular

16  project.  We'll try to get to that cause and try to get

17  that down on a plan of some sort.

18       So just some typical ones we've done as of recent, we

19  had an electrician up in Massachusetts, we took the plans

20  out and they had several design hits, I'll call it, design

21  conflicts with HVAC sprinkler.  We laid it out on the

22  drawings as far as where these conflicts happened.  There

23  was several RFIs, requests for information, within

24  construction where there's a clarification needed, where

25  those occurred, we plotted them geographically on the

1    drawings.  Change orders, changes that happened within the

2    job during that time, get those.  Then we try to look for

3    a pattern of kind of where there might be loss of

4    productivity where we didn't have a clear running of

5    completing something.

6    Q.    Okay.  And you've had experience both looking --

7    preparing those and reviewing those, right?

8    A.    Yes.

9    Q.    Okay.

10              THE COURT:  Can I ask, what is a loss of

11   productivity?  How would this witness define it?  I know

12   we've heard a bit.

13              MR. HUG:  Terrific.

14   BY MR. HUG:

15   Q.    Could you answer the Judge's question?

16   A.    Sure.  When you go into a project, you have a certain

17   productivity you expect to obtain when you go to complete

18   that project.  When you lose productivity, whether it be

19   from a design change or some other issue on the job, it

20   could be an internal issue, losing it because of things

21   you have going on internally, but you budgeted so many

22   hours to complete a particular task, a project, phase, and

23   now it's taking you longer.  It's that loss, that extended

24   period would be your loss.

25   Q.    So let's -- because there's been a number of terms,

1    and the Judge brings up a point.  Loss of productivity,

2    how does that relate to an inefficiency claim?  Are they

3    the same thing?  What's the difference?

4    A.   I'd look at them as being the same type of thing.  If

5    you're inefficient, you're stating it's going to take you

6    longer to complete a task.

7    Q.   How about impact claims, is that another way of

8    saying a similar thing?

9    A.   Impact has a bit of a broader term.  Where something

10   has happened on the job and now you have impact, whether

11   it's to your home office, your general conditions.  Could

12   be general conditions impact, could be a field impact, but

13   it's the cost side.

14   Q.   Okay.  What are some of the typical industry-used

15   methodologies?  First of all, are you familiar with

16   industry methodologies to value loss of productivity

17   claims?

18   A.   Sure.

19   Q.   Could you explain to the Court some of the methods

20   that are used to value loss of productivity type claims?

21   A.   Sure.  There's no one way, per se.  You have to kind

22   of prove that it's taken you longer to perform certain

23   tasks than you anticipated or you had planned.  So we've

24   done it several ways.  Sometimes we'll start with the

25   ideal situation where you have a measured mile where you

1    were completing a certain task of work in a certain period

2    of time and then all of a sudden you get to a different

3    place or part of a project and now it's taking you longer

4    and now you kind of show, whether it be geographically of

5    the change orders or through RFIs, request for information

6    clarifications, that these particular issues happen in a

7    certain area which we didn't have under our measured mile

8    approach area and therefore now it's taking you longer.

9    Q.    Okay.  So if I understand, just to kind of make sure

10   the Court does, measured mile, you take a look at a period

11   of the project where there's no loss of productivity or

12   limited -- it's clean.  And to another part of the --

13   compare that to another part of the project that has some

14   of these events that happened?

15   A.    That's correct.

16   Q.    And the difference in productivity is the claim?

17   A.    Right.  If you can show an area where it was clean

18   and you were able to do a productivity of so many square

19   feet a day, so many linear feet a day under the call it

20   non-impacted area, and then go to the impacted area and

21   you can kind of show because of certain issues it took you

22   longer, that would be loss of productivity.

23              THE COURT:  Measured mile refers to the control

24   area?

25              THE WITNESS:  That's correct.

1    BY MR. HUG:

2    Q.   That's not the only way that you can measure loss of

3    productivity, is it?

4    A.   It's not the only way, but that's one of the best

5    ways if you can find that measured mile area on a

6    particular project.

7    Q.   Let's tie it back to the ECI claim in this case.

8    A.   Sure.

9    Q.   First of all, you did do an analysis of the ECI

10   claim, didn't you?

11   A.   I did.

12   Q.   Did they use a measured mile approach?

13   A.   No.

14   Q.   Okay.  Explain to the Court, first of all, I think

15   what you did, and then I'll go on from there as to what it

16   means.  Please explain to the Court what you did and what

17   you were asked to do in this particular case?

18   A.   Sure.  We were -- this is obviously we've had several

19   witnesses I believe on both sides in this case, factual

20   witnesses.  We were tasked not necessarily going into

21   validity of the claim, but rather looking at the actual

22   hours worked.  The actual hours worked in Phase 3, which

23   is the impacted area, during the impacted time and

24   comparing that to their milestone that they had, and

25   evaluated their milestone as well.

 1   Q.    Okay.  And their milestone is what?

 2   A.    Their base pay.

 3   Q.    Total cost claim, what is that?

 4   A.    Total cost claim is when you determine your cost for

 5   a certain task phase project was X and now it's cost you

 6   2X.  So you're claiming the portion over.

 7   Q.    Is the total cost methodology a way to measure loss

 8   of productivity or value loss of productivity?

 9   A.    It could be.  It's a way of looking at it.  It's one

10   factor.

11   Q.    Okay.  Explain to the Court, have you actually

12   evaluated loss total cost claims in the past?

13          MR. KAPLAN:  At this point, Your Honor, I'm

14   going to object.  The philosophical concepts in claims as

15   they may or may not be applied to this case have not been

16   disclosed as anything within the scope of this witness's

17   testimony.  This witness or his company has issued three

18   reports, two sort of supplementing -- in theory

19   supplementing one another.  They're very specific to areas

20   they cover.  They do not get into measured mile.  They do

21   not get into total cost.  By their own statements, they do

22   not get into anything approaching liability issues.  So to

23   pursue a definitions of different claim philosophies

24   obviously to set up questions to the witness about how

25   does that apply to this case is totally beyond the scope

1    of anything that's been disclosed as to this witness's

2    testimony.

3            THE COURT:  Mr. Hug?

4            MR. HUG:  Yes, Your Honor.  First of all, I was

5    dovetailing on your question to ask for a little bit of

6    context for loss of productivity and what that means.  I

7    did add the measured mile approach.  Actually,

8    Mr. Merkhofer will testify to.  I'm not intending to have

9    him do a measured mile analysis or whether that was

10   applicable in this case.  What I was doing was putting it

11   in context for Your Honor.  And as I was getting to in my

12   question is, you know, you ask loss of productivity, is

13   the total cost method a means to measure that?  Next

14   question would be:  Is there a total cost claim made by

15   ECI?  Or how would you describe ECI's claim in this case?

16   And I think I know what the witness will say.  And then

17   that brings us right to where we are, which is now he has

18   disclosed that it is a total cost claim and he has

19   disclosed his analysis of that total cost claim.  So he's

20   right, in a sense, that I did get off on the measured

21   mile.  That was for Your Honor's benefit.

22           THE COURT:  I'm interested in the methodologies.

23           MR. HUG:  The total cost claim is one

24   methodology and that's the one he's analyzing.  Now I'm

25   going to go down that analysis.

1        MR. KAPLAN:  That's the problem, Your Honor.

2    This has not been disclosed in any other reports or any

3    information pertaining to this witness.  Nothing about

4    this witness is going to say this was a total cost claim,

5    is that good, is that not good, is it bad, is it not bad.

6    Nothing of that was disclosed.  They were very discreet

7    areas this witness in his reports reviewed.  He reviewed

8    the estimate, and we'll talk about that I'm sure very

9    shortly.  He reviewed hours, compilations by ECI, and he

10   reviewed their wage rate that they were applying in the

11   claim.  And he specifically said, "I am not commenting on

12   anything pertaining to liability.  I am just looking at

13   various numbers."  When you get into total cost, is it an

14   acceptable approach or not, which Your Honor is very

15   familiar with, we've had arguments on that in this case,

16   that's beyond the scope of anything disclosed by this

17   witness.  That's my problem here.

18        MR. HUG:  Well, on page 3 of his report,

19   Your Honor, he says in big bold, ECI's Budget Hours vs.

20   ECI's Actual Hours for Phase 2.  And then does a complete

21   analysis --

22        THE COURT:  Remind me what exhibit number is

23   this?

24        MR. HUG:  This is Exhibit Number 649.

25        If counsel is objecting to the term "total cost

1    claim," I can do the examination without reference to that

2    term, certainly.  I think the cat's out of the bag on that

3    one.

4                THE COURT:  Okay.  I'm going to overrule the

5    objection for now.  But if it seems, Mr. Kaplan, if you

6    feel we're going too long on an area that you don't think

7    you've gotten disclosure on, feel free to raise that

8    concern again.

9    BY MR. HUG:

10   Q.   So let me go back, and I'm not sure you were able to

11   complete your answer on this.  What were you assigned to

12   do in this particular matter?

13   A.   Sure.  We were asked to look at ECI's claim, how it

14   was prepared.  And then kind of look at a couple specific

15   areas in particular.  When we reviewed their claim,

16   clearly they were stating that they had so many bid hours

17   and for this particular Phase 3 during the months of the

18   summer 2010 took them longer to complete, they had more

19   hours, and we were asked to analyze those actual hours

20   that they spent on Phase 3 during that period.  And then

21   also I think we came up with this methodology, we had to

22   evaluate the baseline which in this particular case was

23   their bid of Phase 3.

24   Q.   Okay.  Baseline.  Did you -- you mentioned baseline.

25   What do you mean by that?

1    A.    Sure.  ECI's claim states that they spent so many

2    hours on certain cost codes within Phase 3 to complete

3    this portion of Phase 3.  They measured that against their

4    bid estimate, which was their baseline.

5    Q.    Okay.  So you did a baseline analysis.  We'll come

6    back to that in a moment.

7          I think you mentioned actual hours.  What did you do

8    with actual hours?

9    A.    That's correct.  There was actual hours alleged in

10   the claim.  And we took a look at those actual hours that

11   were allegedly spent on portions of Phase 3.

12   Q.    And did you look at that from a number of different

13   perspectives?

14   A.    Yes.

15   Q.    And for example, in doing your -- without getting

16   into the detail now, what subparts of your actual hours

17   analysis did you look into?

18   A.    Sure.  We first took certified payroll on the project

19   to see the hours that were billed during the claim period.

20   Q.    Okay.  What else did you look at?

21   A.    We also looked at the daily logs from the ECI

22   foremen.

23   Q.    And did you look at anything else along those lines?

24   A.    Yes.  We also looked at, in our second report, the

25   weekly reports from ECI's foremen.

1    Q.    Are those referred to as weekly foremen reports?

2    A.    I believe so, yes.

3    Q.    And did you look at anything else in terms of actual

4    hours?

5    A.    Yes.  We looked at subcontractor invoices along with

6    their own labor.  ECI hired outside electricians to assist

7    them with this project.

8    Q.    Okay.  Anything else?

9    A.    I did look at payment requisitions, see what work was

10   completed in those periods.

11   Q.    Now, other than looking at baseline and actual hours

12   analysis, did you perform any other analysis?

13   A.    I did look at the rate that was claimed in their

14   claim.

15   Q.    The wage rate?

16   A.    The wage rate.

17   Q.    Okay.  And did you also, in your supplemental report,

18   your second report, did you look at anything else?

19   A.    I looked at ECI's bid that was provided.  It was a

20   summary of their bid.

21   Q.    Okay.  Now, did you look -- did you focus in on any

22   particular period of time in doing your analysis?

23   A.    Yes.

24   Q.    What period of time was that?

25   A.    It was from June 28, 2010 until September 4, 2010.

1    Q.    Okay.

2    A.    I believe that came from their claim which kind of

3    summarized their hours per week during that ten-week

4    period.

5    Q.    Are you aware of whether or not there were hours

6    before or after that period?

7    A.    It appeared, from our analysis, that there was some

8    hours before that period.

9    Q.    Okay.

10   A.    Or maybe after.

11   Q.    And I want to make sure, for the Court's benefit as

12   well as to ease Mr. Kaplan, did you look at the -- did you

13   look at why ECI -- in other words, did you look at ECI's

14   schedule?  Did you look at their -- what happened, the

15   RFIs, things like that on the project, did you do any of

16   that analysis?

17   A.    I did look at the baseline schedule that was in the

18   documents.  I did not get into the RFIs on the project.

19   Q.    Did you do any analysis as to whether or not ECI was

20   actually impacted by any events?

21   A.    No.

22   Q.    Okay.

23   A.    I was strictly looking at the hours that were claimed

24   during that period that backed into their claim.

25   Q.    Now, as you understand it, does ECI's claim include

1     period for only the impacted time period or for the entire

2     Phase 3?

3     A.    Based upon their Exhibit 519, which kind of breaks

4     down their claim, which gives a total man hours that they

5     spent, that's just for the impacted period.

6     Q.    That portion of the claim is just for the impacted

7     period or for the entire Phase 3?

8     A.    Appears just for the impacted period.

9     Q.    Okay.  Now, did you review records -- you've talked a

10    little bit about records, but give a general summary for

11    the Court of the records that you did review.

