UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                 :
ELECTRICAL CONTRACTORS, INC.,    :  No. 3:11CV1449(JAM)
                                 :
              Plaintiff          :
                                 :
         vs.                     :
                                 :
THE PIKE COMPANY,                :
                                 :  Bridgeport, Connecticut
              Defendant          :  July 25, 2014
                                 :
- - - - - - - - - - - - - - - - x


BENCH TRIAL
VOLUME VII


B E F O R E:

     THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


A P P E A R A N C E S:

     FOR THE PLAINTIFF:

          MICHELSON KANE ROYSTER & BARGER
               Hartford Square North
               10 Columbus Blvd.
               Hartford, Connecticut 06106
          BY:  STEVEN B. KAPLAN, ESQ.

     FOR THE DEFENDANT:

          ROBINSON & COLE
               280 Trumbull Street
               Hartford, Connecticut 06103-3597
          BY:  CHRISTOPHER J. HUG, ESQ.
               DEBORAH A. VENNOS, ESQ.


                              Diana Huntington, RDR, CRR
                              Official Court Reporter

1                        <u>TABLE OF CONTENTS</u>

2

3    DEFENDANT'S                                                VOIR
     WITNESS           <u>DIRECT</u>  <u>CROSS</u>   <u>REDIRECT</u>  <u>RECROSS</u>  <u>DIRE</u>

4    DENNIS O'NEILL
5      By Mr. Hug         1320
       By Mr. Kaplan             1386
6      By Mr. Hug                         1431
       By Mr. Kaplan                                 1438
7
     RICHARD MERKHOFER
8      By Mr. Hug         1443
       By Mr. Kaplan             1481
9
     WILLIAM LYNCH
10     Deposition played  1494

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **8:30 A.M.**

2              THE COURT:  Please be seated.

3              MR. HUG:  First of all, Your Honor, my witness

4    was here on time, but he packed a paper that he needs in

5    his other bag in his car.  He just left the courtroom, I

6    told him run down grab it.

7              THE COURT:  No worries.  Okay.

8              MR. HUG:  It should be five minutes.  A matter

9    of getting through security.

10             MS. VENNOS:  Your Honor, if I may, we conducted

11   a couple of video depositions outside of court in order to

12   save some time.

13             THE COURT:  Great.  I guess maybe we should

14   stop.  If we're going to talk business, maybe I should

15   have appearances, if that's okay.

16             We'll start today in Electric Contractors vs.

17   Pike Company.  May I have appearance of counsel, please?

18             MR. KAPLAN:  Yes, Your Honor.  For the

19   plaintiff, Steve Kaplan, from Michelson Kane Royster &

20   Barger.

21             THE COURT:  You're here with?

22             MR. KAPLAN:  Mr. Flynn, Vice President of ECI is

23   here.

24             THE COURT:  Okay.

25             MR. HUG:  Christopher Hug of Robinson & Cole on

 1   behalf of the Pike Company.

 2           MS. VENNOS:  Deb Vennos, Robinson & Cole, on

 3   behalf of the Pike Company.

 4           THE COURT:  Ms. Vennos, you may continue.

 5           MS. VENNOS:  We conducted a couple depositions

 6   outside of court.  At one of the depositions an exhibit

 7   was offered and there was no objection to its admission.

 8   We just want to get it on the record that Your Honor's

 9   okay with that being admitted, Exhibit 536.

10           THE COURT:  So it's Exhibit 536 to the

11   deposition of --

12           MR. HUG:  Gary Schnip's deposition.

13           THE COURT:  Was this the deposition that was

14   conducted yesterday morning?

15           MS. VENNOS:  It was the day before.

16           THE COURT:  You're intending to put this

17   deposition in as a trial exhibit?

18           MS. VENNOS:  Yes, Your Honor.

19           THE COURT:  Is the transcript or video coming?

20           MS. VENNOS:  That was one thing we wanted to ask

21   Your Honor, how you wanted to handle that in terms of

22   getting the transcript and video to Your Honor, one of the

23   videos we might play today if we have time.

24           THE COURT:  Sure.  Well, I think it's fine to

25   file them formally as exhibits --

```
 1              MS. VENNOS:  Okay.

 2              THE COURT:  -- with the Clerk of Court.

 3              MS. VENNOS:  Okay.

 4              THE COURT:  And assuming there's no objection to

 5  that, both sides are fine with that, it certainly would be

 6  fine with me.

 7              MS. VENNOS:  Okay.

 8              THE COURT:  Then with respect to that one

 9  exhibit, I assume there's no objection to that exhibit?

10              MR. KAPLAN:  Correct, Your Honor.

11              THE COURT:  536.  I would assume that any

12  exhibits that were shown in the depositions that you're

13  entering also come in along with the deposition

14  transcript.  Maybe I don't need to make special provision

15  for that one exhibit, but if you could submit those

16  accompanying exhibits as well, that would be great.

17              MS. VENNOS:  As far as timing, when would

18  Your Honor like to have the transcripts and the videos for

19  your consideration?

20              THE COURT:  Well, I'm not here next week so I

21  think at some reasonable time.  I would not go ordering

22  expedited production of that if that's going to cause

23  additional cost to the parties.  I would do it the least

24  expensive way, because it will be some time, especially in

25  light of the fact I know we're going to be at some point
```

1    discussing post-trial briefing schedule and the like as

2    well.  Take your time is really what I'm saying.

3              MS. VENNOS:  Thank you, Your Honor.

4              MR. HUG:  While we have a couple extra minutes,

5    maybe it would be appropriate to talk about post-trial

6    briefs.  Attorney Kaplan and I have spoken that 30 days

7    following the receipt of the transcript.

8              THE COURT:  That would be fine.

9              MR. HUG:  I can't remember what we talked about,

10   if we talked at all about replies.

11             MR. KAPLAN:  I would defer to the Court's

12   request, but my inclination, given the history of the

13   case, would be that we just submit simultaneous briefs and

14   call it a day at that point.  Unless the Court --

15             THE COURT:  I actually would benefit from having

16   a reply.  I don't mean to run up the expenses here, but

17   this is very complex material, you know.  I don't come

18   into this, as you know, having done a large number of

19   construction litigation cases.  Both counsel in this case

20   are obviously expert in this area, all counsel in this

21   case, so I would say that it would be helpful for me for

22   the parties to file replies, if they wish to, if they

23   think it's warranted.  If they think it's not warranted,

24   they can do that as well.  I don't want to make a mistake

25   about my interpretation of an exhibit without having

1     received that reply and only then to hear that I made a

2     mistake about it in some sort of motion for

3     reconsideration.

4               MR. KAPLAN:  Fourteen days after?

5               MR. HUG:  Close.  I was going to suggest 21.

6               THE COURT:  Twenty-one is fine.

7               MR. KAPLAN:  Okay.

8               MR. HUG:  We'll probably -- somehow we'll give

9     notice to the Court so we have agreement as to when the

10    transcript is in and Your Honor can docket when you want

11    briefs.

12              THE COURT:  Very helpful.  That would be great.

13              MR. HUG:  That's it for administration.

14              We talked briefly that if Your Honor wanted any

15    further argument on this --

16              THE COURT:  I would call you.  I think I would

17    like to see the briefing, but then I would call you, if

18    that's okay.

19              MR. HUG:  Okay.  We're hopeful that we can, as

20    soon as my witness gets here --

21              THE COURT:  Okay.

22              MR. HUG:  -- we can get done today.

23              THE COURT:  I'm hopeful, too.  Obviously we have

24    the jury in the other case that's just begun their

25    deliberations.  If that jury comes back with a verdict

 1    today, I don't know that they will, but if they do come

 2    back, obviously I need to take a break to handle that.

 3    And that would, I would anticipate, take some considerable

 4    amount of time in light of the fact that there are complex

 5    jury verdict forms and my practice to meet with the jurors

 6    and thank the jurors afterwards.  I would think at a point

 7    in time if there does end up being a verdict in that case,

 8    it's basically an hour of lost time.

 9            MR. HUG:  I have a witness coming at 10:00 and a

10    witness coming at 12:00.  I'm expecting not much further

11    with Mr. O'Neill.  And Mr. Merkhofer will be here at

12    10:00, probably won't start at 10:00.  And then

13    Mr. Strauss I'm presently intending to have him at noon,

14    but I'll give him an update at the first break.  That's

15    the way that I plan to proceed.

16            THE COURT:  Attorney Hug, I wanted to make sure

17    there wasn't a misunderstanding.  As you see at times I

18    ask questions of the witness and I'm not trying to disrupt

19    your presentation with respect to the witness.  When we're

20    on very specific pages at times I feel like I need to have

21    the witness clarify something because if I were to wait

22    until the end of your examination or the termination of

23    cross-examination, I feel I would not be able to logically

24    come back to that exhibit.  I hope you're not troubled by

25    the fact that I'm asking questions of a witness.

1          MR. HUG:  Not at all, Your Honor.  I think

2   probably Mr. Kaplan feels the same.  That actually gives

3   us a clue of you're not sure about -- particularly the

4   technical part.  There's understanding the facts and the

5   opinions, but there are certain -- in this case there's a

6   lot of just background that Your Honor may not have, it

7   appears maybe the level of detail that you don't have.

8          THE COURT:  Okay.

9          MR. HUG:  That's helpful.

10         THE COURT:  I want to let you know that.  I

11  won't ordinarily to that if it were a jury case or

12  something like that.  In this case, I feel it's probably

13  most helpful to follow up immediately.

14         MR. HUG:  Thank you for your courtesy.

15         THE COURT:  Please proceed.

16

17              DENNIS O'NEILL,

18      a witness, having been previously duly sworn,

19      was examined and testified further as follows:

20

21          CONTINUED DIRECT EXAMINATION

22  BY MR. HUG:

23  Q.   Mr. O'Neill, all set?

24  A.   All set.

25  Q.   You didn't find your annotated copy of your latest

```
 1    report though?

 2    A.   I did not, no.

 3              THE COURT:  Mr. O'Neill, I trust you know you're

 4    still under oath.

 5              THE WITNESS:  Yes.

 6    BY MR. HUG:

 7    Q.   We left off yesterday talking about baseline analysis

 8    and actual hours, which is up on the board here.  I'd like

 9    to turn to one of the other topics you reviewed in your

10    report, that would be wage rates.  Did you do any analysis

11    of the wage rates?

12    A.   Yes, we did.

13    Q.   Turning to Exhibit 656, where does your analysis

14    begin on wage rates?

15    A.   Sure.  It's Section 2d.

16    Q.   All right.  And that appears on page 5 of my copy,

17    which I think is the same as the Court's.

18         There is also an exhibit that goes with that that is

19    attached to your report or appendix?

20    A.   Yes.

21    Q.   That would be Appendix D?

22    A.   Yes.

23    Q.   Okay.  And then you make references to that appendix

24    in your report.  Okay.

25         With that in front of you and hopefully in front of
```

1    the Court, could you go through your analysis of ECI's

2    wage rate beginning with what you did and why you did it?

3    A.   Sure.  So within ECI's claim, they're carrying a rate

4    of $81.46 per hour for the labor.  To kind of check that

5    rate, this is a prevailing wage job municipal project.  We

6    just wanted to check the prevailing wage rate for that

7    class of workers in this area.  We went to some of the

8    information from the state and obtained information on

9    wage rate which came out to -- the wage rate consists of

10   your base wage for labor plus fringe benefit, so that came

11   out, the state records for 2010, for this area, $35.40 for

12   the base wage plus $19.51 for the fringe, for total of

13   $55.91.

14   Q.   All right.  And did you -- take us through your

15   analysis using Appendix D as to how you reached your

16   conclusions in this matter.

17   A.   Sure.  So in my Section 2d, kind of stepped through

18   it, but the first thing we did was, if you look at

19   Appendix D1.

20   Q.   That's D page 1?

21   A.   Yes.  It's also Clauson 509.

22        Okay, this appears to be a breakdown sheet from ECI

23   which shows the number of hours in their base bid, 7593

24   and cost associated with that, 426,208.

25   Q.   How do you come up with 425,208?

1    A.    The 425,208, this is out of Clauson 509 and it's the

2    dollars they associated with the hours for looks like the

3    base Phase 3.  Top left corner it says Phase 3.  Dividing

4    one by the other, 425,208 by the hours, 7,593, comes out

5    to $56 an hour.

6    Q.    What did you do next?

7    A.    So in D2 -- and this is a document from the state

8    noting prevailing wage, we looked at the prevailing wage

9    rate which is $55.91 per hour, which includes the fringe

10   benefit.

11   Q.    What page does that appear on?

12   A.    That is Appendix D2.

13   Q.    And what page of that document is it on?

14   A.    Third page in.

15   Q.    Okay.

16   A.    Middle of the page.  Item 6.  Electrical Worker.

17   Q.    Is there a circle around it in your copy?

18   A.    There is, yes.

19   Q.    Hopefully in the Court's copy.

20   A.    This would be for the journeyman rate.

21   Q.    Why is that important in your analysis?

22   A.    Because -- and this is typical with any electrical or

23   project like this.  You'll have a foreman rate, which

24   might be a dollar or two higher, apprentice rate, which

25   would be substantially less, usually about 15 to $20 less

1    an hour.

2    Q.    Okay.

3    A.    And those are noted on the certified payrolls, those

4    rates.

5    Q.    What did you to next?

6    A.    Next we just looked at what burden that -- employer

7    burden you would have on top of that rate, which includes

8    FICA, Medicare, SUTA, these are employer taxes that would

9    have to be paid, we call it the burden.

10   Q.    Okay.

11   A.    And ECI has a document, it's just following that

12   section.

13   Q.    Is that also known as Clauson 514 and appears after

14   the prevailing wage information?

15   A.    That's correct.   Clauson 514.

16         As you can see that first document going left to

17   right is Kelly Middle School, it's their labor for the

18   month of June 2010.   And it has a burden rate there of

19   12,391.64.

20   Q.    Is this a document you prepared?

21   A.    No.   This is from ECI's accounting system.

22   Q.    In fact, you see JC Cost by Category, and on the top

23   left Electrical Contractors, Inc.?

24   A.    That's correct.

25   Q.    And these are some of the documents you received to

1   review?

2   A.   Yes.

3   Q.   Okay.  All right.  So, if I understand this

4   correctly, ECI is identifying its own labor burden?

5   A.   That's correct.

6   Q.   Continue on.

7   A.   This is the month of June, this first sheet.

8        The next sheet is the month of July.

9        The next sheet is August.

10       September.

11       October.

12  Q.   And why did you look at all of them?

13  A.   We looked at all of them to see what they were

14  carrying for burden for each one of those months against

15  gross labor.  And on our chart, going back to our report

16  in Section 2d --

17  Q.   That's on page 6?

18  A.   Page 6.

19  Q.   There's a chart in the middle of the page, what does

20  that show?

21  A.   We summarized their information off of their sheet,

22  which is the gross labor and the burden amount, and came

23  up with a percentage of burden to wages.  Which, as you

24  can see, was 11 percent for June; 12 percent for July;

25  August, 11 percent; September, 10; October, 8.  And

1    there's an average of 11 percent.

2    Q.   What did you do with that labor burden percent?  How

3    does that factor into your analysis?

4    A.   Sure.  So we took the prevailing wage rate, which we

5    had at 55.91.  On the certified payrolls, however, they

6    were paying 56.16, slight adjustment.  We took that rate,

7    it seemed reasonable, and added the 11 percent to that.

8    Q.   Okay.  And is that shown in one of the paragraphs,

9    two paragraphs below the table?

10   A.   Yes, that's correct.

11   Q.   So 56.16 plus 11 percent?

12   A.   Or $6.18.

13   Q.   That came out to what?

14   A.   $62.34.

15   Q.   Was that the end of your inquiry?

16   A.   No.  Then we determined there's typically an overhead

17   and profit on a rate, so we added 10 and 5, 10 percent

18   overhead, 5 percent profit, which is typical in

19   construction for something like this.  So $9.35 on top of

20   that.

21   Q.   Do you know what ECI's overhead and profit rate was

22   for this job?

23   A.   Yes.

24   Q.   Okay.  What was it?

25   A.   Zero, according to their bid summary sheet.

1   Q.   So, in other words, they had no -- there was nothing

2   in the project documentation that indicated what their

3   overhead and profit was?

4   A.   No.  Their bid summary sheet had hours, material, and

5   it came to the bid amount.

6   Q.   So you're using 15 percent.  Why?

7   A.   For change order work, it's typical in construction

8   you have 10 and 5 is a typical markup you have for change

9   order work.

10  Q.   Okay.  So go over the math with the Court.

11  A.   Sure.  We started out with the 56.16, which they were

12  paying for prevailing wage rate, 11 percent for burden,

13  and another 10 percent and 5 percent for overhead.  Came

14  to a total of $71.69.

15  Q.   I'd like to back up a second.  This issue of labor

16  burden, are there different ways to look at labor burden

17  and does it vary by employer to employer, in your

18  experience?

19  A.   Yes, it could.

20  Q.   Okay.  In this particular case, you're using what ECI

21  has said is their labor burden; is that right?

22  A.   Yes.

23  Q.   Did that end your analysis of concluding that 71.69

24  was more appropriate rate or did you do anything further?

25  A.   The 71.69 we felt was an appropriate rate for that.

1   We did look at what they were paying the subcontractors.

2   Q.   What did you do and what did you look at and what did

3   you conclude?

4   A.   It appeared the subcontractors rates were roughly in

5   line with that 71.69.  But secondly, there was potentially

6   some rates below the prevailing wage rate looking at that.

7   Which could conclude that those subcontractors were

8   strictly providing apprentices at a lower wage rate.

9   Q.   Okay.  Let's take a look at Exhibit E for the moment,

10  and I want to really actually skip over the first page of

11  Exhibit E.

12        Exhibit E, Your Honor, is one of the ones that we

13  disputed earlier.  This is where the typo issue began.

14  The typo issue has gone away and he'll explain why,

15  because it's just become irrelevant.  So that portion of

16  this document that would suggest this is for a phase other

17  than Phase 3, it goes away.  But there's still other

18  relevant information on here relative to the rate.

19             THE COURT:  I have a question just about the

20  wage rate comparator information that you have there.

21             THE WITNESS:  Yes.

22             THE COURT:  I don't know if you were about to

23  get into that for other firms.

24             MR. HUG:  With the subcontractors?

25             THE COURT:  Yes.

1          MR. HUG:  The next pages, that's exactly where

2     I'm going.

3          THE COURT:  Great.

4     BY MR. HUG:

5     Q.   Sir, the first page of Appendix E?

6     A.   Yes.

7     Q.   Explain to the Court what that document is.

8     A.   Sure.  We summarized the subcontractor invoices to

9     ECI and just noted the hours they were billing.  Sometimes

10    you could tell per week what they were billing, sometimes

11    it was monthly they were billing.  Rarely was it daily.

12    It's kind of summarized there.  Hours they were billing,

13    invoices they were billing ECI, try to come up with the

14    total hours.  We noted the rate they were billing them.

15    And that's what this document is here.

16         MR. KAPLAN:  Point of clarification, I'm sorry

17    to intercede.  Is the witness referring to the sheet, the

18    cover sheet at Tab E?

19         MR. HUG:  I have to make sure of that, that he's

20    doing that.

21    BY MR. HUG:

22    Q.   Is that a document you repaired or is that a document

23    prepared by ECI?

24    A.   This is an ECI document.

25         MR. KAPLAN:  Thank you, Mr. Hug.

 1   BY MR. HUG:

 2   Q.   When you say you summarized it, you did your summary

 3   of it?

 4   A.   Yes, we looked at that.

 5   Q.   And that summary, is that shown on your table on the

 6   bottom of page 6 of the wage rates?

 7   A.   Yes, that's correct.

 8   Q.   And it was confusing on that.

 9        But if I look on the first page of Exhibit E, you see

10   the rate, there's a column called Rate?

11   A.   Yes.

12   Q.   Does that just show the rates that were charged?

13   A.   Yes.  Those are the rates from the invoices.

14   Q.   Let's go to the next page and that's an invoice.  Can

15   you explain to the Court, first of all, how to read this

16   and how you gleaned the rate from it?

17   A.   Sure.  So this is an invoice from All Brite Electric

18   to ECI for the Kelly Middle School and they're noting

19   quantity, that's hours.  And they note journeyman at a

20   rate of $69.50 per hour, apprentice at $60 an hour, and

21   the total rate they charged them.

22   Q.   In your summary on page 6, I note you use the higher

23   of the two rates?

24   A.   Yes.

25   Q.   Now, this, as you understand it, is an invoice to ECI

 1   from All Brite?

 2   A.   Yes.

 3   Q.   Is there tax also added to that?

 4   A.   Yes, there is tax added to this one.

 5   Q.   Does the addition of tax actually increase the

 6   invoice slightly?

 7   A.   That would slightly increase it.

 8   Q.   Does that change your opinion at all?

 9   A.   No.

10   Q.   Okay.  So if I go through just the next page, is it

11   the same -- well, that's also All Brite.

12        If I go to the next contractor, C & M Electrical,

13   just explain to the Court, I think, how to read this as

14   well.

15   A.   Sure.  C & M Electrical to ECI, their invoice.  They

16   note the days that the particular labor worked.  They show

17   certain days at eight hours a day, give a quantity.  This

18   particular rate here they use was $57 an hour.

19   Unfortunately, we didn't have any certified payrolls for

20   any of these subcontractors, so we couldn't verify exact

21   rate per classification of employee.

22   Q.   You were able to figure out what the rate was at

23   least based on the invoices?

24   A.   Yes.

25   Q.   And you assumed those to be correct?

1   A.   Yes.

2   Q.   All right.  And you assumed that ECI paid those,

3   correct?

4   A.   Yes.

5   Q.   Going back to your table on page 6, I don't think

6   it's necessary to go through all of the invoices, but did

7   you summarize the basic wage rate that was charged by each

8   of the subcontractors?

9   A.   Yes.

10  Q.   How did that impact your analysis, if at all?

11  A.   It did not.  They were all lower than the proposed

12  rate that we were noting.

13  Q.   Okay.  And did it further justify or substantiate

14  that $71.69 rate was the more appropriate rate?

15  A.   Yes.

16  Q.   Now, you mentioned before that the plaintiff has

17  claimed $81.46 as their wage rate, right?

18  A.   Yes.

19  Q.   Is it fair to say that you don't know how that was

20  determined?

21  A.   I do not know how that was determined.

22  Q.   Therefore you don't -- was anything presented to you

23  by ECI in any of their claim documentation that would give

24  you a numerical buildup as to how that was calculated?

25  A.   No.

1    Q.   Okay.  Do you have an understanding as to how it was

2    calculated?

3    A.   No.

4    Q.   Okay.

5            MR. HUG:  Your Honor, you may have --

6            THE COURT:  I had a question on those

7    comparators to the other subcontractors.  Does their wage

8    rate include the FICA, the other labor burdens?

9            THE WITNESS:  That should be everything.

10   They're acting as a subcontractor to ECI and that's the

11   bill they're charging.  Should include FICA, everything,

12   profit.

13           THE COURT:  Their overhead and profit --

14           THE WITNESS:  Overhead and profit.

15           THE COURT:  -- they should be passing that on

16   effectively?

17           THE WITNESS:  Absolutely.  Ideally, they're

18   providing labor and making a profit from ECI on that.

19   Apply labor at a time rate.

20           THE COURT:  Thank you.

21   BY MR. HUG:

22   Q.   That's typically how it works, subcontractor sends

23   you an invoice, you pay the invoice, correct?

24   A.   Yes.  There's two ways to provide labor.  You could

25   provide a lump sum for a task, to complete this task for a

1    thousand dollars.  Or in this particular case they were

2    charging men per hours under the direction of ECI, it

3    appeared.  So they came up with a rate that they felt they

4    would make a profit.

5    Q.   Were this Court to find that there were any man hour

6    overruns, what do you believe the appropriate rate should

7    be used?

8    A.   The $71.69.

9    Q.   Okay.

10   A.   I think we felt that was a bit of a blended rate as

11   well.  There was a lot of apprentice time.  Beginning of

12   our report showed 32 percent of the labor that we looked

13   at for that period was apprentice time.  We understand

14   also there was overtime and weekend work.  So that's why

15   we felt 71 would be a good blended rate.

16   Q.   You made adjustments, you sort of gave ECI the

17   benefit of the doubt and moved it up a little bit to take

18   into account overtime?

19   A.   As a -- well, no.  I think that 71.69 we came to as a

20   journeyman rate for hours.  We also understand there is

21   apprentice time, which would make it a lot less, but there

22   could be overtime which could be make it slightly more.

23   Q.   The pecking order is journeyman -- what's the pecking

24   order in terms of wages again?

25   A.   Sure.  Foreman, subforeman, journeyman, and then

1   apprentice.

2   Q.   And in terms of numbers on the job, if you know, did

3   ECI have more journeymen, more apprentice, more foremen,

4   subforemen or junior foremen?

5   A.   Sure.  Under the certified payroll section, we just

6   summarized the breakdown.  This is on page 5, top of the

7   page of my report.  The breakdown was 4 percent foremen,

8   64 percent journeymen, and 32 percent apprentice.

