UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                 :
ELECTRICAL CONTRACTORS, INC.,    :  No. 3:11CV1449(JAM)
                                 :
                 Plaintiff       :
                                 :
          vs.                    :
                                 :
THE PIKE COMPANY,                :
                                 :  Bridgeport, Connecticut
                 Defendant       :  August 7, 2014
                                 :
- - - - - - - - - - - - - - - - x


BENCH TRIAL
VOLUME VIII


B E F O R E:

     THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


A P P E A R A N C E S:

     FOR THE PLAINTIFF:

          MICHELSON KANE ROYSTER & BARGER
               Hartford Square North
               10 Columbus Blvd.
               Hartford, Connecticut 06106
          BY:  STEVEN B. KAPLAN, ESQ.

     FOR THE DEFENDANT:

          ROBINSON & COLE
               280 Trumbull Street
               Hartford, Connecticut 06103-3597
          BY:  CHRISTOPHER J. HUG, ESQ.


                              Diana Huntington, RDR, CRR
                              Official Court Reporter

## TABLE OF CONTENTS

| DEFENDANT'S<br>WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR<br>DIRE |
|---|---|---|---|---|---|
| MELVIN STRAUSS | | | | | |
| By Mr. Hug | 1501 | | | | |
| By Mr. Kaplan | | 1571 | | | |
| By Mr. Hug | | | 1589 | | |

| PLAINTIFF'S REB.<br>WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR<br>DIRE |
|---|---|---|---|---|---|
| WILLIAM FLYNN | | | | | |
| By Mr. Kaplan | 1598 | | | | |
| By Mr. Hug | | 1603 | | | |

1                          **8:04 A.M.**

2                    THE COURT:  We're back in ECI vs. Pike,

3      3:11CV1449.

4                    Appearance of counsel, please?

5                    MR. KAPLAN:  For the plaintiff, Steve Kaplan

6      from Michelson Kane Royster & Barger.

7                    THE COURT:  Okay.

8                    MR. HUG:  For the defendant, Christopher Hug,

9      Robinson & Cole.

10                   THE COURT:  Good morning.

11                   Do we have anything to take up before we have

12     our first witness today?

13                   MR. KAPLAN:  Only I expect Mr. Flynn here about

14     8:30, he'll be walking in.

15                   THE COURT:  Sounds good.

16                   MR. HUG:  I'll take care of it later, the last

17     videotaped deposition submitted into evidence before the

18     close of my case.

19                   THE COURT:  Great.

20                   MR. HUG:  Your Honor, we have taken off our

21     jackets.  I hope that is okay with the Court.

22                   THE COURT:  No worries.  Thank you.

23                   If you'd like to call your first witness.

24                   MR. HUG:  Yes, Your Honor.

25                   Mel Strauss.

1          THE CLERK:  Remain standing and raise your right

2    hand.

3

4                        MELVIN STRAUSS,

5          called as a witness, having been first duly

6          sworn, was examined and testified as follows:

7

8          THE CLERK:  Please be seated.

9          Please state your name.

10          THE WITNESS:  Melvin L. Strauss, III.

11          THE CLERK:  Please spell your last name.

12          THE WITNESS:  S-T-R-A-U-S-S.

13          THE CLERK:  Please state your city or town.

14          THE WITNESS:  Glastonbury, Connecticut.

15          THE CLERK:  Thank you.

16

17                     DIRECT EXAMINATION

18    BY MR. HUG:

19    Q.   Do you want to pull that microphone a little closer?

20    We have exhibits, just be careful you don't bang it there.

21          Mr. Strauss, you've given the Court your name.  Tell

22    us a little bit about presently your current employment.

23    A.   I'm currently employed by the Fusco Corporation,

24    New Haven, Connecticut.

25    Q.   What do you do for Fusco?

1    A.    Project manager.

2    Q.    And how long have you been with Fusco?

3    A.    Since December 2013.

4    Q.    Prior to working for Fusco, for whom did you work?

5    A.    The Pike Company.

6    Q.    And how long had you worked with The Pike Company?

7    A.    I started at The Pike Company in 2007.

8    Q.    And prior to The Pike Company, just give a

9    general idea -- by the way, what did you do at The Pike

10   Company?

11   A.    I was project manager at The Pike Company.

12   Q.    We'll go over what that is in a second.

13         Prior to working for Pike, who did you work for?

14   A.    Konover Construction Corporation, which is now KDC.

15   Q.    How long did you work for them?

16   A.    Twelve and a half years.

17   Q.    What did you do for them?

18   A.    I started there as a field superintendent and then

19   project manager for the last five years of my employment

20   there.

21   Q.    And in terms of prior to Konover, who did you work

22   for?

23   A.    It was the Nutmeg Companies of Norwich, Connecticut.

24   Q.    Was that construction as well?

25   A.    Yes, it was construction.

1    Q.   All right.  Focusing on your work with The Pike

2    Company, you say you were a project manager.  What does a

3    project manager do for Pike?

4    A.   The project manager for Pike, for most companies,

5    they interface with the client.  We review owner

6    contracts, make sure we comply with the owner contracts,

7    the terms and conditions of the contracts.  We solicit

8    pricing of contractors, whether it's a public bid or it's

9    a negotiated project, award subcontracts.  Administer the

10   construction of the project, which includes a myriad of

11   things from mitigating subcontractor issues, you know,

12   making sure we get clarification on construction documents

13   through RFI, request for information, process.  Administer

14   submittals/shop drawing process, which is the products and

15   the coordination of all those products that go into

16   construction of the project.  And then administer

17   payments, review payment applications, administer payments

18   and change orders, there's always change orders on the

19   project.

20   Q.   You mentioned submittals and shop drawings.  Is that

21   a significant aspect of a construction manager's duties?

22   A.   Yes, it is.

23   Q.   Okay.  Could you describe for the Court what

24   submittals and shop drawings are?

25   A.   Well, we bid on or our contract is bid on

1    construction documents that are issued by the design

2    professionals that are hired by our client.  In those

3    documents is different products listed.  Our contractors

4    are required to submit each product that goes into the

5    construction of the project.  It might be a type of

6    caulking, a species of wood, door hardware, that sort of

7    thing.  It's really the planning stage of the project,

8    kind of cues up the planning to start off construction.

9    Q.   Does that usually -- does that precede the

10   construction of a particular area or item?

11   A.   In some cases it precedes.  In a lot of cases it's

12   concurrent with the first portion of construction.

13   Q.   Now, electrical contractors, do they typically have

14   submittals or shop drawings they have to submit?

15   A.   They'll submit on their products that they're going

16   to be using on the project, yes.  And they'll also

17   coordinate their work with other contractors, namely the

18   plumbing contractors, HVAC contractors, and site

19   contractors if they have underground work.

20   Q.   You mentioned the term "coordination."  How does

21   coordination occur on a project, in general?

22   A.   What we do -- what I do is I hold meetings with all

23   the pertinent contractors that need to coordinate their

24   work.  I do those on a weekly basis.  Then we actually do

25   drawings to coordinate.  Like we usually start out with a

1   sheet metal contractor, they have the biggest items.  And

2   then we would overlay plumbing, heating piping and

3   electrical fire alarm, that sort of thing.  It's an

4   overlap of all these systems that comprise complete shop

5   drawings or coordination drawings.

6   Q.   And do these occur -- are there meetings and whatnot

7   that are necessary to work with the subcontractors?

8   A.   Absolutely.  And what we do is when we have those

9   meetings, the reason we do these meetings is because it

10  makes the field people understand what they need to do to

11  complete the project.  In some cases they don't look

12  ahead.  It's kind of a look-ahead for them.

13  Q.   Drawings and coordination efforts, are those related

14  at all to scheduling and managing of the project?

15  A.   Yes, they are.

16  Q.   How are they?

17  A.   Well, we obviously need to have our coordination work

18  done prior to construction of a certain phase or the

19  project in general.  So if we don't get the coordination

20  work done timely, then the schedule will suffer.

21  Q.   And in the coordination meetings do you also go over

22  how coordination of the trades and of the work will factor

23  into the schedule?

24  A.   Yes, we do.

25  Q.   Okay.  Are you familiar with the Kelly Middle School

1   project?

2   A.   Yes, I am.

3   Q.   What is your familiarity with that?

4   A.   I was the project manager at the Kelly Middle School.

5   Q.   We've heard from Ed Oloff, who was project

6   superintendent.  Describe your duties for the project and

7   then, if you could, the difference between yours and Ed's?

8   A.   All right.  My role is more of an administrator.  As

9   I said earlier, I'm looking at requests for information, I

10  make sure we get timely responses from the team.  There

11  may be cloudy areas on the documents that we need

12  clarified and that request for information is the process

13  for doing that.  And I administer that, make sure we get

14  timely responses from our design professionals.

15       Same thing with submittals, I make sure the submittal

16  packages are submitted timely so we have our materials on

17  site on time to meet the schedule requirements.

18       Then I make sure everybody gets paid on time.

19  Q.   How about Ed, Ed's role?

20  A.   Ed's the boots on the grounds.  He's out in the field

21  all day long mitigating issues with contractors, you know,

22  advising the contractors on where they need to be on the

23  schedule, making sure they get there.  And he's out there

24  solving problems.

25  Q.   Now, at the Kelly Middle School project, describe how

1    often you were on site?

2    A.   I was assigned there full-time.  In the beginning of

3    the project, I was probably there 10 to 12 hours a day and

4    a lot of Saturdays because of the schedule requirements.

5    Q.   All right.  Did you attend job meetings?

6    A.   We had job meetings with the owner, weekly owner

7    meetings and subcontractor meetings.

8    Q.   Did you attend those subcontractor meetings?

9    A.   Yes, I did.

10   Q.   Did you interact also with subcontractors?

11   A.   Yes, I did.

12   Q.   Did you interact with ECI's on-site management?

13   A.   Yes.

14   Q.   Did you also interact with Cliff Clauson and Bill

15   Flynn?

16   A.   Not Bill Flynn so much.  He wasn't there that much.

17   I only saw him on site a couple times.

18   Q.   Although you were there every day?

19   A.   I was there every day and weekends.

20   Q.   Okay.  But you did have occasion -- and I'll go into

21   it a little bit later -- to meet and talk with Bill Flynn

22   at one point?

23   A.   Yes.

24   Q.   Before we get into some of the details of some

25   things, I just want to go or a couple of documents that

 1   have been introduced into evidence.  If you turn in the

 2   binder, turn first to Exhibit 12.

 3        This is Plaintiff's Exhibit 12 in Binder Number I,

 4   Your Honor.

 5        What I want to do with you, Mr. Strauss, is go over

 6   Exhibits 12, 13, and 14 kind of quickly, put these

 7   documents in perspective, how they work together.

 8        Let's start with Exhibit 12.  And if you could

 9   describe for the Court -- well, let's wait a second.

10        The question I'm going to have for you is:  What is

11   Exhibit 12?  Hold on just a second.

12             THE COURT:  Okay, I'm all set.

13   BY MR. HUG:

14   Q.   What is Exhibit 12?

15   A.   Exhibit 12 is The Pike Company, Inc. subcontract

16   agreement with ECI for the Kelly Middle School project.

17   Q.   Is it the whole subcontract?

18   A.   No, it's a work order for master subcontract

19   agreement.

20   Q.   And describe briefly what it contains.

21   A.   Well, there's a Exhibit AA, which is the work order,

22   which is a general overview of what's involved with the

23   project and the amount, contract amount.

24        There's an attachment with the contract drawing list,

25   which is the bid documents.

1        There's a exhibit -- Attachment B, which is just a

2   general overview of what's contained in the contract

3   documents and in the master subcontract agreement that's

4   specific to the Kelly Middle School project.

5        There's wage rates from Connecticut Department of

6   Labor that were assigned to the project.

7        Then there's a project critical path method schedule.

8   Q.   I think you said Exhibit B.  Do you mean the letter

9   dated December 29, 2009?

10  A.   December --

11  Q.   December 1?

12  A.   Yes.

13  Q.   What is that?

14  A.   That's just instructions to the recipient on what

15  needs to be returned.  It tells you how many copies to

16  execute, insurance requirements, you know, in general

17  the -- it's an executive overview of the contract

18  requirements, the master contract requirements.

19  Q.   Okay.  Turn to page 4 of that letter.

20  A.   Yes.

21  Q.   And there's a title Extra Work.  What is extra work,

22  in your understanding?

23  A.   Extra Work is work that was not part of the

24  contractor's bid.  It might be work that -- in most cases

25  it's work that the owner has requested or it comes about

1   by maybe an error or omission on the contract documents.

2   Q.   Is there other terms for the use of extra work?

3   A.   Yes.  It's called commonly a change order, additional

4   services, that sort of thing.

5   Q.   Out-of-scope work?

6   A.   Out of scope.

7   Q.   All right.  And that highlights on the second

8   sentence that extra work orders will not be signed in the

9   field except for emergencies or special situations.  Do

10   you know -- why is that the way it is?

11   A.   Well, as the project manager, I'm in -- it's my

12   responsibility to manage the financials on the project and

13   I need to be made aware of any changes on those

14   financials, so we cannot have field personnel authorizing

15   additional work.

16              (Interruption in the proceedings.)

17              THE COURT:  Continue.

18   BY MR. HUG:

19   Q.   I think the last question, Mr. Strauss, is the

20   sentence "As a rule, 'extra work orders' will not be

21   assigned in the field" and so forth, why is that the way

22   it is?

23   A.   It's my responsibility -- I'm in charge of the

24   financials on the project.  I need to be made aware of all

25   changes, additional work.  On a lot of projects, we have

1   more than one person in the field.  And if we had people

2   signing extra work, workers in the field without my

3   knowledge, I wouldn't be able to control the finances.

4   Q.   In fact, the last sentence of that actually says that

5   changes in the scope of work should be forwarded to your

6   attention?

7   A.   Everything goes through me, yes.

8   Q.   You're sort of the central point.  Why did you need

9   to know about financial impacts on the project?

10   A.   With our contract -- with any owner's contract, we

11   have a responsibility to notify the owner of any potential

12   costs they may receive from the work being completed.

13   Q.   Did you give monthly reports to the owner?

14   A.   Yes.

15   Q.   Is that a writing?

16   A.   Yes, it is.

17   Q.   I'll go over those with you in a little bit.

18       Staying on page 4 again, Schedules is the next

19   paragraph.  The last sentence of that says, "A weekly

20   updated and detailed four week schedule of your trade's

21   activities must be prepared by each subcontractor prior to

22   each job meeting."  What does that mean?

23   A.   Generally, we prepare a three- to four-week

24   look-ahead so we know where the project is going.  And we

25   need input from the contractors, in some cases, to do

1    that.  That's what that means.  That would come off the

2    master schedule.

3    Q.   Did you get input from contractors and subcontractors

4    in this --

5    A.   No, not at all.

6    Q.   How about ECI?

7    A.   No.

8    Q.   And so how did you manage the subcontractors?

9    A.   We had weekly contractor meetings where we review the

10   look-ahead schedules, the activities and where we were

11   going.  We would be planning ahead two to three weeks,

12   advise everybody where they need to be in those time

13   frames.

14   Q.   So you dealt with it in weekly meetings?

15   A.   We had weekly meetings.

16   Q.   We'll go over those in a minute.

17        The last one on this page is Payments.  "Payments

18   will not be processed without all required documentation,

19   including lien waivers as applicable."  Why is that

20   written in that strict terminology?

21   A.   This is a requirement that's prevalent in the

22   construction industry.  We need to know if there's any

23   outstanding issues with the contractor.  And so we require

24   a lien waiver for that payment for that month.

25   Q.   And by the way, describe the application for payment

1    process from subcontractor to owner?

2    A.    In this case, a subcontractor would submit -- I think

3    on this project the 20th of the month, a draft of a

4    payment application from an approved schedule of values

5    which lists all the work by phase and would be billing

6    line items on that schedule of values.  I would receive

7    that, review it, review it in the field and make sure that

8    the work that was being billed was actually completed in

9    the field.  I would assemble all those bills from our

10   contractors, then I would meet with our client and the

11   architect and review.  And then we would make comments.

