UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
ELECTRICAL CONTRACTORS, INC.,   :  No. 3:11CV1449(JAM)
                                :
              Plaintiff         :
                                :
         vs.                    :
                                :
THE PIKE COMPANY,               :
                                :  Bridgeport, Connecticut
              Defendant         :  June 16, 2014
                                :
- - - - - - - - - - - - - - - - x


BENCH TRIAL
VOLUME I


B E F O R E:

     THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


A P P E A R A N C E S:

    FOR THE PLAINTIFF:

          MICHELSON KANE ROYSTER & BARGER
               Hartford Square North
               10 Columbus Blvd.
               Hartford, Connecticut 06106
          BY:  STEVEN B. KAPLAN, ESQ.

    FOR THE DEFENDANT:

          ROBINSON & COLE
               280 Trumbull Street
               Hartford, Connecticut 06103-3597
          BY:  CHRISTOPHER J. HUG, ESQ.
               DEBORAH A. VENNOS, ESQ.


                         Diana Huntington, RDR, CRR
                         Official Court Reporter

1                          TABLE OF CONTENTS

2

3    PLAINTIFF'S                                                    VOIR
     WITNESS              DIRECT   CROSS   REDIRECT   RECROSS   DIRE
4
     MARK MADORE
5      By Mr. Kaplan         7
       By Mr. Hug                                                 86
6      By Mr. Kaplan        87
       By Mr. Hug                    119
7      By Mr. Kaplan                            199

8    CLIFFORD CLAUSON
       By Mr. Kaplan       218

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **9:09 A.M.**

2                   THE COURT:  We are here for the first day of our

3      bench trial in the matter of Electrical Contractors, Inc.

4      vs. Pike Company, Inc., Civil Action No. 311CV1449.

5                   Appearance of counsel, please?

6                   MR. KAPLAN:  For the plaintiff, Steven Kaplan

7      from Michelson Kane Royster & Barger.

8                   MR. HUG:  Christopher Hug of Robinson & Cole on

9      behalf of Pike Company.

10                  MS. VENNOS:  Deb Vennos, Robinson & Cole, on

11     behalf of Pike Company.

12                  THE COURT:  I'd looking forward to getting

13     started.

14                  It looks like we have a number of witnesses

15     present in court today.  Is there a request concerning

16     sequestration?

17                  MR. KAPLAN:  They're my witnesses.  I certainly

18     don't have such a request, Your Honor.

19                  MR. HUG:  No, Your Honor.  At this time with

20     respect to at least the first witness, I don't have any

21     problem with sequestration, so I'm not requesting.

22                  THE COURT:  Great.

23                  I just want to raise scheduling with counsel at

24     this time.  As you know, I have -- not as you know, but as

25     I mentioned last time we got together, I had a possibility

1    that I would have a criminal matter, a long-delayed

2    criminal matter coming to me from another judge in the

3    district.  That has come to pass.  That is happening.  I

4    have to start and begin a criminal case first thing on

5    Monday.  So my hope is that we will be able to finish this

6    week.  I'll do everything in the Court's power to try to

7    make that happen.

8            The second complication is that that criminal

9    case has a suppression hearing on Wednesday afternoon,

10   which would necessitate us stopping early on Wednesday.

11   That hearing is scheduled for 1:00 p.m.  So my plan would

12   be to have a day on Wednesday that goes until 12:30.

13           And what I'd like to also propose, my strong

14   preference is that, in light of that suppression hearing

15   and in light of everybody's interest in having this case,

16   the evidence come in this week, is we extend our trial day

17   this week, that we endeavor to start at 8:00 in the

18   morning and go until 5:00 in the afternoon rather than the

19   customary 9:00 to 4:00.  And I want to run that by counsel

20   to make sure that that is something that's a possibility,

21   given all kinds of time issues.  I know it's a

22   construction dispute.  Construction companies are used to

23   starting real early.

24           MR. KAPLAN:  We're fine with that.

25           THE COURT:  Great.

1          MR. HUG:  I think I'm fine with that.

2          MS. VENNOS:  I'm fine.

3          MR. HUG:  I can't promise I'll be lucid at 5:00.

4          MR. KAPLAN:  The NBA play-offs are over, I'm

5   good at the end of the night.

6          THE COURT:  There's a deli next door, they open

7   at 7:00.  They have pretty decent coffee and breakfast

8   sweets.

9          MR. KAPLAN:  If the Court is cognizant with

10  traveling, we'll do our best to be here at 8:00.

11         THE COURT:  It will be much easier, less traffic

12  getting here early.  So that's the hope to do that.  Let's

13  plan to start tomorrow at 8:00, run to 5:00 tomorrow;

14  Wednesday, 8:00, run to 12:30; Thursday, 8:00 to 5:00; and

15  Friday, the same.

16         MR. KAPLAN:  You're still at 4:00 today,

17  Your Honor?

18         THE COURT:  I'm still at 4:00 today.  I have to

19  actually depart a bit early today.

20         Okay.  Are there other matters to take up before

21  we hear from our first witness?

22         MR. KAPLAN:  I don't think so.  We sorted very

23  small exhibit things out with the clerk, no problem there,

24  just making sure we tied a few loose ends.  I think we're

25  ready to go.

 1          MR. HUG:  Agreed, Your Honor.

 2          I think we talked about the lack of opening

 3  statements.  I think we agreed that we just wanted to get

 4  to the evidence today, unless Your Honor has a preference.

 5  I think the joint trial memorandum state our positions.

 6          THE COURT:  I've looked at your joint trial

 7  memorandum and proposed findings on conclusions of law.

 8  I'm ready to go.

 9          Call your first witness.

10          MR. KAPLAN:  Mark Madore.

11          THE CLERK:  Please remain standing.  Please

12  raise your hand.

13

14                    MARK MADORE,

15      called as a witness, having been first duly

16      sworn, was examined and testified as follows:

17

18          THE CLERK:  Please be seated.

19          Please state your name.

20          THE WITNESS:  Mark Madore.

21          THE CLERK:  Spell your last name.

22          THE DEFENDANT:  M-A-D-O-R-E.

23          THE CLERK:  Please state your city of residence.

24          THE WITNESS:  Andover, Connecticut.

25          MR. KAPLAN:  Your Honor, I'm going to try to

1    work from here for now with the books and things.  If I

2    have to run back to the table a little bit, I hope that

3    won't be a problem.

4            THE COURT:  No worries at all.  That's great.

5

6                    DIRECT EXAMINATION

7    BY MR. KAPLAN:

8    Q.   Mr. Madore, would you tell the Court where you work?

9    A.   I work for Semac Electric.

10   Q.   Where is Semac located?

11   A.   New Britain, Connecticut.

12   Q.   How long have you been there?

13   A.   Two and a half years.

14   Q.   What's your job position?

15   A.   Senior project manager.

16   Q.   And what kind of work does Semac do?

17   A.   We do commercial and industrial construction.

18   Q.   Okay.  Electrical contractor?

19   A.   Electrical contracting.

20   Q.   What size contracts do you usually get involved with

21   at Semac?

22   A.   Anywhere from 100,000 to 20 million.

23   Q.   Okay.

24   A.   Wide range.

25   Q.   As a senior project manager, what are your job

1    responsibilities?

2    A.   I'm responsible for the labor, material, procurement,

3    and scheduling on projects.

4    Q.   All right.  And you said you've been there about two

5    and a half years?

6    A.   Yes.

7    Q.   Prior to that, where were you employed?

8    A.   Electrical Contractors, Inc.

9    Q.   That's the plaintiff in this case?

10   A.   Yes.

11   Q.   How long were you at Electrical Contractors?

12   A.   I've had two tour duties there.  First one was ten

13   years.  And then the last one was seven.  So I have a

14   total of 17 years.

15   Q.   Okay.  Let's start with that first ten-year period.

16   When was that?

17   A.   Started in 1988.

18   Q.   All right.  So about ten years from '88 to '98?

19   A.   Correct.

20   Q.   What were you doing for ECI at that time?

21   A.   I started out as a field electrician and worked my

22   way up to foreman position.  And then moved into the

23   office and learned estimating and project management.

24   Q.   Okay.  And do you have any electrical licenses in

25   Connecticut?

1    A.    Yes, I do.  I hold an E1 master's license.

2    Q.    Is that a contractor's license?

3    A.    Contractor's license, yes.

4    Q.    Is it protocol you start out with a journeyman's

5    license?

6    A.    Correct.

7    Q.    Okay.  Is that the highest electrical license in

8    Connecticut?

9    A.    Yes.

10    Q.    How long have you had the E1?

11    A.    I've had it probably ten years or more.

12    Q.    Okay.  And at the end of that first ten-year stint at

13    ECI, what was the position you had before you left the

14    company?

15    A.    Project management.

16    Q.    What kind of jobs were you involved with at that

17    point in time for ECI?

18    A.    I was involved in retail construction, school

19    construction.

20    Q.    Okay.  When you say school construction, what type of

21    school?

22    A.    It would be elementary, higher ed, high school level.

23    Additions, renovations, new construction.

24    Q.    Is that mostly public projects or was it a mix?

25    A.    It was a mix of both.

1    Q.   Any public schools you recall working for ECI during

2    that period?

3    A.   Not during that period.  That was a while ago.

4    Q.   When you left, you were a project manager?

5    A.   Correct.

6    Q.   After you left ECI -- would be about '98, roughly?

7    A.   Yes.

8    Q.   Where did you go from there?

9    A.   McPhee Electrical Contractors out of Farmington,

10   Connecticut.

11   Q.   How long were you at McPhee?

12   A.   I was at McPhee for ten years.

13   Q.   What was your position there?

14   A.   Senior estimator.

15   Q.   Okay.  And senior estimator, what did that job

16   entail?

17   A.   Entailed negotiating contracts, overseeing the

18   estimates, contract values that we were negotiating,

19   public bids, bonding, insurance requirements for goods.

20   Q.   Were you preparing estimates on those projects?

21   A.   Yes.

22   Q.   And what was the range of projects you were the chief

23   estimator on at McPhee?

24   A.   Again, it ranged from 100,000 up to 70 million.

25   Q.   Okay.  Do you recall, while you were at McPhee, were

1  you doing any public school construction?

2  A.   Yes, we did.

3  Q.   Do you remember any jobs you were involved with at

4  McPhee?

5  A.   I believe Hartford Public.

6  Q.   High school?

7  A.   High school.

8  Q.   Do you remember the size of that job?

9  A.   I don't recall.  It was several million.

10  Q.   Okay.  And any other public high school?

11  A.   Yes.  I believe Orange.  There were several.

12  Q.   At McPhee?

13  A.   Yes.

14  Q.   And what other kind -- any other public bidding at

15  McPhee other than schools?

16  A.   We did casinos, Foxwoods, Mohegan.

17  Q.   Were those competitive bids?

18  A.   Yes, they were.

19  Q.   Okay.  Public projects, those are competitively bid?

20  A.   Yes, they are.

21  Q.   Okay.  And then when you went back to ECI -- when did

22  you go back to ECI again?

23  A.   2005.

24  Q.   How long were you there?

25  A.   I was there seven years.

```
 1   Q.   Okay.  And then what did you do as your second tour
 2   at ECI?
 3   A.   I did business development and senior estimator.
 4   Q.   And as senior estimator during that period, what were
 5   your job duties?
 6   A.   My duties were to select work that we would bid,
 7   oversee the estimates, review the bid documents, and put
 8   together final numbers.
 9   Q.   Okay.  Were you principally responsible for the bids
10   that were going on at that time from ECI that you were
11   involved in?
12   A.   I was responsible for the final numbers.
13   Q.   Okay.  And during that period did you bid any public
14   construction?
15   A.   Yes.
16   Q.   How many?  Any idea how many public projects you bid?
17   A.   Hundreds.
18   Q.   Literally?
19   A.   Literally hundreds.
20   Q.   And what type of projects was ECI doing, this would
21   have been roughly, if my years are right, somewhere
22   between 2005-2012 or so when you were there as the
23   estimator?
24   A.   We were doing probably a mixture of 50 percent public
25   work and 50 percent private work.  That would entail
```

1    office renovations, new building construction, retail,

2    school projects, higher education projects, cogeneration

3    facilities, solar projects.

4    Q.    Okay.  And did any of those jobs involve critical

5    path schedules as part of the projects?

6    A.    All of the projects involved critical path.

7    Q.    All of those projects you bid involved critical path?

8    A.    Yes, every project involves critical path schedule.

9    Q.    How long have you been working with critical path

10   schedules in your career?

11   A.    Forty-plus years.

12   Q.    Since you started?

13   A.    Since I started in the trade, yes.

14   Q.    All right.  As an estimator -- well, we'll get to

15   that.  Withdrawn.

16        When you were doing chief estimating for ECI, do you

17   recall any public school projects, specific public school

18   projects other than the Kelly School, which we'll get to

19   in a minute?

20   A.    Sure.

21   Q.    Could you just name a few?

22   A.    Middletown High School, Montville High School,

23   Rockville High School, Old Lyme High School.

24   Q.    Those were all jobs ECI performed?

25   A.    Yes.

```
 1   Q.    They won the bids on a competitive bid?

 2   A.    They were public bids, yes.

 3   Q.    What kind of projects were they size-wise,

 4   scope-wise?

 5   A.    They ranged from a million and a half to 10 million.

 6   Q.    Mix of new construction?

 7   A.    Mix of new construction.  Middletown High School was

 8   new construction.  Rockville High School was

 9   addition/renovation.  Montville was addition/renovation.

10   Q.    Did any of those jobs have critical path schedules

11   involved?

12   A.    They all had critical path schedules.

13   Q.    Did any involve summer work where school was out and

14   the project was worked in the summertime?

15   A.    Yes.  Rockville High School and Montville High School

16   would have had those types of summer schedules.

17   Q.    Are you familiar with a term "summer slammer"?

18   A.    Yes.

19   Q.    What does that mean?

20   A.    It's just an acceleration of work in a shorter period

21   of time.  It usually occurs when the owner needs to occupy

22   their facility to maintain school functions.

23   Q.    So for schools, how would that apply, public schools?

24   A.    Typically would apply during the summer months or

25   summer weeks.  Once school ends, you have approximately a
```

1    10- to 12-week schedule before school begins to make that

2    building function.

3            MR. KAPLAN:  Okay.  If I could just get Volume I

4    in front of the witness of our books.

5            Your Honor, I'll be working with Mr. Madore for

6    some time with Volume I, various exhibits in Volume I.

7            THE COURT:  Okay.

8            MR. KAPLAN:  I don't know if you have the

9    Court's copy, it might be easier.

10           THE COURT:  Thanks.

11   BY MR. KAPLAN:

12   Q.   Were you involved with the Kelly Middle School

13   project for ECI, Mr. Madore?

14   A.   Yes, I was.

15   Q.   What was your involvement there?

16   A.   I was the senior estimator, I oversaw the estimate.

17   Q.   Okay.

18   A.   And final bid dollars.

19   Q.   And by overseeing the estimate, just as a general

20   description, what did that mean for you?

21   A.   I would read the specifications and the plans.  I

22   would assign the project to estimators and/or work on it

23   myself.

24   Q.   And what happened here?  Do you recall for Kelly what

25   you specifically did?

1    A.   My role was oversight, for the most part, on this

2    project.  And I assigned it to an estimator.

3    Q.   And we're going to talk about the estimating process

4    and I'll ask you what you did and what other folks did.

5         What did the project involve, from ECI's point of

6    view?

7    A.   Could you clarify that?

8    Q.   For Kelly Middle School -- let me back up.

9         Do you remember when you first got involved with the

10   Kelly project?

11   A.   Yes.  It would have been a notice for bid.

12   Q.   Okay.  And I'm just going to refer to -- refer you to

13   Tab 2 in Plaintiff's Volume I.  The first page shows date

14   for bid bond.  I think it says October 28, 2009, bid date.

15   What does that say about when the bid was actually

16   submitted?

17              THE COURT:  Mr. Kaplan, two things.  Is that

18   Plaintiff's Exhibit Number 2?

19              MR. KAPLAN:  Yes, sir.

20              THE COURT:  And I take it, as we've discussed

21   before, there's no objection to the full admissibility of

22   all of the exhibits in the three -- I think three binders?

23              MR. HUG:  I think there's maybe a couple of them

24   that we'll address.  I'll object at the appropriate time,

25   Your Honor.  I have no objection to this particular

1    exhibit.

2            THE COURT:  Okay, that's great.  So Plaintiff's

3    Exhibit Number 2 is admitted as a full exhibit.

4            MR. KAPLAN:  Thank you.

5    BY MR. KAPLAN:

6    Q.   First page, what does that tell you about the timing

7    of the bid?

8    A.   The bid date was October 28.  I ordered the bond date

9    on October 22nd.

10   Q.   And does that tell you when you would have first

11   gotten involved with the project from a bidding

12   perspective?

13   A.   Yes.  On the date ordered would have been one of the

14   first early days.

15   Q.   All right.  What's the customary period that you had

16   at ECI as bidding public jobs to actually work up the bids

17   from your department?

18   A.   I would say, on an average, two weeks.

19   Q.   Do you recall anything different about the time your

20   department spent on this one?

21   A.   No.

22   Q.   And looking at Exhibit 1 in Volume I, which I think

23   we'd agreed are the part of the bid specifications?

24           THE COURT:  Any objection?

25           MR. HUG:  No objection, Your Honor.

1          THE COURT:  If you could move the exhibit into

2     evidence, just in case there's some hidden objection that

3     I don't know about.

4          MR. KAPLAN:  Sure.  Thank you.

5          THE COURT:  Plaintiff's Exhibit 1, full exhibit.

6     BY MR. KAPLAN:

7     Q.   Would you just look through the Exhibit 1,

8     Mr. Madore, and what is it?

9     A.   It's advertisement for bid, public notification.

10    Also provides the basic requirements, instructions to

11    bidders, bid forms, any special requirements or breakdowns

12    with your proposal that are needed.

13    Q.   All right.  And at -- I have to find the page here.

14         There's some pagination, Mr. Madore, at the bottom of

15    the page in this tab about -- it's about a third of the

16    way in, Section 01010.  On the bottom it says 01010/1.

17    It's entitled Summary of Work.

18         THE COURT:  How far are we into this?

19         MR. KAPLAN:  About a third in, Your Honor.  I'm

20    sorry, I didn't paginate these separately.  These have

21    sections -- it's right after -- at the bottom, it says

22    Electrical Bid Package 18 of 18, there's a couple of pages

23    after that, and then Section 01010/1, says Summary of

24    Work.

25         THE COURT:  Yes, I have that.

```
 1              MR. KAPLAN:  Thank you, sir.

 2    BY MR. KAPLAN:

 3    Q.   Mr. Madore, what does this show, this page show?

 4    A.   This is a basic description of what the project

 5    entailed.

 6    Q.   Okay.  And what did the project entail?

 7    A.   It was an addition and renovation of an existing

 8    school.

 9    Q.   Okay.  And in terms of the square footage -- excuse

10    me for bouncing around, but the information is sort of set

11    forth in some different places.

12         If we go back to Tab 2, the second page.  Exhibit 2,

13    second page, that's your bid summary sheet?

14    A.   Yes, it is.

15    Q.   And we'll get into that in some detail.  Just for

16    summary purposes, what does the summary sheet show?

17    A.   It's a summary of our bid proposal.

18    Q.   Okay.  And the items on the left, just without going

19    through each one of them, what do those categories

20    indicate or how are they set up?

21    A.   They indicate the cost for square foot.

22    Q.   I'm talking about where it says on the left, it

23    starts with allowances?

24    A.   Those would be phase breakdowns of our estimate.

25    Q.   When you say "phase breakdowns," what does that mean?
```

1    A.   It's a way of costing the job in order to track

2    material and labor.

3    Q.   Does this indicate how you actually bid the job by

4    these various categories?

5    A.   Yes.

6    Q.   And we'll go through in detail shortly.

7         And the information that goes off to the right, just

8    as we're on this, just to describe how this is set up,

9    what does the quote for dollar mean?

10   A.   Quote would be materials that we sought out for

11   vendor pricing.

12   Q.   So you're getting -- okay.

13        Does that also indicate your own labor, dollar value

14   for various items?

15   A.   Yes.

16   Q.   Okay.  And then under material dollars, what's that

17   mean?

18   A.   Those are what we consider commodity materials,

19   everyday off-the-shelf type items that are priced within a

20   computer estimating system.

21   Q.   Okay.  And equipment dollars, what's that one?

22   A.   Those would be for some direct job costs, lifts,

23   special equipment, vehicles.

24   Q.   Labor hours on the right column, how is that

25   comprised?

1  A.   Labor hours would consist of the materials that were

2  taken off for the estimate.

3  Q.   Okay.

4  A.   That's a summary total in those phases.

5  Q.   And we'll get into that process shortly.

6       Down below there's a number of items.  For now I just

7  want to ask you, it says total square feet, somewhat down

8  in the left-hand column, 140,218.  What does that mean?

9  A.   That is the square footage of the construction that

10 would be taking place.

11 Q.   At this project?

12 A.   Yes.

13 Q.   Okay.  And so back to the bidding process.  Now, what

14 did your department do to bid this job, to actually

15 prepare this bid?

16 A.   We would review, initially review the documents, the

17 specifications and drawings.  Then that would be assigned

18 to estimators to do quantitative takeoff and measurements

19 of the components within those documents.

20 Q.   Okay.  And when you say "quantitative takeoff," what

21 does that mean?

22 A.   That would mean counting up light fixtures, quantity

23 of light fixtures, switches, wire devices, distribution

24 equipment, life safety systems such as fire alarms, sound

25 systems, security.

1    Q.    Security systems.  Was ECI doing all of that work at

2    the Kelly Middle School project?

3    A.    I believe we were doing all of that work at the Kelly

4    Middle School project.

5    Q.    Okay.  And would you describe in a little more detail

6    how you actually did the bid takeoff and calculations?  I

7    know we have a lot of sheets in Exhibit 2.  And perhaps we

8    can just walk through that and you can describe to the

9    Court what those various forms and sheets are.

10        We were at the summary, and if you could start to go

11   through that, perhaps we just sequentially go through it

12   and you can describe what the various different types of

13   documents are here.

14        After the summary, there's a phase breakdown report.

15   And that's two pages.  Actually, it goes -- what is that,

16   Mr. Madore?

17   A.    These are reports that we use to evaluate our bid

18   proposals.

19   Q.    And when you say evaluate, what do you mean by that?

20   A.    We would evaluate the costs of quotations, material,

21   labor, and how it would compare to other similar projects.

22   Q.    Okay.

23   A.    The project manager may also use this as a sort of

24   his cost coding.

25   Q.    Now, this is dated 12/18/09.  Was that after the bid?

1   A.   Yes.

2   Q.   Was that something you did after you got the contract

3   award?

4   A.   We would do it often after contract award.

5   Q.   Okay.  As a further breakdown?

6   A.   As a further breakdown and to assist the project

7   manager in his breakdowns of the project.

8   Q.   If we go a few pages further, there's a quote request

9   which starts to get into a lot of handwritten information.

10  It says entered 10/23/09.  What is that?

11  A.   This would be a sheet that would we fax out or e-mail

12  to our vendors.  This particular sheet lists the fixture

13  types and quantities that were required on this project

14  based on our takeoff, our counting.

15  Q.   So you send this to vendors.  What do you get back

16  from the vendors?

17  A.   We would receive, normally, a lump sum proposal for

18  these materials.

19  Q.   Okay.  And then how do you choose which ones you

20  carry?

21  A.   We would evaluate them based on their billing

22  materials to make sure they matched ours.  In a

23  competitive market, we would typically choose the most

24  complete and lowest proposal provided at that time.

25  Q.   Okay.  And then after those several quote request

1   forms, there's a couple of other pages with handwritten

2   notes.  It says Kelly Middle School, 1 of 2 sheets on the

3   left?

4   A.   Yes.

5   Q.   K9 in the upper right corner, what's that?

6   A.   These are worksheets, they're takeoff sheets that

7   were used to quantify the materials that are on the

8   drawings.

9   Q.   Okay.  So this goes to that same idea of getting the

10  proposals for materials from the vendors?

11  A.   Correct.

12  Q.   And then if you go -- the next couple pages, there's

13  a number of pricing sheets, again with handwritten

14  information.  What are those?

15  A.   These would be just miscellaneous items that possibly

16  the computer system wouldn't price up for us from a

17  material labor standpoint.

18  Q.   You say the computer system price up?

19  A.   Yes.

20  Q.   What kind of system were you using for estimating at

21  that time?

22  A.   We used ConEst at that time.

23  Q.   ConEst?

24  A.   ConEst estimating software.

25  Q.   What information do you put into that program to

1    formulate your bid?

2    A.   Most of what we would input is quantitative items,

3    either total quantities of fixtures or devices or items,

4    and also linear footage of branch circuiting or feeder

5    circuiting.

6    Q.   How are you determining those footages of the various

7    items?

8    A.   We do a manual takeoff of the drawings and

9    accounting.  That's what these sheets would indicate.

10             THE COURT:  Mr. Kaplan, could I ask for

11   clarification?  It wasn't clear the temporal sequence

12   here.  Are these sheets, takeoff worksheets, pricing

13   sheets, the quote requests, are they all done prior to the

14   bid?

15             THE WITNESS:  They're done during the bidding

16   period.  So, for example, if we initially got the bid

17   documents, drawings and specifications in October 22nd,

18   21st, we would have that two-week period before the bid

19   date.  These would be developed through the two-week

20   period that we're looking at the documents.

21             THE COURT:  So it's done prior to the submission

22   of the bid?

23             THE WITNESS:  Correct.

24   BY MR. KAPLAN:

25   Q.   And just to show a brief example or two, we have

1    Exhibit 58 which --

2                MR. HUG:  No objection, Your Honor.

3                THE COURT:  Okay.  Exhibit 58 is admitted as a

4    full exhibit.

5                MR. KAPLAN:  Is there an extra set for the

6    witness?

7                THE COURT:  Let me give the witness the actual

8    set and I'll take the copy.

9    BY MR. KAPLAN:

10   Q.   Now, what you had at bid time was this one?

11   A.   Yes.

12               MR. KAPLAN:  This is just reduced in size,

13   Your Honor, for the ease of everybody looking at it.

14               THE COURT:  What is Exhibit 58?

15   BY MR. KAPLAN:

16   Q.   Mr. Madore, what is Exhibit 58?

17   A.   These are the electrical drawings that would show the

18   addition and renovations to the school.

19   Q.   So this is what you -- how did you use this for

20   preparing the bid?

21   A.   Well, just in a brief summary, we do estimating in a

22   systematic approach, meaning there's a process involved

23   when we get the bid documents.  Initially, we review the

24   front-end specifications and then would assign the

25   drawings to estimators.  From there we would start out

 1    with a phasing takeoff, lighting, wire and devices, switch

 2    gear, feeders, and quantify those items early in the bid

 3    based on these drawings that you see in front of you.

 4    Q.    Okay.  And what's the system you use?

 5    A.    Typically, we would start out with lighting counts

 6    being the first item to take off.  The reason for that is

 7    we know we need to receive vendor pricing on those and we

 8    want to get those out to those companies as early as

 9    possible.

10          Then from there we would go to switch gear, which is

11    another item that we would seek vendor pricing for.

12    Q.    All right.  And if I can just draw your attention to

13    drawing EL1.2.  These are -- that's about ten in from the

14    back.  The indication's in the lower right-hand corner.

15              THE COURT:  That's Exhibit 58 again?

16              MR. KAPLAN:  Yes, sir.

17    A.    I'm there.

18    BY MR. KAPLAN:

19    Q.    What does this particular drawing show, Mr. Madore?

20    A.    This drawing is a lighting drawing.  It would

21    identify the types and quantity of light fixtures in this

22    particular area of the project.

23    Q.    And how did your department use this drawing to

24    formulate your bid?

25    A.    We would use -- in the system that we use, we would

1    use a yellow highlighter to identify the fixtures and the

2    types, and we would count them and quantitatively list

3    them on a sheet.

4    Q.   Okay.  And in terms of the types of fixtures that are

5    on that sheet, is there another drawing that shows exactly

6    what types of fixtures you're dealing with?

7    A.   Yes.  There would be another sheet that would list

8    the types of fixtures used for this project.

9    Q.   Okay.  And if I draw your attention to E52, which is

10   a couple pages before that, what's that show you?

11   A.   That is the light fixture schedule for the project.

12   The fixtures are identified by type.  Normally, it's

13   alphabetic for light fixtures, it would identify the

14   manufacturers and basic description of the light fixtures.

15   Q.   And then if I could show you a drawing EP1.3, which

16   is towards the back.  That series is in the back, EP1.3.

17   A.   Yes.

18   Q.   As an example, what does this page show you?

19   A.   This is a power drawing, it identifies the wiring

20   devices.

21   Q.   What does that mean?

22   A.   Wiring device is your basic receptacle outlet that

23   you would see within a room.  It would also identify

24   locations of panel boards on the project.

25   Q.   Okay.  And how do you use this type of sheet in

1    preparing your bid?

2    A.    In the same way that we do light fixtures, we would

3    go to a symbol list that's provided with the bid documents

4    that would identify each symbol listed on the drawings and

5    we would quantitively take those off.

6    Q.    So that's how you're counting devices, fixtures,

7    different elements of the job?

8    A.    Yes.

9    Q.    When you talked about linear footage of materials a

10   little earlier, what type of work does that apply to?

11   A.    The linear footage is also referred to as either

12   feeders or branch circuiting.  That's the inner connection

13   of the equipment and wiring devices and light fixtures.

14   Q.    Okay.  And in this kind of school, what are the types

15   of installations ECI ended up doing that involved linear

16   footages?

17   A.    Well, it would be any of the wiring, pipe and wiring.

18   So depending on the specifications, you may have different

19   types of cabling and/or conduit.

20   Q.    What's conduit?

21   A.    Conduit is a piece of metal raceway that we install

22   wires in.

23   Q.    Conduit goes in and then the wires go inside?

24   A.    Correct.

25   Q.    What information are you putting into your program to

1  determine labor hours to bid the job?

2  A.   They would be quantity materials.  For instance, we

3  talked about the light fixtures, we'd have a total

4  quantity of light fixtures for each type.  We would input

5  those types, establish what they were, and the system

6  would provide labor unit for those items, to install that

7  fixture.  It also would be the same for wiring devices

8  and/or any branch conduit required for the project.

9  Q.   Okay.  I want to go back on that point to your bid

10  documents at Exhibit 2.  And there is a lengthy 43-page

11  segment toward the back, it says Cost Codes Report, page 1

12  of 43, goes through 43, it's got ECI logo in the upper

13  right corner?

14  A.   Yes.

15          THE COURT:  This is Exhibit 2?

16          MR. KAPLAN:  Yes, sir.

17          THE COURT:  I have at the end of Exhibit 2

18  IntelliBid documents.

19          MR. KAPLAN:  Yes.  And if you keep going a

20  little further toward the front, it's a 43-page series.

21  Lower right-hand corner it says page 1 of 43, 2 of 43.

22          THE COURT:  Okay.  What page are you on there?

23          MR. KAPLAN:  At the beginning, 1 of 43, please.

24          THE COURT:  Great.  Okay.  You can continue.

25          MR. KAPLAN:  Thank you.

```
 1   BY MR. KAPLAN:
 2   Q.   This 43-page document, what is this?
 3   A.   This is a summary of the materials and labor that we
 4   had taken off.
 5   Q.   Okay.  It's dated October 28, 2009.  Is that when it
 6   was prepared?
 7   A.   Yes.
 8   Q.   This was for the Kelly Middle School bid?
 9   A.   Yes.
10   Q.   If you could just -- I don't want to go through page
11   by page, but sample pages.  The first page, what's being
12   shown there, Mr. Madore?
13   A.   The first page is identifying the fixture types.
14   Q.   Okay.  And then you have quantity in a column there?
15   A.   Correct.
16   Q.   That's the number of those items; is that correct?
17   A.   Yes.
18   Q.   And there's no labor units for those particular
19   items.  Why is that?
20   A.   It's only identifying a designation.  There's no --
21   of a fixture type.
22   Q.   Okay.
23   A.   So it's an assembly, heading of an assembly.
24   Q.   The labor for installing those items, is that also
25   set forth in this 43-page document?
```

1   A.   Yes, it is.

2   Q.   So let's get to where we have some labor entries.

3   Perhaps if we go to page 3 of this document.  Could you

4   just describe how the labor -- on the right-hand column,

5   it says labor.  And there's several entries there.  The

6   one on the right says total, result total in that column.

7   It's got different numbers going down.  What are those?

8   A.   That would be the labor hours used to install the

9   quantity of materials entered for that particular line.

10  Q.   Okay.  So if we go just, for example, to sort of in

11  the middle, it says Item 923.  923, W2 plate to each, 1

12  unit, and then it says 2 on the right side.  If you would

13  interpret what those items mean?

14  A.   Well, there's a -- the W2 plate is probably defining

15  a specific piece of material on the job.  With a quantity

16  of 2 that we found in the documents.  And the 1 hour under

17  unit identifies how long it would take to do that single

18  plate.  And we had a quantity of 2 for this particular

19  item, totals out to the total.

20  Q.   Of 2 man hours?

21  A.   Two man hours.

22  Q.   So your bid would carry 2 man hours for that

23  particular item?

