# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

ELECTRICAL CONTRACTORS, INC.,
     Plaintiff,

     v.                                         No. 3:11-cv-01449 (JAM)

PIKE CO., Inc.,
      Defendant.

## MEMORANDUM OF DECISION

This is a breach-of-contract dispute that stems from a comprehensive renovation project at the Kelly Middle School in Norwich, Connecticut. Plaintiff Electrical Contractors, Inc. ("ECI") was the project's electrical subcontractor, and defendant Pike Co., Inc. ("Pike") was the project's general contractor.

The dispute is about whether Pike should be liable for more than $500,000 in cost overruns that ECI incurred while rushing to complete its work on the project on time. According to ECI, Pike mismanaged the project, with the result that ECI could not timely complete its work without bringing in dozens more electricians than for which it had planned and budgeted. By contrast, Pike contends that ECI underbid the project in the first instance and that any higher costs for ECI were the result of its errant assessment of the project's needs and/or its own mismanagement of electrical workers assigned to work on the project. Pike also contends that ECI failed to give adequate notice of its claim and signed lien waivers that preclude any liability for ECI's claim.

The Court previously denied Pike's motion for summary judgment. *See* Doc. #49. The matter proceeded to a bench trial over eight days during June, July, and August 2014, and I now

1

issue my findings of fact and conclusions of law.

For multiple reasons set forth below, I conclude that that there is no merit to ECI's breach-of-contract claim. First, ECI's claim is barred by the terms of its contract with Pike because ECI failed to furnish timely written notice of its claim. Second, ECI's claim is barred by ECI's execution of lien waivers that released Pike from liability for any claim. Third, ECI has otherwise failed on the merits to show that Pike breached the contract or that any breach caused the damages that ECI claims. Judgment shall enter for Pike.

## STATEMENT OF FACTS

The Court heard trial testimony over a period of eight days from the following individuals:

- Mark Madore (ECI's senior estimator during the bid for the Kelly Middle School project);
- Clifford Clauson (ECI's senior project manager during the Kelly Middle School project);
- Stephane Mathieu (ECI's field foreman for the Kelly Middle School project);
- William Joseph Flynn, Jr. (Vice President of ECI);
- David Caprio (chief estimator for electrical contracting jobs at the Chappy Corporation and one of Pike's expert witnesses);
- Ed Oloff (Pike's superintendent for the Kelly Middle School project);
- Vincent Savino (president and owner of Action Air Systems, which provided the HVAC and plumbing at the Kelly Middle School project);
- Carroll James Lawler, Jr. (architect of the Kelly Middle School project);
- Dennis O'Neill (construction consultant at Beacon Consulting Group and one of Pike's expert witnesses);
- Richard Merkhofer (president and construction consultant at Wagner Hohns Ingils and one of Pike's expert witnesses);
- William Lynch (construction administrator for Van Zelm Engineering, which designed the HVAC, plumbing, and heating/electric systems in the Kelly Middle School project; testifying by videotaped deposition played during the trial); and
- Melvin L. Strauss (Pike's project manager for the Kelly Middle School project).[1]

Based on the testimony and documentary evidence presented at trial, the Court makes the

---

[1] The Court also accepted into evidence the videotaped deposition of Gary Schnip, the onsite representative of the City of Norwich during the Kelly Middle School project, and the transcript of that deposition. *See* Def.'s Exs. 659, 660.

following findings of fact.

In 2008, Pike contracted with the City of Norwich to serve as a construction manager for a project to make additions and renovations to Kelly Middle School. Following a competitive bidding process, ECI was hired as the electrical subcontractor for the project. ECI and Pike entered into a subcontract whereby ECI agreed to complete the electrical work for $3,637,445.

Although ECI won the contract through a competitive bidding process, it had not been the lowest bidder. Another company, Ferguson Electric, had entered a bid approximately $60,000 lower than the bid of ECI.[2] But Pike did not accept the Ferguson bid. Pike's project manager for the Kelly Middle School project, Melvin Strauss, testified credibly at trial that Ferguson was disqualified as a result of poor references and an unfavorable interview, in which Pike worried that it "[d]idn't even appear that [Ferguson] looked at the bid documents" because its response to many of the interview questions was simply "whatever's on the bid documents." Tr. at 1539–41. Similarly, Pike's superintendent for the project, Ed Oloff, testified credibly that Ferguson was disqualified because of poor references and a "[l]ack of understanding of the project"—specifically the portion of the project's schedule referred to as Phase 3. *Id.* at 924.[3]

The subcontract between ECI and Pike included a number of provisions pertaining to the protocol for changes to and affecting subcontractors' work, including the following provisions:

**3.1 Time and Schedule**     Time is of the essence as to the prosecution of the Subcontractor's Work. If requested, the Subcontractor shall provide the Contractor with scheduling information and Subcontractor's proposed schedule for the Subcontract Work. The Contractor may prepare the Schedule of Work for the Project and Contractor shall have the right to modify the construction schedule, to suspend, delay or accelerate, in whole or in part, the commencement or execution of Subcontractor's Work, or vary the sequence thereof, without compensation to the Subcontractor. In the event such a delay or suspension extends the overall

---

[2] T&T Electrical Contractors, Inc. had also entered a much lower bid, but the parties agree that T&T's bid was in error and was subsequently withdrawn.

[3] Ferguson unsuccessfully sued, alleging that its disqualification was unjustified. Pl.'s Ex. 8; *Ferguson Mech., Inc. v. City of Norwich*, 2010 WL 3038439 (Conn. Super. Ct. 2010).

time of performance, the time for the Subcontractor to complete its work shall be extended. The Subcontractor shall commence the Subcontractor's Work promptly upon notice to proceed. The Subcontractor shall prosecute the Subcontractor's Work in a prompt and diligent manner as directed by the Contractor and in accordance with the Schedule of Work without hindering the Work of the Contractor or any other subcontractor. The Subcontractor shall proceed with the Subcontractor's Work, making all necessary deliveries, so as to make timely progress and complete the same in accordance with the Project's Schedule of Work and as directed by the Contractor. Whenever, in the Contractor's opinion, the Subcontractor's Work falls behind, the Subcontractor shall increase its labor force and/or provide overtime, Saturday, Sunday and/or holiday work, and shall have each of its subcontractors do likewise, all at no additional cost to or compensation from the Contractor.

. . . .

**3.4 Delays**     Should the Subcontractor be delayed by the act or omission of the Contractor or by any other contractor or subcontractor on the Project, or by any cause beyond the Subcontractor's control and not due to any fault, act or omission on its part, then the time for completion of the work shall be extended for a period equivalent to the time lost by reason of any of the aforesaid causes, as determined by the Contractor, and Subcontractor agrees to make no claim for damages for delay in the performance of this Subcontract occasioned by any act or omission to act of the Contractor or any of its representatives.

. . . .

**5.1 Change Orders and Directives**     The Contractor and Subcontractor agree that the Contractor may add to or deduct from the amount of Subcontract Work covered by this Subcontract Agreement, and any changes so made to the Subcontract Work, or any other parts of this Subcontract Agreement, shall be by a written Change Order. A Change Order is a written instrument prepared by the Contractor and signed by the Subcontractor stating their agreement upon the change in the Subcontract Work and the value of such change. In addition, the Subcontractor agrees to proceed with the Subcontract Work, as changed, when so directed in writing by a Construction Change Directive issued by the Contractor so as not to delay the progress of the Subcontract Work and pending any determination of the value. If the Contractor requests a proposal of cost for a change, the Subcontractor shall promptly comply with such request. Contractor shall not make changes in Subcontract Work, whether additions, deletions or other revisions in any manner except by written Change Order or Construction Change Directive. All changes in the Subcontract Work made by Change Order or Construction Change Directive shall be deemed a part of the Subcontract Work and shall be performed and furnished in strict accordance with all terms and conditions of this Subcontract Agreement and the Subcontract Documents, including the current Schedule of Work.

**5.2  Compensation**          Subcontractor shall not be entitled to receive extra compensation for extra work or materials or changes of any kind regardless of whether the same was ordered by the Contractor or any of his representatives unless a Change Order or Construction Change Directive has been issued in writing by the Contractor. If extra work was ordered by the Contractor and the Subcontractor performed same but did not receive a written Change Order or Construction Change Directive, the Subcontractor shall be deemed to have waived any claim for extra compensation therefore, regardless of any written or verbal protests or claims by the Subcontractor. The Subcontractor shall be responsible for any costs incurred by the Contractor for any changes of any kind made by the Subcontractor that increase the cost of the Work for either the Contractor or other subcontractors when the Subcontractor proceeds with such changes without a written Change Order or Construction Change Directive.

**5.3  Notice of Claims**          The Subcontractor agrees that no claim for additional services rendered or materials furnished by the Subcontractor to the Contractor shall be valid unless notice is given to the Contractor prior to the furnishing of the services or material or unless written notice of the claim therefore is given by the Subcontractor to the Contractor not later than the last day of the calendar month following that in which the claim originated, with the amount of the claim to be given in writing by the Subcontractor as soon as practicable.

**5.4  Claims**          If the Subcontractor believes that any order, directive or condition, other than as provided for in Paragraph 5.7 ["Unknown Conditions"], entitles him to extra compensation or an extension of time, he shall give the Contractor written notice of his claim not later than three (3) days after the occurrence of the event giving rise to the claim and shall, as soon as practicable, furnish sufficient facts in support of his position as may be necessary for a decision. Any claim by the Subcontractor for extra compensation or an extension of time not so made shall be waived, and the Subcontractor shall not be entitled to any extra compensation or extension of time as a result thereof. The Contractor shall not be obligated or liable to the Subcontractor for, and the Subcontractor hereby expressly waives any claims against the Contractor on account of, any damages, costs or expenses of any nature which the Subcontractor or its subcontractors may incur as a result of any delays, interferences, suspensions, changes in sequence or the like, arising from or out of any act or omission of, or attributable to, the Contractor, it being understood and agreed that the Subcontractor's sole and exclusive remedy in such event shall be an extension of time, but only in accordance with the provisions of this Subcontract Agreement.

**5.5  Impact of Changes**          The Subcontractor shall review each modification issued by the Owner and advise the Contractor in writing within three (3) days of notice of the modification as to the impact, if any, on the Subcontractor's Work, including any adjustment in Subcontractor time or price.

Pl.'s Ex. 13 at 7–8, 10.[4]

Pike prepared a "Critical Path Milestone" ("CPM") schedule to guide the course of the project and specify the sequencing of multiple subcontractor activities. *See* Pl.'s Ex. 1 at 31, 59–103. The project's work was to be completed in a number of phases, corresponding with the term-time and vacation schedule of the school. The dispute in this case revolves around Phase 3 of the project, during which the majority of ECI's electrical work was to take place. Phase 3 was scheduled to occur during ten weeks of the school's summer recess in 2010, and included the renovation of many of the school's classrooms and common areas. The scheduling for Phase 3 was tight, and Pike was determined to complete it on time in order for the school's space to be available for the schoolchildren by the start of the next academic year. During Phase 3, multiple trades would be working concurrently, including plaintiff's electrical workers. The schedule for this complex and fast-paced portion of the project was discussed at length during a pre-construction conference between the parties in late 2009, and ECI assured Pike that it had properly estimated and planned for its Phase 3 work.

ECI was able to begin some of its Phase 3 work well before the original schedule specified. This was noted in the credible testimony of ECI's foreman, Stephane Mathieu, and Pike's superintendent, Ed Oloff. *See* Tr. at 495–96 (Mathieu testimony that Phase 3 work was scheduled for the summer but that ECI began some of the work ahead of time, as early as April), 911 (Oloff testimony that some electrical work for Phase 3 began three months early, and that "[w]e were ahead of schedule" and "[w]e were doing work early"), 1014–15 (Oloff testimony that ECI had started its overhead rough-in work in one Phase 3 area and started placing a third shift crew to work on the area approximately three months earlier than the schedule indicated, in

---

[4] A letter sent from Strauss to ECI in December 2009, which attached the subcontract agreement, included the following language: "Compensation for extra work will not be processed without an executed purchase order or change order, prior to commencing work." Pl.'s Ex. 12 at 18.

an effort to keep personnel busy rather than lay them off).

The early Phase 3 work is additionally verified by a comparison of Mathieu's daily reports, which documented work that ECI was doing each day of the project, and the contract schedule for each type of work. *Compare* Pl.'s Ex. 17 at 50 (on May 19, 2010, ECI was installing feeders in the locker area), *with* Def.'s Ex. 645 at 3 (electrical activity was scheduled to begin in the locker area in July); *compare* Pl.'s Ex. 17 at 60 (On June 3, 2010, ECI installed "guts" in multiple electric rooms), *with* Def.'s Ex. 645 at 3, 4, 6 (activity in all of the electric rooms was not scheduled to begin until July).

Nevertheless, when Phase 3 began in earnest on June 28, 2010, it presented significant difficulties for ECI. Mathieu had anticipated that this phase of work would be "chaotic" and that "[t]here would be a lot of people everywhere trying to perform all their work all at the same time," and he agreed at trial that he had no surprise about that aspect of the job. Tr. at 629. But he was nevertheless overwhelmed by it when it began, and noted that "[i]t was a lot more than [he] originally expected. Everything was all compressed." *Ibid.*

Although an addendum to the contract schedule had noted that "Phase 3 is a seven day schedule" and that "[s]chedule activities may require two shifts to complete per schedule," Def.'s Ex. 503 at 2, ECI initially did not believe that a 7-day workweek was required. *See* Tr. at 154–55 (ECI's bid estimator, Mark Madore, "didn't feel that we were going to be required to do a seven-days-a-week schedule," and therefore did not factor into ECI's bid the additional premium cost of labor for such a schedule), 368 (ECI's project manager, Clifford Clauson, did not believe the contract schedule addendum's language required a 7-day workweek, but that it was up to the subcontractor to do so if needed).