12    A.    Sure.  Certified payrolls -- ECI's certified payrolls

13    on the project, the daily logs from the field foremen on

14    the project, the weekly foremen reports from the project.

15    There was some ECI cost reports that we received that kind

16    of noted per category on Phase 3 the number of hours

17    cost-coded to particular cost codes within Phase 3.  The

18    baseline schedule I looked at.  There was some job

19    performance reports that we looked at.  The wages charged

20    within the certified payrolls.

21    Q.    Are the documents just generally summarized in an

22    appendix to your report?

23    A.    Yes.

24    Q.    Speaking of your report, have you prepared a written

25    report in connection with this matter?

1    A.    Yes.

2    Q.    Let me show you Exhibit 649 and 650.

3          Can you identify Exhibit 649, please?

4    A.    Yes.  This is the initial report we prepared in

5    November 2013.

6    Q.    You said "we."  Did you have assistance working on

7    this particular project?

8    A.    I did.

9    Q.    Who was that?

10   A.    James Bruno.

11   Q.    Who is he?

12   A.    One of my vice presidents that works for me.

13   Q.    All right.  And this is your work?

14   A.    Yes.

15   Q.    And did you do the analysis in this document, 649?

16   A.    Yes.

17   Q.    Okay.  All right.

18              MR. HUG:  I'd offer that, Your Honor.

19              THE COURT:  Any objection?

20              MR. KAPLAN:  Yes, sir.  There's two problems

21   with this report and with the supplemental -- the other

22   two reports which are fundamental and basically

23   structural.

24              The two main points of emphasis, not

25   exclusively, but the main points of emphasis that

1    Mr. O'Neill has targeted in his reports and I'll briefly

2    describe are (1) the ECI bid, and (2) his tally of the

3    hours which he says were performed by ECI in Phase 3 and

4    dovetails into his claims analysis in terms of dollars

5    out.  He relies entirely on Mr. Caprio's two-page letter

6    that we reviewed with Mr. Caprio for his bid analysis.  He

7    makes other gratuitous comments in his report that have to

8    be stricken because he has no competence to comment on

9    electrical bid.  But basically he takes numerical analysis

10   starting with Mr. Caprio's bid hours allocations and goes

11   from there.

12           I would object to any portion of his report that

13   utilizes the Caprio report because I think, as was

14   demonstrated when Mr. Caprio testified, his report, his

15   fundamental aspect of his report was inherently

16   unreliable, defective, deficient, and incorrect, virtually

17   by Mr. Caprio's own admission on cross-examination of what

18   he did and did not do in his report, how limited it was.

19   It was a quickie.  We pointed out numerous errors,

20   fundamental errors in the way his report was comprised.

21   He also gave no background for how he allocated hours to

22   various codes and categories which really defines the

23   structure of the ECI claim.

24           So, in that regard, that's my objection as with

25   regards the use and utilization of Mr. Caprio's report for

 1   his bid analysis.

 2            The second objection goes to what the witness

 3   just described, another fundamental problem.  He did an

 4   analysis of ECI's claimed labor hours from the end of June

 5   to the end of August.  In his report he uses June 28 to

 6   August 31.  The claim has never been limited in that

 7   regard as to the calculation of hours.  It has always been

 8   the totality of the hours for Phase 3 work which was

 9   expended by ECI.  There's nothing that ever limited that

10   for the inception of the claim.  And none of the documents

11   limit that.  The main points of impact, the main part of

12   the hours incurred were during that period.  As

13   Your Honor's heard from extensive testimony, there was a

14   considerable amount of work done by ECI on Phase 3 prior

15   to June 28 that's completely ignored in Mr. O'Neill's

16   report.  There also was a considerable amount of work done

17   in September and October as certain work was pushed out.

18   You heard testimony about that from Mr. Oloff, from

19   Mr. Mathieu, from Mr. Clauson.  Again, this report does

20   not account for that in any way, shape or form.  It

21   ignores it.  In essence, what Mr. O'Neill has done, he's

22   taken what did ECI do in Phase 3 at the end of June, July

23   and August and calculated that.  That dovetails very

24   closely within something like 2 percent of the numbers in

25   ECI's own records, those white rods that Mr. Mathieu did,

1    his weekly labor reports where he allocated hours,

2    Phase 3.  There's very little difference in that

3    calculation, I think it's 200 hours on a total of 10,000

4    or something like that.  We could spend two hours going

5    through that, but that to me is virtually immaterial

6    because that's no calculation of what preceded or

7    succeeded that which is still part of Phase 3.  There's

8    never been any limitation on hours.  The calculation is

9    how many hours did ECI do in Phase 3 broken down into the

10   affected code for entire Phase 3, how does that compare to

11   the bid?  This report cuts off the spring and fall

12   periods.  And I think it's structurally flawed because it

13   leads to a meaningless conclusion.  Inherently, it's

14   flawed.

15            THE COURT:  If there were a single day

16   difference between -- if this witness were testifying that

17   there was a single day, he started one day later than ECI

18   says it started Phase 3, would you be making the same

19   objection?

20            MR. KAPLAN:  Probably not.  I've got a list of

21   50 entries maybe -- or more that I could go through page

22   by page.

23            THE COURT:  Is that a threat?

24            MR. KAPLAN:  Not at all.  I could go through a

25   couple of them to demonstrate.  And the records show what

1    they show.

2              When you get to the bottom of it, and you add

3    those numbers in, there's not a lot of difference in the

4    numbers.  And you think the report is incredibly

5    misleading by truncating it that way and say, see, ECI

6    left out 2000 hours.  Well, they didn't.  And I think it's

7    a structural flaw in that report.

8              Those are my objections, Your Honor.

9              MR. HUG:  Actually, Your Honor, I think counsel

10   has just established the complete invalidity of his own

11   claim.  Because he has said that Pike's conduct impacted

12   him.  That's his case.  Pike's conduct during July and

13   August impacted him.  He's now said that he's included a

14   whole bunch of hours where he wasn't impacted.  So exactly

15   what validity does his claim now have before this Court?

16   He's just completely erased his claim.  The Court can't --

17   so exactly what is the Court supposed to see of his claim

18   for $590,000 relates to being impacted versus pre- or

19   post-impact?  He just established the invalidity of his

20   claim and now cannot meet his burden of proof, plus he's

21   also wrong about what my client is doing.  But I think

22   right now, Judge, we can end this trial because he has

23   just admitted that he can't prove his case.

24             THE COURT:  Okay.  I think -- I'm going to bring

25   us back to Exhibit 649.  There's an objection to

 1   Exhibit 649.  I understand the concerns about the Caprio

 2   report.  I think I was candid about concerns I had about

 3   the testimony of Mr. Caprio at the time.  But given that

 4   the testimony at least stands at this time and given my

 5   sense that the second objection concerning the lack of

 6   perfect or substantial time coincidence seems to me to go

 7   much more to weight than to admissibility.

 8          I'll overrule the objection to Exhibit 649 and

 9   649 is a full exhibit.

10          MR. HUG:  Maybe it's appropriate at this point,

11   Your Honor, to ask for a directed verdict for lack of

12   proof of damages given that admission.

13          THE COURT:  It's not appropriate at this time,

14   Mr. Hug.  If you can continue with the witness's

15   examination.

16          MR. HUG:  I will.

17          I also, I think to make sure it's clear, I think

18   his characterization of Mr. Caprio is argument.  That was

19   not what Mr. Caprio said.  And I think --

20          THE COURT:  We'll have time to revisit that.  We

21   have a witness here, so I would appreciate if you would go

22   forward with having the witness testify.

23          MR. HUG:  All right.

24          So 649 and 650 are full exhibits, Your Honor?

25          THE COURT:  I heard just 649.

1          MR. HUG:  I thought he addressed his objection

2    to both.

3          MR. KAPLAN:  I have no further objection to 650.

4          THE COURT:  650, full exhibit.

5    BY MR. HUG:

6    Q.   So you have a copy of 649 and 650 of your own copy,

7    correct?

8    A.   Yes, I do.

9    Q.   Now, did you do an updated report recently, sir?

10   A.   Yes.

11   Q.   And for what purpose did you do an updated report?

12   A.   To show there's some clarifications that came out of

13   testimony that revised our report.

14         MR. HUG:  Mr. Kaplan, this is the July 10

15   report.

16   BY MR. HUG:

17   Q.   I'm showing you what's been marked as Exhibit 656.

18   A.   Yes.

19   Q.   Do you recognize that document?

20   A.   Yes, I do.

21   Q.   What is that?

22   A.   This is our revised report dated July 10, 2014.

23   Q.   And did you prepare this document?

24   A.   Yes, I did.

25   Q.   And I will go over in a minute, there are -- what --

 1    describe it, in general, for the Court?

 2    A.    Sure.    There was some clarifications that came out

 3    that revised our report.    In particular, there was ECI

 4    direct labor hours and ECI subcontractor hours.    And it

 5    was determined through testimony these were included in

 6    the daily logs.    So, therefore, our report changed due to

 7    the hours being included in the daily logs.

 8              THE COURT:    All right.    And you'll explain how

 9    that changed.

10    BY MR. HUG:

11    Q.    But there's a couple of other technical changes that

12    occurred, too?

13    A.    Minor.    Didn't affect the results.

14    Q.    You have a copy that you can work from?

15    A.    Yes.

16    Q.    And you actually have a red line copy, correct?

17    A.    I do, yes.

18              MR. HUG:    Your Honor, a red line copy and clean

19    copy was provided to counsel on or about July 10.    And I'd

20    like to offer this as an exhibit.

21              THE COURT:    Objection?

22              MR. KAPLAN:    No objection.

23              THE COURT:    All right.    Exhibit 656, full

24    exhibit.

25

1        MR. HUG:  Your Honor, I put the entire

2   document -- all of the exhibits to this particular are the

3   same as the Exhibit 649.  I've reattached them.  Counsel

4   and I agree that to save space we don't need to attach all

5   the same exhibits.  But the official Court exhibit is the

6   full one.  Your Honor, you can take just the piece of it

7   or the exhibits attached at your desire, but I have a

8   bench copy for Your Honor.

9        THE COURT:  I'll take the bench copy, thanks.

10        MR. HUG:  All right.  I first want to turn -- I

11   think the easiest thing to do is to turn to the most

12   recent report of 656, Your Honor.  I think that one, if I

13   may, 656 is basically an update of Exhibit 649.  So

14   there's just some changes in there, it's probably easiest

15   to use that one.

16        THE COURT:  Great.

17        MR. HUG:  I will point out some changes from the

18   earlier report as we go.

19   BY MR. HUG:

20   Q.   So, turning to Exhibit 655 -- excuse me, 656.

21   A.   Yes.

22   Q.   Just explain to the Court a little bit about how this

23   report is organized.

24   A.   Sure.  It's organized very similar to our 11/19, our

25   original report.  Introductory letter with executive

1    summary that explains our task and what we did.  We then

2    look at ECI's claim, how their claim is made up.  And then

3    we get into a couple of parts of the claim.  They are

4    baseline or benchmark where they felt the hours should

5    have been, and then actual hours we take a look at via a

6    couple of different documents, the daily logs, the weekly

7    reports.

8         It then moves on, it looks at the labor rate as

9    claimed in the claim.  And then we took a look at the

10   payment applications during the impacted period to see how

11   much work was completed via the payout, noted on the

12   payout, which would be the revenue that was collected and

13   for what areas on the payment application during this same

14   period.

15   Q.   Okay.  Let's turn to page 3.  First of all, what's

16   the first thing that you did?  What's the first part of

17   your analysis that starts on page 3?

18   A.   My page 3 is the executive summary.

19   Q.   I'm sorry, there's a numbered page 3.  It says

20   Section 2?

21   A.   Yes.  Section 2.

22   Q.   Let's do it by that.

23   A.   Sure.  So --

24   Q.   Go ahead.

25   A.   The first section kind of takes a look at ECI's claim

1    and what they're claiming for.  There was a few documents

2    in the file that kind of broke down what ECI's claim was.

3    There was a letter dated March 24, 2011, it is an exhibit

4    number, I don't recall the exhibit number.  And then

5    attached to that there was an exhibit, I believe it was

6    522 that had the weekly hours of the impacted period that

7    would tie back to this claim.  So we did take their claim

8    and kind of looked at how they built up their claim.

9        Going left to right on our Section 2, the first part

10   I'm call it ECI's benchmark, the original bid hours that

11   they had that they were using as their benchmark in the

12   claim.  There was change orders issued on the project, so

13   they kind of upped their budgeted hours a little bit.

14   Further going to the right now is ECI's actual hours.

15   You'll see ECI's actual labor hours and then subcontractor

16   labor hours that were worked.  That gives us the total

17   hours that was claimed.

18   Q.   And did you break these out by impacted and

19   non-impacted claim dollars?

20   A.   Yes.  I didn't, necessarily.  I took it from ECI's

21   document.  They stated that the first few cost codes,

22   these are the impacted cost codes.  So I just organized my

23   chart accordingly.  As you can see cost codes, ECI's cost

24   code number 40, 41, 42, 66 and 68, these are the alleged

25   impacted areas by ECI.