9   Q.   Okay.  All right.  Thank you.

10      Now, in doing your analysis, did you also take an

11   opportunity to review other project documentation?

12   A.   Yes.

13   Q.   Why?

14   A.   We were given files.  We try to look at documents

15   that we felt might be relevant to what work was being

16   performed during that July and August time period.

17   Q.   Did you find any documents that beared upon your

18   analysis?

19   A.   Yes.

20   Q.   Could you explain to the Court -- and I believe your

21   reference is to the 2f section on page 7 of your

22   Exhibit 656.  If you could take the Court through that,

23   and I believe you have documents attached as Exhibit G.

24   Take the Court through your analysis.

25   A.   Sure.  This is the page 7 of my report, bottom of

1    page 2g, Review of Job Performance Review Forms.  This

2    appears to be an internal report generated by ECI of them

3    looking at the job and kind of giving themselves a review

4    of where the job is right now.  So we kind of summarize a

5    few of these reports.

6    Q.    Okay.  And let's turn to Exhibit G for the moment.

7    A.    Sure.

8    Q.    And you have several reports.  Could you go through

9    those and tell them how they -- I think the Court has seen

10   these once before, but I think the Court probably is

11   interested in how these affected your analysis, if at all.

12   What did they do in terms of your analysis?

13   A.    Sure.  Within Exhibit G, second page, and top of the

14   page, the date of the job performance review is 6/18/2010.

15   If you go to the bottom of the page, it says "Working in

16   all Phase 2 and 3 areas.  Work going okay, increase crew

17   for summer."  6/18.

18   Q.    Why is that important?

19   A.    Well, because it was noted in the letters with the

20   claim that the impact period was that ten-week period from

21   when school closed and they got into July and August to

22   complete Phase 3.  So 6/18 appears the job is going okay.

23   Q.    Okay.  So the next one --

24   A.    This is 7/19.  Again, this would be during the

25   impacted period.  And at the bottom of the page there is

1    says, "Working in all Phase 2 and 3 areas.  Increased crew

2    for summer work.  The place is a zoo - send help."  But

3    they are working in all areas.

4    Q.   Okay.  Why is that -- what impact does that have on

5    your analysis?

6    A.   It just notes that it wasn't all Phase 3 work.

7    Phase 2 work going on during the summer as well.

8    Q.   Okay.  Let's turn to the next one.

9         The next one has been the subject of some discussion

10   with other witnesses and it's blown up right here as well.

11   Could you tell us what impact this had, if any, on your

12   analysis?

13   A.   Sure.  This is dated August 13, 2010.  Again, it says

14   working in all Phase 2 and 3.

15   Q.   Why is that important to you?

16   A.   It's during the impact period.  It appears that

17   Phase 2 is full blown as well as Phase 3.

18   Q.   Okay.

19   A.   Several bullets here within this report.  The fifth

20   bullet down it says, "Fixture labor units way, way off

21   what it's taking in the field."

22        Basically, it appears the foreman is stating that

23   it's taking way longer to complete items or tasks than I

24   was provided with this budget.

25   Q.   And you previously given an opinion to this Court

1   that you had concerns that the baseline estimate was not

2   reasonable.  Is this –– in your view, does that impact

3   that analysis at all?

4   A.   Yes, that's definitely someone else questioning the

5   baseline estimate that he was given.

6   Q.   Is it just someone else or who is it who is

7   questioning?

8   A.   It's the foreman, Stephane Mathieu, or Cliff Clauson,

9   one of them developed this report.

10  Q.   All right.  Anything else on this document?

11  A.   The next bullet down right below that, "A lot of

12  wasted time due to lack of supervision."

13  Q.   How does that impact your analysis, if at all?

14  A.   Just appears that there could be internal

15  inefficiencies with ECI.  It's a summer project.  It's a

16  lot of work to get done in a short period of time before

17  the kids get back to school.  It appears that they're

18  stating we need more supervision in the field to go over

19  this work.

20  Q.   Later on in your analysis you did an analysis of the

21  bid summary.  In the bid summary, is there –– did you make

22  any observations regarding supervision there?

23  A.   Yes.

24  Q.   And what are those observations?

25  A.   There was no supervision added or shown in the bid

1     summary.

2     Q.   So you have this job performance reviewed dated 8/13

3     that says, "A lot of wasted time due to lack of

4     supervision.  This is now being corrected."

5     A.   Yes.

6     Q.   And that's now about two-thirds of the way through

7     the project, ten weeks of the project, correct?

8     A.   Yes.  Seven weeks into the performance of that

9     ten-week period.

10    Q.   Okay.  And you mentioned yesterday this is a loss of

11    productivity claim, correct?

12    A.   Yes.

13    Q.   And a loss of productivity I think you defined as it

14    took longer to do tasks than it should have, that's sort

15    of a simple way, correct?

16    A.   That's correct.

17    Q.   This document says a lot of time wasted due to lack

18    of supervision?

19    A.   Yes.

20    Q.   Does that confirm or contradict any of the analysis

21    you've given to this Court?

22    A.   No.

23    Q.   Okay.  Does it support your analysis as to whether or

24    not the actual hours are correct or potentially incorrect?

25    A.   It supports it's potentially incorrect.

1        We also knew at that time they were bringing in a lot

2   of subcontractors on time and material.  So I think when

3   you're doing that in the field, bringing a lot of

4   subcontractors, you're going to need more management to

5   help manage those type of employees that are just coming

6   in to the job.

7   Q.   All right.  Then the next -- is there anything else

8   on that document that you noted?

9   A.   Sure.  One of the last comments down the bottom of

10  the page, the author writes, "Someone needs to stop the

11  estimating department from ignoring the project schedules

12  at bid time and providing an estimate that's going to cost

13  the company huge amounts of loss.  The project will

14  continue to show larger losses."

15  Q.   Again, does that confirm any opinion or support any

16  opinion that you've already given to this Court in this

17  matter?

18  A.   Sure.  It kind of supports Mr. Caprio's position that

19  the base bid number might have been off.  There were

20  problems with the labor units for completing Phase 3.

21  Q.   Okay.  Apart from Mr. Caprio, and just assume for the

22  moment Mr. Caprio's estimate doesn't exist --

23  A.   Yes.

24  Q.   -- do you still have issues with the estimate --

25  excuse me, the baseline that is used by ECI in their

1    claim?

2              MR. KAPLAN:  Objection, Your Honor.  By his

3    testimony, very clearly he's using the Caprio estimate

4    exclusively to come up with his baseline, what he's been

5    calling his baseline.  There's no other work or competency

6    by this witness to establish a baseline, as he's using

7    that term here, in terms of what the bid was.  He's

8    testified repeatedly he relied exclusively on the Caprio

9    bid.  So the notion of excluding the Caprio information

10   and asking him to comment on the efficacy of ECI's bid is

11   totally outside the realm of what's been disclosed and

12   also his competency as a witness.

13             THE COURT:  I appreciate the concern, but I'm

14   going to overrule the objection and allow the witness to

15   answer the question.

16   A.   Outside of Caprio -- and I think what we were looking

17   at was the ECI baseline, not necessarily was the Dave

18   Caprio estimate correct, although I think it is.  I

19   think -- so I wanted to check that.  That's step one to

20   look at one of these claims.

21        But to kind of support that, aside from Mr. Caprio,

22   obviously internally ECI people were questioning their

23   baseline bid as far as what they were given to complete

24   this job in the field.

25

```
 1   BY MR. HUG:
 2   Q.   Okay.  That's what this document shows is that -- it
 3   lends added support that you have a concern that their
 4   baseline may not be reasonable?
 5   A.   Sure.
 6            MR. KAPLAN:  I object to leading, Your Honor.
 7   Mr. Hug's testifying.
 8            THE COURT:  Overruled in this context.
 9   BY MR. HUG:
10   Q.   Staying on that subject for a moment, you testified
11   earlier about -- this is going back to Appendix A to your
12   report.  And you testified about Exhibit 519,
13   Mr. Clauson's Deposition Exhibit 519.  And I asked you a
14   couple of questions yesterday about this document.
15   A.   Yes.
16   Q.   All right.  I want to go back over that and it seems
17   like a good time to do it, go over that document again and
18   what -- first of all, did you use this document in your
19   analysis?
20   A.   Yes.
21   Q.   And is this document -- did you rely on this document
22   and review this document to support any of your opinions
23   in this case?
24   A.   Yes.
25   Q.   Okay.  It's actually attached as an exhibit to your
```

1    report, it's that important, correct?

2    A.   That's correct.

3    Q.   Yesterday I asked you some questions -- I'll stop

4    leading in a moment -- I asked you questions about branch

5    wire and how it affected through the phases.

6    A.   Sure.

7    Q.   But there's a lot more that this document shows,

8    isn't there?

9    A.   Yes.

10    Q.   Please explain to the Court what this document shows

11    and please tie it to your overall opinions as it relates

12    to baseline and actual hour analysis reliability.

13    A.   Sure.  Before even questioning or commenting that a

14    baseline is bad or good, we wanted to do some efforts to

15    see if it is bad or good.  So I stated and testified

16    earlier, we did bring Mr. Caprio in to estimate Phase 3

17    and tell us what he thought that was.  That's one part of

18    our analysis and what we looked at to do.

19        Secondly, we looked at some of the project documents

20    which some of them we went over and others we went over

21    yesterday.

22        Third, and this is just a document that we look at.

23    This is an internal ECI document, accounting report.  What

24    this appears to be or it is is the labor hour report for

25    the project.

1            THE COURT:  Clauson Exhibit 519.

2   A.    Clauson Exhibit 519.

3        And it's broken down into phases.  The first phase is

4   Phase 2.  The next phase is the site work.  Next phase is

5   Phase 3.  Next phase is 4 East.  Next phase is 4 West.

6        And when you total the first column that has numeric

7   values, that's the estimated hours it appears to complete

8   the job, it seems adjusted slightly from the bid summary.

9   The bid summary had about 22,000 hours.  This totals

10  24,000 hours in the estimated hours.

11       So we looked at it, and I think I testified yesterday

12  that on the far right shows negatives and positives as far

13  as where the hours ended up at the end of the day with

14  this particular project.  So we did look at the deviation

15  between the estimated hours and the actual hours per

16  phase, both positive and negative.

17            THE COURT:  Can you explain to me, you just said

18  24,000 hours.

19            THE WITNESS:  Your Honor, there's no subtotal on

20  this particular page, but if you add up the base -- if you

21  add up the subtotal for each phase, it does add up to

22  24,480.

23  BY MR. HUG:

24  Q.   Mr. O'Neill, what column would you add up to get to

25  that?

1    A.   First numeric column, Estimated Hours.

2    Q.   If you add up all the estimated hours for all the

3    areas, what do you come out to?

4    A.   24,480.

5    Q.   What amount was shown on their actual bid document?

6    You can go to your supplemental report which has the bid

7    summary on it.  I think that may have the number.

8    A.   Sure.

9         MR. HUG:  That's Exhibit 650, Your Honor.

10   Appendix E to that.  Although I don't know if Your Honor

11   needs to --

12   A.   Yes.

13   BY MR. HUG:

14   Q.   Where is the total hours in their bid shown?

15   A.   On the bid summary sheet, which is in my Appendix E,

16   and there's a Bates number at the bottom of the page,

17   ECI 03225.  Last column on the right they sum up the labor

18   hours on the project.  And it's 22,383.52.

19   Q.   By the way, while we're on that page, did you do a

20   calculation of the labor hour rate just by looking at the

21   total direct labor dollars divided by the labor hours?

22   A.   Yes, we did.

23   Q.   What did it come out to?

24   A.   $56 an hour.

25   Q.   That's consistent with your wage analysis and

1    understanding of their claim?

2    A.   Yes.

3    Q.   Okay.  Going back to this, so the total labor hours

4    estimated is 22,383.52?

5    A.   Yes.

6    Q.   Do you know why in their labor hours report back in

7    Appendix A to your report, Clauson 519, why that extra

8    2,000 or so hours is in there?

9    A.   I do not.  A couple of assumptions may be change

10   orders, maybe somebody wanted to adjust the budget up.

11   Q.   All right.  I did notice that in Phase 2 there are a

12   couple of items in Phase 2, Items 70, 72, 73 --

13   A.   Yes.

14   Q.   -- for which there was very little and in two cases

15   no estimate made for those line items?

16   A.   Yes.  It appears they provided no estimated hours or

17   budgeted hours for those particular cost codes.

18   Q.   And for overhead, which is Item Number 70, they only

19   included 11 hours in their bid, according to this

20   document?

21   A.   Yes.

22   Q.   All right.  Continue on with your analysis of 519.

23   A.   Sure.  We looked at each phase.  So the first phase

24   with the subtotal is Phase 2.  So they budgeted there

25   9,312 hours.  And the actual hours spent was 13,118.  That

1    was a 41 percent deviation there.

2         Then went down to the site work, they budgeted 939

3    hours.  Their actual hours were 143.  So that was an

4    85 percent deviation.

5         Phase 3, which we spent a lot of time talking about

6    in different ways, based off the budget here they had

7    8839.73.  And ECI hours, 12,684.  And this was a

8    43 percent deviation there.

9         Phase 4 East they budgeted 2,407 hours and they spent

10   784 hours.  Again, this was to the good, 68 percent

11   deviation.

12        And then lastly, Phase 4 West they budgeted 2,913

13   hours and the actual hours were 3,795.  That was a

14   30 percent deviation.

15        So there's definitely a couple of conclusions that we

16   came to here: one, potentially the baseline bid is off; or

17   two, there could have been coding problems between the

18   field getting hours into the system; or three, there was

19   inefficiencies, whether internally or externally

20   somewhere.

21   Q.   Okay.  But to a reasonable degree of certainty, can

22   you conclude that something is wrong with this

23   presentation of those two hours or those two columns

24   estimated and actual hours?

25   A.   Well, I think the presentation is the presentation.

1    I conclude -- or one issue I think is that I'm questioning

2    now, this is another support that would question the

3    baseline estimated hours.

4    Q.   Does this lead you to conclude that you need to do

5    something else to verify both actuals and estimates?

6    A.   Absolutely.

7    Q.   Okay.  If you were -- hypothetically, if you were

8    retained to present a claim to show loss productivity

9    claim by comparing a baseline to actuals, would you rely

10   upon the estimate and the actual hours as presented in

11   this report?

12   A.   No.

13        MR. KAPLAN:  I object, Your Honor.  It's beyond

14   the scope of his disclosure as an expert witness.  He's

15   been disclosed as somebody who has reviewed information,

16   he states not only in his report but in his testimony he's

17   not commenting on any liability issues.  He also does not

18   talk in his report at all about any kind of methodology,

19   about how this claim should have been presented.  This is

20   just beyond the scope of anything that's been disclosed.

21        THE COURT:  Mr. Hug?

22        MR. HUG:  Your Honor, this is a numerical

23   analysis.  Still is a numerical analysis.  He actually

24   expressly said you have to look.  I think he said three

25   things.  You have to look at the estimated hours, the

 1   baseline, you have to look at the actuals and make sure

 2   they're reliable, or it could be some other

 3   inefficiencies, either the result of internal factors or

 4   external factors.  He testified he did not do an

 5   examination --

 6              THE COURT:  I'll allow it.

 7              MR. HUG:  Thank you, Your Honor.

 8   A.   In evaluating ECI's claim, one of my tasks was to

 9   look at what their benchmark or baseline was.  And just

10   looking at this document, this is just another -- some

11   more information that supports that I should be checking

12   what their baseline is.  They seem to be off on every

13   single phase substantially.

14   BY MR. HUG:

15   Q.   Now, it could also be that the actual hours are off

16   either in addition or in lieu of, correct, that column?

17   In other words, assume for the moment that the -- you

18   don't know whether the estimated hours or the actual hours

19   are off, you just know they're very off in impacted as

20   well as unimpacted time periods, correct?

21   A.   Yes, per this report, they're substantially off.

22   Q.   In terms of the actual hours as presented, do you

23   have any opinion as to whether the actual hours as

24   presented are reliable -- you would rely on those?  Do you

25   understand my question?

1   A.   No.

2   Q.   Let me take you back to the weekly foreman reports

3   you testified to yesterday.

4   A.   Sure.

5   Q.   Remember Exhibit C, it didn't have any designation?

6   A.   Yes.

7   Q.   Okay.  Does that impact your understanding of the

8   reliability of the actual numbers that went into the cost

9   code system?

10  A.   In regard to the actual hours that were booked to

11  this job, as regards what cost codes they were placed

12  into, based on some of those foreman reports, there's

13  definitely a chance that whoever was in accounting took

14  the foreman report and placed certain cost codes in other

15  than where they actually should have went, based on

16  information they were getting from the field.

17  Q.   Could that also contribute to the significant

18  deviations that we see in Exhibit 519?

19  A.   Yes.

20  Q.   Okay.

21  A.   So they may have cost coded something to, say, site

22  work and it ended up going to Phase 3 instead.

23  Q.   So because of that type of analysis, did you go back

24  and do a baseline analysis with Mr. Caprio?

25  A.   Yes.

1    Q.   And did you do an actual analysis by looking at

2    things I have posted up here on the poster board, such as

3    certified payroll, daily reports, weekly foreman reports,

4    and payment requisitions?

5    A.   Yes.

6    Q.   Okay.  And these daily reports -- excuse me, job

7    performance reports I just went over with you, do they

8    tend to support your conclusions that there's something

9    wrong?

10   A.   Yes.

11   Q.   Now, I'd like to turn briefly to explain to the Court

12   the 2e on page 7 of your report.  You mentioned in here

13   subcontractor invoices and a review of subcontractor

14   invoices in addition to looking at them for wages, there

15   was a period of time in your analysis that you looked at

16   subcontractor invoices and it factored into your report;

17   do you remember that?

18   A.   Yes.

19   Q.   Okay.  And in this revised report, you have done what

20   with that analysis?

21   A.   Yes.  Originally, and just trying to looking at ECI's

22   claim, there was ECI man hours internally and then there

23   was subcontractor hours that were spent allegedly on this

24   portion of the work too.  But when you look at the daily

25   logs, the foremen and those number of men carried in those

1    were both ECI men and all the subcontractors were

2    originally, but that was just going to be ECI men and the

3    subcontractors separately.  The revised report states that

4    the daily logs include everybody and our deductions are

5    based on both ECI and subcontractors.

6    Q.    In your earlier report was based on this typo that

7    appeared on a particular document as well, correct?

8    A.    Yes.  The summary prepared by, I assume, ECI of all

9    the subcontractor invoices, at the bottom of that page it

10   notes that the hours were for Phase 2.

11   Q.    And that's been represented as being a typo?

12   A.    That's been represented as a typo recently.

13   Q.    Whether it's a typo or not, is that now irrelevant

14   because of what you just said to the Court?

15   A.    Yes.  It's irrelevant.  If we're just going to look

16   at the daily logs, we assume that labor is in the daily

17   logs.

18   Q.    So that's been deleted from your analysis and any

19   associated consequences of that analysis have been deleted

20   from your report?

21   A.    That's correct.

22   Q.    You also took a look at the Bid Summary form in your

23   supplemental exhibit, which is Exhibit 650.  Could you

24   explain to the Court what analysis -- first of all, why

25   you did that analysis and then what you did?  It begins on

1    page 5 of your supplemental report, Exhibit 650.

2              THE COURT:  I have just a question before we go

3    to 650.  If I can ask you to go back to Clauson

4    Exhibit 519.

5              THE WITNESS:  Yes.

6              THE COURT:  From Exhibit A -- excuse me,

7    Attachment A to Exhibit 656.  When you look at the -- when

8    you focus on the specific entries through each of these

9    phases for the codes for branch conduit and branch wire,

10   40 and 41 --

11             THE WITNESS:  Yes.

12             THE COURT:  -- those are the areas, would it be

13   fair to say, that are the principal areas of alleged

14   impacted hours drawing from the first page, page 3 of your

15   analysis, isn't that right, when we look at that?

16             THE WITNESS:  Yes, that's correct.  According to

17   ECI, that's their claim.

18             THE COURT:  Right.  So I'm looking at the

19   discrepancy between the estimated hours and the actual

20   hours not only within Phase 3 where we see, for example,

21   branch conduit from 2900 hours up to more than 5,000, but

22   it seems that there are similar magnitude type of

23   discrepancies in Phase 2 for the same entries.  For

24   example, for branch conduit for Phase 2 goes from 4600 up

25   to 43 or if we jump down to Phase 4, we have a magnitude

1    for the same branch conduit entry of 1,045 up to 1,417.

2              THE WITNESS:  Yes.  That's correct.

3              THE COURT:  Do you draw any conclusion from that

4    discrepancy of essentially overruns in those areas of the

5    chief impacted areas for branch conduit and branch wire

6    that are essentially large overruns in Phase 2 and Phase 4

7    as they are also in Phase 3?

8              THE WITNESS:  Yes.  I think, one, one potential

9    conclusion would be that the bid estimate for those

10   particular items was low.  That's number one.  Number two

11   is potentially when it got coded from the field into the

12   system, they put the hours in there.  It wasn't that

13   clear, they just put the hours in those items.  Three,

14   there was potentially some inefficiencies, whether

15   internal or external.  Internal being ECI's issues;

16   external being from some other cost.  That's clearly what

17   we concluded from those.

18              THE COURT:  Okay, thanks.

19   BY MR. HUG:

20   Q.   These inefficiencies, they would have happened not

21   only the similar type of inefficiencies for those cost

22   items -- if that were one of the reasons that were there,

23   that wasn't an inefficiency just on Phase 3, but also on

24   Phase 2 and Phase 4 West then, correct?

25   A.   Yes.  That's correct.

1    Q.    But there's no claim made for inefficiencies on

2    Phase 2 or Phase 4 West, is there, that you know of?

3    A.    That's correct.

4    Q.    So does that increase or decrease your evaluation as

5    to whether or not there were inefficiencies in all three

6    of these areas of similar and like kind?

7    A.    Looking at that, it appears that there was either a

8    challenge with the hours that are estimated for that work

9    or how the coding worked or other inefficiencies.  One of

10   those three answers.

11   Q.    At the very least, is it your opinion that it needs

12   to be explained?

13   A.    Absolutely.  The baseline would have to be questioned

14   and explained.

15   Q.    Okay.

16   A.    As well as the actual hours.

17   Q.    Okay.  I'd like to go on to Exhibit 650 and page 5 of

18   your report where you begin your analysis of the bid

19   summary.  And first explain to the Court why doing an

20   analysis of the bid summary is relevant at all to your

21   overall analysis.

22   A.    Sure.  I think we had some of these accounting sheets

23   that showed budgets for Phase 3.  We wanted to see the bid

24   summary sheet to see if we could determine the budget for

25   Phase 3 as well.  So we looked at the bid summary.

1   Q.    The bid summary is attached as an appendix to your

2   Exhibit 650?

3   A.    Yes.

4   Q.    Would that be Appendix E?  The Court has looked at

5   this in another exhibit before.  It is multiple pages,

6   correct?

7   A.    Yes.  I'm sorry, I'm just pulling up the exhibit.

8   Q.    It has been about a month since the Court saw this

9   before, so -- unless the Court directs otherwise, I'd like

10  you to explain how to read this.

11  A.    Sure.

12  Q.    Starting with the first page.

13  A.    The first page appears to be a summary sheet of their

14  overall bid.  Just going left to right, the items in the

15  phase are just categories, but appears to encompass all

16  the phases.

17        Appears they just broke down the bid between quotes

18  which I assume are subcontractor or vendor quotes.  When I

19  say "vendor," potential materials or could be equipment

20  under the quote part.  Quotes they received from someone

21  outside of ECI.  Then there's materials.  These were

22  materials they estimated: conduit, wire, lighting, panel,

23  whatever might be in there.  Equipment, line of equipment.

24  Subcontractors, could be outside testing, I'm not sure

25  what that cost would be.  Lastly, labor hours on the far

1   right.

2        So that's like the way they broke it down on their

3   summary sheet, the five components of their bid.

4   Q.   Okay.

5   A.   So we looked at just the far right column is the

6   labor hours and looks like they estimated for the whole

7   project 2,383 in labor hours.  Moving down on the page,

8   they do subtotal the first three columns or first four

9   columns.  The quotes, the material, the equipment, and

10  subcontractors, and looks like that comes to 2.1 million.

11  Right below that they subtotal the direct labor at

12  1.2 million.  Doing the simple math, we took the

13  1.2 million divided by the 22,000 hours, looks like they

14  carried about $56 an hour in their bid.

15  Q.   For labor hours?

16  A.   For labor hours.

17  Q.   Okay.  Now, just to clarify, it's not shown on there,

18  in construction jobs, oftentimes when you do a bid there's

19  sort of a base contract bid and then there's alternates?

20  A.   Yes.

21  Q.   Okay.  And did that apply in this particular case?

22  A.   This does not sum up the alternates.  This is

23  strictly the base bid.

24  Q.   In this case, though, there were alternates that were

25  also bid and accepted or not accepted by the owner?