12   Sometimes we didn't have any comments; sometimes we did.

13   We'd have them revised by our contractors.  And then I

14   would assemble a final bill that I would forward to the

15   owner for payment.

16   Q.    And that would include the -- would that include lien

17   waivers as well?

18   A.    The lien waivers would be sent to Pike's office in

19   Rochester.  Lien waivers are required for payment.  That

20   was a function of the accounting department in Rochester.

21   Q.    My question is:  Did they ultimately, a copy of

22   those, end up in the owner's hands?

23   A.    The lien waivers?  No.

24   Q.    Turn to the next one, Attachment C.  Attachment C I

25   think you described as Connecticut Department of Labor

1    Wage and Workplace Standards Division, these are the labor

2    rates, correct?

3    A.    Yes.

4    Q.    Now, turn to page 4 -- or excuse me, 3 of that.  Is

5    there an electrical worker labor rate?

6    A.    Yes, there is.

7    Q.    Describe what that is?

8    A.    There's two columns there.  There's $35.40, which is

9    their hourly rate.  19.51 is second column, which is the

10   benefits, which would include any myriad of things,

11   holiday pay, vacation pay, health and medical benefits,

12   that sort of thing.

13   Q.    Okay.  So these are the minimum labor rates that are

14   prevailing labor rates then in effect?

15   A.    Yes, at that time.

16   Q.    And then finally, I'm not going to go over it, but

17   there's a schedule attached, correct?

18   A.    Yes.

19   Q.    All right.  I want you to turn to Exhibit 13.  What

20   is Exhibit 13?

21   A.    Exhibit 13 is The Pike Company's master subcontract

22   agreement.

23   Q.    Okay.  And is this Pike's standard form of

24   subcontractor agreement?

25   A.    Yes, it is.

1    Q.    Are you familiar with this agreement?

2    A.    Yes, I am.

3    Q.    Did you actually administer this agreement at the

4    Kelly Middle School project?

5    A.    Yes, I did.

6    Q.    This particular document, is it related to other

7    industry type of documents?

8    A.    Yes, it's very similar.

9    Q.    Okay.  And by industry type of documents, I'm not

10   sure the Court is familiar.  What are some of the industry

11   type of documents?

12   A.    Generally, it's the AIA formats.  American Institute

13   of Architects, they have their own forms that they use for

14   subcontract agreements.  You know, contracts between a

15   general contractor, construction manager and an owner,

16   that sort of thing.

17   Q.    In fact, the general conditions for this project,

18   were they AIA documents?

19   A.    Yes.

20   Q.    That's in Exhibit 14?

21   A.    Yes.

22   Q.    Okay.  If you go to Exhibit 14 about halfway through,

23   is there an AIA Document A201?

24   A.    Yes, there is.

25   Q.    And that's somewhat standard form of document?

1    A.   Yes, it is.

2    Q.   Now, just staying on that exhibit for a moment, prior

3    to that form of document, there are a number of pages.

4    What are those?

5    A.   These were supplemental general conditions that were

6    issued by the architect on this project modifying the AIA

7    Document A201.

8    Q.   So you have the A201, then you have this supplement

9    that modifies various provisions of the A201?

10   A.   That's correct.

11   Q.   Go back to Exhibit 13 for a moment and turn to

12   page 2.

13           MR. KAPLAN:  Just housekeeping.  We didn't admit

14   14 yet.  It was on one of my checklists to do.

15           MR. HUG:  I stipulate.

16           THE COURT:  Okay.  Exhibit 14, full exhibit.

17           MR. KAPLAN:  Thank you.

18           MR. HUG:  Thank you, Mr. Kaplan.

19   BY MR. HUG:

20   Q.   Continue on with page 2.  I want you to look at

21   1.5.1.  Are you familiar with that provision?

22   A.   1.5.1, Conflicts?

23   Q.   Yes.

24   A.   Yes.

25   Q.   In general, if you could explain to the Court what

1    that provision is?

2    A.   What this does is clarify for all the contractors and

3    construction managers what takes precedent over what.

4    Q.   So it goes on in 1.5, which is entitled

5    Interpretation of Subcontract Documents -- and I want to

6    go over all the details of it, but in general does it

7    provide what document has priority over the next document

8    and so forth?

9    A.   Correct.

10   Q.   In general -- I know there's a lot of different

11   parts, but to the best of your recollection, what are the

12   general contract documents?  What constitutes the contract

13   documents?

14   A.   The contract documents are the documents that were

15   issued during the bid.

16   Q.   Okay.  Does it include Exhibit 13?

17   A.   Yes, it does.

18   Q.   Exhibit 14, does it include as well?

19   A.   Yes, it would.  Yes.

20   Q.   And finally Exhibit 15, which I'm not sure has been

21   admitted either, what is Exhibit 15, sir?

22   A.   Exhibit 15 is an AIA Document A131, it's a

23   construction manager's contract between an owner and

24   construction manager, and it's Pike's contract.

25                MR. KAPLAN:  No objection, Your Honor.

1          THE COURT:  Exhibit 15, full exhibit.

2   BY MR. HUG:

3   Q.   And then, of course, you have -- in addition, you

4   have drawings and specifications.  Are those part of the

5   contract documents, too?

6   A.   Yes, they would be.  They were listed out actually in

7   one of the earlier exhibits.

8   Q.   Exhibit 12?

9   A.   Yes.

10  Q.   Okay.  All right.  I want you to turn next to page 6.

11          THE COURT:  Of Exhibit 13?

12          MR. HUG:  Of Exhibit 13, thank you.

13  BY MR. HUG:

14  Q.   Sir, I want you to point first to -- if you go to

15  Section 3.1, at the bottom of the first column there is a

16  sentence that says, "The Contractor may prepare the

17  Schedule of Work for the Project and Contractor shall have

18  the right to modify the construction schedule, to suspend,

19  delay or accelerate, in whole or in part, the commencement

20  or execution of Subcontractor's Work, or vary the sequence

21  thereof, without compensation to the Subcontractor."

22          Did I read that right?

23  A.   Yes.

24  Q.   And that's a standard form in your provision, in your

25  contract?

1    A.   Yes.

2    Q.   And then it says in the next sentence, "In the event

3    such a delay or extension extends the overall time of

4    performance, the time for the Subcontractor to complete

5    its work shall be extended."

6         Did I read that right?

7    A.   That's correct.

8    Q.   Now, when a contractor seeks to -- subcontractor

9    seeks to delay the overall completion of their work so

10   they need four weeks' extension of time, what is your

11   understanding as to how that should be presented to Pike,

12   as the contractor?

13   A.   I'm not sure I understand the question.

14   Q.   How does a subcontractor go about asking for an

15   extension of time to complete their entire work?

16   A.   There would be a written request.

17   Q.   Is there a provision in the subcontract that provides

18   that?

19   A.   Yes, I'm sure there is, yes.

20   Q.   And we'll come to that in a moment.

21        Two sentences later -- by the way, just staying on

22   that topic for a second, did you ever receive a written

23   request for extension of time by ECI in connection with

24   Phase 3 of the project?

25   A.   No, I didn't.

1    Q.    Did you ever receive an oral request for extension of

2    time from ECI?

3    A.    We did in July.

4    Q.    That was at that July 21 meeting?

5    A.    That's correct.

6    Q.    We'll come back to that in a moment.

7          The two sentences down, "The Subcontractor shall

8    prosecute the Subcontractor's Work in a prompt and

9    diligent manner as directed by the Contractor and in

10   accordance with the Schedule of Work without hindering the

11   Work of the Contractor or any other Subcontractor."

12         Did I read that correctly?  See it?

13   A.    Yes.  Yes, you did.

14   Q.    First of all, what does that mean?

15   A.    That means the contractor, the subcontractor in this

16   case, would need to provide sufficient manpower and

17   materials and equipment to meet the schedule requirements

18   of the project.

19   Q.    And did ECI comply with this requirement?

20   A.    Not in the beginning.

21   Q.    And did you personally observe that?

22   A.    Yes, I did.

23   Q.    And finally, the last sentence of that 3.1,

24   "Whenever, in the Contractor's opinion, the

25   Subcontractor's Work falls behind, the Subcontractor shall

1    increase its labor force and/or provide overtime,

2    Saturday, Sunday and/or holiday work, and shall have each

3    of its Subcontractors do likewise, all at no additional

4    cost to or compensation from the Contractor."

5         Did I read that right?

6    A.   Yes, you did.

7    Q.   Did that happen in this case regarding ECI's work?

8    A.   It eventually did, yes.

9    Q.   In other words, did they fall behind in their work?

10   A.   They did in the beginning of Phase 3, yes.

11   Q.   And did they increase their labor force?

12   A.   Yes, they did.

13   Q.   Did you direct them to increase their labor force?

14   A.   No, I didn't.

15   Q.   Is it your -- what's your understanding as to their

16   obligation if they fall behind in work?

17   A.   They needed to provide whatever resources required to

18   meet the requirement in accordance with the contract.

19   Q.   So they needed to increase their workforce in

20   accordance with the subcontract?

21   A.   Work extended shifts, work additional shifts, work

22   weekends, whatever needed.  Whatever they needed to do,

23   yes.

24   Q.   And this understanding that you have, did you have

25   this understanding at the time this contract was being

1    administered?

2    A.    Yes, absolutely.

3    Q.    Okay.  3.2 refers to a preconstruction conference.

4    Did such a preconstruction conference occur with ECI?

5    A.    Well, yes, in the form of a subcontractor meeting.

6    We had those on the project.

7    Q.    Describe for the Court, first of all, what the

8    preconstruction conference is, start there.

9    A.    Generally, the preconstruction conference is held --

10   the first subcontractor meeting is a preconstruction

11   conference.  What we do is we lay out the schedule.  We

12   put up a phasing plan in the conference room so people

13   understand.  A lot of these people weren't the ones

14   involved in bidding the project.  They're new to the

15   project, seeing it for the first time, a lot of them.  We

16   put up the phasing plan, the four plans of the project.

17   We go through the schedule.  We go through the phases of

18   the project, what's required, the milestones on completing

19   the phases.  We lay down areas for equipment and

20   materials, where we can work, can't work, if this was an

21   occupied school.  Those are the kind of things.  And how

22   payments were administered.  When the deadlines are for

23   payments, draft payment applications, that sort of thing.

24   Q.    And did that preconstruction conference occur with

25   ECI?

1    A.    Yes, it did.

2    Q.    Did you attend?

3    A.    I conducted it.

4    Q.    I'm sorry?

5    A.    I conducted it.

6    Q.    And do you recall who was there from ECI?

7    A.    I believe Cliff Clauson was there and Stephane

8    Mathieu.

9    Q.    Can you recall what, in general, you conveyed to ECI

10   at that meeting?  Was it any different than what you just

11   told the Court how you run preconstruction meetings?

12   A.    I told everybody the same thing on the project.

13   Q.    Did you talk about the phasing?

14   A.    Absolutely did.  We actually had a phasing plan on

15   the conference room wall, showed all the phases with dates

16   on when those phases need to be complete.

17   Q.    What was ECI's response and reaction during that

18   meeting?

19   A.    There wasn't a response or reaction.

20   Q.    What did you construe that to mean?

21   A.    That they were accepting of the schedule and the

22   phasing plan.

23   Q.    Did they complain that they could not be done?

24   A.    No.

25              THE COURT:  What's our date time for this

1    meeting?

2    BY MR. HUG:

3    Q.   When does this preconstruction meeting start?

4    A.   I know it was in the beginning of the project in

5    2009.  November, December time frame.  But it's been a

6    while.

7    Q.   So phase -- we've established pretty clearly Phase 3

8    started right at the end of June 2010.  So this would have

9    been about six or seven months beforehand?

10   A.   That's correct.

11   Q.   And the project actually started in other phases

12   when, Kelly Middle School?

13   A.   Pike didn't start the project until I believe it was

14   November 2009.

15   Q.   2009?

16   A.   Yes.

17   Q.   Now, down at the bottom of page 6 of Exhibit 13,

18   there is a provision 3.4 which has gotten some attention

19   during this trial.  Are you familiar with that provision?

20   A.   Yes.

21   Q.   Okay.  And I think -- I'm not going to read the whole

22   provision, but in general, is it fair to say that if the

23   subcontractor is delayed by any act or omission of Pike,

24   ECI is delayed by any act or omission of Pike or by any of

25   Pike's other subcontractors or anything beyond Pike's

1    control, the time for work, completion of the work shall

2    be extended for a period equivalent to the time lost by

3    reason of the aforesaid loss.  In general, is that what it

4    involves?

5    A.    Yes.

6    Q.    So if -- by the way, did that happen in this case?

7    A.    Yes.

8    Q.    Okay.  And how did it go about happening?  Explain to

9    the Court what you mean it happened in this case.

10   A.    We had some areas -- during the demolition process in

11   Phase 3, there were areas of the existing school that we

12   found structural issues.  It was the art room wing and the

13   locker room wing, there was structural issues.  There had

14   to be some re-design and we had to order new steel for

15   those areas.  We endeavored to finish this area before the

16   opening of school, but it became obvious to us, as we

17   started into the summer, that it wasn't going to be

18   possible, so we went back to our client and advised them

19   of the situation.  They were aware of the design issue.

20   We advised them of our schedule issue, and they allowed us

21   more time to complete those areas.

22   Q.    Did you communicate that to ECI?

23   A.    I communicated that to all the subcontractors.

24   Q.    And as we saw in another exhibit -- I'm not going to

25   take the time to do it -- there's another exhibit where it

1    was written to all the subcontractors about August 1,

2    2010, do you recall that being about the right date?

3    A.   Yes, that's about the right time.

4    Q.   So you tell the subcontractors in writing that they

5    now have more time?

6    A.   Yes.  For those two areas, yes.

7    Q.   Now, on page 7 I'll just point out there is a

8    provision 3.5 and 3.7 referred to the items of Submittals

9    and Coordination that you testified to a moment ago,

10   correct?

11   A.   Yes.

12   Q.   All right.  Now, turn to page 9.

13        Now, did ECI perform extra work, extra work on this

14   project?

15   A.   Yes.

16   Q.   Okay.  I want to show you Exhibit 631.

17        Sir, what is Exhibit 631?

18   A.   This is a change order for -- it's specific for ECI

19   for this project.

20   Q.   That's just for ECI?

21   A.   Yes.

22   Q.   Okay.  So ECI, did they -- can I deduce from that

23   that ECI submitted claims for extra work?

24   A.   Yes.

25   Q.   And did you grant them some of them, at least?

1    A.    It would appear so from the log, yes.

2    Q.    Did they do their requests for these particular

3    change orders shown in this log, was there writings

4    exchanged between the parties?

5    A.    There were forms that were submitted by ECI to Pike

6    requesting these changes.

7    Q.    Could you describe, in general, the process for the

8    Court?

9    A.    Generally, the changes would come about from a sealed

10   condition or something that was issued by the design team.

11   And ECI would submit the pricing for those changes.

12   Q.    Okay.

13   A.    And in this case we used the contractor's forms.

14   Q.    Were those typically exchanged, were they paper or

15   were they by e-mail?

16   A.    I think in this case they were e-mailed.  They were

17   actually attachments to an e-mail, there was an actual

18   form, but it was an attachment to an e-mail.

19   Q.    Who did you typically deal with from ECI with respect

20   to changes in the project?

21   A.    Cliff Clauson.

22   Q.    So is it fair to say it appears ECI knew how to

23   submit requests for change orders?

24   A.    Yes.

25              THE COURT:  Did you want to offer 631?

1           MR. HUG:  Yes, I do.

2           THE COURT:  Any objection?

3           MR. KAPLAN:  No objection.

4           THE COURT:  631, full exhibit.

5   BY MR. HUG:

6   Q.   Now, I want to turn to paragraph 5.4 for a moment.

7        The first sentence reads that "If the Subcontractor

8   believes that any order, directive or condition, other

9   than as provided for in Paragraph 5.7, entitles him to

10  extra compensation or an extension of time, he shall give

11  the Contractor written notice of his claim not later than

12  three days after the occurrence of the event giving rise

13  to the claim and shall, as soon as practicable, furnish

14  sufficient facts in support of his position as may be

15  necessary for a decision."