24  A.   Yes.

25  Q.   The unit for this one was 1.  If you go down, there's

1   various items, some are 1, some 2, some 1.5, some are .5.

2   Obviously they vary as indicated.  Where do those units

3   come from?

4   A.   These units are national averages that have been

5   developed by several different organizations that track

6   the installation time.

7   Q.   And ECI was using these for the bid on this job?

8   A.   Yes.

9   Q.   How do you -- at the time you were chief estimator at

10  ECI, did you vary these units or adjust them in different

11  ways?

12  A.   Yes.

13  Q.   How did that work?

14  A.   It would occur two different ways.  The estimating

15  software program that we used has calculations or methods

16  within it that could adjust labor differently, higher or

17  lower, depending on quantitative items.  You know, a

18  larger quantity of, say, feeder wire would take less labor

19  units than installing one, because it's being done at the

20  same time.  So productivity is better.  We would also

21  track in-house ourselves knowing what our labor could

22  perform on jobs, on past projects, and we may adjust

23  certain items to fit to our company in a competitive

24  nature.

25  Q.   On this particular job, do you remember making any

1    adjustments to your standard labor units that were used

2    for bidding?

3    A.    Not specifically, but I would say we probably did.

4    Q.    What kinds of things for this type of job would have

5    affected the labor units?

6    A.    Well, we would look at, you know, large quantities of

7    materials and methods of -- we had the ability to do

8    prefabrication within our office which allowed us to use

9    what we're going to say is a more competitive environment

10   to make assemblies for these jobs.

11   Q.    So on Kelly, what kind of thing would have been

12   prefab?

13   A.    We would prefab --

14          MR. HUG:  Objection, Your Honor.  I think the

15   question, as phrased, it's speculation.  He's asking what

16   would you have done.  I think the issue is what he did do.

17          MR. KAPLAN:  Fair enough, I'll rephrase.

18   BY MR. KAPLAN:

19   Q.    Do you recall whether you anticipated doing prefab on

20   Kelly?

21   A.    Yes, we would have done prefab on Kelly.

22   Q.    What items did you anticipate doing prefab for?

23   A.    Those would be inwall rough assemblies in either a

24   gypsum wall or masonry walls.

25   Q.    Could you explain a little more?

1    A.   Basically take a wiring device receptacle.  Within

2    that you would have a box, a ring, a length of conduit

3    going up the wall.  And that install would be done with

4    the mason at the same time their block walls were going

5    up.

6    Q.   So you would bring some of these pieces preassembled

7    to the site?

8    A.   Yes, we would.

9    Q.   That preassembly would occur when?

10   A.   That would occur in our prefab shop back at our

11   office.

12   Q.   Okay.  Public school jobs are prevailing wage jobs?

13   A.   Yes.

14   Q.   Could you explain to the Court what that is.

15           MR. KAPLAN:  Your Honor, if you know what

16   prevailing wage is, I don't have to do this.

17           THE COURT:  Go ahead and explain this.

18   A.   Prevailing wage is a set wage and benefits package

19   that we're required to carry in our proposal and pay our

20   workers.

21   BY MR. KAPLAN:

22   Q.   For public --

23   A.   On the site.

24   Q.   For public project?

25   A.   Right.

1  Q.   If you're doing work in-house at your shop, such as

2  prefab, do you have to carry prevailing wage rates for

3  that work?

4  A.   No, we don't.

5  Q.   Is there a significant difference between in-house

6  rates and on-site rates for the same workers?

7  A.   Yes.

8  Q.   What's the difference?  Scale or percentage?

9  A.   It would be variable.  I couldn't specifically

10  identify how much.

11  Q.   It's significant?

12  A.   It's significant, yes.

13       THE COURT:  One is less than the other?

14  A.   Yes.  In our prefab division, we would not have to

15  pay the full benefit package that was stipulated.  We also

16  wouldn't have to pay the full wages that were stipulated

17  in the bid documents.

18  BY MR. KAPLAN:

19  Q.   So an electrician working on site in a prevailing

20  wage job at this time, typical wage and benefits package

21  was what?

22  A.   Probably up in the mid-60-dollar range.

23  Q.   And then in the shop, what was the comparable rate?

24  A.   It would probably be, with benefits and everything,

25  probably in the mid-20 range.

1    Q.   So it's about half or less?

2    A.   Yes.

3    Q.   All right.  And throughout, just back where we were

4    with the various items, if you go through, you have 43

5    pages, most of which have these labor entries that go next

6    to the various items.  Is that how you compile the

7    man-hour total for the bid?

8    A.   Yes.  This is an item summary of all the components.

9    When we're doing entry, it may be an assembly that we're

10   putting a quantity to.  And then is just a breakdown of

11   that assembly.

12   Q.   Okay.  And if we go back within this same document

13   but we go back to the beginning of it, Exhibit 2, the

14   second page of the bid summary now.  Could you just

15   explain, we've gone through how you generated the man

16   hours versus the various items that go into the job.  How

17   is that reflected in this second page, this bid summary

18   sheet?

19   A.   This sheet provides you a total of the man hours.

20   Q.   And where is that, is that in the labor hours column?

21   A.   It's in the labor hours column.

22   Q.   And at the bottom, that total of 22,383, is that what

23   you actually bid for labor hours for this project?

24   A.   Yes.

25   Q.   And again, is that based on that summary of

```
 1   information we just went through?
 2   A.   Yes.
 3           THE COURT:  That's based on the cost code
 4   report?
 5           MR. KAPLAN:  Yes.
 6           THE COURT:  I have a question about some of the
 7   cost code report results for labor that show -- for
 8   example, on page 5 of 43, just trying to understand the
 9   document, it shows a number of line items in which there's
10   a part such as an enclosure hole punch or drill hole
11   patch, but there's no corresponding entry for labor.  So
12   I'm trying to figure out why it is that sometimes there's
13   labor required for the W2 plate but none for a whole bunch
14   of other apparent parts.
15           THE WITNESS:  These would be headings of
16   assembly within the program.  So the heading would not
17   have a labor unit or material unit associated with it.
18   The components would show up later in the cost code
19   summary.
20           THE COURT:  So, for example, three-quarter drill
21   hole and patch, would it have components otherwise
22   accounted for?
23           THE WITNESS:  Correct.
24   BY MR. KAPLAN:
25   Q.   And just staying with this for a moment, I want to
```

1    ask you about a couple of items that I just want to take

2    note of since we're in this document, it would be easier

3    to do it now.  I'm just going to pick out a number of

4    things here.  Actually, I'll do this later, I'm sorry.

5    Withdraw that.

6         All right.  So back to the bid summary sheet.  So

7    you've got the man hour totals.  Was there any -- at the

8    bottom of that bid summary sheet, again there's a box with

9    different entries.  You have a labor rate cost, $55.20,

10   that's down in that left-hand grid at the bottom.  What

11   does that mean or what does that refer to?

12   A.   Those would be the wages that we would apply to the

13   total man hours.

14   Q.   Is that a composite rate?

15   A.   That would be a composite rate.

16   Q.   What goes into that?  What various components go into

17   that composite rate?

18   A.   Composite rate is percentage of foreman time,

19   licensed electricians and apprentices and/or laborers on a

20   project.

21   Q.   How about your shop people who would be doing prefab,

22   does that come into that as well?

23   A.    Indirectly it would.  Not directly.

24   Q.   What do you mean by that?

25   A.   We probably refer to our shop time more from an

1  apprentice standpoint to make up that composite rate.

2  Q.   Okay.  Did you adjust that rate in 2009 for public

3  school bidding or was that something that was more

4  standard?

5  A.   We standardized doing composite rates.

6  Q.   Okay.  So, for a period of time when you're doing

7  Connecticut public school jobs, you're using the same

8  standard rate for bidding?

9  A.   For prevailing wage rate, use typically the same

10  method to come up with composite rate.

11  Q.   Were you successfully getting jobs at this time on

12  public school bidding?

13  A.   Yes.

14          MR. HUG:  Objection, Your Honor.

15          THE COURT:  Basis?

16          MR. HUG:  Yes, Your Honor.  I don't think -- I

17  want to be careful, he's not disclosed as an expert.  He's

18  not disclosed with anything other than to do with the bid.

19  So I worry that -- I worry that we're surreptitiously

20  getting into sort of his expert analysis how they compare

21  to other projects.  So maybe it's a little premature

22  objection, but that's the reason for my objection.

23          THE COURT:  As I understand it, the questioning

24  is concerning the basis for the $55.20?

25          MR. KAPLAN:  Yes.  I asked the witness were they

1  successful using this rate at other times.

2          THE COURT:  That's a personal knowledge

3  question, I think.

4          MR. HUG:  I think what it's attempting to do,

5  Your Honor, is surreptitiously bring in expert testimony

6  that is somehow reasonable and that somehow validates

7  their estimate.

8          THE COURT:  As I understand, the question is

9  posed simply whether that's the same rate that's been used

10  in other projects.  I guess I'll overrule it for now, but

11  keep on the lookout for any smuggled expert testimony.

12          MR. HUG:  Thank you, Your Honor.

13  BY MR. KAPLAN:

14  Q.  Was ECI winning jobs using that -- public school jobs

15  using that rate at this time?

16  A.  Yes, we were.

17  Q.  When ECI did jobs --

18          THE COURT:  Can I ask, is that rate essentially

19  what we talked about, that's the prevailing wage rate

20  composited with the non-prevailing wage rate that would

21  apply, for example, for prefab?

22          THE WITNESS:  It is the prevailing wage rate

23  with a composite of foremen, electricians and apprentices.

24          THE COURT:  So that's the prevailing wage rate.

25  That does not take account of the lower wage rate that you

1    said applied.

2            THE WITNESS:  Correct.

3    BY MR. KAPLAN:

4    Q.   Basically, if you did work at 50 percent of

5    prevailing wage, you'd be picking up money on the swing,

6    correct?

7    A.   Yes, we could.

8    Q.   But you didn't figure that in specifically?

9    A.   No.

10   Q.   As chief estimator for -- was it ten years at ECI?

11   A.   Last seven years.

12   Q.   Seven years, sorry.  Did you track ECI's performance

13   on jobs?

14   A.   Yes.

15   Q.   Going forward for bidding purposes on new jobs?

16   A.   Yes.

17   Q.   Did that go into your labor rates, how you viewed

18   your labor rates?

19   A.   Yes.

20   Q.   Did it go into how you viewed your labor units, all

21   those various units for the various items?

22   A.   Yes.

23   Q.   Okay.

24   A.   It's a competitive market.  So in order to stay with

25   our competition and win work, we would have to evaluate

1    our own people and performance on projects.

2    Q.   And you did that?

3    A.   Yes.

4    Q.   Now, there's also an entry for labor hours per square

5    foot still on that bid summary sheet.  It says .16, that's

6    a little -- couple lines below that rate.  What does that

7    mean, Mr. Madore?

8    A.   That would tell you how many man hours per square

9    foot was estimated for this project.

10   Q.   So that's just basically a mathematical function of

11   square feet and labor hours?

12   A.   Yes.

13   Q.   Okay.  And that .16, how did that fit within your

14   bidding practices for public school construction in 2009

15   at ECI?

16   A.   It fit right within the average of our historical

17   cost data for projects that were similar in nature.

18   Q.   What was that high end and low end that you had at

19   that time for public school construction?

20          MR. HUG:  Objection, Your Honor.  Now we're

21   getting into an area that he's trying to testify that this

22   estimate is reasonable because their other estimates are

23   reasonable.  That's beyond the scope of any disclosure

24   made in this case, including the Rule 26 disclosures.  If

25   those other jobs are relevant to their estimate here, I

1   should have known about them before today.

2           He's here to testify about the bid and what he

3   did in this case.  If they want to start to testify, have

4   this witness testify about our bid and our estimate is

5   good compared to all the other bids we've done and

6   whatnot, not that that actually establishes

7   reasonableness, but still, I don't have anything to

8   cross-examine him on because I've never been given the

9   documents that show these other bids that he's talking

10  about.  So that's why I'm concerned about it.  That was

11  the basis of my earlier objection, and we were going down

12  this road right now.  This also gets back to the motion in

13  limine that we had on this.  That's where this is going.

14  And I object to it on that basis.

15          THE COURT:  All right.  Mr. Kaplan, response?

16          MR. KAPLAN:  Mr. Madore is testifying as to the

17  information in the bid itself, which counsel has had for

18  several years.  And he's talking about the various

19  components.  He's talking about how the bid was done and

20  what the units mean.  And he's entitled, as the chief

21  estimator, talking about what he does, what he did for the

22  company, to explain what the various components of the bid

23  are and how they stand in terms of his normal bidding

24  practices at ECI.  All this goes to show they were doing

25  their normal bidding practices and that these numbers fell

 1   within the normal range of bidding practices that they did

 2   at this time.  Of course, it's expert testimony to some

 3   extent, which is what I responded in my response to that

 4   motion in limine because he's dealing as an expert, but

 5   not in the sense of a detached third-party expert giving

 6   opinions on something he wasn't involved in.  This goes to

 7   the heart of what he did in explaining what it was that he

 8   did and talking about did you adjust the bid, did you not

 9   adjust the bid, why did you adjust it, why did you not

10   adjust it, that's all it's doing.

11           So the question simply was how was this in the

12   range; his answer is it's right in the range.  A follow-up

13   question will explain what that means and I'm off to the

14   next topic.  I'm not getting into some detailed analysis

15   of some other jobs, although it's relevant for the chief

16   estimator to say this is what I look at, this is what

17   we're looking at, this is where it fits in the overall

18   spectrum, this is why we did or did not do something to

19   change this.  I think it's perfectly fair for explaining

20   what he did in context.

21           THE COURT:  Okay.  I'm going to overrule the

22   objection.  I do think it's fair game for the witness to

23   testify concerning the quantities, whether the labor or

24   hard items that had been done with respect to other

25   projects that the witness knows about, based on personal

1    knowledge.  I don't think that that is expert testimony

2    within the scope of the rule.  I think the defense would

3    be the first to claim if these numbers were well out of

4    whack with what ECI ordinarily does, this was a problem

5    with respect to this bid.  And also with the understanding

6    that we're not going to spend a lot of time on what ECI

7    has bid with respect to other projects.

8            Mr. Hug, it's fair game for cross-examination

9    because I'm assuming you're going to say, well, everything

10   ECI has done is somehow unreasonable essentially in terms

11   of what the comparator is here.  But I think he has a

12   basis for it and it is at least relevant.

13           MR. HUG:  Your Honor, I can't do that.  Because

14   now they're going into areas they have produced no

15   documents and information on.

16           THE COURT:  Was there discovery on this issue?

17           MR. HUG:  Sure.

18           THE COURT:  Was there a request that you didn't

19   get documents?

20           MR. HUG:  Well, first of all, Rule 26 disclosure

21   covers it, but yes, there are discovery requests that

22   specifically ask for documents in support of their claim.

23   To the extent he's saying how he put his estimating system

24   together, I understand that to be fair game.  But then

25   when he starts to compare, say, well, this is within the

1    range of all these other projects, that's where I draw the

2    line, Your Honor.  Because I don't have those other

3    projects.  I don't know what they are.  So how he put it

4    together, that's, I understand, fair game.  How does it

5    compare, that crosses the line.  That's the distinction.

6              THE COURT:  I'm just not convinced that that

7    does cross the line.  I think that anybody doing a bid

8    would have to draw upon their experience with respect to

9    what other bids they've done if it's essentially your

10   full-time or close to your full-time job as an estimator

11   for the project.

12             I'm going to overrule that objection and allow

13   you plenty of leeway to cross-examine on the lack of

14   evidence concerning what the prices are or used in

15   connection with other projects.

16             You may proceed, Mr. Kaplan.

17             MR. KAPLAN:  Thank you, Your Honor.

18   BY MR. KAPLAN:

19   Q.   On your summary sheet, Mr. Madore, sticking with the

20   sheet we have in Exhibit 2, is there a calculation of

21   material cost here?

22   A.   On the first page?

23   Q.   Yes.

24   A.   Yes.

25   Q.   Where is that?

 1   A.   It's the second column.

 2   Q.   502,000?

 3   A.   Correct.

 4   Q.   And is that all material or some part of material

 5   cost?

 6   A.   Some part of the material.

 7   Q.   What part is in the $502,000 figure in the material

 8   column?

 9   A.   These items we would consider commodity materials,

10   which would be pipe, wire, boxes, standard materials used

11   on most electrical construction projects.

12   Q.   Okay.  And then specific quoted equipment, is that in

13   a separate column here?

14   A.   Yes, the first column before the material column.

15   Q.   That's 1,639,000?

16   A.   Yes.

17   Q.   So the material total, that's totaled up I think at

18   2,151,000; is that correct?

19   A.   Yes.

20   Q.   And then the bid -- the bid was 3.496?

21   A.   Yes.

22   Q.   It so the rest is the labor component?

23   A.   Correct.

24   Q.   Now, what's a buyout, a material buyout?

25             THE COURT:  I'm going to slow you down there.  I

1    want to understand what the difference between the figure

2    1.639 and the 502.

3    BY MR. KAPLAN:

4    Q.   Mr. Madore, could you explain?

5    A.   The 1.639 would be items that we received quotations

6    on, specific items related to this job only.

7               THE COURT:  From the vendors.

8               THE WITNESS:  From the vendors, correct.

9               Where the materials items are what I'm going to

10   call commodity items, off-the-shelf everyday items that

11   are typical for electrical contract.  Not specific to this

12   particular job, would probably apply to most jobs.

13   BY MR. KAPLAN:

14   Q.   Fixture branch item, which is a large item in the

15   quoted column, $818,000, that is for what?

16   A.   That is for light fixtures only.

17   Q.   Okay.  And then to the right of it, there's an entry

18   of $69,743 that's on the same light item, what is that?

19   A.   That would make up branch circuiting, boxes,

20   components that make up.

21   Q.   And those are the commodities --

22   A.   Correct.

23   Q.   -- that go along with the branch fixtures?

24   A.   Yes.

25               THE COURT:  And then equipment?

1          THE WITNESS:  Equipment would be related to any

2     special needs for like scissors list, man list, staging,

3     those types of items that could be company owned or

4     rental.

5     BY MR. KAPLAN:

6     Q.    And subcontract had just a $2400 entry.  What was

7     that for?

8     A.    It's under distribution equipment.  Without getting

9     deeper into the bid summary, it's probably for testing

10    services related to that equipment.

11    Q.    At the outset, did ECI intend on using a lot of

12    subcontractors for this work?

13    A.    No, that would be the only subcontractor we intended

14    to use.

15    Q.    Okay.  I remember where I was.  A material buyout,

16    what does that mean, Mr. Madore?

17    A.    A material buyout, I guess essentially, in layman's

18    terms, would be a sale price on an item in a store.  For

19    instance, you would have a list price for light fixtures

20    that would be submitted at the time of the bid.  And then

21    afterwards if you were lucky enough to be awarded the

22    project, you would go out and procure the materials for

23    that, and in some cases you would receive a reduced cost

24    for that material than you had at the time.

25    Q.    So in this bid sheet, you have 0 in the profit column

1    down in the right, there's a 0 percent profit that's

2    assigned.

3    A.    Yes.

4    Q.    First of all, what does that refer to?

5    A.    That's an area where companies would typically put a

6    percentage markup of their bid for the project.

7    Q.    And on this bid, you carried zero profits?

8    A.    Yes.

9    Q.    Why was that?

10   A.    Because we felt comfortable enough with our

11   historical data on similar projects and where we felt we

12   could buy out the materials and how our labor productivity

13   would be.

14   Q.    So how would that have translated into an anticipated

15   profit if you got the job at this $3.496 million bid

16   price?

17   A.    Well, based on past history of other projects that

18   are similar in nature, we would have a percentage of what

19   we bought the materials for.  And we could use that as an

20   evaluation tool on whether or not we wanted to put

21   overhead and profit within a job or use those buyouts as

22   our overhead and profit.

23   Q.    And on this job, what were you anticipating as a

24   percentage on material buyout?

25   A.    There is no set percentage on a material buyout.

1  Q.   Did you have a range in mind when you did this?

2  A.   Yeah, I would have a range in mind.  Probably 10 to

3  20 percent.

4  Q.   That would be 10 to 20 percent of what?

5  A.   Of the quoted materials and commodity materials.

6  Q.   So that would be of the 2.1 million figure?

7  A.   Yes.

8  Q.   And is that a number you anticipated would actually

9  be realized that's in addition to -- well, strike that.

10       How would that be realized in the course of a

11  project?

12  A.   That would be realized after award of the project

13  during the buyout of the materials.  So it would be early

14  in the project, within the first three to four weeks of

15  being awarded the project.

16  Q.   Okay.  And who does the buyout or who did the buyout

17  for ECI on this project?

18  A.   Project manager Cliff Clauson would be an essential

19  part of that buyout.

20  Q.   Who did he work with in the buyout process?

21  A.   We had a purchasing agent at that time, they would be

22  involved.

23  Q.   In-house purchasing?

24  A.   Yes.  And then myself as senior estimator would have

25  some involvement with that, possibly.

1    Q.   Did you continue involvement in this job after the

2    bid was submitted and awarded to ECI?

3    A.   I would say yes, initially, on the buyouts.

4    Q.   What happened with the buyouts?

5    A.   We purchased materials within, you know, what we

6    historically thought we would for similar projects.  We

7    received money.

8    Q.   By way of savings?

9    A.   Yes.

10   Q.   Do you remember what the percentage buyout was on

11   this job?

12   A.   I believe it was somewhere in the range of

13   15 percent.

14   Q.   Okay.  So that would be 15 percent of the 2,151,000?

15   A.   Yes.

16   Q.   That would go to the bottom line?

17   A.   Yes.

18   Q.   But it's not indicated as profit on this?

19   A.   Correct.

20   Q.   And in fact that's what happened with the material

21   buyout here?

22   A.   I believe so, yes, if I recall.

23        MR. KAPLAN:  And Mr. Clauson will testify more

24   specifically to that issue, Your Honor.

25        THE COURT:  Okay.

1          MR. KAPLAN:  I may have a moment, Your Honor.

2    I'm just checking my notes.

3              (Pause.)

4    BY MR. KAPLAN:

5    Q.   If we could go to Exhibit 1 in this book, which was

6    Book I of III, the invitation to bid in electrical

7    specification.  I want to show a few things to you,

8    Mr. Madore.

9        Now, you reviewed these documents in preparing the

10   bid?

11   A.   Yes.

12   Q.   Okay.  And if I can direct your attention to a couple

13   entries here, Article 18, which is -- well, there's a

14   table of contents.

15       My apologies, Your Honor, I really should have

16   independently numbered these.

17       Eight or nine pages after the table of contents ends,

18   there's Article 18 Construction Schedule?

19          THE COURT:  I have it, yes.

20   BY MR. KAPLAN:

21   Q.   Do you have that, Mr. Madore?

22   A.   The schedule itself?

23   Q.   Article 18, first of all.  It's about eight pages

24   after the table of contents.  I'm sorry.

25   A.   Could you identify the document for me, Mr. Kaplan?

 1   Q.   Tab 1, Article 18.  Do you have that?  It's about

 2   seven or eight pages after the table of contents.

 3   A.   Yes, I do.  Thank you.

 4           MR. HUG:  I'm there, Construction Schedule.

 5           MR. KAPLAN:  Yes.

 6   BY MR. KAPLAN:

 7   Q.   Now, this states:  18.1, The construction schedule is

 8   provided in Division 1, Section 01110 of the bid

 9   documents.  The following criteria should be in

10   preparation of the bidder's proposal.  Each contractor

11   shall cooperate with the construction manager in adhering

12   to the construction schedule.

13        Is this something you noted in preparing the bid?

14   A.   I would have read this and been aware of it.

15   Q.   A couple pages past that, just about five pages past

16   that it says page 4 of 18 and there's paragraph Q towards

17   the bottom of page 4 of 18.  Are you there, Mr. Madore?

18   A.   Yes, I am.

19   Q.   There's a couple entries here I want to ask you

20   about.

21        In paragraph Q of page 4 of 18, the first sentence,

22   Subcontractor shall execute and complete its work in

23   phases.

24        What did that refer to, Mr. Madore?

25   A.   That was based on the construction schedule, how the

1    work would be performed on the job.

2    Q.    Did that have -- just that idea of constructing the

3    work in phases, did that affect the way ECI prepared its

4    bid for this project?

5    A.    We would evaluate it.

6    Q.    Do you recall -- what factors did you evaluate?

7    A.    We evaluate all jobs based on the construction

8    schedule in order to set manpower requirements that may be

9    needed, tooling, things of that nature.

10   Q.    Okay.  And then it says in the next sentence:   A

11   subcontractor will be required to follow the construction

12   manager's critical path milestone schedule.

13         There was a schedule attached, correct?

14   A.    Yes.

15   Q.    And we'll get to that in a moment.

16         Is that unusual for bidding these kind of public

17   school jobs in 2009 to have a CPM schedule part of the bid

18   documents?

19   A.    No.  It's standard practice to have one.

20   Q.    As you said, I think you said you worked with a

21   hundred of those before?

22   A.    A hundred or more.

23   Q.    And if we then go to page 9 of 18 in the same

24   sequence?

25   A.    Yes.

1   Q.   At the top, number 2, it says, Time is of the

2   essence.  See that?

3   A.   Yes.

4   Q.   This, again, refers to the project schedule.  And it

5   says -- it shows overall durations of activities and

6   project completion dates that must be maintained and met?

7   A.   Yes.

8   Q.   Is that unusual for a CPM schedule?

9   A.   No.

10  Q.   And then the next page, page 10 of 18, number 11, it

11  says Construction Schedule.  Do you see that?

12  A.   Yes.

13  Q.   It says:  A critical path construction schedule has

14  been developed for this project.  Subcontractor will base

15  its bid for this project on the Critical Path Milestone

16  contained in the project schedule Section 01110.

17       What are critical path milestones?

18  A.   Critical path milestones are activities that would

19  hold the most importance on a project --

20  Q.   Okay.

21  A.   -- to keep it within its schedule.

22  Q.   Okay.  And it also says:  The schedule will be

23  updated by the construction manager at least once a month

24  and distributed to all subcontractors.

25       Was Pike acting as the construction manager in this

1    project?

2    A.   Yes, they were.

3    Q.   Then if we go to the schedule, which is about 20

4    pages further, and there's a cover page, it says

5    Section 01110, and then there's the schedule itself which

6    goes for numerous pages.

7    A.   Yes.

8              THE COURT:  I'm not there.  Give me a little

9    more.

10             MR. KAPLAN:  It looks like this (indicating) and

11   has about 30 or 40 pages.

12             THE COURT:  After the section on additions and

13   renovations?

14             MR. KAPLAN:  Yes.  It's towards about the middle

15   of that tab, after where we were.

16             THE COURT:  All right, I've got that.

17             MR. KAPLAN:  All right, thank you, sir.

18   BY MR. KAPLAN:

19   Q.   If you go to the first page, Mr. Madore.

20   A.   Yes.

21   Q.   When was this project supposed to start, based on

22   this bid schedule?

23   A.   November 5.

24   Q.   And when did ECI get the award, do you recall?

25   A.   The job was bid, I believe, October 28.

 1   Q.   Do you remember when ECI actually entered into a

 2   contract for the job?

 3   A.   I do not recall.

 4   Q.   We have that information.  Let me just dig it out

 5   since I mentioned it.

 6        If we go to Tab 10, which I would offer.  This is a

 7   letter from Pike to ECI dated November 19th.

 8              THE COURT:  Any objection?

 9              MR. HUG:  No objection, Your Honor.

10   BY MR. KAPLAN:

11   Q.   That shows an intent to award the contract to ECI?

12              THE COURT:  Plaintiff's Exhibit Number 10, full

13   exhibit.

14   A.   The date on that was?

15   BY MR. KAPLAN:

16   Q.   November 19th letter to ECI.

17   A.   Yes.

18   Q.   And then if we go to Exhibit 12, which is the part of

19   the subcontract Exhibit AA, which I would offer.

20              THE COURT:  Objection?

21              MR. HUG:  No objection, Your Honor.

22              THE COURT:  Plaintiff's Exhibit 12, full

23   exhibit.

24   BY MR. KAPLAN:

25   Q.   This is actually the part of the contract documents

1    dated November 25, '09.  I think, if I recall, these were

2    actually executed at or about that time.  Just to put some

3    dates into play here, Your Honor.

4        The very back page of Tab 12 is dated, signature

5    dates of December 8, '09 and December 11, '09, that's when

6    ECI executed the contract, Mr. Madore?

7    A.   Yes.

8    Q.   We'll get back to that briefly.

9        Going back to that bid, the schedule that was with

10   the bid in Exhibit 1, this is paginated -- the schedule is

11   paginated Sheets 1 through 44.  I just want to go to Sheet

12   15 of 44 in the bid schedule.

13   A.   Yes.

14   Q.   This shows Phase 3 renovation.  When does it show --

15   let me see.

16       Go to page 16, my mistake.  This is all -- is this

17   all the Phase 3 activities that are starting to be listed

18   here, Mr. Madore?

19   A.   It appears so, yes.

20   Q.   Are those P3, does that indicate Phase 3?

21   A.   Yes.

22   Q.   If we go down to P3AD-100, which is on page 16, it's

23   towards the bottom there in the column, it says Start

24   Phase 3 June 28?

25   A.   Yes.

1    Q.   Is that when the bulk of your electrical activities

2    were supposed to start for Phase 3 on this job?

3    A.   That's where Phase 3 would begin work for all

4    contractors.

5    Q.   In terms of sequences of work, I'm not going to go

6    through a lot in here, how did you review this when you

7    were preparing the bid?

8             MR. HUG:  Objection, Your Honor.  There's no

9    foundation he reviewed it himself.  He did testify he

10   oversaw it.

11   BY MR. KAPLAN:

12   Q.   Did you review the schedule in preparing the bid?

13   A.   We would review it in preparing the bid.

14   Q.   Do you look at it?

15   A.   Yes.

16   Q.   What were you looking for for bidding purposes?

17   A.   We would look for start and completion dates for the

18   project.

19   Q.   How about internally, different phases for different

20   activities, what did you look for?

21   A.   Potentially look for different areas where we may

22   have additional scopes of work or manpower requirements or

23   material requirements.

24   Q.   When you say additional, what do you mean by that?

25   A.   Well, early in the testimony, you mentioned summer

1    slammer type of work.

2    Q.    Yes.

3    A.    That would be a lot of work that's done in a shorter

4    period of time or shorter duration.

5    Q.    For a school job to start a phase on June 28, is that

6    a normal thing to start a chunk of work at the end of the

7    school period?

8    A.    Yes, it is.  School ends second or third week of

9    June.

10   Q.    And in looking at -- was there anything that caught

11   your eye here when you were viewing it for bid purposes

12   about this schedule, anything unusual or different?

13   A.    No.  From a sequence of operations of tasks to be

14   performed, no.

15   Q.    How about the durations for doing certain work,

16   electrical work obviously?  Anything unusual there that

17   you saw?

18   A.    No.

19   Q.    Okay.  When you looked at this schedule, was there

20   anything that caused you to adjust your labor hours in any

21   way?

22   A.    No, there would be no reason to.

23   Q.    Why do you say that?

24   A.    This is a standard project for us.  We've done

25   hundreds of them.  And have historical cost data to

1    support what we accomplished.

2    Q.   Now, Pike, you said -- I don't think it's in dispute

3    that Pike was construction manager for this project.  Were

4    you aware of that at the time you bid this job?

5    A.   Yes.

6    Q.   Had you ever worked with Pike before?

7    A.   I believe I had with McPhee when I worked for McPhee.

8    Q.   How about with ECI?

9    A.   No.

10   Q.   In terms of administering the schedule, the way that

11   the project was actually run and tasks were performed, who

12   was responsible for that?

13   A.   Pike would be responsible for that.

14   Q.   In their capacity as construction manager?

15   A.   Yes.

16   Q.   Do you know who developed this schedule?

17   A.   I don't know who developed it.  One of the people --

18   the contact people that I was dealing with was Mel

19   Strauss.

20   Q.   And he was what?

21   A.   I believe he was project manager.

22   Q.   Did you have any discussion with Pike prior to the

23   award of the job to ECI?

24   A.   We had several scope reviews.

25   Q.   Were you involved in any meetings?

1   A.    Yes.

2   Q.    Do you recall what -- this was before the job was

3   awarded to ECI?

4   A.    Correct.

5   Q.    After bid and before the award?

6   A.    Yes.  I don't know if you recall, we were not low

7   bidder on this project.

8   Q.    I'm going to get to that in a minute.

9         And do you remember the nature or substance of your

10  discussion with the Pike folks in this pre-award?

11  A.    A standard conversation would have been to go through

12  the electrical scope of work, which is somewhere within

13  your documents here we briefly looked at, it would

14  basically give a description of the work that would be

15  required by us, it would also include the schedule.  And

16  we did have those conversations.

17  Q.    You did personally?

18  A.    Yes.

19  Q.    Do you recall who you met with?

20  A.    Yes, Mel Strauss.

21  Q.    Anybody else you recall?

22  A.    There were other people in the room, I don't recall

23  who.