But during Phase 3, ECI workers did ultimately need to work at least six days a week

and, for most weeks, seven days per week. *See id*. at 369. And although when preparing the

project bid for ECI, Madore had anticipated that there would be ECI crews of 30 to 35

electricians during the whole summer, *id.* at 111–12, Clifford Clauson (ECI's on-site project

manager) testified that as of July there were only about 17 to 18 electricians per crew. *Id*. at 274.

Oloff and others noted early in Phase 3 that ECI's manpower was inadequate for the

work. Oloff testified credibly that ECI's insufficient manpower caused ECI to fall behind in its

work. *Id*. at 919–20. Mel Strauss (Pike's project manager) also agreed. *Id*. at 1582. Even

Mathieu—ECI's own foreman—testified that "we needed more manpower," *id*. at 534, and that

ECI was not able to do all the work available to it, *id*. at 620.[5] Multiple parties testified credibly

that Pike repeatedly told ECI that it needed more manpower. *Id*. at 535 (Mathieu testimony that

he and Oloff spoke daily and that Oloff "would always be telling me more manpower"), 620

(Mathieu testimony that Oloff had told him that ECI did not have the manpower to do all the

work that was available), 746 (Flynn testimony that "Mr. Oloff and Mr. Strauss never thought

ECI had enough men on the job"), 921 (Oloff testimony that he raised the manpower issue with

ECI and "[t]hey were working on getting more people"), 1542 (Strauss testimony that he and

Oloff informed Clauson that "there didn't seem to be sufficient manpower to complete the work

that was available").

But it was not purely a matter of more manpower. William Lynch, who was onsite as the

contract administrator for the company that designed the HVAC and electric systems, testified

credibly through his videotaped deposition that ECI's manpower issues included large

inefficiencies, due to a lack of leadership and the fact that the second-shift electricians were

unable to be very productive because the electrical warehouses were closed by the evening start

---

[5] After having so testified, Mathieu later also testified, inconsistently, that he did believe ECI was able to do all the work available to it at this stage of Phase 3, and then acknowledged that he had done no analysis to determine whether that was true. Tr. at 621.

of their shift. *See* Def.'s Ex. 661 (Lynch Dep.) at 14.

Oloff similarly testified about ECI's inefficiencies:

[T]here was inefficiencies of people waiting around for a foreman telling them what to do or someone bringing them material. I recall they added a few apprentices at some point to try to chase material and whatnot. They didn't want journeymen chasing material. And the journeymen would sit around waiting for someone to bring them material. So, you know, there was a lot of inefficiencies on that part. I feel they could have had more supervision running areas for certain guys to make sure that those guys had what they need[ed] and they were productive.

Tr. at 921–22. Furthermore, Oloff testified, "[t]he transitions [between shifts] were uncoordinated. The new guys would come in, they wouldn't know where they're going. And supervisors had to get to them to find out what happened to them during the day and then get going in the night." *Id.* at 1018. Oloff testified that he observed such inefficiencies in early and mid-July, but they were "getting better" toward the end of July. *Id.* at 1022–23.

At some point in Phase 3, it became clear that ECI was falling behind.[6] Lynch testified that he could personally observe ECI falling behind, and that Mathieu discussed with him that

---

[6] The testimony of ECI's witnesses was inconsistent with regard to the progress of the project in the first portion of Phase 3. Flynn testified that Clauson told him "in early July that things weren't progressing – the project wasn't progressing, certain activities were behind and weren't progressing," Tr. at 640, and that as a result he (Flynn) visited the site around the second week of July and observed that the project "appeared to be running behind in a number of areas. . . . If you went to the schedule, there was a sequencing of work that was not being followed." *Id.* at 650–51. In contrast, Mathieu testified that Phase 3 began "getting thrown off a little" "about three weeks into it," which would be approximately July 18, 2010, and that before then, Phase 3 work was tracking the schedule. *See* Tr. at 502–03. Mathieu's daily job reports for this portion of Phase 3, however, reveal a number of complaints with the progress of other trades, which he believed were holding up ECI's work from the very beginning of Phase 3. For example, on June 28, the first day of Phase 3, he wrote that "Steel I beams for rooftop units still need to be finished for rooftops also on the north side of the gym." Pl.'s Ex. 17 at 77; Tr. at 516. The next day, he noted "[s]till lots of steel and ductwork and demo that needs to get done." Pl.'s Ex. 17 at 78; Tr. at 517. On July 21, he stated that "[a]ll trades are behind in all areas." Pl.'s Ex. 17 at 94; Tr. at 539. Mathieu revealed in his testimony that he did not look at the schedule when writing his daily job reports. Tr. at 612, 614. Rather, he based his testimony on the discussions at the weekly foreman meetings, from which he believed that the actual work on the project varied. *Id.* at 614. But on cross examination, he conceded that he had no idea whether any updated schedules discussed in those meetings had accelerated dates, delayed dates, or a mixture. *Id.* at 616. As a result, whether Mathieu believed the project proceeded in line with the weekly discussions says little about whether the project proceeded according to an appropriate—or the actual—schedule. Oloff testified that he "[didn't] think Stephane [Mathieu] spent a lot of time looking at the schedule. I think Stephane spent a lot of time working where he thought he could." *Id.* at 1121. In short, I find the testimony of Flynn and Mathieu of limited value in determining whether ECI's or others' work in the first portion of Phase 3 occurred according to the original or updated schedules.

9

"[h]e was having a hard time keeping up with everybody during the project in general." Def.'s Ex. 661 at 32. Hesitantly, Lynch stated: "You know, it wasn't – I don't mean to put a bad thing – I know it's the court, but in probably the first half, three-quarters of the project they were probably a couple of steps behind across the board." *Id.* at 34.

Eventually, a meeting between the project principals of ECI and Pike took place on July 21, 2010, the events of which are hotly contested. For the sake of thoroughness, I will walk through the account of each person who was present at the meeting: Pike's Strauss and Oloff, and ECI's Clauson, Mathieu, and Flynn.

*Strauss's Notes and Testimony.* Strauss's account comes via his trial testimony and the only contemporaneous written account of the meeting—Strauss's handwritten notes of the meeting (Def.'s Ex. 537). The notes indicate that the parties discussed the timing for completing several areas of the project (and noted ECI's concerns regarding steel work that was running late and impacting ECI's ability to work), security, HVAC, the fire alarm system, the kitchen, and a generator. *See* Def.'s Ex. 537. The notes include a small chart with columns titled "1$^{\underline{ST}}$," 2$^{\underline{ND}}$," and "3$^{\underline{RD}}$," and beneath each of those headings the numbers "20," "3," and "5," respectively, which refer to the number of people in ECI's first-, second-, and third-shift crews. *Ibid.*; Tr. at 1548.

Strauss testified that Clauson introduced Flynn early in the meeting as "the gentleman that can get us the manpower we need and finish the project. Increase our manpower, he's the guy I need on my side to get the manpower." Tr. at 1544. ECI brought up challenges the workers were facing with other trades, and the parties discussed the schedule and the extra manpower needed to meet the schedule. *Ibid.* ECI requested additional time at the meeting to complete its

work, but Pike denied the request, explaining that the school must open on time.[7]

According to Strauss, Oloff explained to ECI that there could be no "Plan B," because school needed to open. *Id.* at 1545. He further testified that there was nothing discussed about claims for additional monies, and that Pike gave no change order directives—either verbally at the meeting or in writing later. *Id.* at 1548–49. Nor was it an acrimonious event, merely "a rundown of what they needed from us and what we needed from them with regards to the schedule." *Ibid.*

*Oloff's Testimony.* Oloff testified that the meeting was a typical "issues meeting" to work through the remainder of the project's work, and that there was no anger or contentiousness. *Id.* at 937–38. He did not recall any request made for an extension of time, but did recall noting that there could be no "Plan B" and that the job needed to finish so that the school could open on time. *Id.* at 938–39. He testified that he described the need for ECI to increase its manpower, including increasing the number of foremen to make sure the electricians were productive. Oloff was clear in his testimony that no ECI representative mentioned a claim or requested extra compensation, and that there was no unprofessional or derogative conversation at any point. *Id.* at 940–41. He left the meeting believing they had "[come] up with a game plan and . . . were going to go execute it and finish the job on time." *Id.* at 942.

*Clauson's Testimony.* ECI's representatives at the meeting saw it quite differently. Clauson saw the purpose of the meeting as "to ask for an extension of time." *Id.* at 296. But

---

[7] Even before the July 21 meeting, Pike had been consulting with the City of Norwich to discuss extending the scheduled time to complete the art room, storage room, and locker room areas. *See* Tr. at 1592. This was due to structural steel issues in the art room and locker room that affected the work of many subcontractors, including ECI. *Id.* at 1592–93. When Pike opened up the art room and locker rooms, the steel was different than the plan had shown, so Pike needed the architect to redesign that part of the plan and the steel subcontractor to fabricate and install the steel differently than it had expected. *See id.* at 908. Ultimately, Pike requested an extension of time from the city for those areas. *Id.* at 1593. The city granted Pike's request, and in the beginning of August 2010, Pike informed all subcontractors of the extended schedule for those areas.

according to his testimony, Oloff and Strauss denied that request, emphasizing that ECI needed to finish its work before the school year began and that there could be no "Plan B." *See id.* at 297. Clauson testified as well that Strauss told ECI to increase its manpower: "bring in more men, do whatever you got to do to get the job done." *Id.* at 299. According to Clauson, Flynn stated that if ECI's costs "went over" as a result of bringing in more men to work, they would "be looking for payment." *Id.* at 303. Clauson could not recall Pike's response to that statement, but testified that Strauss threatened ECI with liquidated damages in the event that they did not complete the job. *Id.* at 303–04.

*Mathieu's Testimony.* Mathieu testified about the meeting as well, though he noted that he was fielding phone calls during the meeting and therefore "wasn't paying a hundred percent attention." *Id.* at 538. He described needing more manpower and needing other trades to complete work in certain areas for ECI to do its work. According to Mathieu, there was some discussion of a time extension, but Pike was unwilling to provide an extension and instead told ECI to "get more men." *Id.* at 537. Like the other participants at the meeting, Mathieu also remembers a comment from one of the Pike representatives that there was "no Plan B." *Id.* at 538. Mathieu did not recall a discussion about the financial implications of ECI increasing its manpower, only that "they told us we owned it per our contract. We owned having guys there to do this work, we bought it in our contract." *Ibid.* Mathieu did not testify that any claims were made or change-order directives given. On cross examination, Mathieu stated that he left that meeting with the understanding that Pike was not going to give ECI any extra money for the added manpower. *Id.* at 619–20.

*Flynn's Testimony.* Finally, Flynn testified as well about the July 21 meeting. According to his testimony, Mathieu and Clauson described in detail the problems that they felt were

12

holding back ECI's progress, and Oloff and Strauss agreed that those problems existed. *Id.* at 655–56. But "the conversation was that ultimately we needed an extension of time." *Id.* at 656. Specifically, at a minimum, "we need[ed] a four-week extension of time." *Id.* at 660. According to Flynn, Strauss made clear that "[t]here will be no extensions of time for Phase 3," because the town would never approve such an extension, and the school needed to open on time. *Ibid.* In response to Flynn's query about a "Plan B," Strauss allegedly stated that "[t]here is no Plan B. You got to do whatever you got to do, get as many men here as you need to get here, and you need to meet the deadline." *Id.* at 661.

Flynn testified that, in response to this insistence that ECI meet the deadline, he told Pike that there would be financial consequences and that if ECI were harmed by those consequences it would be seeking compensation from Pike. *Id.* at 662. To that, according to Flynn, Oloff and Strauss laughed at him and told him that they had bought from ECI through their subcontract the right to have ECI do whatever it needed to do to meet its deadline. *Id.* at 662–63. One of the Pike representatives allegedly told ECI that if ECI did not "gear up" and instead delayed the opening of the school, there would be liquidated damages assessed against ECI. *Id.* at 663.

I credit the testimony of all of the meeting's participants for the fact that at the meeting, ECI's representatives told Oloff and Strauss that ECI would like more time to complete its Phase 3 work, and that Pike's representatives were adamant that the school needed to open on time, thereby denying any request for an extension of time.[8] I further credit the testimony of all of the individuals that Strauss and/or Oloff told ECI to increase its manpower (as they had been saying before the meeting, and as Mathieu and Clauson testified ECI needed to do) and to do whatever

---

[8] Although Oloff testified that he did not recall any request for an extension of time, he also testified confidently that he and Strauss told ECI that there could be no extension (no "Plan B") and that the school needed to open on time. I infer, therefore, that he recalled the conversation about the need for more time just as the others did, but merely did not consider that part of the conversation to constitute an actual request on ECI's part.

else was necessary to ensure that it caught up on its work.