1    Q.   All right.

2    A.   The remaining down below are part of Phase 3, but

3    they stayed in their claim, these are the unimpacted

4    areas.

5    Q.   In the final prep for this, did you notice a typo for

6    the total hours in there?

7    A.   I did, yes.

8    Q.   Where is the typo?

9    A.   Sure.  So where we have the column Total ECI Hours,

10   second to the last column there's a subtotal of 13,240,

11   that's correct.  The next subtotal currently states

12   1,477.5 should read 1,783.5.

13   Q.   And then any others?

14   A.   Which results just to the right of that a negative

15   755.5 in lieu of negative 1068.

16          THE COURT:  What was that number, negative what?

17          THE WITNESS:  755.5.

18   BY MR. HUG:

19   Q.   Any other changes?

20   A.   Sure.  Second to last column, last number where it

21   reads 14717.5, that should be 15023.5.

22   Q.   All right.

23   A.   And the last number on the bottom last column should

24   in turn read 6,201.77.

25   Q.   Now, did these changes impact your analysis in any

1   material way?

2   A.   No.

3   Q.   Okay.  All right.  Something you just discovered in

4   the process of final preparation?

5   A.   Yes.

6   Q.   All right.  So when you put this together -- why did

7   you put this together, first of all?  And what does it

8   tell you?

9   A.   Number one, this is for us first to understand their

10   claim.  We took their documents and prepared it against

11   the cost codes they were claiming they're impacted and the

12   cost codes they're claiming they were not impacted to

13   organize the claim and where it was at.

14   Q.   Did you notice any difference between the actual

15   hours ECI claimed for non-impacted versus impacted?

16   A.   Could you repeat that?

17   Q.   Yeah.  Did you make any observation with respect to

18   the accuracy of ECI's actual hours for impacted and

19   unimpacted cost codes?

20   A.   Well, they are stating -- this chart is just what

21   they're stating that they were impacted by 6,963 hours on

22   the first few cost codes, and that they were under by

23   about 755 hours on the last few cost codes.

24   Q.   Okay.

25   A.   So they did better on the last few cost codes,

1    non-impacted cost codes, and worse on the first cost

2    codes.

3    Q.   Is that something that happened on other phases of

4    the project as well, as far as you know?

5    A.   That's correct.

6    Q.   I'd like you to turn to the last page of Appendix

7    A -- excuse me, second to last page of Appendix A.  I'm

8    sorry, Appendix A is bigger than I thought.  This is the

9    labor hours report.  You have Chappy.  You have a drawing.

10   And then you have a labor hours report?

11   A.   Clauson 519?

12   Q.   Yes, Clauson 519.  The question before that was:  Did

13   you have any observations with respect to cost code

14   impacts generally on the project?  I think I didn't say it

15   quite that way, but that's a better way.

16   A.   Sure.  In the middle of the page is Phase 3, this is

17   an ECI document, where they have the budgeted hours and

18   then actual hours.

19   Q.   Yes.

20   A.   This would only be ECI's labor, not the subcontractor

21   hours.

22        When you go to the far right, it shows if they were

23   under or over.

24   Q.   So --

25   A.   Sorry.  So the middle of the page is Phase 3.  This

1    other area below it, Phase 4 East, Phase 4 West, and up

2    above was Phase 2.  And you'll see negatives and positives

3    throughout the page.

4    Q.   Okay.  With respect to cost codes 40, 41, 42, 66, 68,

5    did you see any pattern from phase to phase?

6    A.   Yeah.  This is what we call more of the finish work

7    in construction.  So it's the branch conduit, the branch

8    wire, the lighting, those types of things.  And you can

9    see it in Phase 4 West which they were also over in that

10   area.  And furthermore, if you go to the top of the page

11   in Phase 2, they were also over on those branch conduit,

12   branch wire items as well.

13             THE COURT:  Top of which page?

14             THE WITNESS:  Exhibit 519, top right-hand

15   corner, first two lines.

16   BY MR. HUG:

17   Q.   Under Phase 2 it says written in on the left?

18   A.   Yes.

19   Q.   You saw 40 and 41 cost codes?

20   A.   Yes.

21   Q.   And those are also the impacted cost codes in

22   Phase 3, correct?

23   A.   Yes.

24   Q.   Or two of the cost codes impacted?

25   A.   ECI laid out their cost report similar on each phase

1    where they had branch conduit, branch wire.  You'll see

2    similar cost codes, similar number, and it was per phase.

3    So same type of work in a different area.

4    Q.   Okay.

5              THE COURT:  How are we able to tell the phase of

6    the top two?  I see where the circled Phase 3 is in the

7    middle.  But the top two banks of data I just can't tell

8    what phase.

9    BY MR. HUG:

10   Q.   Do you see Phase 2 in writing to the left at the top?

11             THE COURT:  Not on my copy.

12             MR. HUG:  Your copy it doesn't have it?

13   A.   Mine has a handwritten Phase 2, but I see the other

14   ones have Phase 3, Phase 4 East, Phase 4 West.

15             THE COURT:  I don't see for those first two

16   banks of data.

17             MR. HUG:  Check Exhibit 649, Your Honor.

18   There's so many versions of that document.

19             THE COURT:  I have it in writing in Exhibit 649.

20   Okay.

21   BY MR. HUG:

22   Q.   I think where we were, Mr. O'Neill, is that I asked

23   you if you saw some pattern with respect to impacted cost

24   codes in some of the other phases.

25   A.   Yes.  And within the branch wire, branch conduit we

```
 1    did see they were over in other areas as well.

 2    Q.   Now, does that mean anything to you in your overall

 3    analysis?

 4    A.   Not in the overall analysis, but when you look at the

 5    cost report and you see they're in one area and see

 6    they're over in another area, it's something we looked at

 7    but it doesn't factor into our actual analysis that we

 8    did.

 9    Q.   Okay.  After you took a look at -- before we leave

10    Section 2, do you know the approximate percentages that

11    ECI is over for its cost codes, for the impacted cost

12    codes?

13    A.   It's about 200 percent --

14    Q.   Yeah.

15    A.   -- on Phase 3.

16              THE COURT:  What are you looking at?

17    A.   I go back to my chart, Section 2 of my analysis.  So

18    this analysis, Judge, would include the subcontractor

19    hours as well.

20              THE COURT:  All right.

21    BY MR. HUG:

22    Q.   So they're how much off on those?

23    A.   Looks like they're about double.

24    Q.   Okay.  If you take a look at page 4 under part 2a?

25    A.   Yes.
```

1   Q.   You kind of summarize, you did the actual

2   calculations -- I'm sorry, that gets -- I'll get to that

3   in a second.

4        So that's a lot.  That's a big difference, correct?

5   A.   It's a big difference.

6   Q.   That's not -- what does that tell you happened on the

7   project?

8   A.   There's something going on there.  Number one, maybe

9   your original budget wasn't correct.  Maybe there was

10  extra hours spent because of something going on in the

11  project.  There's clearly some sort of issue with that

12  portion.

13  Q.   Okay.  You focused on the numerical and the financial

14  end of it, correct?

15  A.   That's correct.

16  Q.   So after you did this basic understanding in this

17  table on Section 2, what did you do next?

18  A.   So I saw what they were claiming for actual hours.

19  And I saw what they were using as a baseline or a

20  benchmark.  So I wanted to just kind of determine was the

21  benchmark an accurate benchmark to use in this particular

22  case.

23  Q.   Benchmark, is that the same as baseline?

24  A.   That's correct.

25  Q.   Did you perform a baseline analysis?

 1    A.    Yes.

 2    Q.    Explain to the Court what you did.

 3    A.    Sure.  So I wanted to get from -- I wanted to get

 4    what the actual hours would have been to complete Phase 3.

 5    So that's when we retained Mr. Caprio, who is an

 6    electrical estimator for 20-plus years, 30 years.  He has

 7    15, 20 years of schoolwork alone.  I asked him to take

 8    Phase 3 not under the pressure of a bid and provide me

 9    with the man hours, the man hours to complete Phase 3.

10    Q.    Okay.  Why not under the pressure of a bid?

11    A.    Sometimes when you're putting bids in, you'll be

12    putting your bid together and at the last hour, last half

13    hour 15 minutes, you're slicing, you're changing things,

14    you want to get the job and you do whatever you can to win

15    the bid.  So at that moment those hours might not be

16    totally accurate.

17          I wanted Mr. Caprio to go in -- again, all he does

18    full-time is electrical estimating.  He uses McCormick

19    software, I've worked with him on claims before.  I asked

20    him to do a takeoff of Phase 3, what do you think Phase 3

21    is going to take to complete.

22    Q.    So you didn't have him do Phase 2 or the site work or

23    Phase 4, right?

24    A.    No, just Phase 3.

25    Q.    Doesn't that just completely screw up his analysis?

1    A.    No.   I asked him for the man hours for Phase 3,

2    that's all that was being claimed here.   I wanted to

3    compare their benchmark or baseline to an estimate of what

4    Phase 3 should take.

5    Q.    Okay.   So --

6    A.    To see if it's accurate or not.

7    Q.    To see if the baseline is accurate, correct?

8    A.    That's correct.

9    Q.    So are you concerned that maybe -- I think you're

10   concerned that the baseline may or may not be accurate,

11   right?

12   A.    Well, when I see a deviation like this, that's one

13   thing I want to check.

14   Q.    Wouldn't the fact that if he had done a full man hour

15   estimate for Phase 2 -- by the way, you didn't ask him to

16   do any sort of estimate in terms of dollars, correct?

17   A.    No.   Strictly man hours.

18   Q.    Doesn't that just make his whole analysis basically

19   useless?

20   A.    Absolutely not.

21   Q.    Why not?

22   A.    Because the claim is based on man hours.   So I needed

23   Mr. Caprio to put together what he felt the man hours were

24   to complete Phase 3.

25   Q.    You want to know the man hours it should have taken?

1   A.   The man hours it should have taken to complete

2   Phase 3 to get a baseline to evaluate how long it actually

3   took.

4   Q.   Now, there are materials that are in bids, correct?

5   A.   Yes.

6   Q.   And you can have -- if you have 500 of a fixture in

7   the entire project but only 100 in Phase 3, isn't that

8   going to completely skew your man hour estimate?

9   A.   No.

10  Q.   Okay.  Why not?

11  A.   He's putting the labor estimate together for Phase 3

12  to hang certain fixtures, put outlets in, conduit, wire,

13  different systems, fire alarm systems.  He's strictly

14  focused on the labor to put those devices, items in.

15  Q.   So if you have 500 light fixtures for material, you

16  could save on the cost of the light fixtures, but it still

17  takes you a certain amount of time to put in that light?

18  A.   Sure.  If there was any savings or costs with the

19  materials, value engineering on fixtures, we didn't have

20  him price out material whatsoever.  For that matter, I

21  didn't have him put any cost against the labor hours.  I

22  just wanted labor hours.

23  Q.   If you didn't have him put labor costs on his

24  manpower estimate, wouldn't that skew his manpower

25  estimate?

1    A.   No.  We were doing cost because it was a prevailing

2    wage job and the rate is set in Connecticut.  Rate set for

3    journeyman, apprentice, foreman, they're set.  All I asked

4    him for was just the man hours.

5    Q.   Would it matter at all whether it was prevailing wage

6    or not in terms of man hours?

7    A.   No.

8    Q.   Why not?

9    A.   Because he's doing a man hour estimate to install.

10   Q.   You're strictly trying to see whether or not the

11   actual hours are different than what it should have taken

12   to do by looking at how long it should have taken to do

13   the tasks in Phase 3, correct?

14   A.   That's correct.

15   Q.   So you didn't have him do a full-blown estimate, did

16   you?

17   A.   No, just the man hours for Phase 3 so I could compare

18   it to this baseline.

19   Q.   Did you give Mr. Caprio any instructions on the

20   standard he was to meet in doing his manpower estimate?

21   A.   Well, I wanted him, as a professional electrical

22   estimator, to do a takeoff.  The job is designed by

23   someone else.  Do a takeoff of what is there, lights,

24   fixtures, conduit, wire, fire alarm, PA systems, provide

25   me with a labor estimate to complete that work.

 1  Q.   What about the fact that it's being done versus

 2  Massachusetts versus Maine or New York, does that make a

 3  difference?

 4  A.   No.

 5  Q.   Why not?

 6  A.   It's school construction.  It's very typical from

 7  state to state.  There's Federal Standards Board as well.

 8  It's a very standard type of construction.

 9  Q.   Again, you're looking at man hours it takes to do

10  particular tasks, right?

11  A.   That's correct.

12  Q.   Branch conduit, the Court has had explanations, use

13  that as example, branch conduit, if you could explain what

14  that is?

15  A.   Sure.  There's going to be a main service.  The main

16  service is going to come up to panels, electrical panels

17  in a certain area.  The branch conduit will go from those

18  panels throughout the particular area to power up your

19  lights, your outlets, your systems, mechanical equipment,

20  whatever it might be.

21  Q.   How about codes?  Connecticut Building Code,

22  Massachusetts Building Code make any allowance for that?

23  A.   The designer would have taken into consideration

24  those items.  Obviously, he has to do work in a

25  professional manner when he's out there.  As far as

1    estimating the hours for that, any certain special code

2    would have been picked up by the designer out there.  So

3    that shouldn't affect his estimate for putting in conduit,

4    wire, switches, lights.