1    A.   Yes.

2    Q.   Are they relevant at all for purposes of the

3    analysis?

4    A.   No.

5    Q.   So if the Court were to look at the contract and find

6    a larger number than the selling price at the bottom of

7    this page, would those alternates explain the difference?

8    A.   Yes.

9         There was $141,000 what they call alternates accepted

10   with the bid as well.  So above and beyond the base bid,

11   the owner that was pricing out the job asked for certain

12   alternates and they accepted five of them.  So that added

13   $141,000 to the bid.

14             THE COURT:  The alternates are what?

15             THE WITNESS:  This would be like the owner may

16   want to add on certain lighting in a certain area.  May

17   want to add on something, actual things.  So appeared in

18   this bid may have been like 19 of them.  And then I show

19   here that Alternate 1, Alternate 3, Alternate 4, Alternate

20   10 and Alternate 19 were accepted.

21   BY MR. HUG:

22   Q.   Did ECI reconcile in any of the paperwork you looked

23   at whether or not any of those alternates were performed

24   in Phase 3?

25   A.   No, I didn't see that.

1   Q.   Okay.  So you don't know whether or not any of those

2   were performed in Phase 3 or not from the documentation

3   you got?

4   A.   No, I do not.

5   Q.   If they are in Phase 3, then it's possible hours for

6   those alternates could also be in Phase 3, but we know

7   that, from the way it's been presented, the baseline is

8   not included, correct?

9   A.   That's correct.

10  Q.   All right.  And you don't have any tools or whatnot

11  to do that analysis, do you?

12  A.   No.  It could be in Clauson 519 where it went from

13  22,000 to -- or 24,000, that could explain some of the

14  hours that are in there.

15  Q.   All right.  Continue on with the next page.

16       First of all, if you look at the top, there's -- the

17  top boxes, Estimated Hours, Regular, Overtime, Shift, what

18  are those for?

19  A.   I'm sorry, which page?

20  Q.   Second page.

21  A.   Sure.

22  Q.   3226.

23  A.   Sure.  So there's a breakdown of -- the top part

24  breaks down the labor hours.  I see 22,383 again for the

25  labor hours.  And then below that it appears they're

1    showing how much is going to be carried in overtime or

2    shift work and it's all zeros.  Looks like they carried

3    that rate of -- I was saying 56 earlier, it's actually

4    55.19 or 55.20 here.  Total of 1,235,569.  It's

5    interesting.  I don't see burden on top of that rate.

6    Q.   Does that give you more or less comfort that the

7    baseline estimate that ECI's using is reasonable and

8    reliable?

9    A.   This shows that their bid is made up of their labor

10   hours, material, subcontractor quotes, and they came to a

11   total -- and I don't see any other markups, adjustments to

12   the bid that went in.  So, I mean, looking at this, it

13   appears they had two philosophies.  One, they wanted to go

14   in and beat their man hours to make a profit or, two, have

15   really good buyouts on their materials.  But knowing you

16   have a ten-week schedule while kids are out and kids have

17   to get back in, I would think there would be some

18   adjustments for overtime, shift work, something during

19   that period.

20            THE COURT:  And there's nothing in there for

21   labor burden either?

22            THE WITNESS:  I don't see it, Judge.  I don't

23   see any labor burden in here.

24            On the last page 4 of 4 --

25

1    BY MR. HUG:

2    Q.   Go ahead.

3    A.   -- there's an Overhead section and it's summarized at

4    zero.

5         Just above that, they do carry 59,000 for field

6    office expenses.  59,782.  That's the only overhead that I

7    see on this particular project.

8    Q.   In their bid?

9    A.   In their bid.

10   Q.   Okay.  Is that something that is unusual in your

11   experience?

12   A.   It's unusual.  However, if you're bidding a job and

13   this is your bid, it's bid day, you're putting in this

14   number because you want to get that job.  And now you're

15   betting on beating your hours in the field and getting

16   good buyouts on your materials.

17   Q.   That's not necessarily a great measure, though, for

18   the actual amount of hours it took to do a particular task

19   though, is it?

20   A.   No.

21   Q.   Going back to page 3226 Bates number, there are also

22   adjustments.  And I see those were all zeros, too.  Given

23   the conditions on this site, would you have seen some

24   adjustments in that category as well?

25   A.   Yes.

1    Q.    Explain that.

2    A.    Sure.  You have an occupied school.  Not just Phase 3

3    but other areas, I'd assume there would be some adjustment

4    for off hour work, shift work, overtime work.

5          THE COURT:  And I lost you, where are you?

6    You're on 3226?

7          MR. HUG:  3226, the top box it says Estimated

8    Hours and then Adjustments.  And then right under that you

9    say Weather, Occupied, Poor, whatever.

10         THE COURT:  All right.  Yes.

11   BY MR. HUG:

12   Q.    So you mentioned Occupied?

13   A.    Sorry, in the middle of the page it says Adjusted

14   Labor and far right 22,383.

15   Q.    Yes.

16   A.    Within here there's an option within their bidding

17   software to add in shift work, overtime work, and I don't

18   see that.  I see the straight 22,000 hours at their $55.20

19   an hour.

20   Q.    Okay.

21   A.    Being an occupied school, I would assume there would

22   be some sort of shift work or overtime work somewhere.

23   Q.    Not necessarily in Phase 3, but in other phases as

24   well?

25   A.    Could be Phase 3, could be other phases as well.

1        And again, that brings me to the conclusion that the

2    mindset going in was we have to put this bid in and this

3    is the number we feel will get the job.  Once you get in

4    you have good buyouts on material and you have to

5    hopefully beat your labor hours in order to make a profit

6    here.

7    Q.   Now, the next box, which has Direct Labor on it,

8    we've kind of gone over this, but this has the columns

9    Crew, Regular, Crew, Overtime, Crew, Shift.  Explain to

10   the Court what those mean.

11   A.   Sure.  So going left to right, it shows the regular

12   time rate.  So in this case, $55.20.  Then they have

13   overtime rate of $82.80.  And then very have a shift rate

14   of $60.72.

15   Q.   Okay.  And mathematically what did they use?  Were

16   you able to determine that?  What rate did they use?

17   A.   It was all the regular time rate that was used on the

18   first column.  And that carries over to the far right.

19            THE COURT:  And the shift rate is higher because

20   it's second shift, slightly off hours?

21            THE WITNESS:  Yes.

22   BY MR. HUG:

23   Q.   Overtime is just overtime?

24   A.   Overtime might be another rate again.

25   Q.   There's no shift and no overtime built in in this

1   estimate as described in this document?

2   A.   That's correct.

3   Q.   Now, the next page is Bates number 03227.  Is there

4   anything that you wish to remark on on that page?

5   A.   Top right-hand corner there's a box that says Direct

6   Labor Total, $1.2 million number we see.  There is a labor

7   escalation rate which typically what this would be is the

8   prevailing wage, rate goes up slightly, that would account

9   for that rate.  We assume that that's what that adjustment

10  is, total dollars, 1.254 million.

11  Q.   And then the next --

12  A.   Sorry, on that sheet there's no indirect labor on the

13  sheet, it's all 22,000 man hours and that's it.  There

14  wasn't any adjustment there.

15  Q.   What do you mean my indirect labor?

16  A.   Indirect labor would be your nonproductive

17  supervision, nonworking labor.  Managing, putting some

18  middles in, that type of thing, in the project.

19       Under the material part, there was no material

20  escalation.  That's not a surprise.

21       And on the quotations, I think there was a summation

22  of the quotations.  There was nothing else on that page.

23  Q.   Next page, 03228.

24  A.   Sure.

25  Q.   Could you explain what this shows and any concerns

1    you have with what is shown?

2    A.   Top of the page, this cost out for the field office,

3    59,782, the trailer, field storage trailer, some tools.

4         The next section just shows overhead and it was

5    carried at zero.

6         The next section shows profit, it was carried at

7    zero.

8         And then they did have to provide a performance bond

9    and payment bond on the project which cost them $30,000.

10        So total bid, adding up those categories, was

11   3,496,153.

12   Q.   Okay.  How did --

13   A.   Plus the alternates.

14   Q.   How did this analysis -- how does this fit into your

15   overall analysis of their construction claim from a

16   numerical standpoint?  If you could explain that to the

17   Court.

18   A.   Sure.

19        The labor hours, not only was no shift work or

20   overtime work carried, it carried just the base rate of

21   the 55.20, which I would have thought would have been some

22   sort of burden at a minimum on top of that.

23        Secondly, I didn't see any overhead carried within

24   the bid summary or any profit.  So the only conclusion I

25   could come to is that of that 22,000 hours and material

 1    cost, they had two ways of making money: (1) they wanted

 2    to really beat their hours and thought they could beat

 3    their hours; and (2) they thought they were going to have

 4    really good buyouts on their material or other items on

 5    the project.

 6    Q.   Turn to Appendix G of Exhibit 650 for a moment.

 7    A.   Yes.

 8    Q.   And did you review this document in the course of

 9    your analysis?

10    A.   Yes.

11    Q.   And what does that document -- what is the document,

12    first?

13    A.   It's an ECI document, internal document.  And appears

14    they call it the score card.  And they kind of score their

15    projects.

16         So this one appears to be for Kelly Middle School.

17    And they look at different job conditions, looks like

18    situation they call it on the left-hand side of the page.

19    And they rate it between normal, difficult, very

20    difficult.  And they given it on score on the right-hand

21    side of the page.

22    Q.   Did you make any observations with respect to the

23    scoring for this project?

24    A.   Yes.

25    Q.   Could you please explain to the Court your

1   observations?

2   A.   Sure.  So hours worked, they gave that a very

3   difficult.

4        To back up, the way they scored, see the first column

5   Normal, they'd give it 1 point, Difficult would give it 2

6   points, Very Difficult they give it 3 points.  They graded

7   on the far right.

8        Hours Worked, they graded that as a 3, knew there was

9   going to be a lot of hours worked on the project.

10       Going down four items, Crew Density, that got Very

11  Difficult, Extreme, that got rated a 3.

12       Job Duration, Shorter.  Sometimes a lot of

13  contractors like that, get a lot of work done quickly.

14  That got rated a 3.

15       Job Condition, it's Occupied so it got a 3.

16       Systems, that would be fire alarm, HVAC systems.

17  That got Complex, Very Difficult, got rated a 3.

18       Coordination, moving down the page, that got Maximum

19  or Very Difficult, a 3.

20       Stored Materials, ideally, you like to store material

21  on the site, deliver it once from the vendor to your site.

22  This got Remote, which means you may have to store

23  materials off site.  That got rated a 3.

24       And then Job Schedule, that got rated a 1 and it says

25  As Planned.  So it appeared that that bid schedule I think

1    they thought at the time this is the schedule.  That's

2    typical with schools.  A lot of times there's no options,

3    the kids have to get back in school.  Between the owner,

4    the contractor, the designer, everyone is working to get

5    the kids in by a certain date.

6    Q.   Now, you don't know this, or maybe you do, do you

7    know who actually prepared this document?

8    A.   I do not.  ECI.  It's an ECI document, I wouldn't

9    know who within ECI.

10   Q.   It has a last modified date on it?

11   A.   Yes.

12   Q.   Is that something you added or was that on the

13   document as you got it?

14   A.   That was on the document.

15   Q.   That date is 12/24/09?

16   A.   That's correct.

17   Q.   Explain to the Court why you have this document in

18   here and you just gave the Court your analysis.

19   A.   This kind of ties in to the bid.  You can see the bid

20   all straight time hours and you see the score card as

21   noted and it rates a lot of things difficult or extreme.

22   Again, it questions the bid hours, how were they carried?

23   Was there some sort of adjustment made to consider these

24   type of tight schedules in an occupied building?

25   Q.   Okay.  Page 6 of your supplemental report you give

1    some additional notes.  I think you've covered them all.

2    And I just want to make sure you covered them all for the

3    Court.  Just take a look at that, I think you have --

4    A.    This is Exhibit 650?

5    Q.    Page 6 of your narrative.

6    A.    Just as we kind of summarize, this shows there was no

7    contingency or adjustments or any kind of considerations

8    made for the rating of difficulty for this particular

9    project within the summary of the bid.

10   Q.    Okay.  All right.

11   A.    I think that's it.

12   Q.    And again, just to make sure it's clear, you did not

13   look to see whether or not ECI had any faults that

14   contributed in any way to the result we have here?  In

15   other words, you didn't look at the schedule as we have

16   here and -- it's not there right now.  You didn't look at

17   that and say they were delayed here, they were delayed

18   there; you didn't do that?

19   A.    I did not.  Or the cause of who delayed them one way

20   or the other, I did not look at that.

21   Q.    All right.  I would just like to sort of summarize up

22   where you are, sir.

23         I have on the board here sort of an outline of your

24   testimony.  If you could summarize for the Court what your

25   opinions are.  You don't need to go into the detail again,

1    but summarize for the Court your opinions in this case.

2    A.   Sure.  Mr. Hug, could you turn that slightly?

3    Q.   Sure.

4    A.   Thank you.

5         Just to summarize, when we received the ECI claim,

6    the claim's based on impacted hours per ECI and a

7    baseline.  So we first wanted to look at just the baseline

8    to see is it valid.  So there was some documents, ECI

9    documents in here, I think that clearly questioned the

10   validity of the baseline or what the baseline should be.

11   Number one, the cost report kind of noting hours both

12   positive and negative as far as where they came.  Two, the

13   score card.  Three, the bid.  So these are all items that

14   resulted in us feeling that we need to verify this

15   baseline benchmark, and that being to estimate Phase 3.

16        We were having Dave Caprio kind of go through and

17   compare and give us a baseline estimate of Phase 3.  In

18   particular, he estimated the man hours to do Phase 3.  We

19   already knew the labor rate, and materials were no

20   question.  It was the labor and extended labor.  So we had

21   Mr. Caprio that I truly feel, I've worked with him in the

22   past, that he's estimated for think years, he knows

23   electrical work inside and out --

24             MR. KAPLAN:  Your Honor, I have to object.  This

25   is entirety duplicative of the witness's prior testimony.

1            THE COURT:  I'll allow it.  Overruled.

2   A.    Mr. Caprio, I have confidence in him.  He prepared an

3   estimate what he felt the baseline was.  We retained him,

4   that's one item we had.  He gave us a number for what that

5   is which questions the ECI baseline.  Secondly, looking at

6   some of the documents separate from Mr. Caprio, it

7   questions that baseline that was used.

8            The second part of our analysis is we wanted to look

9   at the impacted area and what the hours were that were

10  spent.  So we did look at that.  We looked at certified

11  payrolls which give us the man hours that are spent, but

12  it doesn't really allot per time, per hour, where time was

13  spent.  We used both the daily logs to look at and see

14  where time was spent, whether it was Phase 3 during that

15  time period, 2, or site work or another phase.

16           We then determined through that that during this

17  impacted period, there was substantial amount of time,

18  approximately 2028 hours, spent in other areas during that

19  impacted time.

20           We also looked at those weekly foreman reports, kind

21  of determined that they weren't as accurate as the daily

22  logs as far as where people worked, but two, there could

23  be an issue as far as how those got booked in ECI's

24  accounting system as far as what cost code they put them

25  in potentially, just based on the accuracy of some of

1  those documents if that was going into accounting to input

2  into this system.

3            THE COURT:  I take it, even looking at those

4  weekly reports, it showed about 1800 hours; isn't that

5  right?

6            THE WITNESS:  That's correct.  They showed about

7  1800 hours in phases other than Phase 3.

8  BY MR. HUG:

9  Q.   That was giving them the benefit of the doubt of all

10  the ambiguities?

11  A.   That's correct.  That would include the blank

12  reports.

13      He also looked at subcontractor invoices and the rate

14  they paid them, that seems in line with the rate that we

15  suggest, if there was going to be any change order issued

16  here.

17      And we looked at the pay reqs and the amount of work

18  that got performed during this impacted period.  And that

19  definitely concurs that there was work done in other

20  phases other than Phase 3 as well.  Our breakdown was

21  about 75 percent of the work was in Phase 3 and about

22  25 percent of the physical work was in other phases on the

23  job.

24      With that stated, I think our analysis is that

25  there's 6900 hours that was claimed.  We feel that

1    Mr. Caprio's estimate is correct and 3900 hours should

2    come off of that impacted area.  And then another 2,028

3    hours should come out for hours worked in other areas.

4         In regard to the 6900 hours, the way ECI laid out

5    their claim is although there's a lot of talk of Phase 3,

6    I think they kind of arbitrarily kind of put hours into --

7    or accounted these hours within those first few cost

8    codes.  When you look at their claim, there was actually a

9    positive on the other cost codes within Phase 3.  So

10   potentially I think that had another 755 hours to the

11   positive within their claim and that's summarized in the

12   first page of my report.  If we're talking all of Phase 3,

13   that 755 hours would have to come out as well.  That's

14   just another side comment, looking at the numbers on the

15   page.

16   Q.   How about hours before July 1st and after September

17   1st?

18   A.   Secondly, if we're talking all of Phase 3 for certain

19   cost codes, any hours that were booked prior to 6/28, to

20   my knowledge, are not claimed to be inefficient, or after

21   9/4 were not claimed to be inefficient.

22   Q.   If they're in their claim, is it your opinion they

23   shouldn't be in there at all?

24   A.   That's correct.

25   Q.   Do you have anything else to summarize for the Court?

1    A.   I think that's it, Mr. Hug.

2              THE COURT:  One more time on how the wage rate

3    calculation between your calculation of roughly $71 versus

4    the $81 factors into your conclusions?

5              THE WITNESS:  With ECI's claim, they basically

6    took the 6900 hours and they times it by 81.46 an hour.

7    We wanted to check that rate.  So our analysis was that if

8    there's going to be an extra here, call it the blended

9    rate should be $71 -- roughly $71 an hour for the blended

10   rate if there's going to be any kind of change order in

11   lieu of $81 an hour.

12             THE COURT:  You talked about Mr. Caprio as well.

13             THE WITNESS:  Yes.

14             THE COURT:  When you asked Mr. Caprio to do his

15   analysis, what did you ask him to do?

16             THE WITNESS:  Sure.  I asked him -- we gave him

17   drawings and specs.  I said I need an estimate of Phase 3

18   as if you were looking at this job clean.  What would your

19   man hours be for Phase 3?  I don't need numbers against

20   it, I don't need rate; I just want man hours to complete

21   Phase 3.  I was trying to figure out just what the basic

22   man hours would be to complete that Phase 3.

23             THE COURT:  And that would be, I take it, based

24   on the amount of materials that are necessary to do

25   Phase 3?

1           THE WITNESS:  Sure.  It would be based on his

2    takeoff of the project.  So he needs to say X many lights

3    have to go in --

4           THE COURT:  He's looking at the drawings and

5    figuring that, right?

6           THE WITNESS:  Yes, he's figuring out the lights,

7    the switches, which HVAC devices have to be wired up, how

8    long does it take to hang conduit, wire, how long does it

9    take to hang a fixture, to do terminations at the panels.

10          THE COURT:  I take it, as far as you know, he

11   basically, by looking at the drawings, figured out how

12   much materials were required?

13          THE WITNESS:  That's correct.

14          THE COURT:  Were you aware at that time that it

15   would have been possible simply to have obtained

16   information about how much actual materials were used on

17   the project because you were doing this after the fact,

18   right?

19          THE WITNESS:  Yes, but ECI based their benchmark

20   baseline on the original bid.  So I wanted to say, okay,

21   if that's the baseline, let's see if that number was

22   right.  I wanted him to have a clean set of drawings, what

23   would your bid have been for this particular project as

24   bid.  I asked him to put a baseline together of that, man

25   hours.  I just wanted the man hours to complete that.

1              THE COURT:  But that depends upon -- the man

2      hours depends entirely on how much actual materials were

3      used at the project, right?

4              THE WITNESS:  That's correct.

5              THE COURT:  That's a function of that.  So I

6      guess I'm wondering why Mr. Caprio wasn't furnished the

7      actual materials used by ECI.

8              THE WITNESS:  I think we say that the job had

9      change orders as well to it, they may have added or

10     deducted items on the job.  There's a final quantity,

11     final items done.  So I think that's what you said.

12             THE COURT:  I think I'm saying that if

13     Mr. Caprio wanted to figure out if there was a problem

14     with the labor hours, I would think the most reliable

15     source, working start for this seems to me would be the

16     actual materials that were used by ECI at the project site

17     unless there were a claim that ECI overbought materials,

18     and I don't understand there ever was a claim for that.

19     So in this position where Mr. Caprio is not actually

20     having to do the bid himself, we don't have to guess about

21     the future, we knew.  It was shown what were the actual

22     materials that were used at the site.  And I am wondering

23     how it is and why it is Mr. Caprio's estimate or the

24     instructions given to Mr. Caprio in connection with his

25     doing his estimate didn't require him to actually base it

```
 1    upon the actual materials used by ECI as opposed to him

 2    looking at the drawings and coming up to his own

 3    conclusions about how much actual materials would be used.

 4              THE WITNESS:  Right.  If I understand this

 5    correct -- one comment.  The way ECI's claim was laid out,

 6    they brought the baseline benchmark hours back to their

 7    original bid estimate.  I wanted to kind of get someone,

 8    hey, I'm an estimator, what would I have bid for Phase 3

 9    to get that baseline proper?  And he did that.

10              I did see from their cost reports that they

11    increased their baseline -- this is ECI, they increased

12    their baseline from approximately 7600 to about 8800.

13    They did add some hours in.  I assume those are for change

14    orders.  I'm also assuming that with their change order

15    work, you negotiated that, those probably weren't the

16    inefficient areas, they kind of negotiated that.  I wanted

17    to have him go apples to apples with ECI's baseline and

18    give us that.

19              THE COURT:  And did you understand whether you

20    were asking him to do a full-blown analysis of work -- of

21    the labor hours that would be required?

22              THE WITNESS:  Yes.  He was doing a full-blown

23    estimate of labor hours for Phase 3.

24              THE COURT:  Did you give him at any time an

25    impression that he should just do a, quote, quickie
```

1    analysis?

2              THE WITNESS:  No.  No.

3    BY MR. HUG:

4    Q.    Did you understand him to do a quickie analysis?

5    A.    No.

6    Q.    Did he ever express to you that it was a quickie

7    analysis?

8    A.    No.  And it's not -- not to simplify it, but it's not

9    that difficult of an estimate.  You go to the gym, take

10   off the lights, there's conduits, you got to tie them back

11   to the panel.  There's HVAC units that have to be wired

12   up.  So I mean --

13   Q.    There's a lot of things he didn't do from a regular

14   estimate, correct?

15   A.    Well, he didn't do any buyouts or quotes on

16   materials, what that would have cost.  He knew he had to

17   install quarter-inch pipe, whatever size pipe, he had to

18   wire outlets.  There's no material pricing he had to do.

19   There's no labor rates.  I said I'll do the labor rates.

20   Just a man hour estimate that I asked him to do.

21             THE COURT:  So it would not be fair to say that

22   you asked him do a back-of-the-envelope quickie analysis?

23             THE WITNESS:  No.  Absolutely not, no.

24   BY MR. HUG:

25   Q.    Do you understand he provided you a

```
 1    back-of-the-envelope analysis or a quickie analysis or not
 2    a legitimate analysis?
 3    A.    No.  From my understanding, he did a takeoff of the
 4    drawings.  I look at his drawings, they're all marked up,
 5    each device and what have you.  It appeared he took off
 6    the whole project, all of Phase 3.
 7              THE COURT:  You looked at his drawings?
 8              THE WITNESS:  I saw his drawings, they were
 9    marked up.
10              THE COURT:  Do you know where those drawings are
11    now?
12              THE WITNESS:  I think they're in a box over
13    there.
14              THE COURT:  I don't remember seeing those
15    drawings that he used.
16              MR. HUG:  Yes, Your Honor.  Perhaps --
17              THE COURT:  Did you locate them now?
18              MR. HUG:  Yes, Your Honor.  Within days after --
19    we took your comments to heart, Your Honor, I hope you
20    appreciate that, and also in fairness to opposing counsel,
21    we immediately located those, we provided them to counsel,
22    and we offered counsel an opportunity to depose Mr. Caprio
23    or to recall Mr. Caprio in order to examine him on those.
24    That's all in our brief on that subject.  So all of that
25    is out there, it's there for examination.  And for that
```

1   matter, if Mr. Kaplan wants to recall in Caprio in his

2   case, I'm happy to provide him.

3          Whatever -- I didn't think it was incumbent on

4   me to do anything more than, given everything Your Honor

5   instructed me to do, and give him every opportunity to

6   point out where Mr. Caprio's materials or anything was

7   wrong.  And he still stands ready to be brought back in.

8   BY MR. HUG:

9   Q.   Sir, in terms of as-builts, when you're evaluating

10  one of these claims, do you want to put your guy in the

11  shoes that ECI was in?

12  A.   Yeah, in particular, in this particular claim, ECI

13  used the baseline bid.  So I wanted to put him in the

14  shoes of ECI to look at that baseline bid.  Clean set of

15  drawings, specs, and do the takeoff of what it was going

16  to take manhour-wise to complete that work.