16       Did I read that correctly?

17  A.   Yes.

18  Q.   So earlier I'd asked you whether or not in connection

19  with a request for extension of time to complete the work

20  whether a writing was needed.  Is 5.4 the provision you

21  were talking about?

22  A.   Yes.

23  Q.   It says -- and the language speaks for itself.

24       Turning back for a moment, keeping this provision in

25  mind for a moment, we went over what a change order is.

1    What is a change directive?

2    A.   Change directive would be a directive from, in this

3    case, myself directing a contractor to perform additional

4    work or services.

5    Q.   Okay.  Is that provided for in 5.1 on that same page?

6    A.   Yes.

7    Q.   So give me an example of a directive that you might

8    give on any particular project.

9    A.   We may find that -- and I can use electrical as an

10   example.  We may find we have an issue with the existing

11   fire alarm system that is under maintenance by the owner;

12   however, because we're there, I might direct the

13   electrical contractor to make repairs on that system

14   because it's a life safety issue.

15   Q.   How do you handle compensation with that?

16   A.   If it's an emergency, in most cases it would be on a

17   time and material basis.

18   Q.   And if it's not an emergency, how would you deal with

19   it?  Would it become a change order?

20   A.   The time and material would eventually become a

21   change order after it was all vetted.  In the other case

22   we would request pricing for the change.

23   Q.   Going back to 5.4, would an order that a sub increase

24   their manpower be an order, directive or condition?

25   A.   No.  No.

1   Q.   If you ordered ECI to increase its workforce, would

2   you expect them -- would you have to give notice of that?

3   A.   I wouldn't think so because it's in the contract that

4   they would need to provide the manpower, sufficient

5   manpower to meet the schedule.

6   Q.   If ECI disagrees with you, ECI disagrees with you

7   that it's in their contract, do they have to give you

8   notice?

9   A.   They have an obligation --

10            MR. KAPLAN:  I'll object at this point,

11  Your Honor.  This is up to the Court to decide the

12  requirements of the contract.

13            THE COURT:  Yeah, I think if you can route it to

14  some conversation that he had, but otherwise I think he's

15  just giving his opinion.

16            MR. HUG:  Okay.  I wanted him to go through a

17  little bit about how it works.  Maybe I've done that a

18  little bit.

19  BY MR. HUG:

20  Q.   In terms of ECI in this case, did they at any time

21  give you written notice that they were going to claim

22  additional costs for manpower associated with Phase 3?

23  A.   Not until October 1st.

24  Q.   Prior to October 1st, did they give you oral

25  notification?

1    A.   Two weeks before that in the middle of September,

2    that would be 2010.

3    Q.   Okay.  In between July 21 and whenever that time

4    period they gave you oral notification, did you receive

5    any e-mail from ECI complaining that they were incurring

6    extra costs for which they would hold Pike responsible for

7    related to manpower issues on Phase 3?

8    A.   No.

9    Q.   In your every day on the job, did Bill Flynn ever

10   come up to you and say, to the effect, I have an extra

11   claim I'm going to have to file related to Phase 3 and the

12   extra manpower I have incurred?

13   A.   No.

14   Q.   Is it fair to say that there were frequent

15   communications between ECI and Pike on this project?

16   A.   Yes, there was.

17   Q.   And that you attended the subcontractor meetings --

18   did you also attend coordination meetings?

19   A.   Yes, I did.

20   Q.   You attended the subcontractor meetings?

21   A.   Yes, I did.

22   Q.   At any of those meetings did ECI or any personnel

23   from ECI tell you that they were going to make a claim

24   related to Phase 3 and extra manpower need?

25   A.   No.

1    Q.   Were you surprised when you finally heard from

2    someone in September that a claim was going to be filed?

3    A.   Yes.

4    Q.   And we've seen in Exhibit 631 ECI does know how to

5    make a claim, correct?

6    A.   Yes.

7    Q.   Now, in the course of projects, do occasions arise

8    when someone knows that a condition or claim exists that

9    is going to cost them extra money but they don't yet know

10   what that amount is, do they nevertheless typically give

11   you notice that they're going to file a claim?

12   A.   Generally, yes.

13   Q.   Okay.  And does that happen from time to time that

14   the actual dollars follow the notice?

15   A.   In my experience, yes.

16   Q.   So I see in this 5.4, it says in part after it talks

17   about written notice of the claim, "and shall, as soon as

18   practicable, furnish sufficient facts in support of his

19   position as may be necessary for a decision," correct?

20   A.   Yes.

21   Q.   And that's the kind of situation where you know a

22   condition exists, you know something's happening, but you

23   don't know what the amount is?

24   A.   That's correct.

25   Q.   And did that happen, by the way, from time to time in

1    general on the Kelly Middle School project?

2    A.    No, it never did.

3    Q.    Okay.  Now, turning to Exhibit 14, I think I've gone

4    over Exhibit 14, what it is and how it relates to

5    Exhibit 13, but exhibit -- is it fair to say Exhibit 13

6    includes the general conditions, correct -- Exhibit 14,

7    excuse me?

8    A.    Yes.

9    Q.    All right.  Finally, Exhibit 15, I think that was

10   just -- I don't know if that's been admitted yet.  If not,

11   I'd like to offer it for admission.

12           THE COURT:  I think it's in.

13   BY MR. HUG:

14   Q.    Sir, that is the contract between Norwich and The

15   Pike Company, correct?

16   A.    That's correct.

17   Q.    Now, when you read the -- for point of clarification,

18   well, I'll leave that.

19       One last document.  I'm going to show you

20   Exhibit 506.  Have you seen that document before?

21   A.    Yes.

22   Q.    And what is it?

23   A.    It's a labor material payment bond issued to the City

24   of Norwich by The Pike Company.

25   Q.    As a public project, were you required to give notice

1    of the -- or give a performance bond?

2    A.   Yes.

3    Q.   And you were also required to give a payment bond?

4    A.   Yes.

5    Q.   Okay.  I can take those back.

6             MR. HUG:  Your Honor, I'd like to move

7    Exhibit 506.

8             THE COURT:  Objection?

9             MR. KAPLAN:  No, sir.

10            THE COURT:  Exhibit 506, full exhibit.

11   BY MR. HUG:

12   Q.   Sir, turning over to the bid process, were you

13   involved with the project during the bid portion of the

14   project?

15   A.   Yes, I was.

16   Q.   And did you receive the bids?

17   A.   Yes, I did.

18   Q.   Did you open the bids?

19   A.   Yes, I did.

20   Q.   Now, turning back to your volume, I want to just go

21   to -- well, I don't think I need an exhibit.

22        When you get the bid, a bid, say, from ECI, did you

23   get all the backup documentation that supported their bid?

24   A.   You mean the estimate?

25   Q.   Yes.

1   A.   No.

2   Q.   Did you get their bid summary?

3   A.   No.

4   Q.   Did you get their takeoff?

5   A.   No.

6   Q.   What you get is the number, correct?

7   A.   Requested the lump sum number for the project, yes.

8   Q.   And so it's fair to say you don't have the ability to

9   scrutinize every line item in their bid at the time of bid

10  time, correct?

11  A.   No, I don't.

12  Q.   So Exhibit 2, if you take a look at Exhibit 2 in

13  there, that first page of Exhibit 2, that's a Bond Order

14  Form.  Is that something that you would see in the bid?

15  A.   No.

16  Q.   Okay.  The next page, the Bid Summary Sheet, would

17  you see that when they submitted their bid?

18  A.   No.

19  Q.   Okay.  And the page -- the whole bid summary, which I

20  think is a total of four pages, you didn't see that, did

21  you?

22  A.   No, I didn't.

23  Q.   In fact, the entire Exhibit 2, you did not see,

24  correct?

25  A.   No, I didn't.

1  Q.   And that's not true just for ECI, that's true for

2  every subcontractor, correct?

3  A.   That's proprietary information for that

4  subcontractor.

5  Q.   Typically what the Court has before it, Exhibit 2, is

6  generally considered proprietary?

7  A.   Yes.

8  Q.   In fact, when Pike does bids, you don't want another

9  contractor to see how you came up with your number, do

10  you?

11  A.   Not at all, no.

12  Q.   So, fair to say you didn't have the ability to take a

13  look if ECI did or didn't have certain things included in

14  its bid?

15  A.   Not from this document.

16  Q.   After the bids were received, did you have any sort

17  of pre-bid meetings concerning electrical contracting?

18  A.   What was the question again?

19  Q.   After the bids were received, did you have some sort

20  of meeting to discuss the bid with any contractors?

21  A.   What we did is we generally brought in two or three

22  bidders for each bid package and would review the

23  requirements of the project, the schedule and what their

24  approach was on executing the work.

25  Q.   Did you go over those items with ECI?  They were one

1    of them?

2    A.   Yes, they were.

3    Q.   Who was the other subcontractor?

4    A.   The other subcontractor was Ferguson Electric.

5    Q.   Staying with ECI for a moment, what kinds of

6    questions did you ask ECI at that meeting?

7    A.   Well, what we did is in preparing our bid package

8    there's a document that lists the bid scope, what's

9    required of the bidder.  So we would go through that and

10   make sure that they had all those items.  We would walk

11   through the documents page by page and look at the actual

12   plans, gives us comfort levels, we get assurance that the

13   bidder actually looked at the drawings when they bid the

14   job.  And then we walk through the schedule.  As we had

15   very tight schedule requirements on this project, we

16   really dove down on the schedule with all of the bidders

17   on this project.

18   Q.   And we've seen -- we've seen for an Exhibit 6, if you

19   turn to Exhibit 6, is that a summary of the bids?

20   A.   It's a bid tabulation for the electrical bid package.

21   Q.   And the numbers on the left-hand side, are those the

22   total base bid and alternates or just the base bid value?

23   A.   They would just be the base bid.

24   Q.   You were able to verify that?

25   A.   Yes.

1    Q.   Okay.  There's another document that would verify

2    that in a later exhibit, correct?

3    A.   Yes.

4              THE COURT:  May I ask, is this an exhibit that's

5    been admitted?

6              MR. HUG:  I believe so.  If not --

7              MR. KAPLAN:  No, it's not.  But certainly it's

8    my exhibit, I have no objection.

9              THE COURT:  6, full exhibit.

10             MR. HUG:  There's another one, a duplicate of

11   this, same basic document, this is just handwritten.

12             THE COURT:  I'm not sure I understand what's the

13   providence of this document, whose handwriting it is.

14   BY MR. HUG:

15   Q.   Sir, the handwriting on this document, do you know

16   whose that is?

17   A.   I believe it's Maristella McGregor's.  She was my

18   assistant on the project.

19   Q.   And this was -- what is the document again?

20   A.   It's a bid tabulation that was handwritten as we

21   publicly read the bids as we received them.

22   Q.   And let's turn to Exhibit 8 for a minute.  This may

23   be of some assistance to the Court.  Turn to the last page

24   of Exhibit 8.  Excuse me, this is Exhibit 9.  Exhibit 9.

25             THE COURT:  Has this been admitted?

1          MR. HUG:  This is the one that's been admitted.

2          MR. KAPLAN:  Yes, sir.

3          THE COURT:  Okay.

4          MR. HUG:  I think this is the one that was

5    referred to on --

6          THE COURT:  Okay, I have a mark on this.

7    BY MR. HUG:

8    Q.   Is this essentially the same document, just typed up?

9    A.   Yes, just cleaned up.

10   Q.   Let's use this document.  This document was prepared

11   by Pike?

12   A.   Yes.

13   Q.   All right.  And the cover letter is a letter from you

14   to the City of Norwich and signed by you?

15   A.   Yes, it is.

16   Q.   And now, just to clarify, with respect to Ferguson

17   and electrical contractors in any of these other

18   subcontractors, did you have a breakdown as to how they

19   bid each phase of this project?

20   A.   No, I didn't.

21   Q.   And did you speak with just electrical contractors

22   and Ferguson?

23   A.   We also spoke with Bloomfield Electric.

24   Q.   Why did you speak with Bloomfield Electric?

25   A.   They were the third bidder.  As a rule, we did bring

1    in the low three bidders.

2    Q.   Okay.  And did you discuss with them whether or not

3    their bid appeared to be -- they understood the bid?

4    A.   Yes.  We went through the same questions as we did

5    with the other two bidders.

6    Q.   Did you disqualify them?

7    A.   We disqualified them based on price, yes.

8    Q.   Based on price?

9    A.   On the bid, yes.

10   Q.   And you disqualified Ferguson as well?

11   A.   Yes, we did.

12   Q.   Why did you disqualify Ferguson?

13   A.   What we did is, because the project had such a tight

14   schedule, we had to really -- we had to closely vet the

15   bids to ensure that all the contractors had the scope,

16   they understood the schedule, and they understood the job

17   in general.  So what we did is after we received bids, we

18   sent out post-bid questionnaires to the low three bidders

19   and we requested financial information, trade references,

20   and then we requested client references.

21        Pike received Ferguson's, we followed up with the

22   references and we didn't get very favorable responses from

23   their references.

24   Q.   Did you have a favorable interview with them?

25   A.   Not at all.

1    Q.    What happened in the interview that caused you

2    concern?

3    A.    Well, as I said earlier, we asked very specific

4    questions about the project to all the bidders, not just

5    electrical people, all the bidders.  And again, that gave

6    us a comfort level and ensured us that the bidders knew

7    the project and knew what they were getting themselves

8    into, so to speak.  When we asked Ferguson these

9    questions, they were evasive, didn't want to answer the

10   questions.  They basically -- their responses to a lot of

11   the questions were "whatever's on the bid documents."

12   Didn't even appear that they looked at the bid documents.

13   That was their patent responses, "whatever is on the bid

14   documents."

15   Q.    Now, Counsel has attached a decision and entered a

16   decision on Plaintiff's Exhibit 8.  You are aware that

17   Ferguson filed a bid protest?

18   A.    Yes.

19   Q.    And you're aware that City of Norwalk and Pike won

20   that bid protest, correct?

21   A.    Yes.

22   Q.    In other words, the court confirmed the actions that

23   you were entitled to disqualify Ferguson, correct?

24   A.    Yes.

25   Q.    And you testified at that hearing?

1    A.   Yes, I did.

2              THE COURT:  Is this a full exhibit?

3              MR. HUG:  I think it is.

4              MR. KAPLAN:  Yes, Your Honor.

5    BY MR. HUG:

6    Q.   All right.  Let's turn to the July 21 meeting.  Did

7    you attend a meeting on July 21 with ECI?

8    A.   Yes, I did.

9    Q.   How did that meeting come about?

10   A.   Ed Oloff and I had some concerns about the progress

11   ECI wasn't making on the project.  We expressed those

12   concerns to Cliff Clauson.  At which point Cliff and Bill

13   Flynn requested a meeting and, you know, subject of the

14   meeting was how we're going to get the project finished.

15   Q.   In these early conversations before the meeting, was

16   manpower discussed?

17   A.   Yes.

18   Q.   Did you express concerns with ECI's performance of

19   their work?

20   A.   Well, there didn't seem to be sufficient manpower to

21   complete the work that was available.

22   Q.   Did Mr. Mathieu or Mr. Clauson say anything to you

23   with respect to whether they could add manpower or not add

24   manpower?

25   A.   My understanding from Cliff Clauson was that Bill

1    Flynn was the person to handle the project.

2    Q.    And is that how this meeting came about?

3    A.    Yes.

4              THE COURT:  So, to be clear, the witness is

5    saying that there were earlier meetings or discussions,

6    earlier than July 21 with Cliff Clauson and Stephane

7    Mathieu?

8              MR. HUG:  Yes.

9    BY MR. HUG:

10   Q.    Just to be clear, did you discuss ECI's performance

11   on the work with either Cliff Clauson or Stephane Mathieu

12   prior to July 21?

13   A.    Both Ed Oloff and I did.  They weren't formal

14   meetings.  They were conversations that we had in the

15   field because we were there every day.  It was just part

16   of the daily operation, review manpower requirements.