24  Q.    Did anything unusual or extraordinary come up in

25  those discussions?

```
 1   A.   No.

 2   Q.   Any particular aspect of the schedule that Pike

 3   pointed out to you?

 4   A.   We had talked about the schedule because of the

 5   phasing and the work involved at certain periods of times.

 6   And just, you know, overall comfort level of Pike and ECI

 7   in accomplishing these.

 8   Q.   Any problems arise or anything that stands out to

 9   you?

10   A.   Not based on the schedule that was provided at bid

11   time.

12   Q.   Okay.

13             THE COURT:  May I ask:  The schedule, you mean

14   the one we just looked at in the bid documents?

15             THE WITNESS:  Yes.

16             THE COURT:  And I'll just ask also on the bid

17   documents on Sheet 15 and 16, it looks like on Sheet 15

18   there's -- it starts with entries for Phase 3 renovation.

19   But then in the middle of 16 there's an entry 28 June for

20   start Phase 3.  I'm wondering what's the difference.

21             MR. KAPLAN:  I probably could have Mr. Clauson

22   get into that a little more.

23   BY MR. KAPLAN:

24   Q.   Mr. Madore -- without testifying, which I think --

25             THE COURT:  I can wait on that.  I was curious.
```

1          MR. KAPLAN:  Maybe I could help.

2    BY MR. KAPLAN:

3    Q.   Mr. Madore, if we start at page 15, there's different

4    descriptors, P3LI, we have a number of those, and then

5    P3M, and then next page P3AD.  Do you know what those

6    different descriptors refer to?

7    A.   I don't know specifically what those activity IDs

8    account for.

9    Q.   Are they areas?

10   A.   I would assume, in looking at the items in the

11   activities, that they're different areas or rooms within

12   that particular phasing.

13   Q.   And just the layout of this, if we go to page 16,

14   just looking at P3AD, says Start Phase 3.  And then on the

15   right side in the calendar part, there's different

16   descriptions.  What do those describe?  Like the first

17   line, demolition under Start Phase 3.  P3AD demolition,

18   and it's got an entry of June 28 to June 29, what does

19   that mean?

20   A.   That's the duration to perform the demolition in that

21   particular area.

22   Q.   Okay.  And then, just in that area, are all these

23   items listed in sequence; is that the way this runs?

24   A.   Typically, you would do them in sequence as to how

25   the work would be performed.

1  Q.   All right.  And then you get to the next page where I

2  think the first item that says electrical is P3CL-280.  Do

3  you see that on page 17 about halfway down, says

4  electrical overhead rough-in?

5  A.   Yes.

6  Q.   Okay.  Does all the other stuff going on in that

7  area, is that scheduled to occur prior to that activity,

8  that electrical rough-in activity?

9  A.   Some of them will take place prior to us performing

10 overhead electrical and then some items will also be done

11 in construction at the same time.

12 Q.   But it's based on the timing?

13 A.   It's based on the timing ahead of it, yes.

14 Q.   So you have basically timing and duration?

15 A.   Correct.

16 Q.   That's set forth in the schedule?

17 A.   Yes.

18 Q.   And sequencing?

19 A.   Yes.

20 Q.   Now, staying on page 17, you have the item we just

21 looked at was electrical overhead rough-in and has July 3

22 to July 10 period of time.  Do you see that?

23 A.   Yes.

24 Q.   And then --

25              THE COURT:  And to be clear, this is Sheet 17 of

1  44 in Plaintiff's Exhibit Number 1.

2          MR. KAPLAN:  Yes, sir.  Thank you.

3  BY MR. KAPLAN:

4  Q.   If you look above that, it says about 12 lines up or

5  so it says P3CL-230 interior CMU.  What does that refer

6  to?

7  A.   That would be the interior block walls, scope of work

8  performed by another contractor.

9  Q.   Okay.  Now, for those two items, is there a

10 relationship between those two that I just pointed out to

11 you?

12 A.   Yes.

13 Q.   What is that relationship?

14 A.   Well, any inwall electrical rough-ins would have to

15 be done within that same period of time and/or any rooms

16 constructed of CMU would have to be completed.

17 Q.   What's CMU?

18 A.   It's concrete blocking.

19 Q.   Block walls?

20 A.   Block walls.

21 Q.   And you had work to do within the block walls of this

22 job?

23 A.   Yes, we would.

24 Q.   What was that?

25 A.   Inwall rough-in.  So boxes, conduit within those

 1    walls.

 2    Q.   So how does that interface with the mason actually

 3    building a wall?  In this area he's going to build a wall,

 4    you're going to put your inwall roughing in, what's the

 5    coordination that goes on?

 6    A.   You would work in conjunction with the mason at that

 7    time to get your equipment in the walls.

 8    Q.   Can you do it when he's finished or it happens while

 9    he's building?

10    A.   It can be done afterwards, but typically when you're

11    constructing a new wall like this, you would want it

12    within the wall.

13    Q.   Was that the --

14    A.   That was the intent of the project.

15    Q.   Was there a lot of masonry wall on this job?

16    A.   I believe there was a mixture of masonry wall and

17    gypsum wall.

18    Q.   What happens with the schedule if the masonry wall is

19    not done at the time it's scheduled to be done?

20    A.   You can't perform your electrical work.  It's an

21    integral part of installing your inwall roughing.

22    Q.   When you bid this job, did you assume the schedule

23    was going to be followed?

24    A.   Yes.

25    Q.   Okay.  Could you have bid the job on the assumption

1   the schedule was not going to be followed?

2   A.   There would be no reason to.

3   Q.   What do you mean by that?

4   A.   Well, I wouldn't look at a job in the early bid

5   stages and just assume that it wouldn't be done per

6   schedule or on time.

7   Q.   And we saw the information bidders instructing you to

8   actually assume the -- to base your bid on the schedule?

9   A.   Correct.

10  Q.   Is there any way, as a bidder for this project, you

11  can anticipate things not happening per the schedule?

12  A.   No.

13  Q.   Okay.

14  A.   Not at time of bid you wouldn't anticipate.

15  Q.   At the time of bid, do you -- did you put any

16  contingencies in your bid for the schedule not being

17  followed?

18  A.   No.  If I carried contingencies, I wouldn't be

19  competitive.

20  Q.   What do you mean?

21  A.   Well, if I carried contingencies with a thought or

22  gut feeling or assumption that they couldn't perform the

23  job within the function they provided, I wouldn't even

24  have the project.  If I went into every project assuming

25  they weren't going to meet their schedules provided, I

1   wouldn't be in business.

2   Q.   Okay.   Is there any way you can anticipate specific

3   areas not being performed per a bid schedule?

4   A.   No, I wouldn't.

5   Q.   Can you?

6   A.   No.

7           THE COURT:   Just a point of clarification.

8   You've contrasted the interior CMU line and the electrical

9   overhead rough-in lines.   I'm wondering, it doesn't appear

10  that those dates there overlap all that much.   The

11  interior CMU is 30 June to 4 July.   The overhead rough-in

12  is 3 July to 10 July.   I'm just wondering if you can

13  explain, it seems to me, from your testimony, that one

14  would have expected those dates to be simultaneous rather

15  than with a small overlap.

16          THE WITNESS:   Typically, you'd like to see an

17  overlap on those.   In most CPM schedules, you won't get

18  that kind of detail exactly, the overlap.

19  BY MR. KAPLAN:

20  Q.   Let's go to the next page, if we might.   Sheet 18.

21      There's two entries a little more than halfway down,

22  P3CL-170, notch existing walls for rough-in.   And below

23  that, P3G-160, rough in new electric.   Could you explain

24  what those two entries are?   First, the one for notch

25  existing walls, what does that refer to?

1    A.   That would refer to existing walls.

2    Q.   What's being done to that?

3    A.   They're being cut out to allow installation of the

4    electrical.

5    Q.   The rough-in?

6    A.   Yes.

7    Q.   What is rough in electric for an existing wall?

8    A.   That would be, again, wiring devices, switches,

9    possibly a light fixture, any components that they want

10   hidden within a wall and any wiring methods to complete

11   that.

12   Q.   Does that activity, the notch existing wall, have to

13   precede the installation of the rough-in in the wall?

14   A.   Yes.

15   Q.   Okay.  And if the notching was not done at that time,

16   can you do the installation of the rough-in in that area?

17   A.   No.

18   Q.   Is there any way you can anticipate at bid time that

19   that activity would not be performed per the schedule?

20   A.   Absolutely not.

21   Q.   Is there any way you can add contingencies to your

22   man hours for that type of activity not being done per the

23   schedule?

24   A.   I wouldn't.  I wouldn't make those kind of

25   assumptions.

```
 1   Q.    You've worked for -- you did bidding for McPhee?

 2   A.    Yes.

 3   Q.    And McPhee's a major electrical contractor in

 4   Connecticut?

 5   A.    Yes.

 6   Q.    Did you make assumptions of those type for McPhee?

 7   A.    I wouldn't do it any differently than I've been doing

 8   the past 25, 30 years.

 9   Q.    Okay.

10              THE COURT:  Mr. Kaplan, we might want to take

11   our mid-morning break if this is a logical stopping point.

12              MR. KAPLAN:  Perfect, Your Honor.

13              THE COURT:  Let's take a break until 11:00 a.m.

14   and we'll be back here to begin 11:00 a.m. sharp.

15              MR. KAPLAN:  Thank you, Your Honor.

16              THE COURT:  We'll stand in recess.

17                   (Whereupon, a recess followed.)

18

19              THE COURT:  We are ready to resume?  I think

20   we'll plan to go to 12:30.

21              You don't, by chance, have yet one more

22   available of Volume I, do you?

23              MR. KAPLAN:  I don't.  I don't.  I don't, sorry.

24              THE COURT:  It would be helpful for us if we had

25   one more chambers copy.
```

1          MR. KAPLAN:  I'll check.  We have an extra copy

2    at ECI.  I don't know if it's marked up or not.  I'll

3    check on that.

4          THE COURT:  Thank you.

5          MR. KAPLAN:  It might be, I don't know.

6    BY MR. KAPLAN:

7    Q.   Mr. Madore, could I just draw your attention to

8    Exhibit 11, which is a post-bid questionnaire that I think

9    you submitted to Pike before the contract award.

10          MR. KAPLAN:  I would offer that, Your Honor.

11          THE COURT:  Any objection?

12          MR. HUG:  No objection, Your Honor.

13          THE COURT:  Plaintiff's Exhibit 11, full

14    exhibit.

15    BY MR. KAPLAN:

16    Q.   This has got a letter from you dated November 3, 2009

17    on the second page, do you see that?

18    A.   Yes.

19    Q.   And various information attached.  What was this,

20    generally?  What was this document or what is this

21    document?

22    A.   It's basically a qualification segment that would

23    list our past clients and projects.

24    Q.   Okay.  And you have some letters of recommendation

25    that are attached?

1    A.    Yes.

2    Q.    Okay.  There's one from Gilbane Building Company

3    regarding the Middletown High School project.  You

4    mentioned that project earlier, correct?

5    A.    Yes.

6    Q.    There's one from Moriarty Company regarding a

7    475,000 square foot project.  What was that one?

8    A.    That was an office, new construction office.

9    Q.    All right.  And then you had several other letters of

10   recommendation there.  I'm just looking to see if there's

11   anything else in here I want to draw the Court's attention

12   to.

13       And so that's November 3, 2009.  Then if we go to

14   Exhibit 9, which is a letter from Pike of November 18, '09

15   and also includes a bid form and it includes a bid

16   tabulation results of October 28.

17            MR. KAPLAN:  I'd offer this, Your Honor.

18            THE COURT:  Any objection?

19            MR. HUG:  I'm sorry, is this Exhibit 9?

20            MR. KAPLAN:  Yes.

21            MR. HUG:  Your Honor, I have objected to the bid

22   package as relevance.  I don't know if I've objected to

23   this particular document up until the -- I don't have any

24   objection up until the bid package electrical document.

25   My basis for that objection to that portion of the

1    document is relevance.  That's one of the arguments we

2    discussed last week in chambers, Your Honor.

3                THE COURT:  Okay.

4                MR. HUG:  Yes, I object to the document because

5    of the attachment.

6                THE COURT:  This is the one sort of fold-out

7    document?

8                MR. HUG:  Yes.

9                THE COURT:  And maybe you refresh my

10   recollection.  I don't think we looked at this particular

11   document in chambers or I don't recall that.  Tell me how

12   is this document not relevant.

13               MR. HUG:  The other bids are not relevant,

14   Your Honor, for the purposes of this particular

15   litigation.

16               THE COURT:  Okay.  I will overrule that

17   objection.

18   BY MR. KAPLAN:

19   Q.   Looking at Exhibit 9, you have -- Mr. Madore, you

20   have a November 18 letter.  Is this the actual bid award

21   from Pike?

22   A.   Yes, it is.

23   Q.   And they're recommending the award to the City of

24   Norwich?

25   A.   Correct.

1    Q.   And then you have an actual bid form that follows

2    that that's on ECI stationery.  It's three pages dated

3    October 28, '09, signed by Louis Bona, president, at the

4    end.  Is this the actual bid that was submitted by ECI?

5    A.   Yes, it is.

6    Q.   So is this what you would call a lump sum bid?

7    A.   Yes.

8    Q.   And how does that differentiate from different types

9    of bids for electrical work?

10   A.   It's turnkey proposal to perform scope identified.

11   Q.   So this bid is for the whole project, all the

12   electrical work on the project?

13   A.   Right.  There are exceptions to that and they have

14   the alternates with the bid.

15   Q.   The second page shows certain alternates.  What are

16   alternates?

17   A.   Alternates are either additions or deletions to the

18   project.  It's based on funding.

19   Q.   Based on the owner's --

20   A.   Owner's funding, yes.

21   Q.   And then we go to -- Mr. Bona is the president of the

22   company?

23   A.   Yes.

24   Q.   Does he own the company as well?

25   A.   Yes.

1    Q.   Then we go to the bid package electrical, the

2    fold-out.  What does this show?

3    A.   This identifies the bidders that submitted proposals

4    for it and the placement and where their bids were

5    tallied.

6    Q.   Okay.  Is this public information?

7    A.   Yes, it is.

8    Q.   Is this information that you solicited after the bids

9    were open?

10   A.   No.  These would have been provided at the time of

11   the bid opening.

12   Q.   By whom?

13   A.   This particular sheet may not have been provided at

14   the time of the bid, but we would record it ourselves at

15   the bid opening.  This was probably provided after.

16   Q.   By whom?

17   A.   I would assume by the Pike Company.

18   Q.   And if you look at the base bid values, ECI is

19   3,496,000.  You weren't the low bidder, were you?

20   A.   No, we weren't.  We were third, according to this

21   sheet.

22   Q.   Do you know what happened to the T&T bid after the

23   bids were submitted?

24   A.   I believe they had an error in their proposal.

25   Q.   It was withdrawn?

1    A.   And it was withdrawn, correct.

2    Q.   Who told you that?

3    A.   It's just -- we would have been told by the Pike

4    Company that the bid had been withdrawn.

5    Q.   Now, Ferguson Electric, are you familiar with

6    Ferguson Electric?

7    A.   Yes, I am.  They're one of our major competitors.

8    Q.   In your bidding practices, as the chief estimator at

9    ECI, did you come up against Ferguson very often in public

10   bids?

11   A.   Very often.

12   Q.   And did Ferguson bid the same types of jobs as you

13   did?

14   A.   Yes.

15   Q.   Do you know what size company Ferguson is?

16   A.   I believe Ferguson was equivalent to the size of ECI,

17   probably close to $30 million a year.

18   Q.   And the Ferguson bid, the base bid was about roughly

19   $60,000 lower than the ECI bid?

20   A.   Yes.

21   Q.   Normally, would the low bidder be awarded a public

22   competitive school job?

23   A.   Yes, in most cases.

24   Q.   When you talked to Pike prior to the actual award

25   post-bid, you mentioned you talked to Pike post-bid but

1    pre-award, was there any discussion about the status of

2    Ferguson versus ECI as number one or number two bidders?

3    A.    Referred to one and two bidders after T&T withdrew,

4    but most conversations were regarding scopes of work.

5    Q.    When did you find out that Pike and the City were not

6    going to go forward with Ferguson?

7    A.    Either shortly before we had the letter of intent or

8    at the letter of intent.

9    Q.    Did anybody from Pike give you any information about

10   that?

11   A.    Yes.  I believe I talked to Mel Strauss.

12   Q.    What did he say?

13   A.    After our scope review and bid documents were

14   reviewed, it was going to be their intent to recommend ECI

15   to perform.

16   Q.    Did he say why?

17   A.    The City and, I believe, Pike Company didn't have a

18   comfort level with Ferguson Electric based on past

19   history.

20   Q.    Okay.  Now, when you saw you were getting this job at

21   roughly $60,000 higher than Ferguson, what was your

22   response?

23   A.    We were ecstatic.

24   Q.    Why?

25   A.    It doesn't happen very often that you're not the low

1    bidder on a competitive nature on public work and are

2    awarded the project.

3    Q.   And were there any other specific reactions you had

4    to that information?

5    A.   We felt our bid was competitive where it needed to

6    be.

7    Q.   And just to draw the Court's attention, Plaintiff's

8    Exhibit 8 is a recorded court decision from the Superior

9    Court of *Ferguson Mechanical and Ferguson Electric vs.*

10   *City of Norwich.*  And I won't argue what it means, but it

11   has to do with Ferguson's protest in court of not being

12   given the electrical bid on this job.  We've mentioned

13   this in some of the briefs before.  I would offer it as an

14   exhibit, although I'm not sure I have to, but I have it as

15   an exhibit.

16            THE COURT:  Plaintiff's Exhibit 8?

17            MR. HUG:  Your Honor, I again renew my relevancy

18   objection.  The issue is whether the Phase 3 was bid

19   properly.  They have a cost overrun in Phase 3, additional

20   man hours or whatever they're claiming.  This is the full

21   project.  There's no relationship to Phase 3.  And any

22   relationship is tenuous to what happened in Phase 3.  So

23   looking at the total bids and looking at even why Ferguson

24   was disqualified isn't relevant to the purposes of

25   determining whether or not they needed additional manpower

 1   because of Pike's conduct on Phase 3.  I object on

 2   relevancy grounds.

 3            THE COURT:  And as indicated at our prior

 4   conference, the Court will overrule the objection on the

 5   grounds that the case law is clear in the Court's

 6   recollection that other bids are admissible evidence for

 7   purposes of establishing the accuracy of a bid and,

 8   although it would be optimal to have phase-specific bid

 9   information, I don't know that we are going to have here,

10   I'm unable to say that it's altogether irrelevant under

11   the broad standards of relevancy under Rule 401, 402 that

12   govern, and therefore I conclude that the bid information

13   from other bidders is at least relevant.  And the concerns

14   that you're expressing are certainly valid as to weight,

15   but not admissibility.

16            MR. HUG:  Thank you, Your Honor.

17            THE COURT:  So Exhibit 8 and Exhibit 9 are full

18   exhibits.

19            MR. KAPLAN:  Thank you, Your Honor.

20   BY MR. KAPLAN:

21   Q.   Mr. Madore, this job was not bid by phases, right?

22   A.   Correct.

23   Q.   The bid form that we just saw, Exhibit 9, did not

24   require it to be broken down by phase?

25   A.   Correct.

1    Q.   In fact, on public bidding are you allowed to tamper

2    or modify a bid form?

3    A.   No.

4    Q.   You have to submit it as the form is printed?

5    A.   Yes.

6    Q.   So none of the bidders would have bid this to the

7    City -- I mean to Pike and the City in any other form than

8    the form that's set forth in Exhibit 9?

9    A.   Correct.  The only difference there is they wanted it

10   on your company letterhead.

11   Q.   And the numbers might have been different?

12   A.   Correct.

13   Q.   But basically a lump sum bid for the whole project

14   from the various bidders as tabulated from that table in

15   Exhibit 9?

16   A.   Yes.

17   Q.   Do you recall what percentage of the project Phase 3

18   compiled in terms of man hours?

19   A.   No, I don't.

20   Q.   Okay.

21        May I show you, please, Exhibit 3 for identification

22   which has a breakout of costs -- this is an ECI document.

23   Breakout of costs by phases.  And then there's a detailed

24   backup, a number of detailed backup sheets as to the

25   summary sheet that precedes it.

```
1              MR. KAPLAN:  I would offer this.

2              THE COURT:  Any objection to Plaintiff's

3    Exhibit 3?

4              MR. HUG:  Well, I object to it being offered

5    through this witness.  He just testified he didn't do any

6    of this.  I think he just said he didn't do any of

7    breaking it down by phases.

8              THE WITNESS:  That was at the time of bid --

9              MR. KAPLAN:  Hold on, please.

10             The witness said at the time of bid he did not.

11   I'm going to ask him about what he did after the award and

12   he was involved in the preparation of this document.

13             THE COURT:  Lay the foundation and we'll see.

14   Go ahead and lay the foundation.

15   BY MR. KAPLAN:

16   Q.   Mr. Madore, after the bid was awarded to ECI, did you

17   then work on any kind of a breakdown by phases?

18   A.   Yes.

19   Q.   Okay.  And at whose request did you do that?

20   A.   Cliff Clauson, the project manager.

21   Q.   What did you actually do in that regard?

22   A.   We compiled our estimate into a more defined detail

23   associated with the phasing schedule on the project.

24   Q.   So did you actually break your bid down by phases

25   after you got the contract?
```

1   A.   Correct.

2   Q.   And were you involved with that?

3   A.   Yes.

4   Q.   Okay.

5            MR. KAPLAN:  I would offer this document.

6   BY MR. KAPLAN:

7   Q.   Are you familiar with the document that's in

8   Exhibit 3?

9   A.   Not exactly that document, but the ones behind it,

10  yes.

11  Q.   The project breakdown?

12  A.   Yes.

13  Q.   And it that summarized with the front document?

14           THE COURT:  Does the first page of the document

15  summarize?

16           THE WITNESS:  Yes.

17  BY MR. KAPLAN:

18  Q.   That's a summary of the breakdown you prepared?

19  A.   Yes.

20           MR. KAPLAN:  I'd offer it.

21           THE COURT:  Mr. Hug?

22           MR. HUG:  Is the witness's testimony that he did

23  this breakdown?

24  BY MR. KAPLAN:

25  Q.   Did you participate in the breaking down the bid into

1   the various phases?

2   A.   Yes.

3           MR. HUG:  And when was this done?

4           THE COURT:  I'm going to allow Mr. Hug to

5   voir dire the witness.

6           Mr. Hug, go ahead.

7

8                   VOIR DIRE EXAMINATION

9   BY MR. HUG:

10  Q.   When was this document prepared?

11  A.   This was prepared after the award of project.

12  Q.   Okay.  "After the award" is a little vague.  Could

13  you be a little more specific?

14  A.   After the letter of intent, which was one of the -- I

15  believe it was Item 9, letter of authorization to proceed.

16  Q.   Was it before construction began?

17  A.   I can't say whether it was before construction

18  because there could have been other subcontractors already

19  under way on the project.

20  Q.   Allow me to be more specific.  Was it before ECI

21  began its work on the project?

22  A.   Yes.

23  Q.   Okay.

24          MR. HUG:  No objection, Your Honor.

25          THE COURT:  It appears that the document has a

 1  date of 25 November, 2009.

 2          MR. KAPLAN:  Yes, sir.

 3          THE COURT:  Plaintiff's Exhibit 3 is admitted as

 4  a full exhibit.

 5

 6          DIRECT EXAMINATION (Resumed)

 7  BY MR. KAPLAN:

 8  Q.   Just to go through this, there's a cover page

 9  summary.  What does that first page in Exhibit 3 show,

10  Mr. Madore?

11  A.   That shows the phasing of the project.

12  Q.   So you have on the left-hand side of that cover page

13  Site 2, 3, 4 East, 4 West and 5?

14  A.   Yep.  Those are the construction phases.

15  Q.   And then it's broken down by material column, labor

16  column, and then hours?

17  A.   Yes.

18  Q.   Okay.  And the hours for Phase 3, again, did you --

19  when you broke this down, what was the process you used?

20  A.   We would have looked at the contract documents and

21  the phasing schedule which was provided at bid time.

22  Q.   And then if we look at Exhibit 4, would you just

23  describe what that is?  And I'm specifically looking at

24  the page after the summary is project breakdown and then

25  there's a bunch of pages of -- from the IntelliBid,

1   appears to be 31 pages from that program.  What are those

2   documents?

3   A.   This is the phasing breakdown associated with the

4   construction schedule provided at bid time.  And these are

5   the components, equipment, materials that would be

6   installed in those phases.

7   Q.   Okay.  So this was part of your work in breaking the

8   bid down into the various phases?

9   A.   Yes.

10  Q.   And that's what's included in Exhibit 4?

11  A.   Correct.

12          MR. KAPLAN:  I'd offer Exhibit 4, Your Honor.

13          MR. HUG:  No objection, Your Honor.

14          THE COURT:  Plaintiff's Exhibit 4, full exhibit.

15  BY MR. KAPLAN:

16  Q.   So just to explain, I think it helps to explain if

17  you're in Exhibit 4 and you go three pages in, it says

18  Phase 3, Cost Codes Report and it starts at pages 1 of 31.

19  Now, this appears to follow a comparable format to the bid

20  format that we looked at.  These sheets are dated

21  December 30, 2009.  Is that when they were run off?

22  A.   On that particular day, the report was run, yes.

23  Q.   And you mentioned this was the detail of your

24  breakdown for the various phases?

25  A.   Correct.

1    Q.    Did you follow the same approach that you had

2    followed with the bid, the overall bid?

3    A.    The exact same approach.

4    Q.    Did you use the same information?

5    A.    Yes, we would.  We would have used our quantitive

6    takeoff sheets and apply those quantities to each phase.

7    Q.    You didn't rebid it, per se, you just assigned your

8    bid values to the various phases?

9    A.    Correct.

10   Q.    Using the same values you developed for the bid?

11   A.    The exact same values.

12   Q.    And do you know why this was done?

13   A.    It was done in preparation to assist the project

14   manager and the foreman on the job.

15   Q.    And let's see.  In Exhibit 3, the cover page we were

16   looking at, I believe, the total hours on that front page

17   for the bid for the job, 23,406?

18   A.    22,000 --

19   Q.    I'm looking at Exhibit 3, the first page.

20   A.    Okay.

21   Q.    And the total hours shown?

22   A.    Yes.

23   Q.    Is that 23,406?

24   A.    Yes, it is.

25   Q.    That's from the bid total?

```
 1   A.   Yes, it is.

 2   Q.   And for Phase 3 you had 7,593 man hours?

 3   A.   Yes.

 4   Q.   That was the allocation for Phase 3 from your bid?

 5   A.   Yes.

 6   Q.   And that's about a third, roughly, in terms of man

 7   hours of the overall?

 8   A.   Yes.

 9   Q.   All right.  Was there anything about the work in

10   Phase 3 that was significantly different than the work of

11   the other phases?

12   A.   I believe it was on a more aggressive schedule.

13   Q.   Anything else?

14   A.   No.

15   Q.   Okay.  Did you anticipate using different shifts to

16   do the Phase 3 work?

17   A.   Yes.

18   Q.   What does that mean?

19   A.   In order to avoid overstacking and to avoid

20   complications with coordination of other trades, we would

21   have multiple crews working two different shifts.

22   Q.   And that was what you anticipated to do during the

23   bid itself?

24   A.   Yes.

25   Q.   Is there anything unusual about shift work for ECI on
```

1    these types of jobs?

2    A.   No, it's common practice for us.

3            MR. KAPLAN:  I just have to get another book.

4    Excuse me, Your Honor.

5                (Pause.)

6    BY MR. KAPLAN:

7    Q.   I'd like to -- could I show the witness

8    Exhibit Volume III, I'd like to ask him about some of the

9    exhibits there.

10           I'd like to direct your attention to Exhibit 35,

11   Mr. Madore.  Before I do that, I just want to pick up on

12   something.

13           After you helped to prepare Exhibits 3 and 4, which

14   were the allocations for the various phases, did you have

15   any further involvement with this project?

16   A.   Yes.

17   Q.   What was that?

18   A.   Later during the summer work, construction.

19   Q.   And what did you do?

20   A.   Reviewed our estimates and labor hours and the

21   construction schedule in an effort to assist Cliff Clauson

22   with what was going on on site.

23   Q.   And when did you get involved in that regard?

24   A.   That would have been July of 2010, I believe.

25   Q.   And the records that are in Exhibit 35 -- just let me

1    follow up.

2         In terms of a little more specifically at the end of

3    July, what were you doing in regard to the job to assist

4    Mr. Clauson?

5    A.   It was more just during the period of Phase 3.  Is

6    that what you're referring to?

7    Q.   At the end of July, 2010, you mentioned you were

8    involved in assisting Mr. Clauson.  I want to ask you more

9    specifically what you were doing.

10   A.   There were questions that had arisen relative to the

11   construction schedule and our bid from upper management.

12   Q.   Within ECI?

13   A.   Yes.

14   Q.   And did you -- were you involved in any specific

15   activities for ECI as to this job at the end of July?

16   A.   No, not specifically.

17   Q.   Okay.

18   A.   Not directly involved on the job.

19   Q.   How about indirectly involved?

20   A.   Indirectly, discussions, in-house office discussions.

21   Q.   Did you get involved with any labor allocations of

22   ECI folks at the end of July?

23   A.   We did have discussions relative to foremen and

24   manpower requirements.

25   Q.   Were you involved with allocating people?

1    A.    I was not involved with allocating.

2    Q.    What were you involved in?

3    A.    In the sense of trying to provide additional

4    supervision and manpower to certain areas of the project,

5    get it back on track.

6              MR. HUG:  Objection, hearsay.

7    BY MR. KAPLAN:

8    Q.    In terms of what you did, okay, you talked with folks

9    within ECI?

10             THE COURT:  Let me just rule on the objection,

11   if I can.

12             MR. KAPLAN:  I'm sorry.

13             THE COURT:  I don't understand the witness to

14   have testified about the truth of any matter.  I think he

15   is permitted, appropriately, under the hearsay rules to

16   say the subject matter of discussions without it being a

17   hearsay problem.

18             MR. HUG:  Well --

19             THE COURT:  That's how I understand the hearsay

20   rules.

21             MR. HUG:  I think he was testifying as to what

22   others said, though, at the meeting.

23             THE COURT:  I'll just instruct the witness not

24   to testify concerning specifics of what other people

25   stated if, Mr. Kaplan, you're introducing that testimony

1    for the purpose of establishing its truth, such as

2    something that was actually said or done.  But if you want

3    to ask him about the subject matter, in general, of the

4    discussions --

5              MR. KAPLAN:  That's all.  I'm just trying to

6    establish what his involvement was and what he was doing

7    regarding this job.  I'm aware of the hearsay problems

8    with that type of testimony.

9              THE COURT:  Okay.  So the objection is overruled

10   subject to those limitations.

11   BY MR. KAPLAN:

12   Q.   And Mr. Madore, did you get involved with any

13   allocations of manpower for ECI or assignment of folks to

14   the Kelly Middle School?

15   A.   No.

16   Q.   But you were involved with discussions concerning

17   those issues?

18   A.   Yes.

19   Q.   Looking at Exhibit 35, these are a series of what are

20   entitled Job Performance Review Forms and Project Job Cost

21   Worksheets for Kelly Middle School for various periods

22   from December '09 to -- and also Project Manager Notes

23   through August of '11, November of 2011.  Generally, in

24   terms of the types of reports, are you familiar with these

25   reports?

1    A.   I am familiar with these.

2    Q.   As a project manager for ECI, did you prepare these

3    types of reports on your own projects?

4    A.   On my own projects, I would prepare these.

5    Q.   Are you familiar with these records as being the

6    records that were prepared by the project manager for this

7    particular project, Kelly Middle School project?

8    A.   I wouldn't have been involved in preparing these

9    documents.

10   Q.   Not that you prepared, but are you aware that these

11   are the records that Mr. Clauson prepared?

12   A.   Yes.

13        MR. KAPLAN:  I'd offer these, Your Honor.

14        MR. HUG:  Objection, Your Honor.  I think

15   they're appropriately brought from Mr. Clauson who can

16   testify as to their contents.  I don't think it's

17   appropriate that this witness testify about these

18   documents which he neither prepared nor was involved in

19   the making of, per his own testimony.

20        As to the document itself, I don't object to it

21   coming in through Mr. Clauson.  I do object if Mr. Madore

22   is going to be testifying about what these things mean or

23   whatnot because Mr. Clauson, by the testimony so far,

24   generated these documents.

25        MR. KAPLAN:  These are business records to which

1  no objection has been raised by counsel as to their

2  admissibility, as he just said.  As business records,

3  there's information in here that Mr. Madore, I think, is

4  competent to testify about information that's set forth in

5  here.  Mr. Clauson will testify at length about some of

6  the information in here, and I think Mr. Madore is

7  perfectly competent to testify about some of the

8  information that's part of the business records.

9           THE COURT:  A concern I have is that it's not

10  clear that Mr. Madore has ever seen these records.  Is

11  that the witness's testimony?

12           MR. KAPLAN:  I can ask him.

13  BY MR. KAPLAN:

14  Q.   Mr. Madore, have you seen these records?

15  A.   I have seen these records.

16  Q.   And when did you review them?

17  A.   It would have been in July.

18  Q.   Of what year?

19  A.   2010, I believe.

20  Q.   So you saw these contemporaneously as they were being

21  issued by Mr. Clauson?