On the other hand, I do not credit the testimony of Clauson and Flynn that Flynn stated that ECI would seek compensation for the costs of its additional manpower. First, that testimony is at odds with the credible testimony of Oloff and Strauss and finds no support in the contemporaneous handwritten notes taken by Strauss. In fact, those notes reference manpower only via the small crew-size chart, while the notes go into much more depth with regard to the meeting's other discussion items pertaining to the work itself, suggesting that the manpower issue did not constitute a hugely significant portion of the discussion. Second, even one of ECI's own witness, Mathieu, did not testify that Flynn made any such statement at the meeting.[9] Third, while Clauson testified that he recalled Flynn's alleged statement about seeking compensation, he could not remember Pike's response to it—a curious memory lapse for a response that, according to Flynn, allegedly consisted of derisive laughter.

Finally, the possibility of a claim against Pike for extra compensation does not appear to have been spoken of again by anyone at ECI or Pike for several weeks until September 2010; nor does the claim itself appear in any written documentation by ECI or Pike until October 2010. It was not mentioned in Pike's next monthly report to the owner, *see* Def.'s Ex. 536, or either party's notes of other meetings—including a meeting held just a week later. *See* Def.'s Ex. 538; Tr. at 1550–51. The parties presented no emails from the days following this meeting in which

---

[9] To be sure, on cross examination of Mathieu, Pike's counsel referenced a statement by Flynn about costs:
Q. But we're there now. That's what Pike said. Pike said it was ECI's — by the way, this is in response to Mr. Flynn saying -- telling him he's going to add more manpower, it's going to cost you, it may cost you something. Pike said, Do what you have to do, it's ECI's contractual requirement to do what you have to do to get the job done. Correct?
A. Yes.
Tr. at 619. It is not clear whether Mathieu's "yes" was in response to what the question asserted Pike said, what the question asserted Flynn said, or both. I infer that Mathieu's "yes" was primarily a response to the assertion about Pike's statements, because (1) Mathieu had initially testified credibly that he could not recall discussion about the financial implications of more manpower, *id.* at 538; (2) the questions immediately preceding the question including the reference to Flynn were focused entirely on what Pike's representatives said at the meeting, *id.* at 618–19; and (3) Mathieu also testified that he left the meeting not thinking that Pike would provide ECI extra money for added manpower, *id.* at 620.

the claim—or even the supposedly contentious meeting—was discussed. While the parties

entered into a number of change orders over the course of the project, including one in August

2010 (*see* Pl.'s Ex. 44 at 2 (noting that ECI "will require a 0 day extension of time to complete

this work")), no change order was ever proposed with regard to any claim for extra compensation

as a result of ECI increasing its manpower for Phase 3 after the July 21 meeting.

ECI never alerted Pike to keep track of ECI's additional man-hours for the purpose of

any future claim. Nor did ECI even have Mathieu keep track of the additional man-hours

incurred because of problems onsite (such as the steel, masonry, and demolition issues ECI

argues delayed its work), for the purpose of calculating a future claim. *See* Tr. at 404–06.[10] And

---

[10] On cross examination, Clauson testified as follows:
Q. So knowing that — so you knew July 21 you were going to probably file a claim, correct?
A. Correct.
Q. But you didn't actually tell Pike that, did you?
A. We told them if there was additional cost, that we were going to claim those costs.
Q. Did you follow up with a writing on that?
A. We did not.
Q. I take it, of course, since you knew you might have to have a claim if you were going to have additional costs, you certainly alerted Pike that they should also keep track of the additional man hours and the impact so they could make sure and verify that your claim would be correct? That would be the fair thing to do, correct?
A. We did not do that, no.
Q. No. So Pike didn't have the benefit, you would say, of being able to track whatever additional man hours you were having because of these impacts that you discussed, correct?
A. They received certified payrolls every week.
Q. And those certified payrolls specifically identified what work was being done because of what impact, correct?
A. No, it identifies how many men we had on the job.
Q. Okay. So Pike just knew you had more men on the job; is that right? Is that your testimony?
A. Well, they knew where we were working. They had our daily reports and they had their own people on site.
Q. So it's your position Pike knew you had a claim because you had more men working on the job?
A. We told them we were going to file a claim if we were harmed by the project.
Q. So I take it that after that, you directed Mr. Mathieu to do his daily reports or do something else to make sure that he tracked the additional man hours as it relates to how it was specifically impacted by the steel, the mason, the demo, and thereafter so that you had a nice clear documentation of exactly what that claim was going to be, because you knew July 21 you were going to make a claim; you did that, didn't you?
A. No.
Q. I think your testimony is that you told Mel Strauss and Ed Oloff in mid-September that ECI was going to file a claim, correct?
A. Correct, somewhere around there.

even when ECI notified Pike verbally in mid-September and in writing in October of its claim, it did not mention the July 21 meeting at all, nor did it reference any demand by Pike for ECI to increase its manpower or any notice by ECI that it would seek compensation for the costs associated with that increase.

In short, I find that at the July 21 meeting, Pike denied any request for a time extension and instructed ECI to increase its manpower (as it had been instructing ECI to do for some time) or to do whatever else was necessary to complete its work on time. I further find that ECI did not notify Pike at the July 21 meeting of any intention to file a claim for extra compensation resulting from increasing its manpower.

Nor could it have come as a surprise to ECI that it had not committed enough electricians to work on the job. Long before the July 21 meeting, ECI feared that it would lose money on the Kelly Middle School project because it had underbid the job. As early as January 2010, an ECI internal job performance review form noted that the bid had neglected to include any project manager time, and projected a profit margin loss of over $55,000. Pl.'s Ex. 35 at 4; Tr. at 185. By mid-March 2010, the projected loss was nearly $200,000. Pl.'s Ex. 35 at 7. And by mid-August 2010, the projected loss was over $700,000. *Id.* at 17.

Clauson prepared these internal review forms, and on the mid-August review form he caustically criticized ECI's bidding department for underbidding what was necessary for the job:

> Someone needs to STOP the estimating department from ignoring the project schedules at bid time and providing an estimate that's going to cost the company huge amounts of loss. The project will continue to show larger losses. 3 ½ more phases to go and it's not going to get better. The place is a zoo. Send more help.

---

Q. I'm sorry?
A. Yes, sir, mid-September.
Q. And Exhibit 36, which is the October 1, 2010 letter, that letter is the first written notice of any claim that ECI was making with respect to impacts in Phase 3?
A. Correct.
Tr. at 404–06.

*Ibid.* Clauson also noted: "[f]ixture labor units way way off what it's taking in the field," and "[a] lot of time wasted due to lack of supervision. . . now being corrected." *Ibid.*

At trial, Clauson testified that this report amounted to merely a personal meltdown on his part. Tr. at 398. But during this same period, ECI was abuzz with "questions that had arisen relative to the construction schedule and our bid from upper management," during which time there were in-house discussions regarding the foremen and manpower requirements, *id.* at 92, discussions that "[m]ost definitely" included Clauson's job performance review forms. *Id.* at 96.

Ultimately, ECI increased its manpower considerably for the remainder of July and August.[11] The project was completed on time, with the exception of certain areas for which schedule relief had been provided, and the school opened on time.

In mid-September 2010, Clauson called Strauss to inform him that ECI intended to make a claim for the increased costs it incurred during Phase 3. *Id.* at 1561.[12] Clauson testified that he decided to wait until mid-September because ECI was putting together its cost figures. *Id.* at 309–10. The call lasted approximately five minutes, and Strauss informed Clauson that "he needed to comply with the contract documents." *Id.* at 1562. Prior to the phone call, according to Strauss's credible testimony, Pike knew nothing about ECI's potential claim. *Id.* at 1559. During

---

[11] Mathieu's daily reports indicate that ECI's weekday crew size increased to 45 men by one week after the July 21 meeting (*see* Pl.'s Ex. 17 at 98), and gradually increased into August, peaking at 60 on August 16, 18, and 19 (*id.* at 113, 115, 116), then tapering back down at the end of August and early September to the low-to-mid teens (*id.* at 125–29), and finally down to 7 or fewer for the rest of September (*id.* at 130–47), and then just a few crew members for the remainder of the project in October (*id.* at 148–62). The weekend crews were much smaller than the weekday crews during the heaviest periods of time, generally numbering in the teens and twenties.

[12] Clauson testified that he had actually met with both Strauss and Oloff in the middle of September to notify Pike that ECI was preparing a claim. Tr. at 309. ECI apparently concedes that Strauss and Clauson spoke over the phone, though it urges the Court to find that Strauss called Clauson (without citing any evidence that supports that contention) and that this conversation occurred after the in-person conversation to which Clauson testified. *See* Doc. #136-1 ¶ 57. I reject Clauson's testimony with regard to meeting the two Pike representatives to notify them of ECI's upcoming claim, and instead credit the contrary testimony of Strauss that Clauson called him over the phone. Both parties in their post-trial submissions also reference an email sent by Oloff in late September noting that ECI had "indicated to Mel [Strauss]" (not Oloff) "that they may have some sort of claim." *See* Pl.'s Ex. 57. It is not clear that this email was admitted into evidence at trial, but I consider it as stipulated because of both parties' reliance on it.

the phone call, neither party mentioned the July 21 meeting. At some point soon afterward, Strauss called the City of Norwich and notified it of the possibility of an ECI claim.

Meanwhile, on September 17, 2010, ECI executed and submitted a lien waiver to Pike, as it did regularly as part of its application for periodic payments from Pike. Each application for payment covered the payments owed for work performed through the previous month; for example, the application submitted in August was for payments owed for work through July 31, and the application submitted in September was for payments owed for work through August 31. *See id.* at 419, 421. The lien waivers in each application certified that ECI had fully paid its employees and suppliers (and others such as independent subcontractors, if relevant) for work during the relevant period. *See id*. at 416–17. The September lien waiver, like the previous lien waivers submitted by ECI to Pike, stated ECI's intent to release Pike from liability for any claim:

> [ECI], in consideration of the sum of [Amount] paid to it by Pike, the receipt of which is hereby acknowledged, releases and forever discharges Pike and the Owner . . . from any and all claims, causes of action, suits, debts, sums of money, damages, claims and demands whatsoever in law or at equity and any other obligations respecting payment for, upon and by reason of the materials or equipment heretofore performed or furnished by [ECI] and its employees in connection with the Project.

Pl.'s Ex. 49 at 6.

Lien waivers prior to the September lien waiver had included additional reservation-of-rights language that had been added by ECI:

> Specifically excluded from this lien waiver and release are any amounts due for retainage; any pending change order proposals or requests; and any pending requests for equitable adjustment to the contract time or amount.

*Id.* at 2 (February 2010 lien waiver), 3 (May 2010 lien waiver), 4 (July 2010 lien waiver), 5 (August 2010 lien waiver). So did the lien waivers executed after September 2010. *See id.* at 7 (early November 2010 lien waiver), 8 (mid-November 2010 lien waiver), 9 (March 2011 lien

waiver). But the September lien waiver omitted the additional exclusionary language, *see id.* at 6, apparently because ECI simply overlooked including it. *See* Tr. at 423.

On October 1, 2010, ECI sent Pike, via Strauss, a letter constituting its written notice of a claim, which stated that ECI's work had been delayed during Phase 3 due to other subcontractors' work and unforeseen issues (such as the structural steel delays), and that ECI's costs had increased as a result of Pike's refusal to provide an extension of time. *See* Pl.'s Ex. 36. The letter included the following paragraph:

> We completely understand that many of the issues that caused ECI harm were unexpected and that Pike made every effort to mitigate these delays and interruptions. We respect and admire your efforts. However, when these delays or interruptions did occur, a decision was made by the owner to compress the schedule for ECI and the other project subs to complete their work in shorter durations. No time extensions were granted or even considered. ECI was consistently told by Pike that no time extensions would be granted for any reason and that Pike expected ECI to take whatever steps were necessary to accelerate the work and to overcome the delays or interruptions since the school had to open on time. This decision places the burden of making ECI whole squarely on the shoulders of Pike and the owner.

*Id.* at 3. The October 1 letter made no mention of the July 21 meeting or any other prior discussion relating to the claim. The letter stated that the direct cost to ECI for its additional man-hours was $521,344.00. *Ibid.* There was no explanation of the calculation behind that figure.

Several weeks later, Strauss responded to ECI's letter, stating that Pike was rejecting ECI's request for lack of proper written notice. Pl.'s Ex. 37 at 2. This response cited to Section 5.3 of the subcontract between ECI and Pike, which specifies how and when ECI was required to provide notice of its claims. *Ibid.*

Another month later, in late November 2010, ECI responded by letter, challenging Pike's rejection of its claim. Pl.'s Ex. 38. First, ECI argued that Section 5.3 was not applicable because

the cost increases were not a result of actual changes in work (Article 5 is, after all, titled

"Changes in the Work"), but rather a need to accelerate the work to meet the schedule. Instead,

ECI argued, Sections 3.1 and 3.4 of the parties' contract applied. Those sections provide that

under certain circumstances, the contractor was required to extend the time for a subcontractor's

completion of work that was delayed through no fault of the subcontractor. ECI argued that

Pike's rejection of ECI's July 21 request for an extension constituted a material breach of Article

3 of the contract. It further argued that, even if Section 5.3's notification requirement applied,

Pike had prior notice of ECI's efforts to increase its crew size and accelerate its work because

Pike had ordered it. ECI additionally argued that it had provided written notice no later than the

last day of the calendar month following that in which the claim originated, because the claim

"originated," in ECI's mind, in September 2010, "when ECI first became aware that it in fact

would have a claim." Pl.'s Ex. 38 at 4.

Pike again rejected ECI's request. *See* Pl.'s Ex. 39. Correspondence about the merits of

ECI's claim continued into June 2011, but no resolution was reached. *See* Pl.'s Exs. 40, 41, 42.