5              THE COURT:  And I take it that the man hours

6    estimate would be a direct variable of the materials,

7    quantity of materials?

8              THE WITNESS:  That's correct.  That's correct.

9    So many fixtures in the gymnasium, so many fixtures

10   throughout the site.

11   BY MR. HUG:

12   Q.   Did you provide him with documentation?

13   A.   Yes, we did.

14   Q.   Did you do that on an FPT site?

15   A.   We did.  Drop box, drawings, specs.

16   Q.   Did those include the materials?

17   A.   Yes.  The drawings and specs would say exactly what

18   materials would be required.

19   Q.   And did you give him any instructions with regard to

20   the materials?

21   A.   No.  I said take off what's on the drawings as you do

22   in a bid.  Do it just like you do in a bid and I want the

23   man hours for that phase.

24   Q.   Did you ask him to make sure that his -- I think you

25   testified to this, that his bid accurately reflected the

1    man hours to do the Phase 3 work?

2    A.   Yes.

3    Q.   Now, with respect to materials, did you discuss with

4    him the need to have an accurate measurement of materials?

5    A.   Yes.

6    Q.   And what did you discuss with him?

7    A.   Well, there's the drawings that are going to show the

8    material that's required to be installed.  Then I

9    discussed that I wanted the manpower estimate, the man

10   hour estimate to provide everything that's shown on those

11   electrical drawings per the electrical scope of work --

12   Q.   All right.

13   A.   -- in that phase.

14   Q.   And did you -- now let me back up a second.

15   Mr. Caprio, you've worked with him before I think you

16   testified?

17   A.   Yes, I have.

18   Q.   You have worked with his company as well?

19   A.   Yes.

20   Q.   Has he assisted you or your firm in the past with

21   electrical estimates?

22   A.   Yes.

23   Q.   All right.  And why did you choose to have assistance

24   in this regard again?  I'm not sure you said why.

25   A.   Sure.  I mean, I'm more of a generalist, prepare

1    claims.  But Dave is 100 percent full-time electrical

2    estimator.  He's got a special software, McCormick

3    software, that I'm sure ECI and the other electricians

4    would be familiar with that has built in takeoff for types

5    of conduit, size of conduit, elbows, fittings, everything

6    is built into this system.  I felt he could give a much

7    more accurate estimate than I could give in this

8    particular case.

9    Q.   Pulling conduit in a particular job, will it vary

10   from job to job?

11   A.   Hanging conduit?

12   Q.   Excuse me, hanging conduit.

13   A.   It could.

14   Q.   Could it change from school to school even?

15   A.   It could.

16   Q.   It could change because it's industrial job versus

17   non-industrial job, correct?

18   A.   That's right.

19   Q.   But did you check to see if he did a variety of type

20   of jobs where they installed conduit and the other cost

21   codes that you had him look into?

22   A.   I'm sorry, would you repeat that?

23   Q.   When you asked him to do the work, did you have any

24   understanding as to his experience in the types of work

25   that was required in connection with this particular

1    project?

2              MR. KAPLAN:  At this point I'm going to object,

3    Your Honor.  This witness can only attempt to rehabilitate

4    Mr. Caprio's deficiencies to a certain extent.  This is

5    hearsay.  Mr. Caprio was here.  He testified as to what

6    his background and experience was.  The witness has

7    already explained why he used Mr. Caprio.  Mr. Caprio's

8    efforts really need to stand on his own testimony and

9    product of his efforts and his testimony.

10             THE COURT:  Are you about done on this?

11             MR. HUG:  I'm about done on this.

12             THE COURT:  Why don't you wrap it up.

13             MR. HUG:  I'll withdraw the last question and

14   move on.  I probably did go one question further than I

15   needed to.

16   BY MR. HUG:

17   Q.   I want to go to one other thing, though, about

18   Mr. Caprio on this point.  What did you tell Mr. Caprio

19   about the claim?

20   A.   Not much.  I just wanted him -- I wanted an

21   independent estimate from him just to verify how many

22   hours it would take for this claim.

23   Q.   Did you tell him you represented any particular party

24   and what the value of the claim was?

25   A.   I probably told him I represented the general

1    contractor, but I didn't go over value with him

2    whatsoever.

3    Q.    Did you provide him with a copy of ECI's estimate?

4    A.    No.

5    Q.    Did you provide him with ECI's claim?

6    A.    No.

7    Q.    Now, have you used experts in the past to assist you

8    in doing your claims analysis?

9    A.    Yes.

10   Q.    And you testified you used even Mr. Caprio in the

11   past, right?

12   A.    Yes.

13   Q.    And this is something that you customarily use in

14   preparing -- you customarily rely on some other experts to

15   assist you in your claims analysis?

16   A.    Sure.  If I feel that I can get better accurate

17   products, we will absolutely work with other consultants.

18   Q.    Okay.  So you have Mr. Caprio's estimate.  What did

19   you do with it?

20   A.    Sure.  So --

21   Q.    If you refer to Section 2a of your report in giving

22   your testimony, sir.

23   A.    Sure.  So Mr. Caprio prepared a report, I believe

24   it's Exhibit A.  And he summarized the hours that it would

25   take to complete Phase 3 and he gives a little narrative

1    in his Exhibit A of what he looked at and how he did that.

2         So I did ask him to break it into certain cost codes,

3    the branch work, the light fixtures, the system, the

4    feeder conduit, just so I could get apples to apples with

5    the ECI baseline.  So he provided me with those estimates

6    of hours.

7         And I plotted it here against -- this is my

8    Section 2a.  I plotted it against ECI's base estimate for

9    that same work.

10   Q.   So you're referring to that table in the middle of

11   page 2a, my numbered page 4?

12   A.   That's correct.

13   Q.   Okay.  So I have in that -- under budget I have a

14   left column for ECI which represents what?

15   A.   That's ECI's original bid.

16   Q.   And is that original bid without change orders?

17   A.   That's without change orders.

18   Q.   And then Caprio's, you don't have change orders in

19   there either, do you?

20   A.   I do not.

21   Q.   Okay.  And then the math comes out to 3907, right?

22   A.   For the first --

23   Q.   3903?

24   A.   For the first few cost codes, it appears that either

25   ECI was 3900 too low or Dave was 3900 higher than ECI.  So

1    about 77 percent difference on those cost codes alone.

2    Q.   When you look at comparing estimates, do you expect

3    some differential between estimates?

4    A.   Sure.  Absolutely.

5    Q.   Okay.  A 77 percent differential?

6    A.   That's big.  That's big.

7    Q.   So did you also take a look at the unimpacted cost

8    codes?

9    A.   We did.

10   Q.   What was the differential there?

11   A.   So the differential there was looks like ECI budgeted

12   more in those particular cost codes than Mr. Caprio by

13   about $1149.  And the total for Phase 3, Mr. Caprio was

14   about 2700 hours higher than ECI's baseline.

15   Q.   All right.  Now, so what does that -- does that -- is

16   that a conclusive determination to you that ECI's baseline

17   is inaccurate?  What import does that have on your

18   opinion?

19   A.   It may not be fully inclusive, but it's definitely

20   stating there's an issue with that baseline bid or

21   baseline cost codes set up to do this work.  Maybe further

22   details or further information will also confirm that.

23   Q.   Okay.  So did that end your inquiry into looking at

24   the claim in total?

25   A.   No.

1  Q.   So you looked at other aspects of ECI's claim as

2  well?

3  A.   Yes.  Strictly looked at the benchmark or baseline

4  that ECI was using.

5  Q.   In terms of the reasonableness of ECI's baseline that

6  they've established here, do you consider, in your

7  professional opinion, based upon what you know and have

8  seen, is it reasonable?

9           MR. KAPLAN:  Objection.  He has no competency to

10  comment on ECI's bid.  By his own admission, he has no

11  competency.  His sole resource for any analysis of ECI's

12  bid is what he received from Mr. Caprio by this witness's

13  own testimony.  He cannot answer an opinion on whether he

14  thinks ECI's bid was good, bad, or anything beyond the

15  comparison that he's using with Caprio's numbers and ECI's

16  numbers.

17           THE COURT:  Do you have a response to that?

18           MR. HUG:  Yes, Your Honor.  He's entitled to

19  rely on the opinion of others.  He's cross-examined

20  Mr. Caprio and he can state what he's relied upon in his

21  own estimate, and Your Honor can take it for what it is

22  worth.  But he's certainly qualified to testify and rely

23  upon other experts in preparing his overall opinion.

24           THE COURT:  Overruled.

25

 1   BY MR. HUG:

 2   Q.   Sir, based upon your analysis up to this point, in

 3   your analysis did you consider ECI's baseline to be

 4   reasonable?

 5   A.   Based upon the information now that we had from

 6   electrical estimator, it appears to be low.

 7   Q.   Okay.  And you can say that to a reasonable degree of

 8   certainty?

 9   A.   Sure.  And some of the cost reports that we saw on

10   the final as well, kind of supplement that as well.

11   Q.   We'll get down to that because you mentioned you also

12   looked at some -- I don't have it written here, but you

13   looked at some project documentation as well.

14        All right.  As I said before --

15        Your Honor, I don't want to stop, but also don't want

16   to go beyond the normal break period, either.

17            THE COURT:  I think we planned to go to 3:30 and

18   then we'll take a break then.

19            MR. HUG:  Okay.

20   BY MR. HUG:

21   Q.   What did you look at next?  Did you start to look at

22   actual hour analysis?

23   A.   Yes.

24   Q.   Let's start with what you did next in your actual

25   analysis beginning on the bottom of page 4, 2b of

1    Exhibit 656.  Explain that to the Court.

2    A.    Sure.  There's an Exhibit 519 which shows the ECI

3    hours spent to complete Phase 3.

4              MR. HUG:  That's part of Appendix A that we were

5    looking at before?

6              THE COURT:  All right.

7    BY MR. HUG:

8    Q.    Go on.

9    A.    So 519 shows the actual hours spent, and this report

10   is dated 7/26/2011.  This would encompass all Phase 3

11   hours because the job would be done at that point in time,

12   Phase 3 is clearly done at that point in time, was 12,684.

13   So, based upon the correspondence, the impacted period was

14   July and August.  So we then took a review of the

15   certified payroll to see how many hours were actually

16   worked during July and August during this impacted period.

17   Q.    Okay.  And what did you find when you did that

18   analysis?

19   A.    We found that 12,137 hours were worked with all of

20   ECI's labor on this particular project.  They could have

21   worked in a different phase, different area, but that was

22   all their labor from June 28, 2010 to 9/4/2010.

23   Q.    Take a look at Appendix B to your report and the

24   first page.  Is that a summary of your analysis of the

25   certified payrolls?

1   A.   Yes, it is.

2   Q.   Okay.  Now, the number of -- on page 4 of your report

3   and on page --

4   A.   Excuse me, Mr. Hug.  Can you go by section number?

5   Q.   Okay, I'll go by section number.  Okay, that's

6   because you're using the red line.

7        The 12,684 --

8   A.   Yes.

9   Q.   -- is that the total hours for Phase 3 exclusive of

10  subs for all cost codes?

11  A.   That's for all of Phase 3, all cost codes, the whole

12  job.

13  Q.   And that's shown your Section 2 analysis?

14  A.   That's correct.

15  Q.   And the number that appears on the first page of

16  Exhibit B, your summary of weekly reports, that 12,137,

17  what does that represent?

18  A.   That's all the ECI labor from June 28, 2010 to

19  September 4, 2010.

20  Q.   Okay.  And we know that -- do we know what percentage

21  completion from another portion of your report -- and I

22  can point you to it -- of how complete ECI was as of June

23  1st -- or excuse me, July 1st and September 1st?

24  A.   Yes, I'd have to look at the payment application at

25  that point in time.

1    Q.   Right.   Turn to Section 2f of your report and I'll

2    get to this detail a little later.

3    A.   Yes.

4    Q.   And you see under 2f the second paragraph?

5    A.   Yes.

6    Q.   Okay.   Did you do an analysis of the percentage of

7    completion before and after the impacted period of July

8    and August 2010?

9    A.   Yes.

10   Q.   And what was it as of July 1st?

11   A.   Sure.   Per the panel requisition as of July 1st,

12   Phase 3 was about 15 percent complete.   And at the end of

13   the impacted period, it was 99 percent complete.   Which

14   makes sense because they moved into the school that fall.

15   Q.   Okay.   So approximately -- I'll use round numbers,

16   85 -- I'm not sure if it's 86 or 84.   I think it's 84.

17   84 percent was completed during July and August?

18   A.   That's correct.

19   Q.   And that's based upon payment applications, correct?

20   A.   That's correct.

21   Q.   And are those important things?   What are those?

22   A.   Sure.   The payment application would have been what

23   ECI used to bill Pike for work completed.

24   Q.   Are they certified as being truthful and accurate?

25   A.   Yes.   They would certify that when they submit that

1    to Pike.

2    Q.   Okay.  And you determined those 15 percent and

3    99 percent by an analysis of those payment applications?