17  Q.   He didn't have the ivory tower type, this was

18  everything actually done, including change orders and

19  alternates and whatever else there may be.  He was looking

20  at it from what ECI could reasonably expect to have to do,

21  correct?

22  A.   That's correct.

23  Q.   And an as-built approach to that, does that give you

24  the same flavor as giving him the raw documents, the same

25  very documents that ECI had to base their bid on and from

1   which they used to measure their damages?

2   A.    Yeah, we were trying to compare it to ECI's baseline.

3   I think with the as-builts, you could take off the

4   as-builts, but now those are usually marked up.  You don't

5   know the accuracy of those either as far as what those

6   might be.  Did they forget to put a light fixture?  That's

7   something that could have been used.  Again, we were

8   trying to go apples to apples with ECI's baseline.

9   Q.    By the way, who typically provides the electrical

10  conditions as-builts?

11  A.    The electrician would prepare them.  ECI.

12  Q.    Did you see in any of the documentation where ECI

13  compared their actuals to the as-builts?

14  A.    No.

15  Q.    So they had within their power to present this Court

16  with something other than their baseline as well, correct?

17  A.    Yes, I believe so.

18  Q.    All right.  They, for whatever reason, chose to

19  present their baseline in their estimate?

20  A.    Yes.

21  Q.    You examined that?

22  A.    That's correct.

23  Q.    Because that was the claim that was presented?

24  A.    Yes.

25  Q.    And if you had used the as-builts, you wouldn't

1    have -- your estimator wouldn't have the same view that

2    ECI had?  In other words, ECI was looking at the schedule,

3    the drawings, the specifications as presented in the bid

4    documents?

5    A.   That's correct.

6    Q.   All right.  Not in at the time clean ivory tower of

7    as-builts?

8    A.   Right.  If there was a large change on the as-builts,

9    there would be large change orders associated with that, I

10   would assume.

11   Q.   Do you know why ECI did not present their claim in

12   terms of as-built?

13   A.   I do not.

14            THE COURT:  Are we at a stopping point now?

15            MR. HUG:  I would like a short break,

16   Your Honor.  I may be done.  I was concluding, but I would

17   like an opportunity to think and a break would be good.

18   And I hope to say --

19            THE COURT:  I think maybe we'll take our morning

20   break.  And then if you're done, you can announce that.

21            And Mr. Kaplan, it looks like you'll be up to

22   cross-examination very shortly.

23            We will take a 20-minute break and reconvene at

24   10:35.  Stand in recess.  Thank you.

25                    (Whereupon, a recess followed.)

1          THE COURT:  Please proceed.

2    BY MR. HUG:

3    Q.   A couple of follow-up points before I finish with

4    you.  On page 6 of Exhibit 656 you have a discussion about

5    the wage rate which you've gone over in some detail.

6    A.   Yes.

7    Q.   At the bottom of that page you give your opinion

8    which says the labor rate should be adjusted to a maximum

9    of $71.69 per hour.  What do you mean by that statement?

10   A.   Yes.  So within ECI's claim they carry a labor rate

11   of $81 approximately for --

12          THE COURT:  Hold on a second.

13               (Interruption in the proceedings.)

14   BY MR. HUG:

15   Q.   Okay.  The question before you, the labor rate should

16   be adjusted to a maximum 71.69 per hour, what do you mean

17   by that?

18   A.   A couple things.  Number one, we know that they paid

19   the subcontractors less than that value.  And then, two,

20   we know there was about 32 percent of the labor during

21   that period we looked at was apprentice labor.

22   Q.   So you're not saying that the Court should use $71.69

23   per hour, right?

24   A.   No.  The maximum number based upon what was paid and

25   what the breakdown in labor classifications were.

1    Q.   On the last page of Exhibit 656, you give a summary.

2    And in the middle of that summary you do somewhat of an

3    hours breakdown, do you see that?

4    A.   Sorry, this is Section 3, the Conclusion?

5    Q.   Yes.

6    A.   Yes.

7    Q.   Now, what's the purpose of putting back these numbers

8    in, potential impacted hours?  Why are you showing that

9    illustration for the Court?  In other words, is this what

10   you're saying ECI should be paid for?

11   A.   No.  This is if there is a claim here, a valid claim

12   here, we think the maximum potential would be about 1032

13   hours.

14   Q.   Okay.  Are there other things that would further, in

15   your mind, suggest -- from a financial review standpoint

16   only, are there other things that would also come into

17   play that would further take into account or cause you to

18   adjust the amount of hours that might be compensated?

19   A.   Well, I think our analysis, we did -- we went through

20   the labor during the period of July and August, during the

21   impacted period.  And I think we were trying to figure

22   exactly where guys worked, there was no document that said

23   exactly where everyone worked.  I was relying on weekly

24   foreman reports that had some information but not all the

25   information.  I had daily logs that had areas worked,

1    number of men, but not all the men were allocated on those

2    logs.  We just tried to extract as much information as we

3    could to state at a minimum we should take out 2,028

4    hours, that was pretty clear.  There could be more that's

5    in there.

6    Q.   You're not saying that ECI has demonstrated that the

7    hours that you do acknowledge in fact are for Phase 3 and

8    for the particular cost codes, are you?

9    A.   They're stating that some of that is definitely for

10   Phase 3.  Could I say that all of it is?  No.  I think

11   it's potential that 2,028 could be higher based on the

12   records we reviewed, in particular the daily logs out

13   of -- the information we reviewed that had the most

14   information regarding allocation where labor was.

15   Q.   And what you have is lacking, as I think the Court

16   even inquired about how you made your allegations between

17   Phase 2 and Phase 3 in terms of men per day, eight hours,

18   things like that.  Do you recall that testimony?

19   A.   Yes, we tried to extract as much information as we

20   could out of those, but unfortunately it wasn't exact.

21   Q.   In fact, is there any documentation that you've been

22   able to see that enables you to do an exact interpretation

23   of exactly what was worked on on Phase 3?

24   A.   To clarify, the 2,028 I'm fairly confident that at

25   least that should come out.  With regards to what more

1    than that, I can't give an exact allocation of that.

2        There's the cost reports that allocate labor per cost

3    codes.  In review of Exhibit 519, you know, I kind of

4    question where some of those hours might be, if they got

5    coded properly.  Similarly, the review of the weekly

6    foreman reports which I believe got fed to accounting to

7    be put input into the system, those would lead to a

8    question if those hours got allocated properly.

9              MR. HUG:  Thank you, Your Honor.

10             THE COURT:  Thank you.

11             Mr. Kaplan, cross-examination?

12             MR. KAPLAN:  Yes, sir.

13             May I ask the Court and the witness be given

14   Volume III of the plaintiff's exhibits, please.

15

16                   CROSS-EXAMINATION

17   BY MR. KAPLAN:

18   Q.   Good morning, Mr. O'Neill.

19   A.   Good morning.

20   Q.   Mr. O'Neill, who hired you?

21   A.   Robinson & Cole.

22   Q.   What are they paying you?

23   A.   They pay an hourly rate.

24   Q.   Which is?

25   A.   I have to check our accounting system.  Approximately

 1   $175 an hour.

 2   Q.   How much have you billed them so far for your

 3   services?

 4   A.   I'd say in the neighborhood of $15,000.

 5   Q.   Okay.  Is it your understanding that Pike is actually

 6   paying for that?

 7   A.   That's correct.

 8   Q.   What other cases does your firm have where you work

 9   with Robinson & Cole as an expert?

10   A.   I have other cases with them where we work -- where

11   we both represent a surety.  We have a few cases in that

12   regard.

13   Q.   Do you know how many?

14   A.   Probably two or three currently active.

15   Q.   And when you were hired, you understood that you were

16   hired on behalf of Pike even though the attorney actually

17   hired you, right?

18   A.   Yes.  Our invoices go to Robinson.  I understand Pike

19   will be paying those.

20   Q.   You understand you're working for Pike, basically?

21   A.   Yes.

22   Q.   And you understood when you first got this assignment

23   that Pike was being sued by ECI as to the claims in

24   question, correct?

25   A.   Yes.

1   Q.   So you knew you were being hired to assist Pike in

2   defending the claims by ECI, correct?

3   A.   To evaluate the claim, that's correct.  Portions of

4   their claims.

5   Q.   But you knew they hired you to assist in defending

6   their claims, correct?

7   A.   Yes.

8   Q.   Now, I like to go to page 9 of your Exhibit 656,

9   which is basically your conclusion page.

10      Now, you start with the hours claimed by ECI, this is

11  at the very bottom there.  You reduce by 3,903 basically

12  hours that Caprio told you ECI's bid was too low in man

13  hours for Phase 3, correct?

14  A.   Yes.  Not just for Phase 3, but in particular the

15  6,900 was allocated to certain cost codes within Phase 3.

16  Q.   Right.  Thank you for that.  But that number is

17  coming directly from Caprio?

18  A.   Yes.

19  Q.   3,903?

20  A.   Correct.

21  Q.   As the Court asked you yesterday, if the Court were

22  to, for whatever reason, put aside that reduction based on

23  Caprio's bid, that 3,903 would come out of your equation,

24  correct?

25  A.   Yes, unless due to other parts of my report they felt

1   that the baseline benchmark was not accurate.

2   Q.   You haven't given any particulars other than the

3   Caprio report?

4   A.   That's correct.

5   Q.   So you have absolutely nothing independent of the

6   Caprio report showing, gee, this baseline, as you've been

7   calling it, the baseline numbers for ECI should be changed

8   in some specific fashion; the specific numbers are coming

9   from the Caprio work, correct?

10  A.   That's correct.

11  Q.   And then so if you put Caprio's work aside, you're

12  left with the reduction of 2,028, correct?

13  A.   That's correct.

14  Q.   And if, for whatever reason, the Court found that the

15  2,028 number was incorrect, that ECI's number should not

16  be reduced, you would have nothing then coming off of

17  ECI's claimed hours, from a mathematical point of view, as

18  your summary is presented here, correct?

19  A.   If someone concluded that the 6,900 was correct to

20  start with.

21  Q.   Well, I'm just talking about your reductions for now.

22  You're reducing the 6,963 by two items?

23  A.   Yes.

24  Q.   What we've called the Caprio hours that he provided

25  you and also your reduction of 2,028 for work done during

 1    the claim period other than Phase 3, right?

 2    A.    That's correct.

 3    Q.    Okay.  That's it in terms of any specific reductions

 4    that you're suggesting to ECI's claim, correct?

 5    A.    Yes.  And we state that these are, number one, 2,028

 6    is probably the minimum to be taken out.

 7    Q.    Please just answer my questions.

 8    A.    It's not totally where it's just a minimum.

 9    Q.    Okay.  You made that clear.  But you didn't -- in

10    your calculations, you have tables and charts which we

11    went through which show how you came up with the 2,028?

12    A.    Yes.

13    Q.    Now, the 2,028 -- and unless I have to, I'm not going

14    to go back to the tables, I think it's clear to the Court

15    where the numbers are coming from for now.  You basically

16    went through ECI's daily reports, both the foreman's daily

17    logs and weekly daily reports.  You came up with ECI

18    worked 2,028 hours other than Phase 3 basically for two

19    months, essentially, July and August.  And you're saying

20    therefore those hours had have to be taken out of ECI's

21    claim.  Forget about the propriety of the claim, whether

22    it's right or not, just from a mathematical function; is

23    that true?

24    A.    That's correct.

25    Q.    If ECI never included those hours in its claim to

1   begin with, there's no reason to take them out, whatever

2   they are; is that correct?

3   A.    Yes.

4   Q.    Because if ECI never included in its claim any work

5   it did outside of Phase 3 period, then any reduction of

6   any kind for work you're observing was done outside of

7   Phase 3 makes no sense; would you agree with me on that?

8   A.    Could you repeat that?

9   Q.    I'll try.  If ECI never included in its claim any

10  hours other than Phase 3 hours, okay, then there's nothing

11  to reduce from their claim based on your observations

12  that, gee, they worked in other phases at any given time;

13  would you agree with me on that?

14  A.    There would be a benchmark reduction if we felt the

15  benchmark wasn't proper.

16  Q.    I'm not talking about your benchmark reduction based

17  on what Caprio told you.  I'm just talking about you have

18  2,028 hours you're calling as reduction for working in

19  areas other than Phase 3, during the impacted period,

20  which you've identified as basically July and August?

21  A.    Yes.

22  Q.    What I'm posing to you is if ECI never included in

23  their claim any hours worked anywhere other than Phase 3,

24  there's nothing to reduce from their claim?  They may have

25  other problems with their claims, but just on that concept

1    alone for which your 2,028 hours appears, would you agree

2    with me on that?

3    A.    That's correct.

4    Q.    Okay.  And in fact, are you aware that Mr. Mathieu

5    testified at length in this trial that he was in fact the

6    field superintendent who prepared those records that you

7    reviewed?

8    A.    Yes, I did not see his testimony.

9    Q.    Are you aware that Mr. Mathieu testified that he was

10   the one who went back through all of those records, both

11   his daily logs and those weekly labor reports, it was his

12   handwriting indicating Phase 2, Phase 3, circling all

13   those notations, and that he went back not only once,

14   twice, but three times since this claim arose to make sure

15   those numbers were accurate and that the only hours

16   included in ECI's claim were Phase 3 hours; are you aware

17   that he testified to that effect?

18   A.    No, I was not here for his testimony.

19   Q.    Okay.  Are you aware that at no time did ECI present

20   this claim as involving anything other than Phase 3 hours

21   from its inception?

22   A.    Yes.

23   Q.    Okay.  I'm also going to need Volume II.  I'm sorry,

24   Your Honor, I'll get to Volume III.  I need Volume II as

25   well of the plaintiff's exhibits.

1    A.   Is this Volume III?

2    Q.   I'll get to that, but I'm going to go to II first,

3    thank you.  Sorry.

4         Now, in your analysis -- again, I don't think we have

5    to go back to your page because I think we're all pretty

6    fresh on it.  Your period for your taking off that 2,028,

7    that's for July and August, basically, of 2010, right?

8    A.   Starts 6/28/2010 and is ten weeks.

9    Q.   You made no effort whatsoever to look at the records

10   ECI provided as to any work they did for Phase 3 either

11   prior to June 28 or after August 31 -- or September 4 I

12   think you said; is that true?

13   A.   I don't think we had those documents.

14   Q.   You don't think you had those documents?  Weren't you

15   provided with ECI's daily job reports that are in Tab 17

16   for basically all of 2010?  They certainly were provided

17   to Attorney Hug.  Did you get those?

18   A.   We may have had these.  But clearly I think through

19   the March 24 letter and the claim that we received, I

20   think it's Exhibit 522, we focused on that claim period

21   from 6/28 forward.

22   Q.   Well, that's what you focused on.  I'll get there,

23   what you focused on.  I'm talking about the records you

24   had to review now.  Didn't you have the entirety of Tab 17

25   which are all the daily job reports for 2010, basically?

1    A.    I believe we would have had access to this.

2    Q.    And then if you flip to Tab 18 -- and these go 18,

3    19, 20, they go through tab -- I think even the end of the

4    book, all of the foreman's weekly labor reports starting

5    in March of 2010 and going basically through the end of

6    2010, you had those as well, did you not?

7    A.    We received them after our first report was repaired.

8    Q.    Right.  You got those in December of last year?

9    A.    Yes.

10   Q.    That's what prompted, to some extent, your March --

11   your supplemental report in March?

12   A.    That's correct.

13   Q.    So you had all of Mr. Mathieu's daily job records and

14   you also had all of his weekly labor reports basically for

15   2010 when you did your March report and when you did this

16   July report as well, that's Exhibit 656, right?

17   A.    Yes.

18   Q.    Okay.  Given those records -- strike that.

19         Are you aware that Mr. Mathieu testified here as the

20   project foreman who created these records that he went

21   back and audited ECI's hours in September of 2010

22   preparatory to this claim being submitted so that he could

23   verify the Phase 3 hours and the code allocations; were

24   you aware of that?

25   A.    No, I was not here for his testimony.

1    Q.   Well, he also was deposed and I think he testified to

2    that.  Were you aware that he said he went through those

3    functions on behalf of ECI to prepare this claim?

4    A.   No.

5    Q.   Okay.  Now, if the project foreman is keeping daily

6    records, daily job records which you reviewed, right?

7    A.   Yes.

8    Q.   This is Tab 17.  And they're fairly detailed, are

9    they not, Tab 17, daily job reports?

10   A.   To a point.  They don't allocate all the labor.

11   Q.   Have you ever read daily job reports before from

12   subcontractor foremen?

13   A.   Yes.

14   Q.   These are pretty detailed by comparison, are they

15   not?

16   A.   I think they're average.

17   Q.   Okay.  And he also kept the weekly labor reports for

18   the employees, which are in all the various other tabs.

19   Are you aware that that's what generated the actual

20   certified payrolls for ECI's employees?

21   A.   I would assume that's where it came from, yes.

22   Q.   So you're aware that's an important function for the

23   foreman, is it not?

24   A.   It is.

25   Q.   Because he's actually generating the payroll

1    information through these records, right?

2    A.   Yes.

3    Q.   And also the code allocations which appear

4    throughout -- and I know the Court has viewed these -- all

5    of these various forms, they're all the same form, they

6    have all the ECI codes at the top starting with Tab 18 and

7    going throughout all the rest.  The form is the same.

8    This is, Your Honor, Book II, Exhibit 18 -- all of these

9    records -- give the Court a moment.  We can start at 18,

10   I'll flip to the other ones.  But the forms are all the

11   same?

12   A.   Tab 18, the first ten probably don't have that top

13   right-handed coding.

14   Q.   That's right.  Let's go to Tab 19.  It's a little

15   easier.  Thanks for pointing that out.

16        First of all, the top codes Branch Conduit, Branch

17   Wire, Feeder, all those work codes, those are part of this

18   form, right?

19   A.   Those are the standard cost codes that appeared in

20   each one of them.

21   Q.   I presume you've seen these types of reports before,

22   field reports before from other subcontractors, have you

23   not?

24   A.   Yes.

25   Q.   Electrical contractors tend to do this type of

1  coding, pretty much standard custom practice?

2  A.   Many self-performing contractors have a coding

3  system.

4  Q.   It's not unusual for a foreman to be doing this on a

5  weekly or daily basis, filling out these forms assigning

6  the workers to the various codes and allocations?

7  A.   Sure.  He might have.  The project manager might be

8  involved.  Someone else could be assigned.

9  Q.   Mr. Mathieu did this throughout 2010.  Every one of

10  these is his work product, basically this whole book,

11  Volume II is his work product.

12       So who would know best as to what his people were

13  doing in the field on a daily basis, anybody besides -- at

14  this point Mr. Mathieu, the field foreman, who is

15  directing the people what to do, filling out these forms

16  on a daily or weekly basis for purposes of payroll, code

17  allocation, recordkeeping for his company, would he be the

18  guy who knew best where his people were working on a daily

19  or weekly basis?

20  A.   If he had the time to properly fill these out.

21  Q.   He's the guy?

22  A.   Right.

23  Q.   When he's filling out daily or weekly how many hours

24  his men worked for various codes, what phases they were

25  working on, he's pretty much the guy who knows that better

 1   than anybody in realtime, correct?

 2   A.   That's the person you probably want to fill it out.

 3   Q.   If he's doing his job, he will probably be fairly

 4   accurate, if not very accurate, would you agree?

 5   A.   That's his job.

 6   Q.   Right.  That's his job.  And if a company keeps him

 7   for 20, 25 years, he's probably done that pretty well,

 8   right?

 9           MR. HUG:  Objection, speculation.

10           MR. KAPLAN:  I'll move on.

11           THE COURT:  I think you've made the point.

12           MR. KAPLAN:  Thank you.

13   BY MR. KAPLAN:

14   Q.   And if Mr. Mathieu, as he testified, goes back two,

15   three times to check these records to make sure the

16   allocations by code and phase are accurate because he

17   knows there's a claim, he's been charged by his boss to do

18   that, is it a fair assumption that he at least would be

19   trying to get these as accurate as possible?

20           MR. HUG:  Objection.

21           THE COURT:  Sustained.  Move on.

22           MR. KAPLAN:  Thank you.

23   BY MR. KAPLAN:

24   Q.   Now, you said you did not go at all prior to June 30?

25   A.   Twenty-eight.

1    Q.    Twenty-eight, sorry, in trying to see what Phase 3

2    work ECI did?

3    A.    There wasn't that much.

4    Q.    There wasn't that much.  Okay.

5          Let's start flipping through this.  Start at page 19,

6    first few pages.

7                THE COURT:  What exhibit?

8                MR. KAPLAN:  Tab 19.

9    BY MR. KAPLAN:

10   Q.    These are May 8 records, starts with Mr. Mathieu in

11   the first page, is that what your first page in Tab 19?

12   A.    May 1st, 2010 is all Phase 2.

13   Q.    Tab 19?

14   A.    Tab 19.

15   Q.    If you flip through, I think some of these may be in

16   different order.  If you flip through what's in

17   Exhibit 19, these are the May 1st, May 8, May 5, would you

18   agree that there are a number of workers who Mr. Mathieu

19   has circled Phase 3 for?  I'm looking at Mr. Mathieu

20   himself for the entire week.

21   A.    Are you looking at a certain --

22   Q.    Yeah, Mr. Mathieu -- they may be slightly out of

23   order.  I'm sorry for that.  Mr. Mathieu for May 8?

24   A.    Yes.

25   Q.    That's all Phase 3, right?

1   A.   Four hours under branch conduit, four hours under

2   feeder which was not part of the claim.

3   Q.   You're saying that the feeder was not part of what?

4   A.   I don't think that was part of your claim.

5   Q.   Well, in terms of -- I beg to differ, but that's

6   okay.  I'm looking at what he's got Phase 3 at the top and

7   he's circling Phase 3 for that sheet, right?

8   A.   He is, yes.

9   Q.   And then Mr. Kuczynski from May 8, do you have him?

10  A.   Yes.

11  Q.   And that's circled for Phase 3, the right corner?

12  A.   Yes.  And that cost code is not part of your claim.

13  Q.   And I'm looking at -- in terms of right now, I'm

14  asking you about the hours for Phase 3 because you did

15  not -- isn't it true that you did not make any effort to

16  check out any of the hours for whatever codes they were

17  for Phase 3 prior to June 28, right?

18  A.   Oh, I made an effort.  But I couldn't with the

19  documentation provided.

20  Q.   You're claiming you could, but you didn't go through

21  and take the allocations from Mr. Mathieu's records prior

22  to June 28 to see what he wrote down for Phase 3 hours,

23  did you?

24  A.   No, I think we determined from the review with these

25  that the daily logs were more accurate.

1    Q.   That was not the question.  The question was:  You

2    did not make any effort to go through his foreman's weekly

3    labor reports for the periods prior to June 28 to see what

4    Mr. Mathieu indicated ECI had done in Phase 3 work, did

5    you?

6    A.   That's correct.

7    Q.   That's correct.  Despite the fact that Mr. Mathieu

8    has testified and actually was deposed and stated that he

9    based all the hour input both by code and phase from these

10   records, you still didn't make any effort to look at what

11   his records were before June 28, right?

12   A.   No, because the claim we believe was based on --

13   Q.   The answer is no?

14   A.   The answer is no.

15   Q.   And then if we go to Tab 20, you have tab here

16   Exhibit 20 from June 5, these go through June 26, this is

17   all the period prior to what we did.  And I believe if we

18   flip through these, every single page of this exhibit says

19   Phase 3 at the top, does it not?

20   A.   I just flipped to June 12, Pawel Shorupski, and it's

21   circled Phase 3 but he notes Phase 2.

22   Q.   Right, exactly.  Good point.  Let's start with my

23   question.  Every one of his tab is stated as Phase 3 in

24   the upper right corner, correct?  Every single page?

25   A.   Yes.

1    Q.    Okay.   Then Mr. Mathieu has gone through for some of

2    these, right, and as you said, indicated some was Phase 2

3    or some was Phase 3, some he left alone, right?   Some have

4    no notations.   Some say no, this is Phase 2, right?   A

5    number of them say Phase 2.   Some of them are split

6    between Phase 2 and Phase 3.   So obviously he went through

7    this to make sure, from his point of view, as he

8    testified, that these were accurate as to the allocation

9    that was being made, right?

10   A.    He testified.   If that's what he told you.

11   Q.    Certainly you can see notations as to what he was

12   assigning to Phase 2 or keeping in Phase 3?

13   A.    One of my problems is it didn't have a Phase 2 in the

14   top right corner.

15   Q.    This particular tab I think we just agreed every

16   single page in it has Phase 3 circled in the right corner,

17   right?

18   A.    Yes.

19   Q.    And then on some of them there's no other notation,

20   some of them they say Phase 2, some of them say part

21   Phase 2, Phase 3, right?   Is that correct?

22   A.    That's correct.

23   Q.    So if you're working on this tab, not that you have

24   to accept what Mr. Mathieu wrote was correct, but in terms

25   of the detail of what he was recording for purposes of

1    going into ECI's system, in Exhibit 20 for the month of

2    June or good part of the month of June, that information

3    is set forth fairly clearly, is it not?