17   Q.    Were they contentious meetings?

18   A.    Not at all.

19   Q.    It was pretty much business as usual?

20   A.    Business as usual.

21   Q.    Did ECI, Cliff Clauson and Stephane Mathieu, complain

22   about -- this is prior to July 21 -- complain about any

23   problems with the project that they were having?

24   A.    Not that I recall, no.

25   Q.    Did they remark about demolition or -- this is prior

1   to July 21, demolition problems or anything like that?

2   A.   Not that I recall.

3   Q.   So come to this July 21 meeting, other than yourself,

4   was Ed Oloff there?

5   A.   Yes.

6   Q.   Who else was there?

7   A.   Bill Flynn.  Cliff Clauson.  And I'm fairly certain

8   Stephane Mathieu was there as well.

9   Q.   Okay.  Describe for the Court, in your own words,

10  what happened at this meeting.

11  A.   This meeting followed one of our weekly subcontractor

12  meetings.  It was a meeting we had after that meeting.  As

13  we started the meeting, Cliff Clauson introduced Bill

14  Flynn and said, "This is the gentleman that can get us the

15  manpower we need and finish the project.  Increase our

16  manpower, he's the guy I need on my side to get the

17  manpower."

18  Q.   And what happened?  What did you discuss?

19  A.   Well, ECI started off with some items, challenges

20  they were finding with other trades, two or three items

21  that they needed to have done so they could finish their

22  work and talked about that.  We discussed the schedule and

23  how we felt they needed more manpower there to meet the

24  schedule.  There were concerns I had about procurement of

25  light fixtures.  There were several light fixtures that

1   hadn't shipped from the manufacturer and it's July 21 and

2   we have a month, in essence, to finish, had concerns about

3   that.  And ECI asked for more time at that meeting.  We

4   told them we couldn't give them more time because the

5   school had to open, there was no place for those children

6   to go to school when they opened the school.

7   Q.   Did the term "Plan B" come up at all?

8   A.   Yes.  Someone mentioned Plan B.  And I believe it was

9   Ed Oloff said, "There isn't a Plan B, school needs to

10  open."

11  Q.   Did ECI request more time to complete their work,

12  extend the project out?

13  A.   They asked for more time at that meeting.

14  Q.   What did you respond or how did Pike --

15  A.   Well, that's when it was said there's no Plan B,

16  there's no way we can extend the project, the school

17  needed to open.  You've got to remember, this was the core

18  of the school that was occupied, needed to be reoccupied

19  when they came back to class at the end of August.  There

20  was no other part of that school that was -- that they

21  could even occupy.  The school was basically ripped apart.

22  It needed to be occupiable for the end of August, 2010.

23  Q.   Did you reach any consensus at the meeting as to what

24  was going to happen next?

25  A.   No.  No, we expressed our concerns and there was --

1    as you said earlier, they brought up some concerns,

2    challenges they had.  And Ed Oloff went out in the field

3    and addressed those areas that they had concerns about.

4    Q.   Did that have to do with electrical rooms?

5    A.   There was electrical rooms.  Might have been a couple

6    other things.  Ed immediately went out there and addressed

7    these issues with the other subcontractors to give them

8    what they requested.

9    Q.   Did you take notes at that meeting?

10   A.   Yes.  There was some notes.

11   Q.   I show you what has been marked as Exhibit 537.  What

12   is 537, sir?

13   A.   These are my notes from that meeting on July 21,

14   2010.

15   Q.   Have you doctored these notes or erased anything from

16   these notes at all?

17   A.   No, not at all.

18   Q.   Is there anything on here about ECI requesting an

19   extension of time?

20             THE COURT:  If you're going to ask him about the

21   notes, are you going to offer --

22             MR. HUG:  Thank you.

23             MR. KAPLAN:  I have no objection, Your Honor.

24             THE COURT:  Exhibit 537, full exhibit.

25             MR. HUG:  I'm sorry, Your Honor.  We've been

 1   going on long enough, I forgot the formalities today.

 2   BY MR. HUG:

 3   Q.   So I think my last question was, sir, if somebody --

 4   do you see any notes in here relating to a request for an

 5   extension of time?

 6   A.   No.

 7   Q.   Do you see any comments here, any notes in here where

 8   ECI is going to make a claim for more money?

 9   A.   No.

10   Q.   Mr. Flynn didn't say "this is going to cost you" at

11   any time during that meeting?

12   A.   No, he did not.

13   Q.   Mr. Flynn didn't say "this is going to cost a lot of

14   money"?

15               MR. KAPLAN:  Objection.

16               THE COURT:  Can we not have leading at this

17   point?

18               MR. KAPLAN:  Thank you.

19               MR. HUG:  Thank you, Your Honor.

20               THE COURT:  I'm fine with you asking him what

21   Mr. Flynn said, but just not saying it in a way that's

22   suggesting.

23               MR. HUG:  I think when he answered the first

24   question that nobody objected to, I sort of got an answer.

25

1   BY MR. HUG:

2   Q.   Without a leading question, what did Mr. Flynn say,

3   if anything, about additional monies at this meeting?

4   A.   There was nothing discussed about additional monies.

5   Q.   Was Mr. Flynn animated at all during this meeting?

6   A.   No, I didn't think he was.

7   Q.   What was the tenor and tone of this meeting?  Was it

8   acrimonious?

9   A.   You can look at my notes and really what was

10  discussed is some areas where they needed us to address --

11  assign resources from our subcontractors to get these

12  areas completed for them so they could do their work.

13  That's kind of the first part of the meeting.

14      Then there was discussion about the security system.

15  I do recall them saying they were having problems with the

16  security system.  They requested HVAC to get on the site.

17      Talked about manpower, what they had for manpower on

18  the job at that point.  That's the Item Number 3 where I

19  have this little grid, first, second and third.  They were

20  working the first, second and third shift.  They had 20

21  people at that time on first, three on second, and five on

22  the third shift.

23      And then the last part talked about -- on the second

24  page, talks about fire alarm because we needed the fire

25  alarm active when they opened the school.

1        And for some reason we were talking about the

2   kitchen.  The kitchen wasn't part of this phase, but we

3   were talking about the kitchen and then the generator.

4   That was the last item we talked about.

5        It was really a rundown of what they needed from us

6   and what we needed from them with regards to the schedule.

7   Q.   Okay.  Did you give any change order directive at

8   this meeting verbally?

9   A.   No.

10  Q.   Did you give any change order directive in writing to

11  ECI concerning manpower at any time?

12  A.   No.

13  Q.   Now, did Item Number 1, RTU steel, it says QSR steel

14  late in completing, was there some discussion -- I take it

15  there was some discussion about that?

16  A.   That was really what Bill Flynn started off with.  He

17  was concerned about the steel.  And QSR steel late in

18  completing is what he had said.  We discussed that.  And

19  the time frame when work was going to get done and how it

20  was going to get done.

21  Q.   And is that the issue that eventually led to an

22  extension of time for certain areas?

23  A.   Yes, this occurred in the art room and the locker

24  room areas.  We had a lot of steel work in those areas.

25  Q.   Is it fair to say you listened to what they had to

 1   say and you acted on --

 2   A.   Yes.

 3   Q.   They weren't the only subcontractor affected by the

 4   steel, were they?

 5   A.   If you go back to some of the notes I wrote, they

 6   talked about electrical rooms.  And Ed Oloff had made a

 7   commitment to have these rooms done, he said they would be

 8   ready for them.  Those are the dates that we gave them.

 9   Q.   Was that okay with ECI at that meeting?

10   A.   Yes.

11   Q.   Did they tell you that would cause them some sort of

12   harm?

13   A.   No.

14   Q.   Now, I want to show you what's been marked as

15   Exhibit 538.  What are those, sir?

16   A.   These are my handwritten notes from a meeting we had

17   at the job site with ECI, Bill Lynch, who was the

18   electrical consultant on site, and contract administrator.

19             MR. HUG:  I'd like to offer Exhibit 538.

20             THE COURT:  Objection?

21             MR. KAPLAN:  No, sir.

22             THE COURT:  538, full exhibit.

23   BY MR. HUG:

24   Q.   So about seven days later after the July 21 meeting,

25   you have another meeting with Mr. Flynn?

1    A.    I don't have him written down here as attending.

2    Q.    Oh, he's not attending?

3    A.    I don't recall.  But I know we had this meeting.

4    This is where we discussed all these light fixtures.

5    Q.    Oh, I read Bill Lynch.  Bill Lynch is somebody

6    different than Bill Flynn.

7    A.    Yes.

8    Q.    What was the purpose of this meeting?

9    A.    We recognized issues with procurement of light

10   fixtures.  We wanted to get ECI in the room and go through

11   these and see when these light fixtures were going to be

12   on site.  We needed them to open school.

13   Q.    Do your notes have anything in here about a claim by

14   ECI against Pike?

15   A.    No.

16   Q.    Is there any -- did any -- did Mr. Clauson or

17   Mr. Mathieu make any complaints to Pike about manpower at

18   that meeting?

19   A.    No.

20   Q.    Now, did you threaten ECI with liquidated damages at

21   that July 21 meeting?

22   A.    No.

23   Q.    Now, you mentioned earlier that you provide reports

24   to the owner, correct?

25   A.    Yes.

1    Q.    Do you meet with the owner regularly?

2    A.    We were meeting with the owner weekly.

3    Q.    And by "owner," who was it you met with for the

4    owner?

5    A.    Gary Schnip, he was the owner's rep assigned by the

6    City of Norwich.  Jim Lawler, who was the project

7    architect.  And from time to time his consultants would

8    attend these meetings as well, depending on where we were

9    at in the project.

10   Q.    Were those weekly?

11   A.    Yes, they were weekly.

12   Q.    At these weekly meetings, what would you discuss?

13   A.    We would discuss the progress of the project, where

14   we were at, issues that we might need resolution from the

15   design team.  We'd review requests for information that

16   hadn't been responded to.  We'd look at submittal

17   packages, some of the items that needed action on from the

18   design team.  And then we would talk about change orders.

19   And then we would review our monthly pay at one of the

20   meetings per month.

21   Q.    And did you also provide any written report to the

22   owner?

23   A.    I provided a written report to the building

24   committee.

25   Q.    I want to show you what's been marked as Exhibits 535

1    and 536.  Starting with Exhibit 535, sir.  535, explain to

2    the Court what that document is, please.

3    A.   535 is the project status report that I issued to the

4    Kelly Middle School Norwich building committee every

5    month.

6    Q.   And did you -- in the second page did you sign the

7    transmittal letter?

8    A.   Yes.

9    Q.   And you're familiar with this document and the

10   contents of it?

11   A.   Yes, I am.

12          MR. HUG:  Your Honor, I'd like to offer

13   Exhibit 535.

14          THE COURT:  And 536 perhaps?

15          MR. HUG:  Yes.

16          THE COURT:  Any objection?

17          MR. KAPLAN:  No, sir.

18          THE COURT:  536 and 536, full exhibits.

19          MR. HUG:  Thank you, Your Honor.

20   BY MR. HUG:

21   Q.   I just want to go over 535 for a moment just to

22   explain to the Court how to read it.

23       Turning to Executive Overview, which is about four

24   pages in, explain the organization of this section, sir.

25   A.   What this is, you know, we're dealing with a building

1    committee.  In most cases, they're not really familiar

2    with the construction process or even construction.  What

3    we do is I try to give it to them in snippets, give an

4    overview of what happened after the last 30 days of the

5    project, try to keep it very simple for comprehension

6    purposes.  I would list where we were at with certain

7    items.  Some of these items were just updates on -- like

8    the first one, project submittals ongoing, approximately

9    90 percent complete.  There would be an update every month

10   on that.

11   Q.   The first page of the Executive Overview, fourth

12   bullet down, it says the judge's ruling for the Ferguson

13   trial still pending?

14   A.   That's correct.

15   Q.   Did you also include in this summary if you had any

16   major issues or major claims?

17   A.   Oh, absolutely, yes.

18   Q.   And then after that, I see it appears that you go

19   through each of the subcontractors, each of the trades,

20   including electrical?

21   A.   Yes.

22   Q.   And then after you go through that, there's a sheet

23   called Next 30 Day Activities?

24   A.   Yes.

25   Q.   And that talks about what's going to happen in the

1    next 30 days for each of the major subcontractor trades?

2    A.    Yes.

3    Q.    The next area is entitled Construction Schedule

4    Analysis.  Would you describe to the Court what you do in

5    that section?

6    A.    What we do is we run a report on the construction

7    schedule and then we just advise the owner of any

8    slippages in the schedule, how much work we got done in

9    the last 30 days, that sort of thing.  It's really basic.

10   Analysis of critical path milestone.

11   Q.    That follows the schedule overview?

12   A.    Yes, it does.

13   Q.    There's a narrative in there.  Is it your office that

14   prepared the narrative for that?

15   A.    Yes.

16   Q.    Turning to page 1 of the narrative, and it lists in

17   the middle of that page, it has an executive summary, it

18   has a listing of impacts, and it lists five items where it

19   has impacts, see that?

20   A.    Yes.

21   Q.    And so, as of the date of this report, you were

22   reporting some steel issues, correct?

23   A.    Yes.

24   Q.    At the end of that section, there's Analysis Of Time

25   Lost/Gained.  Is that where you summarize where you are at

1    that particular moment?

2    A.   Yes.

3    Q.   The next sentence is Project Budget.  Is that an

4    important item for the owner?

5    A.   Yes, it is.

6    Q.   And immediately following the budget is the Change

7    Order Report?

8    A.   Yes.

9    Q.   Describe for the Court what this multi-colored

10   document -- Your Honor, it may not have come through real

11   clearly for Your Honor.  I think you could read it.

12            THE COURT:  It's legible.

13            MR. HUG:  I have the originals.

14            THE COURT:  I think I'm okay.

15            MR. HUG:  It's easy probably for Attorney Kaplan

16   and me to read because we know what we're looking for.  If

17   Your Honor does wish to look at it, we have it available.

18   BY MR. HUG:

19   Q.   Generally, sir, what does this document show and why

20   is it in here?

21   A.   This is a list, a log of all the changes that had

22   been submitted to Pike.  Also, the colors represent

23   different stages, where they're at.  Yellow would be

24   proposed, something that's being proposed by a contractor,

25   it hadn't been acted on by the owner.  So anything that a

1    contractor would send us, if they felt they were due

2    additional compensation for additional services or changes

3    in work, they would send that to us and would go

4    automatically to yellow.  As we go through the change

5    process, it might be rejected or voided, which is the

6    orange and red.  Then there might be a green, which was a

7    notice to proceed.  We might give the contractor notice to

8    proceed based on an owner's recommendation, go ahead and

9    do that, we'll come up with paperwork later.  It may be an

10   authorization from myself to do the work.  The blue would

11   be an approved change order signed by the owner, blue

12   line.

13   Q.   Is this updated monthly?

14   A.   This is updated weekly.

15   Q.   Okay.  Is it submitted to the owner weekly?

16   A.   We would submit this to the owner at our owner's

17   meeting, but we would submit it to the building committee

18   once a month.

19   Q.   Okay.  So it's something that -- it was something of

20   a working document?

21   A.   This is a living document.  This is something that's

22   updated weekly if not every day, depending on the progress

23   of the project.

24   Q.   So if ECI requests monetary relief at some point in

25   time for anything, whether it's an extra work order or

1    anything else, would it show up in this report somewhere?

2    A.   Absolutely.

3    Q.   If it's a change order, it would show up on these

4    documents?

5    A.   Yes, it would.

6    Q.   Change Order Report?

7    A.   Yes.

8    Q.   And I note the date of this one is July 7.  So this

9    is before the July 21 meeting?

10   A.   Yes.

11   Q.   After the July 21 meeting, you produced another

12   report to the building committee on August 4, that's

13   Exhibit 536.

14   A.   Yes.

15   Q.   Again, it's the same basic layout?

16   A.   Same format, yes.

17   Q.   Is there any -- to the best of your knowledge, is

18   there anything in here referencing a claim by ECI?