22  A.   Yes.

23  Q.   Okay.  Were these -- did some of these records become

24  part of the discussions you mentioned?

25  A.   Most definitely.

1          THE COURT:  Are these records made and kept in

2     the ordinary course of business?

3          THE WITNESS:  Yes, they are.

4          THE COURT:  Mr. Hug, do you have anything

5     further?  I think the witness has established an adequate

6     foundation at this point, especially since we have

7     Mr. Clauson coming in who can authenticate to anyone's

8     satisfaction the providence of these records.  The witness

9     does not have to be the author or the person who hit the

10    print button to authenticate these records.  It appears to

11    me we have enough here.  If you have something else to

12    add --

13         MR. HUG:  Well, I have no objection to the

14    document coming in, Your Honor.  And I object that there's

15    particular testimony about the document as to the

16    witness's competency to testify to particular issues

17    raised by these documents.

18         I would note, however, the witness said that he

19    looked at these in July of 2010.  These documents are

20    dated post-July 2010 as well as pre-2010.  So I assume

21    that the witness looked at them as they came in throughout

22    the course of the project and while he was there at ECI.

23    If that's the testimony, then no objection.  If he only

24    looked them up through July, I object to everything after

25    July him testifying to.

1        MR. KAPLAN:  Point well taken, Your Honor.  Let

2   me clarify with the witness.

3        THE COURT:  Yes.

4   BY MR. KAPLAN:

5   Q.   As Mr. Hug accurately said, a number of these

6   documents go through July, August, September, October.

7   Were you looking at these documents as they came in

8   throughout 2010?

9   A.   At various times, I would have.

10  Q.   So did you see -- by the end of the project, had you

11  reviewed all of those documents?

12  A.   No, I did not review all of the documents.

13  Q.   Through what period of time do you recall having

14  reviewed these documents?

15  A.   The time typically I would review them is early

16  stages of buyouts on projects and if there were

17  complications or questions relative to the estimate.

18  Q.   You say some questions arose at the end of July?

19  A.   Correct.

20  Q.   Did you review the available documents at that time?

21  A.   Yes.

22  Q.   How about after July, did you review any in August or

23  September, do you recall?

24  A.   Yes, I did.

25  Q.   September, you recall having reviewed this series of

1    documents?

2    A.   Yes.

3             THE COURT:  Well, the concern is there's

4    documents that are post-September.

5             MR. KAPLAN:  I don't think I'm going to ask him

6    anything post-September with this witness.  And

7    Mr. Clauson will --

8             THE COURT:  Then I will allow Plaintiff's

9    Exhibit Number 35 subject to further authentication

10   through the testimony of Mr. Clauson and subject to the

11   limitation that you will not question the witness

12   concerning any document that he does not have personal

13   knowledge of it.

14            MR. KAPLAN:  Absolutely, Your Honor.  Thank you.

15            THE COURT:  And within those time frames that

16   we've stated.

17            MR. KAPLAN:  Thank you.

18   BY MR. KAPLAN:

19   Q.   Now, if we look at the January 2010 project cost

20   worksheet, it's about four pages in.  And I just want to

21   ask you about the top box and what's that -- in terms of

22   what that shows as to the material cost for the job.

23   A.   I'm sorry?

24   Q.   It's dated January 18, 2010.  I think it's the fourth

25   sheet in Exhibit 35?

1    A.    Yes.

2    Q.    There's a box at the top which has a number of items

3    listed, different material items.

4              THE COURT:   The document's entitled Project Job

5    Cost Sheet.

6              MR. KAPLAN:   Yes.

7    BY MR. KAPLAN:

8    Q.    What does that show?

9    A.    Would show your contract amount and any potential

10   savings or possible cost overruns.

11   Q.    When you say contract amount, are you talking about

12   what you carried in the bid for these various items?

13   A.    Yes.

14   Q.    Okay.  And does that indicate anything in regard to

15   the buyout, the material buyout?

16   A.    Yes.  At the bottom of that page it identifies

17   18 percent buyout of the materials.

18   Q.    Bottom of the box, 1.18?

19   A.    Yes.

20   Q.    And that's what, a savings of 18 percent on the cost?

21   A.    Correct.

22   Q.    Was that actually what was going on with the buyout

23   on this project?

24   A.    Yes.

25   Q.    And that's what you had referenced before --

```
 1    A.    Right.

 2    Q.    -- when we talked about what you expected in the bid?

 3    A.    Yes.

 4    Q.    And you said -- I think you said in actuality you

 5    thought it was 15 percent?

 6    A.    15 percent, yes.

 7    Q.    Did this hold up at 18 percent as the buyout?

 8    A.    I believe it held up throughout the entire project.

 9    Q.    So what does that tell you about the accuracy of the

10    bid in terms of the material takeoffs?

11    A.    For me, that would confirm that the quantities and

12    the materials taken off were sufficient for the project.

13    Q.    Why?  Because the buyout worked out as you

14    anticipated?

15    A.    Correct.  If we were missing material, it would have

16    been costing us money to make up for the materials not

17    included in our estimate.

18    Q.    Okay.  And so are you saying that your bid quantities

19    from the bid, the quantities for materials from the bid

20    turned out to be accurate because the buyout turned out to

21    be what you expected?

22    A.    Yes.

23    Q.    And again, just to make it clear, your labor hours

24    were derived from the bid quantities, right?

25    A.    Correct.
```

1   Q.   So if the bid quantities were accurate, what does

2   that tell you about your labor hours?

3   A.   I would feel very comfortable that my labor hours

4   were accurate.

5   Q.   Have you reviewed your bid and this information for

6   purposes -- strike that.

7        You said that in July some issues came up and that

8   you went back and reviewed your bid?

9   A.   Yes.

10  Q.   What did you do then at that point in time?  What did

11  you do?

12  A.   We were just trying to identify any potential

13  problems, whether it was in the estimate quantities,

14  materials types, quotations that possibly could have been

15  missed.

16  Q.   Did you find out any problems?  Did you discover any

17  problems?

18  A.   We didn't discover any problems.

19  Q.   Have you reviewed your bid documents since then?

20  A.   Just prior.

21  Q.   Since July of 2010?

22  A.   No.

23  Q.   Did you do it for purposes of this trial?

24  A.   Yes.

25  Q.   At any time after you submitted the bid, have you

1   found anything you would call a problem with your bid?

2   A.   No.

3   Q.   Do you think you did anything wrong with that bid?

4   A.   Absolutely not.  Part of my position, as senior

5   estimator, chief estimator, is based on historical cost of

6   the company.  We had a lot of documentation to support

7   that.  And this bid fell well within our competitive

8   nature.

9   Q.   And the buyout?

10  A.   The buyout was exactly what was standard -- would be

11  a standard buyout for us.

12           THE COURT:  Mr. Kaplan, may I ask clarifying

13  questions about this sheet?

14           MR. KAPLAN:  Certainly.

15           THE COURT:  I heard you asking the witness about

16  the accuracy of the labor estimates and the witness

17  suggesting that the fact that the buyouts work to the

18  company's advantage in the amount of 18 percent suggested

19  to him, at least, that the materials estimate had been

20  correct.  Why does that say anything about the accuracy of

21  the labor estimates?

22           THE WITNESS:  They go hand in hand.  Our labor

23  hours are based on the quantities within the estimate.  So

24  if our quantities were sufficient in the bid, our labor

25  hours would also be.

1    BY MR. KAPLAN:

2    Q.    During the project, were you kept apprized of the

3    progress of the job throughout?

4    A.    Probably more towards the June, July dates.

5    Typically, we would not be involved in a project after

6    award, you know, other than to assist the PM in breakdowns

7    or buyouts.  If a project is going smoothly, we wouldn't

8    directly be involved.

9    Q.    And did you ever -- did anybody at ECI ever complain

10   to you about errors with your material takeoffs or

11   estimates?

12   A.    Regarding this project or any project?

13   Q.    This project.

14   A.    No.

15            THE COURT:  Mr. Kaplan, just one more thing on

16   that sheet there.

17            You can see under, again, the fourth page into

18   Exhibit 35, there's a line item there for total labor

19   which has the column for variance and EM estimate.  Could

20   you explain what goes into those numbers?

21            THE WITNESS:  Point out --

22            MR. KAPLAN:  On the right column.

23            THE COURT:  On the right-hand column towards the

24   bottom of the page, there's a line item for total labor,

25   and then there are columns there for variance,

1    1.3 million, approximately, and then PM estimate 1.36 or

2    1.359.  Can you explain what those numbers are supposed to

3    capture?

4             THE WITNESS:  The variance would be based on the

5    estimate performed, the bid proposal.  The PM estimate is

6    their cost projections at that time for the project.

7    BY MR. KAPLAN:

8    Q.   Variance isn't really variance; variance is an

9    estimated quantity?

10   A.   Yes.

11   Q.   We got hung up on that in the deposition too.  We

12   went through that before.

13        And the PM estimate is as of the date of this report,

14   that's what he's estimating that total labor will cost

15   from that point forward?

16   A.   Yes.

17   Q.   And the variance is actually what was in the bid for

18   the labor at that point forward?

19   A.   Correct.

20   Q.   So, in normal parlance, the variance would be the

21   difference between the two numbers?

22   A.   Yes.

23             MR. KAPLAN:  Did that clarify, Your Honor?

24             THE COURT:  Yes, thank you.

25             MR. KAPLAN:  We chased our tail in a deposition

1   for a while on that one.

2   BY MR. KAPLAN:

3   Q.   If we just skip ahead to the May 13, 2010 report,

4   project job cost worksheet, same report dated May 13,

5   2010, the box up top for the materials and the buyout,

6   that appears to be pretty much unchanged, Mr. Madore, the

7   1.18 percent?

8   A.   Yes.

9   Q.   And then on that same point that His Honor just

10  pointed out that total labor, there's been a slight

11  shifting at that point between what's labeled variance and

12  the PM estimate, now he's estimating a little less, the

13  1.238 million versus 1.221 million?

14  A.   Correct.

15  Q.   And then the total profit and overhead below at that

16  point says .47 percent.  What does that mean?  The very

17  bottom.

18  A.   That would be the amount of profit after your costs

19  on the job.

20  Q.   That's a projection from the PM at this point in

21  time?

22  A.   Correct.

23  Q.   Now, does that number factor in this buyout, this

24  18 percent buyout?

25  A.   Indirectly, it would.

 1  Q.   Does it carry it in this total contract with COs and

 2  total cost of work or something separate?

 3  A.   Could you --

 4  Q.   At the box below, you have total contract with COs,

 5  it's got 3.637?

 6  A.   Yes.

 7  Q.   And that's taking -- it says total revised.  There's

 8  a relationship.  Under cost -- let me start in the middle.

 9     Cost to complete, original contract says 3.637445.

10  That number is carried down to the total.  So at that

11  point no change orders had been processed?

12          MR. HUG:  Objection, Your Honor.

13          MR. KAPLAN:  Let me rephrase.  I'll withdraw it.

14  BY MR. KAPLAN:

15  Q.   The original contract value 3.367445 under cost to

16  complete, that appears to be carried down to the box?

17  A.   Yes.

18          MR. HUG:  Objection, Your Honor.  This is a

19  concern I have.  This is getting into cross-examination of

20  the witness.  The witness didn't -- you can ask the

21  witness what does this mean is I think --

22          THE COURT:  I'll sustain it.  If you could be

23  open ended in your question.

24          MR. KAPLAN:  Certainly.

25

1    BY MR. KAPLAN:

2    Q.    The second line on this summary, total cost of work

3    with overhead, what goes into that number, Mr. Madore?

4    A.    Would be all the buyouts, the labor dollars

5    associated with the project at that point.

6    Q.    Okay.  So a slight profit is being projected at that

7    point in time?

8    A.    Yes.

9    Q.    Now, at the end of July -- you mentioned at the end

10   of July there were certain concerns about the schedule

11   raised.  What concerns were raised to you?

12   A.    Work was not being completed.

13              MR. HUG:  Objection, Your Honor, hearsay.

14              THE COURT:  I will sustain that objection absent

15   foundation, personal knowledge.

16              MR. KAPLAN:  All right.  I'll move on.

17              THE COURT:  Mr. Hug?

18              MR. HUG:  Your Honor, I didn't ask at the

19   beginning of trial.  When I give an objection, I just

20   blurt it out hearsay.  Some of the judges in this district

21   do not want lawyers to do that.

22              THE COURT:  I ask for you to object and state

23   the grounds.

24              MR. HUG:  Thank you, Your Honor.

25              THE COURT:  And given that we don't have a jury

1    here, you can feel more expansive.

2              MR. HUG:  Magistrate Martinez, though, she

3    actually does sidebars in bench trials.  She won't allow

4    me to give a basis.  But I know your rule now, Judge.  I

5    didn't want to overstep.

6              THE COURT:  All right, thank you.  That's not an

7    invitation to -- just enough to make clear the basis for

8    your objection, please.

9              MR. HUG:  I will endeavor to say "objection,

10   hearsay" and if you want more, I'll tell you.

11             THE COURT:  Thank you.

12   BY MR. KAPLAN:

13   Q.   Now, did you track -- in July and August of 2010, did

14   you track ECI's actual labor forces that were being

15   utilized on the project?

16   A.   I didn't directly.

17   Q.   Okay.

18   A.   The company would.

19   Q.   Okay.  Did you yourself get involved in looking at

20   that, the man hours that were being expended by the

21   company in July and August?

22   A.   Yes.  For this project, yes.

23   Q.   And what did you see in that regard?

24   A.   There were overruns.

25   Q.   How would you characterize the overruns?

1    A.   I would characterize them relative to sequence of

2    work being performed.

3    Q.   In terms of size.  For example, did you have an

4    average crew size that you anticipated would be used?

5    A.   At bid time, yes.  That's one of the reasons I look

6    at CPM schedule, to get an average crew size.

7    Q.   For Phase 3, I think we looked at those figures, let

8    me get the exact figures so I'm not speculating.

9         In Tab Exhibit 3, original bid I'll round off to 7600

10   man hours?

11   A.   Yes.

12   Q.   And that's off of the summary sheet in Exhibit 3.

13        What were you projecting for crew sizes, average crew

14   sizes in the summer of 2010 for Phase 3?

15              MR. HUG:  Objection, Your Honor.  Is the witness

16   testifying as to what he projected or what ECI projected?

17   That's an important distinction, and I can't get into it

18   now, Your Honor, but it is important.

19              MR. KAPLAN:  I'm asking him what he projected.

20              THE COURT:  I heard the question what he

21   projected.

22              MR. HUG:  As long as the witness understands

23   it's what his projection was.

24              THE COURT:  Objection overruled on the grounds

25   that the question stands.

1    BY MR. KAPLAN:

2    Q.   Just to make sure the question is clear, I referenced

3    roughly 7600 man hours that were allocated to Phase 3 that

4    you testified to before.  And you had the work going on in

5    the summer of 2010 on Phase 3.  What did you project for

6    man hours at around the time of bid or even when you were

7    doing the allocation at the beginning of the bid prior to

8    Phase 3 for crew sizes?

9    A.   The hours are based on the quantity of the takeoff.

10   Q.   Okay.  But what about the size of crew?  Did you get

11   into establishing what kind of crew sizes, 10 guys, 20

12   guys, 50 guys?

13   A.   Yeah, we would evaluate it from an average

14   standpoint.

15   Q.   What were your evaluations?

16   A.   I believe it was -- if I recall, it was around 30 to

17   35 at peak on the project.

18   Q.   And was there an average?

19        THE COURT:  I'm sorry, I don't understand the

20   question.  Thirty to 35 what?

21   BY MR. KAPLAN:

22   Q.   Thirty to 35 what?

23   A.   Electricians on the project.

24   Q.   During a week or what period of time?

25   A.   It would have been during the summer months.

1    Q.   For the whole summer or a period of the summer?

2    A.   For the whole summer.

3    Q.   Is that an allocation based on your 7600 man hours

4    for Phase 3?

5    A.   Yes.

6    Q.   Are you aware of what the actual man hours ECI used?

7    Did you track that?

8    A.   I didn't track it.

9    Q.   Were you aware of that information during the summer

10   of 2010?

11   A.   Yes.

12   Q.   Okay.  How did that compare?

13   A.   I believe it doubled in size.

14   Q.   Okay.  Is that something you anticipated when you bid

15   the job?

16   A.   Not at all.

17          MR. KAPLAN:  I just have a few things to go over

18   with this witness and then I think I'm done.

19   BY MR. KAPLAN:

20   Q.   I want to go back a couple of moments to Tab 4,

21   Exhibit 4, which we had looked at previously.  It's in

22   Book I, Mr. Madore.

23       I want to ask you about a few of your entries in your

24   cost code report for Phase 3.  This, I think, you

25   testified this was the detailed allocation that's in pages

1  of 31 and you went back and allocated the bid based on

2  the phases?

3  A.   Yes.

4  Q.   I want to ask you about some of the entries in here,

5  a number of them.

6      If we go to page 4 of 31 of that detailed cost codes

7  report.  And there's an item number on the left-hand

8  column, Item 3119.  What is that?  What is that item?

9  Starts with three-quarter EMT steel?

10 A.   Three-quarter inch EMT set screw couplings.

11 Q.   And then the quantity, just explain what that is

12 across what those numbers are across, please?

13 A.   Quantity is obvious total quantity required.

14 Q.   That was based on your bid?

15 A.   Based on our bid, quantity of takeoffs.

16 Q.   You estimated 2,332 of those items?

17 A.   Correct.

18 Q.   And then you have --

19 A.   A cost.

20 Q.   Dollar unit.  And then the factor of this one is 1.

21 What does that mean?

22 A.   Actually, factor on that item .93.  Are we looking at

23 the same thing?

24 Q.   Item 3119?

25 A.   Oh, for materials, it was 1.  Which would be -- there

1    was no discount taken for that material.

2    Q.   Then unit .0233, that's under a labor column?

3    A.   Yes.

4    Q.   And what does that mean?

5    A.   That's the amount of time it takes to install that

6    piece of equipment.

7    Q.   Okay.  And then you have a total in the right-hand

8    column, is that a total man hours to do that particular

9    item?

10   A.   Yes.

11   Q.   And then you have a factor of .93, which is what I

12   think you were looking at a second ago.  What is that,

13   Mr. Madore?

14   A.   That's a factor to the labor it would take to do it.

15   Q.   Where is that coming from?

16   A.   That could come from two places.  Within the

17   estimating program itself they have calculations for

18   increase materials.

19   Q.   Quantities?

20   A.   Quantities that you would be more productive with

21   more materials.  Or that would be an item that we would

22   look at and possibly do a factor based on our historical

23   costs.

24   Q.   Okay.  I just want to show you a few more just to get

25   a feeling for this.

1       The next page of this exhibit, page 5, there is a

2    item 4157?

3    A.   Yes.

4    Q.   It says 1 plastic bushing.  What is that?

5    A.   It's fitting that goes on a piece of pipe.

6    Q.   And the same type of information carried across that

7    we discussed, same organization?

8    A.   Correct.

9    Q.   Number of items and the labor units it takes to

10   install that?

11   A.   Yes.

12   Q.   Okay.  And that comes up as a result of how much time

13   it takes for that particular item?

14   A.   Yes.

15   Q.   And then also on that page you have at the bottom

16   number 1506.  What is that item, Mr. Madore?

17   A.   That's a conduit hanger clip.

18           THE COURT:  Is that 15006?

19           MR. KAPLAN:  Yes.

20   BY MR. KAPLAN:

21   Q.   And you have 627 of those?

22   A.   Yes.

23   Q.   And extrapolates across to 56.43 man hours to do all

24   those things?

25   A.   Yes.

1  Q.   And I don't want to belabor this too much, I just

2  want to pick out a few more.

3       If we can go to page 12 of 31 of this report.

4       If we look at item 7231 –– 7218, 7231.  One is a 122

5  MC cable and the other is 123 MC cable.  What is that?

6  A.   That's what we refer to as branch circuits, it's

7  wiring between two different devices.

8  Q.   One is 17,318 feet, the other is 3,204 feet?

9  A.   Correct.

10  Q.   Then those extrapolate, the same approach with the

11  man hours being assigned?

12  A.   Yes.

13  Q.   Now, if those quantity items were significantly

14  higher or significantly lower, what effect would that

15  have –– withdrawn.

16       If the quantity items in the first column is

17  significantly higher, what effect would that have on the

18  extrapolated man hours?

19  A.   Materials were more?  Increase your material cost and

20  labor hours.

21  Q.   Larger quantities you'd have more labor hours

22  assigned?

23  A.   Correct.

24  Q.   Smaller quantities?

25  A.   Lower labor.

1    Q.   Does that run true for all of the items listed in

2    this 31 pages?

3    A.   Yes.

4    Q.   That's, in fact, how the bid was generated?

5    A.   Yes.

6              MR. KAPLAN:  I have nothing else with

7    Mr. Madore.

8              THE COURT:  Just one question with respect to

9    the last line of inquiry.

10             Is it your testimony then that the exclusive

11   determinant of the labor cost is the amount of materials

12   that are used?

13             THE WITNESS:  Labor hours?

14             THE COURT:  Or the labor hours, is it solely a

15   function of the amount of materials that are used?

16             THE WITNESS:  Correct.

17             THE COURT:  And how the computer program is

18   allocating how long it takes to install a particular piece

19   of equipment?

20             THE WITNESS:  Correct.

21   BY MR. KAPLAN:

22   Q.   Just to follow up, you review the summaries before

23   you put your bid together in terms of dollars and cents?

24   A.   Yes, definitely.

25   Q.   Do you make adjustments if you think adjustments need

1    to be made?

2    A.    Yes.

3    Q.    I think you said this before, but do you recall

4    making any particular adjustments with this bid?

5    A.    We had made adjustments.

6    Q.    But with this bid?

7    A.    Yes.

8    Q.    Do you recall what they were?

9    A.    We made a material adjustment.

10   Q.    Okay.  What was that?

11   A.    It was a reduction.  We felt that we could buy the

12   materials a little bit better and use that as a cost

13   savings for our bid proposal.

14   Q.    So you did that?

15   A.    Yes.

16   Q.    And your buyout was after that in terms of you went

17   in with the bid cost and then when you talked about

18   18 percent buyout, it was even with that factored in?

19   A.    Correct.

20   Q.    So the 18 percent was off the price that went into

21   the bid?

22   A.    Yes.

23   Q.    Okay.  Thank you.

24              MR. KAPLAN:  I'll clear out of here.

25              THE COURT:  Mr. Hug, cross-examination?

1        MR. HUG:  Yes, Your Honor.  Thank you.

2

3                    CROSS-EXAMINATION

4    BY MR. HUG:

5    Q.   Mr. Madore, is it?

6    A.   Yes.

7    Q.   Did I pronounce your name correctly?  Thank you.

8        While the Judge has the book open, in light of his

9    question, I want to just go through quickly, as I

10   understand it, you come up with a quantity for a

11   particular item and I think we left off on page 5 of 31 or

12   thereabouts of Exhibit 4.  Why don't we just go there.

13       So if we go to line item 4157 on page 5 of 31.  Let

14   me know when you're there.

15   A.   Under which tab?

16   Q.   Tab 4.

17   A.   Yes.

18   Q.   Okay.  So line 4157, 1 plastic bushing, the quantity

19   of that particular item is 91, correct?

20   A.   Yes.

21   Q.   And the unit cost for that particular item is .3624,

22   correct?

23   A.   That's a listed cost.

24   Q.   That's a listed cost.  What's .50?

25   A.   That's a factor, discount.

1    Q.   It's a discount?

2    A.   Yes.

3    Q.   So you're going to include in your bid instead of

4    .3624, 50 percent of that unit?

5    A.   We know that that particular material was costing us

6    50 percent less than the published price.

7    Q.   Correct.  So you're going to put it in at

8    50 percent -- in your bid --

9    A.   We're going to purchase it at 50 percent.

10   Q.   This is your bid document, correct?

11   A.   Yes.

12   Q.   So in your bid, you've calculated that quantity as

13   costing 50 percent of the unit cost; do I have that right?

14   A.   Yes.

15   Q.   Okay.  So in your bid, 50 percent.

16        Then I go over to labor, 32.98 is the result, all

17   right?  That measures the math, looks pretty good.  For

18   that particular installing each one of those items, the

19   unit factor under labor is .200, correct?

20   A.   .0200.

21   Q.   I'm sorry, .0200, that's right, correct?

22   A.   Yes.

23   Q.   Now, that's how much it will take, in terms of the

24   cost, to install each individual unit?

25   A.   That's the labor hours, the time.

1    Q.   That's a fixed in your ConEst system.  That's a fixed

2    number in your ConEst system that you testified to before?

3    A.   That's based on national averages.

4    Q.   And you said that that is going to take -- it's going

5    to take you 50 percent of what that unit factor is, that

6    unit number, for instead of charging the amount in ConEst,

7    you're going to charge only 50 percent of that or the cost

8    is only 50 percent of that, right?

9    A.   Correct.

10   Q.   And that comes out to 1.82?

11   A.   These are hours and minutes, not dollars.

12   Q.   Okay, I'm sorry.

13   A.   They're not dollars.

14   Q.   You're right.  It was dollars for materials, right?

15   A.   Yes.

16   Q.   Okay.  But for labor it's hours?

17   A.   Yes.

18   Q.   So it's going to take 50 percent of the national

19   average.  You estimate 50 percent of the national average?

20   A.   Yes.

21   Q.   So, on the one hand, you have the labor and you --

22   excuse me, the material, you estimate how much the

23   material is going to cost.  And you have your material

24   cost in there and then you adjust it, correct?

25   A.   If need be.

1    Q.   And then you adjust -- on the other side, you have a

2    national average for how much the labor is going to cost,

3    and you adjust that as well?

4    A.   In some cases.  Not in all cases.

5    Q.   And then these numbers, when we tabulate them all,

6    they go into the bid?

7    A.   Yes.

8    Q.   All right.

9              THE COURT:  Mr. Hug, could I ask a clarifying

10   question?

11             MR. HUG:  Sure.

12             THE COURT:  So the .3624 is the national average

13   for the unit cost?

14             THE WITNESS:  That is the cost, yes.  It would

15   be based on a list price from the manufacturer.

16             THE COURT:  Going back to what the vendor prices

17   were?

18             THE WITNESS:  Yes.

19             THE COURT:  And then the .50 is your -- what is

20   the .50 exactly?

21             THE WITNESS:  It's our actual what we consider

22   our buy price.

23             THE COURT:  You're really thinking you're going

24   to be able to buy this for 18 cents versus 36 cents?

25             THE WITNESS:  We know we were going to buy it at

1  18 cents.

2          THE COURT:  But you're bidding it at 36 cents?

3          THE WITNESS:  It's a percentage discount off the

4  listed price similar to, say, a car.  Automobile has a

5  listed manufacturer's retail price, but your actual

6  purchase price of that is typically less.

7  BY MR. HUG:

8  Q.   So that's your discount off -- that's your favorable

9  buyout you're going to get, right?

10  A.   It's a portion of it, not all of it, for that

11  particular item.

12  Q.   Where is the other portion?

13  A.   It would be in our quotations.

14  Q.   In your quotations?

15  A.   For instance, that particular item maybe would cost

16  us less than the 18 cents.

17  Q.   Okay.

18  A.   At that time of this bid proposal, that's what we

19  were anticipating having a cost for that material.  But it

20  could have cost us significantly less or could have cost

21  us more.

22  Q.   I'm looking at what it would cost in your bid right

23  now.  In your bid, you're going to bid 18 cents --

24  approximately 18 cents per unit for that item?

25  A.   Yes, it's an estimated item.

1   Q.   And for that particular item, do you know whether or

2   not you're going to be able to even buy it for less?

3   A.   Yes, I would.

4   Q.   How would you know that?

5   A.   I would check vendor pricing.

6   Q.   Is that in these bid documents?

7   A.   The factor is based on those.  No, it's not.

8   Q.   The factor reflects that buyout discount?

9   A.   To a portion.  But it doesn't mean we're going to

10  capture all of it.  Do you understand what I'm saying?

11  Maybe my discount will be 60 percent, 70 percent, but I

12  may not want to capture that based on the duration of the

13  job and when I'm going to purchase the materials.

14  Q.   Does the factor take into account the potential

15  discount you're going to be able to buy out?

16  A.   The discount is provided right at that time.

17  Q.   Okay.  All right.

18            THE COURT:  Mr. Hug, I'm sorry to be confused.

19            MR. HUG:  That's okay, Your Honor.  I'm confused

20  as well.

21            THE COURT:  It looks as if you have a 91

22  quantity for this, and arriving at a result of 32.98, that

23  that's simply the product of 91 times 36 cents per unit,

24  right, for the plastic bushing?

25            THE WITNESS:  With the factor.

1           THE COURT:  All right.  So I say 91 times 36

2    cents is about $32, no?  So strikes me that the .50 is

3    essentially if you went to the national average, I assume

4    it would be 72 cents per unit and essentially what you've

5    done is you've arrived at the 36 cents per unit --

6           THE WITNESS:  With the factor.

7           THE COURT:  -- by applying a .5 factor?

8           THE WITNESS:  Yes.

9           THE COURT:  But if you went to the national

10   average of 72 cents per plastic bushing, you're saying,

11   oh, no, we're going to bid it at half that knowing that

12   you're probably going to get it less than that?

13          THE WITNESS:  Yes.

14          THE COURT:  All right, Mr. Hug, you've come back

15   with a calculator.

16          MR. HUG:  Yes.  And if Your Honor would like the

17   calculator, I'll give it to you.

18   BY MR. HUG:

19   Q.   So the math, if I multiply 91 times .3624, that's

20   32.9784, which is I think what the Judge was saying.

21   A.   Yes.

22   Q.   If I understand it, the .3624 already takes in the

23   50 percent factor?

24   A.   Yes.

25   Q.   Okay.  So one point -- if it were one point zero,

1    that would be the national average for that, correct?

2    A.    Yes.

3    Q.    So the .50 is 50 percent of whatever is in the ConEst

4    system for that particular item?

5    A.    Yes.

6    Q.    And that's the item, and then that number goes into

7    your bid?

8    A.    Yes.

9    Q.    And that's the number that you believe you can

10   believe -- you believe you're going to get for a buyout

11   for that particular item, correct, give or take?

12   A.    No, I can't say it was a buyout.  It could be the

13   cost for that particular item.

14   Q.    All right.  How is the buyout --

15   A.    I'm sorry, the question is not clear to me.

16   Q.    And I apologize.

17         How is the buyout different than the factor?

18   A.    Our buyouts typically are associated with our quoted

19   materials.  Lump sum, large materials.

20   Q.    All right.  Why do you use a -- maybe I'll try it

21   this way.  Why do you use a .50 factor in this instance?

22   A.    Because we're buying the material for that cost.

23   Below the national published price or the manufacturer's

24   published price.  It's very similar to the suggested

25   manufacture retail price on an item is, but there's a

1    discount to that.  Because they suggest it doesn't mean

2    you're buying it for that suggested price.  Normally,

3    there's a reduced price for that in any store you go into.

4    No different for our materials.

5    Q.   If I put it in math, we establish that 32.98, you're

6    not buying it for $64, you're buying it for $32?

7    A.   Yes.

8    Q.   Okay.  And that's what goes into your bid?

9    A.   Yes.

10   Q.   And that's true with respect to all of the materials.

11   If I go down this list, you can see for materials, you see

12   factors of a lot of 1.0s, a lot of .5s and a lot of, you

13   know, I think I saw one where it was greater than 1.0?

14   A.   1.89 right above it.

15   Q.   So if I start on page -- so if I start on page 4 of

16   31, I go to line item 3119, that's one of the ones that

17   you were asked about before.  So that one you have in your

18   bid 1.0 as a factor which means that the cost that you

19   anticipate is going to be equal to what ConEst has in its

20   system?

21   A.   Yes, or the discounts we applied.

22   Q.   And if I go up a little bit, I see that there is 4

23   EMTs, line 1057, is that a material cost?

24   A.   Yes, it is.

25   Q.   Okay.  And I got 3,021 materials and I've got a .88

1    factor.  So you have a discount in there from the national

2    average?

3    A.   Yes.

4    Q.   Okay.  I see a larger quantity one up top here, 1049

5    three-quarter EMT, I see a .88 factor, that's 1049?

6    A.   Yes.

7    Q.   So that's the buyout you think is going to be about

8    .88 of the national average, right?

9    A.   I wouldn't call that a buyout.  That's the cost of

10   the materials at that time.

11   Q.   Okay.

12   A.   The cost of material.  That's what we have determined

13   the cost of materials are going to be.

14   Q.   That's what you're going to put on the bid?

15   A.   It's not a buyout.

16           THE COURT:  I have a question to ask on that.

17           I think I understood your testimony before to

18   say these are the numbers that you used for purposes of

19   tabulating the bid?

20           THE WITNESS:  Yes.

21           THE COURT:  These column numbers.  But you know

22   that you're actually going to be able to buy many of these

23   materials even cheaper?