In August 2011, ECI filed suit against Pike in Connecticut Superior Court, alleging

breach of contract. The case was removed on diversity grounds to federal court in September

2011, and in March 2013, the Court (Michael P. Shea, J.) issued an oral ruling denying Pike's

motion for summary judgment, based largely on factual questions about whether Pike had,

through its conduct at the July 21 meeting, waived any written notice requirements in the

subcontract, as well as whether ECI had provided sufficient prior notice at that meeting of its

claims. *See* Doc. #49. The case was transferred to my docket, and it proceeded to a bench trial

that was held over eight trial days during June, July, and August 2014.

### DISCUSSION

ECI brings this case for breach of contract. It alleges that Pike breached the subcontract by failing to follow the CPM schedule it prepared and refusing to provide any extension of time to ECI for its Phase 3 work. ECI argues that Pike unlawfully refused to extend the end-date of the schedule and required ECI to perform its Phase 3 work in a jumbled sequence over a much shorter period of time, and that Pike is therefore liable to ECI for the additional labor costs it incurred during Phase 3. ECI seeks damages of $567,268.70 plus interest, including prejudgment interest.

ECI bears the burden to prove its breach of contract claim by a preponderance of the evidence. *See Madigan v. Hous. Auth. of Town of E. Hartford*, 156 Conn. App. 339, at *12, -- A.3d -- (2015); *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). For the reasons below, I conclude that ECI has not met its burden.

### 1. *ECI's Claim Is Barred for Failure to Comply with the Contract's Written Notice-of-Claim Requirements*

As an initial matter, I conclude on the basis of the full record presented at trial that ECI's claims are barred by the notice-of-claim requirement under Section 5.4 of the parties' contract. Section 5.4 of the subcontract provides:

> **5.4 Claims**     If the Subcontractor believes that any order, directive or condition . . . entitles him to extra compensation or an extension of time, he shall give the Contractor written notice of his claim not later than three (3) days after the occurrence of the event giving rise to the claim and shall, as soon as practicable, furnish sufficient facts in support of his position as may be necessary for a decision. Any claim by the Subcontractor for extra compensation or an extension of time not so made shall be waived, and the Subcontractor shall not be entitled to any extra compensation or extension of time as a result thereof. The Contractor shall not be obligated or liable to the Subcontractor for, and the Subcontractor hereby expressly waives any claims against the Contractor on account of, any damages, costs or expenses of any nature which the Subcontractor or its subcontractors may incur as a result of any delays, interferences, suspensions, changes in sequence or the like, arising from or out of any act or omission of, or attributable to, the Contractor, it being understood and agreed that the Subcontractor's sole and exclusive remedy in such event shall be an extension of

time, but only in accordance with the provisions of this Subcontract Agreement.

Pl.'s Ex. 13 at 10. This provision expressly requires that any claim by ECI for extra compensation include written notice within three days of the event giving rise to the claim. ECI has argued repeatedly that it believes the July 21 meeting included an order or directive for ECI to increase its manpower, and it is undisputed that at and before that meeting, Oloff had asked or at least encouraged Mathieu to increase ECI's manpower to stay on top of the schedule. There is no evidence that ECI provided written notice of its claim within three days of that July 21 meeting, and certainly not within three days of the previous times Oloff told Mathieu that ECI needed more manpower, even assuming those conversations would otherwise entitle ECI to extra compensation for increasing the manpower.

To the extent that ECI argues that Mathieu's daily reports—submitted to Pike with Mathieu's criticisms of project delays—provided "ongoing, contemporaneous written notice" of its claims, *see* Doc. #136 at 28, I do not agree for the same reason that the argument has been rejected when raised by ECI in another recent lawsuit in this District. *See Elec. Contractors, Inc. v. Fid. & Deposit Co. of Md.*, 2015 WL 1444481, at *9 (D. Conn. 2015) ("The daily and weekly reports prepared by ECI's supervisors, even if they did note certain inefficiencies, did not notify [the contractor] that ECI was making a *claim* against [the contractor]. Thus, contrary to ECI's assertions, they did not furnish [the contractor] with 'actual knowledge of a *claim*,' as opposed to knowledge of conditions affecting coordination of work among subcontractors."). ECI waived any claim against Pike under this section of the subcontract.[13]

---

[13] Similarly, Section 5.5 of the subcontract requires a three-day written notice period for any changes made by Pike that would impact ECI's work:

    **5.5 Impact of Changes**    The Subcontractor shall review each modification issued by the Owner and advise the Contractor in writing within three (3) days of notice of the modification as to the impact, if any, on the Subcontractor's Work, including any adjustment in Subcontractor time or price.

Pl.'s Ex. 13 at 10. ECI provided no such notice in the days immediately after the July 21 meeting or other

When this case was before Judge Shea, he concluded at the summary judgment stage that there was a genuine dispute of material fact as to whether Pike waived its reliance on ECI's lack of written notice by ordering ECI to perform additional work to meet the project deadline. *See* Doc. #49 at 3. That finding relied on *Wexler Constr. Co. v. Hous. Auth. of Norwich*, 144 Conn. 187, 193, 128 A.2d 540 (1956), in which the Connecticut Supreme Court held that directions by a contractor "for the performance of work not called for by the[ ] contract are necessarily and of themselves a waiver of the requirement for written approval." *See also Segan Constr. Corp. v. Nor-West Builders, Inc.*, 274 F. Supp. 691, 698 n.25 (D. Conn. 1967); *Von Langendorff v. Riordan*, 147 Conn. 524, 528, 163 A.2d 100 (1960).

Now, however, in light of the full trial record, I conclude that ECI has not met its burden to prove that Pike waived its right to rely on the written notice requirement in the subcontract.

> Waiver involves an intentional relinquishment of a known right[.] Waiver does not have to be express, but may consist of acts or conduct from which waiver may be implied[.] In other words, waiver may be inferred from the circumstances if it is reasonable to do so[.] Furthermore, whether a waiver has occurred is a factual question for the trier [of fact].

*RBC Nice Bearings, Inc. v. SKF USA, Inc.*, 146 Conn. App. 288, 305, 78 A.3d 195 (2013) (internal quotation marks and citation omitted).

Pike's conduct in instructing ECI to increase its manpower or do whatever else was necessary to meet the project deadline did not constitute a waiver of its written notice requirement. The evidence adduced at trial did not establish that Pike intended by its "more manpower" refrain that ECI should put in "work not called for by the[ ] contract," *see Wexler*, 144 Conn. at 193, or that it constituted "changes in the work" or "extra work" beyond what ECI was contractually obligated to provide, *see Von Langendorff*, 147 Conn. at 528. The contract did

---

discussions about increasing ECI's labor force.

not specify the precise number of electrical workers ECI would have on the job or the number of

man-hours ECI would put in; in fact, ECI's estimator assumed a higher number of workers than

ECI originally assigned to the job. *Compare* Tr. at 111–12 (Madore testimony that when bidding

the project he anticipated that there would be ECI crews of 30 to 35 electricians during the whole

summer), *with* Tr. at 274 (as of July, there were about 17 to 18 electricians per crew). And the

subcontract itself specifically provided that "[w]henever, in the Contractor's opinion, the

Subcontractor's Work falls behind, the Subcontractor shall increase its labor force and/or provide

overtime, Saturday, Sunday and/or holiday work, and shall have each of its subcontractors do

likewise, all at no additional cost to or compensation from the Contractor." Pl.'s Ex. 13 at 7

(Section 3.1 of the subcontract).

There is insufficient evidence for me to find that Pike intended ECI to perform additional

work and incur costs beyond those contemplated by the subcontract, and so intended to waive its

right to written notice of claims for those additional costs. Rather, I find that Pike intended only

to remind ECI of what Pike saw as ECI's contractual obligation. *See* Tr. at 538 (Mathieu

testimony that Pike "told us we owned it per our contract. We owned having guys there to do this

work, we bought it in our contract."), 662–63 (Flynn testimony that after he informed Pike that it

would seek compensation for any financial consequences it suffered, Oloff and Strauss laughed

and told him they had purchased through the subcontract the right to have ECI do whatever it

needed to do to meet its deadlines).

Moreover, the evidence presented of both Pike's and ECI's conduct after the July 21

meeting does not suggest that Pike intended the meeting to include a waiver of its right to expect

ECI to submit a written notice for any claims. As stated above, I find as a matter of fact that ECI

did not provide notice of a claim at the July 21 meeting. And after the meeting, neither party

referenced any potential claim again for several months until a phone conversation in mid-September 2010 and a written request in October 2010, and even then did not mention the July 21 meeting. No witness testified that Pike ever acknowledged even the possibility of any claim by ECI before it received actual notice of a claim in the fall of 2010, and no internal Pike documents reflect an awareness of a possible claim by ECI before then.

Neither ECI nor Pike was monitoring ECI's additional Phase 3 labor hours in a systematic manner for the purpose of a future claim.[14] Nor did ECI produce any documents suggesting that it had understood Pike to have waived its written notice requirement or that anyone at ECI believed Pike would be expecting ECI's claim before Clauson's September conversation with Strauss. On the contrary, when ECI was worried in August 2010 about its likely financial loss, Clauson quite damningly wrote in a job performance report that ECI had underbid the project and that there were supervision problems in the field; he made no mention of any failures on Pike's or any other subcontractor's part, nor did he mention the July 21 meeting or any future claim Pike might expect from ECI—any of which he might be expected to mention to shift some of the responsibility away from ECI for its large projected losses.

Thus, I cannot find that Pike intended by its July 21 instructions for ECI to comply with its contract obligations to waive the written notice provision in the subcontract.[15] Therefore, ECI's claim is barred by Section 5.4 of the subcontract unless it can be saved by another contract provision.[16]

---

[14] Labor hours are synonymous with man-hours, and the terms are used interchangeably in this ruling.

[15] The fact that the claim could not be quantified until the August labor hours were accounted for in September does not relieve ECI from its obligation under Section 5.4 to provide written notice of the claim within three days of the event (the "order, directive, or condition") giving rise to it; the section anticipated that possibility and noted ECI's obligation to later, "as soon as practicable, furnish sufficient facts in support of his position as may be necessary for a decision." See Pl.'s Ex. 13 at 10.

[16] Pike raises in its post-trial briefs strong arguments that the Court should reconsider its previous reliance on *Wexler* in its summary judgment finding of a factual question as to whether Pike waived its right to enforce the notice provisions of the subcontract. *See* Doc. #137 at 73–77 (citing, *inter alia*, *J. Wm. Foley, Inc. v. United*

Section 5.3 of the subcontract appears to provide two possible alternatives to Section 5.4's three-day notice requirement:

> **5.3 Notice of Claims** The Subcontractor agrees that no claim for additional services rendered or materials furnished by the Subcontractor to the Contractor shall be valid unless notice is given to the Contractor prior to the furnishing of the services or material or unless written notice of the claim therefore is given by the Subcontractor to the Contractor not later than the last day of the calendar month following that in which the claim originated, with the amount of the claim to be given in writing by the Subcontractor as soon as practicable.

Pl.'s Ex. 13 at 10.[17] Under this provision, ECI could provide valid notice of a claim for its additional manpower costs either by giving notice prior to furnishing the additional manpower or through written notice by the last day of the month after that in which the claim originated. I have already found that ECI did not provide notice of its claim before increasing its manpower because no notice of the claim was provided until fall 2010. And even if Flynn had made some vague comment about a possible future claim at the July 21 meeting, such a comment would be insufficient to constitute notice of an actual claim. *See Fid. & Deposit Co. of Md.*, 2015 WL 1444481, at *9 ("The letter . . . went further towards putting [the contractor] on notice that the matter was headed towards a dispute or claim, but it was still only a general warning that *in the future* ECI *would* be submitting claims for additional compensation, as distinguished from an actual present claim." (emphasis in original)).

Nor did ECI fulfill the second notice option in Section 5.3 through written notice "not later than the last day of the calendar month following that in which the claim originated, with

---

*Illuminating Co.*, 2013 WL 5422454 (Conn. Super. Ct. 2013) and *Mafco Elec. Contractors, Inc. v. Turner Constr. Co.*, 2009 WL 807469 (D. Conn. 2009)); Doc. #139 at 18–20 (noting that *Wexler* dealt with additional *work*, not additional labor hours to accomplish the work set out in the contract, and that the instant subcontract included provisions the *Wexler* contract did not and which were designed to prevent the *Wexler* confusion from arising). Because I find that ECI has not established any waiver by Pike of its notice requirement, I need not reexamine whether such a waiver under *Wexler* would have been impossible in this case.