4    A.   That's correct.

5    Q.   I'll get back to that in a little bit.

6         So going back to your Section 2b and the Appendix B

7    of 12,137, what is the 12,137 again?

8    A.   That's the total hours worked by ECI on all phases of

9    the Kelly School project from June 28, 2010 to

10   September 4, 2010.

11   Q.   So 12,137 of 12,684 were worked during that impacted

12   period?

13   A.   That's correct.

14   Q.   So that leaves 500 or so hours difference, correct?

15   A.   Right.  Their cost report shows 12,684 hours worked.

16   We have 12,137 there.  So probably about 500 hours either

17   before or after the impacted period.

18   Q.   So to put it in percentage perspective, about

19   15 percent of the hours are during unimpacted periods,

20   from your analysis?

21   A.   About 4 percent.

22   Q.   Okay.  4 percent.

23        So 4 percent -- okay.  I know why I had that wrong.

24   Okay, I got it.  4 percent occurred during the

25   unimpacted -- if that's the --

1    A.    If those numbers are correct.

2    Q.    If those numbers are correct.  And that 4 percent is

3    included in ECI's claim?

4    A.    Yes.

5    Q.    Okay.  And if that number is higher, as ECI may

6    contend, that means that more unimpacted hours are in

7    ECI's claim, correct?

8    A.    That's correct.

9    Q.    Now, did ECI provide you with any documentation where

10    you could compute what portion of their estimate relates

11    to that 4 percent of those cost codes that were impacted

12    during Phase 3?

13    A.    No.

14    Q.    Or unimpacted, I should say, during Phase 3?

15    A.    No, I didn't have any information as far as what they

16    billed or performed after that period or before that

17    period.

18    Q.    Let's say the unimpacted hours are 2,000 hours.  Say

19    the unimpacted hours are 2,000 hours.  Let's just say that

20    becomes a hypothetical for you for ECI.  It's 2,000 hours.

21    How many hours -- how many hours of that is from -- so

22    that's their actual hours, but you got to compare that to

23    the baseline.  Do you know what their baseline is for that

24    2,000 hours of work?

25    A.    So, for the period before June 28 or after June 28?

1    Q.    Right.

2    A.    Do we know what their baseline was against doing that

3    work?

4    Q.    Yeah.

5    A.    No, we wouldn't know that.

6    Q.    So you wouldn't know whether or not for that 2,000

7    hours that they have for actual unimpacted claims, they

8    could have actually estimated 300 hours for that work or

9    could have estimated 3,000 hours for that work, you don't

10   know?

11   A.    I don't know.

12   Q.    And is there anything from the documentation where

13   you could figure that out?

14   A.    You might be able to figure out the actual hours of

15   what they spent and what they budgeted for that, there

16   would be nothing in the file regarding that.

17   Q.    As far as you understand, the impacted claim occurs

18   in July and August, correct?

19   A.    That's correct.  Per a couple documents.

20           THE COURT:  We do need to take a break.  I just

21   have one question for the witness before.

22           Tell me why the certified payroll hours which

23   you have I think 12,100 something, why that would differ

24   from the 12,684?

25           THE WITNESS:  So the 12,684 on that exhibit is

```
 1    ECI's cost report.  So that would include hours from the
 2    beginning of time, beginning of this job for Phase 3, and
 3    it would also include time after September 4, 2010 to
 4    complete whatever punch list have to be done on the job.
 5              THE COURT:  Okay.  So the 12,684 corresponds to
 6    what ECI allocated to Phase 3 in its cost reports?
 7              THE WITNESS:  In their actual -- that's what
 8    they allocated for actual hours in their cost reports.
 9              THE COURT:  In their own cost reports.  And the
10    certified payroll is a different way of measuring hours
11    worked, right?  Again, a different measure, this time
12    still by ECI, right?
13              THE WITNESS:  That's correct.  These are ECI
14    documents and we looked at it from that period, June 28 to
15    9/4.
16              THE COURT:  The impacted period.
17              THE WITNESS:  The impacted period.
18              THE COURT:  I guess we better take our break.
19    Why don't we take a 20-minute break.  We will see you back
20    here at ten minutes until 4:00.
21              It's looking like -- I have a 5:30 conference
22    call, so we may need to break around 5:00 p.m.
23              MR. HUG:  That's fine.  I think the witness will
24    be continuing into tomorrow.  And in fact, I'm sure of it.
25    I'm sorry.
```

1            Judging by actually your question, Your Honor, I

2    do -- I feel I need to take it slow.  It's a lot to

3    absorb.  It's a lot to figure out.  And I'm feeling I'm

4    not doing my job unless I take it slow.

5            THE COURT:  All right.  Sorry I'm not up to more

6    speed.

7            MR. HUG:  No, no, no, no, that's okay.  I'm glad

8    you're doing that.  Now I know what you know and what you

9    don't know.

10           THE COURT:  Thank you.  We'll stand in recess.

11               (Whereupon, a recess followed.)

12

13           THE COURT:  I'm anticipating I may have to bring

14   in the jury in this other case, and that might happen at

15   4:00 or so, but we'll let you know if they want to be

16   dismissed.

17           Please continue.

18   BY MR. HUG:

19   Q.   We left off discussing Part 2b of your report,

20   Exhibit 646.  I want to go over things again partially in

21   light of some of the Court's inquiries.

22        Okay.  The number 12,684, that is ECI's total hours

23   for Phase 3 for all cost codes, correct?

24   A.   That's correct.

25   Q.   You have in there, you mention that you did a

1   certified -- a review of certified payrolls for two

2   months.  Those months are July and August, correct?

3   A.   That's correct.  Started on 6/28.

4   Q.   And in Appendix B you summarize -- in the first page

5   of Appendix B, you summarize those certified payrolls for

6   those two months, correct?

7   A.   That's correct.

8   Q.   Now, I think the first two columns are

9   self-explanatory.  What's the column in blue?

10           THE COURT:  Are you on Exhibit B?

11           MR. HUG:  Yes, the first page of Exhibit B.

12   That's certified payroll sheets.

13           THE COURT:  It's not blue in mine.

14           MR. HUG:  It isn't?  Okay.  It's the column

15   title Total under Certified Payroll Sheets.

16   A.   That's the total men, names, that were on the

17   certified payroll that day.

18   BY MR. HUG:

19   Q.   Okay.  What does the next column mean in title form?

20   A.   Sure.  So of the total amount of men, it was broken

21   down between foremen, journeymen or apprentice.  So it's a

22   breakdown of those classifications of workers on that

23   particular day.

24   Q.   I notice at the very bottom of page 3 to those

25   columns there's percentages?

1    A.    Yes.

2    Q.    What do those percentages mean?

3    A.    Sure.   Of the overall man hours, man days.

4    Q.    Okay.

5    A.    There's 4 percent foremen, 64 percent was journeymen,

6    and 32 percent of the hours were apprentice.

7    Q.    Jumping ahead a little bit, in terms of compensation,

8    who is the highest compensated of the three?

9    A.    The foreman.

10   Q.    And then?

11   A.    The journeyman.

12   Q.    And then?

13   A.    The apprentice.

14   Q.    Okay.   And then you have another column From

15   Certified Weekly Payroll, and what does that represent?

16   A.    That's the total hours.

17   Q.    Okay.   So you have Man and Man Days and then Total

18   Hours?

19   A.    That's correct.

20   Q.    And the total hours were for 12,137?

21   A.    That's correct.

22   Q.    That's only for the two months which you understood

23   to be the impacted period, correct?

24   A.    To be clear, ten weeks.

25   Q.    Ten weeks.   All right.

1          Now, do you have any understanding as to whether or

2     not there are hours performed before July 1st and after

3     September 1st?

4     A.   Repeat the question, please.

5     Q.   For Phase 3, I'm sorry.  Were there hours performed

6     before July 1st and after September 1st on Phase 3?

7     A.   I believe so, yes.

8     Q.   Did you do any analysis of those hours?

9     A.   No.

10    Q.   Why not?

11    A.   Because that wasn't noted as the claim period in the

12    documentation.

13    Q.   Okay.  The claim period being where the problems

14    happened on the job?

15    A.   That's correct.

16    Q.   So would those be what you would call unimpacted

17    periods?

18    A.   That's correct.

19    Q.   Okay.  Do you understand that ECI -- whatever hours

20    those are, did you understand that ECI included those

21    unimpacted hours in its claim?

22    A.   Yes.

23    Q.   Did ECI break those hours out at all?

24    A.   No.

25    Q.   And by that, I mean did they break the actual

1    unimpacted hours out of their claim?

2    A.    No.

3    Q.    Okay.  Did ECI break out -- so if you're going to

4    take out unimpacted hours, you wouldn't just -- you would

5    agree with me that you wouldn't just leave the baseline

6    alone, would you?

7    A.    You'd have to get the baseline that represents the

8    same portion of work that you're performing.

9    Q.    Okay.  Did ECI, in its presentation of its claim that

10   you looked at, reduce its baseline at all for unimpacted

11   hours?

12   A.    No.

13   Q.    So if ECI were to say to you today -- hypothetical --

14   that there were 2,000 hours that related to work in

15   Phase 3 that occurred before July 1st or after September

16   1st, how would that impact your claim analysis?

17   A.    In Section 2 of my report where it says total hours,

18   total ECI hours, that would be reduced by 2000 hours.

19   Q.    Okay.

20   A.    Similarly, ECI's budget or baseline would have to

21   come down by whatever their estimate was to perform those

22   2000 hours.

23   Q.    Did they do that at all?

24   A.    No.  Not in their claim submissions.

25   Q.    That alone, that problem alone, without consideration

1    of anything else, does it cause you to believe that their

2    actual hour analysis versus their baseline hour analysis

3    is unreasonable?

4    A.   As presented, it clearly doesn't address the hours

5    that were unimpacted before 6/28 and after 9/4.

6    Q.   And therefore you don't know what their claim is,

7    dollars is.  If they have those hours, if they have 2,000

8    hours or 3,000 hours that happened before or during the

9    non-impacted period, that would mean you would not know

10   what their claim is; is that right?

11   A.   Right.  It's my understanding they're not claiming

12   for before 6/28.  So there's an exhibit, I'm going to say

13   it's Exhibit 522, where they note the impact period and

14   the hours, which includes the ECI hours and the sub hours

15   for the alleged impact period.  And that's the area that

16   we looked at and that's what kind of ties into their

17   claim.

18   Q.   Okay.

19   A.   But it does tie into their overall hours for Phase 3.

20          MR. HUG:  Shall I pause for a moment,

21   Your Honor?

22          THE COURT:  We're going to get some word whether

23   the jury wants to come out now to be dismissed.

24          (Pause.)

25          THE COURT:  All right.  We're going to suspend

1   this right now to bring the other parties in.  Maybe you

2   can let the jury know we're going to bring them out in

3   just a couple minutes when we get the other parties in

4   here.

5           I'm sorry about the distraction.  I'm going to

6   have to address this note from the jury in a couple

7   minutes as soon as the parties in the other case are

8   present.

9           MR. HUG:  May the witness come off the stand?

10          THE COURT:  Yes.

11          MR. HUG:  May I move this, Your Honor?  I take

12  it you want me to move it.

13          THE COURT:  Appreciate it.

14              (Recess in the proceedings.)

15

16          THE COURT:  Mr. O'Neill, you can take the stand

17  again.

18          MR. HUG:  Okay.  May I continue Your Honor?

19          THE COURT:  Please do.

20  BY MR. HUG:

21  Q.   Okay.  We've been working on Part 2b of Exhibit 656.

22       I'd like to jump to your opinion and summarize your

23  opinion with respect to item 2b which, if we go to this

24  poster here, we cover baseline, we're in actual hours,

25  we're on certified payroll, your analysis of certified

1    payroll.  On page -- well, it's my page 5.  It's right

2    before the paragraph right before 2c.  You give an

3    opinion.  Could you summarize for the Court your opinion

4    with respect to your analysis of the certified payrolls?

5    A.   Sure.  I'll just read what's in the report here.

6    Then I can explain a little bit.

7         "We understand that ECI included in their claim hours

8    worked during the unimpacted time periods, namely prior to

9    July 1st, 2010 and after August 31, 2010.  This may

10   explain, at least in part, why our certified payroll

11   review of the impacted period concluded that ECI had less

12   total hours worked than ECI claimed (the 12,684 from the

13   cost report vs. the actual hours worked from the certified

14   payrolls).  However, it doesn't explain all the

15   differences because, as you know, from the payment

16   application, our analysis below, ECI's total hours during

17   the impacted time frame include hours worked on non

18   Phase 3 work."

19   Q.   Okay.  So to the extent ECI has included all of those

20   12,137 hours in their claim, you have an issue with that,

21   correct?

22   A.   Yes.

23   Q.   All right.  And is that the subject of your next

24   analysis in the report?

25   A.   That's correct.  The certified payroll just told me

1    how many hours were worked during that period.

2    Q.    And to the extent -- again, just to repeat to make

3    sure, to the extent -- your understanding is to the extent

4    there are hours included in their claim that relate to

5    unimpacted periods, is it your opinion that they shouldn't

6    be in the claim at all?