4    A.   I wouldn't say clearly where he circles Phase 2 but

5    notes Phase 2 on some of these documents.

6    Q.   Right.  So he's saying -- well, you don't know what

7    he's saying, but the indication there what he's circling

8    is that those should be assigned to Phase 2, which is what

9    he testified to.  All right.

10       Now, are you aware -- forget about how many specific

11   hours.  But are you aware that prior to June 28 ECI was

12   doing some amount of Phase 3 work?

13   A.   Yes.

14   Q.   And they were doing that at Pike's direction,

15   correct?

16   A.   I assume so.

17   Q.   Okay.  Are you aware that they did a fair amount of

18   work on Phase 3 after September 4, again at Pike's

19   direction?

20   A.   I am not aware of that.  I saw it was 99 percent

21   completed in the payment application.

22   Q.   Are you aware that certain amounts of the Phase 3

23   work, what was supposed to be done at the end of August

24   got pushed out into September and early October based on

25   problems with structural steel and some areas had to be

1    delayed in terms of Phase 3 completion; were you aware of

2    that?

3    A.   Yes.

4    Q.   Okay.  And were you aware that ECI did work in those

5    areas after September 4?

6    A.   Yes.  I saw, I believe, a document that showed 800

7    hours potentially worked after September 4.

8    Q.   What document was that?

9    A.   Exhibit 522.

10   Q.   That would have been an ECI record?

11   A.   Yes.

12   Q.   Okay.  So you're aware that ECI did work before your

13   period that you tallied up and after the period you

14   tallied up work in Phase 3?

15   A.   Yes.

16   Q.   And you do not include any of those hours in any way,

17   shape or form in your various reports, do you?

18   A.   That's correct.

19   Q.   That's correct.

20        Now, are you aware that ECI's claim in this matter is

21   for the overruns in Phase 3 in the specific job codes that

22   have been identified?

23   A.   That's correct.

24   Q.   All right.  And their baseline, as you call it, or

25   their bid hours, as adjusted for whatever change orders

1    affected that, versus the actual hours spent in performing

2    those specific codes of work, categories of work for

3    Phase 3?

4    A.   That's correct.

5    Q.   Are you aware that nowhere in any document ECI's

6    presented do they say we measured our hours starting

7    June 28 of Phase 3, we stopped measuring our hours for

8    Phase 3 on September 4, and therefore here's how our claim

9    is set up only between the periods June 28 and

10   September 4?  Is there any document in this record that

11   says that?

12   A.   Clauson 522.

13   Q.   Where is that, please?

14           THE COURT:  Is that part of your report?

15           THE WITNESS:  Yes, it is.  Appendix A.

16           THE COURT:  To Exhibit 656?

17           THE WITNESS:  Or the original report, either

18   one.

19   BY MR. KAPLAN:

20   Q.   I'll use 656 because I have it handy.  You're saying

21   Clauson 522?

22   A.   Yes.

23   Q.   Now, are you aware that this was part of a manpower

24   loading chart that ECI provided to Pike during their

25   discussions of their claim?

1   A.   I understood it was part of their claim justifying --

2   attempting to justify their overruns.

3   Q.   And let me show you, you don't have it here, but let

4   me show you what that goes with.  It will take me one

5   second, I just have to find it.

6        This would be Plaintiff's Exhibit 30 which is in

7   Book III, Your Honor.

8        I think you have Book III in front of you,

9   Mr. O'Neill.

10  A.   Book III.

11  Q.   Book III, Tab 30.

12  A.   Yes.

13  Q.   And you have what you refer to as Clauson 522 as the

14  first page, I believe.  And the next couple pages are the

15  actual graphic representations of the crew size.

16  A.   Exactly.  What they felt they bid.

17  Q.   So they're comparing for that period of time which

18  was, by the way, when Phase 3 was supposed to run based on

19  the bid schedule, which was the end of June to

20  September 4, they're comparing their estimated crew sizes

21  for that period and the actual crew sizes for that

22  period --

23           MR. HUG:  Objection, Your Honor.  I think he's

24  beginning to testify about the document that the

25  witness -- there's no foundation for the witness to

1    answer.

2                THE COURT:  Sustained.  You can ask the witness

3    about the document.

4    BY MR. KAPLAN:

5    Q.   You know what a manpower loading chart is,

6    Mr. O'Neill?

7    A.   Yes.

8    Q.   Can you tell, from looking at this comparison, that

9    it's comparing the bid manpower for the various weeks to

10   the actual manpower for the various weeks?

11   A.   Yes.

12   Q.   And you could tell that that -- and are you also

13   aware that the original bid schedule, not what was done,

14   but what was provided to ECI for bid purposes by Pike in

15   their schedule indicated Phase 3 would start at the end of

16   June and would be completed by September 4?

17   A.   Yes.

18   Q.   Okay.  And in fact, that's not what happened, because

19   you've already testified that you know that ECI did work

20   prior to the 27th on Phase 3 and did work into October?

21   A.   I believe minimal work was done prior to.  And this

22   document showed 800 hours for punch list after

23   September 4.

24   Q.   You say minimal work, but you made no effort to find

25   out how much work was done prior to the 27th?

1    A.    The payment application shows 15 percent was billed

2    on Phase 3 during that period.

3    Q.    You made no attempt to look at the hours that

4    Mr. Mathieu recorded and assigned to Phase 3 in his weekly

5    labor reports for that prior period?

6    A.    That's correct.

7    Q.    Nor did you do anything like that for the hours

8    expended by ECI after September 4 for the remainder of

9    Phase 3?

10   A.    That's correct.

11   Q.    Okay.  Now you referred to a letter, a March 2011

12   claim letter from ECI.  And you have Plaintiff's

13   Volume III in front of you.  If you go to Tab 40, would

14   you look at that, please?  That's Exhibit 40.  I want to

15   ask you, that's the letter you mentioned?

16   A.    Yes, Mr. Kaplan.

17   Q.    So you've seen that and that's the letter you

18   referenced, and I think you said -- and correct me if I'm

19   wrong -- that this letter told you that ECI's claim was

20   only for the impact hours from June 28 to September 4, did

21   I get that right?

22   A.    This referenced a ten-week period.  This claim, what

23   it did, it took the overrun hours for those selected cost

24   codes within Phase 3 and added subcontractor hours for

25   those selected cost codes and that was the claim on this

1    letter.

2    Q.   But your ten-week phase -- the reference to ten weeks

3    is in the next to the last paragraph, right, where

4    Mr. Flynn says --

5    A.   There's several references in that letter to ten

6    weeks.

7    Q.   Well, at page 3, at the top he talks about the

8    ten-week bid period, right?

9    A.   Not bid period.

10   Q.   At the top throughout the last five weeks of the

11   ten-week bid schedule?

12   A.   Bid schedule, sorry, yes.  How the job was bid,

13   right.

14   Q.   And then if you look at the attachment, there's an

15   attachment -- several attachments.  There's a page that

16   says Kelly Middle School Phase Overrun and he has ECI

17   total labor overrun, et cetera, right?

18   A.   Yes.

19   Q.   And then when you go to the next page they have a

20   2/25/2011 labor hours report, right?

21   A.   Yes.

22   Q.   And although I know your reports used a subsequent

23   one, but for present -- you used a July one, but for

24   present purposes I think it's fine, the format is the

25   same, the numbers aren't that far off.

1    A.    We represent this letter and it was updated with the

2    July report.

3    Q.    Right, right.  But the claim, some variations is

4    presented here in the same format, same approach, this

5    indicates the estimated hours for all of Phase 3 because

6    you checked those estimated hours with the original

7    estimate, right?

8    A.    Yes.

9    Q.    So you know that ECI's baseline, as you call it, is

10   to perform all of the Phase 3 work, right?

11   A.    Yes.

12   Q.    Okay.  And they're taking their actual hours for

13   performing all of the Phase 3 work as that information is

14   current as of February 25, right?

15   A.    Yes.

16   Q.    And that's what's driving the claim here, the numbers

17   that Mr. Flynn is presenting in his letter to Pike,

18   correct?

19   A.    No.

20   Q.    Well, if you take his overruns in the codes that are

21   being identified, that's where his hours are coming from

22   plus the subcontractor hours, right?

23   A.    Correct.  But it doesn't consider those codes where

24   the labor codes may have done better.

25   Q.    I'm with you on that.  I'm saying the format hasn't

1   change.  The point here is the numbers for actual hours

2   that ECI has recorded, whether you like it or not, are for

3   all of the Phase 3 work for the codes they're identifying,

4   right?

5   A.   Their claim is based on certain codes, not all the

6   codes.

7   Q.   Right.  The claims -- the codes --

8   A.   Only the negative codes.

9   Q.   The codes that they've identified that they're

10  claiming on, that's the work for all of Phase 3 applicable

11  to those codes, right?

12  A.   These codes are all the Phase 3 codes, to my

13  understanding.

14  Q.   Right.  So their baseline is the estimate for all the

15  work for Phase 3 as to the affected codes, right?

16       In Phase 3, their baseline is all of the Phase 3 work

17  for the affected codes, right?

18  A.   For the affected codes, yes.

19  Q.   And their actual hours for the affected codes are for

20  all of the work in Phase 3 for those codes, right?

21  A.   For just those codes, right.

22  Q.   And if they had to do work because the schedule got

23  changed -- forget about right, wrong, whatever -- because

24  in fact the schedule got changed, they did some of the

25  Phase 3 work prior to the scheduled start date of June 28,

1    right?

2    A.    I don't know if it's because the schedule got

3    changed.

4    Q.    They did it for whatever reason they ended up doing

5    it.  And they ended up doing some of the work after the

6    scheduled completion for Phase 3, right?

7              MR. HUG:  Objection, there's really no question

8    there.  He's just sort of speaking to the witness about

9    facts in the case.

10             MR. KAPLAN:  The point here is, Your Honor,

11   Mr. O'Neill has made a big point to his report that he's

12   limiting certain analyses to June 28 to September 4 in

13   Phase 3 work in fact preceded and followed those periods,

14   and that the claim has always been set up for the Phase 3

15   work for the affected codes wherever it was done.  The

16   major impact period, of course, was in that ten-week

17   period because that was the scheduled period.  And this is

18   what I was talking about yesterday before we even got into

19   Mr. O'Neill's testimony.  The problem I had with his

20   approach, because it's cutting out information not only

21   that's relevant but that he had in front of him.  So

22   that's why I'm trying to go through this with him to

23   establish what he did and didn't do and what he had in

24   front of him and what the claim consisted of.

25             THE COURT:  Okay.  It's just that if you could

1   be -- it sounds like you're almost testifying a lot.  So

2   if you could do it by showing him where in the document

3   specifically and have the witness testify about that,

4   that's fair.

5          MR. HUG:  Your Honor, may I respond to that?  I

6   mean, he's just given you basically argument to the Court.

7   And the reality is is that what's happening is he's trying

8   to backpedal from a claim that he now has been shown has

9   been defectively filed because it includes a claim for

10  periods during unaffected periods.  Now he's trying to

11  figure out a way to say it's okay to do that.  The fact of

12  the matter is he's backpedaling around an insufficient

13  claim.

14         THE COURT:  That's a matter for argument later

15  on.

16         If you could just try to limit to showing this

17  witness concerning facts that establish the predicate for

18  your argument without making an argument yourself.

19  BY MR. KAPLAN:

20  Q.   Mr. O'Neill, your Exhibit 656, you have in Tab A,

21  this is your most recent report --

22  A.   Hold on.  Sorry.  Yes, Counsel.

23  Q.   You have in Tab A a couple pages in the 7/26/2011

24  labor hours report, you testified at length about this?

25  A.   Yes.

1    Q.   And the circle for Phase 3, these are basically what

2    we'll call the final numbers for ECI's claim, right?  The

3    numbers they used in terms of the estimated hours and

4    actual hours that went into their claim for the affected

5    codes, right?

6    A.   That's my understanding, yes.

7    Q.   And it's also your understanding that these

8    represent, both in terms of estimating and actual, the

9    work for all of Phase 3 for those codes regardless of when

10   it was performed?

11   A.   Yes.

12   Q.   Right.  And going back to the question I started with

13   you on when you were talking about reducing this 2,028

14   hours because they worked elsewhere, again, if their claim

15   never included this elsewhere stuff, the hours other than

16   Phase 3, then your attempt to reduce the claim by 2,028

17   man hours or some other amount is an incorrect effort,

18   isn't it?

19         MR. HUG:  Objection, Your Honor, asked and

20   answered at least twice before.

21         THE COURT:  I'll allow it.

22   A.   I'm sorry.  Could you repeat the question?

23   BY MR. KAPLAN:

24   Q.   If in fact ECI's claim did not incorporate

25   non-Phase 3 hours, either in the estimated category or in

1    the effected code category, your reduction of 2,028 man

2    hours that you have in your conclusion in your report

3    because they worked other hours in that summer period,

4    that would be incorrect; do you agree with that?

5    A.    That's correct.

6    Q.    Okay.  Now let's talk about the rate.

7          You talked about $71.69 as a maximum rate that you

8    thought ECI would be -- could properly claim.  Said it

9    might be less, but that would be the maximum rate?

10   A.    Yes.

11   Q.    I think you indicated that would be for a change

12   order type situation, I think you used that phrase a

13   couple of times?

14   A.    Yes.

15   Q.    If there was an agreed-upon change order rate for the

16   job that Pike had agreed with ECI and actually paid ECI

17   for a number of change orders at a blended rate, would you

18   agree that that would be a legitimate rate to use for a

19   change order type claim?

20   A.    In general, yes.

21   Q.    Okay.

22   A.    If there was an agreement on that.

23   Q.    Okay.  You have Volume III in front of you.  If we

24   could go to Tab 44, Exhibit 44.

25         I'd like to go into about the fourth page or so.

1  A.   I'm sorry, which exhibit?

2  Q.   This is Exhibit 44, Tab 44.

3  A.   Yes.

4  Q.   And if you go to about the fourth page, it says

5  change order number 026 in the upper left-hand corner,

6  September 29, 2010?

7  A.   September 29, 2010, a letter to Mel Strauss.

8  Q.   I think right after that there's actually a change

9  order form?

10  A.   Got you.

11       MR. HUG:  I'm sorry, Counsel.  Which one are you

12  referring to?

13       MR. KAPLAN:  Tab 44, four pages in, ECI change

14  order proposal, Project Modification And/Or Change Order

15  Proposal, ECI change number 026.  Everybody have that?

16  BY MR. KAPLAN:

17  Q.   There is a bunch of rates there, right?

18  A.   Yes.

19  Q.   And for electrician it says $81.46 per hour, does it

20  not?

21  A.   Looks like for straight time, yes.

22  Q.   That's the same rate that ECI has used for this

23  claim, right?

24  A.   Yes.

25  Q.   And are you aware that Mr. Clauson testified that ECI

1    processed a number of change orders at that rate that was

2    agreed upon with Pike and paid by Pike for change order

3    work, straight time journeyman?

4              MR. HUG:  Objection, Your Honor, irrelevant.

5              MR. KAPLAN:  It's not irrelevant, Your Honor,

6    because he's talked about categorizing pricing for change

7    orders.  And when the parties actually utilized a change

8    order rate, I'm certainly entitled to ask him whether that

9    would be an appropriate rate to use for what he has

10   categorized.

11             THE COURT:  You are.  But if you could do it

12   without pitting him against other witnesses that he wasn't

13   here to hear testify.

14   BY MR. KAPLAN:

15   Q.  Are you aware that, from a factual standpoint, Pike

16   paid ECI change orders based upon an agreed-upon

17   journeyman straight rate of $81.46?

18             MR. HUG:  Objection, assumes facts not in

19   evidence.  There's no evidence that Pike ever agreed to

20   that.

21             MR. KAPLAN:  Mr. Clauson testified --

22             THE COURT:  I'm going to allow it.

23             And you're welcome to make an argument at a

24   later point in time concerning that.  I'm just trying to

25   get through this particular witness in terms of he's come

1    up with a particular wage rate.  Mr. Kaplan wants to say

2    there's another wage rate that's properly applicable.  He

3    wants to posit and apparently has some basis, he thinks,

4    to say that's an agreed-upon rate.  You disagree with

5    that, but that's not a basis to sustain the objection.

6         MR. HUG:  He's just arguing with the witness,

7    that's all.  If he could just phrase his questions -- he

8    can do leading questions but without arguing with the

9    witness every time, it would be more productive.  I don't

10   think arguing with the witness is appropriate

11   cross-examination.

12        THE COURT:  You can continue, Mr. Kaplan.

13        MR. KAPLAN:  Thank you, sir.

14   BY MR. KAPLAN:

15   Q.  Mr. O'Neill, I think you said -- let me ask you this.

16   If Pike had paid ECI on a number of change orders at an

17   agreed-upon rate, whatever it was, would you accept that

18   as a proper rate for ECI to use for a change order type

19   claim such as the one we have in dispute here?

20   A.  No.  I think you've got to consider -- I think for

21   the journeyman rate, you represent it's 81.46 he charged

22   him in this particular change order.  But I think Pike has

23   the right to, one, evaluate that rate as a journeyman, but

24   two, considering they hired subcontractors, apprentices, I

25   think that the rate's open for discussion on a subsequent

1    change order.

2    Q.   All right.  But you weren't -- were you aware when

3    you did your analysis whether there was an agreed-upon

4    change order rate that was used on this project between

5    ECI and Pike?

6    A.   No.

7    Q.   Did you ask about that?

8    A.   No.  It's a prevailing wage rate job, so I know

9    there's rates that are typical.

10   Q.   It's not unusual for parties to agree on a change

11   order rate, is it?

12   A.   I've seen that done in the past.

13   Q.   And that they use on change orders so there's no

14   dispute what the appropriate rate would be, whatever that

15   rate might be?

16   A.   I have seen that in the past.

17   Q.   Okay.  And I think you said your $71.69 as a maximum

18   rate, I think you had a note in your report that your

19   calculations did not include tax.  Let's find your report.

20   Maybe you were referring to the subcontractors.

21   A.   The bottom of page 6 there was labor rates noted as

22   to contractors who were paid on their invoices.

23   Q.   Right.  At the bottom you said you understand ECI

24   paid certain taxes over and above these rates?

25   A.   That's right.  It appeared on those invoices there

1  was taxes, valid or not.

2  Q.   You know there's 6 percent sales tax in Connecticut

3  for labor?

4  A.   Most jobs are tax exempt when they're public jobs.

5  So I didn't check it into tax exempt or not.

6  Q.   A prime contractor who hires a sub or a sub who hires

7  a sub-sub to do labor is entitled to add either overhead

8  or profit to those raw invoices in submitting them up the

9  ladder?

10  A.   The sub-sub?

11  Q.   In this case, ECI hired sub-subcontractors --

12  A.   Yes.

13  Q.   -- to do various work.  And you pointed to the

14  invoices they submitted.  If it was a time-and-material

15  situation, I know this is hypothetical, and ECI was

16  saying, gee, All Brite charged us a certain amount of

17  money, here's their invoice, normally they would be

18  entitled to a markup when they handed that up to the prime

19  contractor or the owner, right?

20  A.   If it's just labor, I assume the parties would start

21  at the prevailing wage rate and figure out a rate -- a

22  buildup off of that to a final rate.  Not necessarily what

23  the subcontractor charged.

24  Q.   Okay.  Did you see anything -- in your analysis, did

25  you include for the subcontractors that you put in this

 1   table at page 6 anything for ECI's markup on the

 2   subcontractor labor?

 3   A.   Yes.

 4   Q.   Where is it?

 5   A.   I said 71.69 which is more than --

 6   Q.   That includes markup?

 7   A.   That includes markup.

 8   Q.   Okay.  So you're saying if Ferguson charged them

 9   71.29, they're entitled to 40 cents an hour markup on

10   Ferguson?

11   A.   If that's what it was.

12   Q.   What do you mean if that's what it was?

13   A.   Yeah.

14   Q.   Okay.  Now, are you aware -- you talked about you

15   went into some detail looking at ECI's bid.  I think this

16   was -- I think you were in Exhibit 650.

17        Your Exhibit 650, Tab E.  If we could go to that for

18   one moment.  I just want to ask you a question or two

19   about that.

20   A.   I'm sorry, Mr. Kaplan, which job?

21   Q.   Exhibit 650.

22   A.   I have that.

23   Q.   And it was Tab E.

24   A.   Yes.

25   Q.   And if we go to the third page of this bid summary

1    sheet, at the bottom it says ECI 03227?

2    A.    Yes.

3    Q.    There's a quoted material figure in the middle?

4    A.    Yes.

5    Q.    $1.639 million?

6    A.    Yes.

7    Q.    Now, you talked about buyouts?

8    A.    Yes.

9    Q.    What's a buyout?

10   A.    Whether it be a subcontractor that you hire or a

11   vendor that you purchased material from, you have to buy

12   them out, put them under contract to complete your

13   project.

14   Q.    That would be -- are you familiar with the notion

15   that when an electrical contractor bids jobs, oftentimes

16   they assume they're going to have a certain buyout on

17   materials, actually reduced price of purchasing the

18   materials versus what they carried in their bid for those

19   materials?

20   A.    I think as -- an estimator will get quotes before

21   they're bid and then they will estimate certain items that

22   are in their bid.  Once they get the job is when they're

23   going to actually contract with someone.  Between the

24   estimate they placed in and actually awarding the

25   subcontractors or vendors, you start with a quote, you end

1    with the contract.

2    Q.   And if ECI achieved a 20 percent buyout on this job

3    based on that number, that would equate to basically a

4    savings of well over $300,000, right?

5    A.   On just the material items?

6    Q.   Quoted material.

7    A.   Quoted material.  $327,000, 20 percent of that

8    number.

9    Q.   If in fact they achieved that, that would go to the

10   bottom line in a positive way?

11   A.   Right.  Or cover overhead or other items.

12   Q.   However it was decided.

13        And did you make any inquiry to see whether ECI

14   actually achieved any buyout for this job in actuality?

15   A.   No.

16   Q.   Going back -- I'm sorry to jump around, Your Honor,

17   I'm just picking up topics here.

18        Going back to your Exhibit 656, which is your July 10

19   report, and going back to Tab A, which is your labor hours

20   report that you spent some time on.

21   A.   The next designer has to build these boxes bigger.

22             THE COURT:  Yes, maybe we'll do that.

23   A.   Mr. Kaplan, I have the exhibit.

24   BY MR. KAPLAN:

25   Q.   What was here it's marked Clauson 519 for

1   Mr. Clauson's deposition at the bottom right.  Tab A, the

2   labor hours report?

3   A.   Yes.

4   Q.   Now, you spoke about not only ECI's Phase 3 hours,

5   but you were commenting on various overruns in some of the

6   same categories for the other phases?

7   A.   Overruns and underruns.

8   Q.   Discrepancies I think you called them, is that true?

9        And I think, if I get this right -- I was looking at

10  my notes because I want to get this right in terms of what

11  your answer was, I think you said there's a variety of

12  possible explanations for why you have these overruns not

13  only in Phase 3, overruns or underruns in Phase 3, but

14  some of the other phases as well.  I think one of them was

15  you said the baseline might be off, which in this case

16  ECI's bid, that's what the estimated hours are coming

17  from, right?

18  A.   Yes.

19  Q.   That would be one possibility.  And coding problems,

20  coding being that the man hours were not entered in the

21  proper codes or phases even, right?

22  A.   That's correct.

23  Q.   That would lend to an inaccuracy of the report

24  itself?

25  A.   Yes.

1    Q.   And then you said inefficiencies.  And you didn't

2    talk too much about that, I want to ask you about that.

3    Inefficiencies I think you said were either external or

4    internal, I think that's how you distinguished it?

5    A.   Yes.

6    Q.   And I think by internal you said basically, in

7    essence, if ECI was inefficient, if they didn't do things

8    properly, that would leave them to have overrun their bid

9    hours because they didn't either manage the job or perform

10   it efficiently or something; is that fair?

11   A.   Yes.

12   Q.   You didn't talk about external inefficiencies very

13   much.  What did it mean when you talked about external

14   inefficiencies?

15   A.   If ECI could show that they were inefficient or it

16   cost them extra hours due to some external component,

17   whether it's the owner, a design issue, another

18   contractor, the contractor, any external force that's not

19   in ECI's control.

20   Q.   Somebody else did something or didn't do something

21   which would have caused them to run into problems on the

22   job that caused them to be inefficient or expend more

23   hours than they had anticipated; is that a fair way to put

24   it?

25   A.   Yes.

1    Q.    And are you aware of the term "compression" from a

2    scheduling point of view?

3    A.    I assume you mean the schedule got compressed.

4    Q.    Sure.  What's your understanding of that term?

5    A.    In your context, I think you're stating that a

6    schedule was supposed to get done in a certain period and

7    it got compressed.

8    Q.    And if a ten-week schedule for a lot of the work such

9    as Phase 3 was effectively compressed to, let's say, five

10   weeks or six weeks, would that be something which would

11   suggest to you that that could cause labor inefficiencies,

12   therefore labor overruns of the type we're looking at?