19   A.   No.

20   Q.   When is the first time you reported in writing to the

21   building committee that ECI had filed a claim?

22   A.   I believe it was November, December of 2010.

23   Q.   And when was the first time you brought it to the

24   attention in the owner's meeting?

25   A.   It would probably have been around that September,

1    October time frame when I received the first phone call

2    and a letter of notification, October 1st.  So would be

3    that time frame.

4    Q.    Okay.  Do you recall talking to Mr. Lawler or

5    Mr. Schnip, they were at these weekly owner meetings?

6    A.    Yes.

7    Q.    Prior to that phone call in September, did you ever

8    tell them watch out for a claim by ECI or ECI's going to

9    file a claim?

10   A.    No.  I didn't know anything about a claim.

11   Q.    After ECI filed its claim -- and let's turn to that

12   for a moment.  Let's close those and we're going to turn

13   to another exhibit.  I think it's in the 30s.

14         Exhibit 36, I want to show you Exhibit 36, sir.  You

15   mentioned you got written notice from ECI at some point.

16   Is Exhibit 36 that written notice?

17   A.    Yes.

18   Q.    Okay.  And this letter is to your attention, correct?

19   A.    Yes, it is.

20   Q.    And that's the proper person?  They addressed it to

21   the proper person?

22   A.    Yes, they did.

23   Q.    And we've gone over this letter and I'm not going to

24   go over it in any great detail, but take a look at

25   Exhibit 37.  Is that your response?

1   A.   Yes.

2   Q.   Okay.  And did you prepare this document?

3   A.   Yes.

4   Q.   Did you have input from the home office on that?

5   A.   Yes, I did.

6   Q.   Prior to issuing this particular letter, had you

7   looked at all at ECI's claim?

8   A.   One more time?

9   Q.   Did you analyze ECI's claim before issuing the letter

10  on October 26?

11  A.   There was really nothing to analyze.  It was just a

12  letter, there was no documentation or backup for any of

13  the items outlined in this letter.

14  Q.   So is Exhibit 36 the sum total of what you received

15  on October 1st?

16  A.   Yes, that's what I received.

17  Q.   And ECI wanted you to pay them $521,000 without any

18  further backup?

19  A.   It would appear so.

20  Q.   So let's turn to Exhibit 38.  And that's also

21  addressed to you, correct?

22  A.   Yes.

23  Q.   I want you to turn to the second page.  And beginning

24  on the second page it -- bottom of the page talks about

25  the July 21 meeting.  Okay.  And at that point in time it

1    says that Pike also threatened ECI with liquidated

2    damages, see that?

3         Very last line?

4    A.   Yes, I do.

5    Q.   Is that true?

6    A.   That's not really part of my nature.  I find that

7    hard to believe.

8    Q.   Turn to page 4.  The first line at the top of the

9    page is "Even if one somehow gets past all the preceding

10   arguments, the fact that Pike had actual notice in

11   September that ECI's request for an equitable adjustment

12   was forthcoming."

13        Essentially, that's accurate, correct?  The part that

14   Pike had actual notice in September that ECI's request for

15   equitable adjustment was forthcoming, was that accurate?

16   A.   Not in terms of the contract requirements.

17   Q.   Okay.  He told you at some point in -- sometime in

18   September, was that early, middle, late --

19   A.   It was middle to early September, it was a

20   five-minute conversation.

21   Q.   I notice that they don't say they had any

22   conversations with you before that date and that is

23   correct, right?

24   A.   There were no conversation before that.

25              THE COURT:  It would assist me if you could ask

1    about this phone call and what was in the phone call mid

2    to late December.

3    BY MR. HUG:

4    Q.    Describe to the Court who initiated this phone call

5    and what was said?

6    A.    I received a phone call from Cliff Clauson, who was

7    project manager for ECI.  And he kind of -- it was kind

8    of, you know, we went over our hours, we're going to be

9    filing -- I don't know if he used the word "claim" or

10   "equitable adjustment."  That's all I really recall.  It

11   was a very short conversation.

12   Q.    Was there any things that went on in the

13   conversation, other topics?

14   A.    No.  I just said he needed to comply with the

15   contract documents.

16   Q.    Okay.  And then did -- what did you do after that?

17   A.    I did notify the owner at some point.  It wasn't in

18   writing, but we had a very close relationship with our

19   client so I could pick up the phone and call them.  I know

20   at that point they were notified.  I just don't have an

21   accurate document of that, when that took place.

22           MR. HUG:  Your Honor, if you have any --

23           THE COURT:  This is mid to late September, this

24   phone call?

25           THE WITNESS:  Yes.

```
 1              THE COURT:  From Cliff Clauson?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Thank you.

 4     BY MR. HUG:

 5     Q.   The next paragraph says, "Pike cannot claim there was

 6     prejudice to it by virtue of receiving ECI's request on

 7     October 1, as opposed to September 30."

 8          Question for you, Mr. Strauss:  If you had received

 9     some claim in July 21st or 22nd, 23rd, 24th, in that time

10     frame, is there anything you could have done?

11     A.   Yeah, probably could have better understood what the

12     issues were and tried to mitigate those issues to

13     alleviate financial impact.  That's our job.  That's what

14     we're there for.

15     Q.   What would you need to do first?

16     A.   I need to understand what their issues are.

17     Q.   Okay.  All right.  But you had a meeting on July 21

18     and certain issues were discussed, weren't they?

19     A.   Yes, and we addressed them.

20     Q.   Did you understand those to be enduring issues that

21     were going to come back at you later on at that time?

22     A.   No.  We addressed them.  Within a few days they were

23     addressed, except for the extension on those two areas of

24     the school we mentioned earlier.

25     Q.   Do you have an obligation to inform the owner if
```

1   there's going to be a monetary increase in the cost of the

2   project?

3   A.   I absolutely do.  They're paying for it, yes.

4   Q.   Later on in that paragraph it's described that "Given

5   Pike's edict in late July that ECI must increase its crew

6   sizes and increase work or else suffer liquidated

7   damages," and goes on.  Is that true?  Did you ever give

8   them an edict?

9   A.   No.

10  Q.   Right before that paragraph it says "ECI could not

11  have summarized a monetary amount for this request any

12  sooner because it did not have all of its labor

13  information compiled from the field until then."

14       Does that matter to you, necessarily, in having a

15  notice of claim, that they can't compute their damages?

16  A.   When a contract states we need to know, does not

17  necessarily need the backup for the impact.

18  Q.   Is that so you can mitigate whatever the cause is?

19  A.   If we had received notice, we would have tried to

20  drill down what the issues were to mitigate.  That was an

21  ongoing process on that project with all contractors when

22  they had issues, they would come to us and we would

23  mitigate them and move the project forward.

24  Q.   Now, the next exhibit, 39, which I think is already a

25  full exhibit, is your response or Pike's response.  Again,

1    you're copied on this, do you see that?

2    A.    Yes.

3    Q.    And in addition to absence of notification, ECI

4    also -- or Pike also rejected the claim on the basis of

5    lien waivers.  Could you describe for the Court your

6    understanding of why Pike denied on that basis?

7    A.    I was -- after the claim was filed, I was made aware

8    of the lien waivers, they had been modified by ECI prior

9    to executing them and they had added language to the lien

10   waivers reserving their rights for additional

11   compensation.  I don't remember all the language, verbatim

12   language, but in September we received a lien waiver

13   without that language.

14   Q.    Let's turn to Exhibit 49 for a moment.  And turning

15   to the first document in Exhibit 49 -- first of all, what

16   is Exhibit 49?

17   A.    49 is lien waivers from Electrical Contractors, Inc.

18   from February through March of 2011.

19              MR. HUG:  Your Honor, I believe this is a full

20   exhibit.

21              THE COURT:  Yes, it is.

22   BY MR. HUG:

23   Q.    Turn to the first one.  It says a date of 2/15/2010,

24   do you see that?

25   A.    Yes.

1   Q.   Is this a standard form lien waiver?

2   A.   Yes.

3   Q.   Who prepares this document or the form of document?

4   A.   This was issued by the subcontractor.

5   Q.   The subcontractor fills it out and sends it to you?

6   A.   They date it, sign it, and notarize it, yes.

7   Q.   Down at the bottom there's this language

8   "Specifically excluded from this Lien Waiver" and so

9   forth.  Is that in your original form?

10  A.   No, that was a modification made by ECI.

11  Q.   Okay.  Did you approve that modification?

12  A.   No, I didn't.

13  Q.   Did you notice that modification was in there until a

14  somewhat later time?

15  A.   I never received these waivers.  These go directly to

16  our accounting department in Rochester.  I never approve

17  these or review these.

18  Q.   This one says "Specifically excluded from this lien

19  waiver and releases are: any amounts due for retainage;

20  any pending change order proposals or requests; and any

21  pending requests for equitable adjustments to the contract

22  time or amount."  See that?

23  A.   Yes.

24  Q.   That's the additional language that's not on your

25  form?

 1   A.   That's correct.

 2   Q.   Now, turn to the lien waiver dated 9/17/2010.  See

 3   that?

 4   A.   Yes.

 5   Q.   What does the lien waiver related to this -- or

 6   period covered by this lien waiver -- strike that.  Let me

 7   try again.

 8        What application for payment and pay through date

 9   does this lien waiver apply to?

10   A.   This is for August pay period 2010.

11   Q.   All right.  So if I go back to the August payment

12   application, I'm going to see an invoice amount from ECI

13   for 940,535?

14   A.   Yes.

15   Q.   And their payment applications are through the end of

16   the month, so that would be August 31?

17   A.   Everything is projected to the end of the month, yes.

18   Q.   Were there any pending change orders relating to

19   additional manpower requests for the period of August or

20   prior pending as of August 31, 2010?

21   A.   No.

22   Q.   Were there any pending requests for equitable

23   adjustment pending as of August 31 relating to additional

24   manpower requested concerning Phase 3 work?

25   A.   No, there wasn't.

1              THE COURT:  Now is a good stopping time?

2              MR. HUG:  Yes, Your Honor.

3              THE COURT:  Great.  We'll take a 15-minute

4    break.  Stand in recess.

5                   (Whereupon, a recess followed.)

6

7              THE COURT:  Please be seated.

8              Please proceed.

9              MR. HUG:  Thank you.

10   BY MR. HUG:

11   Q.   Mr. Strauss, we left off with some testimony about

12   the lien waivers.  I'd like to move on from the lien

13   waivers.  We had been on Exhibit 39, which was Pike's

14   response to Exhibit 38.  Are you there?

15   A.   Yes, I am.

16   Q.   And this is where I asked you with respect to lien

17   waivers and your additional reason for denying ECI's

18   claim.

19        I'd like to turn next, after this correspondence from

20   you, what happened next in the ECI/Pike efforts to deal

21   with this claim?

22   A.   There was a meeting held at the Kelly Middle School

23   site at our field office to try to understand what the

24   issues were, bring it to resolution.

25   Q.   And Exhibit 40, is that a letter response from ECI to

1    you that was provided after that meeting?

2    A.   Yes.

3    Q.   In fact, the letter begins with "I would like to

4    begin by thanking you and the Pike team for meeting with

5    us recently and providing us the opportunity to explain

6    the reasoning behind our Request for Equitable

7    Adjustment."

8         Another sentence down there, "Everyone understands

9    that it is up to ECI to present sufficient facts to Pike

10   to demonstrate that harm and to detail ECI's resulting

11   damages."

12        Do you recall any discussion at the January meeting

13   that led to this comment by ECI in their letter?

14   A.   I know we had been struggling with trying to

15   understand what the basis of the request was.  There

16   wasn't a lot of backup to substantiate it.  Everything was

17   very general.

18   Q.   You understand this letter was provided in response

19   to that?

20   A.   Yes.

21   Q.   I'd like you to turn to page 4 of that letter.

22        On the first full paragraph beginning with "ECI's

23   audit," he refers to a billable rate for this job as

24   $81.46.  Do you know, was there a billable rate for this

25   job at $81.46?

1    A.    There wasn't one included in the contract, no.

2    Q.    Did you have -- at any time did you have any

3    agreement with ECI for change orders what the rate should

4    be?

5    A.    Not that I recall, no.

6    Q.    And then ECI responds -- excuse me, you respond, that

7    is Pike responds with Exhibit 41, which I'm not going to

8    go over with you, Mr. Strauss, because we did that with

9    Mr. Oloff.

10        Now, has Pike received any other claims from any

11   other subcontractors for loss of productivity resulting

12   from Phase 3 work?

13   A.    No.

14   Q.    Have any other contractors submitted any other claim

15   for inefficiencies related to Phase 3?

16   A.    No.

17   Q.    Do you recall any complaints about being impacted in

18   any meaningful way by any of the other subcontractors on

19   Phase 3?

20   A.    No.

21            MR. HUG:  No further questions, Your Honor.

22            THE COURT:  Thank you.

23            Cross-examination?

24            MR. KAPLAN:  Yes, sir.

25

1                           CROSS-EXAMINATION

2    BY MR. KAPLAN:

3    Q.   Mr. Oloff, let's talk about Ferguson for a minute.

4    A.   Mr. Strauss.

5    Q.   I'm so sorry.  My apologies.

6         Mr. Strauss, you testified about your involvement

7    with basically rejecting Ferguson's bid, right?

8    A.   Yes.

9    Q.   And they were the low bid who was rejected?

10   A.   Yes.

11   Q.   And they were low by some -- I'm looking at one of

12   the exhibits, depending on whether you use the alternates

13   or not, somewhere in the range of twenty to $40,000, that

14   was a close bid with ECI, right?

15   A.   I recall it being close.

16   Q.   You say you disqualified Bloomfield Electric, the

17   third bidder, because they were too high?

18   A.   Well, we're obligated to take the lowest qualified

19   bidder.

20   Q.   But your testimony was they were disqualified because

21   their price was too high is what you said this morning,

22   right?

23   A.   Well, yes, I did say that.

24   Q.   Now, when you were suggesting basically the rejection

25   of Ferguson and going with ECI to the City, you basically

1    said you got bad feedback from other owners or people

2    involved with Ferguson on other jobs, and that was one of

3    the main criteria you used to reject them?

4    A.   That was one of the criteria.

5    Q.   And then Ferguson filed a lawsuit, and we have the

6    memorandum of decision, Exhibit 8, where you testified.

7    In fact, the memorandum says you testified.  When you

8    discussed the rejection of Ferguson with the Town, you

9    didn't tell the Town, did you, that Pike was involved with

10   litigation at that time with Ferguson from another

11   project, did you?

12   A.   I don't recall if I had.

13   Q.   In fact, one of the allegations that Ferguson made in

14   their lawsuit, which is mentioned in the memorandum of

15   decision, Exhibit 8, is that there was a conflict of

16   interest by Pike because they did not tell the Town that

17   they were currently engaged in litigation over the Buley

18   Library project when they rejected Ferguson's bid; do you

19   remember that being asserted in that lawsuit?

20   A.   Could you repeat that?

21   Q.   Let's break it down.

22        When you rejected Ferguson, you were in litigation

23   with them on another project, right?

24   A.   Yes.

25   Q.   Buley Library, which was a UConn job, right?

1    A.    No, it was not UConn.

2    Q.    It was State of Connecticut?

3    A.    State university system.

4    Q.    Right.  And you didn't tell the Town at the time you

5    rejected Ferguson that your company was also engaged in

6    ongoing litigation with Ferguson; fair statement?

7    A.    I don't recall.

8    Q.    Okay.  Do you recall that that was one of the

9    assertions Ferguson made in claiming that your rejection

10   of them was incorrect, and that's all stated in the

11   memorandum of decision, which is Exhibit 8?

12   A.    I don't recall that.

13   Q.    You don't recall?

14   A.    No.

15   Q.    Okay.  Now, let's go to your notes from the July 21

16   meeting.  I just have to go to my notes here to see which

17   exhibit it was.  Do you have that?

18   A.    I have it right here.

19   Q.    Exhibit 537, I believe.

20            THE COURT:  Go ahead.  I remember these notes

21   well.