24           THE WITNESS:  Yes.

25           THE COURT:  To the tune of 18 percent that you

1    talked about earlier in your --

2              THE WITNESS:  In some cases, yes.

3              THE COURT:  It may be up and down for specific

4    materials, but overall, according to the other exhibit we

5    looked at, maybe 35, you had -- yes, Exhibit Number 35,

6    you did a material buyout -- or a material buyout

7    calculation was done to show that you actually did have an

8    18 percent savings?

9              THE WITNESS:  Yes.

10             THE COURT:  So this number here is not -- is, if

11   anything, higher than the actual cost.  When I say here,

12   the number that appears on page 4 of 31 for 4 EMT,

13   $8,952.02, you're thinking you're going to be able to get

14   that even cheaper?

15             THE WITNESS:  Our hopes would be that we can get

16   it cheaper.  At that time with the .88 factor, that's what

17   it would cost us at that bid time.  So a good -- you know,

18   you'd like to go into the job thinking you're going to do

19   better than the .88 factor.  And that's where you would

20   call it your buyout.

21   BY MR. HUG:

22   Q.   So your .88 factor in this example is your discount

23   that you think you're going to be able to buy at?

24   A.   Yes.

25   Q.   That's the number that goes into your bid?

1   A.   Yes.

2   Q.   Okay.  That's different from what the Judge was

3   asking you.

4   A.   How so?

5   Q.   The Judge was asking you was there another discount.

6   A.   Is there another discount?  Is that correct, Judge?

7   I didn't interpret it that way.  I guess I'd like to get

8   his interpretation if that's the question.

9            THE COURT:  I'll clarify my question again.

10           I think at the time you give this bid and you're

11  basing it on the $8,952, I understand that's what you

12  think at the time that the company may have to pay for

13  these parts.

14           THE WITNESS:  Correct.

15           THE COURT:  But from your years of experience,

16  you know that the company often is able to buy these parts

17  even cheaper.

18           THE WITNESS:  Yes.

19           THE COURT:  Which is the testimony that you

20  spoke about in your direct concerning material buyouts.

21           THE WITNESS:  Right.

22           THE COURT:  And that you found out from

23  Exhibit 35 you could actually do so as of July 2010,

24  18 percent cheaper, correct?

25           MR. HUG:  Your Honor, his testimony --

1          THE COURT:  I think that's what I understood the

2     testimony, but I may be confused.

3          THE WITNESS:  But the 18 percent at the onset of

4     all our purchases was for all the materials, quoted

5     materials and commodity materials.

6     BY MR. HUG:

7     Q.   When you prepared the specific line items for these

8     materials in Exhibit 4, you took into account in the

9     factors what it was that you were going to be able to

10    actually purchase the materials at, correct?

11    A.   Yes.

12    Q.   The fact that you actually saved another 18 percent

13    beyond that was not planned.  It was planned that you

14    would make the savings from the system, you would have the

15    savings and that's why you have the .88.  I asked you that

16    question, sir, didn't I?  I said when I multiply --

17         MR. KAPLAN:  Objection, Your Honor.  This is a

18    speech.  There's no question.

19         THE COURT:  No, I'm going to give leeway here to

20    have a satisfactory explanation.

21         MR. KAPLAN:  Okay.

22    BY MR. HUG:

23    Q.   Looking specifically at 1049, you thought you could

24    buy 1049 at .88 of factor of what it showed in the system?

25    A.   I will tell you we could buy it at that price because

1    a factor to that amount, we would have went out and got

2    quotations for those materials based on these quantities.

3    So at that time we carried the cost quoted to us for that

4    material.

5    Q.   All right.  So you could -- okay.  So you could buy

6    it at that amount?

7    A.   Yes.

8    Q.   That's part of your 18 percent discount?

9    A.   No, I don't believe you're looking at it the same

10   way.  I feel like you're trying to have me answer in a way

11   that's not correct.

12   Q.   No, I'm just trying to get to the specific item.

13   A.   The 18 percent doesn't just involve that one

14   particular item.  You need to look at the job as a whole.

15   Q.   Okay.  I look at the job as a whole.  I look at the

16   job as a whole.  I look at all of the materials in your

17   bid and I see if I go through this bid, and we can jump

18   through a few pages on materials, I see .88, 1.0, .89, and

19   go down on the next page and I'll see a bunch of .50s, I

20   know there was one -- here it is, 4155 on page 5 of 31,

21   that's 1.89.  So that's one you thought you wouldn't get a

22   discount on, you'd have to pay more for it, correct?

23   A.   Right, cost of national average was below what it

24   publicly listed.

25   Q.   Did you yourself do these factors?

1    A.    Did I personally do these factors?

2    Q.    Yes.

3    A.    In most cases, yes.

4    Q.    And I would go down, if I go through your entire bid,

5    you're going to have some 1s and something less than 1, or

6    I don't remember seeing any others that were above 1, but

7    perhaps there are.  And that is -- that's how you get your

8    savings off of what the materials would otherwise cost,

9    correct?

10   A.    Yes, but that could work both ways.

11   Q.    You could be wrong and you could be right?

12   A.    Correct.  I could carry less money for the material.

13   Q.    That's how you calculate the range.  I think you said

14   you had a range, I don't recall exactly --

15   A.    You're mixing the materials.  You need to also

16   include the quotations.  The 18 percent is the overall of

17   all materials.  You can't just identify one particular

18   item or group of items.

19   Q.    Where is that 18 percent reflected in the bid that

20   you have an overhead of profit?

21   A.    Where is it reflected?

22   Q.    Yes.

23   A.    It's in our costs.

24   Q.    That's in these costs that I'm showing you right now,

25   page 6 of 31, that's a cost, correct?

1    A.    It's a cost included in our proposal, yes.

2    Q.    And that's the cost that you expected to incur for

3    those materials, for example?

4    A.    The dollars listed at the totals is the cost we

5    expected to spend.

6    Q.    And I just went over these factors, and the factors

7    state, as you've testified, take into account that you may

8    be able to buy these items for less?

9    A.    Possible.

10   Q.    It just so happens that you were actually able to

11   perform better than that, correct?

12   A.    Purchase?

13   Q.    Yes.

14   A.    Are you talking labor or are you talking purchasing

15   materials?

16   Q.    Just materials now.

17   A.    Yes.  We were able to.

18   Q.    So I know that you've already discounted the

19   materials in your bid in your cost codes and line items.

20   So I go back now to Exhibit 2.  If you go back to

21   Exhibit 2 and I go to the second page, you have a

22   materials line item of 502,000 in there, correct?

23   A.    Yes.

24   Q.    And that's a combination of all of those sheets I was

25   just looking at, right?

1    A.   Yes.

2    Q.   If you tab them all together, taking into account all

3    the factors that you've inserted in there, that comes out

4    to 502 and that's expressed in dollars?

5    A.   Yes.

6    Q.   All right.  And that number already has in it those

7    factors that has discount on certain line items and some

8    certain increases on some line items?

9    A.   Yes.

10   Q.   Okay.  Where's the another 18 percent that you talked

11   about?

12   A.   It comes in from the quotation column, the million

13   639.

14   Q.   Okay.

15   A.   It's a combination of our purchasing power between

16   both columns.

17   Q.   The quotation amount is 1,639,080, what is that for?

18   A.   That would be for light fixtures, switch gear, fire

19   alarm, any major components to the project.

20   Q.   Okay.  Is that materials?

21   A.   Yes.

22   Q.   So what's the relationship between the material

23   number of 502,000 and 1.6 million in the quote number?

24   A.   Well, one is based on commodity materials.  The other

25   one is based on specific materials required for the

1    project.

2    Q.   Okay.  When you say commodity material, explain to me

3    what the commodity material is.

4    A.   Pipe, wire, boxes, connectors, couplings, straps,

5    hardware.

6    Q.   Okay.  And that's the one that you have 18 percent

7    discount, that you're going to get an 18 percent discount

8    on?

9    A.   No.  You're twisting this.  I've got to say you're

10   twisting this in a way that the overall 18 percent

11   discount was based on the purchasing of the materials and

12   the quotations, not based just on the material.

13   Q.   It was based upon the labor as well?

14   A.   That's not what I said.

15   Q.   Okay.  Say it again, I'm sorry.

16   A.   The 18 percent buyout that was performed on the job

17   is a combination of the quotations and the material.

18   Q.   All right.

19   A.   It has no relation to the labor.

20   Q.   Okay.  I'm just trying to figure out where the

21   18 percent is.  Let me ask you the open-ended question.

22   A.   I don't think we have a problem on any material cost

23   overruns on this project, so I'm not sure what's relative

24   to the question.

25            THE COURT:  Well, I'm going to ask you,

1    unfortunately as a witness, you don't get to challenge the

2    Judge or the counsel about the question is relevant.  This

3    is a complicated subject matter.  If you can be as patient

4    as you can in terms of trying to explain it, that would

5    probably help us all.

6              THE WITNESS:  Okay.

7    BY MR. HUG:

8    Q.   So in this quotation amount, you think you can beat

9    that by a certain percentage?

10   A.   Yes.

11   Q.   Okay.  Where is that reflected in your bid?

12   A.   It's included in my bid.  It's not a separate

13   breakout.

14   Q.   Okay.

15   A.   It's not a separate line item or breakout to the

16   proposal.  It's based on our history, historical cost data

17   and our performance on past projects.

18   Q.   So if I look at these quotes, say, for branch power,

19   11,600, I'm going to -- that's actually -- that's going to

20   cost 18 percent more or some factor more?

21   A.   18 percent less.

22   Q.   Excuse me?

23   A.   It's a discount.

24   Q.   This number here -- excuse me, I'm sorry, I said the

25   opposite.  11,600 is 18 percent more than what you're

 1    going to be able to get?

 2    A.   Possibly.  Not in all cases.

 3    Q.   And for distribution equipment, 163,500 is going to

 4    be about 18 percent more than what you think you're going

 5    to be able to buy it out?

 6    A.   Possibly.

 7    Q.   Okay.

 8    A.   Each item would be different.

 9    Q.   All right.

10              THE COURT:  And just so I understand, I think I

11    understood at least this way when you were on your direct

12    testimony, the column for quote dollars and the column for

13    material dollars both concern materials?

14              THE WITNESS:  Yes.

15              THE COURT:  The only difference is the quote

16    dollars pertains to kind of specialized materials that

17    you're having to buy from -- that you're going out to

18    vendors and getting pricing from?

19              THE WITNESS:  Yes.

20              THE COURT:  The materials column is simply the

21    stuff that you can go to Home Depot, right?

22              THE WITNESS:  Yes.

23              THE COURT:  Commodities, as you said?

24              THE WITNESS:  Correct.

25              THE COURT:  Okay.

1    BY MR. HUG:

2    Q.   But it's the quotation amount.  I want to make sure I

3    understood.  The quotation amount is where you're going to

4    get the 18 percent savings?

5    A.   It will be at both and it's not a set percentage.

6    The 18 is an average at the end of all our purchasing.  I

7    don't think we should be -- there's no set 18 percent

8    percentage.  I might buy -- you referenced Grant's Power

9    under quotation for $11,600.  For whatever that item was,

10   I may have purchased that for $11,600 or I may have

11   purchased it for $9,000 or more.  And then when you also

12   mentioned distribution equipment for 163,000, possibly I

13   bought that for 30 percent less than what I carried.

14   Q.   All right.

15   A.   So that's where the 18 percent is an average overall

16   in the estimate on the buyout.

17   Q.   If I look at communications rough-in, I don't see

18   anything in your quote for that, but I see a materials of

19   22,041.  See that?

20   A.   Yes.

21   Q.   Now, that material, that line item comes from the bid

22   cost sheet I was showing you before in Exhibit 4?

23   A.   Yes.

24   Q.   Okay.  That's -- and this is where -- maybe I'm

25   confused or whatnot, but that already has built in it any

1    factor that you would have taken into account in that

2    particular line item?

3    A.   For the commodity materials, yes, if we discounted

4    that.

5    Q.   Okay.  So do you expect a discount, a further

6    discount on the materials line item?

7    A.   I did.

8    Q.   Beyond the factors you'd already put in there?

9    A.   Correct.

10   Q.   And you already went over the quote.  So when I look

11   at down in the right-hand column there, there's a line

12   item for profit.  You didn't have any real knowledge going

13   into this of what you were actually going to be able to

14   buy this material at, you just had a general idea that

15   you'd make 18 percent?

16   A.   No, that's based on historical costs.  We had an idea

17   of what our buyouts would be.

18   Q.   So you overquoted the items in the column quote?

19   A.   Not necessarily.  Not necessarily.

20   Q.   Okay.  Where do those numbers come from?

21   A.   Well, quotations would come from vendors.

22   Q.   Okay.  And did you include the quotation in your

23   sheet, in your price?

24   A.   We would have chosen the best price --

25   Q.   All right.

1    A.    -- with our correct billing material.

2    Q.    If you got a quote from somebody for 40,000 -- well,

3    for 163,000 for distribution equipment or a series of

4    quotes for that to add up to that, didn't you expect to

5    have to pay that amount?

6    A.    No, not based on historical cost.

7    Q.    So the quotes that you got for that, you wouldn't

8    actually buy at that amount?

9    A.    In most cases, correct.

10   Q.    Did you buy them from the same people?

11   A.    We didn't do buys at bid time.  We had proposals,

12   quotations for that material.

13   Q.    So you went to the trouble to go get quotes, you used

14   the quotes for the purposes of your bid, and then you

15   ended up purchasing them at a lesser amount?

16   A.    Yes.

17   Q.    And you knew going into it you would be able to get

18   them at a lesser amount?

19   A.    We have historical costs that backed up that we

20   could.

21   Q.    I know you had historical costs, but you already had

22   a quote?

23   A.    Yes.  That's our prerogative to use that quote or use

24   something less or higher.  That's based on my experience

25   in the business and knowing what these projects are and

1    what we're buying things for.  That's our choice.

2    Q.   Then why did you get the quote to begin with?

3    A.   Because it's material that's not updated on a monthly

4    basis.  It's specialized material that there's not

5    published price on.  We're required to get quotes.

6    Q.   Did you get quotes for all of these materials?

7    A.   Yes.

8    Q.   And you used those quotes in preparing your bid?

9    A.   We used them as an evaluation tool to prepare our

10   bid.

11   Q.   And did you sometimes use more than that number in

12   your bid or less than that number, that quote that you

13   got?

14   A.   Yes.

15   Q.   Okay.  So you used more sometimes and you used less

16   sometimes?

17   A.   Yes.

18   Q.   Well, why would you use less?

19   A.   That would be based on what we're buying material for

20   at that time for similar project -- or similar product.

21   Q.   So you could buy the material for less than what you

22   got in the quote?

23   A.   Yes.

24   Q.   And then when you actually went to buy the material,

25   you would buy it for even less than that?

1    A.    Yes.

2    Q.    And that was a plan right from the beginning as to

3    how you were going to make this profit on this job?

4    A.    It's a determination.  It's a method of determining

5    where we are.

6    Q.    You factored in -- it's overhead and profit, correct,

7    not just profit?

8    A.    Correct.

9    Q.    And your overhead and profit was factored into this

10   method you just described by obtaining quotes and

11   sometimes using and sometimes not using the quotes?

12   A.    Most definitely.  I wouldn't put a number in unless I

13   knew I could cover my costs.  Costs are the most important

14   thing to a bid.  Whether I can save money off what my

15   proposal is based on the cost, it doesn't matter what I

16   put into overhead or profit.

17            THE COURT:  Mr. Hug, I see you pulling out your

18   calculator, I was thinking it was your wristwatch.  We're

19   past our 12:30.

20            MR. HUG:  It's time.  My iPhone has a time on

21   it.  I was worried I might be past the time.

22            THE COURT:  If it's okay, we'll make this a

23   stopping point and plan to reunite here.  Is 1:15 too

24   early for people to come back?  I want to keep things

25   moving.  So let's plan to get back together here at 1:15.

1          You may step down.

2          We'll stand in recess.

3               (Whereupon, a recess followed.)

4

5          THE COURT:  You may resume, please.

6          MR. HUG:  Thank you, Your Honor.

7  BY MR. HUG:

8  Q.   Mr. Madore, I just want to go back through things

9  with you from the beginning of your testimony today.

10          You mentioned your experience a little bit to the

11  Court.  Had you actually bid summer slammers, as you call

12  them, before this particular Kelly Middle School project?

13  A.   Yes.

14  Q.   Approximately how many?

15  A.   Probably a dozen at least.

16  Q.   Were any of them with the kind of compressed schedule

17  between the end of school and the beginning of school as

18  this one?

19  A.   Yes, if there's a summer slammer, they all are.

20  Q.   So the definition of a summer slammer is right in

21  that period of time?

22  A.   Yes.

23  Q.   Were any of those with ECI, those estimates?

24  A.   Yes.

25  Q.   And you left ECI at what time this last time around?

1    A.    Two and a half years ago.

2    Q.    Why did you leave ECI?

3    A.    I had a better job opportunity.

4    Q.    Okay.  Were you terminated at all from ECI?

5    A.    No.

6    Q.    Okay.  Now, you mentioned that your involvement with

7    this particular Kelly Middle School project was to oversee

8    the estimate.  You were the overseer, correct?

9    A.    Correct.

10   Q.    You had other people working on the estimate for you;

11   is that right?

12   A.    Yes.

13   Q.    So they would be the ones looking at the detailed

14   drawings and getting number of units, correct?

15   A.    They would be quantifying.

16   Q.    And looking at the work that needed to be done?

17   A.    Yes.

18   Q.    And to do that, I think you testified that you looked

19   at a number of things, including drawings which were, I

20   think, Exhibit 58, the bid set of drawings, do you

21   remember that?

22   A.    Yes.

23   Q.    And there were also some specifications as well of

24   the particular -- that were included in the bid documents?

25   A.    Yes.

1    Q.   Okay.  And you also looked at, and I think you

2    mentioned, the schedule as well; is that right?

3    A.   Yes.

4    Q.   And in the bid process there's also addendums on

5    occasion, are you familiar with that?

6    A.   Yes, I am.

7    Q.   In this project they had addendums as well; is that

8    right?

9    A.   Yes, they did.

10   Q.   You reviewed those addendums?

11   A.   Yes.

12   Q.   In those addendums it says that there were -- it

13   talked specifically about Phase 3, did it not?

14   A.   I don't recall.

15   Q.   Okay.  Let me show you Exhibit 503.  I'm not sure

16   where they are, the original exhibits.

17                   (Pause.)

18   BY MR. HUG:

19   Q.   I'll show you what's been marked as Exhibit 503.  Do

20   you recognize that document?

21   A.   Yes.

22   Q.   What is it?

23   A.   It's an Addendum Number 1 for the Kelly Middle School

24   project.

25   Q.   Is that a document you reviewed in preparing the bid?

1    A.   Yes.

2    Q.   And actually there are other addendums in

3    Exhibit 503, correct?  It's not just Addendum Number 1,

4    there's other addendums?

5    A.   Yes.

6    Q.   I want you to turn to the second page.

7              THE COURT:  Are you going to offer that?

8              MR. HUG:  Yes, Your Honor, I'm sorry.  I'd like

9    to offer Exhibit 503.

10             MR. KAPLAN:  No objection.

11             THE COURT:  Exhibit 503 is admitted as full

12   exhibit.

13   BY MR. HUG:

14   Q.   And on Question 021 on page 2, do you see that?

15   A.   Yes.

16   Q.   And there was a question that was prepared that asked

17   for clarification of the phasing sequence, and it says the

18   precon meeting.  Is that the preconstruction meeting?

19        You understand precon to mean preconstruction?

20   A.   I do.  I'm reading it.

21   Q.   I'm sorry.

22   A.   Yes.

23   Q.   It seems the precon meeting seemed to stipulate a

24   different sequence than that of the published schedule.

25        Did I read that right?

1    A.    Yes.

2    Q.    And it was my understanding that Phase 3 would

3    require two shifts seven days a week until completed.  Do

4    you recall that?

5    A.    That's what it reads there.

6    Q.    And so you knew that Phase 3 was to be a seven-day

7    schedule, and did you know the duration of Phase 3 in

8    terms of weeks?

9    A.    Ten to 12 weeks, as I recall.

10   Q.    Would ten weeks sound about right?

11   A.    That's what I recall, 10 to 12 weeks.

12   Q.    And?

13          THE COURT:  Mr. Hug, I'm having trouble finding

14   that page.

15          MR. HUG:  Second page.  The very top one,

16   Your Honor, 021, it says construction schedule.

17          THE COURT:  Of 503?

18          MR. HUG:  503.

19          THE COURT:  Got it, thank you.

20   BY MR. HUG:

21   Q.    That was 021, the schedule.

22         Just to get you back up to speed, to summarize,

23   multiple shifts, two shifts, and a seven-day work week.

24   And you understand that the schedule would be

25   approximately ten weeks long, correct?

1   A.   Yes.  But it says "may require two shifts."

2   Q.   Okay.  Did you take into account that it might take

3   into account two shifts?

4   A.   Yes.

5   Q.   And I think your testimony was -- and by the way, you

6   also took into account that it would take 10 weeks,

7   correct?

8   A.   I said 10 to 12 weeks.  I don't recall the exact

9   duration.

10  Q.   All right.  Did you take into account that it would

11  be seven-days-a-week schedule?

12  A.   If required.  It wasn't necessarily mandated that it

13  was going to be a seven-day-a-week work schedule.

14  Q.   So if it was necessary, you should be prepared to

15  work up to seven days per week?

16  A.   Yes.

17  Q.   How did you take into account the compressed time

18  schedule in preparing your bid?

19  A.   The same way we would normally have looked at the

20  job.  You have quantity of materials going in that area

21  and labor hours to perform the work.

22  Q.   Let's back up a second.  We've talked about phases in

23  the generic form.  I actually want to put a document up.

24  This is Exhibit 652.  Do you recognize what is shown on

25  here, sir?

1   A.   I have seen that.

2           MR. KAPLAN:  Could I take a look, please?

3           MR. HUG:  Yes.  Exhibit 652, this is the

4   phasing.

5           I'd like to offer this, Your Honor.

6           MR. KAPLAN:  No objection.

7           THE COURT:  So admitted.  Exhibit 652, full

8   exhibit.

9           MR. KAPLAN:  Your Honor, may I move over there?

10          THE COURT:  Yes.

11          MR. KAPLAN:  Thank you.

12          MR. HUG:  It's close to the witness --

13          THE COURT:  Counsel is fine to wander the

14   courtroom as you like.

15          MR. HUG:  I'll try to stay out of his way.

16   BY MR. HUG:

17   Q.   We've talked about Phase 2, Phase 3.  There are

18   multiple phases to this particular project, correct?

19   A.   Yes.

20   Q.   And this litigation focuses on Phase 3, correct?

21   A.   Yes.

22   Q.   Now, just general education, I see P3CL, do you know

23   what that means?

24   A.   Phase 3.

25   Q.   What does CL mean?

1    A.    That, I can't recall.

2    Q.    Do you know what P3C means?

3    A.    No.

4    Q.    Or any of the other with the numbers on them?

5    A.    I don't recall.

6    Q.    P2A, do you know what that means?

7    A.    Phase 2.

8    Q.    And if I see PK you know what that means?

9    A.    I don't know what the K stands for.

10   Q.    But the P5.  And we see P4E over here?

11   A.    Yes.

12   Q.    That's Phase 4?

13   A.    Yes.

14   Q.    And Phase 4 is also over here?

15   A.    Yes.

16   Q.    And do you recognize that those are the various

17   phases of this project?

18   A.    Yes.

19   Q.    And you prepared a bid for the entire project,

20   correct?

21   A.    Correct.

22   Q.    Or under your direction; is that right?

23   A.    Yes.

24   Q.    And isn't it true that different phases had different

25   schedules to them, correct?

1   A.   Yes.

2   Q.   And even within a phase you had different areas

3   within a phase, correct?

4   A.   Possibly, yes.

5   Q.   Go ahead.

6   A.   Are you saying phases intermixed?

7   Q.   Good point.  Let's talk first about intermixing of

8   phases.  Were there times when one phase overlapped into

9   another phase?

10  A.   I believe there would be.

11  Q.   How about particularly Phase 3, did any other phases

12  overlap with Phase 3?

13  A.   I believe there were.

14  Q.   Do you know what phase it was?

15  A.   No, I don't.

16  Q.   And within each phase -- and I'll focus on Phase 3 --

17  you know that there's different subareas within Phase 3?

18  A.   Yes.

19  Q.   Okay.  So, for example, you had classrooms that

20  needed to be renovated, correct?

21  A.   I guess that's the work that was going on.

22  Q.   Well, as estimator --

23  A.   We're going back five years.  To recall the specific

24  areas and what work was going on, it's a little difficult.

25  Q.   All right.  And does this refresh your recollection

1    P3CL, is that the classroom area?

2    A.   I told you I couldn't tell you what the CL or other

3    definitions were.

4    Q.   You are aware there were different areas within

5    Phase 3?

6    A.   Yes.

7    Q.   Okay.  Do you know generally what was being conducted

8    during Phase 3, what kind of work was being conducted?

9    A.   It was, I believe, renovation, if I recall.

10   Q.   So there was a portion of the work that was an

11   addition as well?

12   A.   To the project, yes.

13   Q.   Now, after you prepared your bid, did you attend a

14   conference, a pre-bid conference?

15   A.   Either myself or one of my employees would have.

16   Q.   Do you remember that being October 6, 2009?

17   A.   I don't recall.

18   Q.   Do you recall whether or not it was mentioned that

19   Phase 3 was a 10-week compressed schedule?

20   A.   I don't recall if it was, but I'm sure it was

21   somewhere in the documents.

22   Q.   That would be the kind of thing that would have been

23   pointed out to you, correct?

24   A.   Yes.

25   Q.   It would also have been pointed out to you about

1    whether or not multiple shifts might be needed that you

2    should take that into account in your bid?

3    A.    Yes, if required.

4    Q.    And also that it was a seven-day work week and you

5    should take that into account in doing your bid; is that

6    right?

7    A.    Well, it didn't mandate a seven-day work week or

8    second shift; it said may be required.

9    Q.    But you should take it into account when preparing

10   your bid?

11   A.    You would consider it if you thought it was required.

12   Q.    Well, if somebody works on the weekend, would they be

13   paid straight time or would they be paid overtime?

14   A.    Depends on the structure of their employer, I guess,

15   whether they got paid over 80 or 40.  I'm not sure what

16   the exact laws were.

17   Q.    In this particular project?

18   A.    If they worked their normal work week and worked

19   overtime, yes.

20   Q.    So if that were to happen on this project, you were

21   instructed that you should take that into account in doing

22   your bid?

23   A.    If it may have been required.  There's nothing

24   indicating that it was a mandatory requirement.

25   Q.    All right.  When you were preparing your bid and

1   looking at the schedule in detail, as you must have, did

2   you determine whether or not you would need to work

3   weekends?

4   A.   Yes.

5   Q.   And therefore, would you need to do anything special

6   in the bid to account for that?

7   A.   We would.

8   Q.   And what would you do?

9   A.   We'd carry escalation costs for that.

10  Q.   All right.  And what are escalations costs?

11  A.   Just the additional premium cost of the labor.

12  Q.   And did you so factor that into your bid?

13  A.   No, we did not.

14  Q.   Why not?

15  A.   Because we didn't feel we were going to be required

16  to do seven-days-a-week schedule.

17  Q.   All right.  I want you to turn -- I think you still

18  have plaintiff's first binder in there, Exhibit 1.

19  A.   Yes, I do.

20        THE COURT:  The Court has it as well.

21  BY MR. HUG:

22  Q.   I want you to turn first to -- Attorney Kaplan went

23  over a couple of provisions with you.  I have just a

24  couple of others.

25        I want to go to Article 18.  That appears in the

1    first part of the bottom portion of the bid, it says Kelly

2    Middle School Additions and Renovations.  I think it was

3    referred that this reference, the fact that there was

4    construction.  But if you turn to the next page, you go to

5    Section 18.3, there's also an instruction as to which had

6    happened under certain situations.  And 18.3, does it

7    provide that in the event the construction schedule is

8    interrupted or delayed because the subcontractor does not

9    have sufficient materials, equipment, or workforce on the

10   job site, the construction manager shall direct the

11   subcontractor to make up the lost time through use of

12   additional labor and/or working beyond normal working time

13   at no additional cost to the owner or construction

14   manager.  Do you see that?

15   A.   Yes.

16   Q.   Did that factor at all into your bid?

17   A.   No.

18   Q.   Okay.  I want you to turn to page 4 of 18 in that

19   same packet.  I think Attorney Kaplan went over this with

20   you as well.

21   A.   Yes.

22   Q.   I think Attorney Kaplan referred you to the fact that

23   the subcontractor will be required to follow the

24   construction manager's critical path milestones.  Do you

25   see that?

1    A.    Yes.

2    Q.    The next sentence says that the subcontractor shall

3    provide additional shifts to complete the milestone

4    objectives, correct?

5    A.    Yes.

6    Q.    And that you're required, in the next sentence, to

7    include those in the subcontractor's bid; is that correct?

8    A.    Yes.

9    Q.    And since you've done summer slammers before, you

10   knew, did you not, that there was really no possibility

11   that the project had to be done in the summer slammer

12   period, correct?

13   A.    Correct.

14   Q.    That's the way these worked.  The school is out,

15   you've got to get it done because the kids have to go back

16   to school?

17   A.    Yes.

18   Q.    And you knew that when you were doing the bid?

19   A.    Yes.

20   Q.    ECI, as a practical matter, your experience with ECI,

21   ECI knows that as well, generally, doesn't it?

22   A.    Yes.

23   Q.    So particularly with respect to Phase 3, time is of

24   the essence, isn't it?

25   A.    Yes.

1    Q.   So therefore it's important that the subcontractor

2    provide sufficient labor and sufficient supervision to get

3    the job done correctly and on time, correct?

4    A.   That's the goal.

5    Q.   And you, as the estimator, need to take that into

6    account in doing your estimate, correct?

7    A.   Yes.

8    Q.   And you agree with me that the different phases are

9    different, correct?

10   A.   They're different areas of a building, but the scope

11   of work is the same throughout the project.

12   Q.   One is a new construction, part of it is building an

13   addition, correct?

14   A.   Yes.

15   Q.   And part of it is doing a renovation in an intense

16   period of time during the summer?

17   A.   Yes.

18   Q.   Those are very different, aren't they?

19   A.   Yes.  Schedule-wise, yes.

20   Q.   Aren't they very different cost-wise?

21   A.   They could be.

22   Q.   I want you to turn to, I think it was referred to by

23   Attorney Kaplan.  No, it wasn't.  00800/1, a little

24   further down, starts "General Requirements."

25              THE COURT:  What exhibit are we in?

1          MR. HUG:  Same exhibit, Your Honor.  I'm going

2    through this exhibit first.

3    BY MR. HUG:

4    Q.   So at the bottom of Exhibit 1, 00800/1.  Top of it

5    says General Requirements.  Are you there, Mr. Madore?

6    A.   Yes.

7    Q.   And part 3 concerns execution, correct?

8    A.   That's what it's listed as.

9    Q.   In fact, that 3.01 is in bold, correct?

10   A.   Yes.

11   Q.   And it advises the contractor, such as ECI, that the

12   scope of work is going to be in phases and may be started

13   and completed in multiple areas as outlined in the project

14   schedule, and that multiple mobilizations will be part of

15   the overall project, correct?

16   A.   Yes.

17   Q.   And then the last sentence of that paragraph 3.01

18   before you get to A, it admonishes the reader of this that

19   the phasing plans should be carefully reviewed to ensure

20   the work required of this contract is included in the work

21   as shown in the plans and drawings; is that right?

22   A.   Correct.  We didn't have any issues of scheduling

23   work under their schedule.

24   Q.   Turn to page 00800/3 a few more pages down.

25          And I look at Item Number V there, which is written

1    to the subcontractor, such as ECI, to provide any premium

2    time, shift work, multiple crews, special supervision that

3    may be required to maintain the project schedule.

4         Did I read that correctly?

5    A.   Yes, you did.

6    Q.   And then you went over the schedule with Mr. Kaplan a

7    little bit.

8         Now, did you understand when you were doing this bid

9    that ECI may be working in multiple areas in Phase 3 at

10   the same time?

11   A.   Yes, I understood that.

12   Q.   So it might be working, for example, in the classroom

13   area and the gymnasium, just for example?

14   A.   Yes.

15   Q.   It might also be working on Phase 2 and Phase 3 at

16   the same time, correct?

17   A.   If that's the way the schedule showed.

18   Q.   And it might be working on Phase 2 in various parts

19   of Phase 2 and Phase 3 in various parts of Phase 3,

20   correct?

21   A.   Yes.

22   Q.   And in addition to all that, it might be doing site

23   work at the same time?

24   A.   Sure.

25   Q.   So there was a light pole, I think, some electrical

1    work on the exterior of the building; do you remember

2    that?

3    A.    Yes.

4    Q.    And that occurred during Phase 3, do you remember

5    that?

6    A.    I don't recall that.

7    Q.    So when you did your bid, you took into account not

8    only would you be working on Phase 3 during that 10-week

9    summer slammer, but also might be working on Phase 2 and

10   site work?

11   A.    Yes, that's normal construction for us.  We're not

12   limited to one area at any specific time or exclusively to

13   that area.