[17] It is true, as the Court noted in its summary judgment ruling, that Sections 5.3 and 5.4 seem unlikely to apply together, as the sum of the two sections provides three different notice requirements. *See* Doc. #49 at 11. The contract is arguably ambiguous in that regard. However, the Court need not attempt to resolve the ambiguity because ECI failed to provide notice of its claim under the requirements of either section.

the amount of the claim to be given in writing by the Subcontractor as soon as practicable." *See* Pl.'s Ex. 13 at 10. Although ECI argued in one of its early claim letters to Pike that it believed its claim originated in September 2010, "when ECI first became aware that it in fact would have a claim," Pl.'s Ex. 38 at 4, ECI cannot credibly argue both that it provided oral notice of a claim in July 2010 and that it did not know it would have a claim until September 2010. It cannot be seriously disputed that any claim to additional compensation originated in July, when ECI increased its labor force to comply with Pike's instructions and ensure that the project would be completed on time. This means that ECI was required to provide written notice of its claim by the last day of August and to provide the amount of the claim as soon as practicable afterward. ECI provided no written notice of any sort until October, over a month later. I therefore find that ECI's claims are barred both by Section 5.3 and Section 5.4 of the subcontract, for failure to provide timely notice of its claim.[18]

### 2. ECI's Claim Is Barred by the August and September 2010 Lien Waivers

Because ECI made no claim for its additional labor costs until October 1, 2010, its claim is also barred by the unconditional lien waiver that it signed in September 2010. The Court construes lien waivers under traditional principles of contract interpretation. *See Bialowans v. Minor*, 209 Conn. 212, 217, 550 A.2d 637 (1988). "In construing the scope and effect of a release, the intent manifested by the parties must govern," and those intentions "may be determined by looking at the specific language of the release and circumstances surrounding its execution." *Chorches v. Stewart Title Guar. Co.*, 48 F. Supp. 3d 151, 156 (D. Conn. 2014)

---

[18] Flynn testified that the reason ECI did not submit a written claim to Pike after the July 21 meeting was that he believed Pike already knew and did not care that ECI was being harmed. Tr. at 669–70. He also testified that he simply did not realize the subcontract required written notice. *Id.* at 779–80. Neither of these things, even if true, excuses the failure to provide notice as required by the subcontract to which ECI was bound. *See* Restatement (Second) of Contracts § 12(2) ("A natural person who manifests assent to a transaction has full legal capacity to incur contractual duties thereby unless he is (a) under guardianship, or (b) an infant, or (c) mentally ill or defective, or (d) intoxicated.").

(internal quotation marks and citation omitted); *see also Sakon v. Manager*, 113 Conn. App. 802, 804, 969 A.2d 781 (2009).

All of ECI's lien waivers specifically stated that "[ECI], in consideration of the sum of [Amount] paid to it by Pike, . . . releases and forever discharges Pike . . . from any and all claims, causes of action, suits, debts, sums of money, damages, claims, and demands whatsoever . . . respecting payment . . . in connection with the Project." *See* Pl.'s Ex. 49 at 2–9. All of the lien waivers submitted by ECI except for the September 2010 lien waiver exclude from that release "any pending change order proposals or requests[,] and any pending requests for equitable adjustment to the contract time or amount[.]" *Ibid.* I accept for the purpose of my analysis that the omission of the exclusionary language in the September lien waiver was merely an administrative error by ECI. But the lien waiver by its explicit terms released Pike from liability. This is plainly true for the September 2010 waiver that had no reservation-of-rights language at all. Even as to the August 2010 waiver that had reservation-of-rights language, that waiver did not preserve ECI's rights as to costs incurred through July, because ECI had not yet made a pending change order proposal or request.

As the Connecticut Supreme Court has explained, "'any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms[.]'" *Nat'l Grange Mut. Ins. Co. v. Santaniello*, 290 Conn. 81, 89, 961 A.2d 387 (2009) (quoting *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 373, 949 A.2d 1084 (2008)). Because there is no ambiguity in the scope of the written exclusionary language, the parol evidence rule forbids the use of extraneous evidence "to vary or contradict the terms" of the waiver. *See Capp Ind., Inc. v. Schoenberg*, 104 Conn. App. 101, 112, 932 A.2d 453 (2007). It is therefore of no matter whether ECI subjectively believed it could bring a late claim for

28

equitable adjustment regardless of the lien waivers, or whether Pike inquired about the claim after receiving the August and September lien waivers, because ECI's own language explicitly excluded from the general release only pending requests and not future ones.[19] I find that ECI's breach-of-contract claims with regard to costs incurred through August 2010 are barred by its execution of the lien waivers in August and September 2010.[20]

### 3. ECI Has Failed to Prove a Breach of Contract

ECI argues that Pike cannot invoke the protection of the subcontract's written notice requirements because it materially breached the subcontract when it mismanaged the project by abandoning the contract schedule and refusing to even consider a time extension for Phase 3—the basis for ECI's underlying claim in this case. Even if ECI's claims were not precluded by the notice requirements of the subcontract or by the lien waivers, they would fail on their merits because ECI has not established by a preponderance of the evidence that Pike's actions constituted a breach of contract.

In order to establish liability for breach of contract, a plaintiff must show (1) the formation of an agreement, (2) performance pursuant to it by one party, (3) breach by another

---

[19] This finding is not inconsistent with the Court's previous ruling denying summary judgment as to the lien waiver issue. At that point, there were factual questions regarding the July 21 discussion, which, taking the facts in the light most favorable to ECI, allowed for the possibility that a pending request for equitable adjustment might already have been made before the August and September 2010 lien waivers were executed. Now, with the benefit of the full trial record, the Court concludes that ECI has not established the existence of any pending request relating to the Phase 3 impacts on ECI at the time the relevant lien waivers were submitted.

[20] To the extent that ECI would argue that the oral notice of its claims provided by Clauson to Strauss in mid-September 2010 constitutes a pending request for equitable adjustment at the time of the September 17 lien waiver, such argument fails. Strauss's credible testimony regarding that conversation describes Clauson as informing him that ECI would be filing a claim in the future. A statement about a future claim does not constitute a pending request. *See Fid. & Deposit Co. of Md.*, 2015 WL 1444481, at *9. Furthermore, it is doubtful that any such conversation took place before the lien waiver was executed on September 17, 2010. Clauson testified that he informed Pike "sometime in the middle of September" that ECI "was preparing a claim." Tr. at 309–10. Strauss remembered the conversation as occurring in "middle to early September." *Id.* at 1561. And Oloff acknowledged the conversation between Clauson and Strauss on September 28 via email. Pl.'s Ex. 57. Meanwhile, ECI's post-trial briefing urges the Court to find that a conversation occurred "around the third week of September 2010." Doc. #136-1 ¶ 57. All in all, ECI has not established by a preponderance of the evidence that its oral notice in September of a future claim constituted a "pending request for equitable adjustment to the contract time or amount" at the time of the September 2010 lien waiver, so as to preserve the claim from the general release of the lien waivers. *See* Pl.'s Ex. 49 at 2–9.

party, and (4) damages. *See Hawley Ave. Assocs., LLC v. Robert D. Russo, M.D. & Assocs. Radiology, P.C.*, 130 Conn. App. 823, 832, 25 A.3d 707 (2011); *see also NCM Contracting Grp. LP v. Asset Recovery Grp. LLC*, 2014 WL 2480000, at *3 (D. Conn. 2014) (plaintiff bears the burden to establish each element). There is no dispute that the subcontract between Pike and ECI constituted an agreement, and I will assume for the purpose of my analysis that ECI performed its duties under it, as Pike has not argued that ECI's work constituted a lack of substantial performance. But ECI has not proven the remaining two elements—Pike's breach and ECI's damages.

*Breach*

ECI at various times styles its claim as for "delay," "compression," "acceleration," and/or "stacking of trades."   *See, e.g.*, Doc. #136 at 10 ("accelerat[ion]"), 12 ("stacking of trades"), 23 ("delay[ ]"); Doc. #136-1 at 24 ("compress[ion]"). The basic argument is that ECI believes its labor costs were unfairly increased because Pike's management of the project caused ECI's work to take longer than it should have (thereby incurring more man-hours), and/or forced it to be completed unreasonably quickly (thereby incurring the increased costs associated with the extra manpower needed on the job), and/or involved an otherwise inefficient work schedule (thereby incurring the increased costs associated with lesser productivity). ECI urges me to find that "[b]y refusing to extend the Schedule end-date, and also requiring ECI to perform ten weeks of specifically sequenced work in a 4 to 5 week period in an altogether different (and jumbled) sequence of operations, Pike breached the contract." Doc. #136-2 ¶ 9.

Based on all the testimony and documents presented at trial, I find that there were no substantial problems during Phase 3 for which ECI was not afforded appropriate relief. Pike was not obligated to extend the schedule's end-date on any more areas than those for which it was

provided extra time by the City of Norwich, and Pike did not breach the contract by declining to do so on July 21 or at any other time. I additionally find that Pike did not require ECI to perform its Phase 3 work in a 4- to 5-week, condensed period of time or to perform its services in an inappropriately jumbled sequence of operations.

Section 3.4 of the subcontract provides:

> **3.4 Delays**     Should the Subcontractor be delayed by the act or omission of the Contractor or by any other contractor or subcontractor on the Project, or by any cause beyond the Subcontractor's control and not due to any fault, act or omission on its part, then the time for completion of the work shall be extended for a period equivalent to the time lost by reason of any of the aforesaid causes, as determined by the Contractor, and Subcontractor agrees to make no claim for damages for delay in the performance of this Subcontract occasioned by any act or omission to act of the Contractor or any of its representatives.

Pl.'s Ex. 13 at 7–8. At the summary judgment stage, the Court found that the "no damages for delay" clause in this section was inapplicable to the present case. The Court found that there was no "delay" here because there was never a determination by Pike under this section that there was any "time lost" by reason of the "act[s] or omission[s]" of others and outside of ECI's control. *See* Doc. #49 at 12. Furthermore, the Court reasoned, even if there were a "delay" under this section, an extension for the "time lost" would be a condition precedent to ECI's obligation to refrain from making a claim for damages for delay; therefore, because Pike refused to provide an extension when requested by ECI at the July 21 meeting, ECI's obligation was never triggered. *See id.* at 12–13.

Now with the benefit of the full trial record, it is clear that there was at least some "delay" under this section of the subcontract—the delay caused by the structural steel issue in the art room and locker rooms. The need for the architect and steel subcontractors to address the issue undeniably resulted initially in time lost before ECI could perform its work in those areas. *See* Pl.'s Ex. 41 at 11–13; Def.'s Ex. 645 at 2–3. And that issue was undisputedly "beyond

[ECI's] control and not due to any fault, act or omission on its part." *See* Pl.'s Ex. 13 at 7–8; Tr. at 908–09 (Oloff testified that the issue was neither Pike's nor ECI's fault). Acknowledging this, Pike extended the time for completion of the work on those areas, as required by Section 3.4. To the extent that ECI's claim is based on its Phase 3 work within those areas, that portion of the claim is foreclosed by the "no damages for delay" clause, which limits ECI's redress for such delays to an extension of time and bars ECI from claiming damages.

Moreover, even if Section 3.4 of the subcontract did not foreclose that portion of the claim, ECI has not established that it suffered any increased costs due to delays in those areas affected by the structural steel issue. ECI's locker room work actually began months before Phase 3 was scheduled to begin. *See* Pl.'s Ex. 41 at 13; *compare* Pl.'s Ex. 17 at 50 (on May 19, 2010, ECI was installing feeders in the locker area), *with* Def.'s Ex. 645 at 3 (electrical activity was scheduled to begin in the locker area in July); *see also* Tr. at 1014–16. And although, per the extension, the completion date for the locker room was later than originally scheduled, ECI has not shown that the work involved putting in more labor hours than anticipated. On the contrary, Oloff testified credibly that ECI did not have to spend more time in the locker room than it would have had it not been delayed, and that ECI simply shifted the dates when some of that work occurred in order to accommodate the installation of the new steel. Tr. at 1015–17. ECI has not proven that impact from the structural steel issues and delays to the locker room area increased its labor costs.

As for the art and storage rooms, it is similarly clear that much of the work began and ended later than originally contemplated, *see* Def.'s Ex. 645 at 2–3, and that the duration that certain tasks were open—that is, the span of time between when they began and when they were completed—was longer for some tasks than had been originally scheduled, *see* Def.'s Ex. 655 at

1–2 (for example, the "Electrical Overhead Rough In" task was apparently in progress for multiple weeks, when it was scheduled to require less than a week). This makes sense: those tasks were delayed by the structural steel problems, and after Pike received an extension from the City of Norwich for those areas, it instructed ECI to stop work on those areas and complete them later. *See* Tr. at 1005–08 (Oloff testimony describing in detail how the structural steel delays affected ECI's work in these areas).

The only question is whether ECI has proven that something about the shift in scheduling led to increased labor costs for its work, and I conclude that it has not. As testified to by Richard Merkhofer, an independent construction consultant with expertise in CPM scheduling, the period of time during which certain tasks are in-progress does not provide any information about the actual labor hours that went into the task: for example, it could be that the task was substantially complete for a long time but waiting for a single finishing touch to end it on the scheduling program; or it could have been started, stopped for a period of time, and finished later. *See* Tr. at 1470–72. Merkhofer testified that, based on his analysis, the only areas of the project that seemed as though they might have been pushed toward the end of the job were the art and instrumental areas.[21] *Id.* at 1475–76. But he reiterated that "[w]hat is important about that concept is that just because work moves to a different area, a different time frame, doesn't mean that it's going to be less productive, [that] the contract was going to be automatically incurring loss of productivity. It means you're doing it at a different time frame." *Id.* at 1476. ECI has not proven that impact from the structural steel issues and delays to the art and storage room areas increased its labor costs.

---

[21] "Instrumental" is listed as the same area as the art and storage rooms on the CPM schedules. *See, e.g.*, Def.'s Ex. 645 at 2.

The only room that was delayed by the structural steel issues but not the subject of any schedule relief was a toilet area, which was delayed by nine days. *Id*. at 996. This delay affected ECI and other subcontractors. *Id.* at 997. But the toilet area is not very large, *id*. at 998, and there is no evidence that ECI's productivity in that area ever suffered as a result of the delay. On the contrary, Oloff testified credibly that he did not observe ECI to appear slowed down in its productivity in that area once it began working on it. *Id.* at 1000. According to his testimony, ECI never complained about impacts in that area or any additional manpower funneled into the area to complete it on time. *Ibid*. I cannot find that there were any impacts in the toilet area for which Pike can be held responsible.