7    A.    No, they shouldn't.

8    Q.    So, did you look at what happened during July and

9    August to determine whether all of the work that was

10   performed during those two months was related to Phase 3?

11   A.    Yes.

12   Q.    And what analysis did you perform?

13   A.    Sure.  So we looked at the daily -- ECI's daily logs

14   that were completed and filled out by the foreman.  And

15   some are more detailed than others, some would list the

16   number of men, sometimes it tied to the certified payroll.

17   It was close though.  And he'd also narrate what areas of

18   work, where he would have different labor working.

19   Sometimes he'd quantify the men, two men, three men, four

20   men in certain areas.  Other times it says we were working

21   in certain areas.  We went through the daily logs for that

22   period and kind of determined what was not Phase 3 work.

23   Q.    Okay.  So the daily logs are all already in evidence

24   in this case, but you have I think attached as Exhibit C

25   many of the relevant, if not all of the relevant daily

1    reports during that time period, correct?

2    A.   That's correct.

3    Q.   And you have a cover page on Exhibit C to your

4    report, see that?

5    A.   Yes.

6    Q.   And what is that?

7    A.   So this notes from left to right each day the total

8    number of men that are not working in Phase 3.

9    Q.   Okay.

10   A.   And then we break it down per the areas where we knew

11   they were working from the daily logs or from the weekly

12   reports where we got that information.

13   Q.   So that sums up to the number 2,028, correct?

14   A.   That's correct.

15   Q.   So is it fair to say of the 12,137 hours performed

16   during July and August, that number of hours was on phases

17   other than Phase 3?

18   A.   During that period, the 2,028 hours worked during

19   that period was on other phases other than Phase 3.

20   Q.   You did that by an analysis of the daily reports?

21   A.   That's correct.

22   Q.   And then you also did a supplemental report as well?

23   A.   Yes.

24   Q.   And what did you do in that supplemental report?

25   A.   At the time we did the first report, I didn't have

1    the foremen's weekly logs.  And then those were then

2    produced and we prepared a report that analyzed those as

3    well.  But it turned out that the daily logs were more

4    accurate than the weekly foreman reports.

5    Q.   And we'll cover that in a little bit.  I'd like to

6    turn to some samples to the daily reports.  If you can

7    turn to daily report for 7/2/2010, do you see that?

8    A.   Yes.

9    Q.   Okay.  And you have your summary report there as well

10   for that period of time.  Your summary report says there

11   were 88 total hours worked on non -- if I'm reading it

12   right, 88 total hours worked on non Phase 3 work.  Am I

13   reading that right?

14   A.   That's correct.

15   Q.   Going to the actual daily report, how did you go

16   about making that determination?

17   A.   Sure.  So this is the foreman's daily report.  Under

18   the work performed, he kind of describes where they have

19   men working.  So the first portion, four men work in

20   Area C, which is part of Phase 3.  Fourth line says three

21   men wiring site lighting fixtures.  That would not be part

22   of Phase 3.

23   Q.   Site being site work?

24   A.   Site, outside the site.

25   Q.   Okay.

1    A.    It also notes two men pulling branch wire in the

2    upper E Wing which is also not part of Phase 3.

3         Four men piping branch conduits in the connector,

4    which is not part of Phase 3.

5         Lastly, two men in the auditorium working on slab

6    conduits, which is not part of Phase 3.

7    Q.    You add all that up?

8    A.    Add all that up, it comes to 88 hours on that

9    particular day.

10   Q.    Did you do this same kind of analysis with every

11   daily report during the impacted time period?

12   A.    Yes.

13   Q.    I'm just going to go over a couple of other samples

14   just to see.  I suspect Mr. Kaplan will take you through a

15   couple others.

16        Go to 7/7.  Explain to the Court how you would read

17   that.

18   A.    Yes.  So on 7/7 we have about 72 hours of work being

19   performed in other areas other than Phase 3.  So -- okay.

20   So, in fourth line down is the foreman's writing.  We also

21   prepped a little more stuff in the auditorium stage, slab

22   pour.  Again, that's not part of Phase 3.  Next line,

23   three men pulling branch conduit upper E.

24   Q.    Okay.

25   A.    Moving down a few lines, foreman doing branch piping

1    in connector, upper and lower.

2    Q.   Okay.  Next?

3    A.   I think that's it on that page.

4    Q.   Okay.  So again, you add those up and you take those

5    as to what's the non-Phase 3 work, correct?

6    A.   That's correct.

7              THE COURT:  And when you are adding those up,

8    are you assuming for each of those men an 8-hour day?

9              THE WITNESS:  Your Honor, that's a great point.

10   We assumed an 8-hour day for those.

11             THE COURT:  And you're assuming that if somebody

12   is mentioned as two men worked, for instance, on the

13   7/7/2010 report it says two men worked on installing

14   4-inch conduits.

15             THE WITNESS:  Waiting on steel I beams.

16             THE COURT:  You're assuming the fact that the

17   foreperson has written this down means that those two men

18   did that the whole eight hours?

19             THE WITNESS:  That's correct.

20             THE COURT:  As opposed to they did that four

21   hours and went off and did something Phase 3 oriented?

22             THE WITNESS:  That's correct.  Some of the men

23   did more than 8 hours.  Some of the then were working

24   overtime at certain periods, things like that.  We tried

25   to make the best estimate based on the foreman's reports

1    that were represented.

2              THE COURT:  But the estimate is 8 hours for each

3    identifiable person?

4              THE WITNESS:  Yes.  But I could see from the

5    certified payroll if men worked overtime, but don't know

6    which man worked on what, because they don't identify the

7    person's name working on a certain task.  I used 8 hours

8    as far as a deduct number.

9              THE COURT:  Thanks.

10   BY MR. HUG:

11   Q.   That's the assumption that you made in analyzing

12   these reports?

13   A.   That's correct.

14   Q.   Okay.  Let's move to another one, 7/23/10.

15   A.   Okay.  So 7/23 we had 96 hours that were not Phase 3

16   and appeared all to be in the E Wing.  So going down one,

17   two, three, four lines, four men in E Wing.  Going down

18   two more lines, two men pulling branch wire in lower E

19   addition.  Right after that, six men on feeder conduit for

20   gear.

21        So that was 12 man days times 8, 96 hours is how we

22   did that.

23   Q.   Okay.  All right.  There's other examples we can go

24   down, but in the interest of brevity, did you follow the

25   same basic analysis throughout the assumption of 8 hours

1    just picking through here and finding out hours where

2    non-Phase 3 hours, correct?

3    A.   That's correct.

4    Q.   Where there was any ambiguity, did you make an

5    assumption?

6    A.   If there was any ambiguity, I assumed it was still

7    Phase 3.

8    Q.   You gave ECI the benefit of the doubt?

9    A.   That's correct.

10   Q.   Now, in Exhibit 615, which is your supplemental

11   report, did you undertake an analysis of the weekly

12   foreman reports?

13   A.   Yes, I did.

14   Q.   Okay.  That would be Exhibit 650, Your Honor.

15             THE COURT:  That's not revised.

16             MR. HUG:  That's not revised, correct.

17             MR. KAPLAN:  650 or 651?

18             MR. HUG:  In my book it's 650.  March 3, 2014,

19   report.

20             MR. KAPLAN:  Okay.

21             MR. HUG:  Does Your Honor have it at 650?

22             THE COURT:  Think so.  There's a cover letter.

23   BY MR. HUG:

24   Q.   First of all, sir, if we could introduce 650, we've

25   got it into evidence, but let's turn to page 3 of that

1    report, Part 2a.  Describe what you did in Part 2a.

2    A.   Sure.  So in our original report, we looked at the

3    daily logs.  And it was then presented.  There was also

4    weekly foreman reports which may bring clarity to where

5    the men worked.  We received them, reviewed them for the

6    same time period.  And we went over them.

7         So what we did here in 2a is kind of discussed the

8    report, how it's laid out.  And then we went down each one

9    of the weeks.  And although the documentation wasn't as

10   clear as the daily logs, based on whether it be

11   handwritten notes or other document notes or documentation

12   on these reports, it looked like the foreman allotted

13   1,822 hours to other areas other than Phase 3.

14   Q.   Okay.  Let's dive into that a little bit.  First of

15   all, you do a summary table in the middle of the page.  Is

16   that what you were referring to?

17   A.   That's correct.

18   Q.   Is that how the weekly reports were done, by weekend?

19   A.   Weekend per persons.

20   Q.   So if I turn to Exhibit C, the first page, which has

21   Bates number 829, ending in 829 --

22   A.   Yes.

23   Q.   -- that is a weekly foreman's report -- this was

24   already introduced in the case as another exhibit or this

25   particular week, so the Court probably has some

 1   familiarity with it.  But if you could explain the

 2   different parts of it for the Court as it relates to your

 3   analysis?

 4   A.    Sure.  Again, we were comparing these or using these

 5   to complement the daily logs to see if we could determine

 6   where the men worked.  So this particular sheet is for one

 7   individual, Stephane Mathieu, for week ending 8/21/2010.

 8   What they did was allot his hours for that week into

 9   different cost codes.  And then up on the top right corner

10   it discusses which phase that it would be associated with.

11   However, on this particular report, we ran into this with

12   some other reports, they didn't circle which phase this

13   would include.  So now the cost codes are identical per

14   phase for the most part on their cost report.  So up here

15   this wasn't filled out by the foreman as far as which

16   phase they were working on.

17   Q.    Okay.  All right.  So when that happened, how did you

18   deal with it?

19   A.    Well, I think the 8/21 daily report would provide a

20   little more clarity as far as where the men were working.

21   Q.    That's the daily report that we looked at just a few

22   minutes ago?

23   A.    That's correct.

24   Q.    So that might give you a little better idea where

25   work was being performed on the project.  The daily

1    reports don't include individual names, do they?

2    A.   The daily reports would say at the top which men are

3    working, but wouldn't tell you which men are working on

4    which task.

5    Q.   I see.  So then --

6    A.   Just to be clear, these reports do not include

7    subcontractors.  They're strictly ECI workers.

8    Q.   The weekly --

9    A.   The weekly reports.

10   Q.   Are you sure about that?  I think you might be

11   mistaken, sir.  In Exhibit C go to Exhibit Bates number

12   ending in 893.

13   A.   Yes.

14   Q.   Okay.  And it says Chris Chapps, Project No., see

15   that, 19E341-SOS?

16   A.   Yes.

17   Q.   Do you know what that SOS is?

18   A.   Sorry, that is one of the subs.

19   Q.   Prior page, 892, it says project number, the same

20   number says Horton?

21   A.   That's correct.

22   Q.   Those are subs?

23   A.   Those are subcontractors, sorry about that.

24   Q.   That dovetails into one of the reasons you

25   supplemented your report.  We'll go into that a little

1    later.

2    A.   Yes.

3    Q.   So --

4    A.   On that particular report we're on right now --

5    Q.   393?

6    A.   392.  Again, on the top right corner, it doesn't

7    indicate what phase they're working on on that particular

8    report.

9    Q.   That was Bates number ending in 3892, right?  Or

10   3893?

11   A.   3892.

12   Q.   Let me take you through a couple of these reports.

13   Before I get there, on the top of page 4 and on page 4, do

14   you have an opinion as to whether or not these weekly

15   foreman reports were better or worse in helping you figure

16   out how many men were working in a particular area?

17   A.   Yeah, they were worse.  They weren't as much detailed

18   on these particular reports.

19   Q.   Let's go into why.  And let's starting with --

20            THE COURT:  Can I just ask a question?  These

21   reports, the witness has said that one can't tell from the

22   top right-hand corner where the work is taking place.

23            MR. HUG:  Yes.  I'm going to show you an example

24   and explain that, Your Honor.

25            THE COURT:  I want you to know, because we've

1    had an issue here in terms of my documents not being the

2    same as yours, I don't have in this entire Attachment C, I

3    don't have that notation in any of the documents of what

4    phase they are.  I want to make sure that's the same.

5              MR. HUG:  Attachment C?

6              THE COURT:  Attachment C there's a listing of

7    phases, but never a circle or a checkmark on any of mine.

8              MR. HUG:  Exactly, Your Honor.

9              THE COURT:  All right.  Thank you.

10             MR. HUG:  Exactly.

11   BY MR. HUG:

12   Q.   Let's turn, first of all, to Bates number ending in

13   835.  Explain to us what your concerns are in terms of

14   this particular weekly foreman report as it impacts your

15   analysis of actual hours.

16   A.   Sure.  Top right corner it doesn't indicate which

17   phase they're working.  In regard to cost codes, it's

18   miscellaneous.  I don't know what area that would be.

19   Q.   Okay.  So that's really -- is it fair to say that's

20   really of no help to you in your analysis?

21   A.   Right.  And then when I tied it back to that chart in

22   my report under 2a, we kind of note that the cost codes

23   that are under miscellaneous and that would tie into that

24   being a miscellaneous item, not necessarily associated

25   with Phase 3.

1    Q.   Okay.  Let's turn to page number 385 -- excuse me,

2    3835.

3    A.   Yes.

4    Q.   Same problem there?

5    A.   Exact same.  Same issue, yes.

6    Q.   Okay.  Now I want you to turn to page 3846, that's

7    Bates number.

8              MR. HUG:  I think yours should be Bates

9    numbered, Your Honor.