13   A.    Potentially.

14   Q.    What about acceleration in that same context,

15   especially with the context of compression?  Do you have

16   an understanding of what acceleration would be in the

17   context of compression?

18   A.    Sure.

19   Q.    Would you explain what your understanding is?

20   A.    If you thought you would be using ten men for a

21   period of time to complete a job, now you have to

22   accelerate and put 15 men on that job to complete the

23   task.

24   Q.    Would that also be something which might reasonably

25   cause inefficiencies in labor hours or labor productivity?

1  A.    Potentially.

2  Q.    Now, what if you bid a job as an electrical

3  subcontractor, a ten-week job, Phase 3 at the Kelly Middle

4  School with the anticipation you'd be using an average of

5  20-man crews.  And that for a good portion of that, let's

6  say the last four or five weeks of that period, you had to

7  use 40-man crews, 50-man crews, 60-man crews, would that

8  suggest that there would be at least a reasonable

9  possibility that that could adversely affect your labor

10  productivity?

11  A.    Potentially.

12  Q.    Potentially, because it's a lot more difficult to

13  manage 40, 50, 60 guys than to manage 20, for starters?

14  A.    You need more management.

15  Q.    Right.  Then you get into other factors such as

16  sequences of work.  If sequences of work in a tightly

17  coordinated ten-week period are off, that also could cause

18  a loss of productivity, right?

19      Give you an example.  You're supposed to be doing

20  work with areas where masonry walls are supposed to be

21  taken down in a certain sequence and they're not taken

22  down in the sequence, so you have to come back to areas

23  and do work out of sequence; is that something that would

24  affect your labor productivity?

25  A.    Certain sequence work wouldn't affect whatsoever.

1    Other sequence work could potentially affect productivity.

2    Q.    Basically, the more of that out-of-sequence work and

3    the more significant the out-of-sequence work is,

4    especially in a ten-week period, it's more likely to

5    adversely affect your labor productivity; fair statement?

6    A.    Yes.

7    Q.    Okay.  And that would be one of the possible external

8    inefficiencies you were referring to, that whole series of

9    issues, right, those would be possible external

10   inefficiencies which might have caused these discrepancies

11   in ECI's labor, correct?

12   A.    Yes.

13   Q.    You don't know if they happened or not, but --

14   A.    Potentially, yes.

15   Q.    -- that was what you were talking about indirectly in

16   your direct testimony, correct?

17   A.    Yes.

18   Q.    Okay.  Also in the same theme of labor productivity,

19   if a contractor does not originally intend to bring in

20   five or six crews of supplemental labor and ends up having

21   to bring in five or six crews of supplemental labor, would

22   that also be something which potentially could affect

23   their labor productivity?

24   A.    Yes.  It's more men to the project, would require

25   more management.

1    Q.   And it's actually more management -- it's compounded,

2    is it not, when you're bringing in external forces, people

3    who don't customarily work for you, right?

4    A.   Could be on an individual basis with some of the

5    labor.

6    Q.   Are you aware that ECI's a non-union contractor?

7    A.   Yes.

8    Q.   So are you aware that all their own employees are

9    basically staff employees, permanent employees of the

10   company?

11   A.   Yes.

12   Q.   They're not calling these guys off the bench from the

13   union halls.  These are guys that work with them on a

14   customary basis?

15   A.   Yes.

16   Q.   So when they bring outside crews from other

17   companies, they don't have any of that kind of familiarity

18   or working relationship, right?

19   A.   If you're pulling in people, usually it's people

20   you've worked with in the past, you may or may not.

21   Sometimes you pick up a gem; sometimes you don't pick up a

22   gem.

23   Q.   Now, you said in your March report that you had gone

24   through ECI's weekly labor reports for the July and August

25   period?

1    A.    Yes.

2    Q.    And that you compared what you estimated might be --

3    basically I'm rounding off an 1800 man hour total for work

4    other than Phase 3 in that period versus the 2,000,

5    roughly, man hours that you indicated was for work other

6    than in Phase 3, right?

7    A.    That's what we could determine what the foreman noted

8    on those forms.

9    Q.    And on that point, you've deducted 2,000 hours or so,

10   we've talked about this and you testified to this, I think

11   we all understand where you're coming from on that?

12   A.    Yes.

13   Q.    And you noted that ECI itself identified what you

14   estimated to be about 1800 hours of other non-Phase 3 work

15   during that same period, right?

16   A.    Yes.

17   Q.    Because that's where you were getting that number

18   from, Mr. Mathieu's notations in his weekly labor reports?

19   A.    That's correct.

20   Q.    If Mr. Mathieu was true to his word and did not

21   include those 1800 hours in the claim, then excluding them

22   again would be baseless, right?

23        If they never were included, they shouldn't be

24   excluded at this point in time?

25   A.    Right.  Our comment was, at a minimum, he wrote down

1    1800 hours, there could have been more because forms

2    weren't completely filled out.

3    Q.   Certainly if he did not include non-Phase 3 hours,

4    then those 1800 hours you identified for the impact period

5    were not carried in the claim, right?

6    A.   Yes.

7    Q.   Okay.

8         MR. KAPLAN:  I just want to check my notes.  I

9    may be done.  Bear with me.

10              (Pause.)

11        MR. KAPLAN:  I've nothing else.

12        THE COURT:  Thank you, Mr. Kaplan.

13        Redirect examination?

14        MR. HUG:  Yes, Your Honor.  I should conclude

15    before 1:00.

16

17                    REDIRECT EXAMINATION

18   BY MR. HUG:

19   Q.   Following up on Mr. Kaplan's comment about external

20   inefficiencies, he asked you if a sub hires another sub

21   could that result in inefficiencies, and I think your

22   answer was if they're not adequately supervised; do you

23   recall that?

24   A.   Yes.

25   Q.   Okay.  In your experience, who has got the

1   requirement to supervise?

2   A.   The person that's hiring them.

3   Q.   So if there's inefficiencies because of lack of

4   supervision of that sub-subcontractor, whose fault is

5   that?

6   A.   ECI's.

7   Q.   Okay.  Again, you don't know whether that happened in

8   this case, but if in fact somebody is asked to put more

9   men on the job and they do put more men on the job, it's

10   reasonable to expect that they will provide the

11   appropriate supervision to manage those people, correct?

12   A.   That's correct.

13   Q.   So does that become an internal inefficiency for the

14   sub at that point in time?

15   A.   That would be internal, yes.

16   Q.   Now, you were asked a little bit about the amount

17   complete and work done prior to and after.  The

18   application for payment as of August 31 had what

19   percentage completion for Phase 3?

20   A.   99 percent complete.

21   Q.   And is that a certification that is filed under oath?

22   A.   Yes.

23   Q.   And therefore you would assume that it's correct?

24   A.   Yes.

25   Q.   So you mentioned in your testimony that you saw 800

1    hours or 900 hours after August 31?

2    A.   Yes.

3    Q.   That's inconsistent with it being 99 percent

4    complete, correct?

5    A.   That's correct.

6    Q.   So either ECI was incorrect in that Clauson

7    exhibit which had that round number of 900 hours, correct?

8              THE COURT:  Exhibit 522 Clauson?

9              MR. HUG:  It's part of Exhibit A.

10             THE COURT:  It's also part of an exhibit in the

11   case.

12             MR. HUG:  Exhibit 30.  And it's also part of

13   Exhibit A to his report, first report and third report.

14   BY MR. HUG:

15   Q.   If you can turn to that for a moment.  If you just

16   look at Exhibit A to your report.

17   A.   Yes.

18   Q.   And it's right in there?

19   A.   Yes.

20   Q.   First of all, see how this is done, manpower

21   required, manpower actual?

22   A.   Yes.

23   Q.   They're all round numbers, aren't they?

24   A.   Yes.

25   Q.   Has that ever happened?

1    A.    In your estimate, you'll put round numbers in.

2    Q.    How about in actuals?

3    A.    Actual, you're going to try to take an average of

4    where you were for that week.

5    Q.    I'm talking about these are actual recorded numbers.

6    Would it be reasonable to assume that these numbers are

7    accurate when it says, going backwards, 800, 600, 1400,

8    2400, and so forth, it goes a little more specific.  Those

9    are round numbers, aren't there?

10   A.    Those are round numbers, yes.

11   Q.    Now, the application for payment says it's 99 percent

12   complete as of 8/31, correct?

13   A.    Yes.

14   Q.    And this is where in this manpower report it says 800

15   hours, finish art, lockers, punch out, test.  In reality,

16   you don't know whether that's before or after August 31,

17   do you?

18   A.    I assume the punch out is after, that's something you

19   did at the end of the job.

20   Q.    It's not delineated here, is it?

21   A.    No.

22   Q.    If it is after, it would be inconsistent with the

23   representation under oath that they were 99 percent

24   complete with Phase 3, correct?

25   A.    That's correct.

1   Q.   Now, you also testified that as of July 1st they were

2   15 percent complete, correct?

3   A.   Yes.

4   Q.   And did you review the project claim correspondence

5   when you were preparing your analysis?

6   A.   Yes, I did.

7   Q.   And in fact, counsel pointed you to several of the

8   letters, I think it was a March 2011 letter?

9   A.   Yes.

10   Q.   Did you review the sequence of letters beginning from

11   October 1st and thereafter that described ECI's claim?

12   A.   Yes.

13   Q.   Is that how you came up with your summary for ECI's

14   claim?

15   A.   Yes.

16   Q.   In all of those letters, did you understand when the

17   impact period was?

18   A.   Yes.  I thought it was pretty clear in those letters

19   that it was during that ten weeks from June 28 to

20   September 4, 2010.

21   Q.   So if Mr. Kaplan now tells you the impact period

22   occurred prior to July 1st, that's something new to you,

23   correct?

24   A.   Yes.

25   Q.   And if Mr. Kaplan is now telling us that his claim

1    now includes hours before July 1st and after September

2    1st, how would you respond to that?

3    A.   My understanding is those aren't part of the impact.

4    Q.   They're not impacted?

5    A.   That's correct.

6    Q.   There's no loss of productivity during that period of

7    time, is there?

8    A.   That's what I would understand, yes.

9    Q.   So if they're in the claim, that claim is wrong?

10             THE COURT:  It looks like we're in Argument Land

11   here.

12   BY MR. HUG:

13   Q.   So, suffice it to say, you tried to look at the hours

14   during the impact period, correct?

15   A.   Yes.

16   Q.   All right.  And if the hours are not in the impact

17   period, you don't consider them a part of the claim?

18   A.   That's correct.

19   Q.   At the beginning of your examination you were asked

20   some questions about whether or not you are who you work

21   for and whatnot.

22        Are your opinions in this matter your independent

23   judgment?

24   A.   Yes.

25   Q.   Were you told to reach any conclusion in this case?

1    A.    No.

2    Q.    In fact, weren't you told exactly the opposite?

3    A.    Yes.

4    Q.    What were you told?

5    A.    To take a look at the hours billed and see are they

6    valid, not valid.  Look at the claim document in general

7    and see if it's valid or not valid.

8    Q.    And if you have bad news to tell Pike or good news to

9    tell Pike, you treat those two things the same?

10   A.    Absolutely.

11   Q.    Now, there's an implication that you've worked with

12   Robinson & Cole before.  Have you ever worked with me

13   before?

14   A.    No.

15   Q.    Ever worked with Pike before?

16   A.    No.

17                MR. HUG:  No further questions, Your Honor.

18                THE COURT:  Thank you.  I think at this point --

19                MR. KAPLAN:  I could do this in two minutes,

20   Your Honor, or if you want --

21                THE COURT:  I'd rather be done with this

22   witness.  Is this within the scope?

23                MR. KAPLAN:  Yes.  Just a couple of questions,

24   quickly.

25

1                    RECROSS-EXAMINATION

2    BY MR. KAPLAN:

3    Q.   Two items.  Pay applications first.

4    A.   Yes.

5    Q.   Pay applications are approved by in this case Pike,

6    right, as construction manager?

7    A.   Submitted by ECI, approved by Pike, yes.

8    Q.   They're also reviewed and approved by the project

9    architect, right?

10   A.   Pike's was probably reviewed by the project

11   architect.

12   Q.   In order for ECI to get paid their August

13   requisitions saying they're 99 percent done with certain

14   types of work, Pike reviews that and signs off, right?

15   A.   Yes.

16   Q.   Architect reviews that and signs off, right?

17   A.   Review Pike's application, yes.

18   Q.   And if they didn't like it, the architects and

19   construction managers aren't shy, they go back to the

20   subcontractor and tell them to adjust values, correct?

21   A.   Right.

22   Q.   That's done all the time?

23   A.   Yes.

24   Q.   If Pike and the architect know that they have pushed

25   Phase 3 work, art rooms, locker rooms into September and

 1   October, they know ECI still has to do that work and still

 2   has to bill for that work; isn't that a fair assumption?

 3   A.    If they cut the requisition?

 4   Q.    No, no.  If Pike and the architect have told ECI or

 5   agreed with ECI, all right, there's art room work and

 6   locker room work, you were supposed to get it done at the

 7   end of August but we had some issues, it's going to get

 8   done in September, October, they know that that work is

 9   going to be completed at a later date, right?

10   A.    Yes.

11   Q.    So they're reviewing the req in August knowing full

12   well what the status of completion of Phase 3 is; isn't

13   that a fair assumption?

14   A.    Yes.

15   Q.    So if they approve a requisition for a certain

16   amount, they're doing that presumably with open eyes on

17   the status of the work, right?

18   A.    Yes.  Maybe haven't done all their inspections.

19   Q.    In terms of the impact Mr. Hug talked about, take a

20   very simple example.  You're supposed to do 1000 hours of

21   work, let's say, in June and July, right?  Let's just --

22   no, in July and August, to use your impact period.  You

23   end up starting it June 1st and finishing it October 1st,

24   takes you 1200 hours.  If you're going to measure the

25   impact of what it took you, you would say, would you not,

1    I anticipated 1000 hours for this work in question, I

2    anticipated doing it in a two-month period, instead I did

3    it in a three-month period, let's say, and it took me 200

4    hours more.  And if you were going to present a claim on

5    that issue, as I framed it, that's how you would present

6    it, would you not?

7    A.   I'd have to have more information how to present that

8    claim.

9    Q.   It's a fair fact when a piece of work is scheduled

10   for July and August and you started it early and finished

11   it late and you're saying I ran over for a lot of reasons,

12   most of which or all of which occurred in July and August,

13   you would still, would you not, wouldn't it be reasonable

14   to say this is how long it took me to do the work when I

15   started in June and finished in October?

16   A.   This is just my opinion.  On a project like this, if

17   you can get in early to do some work prior to the shutdown

18   period when the kids vacate the school, you'd love to get

19   in and do a few things if you can.  Maybe that happened in

20   this case.  Then you get in there, do the work.

21   Potentially punch list and things after, after the kids

22   get back in school.

23   Q.   The point is it took you X hours to do all of that

24   work and you're claiming that it should have only taking

25   you Y to do all that work, and you have to compare your

 1   baseline, which is what you thought it would take you, to

 2   what your actual was, right?

 3   A.    Right.

 4   Q.    And the fact you started it early or finished it

 5   later, just because it was impacted in the middle or in

 6   the major period there, you still don't block off the work

 7   you did at the beginning and the work you did at the end,

 8   do you?

 9   A.    Right.  And I don't think we did.

10   Q.    Oh, okay.  I'm not going to argue about you about

11   that one.  Thank you.

12            THE COURT:  As I understand, your testimony is

13   to the extent that there were hours for Phase 3 that were

14   billed that occurred prior to June 28 and post-September

15   3rd, you didn't include them because there was no loss of

16   productivity --

17            THE WITNESS:  Yes.

18            THE COURT:  -- because they weren't impacted by

19   the claim or disorganization of the project?

20            THE WITNESS:  Yes.

21            THE COURT:  Anything else?  All right.  We'll

22   stand in recess.  Hold on just a second.

23                 (Pause.)

24            THE COURT:  Maybe we'll try half an hour, is

25   that enough for you all in light of all the disruptions?

 1    We can go off the record.

 2                      (Discussion off the record.)

 3                      (Whereupon, a recess followed.)

 4

 5               THE COURT:  Please be seated.

 6               Mr. Hug, please feel free to call your next

 7    witness.

 8               MR. HUG:  Your Honor, I'd like to call

 9    Mr. Richard Merkhofer to the stand, please.

10               THE CLERK:  Please remain standing and raise

11    your right hand.

12

13                      RICHARD MERKHOFER,

14         called as a witness, having been first duly

15         sworn, was examined and testified as follows:

16

17               THE CLERK:  Please be seated.

18               Please state your name.

19               THE WITNESS:  Richard Merkhofer.

20               THE CLERK:  Please spell your last name.

21               THE WITNESS:  M-E-R-K-H-O-F-E-R.

22               THE CLERK:  Please state your city or town.

23               THE WITNESS:  Mount Laurel, New Jersey.

24

25

1                   DIRECT EXAMINATION

2    BY MR. HUG:

3    Q.   Good afternoon, Mr. Merkhofer.

4    A.   Good afternoon.

5    Q.   First, you've given your name and your address.

6    Could you state your occupation?

7    A.   I'm a construction consultant.

8    Q.   And by whom are you employed?

9    A.   A company named Wagner Hohns Ingils.

10   Q.   What do you do for that company?

11   A.   I'm the president of the company.  I oversee both our

12   Florida and our New Jersey offices.  I oversee the

13   administration and marketing of the company, but most of

14   my time is doing consulting, taking care of construction

15   claims, particularly in the delay area and the disruption

16   of loss of productivity.

17   Q.   I think sometimes your company goes by WHI?

18   A.   Yes.

19   Q.   Describe a little bit just generally the kinds of

20   cases and things that you do and work on.

21   A.   Okay.  Well, for the first part of my career, I spent

22   many years doing critical path method scheduling, working

23   for general contractors, producing CPM schedules.  Later

24   in my career and currently I will work on various types of

25   construction cases that again relate to delay and

1    disruption.  They can be schools, they can be highrises,

2    water treatment plans, various types of projects.

3    Q.    All right.  Talk a little bit about your education

4    for the moment.

5    A.    I have an associate's degree in construction

6    technology from State University of Farmingdale and a

7    four-year degree in architectural technology from New York

8    Technology Institute.

9    Q.    Any further degrees beyond that?

10   A.    No.

11   Q.    Now, in terms of your employment, other than with

12   WHI, do you teach at all?

13   A.    Yes, I do.  I teach for the Associated General

14   Contractors of America.  I've been involved in their

15   project manager course, it's a week course that goes on

16   four times a year in Dallas.  I've been teaching that for

17   25 years.

18        I taught for nine years at Rutgers University in

19   New Jersey, taught the CPM scheduling course there.

20        I teach courses to contractors and owner professional

21   groups on a requested basis.

22        And in the last three years I just started offering

23   CLE, continuing legal education courses to attorneys

24   regarding scheduling methodology and loss of productivity

25   analysis.

1   Q.   Have you assisted various contractors in teaching

2   individual companies and contractors scheduling and proper

3   scheduling?

4   A.   Yes, many of them.

5   Q.   Is it fair to say in terms of actually doing CPM

6   analyses and claims analyses, could you describe for the

7   Court your experience?

8   A.   Sure.  From creating critical path method schedules,

9   I think the last time I got a perspective of it, I think I

10  did probably more than 500 projects over my career

11  totaling over $8 billion.  Construction claims, working

12  with attorneys and owners and contractors, probably in

13  excess of 150 of them.

14  Q.   Okay.  And you know, we've talked about CPM

15  scheduling and whatnot.  Could you describe for the Court

16  in general how to put together a schedule?

17  A.   Okay.  Well, CPM scheduling is called critical path

18  method scheduling, it's a computerized software where what

19  a contractor will do, usually the general contractor, will

20  break the project down into little pieces and link those

21  pieces together using what we call logic putting durations

22  against each one of the work activities to create what we

23  call the schedule logic or the plan for the project.  When

24  you link them together and you push the calculation

25  button, you get the critical path.  The critical path is

1    defined as the longest path to the project, meaning you

2    have to work on that path to get the project done on time.

3         The other activities that are not on the critical

4    path have what we call float, meaning that you can start

5    them as early as a date, but you can start them later and

6    still get the project done on time.  So it gives you

7    flexibility in the workday.

8    Q.   Earlier on in this case there were a number of

9    exhibits that were introduced.  I'm kind of getting ahead

10   of myself, but let's start.  I want to show you

11   Exhibit 645.  These are all admitted into evidence.  And

12   Exhibit 655.

13   A.   Okay.

14   Q.   I'm going to put 648 down right here, but we'll get

15   to that in a moment.  Just while I have them all there.

16        So starting with Exhibit 645 --

17   A.   Yes.

18   Q.   -- is that a critical path type of schedule or a

19   type -- well, explain what it is.

20   A.   It is what they call a layout.  It is a CPM schedule.

21   Look at the bottom left-hand corner, it's done in

22   Primavera Systems, that's one of the softwares that you

23   can use to do CPM scheduling.  The software will produce

24   what we call bar chart layouts or this format where it

25   will give you a bar for each one of the work activities.

1    Q.    Now, what are predecessor activities?

2    A.    Okay.  When I mentioned that when a CPM schedule is

3    put together it's broken down into pieces, you have to

4    take each piece or each work activity, say pour concrete,

5    erect steel, you have to link them together so they

6    logically line up.  The activity that precedes the work

7    activity is called predecessor and the activity that

8    succeeds the activity is called the successor.  So every

9    activity has a predecessor and a successor.

10   Q.    If you were actually looking at it on a computer

11   screen, could you actually click on a particular activity

12   and see all the predecessor activities or see all the

13   successor activities?

14   A.    Yes.

15   Q.    It's kind of like a 3D, not a 3D -- when you're

16   looking at Exhibit 645, you're seeing it in only one

17   dimension, right?

18   A.    Correct.  You're not seeing the relationships between

19   the bars.

20   Q.    But there's a lot of what you call logic that goes

21   underneath?

22   A.    Correct, correct.

23   Q.    Okay.  So have you testified before?

24   A.    Yes, I have.

25   Q.    On approximately how many occasions?

1  A.   I've testified in state and federal courts about six

2  times and in arbitration about five.

3  Q.   All right.  Have you provided expert counseling to

4  various clients over the course of your career?

5  A.   Yes.

6  Q.   On many occasions?

7  A.   Yes.

8  Q.   Have you published articles relating to your area of

9  expertise?

10  A.   Yes, I have.

11  Q.   In fact, if you take a look at Exhibit 648 that's in

12  front of you, did you prepare a report?  I'm not going to

13  offer the report just yet, but did you prepare a report?

14  A.   I did.

15  Q.   And attached to that report is there is a summary of

16  your experience, publications and testimony --

17  A.   Correct.

18  Q.   -- among other things?

19  A.   Experience, right.

20  Q.   Before I get down there, have I missed anything

21  significant in your background, sir, that you wish to

22  bring to the attention of the Court?

23  A.   No, I think you covered it.

24  Q.   Okay, good.

25       Were you retained by Pike in connection with this

1  matter to take a look at any particular issue?

2  A.   Yes.  I was retained by Pike to look at the ECI claim

3  on the Kelly Middle School.

4  Q.   And were you given any particular specific task in

5  connection with that effort?

6  A.   They said they want me to do a basic overview of the

7  claim and comment on it and to not worry about the man

8  hours because there was another consultant involved to

9  take care of that, the consultant that testified before

10  me.

11  Q.   Did you look at any other aspect of the claim?

12  A.   Well, I looked at particularly the methodology, what

13  they used to determine their damages as well as I looked

14  at the allegations of why the damages occurred.  They

15  wanted me to look at that and comment on that.

16  Q.   Did you prepare a report?

17  A.   Yes.

18  Q.   And is that report in Exhibit 648?

19  A.   Yes.

20       MR. HUG:  Your Honor, I'd like to offer that

21  report.

22       THE COURT:  Any objection?

23       MR. KAPLAN:  Yes, sir.  At page 4 of

24  Mr. Merkhofer's report, he indicates that they performed

25  an as-planned, as-built comparison delay analysis to be

1    provided and then he goes on to draw conclusions from that

2    analysis.  I have never been provided with that analysis.

3              MR. HUG:  May I?

4              THE COURT:  Where does it say that?

5              MR. KAPLAN:  Page 4, paragraph 3.0.

6              MR. HUG:  This came up in the motion in limine,

7    Your Honor.

8              MR. KAPLAN:  It did, Your Honor.

9              MR. HUG:  And if I may voir dire the witness on

10   that?

11             THE COURT:  Sure.

12   BY MR. HUG:

13   Q.   Sir, on page 4 of your report, it indicates that you

14   performed an as-planned, as-built comparison delay

15   analysis and then it says to be provided.  Did you

16   actually ever complete any particular schedule or as-built

17   schedule?

18   A.   I did the analysis, I had notes, I went through and

19   did what I -- the comparison, but I didn't create any

20   final product, no.

21   Q.   And is Exhibit 645 essentially something that you

22   could use in this case as an effective as-built type of

23   schedule that you would have prepared?