22   BY MR. KAPLAN:

23   Q.    Now, you described what's in your notes and you said

24   on direct that there was discussion you had at this

25   meeting with ECI where ECI asked for a time extension,

1    right?

2    A.   Asked for additional time, yes.

3    Q.   And you said no, basically no time extension will be

4    granted or considered, which one was it?

5    A.   We wouldn't give them the time extension.

6    Q.   So it was very clear, right, that you were not going

7    to give them a time extension at that July 21 --

8    A.   We weren't in a position to give anyone a time

9    extension because they had to open the school.

10   Q.   You made it very clear you were not going to give a

11   time extension to ECI when they requested one on July 21;

12   fair statement?

13   A.   Yes.

14   Q.   All right.  We could go back in the contract

15   provision that Attorney Hug went through with you, but for

16   my question I don't know that it's necessary.  Do you

17   recall anything in that contract provision you referred to

18   with Attorney Hug this morning about extensions of time

19   that says except for Phase 3?

20   A.   No.

21   Q.   There's no exclusions, are there, where there's

22   provisions for how extensions of time would be granted, no

23   delay of damages but you can get extension of time if

24   warranted -- you know I'm paraphrasing -- there's no

25   exclusion for Phase 3?

1    A.    No.

2    Q.    So if a contractor was truly entitled to an extension

3    of time, ECI on July 21, weren't you -- wasn't it your

4    obligation to fairly consider that request rather than

5    just say no, you can't have one because we have to open

6    school on time?

7    A.    We didn't understand at that time why it was being

8    requested.

9    Q.    Okay.  And what follow-up information did you request

10   from ECI to further your understanding of their request

11   for an extension of time?

12   A.    I didn't request any, but none was provided.

13   Q.    So you didn't request any.

14         It's true, right, that on July 21 you said you're not

15   getting an extension of time, end of discussion, or

16   something to that effect, right?

17   A.    That's correct.

18   Q.    All right.  And did you also tell them at that time

19   you got to get more manpower here?

20   A.    No.

21   Q.    You didn't.  Do you know whether Mr. Oloff did?

22   A.    I don't believe he did.

23   Q.    You don't believe he did.  Okay.

24         Did you or Mr. Oloff discuss right around this time

25   or a couple case before or the same time or a few days

1    after this July 21 period whether or not ECI had

2    sufficient manpower on the job at the time?

3    A.   Could you repeat the question?

4    Q.   Right around the July 21 time frame, a few days

5    before or after, right around that time frame, did you

6    discuss with Mr. Oloff, gee, I don't think ECI's got

7    enough manpower here?

8    A.   We had that discussion prior to the July 21.

9    Q.   Did you tell Mr. Oloff to take some action in that

10   regard?

11   A.   No.

12   Q.   Do you know whether he did?

13   A.   I believe he sent an e-mail to ECI --

14   Q.   Oh, really?

15   A.   -- regarding manpower.

16   Q.   Regarding manpower.

17        Were you aware of the daily reports, the foreman's

18   reports that Stephane Mathieu was submitting to Mr. Oloff

19   on a weekly basis, if I recall Mr. Mathieu's testimony?

20   A.   We received daily reports from all the contractors.

21   Q.   From all of them?

22   A.   Yes.

23   Q.   Really?  Who got them?

24   A.   They usually went to Maristella McGregor.

25   Q.   Did you discuss ECI's reports?  Again, the Phase 3

1    period, basically June, July, August of 2010, that's where

2    I'm asking the time frame.  Did you discuss ECI's daily

3    reports with Oloff at any time during that Phase 3?

4    A.    No.

5    Q.    So did you read them?

6    A.    I don't believe I did.

7    Q.    So to the extent that Mr. Mathieu was complaining

8    about specific issues in his daily reports, you would have

9    been unaware of those complaints; is that a fair

10   statement?

11   A.    That's not true.

12   Q.    Based on his reports -- you didn't read them, right?

13   You just said you didn't read his reports?

14   A.    No, I didn't.

15   Q.    Okay.  You also said -- and you correct me if I'm

16   wrong -- you didn't talk to Oloff about his reports; fair

17   statement?

18   A.    That's fair.

19   Q.    So based on his reports, you didn't read them, you

20   didn't talk to Oloff about them, you were not aware of

21   what Mathieu was complaining about, whatever that might

22   be, in his daily reports; fair statement?

23   A.    I spoke to Stephane Mathieu on the job site, I was

24   there every day.

25   Q.    So you'd speak to him.  But in terms of what

```
 1    Mr. Mathieu was actually writing daily, submitting to your
 2    project superintendent, Mr. Oloff, you didn't read them
 3    and you didn't talk to Oloff about what was in those daily
 4    reports; fair statement?
 5    A.    Based on my conversation with Stephane Mathieu, I had
 6    no reason to believe I needed to read them.
 7    Q.    I appreciate you spoke to Mr. Mathieu.  I'm talking
 8    about his written daily reports.
 9    A.    No.
10    Q.    So you have no knowledge, you have no knowledge of
11    what was in those reports either directly or indirectly,
12    right?
13    A.    None.
14    Q.    Thank you.
15          Now, in terms of -- you mentioned that, based on your
16    testimony, that July 21 ECI did not tell you they would be
17    filing some kind of claim, that's pretty much what you
18    said, I think, you did not have the opportunity to drill
19    down -- you used that expression -- as to what their
20    issues were.  Did I get that right?
21    A.    Yeah.
22    Q.    If Mathieu's complaining daily about whatever issues
23    he's got in his written reports to Oloff, he's speaking to
24    Oloff, he's speaking to you, what other information do you
25    need to drill down to address ECI's problems on the job?
```

1   A.   That's just the point.  We were talking to the

2   foreman daily and we were addressing his issues.

3   Q.   Okay.

4   A.   Any submissions that were out there, we weren't aware

5   of them.

6   Q.   You have a good line of communication with Mathieu

7   yourself personally; fair statement?

8   A.   And Oloff, yes.

9   Q.   Ed did, too?

10  A.   Absolutely.

11  Q.   Mathieu is giving you his written daily reports

12  through Oloff?

13  A.   He is.

14  Q.   Mr. Oloff said he was reading them, he was aware of

15  them, reading them.  So you have a good line.  ECI,

16  whatever their issues are there, have full opportunity to

17  tell you what they are, right?

18  A.   That's correct.

19  Q.   Whatever you need to do to address them, you or Ed,

20  you're addressing them on a daily basis to get the job

21  done, right?

22  A.   Yes.

23  Q.   Okay, good.

24       In your notes, where I started this and I still

25  haven't gotten there, you did not -- this is Exhibit 537.

1    You testified that you made no entries here about the

2    request by ECI for an extension of time on July 21?

3    A.    That's correct.

4    Q.    Okay.  You make a lot of entries about different

5    things, but you don't mention anything about that.  Did

6    you think that was a significant point that ECI asked for

7    an extension of time and you denied it on July 21?

8    A.    It was brought up at the end of the meeting, at the

9    end of that meeting.  We were there about an hour and it

10   came up at the end.

11   Q.    Okay.  But that wasn't the question.  Did you think

12   it was a significant point that they asked for an

13   extension of time and that you denied it?

14   A.    Yes.

15   Q.    But you didn't write it down in your notes?

16   A.    No, I didn't.

17   Q.    Did you tell anybody else other than -- obviously

18   Oloff was there, but did you tell anybody else that ECI

19   had asked for an extension of time and you had denied it

20   peremptorily?

21   A.    I don't recall.

22   Q.    You don't recall or you know you did not?

23   A.    I don't recall I told anybody.

24   Q.    So, to your best recollection, you did not tell

25   anybody?

1    A.   Probably not.

2    Q.   You didn't write it down, you didn't tell anybody,

3    but you admit it was an important issue that ECI brought

4    up?

5    A.   Yeah.

6    Q.   Okay.  Looking at your notes, was it more important

7    than your notation that the P3AR is being built?

8    A.   What was the question?

9    Q.   Looking at your notes, under Electrical, "P3AR –

10   being built"?

11   A.   Yes.

12   Q.   Was ECI's request for an extension of time and your

13   denial of that more important than the issue that the P3AR

14   is being built?

15   A.   I'm not sure I understand what the question is.

16   Q.   Never mind, I'll withdraw it.

17        You put down on this note a little grid of their

18   manpower, 20, 3, 5 that you said showed they had total of

19   28 guys, different shifts, right?

20   A.   Yes.

21   Q.   So, to your understanding, they had 28 men there on

22   July 21?

23   A.   On different shifts.

24   Q.   But total --

25   A.   Yes.

1   Q.    -- was 28 guys.

2         Do you believe that was sufficient as of July 21 for

3   ECI to perform the work available to them at the time?

4   A.    No, we didn't.

5   Q.    How many men should they have had at the time to

6   perform the work available to them?

7   A.    That would be up to ECI to determine.

8   Q.    One more?  Five more?  Ten more?

9   A.    I wouldn't be able to tell you.  That's up to ECI to

10  provide the manpower and evaluate the work.

11  Q.    Okay.  But you are saying that, based on your --

12  well, your belief, 28 men as of July 21 was not enough?

13  A.    It was apparent from the work, how the work was

14  progressing in the field they did not have sufficient

15  manpower.

16  Q.    So they should have had more.  Should they have had

17  more men the prior week?

18  A.    It would -- based on the crux of this meeting, that's

19  why we had the meeting because we felt they didn't have

20  enough manpower at that time.

21  Q.    Are you aware that following the meeting of the 21st,

22  within the next week they increased their crew and

23  continued to increase their crew up to a max of 60 men at

24  some point in August?

25  A.    They did increase their crew.

1    Q.    Do you think they ever brought too many men in?

2    A.    No, I wouldn't really have an opinion on that.

3    Q.    Well, you were basically the project manager for Pike

4    and your job was to basically control the project, right?

5    A.    It was to manage the scheduling, yes.

6    Q.    If you thought they had too many men, would you have

7    said to Ed or discussed that with Ed, gee, ECI's got too

8    many men, they're not productive, why do they have so many

9    guys?

10   A.    It's really the contractor's responsibility to

11   provide the manpower to keep up with the schedule.

12   Q.    Did Pike keep to the schedule for Phase 3?  When I

13   say the schedule, I mean the schedule that was part of

14   ECI's contract.

15            MR. HUG:  Objection, beyond the cope.

16            MR. KAPLAN:  He referred to the contract.

17            THE COURT:  I'll allow it.

18            MR. KAPLAN:  Thank you.

19   BY MR. HUG:

20   Q.    Let me repeat.  Did Pike keep to the schedule for

21   Phase 3?  As I say the schedule, the schedule in ECI's

22   contract.

23   A.    No.

24   Q.    No.  Okay.  How did Pike not keep to that schedule?

25   A.    We had two areas that were impacted by structural

1    steel structures that I mentioned earlier.

2    Q.   The art room and locker rooms?

3    A.   Boys and girls locker rooms, art room and music room.

4    Q.   That's what pushed those areas out to October?

5    A.   Yes, around Columbus Day weekend.

6    Q.   When you met with ECI on July 21, did you tell them

7    that there would be extensions of time granted for the art

8    room and the locker room until through October?

9    A.   No.

10   Q.   No.  Okay.  Wasn't one of the issues they mentioned

11   on July 21 those same issues that were delaying the art

12   room and the locker rooms?

13   A.   Yes.

14   Q.   So, on the 21st, you said no extensions of time, end

15   of story.  And then ten days later or so or in early

16   August, you're talking to the owner about we have to

17   extend time to October based on these particular problems.

18   And my reference is your testimony before and your report

19   to the owner, Mr. Hug went through there was a mention in

20   the report these rooms are going to be delayed until

21   October?

22   A.   That's right.

23   Q.   So I got that right?

24   A.   Yes.

25   Q.   Okay.  You didn't have any written requests for

1    extension of time from ECI to extend the time on the art

2    room and the locker room to October, did you?

3    A.    I didn't have any extension requests from ECI.

4    Q.    You had an oral request on July 21, right?

5    A.    It was an oral request, not written.

6    Q.    And I just said -- let's be clear.  You didn't have a

7    written request for an extension of time from ECI to

8    extend time for the art room and the locker room?

9    A.    That's correct.

10   Q.    When they talked to you on July 21, did they ask for

11   a four-week extension of time?

12   A.    I don't recall the exact amount of time.

13   Q.    But ten days to two weeks later, without any written

14   request from ECI, you're talking with the owner about

15   extending time in those areas until October; fair

16   statement?

17   A.    That's a fair statement.

18   Q.    Any other sub give you a written request for an

19   extension of time for the art room or locker room?

20   A.    Not a written request.  Oral request.

21   Q.    As did ECI?

22   A.    Yes.

23   Q.    Did the owner in fact extend your time for those

24   areas to October?

25   A.    After we conferred with them, yes.

1    Q.   Did they say where's the written request for

2    extension of time from the subcontractors, we can't do

3    this because we don't have that?  Did they say anything

4    like that to you?

5    A.   Not at all.

6    Q.   No.  You had a change order -- you had approved

7    change orders with ECI?

8    A.   I had what?

9    Q.   Pike had approved change orders with ECI?

10   A.   We had recommended change orders to the owner that

11   they approved that we would, in turn, issue.

12   Q.   And those had labor rates as part of the change

13   orders, right?

14   A.   Yes, they would.

15   Q.   I think it's Exhibit 44.  Do you have that volume in

16   front of you?  It's Volume III of the plaintiff's

17   exhibits.  Do you have that, Mr. Strauss?

18   A.   Yes.

19   Q.   Okay.  And in 44 there's a series of change order

20   requests from ECI.  And if we go to the -- I think it's

21   the fourth page in and thereafter, there's a number of

22   them that have the same pricing schedule for foremen,

23   electrician.  And for the electrician, I'm looking at the

24   one for September 29, which is ECI change 026, about four

25   pages into the exhibit.  See that one?

 1   A.   Yes.

 2   Q.   And there's a schedule of pricing, right?

 3   A.   Yes.

 4   Q.   And there's $81.46 an hour for electrician and

 5   there's overtime, et cetera, right?

 6   A.   Yes.

 7   Q.   And then if we go to the other change order requests

 8   that are in there, they all have the same pricing

 9   schedule, don't they?

10   A.   Yes.

11   Q.   Wasn't this the pricing schedule that provided the

12   basis for the change orders that Pike did grant to ECI?

13   A.   Yes.

14   Q.   Okay.  You talked about the process of approving

15   payment requisitions?

16   A.   Yes.

17   Q.   For any of the payment applications that ECI was paid

18   for by the Town/Pike, those would have gone through that

19   approval process, right?  The one you described?

20   A.   Yes.

21   Q.   So, just refresh us, who was involved in reviewing

22   and approving ECI's payment applications before they were

23   actually paid?

24   A.   Initially it would be myself.  And then I would make

25   a recommendation to the owner's representative and the

 1   architect.  And in some cases the mechanical, electrical,

 2   plumbing consultant would review as well.

 3   Q.   We've been through this here in our proceedings, of

 4   course, the payment applications are based on percentage

 5   of completion for various items of work in the schedule of

 6   values, and that's basically what generates the payout?

 7   A.   That's correct.

 8   Q.   So is it fair to say that ECI's payouts would not

 9   have been approved and paid if you and those other

10   individuals working for the owner did not approve of the

11   percentages of completion that were being presented in the

12   payouts?

13   A.   That's correct.

14   Q.   So if ECI said we're 80 percent done with this item

15   and 90 percent done with this item and 50 percent done

16   with that item, that's all subject to several people's

17   scrutinizing that and then reviewing and approving that;

18   fair statement?

19   A.   Yes.

20   Q.   So you all agree that whatever values they carried in

21   the payouts were correct and accurate because you accepted

22   them and paid them?

23   A.   That's correct.

24   Q.   Okay.  And if you had problems with that, you'd get

25   back to them and changes would be made, right?

1   A.    That's correct.

2   Q.    Is it fair to say, Mr. Strauss, that your position

3   stated to ECI on July 21 that there would be no extensions

4   of time for Phase 3 --

5   A.    Yes.

6   Q.    -- that that was -- you considered that would be

7   Pike's final position at that time?

8   A.    Yes.

9           MR. KAPLAN:  I'm just checking my notes.  I

10  don't have very much more.  I'm a little scattered

11  sometimes.