14   Q.    Let's turn to Exhibit 2.  Now, the first page of

15   Exhibit 2 is your bid bond, correct?

16   A.    Correct.

17   Q.    Now, the rest of this exhibit -- and actually, I'm

18   not even sure about the first page.  Was any of this

19   exhibit submitted to Pike at the time of bid, any of

20   Exhibit 2?

21   A.    Do you want me to page through every page?  It's a

22   large exhibit.

23   Q.    Well, I think -- do you normally give bidders your --

24   excuse me, construction managers your takeoff at the time

25   of bid?

1   A.   No.

2   Q.   That's because it becomes a public document in a

3   public school project, right?

4   A.   There's many reasons why.

5   Q.   Okay.  There's proprietary reasons, isn't there?

6   A.   There are.

7   Q.   But suffice it to say, if you want to go through it,

8   fine, but I think it's true that you don't submit this

9   kind of detail with your bid, do you?

10  A.   No.

11  Q.   All right.  So the bid summary sheet which appears on

12  page 2 is something that's internal to ECI?

13  A.   Yes.

14  Q.   All right.  And we went over this a little bit before

15  lunch in terms of the top portion of this.  You have a

16  labor escalation factor in here of 18,533.54.  And that

17  labor escalation factor is for what purpose?

18  A.   Increase in prevailing wage rates.

19  Q.   Is it for any other purpose?

20  A.   I don't recall.

21  Q.   Turn to page 3, which actually it will say page 2 of

22  the bid sheet?

23  A.   Yes.

24  Q.   So looking at page 2 of that document, I have at the

25  top I see labor class, I see regular, and I see various

1    columns.  It will say electrical, looks like machine

2    operator, low voltage, and then various classes of labor

3    across to the right.  See that?

4    A.    Yes.

5    Q.    These are your estimated hours by different types of

6    personnel, correct?

7    A.    Yes.

8    Q.    All right.  So at least in this initial portion of it

9    for regular estimated hours, you have 19,383 -- excuse me,

10   300.81 labor hours?

11   A.    Yes.

12   Q.    Is that right?

13   A.    Yes.

14   Q.    There is nothing in the row for overtime; is that

15   right?

16   A.    Correct.

17   Q.    And there's nothing in the row for shift

18   differential, correct?

19   A.    No, I wouldn't necessarily be required to pay a shift

20   differential.

21   Q.    Shift differential means a second shift or third

22   shift?

23   A.    Off your standard work hours.

24   Q.    It's to take into account another shift?

25   A.    Yes, or off hours.

```
 1   Q.   Then there's another group of items called

 2   adjustments.  Do you see that?

 3   A.   Yes.

 4   Q.   What are those adjustments for?

 5   A.   They're to use at your discrepancy.

 6   Q.   You mean your discretion in the case pertaining upon

 7   the particular conditions of the site?

 8   A.   Of a project, yes.

 9   Q.   Of a project, excuse me.

10        So did you make any adjustments for, say, the work

11   conditions during Phase 3 being a compressed time

12   schedule?

13   A.   No, there was nothing indicating that it would have

14   been hard to achieve from ECI's standpoint.

15   Q.   I notice that there's a line item for, it looks like

16   work con, is that work conditions?

17   A.   Yes.

18   Q.   Okay.

19   A.   These are standard items that are within your

20   estimating software.  These aren't necessarily items that

21   we put in there.  This is out-of-the-box type headings for

22   the program.  It doesn't mean you need to use those.

23   Q.   You took into account -- you took into account

24   overtime or the possibility of whether you needed overtime

25   or not; is that your testimony?
```

1    A.    I didn't feel we needed overtime to perform the work.

2    Q.    Did you feel you needed a second shift?

3    A.    Yeah, we had determined we were going to use a second

4    shift, but I wasn't going to pay a shift differential.  I

5    have a select group of guys who are willing and able to

6    work a second shift and it doesn't interrupt their

7    personal or family lives.

8    Q.    Did you make that determination before you sent in

9    the bid?

10   A.    Yes.

11   Q.    Then when I go down to the next box, see direct

12   labor.  You list -- explain to me how to read that.

13   Electrical foreman working, 1?

14   A.    One.

15   Q.    So you're going to have one foreman on the job?

16   A.    That lists one foreman.  This isn't necessarily used

17   as a crew or manpower loading chart for the project.  It's

18   just a method of taking the man hours that are tabulated

19   in the estimate and calculating them out by the wage rate.

20   It's not necessarily a manpower loading.

21   Q.    You would never have less than one foreman on the

22   job, would you?

23   A.    No.

24   Q.    And during more difficult phases where a lot of men

25   were needed, you would have more foremen?

1   A.   You could.

2   Q.   And foremen are also more costly than, say, an

3   apprentice, correct?

4   A.   Yes.

5   Q.   And I notice that for foremen and journeymen, you

6   have as crew, those are the only -- excuse me.  You have

7   the same cost for a journeyman and a foreman.  Is that how

8   it's actually going to happen or is that that composite

9   number again?

10  A.   That is the composite rate.

11  Q.   And then for machine operator, I see you have a crew

12  of 1 at 55.20, and a laborer for 55.20.  Again, that's

13  that composite labor again, correct?

14  A.   Yes, but what I'd like to clarify, the machine

15  operator and the tech, those are headings in the program.

16  These aren't headings that we input into different

17  materials.  It's their labeling and classification.

18  Q.   Okay.  But you didn't use them at all?

19  A.   No.

20  Q.   And I notice that there is a rate for overtime.  That

21  didn't factor into your estimate at all?

22  A.   That rate automatically calculates based on your

23  regular time rate.

24  Q.   Same with shift differential, although it's listed in

25  there, you didn't actually factor that into?

1    A.   It's part of the table with the program.

2    Q.   All right.  So if I were to do the math, I would see

3    it's just a multiplication of the factored man hours,

4    regular 9,650.41 times the labor 55.20, I come up with

5    532,702, right?

6    A.   Yes.

7    Q.   That's how I come to the labor.  And you did want

8    same thing for journeyman and the same thing for machine

9    operator to each task?

10   A.   Yes.

11   Q.   Turn to the next page, if you would.  And on the top

12   column or top box, you described the labor escalation as

13   being your increased cost for anticipated wages over time

14   due to labor cost increase?

15   A.   Effective to the end of June and would increase July

16   1st of every year.  So these costs are with that increase.

17   Q.   Okay.  And then jump over to the next page.  And

18   material overhead, there's a box there for overhead.  And

19   there are several items under that, do you see that?

20   A.   Yes.

21   Q.   That's zero for all of them?

22   A.   Yes.

23   Q.   So you anticipated no overhead with respect to this

24   project?

25   A.   No, that's not the case.  It's no different than the

1    previous columns we referred to with labor where we don't

2    use them.  They're part of the program and they're

3    available to you, but it doesn't mean you're going to use

4    every piece of those headings.

5    Q.    So there's -- I also note that -- by the way,

6    overhead is broken out into materials overhead, quotes

7    overhead, labor overhead, equipment overhead, and so

8    forth.  You actually had costs for some of these items in

9    reality on this project, didn't you?

10   A.    Sure, there are costs.

11   Q.    It's not as though overhead didn't apply in this

12   case, you did have overhead?

13   A.    Yes.

14   Q.    And I assume ECI wanted to make a profit?

15   A.    That's the intent.

16   Q.    Okay.  And you would want to make a material profit,

17   a quotes profit, a labor profit, subcontractor profit,

18   equipment profit, and so forth.  Okay.  See that?

19   A.    Yes.  But we don't have to identify those

20   independently within our estimate.

21   Q.    I know you don't identify it to Pike, but even

22   internally you don't identify for yourself that you

23   anticipated 18 percent for overhead and profit?

24   A.    Because it was into the cost of our project and

25   estimate.  I didn't need to identify that differently.

1   Q.   Okay.  That's not anywhere in writing though, is it?

2   A.   No.  It's based on our company history.

3   Q.   Okay.  It's just -- if I look at your internal bid

4   summary which you used to evaluate your project, I'm not

5   going to find anywhere in here in these documents where

6   you have an expected profit and overhead where you're

7   going to recover that?

8   A.   Listed out in a heading, no.

9   Q.   Isn't it true that you expected to make up the

10  overhead and profit in other ways?

11  A.   No.

12  Q.   You didn't hope to have change orders?

13  A.   Do you hope you have change orders?  No, I prefer not

14  to have any change orders on a job.  They only hinder me.

15  Q.   I'm just -- how do you know -- how do you know

16  whether your estimate is good or not if nowhere do you

17  document where you expect to make the money?  I'm just

18  curious as to how does a company like ECI --

19  A.   I have historical database of all the projects we

20  bid, won, lost, and then what the costs are associated

21  with those.

22  Q.   Is this the way you did it for McPhee?

23  A.   We did do historical cost evaluations, yes.

24  Q.   Did you have an overhead and profit factor in each

25  bid with McPhee?

1   A.   It depended on the project.  That's a company

2   decision.

3   Q.   With ECI, did you have other projects where you

4   included an overhead profit line item in your quote?

5   A.   Yes, there were times.

6   Q.   Now, just a point of clarification.  On page 4 of 4

7   of your bid summary, you have 3,496,153.59, that's your --

8   Attorney Kaplan referred to that earlier as a base bid.

9   Is that a fair statement?

10  A.   Lump sum proposal bid, yes.

11  Q.   Actually, there are alternates that were also bid?

12  A.   Yes, that would adjust that cost, yes.

13  Q.   Were you involved in the estimate for the alternates?

14  A.   I was involved in overseeing the entire estimate.

15  Q.   Okay.  Is that -- are the alternates included in

16  Exhibit 2?

17  A.   I'd have to look.

18  Q.   Well, if Exhibit 2 is 3.496, that's the base bid?

19  A.   Yes.

20  Q.   The alternates are above that, right?

21  A.   Yes.  They're separate from that, yes.

22  Q.   Now, the alternates, do you know when they were going

23  to be performed?

24  A.   I don't recall.

25  Q.   Because I want to take a look at Exhibit 4 for a

1    moment.  And I'm on the summary sheet and Attorney Kaplan

2    went over with you that Phase 3 is 7593.  And I notice

3    that the total dollars for this is 3,637,445, see that?

4    A.    Yes.

5    Q.    That's the base bid plus the alternates, right?  If

6    you need something, I can show you something.

7    A.    I would need to see whether the alternates were

8    accepted or not.

9    Q.    Take a look at Exhibit 9.

10   A.    Yes.

11   Q.    Attorney Kaplan showed you Exhibit 9 and he brought

12   out the cutout sheet or the lengthy sheet in Exhibit 9?

13   A.    Yes.

14   Q.    If you look at ECI's base bid, it's 3.496?

15   A.    Yes.

16   Q.    And there's highlighted the various phases or

17   alternates that were included.  See that?

18        If you go back to the front page now, you'll see that

19   they total to $3,637,345?

20   A.    I assume the method, yes.

21   Q.    So the total bid is the base bid plus the alternates,

22   right?

23   A.    The accepted alternates, yes.

24   Q.    And it totals up to 3.6 million plus change?

25   A.    Yes.

1    Q.   All right.  So I was just curious, I went back to

2    Exhibit 4 on the first page, that 3.6 million is exactly

3    the same, that's the full bid with the alternates?

4    A.   Okay.

5    Q.   Where are the alternates in the various phases?

6    A.   I don't recall specifically.  I'd have to go back and

7    review the documents.

8    Q.   So you don't know --

9    A.   Could you point out which ones might affect Phase 3?

10   Q.   I don't know.  I was asking you whether the 7593

11   included the alternates or did not include the alternates.

12   A.   It would be based on -- those hours breakdown would

13   be based on the alternates with our contract.

14   Q.   But you don't know whether or not any alternates were

15   in Phase 3?

16   A.   I don't recall.

17   Q.   Now, turning to Exhibit 3 for the moment.  And just

18   the cover page, I suppose we could have done it with

19   Exhibit 4.

20       Phase 3, I think Attorney Kaplan mentioned it was

21   approximately -- consists of approximately a third of the

22   labor hours.  Is that correct?

23   A.   Yes.

24   Q.   And Phase 2 -- by the way, Phase 3 is 7593 labor

25   hours, right?

1    A.    Yes.

2    Q.    Phase 2 is about 1500 hours more at 9,081.  Correct?

3    A.    Yes.

4    Q.    And you're aware, are you not, that Phase 2 is going

5    on at least in part with Phase 3?

6    A.    I don't recall.

7    Q.    Now, after the bid was accepted, you had what was

8    called a de-scope meeting, correct?

9    A.    Yes.

10   Q.    And at this de-scope meeting you were essentially

11   vetted by members of Pike and others as to whether or not

12   your bid was inclusive of all of the items that were

13   necessary to properly perform the work, correct?

14   A.    Yes.

15   Q.    And you were specifically asked about whether or not

16   you took into account Phase 3; do you recall that?

17   A.    Not specifically, I don't recall that.

18   Q.    Do you recall who was there at the meeting with you?

19   A.    The only one I would recall is Mel Strauss.

20   Q.    Let me show you what's been marked as Exhibit 502.

21         Sir, Exhibit 502, do you recognize that document?

22   A.    I'm familiar with it.

23   Q.    Is that your handwriting that appears on it?  Top of

24   the first page?

25   A.    No.

```
 1   Q.    Do you recognize that handwriting?

 2   A.    No.

 3   Q.    Now, during your direct examination, you were asked a

 4   question about your estimate and whether or not you did a

 5   examination of how long it would take for your -- how much

 6   manpower you would need per day during Phase 3.  Do you

 7   recall that questioning?

 8   A.    I do recall that questioning.  I thought we were

 9   referring to the entire project, if I may recall.  From an

10   estimating standpoint, I will look at the job from a

11   whole, start to finish.  I didn't understand it was only

12   to Phase 3.

13   Q.    So you gave an estimate of 30 to 35 people?

14   A.    For peak for the project.  That was peak for the

15   project, yes.  Yes.

16   Q.    And wouldn't Phase 3 be peak for the project?

17   A.    It would be an area of the project.  Would the

18   manpower peak at that specific point?  It could peak at

19   that specific point, yes.

20   Q.    Do you know how the math works out if it is the peak?

21   Did you do --

22   A.    I didn't do the math, no.

23   Q.    How many days a week did you anticipate that ECI

24   would perform its work?

25   A.    Per the schedule.
```

1    Q.   Seven days a week?

2    A.   No.

3    Q.   I'm looking for what ECI planned.

4    A.   Our plan was based on the schedule that was provided

5    with the bid documents.

6    Q.   Okay.  I'm just, from a manpower standpoint, is 30 to

7    35 people per day, is that for five days a week or seven

8    or for six days a week?

9    A.   I would look -- from an estimating standpoint, I

10   would look at that from a five-day-a-week schedule from

11   start to finish for the entire project.

12   Q.   Entire project.  But during the peak periods, during

13   the heaviest periods, you would expect it to be at the 30

14   to 35 range I think is what your testimony is?

15   A.   Yes.

16   Q.   Okay.  So if we take 30 to 35 people -- and I think I

17   have a calculator.  I suspect you know how to use that?

18   A.   Once or twice.

19   Q.   So let's just, if it's 30 to 35, it's 32 and a half.

20   We'll split the difference, 32 and a half, okay.  So 32.5

21   people per day during peak periods.  And that's, what, an

22   eight-hour day?

23   A.   Yes.

24   Q.   So times 8 is how many hours is that?  How many does

25   that come out to -- maybe you can do the math, I can't.

1    A.    I'm sure you could.

2    Q.    I could, but I'd ask you to agree with me and then

3    you'd say I need a calculator.

4    A.    260.

5    Q.    Then they would be working -- so that's 32.5 times 8,

6    260, I'm going to multiply that by 5, five days a week?

7    A.    Yes.

8    Q.    What's that come out to?

9    A.    1300.

10   Q.    1300.  And this was, you said, 10- to 12-week

11   project, Phase 3?  Excuse me, Phase 3 was a 10- to 12-week

12   project?

13   A.    Phase 3 was 10 to 12 weeks.

14   Q.    Let's assume, for purposes of the question, it's 10

15   weeks.

16   A.    Okay.

17   Q.    What do I come out with when I go 1300 times 10?

18   A.    13,000.

19   Q.    Assuming it's 10 weeks, you would expect that when

20   you're starting a phase there would be some ramp up, say a

21   week ramp up and a week ramp down?

22   A.    No.  The entire project was going down multiple

23   phases.  Just like you indicated, there was work being

24   done in Phase 2, Phase 3, Phase 4.  I necessarily wouldn't

25   have to ramp up.  I could be finishing work in other

1  phases and still have the available manpower.

2  Q.   So no ramp up.  You wouldn't need much of a ramp up

3  is what you're saying?

4  A.   Potentially there may be a chance for ramp up or may

5  not.  Depends on how well the project was going.

6  Q.   In Phase 3, starting Phase 3 did you expect to have a

7  ramp up?

8  A.   That wouldn't be up to me at bid time.

9  Q.   So 13,000, that comes out to 13,000 man hours?

10  A.   I already told you, I made an error in the math for

11  manpower.  I based it on the whole job.  At some point I'm

12  going to peak out that high.

13  Q.   I understand that.  I'm asking you --

14  A.   But what's the duration of it?  It's not 10 weeks.

15  You listed 10 weeks.

16  Q.   Well, I don't understand.  Isn't Phase 3 a summer

17  slammer?

18  A.   Yes.

19  Q.   Okay.  As a summer slammer, wouldn't you agree with

20  me that that would be peak time?

21  A.   It could be, yes.  It could be peak time, but it

22  depends on what other activities were going on.  My peak

23  may not be during that summer.  That particular area may

24  be a fast track summer slammer, but it doesn't mean I'm

25  going to peak out during those periods.  I could peak out

1    at the end of the job or somewhere in the middle.

2    Q.   So you don't know whether you would have peaked out

3    during the summer slammer period?

4    A.   No, because I didn't put the schedule together.  So I

5    wouldn't know where the peak would be.

6    Q.   Well, you did review the schedule when you were

7    doing --

8    A.   Yes.

9    Q.   And you'd agree with me a summer slammer, just by its

10   term that you use, that would seem to me to be an intense

11   period during the project?

12   A.   No.  It's an accelerated schedule for that phase.  It

13   doesn't peak the project out.

14   Q.   Is there another phase where you would incur 30 to 35

15   people per phase?

16   A.   It would be throughout the whole job, all phases.

17   I'm sure at some point in the project that all phases were

18   being worked on.  If you go back and check daily reports

19   and things, I think you're going to find that we had

20   people in every area of the project.

21              THE COURT:  Could I understand the derivation of

22   the 30 to 35 hours again, according to the witness?  Could

23   you explain where that 30 to 35 hours is coming from?

24              THE WITNESS:  What I'll do at the time of

25   evaluating a schedule at bid time, I'll take the start and

1   finish date.  So the number of work days to perform the

2   job based on the number of man hours in the bid.  So I

3   look at it more from an average standpoint, not a peak

4   standpoint.

5               THE COURT:  So your average --

6               THE WITNESS:  I would start a job with -- I may

7   have started a job with a foreman on it for two months,

8   one guy, you know.  And then slowly increase my manpower

9   from there.

10              THE COURT:  But your estimate as to the average

11  was 30 to 35?

12              THE WITNESS:  It was a guess on my part at that

13  point.  I didn't do the math when the question was raised

14  to me.

15              THE COURT:  When the question was raised by

16  Mr. Kaplan?

17              THE WITNESS:  By Mr. Kaplan, correct.

18              THE COURT:  Is there anything in our records

19  here that incorporates that 30 to 35 hour estimate?

20              THE WITNESS:  It was a number that, like I said,

21  without doing the math, I didn't calculate it out.  I

22  handle multiple projects and this thing is five years ago.

23  BY MR. HUG:

24  Q.   I think, sir, your testimony, was it not, you were

25  asked on direct examination what you thought the number of

1   manpower per day would be needed -- I recall it being for

2   Phase 3 of the project?

3   A.   And I misunderstood that.

4   Q.   I think that was the question.  And your answer was

5   30 to 35 people per day, labor per day, correct?

6   A.   I didn't understand it as being Phase 3.

7   Q.   Okay.

8   A.   I don't look at it from a phase standpoint when I'm

9   bidding.

10  Q.   Well, you did in this case, didn't you?  That's the

11  whole point?

12  A.   The breakdown that you're referring to in the other

13  exhibits were done post-bid.

14  Q.   Okay.  But I thought your testimony was that the 30

15  to 35 man hours was done post-bid also when you were

16  sitting down with Mr. Clauson?

17  A.   No, that's not what I said.

18  Q.   Did you actually ever sit down with Mr. Clauson and

19  discuss how many man hours or how much manpower would be

20  needed on this project?

21  A.   At the start of the project?

22  Q.   Yes.

23  A.   No.  That's not my job.

24  Q.   So you bid -- for Phase 3 your bid is 7593, correct?

25  A.   Yes.

1    Q.   What's the difference between those two?  13,000 and

2    7593?

3    A.   I'm not sure what the relevance is.

4         5400.  5,407.

5    Q.   Okay.  Now, turn to Exhibit 9.

6    A.   Yes, sir.

7    Q.   Now, Exhibit 9 has that long page in it that I even

8    asked you a few questions about before.

9         Judge, need a minute?

10        THE COURT:  I'm almost there.  Yes, Exhibit 9,

11   okay.

12   BY MR. HUG:

13   Q.   And you were asked some questions about your bid and

14   Ferguson's bid.  And you were asked some questions about

15   Ferguson.  Do you remember that general line of question?

16   A.   Are we referring to the same exhibit?

17   Q.   Exhibit 9, the long page with the bid tabulation?

18   A.   Thank you.

19   Q.   So Ferguson -- it indicates Ferguson was $3,437,000

20   on their base bid, just looking at their base bid, see

21   that?

22   A.   Yes.

23   Q.   In your view, that's reasonably close to your base

24   bid of 3,496,000, right?

25   A.   Yes.

1   Q.   And you already, I think, testified that T&T

2   Electrical Contractors, they withdrew their bid or they

3   were disqualified or they're out of the picture?

4   A.   Correct.

5   Q.   We don't want to take into account their bid either,

6   it's meaningless?

7   A.   Yes.

8   Q.   Okay.  I probably could have phrased that better, but

9   you got the picture.

10       I notice you didn't talk about -- now, before I move

11  on to that, Ferguson, I think your testimony was that you

12  were told by Pike that Pike did not have a comfort level

13  with Ferguson?

14  A.   Correct.

15  Q.   So you don't know what the reason for that lack of

16  comfort level was, do you?  That was never discussed with

17  you, was it?

18  A.   I was aware of past history.

19  Q.   Do you know if there were other reasons?

20  A.   Just past performance with either Pike and/or the

21  town.

22  Q.   Do you know what happened in the Ferguson scope

23  review by Pike?

24  A.   No, I don't.

25  Q.   You weren't told that?

1   A.   No.

2   Q.   That was told by Mr. Strauss in the court case that's

3   attached as Exhibit 8, which I'll leave to the Court to

4   read, but you haven't read Exhibit 8, which is the court

5   case?

6   A.   No.

7   Q.   Okay.  So I notice you didn't talk about Bloomfield

8   Electric, Professional Electrical Contractors, or Kennedy

9   Electrical Contractors.  Those bids were substantially

10  more than your bid, weren't they?

11  A.   It appears that way.

12  Q.   So they had a little bit different view of how much

13  it would take to perform this project, didn't they?

14  A.   Yes.

15  Q.   Do you know of any problems with their bids other

16  than the fact they were higher than yours?

17  A.   No.

18  Q.   They were not disqualified in any way, were they?

19  A.   No.

20  Q.   And you haven't reviewed their bids or compared their

21  bids to your bids, have you?

22  A.   No.

23  Q.   You were asked questions about Exhibit 35.

24       I'm sorry the Court has to continue to move from

25  binder to binder, but --

1          THE COURT:  Good exercise.  It's okay.

2          MR. HUG:  Honestly, Judge, there's just no way

3     to ever figure out exactly how it's going to come in, put

4     it in nice sequential order.  Our combined experience of

5     50 years hasn't done it.

6          MR. KAPLAN:  You've only got 20?

7          MR. HUG:  Okay, 55.

8     BY MR. HUG:

9     Q.   You were asked certain questions about your job

10    performance review forms.  Do you recall that testimony?

11    A.   Yes.

12    Q.   You reviewed these forms as they came in or

13    periodically from time to time, correct?

14    A.   Periodically.

15    Q.   And you reviewed these forms and saw that, say, for

16    example, we take a look at January 18 I think was the

17    first one that Attorney Kaplan referred you to.  See that?

18    A.   Yes.

19    Q.   And in this first page of this document, it has sort

20    of a summary of where you are, projected gross margin,

21    among other things.  Do you see that?

22    A.   Yes.

23    Q.   And it also has down below reasons for deficiencies

24    in proposed corrective measures.  Do you see that?

25    A.   Yes.

1    Q.    And it says buyout almost complete, job cost

2    worksheet 18 percent pickup.  See that?

3    A.    Yes.

4    Q.    And that's in reference to the buyout of the bid

5    value of the materials that shows on page 2, correct?

6    A.    Yes.

7    Q.    That's where you made your 18 percent; is that right?

8    A.    Yes.

9    Q.    Okay.  I notice it doesn't say 18 percent pickup as

10   anticipated or anything along those lines, does it?

11   A.    No, it doesn't say that.

12   Q.    The next line says cost due to, all caps, NO PM TIME

13   IN BID.  Do you see that?

14   A.    Yes.

15   Q.    That means no project manager time in the bid; is

16   that what you understand that to mean?

17   A.    Yes.

18   Q.    Move on to the next job cost worksheet of April 12,

19   2010, do you see that?

20   A.    Yes.

21   Q.    And it says that your projected gross margin is a

22   negative 160,000 at that point, right?

23   A.    That's what it indicates.

24   Q.    And the buyout is almost complete, that same comment

25   is in there at the bottom?

1  A.   Yes.

2  Q.   And the first dashed one says cost due to no PM time

3  in bid, that was as before in the last one I showed you,

4  and it says rate is plus four dollars an hour from

5  estimated cost.

6       Did you read that?  Did you see that when you

7  reviewed this the first time?

8  A.   I see it.  I read it.

9  Q.   Take a look at June 18, 2010, first page of the job

10 performance review form.

11      Okay.  Under the comments, the reason for

12 deficiencies and proposed corrective measures, it says

13 you're working in all Phase 2 and 3 areas.  Do you see

14 that?

15 A.   Yes.

16 Q.   Okay.  So, as of the sort of middle of June, a little

17 past middle of June, almost four years to the day before,

18 they're working in all Phase 2 and 3 areas at this point.

19 Now, I described earlier that Phase 2 and Phase 3

20 accounted for 33 and 38 percent of the project, so that's

21 over 70 percent of the project that is being worked on at

22 that time.  See that?  Is that right?

23 A.   I read it.

24 Q.   That would be a peak time, wouldn't it?

25 A.   Potentially.  I didn't manage the job on a daily

1    basis, I can't tell you exactly where the peak ended up.

2    I was estimator in the early stages.

3    Q.   Next sentence says:  Work going okay, increase crew

4    for summer work?

5    A.   Okay.

6    Q.   Did I read that right?

7    A.   Yeah.

8    Q.   Take a look at the job performance review form for

9    7/19/2010.  Again, in the Comment section, it says that

10   working in all Phase 2 and 3 areas.  Increase crew for

11   summer work.  The place is a zoo, send help.

12        Did I read that right?

13   A.   I'm reading the same thing you are, so yes.

14   Q.   Early in your testimony you said nobody complained

15   about your estimate, did they?

16   A.   There was no complaints about the estimate.

17   Q.   And you read these job performance review forms?

18   A.   Not monthly, no.  I indicated that.

19   Q.   Turn to 8/13/2010.  Do you see the comments in there?

20   A.   I do.

21   Q.   Have you read these comments before today?

22   A.   Yes.

23   Q.   And you're prepared to answer the questions I'm about

24   to ask you, based upon your smile?

25   A.   I'll do my best.

1   Q.   I happened to blow this document up, this particular

2   page.

3        Sir, they're complaining about your estimate, aren't

4   they?

5   A.   It appears that way.

6   Q.   So you were in error when you said before nobody

7   complained about your estimate?

8   A.   No.  At that time prior to that, there was no

9   complaints about my estimate.

10  Q.   Also the fact that people were saying that there was

11  no PM time in the bid and there was plus four dollars or

12  the estimate is actually -- or labor was plus four dollars

13  an hour, those weren't complaints?

14  A.   They're comments, but not necessarily a complaint

15  with the estimate.

16  Q.   Okay.  Well, this is a complaint, though.  This

17  qualifies as a complaint, doesn't it?

18  A.   Yeah, I would take this as a complaint.

19  Q.   It says:  Someone need to stop the estimating

20  department from ignoring the project schedules at bid time

21  and providing an estimate that's going to cost the company

22  huge amounts of loss.  The project will continue to show

23  larger losses.  Three and a half more phases to go and

24  it's not going to get better.  The place is still a zoo.

25  Send more help.

1        That part I read correctly?

2   A.   Yes.

3   Q.   Now, at this point in time also in the upper portion

4   of that the comments, it says:  Working in all Phase 2 and

5   3 areas.  Increased crew up to 40 men.

6        Phase 2 and Phase 3 are the areas that are the two

7   largest components of this prong, correct?

8   A.   Yes.

9   Q.   And then the fifth bullet down it says:  Fixture

10  labor units way, way off what it's taking in the field.

11       Do you see that?

12  A.   Yes.

13  Q.   Now, as I understand it, you made a comment earlier

14  that because the materials you got basically right, that

15  this 18 percent, which never actually appears in your bid,

16  take that as it is.  Because you got the material profit

17  right or the profit from the materials or the buyouts, I

18  should probably say, correct, therefore your labor units

19  are correct.  Do you recall that testimony?

20  A.   Yes.

21  Q.   Okay.  But the two aren't the same thing, are they?

22  A.   Well, they're not the same thing, but they relate to

23  each other based on quantities.

24  Q.   So you have a light fixture and that has a price.

25  Then the labor factor is how long it's going to take you

1  to install that light per unit, correct?

2  A.   Correct.

3  Q.   All right.  So you could be right on the material and

4  way off on the labor?

5  A.   No.

6  Q.   You couldn't?

7  A.   It could go either way.

8  Q.   It could be off on the material and be right on the

9  labor?

10  A.   Correct.

11  Q.   So there's really no relationship between the two, is

12  there?

13  A.   Material dollars and labor dollars, no.

14  Q.   So when you looked at fixture units, to install a

15  fixture you have to take into account a whole bunch of

16  different things in calculating how much it's going to

17  cost to install a fixture in a particular room, right?

18  There's a whole bunch of components that go into it, isn't

19  there?

20  A.   Yes.

21  Q.   There's the actual material, which we've covered, a

22  fixture, whatever it is, correct?

23  A.   Yes.

24  Q.   There's the time and energy it takes to get it to the

25  project.  That may be included in the materials cost, it

1    may not be, correct?

2    A.   Correct.

3    Q.   And then you have to have it unloaded off the truck

4    and stored somewhere at the project in a set area for the

5    project, correct?

6    A.   Possibly.

7    Q.   And then when it comes time to actually install it,

8    somebody has to go and get that material, bring it back to

9    the area where it needs to be done, where it needs to be

10   installed, correct?

11   A.   Yes.

12   Q.   And then they need to install it, correct?

13   A.   Good sequence, yes.

14   Q.   And there may be, you know, multiple light fixtures

15   in a particular area.  So you may actually, you know, go

16   get five lights and bring the five lights over to that

17   area and install them all at once -- not all at once, not

18   have to repeat the same sequence that have to go into the

19   gymnasium or wherever they were located and coming back,

20   go there and get one unit and come back, you might be able

21   to go there, get four units and come back?

22   A.   Correct.

23   Q.   It varies, depending on the room you're in, how big,

24   what the lighting is?

25   A.   Correct.

1  Q.    You might need equipment as well?

2  A.    Yeah, there will be instances.

3  Q.    And then you have to take into account what kind of

4  conditions they might be in in putting in the particular

5  fixture, don't you?

6  A.    In some cases.

7  Q.    So, for example, if you're in an area where there's a

8  mason working or a drywaller working, or somebody else and

9  it's a relatively small space, you need to take that into

10 account, and that may affect how long it takes to put that

11 fixture in because there's three other people in the room

12 with you.  Could that impact your bid?

13 A.    It could impact it, yes.

14 Q.    And also the fact that because you might have so many

15 fixtures but such a short period of time to put it in, you

16 may need to have more people on the job to get it done,

17 correct?

18 A.    If the schedule dictated that.

19 Q.    And you would agree with me that if you have 12

20 people on the job or 60 people on the job working in

21 multiple areas in Phase 3 and Phase 2, that one person

22 can't be the foreman for 60 people?

23 A.    It's possible.  Is it likely?  No.

24 Q.    Thirty-five people or 30 to 35 people working

25 throughout Phase 3 and Phase 2 -- so that encompasses this

1  area here, this area here, here, here, here (indicating),

2  one foreman looking at 30 to 35 guys, is that reasonable?

3  A.   Is it reasonable?  I don't know.

4  Q.   Wouldn't you have to know that when you were doing

5  your bid?