In addition to the structural steel issues affecting the art and locker room areas, there are a number of other issues ECI believes caused its work to proceed in a delayed, compressed, or otherwise inefficient manner, including, *inter alia*, demolition, masonry, steel supports in ceilings, access to electrical room and data rooms, unfinished ceilings, and the boiler room roof. *See* Doc. #136-1 ¶ 35. ECI's complaints about impacts to the rest of the project during Phase 3 are inconsistent and unsubstantiated. The strongest evidence ECI offers in support of its contention that the rest of the project was mismanaged, requiring ECI to do its work in a too-short period of time or in a senseless sequence, is the set of daily reports written by Mathieu during the project. *See* Pl.'s Ex. 17. Those daily reports reflect his ongoing sense that other subcontractors' work was behind schedule and that those workers were in the areas ECI needed to be working in, leading Mathieu to feel as though ECI could not do the work it needed to do at the times it needed to do them. In his testimony, Mathieu walked through many of these daily reports and reviewed a videotape taken of the project site at the beginning of August 2010, pointing out problems he had faced onsite.

But Mathieu also admitted that he did not rely on the schedule when determining whether his complaints were explained by it. For example, Mathieu testified that ECI could not start any in-wall rough-in work for the Admin area until walls were built, but when asked about any delays to the construction of the walls, Mathieu testified "I don't know when exactly they were supposed to be done . . . ." *See* Tr. at 613. And although he testified on the basis of the video that ECI's work was held up because the ceilings had not yet been built for ECI to put lights in, and that walls had not yet been built for ECI to install fire alarm panels, he also testified that the ceilings were not supposed to be done for another two weeks and that that time was "really close" to when the fire alarm installation was supposed to take place. *See id.* at 580–81. On July 21, several weeks into Phase 3 and the date of the critical meeting in this case, Mathieu noted in his daily job report that "[a]ll trades are behind in all areas." Pl.'s Ex. 17 at 94; Tr. at 539. But that comment was a gross overstatement, and none of the other trades complained about significant project delays except for the structural steel issues.

A close examination of the original and actual schedules of task completion verifies that there were no substantial delays in Phase 3, other than those caused by the structural steel issues and for which relief was provided. ECI seeks to rely on Plaintiff's Exhibit 51, an overlay of the July 11 and September 1 project CPM schedules. That overlay demonstrates that various tasks took place later or remained in-progress for a longer span of time than originally scheduled.[22]

---

[22] Exhibit 51 describes the scheduled start and finish dates for various tasks as "Baseline Start" and "Baseline Finish." These baselines appear to refer to the same dates as the "Early Start" and "Early Finish" labels on the CPM schedules presented to the Court. *See* Def.'s Exs. 645, 655. Merkhofer testified about these "early" baseline dates and noted that they were not fixed points in the schedule:

> [MERKHOFER:]. . . . In the CPM schedule where this came out of, there's another set of dates called late start, late finish. That's the flow function. In other words, what the computer does, it says what we want to do is we want to start on an early start, early finish best case. But it also gives you another set of dates and said, fine, you can start as late as this late start, late finish. And if you were to look at these activities in the baseline schedule, you would see that they could move out by a week or two or whatever, whatever the note calculation.
> THE COURT: With late start, late finish.

But as discussed above, this information is of limited value. *See* Tr. at 1470–74.[23] And when looking at the complete picture for the vast majority of tasks, it is clear that most of the tasks for which ECI claims it was hindered took either the same or less time to complete than contemplated by the schedule. *See* Doc. #139-1 at 2–3. ECI has not shown how completing these tasks within or below the duration they were anticipated would have necessitated expending more man-hours, even if many of these tasks took place later than expected.

As for the tasks with durations that greatly exceeded the schedule, ECI has not shown how, if at all, its labor hours were actually impacted by the longer durations. For example, "P3M-320 (connect electric to hot water heaters)" was supposed to take one day to complete. Doc. #139-1 at 3. After it began (eight days late), it remained unfinished for 45 days. *Ibid.* It is difficult to imagine just how many additional labor hours ECI thinks its workers expended on this presumably simple task—certainly not an additional 44 days' worth. Similarly, several short "electrical rough in" tasks were each scheduled to take three or four days to complete, but instead remained open for 17 to 34 days. *Id.* at 4. Yet ECI has not shown that those in-progress durations led to a higher number of man-hours for the rough-in work, either. All in all, ECI has

---

[MERKHOFER]: Exactly. ECI and Pike agreed to that schedule prior to starting the work. So ECI knew that some of that work was going to move.
Tr. at 1486–87.

[23] Merkhofer additionally cautioned the Court about the dangers of over-inferring an increased cost or lost productivity from an increased duration for a task:

When Pike recorded the actual start and completion dates, you have to be really careful, particularly with the completion dates. Because when you're out on the site and you see something start, it's pretty clear, nothing there before, but you still run that risk of, let's say, for instance, let's take this for an example and we see the guy on the ladder and he starts putting the electrical conduit up there. And he goes there and we record him as starting. But he doesn't come back for seven days or eight days or nine days and then he starts up again. Then we have the same thing on the end, he gets most of the work done, but he leaves that one little piece in the corner out and he doesn't do that for another three weeks. Usually the person in the field's recording the last piece. I just caution everyone when they look at those outside dates, they may not be reflective of when most of the work is done.

Tr. at 1479–80.

not provided sufficient evidence to conclude that Pike's management of the project and other subcontractors' delays led to increased labor costs to ECI during Phase 3.

Oloff testified at great length and in painstaking detail as to the work that progressed through Phase 3, describing room-by-room how and why nearly every task on the schedule took place when it did, and what could be inferred from the start and finish dates of those tasks. *See* Tr. at 972–1101. I find his testimony credible and extremely compelling, especially as compared to the vague and inconsistent accounts offered by ECI's witnesses.[24] One thing Oloff pointed out that bears additional emphasis is the number of areas that were available for ECI to work on, but that ECI did not work on as soon as they were available because of its manpower shortage or other reasons. For example, Oloff testified that ECI did not begin the electrical overhead rough-in for the Admin area until July 13, although it had been scheduled to begin on July 9, and the prerequisite demolition had been substantially complete by July 1 and 100% complete by July 6. *See id*. at 977–79. Similarly, Oloff testified that nothing prevented ECI from doing its electrical devicing in the Admin area (a task that was scheduled for July 22–23) at any time after the drywall was complete (July 16), instead of performing the short task over a long stretch of time between July 31 and August 11. *Id.* at 984; *see* Def.'s Ex. 645 at 1. And although many of ECI's tasks did not finish exactly on time, this was not necessarily or likely because another trade was holding up ECI's ability to work. *See, e.g.*, Tr. at 980–81 (Oloff testimony that electrical control

---

[24] For example, Flynn testified that "there was no rhyme or reason to the masonry contractor's work. If you went to the schedule, there was a sequencing of work that was not being followed." Tr. At 651. Clauson agreed and went even further. When asked about the masonry work, he testified that "[n]othing followed sequence of the schedule." *Id.* at 283. Asked again: "Nothing followed the sequence?," he answered "No." *Ibid.* And then when asked specifically about whether the masonry work followed the scheduled sequence, he again answered "No." *Ibid.* But Mathieu testified that the masons were behind the schedule but still building the walls in sequence. *Id.* at 512–13. Meanwhile, the schedule shows that masonry in the gym, for example, actually started well ahead of schedule and was fully completed only one day late. *See* Def.'s Ex. 645 at 4 ("Build New CMU Partition" task in the gym was scheduled to run from July 8 through July 12, and instead ran from June 28 through July 13). Masonry is one of numerous examples of such inconsistent or inaccurate accounts among ECI's witnesses.

wiring in the Admin area may have finished late because ECI pulled laborers away from this task for some time, and the late completion date did not indicate that ECI was being impaired), 1027–29 (Oloff testimony that in the gym, no other trade's work prevented ECI from performing its wall rough-in work so as to explain its 16-day delay in completion; all prerequisite tasks had been completed, and ECI had begun this work ahead of time), 1084–85 (Oloff testimony that he saw no issues that impacted ECI and should have prevented it from completing certain cafeteria work in a shorter duration of time).

Furthermore, Oloff pointed out areas in which it would not make sense to infer that ECI had increased its labor hours to perform a task, even if those tasks began or ended late. *See, e.g.*, *id.* at 1040–43 (Oloff testimony that it would not have been possible to fit more than two people in a small electrical room to perform certain work involving mounting electrical panels, so it could not have been possible to appreciably increase the labor hours to perform that work by adding more workers). And because items were not marked as complete on the schedule until every last bit of the work was 100% complete, it may well have been that much of ECI's work was substantially complete earlier than indicated by the schedules. *See id.* at 904–05; *see also, e.g.*, *id.* at 1029.

I additionally rely on the expert testimony and report prepared by Merkhofer, who analyzed Pike's CPM schedules and the daily field reports. Based on his analysis, he rendered the following expert opinion:

> WHI's analysis concludes that in the <u>majority</u> of Phase 3 work areas, the actual installation of Pike's and ECI's work did not differ significantly from how Pike and ECI planned their work. In a <u>small</u> percentage of the Phase 3 work areas that showed some delay, the impact was at most one (1) to two (2) weeks. Therefore, WHI believes that [t]his type of impact would not yield the magnitude of loss of productivity damages alleged by ECI.

38

Def.'s Ex. 648 at 6 (emphasis in original). In particular, according to Merkhofer, the only areas that were significantly pushed toward the end of the job were the art and instrumental areas—for which relief was granted. *See* Tr. at 1476. Merkhofer's analyses severely undermine ECI's argument that its work was disproportionately pushed into the latter portion of Phase 3 and that it was forced to complete all of Phase 3 in a 4- to 5-week window.

His analysis of ECI's payment requisitions showed that as of the end of July 2010—just under five weeks into Phase 3—ECI had completed (or at least requisitioned) 45% of its Phase 3 work. *See* Def.'s Ex. 648 at 7; Tr. at 1477–78. To be clear, that means that ECI claimed, during the course of the project, to have completed just under half of its Phase 3 work in just under half of the time scheduled for Phase 3. Similarly, Merkhofer's analysis of the original schedule versus the as-built breakdown did not show disproportionate amounts of ECI's work clustered in the latter part of the project. *Id.* at 1478–79 (referring to Pl.'s Ex. 51 and Def.'s Ex. 655). In light of these findings, I cannot credit ECI's contention that its work was significantly delayed and ultimately performed in a shorter period of time at the end of Phase 3.

Finally, every non-party witness testified that Phase 3 work proceeded generally on schedule, with the exception of noted delays resulting from the steel issues in the art/instrumental and locker room areas. For example, Lynch testified that if there were delays in demolition as claimed by ECI, it would have affected all trades, not only ECI. Def.'s Ex. 661 at 13, 20–21. He also noted that there were some slight delays involving the masons at the very beginning of the project (not Phase 3), but that they "definitely pushed the project once they got there . . . . They did a very good job and they pushed the project." *Id.* at 16.[25]

---

[25] He additionally testified that there were no issues with the data room or electrical room other than an electrical room that was moved from one floor to another—a task which he testified did not add any work to ECI. Def.'s Ex. 661 at 19–20.

Vincent Savino, on behalf of the HVAC subcontractor Action Air, remembered the steel issues in the art and locker rooms, but testified that his company experienced no delays on the project, despite the fact that Action Air was working in the same area of the ceilings as ECI was. Tr. at 1176–77. He testified that Action Air received no complaints from its plumbing subcontractor with regard to scheduling, either. *Id.* at 1177.

Carroll Lawler, the project's architect, attended two foremen meetings and was so happy with how Phase 3 was proceeding that he brought grinders, coffee, and doughnuts to all 150 workers on the job. *Id.* at 1195. In fact, according to Lawler, he spoke with Mathieu onsite when he visited, and Mathieu never described any delays; the only complaint Mathieu allegedly made was "[b]oy, as an architect, you sure made the lighting in this auditorium complicated." *Id.* at 1197. Lawler mentioned the structural steel delays and "some other minor, minor delays" involving the steel supports for the roof handling units and millwork, but testified that none of those other delays were significant. *Id.* at 1198–99, 1201.

Lawler and subcontractors other than ECI were impressed with Pike and especially with Oloff. Lawler wrote on his regular project "report cards" that "Ed Oloff is one of the best supers I have worked w/ in 30 years—he is presently in the top two trying to be #1," Def.'s Ex. 532 at 1, and "Ed Oloff is the best super I have worked with in my career—over 40 years," *id.* at 9. He even wrote a note on the back of one of his report cards praising Oloff: "Scheduling—fantastic. . . Ability to coordinate subcontractors—extraordinary. . . . He looks way ahead." *Id.* at 10.[26] Lynch praised Oloff as well and noted that "a lot of people looked up to Ed and Ed helped out a

---

[26] Others who filled out these "report cards" had similarly glowing reviews. *See, e.g.*, Def.'s Ex. 532 at 2 (Charles Jaskewicz on behalf of the Norwich City Board of Education wrote that "[t]he project is ahead of schedule and under budget. The Pike team does not look to be complacent, they are always looking to be more efficient + cost effective."), 3, 5 (one reviewer affixed a smiley face sticker and described him- or herself as "a passionate Piker"), 7 (Jaskewicz praised Pike's "[p]rogressive thinking"), 12 (Jaskewicz noted that "[t]he timeline is ahead of schedule" and praised Pike's "timeline management").

lot of people. He helped out ECI quite a bit." Def.'s Ex. 661 at 16. Savino described it as the

only job he could remember never "bumping heads" or experiencing delays, and described it as

"one of the better jobs I've ever been on as far as management." Tr. at 1181–82.