10             THE COURT:  It is.

11             MR. HUG:  Good.

12   BY MR. HUG:

13   Q.   Were you able to determine Phase 3 and Phase 2 on

14   this particular --

15   A.   Yes.  So this -- although the type right didn't

16   indicate where they were working, within it the foreman or

17   someone wrote Phase 2 E Wing for certain days.

18   Q.   By the way, when it had nothing on it in terms of the

19   phase indicated, what did you do with that one?  How would

20   you -- you explained the miscellaneous ones.  You

21   explained with miscellaneous.  When it had no markings at

22   all on it as to which cost code it was on, could you do

23   anything with it?

24   A.   Not really, no.

25   Q.   Did you have an assumption that you made that it was

```
 1   Phase 3 or not Phase 3?
 2   A.    Yeah, we assumed it was Phase 3.  And on the chart in
 3   2a, I just tried to use the foreman's notes.  We noted
 4   what he noted as Phase 2, temp. work, miscellaneous work,
 5   or site work.
 6   Q.    Okay.
 7   A.    He had about 1822 hours that he had coded elsewhere.
 8   Q.    So you gave them the benefit of the doubt on those.
 9   If there was no phase indicated, you gave them the benefit
10   of the doubt and included it in Phase 3?
11   A.    That's right.  I didn't take it out.  There could
12   have been more, but those weren't coded enough.
13   Q.    Unless it was a code that clearly didn't relate to
14   Phase 3 like site work?
15   A.    Right.
16   Q.    Okay.  So on 3846, what did you do with that one?
17   A.    This was coded Sunday through Thursday, Phase 2
18   E Wing.  That would have calculated into the Phase 2 on
19   our chart, on Section 2a of my report.
20   Q.    All right.  And then go to Bates number 3852.  Again,
21   is this one -- are you able to determine where the work
22   was performed?
23   A.    No.  This had no indication where the work was
24   performed.
25         Down below it looked like there was some -- call it
```

1    an error or there was going to be a makeup of eight hours

2    because it didn't get caught from a previous period for

3    eight hours, and they do code that to gear 64.

4    Q.   So let's go to one where it is coded.  Another one

5    where it's coded, 3869.

6    A.   Yes.

7    Q.   And does that indicate non-Phase 3 work on it?

8    A.   Sure.  This has Sunday through Thursday, Phase 2

9    E Wing.

10   Q.   I want you to jump to 3881.  Excuse me, I'm sorry,

11   3884.  Is that another example where Phase 2 was

12   specifically indicated?

13   A.   That's correct.  Phase 2 E Wing was written on the

14   report.

15   Q.   The next page has some Phase 2 indicated and then

16   some that were left blank.  For the ones that were left

17   blank, did you assume Phase 3?

18   A.   Just assumed Phase 3 and caried the deduct hours of,

19   in this case, 24.

20   Q.   So that's just -- there's -- that's just -- now, this

21   one actually says in the top it's Ferguson, correct?

22   A.   Yes, subcontractor.

23   Q.   And you know that not all -- do you know whether or

24   not all subcontractor labor related to Phase 3?

25   A.   No, it did not.

1  Q.   Okay.  So you can't just make an assumption that just

2  because it's a subcontractor it worked on Phase 3?

3  A.   That's correct.

4  Q.   All right.  Now, let's turn to Exhibit D which

5  relates to the weekly foreman reports for the week ending

6  8/28/10.

7  A.   Okay.  Bates 4026?

8  Q.   Yes.  Now, this one it does have in the top

9  right-hand corner, it has a phase circled?

10 A.   Yes.

11 Q.   When that was circled like that, did you make any

12 assumption?

13 A.   Assumed it was part of Phase 3.

14 Q.   Now, go to the next page 4027.  Do you see something

15 there?

16 A.   Yes.

17 Q.   And what does it indicate?

18 A.   So this is saying blank equals Phase 2.  Whereas so

19 potentially if there's nothing indicated up here, that

20 blank would mean it was Phase 2 work they were working on.

21 This one they kind of note Phase 3 is kind of circled on

22 this one.  But just one thing to note, you see site

23 Phase 3, Phase 4 East, Phase 4 West, and phase on the

24 bottom.  There is no Phase 2 noted here.  Someone wrote in

25 if it's blank it's Phase 2.  So this we would have assumed

1   was Phase 3, but someone wrote in a note blank equals

2   Phase 2.

3   Q.   So there were subsequent pages in this exhibit, too,

4   that are simply blank?

5   A.   Yes.

6   Q.   However, what did you do when you hit a blank in

7   terms of your analysis?  And you can refer back to -- I

8   don't expect you to commit all this to memory all the

9   time.  What did you do -- how is it explained what you did

10  on page 4 of your report?

11       There's a paragraph beginning with note also, one,

12  two, three, four, five?

13  A.   Got you.  We looked at that, I'll read it out, it's

14  pretty clear.

15       Note also that the top part of the Weekly Report

16  where the notation of Phase appears, there is no listing

17  for Phase 2.  However, on the Weekly Report Bates #4027 in

18  the top right corner it is written Blank = Phase 2.  If we

19  associate all the Blank Weekly Reports as Phase 2, it

20  would result in a substantially more labor hours being

21  attributed to Phase 2.  For example, for the week ending

22  8/21,10, we associated 141 hours to Phase 2.  However, if

23  we use Blank = Phase 2, the Phase 2 hours for the week

24  work would be over 2500 hours.

25       Basically, we just used the handwritten notes from

1    the foreman to put into the non-Phase 3 buckets.

2    Q.    You gave ECI the benefit of the doubt in doing your

3    analysis, in other words?

4    A.    That's right.  But I think we also determined that

5    the weekly reports weren't as detailed as the daily

6    reports.

7    Q.    So even though you came up with 1822 hours

8    attributable to non-Phase 3 work during July and August,

9    did that cause you to change your overall analysis of the

10   number of hours worked in non-Phase 3 work during those

11   two months?

12   A.    No, it did not.

13   Q.    And that's because of why?

14   A.    We felt that the daily logs were more accurate than

15   the weekly reports.  So our daily logs -- our review of

16   the daily logs computed about 2028 hours were worked in

17   other hours other than Phase 3.  We kept that analysis in

18   our final report.

19   Q.    Okay.  You don't know whether ECI and how ECI

20   actually treated these, say, their assumptions on these

21   weekly foreman reports are the same as yours, do you?

22   A.    I do not.

23   Q.    So we don't know -- the person was actually entering

24   this data, we don't know whether he or she assumed it was

25   Phase 3 or Phase 2 or site work or whatever, do we?

1    A.   I do not.

2    Q.   Pretty much all the ones in Exhibit C, because none

3    of them -- well, accept the ones that are clearly marked

4    Phase 2, you don't know how ECI actually coded those into

5    the system?

6    A.   I do not.

7    Q.   Now, in your actual hours analysis, I've covered with

8    you certified payroll daily reports and weekly foreman

9    reports.  I'm going to skip over the subcontractor

10   invoices and go to payment requisitions for a moment.

11   What analysis did you perform on payment requisitions?

12   A.   Sure.

13   Q.   Does that appear in your report anywhere?

14   A.   Sure.

15   Q.   And I'm referring to Exhibit 536.

16   A.   In our Exhibit F -- sorry, Appendix F of Exhibit --

17   Q.   In the body of the report, is that Section 2f, Review

18   of Payment Applications?

19   A.   Yes.

20   Q.   Okay.

21   A.   So Exhibit 656, Appendix F.

22   Q.   You want to look at Section 2f and Appendix F, right?

23   A.   Yes.

24   Q.   Let's first go to -- first explain to me -- to the

25   Court why you wanted to look at payment applications?  In

1    other words, why does looking at the payment requisitions

2    factor into your overall actual hours analysis?  Why do

3    you want to do that?

4    A.    Sure.  So the daily logs clearly indicated to us

5    there was work going on in Phase 3 as well as other areas.

6    The weekly foreman reports also indicated there was work

7    going on in other areas.  We wanted to look at the payment

8    requisitions to see how much work was approved during that

9    period in certain areas.  So we took a look at the pay

10   req. that ended the end of June and we took a look at the

11   pay req. that ended the end of August to see how much work

12   was completed in different areas during that time period.

13   Q.    Are those requisitions attached as Exhibit F to your

14   Appendix F to your report?

15   A.    Yes, they are.

16   Q.    Okay.  Now, in the second paragraph of your report

17   2f, you do an analysis about the completion of the work as

18   of the beginning of Phase -- or July 1st and at the end of

19   August 31, do you see that?

20   A.    Yes.

21   Q.    First, what did you do and why?

22   A.    Sure.  So I wanted to see where Phase 3 was at the

23   end of June and then where it was at the end of August,

24   which is this claimed period that we're speaking of and

25   just comparing the two payment requisitions.  At the end

1    of June, Phase 3 was about 15 percent complete and at the

2    end of August, it was 99 percent complete.

3    Q.    Okay.

4    A.    When I say "complete," billed out in the requisition.

5    Q.    And the requisitions are attached as Exhibit F.  What

6    did you have to do to make that determination?

7    A.    Sure.  The requisition will show gross amount of

8    approved to date per line item within the requisition.  So

9    we subtracted the gross amount approved in the August

10   requisition from the gross amount approved in the June

11   requisition per line item.

12   Q.    Okay.  And is Phase 3 work specifically delineated in

13   the application for payment?

14   A.    Yes.

15   Q.    And is Phase 3 labor specifically delineated in the

16   application for payment?

17   A.    Yes.

18   Q.    Okay.  Maybe if you could just show the Court on

19   Application Number 5, which is the first application.

20         I seem to recall I went over this with another

21   witness, Your Honor, but if I'm having trouble remembering

22   it, maybe you are too.  I want to make sure you see it.

23         Application Number 5?

24   A.    Application Number 5 is in our Appendix F.

25   Q.    Yes.  At the top right there are pages 1 of 7, 2 of

1    7, 3 of 7.

2    A.    Yes.

3    Q.    If you go to page 4 of 7, does it indicate a phase?

4    A.    Sure.  And within the other pages as well.  So if you

5    look at line 77, Phase 3, and it gives all the Phase 3

6    line items that are being billed out.  And if you continue

7    down in the requisition, line 116, you'll see Phase 4

8    West, 149, Phase 4 East.  So it breaks it down per area.

9    Q.    Okay.  And within each area does it break it down,

10   the various labor items and material items?

11   A.    Yes.  So furthermore -- and I'm just back on line 17,

12   Phase 3 -- you'll see some of the line on breakdowns,

13   they'll have branch wire material, and then they'll have

14   branch conduit labor, branch wire labor.  So you could see

15   how much labor was billed out over this period.

16   Q.    And did you use these codes or these items to figure

17   out the percentage complete?

18   A.    Yes, I did.

19   Q.    Okay.

20   A.    So in the far -- you're going to see a Column G in

21   the requisition.  Between G and H there's a percentage.

22   Q.    Yes.

23   A.    That's the total percentage billed out as of that

24   period of time.

25   Q.    For each line item?

1   A.   Yes.

2   Q.   Okay.

3   A.   And G is the total completed and stored to date per

4   line item.

5   Q.   You have to go through all those line items and come

6   up with a general percentage of the total project for

7   Phase 3 completed?

8   A.   Yes.  So that shows total amount completed.  And what

9   we did on our cover sheet in Appendix F is subtracted one

10  from the other and you could see the amount completed per

11  line item.

12  Q.   Okay.  So now you're looking at, say, for example,

13  the first page of Exhibit F?

14  A.   Yes.

15  Q.   Okay.  And for what phase of the work is this first

16  page related to and how do I know that?

17  A.   Sure.  So this consists of two pages which are all

18  the items that were billed during this period.  But the

19  first page shows the site work and the line item

20  associated with it.  Then it has Phase 2 items and the

21  line item associated with it.  So you can see that between

22  site work and Phase 2, there was 1.1 million in revenue.

23  Q.   Okay.  So you just looked at the amount billed at the

24  end of August versus the amount billed at the end of June

25  and you have the two months of billing, correct?

1   A.   That's correct.

2   Q.   So for Phase 2 and site, there's a column Value of

3   Work for July and August, that 1.141237 is the total for

4   Phase 2 and site work?

5   A.   Yes.

6   Q.   Underneath that there's a number.  What does that

7   relate to?

8   A.   That's the total amount of that requisition.  So the

9   one million six ninety would have been the total amount

10  billed for those two periods.

11  Q.   For all phases?

12  A.   For all phases.

13  Q.   Staying on that page, I noticed that there is labor

14  and material included in the requisition, correct?

15  A.   That's correct.

16  Q.   And just eyeballing this a little bit, it looks like

17  for site and Phase 2 there's an awful lot of material

18  being billed between July and August, see that?

19  A.   That's correct.  On Phase 2 there was a lot of

20  material billed.

21  Q.   Okay.  So as -- okay.  What I want to do is not

22  mislead the Court.  If you take a look at Phase 3 work,

23  the next page?