24   A.   Yes, it is, because the as-built information that I

25   had in my analysis basically a lot of it came from the CPM

1    schedule, so it's basically the same information.

2    Q.   And Exhibit 655 is in front of you as well which is

3    another schedule that also is of the type of analysis that

4    you would have performed?

5    A.   Exactly, yes.

6           MR. HUG:  Your Honor, in the argument to the

7    motion in limine I said this.

8           THE COURT:  You said that basically he was just

9    comparing two documents that were already going to be in

10   evidence.

11          MR. HUG:  And that's what I think he just said

12   he was going to do.

13          THE COURT:  All right.

14          MR. KAPLAN:  The problem is, Your Honor, that's

15   not what his report says.  His report is very specific as

16   to this analysis he performed, what that particular

17   analysis that he performed, which is to be provided, tells

18   him and he draws conclusions from that.  And the failure

19   to provide that or his -- whatever his analysis is,

20   whether it's in a memo form or semi-completed schedules or

21   sketches, under the rules of practice, this is very clear,

22   those are supposed to be provided to me.  So this is a

23   deficiency on this whole element of ECI's work was not

24   substantially impacted by delays and disruptions, he

25   doesn't discuss an existing Pike schedule which is the

1    exhibit that Mr. Hug just referred to, 655, I think, that

2    that's the basis for his conclusions and can state by

3    looking at that this is what he concluded, et cetera, et

4    cetera.  There's nothing in here other than a rank

5    conclusion that he says his analysis concludes that ECI

6    wasn't impacted, basically.  That's just woefully

7    deficient in terms of the requirements of the Federal

8    Rules.

9            MR. HUG:  I disagree, Your Honor.  It's

10   perfectly acceptable within the Federal Rules.  And he has

11   disclosed the subject matter on what he's going to testify

12   and given his opinions on what he's going to testify to.

13   He was available for deposition.  They never deposed him,

14   they never asked for backup documents.  We provided the

15   documents that were required under the Federal Rules.

16           THE COURT:  They asked for any notes?

17           MR. KAPLAN:  Your Honor, the rule says very

18   explicitly, Federal Rule 26(a)(2)(B)(iii), the report must

19   contain any exhibits that will be used to summarize or

20   support his conclusions.  I don't have to solicit -- fix

21   deficiencies in an expert's report.

22           THE COURT:  Any exhibits?

23           MR. KAPLAN:  There's no exhibits here.  There's

24   none that are attached.

25           THE COURT:  I think he's going to rely on

1    exhibits that are already in evidence.

2              MR. KAPLAN:  There's no statement here what he's

3    relying on or what he intends to rely on.

4              THE COURT:  But you've known for weeks or months

5    that he said he's going to rely on these two documents?

6              MR. KAPLAN:  No.  No.  It's not stated anywhere.

7              THE COURT:  You didn't know that from Mr. Hug's

8    opposition?

9              MR. KAPLAN:  Mr. Hug -- quite frankly, I didn't

10   understand what Mr. Hug was talking about at the time

11   during oral argument.  I didn't know what he was referring

12   to.  My point here is it's not my requirement to fix a

13   glaring deficiency in the expert's disclosure that doesn't

14   meet the requirements of the Federal Rules.  I don't have

15   to depose in order to correct those deficiencies.

16             The rules are very clear, if he's going to talk

17   about exhibits that support his conclusions, he's got to

18   at least refer to what they are in his report or attach

19   them.  He doesn't even refer to what they are.

20             THE COURT:  I overrule the objection for

21   basically the reasons I thought I made clear in overruling

22   the motion in limine here.  Even if there were a claim

23   that there was a technical violation of this rule, I find

24   absolutely no prejudice to ECI from this and subject to

25   the condition that the witness is going to be testifying

1    about exhibits that are already in evidence and about

2    which Attorney Kaplan has known for many weeks or months

3    now.  Objection overruled.

4              Exhibit 648 -- excuse me, yes, Exhibit 648, full

5    exhibit.

6    BY MR. HUG:

7    Q.   Mr. Merkhofer, I think just to kind of get back in

8    the swing of things, did you prepare Exhibit 648, your

9    report?

10   A.   Yes, I did.

11   Q.   And does it contain your opinions in this matter,

12   sir?

13   A.   Yes, it does.

14   Q.   And on page 1, numbered page 1 of your report, is

15   there an executive summary where you discuss your

16   opinions?

17   A.   Yes.

18   Q.   All right.  I'd just like to get a little preview

19   first of what you looked at and relied upon in reaching

20   your opinions in this case.

21   A.   If you look at page 2 of the report, I've listed the

22   documents.  The project record includes the Pike daily

23   field reports, the ECI daily field reports, ECI claims,

24   both of them dated 10/1 and 3/4, contract general

25   conditions, project phasing plan.  I looked at the role of

1    CPM schedules that were produced on the project, the

2    project as-built schedule, ECI's certified payrolls.  I

3    looked at selected project correspondence.  I apologize

4    for my voice.  I'm getting over a cold and it's breaking

5    on me.  ECI's job performance review form I looked at,

6    ECI's project job cost sheets and ECI's payment

7    requisitions.

8    Q.   All right.  And it also indicates the compensation

9    that you were paid on page 2 as well?

10   A.   Correct.

11   Q.   All right.  You first give -- looking at just your

12   executive summary for a moment, your first bullet says

13   that ECI's claim is considered a total cost claim and as a

14   result makes no attempt to calculates loss productivity.

15   Could you explain to the Court what you mean by that?

16   A.   What that basically means is that when a contractor

17   does a total cost, they say if I start with my bid of X

18   amount of dollars and then I go to my project record or my

19   cost reports and I show that I spent this amount of man

20   hours or dollars, all the contractor does is subtract

21   those two numbers and get the delta or the overrun from

22   the bid.  In the industry, it's called a total cost claim.

23   It makes no attempt to calculate any kind of loss of

24   productivity.  It just does a mathematical calculation.

25   Q.   It doesn't try to calculate any loss of productivity?

1   A.   Correct.

2   Q.   Please explain that to the Court.

3   A.   ECI's claim alleges that because of all the issues,

4   impacts, whatever, that happened on the project, ECI spent

5   more man hours.  They were less productive.

6        So, in other words, as an example, let's say you're

7   going to do the electrical work for all the lights in this

8   ceiling for Area A.  And the contractor's bid shows X

9   amount of man hours, X amount of costs.  When they

10  actually look at what it actually took to do the lighting

11  in that area, it doubled.  So they did the same amount of

12  work but they took twice as many man hours, meaning they

13  were unproductive and lost productivity.

14  Q.   Okay.  Thank you.

15       Your next bullet says that ECI's claim fails to

16  establish cause and effect providing no specific link of

17  alleged Pike-specific delays to specific periods of

18  alleged ECI damages.  Please explain that.

19  A.   Sure.  Cause and effect is one of the most important

20  parts of establishing that you have entitlement on a loss

21  of productivity.  Let me give you the same kind of

22  example.  Let's say we have this lighting system in this

23  room and we have the lighting system in the next courtroom

24  and they're part of a project.  So we do the first

25  courtroom and everything goes pretty well, there's no

1    impact, there's no problems going on.  And you can see,

2    through looking at the project record, that everything

3    went pretty well.  But when you go to that courtroom, we

4    see that there was maybe another contractor in the way

5    doing other work from a previous contract, maybe somebody

6    was tearing out something in the ceiling, but there was

7    definitely some kind of disruption on the project,

8    something impacting the contractor's ability to do the

9    work.  Well, what you would do is identify, specifically

10   identify, well, there was a guy on the ladder over there

11   taking down those beams and I'm supposed to be up there

12   trying to put light fixtures up there and he wouldn't get

13   out of my way for a week.  So you identify the specific

14   cause, which is the guy on the ladder.  Then you would

15   identify the effect, which is you go to the man hours that

16   were being worked in that courtroom while the guy was on

17   the ladder and make the correlation or the cause and

18   effect, the cause being the problem and the effect being

19   the disruption of the man hours.

20   Q.   And you can do that in a variety of ways, can't you?

21   Can you do that with looking at the project record?

22   A.   Yes.

23   Q.   And that's daily reports and meeting minutes and

24   things like that?

25   A.   And particularly certified payrolls, yes.

1  Q.   You can also look at the impact on the schedule as

2  well?

3  A.   Yes.

4  Q.   Okay.  And I'd like to go to your third comment on

5  your executive summary, which is ECI elected not to use

6  the measured mile methodology, an accurate and accepted

7  methodology in the construction industry.  Please explain

8  to the Court what you mean by that.

9  A.   There's various methodologies that consultants like

10  myself use to do this kind of analysis.  The one that kind

11  of comes to the top that is really well accepted in the

12  industry is what we called the measured mile.  And simply

13  stated, what it does is it takes and compares an

14  unimpacted area with an impacted area.

15      So let's go back to my example.  The unimpacted area

16  was the lighting -- anything, drywall, masonry, doesn't

17  matter what it is.  You look at the unimpacted area, which

18  would be this courtroom, and look at the man hours and the

19  dollars spent to do this work.  And then you go to the

20  next courtroom and you say that's the area that really got

21  the problem, then you look at those man hours and those

22  dollars and what's going on.  And what you do is you

23  compare them.  And what you're doing when you're taking

24  the unimpacted, you're actually calculating the

25  contractor's productivity.

1          By way of example, let's say you have 100 man hours

2    to do the electrical or drywall work, doesn't matter what

3    it is, and you have a certain amount of men.  If you

4    actually look at what it took five men to do 1000 man

5    hours of work over a period of time, you'd establish their

6    productivity, what they're doing.

7          A nice thing we try to do also is take that number

8    and compare it to their bid.  So then you can see if the

9    bid is accurate, how close they were to the bid.

10          But once you do that, let's say that -- I'm just

11    going to make up numbers for example.  If you have five

12    men that can put in 100 feet of conduit in a day and they

13    consistently do that in this courtroom, and then you go

14    over to that courtroom where the disruption is and you

15    take the same kind of work, and it has to be the same kind

16    of work, and you look at what their productivity is, the

17    five men, and you find that it's different, that their

18    productivity has dropped, then you have a comparison

19    between the two.

20          And what you need to do is link that cause and

21    effect.  You have to be able to show that the loss of

22    productivity in that courtroom was due to the cause.

23    Because what a total cost claim does not do, it doesn't

24    make that -- it doesn't make that separation because it

25    always assumes that all the man hours that were run over

1   are because of something else that's outside the

2   contractor's control.  So it just lumps all the problems

3   into the total number.

4   Q.   Okay.  So is it fair to say you can take a look at,

5   say, an unimpacted period of time for a particular type of

6   work and compare that to a similar period of time for

7   impacted -- for the impacted period, and the two would

8   measure out and you could determine whether productivity

9   was -- you still have to do an impact analysis, but you

10  compare the unimpacted time frame to the impacted time

11  frame?

12  A.   That's correct.  And the delta between the two on the

13  surface, loss of productivity.

14  Q.   If ECI had periods of time where it was performing

15  certain types of electrical work in an unimpacted time

16  frame, they could have taken that and taken a snapshot and

17  figured out what their productivity was and compared it

18  during the period where they claim that they were not as

19  productive, correct?

20  A.   That would be the measured mile analysis, correct.

21  Q.   When you reviewed ECI's claim, did they do that?

22  A.   They did not do that.

23  Q.   So, in your experience, is that a more reliable

24  measure of measuring loss of productivity?

25  A.   Yes, it is.

1    Q.   In the industry, as an industry expert, is that the

2    custom in the industry that it is a more reliable standard

3    of measuring lost productivity?

4    A.   It is.  When you don't do it, I've seen many times

5    where the party on the other side accepting the claim

6    requests it, they'll ask for a measured mile analysis.

7    It's that prominent in the industry.

8    Q.   And isn't it true that a lot of public works and

9    department of transportation folks require that, do they

10   not?

11   A.   I'm not sure.  I have to check that.

12           THE COURT:  Mr. Hug, maybe you're going to get

13   to this, my immediate curiosity, what if you don't have

14   two courtrooms or two schools to compare?  How is the

15   measured mile --

16   BY MR. HUG:

17   Q.   Perfect.  What if you have in the Kelly Middle

18   School, hypothetically, and you have a period of

19   unimpacted work during, say, Phase 4 for putting in branch

20   conduit, branch wire, a whole bunch of other things, and

21   you have an unimpacted period of time.  Is it appropriate

22   to compare that to, say, in that same project, another

23   area, another aspect of the project?

24   A.   Yes.  As long as it represents the same kind of work.

25   You can't do branch conduit and light fixtures, they're

1    apples and oranges.  If they're the same and you have the

2    same supervision and same basic project, yes, very

3    appropriate.

4    Q.   So, in fact, isn't it commonly done that you look at

5    the same project and look for unimpacted periods in the

6    same project with the same workforce and the same general

7    conditions, correct?

8    A.   Correct.

9          MR. HUG:  I think that answers your question,

10   Your Honor.

11         THE COURT:  Yes.

12   BY MR. HUG:

13   Q.   Your next bulleted item says ECI does not eliminate

14   man hours expended for other than phases when computing

15   its claim for Phase 3 work.  I think you can briefly touch

16   on this.  Did you do an extensive analysis in this area?

17   A.   I did not.

18   Q.   Did you defer to others?

19   A.   Yes, daily consultant was handling the man hours.

20   Q.   Did you do any preliminary analysis in that area?

21   A.   Very preliminary.  I looked at the payment

22   requisitions and it appears that during the time frame

23   that the claim addressed, which was the July and August

24   time frame, I saw that there were hours being billed in

25   Phase 2.  So that caught my eye.  I brought that to their

1   attention.

2   Q.   I'm not going to dwell on that one because we just

3   had a day of a witness on that.

4        In the next bullet it says:  In the majority of the

5   Phase 3 work areas the actual installation of Pike's and

6   ECI's work did not differ significantly from how Pike and

7   ECI planned their work.

8        First of all, start from the beginning here.  What

9   did you do and why?

10  A.   Okay.  The claim basically alleged that because of

11  demolition and steel, those two issues impacted ECI's

12  work, caused delay and disruption and pushed the work into

13  different time frames.  So, first thing I did is I went to

14  Pike's baseline schedule, the CPM schedule that was

15  submitted at the beginning of the job, which is part of

16  the exhibit here.

17  Q.   Part of 645 and 655?

18  A.   Correct.  So I start there and say, okay, this is

19  what Pike and ECI agreed on how we're going to build out

20  Phase 3.

21       The next thing I went to was Pike's CPM updates.  And

22  in Primavera, if you go to the last update, you tell the

23  computer give me the actual start and completion date for

24  each activity and it gives you what we call the as-built.

25  And I went to that and looked at that.  And then, in

1    addition to that, I went to ECI's daily field reports and

2    read through those and took information off that,

3    superimposed it on top so I could see what both Pike and

4    ECI were reporting as progress during the job.  And I

5    compared them.  What I was looking for is deviations,

6    major deviations between the two.  And what I found is

7    there were a couple of areas of part of Phase 3 that got

8    pushed two, three weeks, but many other areas we had a

9    combination of things actually started earlier, started on

10   time or maybe a week, seven days, a couple days either

11   way.  Which is pretty common when you have a job where

12   you've got a lot of things going on that they don't always

13   start exactly on time.  There's flexibility.  So I was

14   looking for that.  And when I looked, I laid out my

15   analysis, which is basically the same way these things

16   were laid out, by each component, the music room and the

17   lockers and the electric rooms and that kind of thing.

18   When I looked at it and I compared the two, my conclusion

19   was that there wasn't a significant difference between the

20   two.  And significant, what I mean by that is that I'm

21   seeing something so different that I could understand why

22   ECI would have lost man hours and ran into a problem.

23   What I saw was a little bit of deviation, the sequence was

24   basically in place the way it was planned.

25        And I was also looking for the concept of stacking.

1    They made the point in their claim that their manpower was

2    stacked, meaning you're doing more in one spot.  But when

3    I compared the plan and looked at the plan, they were

4    working in all areas at the same time as the plan, which

5    is basically a plan to stack the work anyway.  So I didn't

6    see that as an issue.

7        So that's basically what I did.  I compared the two

8    to see how different they were and found I think there

9    were two or three areas where there was a deviation.

10            THE COURT:  What you were comparing was the --

11            THE WITNESS:  The baseline CPM plan with the

12    as-built schedule.

13    BY MR. HUG:

14    Q.   The as-built is what actually happened.  And

15    Exhibit 645 and 655 have those in there, right?

16    A.   Right.

17        Just so, Your Honor, you understand, when Pike did

18    their updates, when the scheduling person does their

19    updates, they put an actual start and completion date for

20    each activity.  That's what that is.  The computer is

21    recording that.  And then you can tell the software to

22    spit it out and put it on paper.

23    Q.   You can tell software to do a lot of different

24    things, too, can't you?

25    A.   Yes, it has a lot of information to present

1    information in many different ways.

2    Q.   It can produce Exhibit 51B, for example, as well?

3    A.   As it did there, sure.

4    Q.   I'll come back there in a moment.

5         Concepts were introduced earlier today for

6    compression and acceleration.  Were those a component of

7    ECI's claim, as you understood it?

8    A.   Yes, they did allege that.

9    Q.   Please explain to the Court what those concepts are

10   and how they manifest themselves on a project.

11   A.    Well, compression is exactly as the word is defined.

12   You take work and you compress it into a shorter time

13   frame.  So if you have something, by way of example,

14   something that's going to take three weeks to do and then

15   you decide to do it in two weeks, you compress the time.

16   That would be a compression type thing.

17        Acceleration is very similar where you're saying I

18   want to get it done faster and I can accelerate it by

19   either bringing it back to an earlier time frame or taking

20   a task and make it from two weeks to one week or whatever.

21        So both of them change the plan of the job.

22   Q.   Is there also a concept whereby things are pushed out

23   and everything -- what do you call when something is

24   pushed out to be done in the very few last weeks of the

25   project?

1    A.    Well, in this claim it's called stacking.  It's

2    basically saying because the work was delayed up front by

3    steel and demolition, the work got pushed into the later

4    part of the project and allegedly stacked.

5    Q.    And did you take a look at that issue to see if in

6    fact the schedule supported that, the as-built schedule

7    versus the baseline schedule supported that?

8    A.    I did.

9    Q.    And are there exhibits in front of you that show

10   whether or not that that occurred?

11   A.    Yes.

12   Q.    Okay.  Which exhibits are you referring to, 645 and

13   655?

14   A.    Yes, both of them.  You can use either one of them.

15   They both have the same information but just in different

16   format.

17   Q.    Whichever one you prefer to use.

18   A.    Okay.  Probably 655 is probably a little easier to

19   understand so let's use that.

20   Q.    Hold on just a minute until the Judge --

21           THE COURT:  I need a new binder.

22           MR. HUG:  It is a loose exhibit, Your Honor.

23           THE COURT:  Okay.  I have it here.

24   BY MR. HUG:

25   Q.    Mr. Merkhofer, I think we were talking about

1    stacking.  And just to bring you back up, you understood

2    ECI's claim to have stacking towards the end of the

3    project?

4    A.   Yes.

5    Q.   Explain to the Court whether or not the as-built

6    versus the original schedule supports that contention.

7    A.   Okay.  Well, if you look at 655, if you look at the

8    light blue lines, you'll see that's the baseline schedule.

9    If you flip through and you just look at -- just take, for

10   instance, the last part of July and the first part of

11   August, if you just take the first page and run your eye

12   down, you're seeing that there are various components of

13   the work that are being done in that period of time.  If

14   you turn to the second page --

15   Q.   What period of time are you talking about?

16   A.   I'm sorry?

17   Q.   What period of time?

18   A.   Say July 19 through August 16, the last two weeks of

19   July, the first two weeks of August, just as an example,

20   and you just take your eye down and look at the light blue

21   bars on the first page, do the same thing on the second

22   page, same thing on the third page, it shows that the plan

23   was to have work go on in many different areas.  Basically

24   we're working all over and stacking.

25        Now, if you look at the as-built, the dark blue

1   lines, and you look at the same kind of period, you're

2   going to see that the work was, you know, spread out.  But

3   what I particularly took a look at, because it was alleged

4   that the work got delayed up front and got pushed, I was

5   looking to see what occurred particularly towards the end

6   of the project.  And it appears that Pike, when they

7   produced this, highlighted the last two weeks of August.

8   And if you run your eye down the last two weeks of August,

9   on the first page you've got a lot of inspections going

10  on, three inspections going on, final MEP connections to

11  equipment, that's very minimal work with a very small

12  amount of manpower.  If you look at page 2, there's not a

13  lot going on in the last two weeks of August.  If you go

14  to the third page, you've got electrical devicing, fire

15  alarm, again, devices, final MEP connections, again very

16  non-labor intensive tasks.

17       So I'm not seeing that -- I'm not seeing two things.

18  It's not seeing that the as-built condition of the job

19  really is that much different from the plan.  And I'm not

20  seeing that the work, the major work is being pushed to

21  the later part of the job.  I'm just not seeing that.

22  Q.   All right.  I notice the darker blue lines are often

23  a little longer than the lighter blue lines.  Does that

24  have any significance?

25  A.   Not necessarily.  On the surface, when you look at

1   the document and you look at the dates, it implies it took

2   much longer to do it.

3       So, for instance, if you take -- let's take a long

4   one.  Let's go to page 2.  And you look at under locker

5   rooms, electrical overhead rough in.  The original

6   duration is four days.  If you look at the first column

7   there, it says four days under original duration.  So

8   under ECI's plan, it was only supposed to take four work

9   days to do electrical rough in in the locker rooms.  If

10  you look at the bar, it starts from -- actually, the May 3

11  as a start date and August 5 as a completion date.  So the

12  bar is running very, very long over six, seven weeks.  So

13  when you look at that visually, it shows that the work

14  could have taken that long, but what you're not seeing is

15  when they did the work actually, when that four days

16  occurred.

17      By way of example, they could have done one day on

18  May 3 and then the other three days in August, or did them

19  one day and then waited a week and did another day.  You

20  have no idea by looking at this chart, looking at those

21  two outside dates, what the contractor is actually doing.

22  It's just two dates.

23  Q.   Now, the plaintiff offered Exhibit 51B.  I want to

24  show this to you.  You've seen this before.

25      Does it relate to the analysis you were just

1  performing?

2  A.   Very much.

3  Q.   Explain to the Court, first of all, what this is and

4  how it relates to your analysis.

5  A.   Okay.  What ECI did was take the software, the

6  Primavera software, and took the 9/1/10 update and

7  basically plotted it out, the actual start and the actual

8  completion dates of each one of the activities, that's the

9  blue line.  That's generally from those dates I would put

10  in the computer during the update process.

11      ECI elected to do a mathematical calculation, and

12  that's all it is is to take the baseline finish date,

13  which is this column here, and take the current finish

14  date and compare them and create a number of days, and

15  that's caliber days, by the way, of variance.  So if we

16  look at cable tray, the baseline finish was July 16, the

17  actual finish was July 29, and the variance is 13 days.

18  So why would you create a chart like this, I guess, is the

19  question.  And it is to visually show there's a deviation

20  between the planned finish date and the actual finish date

21  and to graphically show this extended time and I think to

22  show that the project was somehow impacted.  The problem

23  with it is you don't know what's going on between those

24  two points in time.  It doesn't tell you that if there's a

25  33-day variance, almost a month, between the planned

1    finish and the actual finish, how the work was done.

2    Again, it could have been a four-day duration, two days

3    done the first day and a big hiatus of time and the last

4    two days done at the very end.  So what does that tell

5    you?  The graphic does nothing to show what's actually

6    happening on the project.

7             THE COURT:  In the graphic you have a number of

8    heavy blue lines here.

9             THE WITNESS:  That's the as-built.  Actual

10   starting.  These are the planned.

11            THE COURT:  Sure.  So is it overstatement then

12   to say that it doesn't tell you what's going on in the

13   project, it just tells you limited information.

14            THE WITNESS:  Exactly.  It would tell you that,

15   based upon Pike's reporting during the job, they reported

16   that the electrical devicing for that area started on that

17   date and completed on that date.  And that's good

18   information, it tells you the span of time.  But it

19   doesn't tell you how the contractor did the work during

20   that time.

21            THE COURT:  Okay.  But doesn't it at least tell

22   you that the contractor's getting a later start than

23   anticipated in many of these instances here or most of

24   these instances?

25            THE WITNESS:  Well, you have to look at the

1    concept of early start and when you can start.  For

2    instance, if you go into the final MEP connections to

3    equipment as an example.  See how they're planned to be

4    done back here?  But they're actually done here.  That's

5    what your eye is picking up, the difference between those

6    two.

7              Well, let's go back to the concept of CPM

8    schedule.  When Pike and ECI put the schedule together,

9    these equipment connections, based upon the durations and

10   the logic ties, could be done as early as that.  But they

11   had float on.  Meaning that you could do them, but you're

12   probably going to wait until towards the end of the

13   project.  That's exactly what they did.  If you look at

14   the MEP connections and the fire alarm, even though those

15   things could have been done earlier, they were actually

16   done at the end of the job all pretty much on the same

17   days because it makes sense to do it that way.