12          I have nothing else, Your Honor.

13          THE COURT:  Okay, thank you.

14          Redirect?

15          MR. HUG:  A few follow-up questions, Your Honor.

16

17                   REDIRECT EXAMINATION

18  BY MR. HUG:

19  Q.    Mr. Strauss, you were asked questions about Ferguson

20  and they had pending litigation going on, Pike had pending

21  litigation with Ferguson at the time of the bid.  What was

22  that pending litigation?

23  A.    At the Buley Library there was a new water line

24  installed by the local utility, Regional Water Authority.

25  When Pike's site contractor went in to do sanitary line

1    with Ferguson Electric and Ferguson Mechanical, there

2    was -- the line fell apart because of poor workmanship and

3    flooded the basement of the library.

4    Q.   Was it Ferguson that put in the line?

5    A.   Not at all.  No.

6    Q.   And was Ferguson just the only other -- were they the

7    only other party in the lawsuit?

8    A.   Not at all.  And it was Ferguson Mechanical, not

9    Ferguson Electric.

10   Q.   Okay.  Was Ferguson Electrical on that job?

11   A.   They were also on that job.

12   Q.   This was involving Ferguson Mechanical?

13   A.   Separate.

14   Q.   Was that particular lawsuit particularly contentious

15   with Ferguson?

16   A.   No, they were brought in as a co-defendant.

17   Q.   It turned out to be an insurance claim?

18   A.   Yes, it did.

19   Q.   Who was your lawyer on that one?

20   A.   You were.

21   Q.   In terms of Bloomfield High School, you testified

22   that it was too high.  What do you mean by -- not

23   Bloomfield High School, Bloomfield Electric.  You used the

24   term on direct examination and Counsel went over on cross

25   that it was too high.  What do you mean by too high?

1    A.    That was probably not the best term.  As the owner's

2    construction manager, we're required to act in the owner's

3    best interest.  That in this case meant awarding to the

4    lowest qualified bidder.

5    Q.    Since Counsel brought it up, did you think Bloomfield

6    Electric was too high?

7    A.    They were higher than Ferguson and ECI, yes.

8    Q.    Did you think their bid was reasonable after you had

9    your interview with them?

10   A.    Yes.

11   Q.    And had ECI been knocked out and Ferguson knocked

12   out, and Bloomfield Electric turned out to be the low

13   bidder, would you have accepted Bloomfield?

14   A.    I would have made a recommendation to award to them,

15   yes.

16   Q.    Now, you testified on cross-examination about your

17   notes not having any reference to an extension of time, I

18   think your testimony that you thought it was significant

19   at the time.  Why don't your notes contain any reference

20   to extension of time?

21   A.    I really couldn't tell you why.

22   Q.    Did you think at that time, at the end of the July 21

23   meeting, that there was some ongoing or continued dispute

24   between ECI and Pike?

25   A.    Not at all.

1   Q.   Did you think there even was any dispute between Pike

2   and ECI at that time?

3   A.   No, none whatsoever.

4   Q.   Now, you also testified that -- on cross-examination

5   you were asked about the steel.  And you told ECI that

6   there would be no extensions of time, including but not

7   limited to the steel issues.  Did you receive and hear

8   ECI's concerns about the steel at that point in time?

9   A.   Yes.

10  Q.   And did you discuss with them potential -- did you

11  discuss -- let me leave it open-ended.  Did you discuss it

12  with them how you could deal with it?

13  A.   Not directly with them.  Ed Oloff and I were also

14  looking at -- if we're going to not turn something over to

15  our client, we need to confer with our client.  We can't

16  just arbitrarily change the schedule to suit our needs or

17  a contractor's needs.  I have to consult with our client.

18  We were actively consulting with our client turning those

19  areas over to a later date, but we just didn't have the

20  approval to do so.

21  Q.   Did you listen to what ECI said about --

22  A.   Absolutely we were listening.  We had other requests

23  from other contractors, locker rooms are a lot of tile

24  work, a lot of work in those areas.  So it was a lot of

25  work being done in a short period of time.

1    Q.   Did you make a request for extension of time

2    ultimately to the owner?

3    A.   We made a recommendation to the owner, yes.

4    Q.   Do you need to have subcontractors file requests for

5    extensions of time in order for you to go to the owner and

6    ask for an extension of time on your own?

7    A.   No, not at all.  We look at the situation and we make

8    a recommendation based on what we're seeing.

9    Q.   Okay.  So that's a different relationship?

10   A.   Between us and the client, yes.

11   Q.   You have a relationship between you and ECI and you

12   and the owner, correct?

13   A.   That's correct.

14   Q.   And I think on direct examination I even read some

15   provisions in Section 3 about Pike's ability to deal with

16   the schedule; do you recall that?

17   A.   Yes.

18   Q.   So when you extended -- when you extended or went to

19   the owner and asked for an extension of time to finish

20   that area affected by the steel, were you doing that as

21   general contractor or were you doing that as ECI's agent?

22   A.   We were doing it on behalf of our contractors and

23   Pike.

24            THE COURT:  May I ask, was this -- with respect

25   to the art and the locker rooms, were there other

1    subcontractors effected by the steel issues other than

2    ECI?

3              THE WITNESS:  Yes, there were.

4              THE COURT:  Do you know which ones?

5              THE WITNESS:  The tile contractor -- it's

6    ceramic tile.  There's a lot of ceramic tile in the locker

7    room.  It's a very laborious installation process.  They

8    needed more time.  Ed Oloff and I recognized that the

9    steel issue in this area was impacting, but at the July 21

10   meeting we had not had a confirmation from our client that

11   we could extend the schedule.  We were actively working on

12   it at that time.

13   BY MR. HUG:

14   Q.   Can you tell -- while you're working on it, can you

15   tell your subcontractor to go ahead, slow down, don't

16   worry about it?

17   A.   We can't do that.

18   Q.   Why not?

19   A.   We need to hold to the schedule and keep moving

20   forward and we can't back off it.  We didn't have

21   concurrence with our client to back off.  We can't afford

22   that through the project.

23   Q.   That's not unique to this particular project?

24   A.   No, it's not unique at all, no.

25   Q.   The Judge asked you about other contractors other

1    than the ceramic tile contractor.  Were any other

2    contractors affected?

3    A.   Locker contractor, athletic locker rooms, drywall,

4    plaster ceilings in those areas.  There was a lot of

5    plumbing, obviously, it's a locker room.  Plumbing.  We

6    made a presentation to our client that, you know, you

7    don't need locker rooms to open the school, art room.  But

8    you need administrative offices and classrooms.  They went

9    along with that and they agreed with us.

10   Q.   And then you communicated that to --

11   A.   We immediately communicated that to the

12   subcontractors.

13   Q.   And you did that in writing?

14   A.   I believe it was done at a subcontractor meeting,

15   weekly meeting.

16           MR. HUG:  I'll show the Court my brief on where

17   it is in writing, it's previously been admitted.

18           No further questions.

19           THE COURT:  Okay, thank you.

20           MR. HUG:  Your Honor, may I ask one more

21   question?

22           THE COURT:  Sure.

23   BY MR. HUG:

24   Q.   Any of those contractors -- I asked this before, but

25   any of those contractors that were impacted by the change

 1   in the steel, have they filed claims?

 2   A.    No.

 3             MR. HUG:  No further questions, Your Honor.

 4             THE COURT:  All right.

 5             Mr. Strauss, you're excused, thank you.

 6             All right.  What's next?

 7             MR. KAPLAN:  Your Honor, I have some very brief

 8   rebuttal with Mr. Flynn.  Probably about ten minutes.  And

 9   I've already conferred with Mr. Hug and told him what the

10   subject matter would be.

11             THE COURT:  Okay.  Mr. Hug, are you resting?

12             MR. HUG:  I have been remiss a bit on

13   formalities up until about halfway through the

14   examination.  Before I rest, I want to make sure on the

15   record that I'm submitting the videotape of Mr. Gary

16   Schnip, I think it will be 659.  And we have a copy of the

17   transcript, I think that's also being submitted for these

18   witnesses as well.

19             MR. KAPLAN:  I have no objection, Your Honor.

20             MR. HUG:  And then I think 659, Your Honor, will

21   be the actual video.  I think agreement of counsel is we

22   need not take the time today to view it in light of the

23   shortness of time.

24             THE COURT:  Actually, we don't have the proper

25   video equipment in this courtroom.

 1          MR. HUG:  And then Exhibit 660 will be the

 2   transcription of the testimony of Mr. Schnip.

 3          THE COURT:  Okay.

 4          MR. HUG:  And then 661 is the transcription of

 5   the testimony of Mr. William Lynch, which the Court saw

 6   the video of last hearing date.

 7          THE COURT:  Yes.

 8          MR. HUG:  So counsel has copies of all those, I

 9   hope.

10          MR. KAPLAN:  Yes, sir.

11          MR. HUG:  I would like to submit those up.

12          THE COURT:  Yes, please.  So full exhibits.

13          MR. HUG:  With that, Your Honor, the defense

14   rests.

15          THE COURT:  Thank you.

16          Rebuttal case?

17          MR. KAPLAN:  Yes, sir.

18          Mr. Flynn.

19

20                  WILLIAM FLYNN,

21        called as a witness, having been first duly

22        sworn, was examined and testified as follows:

23

24          THE CLERK:  Please state your name.

25          THE WITNESS:  My name is William Joseph Flynn,

1    Jr.

2              THE CLERK:  Please spell your name.

3              THE WITNESS:  F-L-Y-N-N.

4              THE CLERK:  Please state your city or town.

5              THE WITNESS:  My city is Glocester,

6    Rhode Island.

7

8                    DIRECT EXAMINATION

9    BY MR. KAPLAN:

10   Q.   Mr. Flynn, I'm just going to zero in on one issue

11   with you that you testified extensively on direct.  Some

12   questions were raised in some of the evidence presented by

13   the defense about the supervision levels during the

14   Phase 3 work by ECI.  I want to ask you some questions

15   about that.

16        Your first involvement with the project on site was

17   when?

18   A.   In sometime around the early part of July, second

19   week of July.

20   Q.   Following the July 21 meeting, which we've all heard

21   a lot about, were you involved with manpower and assigning

22   people to the job for ECI?

23   A.   Yes, I was.

24   Q.   And what was your involvement in that regard?

25   A.   I was heading up -- I was supervising and managing

1    everything to do to support the project to get it

2    finished, get Phase 3 finished.

3    Q.   Okay.  I'm not going to go back and revisit the

4    levels, manpower levels directly following July 21.  What

5    did you do more specifically in regard to getting adequate

6    supervision to the job to follow the increased manpower

7    after July 21?

8    A.   First thing I did was I reviewed the list of foremen

9    that ECI had throughout the company.  And then I met with

10   the various -- I selected foremen that I wanted to pull

11   from other jobs off of other project managers to put on

12   this project.  And I did that.

13   Q.   Okay.  And then I'd like to show you a document and

14   ask you if you can identify what this is.

15   A.   This is a report that I had generated by our payroll

16   clerk for foreman.  And it represents the particular

17   foremen, ECI foremen, on the project, the number of hours

18   they worked and the weeks they were there from -- well,

19   through July and August.

20   Q.   Okay.  For the Phase 3 work?

21   A.   For the Phase 3 work.

22   Q.   And the basis of this, the source material for this?

23   A.   Certified payrolls.

24   Q.   Also Mr. Mathieu's --

25   A.   Daily reports.

 1  Q.   -- daily reports.  That would be Exhibit 29, the

 2  certified payrolls and Exhibit 20, the weekly reports?

 3  A.   Yes.

 4          MR. KAPLAN:  I'd offer this, Your Honor.

 5          THE COURT:  Do we have a number?

 6          MR. KAPLAN:  It would be Exhibit 59.

 7          THE COURT:  Okay.  Is there objection?

 8          MR. HUG:  No objection, Your Honor.

 9          THE COURT:  Exhibit 59, full exhibit.

10  BY MR. KAPLAN:

11  Q.   Now I want to briefly go through the people who are

12  identified.

13      We've heard from Mr. Mathieu.  We'll skip him, no

14  offense to Mr. Mathieu.

15      Mr. Kuczynski listed at page 2, what was his role at

16  the company in terms of why did you send him there?

17  A.   Well, he was a long-term foreman.  He had some

18  special skills when it came to fire alarm system work.

19  Q.   Was he the night shift foreman, basically?

20  A.   Yes.

21  Q.   And just the format here, this is chronological

22  starting in June 19 through the end of August, early

23  September, hours by week that these individuals were on

24  the job?

25  A.   Correct.

1    Q.    Mr. Smart is listed at the bottom of page 2.  Who is

2    Mr. Smart?

3    A.    Mr. Smart was another ten-plus years with ECI and had

4    worked on a number of projects for us, was a good foreman.

5    Q.    Mr. Reynolds listed at page 3?

6    A.    Mark Reynolds has been with us over 30 years.  Mark

7    is one of our more senior foremen and is particularly

8    talented in the data and systems work.  And I believe Mark

9    handled all of that on the project.

10   Q.    Okay.  Mr. Bona?

11   A.    Jim Bona is the owner's son.  He's a long-time,

12   30-year ECI employee.  Jim has done everything from

13   working in the field, he leads our estimating department

14   now.

15   Q.    Mr. Walz is listed page 4?

16   A.    Rich Walz, 30 years.  Heavy hitter.  He's done every

17   kind of job that we do.

18   Q.    Mr. Campbell was there for a few hours?

19   A.    He was there, as you can see.  He was there to help

20   out.  But again, he's a 30-year-plus person with ECI.

21   Q.    And Mr. Simeon, the last individual?

22   A.    John was with us for ten or so years.  And John now

23   owns his own company and he can do just about anything.

24   Q.    Now, you have a total for the subforemen hours --

25   foreman, subforeman, what's the difference?

1   A.   A subforeman might be in charge of a very specific

2   task like fire alarm system.  A foreman, in general, might

3   be charged with the entire wing or entire area of the

4   project which might include the fire alarm in that area.

5   Q.   The purpose of bringing these particular individuals

6   to the project in the summer 2010 was what?

7   A.   Well, we knew we were going to ramp up somewhere

8   between 50 and 60 people.  We had to have adequate

9   supervision.  In addition to that, with 60 people, you

10  want to be as productive as possible.  We brought our more

11  senior foremen, the guys we knew had been in the trenches

12  on other jobs where you have a difficult schedule to

13  maximize the performance of the people on the job.

14  Q.   Starting your involvement in July on the project

15  through September, were you aware of any supervision

16  problems by ECI?

17  A.   No.  I mean, we had more foremen on this job

18  percentage-wise than we would on any other job.

19  Q.   You have a total at page 5 of just shy of 23,000 man

20  hours, and there's a comparison here to the reference to

21  the Beacon exhibit, Mr. O'Neill's report, Tab B in

22  Exhibit 656 is listed here comparing the same time period

23  and his total of 12,000 man hours, you come up with

24  18.3 percent of your foremen personnel of those total man

25  hours; am I reading that right?

 1    A.    That's correct.  Almost 20 percent of the labor force

 2    were foremen.  You don't ever carry that level on a normal

 3    project.

 4    Q.    This is from that same period tabled the end of June

 5    through the first week of September 2012?

 6    A.    Yes.

 7              MR. KAPLAN:  I have nothing further, Your Honor.

 8              THE COURT:  Cross-examination?

 9              MR. HUG:  Yes.

10

11                        CROSS-EXAMINATION

12    BY MR. HUG:

13    Q.    As I understand it, Mr. Flynn, you relied on the

14    certified payroll reports, for one?

15    A.    Yes.

16    Q.    And the daily reports?

17    A.    Yes.

18    Q.    And the weekly foreman reports?

19    A.    Yes.

20    Q.    Okay.  Anything else?

21    A.    Not that I'm aware of.

22    Q.    All right.  Now, let's turn to the Exhibit 29, which

23    is the certified payroll reports.  Very first page of

24    Exhibit 29.  Let me know when you're there.

25    A.    I'm there.

1    Q.   Okay.  So I look down on that page and you see

2    Stephane Mathieu.  Underneath that I see electrical

3    foreman, see that?