6  A.   I wouldn't anticipate -- I can't predict what the

7  other contractors are doing and where my peak is going to

8  be for foremen.  You've got to remember, our work is done

9  in sequence with other trades.  There's things that need

10  to be performed before our work can be installed.  I have

11  no control on whether they start or complete their task on

12  time.

13  Q.   Turn to the next job performance review form.  So

14  this is the one for September 23, 2010.

15       So if you go a couple of pages into it, the third

16  page into it I see notes.  See that?

17  A.   Yes.

18  Q.   All right.  And again, this is another complaint

19  about the estimating -- well, that's my term.  That's my

20  term.

21  A.   Yes, exactly.

22  Q.   Not to be too argumentative.  We'll figure it out

23  from whatever it says.

24       Phase 3 completed, started back in Phase 2 work.

25  Only seven men at this time.  Phase 4 west to start next

1    month.  See previous review that outlines items missing

2    from estimate.  Bill to write delay letter to Pike to

3    regroup some of the lost hours due to steel and masons.

4    Labor lost this phase by remaining hours required to

5    complete the project based on estimate only.  I believe

6    these hours are still low.

7          Again, is that a complaint about your estimate, at

8    least in the last part?

9    A.   No.  That comment's in regards to what the project

10   manager estimates it's going to take to complete it, the

11   project at that point.

12   Q.   Okay.  That's a fair point.

13         If you go back -- if you go back to the page right

14   before, Attorney Kaplan referred to the variance in PM

15   estimate columns.  Remember that testimony?

16   A.   Yes.

17   Q.   Okay.  And I think it was determined that the

18   variance column is a confusing name.  It really is -- it's

19   really effectively the bid, correct?

20   A.   I believe -- yes, the baseline.

21   Q.   And the PM estimate is what Mr. Clauson, who was the

22   project manager of this job, what he thought it would take

23   to actually complete the entire project?

24   A.   That would be his estimate.

25   Q.   Okay.  So Mr. Clauson -- and Mr. Clauson, by the way,

1    he's here in the courtroom, correct?

2    A.   Yes.

3    Q.   And he is an experienced project manager?

4    A.   Yes, he is.

5    Q.   And he's been with ECI for many years, correct?

6    A.   Yes.

7    Q.   And you know him to be a very competent project

8    manager?

9    A.   Yes.

10   Q.   And an honest person, too?

11   A.   I would say yes.

12   Q.   And he estimated that it was going to be 962,000 left

13   to go versus 284,000 left to go, correct?

14   A.   That's what it states, yes.  But what's that based

15   on?  It's not necessarily based on our estimate.  He was

16   dealing with the inner workings on a daily basis.  There's

17   factors that created that other than our estimate or not

18   even our estimate.  We haven't talked about the

19   construction schedule and when things got performed.

20   Started, completions, in sequence, out of sequence, I

21   haven't heard any discussion on that.

22   Q.   He says in his particular -- says labor lost is based

23   on remaining hours required to complete the project based

24   on estimate only.  See that?

25   A.   That means based on his estimate only, not on our

1    estimate for the bid.  That's his projected.  It's a

2    cost-to-complete report, meaning at that time it's his

3    outlook of what it's going to take for him to complete

4    that project.  Not based on the bid.

5    Q.   So you didn't understand that to be a commentary on

6    your estimate?

7    A.   I don't take that as a commentary on my estimate.

8    Because there's too many factors during the course of

9    construction that affect that.

10   Q.   I want you to turn to the job cost report and

11   worksheet for June 16, 2011, which is pretty far down the

12   road.  Were you still reviewing those at that point in

13   time or had you left the company?  I can't remember.  I

14   did ask you earlier when you left.

15   A.   I've been gone two and a half years.

16        Which report?

17   Q.   It's the June 16, 2011.  And specifically the notes.

18        Did you find it?

19   A.   No.

20             MR. HUG:  May I approach, Your Honor?

21             THE COURT:  Sure.

22             MR. HUG:  I can't remember what date I said.  I

23   think I said July 16 -- June 16.

24   BY MR. HUG:

25   Q.   Here's June 16, 2011.  Do you see that?

1   A.   Yes.

2   Q.   Now go two pages.  Actually, the next page is

3   July 16, 2011.  And there's a comment for 15 April, 2011.

4   And it says:  Phase 4 West and auditorium hours are

5   running over estimate.  We are scheduled to complete these

6   areas at the end of the month.

7        And it goes on from there.  Do you see that?

8   A.   Yes.

9   Q.   Okay.

10  A.   I believe that's just a statement what he's basing

11  his cost to complete on.  He's not identifying or

12  projecting what his hours are going to be to complete that

13  phase and the reason why.  It may be more than the

14  estimated hours which, again, doesn't indicate where the

15  other contractors were on the project and when we had our

16  start and completion dates.

17            MR. HUG:  Your Honor, if I may have a moment?

18            THE COURT:  Certainly.

19               (Pause.)

20            MR. HUG:  No further questions, Your Honor.

21            THE COURT:  I just have one clarifying question

22  that I wasn't quite clear on from cross-examination.  It

23  had to do with the -- and I want to make sure I understood

24  this.  On Exhibit 2, which the witness was asked about

25  whether overhead costs were included at all as part of the

1    bid in this project.  And I understood the answer to be

2    no.

3              THE WITNESS:  They were not identified within

4    those headings.

5              THE COURT:  Okay.  So explain to me, was

6    overhead considered then in some way?

7              THE WITNESS:  We would have considered it in our

8    base proposal, you know, with the buyouts that we had.  We

9    anticipated having buyouts on the project.  It's a risk

10   factor, obviously, but based on our history within the

11   company, we felt confident that those costs would have

12   been secured.

13             THE COURT:  But how does one identify -- what

14   percentage did you estimate to be overhead, for instance,

15   for this project?

16             THE WITNESS:  It varies.  Every project is a

17   little bit different.

18             THE COURT:  What do buyouts have to do with

19   overhead?

20             THE WITNESS:  Well, obviously they're -- it's

21   money coming back, whether you call it profit or overhead.

22   It's money that isn't being spent on commodity materials

23   or productivity on the job.

24             THE COURT:  All right.

25             Mr. Hug, anything else?

```
 1              MR. HUG:  I'm sorry, Your Honor, I'm thinking.

 2              No further questions.

 3              THE COURT:  Thank you.

 4              MR. KAPLAN:  Some redirect, please?

 5              THE COURT:  Are we going to be lengthy on

 6   redirect?

 7              MR. KAPLAN:  Twenty minutes.  Want to take a

 8   break now?

 9              THE COURT:  Why don't we take a ten-minute break

10   since we're going to break around 4:00.  Take a ten-minute

11   break and finish up.

12              We'll stand in recess.

13                   (Whereupon, a recess followed.)

14

15              THE COURT:  Okay.  We have until about 4:15 if

16   folks can stay until then, I'll just refine that time.

17              So if we'd like to do redirect examination.

18              MR. KAPLAN:  Yes, sir.

19

20                   REDIRECT EXAMINATION

21   BY MR. KAPLAN:

22   Q.   Mr. Madore, I'm just going to hand out a couple items

23   you went through with Attorney Hug.  I'd start with

24   Volume 1, Exhibit 1, and Mr. Hug asked you about a few

25   articles of the bid documents, the bid specifications.
```

1       If we go to one of the articles, he spoke with you

2  about actually two, Article 18.3, 18.4, these were in

3  Exhibit 1 and the page at the bottom was 00/8, this is

4  part of the instructions to bidders.  Are you there?

5  A.   I'm there.

6  Q.   He asked you about, in both of these clauses, it

7  talks about the construction manager directing the

8  subcontractor to make up lost time through the use of

9  additional labor or working beyond normal working time.

10  18.3 is conditioned upon the subcontractor not having

11  sufficient materials, and 18.4 talks about major delays

12  and a request for time extension.  I'd like to talk about

13  18.3.

14       To your knowledge, did ECI ever have any problems

15  with materials on the job?

16            MR. HUG:  Objection, Your Honor.

17            MR. KAPLAN:  I'm saying to his knowledge.

18            MR. HUG:  No, I'm objecting because he's

19  mischaracterized what 18.3 says.  If he wants to limit it.

20  It says materials, equipment or workforce on the job.

21            MR. KAPLAN:  I'm fine with that.

22  BY MR. KAPLAN:

23  Q.   Any of those factors, materials, equipment or

24  workforce?

25  A.   No.

1  Q.   So if -- let me ask you this.  Does this apply --

2  this was the same bid requirements for all subcontractors,

3  correct?

4  A.   Correct.

5  Q.   So if other subcontractors were holding up the job

6  because they didn't have sufficient materials, equipment

7  or workforce on the job, does this mean that Pike would

8  have to cause them to catch up as well?

9  A.   Yes.

10 Q.   And if other contractors, subcontractors were

11 interfering or interrupting ECI's work due to the

12 sequences you mentioned in the critical path schedule,

13 could ECI recover until they did their work?

14 A.   No.

15          MR. HUG:  Objection, he's asking for a legal

16 conclusion.

17          THE COURT:  I do think it sounds like a legal --

18          MR. KAPLAN:  On a practical level.  I'm talking

19 about -- I'll restate by question.

20          THE COURT:  I don't know that this witness is

21 involved in collecting money and interpreting.  He didn't

22 write this contract.

23          MR. KAPLAN:  I wasn't talking about that, sir.

24 Let me rephrase it.

25

 1    BY MR. KAPLAN:

 2    Q.   On a practical level, Mr. Madore, you talked about on

 3    direct with me that certain items in the schedule show

 4    they have to be done before ECI could do their work?

 5    A.   Correct.

 6    Q.   You talked about the mason chopping out areas of wall

 7    so ECI could then put in rough branch work?

 8    A.   Yes.

 9    Q.   If those predecessor activities are not being done,

10    what's the effect on ECI?

11    A.   It would delay us in completing our work.

12    Q.   So this is applicable, 18.3 applies to all

13    subcontractors, not just ECI?

14    A.   Yes.

15    Q.   And the construction manager directing the sub to

16    make up the lost time, that would be Pike, correct?

17    A.   Correct.

18    Q.   And then we, in the same few pages ahead, page 4 of

19    18, I think Mr. Hug asked you about some of the

20    paragraph Q, and it says the subcontractor will be

21    required to follow the construction manager's critical

22    path milestone schedule.  We went through that, Attorney

23    Hug asked but that.  That applies to all subcontractors,

24    does it not?

25    A.   Yes, it does.

1   Q.   Who is responsible for making sure that the subs do

2   adhere to the critical path schedule?

3   A.   Pike Construction.

4   Q.   And if a sub falls behind -- not just ECI, any sub

5   subject to this paragraph -- they're instructed to provide

6   additional shifts to complete their milestone objectives?

7   A.   Yes.

8   Q.   So let me ask you, as an estimator, you're looking at

9   CPM schedule, you're looking at this provision, other

10  provisions like this.  What's your expectation -- what is

11  your expectation as to what the construction manager is

12  going to do if his schedule starts falling behind?  What

13  is he going to do with his subcontractors --

14          MR. HUG:  Objection, Your Honor.

15  BY MR. KAPLAN:

16  Q.   -- based on these provisions?

17          MR. HUG:  Objection, Your Honor.  That seems to

18  me like it calls for an opinion testimony for which he's

19  not been disclosed.  Plus he's not the project manager on

20  this particular job either.  Although that is a

21  generalized question, a hypothetical, it sounds to me it's

22  asking for expert opinion.

23          THE COURT:  Do you have response to that?

24          MR. KAPLAN:  Your Honor, Mr. Hug asked

25  specifically if Mr. Madore took this language into

1    consideration in preparing his bid.  I'm asking

2    Mr. Madore, as an estimator in preparing his bid, what his

3    expectation would be if other subs fell behind and what

4    would happen in that situation.  It's a perfectly

5    legitimate question on redirect based on the question that

6    Attorney Hug asked.

7                THE COURT:  Could you reformulate the question

8    in that context, please?

9                MR. KAPLAN:  Certainly.

10   BY MR. KAPLAN:

11   Q.   You're the estimator, you're looking at this clause

12   along with your review of the schedule and you're looking

13   at that language about the requirement that all subs would

14   provide additional shifts to complete milestone

15   objectives.  Now, if the schedule falls behind based on

16   some other subcontractor's failure to adhere, what is your

17   expectation that Pike, as the construction manager, would

18   do?

19   A.   There would be --

20               MR. HUG:  Objection, Your Honor.  That's not a

21   bidding question; that's a construction manager question.

22               THE COURT:  I'm going to allow him to answer it

23   with the understanding that he needs to tie it to what

24   consideration he took into this language when formulating

25   the bid.

1          MR. KAPLAN:  Correct.

2     A.    In formulating any bid, I wouldn't take any -- I

3     wouldn't go through with the assumption that the schedule

4     would not be adhered to and cover any costs due to our own

5     self performance or anyone else's.  I would assume at bid

6     time that the project would be performed per the submitted

7     schedule.

8     BY MR. KAPLAN:

9     Q.    And following up on that, if a sub fell behind,

10    what's your expectation, as the estimator, that the

11    construction manager is going to do about it based on this

12    language?

13         MR. HUG:  I object, Your Honor.  I think the

14    last question and answer I think was consistent with

15    Your Honor's instruction.  This goes beyond your

16    instruction.

17         THE COURT:  I don't get why you are asking what

18    his estimation or expectation of a construction manager

19    is.  This has to do with respect to how he bid his bid for

20    this.

21         MR. KAPLAN:  Correct.  It has to do with a lot

22    of discussion on direct and cross, had to do with how he

23    considered the schedule and what would happen with the

24    schedule.  And these provisions talk about the schedule

25    and how the schedule is basically going to be policed by

1    the construction manager.

2              THE COURT:  But that seems to be something that

3    you can argue about with respect to the language.  The

4    language speaks for itself.  You're trying to have this

5    witness make an argument about the language.

6              MR. KAPLAN:  I'll move on.

7    BY MR. KAPLAN:

8    Q.   If we could go to Exhibit 4, which the first sheet

9    was the breakdown for the labor hours on the various

10   phases.  I might need you to use the calculator here.

11        Phase 2 had how many labor hours per the bid

12   breakdown, the allocation?

13   A.   9,081.

14   Q.   And Phase 3 had how many?

15   A.   7,593.

16   Q.   So Phase 2 had 9,081?

17   A.   Yes.

18   Q.   And Phase 3 had 7,593.

19        Now, you talked about a 10-week schedule for Phase 3?

20   A.   Yes.

21   Q.   And to calculate an expected crew, that would be,

22   let's say 760 hours a week for 10 weeks, would you go with

23   that?

24   A.   Yes.

25   Q.   And then if you divided that by 40, what do you come

1    up with?

2    A.    Nineteen.

3    Q.    Based on these hours, that would allocate to a 19-man

4    crew every week for 10 weeks for Phase 3?

5    A.    Correct.

6    Q.    Okay.  And if at the same time, at least for some of

7    that time you were doing Phase 2, at the same time, say it

8    was for a month, and you had 10 or 15 men doing Phase 2,

9    how many men do you have on the job?

10   A.    Thirty to 32 men.

11   Q.    Or 34, something like that.  Does that go to your

12   issue of peak time with concurrent activities for various

13   phases?

14   A.    Yes.

15   Q.    Okay.  So when you're talking about peak time -- and

16   peak is what, is that every week, month in, month out?

17   A.    No.  That is a short duration of the project.  Short

18   timeline on the project.

19   Q.    Those are actually your highest peaks?

20   A.    Highest level.

21   Q.    Of labor activity?

22   A.    Correct.

23   Q.    And your response to Mr. Hug's questions about peak

24   time could have involved -- let me ask you this.  Did they

25   involve concurrent activities on more than one phase, your

 1   notion of 35 men?

 2   A.   Yes.

 3   Q.   That's what you said for the project?

 4   A.   Correct.

 5   Q.   So, at times, if they're concurrently in the summer

 6   of 2010 doing Phase 2 and Phase 3, you would expect for

 7   your estimate you might have 35 men on the job?

 8   A.   Yes.

 9   Q.   And that would not indicate -- would that indicate

10   there's anything wrong with your estimate?

11   A.   No.

12   Q.   Okay.  Per your estimate, did you expect that you'd

13   have 60 men on the job for a month?

14   A.   No.

15   Q.   Do you know whether that, in fact, happened?

16   A.   I do only from recent documents.

17   Q.   You don't know from your own realtime experience?

18   A.   No.

19   Q.   Now, you were talking -- Mr. Hug took you through

20   some of the reports in Exhibit 35.  I'd like to go back

21   there.

22        Now, let's start with the March 17, 2010 job

23   performance review form, if we could.  This was one --

24   excuse me.

25        This was one -- this is in March of 2010.  That's

1    early on the job, is it not, Mr. Madore?

2    A.   Yes.

3    Q.   And again, I think you said that these costs, this

4    table behind this for the day, are the estimated

5    completion costs that the project manager has?

6    A.   That's what I'm assuming it would be, yes.

7    Q.   When you filled these forms out when you were project

8    manager for ECI, is that what they were?

9    A.   Yes, they were the cost projection to the end of the

10   project.

11   Q.   If you go to the second page of this, which is the

12   actual table of numbers from March 17, 2010, the middle --

13   the whole middle section says cost to complete, right?

14   A.   Yes.

15   Q.   And then the variance and PM estimate we had

16   established variance means what's in the bid, right?

17   A.   Yes.

18   Q.   And is that what's in the bid to complete the

19   remaining work?  Is that what that column stands for?

20   A.   No.  I would say that would be from the original bid

21   recap.

22   Q.   But is that the original bid number that's in the

23   budget to complete the remaining work that's left as of

24   that point in time?

25   A.   That, I'm not sure.

1   Q.    Okay.  Okay.  The PM estimate, what does that stand

2   for again?

3   A.    That's their look-ahead of what it's going to take to

4   complete the job.

5   Q.    That's just the cost to complete from that day

6   forward?

7   A.    Yes.

8   Q.    So they'd be comparing the cost to completing the bid

9   itself?

10  A.    Yes.

11  Q.    At this point in time he's summarizing that he's got

12  a projected growth margin loss of $200,000 on the

13  March 17, 2010 sheet, correct?

14  A.    Yes.

15  Q.    Then if you flip to the next one, that's gone down

16  somewhat, April 12?

17  A.    Yes.

18  Q.    That's gone down to 160.  And then if you flip to the

19  next one, May 13, now the projected gross margin is a

20  positive number of $17,000.  And if you look at the

21  backup, the numbers for May 13, and that cost-to-complete

22  column, you've got a total labor of 1.24 million variance,

23  which we established is the bid number, and 1.22 estimate

24  to complete.  As of May 13, 2010, is it fair to say that

25  Mr. Clauson was projecting the job would make some money?

1   A.   Yes.

2   Q.   And that's as of May 13, 2010?

3   A.   Correct.

4   Q.   Then the next one we have, which is the next month,

5   June 18, he's projecting -- it's changing, but he's got a

6   loss of $448, which is essentially a push, right?

7   A.   Correct.

8   Q.   So as of June 18, there's no -- is it fair to say

9   there's no big problems Mr. Clauson is seeing on this job

10  financially because he's basically where you were at bid

11  time?

12  A.   Based on his cost reports, no.

13  Q.   Now, that changes somewhat with the July 19th report,

14  but to the tune of $27,000 which, again, the way these

15  variations are going, would you characterize that as a

16  significant number?

17  A.   No.

18  Q.   Okay.  And that's as of the middle of July.

19       The next month is the one Mr. Hug has the blowup on,

20  that's the August --

21            THE COURT:  I'm sorry, what was that?

22            MR. KAPLAN:  The blowup page.

23            THE COURT:  Demonstration page?

24            MR. KAPLAN:  Yes.  August 13.

25

1    BY MR. KAPLAN:

2    Q.    Would you say there was a significant difference in

3    the projected gross margin for August 13 versus the prior

4    month or two?

5    A.    Yes.

6    Q.    And how would you characterize a projected gross

7    margin of $712,000 at this point in time in this project?

8              MR. HUG:  Objection, Your Honor.  First of all,

9    I don't understand how would he characterize it.  I'm not

10   sure what he's seeking, which makes me worry that it's

11   something else.

12             MR. KAPLAN:  I don't think Mr. Hug's not

13   understanding my question has anything to do with a

14   relevant objection.  I don't care if he understands.

15             MR. HUG:  Objection, vague.

16             THE COURT:  I'm going to ask you to --

17             MR. KAPLAN:  Rephrase it?

18             THE COURT:  -- rephrase it.

19   BY MR. KAPLAN:

20   Q.    Is that a significant -- does that suggest a

21   significant problem on the job at this point in time

22   looking at this progression that now in August 13

23   report --

24             MR. HUG:  Objection, Your Honor.

25             MR. KAPLAN:  May I finish the question, please?

1          THE COURT:  Finish the question, and then the

2    objection.

3          MR. KAPLAN:  I'll start again.

4    BY MR. KAPLAN:

5    Q.   Does this entry of $712,000 projected gross margin

6    loss in the context of the way these several prior months

7    have gone, does that suggest significant problems on the

8    job?

9          MR. HUG:  First of all, objection, Your Honor.

10   First of all, it's leading the witness.  Secondly, he's

11   talking about specific problems on the job.  As if -- and

12   I think counsel is intending to show that's Pike's

13   problem.  You could just as equally show it's their

14   estimate.  So if he wants to generalize it, I don't think

15   you need to.  $711,000, I'm sure I would stipulate that

16   they didn't want to lose $800,000 on this job as of that

17   date.  Beyond that, I don't see how he could possibly

18   characterize it because he wasn't there on the job as

19   project manager.

20         THE COURT:  Okay, I have a general concern here

21   that essentially the witness is being used for basically

22   legal argument and not for fact expedition when documents

23   seem to speak for themselves.  I'll allow this question to

24   be answered.  You can ask him whether it was significant,

25   but I don't know that the witness has firsthand knowledge

1  to testify about what were the problems that were

2  occurring.

3          MR. KAPLAN:  I wasn't asking him about what

4  problems.

5          THE COURT:  You just want to say is a

6  19.37 percent loss indicative of significant problem, is

7  that what your --

8          MR. KAPLAN:  That was the question.

9          THE COURT:  Okay.

10         You may answer that question.

11  A.   Yes, a significant loss showing up after previous

12  months' cost completes not indicating anything would

13  indicate a serious problem.

14  BY MR. KAPLAN:

15  Q.   Okay.  Now, there were -- Mr. Hug asked you about the

16  commentary on this report about the estimating department

17  ignoring project schedule.  Now, you were familiar with

18  the project schedule for this project when you bid it,

19  correct?

20  A.   Yes.

21  Q.   What -- and I think Mr. Hug asked you about certain

22  items that could cause man hour problems, labor problems

23  in Phase 3 work.  He talked about a lot of men in an area,

24  he talked about doing things at the same time with

25  fixtures, for example.  Would those problems necessarily

1    mean that your estimate was wrong?

2    A.    No, it would not.

3    Q.    What factors -- from your estimate on this job as the

4    estimator, if the estimate was wrong, what about that

5    estimate would have caused $712,000 projected loss as of

6    August 2010?

7    A.    There would be errors in the bid quantitatively for

8    materials, typically, or a missing quote would be a

9    substantial problem.

10   Q.    When you say a missing quote, what do you mean?

11   A.    If you remember when we went to recap sheet, we had a

12   quote column light fixtures, switch gear, fire alarm.

13   Those were big dollar items, specialty items that we

14   received vendor estimates on.  If one of those were

15   missing, that would be a significant downfall to the

16   project.

17   Q.    So leaving things out?

18   A.    Leaving things out of the bid or large quantities

19   missing.

20   Q.    Now, did you discuss -- I'm not going to hearsay.

21   Did you discuss with Mr. Clauson around this time, which

22   is around August 13, 2010 of this report, his concerns

23   about the estimate for this project?

24   A.    I can tell you that at no time up until this point

25   were there any concerns about the estimate.

1    Q.   At this point in time did you talk to Mr. Clauson?

2    A.   Yes.

3    Q.   You did.  And as a result of those conversations, did

4    you learn anything that made you conclude there was

5    anything wrong with your estimates?

6    A.   No.

7    Q.   Now, there's also a comment here in this 8/13/2010

8    review form:  Fixture labor units way off what it's taking

9    in the field.

10        Does that tell you there's something wrong with your

11   estimate for the fixture labor units?

12   A.   No, absolutely not.  It leads you to believe you

13   could look at that as an item, but typically at this

14   point, you know, we wouldn't -- he didn't pinpoint any

15   specific fixtures, types or areas or quantities that he

16   was having problems with.  It was just a general

17   statement.

18   Q.   Okay.  So that very well could refer to a lot of

19   different things?

20   A.   It could refer to a lot of different things.

21             MR. KAPLAN:  I have nothing further.

22             THE COURT:  Thank you, Mr. Kaplan.

23             Mr. Hug, I allow very limited recross, if you

24   have any.

25             MR. HUG:  If I may have just a moment,

1   Your Honor, just to think so I don't just shoot off my

2   mouth on things that I don't need to.

3                    (Pause.)

4             MR. HUG:  Nothing further, Your Honor.

5             THE COURT:  Thank you.

6             The witness is excused.  Thank you.

7             Mr. Kaplan, would you call your next witness,

8   please.

9             MR. KAPLAN:  Yes, sir.

10            Mr. Clauson.

11

12                    CLIFFORD CLAUSON,

13         called as a witness, having been first duly

14         sworn, was examined and testified as follows:

15

16            THE CLERK:  Please be seated.

17            Please state your name.

18            THE WITNESS:  Clifford Clauson.

19            THE CLERK:  Spell your last name.

20            THE WITNESS:  C-L-A-U-S-O-N.

21            THE CLERK:  Please state your city or town.

22            THE WITNESS:  15 Tiffany Road, East Hartford,

23   Connecticut.

24

25

1                     DIRECT EXAMINATION

2    BY MR. KAPLAN:

3    Q.   Good afternoon, Mr. Clauson.

4    A.   Good afternoon.

5    Q.   We've been talking about you a little bit so far.

6    Where are you presently employed?

7    A.   Electrical Contractors, Incorporated.

8    Q.   What's your position there?

9    A.   Senior project manager.

10   Q.   How long have you been a senior project manager at

11   ECI?

12   A.   About 20, 25 years.

13   Q.   Twenty, 25 years.  Did you have any other position at

14   ECI prior to being a senior project manager?

15   A.   Yes.

16   Q.   What was that?

17   A.   I started as an apprentice and then I became a

18   journeyman electrician, foreman, and superintendent, and

19   then a project manager.

20   Q.   Okay.  So you sort of went up the ladder?

21   A.   Right up the ladder.

22   Q.   How long have you been working total at ECI?

23   A.   Thirty-seven years.

24   Q.   Have you had any other job with any other firm in the

25   electrical industry?

1    A.    Yeah, briefly.

2    Q.    Prior to being an apprentice?

3    A.    I was an apprentice for another contractor, yes.

4    Q.    All right.  What licenses do you hold in the

5    electrical industry?

6    A.    Journeyman electrician.

7    Q.    Anything else?

8    A.    No.

9    Q.    Now, as a senior project manager, which you've been

10   doing for quite some time, what are your basic job

11   functions?

12   A.    All the duties of a project manager.  Keep the job in

13   line, follow the schedule, change orders, paperwork,

14   attend the job meetings.

15   Q.    Okay.  And typically do you manage other project

16   managers?

17   A.    A little bit, yes.

18   Q.    Okay.  Are you mostly involved with your own

19   projects, multiple projects, how does that work?

20   A.    Mostly involving my own projects and help out the

21   other project managers as needed.

22   Q.    How many projects to you normally run at the same

23   time?

24   A.    Between three and five.

25   Q.    Okay.  And has that been sort of the way you've done

1    things for the last 20 years at ECI?

2    A.   Yes.

3    Q.   And what kind of projects have you done?  Obviously,

4    over 25 years, I'm sure there's many of them.

5    Principally, what are the main kind of projects you've

6    done as the senior project manager?

7    A.   I do a lot of the school projects, renovation

8    projects, new schools and renovation projects.  Office

9    buildings.  Primarily, I do most of the schools.

10   Q.   That the company does?

11   A.   Yes.

12   Q.   Are most of those publicly bid, competitively bid

13   projects?

14   A.   Yes.

15   Q.   About how many do you usually do a year on an

16   average, are you handling a year on an average?

17   A.   Well, depends on how many we are awarded at the time.

18   I've done them for 20 years.  Probably did about 30 of

19   them.

20   Q.   Thirty schools over 20 years?

21   A.   Probably, yeah.

22   Q.   Public schools?

23   A.   Public schools.

24   Q.   And what's the range of dollar value or square

25   footage or something which would describe the nature of

1    the projects you've done during that period?

2    A.    Between 100,000 and 13 million.

3    Q.    In the public school arena?

4    A.    Yes.

5    Q.    Are they all in Connecticut?

6    A.    Yes.  Oh, I did a couple summer slammers, if you want

7    to call them, up at UMass.

8    Q.    UMass.

9          Were these jobs -- Mr. Madore was talking about the

10   summer slammer.  With the school jobs, is it typical to

11   have a lot of work done over the summer recess?

12   A.    Yes.

13   Q.    Is that something you've been doing for 20 or 25

14   years?

15   A.    Yes.

16   Q.    Okay.  And in the same context, is critical path

17   schedule something you've been familiar with for some

18   time?

19   A.    Yes.

20   Q.    Are they normally included in bid documents on public

21   school projects?

22   A.    Yes.

23   Q.    Okay.  And how long has that been the norm?

24   A.    Ever since I can remember.

25   Q.    All right.  Now, any comparable projects to the Kelly

1    Middle School project that come to mind that you were the

2    project manager on?

3    A.   Glastonbury High School renovation and addition.

4    Hall High School in West Hartford.  Connor High School in

5    West Hartford.  Five elementary schools in Glastonbury one

6    summer.

7    Q.   During the same time?

8    A.   Yes.

9    Q.   All under the same kind of critical path

10   considerations for the summer work?

11   A.   Yes.

12   Q.   Okay.  Were those all renovations?

13   A.   Yes.  Some of them were renovations and additions,

14   but yeah.  I remember renovations.

15   Q.   Your usual involvement with the job, do you ever get

16   into the estimating of the job itself?

17   A.   No.

18   Q.   Let's trace your involvement, the typical involvement

19   you have with the project.  When do you usually get

20   involved, say, with a school project?

21   A.   Normally once we get a letter of intent.  And then

22   I'll -- if I'm the person doing the job, I'll take it over

23   for them.

24   Q.   And then what do you do first?  What's your first

25   range of activity when you're taking over a job?

1    A.    Normally, you start reviewing the drawings, start

2    your buyouts, and start breaking down all the costs on the

3    project.

4    Q.    Okay.  Do you review the contract documents as a

5    rule?

6    A.    Oh, absolutely.

7    Q.    Specifications, general conditions, all that?

8    A.    Yes, yes.

9    Q.    Now, what was your role with the Kelly Middle School

10   project, the one that's the subject of the lawsuit?

11   A.    I was the project manager.

12   Q.    What was your first involvement with this job?  What

13   did you do initially?

14   A.    Initially, I started to break the project out and

15   buyout.

16   Q.    When you say break it down, what do you mean?

17   A.    Do the estimate breakdowns for the project to find

18   out where all your costs are.

19   Q.    And I'll get into some of your documents about what

20   you actually did.

21        And when you talk about the buyout, explain that,

22   please.  I know Mr. Madore did it, but let's hear it from

23   you.  What's the buyout for you, as the project manager?

24   A.    Normally, we would look at the bid packages.  We'd

25   re-count the lighting to make sure the counts provided in

1   the estimate were correct.  We would -- along with the

2   purchasing department, we would send out line numbers to

3   all the vendors for each product that we're going to buy

4   and get those back in.  And then once we found out the

5   couple people we're going to use, we'd vet them out and

6   make sure they have everything that was called for in the

7   specification.

8   Q.   In this particular job, were there any omissions in

9   the bid for materials?

10  A.   I don't -- I'm not sure I understand what you're

11  asking.

12  Q.   Was anything left out of the bid?  Did you discover

13  anything had been left out of the bid?

14  A.   No.

15           MR. HUG:  Objection, Your Honor.  I don't think

16  he's testified he even looked at the bid.

17           MR. KAPLAN:  I think he just testified he

18  reviewed what was in the bid for the buyout, compares it

19  to the quantities.

20           THE COURT:  I thought he talked about

21  re-counting the lighting and all that.

22           Did you look at the bid paper?

23           THE WITNESS:  Absolutely.  I broke the entire

24  estimate down into all the phases.

25

1    BY MR. KAPLAN:

2    Q.   So you actually review the bid closely when you first

3    take over the job?

4    A.   Yeah, real close.

5    Q.   Let's be specific as to what you do with a bid when

6    you're first taking over the job.  What is it that you do

7    with the bid information?

8    A.   I have to take the entire estimate and break it down

9    into each of those phases we use for labor and material.

10   Q.   You mean the cost codes?

11   A.   Cost codes.

12   Q.   We have phases as a term here and I wanted --

13   A.   Cost codes.

14   Q.   So ECI has its own cost codes?

15   A.   That's correct.

16   Q.   Which we'll look at.  We're just sort of generalizing

17   now.