When Savino learned that ECI had filed a claim in this case, he "was very surprised"

because he "[didn't] remember people being upset with the job. We finished on time. We

finished ahead of schedule," so he was "a little taken aback that there was any kind of claim

against [Pike]." *Id.* at 1183. Gary Schnip, the owner's representative on the job, who had himself

lost out on his bid for this project in favor of Pike as the contractor, testified through his

deposition that Oloff "is as good a superintendent as I've seen in . . . the industry, and I've been

in construction for forty years. So he—he's very good." *See* Def.'s Ex. 660 (Schnip Dep.) at 24.

According to Schnip, Oloff "was always two or three weeks ahead of what [the field foremen]

were doing. . . . He had them all organized and scheduled so they all moved in unison through

the job. . . ." *Ibid.* Even Mathieu apparently told Lynch and Lawler that Oloff was the best

project manager he had ever worked with. Tr. at 622. Ultimately, no subcontractor except for

ECI ever filed any claim against Pike in connection with the Kelly Middle School project.

Based on the sum of the evidence, I conclude that Phase 3 took place generally as

scheduled and that the areas where a task was not completed on time were not necessarily the

result of another trade holding up ECI's work or of Pike's mismanagement of the schedule. To

the extent that the schedule was modified over the course of Phase 3, I find that such

modifications fell within Pike's authority under Section 3.1 of the subcontract, which notes that

Pike "shall have the right to modify the construction schedule, to suspend, delay or accelerate, in

whole or in part, the commencement or execution of Subcontractor's Work, or vary the sequence

thereof, without compensation to the Subcontractor," except to the extent that the time for

completion needs to be extended. *See* Pl.'s Ex. 13 at 7. I therefore conclude that ECI has not met

its burden to establish by a preponderance of the evidence that Pike breached the subcontract by

obstructing ECI's ability to complete its work, by abandoning the schedule, or by declining to

grant an extension of time for work other than the art room, locker room, and storage room

areas.[27]

*Damages*

I additionally conclude that ECI has not sufficiently established its damages to prevail on

its breach-of-contract claim. ECI seeks damages in the sum of $567,268.70. This figure is

derived from ECI's overruns of 4,930.27 man-hours for its own labor plus 2,033.5 man-hours for

its subcontractors' labor, at the labor rate of $81.46 per hour. These man-hours themselves are

the "overruns for <u>all</u> of the Phase 3 work" in the five categories of work that ECI alleges were

affected by Phase 3 problems (branch conduit, branch wire, branch finish, fixtures, and systems),

but not for other items of work (such as feeder conduit and feeder wire), as compared with the

bid estimates for those categories. *See* Doc. #136 at 12 (emphasis in original). ECI's damages

calculation is deeply flawed and altogether inadequate to meet its burden.

---

[27] ECI makes one more claim regarding Pike's scheduling, which is that Pike refused to distribute updated schedules over the course of Phase 3 and never made those schedules available until the instant lawsuit. It is undisputed that Pike regularly updated the CPM schedules to track the progress of the job and also prepared two- to three-week "look-ahead" schedules to guide the short-term tasks that needed to get done. A wealth of testimony indicates that those updated full schedules as well as shorter range "look-ahead" schedules were available during every weekly meeting during the project. Oloff testified explicitly to making them both available at the meetings. *See* Tr. at 1132. Strauss and Savino testified to the availability of the look-ahead schedules. *Id*. at 1175 (Savino's testimony), 1512 (Strauss's testimony). Even Mathieu conceded that the schedules were made available. *Id*. at 522 ("They did have some schedules, but they – I never – I didn't take them out in the field with me or anything."), 598 (updated schedules were available, but Mathieu focused on the two-week look ahead schedules). And even Clauson, who initially testified that no updated CPM schedules were ever issued to subcontractors, *id*. at 248, later testified that two-week look-ahead schedules on a whiteboard were discussed but with no relation to the CPM schedule, *id*. at 291–92, and eventually testified that the look-ahead schedules were available in writing on the back of the meeting minutes, *id.* at 376. Clauson's testimony with regard to scheduling was generally inconsistent: he testified both that it was "pretty difficult" to manage without an updated schedule, *ibid.*, and that he personally "didn't need the schedule . . . to figure out what [he] had to do." *Id*. at 377. He was sure that Pike did not follow the original schedule, but did not know whether Pike was following their updated schedule. *Ibid.* Only Flynn consistently insisted that no updated schedules were ever made available to the subcontractors. *See id*. at 657–58. Having considered all the testimony on the matter, I find that Pike adequately informed the subcontractors of its updated schedule over the course of Phase 3.

A subcontractor claiming compensation from a general contractor for cost overruns "must establish the extent to which its costs were increased by [the contractor's] improper acts because its recovery will be limited to damages *actually sustained*." *Wolff & Munier, Inc. v Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1010 (2d Cir. 1991) (emphasis in original) (internal quotation marks and citation omitted). "Generally, [p]roof of damages should be established with reasonable certainty and not speculatively and problematically." *Meadowbrook Ctr., Inc. v. Buchman*, 149 Conn. App. 177, 189, 90 A.3d 219 (2014) (alteration in original) (internal quotation marks and citation omitted). Although "the quantum of proof required is relaxed in instances involving the wrongful breach of a contract by the defendant," that relaxation is limited to instances in which "'the defendant by his own wrong has prevented a more precise computation.'" *See ibid.* (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)). And "[e]ven under a more relaxed standard, the plaintiff must furnish *some* proof that the breach caused the damages of which it complains . . . . and 'the trial court *must have evidence* by which it can calculate the damages, which is not merely subjective or speculative.'" *Id.* at 191 (emphasis in original) (quoting *Bronson & Townsend Co. v. Battistoni*, 167 Conn. 321, 326–27, 355 A.2d 299 (1974)).

ECI has failed to present sufficient evidence of causation in the present case between the alleged delays and mistakes made by Pike and the damages ECI seeks. For one thing, ECI's claim emphatically includes compensation for work performed throughout Phase 3—from late April through at least late September 2010 and possibly October 2010. *See* Doc. #136 at 31 (describing the claims as including work from late April through late September 2010); Tr. at 1230 (ECI's counsel stated that the claims included compensation for the "considerable amount of work done" by ECI on Phase 3 "prior to June 28" and "in September and October."). But ECI

has presented almost no evidence of any problems on the job that occurred outside of the period including late June through August 2010, and even ECI's counsel admitted that "[t]he main points of impact . . . were during that period." Tr. at 1230. In particular, any labor overruns for work done on Phase 3 prior to the official start of Phase 3 on June 28 is senseless to attribute to Pike in a claim that Pike delayed, accelerated, and compressed the schedule for Phase 3 work. On this basis, Pike's expert witness Dennis O'Neill declined to analyze work ECI performed outside of the June 28 through September 4, 2010 period. *Id.* at 1225–26. But ECI nevertheless insists on including those hours in its claim.

In addition to including costs for Phase 3 work undertaken outside of the period of alleged impact, ECI's damages improperly include costs for non-Phase-3 work performed during the period of alleged impact. Although ECI's claim is for Phase 3 impacts only, O'Neill's analysis of Mathieu's daily and weekly reports during the June 28 through September 4 period indicates that ECI workers worked at least 2,028 hours on work for phases other than Phase 3 during that period. ECI argues that Mathieu carefully culled from his reports any non-Phase 3 work, *see id.* at 1392; however, I am persuaded by O'Neill's testimony that as he combed through those reports himself, he independently determined what was and was not Phase 3 work, *see id.* at 1275, and otherwise resolved any ambiguities in favor of assuming a laborer was working on Phase 3, *see id.* at 1281.

As such, I find that ECI's claim includes hours for work done outside of the allegedly impacted period (which therefore cannot be traced back to Pike's alleged mistakes during Phase 3) and hours for work done on non-Phase 3 portions of the project (which also cannot be traced back to Pike's alleged Phase 3 failures, and which ECI denies are included in its claim).

Moreover, ECI's restriction of its claim to the five listed categories of work is not linked

44

in any way with issues attributable to Pike with regard to ECI's work in those categories. ECI does not even attempt to break down its hours in those categories of work to show which were undertaken during the impacted period of the project. Rather, it seems ECI merely selected the five categories of work in Phase 3 for which its actual labor costs happened to exceed its bid estimates: branch conduit, branch wire, branch finish, fixtures, and systems. *See* Pl.'s Ex. 43 at 3. ECI *overestimated* its labor costs for the other categories of work in the phase—feeder conduit, feeder wire, demolition, and gear—but declined to adjust its claim downward to account for any net savings, proceeding presumably under the theory that Pike is responsible for everything that went awry for ECI during Phase 3, but not for anything that went better than anticipated. Were ECI to take into account the labor costs for which it overestimated as well as those for which it underestimated at bid-time, its Phase 3 labor overrun would be considerably lower: 3,844 man-hours. *See ibid.*

Additionally, ECI made no adjustments to its damages calculation for any of its own inefficiencies, arguing that "ECI was not inefficient in performing the Phase 3 work." Doc. #136 at 12. But as described above, there is ample evidence from Oloff and other witnesses that ECI did not pursue its work in an efficient manner: there were supervision issues, manpower issues, and numerous instances in which ECI had work available to it that it did not perform. Even Clauson admitted in his mid-August 2010 job performance review form that there was "[a] lot of time wasted due to lack of supervision." Pl.'s Ex. 35 at 17. It is impossible for the Court to determine exactly how many man-hours should be deducted from ECI's claim on the basis of its own productivity issues.

Not only is the number of man-hours in ECI's claim suspect, but the choice of labor rate was unreasonably high. A rate of $81.46 per hour is simply not supportable as a measure of

ECI's actual damages—its actual increased costs as a result of Pike's alleged breach. That rate

was based on a rate for journeymen that Pike had agreed to for some change orders. Tr. at 349–

50; *see also, e.g.*, Pl.'s Ex. 44 at 5. It was significantly higher than the journeyman rate listed on

other change orders. Tr. at 735–36. More importantly, the alleged additional manpower incurred

in this case was never subject to *any* change orders, as far as the record shows. And while that

rate allegedly fell roughly midway between some of ECI's rates for journeymen and foremen, at

most, foremen hours constituted only 18% of the total ECI man-hours for the portion of Phase 3

between June 8 and September 4. *See* Doc. #136 at 24. According to O'Neill's analysis of the

certified payrolls submitted by ECI for the project, the actual journeyman rate paid was $56.16

per hour. *See* Def.'s Ex. 656 at 6. Adding 11% for labor burden and 15% for overhead and profit,

O'Neill opined that the highest justifiable rate would be $71.69 per hour, but noted that all of

ECI's subcontractors for its additional labor were actually paid less than that. *Ibid.*

When the Court asked at trial if there was any evidence of "what the company *actually*

*spent* as opposed to what it would have gotten if it had been able to charge all these extra hours

as a change order," Flynn was unable to answer. *See* Tr. at 785. In fact, when asked whether the

actual cost for the additional man-hours was in the record, and whether Flynn could tell the

Court the amount, Flynn responded that he did not know and could not tell the Court. *Ibid.*

Nothing the Court has seen in the record has allowed it to determine that actual cost.

But most importantly, ECI's baseline for determining its labor overruns—its estimated

hours for Phase 3 at the time of its bid for the job—is deeply unreliable. For one thing, an

examination of the estimated versus actual hours incurred for each phase of the project reveals

that ECI's bid labor hours were not borne out in other phases, either. For Phase 2, for example,

ECI's bid was 9,312 hours, and it actually required 13,118 hours—a 41% increase. Pl.'s Ex. 43

at 3; Tr. at 1346–47. For Phase 4 West, ECI's bid was 2,915 hours, and it actually required 3,795 hours—a 30% increase. *See* Pl.'s Ex. 43 at 3. In contrast, for Phase 4 East, ECI overestimated: it estimated 2,474 hours but required only 794.5 hours—a 68% decrease. *See ibid.* And for the site work on the job, ECI overestimated by even more: its bid estimated 939 hours, and it required only 143 hours—an enormous, 85% decrease. *See ibid.* In this context, the Phase 3 net overrun of 3,844 hours, or a 43% deviation, does not seem out of place.

These discrepancies were specifically apparent with regard to most of the categories of work for which ECI claims it is entitled to damages. For example, ECI's Phase 2 labor estimates for branch conduit, branch wire, and fixtures were underestimated by 15% to 21%; its estimate for branch finish was overestimated by 27%. *See ibid.* More dramatically, in Phase 4 West, ECI underestimated its branch conduit, branch wire, branch finish, fixtures, and systems labor hours by 14% to 95%; for Phase 4 East, ECI's overestimated its branch wire, fixtures, and systems labor hours by 95% to 98%.[28]

O'Neill, noting these discrepancies, stated that they provided support for an inference that ECI's Phase 3 baseline bid was off. Tr. at 1347–48. Clauson testified that Phase 2 had also suffered from delays, for which ECI did not seek relief. *See id.* at 458. Flynn similarly testified that all labor overruns outside of Phase 3 were due to Pike's mismanagement of the project, *id.* at 781, but that ECI chose to focus its claim on Phase 3 because it "decided that one battle was enough," *id.* at 784.[29] This Court has not been presented evidence to make any findings with regard to Pike's management of phases other than Phase 3, but it is clear that ECI's labor hour

---

[28] ECI, in its post-trial reply brief, argues that when Phase 4 East and Phase 4 West are added together, there was no net man-hour overrun for any category of work. *See* Doc. #138 at 9. This misses the point. The Court is not concerned with ECI's net loss or gain. Its concern is that ECI's bid estimates were well out of alignment for other phases and not just Phase 3, which casts significant doubt on the proposition that problems specific to Phase 3 (let alone attributable to Pike's actions during Phase 3) account for ECI's overruns.