24  A.   Yes.

25  Q.   Okay.  Explain to the Court what this shows.

1    A.    Sure.  This is the total amount of work that was

2    billed out on Phase 3 during the summer months of July and

3    August.

4    Q.    Okay.  And that includes also -- there's no

5    description for some reason in this, but that relates to

6    labor and material as well?

7    A.    It does.

8    Q.    So 509,000 -- and the total requisitions for that

9    period were 1.6 million, right?

10   A.    That's correct.

11   Q.    But was more labor billed in Phase 3 than in

12   non-Phase 3 work during that period?

13   A.    Excuse me?  Repeat that.

14   Q.    During the period of July and August --

15   A.    Yes.

16   Q.    -- I'm looking at these two and it looks like, you

17   know, Phase 3 billing is about half as much of the

18   non-Phase 3 billing?

19   A.    That's correct.

20   Q.    But that's labor and material, correct?

21   A.    That's correct.

22   Q.    Now, if you break this down some more, was there more

23   Phase 3 labor during those two months than Phase 2 labor?

24   A.    There was.

25   Q.    Okay.

1   A.   Look at the individual line items, there's going to

2   be more labor in Phase 3 than Phase 2.

3   Q.   And approximately percentage-wise of 100 percent of

4   labor during that period of time, approximately -- did you

5   do a calculation as to approximately what percentage of

6   labor was Phase 3 and then non-Phase 3?

7   A.   That's exactly what we did.  It was about 75 percent

8   of the labor was associated with Phase 3, and 25 percent

9   of the labor was associated with other phases other than

10  that Phase 3.

11  Q.   The Court shouldn't be misled, the fact that even

12  though a lot more billings were occurred on non-Phase 3

13  work, the actual labor for Phase 3 was more?

14  A.   That's correct.

15  Q.   Okay.

16  A.   That's correct.

17          THE COURT:  Just a question on the numbers.  So,

18  again, on Exhibit F you've got the total billings for

19  Phase 2 and site work at 1.141, roughly?

20          THE WITNESS:  Yes.  Excuse me, Your Honor,

21  that's the difference between -- yes, total billings,

22  that's correct.

23          THE COURT:  I thought that's total billings or

24  the value of work for July and August.  And then complete

25  and stored to date, you've got 1,690,562, what's that?

1          THE WITNESS:  That would add in the next page.

2    The 509,430.

3          MR. HUG:  This is construction speak,

4    Your Honor, a little bit.

5    BY MR. HUG:

6    Q.   Maybe what you can do is kind of explain this pay

7    requisition, completed, stored to date, and try to break

8    it out in non-construction speak.

9    A.   Sure.  So the first page is I'll call it the

10   non-Phase 3 work that was billed out on that line item.

11   Q.   All right.

12   A.   The second page is the Phase 3 work that was billed

13   out.

14   Q.   The value of work -- the value of work, I know that's

15   a construction term, right?

16   A.   Value of work is a construction term.

17   Q.   What does it mean, though?

18   A.   It's the value -- in this particular case, it's the

19   value of work completed or stored material that's been

20   paid for to date.

21   Q.   And billed?

22   A.   And billed and approved.

23   Q.   Not necessarily approved, but billed.

24   A.   And billed.

25   Q.   All right.  Non-construction speak, it's the amount

 1    invoiced for those two months?

 2    A.   That's correct.

 3    Q.   Okay.  And that 509,430 is that the amount invoiced

 4    for Phase 3 for July and August?

 5    A.   Yes.

 6    Q.   Okay.

 7              MR. HUG:  Does that answer your question,

 8    Your Honor?

 9              THE COURT:  I guess in part.  I was wondering,

10    is that supposed to add up, combined with the Phase 2 and

11    the site work, to the complete and stored to date?

12              THE WITNESS:  It should.

13              THE COURT:  Can you do the math on that and tell

14    me if it adds up?

15              THE WITNESS:  It does not.  I just did the math

16    and it's off by about 40 grand less.

17    BY MR. HUG:

18    Q.   Can that be explained by general conditions and

19    other --

20    A.   I believe that it would be in the general part --

21    might be general conditions that was being billed out.

22    Q.   If you take a look at Application Number 5, if you

23    look at line items 1 through 31 --

24    A.   Your Honor, it appears lines 1 through 12, which are

25    like general items on the payment requisition, we didn't

1    summarize those, but those were other areas that were

2    billed out.

3               THE COURT:  That would account for the

4    difference?

5               THE WITNESS:  That would account for the

6    difference.

7               THE COURT:  Mr. Hug mentioned on the second page

8    of that exhibit that there's a lack of description for the

9    Phase 3 work.

10              THE WITNESS:  Yes.  I actually have that

11   description here.

12              THE COURT:  Well, but it sounds like -- and just

13   refresh me, the claim is that about 75 percent of the

14   Phase 3 work that was billed here was labor?

15              THE WITNESS:  That's correct.

16              MR. HUG:  Of the total of both pages.  And

17   25 percent non-Phase 3.

18              THE COURT:  All right.

19   BY MR. HUG:

20   Q.   So if you look at the first two pages of Exhibit F

21   and G.  So looking at the amount of labor billed for

22   Phase 3 and labor billed for Phase 2, what's the

23   percentage difference?  Again, just to make sure it's

24   clear.

25   A.    Phase 3 was 75 percent of the labor in that period.

1    And non-Phase 3 was 25 percent.

2    Q.   And that's really not anything more than mathematics,

3    is it?  It's not really much of an analysis by you, it's

4    just mathematics?

5    A.   Just math.

6    Q.   And to be very clear, you've rounded to 25 percent,

7    it's a little bit slightly a little off of that?

8    A.   I believe it was 23 point something was the

9    non-Phase 3 and around 75 percent was Phase 3.

10   Q.   Okay.

11          MR. HUG:  Do I have ten minutes, Your Honor,

12   maybe five minutes?  Or do you want me to end right at

13   5:00?  I'm finishing this area, I just have one little

14   thing to do, but it might take a couple of minutes.

15          THE COURT:  Ten minutes is fine.

16          MR. HUG:  Thank you, Your Honor.

17   BY MR. HUG:

18   Q.   Sir, now I've seen you do analysis of -- you've

19   explained to the Court your baseline analysis.  Your

20   actual hours analysis for certified payroll daily reports

21   and payment reqs.  At this point in time, in the context

22   of your overall analysis, do you do sort of a

23   does-this-make-sense approach?

24   A.   Yeah, absolutely.

25   Q.   Okay.  And we've thrown a lot of numbers out as to

1  number of hours worked on Phase 2 or non-Phase 3 work and

2  percentage of work that was during Phase 3 and during the

3  two months.  Have you done any sort of a back analysis of

4  how all this seems to work together?

5  A.    Right.  I did a couple I call them sensibility tests

6  on the analysis.

7  Q.    Okay.  Could you take the Court through that

8  sensibility test?

9  A.    Sure.

10       First, as we stated, we kind of try to give ECI the

11  benefit of the doubt with some of the hours going through

12  our analysis.  Rather than state this was definitely

13  Phase 3, we said this was not Phase 3 so we could see

14  clear documentation of it not being Phase 3, we took that

15  out.  So the 2,028 hours that we took off through the

16  daily logs seemed to be confirmed through the foreman's

17  working reports where he documented 1800 and it clearly

18  could have been more in there.

19            THE COURT:  The weekly reports.

20  A.    The weekly reports.  Daily showed about 2,000.  His

21  showed about 1800, but I think that could have been higher

22  if more forms were filled out to the fullest.  So then we

23  look at the payoff analysis, and I'm like, okay, well,

24  definitely other labor was spent in other areas and looks

25  like a 75/25 split.  That kind of lines up with the first

1    few things we looked at.

2         So I kind of took it one step further and I said,

3    okay, well, the claimed hours -- and I'm looking at my

4    Section 2, chart on Section 2.

5              THE COURT:  Still on Exhibit 656?

6    A.   656 Section 2.  There's a chart there that breaks

7    down ECI's claim.  It's titled ECI's Budget Hours vs.

8    ECI's Actual Hours.

9              MR. HUG:  It's the one where he made a couple of

10   typo changes, Your Honor.

11             THE COURT:  All right.

12   A.   So on that, the first section is the alleged impact

13   on cost codes.  ECI's total hours alleged was 13,240.  So

14   I said, okay, if you take 25 percent off of that, or

15   moreover say 75 percent is associated with Phase 3, I had

16   about 9900 -- excuse me, 9930 is 75 percent of the 13,240.

17   So maybe that's what ECI's claim should have been.

18   BY MR. HUG:

19   Q.   Okay.  How does that relate to any other number that

20   you've seen in this whole analysis you've done?

21   A.   Sure.  Well, then I was trying to compare that to

22   kind of what Caprio had for a number.  And he had 10,347.

23   Q.   What did he have for the impacted hours?

24   A.   Total.  And the impacted hours he had 8,957.

25             So if I took the 9,930 less Caprio's estimate of the

1    impacted hours of 8,957, we had 973 hours of potentially

2    impacted hours.  So that was kind of like I'll call it

3    sensibility test number one.

4        I then kind of looked at, okay, they're claiming the

5    66,630, and I did two things to that number.  I said,

6    okay, let's take off what Caprio feels that's impacted or

7    what he feels the baseline should have been, as we can see

8    on the next page --

9              THE COURT:  I'm sorry, where is the 66,230?

10             THE WITNESS:  On the first page, Section 2.

11             MR. HUG:  The table that you edited, Your Honor.

12             THE COURT:  I've got it.

13             THE WITNESS:  Middle of the page.  6,963.

14             MR. HUG:  Last column.

15             THE COURT:  Got it.

16   A.   This is ECI's current claim for impacted hours.  So

17   in the conclusion of this report, I adjust that in two

18   ways.  I said, okay, Caprio feels that their baseline was

19   off by 3900 hours.  So I took the 39, which is on the next

20   page, 3903 off of that.  And the second thing I did to

21   that number was I subtracted the 2,028, which was the

22   hours from the daily report analysis that I did that

23   showed they worked in other areas.  And doing that math,

24   it's in the back of my report.

25

1  BY MR. HUG:

2  Q.   That's the last page of your narrative?

3  A.   Yes.

4      That comes out to 1,032.77 of potentially impacted

5  hours.  So the two of them kind of talk to each other,

6  both reviewing a daily log review and then a payout review

7  of the work they got completed.

8  Q.   So did you go about seeking this type of result when

9  you were doing this analysis?

10  A.   No.

11  Q.   Just how it worked out?

12  A.   It's how it worked out.  Try to analyze the actual

13  hours worked during the impacted period and try to see

14  what was associated with Phase 3, what was not.  I feel we

15  definitely gave ECI the benefit on hours as far as what

16  was worked on Phase 3 based on our review of the daily

17  logs, and that is what it resulted.

18  Q.   Does this cause you to be more or less comfortable

19  with Mr. Caprio's estimate?

20  A.   I think more comfortable.

21  Q.   Okay.

22          MR. HUG:  Your Honor, that's the end of a line

23  of questioning for me.  And I think I exhausted the time I

24  requested.

25          THE COURT:  Great.

1          One question.  Looking at page 9 of your

2     conclusion, if the Court were not to credit Caprio, would

3     that result in a potential impacted hours of 1,032 plus

4     3,903?

5                THE WITNESS:  Yes.

6                THE COURT:  I know you have faith in Caprio, but

7     if the Court were to simply conclude that his testimony

8     was unreliable, then that would still mean a lower

9     potential impacted hours, but not as low as you're saying?

10               THE WITNESS:  That's correct.  That's correct.

11     BY MR. HUG:

12     Q.   That's potential impacted hours, correct?

13     A.    That's potential impacted hours.  So I understand

14     there was other testimony on the whole entitlement of the

15     claim itself.

16               THE COURT:  Okay.  Looks like we're out of time

17     today.  Thank you.  And so we will start tomorrow -- we

18     have been start starting at 8:00 a.m.  Do you want to the

19     try 8:30?

20               MR. HUG:  Your call, Your Honor.

21               THE COURT:  We've got issues with timing and all

22     that for tomorrow.

23               MR. HUG:  What time is your jury coming in?

24               THE COURT:  They'll be coming in at 8:30, so I

25     suspect we wouldn't hear from them for a while.

1            MR. HUG:  Do you need to meet with them

2   beforehand?

3            THE COURT:  I don't.  We can go off the record.

4                 (Discussion off the record.)

5            THE COURT:  We will stand in recess.  Thank you.

6                 (Proceedings adjourned at 5:05 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4


5    RE:  ELECTRICAL CONTRACTORS, INC. v. THE PIKE COMPANY

6                    No. 3:11CV449(JAM)

7

8


9            I, Diana Huntington, RDR, CRR, Official Court

10   Reporter for the United States District Court for the

11   District of Connecticut, do hereby certify that the

12   foregoing pages are a true and accurate transcription of

13   my shorthand notes taken in the aforementioned matter to

14   the best of my skill and ability.

15

16

17

18

19                        _____
                                /s/

20                    DIANA HUNTINGTON, RDR, CRR
                        Official Court Reporter
21                   United States District Court
                     915 Lafayette Blvd., Room 423
22                   Bridgeport, Connecticut 06604
                            (860) 463-3180
23

24

25