18             THE COURT:  You were saying even though these

19   projects could have been done earlier, as I understand

20   ECI's claim is, no, they couldn't have because they didn't

21   have access to them.  And what this exhibit is telling us

22   is, one way or the other, the project or the work is

23   starting later, by and large, than what had been initially

24   planned; is that right?  It's starting later, and then the

25   question is, well, is it starting later because they were

1    disorganized in some manner or they just decided we'll

2    just let it float because it's not critical, or is it

3    starting later because they really didn't have access in

4    some manner because we were impeded by some external

5    force?

6             THE WITNESS:  Exactly right.  What I did is I

7    particularly focused on in my analysis was areas where the

8    steel and the demolition was a problem.  And those areas

9    were certainly impacted.  But if you also look at some of

10   the other lines here, like this, there, there, there,

11   there, they're all being done within the planned time

12   frame.  That's what that means.

13            THE COURT:  Yes, some of those lines.

14            THE WITNESS:  And the deviation that I saw were

15   mostly in three areas.  What's a little confusing and

16   someone that doesn't see CPM schedules and see the way

17   contractors bill work, some of these things show up very,

18   very early, but they were done later.  You also have to

19   put into context what work are they doing.  Like one of

20   the biggest deviations here is the connections to the hot

21   water heater.  How long does it take you to put in hot

22   water heater, that kind of thing.

23            THE COURT:  Thank you.

24   BY MR. HUG:

25   Q.   Any other analyses that you did that relate to the

1    scheduling analysis, sir?

2    A.    Couple of other things.  I noticed that -- I'm

3    looking at 655 again.  The areas that were impacted, like

4    if you go to page -- let's stay with page 1 for a second.

5    You look at to the right of August 30th, vertical lines,

6    those green lines, that's basically showing as of 9/1 that

7    work had not started yet.  So in the arts and instrumental

8    area, that work was done after August 30th.  You see the

9    same thing for the locker rooms in the middle of the page

10   there.  And you see a little bit on the gym, on the last

11   page.  Basically saying that ECI did that work outside the

12   impacted area.  So that work, those man hours, wouldn't

13   have caused any loss of productivity because it's outside

14   the window.

15   Q.    Okay.  Any other observations in the schedule?

16   A.    I think I just mentioned to Your Honor that the work

17   that's being done in that gray highlighted area, that

18   slashed area, is a lot of testing fire alarm, things that

19   normally go on at the end of the job and do not require a

20   lot of manpower.  If you look at what makes up most of

21   ECI's work, it's the guts of it, the overhead electrical,

22   the in-wall rough in and the light fixtures, and that's

23   done pretty much earlier than that last two weeks.  Again,

24   I focused on that because it was alleged that everything

25   moved down.

1   Q.   Everything was moved down towards the end of the job?

2   A.   There was a lot of that happening, right.

3   Q.   And when you looked at this, did you see that and

4   does that still show that?

5   A.   Only, again, in those limited areas which would be

6   the art and instrumental.  You're seeing that the work was

7   pushed down.

8        What is important about that concept is that just

9   because work moves to a different area, a different time

10  frame, doesn't mean that it's going to be less productive,

11  the contract was going to be automatically incurring loss

12  of productivity.  It means you're doing it at a different

13  time frame.

14  Q.   Let's say, for example, ECI couldn't do the

15  electrical closet or work in, say, electrical closet

16  because it wasn't available.  Does it necessarily mean

17  that the work they have to do in that electrical closet is

18  going to take more time?

19  A.   No.

20  Q.   Why not?

21  A.   Because what you just described is that instead of

22  doing it the week of July 12 because it's not available

23  and I come in and do it the week of August 2, two or three

24  weeks later, I'm going to put the same manpower on it and

25  I'm going to do the same work, I'm just doing it in a

1    different time frame.  Unless there's something impacting

2    me in that electrical closet that's stopping me from being

3    productive, that cause, it should be the same.

4    Q.   And there are things that happen on projects that

5    sometimes impact the amount of time it takes you to do

6    that work in that electrical closet, for example?

7    A.   It could, yes.

8    Q.   All right.  Any other opinions concerning the

9    schedule analysis?

10   A.   I think we've covered it.

11   Q.   Okay.  Lastly, you state, based on ECI's payment

12   requisitions, ECI accomplished half of its work in

13   approximately half of the Phase 3 contract time frame.

14   How does that factor into your analysis?

15   A.   I was going through the payment requisitions and this

16   concept that the work was being pushed into a later time

17   frame, I went to the July -- I believe July 31 or close to

18   that payment req and I looked at the labor and saw what

19   was requisitioned at that time.  And what I was looking

20   for is the concept that if ECI, in fact, could not get

21   their work done when they planned it and it got moved,

22   then I would see that they're going to have less

23   requisitioning up through July and more requisitioning in

24   August.  So, in other words, the hours are being pushed.

25   But when I did the math and I added up the labor on the

 1  payment requisitions, they were 45 percent filled out.

 2  And --

 3            THE COURT:  For what time period?

 4            THE WITNESS:  Up through July 31.  So they've

 5  got half of the job done, 45 percent -- half of the time

 6  frame done and 45 percent of their hours billed.  It just

 7  raised a flag because what I thought I would see is less

 8  hours billed up to that point and more hours billed in

 9  August because of the push, but I didn't see that.

10  BY MR. HUG:

11  Q.   Just sort of describing graphically, in terms of the

12  blue lines on Exhibit 655, what did you expect to see

13  after you read their claim and you expected these

14  as-builts to show?

15  A.   I expected those blue lines to move to the right and

16  be more vertical, more things going on and the work not

17  being done earlier and being done later.  I had that very

18  recently in a project in Philadelphia where the contractor

19  hired me to show the owner that they planned on doing the

20  work in typical fashion, but the owner never turned the

21  areas over to him.  And then the owner said, You got to

22  get it done.  When we did this analysis, we saw all the

23  work being stacked in that area.

24  BY MR. HUG:

25  Q.   You see the dark blue lines going up in one area or

1    clustered in the last part of the project, clustered in

2    that particular area?

3    A.    That would be what I was looking for.

4    Q.    When you did the -- from the as-built review, it

5    doesn't show that, does it?

6    A.    It does not.

7    Q.    And even ECI's own exhibit, does it show everything

8    clustered?  Although it graphically looks a little bit

9    more, but there's more on the page, is that showing that

10   as either?

11   A.    No, because if you just put a vertical imaginary line

12   down on that graph on 7/31, you've got work on both sides

13   and pretty equal.

14   Q.    You're seeing it go like this, you expected to see it

15   like this (indicating)?

16   A.    Yeah, more to the right.

17   Q.    And that would be -- seeing it just going straight

18   down in a particular time frame later in the project, that

19   would be consistent with what their words say in their

20   claim?

21   A.    Correct.

22   Q.    Do you have any other opinions, sir, in this matter?

23   Have I gotten to them all?

24   A.    Just one other thing that I caution the Court and

25   want to make sure the Judge understands.  When Pike

1    recorded the actual start and completion dates, you have

2    to be really careful, particularly with the completion

3    dates.  Because when you're out on the site and you see

4    something start, it's pretty clear, nothing there before,

5    but you still run that risk of, let's say, for instance,

6    let's take this for an example and we see the guy on the

7    ladder and he starts putting the electrical conduit up

8    there.  And he goes there and we record him as starting.

9    But he doesn't come back for seven days or eight days or

10   nine days and then he starts up again.  Then we have the

11   same thing on the end, he gets most of the work done, but

12   he leaves that one little piece in the corner out and he

13   doesn't do that for another three weeks.  Usually the

14   person in the field's recording the last piece.  I just

15   caution everyone when they look at those outside dates,

16   they may not be reflective of when most of the work is

17   done.

18   Q.   Do you hold the opinions you've given in this matter

19   to a reasonable degree of professional certainty?

20   A.   I do.

21            MR. HUG:  No further questions, Your Honor.

22            THE COURT:  Thank you.

23            Cross-examination?

24            MR. KAPLAN:  Yes, sir.

25            May I show the witness Plaintiff's Volume III,

1    please.

2            Your Honor, I'm going to refer to Exhibit 30.

3

4                    CROSS-EXAMINATION

5    BY MR. KAPLAN:

6    Q.   It would be under Tab 30, sir, which is Exhibit 30.

7    And I'm going to ask you a question about that in a

8    moment, okay?

9        Now, I just want to ask you -- I'll get to that

10   exhibit in one second.  You mentioned towards the end of

11   your testimony that you noted that 40 percent of the hours

12   billed -- and you used the term "hours" -- were billed as

13   of July 31.  Did you mean to say dollars, not hours?

14   A.   It's labor dollars, that's what I meant.

15   Q.   Dollars for the labor.  What labor?  40 percent of

16   what labor?

17   A.   The labor for all the electrical work.

18   Q.   So per the dollar values in the schedule of values

19   for Phase 3, and that was based on the bid, right?

20   A.   I would assume it would be, yes.

21   Q.   So, to set up a schedule -- would you explain what a

22   schedule values is to refresh the Judge's recollection?

23   A.   Okay.  When the contractor, all contractors come on

24   board, they have to create what we call a schedule of

25   values which breaks down material and labor for each one

1    of their functions.  How much detail is put into it is up

2    to the architect and the owner and the contractor.

3    Basically, it's everything they'll do, including general

4    conditions.  Each month when the contractor requisitions

5    are to be paid, he or she would fill out each category and

6    then he would talk about percentages that I am 20 percent

7    complete on this, 30 percent complete on that, and they

8    get their payment requisition that way.

9    Q.   The dollars are given by what's carried in the bid

10   and how that gets allocated at the outset of the job in

11   the schedule of values?

12   A.   Correct.

13   Q.   So let's say for Phase 3, I'll take a guess, this may

14   be wrong, but $500,000 of labor for Phase 3.  I may be

15   pretty close, don't hold me to it.  And they were halfway

16   done with the activity, they bill out $250,000 for labor

17   and that's how you're generating your percentage?

18   A.   Yes.

19   Q.   But that's not equated at all, is it, to the actual

20   labor hours they're expending in the field during that

21   period?

22   A.   That would be correct.

23   Q.   So Exhibit 30, which I put in front of you, this is a

24   manpower loading chart that ECI submitted to Pike.  And

25   I'd like you to look at the color pages, which are the

 1   second and third pages.  Are you familiar with a manpower

 2   loading chart?

 3   A.    I did review the whole claim.

 4   Q.    So you had seen this?

 5   A.    Oh, sure.

 6   Q.    This chart, forget about what you accept or don't

 7   accept about it, in terms of the anticipation of

 8   anticipated hours and actual hours spent, that shows a

 9   tremendous increase of the actual hours spent way above

10   the anticipated hours starting mid to late July and

11   continuing through August, does it not, as far as what's

12   represented here?

13   A.    It shows the actual man hours spent on looks like on

14   a weekly basis, yeah.

15   Q.    Those green bars of the actual hours really spikes

16   significantly late July and throughout August, correct?

17   A.    Absolutely.  We wouldn't be here today if they didn't

18   spend more hours.

19   Q.    So just to clarify, there's no question whether

20   there's entitlement or not or who is at fault, you have no

21   question, do you, that ECI ended up spending a tremendous

22   amount of manpower in the context of this project the

23   third or fourth week of July through the end of August?

24        MR. HUG:  Objection.  No foundation for that

25   witness to answer that factually.

1          THE COURT:  I'll allow it.

2          MR. KAPLAN:  He also said he reviewed the

3  documents.

4  A.   I have not done an exhaustive study of their

5  manpower, their man hours.  I knew the other consultant

6  was doing that.

7          But just to make sure -- I think we're talking an

8  apple and orange.  You are correct that this represents

9  the actual man hours in the field, and I'm sure they spent

10  more man hours or we wouldn't be here today, but that

11  wasn't my purpose of the observation.

12  BY MR. KAPLAN:

13  Q.   I didn't ask you about the purpose of your

14  observation.  I just asked you about the information as to

15  the manpower they were spending late July and August.

16  A.   Yes.

17  Q.   I put that in the context of your comment about how

18  much dollars were billed in July.

19  A.   Understood.

20  Q.   Okay.  All right.

21          Now, if we -- you have Exhibit 655 still in front of

22  you?

23  A.   I do.

24  Q.   Just so we're clear, and I know it's fairly well

25  reflected, on the first page, the dark blue represents the

1    time periods and the time when those particular activities

2    were actually performed, right?

3    A.    That's correct.

4    Q.    Both time period and the tie in when it was

5    performed?

6    A.    Yes.

7    Q.    And the light blue is the time period and the time

8    frame that was anticipated through the bid schedule or the

9    contract schedule?

10   A.    Right.  On early start, early finish basis, correct.

11   Q.    When you see, for example, the third line electrical

12   rough in, the dark blue was done roughly a week after it

13   was anticipated to have been done.  And if you look at the

14   next one down, the light fixtures were completed maybe a

15   week, something like that, after it was supposed to be

16   done.  And the electrical devicing, which was supposed to

17   have been done July 22 actually that got pushed into

18   August 10 based on the entry in the schedule.  I'm reading

19   that correctly?

20   A.    Yes.

21   Q.    So if you go through this, one can draw their own

22   inference or conclusion as to what it means or what it

23   doesn't mean, but it's fair to say, is it not, on the

24   first page most of those activities in the dark blue are

25   being done a week, two weeks, even three weeks later than

1   the original schedule stated; isn't that a fair

2   conclusion?

3   A.   Some of them are, yes.

4   Q.   There's a number of them?

5   A.   Yes.

6   Q.   This is Pike's document, right?  This is Pike's

7   as-built information?

8   A.   Right.

9   Q.   Okay.  And regardless of whether or not this impacted

10  ECI, there's no question, is there, based on Pike's

11  information, that for all of those line items where that

12  dark blue is pushed out a week, two weeks, three weeks

13  past the estimated time frame, that those activities were

14  in fact done and completed at a later time than the

15  schedule indicate; fair statement?

16  A.   Well, not necessarily.  Because your observation is

17  only based on early start, early finish.  In the CPM

18  schedule where this came out of, there's another set of

19  dates called late start, late finish.  That's the flow

20  function.  In other words, what the computer does, it says

21  what we want to do is we want to start on an early start,

22  early finish best case.  But it also gives you another set

23  of dates and said, fine, you can start as late as this

24  late start, late finish.  And if you were to look at these

25  activities in the baseline schedule, you would see that

 1    they could move out by a week or two or whatever, whatever

 2    the note calculation.

 3              THE COURT:  With late start, late finish.

 4              THE WITNESS:  Exactly.  ECI and Pike agreed to

 5    that schedule prior to starting the work.  So ECI knew

 6    that some of that work was going to move.

 7    BY MR. KAPLAN:

 8    Q.   When you say ECI and Pike agreed, ECI -- were you

 9    aware this is a public bid?

10    A.   Yes.

11    Q.   Are you aware it's not a negotiated bid, you bid

12    what's in the documents and you get it or you don't get

13    it?

14    A.   Yes.

15    Q.   And you're aware that Pike provided the schedule as

16    part of the bid documents, were you aware of that?

17    A.   I'm not familiar with that.

18    Q.   You didn't know that?

19         Because you said a couple times ECI and Pike agreed

20    on the schedule.  I'm not sure you said ECI and Pike --

21    I'm not sure if you're saying anything other than agreed.

22    I know you said agreed.  But you weren't aware that this

23    schedule was part of the bid documents in a publicly bid

24    job; is that what you're saying?

25    A.   It might have been.

1    Q.   I'm not asking if it might have been.  I want to know

2    if you knew it was or was not.

3    A.   I don't know.

4            THE COURT:  Can you be clear, Mr. Kaplan, when

5    you say "this schedule" --

6            MR. KAPLAN:  The original contract schedule.

7            THE COURT:  655.

8            MR. KAPLAN:  The original contract, the baseline

9    schedule --

10           THE COURT:  The light blue segments in 655.

11           MR. KAPLAN:  That's physically part of the

12   contract documents that we have in evidence.

13           THE COURT:  Sure.

14   BY MR. KAPLAN:

15   Q.   As a publicly bid job with a schedule as part of the

16   contract documents, you understand, don't you, that a

17   subcontractor like ECI has no ability to negotiate or

18   change or, as part of the contract process, they can't

19   change anything?

20   A.   I understand.  I'm a little confused about what

21   schedule you're referring to.

22   Q.   There's an actual physical schedule that's part of

23   the contract.

24   A.   That's not uncommon.  My question is, the schedule

25   that Pike put together for this project, which is what

1   we're looking at, is based upon that contract schedule but

2   isn't necessarily that contract schedule?

3   Q.   Well, I'm not going to answer your question.

4   A.   No, no.  But you're asking me a question about the

5   scheduling and the contract schedule.  It's very common to

6   have a contract schedule as part of the contract to say

7   this is what I want to do.  But my understanding was Pike

8   produced this CPM schedule as they would on any job and

9   shared that information with ECI, and ECI would have the

10  ability of commenting back on that schedule and saying,

11  yeah, looks like I can do it.  That was my understanding.

12  Q.   Okay.  If we go to the next page.

13           THE COURT:  Exhibit 655?

14           MR. KAPLAN:  Yes, sir.

15  BY MR. KAPLAN:

16  Q.   You mentioned that a whole number of activities got

17  pushed out, and these were actually the subject of pushing

18  work into September, October, as you noted.  Again, we

19  could draw our own inferences and conclusions, but the

20  same holds true of the dark blue lines, light blue lines,

21  what's pushed out, what starts, what doesn't.  Right,

22  Mr. Merkhofer?

23  A.   Yes.  The green lines is the work that got pushed

24  out.

25  Q.   In terms of Exhibit 51B, which I'll use, which we

1    saw -- and just to reiterate, we're all clear that these

2    light, dark black lines here were the baseline schedule

3    dates for the various items, right?

4    A.   Correct.

5    Q.   And that the dark blue are the actual dates when

6    these activities were actually performed, the periods of

7    time?

8    A.   That's correct.

9    Q.   And one could draw whatever inferences one wants from

10   the effect of the time shifts that are indicated here, but

11   there's no question there are substantial numbers of time

12   shifts in the durations and dates of activities being

13   performed as indicated here, would you agree with that?

14   A.   Well, I would say that that document shows the time

15   frames, but it doesn't necessarily show how ECI's work was

16   actually done in relationship to the plan.

17   Q.   Okay.  Okay.  And what's your understanding of what

18   the Phase 3 work involved?  What did it involve?

19   A.   It involved demolition, some additional steel work,

20   and basically drywall work, ceiling work, basically

21   renovation of the area.

22   Q.   Okay.  And the Phase 2 work, what did that involve?

23   A.   Similar type work.  I didn't pay too much attention

24   to Phase 2.

25   Q.   Phase 4, what did that involve?

1    A.    Same kind of thing.  But again, I didn't pay too much

2    attention to it.

3    Q.    Do you know if Phase 2, Phase 4 were new work,

4    renovation?

5    A.    I don't recall.

6    Q.    Do you know whether Phase 3 was new work or

7    renovation?

8    A.    I think it was a combination of both.

9    Q.    How was Phase 3 originally scheduled?

10   A.    It was a ten-week duration.

11   Q.    Within that ten-week period -- strike that.

12         Are you aware of, in Phase 2, whether there was a

13   ten-week period of electrical activities that was

14   comparable enough to the Phase 3 activities here that you

15   could have conducted a measured mile comparison?

16   A.    I do not know that.

17   Q.    Same question as to the Phase 4:  Was there a

18   ten-week period that was comparable, enough of electrical

19   activity in Phase 4 by which you could conduct a measured

20   mile comparison with the Phase 3 work?

21   A.    I do not know that.

22   Q.    And would you agree that a ten-week period of time to

23   do the work in Phase 3 was a fairly short and compressed

24   amount of time to do that amount of work?

25   A.    I don't know.  I never did that analysis.

1   Q.   You don't know about that?

2   A.   I do not.

3              MR. KAPLAN:  Nothing further.

4              THE COURT:  I want to ask him a question, I want

5   to make sure.

6              I heard you say about the 40 percent or was it

7   45 percent?

8              THE WITNESS:  45 percent.

9              THE COURT:  Mr. Kaplan was asking 40 percent.

10  Explain what that 45 percent is.

11             THE WITNESS:  What I did is I took the labor on

12  the payment requisitions, added it all up, and then on

13  July 31 looked at those categories and saw what the

14  architect and ECI and Pike agreed to -- just so I could

15  see -- these are the people out on the field are looking

16  at the work that's being done.  And before I put that

17  statement in, I actually called Mel Strauss, he's going to

18  testify after me, he's the project manager.  And I said,

19  Did you make sure that the percentages were correct?

20  Meaning that if ECI said that the electrical conduit in

21  the musical area was 30 percent complete, 30 percent of

22  the dollars were earned, did you make sure it looked

23  pretty accurate.  He said, We did, we made sure of that.

24  The whole purpose of me doing that was not to dispute that

25  there were more man hours being spent in the field.  We

1    know that, that's what their records show.  What I'm

2    saying is that if in fact a contractor says because of

3    steel and demo and whatever and the work is being delayed

4    and pushed, that means the work couldn't be installed so

5    you couldn't requisition it for dollars.  Those dollars

6    represent actual amounts of work in the field.

7              So when I saw the 45 percent, even though

8    there's more man hours being spent actually in the field,

9    the project team agreed that there was 45 percent of the

10   work done by July 31, regardless of how many actual hours

11   are being spent, we got 45 percent done.  Then that

12   doesn't hold true if the work is being pushed into the

13   next month.  It would be a lower percentage, that's the

14   way I would be looking at it, because they couldn't get to

15   it.  But they did.

16             THE COURT:  All right.

17             Mr. Hug?

18             MR. HUG:  No further questions, Your Honor.  But

19   I thought I'd come up here and say that.

20             THE COURT:  No further questions?

21             MR. HUG:  Really.  No further questions.  You

22   look surprised.

23             THE COURT:  I am surprised.

24             Thank you.  Safe travels.

25             THE WITNESS:  Thank you.

 1          THE COURT:  Great.  Well, are we ready for our

 2   video presentation?

 3          MR. HUG:  Yes, Your Honor.

 4          I would suggest we take -- all right.  I guess

 5   we're ready.  We just have to huddle around.

 6          THE COURT:  We can't plug it in?  Let's play it

 7   on our courtroom system.

 8          MR. HUG:  We have a computer that works that can

 9   show it and we're happy to plug it in if it can be done.

10          May I be excused for one minute?

11          THE COURT:  Sure.  Let's take a ten-minute

12   technology break.

13          MR. HUG:  Thank you.

14              (Whereupon, a recess followed.)

15

16          THE COURT:  All set?

17          MS. VENNOS:  This is going to be the video

18   deposition of William Lynch.  We would introduce that as

19   Exhibit 657 in the case.

20          THE COURT:  Any objection to 657?

21          MR. KAPLAN:  No, sir.

22          THE COURT:  Full exhibit.

23          (Video played.)

24          THE COURT:  All right.  That concludes our video

25   presentation, it appears.

1          Is there anything else?

2          MR. HUG:  No, Your Honor.  The other video that

3    was taken was of a gentleman by the name of Gary Schnip.

4    He had to have surgery on Thursday, so his deposition was

5    taken on Wednesday.  We'll submit that as an exhibit, file

6    that with the Court as it comes in in due course.

7          THE COURT:  Sure.  Okay.

8          MR. HUG:  I don't think there's -- there is one

9    question on there that relates to relevancy, but I think

10   we just leave it for the Court to decide.

11         MR. KAPLAN:  I'm happy for the Court to

12   determine what it wants to do with that particular

13   question and objection.

14         MR. HUG:  Just listen to it and take it for what

15   it's worth, I suppose.

16         THE COURT:  Good.

17         So, in terms of future scheduling, it looks like

18   we're on for the morning of August 7.  Thursday, August 7.

19   It probably makes sense to maybe do an 8:00 a.m. start to

20   ensure that we perhaps get done by the time I have to run

21   off to this lunch, although I don't know if we'll get done

22   in time.

23         MR. KAPLAN:  We'll be done, Your Honor.  Won't

24   we, Mr. Hug?

25         THE COURT:  Great.  All right.  Thank you,

1    counsel, for all your patience.  I look forward to seeing

2    you then.

3              Stand in recess.

4                   (Proceedings adjourned at 3:57 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5    RE:  ELECTRICAL CONTRACTORS, INC. v. THE PIKE COMPANY

6                    No. 3:11CV449(JAM)

7

8

9              I, Diana Huntington, RDR, CRR, Official Court

10   Reporter for the United States District Court for the

11   District of Connecticut, do hereby certify that the

12   foregoing pages are a true and accurate transcription of

13   my shorthand notes taken in the aforementioned matter to

14   the best of my skill and ability.

15

16

17

18

19                    _____/s/_____

20            DIANA HUNTINGTON, RDR, CRR
                 Official Court Reporter
21           United States District Court
             915 Lafayette Blvd., Room 423
22           Bridgeport, Connecticut 06604
                    (860) 463-3180
23

24

25