4    A.   Yes, I do.

5    Q.   That's his designation, correct?

6    A.   For the purposes of certified payroll.

7    Q.   Correct.  Okay.  Take a look at Russell Kuczynski,

8    however you pronounce his name.  He's listed as electrical

9    subforeman, correct?

10   A.   Correct.

11   Q.   Now, Carl Smart, I think if you go in a little bit

12   and it's indicated he was working for the period ending

13   7/24.  If you go through the certified payroll reports and

14   you go to that period.

15        And the way you find that, Your Honor, is right in

16   the middle of the page it says For the Period Ending,

17   you'll see 7/24/10.

18             THE COURT:  All right.  Give me a moment here.

19                  (Pause.)

20             MR. HUG:  Unfortunately, they're not Bates

21   numbered.

22             THE COURT:  I have that.

23             MR. HUG:  And you go to -- the names are in

24   alphabetical order, generally, Your Honor.

25             THE COURT:  Sure.

1    BY MR. HUG:

2    Q.   If you go to Carl Smart, page 12 I think of that

3    particular report.

4             THE COURT:  Yes, I have it.

5    BY MR. HUG:

6    Q.   You see Mr. Smart there, he's listed as an

7    electrician, correct, for payment purposes?

8    A.   Yes.

9    Q.   So your testimony is he acted as a foreman, but you

10   paid him as an electrician?

11   A.   Absolutely correct.

12   Q.   You didn't give him any extra pay because he was

13   assuming greater duties and more responsibility on this

14   job?

15   A.   We did not.

16   Q.   Okay.  And that's true also -- I could go through,

17   that's true also with Mr. Reynolds, Mr. Bona, Mr. Walz,

18   Mr. Campbell, and Mr. Simeon.  If I go through the payroll

19   reports, I'll find they're all listed as electricians?

20   A.   Because that's what they were paid.

21   Q.   They're not listed as electrical foremen or

22   electrical subforemen, correct?

23   A.   They're not.  Because they were paid the rate that

24   it's appropriate for whatever the title was, but that was

25   not their title on the job.

1    Q.   Okay.  Their title on the job was different from what

2    they were paid?

3    A.   Correct.

4    Q.   Now, the daily reports which are I think Exhibit 17.

5         Let's first go back to your Exhibit 29 for a moment.

6    Mr. Kuczynski, for the period of time through 7/24, it's

7    true, isn't it, at least through that time period, that

8    you only had one foreman during the day and one foreman at

9    night, correct?

10   A.   I don't know.  I'd have to go back and check all the

11   records.

12   Q.   You didn't check that, did you?

13   A.   No, I checked the number of foremen that we had

14   assigned to the project and the dates and the times that

15   they worked.

16   Q.   Are you aware that Mr. Kuczynski was the night

17   foreman for the periods on his list in Item Number 2 on

18   your Exhibit 29 through 7/31/10?

19             THE COURT:  You mean Exhibit 59?

20             MR. HUG:  Exhibit 59, I'm sorry, Your Honor.

21   Thank you.

22   BY MR. HUG:

23   Q.   Exhibit 59, are you aware that Mr. Kuczynski worked

24   the night shift and was the subforeman for the night shift

25   through 7/31?

 1  A.   I believe that is correct.

 2  Q.   If I go to the daily reports, it's listed in there,

 3  isn't it?

 4  A.   I'd have to go back and look.  If that's what the

 5  daily report says, that's what it says.

 6  Q.   Let's go to one example of that.  Let's go to the

 7  daily report --

 8  A.   What exhibit would that be, sir?

 9          THE COURT:  Is this Exhibit 17?

10          MR. HUG:  Exhibit 17, yes, Your Honor.  No, I

11  have to go to another exhibit, I'm sorry.  It's going to

12  be the weekly foreman reports.

13  BY MR. HUG:

14  Q.   If you go to Exhibit 20.

15  A.   Which I don't have.

16  Q.   Okay.  So if I go in Exhibit 20 and I go to the week

17  ending date of 6/26, for example --

18      And Your Honor, each one of these, from my

19  recollection, each week begins with Steven Mathieu, he's

20  always the first one.  Once you hit Steven Mathieu, you

21  know you're on another week.

22      So if I look at Steven Mathieu, which is the first

23  one in there, it just says his time.  But if I go a few

24  pages in to Mr. Kuczynski, I see Mr. Kuczynski in there.

25  And if you look at the comments, 3rd shifter, see that?

1    A.    Yes, sir.

2    Q.    Okay.  And it also lists at the top Russell

3    Kuczynski.  Next to his name, I might be wrong but I think

4    that means foreman or foreperson something?  Can you read

5    that?

6    A.    I can read it, but I don't know what the word is.

7    Q.    Okay.  Anyway, he was paid -- we know he's paid as an

8    electrical subforeman.  If I look through here and if the

9    Court looks through here, we can see designations of

10   whether they were the night shift or the day shift, right?

11   A.    Correct.

12   Q.    Now, back to Mr. Mathieu for a moment.  Did you do

13   any analysis of your foremen -- let's look at the same

14   week, the week ending 6/26 again.  Same week, if we go to

15   that week again.  I was noticing this, Mr. Mathieu's

16   times, if I go to his, his time is allocated entirely to

17   Phase 3, correct?

18   A.    Yes.

19   Q.    Okay.  But during that week, how many men were

20   actually working on Phase 3?  Did you do that analysis?

21   A.    Say that again?

22   Q.    I was trying to figure out why Mr. Mathieu -- let me

23   ask it this way.  Why is Mr. Mathieu's time, he's the

24   supervisor, why is his time for the day shift allocated

25   100 percent to Phase 3 even though for this particular

1    week an enormous amount of work is being done on Phase 2?

2    I know that because if I go through the pages, I can see

3    Phase 2, Phase 2, Phase 2.  And I actually did the count

4    and, although it wasn't exact, it was somewhere around

5    five of the 17 men were on Phase 3, including Mr. Mathieu,

6    and the rest were on other phases.  What I'm wondering is

7    why Mr. Mathieu's entire time is devoted to Phase 3 when

8    he has supervisory responsibility for everybody there?

9    A.   Because in Mr. Mathieu's opinion, obviously he's the

10   man on the ground supervising the whole project, he

11   determined that majority or all or whatever at that period

12   of time of his time was being utilized in Phase 3

13   supervision.  I can't stand in his shoes and tell you why

14   he did that, but that was his call on that day.  Maybe he

15   felt that the work in Phase 2 was supervised sufficiently

16   by an ECI foreman and didn't need any additional

17   supervision by him.

18   Q.   If I go through all of the weeks, all the weeks where

19   only he is there as supervising during the day shift, I'm

20   seeing all of his time charged to Phase 3 work even though

21   Phase 2 work is being done.

22   A.   Again, that's his call.  He knows what he was

23   supervising.

24   Q.   Okay.  But we do know, because I think it's your

25   testimony, that he was supervising all of the work,

1   correct?

2   A.   He was applying his supervision time to the

3   appropriate areas he deemed necessary.  Just because he

4   was in charge of the overall job does not mean that he was

5   supervising the work in some percentage manner.  On any

6   given day, his total focus may have continually been on a

7   particular area in the project so he assigned his time to

8   that particular area.

9   Q.   So that -- in your mind, somebody who is spending

10  really all of their time, because all I can see here on

11  his time sheet here is all of his time is being spent

12  on -- 6/26 is being spent on branch conduit Monday through

13  Friday, and on Saturday he's spending three hours on

14  demolition and four hours on temporary.  None of it is

15  assigned to supervision.

16  A.   He's assigning his time to the areas he believes

17  fairly represent what he was doing on any given day.

18  Q.   All right.  So what percentage of his time is

19  applicable to supervision of other work?

20  A.   You'd have to ask Mr. Mathieu.

21  Q.   But as far as you know, there is no allowance in

22  these documents for that?

23          MR. KAPLAN:  I object.  I don't know what

24  documents.

25

1    BY MR. HUG:

2    Q.    I can't look through these documents -- is there a

3    document I can look to to see how much time Mr. Mathieu

4    spent supervising?

5    A.    Supervising what?

6    Q.    The job.

7    A.    He assigned his hours to the areas that he believes

8    he was working in or supervising.

9    Q.    So he left -- if I'm to believe that, then the

10   supervisor worked on all of Phase 3 even though most of

11   the workers were on Phase 2 and he left them unfettered?

12   A.    It seems reasonable to me.  I'm sitting here as

13   vice president of ECI and I'm sure that there's things

14   going on in the company right now that I'm supervising but

15   I'm not going to assign my time to them today.

16   Q.    Now, with respect to Carl Smart, I know from the

17   certified payrolls Mr. Smart is not listed as a foreman.

18   You've explained that.  That's for payroll purposes.  Your

19   testimony now is that he was actually a foreman out there.

20   So if I go to -- if I go to the weekly reports, weekly

21   foreman reports, I'm not going to see any designation of

22   him as a foreman in those documents, am I?

23   A.    No.

24   Q.    I'm not going to see any designation in the documents

25   in the daily reports as a foreman either, am I?

1   A.   No.  We pulled these guys from other jobs to help

2   Stephane and his crew to help in the crunch basically the

3   month of August to supervise the additional people we were

4   bringing on the job.

5   Q.   And the same holds true with Mr. Reynolds, Mr. Bona,

6   Mr. Walz, Mr. Campbell, and Mr. Simeon.  If I looked

7   through the weekly reports, and I have, and gone through

8   all of the daily reports, and I have, I'm not going to

9   find any that list them as foremen?

10  A.   No.  Mr. Bona was acting directly under my

11  supervision and was organizing the job in the field for

12  Stephane.

13  Q.   Okay.  So there's no record of them acting as foremen

14  other than your memory.  You didn't pay these guys as

15  foremen other than Mr. Mathieu and Mr. Kuczynski as

16  subforeman, do I have that right?

17  A.   That's correct.

18  Q.   And these gentlemen are so good at their job as

19  foremen that you saw fit to continue to pay them at the

20  lower electrician rate than at the foreman rate?

21  A.   These gentlemen -- Mr. Bona, like I said, is the

22  owner's son and has been the general foreman, has had

23  Stephane's position on a number of other schools.  He

24  elected to go there to help out, as did the other guys,

25  for the prevailing wage rate.  They may have been coming

1   from other projects that were private that had a much

2   lower rate than the prevailing wage rate and were happy to

3   be on the job to get the extra money.

4   Q.   If I'm reading these correctly, through the meeting

5   on July 21, you have one foreman during the day and one

6   foreman at night, correct?

7   A.   Right.

8   Q.   And the one foreman on the day is devoting

9   100 percent of his time, according to his time sheets, to

10  work?

11  A.   May be.  That's his call.  You're asking me about

12  someone else's records.

13  Q.   I'm just --

14  A.   No, you are.  I didn't make these records.  Stephane

15  did.  Stephane was at this seat and very easily could have

16  answered those questions for you had you asked him.

17  Q.   You're the one who is proposing the exhibit.  I'm

18  just inquiring.

19  A.   I'm only proposing what it represents.  These are

20  foremen for ECI who were on this job working as foremen.

21  Q.   And you agree with me that they're completely

22  contrary to the contract records?

23  A.   No, I don't agree with you that they're contrary.  I

24  agree the certified payrolls are for the purposes that

25  they are, reflect the rates being paid to the individuals.

1    And certainly Mr. Bona is one of our most qualified senior

2    foremen in the company.  I guarantee you he was not out

3    there carrying pipe.

4    Q.   That brings up another point in here, is that in

5    preparation for your testimony today, I notice something

6    that I hadn't noticed before.  As you go through these

7    weekly labor reports, I'm going to find laborers in there

8    too?

9              THE COURT:  Which exhibit are you talking about?

10             MR. HUG:  The weekly foreman reports,

11   Exhibits 18 through 25 or so.

12   BY MR. HUG:

13   Q.   I'm going to find laborers in there?

14             MR. KAPLAN:  I'm going to object.  Beyond the

15   scope of direct.

16             THE COURT:  Well, is this going to hook up to

17   the foremen issue at all?

18             MR. HUG:  It hooks up to the pay issue, that's

19   how it hooks up.  I wouldn't have been looking at this,

20   Your Honor --

21             THE COURT:  I'll allow it, but you'll be able to

22   redirect on it.

23   BY MR. HUG:

24   Q.   When I was trying to figure out how you pay these

25   guys, you have laborers listed in your weekly report,

1    they're not electricians or journeymen or apprentices or

2    foremen, correct?

3    A.    I'm not sure what they are.  If they're listed as a

4    laborer, they were paid the laborer's rate.  And I'm going

5    to assume -- I don't have personal knowledge, I'm going to

6    assume they were doing a laborer's job.

7    Q.    Okay.

8              MR. HUG:  No further questions, Your Honor.

9              THE COURT:  Anything else?

10             MR. KAPLAN:  No, sir.

11             THE COURT:  Okay.

12             THE WITNESS:  Thank you, Your Honor.

13             THE COURT:  Does that conclude our evidence in

14   this case?

15             MR. HUG:  Yes, Your Honor.

16             MR. KAPLAN:  I believe so.

17             MR. HUG:  Except for your review of that

18   document -- or the video.

19             THE COURT:  The video of the -- well, the two

20   transcripts and the video on Mr. Schnip.  I will do that.

21             Let's be seated, if you'd like.  Let's talk a

22   little bit about scheduling for post-trial briefs.  Tell

23   me what makes sense for you all in terms of your time.

24             MR. KAPLAN:  I think we had mentioned this

25   before.  Once we get the transcripts --

 1             THE COURT:  Refresh my recollection.

 2             MR. KAPLAN:  We were just talking about it,

 3   Your Honor.  Forty-five days after the transcript we would

 4   submit simultaneous briefs.  And Your Honor had requested

 5   a reply brief.

 6             THE COURT:  Yes.

 7             MR. KAPLAN:  Which would be what, two weeks?  I

 8   think that's what we were fleshing out.

 9             THE COURT:  That's fine.

10             MR. HUG:  And I think, Your Honor, we also said

11   that if you felt you needed to direct us on any particular

12   item, call us in for argument, we're available to do that.

13             THE COURT:  Yes.  After I've looked at those

14   briefs, I'll be happy to make a decision on it.  Great.

15             Thank you, counsel.

16             Thank you to the parties as well who have

17   appeared here as well.

18             I, of course, look forward to getting your

19   post-trial submissions and trying to make a decision.

20             MR. KAPLAN:  Could I say something, Your Honor?

21   I'm not a brown-noser and Chris knows that.

22             MR. HUG:  Oh, yes, he is.  He's about to do it.

23             MR. KAPLAN:  I'm about to do it.  I don't know

24   I've ever said this to a judge.  I'm very sincerely

25   impressed with your level of attention.  I know this was a

1   lot of –– it was new stuff to you.  To a lot of people

2   it's like watching paint dry and I'm sure you felt that,

3   too.  But I really want to thank you.  I know you were

4   really paying a lot of attention to both of us.  I am sure

5   Chris feels the same way.

6           THE COURT:  Thank you.  It's been an education.

7               (Proceedings adjourned at 11:16 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                        C E R T I F I C A T E

5

6     RE:  ELECTRICAL CONTRACTORS, INC. v. THE PIKE COMPANY

7                       No. 3:11CV449(JAM)

8

9

10          I, Diana Huntington, RDR, CRR, Official Court

11    Reporter for the United States District Court for the

12    District of Connecticut, do hereby certify that the

13    foregoing pages are a true and accurate transcription of

14    my shorthand notes taken in the aforementioned matter to

15    the best of my skill and ability.

16

17

18

19

20                    _____/s/_____

21                       DIANA HUNTINGTON, RDR, CRR
                          Official Court Reporter
22                     United States District Court
                       915 Lafayette Blvd., Room 423
23                     Bridgeport, Connecticut 06604
                           (860) 463-3180
24

25