18        And so you break the bid down of cost codes how?

19   What's the process you use?

20   A.   We take the estimate and we separate into each of the

21   cost codes that we're talking about.  And then we add up

22   the costs of each one of those codes.

23   Q.   So let's see.  It's always easier to be specific.

24        In this Tab 4 -- do you have Volume I in front of

25   you, Mr. Clauson?  Volume I, Tab 4 of Plaintiff's

1    Exhibit 4.

2         Now, this -- first of all, this phase breakdown,

3    which is on the first page of Exhibit 4, were you involved

4    with this?

5    A.   Yes.  That's a document I created.

6    Q.   Okay.  Where did you get these numbers from?

7    A.   From the estimate.

8    Q.   Okay.  And was that something that you worked with

9    Mr. Madore on in terms of allocating these various costs

10   of various phases?

11   A.   Well, initially the estimate was just one big number.

12   And then we broke it down into each of the phases.

13   Q.   And Mr. Madore worked with you on that?

14   A.   Yes, he did.

15   Q.   And this was the summary sheet for that?

16   A.   That's correct.

17   Q.   Okay.  Why did you do that?  Why did you break the

18   bid down to phases when it had not been bid that way?

19   A.   Well, Pike had asked for schedule values for the

20   project and wanted it by phase.

21   Q.   Who were you dealing with at Pike primarily?

22   A.   Mel Strauss.

23   Q.   Mel Strauss was what for Pike on this project?

24   A.   He was the project manager.

25   Q.   When you talk about a schedule of values -- again,

1    Your Honor, I'm not sure if you know what that term means.
2              THE COURT:  Explain it for me.
3    BY MR. KAPLAN:
4    Q.   Would you explain for the Court what schedule of
5    value is?
6    A.   It's a breakdown of the costs for material and
7    equipment.  And like I said, he wanted it for each phase.
8    Lighting, a line item for fire alarm, along with that
9    labor values for each.
10   Q.   Is that used primarily for billing purposes?
11   A.   Yes.
12   Q.   I know we have this schedule of values in here
13   somewhere, I'll come across it somewhere, Your Honor, and
14   point it out in my travels.
15             THE COURT:  Is it somewhere on Exhibit 4?
16             MR. KAPLAN:  In fact, I think it's in Exhibit 3.
17   BY MR. KAPLAN:
18   Q.   Mr. Clauson, if you wouldn't mind looking at
19   Exhibit 3.  There is what's called Application for
20   Payment.  It starts about five pages into this exhibit and
21   goes for a number of pages.  Does that essentially show
22   the schedule of values you're talking about?
23   A.   Yes.
24   Q.   Using this in front of you perhaps would be easy for
25   you to explain to the Court how this is set up and what

1    it's used for.

2    A.    Well, it separates the project the way that they

3    requested it, by phase and by specific material.

4    Q.    Okay.  So if you're looking at what's called page 2

5    of 7 at the top right-hand corner, Application for

6    Payment, it has all caps SITE and then different things

7    below that.  What is that referring to there, the

8    reference to site?

9    A.    That would be all of the work that's part of the site

10   on the project.

11   Q.    The site work itself?

12   A.    The site work itself.

13   Q.    This would be ECI's work on the site part of the

14   project?

15   A.    Correct.

16   Q.    And then at the bottom of that, it says Phase 2 and

17   it goes to the next page and there's a whole number of

18   entries that goes on to page 4.  Is that the breakdown for

19   the Phase 2 work?

20   A.    That's correct.

21   Q.    And then it sort of continues for Phase 3 and 4

22   and 5, accordingly.  And that was used for billing

23   throughout that project, that kind of breakdown?

24   A.    Yes.

25   Q.    Now, back to Tab 4, if we go to the second page, you

1    have project breakdown, Phase 3.  And this is dated

2    November 25.  So this was right around the time of the bid

3    award, was it not?

4    A.    That's correct.

5    Q.    Okay.  And what are you showing here on this page?

6    A.    It's showing the Phase 3 breakdown for the hours for

7    each phase.

8    Q.    These codes in the left, what do those refer to?

9    A.    Those are what we call our cost codes.  Each of those

10   numbers represent an activity.

11   Q.    I may need another book to tie in.  Do you have

12   Volume III of the plaintiffs in front of you?

13   A.    Yes.

14   Q.    Okay.  And if we look at in Volume III, Exhibit 32.

15   Could you just describe what this one-page exhibit, what

16   Exhibit 32 is?

17   A.    This is labor hours report that's printed from our

18   software program.

19   Q.    Okay.  And this is dated February 25, 2011.  Is this

20   the labor hours report for Phase 3 at that time?

21   A.    Yes.

22              MR. KAPLAN:  I offer this, Your Honor.

23              THE COURT:  Any objection?

24              MR. HUG:  No objection, Your Honor.

25              THE COURT:  Exhibit 32, full exhibit.

 1    BY MR. KAPLAN:

 2    Q.    I'll get back to this later, Mr. Clauson.  I just

 3    wanted to refer to this primarily for the description

 4    items on the left-hand side.

 5          Do those code numbers that are listed on the

 6    left-hand side of your labor hour reports, do those

 7    correlate to the cost code numbers we were just looking at

 8    in your project breakdown in Exhibit 4?

 9    A.    Yes, they do.

10    Q.    So Exhibit 4 you arrive at the outside of the job

11    breaking down your hours; is that correct?

12    A.    That's correct.

13    Q.    And you assigned the hours to the various codes based

14    on the total estimated number of hours from the bid; is

15    that how you did it?

16    A.    From the breakdown of the bid, yes, after it was

17    broken down.

18    Q.    Who decided which hours went to which code?  For

19    example, Code 40, looking back and forth between the two

20    exhibits, Exhibit 32, Code 40 is called branch conduit and

21    then 41 is branch wire, the other numbered items are

22    listed.  Do those refer to different types of activities

23    ECI was doing on the project?

24    A.    Yes.

25    Q.    Okay.  So who decided, for example, for Code 40,

1   branch conduit, in your initial allocation you put 2,241

2   hours from the bid to that code or activity category, who

3   did that?

4   A.   I did by reviewing the breakdown of the cost code

5   report that was provided by estimator.

6   Q.   What else did you bring to the table in order to do

7   that?  How did you do it, in other words?

8   A.   It's the pages that follow in Exhibit 4.  If you look

9   at the Phase 3 cost code report.

10  Q.   Okay.  Now, this is -- what follows is the IntelliBid

11  numbers Mr. Madore described for the Phase 3 part of the

12  job; is that correct?

13  A.   That's correct.

14  Q.   And would you explain, for example, how you utilized

15  that document to actually come up with the various

16  allocations of man hours for the different codes?

17  A.   I'd have to --

18          THE COURT:  Which document, to be clear?

19          MR. KAPLAN:  This is in Tab 4, Exhibit 4.  After

20  the two-page project breakdown, there's a 31-page cost

21  codes report Mr. Madore had described.  I'm asking

22  Mr. Clauson basically how he went from this report to the

23  summary of the hours that were allocated to this -- the

24  cost codes in the project breakdown.

25          THE COURT:  From the first page of Exhibit 4?

1           MR. KAPLAN:  The first and second -- the second

2    page is what I'm talking about.  We have the cost codes on

3    the second page, on the left-hand side, Code 40, 41, 42,

4    they're not labeled but they're numbered.  I had gone to

5    Exhibit 32 just to show what --

6           THE COURT:  What the content is.

7           MR. KAPLAN:  Some of them were.  I wanted to

8    have Mr. Clauson explain how he allocated those numbers.

9           THE COURT:  Sounds great.

10   BY MR. KAPLAN:

11   Q.   If you could give us a few examples how you did that?

12   A.   Yes.  So if you looked at page 1, the only code

13   number down there is 64, you'll see a mark 64.  That's for

14   three hours of 200 amp motorized circuit breaker

15   enclosure.  And 64 is our code for gear.  So that would be

16   three hours of labor for gear.

17   Q.   And then the next page has a number of hand notes.

18   Are those your handwritten notes?

19   A.   Yes.

20   Q.   So on page 2 of 31 on the right-hand column, you have

21   40, 64, 64, 68.  What do those refer to?

22   A.   Those all refer to the cost codes.  So 40 is branch

23   circuit.  64 is gear.  68 would be systems.  And 51 would

24   be feeder wire.  So the labor and material are shown on

25   this report.

1    Q.   All right.  And so those notes are how you're

2    allocating the various line items to the different cost

3    codes?

4    A.   That's correct.

5    Q.   Okay.  How many times have you done this process on

6    ECI projects?

7    A.   Probably about 300, maybe 400.  Every time we have to

8    do it.

9    Q.   Is this something you do at the beginning of every

10   job you're managing?

11   A.   Absolutely.

12   Q.   So you went through the whole document, basically the

13   whole bid for this phase to do those allocations?

14   A.   For all phases, yes.

15   Q.   And you did the same process for all the other

16   phases?

17   A.   Yes.

18   Q.   So, just again, same context, but looking back at

19   Exhibit 32 with the one-page report?

20   A.   Yes.

21   Q.   Okay.  So the estimated hours, if one were to compare

22   those codes to the codes -- this is in 2011 that we're

23   about a year and a half earlier in your initial breakdown,

24   there's some differences just on the estimated hours

25   column.  For example, branch conduit in Exhibit 32 has got

1    2740 hours, branch conduit, which is Code 40 in the

2    Exhibit 4, which is November of 2009, has got 2241, it's

3    about 500 hours or much less.  What explains the

4    difference there?

5    A.   Off the top of my head, probably change orders.

6    Q.   What do you do with change orders?

7    A.   We have to enter them.  Every time we get a change

8    order, we have to enter them into our cost accounting

9    system so we keep the numbers correct.

10   Q.   So if you had --

11   A.   Material.

12   Q.   I'm sorry?

13   A.   Labor and material and total cost of the project has

14   to remain correct.

15   Q.   So you update your numbers?

16   A.   Correct.

17   Q.   So if you had a change order that added 100 hours to

18   the estimated column for branch conduit, for example, that

19   would go into the updated number for branch conduit?

20   A.   That's correct.

21   Q.   Okay.  All right.  How do you -- since we're in

22   Exhibit 32, there's an actual hours column that's next to

23   that, next to your estimated hours.  Where do those

24   numbers come from?

25   A.   Those numbers come from our foreman's daily reports.

1    We call them white rods.  It's a daily report that he

2    keeps.

3    Q.   Okay.  So your foreman actually enters those hours

4    into his own reporting system?

5    A.   He enters them onto a sheet, which we call a white

6    rod.  It's piece of paper with the codes on it.

7             THE COURT:  That's called a white --

8             THE WITNESS:  We called it a white rod.

9             THE COURT:  R-O-D, okay.

10            THE WITNESS:  It's a labor report.

11   BY MR. KAPLAN:

12   Q.   Old-fashioned multiple copy kind of thing where you

13   make an entry and two or three copies come out, is that --

14   A.   No, no.  That's not.

15   Q.   Never mind.  I'm sorry.

16            And we'll look at those.  I don't think I'll pull

17   them out right now.  That will be one of the things we do

18   first thing in the morning with Mr. Clauson, we'll review

19   some of those daily reports.

20            So that's the overview of how you're setting this up,

21   okay.

22            Now, let's talk briefly about exactly what this

23   phasing situation was.  And I'll use -- you have the same

24   thing.  This is from your 504, I made it a little bit

25   bigger.

1              MR. HUG:  I have one over there.

2              MR. KAPLAN:  Is it bigger still?

3              MR. HUG:  Might be.

4              MR. KAPLAN:  And prettier.  Okay.  I'll use the

5    bigger prettier one.

6              This is Exhibit 504, actually Defendant's

7    Exhibit.  But obviously I don't have an objection to it.

8              MR. HUG:  No objection.

9              THE COURT:  504 full exhibit, admitted.

10             MR. KAPLAN:  It's in your notebook, Your Honor.

11   This is just easier to deal with.

12   BY MR. KAPLAN:

13   Q.   If you could explain, there was some talk with

14   Mr. Madore about the phasing.  You're the project manager,

15   you're familiar with how the phasing went on this job?

16   A.   Yes.

17   Q.   Could you briefly explain and point me to whatever I

18   need to show.  What was the phasing layout, what was

19   basically the sequence of operations here?

20   A.   There was a site phase, which obviously is not shown.

21   Q.   Site is outside?

22   A.   Right.  Site is outside.

23             We had a Phase 2 plan which consisted --

24   Q.   That's in the pink?

25   A.   Pink area there which was a portion of it was an

1    addition, two-story addition.

2         And then that center piece was an addition.

3    Q.   2C?

4    A.   2C.

5         And upper portion here, it was a renovation of part

6    of that 4W area, but listed in Phase 2.

7    Q.   So most of it was an addition and some of it was

8    actually renovation in Phase 2?

9    A.   Correct.

10   Q.   Did the Phase 2 precede Phase 3?  Same time?  Later?

11   A.   We started Phase 2 first.

12   Q.   Did that go concurrently with Phase 3?

13   A.   Yes.

14   Q.   Okay.  And then Phase 3 is --

15   A.   There's still another Phase 2 down there.

16   Q.   Phase 2 in yellow?

17   A.   That's Phase 2 auditorium area.  Which actually

18   started at the same time as Phase 2.

19   Q.   That was before Phase 3?

20   A.   Before Phase 3, that's correct.

21   Q.   Okay.  Did that go the same time as Phase 3?

22   A.   During the Phase 3 construction, we stopped work on

23   Phase 2.

24   Q.   Oh, you did?

25   A.   Yeah.  We were missing some steel there.

1   Q.   We'll get to that tomorrow.

2   A.   Right.

3   Q.   So there was some interruptions for that work in

4   Phase 2?

5   A.   Correct.

6   Q.   Okay.  And then a lot of this is Phase 3 -- well,

7   this green area, all the P3s are Phase 3?

8   A.   Yeah, everything.  Everything that says P3 is

9   Phase 3.  Upper portion there, P3M would be mechanical.

10  P3CL would be classrooms.  P3C would be the cafeteria.

11  And that's Phase 5, which is the kitchen.  Phase 3CL would

12  be classrooms again.  Phase 3LI is the library.

13  Q.   And then in here?

14  A.   That's the admissions area.

15  Q.   Administration?

16  A.   Administration, yeah.

17  Q.   P3G?

18  A.   Gym.

19  Q.   LO?

20  A.   Locker area.

21       And AR would be the art room.

22       And toilet.

23  Q.   Then you have Phase 4 over here?

24  A.   Phase 4 East and Phase 4 West.

25  Q.   And Phase 4, did those go in after Phase 3?

1   A.   Yes.  As soon as Phase 3 ended, we started Phase 4

2   West.

3   Q.   Okay.  All right.

4        And what was ECI doing here?  What kind of work were

5   you doing on this project?

6   A.   What kind of work were we doing?

7   Q.   What were the things you were doing?

8   A.   Underground conduits, so worked with the masons

9   running feet of conduit.  What do you mean?

10  Q.   Lights.  What kind of systems?

11  A.   Total electrical demolition and replacement.

12  Q.   Okay.  This was for the school, so did you have a

13  fire alarm system?

14  A.   Fire alarm system, security system, telecommunication

15  systems, fiberoptic systems.

16  Q.   And then you had your basic power, lighting?

17  A.   Correct.

18  Q.   Okay.  Were you working with any of the mechanical

19  contractors, interfacing with any of the mechanical

20  equipment at all?

21  A.   Yeah, we had to wire the rooftop units and all the

22  street drives and starters that they provided.

23  Q.   Now, in volume -- in Volume I, in Exhibit 13,

24  which -- Exhibit 12, rather.  I think we already had

25  visited 12.  I think 12 has been admitted.

```
 1              THE COURT:  Yes, I believe it has.

 2   BY MR. KAPLAN:

 3   Q.   If you have Exhibit 12 there, Mr. Clauson, there is

 4   the schedule, the contract schedule, which is sort of the

 5   second half of that document.  It's in color?

 6   A.   Yes.

 7   Q.   Okay.  Did you review this at the outset of the job?

 8   A.   Yes.

 9   Q.   Okay.  And when you first got involved with this

10   project end of 2009, beginning of 2010, what were you

11   using this schedule for?

12   A.   We were using this schedule to lay out our work and

13   find out when we would need equipment on the job site.

14   Q.   Okay.  So, in terms of when you say when you would

15   need equipment, what do you mean?  Ordering the materials?

16   A.   Yeah.  So that when the time comes to do an area

17   that's shown that has the switch gear, we would have it on

18   site.

19   Q.   Okay.  And we had reviewed a number of references

20   with Mr. Madore to the contract schedule for bidding

21   purposes.  Were you -- had you reviewed those provisions

22   when you took over this project, provisions that reference

23   the schedule?

24   A.   Yes.

25   Q.   Was it your understanding that ECI had to follow this
```

1    schedule in doing its work?

2    A.    Yes.

3    Q.    Okay.  What was your understanding of Pike's

4    obligation in regard to this schedule for performing the

5    work?

6    A.    With regard to the schedule, that they would have to

7    maintain it and make sure everybody else followed it

8    besides us.

9    Q.    What does "maintain it" mean, as you've used this

10   term?

11   A.    Update it as, you know, every week or every month,

12   give us updates.

13   Q.    If we look at the Phase 3 activities as they're noted

14   here, they start at Sheet 15.  It says Phase 3 renovation.

15   I think the schedule is pretty much broken down by phases.

16   Is this a typical critical path method schedule or

17   critical path milestone schedule that you've worked with

18   in the past?

19   A.    Yes.

20   Q.    Was there anything unusual about this particular

21   schedule for this project?

22   A.    No.

23   Q.    Okay.  And did other subcontractors have to perform

24   work before you did in order to get your work done?

25   A.    Yes.

1    Q.    Is that laid out in various places in this schedule?

2    A.    Yes.

3    Q.    Okay.  Did ECI have any power to instruct or require

4    another sub to get their work done by a certain period of

5    time?

6    A.    No.

7    Q.    Who had the authority to do that?

8    A.    Pike did.

9    Q.    Okay.  And did Pike -- was this schedule followed for

10   Phase 3, generally?

11   A.    No, I don't think so.

12   Q.    Okay.  Was the schedule from the end of June until

13   roughly -- when did you finish Phase 3?

14   A.    First part of September.

15   Q.    Okay.

16   A.    September 5 or 6, somewhere around there.

17   Q.    When did you actually start Phase 3 work?

18   A.    We actually started some work on second shift in

19   Phase 3.

20   Q.    When was that, do you recall?

21   A.    Maybe April.

22   Q.    What were you doing initially in -- what was the

23   first Phase 3 work you were doing?

24   A.    We were running some feeders above some ceiling --

25   where they took some ceilings down.

1    Q.   And did you have any demolition requirements as the

2    electrical contractor?

3    A.   We were required to cut and make safe.

4    Q.   What does that mean?

5    A.   Which is just to turn the power off, make sure it's

6    dead, and cut it away from the panels.

7    Q.   And then what happened after that?  What was supposed

8    to happen?

9    A.   The demo contractor was supposed to take everything

10   out.

11   Q.   Was Phase 3 a complete renovation job?

12   A.   It was a complete gut job.

13   Q.   That means everything was basically being ripped out?

14   A.   Everything.  Even windows.

15   Q.   Even windows?

16   A.   Windows, walls, you name it.

17   Q.   I'm sorry?

18   A.   Windows, walls, everything.

19   Q.   Outside walls, too?

20   A.   In some cases, yeah.

21   Q.   And you weren't responsible for the demolition, were

22   you?

23   A.   No.

24   Q.   Other than the cut and make safe, that was all you

25   did?

1    A.    That's correct.

2    Q.    Another subcontractor did the demolition?

3    A.    Yes.

4    Q.    Did you have to wait for the demolition to get done

5    before you could start your work?

6    A.    Before anybody could start the work, yeah.  We had to

7    wait for the demolition to get done so they could build

8    new walls.

9    Q.    Who was building the new walls, primarily?

10   A.    General trades contractor and the mason.

11   Q.    So some walls were masonry walls?

12   A.    Some were stud construction.

13   Q.    Okay.  And did you run into any delays in terms of

14   the demolition work?

15   A.    Right from the beginning, yes.

16   Q.    The beginning being when, before June 28?

17   A.    Yeah.  We actually were -- the kids got out, it was a

18   week earlier, four or five days earlier.  And we were

19   given the school.  So the demolition was able to start

20   early.

21   Q.    Did you encounter problems with the timing of the

22   demolition work?

23   A.    Well, the demolition work took more time than it was

24   supposed to, yes.

25   Q.    And what areas did that occur in in Phase 3 now?

1   A.   Every area that's listed there just about.  I can't

2   tell you exactly the time it took to do each area.  There

3   were delays on the demolition.

4   Q.   Throughout Phase 3?

5   A.   Correct.

6   Q.   All right.  So are you saying that going through the

7   various -- just for starters, the first item, Sheet 15,

8   right after start Phase 3, for the Phase 3 work says

9   demolition P3AD-140 and it says two days, June 28 and

10  June 29.  Am I reading that correctly?

11  A.   That's correct.

12  Q.   And what does that mean?

13  A.   That means the administration area demolition should

14  have taken two days.

15  Q.   Okay.  And could you have gotten -- could any other

16  sub get in to do work in that area before that demo was

17  done?

18  A.   No.

19  Q.   Was that demo done in two days at the end of June?

20  A.   I don't believe it was, no.

21  Q.   Did that happen throughout Phase 3, those types of

22  instances?

23  A.   Yes.

24  Q.   And what effect did that have on your being able to

25  do your work?

```
 1    A.   Well, it had an effect on whoever was next in line.

 2    It obviously put my work behind because I couldn't start.

 3    Q.   Well, you have -- if I'm reading this correctly in

 4    this section, the first reference to electrical work is

 5    about ten lines down, it says P3AD-200.  Is that

 6    electrical roughing?  So in that area, what does that

 7    refer to?

 8    A.   Well, that refers to in-wall rough in that area.  We

 9    would have done work prior to that.  We would have -- I

10    mean, two items above they talk about roughing CMU walls.

11    If there's CMU walls in there, we would have had to put

12    our electrical work in there.

13    Q.   Is every item you did listed as a line item here?

14    A.   I'm sorry?

15    Q.   Is every item of work you did in that area listed as

16    a line item in this schedule?

17    A.   No.

18    Q.   All right.  Would you say that Pike followed this

19    schedule for Phase 3 throughout?

20    A.   I would say no.

21    Q.   Okay.  Did Pike ever update this schedule and issue

22    another version of this for the Phase 3 work?

23    A.   I don't believe they did.

24    Q.   How did Pike actually schedule -- did Pike actually

25    schedule work during Phase 3?
```

 1   A.   Yeah, we would schedule work during the weekly job

 2   meetings.

 3   Q.   Would you describe that process?  How did that work?

 4   A.   They would -- they would put an area that was getting

 5   done up on a whiteboard.  And they would list all the

 6   activities that had to be done in that area.  And they

 7   would do the same thing for another area that was getting

 8   ready to start.  It would be like a two-week look-ahead.

 9   Q.   Two-week look-ahead?

10   A.   Yes.

11   Q.   Is that the same as revising a critical path

12   schedule?

13   A.   No.

14   Q.   When you revise critical path schedule, how would you

15   do that?

16   A.   Revise the entire schedule to see when your end date

17   is based on the progress of the job.

18   Q.   Okay.  The Phase 3 activities in this schedule and

19   Sheet 29, although that's not -- time-wise that's not the

20   end of it, but you said in terms of the last calendar day,

21   you said your work in Phase 3 ended in early September?

22   A.   Yeah, just prior to the children coming back to

23   school.

24   Q.   Okay.  If you were updating the critical path

25   schedule weekly, what would you do -- what would you do

1   with the status?  For example, July 10, what would you do

2   with the status of the job on July 10 if you were updating

3   the schedule for Phase 3?

4   A.    I'm not quite sure I understand.

5   Q.    You said that critical path schedule was never

6   updated by Pike and issued to the subs?

7   A.    Correct.

8   Q.    So you never got an updated critical path schedule

9   for the Phase 3 work?

10  A.    Correct.

11  Q.    Okay.  What would have to go into that in order to

12  provide you with an updated critical path schedule on a

13  weekly basis, let's say?

14  A.    They'd have to update each line item to show the

15  actual completion date so that the schedule could run out

16  to see what the actual end date would be.

17  Q.    If you changed these internal completion dates, does

18  that push out the end date?

19  A.    It would, yes.

20  Q.    How so?

21  A.    Well, each of these line items are tied to another

22  line item within the schedule.

23  Q.    In terms of what comes after?

24  A.    Yeah.  So there could be original duration for a line

25  item.  And if you don't make that date, then it's going to

1    push everything further out.

2    Q.   All these things are interrelated?

3    A.   Correct.

4    Q.   Did Pike ever push out the completion date for

5    Phase 3?

6    A.   No.

7    Q.   Were there any items in Phase 3 they told you you

8    could do at a later date than what was indicated in the

9    contract schedule?

10   A.   Towards the end of Phase 3, yes, we were told we

11   didn't have to finish the library or the auditorium -- no,

12   the art room area.

13   Q.   Those were extended --

14   A.   I'm sorry.  The locker room and the art room.

15   Q.   So the contract periods were extended there.  Do you

16   recall for how long?

17   A.   I know they had a steel issue in the art room that

18   was going to delay that.  I don't know when the actual

19   finish date was.  I'd have to look at our daily reports.

20   Q.   Okay.  But the children coming back to school, was

21   that the end of August?

22   A.   Beginning of September.

23   Q.   Beginning of September?

24   A.   Yeah.

25   Q.   Did the other activities ever change at that point?

1   A.   For what activities?

2   Q.   Was the completion date of all the other activities

3   other than the ones you mentioned, the locker room, the

4   art room, were those completion dates changed by Pike?

5   A.   No.

6   Q.   But you said that a lot of things within the schedule

7   were delayed and didn't occur until a later time?

8   A.   That's correct.

9   Q.   That date for the completion other than the two areas

10  that you said never was changed?

11  A.   No, it was not.

12         MR. KAPLAN:  This is a perfect time -- did you

13  say 4:15?

14         THE COURT:  I did.

15         MR. KAPLAN:  Want to go another five minutes?

16         THE COURT:  Sure.

17         MR. KAPLAN:  I can do that.

18  BY MR. KAPLAN:

19  Q.   We mentioned the labor report.  Let me briefly refer

20  to those.  This is in Volume II of plaintiff's exhibits.

21  And this would be -- I believe we can look at Exhibit 19.

22       Now, just Exhibits 18 through 28 are the weekly

23  foreman's labor reports, Your Honor.

24         THE COURT:  I have the original here.  Does the

25  witness have Volume II?

 1              THE WITNESS:  Yes.

 2              MR. KAPLAN:  They're probably identical.

 3              Just for the reference, I would think we could

 4    take care of many of these at the same time.

 5              Plaintiff's 18 through 28 are all the same type

 6    of document, foreman's weekly labor reports broken down by

 7    periods throughout much of 2010.  I would offer these.  I

 8    don't know if Mr. Hug has an objection or not.

 9              MR. HUG:  Can I look at yours?

10              MR. KAPLAN:  You can look at mine.

11              MR. HUG:  No objection, Your Honor.

12              THE COURT:  So Plaintiff's Exhibits 18 through

13    28 --

14              MR. KAPLAN:  Yes, sir.

15              THE COURT:  -- are admitted as full exhibits.

16              MR. HUG:  No objection.

17    BY MR. KAPLAN:

18    Q.   Just to explain what these are, if we look at 19,

19    first of all, who prepared these throughout the project?

20    A.   Stephane Mathieu would have prepared these on a daily

21    basis to check in the hours for each of his guys.

22    Q.   Mr. Mathieu was employed by ECI?

23    A.   Correct.

24    Q.   What job did he have for this project?

25    A.   Project superintendent.

1   Q.   And Mr. Mathieu will testify tomorrow, I believe.

2        Just to get at the format of this, just to show what

3   it is --

4   A.   Yes.

5   Q.   -- the first page of Exhibit 19, in the upper

6   right-hand corner, it's got some indications.  It says 1

7   equals site, 2 equals Phase 3, et cetera.  What does that

8   mean, Mr. Clauson?

9   A.   That is the areas that we broke the project down into

10  for our Sage accounting system.  Initially -- when I

11  initially had started to break down the project, I was

12  only breaking it down onto a base bid breakdown.

13  Q.   So you didn't initially break it down by phase?

14  A.   I didn't initially break it down by phase.

15  Q.   Okay.

16  A.   And then, as I mentioned before, Pike had indicated

17  he wanted a schedule of values broken down by phase.  So I

18  did go back to estimating, that's how they broke it down,

19  by phase.  Then we went back and figured we had to monitor

20  the job and record the hours by phase.  So initially the

21  base bid didn't have an area or a number to go by.  So we

22  broke it down after that, we broke it down to 1, 2, 3, 4

23  and 5 to cover the five other areas.

24  Q.   You've got site Phase 3, 4 West -- 4 East, 4 West,

25  and last is Phase 5?

1    A.    5 is the kitchen area.

2    Q.    Okay.  Where does Phase 2 fit into this scheme?

3    A.    Like I said, it was listed under the base bid phase

4    of the project.  So there's no number for it.

5    Q.    How was it accounted for in your system, in the

6    system that these hours went in to report, how is Phase 2

7    hours accounted for?  Were they listed under Phase 2 code?

8    A.    Yeah.  There's a breakdown that we did.  You

9    referenced it in another exhibit.

10   Q.    So the Phase 2 hours, they were kept separately as

11   well?

12   A.    Correct.

13   Q.    So the allocations of the hours went to whatever

14   phase was being worked on?

15   A.    That's correct.

16   Q.    And Mr. Mathieu was responsible for this on a daily

17   basis?

18   A.    Yes.

19   Q.    Okay.  So these are his records?

20   A.    These are his records, that's correct.

21   Q.    And at the top, again just for format purposes, you

22   have these various codes.  Are those the same code items

23   and descriptions and numbers that we had looked at a while

24   ago on your labor hour records?

25   A.    Yes.  40, branch conduit.  41, branch wire.

1   Q.   Was it his job to allocate the men's work in the job

2   to the various codes as well?

3   A.   The location they're working at and the type of work

4   they're doing.

5   Q.   So phase and code, that's what Mr. Mathieu is doing?

6   A.   That's correct.

7   Q.   Does this dovetail with your payroll system?

8   A.   Yes.  Stephane would turn these over to the payroll

9   department on Thursday and they would get entered into our

10   accounting system.

11   Q.   And the payroll department also entered the

12   information by phase and code as well?

13   A.   That's correct.

14   Q.   And that's how it generated your summary man hour

15   reports such as the one we looked at a little while ago?

16   A.   That's correct.

17           MR. KAPLAN:  Mr. Mathieu will testify a little

18   more detail about how he handled that.  I just wanted to

19   give the Court an idea of those records.

20           THE COURT:  Great.  Why don't we suspend at this

21   time.  And I thank the witness for testifying and invite

22   the witness to come back tomorrow.

23           We will -- a couple of housekeeping matters for

24   tomorrow.  We'll start at 8:00 a.m. and plan to go to

25   5:00.

1           Do counsel have a sense of whether it would be

2    possible to provide one more copy of your exhibits for

3    purposes of my law clerk, Ms. Ramesh, to review?

4           MR. KAPLAN:  We have a spare copy at ECI's

5    offices.  I don't think they're marked up.  So we'll bring

6    those in tomorrow.

7           THE COURT:  She just needs something to be able

8    to follow along as we go along.  I think that will assist

9    the Court.

10          Two other things.  I know we touched upon this

11   briefly at last week's conference.  It's readily apparent

12   to me from the detail that we've gone into today, the

13   sheer number of documents, that I'm going to want

14   post-trial briefing in this case.  And I appreciate the

15   fact that you've done your initial briefs and it's a good

16   start for purposes of guidance.  I'm going to want to have

17   that post-trial briefing which draws upon what we've heard

18   during live testimony and what the witnesses have said

19   about exhibits.  And in that connection, I encourage you

20   to order transcripts from the trial.  I appreciate the

21   fact that that comes at some cost, but I can't imagine,

22   based on what I've seen, trying to essentially fly solo

23   here without further guidance on both sides from the

24   parties.

25          Okay.  We will stand in recess and I look

 1    forward to seeing you at the crack of 8:00 a.m. tomorrow

 2    morning.

 3                    (Proceedings adjourned at 4:17 p.m.)

1

2

3                    C E R T I F I C A T E

4

5     RE:  ELECTRICAL CONTRACTORS, INC. v. THE PIKE COMPANY

6                    No. 3:11CV449(JAM)

7

8

9          I, Diana Huntington, RDR, CRR, Official Court

10   Reporter for the United States District Court for the

11   District of Connecticut, do hereby certify that the

12   foregoing pages are a true and accurate transcription of

13   my shorthand notes taken in the aforementioned matter to

14   the best of my skill and ability.

15

16

17

18

19                    _____
                              /s/

20            DIANA HUNTINGTON, RDR, CRR
                Official Court Reporter
21           United States District Court
             915 Lafayette Blvd., Room 423
22           Bridgeport, Connecticut 06604
                   (860) 463-3180
23

24

25