[29] Flynn confidently laid the blame at Pike's feet for all labor overruns outside of Phase 3, despite the fact that according to Flynn's own testimony, his first involvement in the project was in early July 2010, during Phase 3. *See* Tr. at 640.

estimates at bid-time for multiple phases of the project proved to be wildly off the mark from the actual labor hours expended, making it difficult to assume without more that the Phase 3 bid-time estimate was accurate in the first instance.

Nor does a comparison with the other bids for the project help ECI establish the integrity or reasonableness of its bid. Six companies originally bid for the electrical subcontract. *See* Pl.'s Ex. 9 at 8. The lowest initial bid, a $2.8 million bid from T&T Electrical Contractors, Inc., was made in error and withdrawn. The next lowest was from Ferguson Electric Co., Inc. That bid, at approximately $3.9 million, was very close to ECI's bid but was rejected in large part because Ferguson did not seem to understand the strenuous requirements that Phase 3 would pose. *See* Tr. at 924. The next was ECI's bid.[30] Above ECI's bid were bids from Bloomfield Electric Co. for $4.7 million, from Professional Electrical Contractors of CT for $5.3 million, and from Kennedy Electrical Contractors, Inc. for $5.6 million. ECI's bid preparer (Madore) testified that he knew of no problems with the three bids higher than ECI's, and the Court has been presented with no other evidence that those bids were unreasonable. *See id.* at 183. So the only legitimate bid lower than ECI's was disqualified in part because Pike worried about the company's ability to manage Phase 3, and three other companies without known problems in their bids requested one to two million dollars more than ECI to do the job. This is highly suggestive that ECI underbid the job.

Furthermore, a breadth of evidence reveals other problems with ECI's bid. As Clauson noted in several job performance review forms, there was no project manager time built into the bid. *See id.* at 185 (Madore confirmed as much). And he revealed in his mid-August 2010 job performance review form that the fixture labor units in the bid were "way, way off what it's

---

[30] ECI's base bid of $3,496,000 plus alternatives totaling $453,798 are listed as a total bid of $3,949,798, *see* Pl.'s Ex. 9 at 4–9, but ECI's accepted total bid, including the base and accepted alternatives, was $3,637,445. *See id.* at 2; Tr. at 171.

taking in the field." Pl.'s Ex. 35 at 17. Moreover, Madore testified that he had predicted crew sizes of 30 to 35 men during the whole summer. Tr. at 111–12. But as of July there were only about 17 to 18 electricians per crew. *Id.* at 274. And because Madore "didn't feel that we were going to be required to do a seven-days-a-week schedule," he did not factor into ECI's bid the additional premium cost of labor for such a schedule, which was ultimately required. *See id.* at 154–55. Assuming 32.5 laborers per day (the middle of Madore's 30 to 35 assumption) working 8 hours a day, 5 days a week (as contemplated by Madore) for the 10 weeks of Phase 3, Madore's bid estimate should yield 13,000 man-hours, rather than the approximately 7,600 man-hours actually in the bid, a difference of 5,400 man-hours. ECI's claim is for 6,963.77 man-hours.

Similarly, Mathieu testified that he initially thought there would be 20 to 25 men working on the beginning of Phase 3, on a six-day-per-week schedule. *See id.* at 501, 530. Assuming 22.5 laborers per day (the middle of Mathieu's 20 to 25 assumption) working 8 hours a day, 6 days a week for 10 weeks, Mathieu's personal estimate should yield 10,800 man-hours, still 3,200 more man-hours than were in the bid and close to ECI's net Phase 3 overrun of 3,844 man-hours.

Pike's expert witnesses O'Neill (its construction expert) and David Caprio (its expert estimator) agreed that ECI severely underestimated the labor hours for Phase 3 in its bid. O'Neill noted that the bid had neglected to include supervision, overtime, shift work, off-hour work, labor burden, indirect labor, or profit, and had included very little overhead. *See id.* at 1338, 1359–65; *see also* Def.'s Ex. 656 at 8.[31] He further noted that ECI had made no adjustments to its bid to account for what ECI knew to be difficult work conditions during Phase 3. Tr. at 1366–68. Caprio, the chief estimator for a Massachusetts electrical contracting company, was provided

---

[31] ECI offered some evidence that it intended to make its profit through cost savings on the materials it used.

the project plans and specifications and asked for a simple estimate of the man-hours required for

Phase 3, to provide to O'Neill for his expert report. *Id*. at 1246. Based on what seemed at trial to

be a very quick, almost back-of-a-napkin look at the project, Caprio estimated that an appropriate

bid would include 10,347 man-hours in Phase 3. *See* Def.'s Ex. 649 at 5; Def.'s Ex. 649-A at 2;

Tr. at 822. Although the value of Caprio's estimate is highly questionable in many respects (*e.g.*,

that Caprio provided no documents showing how he had calculated the quantity of materials he

had used as the basis for his man-hour estimate, and he did not perform a complete bid but

merely an isolated "gut check" of the Phase 3 man-hours, *see* Tr. at 885), that Caprio's number is

considerably higher than ECI's actual estimate is consistent with the weight of other evidence on

the matter.

Lastly, I cannot ignore Clauson's job performance review form in August 2010, which

stated that the estimating department had "ignor[ed] the project schedules at bid time and

provid[ed] an estimate that's going to cost the company huge amounts of loss." *See* Pl.'s Ex. 35

at 17. Needless to say, it is telling that ECI's senior project manager for the Kelly Middle School

project himself believed that ECI's bid-time estimate was inaccurate enough to cause huge losses

to ECI.

Based on all of evidence submitted at trial regarding the matter, I conclude that ECI's

baseline of its actual bid estimates for the Phase 3 labor hours in the allegedly impacted areas of

work is not a reliable starting point from which to determine its actual damages from any

mistakes made by Pike. ECI has failed to show that its bid was reliable or reasonable.

ECI's claim boils down to what is known as a "total cost" or "global cost" claim, in

which it takes its alleged total Phase 3 labor costs for five types of work, subtracts its bid

estimates for those costs, and seeks the difference as its damages.[32] This approach is somewhat

disfavored as a means to reliably demonstrate damages resulting from onsite delays or loss of

productivity. *See, e.g.*, *J. Wm. Foley, Inc. v. United Illuminating Co.*, 2013 WL 5422454, at *16

(Conn. Super. Ct. 2013) (calculating a total delay period and assigning responsibility to the

defendant is "insufficient and of virtually no value"); *cf. Catel, Inc. v. United States*, 2012 WL

3104366, at *34 (Fed. Cl. 2012) (an approach that "simply takes the original and extended

completion dates, computes therefrom the intervening time or overrun, points to a host of

individual delay incidents for which defendant was allegedly responsible and which

'contributed' to the overall extended time, and then leaps to the conclusion that the entire

overrun time was attributable to defendant" is insufficient to demonstrate excusable delay

because such theory "assumes that the [defendant] is responsible for all of the delay" (some

internal quotation marks and citations omitted)); *Morganti Nat'l v. United States*, 49 Fed. Cl.

110, 134 (2001) ("Although Mr. McDonough purported to compare Morganti's as-built

performance against Morganti's as-planned . . . schedule, his analysis is in essence a 'total time'

approach, which is of virtually no value. . . . The 'total time' approach to proving delay is as

unsatisfactory as the 'total cost' method of proving damages, because it assumes that the

[defendant] is responsible for all of the delay." (some internal quotation marks and citations

omitted)).[33] But it is not prohibited as a method of calculating damages, and in fact can be relied

---

[32] Although ECI is emphatic that it "assuredly has not simply taken its total project costs, deducted the bid price, and claimed the rest as damages," Doc. #136 at 35, the record does not indicate that ECI has done a great deal more than that to support its claimed damages. The only difference is that ECI has taken not its total project costs, but its total Phase 3 project costs for five categories of work, and then subtracted the bid estimate labor hours for those categories, and claimed the rest as damages (notably while using a far higher labor rate than it actually paid for those additional labor hours). As ECI's counsel explained, "[t]he calculation is how many hours did ECI do in Phase 3 broken down into the affected code[s] for entire Phase 3, how does that compare to the bid?" Tr. at 1231. I additionally rely on Merkhofer's expert opinion that ECI's claim ought to be considered and analyzed as a total cost claim. *See* Def.'s Ex. 648 at 5.

[33] A preferred methodology is the "measured mile," approach, about which Merkhofer testified. *See* Def.'s Ex. 648 at 5–6; Tr. at 1458–61. "Measured mile" analysis would examine an unimpacted area (or timeframe on a

upon under factual circumstances in which a plaintiff sufficiently supports its claim with proof of a connection between a contractor's wrongs and the resulting damages to a subcontractor. *See, e.g.*, *Paragon Constr. Co. v. Dep't of Pub. Works*, 2013 WL 1943953, at *6 (Conn. Super. Ct. 2013) (total cost analysis was sufficient to establish damages where the only work claimed for was the deleading and painting of windows, so it was "fair to attribute all of the extra costs incurred by [the subcontractor] to the extra deleading responsibilities imposed by the [defendant]"); *see also E.E. Cruz v. Coastal Caisson, Corp.*, 346 F. App'x 717, 719–20 (2d Cir. 2009).

The Federal Circuit has admonished that "[a] trial court must use the total cost method with caution and as a last resort" because "[u]nder this method, bidding inaccuracies can unjustifiably reduce the contractor's estimated costs. Moreover, performance inefficiencies can inflate a contractor's costs. These inaccuracies can thus skew accurate computation of damages." *Servidone Constr. Corp. v. U.S.*, 931 F.2d 860, 861–62 (Fed. Cir. 1991). According to that Circuit's caselaw, a subcontractor claiming damages under the total cost method would have to show: "(1) the impracticability of proving actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs." *Id.* at 861. The court may also make such modifications as necessary to the total cost computation, including by accounting for bidding inaccuracies, in order to be satisfied that the "[damages] figure fairly represented the increased costs the contractor directly suffered from the particular action of defendant which was the subject of the complaint." *Id.* at 862 (internal quotation marks and citation omitted).

---

project) with an impacted area and compare man-hours for the same or analogous work over the same span of time, in order to calculate the productivity difference between the two areas. *Id.* at 1458. The analysis would still require the additional step of establishing that the cause of the lost productivity is attributable to the general contractor (or whoever the claim might be against). *Id.* at 1459–60. Neither party has undertaken such analysis in this case.

ECI has not fulfilled those requirements. For the reasons stated above, even assuming that it would be impractical or impossible for it to prove its actual losses directly, ECI has not established that its bid was reasonable, that its actual costs were reasonable, and that it played no role in any of its added costs. The bid neglected to account for numerous considerations and was inaccurate for multiple phases of the project.

The Court cannot help ECI overcome its shortfalls in establishing its damages by modifying its total cost analysis, either. Although I might hypothesize a new initial baseline, it would not be clear, for example, how many of those baseline hours to subtract for work anticipated to occur outside the impacted period. Nor would it be clear how to modify the actual, as opposed to estimated, labor hours. I could deduct 2,028 hours from ECI's claim for work on phases outside of Phase 3 during the impacted period, and I could lower the labor rate to $71.69 or lower, but I have no information regarding the number of hours to deduct for work done before and after the impacted period, and I could not hope to make reliable adjustments to account for ECI's unquantified inefficiencies or otherwise isolate the damages caused by Pike's alleged mismanagement of Phase 3.

I find that ECI has not met its burden to establish what damages, if any, it "*actually sustained*" as a result of the actions for which it contends Pike should be held liable. *See Wolff & Munier, Inc.*, 946 F.2d at 1010 (emphasis in original) (internal quotation marks and citation omitted). ECI's claimed damages are not sufficiently tied to the alleged impacts during Phase 3, and the Court does not have sufficient evidence in the record from which it could calculate any appropriate damages itself, without relying inappropriately on "merely subjective or speculative" conjecture. *Meadowbrook Ctr., Inc.*, 149 Conn. App. at 191 (internal quotation marks and citation omitted).

## CONCLUSION

I conclude that ECI has not satisfied its burden to prove by a preponderance of the evidence that Pike breached the contract. ECI's claims are barred by the terms of the contract itself for failure of ECI to provide proper notice of its claim and by the lien waivers that ECI executed to release any non-pending claims against Pike. Even if the claims were not so barred, ECI has failed to prove its breach-of-contract claims on the merits. There is insufficient evidence to conclude that Pike mismanaged the project, impermissibly delayed, accelerated, or compressed ECI's work, or otherwise breached its duties under the contract, and ECI has failed to prove its alleged damages to a reasonable degree of certainty. Accordingly, judgment shall enter in favor of defendant Pike, and ECI's motions for prejudgment remedy (Docs. #54, #62) are denied as moot.

It is so ordered.

Dated at Bridgeport this 29th day of May 2015.

/s/ Jeffrey Alker Meyer
Jeffrey Alker Meyer
United States District Judge